FILED by __ R B __ D.C.

ELECTRONIC

**Jan. 12, 2010**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

Case No._____ -Civ

GEORGE BRINCKU, BRENDA BRINCKU,
LYDIA GARCIA, APOLINAR GARCIA,
individually and on behalf of all others similarly
situated,

        Plaintiffs,

    v.

NATIONAL GYPSUM COMPANY, a Delaware
Corporation, and BANNER SUPPLY CO.,
a Florida corporation, ,

        Defendants

_____/

## 10-20109-Civ-Martinez/Brown

### COMPLAINT--CLASS ACTION

Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this class action on behalf of themselves and all other similarly situated homeowners  who own a  home containing National Gypsum drywall that is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that causes property damage and  health hazards.  The drywall has been manufactured, exported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants, National Gypsum Company ("National Gypsum") and Banner Supply Co. ("Banner Supply").  In support thereof, Plaintiffs state as follows:

### INTRODUCTION

1.    There is a significant problem in the United States with defective American-manufactured drywall.  This defective drywall contains high levels of sulfur, and/or other organic compounds. Defendants' American-manufactured drywall, which is a domestically

1

manufactured product, not a Chinese-manufactured product, used in the homes of Plaintiffs and the Plaintiff Class Members, is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that create noxious, "rotten egg-like" odors, and causes corrosion ("the Defect") of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property"), and causes irritant effects and health hazards.

2. This Defect is latent and existed in Defendants' American-manufactured drywall at the time of installation regardless of the way the product was installed, maintained, and/or painted. There is no repair, short of removal, that will correct the Defect.

3. As a result of Defendants' conduct as alleged herein, Plaintiffs and other Class Members have suffered economic losses by owning a home containing inherently defective American- manufactured drywall that has caused damage to their home and Other Property.

4. Plaintiffs and Class Members have incurred or will incur damages in excess of $75,000 including, but not limited to: repair/replacement of their home; damage to Other Property, and/or any materials contaminated or corroded by the drywall as a result of "off-gassing"; and/or incidental and consequential damages.

5. Further, as a result of Defendants' conduct as alleged herein, Plaintiffs and other Class Members in the United States, and particularly in Florida, have suffered harm and/or been exposed to an increased risk of harm and thus have a need for injunctive and/or equitable relief in the form of emergency notice, environmental monitoring and medical monitoring.

6. Plaintiffs bring this action on behalf of a Class of all similarly situated owners of residential homes in the United States that contain defective, hazardous, or dangerous American-

2

manufactured drywall manufactured, exported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants, and on behalf of a subclass of similarly situated Florida homeowners, and similarly situated Florida homeowners whose homes were built with defective drywall distributed by Banner Supply.

## JURISDICTION, PARTIES, AND VENUE

7.     This nationwide class action is within the original jurisdiction of this Court by virtue of 28 U.S.C. §1332(d)(2) and the Class Action Fairness Act. The amount in controversy of this Class action exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

8.     Venue in this district satisfies the requirements of 28 U.S.C. §1391(b)(1-2) because at least one of the Defendants resides in this jurisdiction and a substantial amount of the events and occurrences giving rise to the claim occurred in this District, or a substantial part of the property that is the subject of this action is situated in this district.

## PARTIES

9.     Plaintiffs George and Brenda Brincku are residents of Lee County, Florida, and own a home located at 18891 River Estates Lane, Alva, Florida 33920. Plaintiffs' home was built and constructed using defective drywall manufactured and supplied by one or more of the Defendants. The Brinkus moved into their home on or about October 5, 2004, and solely due to the effects of Defendants' defective American-manufactured drywall, moved out on or about March 14, 2009.

10.     Plaintiffs Lydia and Apolinar Garcia are residents of Lee County, Florida, and own a home located at 1141 S.W. 13th Street, Cape Coral, FL 33991. Plaintiffs' home was built by Advantage Builders using defective drywall manufactured and supplied by one or more of the Defendants. The Garcias moved into their home in July of 2004, and solely due to the effects of

Defendants' defective American-manufactured drywall, moved out during July of 2009. The Garcias currently reside at 1528 Southwest 53rd Lane, Cape Coral, Florida 33914.

11.    Defendant National Gypsum is organized and incorporated under the laws of the state of Delaware, with its principal place of business located at 2001 Rexford Road, Charlotte, North Carolina 28211. National Gypsum is one of the largest manufacturers of gypsum board in the world, specifically including its operations of its manufacturing plant located at 12949 US Highway 41 S, Gibsonton, Florida ("Apollo Beach Plant").

12.    Defendant National Gypsum directly, or indirectly through agents, affiliates or co-conspirators, manufactured, processed, distributed, delivered, supplied, inspected, marketed and/or sold defective American-manufactured drywall in the United States, including Florida. Defendant National Gypsum's acts or omissions related to defective American-manufactured drywall, directly, or indirectly through agents, affiliates or co-conspirators, injured Plaintiffs and Class Members as alleged herein.

13.    Defendant Banner Supply is a Florida corporation with its principal place of business located at 7195 N.W. 30th Street, Miami, Florida 33122.

14.    Defendant Banner Supply distributed, delivered, supplied, inspected, marketed, and/or sold defective American-manufactured drywall in the United States, including Florida. Defendant Banner Supply's acts or omissions related to defective American-manufactured Drywall, directly or indirectly through agents, affiliates or co-conspirators, injured Plaintiffs and Subclass Members as alleged herein.

## GENERAL ALLEGATIONS

**A.     Drywall Background**

15.    Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc, or simply board.

16.    A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

17.    Drywall is typically available in 4 ft (1219 mm) wide sheets of various lengths. Newly formed sheets are cut from a belt, the result of a continuous manufacturing process.

18.    The most commonly used drywall is one-half-inch thick but can range from one quarter (6.35 mm) to one inch (25.4 mm) thick.

19.    The core material of drywall, gypsum, is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade.

20.    Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown, or pink.

21.    Synthetic gypsum is generally manufactured with byproducts of coal-fired power plants.

22.    Coal combustion byproducts ("CCBs" or "CCPs") are the inorganic residues that remain after pulverized coal is burned.

23.    The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

24.    In order to meet emission standards, many utilities have installed flue-gas-desulfurization (FGD) equipment.  Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning power plants.

5

25.   Various FGD methods have been developed that chemically combine the sulfur gases released in coal combustion by reacting them with a sorbent, such as limestone or lime.

26.   As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

27.   Twenty to thirty percent of all American-manufactured drywall is made with synthetic gypsum.

28.   National Gypsum produces synthetic gypsum at its Apollo Beach Plant near Tampa, Florida.

29.   National Gypsum's synthetic gypsum is produced utilizing waste from the pollution scrubbers of Tampa Electric Company's coal fired power plants.

**B.    How Drywall Is Created**

30.   In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.

31.   When gypsum is heated, it loses about three quarters of its water and becomes hemihydrate gypsum which is soft and can be easily ground to a powder called hemihydrate gypsum plaster.

32.   The gypsum powder is then mixed with water to form a paste or slurry.

33.   While the hemihydrate gypsum plaster is in slurry form, it is poured between two paper layers to make drywall.

34.   Drywall is formed by sandwiching a core of wet gypsum between two sheets of heavy paper or fiberglass mats. When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

35.   The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass), plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

36.   Drywall may consist of two other materials with sulfur content: alkyl ethoxy sulfates as foaming agents and lignin or napthalene sulfonates as dispersing agents.

37.   On information and belief, Defendant National Gypsum completes its production process by labeling and printing on the back of finished board information, specifically including the production date.  This identifying information should allow the identification of the date of manufacture, location of manufacture and the volume of material produced. .

C.   **RECYCLED GYPSUM**

38.   In recent years, there has been an increase in the use of recycled scrap drywall in the manufacture of new American-manufactured drywall.

39.   The construction of an average 2000 square foot home will generate one ton of unused scrap drywall.

40.   Gypsum recyclers collect scrap drywall from mobile recycling units and other sources for sale to gypsum board manufacturers, including Defendant National Gypsum.  The recycled gypsum powder generated from recycled construction waste is less expensive than the price of some other gypsum raw materials.

41.   Defendant National Gypsum, as well as other American drywall manufacturers, participate in gypsum recycling systems and purchase wallboard scrap from gypsum recyclers.

42.   Defendant National Gypsum and other America drywall manufacturers process and add recycled waste drywall to the mix of raw materials in the production process of American drywall.

**D.    The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur Gases**

43.    Upon information and belief, Defendants' drywall contained naturally mined gypsum, synthetic gypsum manufactured from CCBs and recycled gypsum.

44.    When gypsum, mined, synthetic or recycled, is subjected to certain environmental conditions present in the United States, or Florida in particular, which has both hot weather and high humidity, the product breaks down into sulfate ions which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.

45.    The problem of sulfide emissions from drywall is well-understood in the drywall industry and has been studied for many years.

46.    The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

47.    Sulfide emissions from drywall have been a particular problem in landfills and, as such, many landfills refuse to accept drywall or place strict limitations on the amounts and on the ways in which drywall can be disposed.

48.    Defendant National Gypsum manufactured, processed, distributed, delivered, supplied, inspected, marketed and/or sold defective American-manufactured drywall in the United States and in Florida, which was unreasonably dangerous for its normal use in that the drywall caused, and continues to cause, corrosion to HVAC coils, electrical wiring, plumbing components, appliances and other building materials and items in the home.

49.    The sulfide released from the defective drywall further makes the product unreasonably dangerous for its normal intended use because it causes people to suffer corrosion and irritant effects.

8

50.   Defendant   National   Gypsum's   defective   American-manufactured   drywall detrimentally affects and ultimately requires the replacement of a variety of household items, including but not limited to, air conditioning units, wiring, plumbing components, appliances and other building materials and items in the home.  In addition, the defective drywall has a noxious odor.

51.   Plaintiffs George and Brenda Brincku began construction of their home located at 18891 River Estates Lane, Alva, Florida in February 2004. The home was completed on October 5, 2004.  Plaintiff George Brincku acted as the owner/builder and subcontracted all of the work done on the home.

52.   On April 29, 2004, Defendant Banner Supply delivered a shipment of 120 sheets of National Gypsum American-manufactured drywall to the Brincku home.

53.   On August 13, 2004, Defendant Banner Supply delivered an additional shipment of 117 sheets of National Gypsum American-manufactured drywall to the Brincku home. Ultimately, 219 sheets of National Gypsum American-manufactured drywall were installed into Plaintiffs' home.

54.   Plaintiffs, Mr. and Mrs. Brincku, have three children who lived with them in the home.

55.   Approximately 18 months after construction was completed, on May 24, 2006, the Brinckus replaced their first air conditioner evaporator coil due to corrosion.  Over the next two and a half years, Plaintiffs replaced two other coils for the same reason.

56.   During the Brinckus' residence within the home, they suffered damages to, among other items, two washing machines, one microwave, one computer, two computer printers,

9

several switches and lamps, numerous plumbing fixtures, furniture, jewelry, and all electrical wiring. In addition, the Brinkus suffered headaches, respiratory problems and coughing.

57.    On or about March 14, 2009, Plaintiffs, George and Brenda Brincku, and their two children who still resided with them, moved out of their family home as a result of exposure to and damages caused by Defendants' drywall. They now reside at 14901 Hawks Shadow Drive, Fort Meyers, FL 33906.

58.    Approximately six months after moving into the home in July of 2004, Plaintiffs Apolinar and Lydia Garcia began to experience problems caused by Defendants' defective American-manufactured drywall. During the period they resided in the home, in addition to foul odors and respiratory problems, they experienced problems related to their air conditioning, electrical wiring and appliances. These problems resulted in the Garcias being forced to replace three refrigerators, three stoves and two microwaves, in addition to experiencing problems with a cable box, television, water heater, water fountain, as well as blackening of jewelry, bathroom fixtures, electrical wiring and air conditioning coils.

59.    No member of the Class could have discovered the existence of the defect in the American-manufactured drywall prior to the time that the Consumer Product Safety Commission (CPSC) announced it was investigating problematic American manufactured drywall in 2009.

60.    On information and belief, Defendant National Gypsum knew of the defective nature of their American-manufactured drywall as described herein and the probable impacts; however, Defendant National Gypsum actively concealed the same from the consuming public, members of the Class, the Brinckus and the Garcias.

## Conditions Precedent

61.   All notice required by Chapter 558, Florida Statutes, and all other conditions precedent to bringing this action have been met, will have been met or were waived by Defendants.

## CLASS ACTION ALLEGATIONS

62.   Plaintiffs bring this suit as a class action pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class and Subclass (collectively referred to herein as "the Class") comprised of:

### Class Definitions

### National Homeowners Class

All owners of residential homes in the United States containing drywall manufactured, sold, distributed, or supplied by National Gypsum who have experienced copper sulfide corrosion of HVAC or electrical systems. All members of the class are seeking compensatory damages, injunctive and/or equitable relief for environmental and medical monitoring. Defendants, its officers, directors, subsidiaries, or any person or other entity related to, affiliated with or employed by Defendants are excluded from the class definition.

### Florida Homeowner Subclass

All owners of residential homes in Florida containing National Gypsum drywall who have experienced copper sulfide corrosion of HVAC or electrical systems.

### Banner Supply Subclass

All owners of residential homes in Florida containing National Gypsum drywall who have experienced copper sulfide corrosion on HVAC or electrical systems, and whose drywall was distributed, delivered, supplied, inspected, marketed, and/or sold by Banner Supply.

63.   George and Brenda Brincku, and Lydia and Apolinar Garcia, are the class representatives for the National Homeowner class and the subclass representatives of the Florida Homeowner Subclass.

11

64.   George and Brenda Brincku are the subclass representatives of the Banner Supply Subcalss.

65.   It is further averred upon information and belief that heretofore named and unnamed distributors were responsible for distributing the drywall to the named Plaintiffs and Class members' homes.   However, this information is in the control and possession of the manufacturing Defendants.   Following discovery, Plaintiffs contemplate that this information will be made available and the responsible distributors will either be specifically designated and/or joined in this action as Defendants.

## NUMEROSITY

66.   Upon information and belief, the Defendants' defective drywall was installed in hundreds of homes in the United States, including Florida; therefore, the Class is sufficiently numerous so that the joinder of all members of the Class in a single action is impracticable.

67.   Upon information and belief, there are thousands of putative Class members involved in this case.

## COMMONALITY

68.   There are numerous common questions of law and fact that predominate over any questions affecting only individual members of the Class.   Among these common questions of law and fact are the following:

> a.     whether Defendants manufactured, exported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall products;
>
> b.     whether Defendants' drywall contains latent and/or manifest defects in the form of emitting sulfides and other chemicals;

12

c.      whether Plaintiffs and Class Members are entitled to recover compensatory, exemplary, incidental, consequential, and/or other damages as a result of Defendants' unlawful and tortious conduct;

d.      whether Plaintiffs and Class Members are entitled to recover injunctive and/or equitable relief as a result of Defendants' unlawful and tortious conduct;

e.      whether Defendants' conduct in manufacturing, exporting, distributing, delivering, supplying, inspecting, marketing, and/or selling their drywall breached the duty of care owed by Defendants to Plaintiffs and Class Members;

f.      whether Defendants are strictly liable for selling a defective product;

g.      whether Defendants failed to warn Plaintiffs of the dangers and hazards related to the defective drywall;

h.      whether Builder/Developer Defendants conduct constitutes negligence;

i.      whether Builder/Developer Defendants breached warranties;

j.      whether Builder/Developers Defendants breached implied warranties of merchantability;

k.      whether Defendants breached implied warranties of fitness for a particular purpose;

l.      whether Defendants violated the Florida Deceptive Trade Practices Act;

m.      whether Defendants created a private nuisance;

n.      whether Defendants should create and fund an emergency notice program, environmental monitoring, and/or a medical monitoring program;

13

o.      whether Defendants should give notice to Plaintiffs and Class Members under Fed. R. Civ. P. 23(b) 2 or (d) of the defects in drywall, of the need for necessary home inspection, and of the potential health risks associated with the drywall's defects; and

p.      whether Plaintiffs and Class members are entitled to attorney's fees, and if so, in what amount.

## TYPICALITY

69.   The legal claims of Plaintiffs are typical of the legal claims of other members of the Class. Plaintiffs have the same legal interests as other members of the Class.

70.   The Plaintiffs and each member of the Class have defective drywall in their homes. Due to the drywall in Plaintiffs and Class Members' homes, Plaintiffs and Class Members suffered damages in the form of economic damages, and the need for injunctive and equitable relief, as set forth herein.

71.   Plaintiffs and Class Members' homes and personal property have sustained the same type of economic damage and potential physical harm due to the defective drywall. Thus, the legal remedies available to Plaintiffs and the Class Members are the same due to the wrongful conduct of Defendants. The Plaintiffs' claims satisfy the typicality requirement.

## ADEQUACY OF REPRESENTATION

72.   Plaintiffs are adequate representatives of the Class and together with legal counsel will fairly and adequately protect the interests of the Class. Plaintiffs have no conflicts with the Class and are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent them. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. Moreover, the class

representative's interests are aligned with the Class Members and it is unlikely there will be a divergence of viewpoint.

73.   The undersigned counsel are competent counsel experienced in class action litigation, mass torts, and litigation involving defective and harmful products.  Counsel will fairly and adequately protect the interests of the class.

## RULE 23(b)(1) REQUIREMENTS

74.   The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

## RULE 23(b)(2) REQUIREMENTS

75.   The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

## RULE 23(b)(3) REQUIREMENTS

76.   The common questions set forth above predominate over Class Members' individual issues.

77.   A class action is superior to other methods of dispute resolution in this case.  The Class members have an interest in class adjudication rather than individual adjudication because

of the overlapping rights.  It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class members would protect their rights on their own without this class action case.  Management of the class will be efficient and far superior to the management of individual lawsuits.

78.    Each Defendants home state is the locus of the decision-making giving rise to all of the torts plead below, and because those home states have the greatest interest in the resolution of such claims, the Defendants' home state law should apply to Plaintiffs' respective claims plead against them.  Therefore, this case is manageable because North Carolina law applies to the claims stated against Defendant National Gypsum by the Nationwide Homeowner Class and the Florida Homeowner Class, and Florida law applies to the claims stated against Defendant Banner Supply by the Banner Supply Subclass.

## COUNT I
## NEGLIGENCE

79.    Plaintiffs adopt and restate paragraphs 1-78 as if fully set forth herein.

80.    Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) distributing, e) delivering, f) supplying, g) inspecting, h) marketing, and/or i) selling drywall, including a duty to adequately warn of its failure to do the same.  Defendants' duty includes, but was not limited to the following:

    a.    using reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

    b.    using reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

    c.    using reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

d.    using reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

e.    using reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

f.    using reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

g.    using reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

h.    using reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

i.    using reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

j.    adequately warning and instructing the Plaintiffs and Class Members of the Defects associated with drywall;

k.    properly manufacturing the drywall to prevent it from containing the Defects as set forth herein;

l.    properly selecting the gypsum that did not contain excessive levels of sulfur;

m.    recalling or otherwise notifying users at the earliest date that it became known that the drywall was dangerous and Defective;

n.    advertising and recommending the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

o.   not misrepresenting that the drywall was safe for its intended purpose when, in fact, it was not;

p.   not manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

q.   not distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

r.   not concealing information from Plaintiffs and Class Members regarding reports of adverse effects associated with drywall; and

s.   not improperly concealing and/or misrepresenting information from the Plaintiffs and Plaintiff Class Members and/or the public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and otherwise exercising reasonable care in the design, manufacturing, exporting, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall to prevent it from containing Defects as set forth herein.

81.   Defendants were negligent and breached their duty to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) distributing, e) delivering, f) supplying, g) inspecting, h) marketing, and/or i) selling of drywall, including a duty to adequately warn of its failure to do the same.  Defendants' negligence included, but was not limited to the following:

a.   failing to use reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

18

b.     failing to use reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein:

c.     failing to use reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

d.     failing to use reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

e.     failing to use reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

f.     failing to use reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

g.     failing to use reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

h.     failing to use reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

i.     failing to use reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

j.     failing to adequately warn and instruct the Plaintiffs and Class Members of the Defects associated with drywall;

k.     failing to properly manufacture the drywall to prevent it from containing the Defects as set forth herein;

l.     failing to properly select the gypsum that did not contain excessive levels of sulfur;

19

m.   failing to recall or otherwise notify users at the earliest date that it became known that drywall was dangerous and Defective;

n.   advertising and recommending the use of drywall without sufficient knowledge as to its manufacturing Defect and dangerous propensities;

o.   misrepresenting that drywall was safe for its intended purpose when, in fact, it was not;

p.   manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

q.   distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

r.   concealing information from Plaintiffs and Class Members regarding reports of adverse effects associated with drywall; and

s.   improperly concealing and/or misrepresenting information from the Plaintiffs and Plaintiff Class Members and/or the public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and failing to otherwise exercising reasonable care in the design, manufacturing, exporting, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall to prevent it from containing Defects as set forth herein.

82.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages

for: replacement/repair of her home; the removal and replacement of all of the drywall contained in her home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

83.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

84.   Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

## COUNT II
## STRICT LIABILITY

85.   Plaintiffs adopt and restate paragraphs 1-78 as if fully set forth herein.

86.   At all times relevant hereto, Defendants were in the business of designing, manufacturing, exporting, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

87.   The drywall, including that installed in the home of Plaintiffs and Class Members, was placed by Defendants in the stream of commerce.

88.   Defendants knew that the subject drywall would be used without inspection for defects by consumers.

89.   Defendants intended that the drywall reach the ultimate consumer, such as Plaintiffs and Class Members, and it indeed reached Plaintiffs when it was installed in her home.

90.   When installed in the Plaintiffs' and Class Members' homes, the drywall was in substantially the same condition it was when Defendants manufactured, sold, and/or delivered it.

91.   At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendants, and in accordance with the Defendants' directions and instructions.

92.   The subject drywall was not misused or altered by any third parties.

93.   The drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, and sold.

94.   The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing and damage Plaintiffs' property that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property") and potential health hazards.

95.   The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors for drywall that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

22

96.   The drywall was also defective because it was improperly exported, distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as described above.

97.   The defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to the Plaintiffs and Class Members.

98.   The drywall is also defective and unreasonably dangerous because Defendants failed to adequately warn and instruct the Plaintiffs and Class Members of the defective design, inspection, testing, manufacturing, marketing, and selling of the drywall.

99.   Plaintiffs and Class Members were unaware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Plaintiffs and Class Members, acting as a reasonably prudent people discover that Defendants' drywall was defective, as set forth herein, or perceive its danger.

100. Defendants' defective drywall was much more dangerous and harmful than expected by the average consumer and by Plaintiffs and Class Members.

101. Defendants' defective drywall benefit to Plaintiffs and Class Members, if any, was greatly outweighed by the risk of harm and danger to him.

102. The defects in the drywall, as well as Defendants' failure to adequately warn the Plaintiffs and Class Members of the defects, rendered the drywall unreasonably dangerous and was the direct and proximate cause of damages to Plaintiffs and Class Members.

103. As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of her home; the removal and replacement of all of the drywall contained

in her home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

104. As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

**COUNT III**
**NATIONAL GYPSUM'S VIOLATION OF THE**
**NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS**

105. Plaintiffs adopt and restate paragraphs 1-78 as if fully set forth herein. This is an action for relief under the various unfair and deceptive trade practices acts.

106. The North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") makes it unlawful to engage in unfair or deceptive acts or practices in or affecting commerce.

107. NCUDTPA provides that any person injured by "any act or thing done by any ... corporation in violation of [NCUDTPA] ... shall have a right of action" thereunder. Plaintiffs and Class Members are "persons" within the meaning of NCUDTPA.

108. NCUDTPA defines "Commerce" as "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

24

109.   Defendant National Gypsum's advertising, soliciting, providing, offering, or distributing of drywall is "commerce" within the meaning of NCUDTPA.

110. Defendant National Gypsum's acts and omissions, as well as their failure to use reasonable care in this matter as alleged in this Complaint, is either a deceptive or unfair act or practice.

111.   Defendant National Gypsum's unconscionable, illegal, unfair and deceptive acts and practices violate NCUDTPA.

112.   Plaintiffs and Class Members have suffered actual damage for which they are entitled to relief pursuant to NCUDTPA.

113.   Plaintiffs and Class Members are entitled to recover their reasonable attorneys' fees pursuant to these statutes upon prevailing in this matter.

114.   As a direct and proximate cause of Defendant National Gypsum's acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of her home; the removal and replacement of all of the drywall contained in her home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

115.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members has incurred or will incur incidental and consequential damages for the costs of moving while her home is being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

116.    Pursuant to NCUTPA Plaintiffs and Class Members are entitled to treble damages.

## COUNT IV
## BANNER SUPPLY'S VIOLATION OF THE
## FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS

117.    Plaintiffs adopt and restate paragraphs 1-78 as if fully set forth herein. This is an action for relief under the various unfair and deceptive trade practices acts.

118.    The Florida Unfair and Deceptive Trade Practices Act ("FLUDTPA") makes it unlawful to engage in "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

119.    FLUDTPA defines "[c]onsumer" as "an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination."

120.    Plaintiffs and Class Members are "consumers" within the meaning of FLUDTPA.

121.    FLUDTPA defines "[t]rade or commerce" as "the advertising, soliciting, providing, offering, or distributing ... of any good ... or thing of value, wherever situated."

122.    Defendant Banner Supply's advertising, soliciting, providing, offering, or distributing of drywall is "commerce" within the meaning of FLUDTPA.

123.    Defendant Banner Supply's acts and omissions, as well as their failure to use reasonable care in this matter as alleged in this Complaint, is either a deceptive or unfair act or practice.

124.    Defendant Banner Supply's unconscionable, illegal, unfair and deceptive acts and practices violate FLUDTPA. Plaintiffs and Class Members have suffered actual damage for which they are entitled to relief pursuant to NCUDPTA.

125.    Plaintiffs and Class Members are entitled to recover their reasonable attorneys' fees pursuant to these statutes upon prevailing in this matter.

126.    As a direct and proximate cause of Defendant Banner Supply's acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of her home; the removal and replacement of all of the drywall contained in her home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

127.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members has incurred or will incur incidental and consequential damages for the costs of moving while her home is being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

## COUNT V
### UNJUST ENRICHMENT

128.  Plaintiffs adopt and restate paragraphs 1-78 as if fully set forth herein.

129.  Defendants received monies as a result of Plaintiffs' and Class Members' purchases of Defendants' defective drywall, or purchase of her home containing this drywall, either directly or through an agent, and Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

27

130. Defendants' acceptance and retention of these benefits under the circumstances make it inequitable and unjust for Defendants to retain the benefit without payment of the value to the Plaintiffs and the Class.

131. Defendants, by the deliberate and tortious conduct complained of herein, have been unjustly enriched in a manner which warrants restitution.

132. As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of her home; the removal and replacement of all of the drywall contained in her home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

133. As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while her home is being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; and the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

134. Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

**COUNT VI**
**EQUITABLE AND INJUNCTIVE RELIEF AND MEDICAL MONITORING**

135. Plaintiffs adopt and restate paragraphs 1-78 as if fully set forth herein.

136.    Plaintiffs and the Class are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

28

137.   Plaintiffs and the Class will suffer irreparable harm if the Court does not render the injunctive relief and medical monitoring relief set forth herein, and if Defendants are not ordered to recall, buy back, and/or repair the Plaintiffs' home.

138.   Plaintiffs on behalf of themselves and all others similarly situated, demand injunctive and equitable relief and further, that defendants be ordered to: (1) remedy, repair and/or replace the drywall in the homes, (2) cease and desist from misrepresenting to the Class and the general public that there is no defect in, or danger associated with, the drywall, (3) institute, at their own cost, a public awareness campaign to alert the Class and general public of the defect, dangers associated with the drywall (4) create, fund, and support a medical monitoring program consistent with the requirements of Florida law.

139.   Until Defendants' defective drywall has been removed, Defendants should provide continued environmental and air monitoring in Plaintiffs' and Class Members' homes.

140.   Plaintiffs and Class Members have been exposed to greater than normal background levels of sulfides and other hazardous chemicals as a result of exposures to Defendants' defective drywall.

141.   The sulfides gases and the other chemicals which have been released from Defendants drywall and to which Plaintiffs and Class Members have been exposed are proven hazardous, dangerous, or toxic substances.

142.   Plaintiffs' and Class Members' exposure was caused by the Defendants' negligence or otherwise tortious conduct.

143.   Plaintiffs' and Class Members' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

144.    The method and means for diagnosing the Plaintiffs' and Class Members' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to the Plaintiffs and Class Members by preventing or minimizing health problems that they may encounter as a result of the defective drywall.

145.    As a proximate result of her exposure to sulfide gases and other toxic chemicals from Defendants' defective drywall, Plaintiffs and Class Members have developed a significantly increased risk of contracting a serious latent disease.

146.    Monitoring procedures exist that makes the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

147.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

**COUNT VII**
**NUISANCE**

148.    Plaintiffs adopt and restate paragraphs 1-78 as if fully set forth herein.

149.    At all times relevant hereto, Defendant was in the business of exporting, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

150.    The drywall, including that installed in the homes of Plaintiffs' and Class Members' were placed by Defendant in the stream of commerce.

151.    Defendant knew that the subject drywall would be used without inspection for defects by consumers.

152.    Defendant intended that the drywall reach the ultimate consumer, such as Plaintiffs and Class Members, and it indeed reached Plaintiffs and Class Members when it was installed in their homes.

30

153.   When installed in the Plaintiffs' and Class Members' homes, the drywall was in substantially the same condition it was when Defendant distributed, supplied, sold, and/or delivered it.

154.   At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendant, and in accordance with the Defendant's directions and instructions.

155.   The subject drywall was not misused or altered by any third parties or Plaintiffs or Class Members.

156.   The drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, delivered, and/or sold.

157.   The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing and damage Plaintiffs' property that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property") and potential health hazards.

158.   The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors for drywall that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

31

159.   The defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to the Plaintiffs and Class Members.

160.   Defendant's defective drywall was unreasonably dangerous and harmful as described herein.

161.   Defendant's defective drywall benefit to Plaintiffs and Class Members, if any, was greatly outweighed by the risk of harm and danger to them.

162.   Defendants' drywall is a nuisance, as the sulphur and other gasses emitted unreasonably interfere with Plaintiffs and Class Members' use and enjoyment of their property by corroding Other Property.

163.   Corrosion itself is an unreasonable interference with Plaintiffs and Class Members' use and enjoyment of their property.

164.   As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of her home; the removal and replacement of all of the drywall contained in her home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

165.   As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while the home is being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the home; the loss of use and enjoyment of real

property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

    a.  an order certifying the case as a class action;

    b.  an order appointing Plaintiffs as the Class Representatives of the Class;

    c.  an order appointing undersigned counsel and their firms as counsel for the Class;

    d.  compensatory damages;

    e.  an order and judgment requiring the necessary repairs, relocation costs, personal property replacement, establishment of environmental and medical monitoring programs;

    f.  pre-judgment and post-judgment interest, as applicable, at the maximum rate allowable at law;

    g.  all statutory damages;

    h.  an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

    i.  the costs and disbursements incurred by Plaintiffs and Class Members in connection with this action, including reasonable attorneys' fees based on the benefits conferred upon the Class, a common fund, statutory, and/or contractual basis;

    j.  an award of taxable costs;

    k.  equitable, injunctive, and declaratory relief;

33

l.   pursuant to Rule 23(b)(2) and/or Rule 23(d), Plaintiffs seek notice to Class Members of the defective drywall in their home, need to have the home inspected, and potential health risks associated with the drywall;

m.   environmental and air monitoring;

n.   medical monitoring; and

o.   such other and further relief under all applicable state and federal law and any other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs individually and on behalf of the Class Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

DATED:     January 12, 2010

THEODORE J. LEOPOLD
Fla. Bar No. 705608
tleopold@leopoldkuvin.com
GREGORY S. WEISS
Fla. Bar No. 163430
gweiss@leopoldkuvin.com
WILLIAM WRIGHT
wwright@leopoldkuvin.com
Fla. Bar No. 138861
LEOPOLD~ KUVIN
2925 PGA Blvd., Suite 200
Palm Beach Gardens, Florida 33410
Phone: (561) 515-1400
Fax:    (561) 515-1401
*Counsel for Plaintiffs*

Robert D. Gary, Esq.
Ohio S.Ct. Reg. # 001961
rdgary@gmail.com
Jori Bloom Naegele, Esq.
Ohio S.Ct. Reg. # 0019602
JBNaegele@gmail.com
Gary, Naegele & Theado, LLC
446 Broadway
Lorain, Ohio 44052-1740
(440) 244-4809 office
(440) 244-3462 fax

*Co-Counsel for Plaintiffs*
*Pro Hac Vice Motion Pending*

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)    **NOTICE: Attorneys MUST Indicate All Re-filed**

**Jan. 12, 2010**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

ELECTRONIC

## I. (a) PLAINTIFFS

GEORGE BRINCKU, BRENDA BRINCKU, LYDIA GARCIA,
APOLINAR GARCIA, individually and on behalf of all others,

## DEFENDANTS

BANNER SUPPLY CO., a Florida corp
BUILDERS OF AMERICA, INC., a Flo

**(b)** County of Residence of First Listed Plaintiff    LEE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Dade
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Theodore J. Leopold, Esq./Gregory S. Weiss, Esq./William Wright, Esq.
2925 PGA Blvd., Suite 200
Palm Beach Gardens, FL 33410
(561) 515-1400

Attorneys (If Known)

**(d)** Check County Where Action Arose:  ☒ MIAMI- DADE   ☐ MONROE   ☐ BROWARD   ☐ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE   HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 2  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

*10 CV 20109   JEM / STB*

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                            and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**  **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane  ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability  ☐ 365 Personal Injury - | of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &   Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander  ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Injury Product | ☐ 650 Airline Regs. | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability   Liability | ☐ 660 Occupational |  | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine   **PERSONAL PROPERTY** | Safety/Health |  | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product  ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability  ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle  ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability  ☒ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act |  | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**  **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting  ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment   Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/   **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations  ☐ 530 General |  | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare  ☐ 535 Death Penalty | **IMMIGRATION** |  | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -  ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application |  |  |
|  | Employment  ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien   Detainee |  | ☐ 950 Constitutionality of State |
|  | ☐ 446 Amer. w/Disabilities -  ☐ 555 Prison Condition | ☐ 465 Other Immigration |  | Statutes |
|  | Other   Actions |  |  |  |
|  | ☐ 440 Other Civil Rights |  |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Re-filed-
(see VI below)

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☒ NO       b) Related Cases ☐ YES ☐ NO

JUDGE                            DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 U.S.C. 1332

LENGTH OF TRIAL via  10  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
5,000,000.00

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ Yes   ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO
THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE   1/12/10

FOR OFFICE USE ONLY

AMOUNT  350    RECEIPT #  726572    IFP