1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

FT. MYERS DIVISION

----------------------------------------------

CHRIS BRUCKER, TREVER S. NUTTING,
XIOMARA RAVELO, WILFREDO E. RETANA
and BEATRIX CELSA RETANA, individually,
and on behalf of all others
similarly situated,

        Plaintiffs,

                                    CASE ACTION NO.
vs.                        2:10-cv-00405-FtM-29SPC

LOWES HOME CENTERS, INC., a North Carolina
Corporation, and NATIONAL GYPSUM COMANY,
a Delaware Corporation,

        Defendants.

----------------------------------------------

VIDEOTAPED DEPOSITION OF MARK CRAMER

February 28, 2012

Tampa, Florida

10:41 a.m.

Reported By:
Kim Auslander
Job No: 23827-B

**2**

```
 1        UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF FLORIDA
 2            FORT MYERS DIVISION

 3   Civil Action No. 2:11-CV-00338-JES-SPC
 4
 5
 6
     GEORGE BRINCKU AND BRENDA BRINCKU,
 7
 8              Plaintiffs,
 9   vs.
10   NATIONAL GYPSUM COMPANY, a Delaware Corporation,
11         Defendant.
12   _____/
13        442 West Kennedy Boulevard
             Tampa, Florida
14        10:41 a.m. to 3:28 p.m.
            February 28, 2012
15
16
        DEPOSITION OF MARK CRAMER
17
18        Taken on behalf of the PLAINTIFF before Kim
19   Auslander, RPR, Notary Public in and for the State of
20   Florida at Large, pursuant to Notice of Taking
21   Deposition in the above cause.
22
23
24
25
```

**3**

```
 1
 2   APPEARANCES:
 3
     ATTORNEYS FOR PLAINTIFFS
 4
 5     VARNELL & WARWICK, P.A.
       20 La Grande Boulevard
       The Villages, Florida 32159
 6     BY:  BRIAN W. WARWICK, ESQ.
         bwarwick@varnellandwarwick.com
 7
     ATTORNEYS FOR PLAINTIFFS
 8
 9     CUNEO GILBERT LADUCA, LLP
       507 C Street, N.E.
10     Washington, D.C. 20002
       BY:  WILLIAM H. ANDERSON, ESQ.
11       wanderson@cuneolaw.com
12   ATTORNEYS FOR DEFENDANTS
13
       MORGAN, LEWIS & BOCKIUS, LLP
14     1701 Market Street
       Philadelphia, PA 19103
15     By:  THOMAS SULLIVAN, ESQ.
         tsullivan@morganlewis.com
16
17
18   ALSO PRESENT:  GREG SCRIVENER, Videographer
19
20
21
22
23
24
25
```

**4**

```
 1              I N D E X
 2
     Deposition of MARK CRAMER        Page No.
 3
 4   Direct Examination by Mr. Anderson      6
 5   Cross-Examination by Mr. Sullivan     140
 6   Redirect Examination by Mr. Anderson  144
 7   Witness Signature Page           146
 8   Errata Sheet              147
 9   Certificate of Oath of Witness       148
10
11              * * *
12          E X H I B I T S
13   PLAINTIFF'S
14   No.        Description       Page No.
15   Exhibit 1      Notice      (Premarked)
16   Exhibit 2      Notice      (Premarked)
17   Exhibits 3-7    Reports        15
18
19
20
21
22
23
24
25
```

**5**

```
 1        VIDEOGRAPHER:  This is Greg Scrivener,
 2   certified legal video specialist.
 3   Today's date is February 28th, 2012.  The time on
 4   the video monitor is approximately 10:41 a.m.  This
 5   deposition is being held in the offices of
 6   Veritext, located at 442 West Kennedy Boulevard,
 7   Suite 240, Tampa, Florida 33606.
 8        The caption of the case is Chris Brucker,
 9   Trever S. Nutting, Xiomara Ravelo, Wilfredo E.
10   Retana, and Beatrix Celsa Retana, individually, and
11   on behalf of all others similarly situated; and
12   George Brincku and Brenda Brincku, Plaintiffs,
13   versus Lowes Home Centers, Inc, a North Carolina
14   Corporation, and National Gypsum Company, a
15   Delaware Corporation, Defendants.
16        The case is being held in the United States
17   District Court for the Middle District of Florida,
18   Fort Myers Division.  The name of our Witness is
19   Mark Cramer.
20        At this time, will counsel please introduce
21   themselves for the record, beginning with
22   Plaintiff's counsel.
23        MR. ANDERSON:  Good morning.  William Anderson
24   on behalf of Plaintiffs.
25        MR. WARWICK:  Brian Warwick on behalf of
```

6

1 Plaintiffs.
2      MR. SULLIVAN:  Tom Sullivan for National
3 Gypsum Company.
4      VIDEOGRAPHER:  And our court reporter is Kim
5 Auslander.  At this time, she will now swear in the
6 Witness, please.
7           MARK CRAMER
8      Was called as a witness, having been first
9 duly sworn and responding, "Yes," was examined and
10 testified as follows:
11      VIDEOGRAPHER:  You may proceed.
12           DIRECT EXAMINATION
13 BY MR. ANDERSON:
14    Q  Good morning, Mr. Cramer.  We met just a
15 moment ago, but for purposes of the record, my name is
16 William Anderson.  I represent the Plaintiffs in the
17 Brincku and Brucker actions in their cases against
18 National Gypsum.
19      And just so that we sort of establish some
20 things at the outset here, the Brucker action includes
21 Nutting, Ravelo, Retana, and so when I refer to the
22 Brucker action, will you understand that I'm referring
23 to all of those individuals as well as the case at
24 large?
25    A  Yes, sir.

7

1    Q  Okay.  And the Brincku case, in that instance,
2 you'll understand that I'm referring to the case and the
3 home owned by George and Brenda Brincku?
4    A  Yes.
5    Q  Okay.  So if we could start, please state your
6 full name for the record.
7    A  Mark A. Cramer.
8    Q  Okay.  Although your counsel has likely
9 already discussed much of this with you, I would like to
10 review a few ground rules.
11      You understand that you took an oath to tell
12 the truth today?
13    A  Yes.
14    Q  And although today will be relatively
15 informal, you understand it is the same oath you would
16 take if you were in court?
17    A  Yes.
18    Q  And if you don't understand a question, you
19 will tell me?
20    A  Certainly.
21    Q  And if you don't hear a question, you will let
22 me know?
23    A  Yes.
24    Q  So it's fair to assume then that any time you
25 answer one of my questions today, you'll have heard the

8

1 question?
2    A  Yes.
3    Q  And understood the question?
4    A  Yes.
5    Q  And that you're answering truthfully?
6    A  Yes.
7    Q  If you realize at any point during the
8 testimony today that a previous answer that you've given
9 is inaccurate or incomplete, just let me know and you
10 can correct the record.
11    A  Okay.
12    Q  Now, your answers today are being recorded by
13 the court reporter for a transcript, and so there's a
14 few things I'd like to go over for the benefit of the
15 court reporter so we don't make her day difficult.
16      Please make sure that your answers are clear
17 and audible.  Can you do that?
18    A  Yes.
19    Q  And you can try to talk slowly?
20    A  Yes.
21    Q  Okay.  And unlike in normal conversation, you
22 need to articulate your response with words, right, so
23 no nodding or head shaking.
24    A  Yes.
25    Q  I'll do my best not to cut you off when you're

9

1 answering questions I may pose, and I would ask that you
2 do the same thing.  It's very difficult for the court
3 reporter to take down your testimony if we're talking at
4 the same time, fair?
5    A  Yes.
6    Q  Are you currently on any medications,
7 Mr. Cramer?
8    A  No.
9    Q  Anything that might keep you from testifying
10 fully and accurately today?
11    A  No.
12    Q  Okay.  If you need a break at any point, just
13 let me know.  The only thing I would ask is that if a
14 question is pending at the time, that you answer the
15 question before we take a break, is that fair?
16    A  Yes.
17    Q  Do you have any questions about the procedures
18 today?
19    A  Yes.  Before we proceed, it's my understanding
20 that Mr. Warwick or your firm is paying my fee for
21 today.
22    Q  Yes.
23    A  Okay.
24    Q  Okay.  I'd like to pass over to you what's
25 been marked as Exhibit 1 and Exhibit 2.  And actually,

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

10

1  the court reporter may need that copy, so let me give
2  you the set here, if you can pass back the marked copy.
3  Thank you.
4       Mr. Cramer, do you recognize these documents?
5  A   Yes.
6  Q   Okay.  And what are they?
7  A   They are notice of -- notices of deposition.
8  Q   Okay.  And Brucker has been marked as 1, and
9  Brincku has been marked as 2, and what do these
10 deposition notices mean to you?
11 A   That I will appear here and give my deposition
12 in these matters.
13 Q   And have you been deposed before?
14 A   Yes.
15 Q   How many times?
16 A   More than a dozen.
17 Q   Would you say less than 25?
18 A   Probably.
19 Q   When's the most recent time that you were
20 deposed?
21 A   I don't recall.
22 Q   Was it this year?
23 A   No.
24 Q   Was it last year?
25 A   I don't recall.  It would have been last year,

11

1  possibly the year before.
2  Q   And that most recent deposition, what was that
3  in connection with?
4  A   Oh, I don't recall.
5  Q   Were you an expert in that case?
6  A   I would have been, yes.
7  Q   Why do you say that, I would have been?
8  A   I haven't been deposed in any cases where I
9  was not an expert.
10 Q   How many times have you been hired as an
11 expert in litigation, Mr. Cramer?
12 A   Dozens.
13 Q   Dozens.  Have you ever been hired as an expert
14 for the plaintiffs in litigation?
15 A   Yes.
16 Q   Okay.  And if you could give me a ballpark,
17 what would you say roughly; how would it break down
18 between testifying as an expert for plaintiffs versus
19 testifying as an expert for defendants?
20 A   I probably would tend to work more for
21 plaintiffs than defendants.  However, I have done both.
22 Q   Did you meet with your -- with a lawyer about
23 today's testimony?
24 A   Yes.
25 Q   And with whom did you meet?

12

1  A   Mr. Sullivan.
2  Q   And how many times did you meet?
3  A   Once.
4  Q   When?
5  A   Yesterday afternoon.
6  Q   For how long?
7  A   Hour-and-a-half.
8  Q   Was anyone else present at the meeting?
9  A   No.
10 Q   Did you discuss that meeting with anyone else?
11 A   No.
12 Q   Did you take any notes at the meeting?
13 A   No.
14 Q   Were you shown any documents at the meeting?
15     MR. SULLIVAN:  Objection to the extent you're
16 getting into work product.  You can rephrase it.
17 Q   I'm not asking you to disclose the content of
18 the documents.  I'm merely asking you whether you were
19 shown the documents at the preparation session.
20 A   No.
21 Q   And it appears that you brought documents with
22 you today?
23 A   Yes.  Those are my reports.
24 Q   Is there anything else in there aside from
25 your reports?

13

1  A   No.
2  Q   Did you make notes on those papers?
3  A   Yes.
4  Q   And aside from reviewing your reports in
5  preparation for the deposition today, did you review any
6  other documents?
7  A   I reviewed the other expert reports that are
8  referenced within my report.
9  Q   And you reviewed all of them?
10 A   Yes.
11 Q   So can you specify for me -- I mean -- strike
12 that.
13     Did that review of the other expert reports in
14 this case occur yesterday?
15 A   No.
16 Q   When did that occur?
17 A   Sunday.
18 Q   Okay.  So if you could specify for me, which
19 expert reports have you read?
20 A   Which case would you like to start with?
21 Q   Well, let's start with Brucker.
22 A   Okay.
23 Q   Just let me stop you there for a second, just
24 because what we can do, I suppose, is to introduce your
25 inspection reports into the record here, and you can

4  (Pages 10 to 13)

14

1  probably set aside those notes.
2      Alternatively, if Mr. Cramer has brought
3  papers and notes to the deposition, I think we have the
4  right to review those, so it may be easier if you just
5  work from those.  If you prefer to work from those, I
6  suppose we can take a couple minutes and review the
7  notes in those --
8      A   When I said notes, there may be one or two
9  notes in these 6 or 700 pages here.  There's one I
10 recall specifically.
11     Q   Okay.
12     A   A note that I made, but that would be the
13 extent of it.
14     Q   And what is the note you recall specifically?
15     A   In the Brincku case?
16     Q   Yes.
17     A   I made a note regarding the Consumer Product
18 Safety Commission investigation of that house,
19 documenting that that took place after they had moved
20 out of the house.
21     Q   Okay.
22     A   If you'd like, I can find it in here, but it
23 will take a few minutes.
24     Q   Mr. Cramer, I trust you.  Why don't we go
25 ahead and have the reports marked as Exhibits 3 through

15

1  7.
2      (Plaintiff's Exhibits 3-7 marked for
3      identification.)
4      Q   This is the same set, Mr. Cramer.
5      Just so everybody understands what we're
6  talking about as we discuss these, number 3 is Brincku,
7  number 4 is Brucker, number 5 is Nutting, number 6 is
8  Retana, and number 7 is Ravelo.
9      Mr. Cramer, if we can start with what the
10 court reporter marked as Exhibit 3.
11     Do you recognize that document?
12     A   That's -- yes.
13     Q   Okay.  What is that?
14     A   That's my reports on the house at 18891 River
15 Estates Lane, Alva, the Brincku residence.
16     Q   And so if we refer to that as the Brincku
17 report, will you understand what I mean when I say that?
18     A   Yes.
19     Q   And is that a full and complete copy of your
20 report on the Brincku home?  Take a moment if you need
21 to review.
22     A   It lacks some of the appendixes, the other
23 expert reports, but otherwise it appears to be.
24     Q   Okay.  And number 4, which is for your
25 identification purposes, 6077 Northwest Pine Level

16

1  Street, do you recognize that document?
2      A   Yes.
3      Q   And what is it?
4      A   That's my reports on the house at that
5  address, the Brucker residence.
6      Q   And if we refer to that as the Brucker report,
7  you will understand what I mean?
8      A   Yes.
9      Q   And is that a full and complete copy of the
10 Brucker report?
11     A   Aside from the other expert reports marked as
12 appendixes, yes.
13     Q   Okay.  And number 5, which is for your
14 identification purposes, 3245 Reef Road, do you
15 recognize that document?
16     A   Yes.
17     Q   Okay.  And what is that?
18     A   That's my reports on the same address, Nutting
19 residence.
20     Q   And if I refer to that as the Nutting report,
21 you will understand what I mean?
22     A   Yes.
23     Q   Is that a full and complete copy of your
24 report for the Nutting residence?
25     A   Aside from the other expert appendixes, yes.

17

1      Q   Moving on, for your identification purposes,
2  the largest report that's with the rubber band, 11412
3  Mountain Bay Drive, Riverview, Florida 33569, do you
4  recognize that report, Mr. Cramer?
5      A   Yes.
6      Q   And what is that?
7      A   That's my report on the same address, the
8  Retana residence.
9      Q   Okay.  And if I refer to that moving forward
10 as the Retana report, you'll understand what I mean?
11     A   Yes.
12     Q   And is that a full and complete copy of the
13 report that you put together for the Retana residence?
14     A   Aside from some of the expert reports marked
15 as appendixes, yes.
16     Q   And if we can move to the final, which is
17 identified address-wise as 1010 Northeast 12th Terrace,
18 Cape Coral, Florida 33909, do you recognize that
19 document, Mr. Cramer?
20     A   Yes.
21     Q   And what is that?
22     A   It is my report on that address.
23     Q   And do you know what Plaintiff's home that
24 refers to?
25     A   That's Ravelo.

5 (Pages 14 to 17)

18

1      Q    Okay.  And if I refer to that moving forward
2  as the Ravelo report, you'll understand what I mean?
3      A    Yes.
4      Q    And is that a full and complete copy of the
5  report you provided to National Gypsum for the Ravelo
6  home?
7      A    Aside from the reference expert reports, yes.
8      Q    Thank you.  We'll get back to those in just a
9  moment.
10         Now, I think a moment ago before we brought
11 these out, you indicated that you had reviewed on Sunday
12 the expert reports that were referenced in each of these
13 reports; Brucker, Retana, Ravelo, Nutting, and Brincku;
14 is that right?
15     A    Yes.
16     Q    And you reviewed each of those reports for
17 each of the houses; is that right?
18     A    Yes.
19     Q    In providing your reports for the five homes,
20 did you rely upon the other expert reports?
21     A    Yes.
22     Q    Did you speak to any of the other experts?
23     A    Yes.
24     Q    Did you revise drafts of your report at all
25 based upon conversations that you had with the other

19

1  experts?
2      A    No.
3         MR. SULLIVAN:  Objection to form.
4      Q    Did the experts recommend anything for you to
5  read or review?
6      A    No.
7      Q    So none of the experts referenced in your
8  reports recommended anything for you to read or review?
9         MR. SULLIVAN:  Objection.
10     A    Not that I recall.
11     Q    Mr. Cramer, where did you attend high school?
12     A    Long Beach High School; Long Beach, New York.
13     Q    Okay.  And did you attend college?
14     A    No.
15     Q    What's your current title, Mr. Cramer?
16     A    I'm president of Mark Cramer Inspection
17 Services, Incorporated.
18     Q    And how long have you been in that position?
19     A    This would be my 23rd year.
20     Q    And I assume, based on the name, you don't
21 report to anyone at Mark Cramer Inspection Services?
22         MR. SULLIVAN:  Objection to form.
23     A    No.
24     Q    How many people report to you?
25     A    None.

20

1      Q    So your company is independent, in other
2  words?
3      A    My company has one employee, me.
4      Q    And how would you characterize your work?
5         MR. SULLIVAN:  Objection to form.
6      A    I don't understand the question.
7      Q    What does Mark Cramer Inspection Services do?
8      A    I perform inspections for people purchasing
9  homes, I perform inspections for people purchasing
10 commercial buildings, I perform inspections for people
11 who are having problems with their homes or buildings,
12 such as water intrusion, roof leaks, all sorts of
13 issues.
14         I perform some insurance inspections, I
15 perform construction inspections for people who are
16 having homes built starting from the ground up.
17         I work for a local contractor who builds
18 high-end, luxury homes, performing inspections and doing
19 consulting for them.
20         I also teach currently home inspection for the
21 Ashley School here in Tampa, and I do some -- I do some
22 training, seminar type training, on the local, state,
23 and national level.
24     Q    And do you also do some --
25     A    And I do some work such as this, some

21

1  consulting work, litigation consulting work, primarily
2  on matters relating to construction, construction
3  defects, causes of various problems, such as water
4  intrusion, I've done some consulting work on matters
5  relating to home inspection, standard of care issues,
6  compensation issues involving home inspection
7  profession.
8      Q    I see.  Thank you.  So what percentage of your
9  time would you say is dedicated to litigation?
10         MR. SULLIVAN:  Objection to form.
11     A    Well, it varies of course from year to year.
12 In the past few years, very little.
13     Q    So, say in the last five years, what
14 percentage of your time would you say was dedicated to
15 litigation?
16     A    I would say no more than 10 percent, guessing.
17     Q    And have you ever been qualified as an expert
18 in litigation?
19     A    Yes.
20     Q    And how many times has that occurred?
21     A    Around a handful.
22     Q    And has a court ever not qualified you as a
23 expert in litigation?
24     A    No.
25         MR. SULLIVAN:  Objection to form.

6  (Pages 18 to 21)

**22**

1     Q  How many hours would you say you've spent on
2 National Gypsum's work in the last year?
3     MR. SULLIVAN:  Objection to form.
4     A  I would guess 80 to 100 hours.
5     Q  And that was all compensated at $150 an hour?
6     A  Yes, except I charge a lower rate for driving
7 time.
8     Q  And Mr. Cramer, what were you asked to do in
9 this case?
10     MR. SULLIVAN:  Objection to form.
11     A  I was asked to inspect the subject properties
12 and determine causes of corrosion of metal components in
13 the homes, with a specific reference to National Gypsum
14 drywall, to determine what the cause of the corrosion
15 was and whether or not the drywall was related to the
16 corrosion.
17     Q  I see.  Now, backing up for a second,
18 Mr. Cramer, are you a licensed contractor?
19     A  Yes, I am.
20     Q  Okay.  And you noted a couple of minutes ago
21 that you were qualified as an expert several times in
22 litigation; is that right?
23     A  Yes.
24     Q  And in those cases, what topics were you
25 qualified as an expert about?

**23**

1     MR. SULLIVAN:  Objection to form.
2     A  I would say construction defects.
3     Q  Can you be more specific?
4     A  Well, the cases I tend to work on are cases
5 where a homeowner has -- well, the most common example
6 would be has water leaking into a wall, and determining
7 what the cause of that water intrusion is and whether or
8 not the wall is properly constructed in compliance with
9 building codes.
10     Q  So have you ever been qualified as an expert
11 in corrosion?
12     MR. SULLIVAN:  Objection to form.
13     A  No.
14     Q  Have you ever been qualified as an expert
15 pertaining to drywall?
16     MR. SULLIVAN:  Objection to form.
17     A  No.
18     Q  Do you have a background in studying drywall,
19 Mr. Cramer?
20     MR. SULLIVAN:  Objection to form.
21     A  I have looked at drywall in probably close to
22 10,000 houses.
23     Q  Okay.  When you say you've looked at drywall
24 in close to 10,000 houses, do you mean that you've
25 inspected close to 10,000 houses?

**24**

1     A  Yes.
2     Q  So was there anything specific that you were
3 looking at in terms of the drywall -- aside from this
4 litigation, was there anything specific that you were
5 looking at in those houses?
6     A  Defects, in most recent years since the issue
7 of Chinese drywall arose, we've been looking at the
8 drywall and the metal components for signs of corrosion
9 caused by drywall.
10     The common question I have been getting in the
11 last five or six or seven years is, I'm buying a house
12 built in 2005, I want you to do a home inspection, and I
13 want to know whether or not there's Chinese drywall in
14 the house.
15     So I would say that, you know, since that
16 point in time, I've looked at more than 100 houses with
17 the possibility of corrosion caused by drywall.
18     Q  And of those 100 houses that had possible
19 corrosion caused by the drywall, how many of those
20 houses actually had corrosion?
21     MR. SULLIVAN:  Objection to form.
22     A  That's not something I keep a record of.  I
23 would guess less than a dozen.
24     Q  So you've seen 12 houses that have corrosion?
25     MR. SULLIVAN:  Objection to form,

**25**

1 mischaracterizes his testimony.
2     A  No.
3     Q  Okay, clarify.  I'm not trying to put words in
4 your mouth.  Explain what you mean.
5     A  I've seen 12 houses that have corrosion that
6 is related to drywall.  I've seen corrosion many, many
7 times long before we had Chinese drywall, the same type
8 of corrosion as caused by drywall.
9     Q  So you've seen corrosion similar to the
10 corrosion in the houses that were affected by Chinese
11 drywall for how long, how many years going back?
12     A  We first started seeing this corrosion back in
13 the '90s as home inspectors, so for almost 20 years.
14     Q  And you would characterize the corrosion that
15 you saw in the houses prior to these Chinese drywall
16 issues as the same corrosion that you're seeing in the
17 Chinese drywall affected houses?
18     MR. SULLIVAN:  Objection.
19     A  You'll need to clarify that question.  Do you
20 mean -- you tell me what you mean.
21     Q  Well, you said you've seen the same kind of
22 corrosion in the houses that are affected by Chinese
23 drywall for 20 years; is that right?
24     A  Close to 20 years, that's correct.
25     Q  And so how would you characterize that

7 (Pages 22 to 25)

26

1  corrosion that you saw before you came upon houses that
2  were affected by Chinese drywall?
3      A   You want me to describe the corrosion or the
4  areas where it occurs or the circumstances under which
5  it occurs or --
6      Q   The corrosion itself.
7      A   The corrosion is a black, heavy coating on
8  copper, typically copper wires and electrical panels is
9  the primary place where we would see it.
10     Q   You say you've been in 10,000 homes for
11 inspections; is that right?
12     A   Yes.
13         MR. SULLIVAN:  Objection.
14     Q   And what percentage of those homes would you
15 say were affected by corrosion?
16     A   Oh, less than 1 percent.
17     Q   Less than 1 percent.  And do you do
18 inspections -- strike that.
19         Those 10,000 homes that you conducted
20 inspections, were they all in the State of Florida?
21     A   Primarily, yes.  I've done an incidental
22 inspection out of state, but one, two.
23     Q   A very small number?
24     A   Yes.
25     Q   I see.  And what percentage of the houses you

27

1  inspected would you say were on well water?
2      A   A small percentage.  Again, not something I
3  keep track of, but probably less than 10 percent.
4      Q   So then would it be fair to say that
5  roughly -- I'm not holding you to an exact number -- but
6  roughly you've inspected 1,000 homes with well water as
7  the source of the water?
8          MR. SULLIVAN:  Objection.
9      A   Again, I don't keep track of the number, but
10 it would be less than that number, I'm sure.
11     Q   Okay.  And of that less than 1,000 homes that
12 you've inspected that were on well water, what
13 percentage of those homes had corrosion in them?
14         MR. SULLIVAN:  Objection to form.
15     A   Again, that's not something I keep track of,
16 but it would be a very small percentage.
17     Q   If you can give me an approximate.
18     A   Well, you know, overall, a very small
19 percentage of houses are going to have corrosion,
20 whether they are on well water or municipal water, so
21 the percentage would be 1.
22     Q   Okay.
23     A   Perhaps.
24     Q   So just following the math for a minute,
25 you've looked at less than 1,000 houses on well water,

28

1  and you would say approximately 1 percent of those had
2  corrosion, so we're looking at about 10 houses that
3  you've seen in your career that have corrosion?
4      A   Well --
5          MR. SULLIVAN:  Objection to form, calls for
6  speculation.
7      A   I don't recall specifically, but speculating,
8  that's a possibility.
9      Q   Well, if you can estimate it for me.  It
10 sounds like it's a pretty small number of houses you've
11 seen that had well water related corrosion.  Would it be
12 fair to say it was 10 or less?
13         MR. SULLIVAN:  Objection to form.
14     A   Again, I don't keep records that are that
15 specific, but given that very small percentage of houses
16 have corrosion, I would go along with that number.
17     Q   And you say in this case you were asked to
18 determine the cause of the corrosion in the houses?
19     A   Yes.
20     Q   Going back for a second, in these homes that
21 were on well water where you saw corrosion, where were
22 they located in the State of Florida?
23     A   They were in Hillsborough, Pinellas, Pasco,
24 Manatee Counties, aside from this particular set of
25 houses.

29

1      Q   Okay.  And when did you see these houses?
2      A   Again, I don't keep those -- I don't keep
3  records referencing well water or corrosion, so I
4  couldn't answer that question.
5      Q   And did you provide written reports on any of
6  these homes that had corrosion that you believe was
7  caused by the well water?
8      A   I provide a written report on every house I
9  inspect, or almost every house.
10     Q   So then in your records, you would have
11 reports detailing all of the homes that you've inspected
12 that have corrosion associated with well water?
13         MR. SULLIVAN:  Objection to form.
14     A   No.  I don't keep reports that long after --
15 you know, I have reports going back maybe five years.
16 Prior to that time, I discarded them.
17     Q   I see.
18     A   Otherwise my garage becomes filled with large
19 cardboard boxes.
20     Q   And in those -- well, strike that.
21         Do you have any of the reports where you found
22 corrosion as the result of well water in any home in
23 Florida aside from in this case?
24         MR. SULLIVAN:  Objection to form.
25     A   I have no idea.

8 (Pages 26 to 29)

30

1    Q   Do you recall when the last time was you found
2  corrosion associated with well water that was not
3  associated with this case?
4       MR. SULLIVAN:  Objection to form.
5    A   No.
6    Q   Five years ago?
7    A   I don't recall.
8    Q   In the reports that you refer to where the
9  home's corrosion you believe was caused by well water,
10  do you indicate in those reports that the well water
11  caused the corrosion?
12       MR. SULLIVAN:  Objection to form.
13    A   I would -- if I were performing a home
14  inspection hypothetically for a client and there was
15  corrosion and there was well water, I would mention that
16  well water is a possible cause of corrosion among other
17  things, but I would not -- as a home inspector, I would
18  not identify it as a cause, because I haven't done the
19  necessary investigation to determine the cause.
20    Q   Now, in this case, you were able to identify
21  water as the cause of the corrosion; is that right?
22    A   Which case?
23    Q   I'm sorry.  In Brucker, were you able to
24  identify water as the cause of the corrosion?
25    A   Yes.

31

1    Q   Okay.  In Brincku, were you able to identify
2  water as the cause of the corrosion?
3    A   Yes.
4    Q   And in Ravelo, were you able to determine that
5  water was the cause of the corrosion?
6    A   Yes.
7    Q   And in Nutting, were you able to determine
8  that water was the cause of the corrosion?
9    A   Yes.
10    Q   But in Retana, it could be the Chinese
11  drywall, it could be the water; is that right?
12       MR. SULLIVAN:  Objection to form.
13    A   In Retana, it was not well water.  While there
14  was some reactive sulfur compounds present in the water,
15  no one could determine conclusively that those were the
16  cause, not knowing the history.
17    Q   Mr. Cramer, do you have a background studying
18  corrosion?
19       MR. SULLIVAN:  Objection.
20    A   By studying, you mean formal education, or do
21  you mean have I seen corrosion in the normal course of
22  my work and thought about it and tried to figure out
23  what's causing it, or tell me what you mean.
24    Q   Have you had any formal education on the study
25  of corrosion?

32

1    A   No.
2    Q   Any formal education on the study of
3  microbiology?
4       MR. SULLIVAN:  Objection.
5    A   No.
6    Q   Any formal education on the study of
7  bacteriology?
8       MR. SULLIVAN:  Objection.
9    A   No.
10    Q   Any formal education on chemistry?
11    A   No.
12    Q   Mr. Cramer, how many houses would you say
13  you've inspected out of that 10,000 number that have
14  corrosion that you attributed to the Chinese drywall?
15       MR. SULLIVAN:  Objection to form.  Objection,
16    calls for speculation.
17    A   I would not have attributed any of them --
18  well, let me -- let me take that back.
19       There have been some cases where there clearly
20  was Chinese drywall that we were -- or someone had
21  ripped a piece of board off the wall, and we were able
22  to see it was made in China, and where there was
23  corrosion present and where there were no other factors
24  that one would suspect contributed to the corrosion, and
25  that would be, in those cases it would be reasonable to

33

1  assume it's the Chinese drywall.  But again, it's an
2  assumption.
3       In those cases, what I would have stated in
4  writing in a report would be that you have drywall made
5  in China, you have corrosion, you need to test the
6  drywall further to determine if this is the cause of the
7  corrosion, but I would tell you in person that most
8  likely this is the cause.
9    Q   So how long would you say you've been studying
10  Chinese drywall -- the Chinese drywall corrosion issue?
11       MR. SULLIVAN:  Objection to form.
12    A   Since we first became aware of it around 2005,
13  '6, in that timeframe.
14    Q   So you first became aware of Chinese drywall
15  causing corrosion in homes in the State of Florida in
16  2005; is that right?
17       MR. SULLIVAN:  Objection to form,
18    mischaracterizes his testimony.
19    A   That's not what I said.
20    Q   Okay.  What did you say?
21    A   I said somewhere around that point in time.
22    Q   So --
23    A   2004, '5, '6.  I don't recall the exact year
24  when it became an issue.
25    Q   Mr. Cramer, do you have any specialized

34

1    knowledge concerning strontium?
2         MR. SULLIVAN: Objection to form.
3         A   Yes.
4         Q   What specialized knowledge do you have about
5    strontium?
6         A   I know it's been identified as a possible
7    marker for corrosive drywall manufactured in China.
8         Q   And when you say marker, what do you mean?
9         A   That the presence of corrosive Chinese drywall
10   can be -- corrosive Chinese drywall usually has
11   strontium in it that can be detected.
12        Q   And do you have any understanding of where the
13   strontium in the Chinese drywall comes from?
14        MR. SULLIVAN: Objection to form.
15        A   Where it comes from?
16        Q   Yes.
17        A   No.
18        Q   So, for example, you don't know if it was in
19   the material that was mined to create the gypsum?
20        A   Oh. Well, yes, I would say that it is, yeah.
21        Q   So it's not something that's added?
22        A   No.
23        Q   I see. Now, does the strontium itself cause
24   the corrosion?
25        A   No.

35

1         Q   So would it be fair to say then that it's
2    something that seems to be coincidentally present?
3         MR. SULLIVAN: Objection to form.
4         A   Yes.
5         Q   Now, do you have any specialized knowledge
6    concerning elemental sulfur, Mr. Cramer?
7         MR. SULLIVAN: Objection to form.
8         A   Yes.
9         Q   Okay. What's that knowledge?
10        A   Well, we've got a lot of sulfur in the water
11   here in Florida and, you know, houses on wells in days
12   past when I first started doing inspections, you would
13   often notice sulfur odor, and later we figured out that
14   that sulfur in the water was causing some of the
15   corrosion that we were seeing in houses before we
16   started importing drywall from China.
17        And then after studying the Chinese drywall
18   issue, sulfur of course is identified as the compound
19   that's causing corrosion in metals.
20        Q   Is the sulfur itself a compound or is it an
21   element?
22        A   Sulfur is an element, but you're asking me
23   chemistry questions now, knowing that I have no formal
24   training in chemistry.
25        Q   But you talked about strontium as a marker,

36

1    and are you familiar with -- when I say elemental
2    sulfur, I'm referring to S8. Are you familiar with S8
3    at all?
4         A   Yes.
5         Q   And is that also identified as a marker of
6    problem drywall?
7         A   Yes.
8         Q   Okay. And do you have any knowledge as to the
9    source of elemental sulfur S8 in the Chinese drywall?
10        MR. SULLIVAN: Objection to form.
11        A   No.
12        Q   In other words, is it something that you
13   understand to have been in the mined gypsum?
14        MR. SULLIVAN: Objection to form.
15        A   That's beyond my area of knowledge.
16        Q   Mr. Cramer, with respect to these cases,
17   Brucker and Brincku, did you conduct any investigation
18   of National Gypsum's processes for manufacturing the
19   drywall?
20        MR. SULLIVAN: Objection to form.
21        A   Yes. I toured their plant. I'm familiar with
22   the process.
23        Q   Which plant of National Gypsum's did you tour?
24        A   The local plant in -- it's Apollo Beach or
25   Gibsonton, I guess it is.

37

1         Q   And when did that occur?
2         A   I believe that was last month.
3         Q   And how long did you spend at the Apollo Beach
4    plant?
5         A   Five hours perhaps.
6         Q   And who was with you on that visit?
7         A   Let's see. Dr. Lewis from HSA; Dr. Zeke He;
8    Z-E-K-E, H-E is the last name. There were a couple
9    attorneys there from Morgan Lewis; Tom Ayala, and I
10   don't recall the other gentleman's name.
11        Q   Would it have been Jim Pagliero?
12        A   I don't recall. And, let's see, who else was
13   there. There were a couple other gentlemen there, and
14   their names I don't recall. They were environmental
15   scientists.
16        I'm sorry, I'm not prepared to answer this
17   question. You didn't request that I bring any other
18   notes other than my reports, so I don't remember.
19        Q   It's okay. Your recollection is what it is.
20   It's fine.
21        Now, you indicated before that you were asked
22   to identify the cause of corrosion in these homes. Did
23   you conduct any investigation at the National Gypsum
24   plant to identify whether there could be any corrosion
25   causing issues occurring at that plant?

10  (Pages 34 to 37)

38

1      MR. SULLIVAN: Objection to form, calls for
2  speculation.
3      A   No.
4      Q   Did you inquire at all on that day about
5  anything concerning bacteria?
6      MR. SULLIVAN: Objection to form, assumes
7  facts not in evidence.
8      A   Did I inquire, no.
9      Q   You identified strontium and S8 earlier as
10  potential markers for corrosive drywall, right?
11      A   Yes.
12      Q   And on that day at the National Gypsum plant,
13  did you inquire at all about the presence of strontium
14  or S8 in the manufacturing process at the National
15  Gypsum plant?
16      MR. SULLIVAN: Objection to form.
17      A   I made no inquiries.
18      Q   Okay.  In other words, you didn't ask any
19  questions on that day, or you didn't ask any questions
20  about S8 and strontium?
21      MR. SULLIVAN: Objection to form.
22      A   I'm sure I asked a question or two, but I
23  didn't ask those specific questions.
24      Q   So it sounds like the purpose of the visit was
25  more as a tour rather than an investigation; is that

39

1  right?
2      A   It was an observation of the process from
3  start to finish.
4      Q   But you weren't asked to identify any
5  potential causes of corrosion stemming from that
6  manufacturing process?
7      MR. SULLIVAN: Objection to form, assumes
8  facts not in evidence.
9      A   I'm sorry.  Ask that question again, please.
10      Q   You weren't asked to identify any potential --
11  strike that.
12          You weren't asked to investigate on that day
13  any potential causes of corrosion stemming from the
14  manufacturing process?
15      MR. SULLIVAN: Objection to form, assumes
16  facts not in evidence.
17      A   No.
18      Q   Did you conduct any investigation on the day
19  you visited the National Gypsum plant?
20      MR. SULLIVAN: Objection to form.
21      A   I don't understand your question.  What do you
22  mean by investigation?  You'll have to define that for
23  me clearly.
24      Q   Well, you said you were asked to identify the
25  cause of corrosion in the Brucker, Ravelo, Retana,

40

1  Nutting, and Brincku homes.  I'm simply asking, after
2  you told me that you visited the National Gypsum plant
3  for five hours whether you conducted any investigation
4  that would help you understand the cause of the
5  corrosion in those homes during that visit to the
6  National Gypsum plant.
7      MR. SULLIVAN: Objection to form.
8      A   I still don't understand what you mean by
9  investigation.
10      Q   Well, did you conduct any tests while you were
11  at the National Gypsum plant?
12      A   No.
13      Q   Did you ask any questions relating to
14  potential causes of corrosion that might have been
15  present at the plant?
16      MR. SULLIVAN: Objection to form, assumes
17  facts not in evidence.
18      A   Yes.
19      Q   And what were those?
20      A   I specifically asked the question what
21  is the temperature of the drywall inside the oven.
22      Q   Why did you ask that question?
23      A   Because of assertions made by some people that
24  there might be microbiological activity causing
25  corrosion in drywall.

41

1      Q   And why would the temperature be relevant to
2  the question of microbiological issues in the drywall?
3      MR. SULLIVAN: Objection, calls for
4  speculation.
5      A   Well, just as we cook our food to kill the
6  bacteria in it, when you cook drywall, when you get to a
7  certain temperature, you're going to kill the bacteria.
8      Q   And what temperature is that?
9      A   The temperature --
10      MR. SULLIVAN: Objection.
11      A   The temperature at which you might kill the
12  bacteria?
13      Q   Yes.
14      A   In food?
15      Q   In drywall.
16      A   Well, in food, you know, generally --
17      MR. SULLIVAN: Objection.
18      A   -- a hamburger we cook to 155 degrees, and we
19  assume that there's no harmful bacteria remaining.
20  Chicken, a little bit higher.  But as far as the
21  specific bacterium, I have no specific knowledge as to
22  the exact temperature.
23      Q   Right.  And you just spoke about food, but
24  just to clarify, I'm asking you what temperature you
25  believe the drywall needs to be heated to in order to

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

42

1   kill bacteria.
2         MR. SULLIVAN:  Objection to forms, calls for
3   speculation.
4      A   I can't answer that question.
5      Q   But you asked the question what temperature it
6   was heated to while you were at the plant, correct?
7      A   Yes.
8      Q   Why did you ask that question?
9         MR. SULLIVAN:  Objection to form.
10     A   Because I thought it was an important point
11  for people who are experts in that area to investigate.
12     Q   But you are not an expert in that area?
13     A   Well, I've cooked about 10,000 steaks.
14     Q   Again, we're not talking about food.  We're
15  talking about drywall.  You are not an expert in the
16  area of microbiology and heating drywall to kill
17  bacteria?
18     A   No.
19     Q   Okay.
20     A   By the way, no one has ever gotten sick from
21  eating my cooking, so I guess I would be an expert in
22  that area then.
23     Q   Fair enough.  I will take your word for it.
24  I'm sure you cook really good steak.
25         Now, in your reports, all five of the reports

43

1   go through Florida Department of Health factors for the
2   identification of corrosive drywall; is that right?
3      A   Yes.
4      Q   And those factors specifically include the
5   identification of the country of origin as a factor,
6   right?
7      A   Yes.
8      Q   And one of the factors that would suggest that
9   the drywall is not corrosive is identifying that the
10  drywall was not manufactured in China, right?
11     A   It's one of the steps in the process of making
12  a determination using that particular protocol, yes.
13     Q   So in other words, you used a protocol for the
14  identification of Chinese drywall in your work related
15  to domestic drywall?
16         MR. SULLIVAN:  Objection to form.
17     A   No.
18     Q   Okay.  Clarify for me, if you would.
19     A   The protocol is useful for investigating
20  whether or not there's corrosive drywall.
21         When we first started seeing these corrosion
22  problems, it was thought that all of the problems were
23  related to Chinese drywall.  Later there was some
24  speculation -- some wild speculation that it was not
25  necessarily related just to Chinese drywall, that there

44

1   might be domestic drywall involved also.
2         So at that point in time, generally in the
3   world of inspection and corrosion investigation related
4   to drywall, we switched from calling it Chinese drywall
5   to calling it corrosive drywall.
6      Q   So you said there was wild speculation.  What
7   was that wild speculation about?
8      A   About the possibility of domestic drywall
9   causing the same corrosion that we were seeing with
10  Chinese drywall.
11     Q   And why would you say that the speculation
12  concerning the domestic drywall causing corrosion is
13  wild?
14     A   Because there's no scientific evidence or
15  investigations to back that up.
16     Q   There are, as it stands right now, no
17  investigations that support the notion that domestic
18  drywall could cause corrosion; is that right?
19         MR. SULLIVAN:  Objection to form.
20     A   Not that I'm aware of.
21     Q   Okay.
22     A   There may be.
23     Q   Okay.  If you would, let's take a look at
24  what's been marked as Exhibit 3, which is the Brincku
25  report.

45

1         Mr. Cramer, you've been to the Brincku home;
2   is that right?
3      A   Yes.
4      Q   And what date or dates did you visit the
5   Brincku home?
6      A   September 6, 2011.
7      Q   And how long were you there?
8      A   I don't recall exactly, but it would have been
9   in the range of six, seven hours.
10     Q   And if you could, direct your attention to
11  page 2, the section entitled Inspection Team.
12         Now, you identify a number of names here.
13  Let's start at the top.  Jack Walker is the director of
14  Quality Services for National Gypsum Company; is that
15  right?
16     A   Yes.
17     Q   And he was present?
18     A   Yes, he was.
19     Q   And was he there for the entire inspection?
20     A   I believe he was.  I hesitate because he was
21  having some medical problems, and we did these
22  inspections concurrently, and there were some where he
23  was not present because he was suffering from medical
24  problems, but I believe he was there the entire time for
25  this inspection, yes.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

46

1   Q   So just to be clear, there were inspections
2   that he did not attend because of the medical issues, or
3   there were inspections that he didn't attend the
4   entirety of the inspection because of the medical
5   issues?
6   A   I think he was at every inspection for at
7   least a brief period of time.
8   Q   I see.  Okay.  Now, Zeke He is the next name
9   listed there, right?
10  A   Yes.
11  Q   And why was Mr. He there?
12      MR. SULLIVAN:  Objection to form.
13  A   He was there for the same purpose, to
14  investigate causes of corrosion, take air and water
15  samples, measure strontium levels, measure sulfide
16  levels in soil gases.
17  Q   And if we can back up for a second, at these
18  inspections, what was your job?  What was your focus?
19  A   My focus was to inspect the entire property
20  and look for anything that could cause corrosion.
21      I also took some of the drywall samples.  I
22  determined where we might take some samples.  I hired
23  and directed the electrician that we had with us as to
24  what we needed to open up and look inside, and
25  interacted with all the other participants in the

47

1   process of performing inspections.
2   Q   Did you conduct any scientific tests while you
3   were at any of the five homes?
4       MR. SULLIVAN:  Objection to form.
5   A   No.
6   Q   Did you take photographs?
7   A   Yes.
8   Q   And did you take photographs at all five of
9   the homes?
10  A   Yes.
11  Q   Did anyone else take photographs?
12  A   Yes.
13  Q   But no one else that took photographs --
14  strike that.
15      None of the photographs in your reports were
16  taken by anyone other than you?
17      MR. SULLIVAN:  Objection to form.
18  A   I believe there was one photograph that I
19  failed to take, and that would have been on the -- this
20  particular house, a photograph of the wiring inside the
21  exterior electrical panel, and I obtained that
22  photograph from Dr. Odle, O-D-L-E.
23  Q   So if we can, let's keep going through the
24  team.  We left off on Dr. He.  You say Dr. He took air
25  and water samples?

48

1   A   Air samples, water samples, measurements using
2   portable instruments, measurements of gases in the soil
3   and --
4   Q   What do you understand to be his expertise?
5   A   He's an environmental engineer.
6   Q   And how about Dr. Lewis, what role did he play
7   in the investigations?
8       MR. SULLIVAN:  Objection to form.
9   A   He visited the homes and he supervised Dr. He
10  and Mr. Tucker, to what extent I don't know.
11  Q   Shannon Tucker is a man?
12  A   Yes.
13  Q   Okay, thank you.  I wasn't there so I didn't
14  know.  So that gets to my next question.  What's
15  Mr. Tucker's expertise?
16  A   I don't know.
17  Q   Okay.  How about Mr. Odle, what's his
18  expertise?
19  A   He is a corrosion engineer, specializes in
20  corrosion.
21  Q   Metallurgy?
22  A   Yes.
23  Q   Mr. Hart, you say you hired the electrician,
24  Mr. Hart; is that right?
25  A   Correct.

49

1   Q   And what was his responsibility?
2   A   To assure that -- well, let me back up.
3       We knew that we were going to take samples of
4   copper wiring at receptacles and switches and possibly
5   inside electrical panels, so it was his job to actually
6   cut the wires and make sure we left everything in a safe
7   condition.
8   Q   Now, the locations that you photographed in
9   the Brincku home, who selected those locations for you
10  to photograph?
11  A   I did.
12  Q   Did anyone else influence your decision making
13  about where you should take photographs?
14      MR. SULLIVAN:  Objection to form.
15  A   No.
16  Q   And would it be fair to say that you
17  100 percent independently made decisions about where you
18  took photographs in the Brincku home?
19  A   Yes.
20      MR. SULLIVAN:  Objection to form.
21  Q   Would it be accurate to say that you exercised
22  100 percent independent judgment about where to take
23  photos in the Brucker home?
24  A   Yes.
25  Q   And same in the Nutting home?

13  (Pages 46 to 49)

50

1    A   Yes.
2    Q   Same in the Ravelo home?
3    A   Yes.
4    Q   Same in the Retana home?
5    A   Yes.
6    Q   How many photos did you take for the Brincku
7    report?
8    A   I don't know.  Hundreds, I would guess.
9    Q   Now, does your report include all the photos?
10   A   No.
11   Q   Why not?
12   A   Well, some of them were redundant, some of
13   them were out of focus.  Typically, I would take at
14   least two photos of everything.  And for a receptacle,
15   for example, I took a photo from a distant viewpoint,
16   3 feet away, and close up, and I didn't include the
17   distance photos in the report in most cases.
18   Q   Would it be fair to say that in the Brincku
19   home, you believe that the corrosion occurred generally
20   in proximity to water?
21        MR. SULLIVAN:  Objection to form.
22   A   Yes.
23   Q   And I don't want to put words in your mouth,
24   but is it essentially the case that your theory is that
25   the hydrogen sulfide coming out of the water is the

51

1    cause of the corrosion?
2         MR. SULLIVAN:  Objection to form.  Go ahead.
3    A   Yes.
4    Q   And so what you observed in the Brincku home
5    was that the heaviest corrosion tended to be in close
6    proximity to water?
7    A   Well, you want to refer to specific statements
8    I made in the report?
9    Q   I'm just asking you a general proposition.  If
10   it would help you to look at some of the photographs,
11   that's perfectly fine.
12   A   Okay.  The heaviest corrosion was found at
13   areas near sources of water, such as the laundry room,
14   inside toilet tanks, near the aerator tank, at the
15   well -- or at the shed detached from the house.  And we
16   didn't observe any corrosion, for example, inside that
17   shed which had no drywall but no water, and we didn't
18   observe corrosion on some copper that had been placed in
19   the house after the house had been vacated.
20        There was heavy corrosion on handheld
21   showerheads, valves, and on the wiring in the house.
22        The corrosion was not really characteristic of
23   what we see with corrosive drywall, except at locations
24   near water, such as in the master bathroom, where
25   corrosion on wire at a receptacle there was the heaviest

52

1    corrosion observed there on a wire in that house.
2    Q   Now, are there any locations in the home where
3    you took photographs that were not included in your
4    report?
5    A   I don't recall.
6    Q   You don't recall what?
7    A   I don't recall if there were any photographs
8    taken at locations in the Brincku home that were not
9    included in my report.
10        I would have to go back and look at all
11   several hundred of my photographs and compare them to
12   the report and see.  I can state that there were no
13   significant photographs that were omitted from the
14   report.
15   Q   You can state, you say, that there were no
16   significant photographs that were omitted from the
17   report?
18   A   Yes.  For example, we took photographs of
19   every switch, I think every, or almost every switch and
20   receptacle inside the house, so that's a lot of
21   photographs.  A lot of those were very, very similar in
22   terms of the extent of the corrosion.
23   Q   And did any of the photographs that you took
24   undermine your theory about the water being the cause of
25   the corrosion?

53

1         MR. SULLIVAN:  Objection to form.
2    A   No.
3    Q   And do you think that you applied an objective
4    criteria to characterizing the corrosion in the
5    photographs?
6         MR. SULLIVAN:  Objection to form.
7    A   No.  I think it was rather subjective.  You
8    know, basically it's using my judgment.
9    Q   Did anyone else assist you in characterizing
10   the corrosion in any of the photographs?
11   A   No.
12   Q   So it would be fair to say that no attorneys
13   from National Gypsum suggested that a photograph be
14   characterized in one way or another?
15        MR. SULLIVAN:  Objection to form.
16   A   No.
17   Q   It was completely 100 percent independent
18   judgment?
19   A   100 percent.
20   Q   And it was just you?
21   A   Yes.
22   Q   I see.  If we could, let's look at location
23   one on page 8.  Actually, before we even get too far
24   into this, you say that it was subjective, your
25   characterizations of the level of corrosion on the

14  (Pages 50 to 53)

54

1  wires, right?
2      A   Yes.
3      Q   How did you come up with your descriptions?
4          MR. SULLIVAN:  Objection to form --
5      A   Based on experience.
6          MR. SULLIVAN:  -- subjective.
7      A   For example, on page 8, there's a photograph
8  of the typical heavy corrosion that we see associated
9  with Chinese drywall, and I use that as what I would
10 characterize as heavy corrosion, and I made judgments of
11 the corrosion that was of a lesser degree.
12         For example, those wires, they would appear to
13 you if we had one in front of you as if someone had
14 taken a can of flat black spray paint and sprayed the
15 wire.  In many cases, the corrosion even proceeds beyond
16 that and the surface starts to become rough.
17         I have seen, for example, that corrosion in
18 electrical panels where there are literally piles of it
19 in the bottom of the electrical panel.
20     Q   Sure.
21     A   Going to a lesser degree, some of the wires in
22 the house, for example, if you look at the top of page
23 12, there's a wire in the living room that has light
24 corrosion on it.
25         There's some slight darkening of some areas,

55

1  but there's some areas where the copper looks relatively
2  pristine.  If the copper was coated with -- let's see if
3  we can find one where I called medium here --
4      Q   How about page 20, location 24.
5      A   Yeah, that's a little heavier corrosion.
6  Again, the whole wire isn't black but, you know, these
7  are again subjective judgments.  I mean, I wouldn't, you
8  know, attach a great deal of significance to them.
9      Q   What wouldn't you attach a great deal of
10 significance to?
11     A   The difference between light and moderate, you
12 know.
13     Q   Okay.  So turning back to page 8, location
14 one.
15     A   Yes.
16     Q   Can you read for me what you wrote here about
17 location one.
18     A   Bare copper in detached carport slash shed
19 electrical panel.  No corrosion is evident.  This
20 building had drywall on the walls that was reportedly
21 removed by the owner.
22     Q   And why did you include the parenthetical
23 there?
24     A   Because it's significant that since we were
25 looking at drywall as a possible cause of corrosion, it

56

1  was significant that there was drywall there and there
2  was no corrosion.
3      Q   I see.  So your characterization here of there
4  being no corrosion being evident seems to run counter to
5  any theory that the drywall would have caused that
6  corrosion?
7          MR. SULLIVAN:  Objection to form.
8      A   Yes.
9      Q   Okay.  If we could, let's turn -- let's focus
10 for a second -- some places you say no corrosion, right?
11         MR. SULLIVAN:  Objection to form.
12     A   Yes, or to such a small degree that I would
13 not look at that wire and say, gee, we might have a
14 problem here.
15         I mean, you know, copper is going to tarnish
16 to some degree from exposure to the atmosphere, but not
17 to the degree that we associate with corrosive drywall.
18     Q   Okay.  And then sort of the next step up from
19 no corrosion would be little corrosion?
20         MR. SULLIVAN:  Objection to form.
21     A   Light to moderate corrosion, where part of the
22 wire is discolored, more of a purplish color rather than
23 the dark black color we see associated with corrosive
24 drywall typically, maybe not covering the entire length
25 of the exposed bare wire.

57

1      Q   You say there's not necessarily much of a
2  difference between light and moderate corrosion?
3          MR. SULLIVAN:  Objection to form.
4      A   Correct.
5      Q   And in terms of when you say light corrosion
6  versus light tarnishing, do you mean there to be any
7  difference between the two there?
8      A   Yes.  For example, if you had a shiny new
9  copper penny, after a period of time, that penny
10 tarnishes and becomes darker in color.  However, it
11 never becomes as black as this clip that I'm holding up,
12 which would be the case when we see corrosion caused by
13 reactive sulfur compounds.
14     Q   So are you saying that the penny is earlier on
15 in the process, or it's a completely different process?
16         MR. SULLIVAN:  Objection to form.
17     A   That it's a different cause.
18     Q   Okay.  So if you would, let's turn to page 53.
19 Can you look at the picture at the bottom there.
20     A   Uh-huh.
21     Q   And can you read what you've written there.
22     A   Inside barns/shed where National Gypsum
23 drywall was removed from walls and stacked in shed.
24 This panel is on the wall adjacent to the aerator.
25 Light tarnishing on copper wires.

15  (Pages 54 to 57)

58

1     Q   Now, you point out that the panel is on the
2   wall adjacent to the aerator.  What's the significance
3   of that?
4     A   The picture on the top of page 53 shows
5   corrosion, black corrosion on copper wiring next to the
6   aerator tank.
7         The panel shown in the photograph on the
8   bottom of page 53 is about 3 feet away from that
9   corroded copper wire next to the aerator tank on the
10  other side of the wall that you can see in the
11  background in the upper photograph.
12    Q   So would it be fair to say that you're
13  identifying the tarnishing there as the result of
14  proximity to the aerator?
15    A   No.
16        MR. SULLIVAN:  Objection to form.
17    Q   Explain, if you would.
18    A   The significance is that here we have two
19  pieces of copper very close to each other.  One was
20  exposed to National Gypsum drywall inside the building.
21        The other is outside the building right next
22  to the aerator tank where it's exposed to reactive
23  sulfur gases that the aerator is intended to remove from
24  the water, and that's the copper that's corroded, next
25  to the aerator tank, disbursing the reactive sulfur

59

1   gases.
2     Q   So the distance of 3 feet from the aerator
3   that this panel was too far for the aerator to cause any
4   corrosion on this panel?
5         MR. SULLIVAN:  Objection to form.
6     A   Given that the aerator is outdoors, and any
7   off-gassing that occurs there was disbursed into the
8   atmosphere, and there is no direct pathway between the
9   two, in other words, from the outside of the building to
10  the inside -- I've completely forgotten what the
11  question was.
12        MR. SULLIVAN:  Could you read it back?
13    A   I can tell you the significance, maybe that
14  will help answer your question.
15        The significance is here we have copper, you
16  know, generally in the same location, only under
17  different environments.
18        The copper inside this building is significant
19  in that it's not corroded, it was exposed to National
20  Gypsum drywall, but it was not exposed to a source of
21  water, because there's no sink or shower or tub inside
22  this building, whereas the copper next to the aerator
23  outside is exposed to water, and there is corrosion
24  there.
25    Q   Sure.  And how far away again was the panel

60

1   from the aerator?
2     A   If you flip back to page 50, the aerator is
3   the white vessel in the left of the photograph at the
4   top of page 50, and you can see on the right side of the
5   photograph, the corner of the building, the electrical
6   panel was inside that corner of the building.
7     Q   Okay.
8     A   So it would have been, probably if you
9   measured it with a tape, 5, 6 feet.
10    Q   I see.  But I guess the significance then is
11  that -- to the extent the aerator was causing corrosion,
12  it didn't go through the wall?
13    A   No.  The significance of that -- those two
14  photographs is that the corroded copper is near the
15  source of water.
16        The copper that is in the second photograph on
17  the bottom of page 53 is completely lacking in black
18  corrosion, was exposed to National Gypsum drywall in the
19  building, but was not exposed to water, and has no
20  corrosion.
21    Q   Okay.  Do you know how long it was exposed to
22  National Gypsum drywall?
23    A   It was still stacked up in the building.  If
24  you look at the photograph -- there's a photograph in
25  here, I'm not sure where it was, but in a photograph

61

1   taken inside that building, you can see the stack of
2   drywall against one wall.
3     Q   And so you characterize this as light
4   tarnishing?
5     A   Yeah, normal.  That's what you would normally
6   expect to see in a copper wire that was not brand new.
7         MR. SULLIVAN:  Just so the record is clear,
8   when you say this, you mean the bottom photo?
9         MR. ANDERSON:  Correct.
10        MR. SULLIVAN:  Thank you.
11    Q   So if you can flip back with me to page 8 for
12  a second but keep your finger at page 53.  Now, is this
13  the same photograph?
14    A   Yes.
15    Q   So in one photograph, you say no corrosion is
16  evident; in the other photograph, you say light
17  corrosion on copper wires?
18    A   Right.
19    Q   But it is the same photograph?
20    A   Yes.
21    Q   But it's a different characterization?
22        MR. SULLIVAN:  Objection to form.
23    A   No.
24    Q   How is that?
25    A   The tarnishing is what we would normally

16  (Pages 58 to 61)

62

1  expect to see.  Corrosion, as I refer to it here, is an
2  entirely different appearance as illustrated by the
3  photo above this one on page 8.
4    Q   Okay, thank you.  Can we turn to page 13 for a
5  second, and can you look at location eight.  You
6  characterize that one as little -- no, you characterize
7  that one as no or little corrosion; is that right?
8    A   Yes.
9    Q   Well, do you see any blackening there?
10   A   Very small amount.
11   Q   But you do see blackening there?
12   A   In the center of that photo where the wire is
13 bent into a bit of a loop, it looks slightly darkened,
14 yes.
15   Q   So why would you characterize it as no or
16 little corrosion if you see blackening on the wire?
17        MR. SULLIVAN:  Objection to form.
18   A   Because there's some other areas of wire here
19 that look pristine.  For example, the wires wrapped
20 around the two screws on the side of the receptacle show
21 they are shiny copper wires.  They look similar to a new
22 penny.
23   Q   My question is just simply, you appear to have
24 put it in the disjunctive, right, you say no or little,
25 but you've said there is little here, so I'm confused as

63

1  to why you wouldn't just characterize it as little
2  corrosion.
3        MR. SULLIVAN:  Objection to form.
4    A   Because there's some areas of the wire shown
5  in the photograph that have no corrosion.  Perhaps I
6  would have been more correct to say no and little
7  corrosion.
8    Q   So let's look at location nine for a second.
9        Here, you say light corrosion on the ground
10 wire, right?
11   A   Correct.
12   Q   Now, do you see any places where the copper is
13 shiny on this one?
14   A   Yes.
15   Q   But you didn't put in here no or light
16 corrosion?
17   A   Correct, because if you compare the two
18 photographs, they are entirely different degrees of
19 corrosion in my eye.
20   Q   Okay.  Explain what you mean.
21   A   The bare copper wire in the lower photograph
22 has more areas that are dark than the bare copper wire
23 up in the upper photograph.
24   Q   But there are places where there's no
25 corrosion in the bottom photograph, right?

64

1    A   I see --
2        MR. SULLIVAN:  Objection to form.
3    A   I see one or two very small spots where the
4  copper is shiny, yes.
5    Q   And you said a moment ago that that was why
6  you said no or little corrosion in location eight,
7  right, because there are places where there's no
8  corrosion?
9    A   Sure.
10   Q   Help me understand then what value the
11 descriptions have for all these photographs then if it
12 appears to be without sort of -- well, strike that.
13       Help me understand the process you used to
14 characterize the corrosion, because I'm a bit confused
15 based on what you just told me.
16       MR. SULLIVAN:  Objection to form.
17   A   Again, as I stated, it's subjective.  I looked
18 at the photograph and I said, well, in my mind, this
19 looks light or little or medium, or oh, this is heavy
20 corrosion.  Again, it's subjective.
21       There are a lot of photographs in here,
22 because we took photographs of every single -- again,
23 almost every single receptacle and switch inside the
24 house.
25   Q   So if your characterizations of the corrosion

65

1  were totally subjective, how is it that they have value
2  for us?
3        MR. SULLIVAN:  Objection to form.
4    A   Because in my experience, when you have
5  corrosive drywall at switches and receptacles, the wire
6  is typically very heavily corroded, as shown in the
7  photograph on top of page 8.
8        The corrosion shown here is in almost all
9  areas to a significantly lesser degree, which would
10 suggest that perhaps it's not the drywall that's causing
11 the corrosion.
12   Q   But your characterizations of the photographs
13 lend credence to your theory that the water is the cause
14 of the corrosion, right?
15       MR. SULLIVAN:  Objection to form.
16   A   No.  The characterization of the degree of
17 corrosion on the wires lend credence to my theory that
18 the drywall is not associated with the corrosion.
19   Q   So you don't say that the water is the cause
20 of the corrosion in the house?
21       MR. SULLIVAN:  Objection to form.
22   A   That's not what I said.
23   Q   Okay.  I'm trying to understand, because
24 you've made characterizations in your report all over
25 the report of the level of blackening that's on this

17 (Pages 62 to 65)

66

1    copper wire, and it appears to me in reviewing it that
2    you characterize all of the corrosion as a means of
3    supporting an argument that the water is the source of
4    the corrosion in the house.  If I'm wrong about that,
5    please explain to me why I'm wrong.
6            MR. SULLIVAN:  Objection to form.
7        A   I just did.  I will state it again.
8        Q   Okay.
9        A   Flip back to page 8.  The top photograph,
10   which is not from this subject property, is typical of
11   the corrosion that I have personally observed at homes
12   that have corrosive drywall.
13           The wires are very, very dark.  The entire
14   area of the exposed copper is covered with corrosion to
15   a significant, heavy degree.
16           You would expect to find that at every
17   receptacle in a board of corrosive Chinese drywall,
18   because at a receptacle or a switch, we've cut a hole in
19   the drywall, exposing the inside of the board to the
20   copper at a distance of about, you know, a quarter of an
21   inch.
22           We then encapsulated that by putting a
23   cover-plate on it, which is not airtight but, you know,
24   it's a box with a cover on it with drywall and copper
25   wiring.

67

1    It's very similar to the tests a laboratory
2    would do to determine whether a piece of drywall causes
3    corrosion.  We put it in a jar, a container, we put the
4    drywall in there, we put the copper in there.  This is a
5    very similar situation.
6            So in cases where the drywall is causing
7    corrosion, I would expect to see heavy corrosion to that
8    degree at every location in the house where there's a
9    board that came from China, and we know that drywall --
10   or that particular drywall that came from China is
11   corrosive.
12           In the other examples where there's less
13   corrosion, well, then that leads you to the theory that
14   drywall is not the cause of the corrosion, that there's
15   some other cause, because the corrosion is not nearly as
16   significant.
17       Q   In your experience, is all the Chinese drywall
18   corrosive?
19           MR. SULLIVAN:  Objection.
20       A   No.
21       Q   So I think you said a moment ago something
22   about you would expect to see corrosion near the Chinese
23   boards.
24           Do you mean to say that you would expect to
25   see corrosion near Chinese boards that are corrosive; is

68

1    that right?
2        A   Yes, because not all drywall that came from
3    China is corrosive.
4        Q   Okay.
5        A   And I stated it that way, because in a given
6    house, we might have a board that's from China here and
7    a board from America on the top or over here.  So where
8    we have corrosive drywall and copper wiring at switches
9    and receptacles in proximity to that corrosive drywall,
10   we would expect to see that very dark heavy corrosion as
11   shown in the photograph on top of page 8.
12       Q   But you could in one of those Chinese drywall
13   houses find wires near corrosive board that are heavily
14   corroded, right?
15           MR. SULLIVAN:  Objection.
16       A   Was that a question?
17       Q   Yes.
18       A   Restate it, please.
19       Q   Sure.  In a home that's affected by corrosive
20   Chinese drywall, you would expect to see heavy
21   corrosion, like pictured in your report, the sample
22   photograph, you would expect to find that heavy
23   corrosion near a board that was defective or corrosive
24   Chinese drywall?
25           MR. SULLIVAN:  Objection to form.

69

1        A   Yes.
2        Q   And to the extent that you went to the other
3    side of that same house and there was perhaps a board
4    that was Chinese but not corrosive, you would expect to
5    find less corrosion on wires in proximity to that board;
6    is that right?
7        A   Yes.  Yes.  Now, I can't say I've ever
8    observed that, but I would think that that makes sense,
9    given that there's more exposure to the reactive sulfur
10   compounds in the drywall at the board known to be
11   corrosive than there would be at the board remote from
12   that.  However, it's a little more complicated than
13   that, because those gases are also distributed
14   throughout the house.
15       Q   Do you know what causes corrosion in the
16   Chinese board?
17           MR. SULLIVAN:  Objection.
18       A   Sulfur compounds, according to the Consumer
19   Products Safety Commission.
20       Q   Has the Consumer Products Safety Commission
21   determined the cause of the corrosion?
22       A   You would have to ask the Consumer Products
23   Safety Commission.
24       Q   You quote extensively from their reports,
25   don't you?

18  (Pages 66 to 69)

70

1    A   Yes.
2    Q   So you have read their reports, right?
3    A   Yes.
4    Q   So I'm just asking you, with your background
5    and expertise in corrosion, has the SPSC stated what the
6    cause of the corrosion was from the Chinese board?
7    A   I thought we had determined I didn't have a
8    background in corrosion.
9    Q   Well, but you said your purpose, the scope of
10   your work in this case, was to determine the cause of
11   the corrosion in these houses, right?
12   A   Yes.
13   Q   Okay.  I would like to look for a second, if
14   we could, at page 29, location 43.  Where was that
15   photograph taken, Mr. Cramer?
16   A   If you refer to the sketch in the beginning of
17   the report, it will show up on there.
18   Q   I mean just the identification that you
19   provided here.  Can you read that?
20   A   Bedroom number one.
21   Q   Okay.  And how do you characterize the
22   corrosion in that photograph?
23   A   Light darkening of copper ground wire.
24   Q   Do you see any portion of that wire that's
25   visible that looks like new penny, like you referred to

71

1    before?
2    A   Not in this photograph, no, I don't.
3    Q   So why would you characterize this one as
4    light corrosion?
5    A   Again, these are subjective characterizations.
6    What I can see in my copy -- actually, let me take a
7    look at yours, because I think yours is a little sharper
8    than mine.
9    Q   It is the exact same copy reprographic
10   service.
11   A   Okay.  Let me look at the photograph I printed
12   out.  This weekend maybe I can give you a better answer.
13   Q   Okay.  In other words, it's hard to see any
14   clean copper on the photograph you have in front of you?
15   A   Let me look at the photograph and I'll comment
16   on it.
17   Q   It's page 29.
18   A   Page 29, okay.  That's much better.  Yeah,
19   there is an area in the center, or near the center of
20   that wire that looks purplish black, and then going to
21   the right towards the receptacle, there are areas that
22   look like they are heavily tarnished.
23   Q   If you could, but --
24   A   If you would like to look at my photograph,
25   it's probably a little more clear than yours.

72

1    Q   So you're saying there's areas of this
2    photograph, location 43, where you see a clean new penny
3    shine?
4    A   That's not what I said.
5        MR. SULLIVAN:  Objection to form.
6    Q   So I guess what I don't understand is how you
7    would characterize this as light darkening.
8        MR. SULLIVAN:  Objection.
9    A   You have to understand that you're looking at
10   printed photographs that are fuzzy, and I'm looking at
11   them on a computer screen that's 30 inches in width at a
12   resolution of 2560 by 1680, and these are very high
13   resolution photographs that I took.  So when I'm looking
14   at them on that screen, I'm going to be able to discern
15   some differences that would not be apparent in the
16   poorly printed quality photograph that you're looking
17   at.
18   Q   Well, let me ask you this.  Did you provide
19   those high resolution photographs to National Gypsum?
20   A   No.
21   Q   And so I wouldn't have access to those
22   photographs in high resolution, would I?
23       MR. SULLIVAN:  Objection.
24   A   I provided them to Morgan Lewis, not to
25   National Gypsum.

73

1    Q   Do you know if they were produced with your
2    expert report?
3        MR. SULLIVAN:  Objection.
4    A   I don't know.
5    Q   Well, if I told you that the photographs that
6    I have were printed by a professional reprography
7    service based upon the exact file that I received from
8    National Gypsum's counsel, would you be surprised to
9    hear that?
10       MR. SULLIVAN:  Objection.
11   A   I have no comment on the quality of their
12   photographs.  All I can do is show you the photograph I
13   printed at my house on my $200 ink jet printer, and it's
14   a lot clearer than yours, and it is the same report and
15   it is the same photograph.
16   Q   When you look at this location 43 --
17   A   Now, those files were converted to PDF
18   documents, so there may have been some resolution lost
19   in a transition, or there may have been some -- it may
20   have been the resolution at which they printed them, it
21   may be the quality of their printer.  I don't know, but
22   you can see the difference in the photographs.
23   Q   For the record, I can't, but --
24   A   I'm sorry that you can't see --
25       MR. SULLIVAN:  Let him ask the questions.

19  (Pages 70 to 73)

74

1     Q  Would it be fair to say then that you would
2 maintain that location 43 would be accurately
3 characterized at light darkening?
4     A  Correct.
5     Q  If you can turn with me to location 50 on page
6 32. Now, that one you characterize as light to moderate
7 corrosion, right?
8     A  Yes.
9     Q  Now, if you flip back for a second to location
10 43, does location 43 look lighter or darker than
11 location 50?
12     A  The corrosion is different. If you look at
13 the photograph on page 43 --
14     Q  I don't want to interrupt you, Mr. Cramer --
15     MR. SULLIVAN: You need to let him answer the
16 question. You asked a question.
17     A  If you look at the photograph on page 43, in
18 the center, there's some purplish, blackish tarnishing.
19 The photograph on page 50, the corrosion is blackish,
20 powdery looking deposits on the wire, primarily the
21 heaviest being close to the receptacle.
22     Q  But in terms of the darkness of the corrosion,
23 would you say that location 50 is darker or lighter than
24 location 43?
25     MR. SULLIVAN: Objection to form.

75

1     A  I said there's not a whole lot of difference.
2     MR. ANDERSON: Okay. Tom, we were not -- just
3 for the record, we were not furnished with high
4 resolution copies of these photographs, and I would
5 like to make a request that all of the original
6 high resolution photographs be produced to us,
7 because I frankly don't see the differences that
8 Mr. Cramer has identified, and perhaps if we were
9 given the original photographs it might assist us
10 in reviewing them.
11     MR. SULLIVAN: We'll consider the request.
12 I'll take note of it, and I'll talk to the people
13 that have knowledge -- who might have knowledge of
14 that, and we'll address it appropriately.
15     MR. ANDERSON: Okay, thank you. I appreciate
16 that.
17     Q  So the last question on this then, would it be
18 fair to say that you view the photograph, the darkening
19 in location 50, as similar or identical to location 43?
20     MR. SULLIVAN: Objection to form.
21     A  No.
22     Q  How would you characterize the difference
23 between those two?
24     A  The appearance --
25     MR. SULLIVAN: Objection, asked and answered.

76

1     A  The appearance of the corrosion itself is
2 different. The corrosion on photograph 43 is purplish,
3 blackish darkening in the center of the wire. The
4 corrosion on photograph number 50 looks like black,
5 powdery deposits on the wire that are more similar to
6 the corrosion shown in location 51 at the top of page
7 33, where in that case, the wire is entirely coated with
8 a dark, powdery looking corrosion.
9     Q  Would you say that location 43 looks more
10 similar to location 50 or more similar to location 51?
11     MR. SULLIVAN: Objection to form.
12     A  I don't think it's similar to either in terms
13 of the corrosion. They're different types of corrosion
14 shown in 43 and 50. The corrosion shown in 50 and 51 is
15 similar but different in degree.
16     Q  Now, does your report explain at all the
17 distinction between corrosion that you've identified
18 just a couple of moments ago?
19     MR. SULLIVAN: Objection to form.
20     A  I'm sorry, I don't understand that question.
21     Q  Well, you've referred today to purplish. Do
22 any of the five reports that you produced for National
23 Gypsum use the word purple?
24     MR. SULLIVAN: Objection to form.
25     A  I don't know. I would have to look, but I

77

1 don't think so.
2     Q  Well, if you need to take a moment to look,
3 feel free.
4     A  There's 600 pages here. It might take me a
5 couple hours, but I'd be happy to read through them if
6 that will be your pleasure.
7     Q  I have to say I'm a bit surprised at the way
8 you're characterizing the photographs, and I'm just
9 asking you whether in any of the 600 pages you
10 characterized corrosion in the way you're characterizing
11 it here today.
12     MR. SULLIVAN: That's just a statement. If
13 you have a question, feel free to ask him a
14 question.
15     Q  Mr. Cramer, to the best of your recollection,
16 prior to today, in any of these reports, do you describe
17 the corrosion as purplish?
18     MR. SULLIVAN: Objection to form.
19     A  Not that I recall.
20     Q  Do you make any distinction in any of the
21 reports that you produced in the Brucker and Brinckx
22 case that distinguishes among the types of corrosion in
23 the same way that you've distinguished between the types
24 of corrosion in location 43 and location 50?
25     MR. SULLIVAN: Objection, asked and answered.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

78

1    A   You're going to have to try that question
2   again, because there were more words in that question
3   than my feeble brain could comprehend.
4    Q   It's certainly not a feeble brain at all.
5    THE WITNESS: I need a break.
6    MR. ANDERSON: Okay.
7    VIDEOGRAPHER: This will mark the end of
8   videotape number one.  Now going off the record at
9   12:27.
10    (A lunch recess was taken.)
11    VIDEOGRAPHER: This will mark the beginning of
12   videotape number two.  Now going back on the record
13   at 1:24.
14    Q   Mr. Cramer, if I can direct your attention to
15   page 10, location three.  Can you tell me -- there's
16   three photographs on page 10.  Can you tell me what they
17   depict?
18    A   Those are copper wires inside the electrical
19   panel in the garage.
20    Q   And you say little or no corrosion was found
21   on the bare copper wiring, right?
22    A   Yes.
23    Q   Do you recall, what material is the wall made
24   out of in that garage?
25    A   Concrete block.

79

1    Q   Okay.  I want to direct your attention, if I
2   could, to -- if I could direct your attention to page
3   50, please.  I'm actually going to ask you some
4   questions, if that's okay, about 50 and 51.
5    On page 50, there's a white PVC pipe that runs
6   across the top of the aerator there, right?
7    A   Yes.
8    Q   Okay.  And it appears that there's a metal bar
9   that runs across there too, it looks like maybe it's a
10   float?
11    A   Yes.
12    Q   And if you turn to page 51 for me, you can see
13   that float again, can't you?
14    A   Yes.
15    Q   Now, what is that float made out of?
16    A   It's a block of styrofoam.
17    Q   And the metal bar that's attached to it, I
18   mean, is that in fact a metal bar?
19    A   Yes.
20    Q   You talk about corrosion on the caps there,
21   but was there any corrosion on the metal bar?
22    A   No.  That appears to be stainless steel, that
23   bar.
24    Q   And did it strike you as odd that the
25   stainless steel bar didn't have corrosion on it?

80

1    A   Not at all.  That's why we call it stainless
2   steel.
3    Q   Okay.  But if I could direct your attention
4   then for a second to -- let's take a look at some of the
5   bathroom photographs.
6    A   Top of page 54 is the one you're looking for.
7    Q   Yes.  So help me understand here, because this
8   is stainless steel too, isn't it?
9    A   No.
10    Q   No?
11    A   No.  That's common steel, or might be brass or
12   bronze, but it's not stainless steel.
13    Q   You say this might be brass or bronze?
14    A   It's so corroded, I can't tell what it is for
15   sure, but it's not stainless steel.
16    Q   You say it's chrome, right?
17    A   No.
18    Q   Is that -- I'm looking --
19    MR. SULLIVAN: For the sake of the record,
20   what are we looking at?
21    MR. ANDERSON: Sorry, guys.  At the top of
22   page 55.
23    THE WITNESS: Okay.
24    Q   What material, if you recall, was this
25   showerhead made out of?

81

1    A   It's a metal alloy, we call it chrome, but you
2   can't identify it visually from looking at it.  You
3   can't identify it specifically.
4    Q   But you don't believe, as you sit here today,
5   that's it's made out of stainless steel?
6    A   No.  That's a plating.  The shiny stuff we're
7   looking at is a plating over something else underneath
8   it, whereas the stainless steel rod in the aerator tank
9   is a solid bar of stainless steel.
10    Q   Now, does hydrogen sulfide, is it known to
11   corrode stainless steel?
12    A   I have never seen corroded stainless steel,
13   but I have no knowledge in that area.
14    Q   And can you read for me what it says on page
15   51, your characterization at the top of 51?
16    A   Inside the aerator tank, the metal nozzles
17   were found to be corroded and black in color.  This is
18   consistent with exposure to reactive sulfur compounds.
19    Q   Now, were those two caps the only items that
20   you identified in the aerator that were corroded?
21    A   The wiring we identified there as being
22   corroded is actually outside the tank.
23    Q   Right.
24    A   That's -- there's not much inside the tank
25   other than that float switch, and if you look at the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

82

1  photo on the bottom of page 50, there's a plastic water
2  pipe with the metal nozzles in it.  There's a block of
3  styrofoam with a stainless steel rod that's connected to
4  a plastic switch.
5      Q   So would you expect the concentrations of
6  hydrogen sulfide in that aerator when the cap is on to
7  be higher inside it than outside it?
8          MR. SULLIVAN:  Objection to form, calls for
9  speculation.
10     A   Yes.
11     Q   So would it be fair to say the only metal you
12  saw in there was the stainless steel rod and these caps?
13     A   There's -- there's wire that comes on the side
14  of the tank and goes under water to pump what's under
15  the water, and there's also, it's probably a little
16  screw or a bolt on the plastic float switch that the
17  switch rotates on.
18     Q   Okay.  Now, the wire, was that wire all coated
19  such that you couldn't see the metal?
20     A   Yeah.  It's insulated wire.
21     Q   Right.  And the screw itself that you referred
22  to, where was that located?
23     A   If you look at the photograph on the top of
24  page 51, on the left side of that photograph below the
25  white horizontal pipe, there's a gray, plastic switch.

83

1  On the left end of that switch that's attached to the
2  rod is a screw or a bolt that it rotates on.
3          In other words, the float goes up and down.
4  It rotates around that little screw there.
5      Q   It pivots on the screw; is that right?
6      A   Yes.
7      Q   Did you find any corrosion on the screw?
8      A   I don't believe so.
9      Q   And do you know what material that screw was
10  made out of?
11     A   I can't tell from this photograph, no.
12  Typically, those would be stainless steel also.
13  Anything that you would put inside a piece of equipment
14  like this would be, you know, some metal that's not
15  subject to corrosion, such as stainless steel, brass,
16  bronze, copper alloys.
17     Q   Looking again at the photograph on page 51 and
18  what you identify to be corrosion on the metal nozzles,
19  Mr. Cramer, would it surprise you to learn that those
20  nozzles are in fact made of plastic and not of metal?
21     A   Yeah, it would.
22     Q   And would it change your perspective about the
23  potential corrosion caused by the aerator?
24     A   No.
25          MR. SULLIVAN:  Objection to form, assumes

84

1  facts not in evidence.
2      A   No.  Since there's other metals directly
3  outside there that are corroded, no.
4      Q   So if there was no corrosion of any metal
5  inside the aerator, that would not change your view as
6  to the aerator being the cause of any corrosion in the
7  home?
8          MR. SULLIVAN:  Objection to form.
9      A   It would depend on what kind of metal was in
10  there and how prone to corrosion that metal was.
11     Q   So the fact that these caps are in fact
12  plastic would not actually change your conclusions about
13  the Brincku house at all?
14         MR. SULLIVAN:  Objection to form, assumes
15  facts not in evidence.
16         If you have data that they are in fact
17  plastic, I think you have to show it to the
18  Witness, and it hasn't been produced to us, so --
19     Q   Let me ask you --
20         MR. SULLIVAN:  -- I'm going to object to the
21  line of questioning, because we haven't been given
22  that data, if in fact it exists, so I think any
23  questions relating to that, I'm going to object on
24  the grounds of it's assuming a fact that's not in
25  evidence, and the evidence hasn't been produced to

85

1  us.
2          MR. ANDERSON:  Mr. Cramer did go to the house
3  and perform an inspection, so his opportunity and
4  the opportunities of all of his colleagues to look
5  and examine this, you know, are clear in the
6  record, and he's made conclusions about what
7  occurred in this aerator that were based on the
8  premise that these are actually metal, and so
9  that's the source of my questioning, but I guess
10  I'll pose the question in a different way, and
11  let's see if maybe this is a better way of
12  approaching it.
13     Q   Would it be accurate to say that if you
14  learned that these caps were in fact plastic, that it
15  would not in any way change the conclusions that you've
16  reached about the Brincku house?
17         MR. SULLIVAN:  Objection to form.
18     A   None whatsoever.
19     Q   And is hydrogen sulfide known to corrode
20  plastic?
21     A   No.
22     Q   Mr. Cramer, could you turn with me to location
23  51, which is page 33.  I think that you mentioned this a
24  little bit earlier today in your testimony, but the
25  corrosion that's depicted in location 51 you say is the

22  (Pages 82 to 85)

86

1    heaviest corrosion found on wiring at any location in
2    the house; is that right?
3        A   Yes.
4        Q   And in other locations in the house where you
5    found heavy corrosion, how did you compare the various
6    locations to reach the conclusion that this was the
7    location with the heaviest corrosion?
8        MR. SULLIVAN:   Objection to form.
9        A   I looked at the amount of wire that was
10   affected versus the amount unaffected or affected to a
11   minimal degree, and also the intensity of the corrosion,
12   based on what I can observe looking at it, and the other
13   factor I'm taking into account here is the actual
14   appearance of the surface of the corrosion.  It becomes
15   not smooth like the corrosion you see in the location 52
16   below there, but the surface actually becomes rough, and
17   eventually that corrosion progresses to the point that
18   small particles fall off.
19       So it's a different appearance not only in the
20   amount of darkness, but also in the texture of the
21   surface of the corrosion.
22       Q   But you didn't take any quantitative
23   measurement of the amount of corrosion on the wire?
24       MR. SULLIVAN:   Objection to form.
25       A   No, other than what I observed.

87

1        Q   Well, I'm referring to quantitative, right, so
2    I'm asking if there was any quantifiable way of
3    determining the amount of corrosion that was on the
4    wire.
5        A   You're asking if there is a way to do that?
6        Q   Yes.
7        A   I suppose one could attempt to scrape the
8    corrosion off and measure the volume that you scraped
9    off, but I don't think that would be very accurate, in
10   that it would be very difficult to scrape just the
11   corrosion off and leave the wire intact without scraping
12   off small particles of wiring also.
13       But in cases where you have heavy corrosion,
14   again, it's really clearly visible that it is to a
15   different degree than in cases where I characterize it
16   as light or moderate corrosion.
17       And as I mentioned, before this progresses to
18   a degree where particles will actually start falling off
19   the wire and piling up in a little pile underneath it.
20       So, visually, yes, you can quantify that if
21   you have experience in looking at corroded copper wires.
22       Q   You say -- you testified earlier that the
23   descriptions of the corrosion were subjective in nature,
24   right?
25       MR. SULLIVAN:   Objection to form,

88

1    mischaracterizes testimony.
2        A   What I said is they're subjective in that
3    they're based on my experience in looking at corroded
4    copper wires.
5        Q   Okay.  And just so the record is clear, you
6    said you've seen approximately 10 homes with corrosion
7    caused by well water, and how many homes with corrosion
8    caused by corrosive drywall?
9        MR. SULLIVAN:   Objection to form,
10   mischaracterizes the testimony.
11       A   Now, I believe what I told you was that I have
12   seen corroded copper wiring long before we even knew
13   drywall was coming from China caused by other sources,
14   so for almost 20 years, I have been looking at corroded
15   copper wire.
16       And as to how many houses I have seen corroded
17   copper wire in, I couldn't begin to tell you, but it was
18   a well-known problem long before Chinese drywall.
19       Q   When you say it was a well-known problem, what
20   was a well-known problem?
21       A   Black corrosion on copper wiring in houses in
22   Florida.
23       Q   And can you direct me to any studies that
24   discuss the black corrosion on homes in Florida?
25       MR. SULLIVAN:   Objection to form.

89

1        A   I know of no such studies.
2        Q   And you said that you teach classes to people
3    seeking certification as home inspectors?
4        A   Yes.
5        Q   And is corrosion caused by water blackening,
6    is that something that you teach about in your classes?
7        A   When I teach electrical, I do touch on that,
8    yes, because it's something that a home inspector in
9    Florida is going to encounter.  And there's not any
10   literature on it.  It's not in any books, any texts, but
11   they're going to see it, and they need to know what the
12   possible causes are and what to tell their clients to do
13   about it.
14       Q   So what are the possible causes that you're
15   aware of of blackening or corrosion?
16       MR. SULLIVAN:   Objection to form.
17       A   I have seen corrosion caused by charging of
18   battery on a golf cart next to the electrical panel in
19   the garage.
20       Q   Okay.  Let's stop and let's talk about that
21   for a second, because I saw that in your report.  How
22   many times have you seen that in your 23 years?
23       A   Maybe less than half a dozen.
24       Q   And --
25       A   Bare in mind, this is a topic that we've

23  (Pages 86 to 89)

90

1  discussed at meetings endlessly.  We have talked about
2  it with electricians, we have talked about it with
3  municipal building inspectors, so it's not a -- you
4  know, it's not something you come across, or I would
5  come across every day primarily, because we don't have a
6  lot of golf carts in garages in the market I work in,
7  whereas if I worked in The Villages, where they probably
8  have a lot of golf carts in garages, you would be very
9  likely to encounter it in that market as a home
10  inspector on an almost daily basis.
11      Q   So you say that in this half dozen or so
12  houses that you saw with corrosion caused by charging
13  the golf cart batteries, you say that the charging of
14  the battery is what's causing the corrosion?
15      A   Yes.  Now, that's an assumption.  There are
16  other things that can cause the corrosion also, but I do
17  know specifically that that will do it, because we had a
18  big discussion about this on the American Society of
19  Home Inspectors members' discussion forum, and one of
20  our members from Oregon, a fellow by the name of Jim
21  Caton, and there were a lot of people who didn't really
22  believe this whole black copper stuff, so he did some
23  experiments, some woodshed science, and put some copper
24  on top of a battery and charged it, and took some
25  photographs showing the darkening that occurs in the

91

1  production of hydrogen sulfide gases when you charge a
2  battery.
3      Q   And how does charging the battery cause
4  hydrogen sulfide gases to be created?
5          MR. SULLIVAN:  Objection to form, calls for
6  speculation.
7      A   I don't know.
8          MR. SULLIVAN:  Give me a chance to make sure I
9  get my full objection out before you answer.
10          THE WITNESS:  Okay.
11      Q   In these half dozen or so homes --
12      A   And I haven't finished answering your question
13  as to what other things could cause it.
14      Q   Okay.  And I want to discuss them all, but
15  since you raised the battery one, if it's okay, I have a
16  couple questions about that, then we can move on to the
17  next possible cause of corrosion.
18          So in these half dozen or so houses where you
19  saw corrosion that you believe was caused by the
20  charging of batteries, was the corrosion limited to the
21  garages in the home?
22      A   Yes.  Electrical panel in the garage.
23      Q   And did you identify any corrosion in these
24  homes?
25      A   No.  Well, it's not something you -- at that

92

1  point in time that we would have even thought to have
2  looked for.  This was prior to drywall being imported
3  from China.
4      Q   All right.  Sorry to have cut you off.  What
5  other sources?
6      A   Sewer gases.  You have a split in a plumbing
7  vent line inside the house, that can cause it.  Then the
8  other relatively common condition that really took us a
9  long time to figure out was hydrogen sulfide gases
10  coming out of the ground, going up piping, leading into
11  the electrical meter, which is connected by another pipe
12  to the electrical panel.
13          We began -- or we saw a lot of corrosion in
14  electrical panels, and talking with municipal
15  inspectors, they were seeing corrosion in electrical
16  panels in houses under construction that had never been
17  occupied or even energized, and we know that there's
18  hydrogen sulfide gas in many areas of the groundwater in
19  Florida, and we started seeing this when we started
20  building a lot of houses in what we call the New Tampa
21  area, which is north of Tampa, and areas that were
22  formerly somewhat swampy type areas.
23          And eventually, we put two and two together
24  and concluded that that corrosion is absent of any other
25  possible sources caused by hydrogen sulfide in

93

1  groundwater.
2      Q   Okay.  Let me back up for a second.  Did you
3  identify battery charging as the source of corrosion in
4  any of the five homes that you inspected for this case?
5      A   No.
6      Q   Okay.  Did you identify sewer gas as the
7  source of the problem corrosion in any of the homes that
8  you inspected for this case?
9      A   No.  We eliminated that as a cause -- or I
10  eliminated that as a cause.
11      Q   How many homes would you say you have seen in
12  your 23 year career that have corrosion associated with
13  sewer gas?
14          MR. SULLIVAN:  Objection to form.
15      A   None.
16      Q   So how are you aware of it?
17      A   I've personally seen it happen.
18      Q   Wait, I'm confused, and that's not a bait.  I
19  thought you just said that you hadn't seen any houses
20  with sewer gas corrosion.
21      A   You asked if I had seen any in houses that I
22  have inspected.
23      Q   I see.  You have seen corrosion associated
24  with sewer gases -- strike that.
25          How is it that you saw houses with corrosion

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

94

1  caused by sewer gases?
2      A   I was involved in renovating a building here
3  in Tampa, and this is an older building and had cast
4  iron drain lines, some of which were vents coming up out
5  of the ground going through the walls up above the roof,
6  which were split, and we were -- we had to take out a
7  bunch of that piping and replace it, and when we opened
8  it up and let sewer gas into the building, there was
9  copper piping there that just turned black.
10     Q   I see.
11     A   So I have personally seen that.  You would not
12 be likely to see it in a house, because when there's
13 sewer gas leaking, people are going to fix it.  It's not
14 going to be a condition you're going to stumble across
15 as a home inspector.
16     Q   You mean because you could smell it?
17     A   Yes.  The smell would be horrendous.
18     Q   Now, after the sewer gas, you talked about
19 groundwater and buried electrical being the source of
20 some corrosion.
21         How many houses have you come across that had
22 corrosion as the result of groundwater?
23         MR. SULLIVAN:  Objection to form.
24     A   Personally, I've probably seen a half a dozen
25 or so, but I'm aware of many, many more in discussions

95

1  with other inspectors.
2      Q   And in those houses, where do you find the
3  corrosion?
4      A   In the electrical panel in the garage.
5      Q   Okay.  And did you find corrosion elsewhere in
6  the home?
7      A   No.
8      Q   Okay.  And none of those half dozen or so that
9  you looked at had corrosion inside the home, only by the
10 electrical panel?
11     A   Correct.
12     Q   And I apologize if I asked you this a moment
13 ago, but did you identify groundwater as the source of
14 the corrosion in any of the five homes that you
15 inspected for this case?
16     A   No.  When I say no, I mean not that specific
17 circumstance, groundwater entering electrical conduit,
18 coming into the electrical panel from the ground.
19     Q   Let me ask you this.  Why would the
20 groundwater cause corrosion in that half dozen or so
21 homes that you're referring to?
22     A   Well, we know there's hydrogen sulfide gas in
23 the ground associated with decomposing organic
24 materials, and in the typical Florida subdivision home,
25 we have an underground electrical service where we have

96

1  a transformer out by the street, and the utility buries
2  wires in the ground up to the house, and the electrical
3  contractor puts a piece of conduit from the meter
4  mounted on the wall outside the house down into the
5  ground to the appropriate depth, and that piece of pipe
6  takes a 90-degree turn and then stops.  The utility runs
7  their wires up that pipe to the meter.
8          Then the electrical code requires that the
9  main disconnect for the building be very near the point
10 that the power enters the building, in fact, it says at
11 the point the power enters the building, so to meet that
12 requirement, we put the main electrical panel on the
13 other side -- the interior side of that wall, connecting
14 the meter with another piece of conduit or pipe between
15 the main panel, the electrical meter, pipe going down
16 into the ground, gas coming up out of the ground through
17 the meter, through the pipe, to the panel where all the
18 copper is.
19     Q   Now, would you expect to see elevated sulfur
20 levels in the well water for a home that had that issue
21 with the groundwater?
22         MR. SULLIVAN:  Objection to form.
23     A   Not necessarily, because typically, that's
24 what you would call surface water, shallow depth water,
25 as opposed to well water, where we might drill a well.

97

1  You know, I've got a well at my house that's 180 feet
2  deep, and the depth of those is not in surface water
3  where that decomposing organic material is.
4      Q   I see.  Okay.  If I could direct your
5  attention to Exhibit 5, which is the Nutting report.
6  And just for your identification purposes to help find
7  it a little bit more quickly, that's the one located at
8  3245 Reef Road.
9      A   Okay.
10     Q   All right.
11     A   I have it.
12     Q   Great.  Mr. Cramer, you've been to the Nutting
13 home, right?
14     A   Yes.
15     Q   And what date were you there?
16     A   September 11, 2011.
17     Q   How long were you there?
18     A   Approximately three, four hours.
19     Q   And I think you may have testified to this
20 earlier, but you took all the photographs that appear in
21 your report --
22     A   Yes.
23     Q   -- for Nutting?
24         And you took all the photos that appear in all
25 five of your reports in this case, right?

25 (Pages 94 to 97)

98

1      A   With the exception of the one photograph that
2  I recall.  That's the only one I recall.  Maybe there's
3  two, but otherwise, yes.
4      Q   Okay.  And you would acknowledge that there is
5  corrosion in the Brucker home, correct?
6      A   Are we talking about Brucker or Nutting?
7      Q   I apologize.  Thank you.
8         And you would acknowledge that there's
9  corrosion in the Nutting home?
10     A   Yes.
11     Q   Would you actually acknowledge that there is
12  corrosion in all five of the homes that you inspected
13  for this case?
14        MR. SULLIVAN:  Objection to form.
15     A   Yes.
16     Q   Okay.  If we turn for a second to page 3, you
17  indicate just below the photograph on page 3 in the
18  second sentence there, Construction is typical.
19        What do you mean when you say that the
20  construction is typical?
21     A   Typical for a subdivision home in Florida, in
22  that it's a one-story, concrete block slab on grade home
23  with metal plate connected wood frame trusses, achieved
24  with plywood or OSB and shingle asphalt, fiberglass
25  shingles on the roof.

99

1      Q   And you note that the water for this house is
2  supplied by a well, correct?
3      A   Yes.
4      Q   You say that a water softener is installed,
5  right?
6      A   Yes.
7      Q   But no aerator is installed?
8      A   Yes.
9      Q   Have you seen other homes on well water in
10  Florida that have a water softener?
11     A   Yes.
12     Q   Of the 10,000 or so homes that you've
13  inspected in the State of Florida, of those that were on
14  well water, roughly what percentage of them have a water
15  softener?
16        MR. SULLIVAN:  Objection to form, calls for
17  speculation.
18     A   I would say that on well water or not, that
19  more than half of the homes I look at are going to have
20  a water softener.
21     Q   Okay.
22     A   And on a well, you would be just as likely to
23  have one as not.
24     Q   Okay.  Have you seen other homes in Florida
25  that have a water softener but no aerator?

100

1      A   Yes.
2      Q   And of the homes that you've inspected that
3  are on well water, what percentage would you say have
4  aerator?
5         MR. SULLIVAN:  Objection to form, calls for
6  speculation.
7      A   Very few, given that the market that I work
8  in, the -- this portion of west central Florida, we
9  don't have a huge sulfur problem in the water, so very
10  few of those have aerators.
11     Q   Okay.  So just so I'm clear, you say you have
12  not inspected very many homes on wells that have
13  aerators?
14     A   Correct.
15     Q   Okay.  Would you say less than 20 percent of
16  the well water homes you've inspected --
17     A   Far less.
18     Q   Okay.
19     A   A dozen houses maybe.
20     Q   Wow.  So out of --
21     A   And it's not a common piece of equipment that
22  we would install in the market that I work in, because
23  we don't have the heavy sulfur problem that they have in
24  southwest Florida.
25     Q   I see.  All right.  Turning to page 4, if we

101

1  could, you say that you noticed a rotten egg odor inside
2  the home; is that right?
3      A   Yes.
4      Q   And how quickly from the time that you entered
5  the house, how long did it take you to detect that
6  rotten egg odor?
7      A   Right away.
8      Q   So almost immediately upon entering the house,
9  you caught a whiff of some rotten egg odor?
10     A   Yes.
11     Q   Was any water running at the time you entered
12  the house?
13     A   We got there probably 9:00 in the morning and
14  they were still kind of wrapping up breakfast, the
15  Nuttings, so they may have run some water at that time
16  to wash dishes.  I'm sure they took some -- probably,
17  I'm not sure -- probably at least one of them took a
18  shower prior to our arrival.
19     Q   And I guess my question was slightly different
20  though.  Did you see the water running when you went
21  into the house?
22     A   No.
23     Q   And when you say that one or more of them
24  might have probably taken a shower, did anything that
25  you observed lead you to that conclusion?

26   (Pages 98 to 101)

102

1    A   No.
2    Q   All right.  If you could, could you read for
3  me the sentence that begins, We noted that the samples,
4  on page 4.
5    A   We noted that the samples taken previously
6  were too small to identify the manufacturer of the
7  specific pieces of drywall, and as such are meaningless,
8  as often boards from multiple manufacturers are present
9  in any given home.
10   Q   What do you mean when you say the samples were
11 meaningless?
12   A   Well, if I take a sample of drywall and I
13 can't identify for sure the manufacturer of the drywall,
14 and I'm trying to determine if that manufacturer's
15 drywall is corrosive, then any lab results I got from
16 that sample would be meaningless.
17   Q   Mr. Cramer, are you familiar with a device
18 called a boroscope?
19   A   I own one.
20   Q   Great.  So what is a boroscope?
21   A   It's very similar to the device they use when
22 they give you a colonoscopy.  It's a handheld TV camera
23 with the lens on the end of a flexible tube that you
24 could use to cut a hole in the drywall and stick it in
25 there and try see the manufacturer's name on the

103

1  back of the board, if you were very lucky.
2    Q   So if you were able to identify the
3  manufacturer of a board, would it matter if the sample
4  size was small?
5         MR. SULLIVAN:  Objection to form, assumes
6  facts not in evidence.
7    A   No.
8    Q   So if I understand correctly then --
9    A   I'll explain it if you ask me to.
10   Q   Well, I think I understand it.  I think what
11 you're saying -- and tell me if I'm wrong -- are you
12 saying that it would be meaningless to take a sample if
13 you didn't know the manufacturer of the sample which you
14 were taking?
15   A   No.  What I'm saying in that sentence is based
16 on the locations where I observed those samples were
17 taken, there wasn't any way with a boroscope or not to
18 identify the particular manufacturer, because in the
19 typical wall, on an exterior wall, for example, the
20 boroscope is useless, because the drywall is on a 4-inch
21 stripe that's three-quarters of an inch wide.  You can't
22 even get the boroscope in there.
23        On an interior wall, the studs are typically
24 16 inches apart, so you can't cut one little hole and
25 see the whole 12-foot length of the board and identify

104

1  the manufacturer.  You have to cut large holes or
2  multiple holes in that board to get to a marking on the
3  back of the board, unless you were extraordinarily
4  lucky.
5    Q   But it is possible if you put the boroscope in
6  on an interior wall that you could catch some stamp or
7  marking, right?
8    A   It's possible --
9         MR. SULLIVAN:  Objection to form.
10   A   -- that someone who's extraordinarily lucky
11 could do that six or seven times in a house.  If I was
12 that lucky, I would just -- I would quit what I was
13 doing and go buy lotto tickets, because it's not very
14 possible.
15   Q   But to the extent that you could identify the
16 manufacturer, even a relatively small sample would be
17 useful?
18   A   Yes.
19   Q   Can I direct your attention to page 7.
20 Actually, I take that back.  Page 8.  I'm sorry.
21 Location number one; that's in a bedroom, right?
22   A   Yes.
23   Q   And you say that there was heavy black
24 corrosion present on the bare copper wire in the
25 bedroom, right?

105

1    A   Yes.
2    Q   If you direct your attention to page 5 --
3    A   Yes.
4    Q   -- does the location where that sample was
5  taken, does it share a wall with the bathroom?
6    A   No.
7    Q   So I'm looking at this photograph, and I see
8  that there is what appears to be between 1 and 3 there,
9  there appears to be a marking that I would recognize as
10 one depicting a doorway; is that right?
11   A   Yes.
12   Q   And does that door go into the -- well, does
13 that door open from where the 9 is, or does it open from
14 where the DW-3 is?
15   A   That opens where the 9 is, from the dining
16 room.
17   Q   So the location of sample one does not share a
18 wall with the bathroom and it does not have a door
19 opening into the bathroom near it?
20   A   There's a door opening into the bathroom.  The
21 door is a sliding door depicted by the symbol between
22 the numbers 5 and 4.
23   Q   I see.  I see.
24   A   It's a pocket door.
25   Q   Right.  Now, do you have any idea why you

27  (Pages 102 to 105)

106

1  would see heavier corrosion there than you see in, say,
2  location two or location three?  Just for your
3  reference, location one is on page 8, locations two and
4  three are on page 9.
5      MR. SULLIVAN:  Objection to form.
6      A  No.  I could speculate if you'd like me to.
7      MR. SULLIVAN:  He doesn't want you to
8  speculate.
9      A  I have a hypothesis.
10     Q  What is that?
11     A  As to how that could occur.  If the source of
12  the reactive sulfur gases is not the drywall but the
13  room itself, the exposure of a piece of wire in a
14  receptacle box would be governed by how tight that cover
15  was and how leaky that box was.
16         So in some cases, you might get more exposure
17  to those sulfur compounds if the cover was loose and
18  there's a little more space for air to get in there.
19     Q  Okay.  Wait, because I'm -- you said if the
20  source of the corrosion was the room.  What do you mean
21  by that?
22     A  I mean --
23     MR. SULLIVAN:  Objection to form.
24     A  -- the air in the room as opposed to the
25  drywall itself.

107

1      Q  Let me ask it this way.  Are locations two and
2  three on page 9 closer to the shower and the laundry
3  room or further from the shower and the laundry room
4  than location one?
5      A  I would say there's -- one and three, there's
6  no significant difference in the distance to the laundry
7  room.  Three would be, oh, 4 or 5 feet closer to the
8  door to the bathroom than one is.  Two would be closer
9  to the door to the bathroom than one is also.
10     Q  And would it be fair to say that across the
11  board, you found in these five homes that the heaviest
12  corrosion was closest to showers?
13     MR. SULLIVAN:  Objection to form,
14  mischaracterizes testimony.
15     A  No.
16     Q  Okay.  Let's take it house by house then.  In
17  the Nutting home, where did you find the heaviest
18  corrosion?
19     MR. SULLIVAN:  Objection to form.
20     A  On page 10, location number four, bath one,
21  there's heavy corrosion on a wire receptacle in that
22  bathroom.
23         Page 14, location number 12, kitchen counter,
24  this is next to the sink, there's heavy corrosion on a
25  copper wire there.

108

1         Page 17, location 18, there's heavy corrosion
2  on a copper wire there which is a bedroom, and that's
3  almost the farthest point you could get from water and
4  still be inside the house.
5      Q  So how's that --
6      A  I'm not -- I haven't answered your question
7  yet.
8      Q  Go ahead.  I'm sorry.
9      A  Then there was very heavy corrosion in the
10  Nutting house at some of the plumbing fixtures in the
11  bathroom and the kitchen.
12         On page 22 and 23, there's abnormal black
13  corrosion on the shower valve, the sink valve.  On page
14  24, there's very heavy abnormal corrosion on the tub
15  spout.  And on page 25, the same bathroom, there's an
16  escutcheon ring, E-S-C-H-T -- I would have to write that
17  down, I'm not sure -- on the escutcheon ring around the
18  valve, just incredibly dense dark corrosion.
19     Q  Is that E-S-C-U-C-H-E-O-N?
20     A  E-S-C-U-T-C-H-E-O-N, a plumbing term.
21         Then on page 26, there's again very, very
22  heavy abnormal black corrosion and pitting on the
23  kitchen sink valve and on the handheld spray nozzle.
24         And on page 27, there's very heavy black
25  corrosion at a copper water hammer arrester located

109

1  directly under the kitchen sink.
2         So aside from an odd wire here and there, the
3  heaviest corrosion is close to water fixtures involving
4  disbursal of water.
5      MR. SULLIVAN:  Sorry, just so the record is
6  clear, did you want him to go through the other
7  reports now or do you -- you asked him to look at
8  each one, so...
9      Q  Let's just start with Nutting and stay there
10  for a moment.
11         Did you reach the conclusion that the cause of
12  the corrosion in the Nutting home was water?
13     A  Yes.
14     Q  If it is in fact the case that the cause of
15  the corrosion in the Nutting home was water, how do you
16  explain location 18, which is in a bedroom, and it
17  appears to be very far from any water?
18     MR. SULLIVAN:  Objection to form.
19     A  Well, the gases that cause the corrosion are
20  distributed throughout the house by the central heating
21  and cooling system, which is very effective at moving
22  the air around inside the house.  That's the reason that
23  we have corrosion all over the house, because we're
24  distributing the gas all over the house with that
25  central system.

28  (Pages 106 to 109)

110

1    The amount of corrosion that you have at an
2    area is going to depend on how much, or what the level
3    of exposure is.  At a receptacle box over here versus
4    one over there, that level is going to vary.
5    It might vary from room to room depending on
6    what volume of air is being delivered in the room, and
7    it might vary from even within the room, based on how
8    airtight that box is or not compared to another one.
9    Q    Did you do any mapping of the HVAC system in
10   the houses to help explain the situations where there
11   was corrosion that appeared to be far away from water
12   sources?
13   MR. SULLIVAN: Objection to form.
14   A    No.
15   Q    Did you do any testing in any of the houses to
16   measure the output of the HVAC systems in areas where
17   you saw corrosion that was far from water sources?
18   MR. SULLIVAN: Objection to form.
19   A    No.  There would be no value to either of
20   those determinations.
21   Q    You said that a possible explanation for the
22   heavy corrosion that you observed at location 18 on page
23   17 could be the distribution of air through the HVAC
24   system; is that right?
25   A    What I said was that assuming that the source

111

1    of the reactive sulfur compounds is the water, you're
2    going to disburse that into the air by running water,
3    taking a shower, running the washing machine, bathing,
4    whatever, and you're going to disburse that at very,
5    very high concentrations.
6    In fact, we demonstrated that closing the door
7    and running the shower, you get levels in the air that
8    are 1,000 times higher than those associated with homes
9    with corrosive drywall.
10   So given that we're disbursing these compounds
11   into the air, all of these houses have central heating
12   and cooling systems, which are going to move every cubic
13   foot of air in that house through the air handler and
14   disburse the material relatively evenly throughout the
15   house.
16   And we can, for the sake of discussion, assume
17   that that dispersion is going to be equal.  It may vary
18   slightly, again, but it's really going to be pretty
19   equal, because we're talking about very, very small
20   quantities of material disbursed in large, large volumes
21   of air.
22   Q    Doesn't the air conditioning system remove
23   humidity and water from the air?
24   MR. SULLIVAN: Objection to form.
25   A    The air conditioning system removes water

112

1    vapor from the air.
2    Q    So how could the air conditioning system then
3    be an explanation for corrosion that we see on the other
4    side of the house far away from the water source?
5    MR. SULLIVAN: Objection to form.
6    A    Because the air on the other side of the house
7    doesn't stay there.  The air in this room doesn't stay
8    there.
9    If, for example, in this room, we've got --
10   you can't see them, they're up on the wall here --
11   there's two supply registers that pump air in, and
12   there's a return register over here that takes air out.
13   So if we're pumping in -- I'm going to guess
14   this is probably pumping in about 450 feet cubic feet,
15   let's say -- yeah, 450 cubic feet per minute of air,
16   that same volume is going out.  Well, eventually every
17   molecule of air in this room is going out, and it's
18   going back to the central point where it's disbursed to
19   all of the other areas.
20   So if you were to -- if you never changed the
21   volume of a substance in the air.  For example, if we
22   didn't go in a house and take a shower, and we measured
23   the concentration of a particular substance in the air
24   with the central system running for a period of time,
25   it's going to be even all over the house.

113

1    Q    So turning to page 35 for a second, the first
2    bullet point at the bottom there, you say, There's even
3    heavy corrosion of metals near sources of water; is that
4    right, is that what you said in your report for the
5    Nutting house?
6    A    Yes.
7    Q    So if the explanation for why a place like
8    location 18 has heavy blackening is that the water
9    disburses evenly throughout the house over time, why are
10   you making this point about there being heavy corrosion
11   near sources of water in your conclusions?
12   MR. SULLIVAN: Objection to form.
13   A    The water doesn't disburse through the house.
14   Your question makes no sense.
15   Q    So what disburses through the house then?
16   A    Gases in the air, such as reactive sulfur
17   compounds that cause corrosion of copper.
18   Q    So if the gases distribute evenly through the
19   house, why wouldn't you expect to see the corrosion be
20   even throughout the house?
21   MR. SULLIVAN: Objection to form.
22   A    Because I said they would be even if we
23   introduced no -- nothing else into the house.
24   Say we have a quantity of -- let's just for
25   argument's sake -- say hydrogen sulfide gas.  I bring a

29  (Pages 110 to 113)

114

1    gallon container into the house and open it up, and we
2    run the central system.  After running it for a
3    relatively short period of time, that substance, that
4    hydrogen sulfide gas would be disbursed evenly
5    throughout the house.
6        Now, the exposure to a given piece of metal
7    behind a wall may vary somewhat, again, depending on how
8    much air can get to that metal.
9        But that's not what happens in a house.  In a
10   house, we're going to constantly introduce the substance
11   or reintroduce the substance by bathing, doing the
12   laundry, taking a shower, washing the dishes, filling
13   the dog's water bowl.  All of those substances are going
14   to constantly introduce more of the hydrogen sulfide
15   into the air, so the concentrations are not going to be
16   even.
17       And also, that central system is not going to
18   run continuously.  It might run continuously on a hot
19   summer afternoon, but it will cycle on and off during
20   the day, so you get varying degrees of exposure at
21   different points in time at different locations.
22       Q   So over an extended period of time, months or
23   years, even though the gases may dissipate, they're
24   going to be in higher concentrations in certain areas?
25       A   At certain points in time, and talking

115

1    specifically about receptacles, which I think that's
2    what your question was about ten questions ago, the
3    exposure would be governed by how much air can get into
4    that receptacle box, how much air containing that
5    corrosive substance gets into that box.
6        Some of them are going to be very loose, some
7    of them are going to be tighter.  If they are on an
8    outside wall, for example, there typically would be
9    foam -- in a relatively modern house anyway, which all
10   of these are.  There would be foam insulation in many
11   cases around that box, or the hole in the wall behind
12   the box that would tend to make the box more airtight.
13   So box A might allow more gas into it than box B.
14       Q   Did you do any testing in any of the five
15   houses to determine air exposure for any of the various
16   receptacles?
17       MR. SULLIVAN:  Objection to form.
18       A   No.
19       Q   Looking at location 18 on page 17, do you see
20   any area on that ground wire that is not heavily
21   corroded?
22       A   No.  That's why -- well, I take that back.
23   Directly above the green screw, there's a small area
24   there where the copper is shining.
25       Q   You see an area on location 18 where the
     copper is shining?

116

1        A   Yeah.  It's directly above the screw, that
2    little spot right there.
3        Q   And you characterize that area as new penny
4    shiny?
5        MR. SULLIVAN:  Objection to form,
6    mischaracterizes testimony.
7        A   I would characterize it as less corroded than
8    the remainder of the wire that's not near the screw.
9        Q   I'm sorry if I'm moving slowly on this point,
10   but if you could help me understand.  This appears to be
11   sort of as far as any receptacle is in the house from a
12   water source.  How do you account -- if the water is the
13   cause of the corrosion, how do you account for the level
14   of corrosion we see on this wire?
15       MR. SULLIVAN:  Objection to form, assumes
16   facts not in evidence.
17       A   I just answered that question for you.  I'm
18   not going to answer it again.
19       MR. SULLIVAN:  Objection, asked and answered.
20       Q   Looking at bullet one on page 35, you say,
21   There's very heavy corrosion of metals near sources of
22   water.  What I'm trying to figure out is why you would
23   make that statement if there's heavy corrosion in areas
24   that are not near sources of water.
25       MR. SULLIVAN:  Objection to form.  You can ask

117

1    him a question.
2        MR. ANDERSON:  I did ask him a question.
3        MR. SULLIVAN:  You said what you're trying to
4    figure out.  That's a statement.  You have to ask
5    him a question.
6        (Record read back.)
7        MR. SULLIVAN:  Same objection.
8        A   I would make that statement because it's true,
9    and the amount of corrosion that was heavy that was not
10   near water is insignificant.
11       Q   So for purposes of the conclusions that you
12   reached, the corrosion that was in areas not near water
13   was insignificant?
14       MR. SULLIVAN:  Objection to form,
15   mischaracterizes testimony.
16       A   The level of corrosion on the wires varies in
17   all of these houses.
18       The only place where I have seen the level of
19   corrosion not varying is houses that have corrosive
20   drywall, where it's all very heavily corroded.
21       So the fact that there's some variations in
22   the corrosion of the wires is not surprising if the
23   drywall is not the source.
24       Q   And it doesn't undermine your theory that the
25   water is the cause of the drywall at all?

30  (Pages 114 to 117)

**118**

1    MR. SULLIVAN:  Objection to form.
2    A    Not at all.
3    Q    Now --
4    A    And again, my opinion, up to the point that we
5    get the evidence to prove that the water has high levels
6    of sulfides in it is just -- it's a hypothesis up to
7    that point.
8    Q    So --
9        MR. SULLIVAN:  Can we take a break?  You can
10   ask your question if you want.
11       MR. ANDERSON:  No, that's totally fine.
12       VIDEOGRAPHER:  We are going off the record at
13   2:27.
14       (A short recess was taken.)
15       VIDEOGRAPHER:  We are now going back on the
16   record at 2:34.
17   Q    Mr. Cramer, if I can direct your attention to
18   page 35, to the second bullet point which comes below a
19   statement by you.  It says:
20       Aside from the scientific evidence that points
21   to sulfide in the water as the source of corrosion,
22   observational evidence also leads to the conclusion that
23   the water is the source.
24       Now, you didn't gather any of the scientific
25   evidence that pointed to sulfide as the source of the

**119**

1    corrosion, did you?
2        MR. SULLIVAN:  Objection to form.
3    A    No.
4    Q    So your expertise in this case for all five
5    houses was limited to observational evidence; is that
6    right?
7        MR. SULLIVAN:  Objection to form.
8    A    Yes.
9    Q    Okay.  So let's focus for a second on the
10   second bullet point:
11       The lack of corrosion in the garage electrical
12   panel and receptacle indicate a source other than the
13   drywall, which is present on the garage ceiling.
14       Can you just explain to me what you mean by
15   that?
16   A    Yes.  There's drywall in the garage, there's
17   metal in the garage, in the electrical panel and
18   receptacles, and we would typically, in a house with --
19   I would typically in a house with corrosive drywall
20   expect to see some corrosion on the copper in that
21   receptacle in that electrical panel.
22       There is some drywall inside a garage.  Aside
23   from the ceiling, typically the back wall of the garage
24   is going to be drywall also.
25   Q    In the Nutting house, was the back wall

**120**

1    drywall?
2    A    If you flip back to page 5 and look at the
3    drawing of the house --
4    Q    Yes.
5    A    -- the right wall would be concrete block, the
6    back wall above the word panel would be drywall, and the
7    wall to the left of the air handler, which is designated
8    AH, that wall would also be drywall, and the ceiling,
9    the entire ceiling in the garage would be drywall.
10   Q    Are there any photographs that you took that
11   show drywall being present anywhere but on the ceiling
12   in the garage?
13   A    I don't believe so.
14   Q    Okay.  And in bullet two, the only reference
15   that you made to there being drywall in the garage is
16   just that it's present on the ceiling, right?
17   A    Yes, and I believe I made that reference
18   because that was -- that was the location where we
19   actually sampled National Gypsum drywall in that room,
20   was on the ceiling.
21   Q    Page 22.  You refer to location one as the --
22   you refer to the black corrosion as abnormal black
23   corrosion.  What do you mean when you say abnormal?
24   A    Based on my experience looking at thousands of
25   plumbing fixtures, that corrosion is abnormal.  It's not

**121**

1    something that I would see -- if I saw it I would be --
2    it would raise a really big red flag.
3    Q    So the presence of black corrosion on a sink
4    spout aerator is something that would raise a really big
5    red flag for you if you inspected a house?
6        MR. SULLIVAN:  Objection to form.
7    A    That particular type of corrosion, that
8    appearance, yes.
9    Q    Are you able to differentiate when you look at
10   a photograph of a corroded sink fixture like this one in
11   the Nutting house and a corroded sink fixture in a house
12   that's got corrosive Chinese drywall?
13       MR. SULLIVAN:  Objection to form, assumes
14   facts not in evidence, calls for speculation.
15   A    I don't really know how to answer that
16   question, no.
17   Q    And maybe I can rephrase it, because what I'm
18   asking is, if you look at corrosion, is there -- is
19   there a difference in appearance between corrosion
20   that's caused by water and corrosion that's caused by
21   corrosive Chinese drywall?
22       MR. SULLIVAN:  Objection to form.
23   A    If the source of the corrosion is reactive
24   sulfur gases, whether they're coming from the drywall or
25   the water, if it's the same gas, the corrosion would

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

122

1   tend to be very similar, putting aside any differences
2   that might result from, you know, what type of coating
3   is on this metal fixture versus this one over here.
4   There's going to be variations regardless.
5       Q   I can appreciate that.  I guess really what
6   I'm focusing on is if you see corrosion in a house
7   that's caused by water, and you see corrosion in a house
8   that's caused by the drywall, if you look at those two
9   pieces of corrosion on an identical thing in both
10  houses, are you able to differentiate in the appearance?
11          MR. SULLIVAN:  Objection to form, assumes
12      facts not in evidence, calls for speculation.
13      A   No.
14      Q   Now, you said a moment ago if you saw
15  corrosion like this in a house that you were inspecting,
16  it would raise a really big red flag, right?
17      A   Yes.
18      Q   It sounds like the majority of your career as
19  an inspector has not really been devoted to litigation,
20  right?
21          MR. SULLIVAN:  Objection.
22      A   Correct.
23      Q   Most of the time you're inspecting a house for
24  someone who's a prospective purchaser, right?
25      A   Correct.

123

1       Q   So if you went into a house and saw black
2   corrosion like this, and you say it would raise a really
3   big red flag, would you encourage your customer not to
4   purchase the house?
5           MR. SULLIVAN:  Objection to form.
6       A   Based on a single fact?  Regardless of the
7   fact, I wouldn't encourage -- I wouldn't advise them one
8   way or another.  In the majority of cases, I wouldn't
9   advise them or give them that advice in any case.
10  That's not my duty.
11      Q   You've made inspections in the last few years
12  of homes that have corrosive Chinese drywall; is that
13  right?
14      A   Yes.
15      Q   And if you were hired to do an inspection of a
16  home by a client who was considering purchasing a house,
17  and you found Chinese drywall that was corrosive in that
18  home, what would you tell the person that hired you?
19          MR. SULLIVAN:  Objection to form, calls for
20      speculation.
21      A   It would depend.
22      Q   On what?
23      A   On whether or not, one, they knew the drywall
24  was there and intended to purchase the house in any case
25  or not.

124

1       Q   That's fair.  So let me ask you the question
2   this way.  If two houses are next to one another in a
3   subdivision and they're exactly the same size, one has
4   corrosive drywall and one doesn't, and they're on the
5   market for the same price, would you encourage your
6   customer to purchase one house over the other?
7           MR. SULLIVAN:  Objection to form.
8       Q   All things being equal?
9           MR. SULLIVAN:  Objection to form, assumes
10      facts not in evidence, calls for speculation.
11      A   The job of an inspector is not to encourage
12  the client to do anything or discourage them from doing
13  anything.  It's to provide information that they can use
14  to make a decision.  The decision is theirs.
15      Q   How could you counsel someone if you
16  identified -- strike that.
17          In the course of your work as a home
18  inspector, have you been asked to inspect homes for
19  prospective purchasers that contained what you believed
20  to be corrosive Chinese drywall?
21      A   Yes.
22      Q   And what information did you provide those
23  prospective customers about the house that contained
24  corrosive Chinese drywall?
25          MR. SULLIVAN:  Objection to form, calls for

125

1   speculation.
2       A   I would report where I observed corrosion and
3   what it appeared to be.  I would report whether or not I
4   observed drywall that was marked made in China on the
5   back of it in the attic, which is about the only place
6   I'm going to have any possibility of seeing it during
7   the home inspection, and then I would advise them to
8   make a further, more detailed investigation to determine
9   the cause of the corrosion and to confirm that the
10  Chinese drywall, which is a known possible source of
11  corrosion, is the actual source of the corrosion.
12      Q   And I want to take it out of the realm of
13  speculation.  I mean, you said a moment ago that you've
14  done inspections for prospective purchasers where the
15  home actually had corrosive Chinese drywall, so let's
16  focus on that for a second.
17          When's the last time you inspected a home for
18  a prospective purchaser where you identified what you
19  believed to be corrosive Chinese drywall in the home?
20      A   A couple months ago maybe.
21      Q   Where was that?
22      A   Latter part of last year, let's say.
23  South Tampa.
24      Q   And summarize if you would for me, in general
25  terms, what did you tell the folks who were considering

32  (Pages 122 to 125)

126

1   purchasing that house?
2       A   This particular house had an outbuilding which
3   was a garage, a detached garage, with an apartment above
4   it, a mother-in-law's apartment, and it was suspected
5   that there was Chinese drywall inside there.
6           There had been a previous inspection.  The
7   deal had fallen through.  Someone had looked at every
8   receptacle in the house and found no corrosion, except
9   at one receptacle in one room, so I inspected the house
10  as I normally would.
11          I also looked for signs of corrosion in the
12  two air handlers inside the house and at receptacles in
13  various areas and things like plumbing valves, like
14  shown in the Nutting case, and around plated light
15  fixtures, door hinges, things like that.
16          Finding none, I advised them that the only way
17  we could really tell, or they could tell for sure is to
18  cut a sample out of every single board and send it to a
19  laboratory and have it analyzed, and a more reasonable
20  method of proceeding might be to screen, or assume the
21  drywall in the outbuilding is corrosive and get rid of
22  it and screen the drywall inside the house with an XRF,
23  and use that information to attempt to locate any
24  corrosive drywall that might be in the house.
25      Q   It sounds like in this instance it was the

127

1   inlaw suite that most likely had Chinese drywall, and I
2   guess I'm asking a slightly different question, which
3   is, have you inspected any homes where the home itself,
4   the home proper, had corrosive, or what you believe to
5   be corrosive drywall?
6       A   Yes.
7       Q   And when was that?
8       A   I couldn't give you exact dates, but since
9   about 2005, a bunch of them.  Handfuls.  Again, looking
10  for corrosive drywall became pretty much every -- not
11  every day, but a common activity for home inspectors who
12  had clients purchasing homes built during that period of
13  time.
14      Q   Why was it such an important thing to look
15  for?
16      A   Because if you buy it, you're basically out of
17  luck financially.
18      Q   What do you mean when you say out of luck
19  financially?
20      A   Exactly what I said here.  You're going to be
21  out a lot of money.
22      Q   Is there a practical difference in your
23  experience between the corrosion caused by hydrogen
24  sulfide coming from water versus hydrogen sulfide coming
25  from corrosive Chinese drywall?

128

1           MR. SULLIVAN:  Objection to form.
2       A   I'm sorry, would you repeat that?
3           MR. ANDERSON:  Could you read it back.
4           (Record read back.)
5       A   Do you mean a difference in the appearance, do
6   you mean a difference in the amount, do you mean a
7   difference in the locations?  There are many differences
8   that could be present.  I'm not -- you have to be a
9   little more specific than that.
10      Q   Okay.  Well, you said if you purchased a house
11  that had corrosive Chinese drywall, you would be out of
12  luck financially.  If you purchased a house that had
13  corrosive water, would you be out of luck financially?
14          MR. SULLIVAN:  Objection to form.
15      A   No.
16      Q   Why not?
17      A   Because that's a problem you could remediate
18  relatively inexpensively.
19      Q   And what would be the remediation process?
20      A   You could install an aeration system that
21  actually works.
22      Q   So putting aside the Retana house for a
23  moment, would it be accurate to say that if you were
24  advising --
25      A   I'm sorry.  We were talking about Nutting.

129

1       Q   Right.  Putting aside the Retana house in
2   which you identified Chinese drywall, so focusing for a
3   moment on Brucker, Ravelo, Nutting, and Brincku, is it
4   your position that installing an aerator would solve the
5   problems in all four of those homes?
6           MR. SULLIVAN:  Objection to form.
7       A   If you installed an aeration system that
8   worked, that was adequate in capacity, and that -- and
9   you maintained in working order, then you could
10  eliminate the problem.
11          You would not correct the corrosion that
12  occurs, but the only significant effect there might be
13  an evaporator coil that was corroded and developed a
14  hole as a result of the corrosion that you would then
15  have to replace, aside from cosmetics.
16      Q   Now, are there any established protocols in
17  the State of Florida for remediation of corrosion
18  resulting from failing aerators?
19          MR. SULLIVAN:  Objection to form.
20      A   No.
21      Q   Mr. Cramer, in your 23 years, have you ever
22  seen any houses -- putting aside for a moment the houses
23  with corrosive Chinese drywall -- have you ever seen any
24  houses with corrosion as significant and extensive as
25  that in the Nutting house?

33  (Pages 126 to 129)

130

```
 1            MR. SULLIVAN:  Objection to form.
 2       A   I have seen similar corrosion, yes, on
 3  plumbing fixtures in houses with well water.
 4       Q   And when was that?
 5       A   I could not give you a specific date or name
 6  or case, but I do recall seeing corrosion like that.
 7       Q   So you have seen a home that had corrosion as
 8  extensive as that in the Nutting house?
 9            MR. SULLIVAN:  Objection, asked and answered.
10       A   You just asked me that question.
11       Q   I just want to make sure I'm clear.
12            MR. SULLIVAN:  Objection, asked and answered.
13       A   I have seen corrosion very similar to that in
14  other houses, yes.
15       Q   Did you identify corrosion on the electrical
16  receptacles in that house?
17       A   At that point in time, no.  It was not a
18  thought that would even have occurred to me, because
19  this was prior to the introduction of Chinese drywall.
20       Q   How about on the electrical panel?
21       A   Again, I don't recall specifically.
22       Q   Outside of the homes you have seen with
23  corrosive Chinese drywall, in 23 years, how many homes
24  would you say you have seen with corrosion as extensive
25  as the Nutting home?
```

131

```
 1            MR. SULLIVAN:  Objection to form, calls for
 2  speculation.
 3       A   A few.
 4       Q   Less than five?
 5       A   I would be guessing, but I'll go along with
 6  that.  And keep in mind that the majority of the houses
 7  I look at are not on wells, they are on municipal water
 8  supplies, so a very small percentage of houses I look at
 9  would there even be the possibility of this type of
10  corrosion.
11       Q   This is essentially the same question, but
12  with respect to the Brincku home, in your 23 years, have
13  you seen -- aside from the corrosive Chinese drywall
14  houses -- have you seen homes with corrosion as
15  extensive as that in the Brincku home?
16            MR. SULLIVAN:  Objection to form.
17       A   Corrosion of what?
18       Q   Corrosion of metals.
19       A   I have seen in plumbing fixtures that
20  corroded.
21       Q   And you say you've seen roughly five house
22  give or take?  I'm not holding you to that exact number.
23       A   You asked me that question five minutes ago.
24  I answered it already.
25       Q   How old were the houses that you saw that had
```

132

```
 1  corrosion as extensive as the Nutting house?
 2       A   No idea, and I don't recall specifics of any
 3  of those houses.
 4       Q   So the only basis for your comparison that you
 5  have with these homes is houses that you can't remember
 6  where they were; is that right?
 7       A   No.
 8       Q   No, it's not right?
 9            MR. SULLIVAN:  Objection to form.
10       Q   Okay.
11            MR. SULLIVAN:  Mischaracterizes the testimony.
12       A   The basis that I have for comparison of these
13  houses is the thousands of other houses that I have
14  looked at that do not have corrosion, and the very small
15  number that I've looked at that do have similar
16  corrosion.  That's the basis for my comparison and my
17  evaluation of these houses.
18       Q   I'm focusing at this time on the houses that
19  you've seen that do have corrosion like this, because
20  you told me you have seen homes that have corrosion as
21  extensive as the corrosion in these homes, so I'm simply
22  asking you whether or not you can identify for me even
23  one of those homes.
24       A   No, I can't.
25       Q   And can you identify for me what decade you
```

133

```
 1  saw any of these homes in?
 2            MR. SULLIVAN:  Objection to form, calls for
 3  speculation.
 4       A   No.
 5       Q   Mr. Cramer, on page 35, can you read the third
 6  paragraph for me.  When I say page 35, I mean of the
 7  Nutting report.
 8       A   Laboratory analysis of the water samples
 9  reveals the presence of high levels of sulfide in the
10  water, almost two times higher than is acceptable for
11  public well water, according to Chapter 62.555.315 of
12  the Florida Administrative Code.
13       Q   So you didn't conduct the laboratory analysis
14  that found the level of sulfide in the water in the
15  Nutting home?
16            MR. SULLIVAN:  Objection to form.
17       A   No.
18       Q   But you reviewed the report and you were able
19  to recognize that the level was almost two times higher
20  than the acceptable public well water limit?
21       A   Yes.
22       Q   Okay.  If one of the Nuttings' neighbors had
23  no aerator and they were on the same well as the
24  Nuttings, would you expect to see similar corrosion in
25  their home?
```

34   (Pages 130 to 133)

**134**

1    MR. SULLIVAN: Objection to form, assumes
2    facts not in evidence, calls for speculation.
3    A    That is not a condition that would ever occur.
4    Q    Why is that?
5    A    They wouldn't be on the same well.
6    Q    Why wouldn't they be on the same well?
7    A    Because every property has its own well.
8    Q    Okay.
9    A    Unless you have a community water system or a
10   municipal water supply.
11   Q    Would they likely be on the same aquifer?
12        MR. SULLIVAN: Objection, assumes facts not in
13   evidence, calls for speculation.
14   A    I wouldn't know.  I wouldn't know, you know,
15   how deep this well was versus this one.  I wouldn't be
16   able to answer that.
17   Q    So if the Nuttings' next door neighbor had no
18   aerator and they were on the exact same aquifer, would
19   you expect to see corrosion similar in their house as
20   what you saw in the Nutting house?
21        MR. SULLIVAN: Objection to form, assumes
22   facts not in evidence, calls for speculation.
23   A    I would have to inspect their house to make
24   any determination.  I wouldn't speculate about any
25   possibilities.

**135**

1    Q    Why would you need to inspect the house?
2    A    Because you can't form an opinion about
3    something until you gather all the relevant facts.
4    Q    And you believe you gathered all the relevant
5    facts in this case?
6    A    Yes.
7        MR. SULLIVAN: Objection to form.
8    Q    Assuming for a second that you went to the
9    Nuttings' next door neighbor and they had no aerator and
10   they were on the same aquifer and they had no corrosion,
11   would that undermine the conclusions that you've reached
12   in this case?
13        MR. SULLIVAN: Objection to form, assumes
14   facts not in evidence, calls for speculation, asked
15   and answered.
16   A    No.
17   Q    No, it would not undermine the conclusions
18   that you reached?
19   A    No.
20   Q    Why not?
21   A    The conclusions I reached here are independent
22   of any information I might gather over here.
23   Q    But wouldn't you expect if the circumstances
24   were otherwise equal and the water's the cause and it is
25   the same water in the house next door that you would see

**136**

1    the same result?
2        MR. SULLIVAN: Objection to form, assumes
3    facts not in evidence, calls for speculation, asked
4    and answered.  Now it's getting argumentative.
5    A    No.  I would have to inspect the other house
6    and do the same kind of analysis, look at all the
7    various factors that might be there.  They might have
8    Chinese drywall in that house, who knows.  The moon
9    might be made out of blue cheese or green cheese.  I
10   don't know until I look.
11   Q    Okay.  Going down to the paragraph that
12   begins, This home does not have an aerator to remove
13   sulfides.  Can you read that paragraph for me, please.
14   A    This home does not have an aerator to remove
15   sulfides.  Driving through the neighborhood, I observed
16   that many of the homes in this area do have aerator
17   tanks, indicating that sulfides are present in the water
18   in this area.
19   Q    When did you make that observation?
20   A    Driving out of the neighborhood.
21   Q    So you made that observation as you left?
22   A    Yes.
23   Q    So you recognize that there were some homes in
24   the neighborhood that in fact did not have aerator
25   tanks?

**137**

1    A    Correct.
2    Q    And did you inquire of any of the neighbors
3    that had no aerator tanks whether or not they had
4    corrosion in their homes?
5        MR. SULLIVAN: Objection to form.
6    A    Do you really think on a Saturday morning I'm
7    going to knock on some stranger's door and ask them if
8    they have an aerator tank or not and why or why not they
9    may have one?  In other words, no.
10   Q    Would you expect to see corrosion in those
11   homes that had no aerator in the neighborhood that you
12   observed?
13        MR. SULLIVAN: Objection to form, assumes
14   facts not in evidence, calls for speculation, asked
15   and answered.
16   A    I wouldn't expect anything.
17   Q    On page 35 of the Nutting report, are these
18   three bullets the only observations that you made that
19   are not derived from the work of others?
20        MR. SULLIVAN: Objection to form.
21   A    I want to read through the whole report before
22   I answer that question.
23   Q    Okay.
24   A    I'll be back in a half hour or so.
25   Q    Okay.

35  (Pages 134 to 137)

138

```
1        VIDEOGRAPHER:  Do you want to go off the
2   record?
3        Counsel?  Are we going off the record --
4        MR. SULLIVAN:  No.  He's staying on the
5   record.
6        VIDEOGRAPHER:  -- while he reads it?
7        THE WITNESS:  There is one other factor that I
8   didn't mention there, and that's the fact that
9   there's no drywall observed that's known to be
10  corrosive, such as drywall manufacturers in China
11  by certain manufacturers.
12       Q   And how did you determine that the drywall was
13  not corrosive?  In other words, isn't that conclusion
14  derived from the testing that other experts in this case
15  conducted?
16       MR. SULLIVAN:  Objection to form.
17       A   The conclusion is derived from my observations
18  and the observations of the other experts.
19       Q   Right.  The question that I asked before
20  though was whether these three bullets represented the
21  conclusions that you arrived at independently, not that
22  you derived from the other experts in the case.  Didn't
23  you rely upon, for example, Columbia Analytical Services
24  regarding the corrosive or noncorrosive nature of the
25  drywall?
```

139

```
1        MR. SULLIVAN:  Objection to form.
2        A   Those bullet points aren't my conclusions.
3   They're points of evidence that lead to the conclusion.
4   The other point that I omitted is that there's no
5   drywall in the house that's known to be corrosive.
6        Q   Right.  But what I'm asking is, how is it that
7   you came to form the opinion that there is no corrosive
8   drywall in the house?
9        MR. SULLIVAN:  Objection to form, asked and
10  answered.
11       A   By reading the results of laboratory testing
12  for the possibility of corrosion.
13       MR. ANDERSON:  Let's take a brief break.  I'm
14  not sure I have a whole lot more.  I want to take a
15  quick look and circle back.
16       VIDEOGRAPHER:  Counsel, there's 15 minutes
17  left.  Do you want me to change it now while you're
18  on a break?
19       MR. ANDERSON:  If I'm finished soon, Tom --
20       MR. SULLIVAN:  I may have a few minutes of
21  follow-up.
22       MR. ANDERSON:  It's just a question of how
23  long --
24       VIDEOGRAPHER:  You let me know whether you
25  want me to change it or not.
```

140

```
1        MR. ANDERSON:  Why don't you go ahead and
2   change it, just to be on the safe side so we don't
3   have to interrupt the flow of things.
4        VIDEOGRAPHER:  This marks the end of videotape
5   number two.  Now going off the record at 3:12.
6        (A short recess was taken.)
7        VIDEOGRAPHER:  This marks the beginning of
8   videotape number three.  Now going back on the
9   record at 3:19.
10       MR. ANDERSON:  Mr. Cramer, I want to thank you
11  for your patience, and at this time, I have no
12  further questions.
13       MR. SULLIVAN:  I have a few questions.
14            CROSS-EXAMINATION
15  BY MR. SULLIVAN:
16       Q   Mr. Cramer, Mr. Anderson asked you a number of
17  questions relating to descriptions that you provided in
18  connection with certain photographs in your reports.  Do
19  you recall those questions?
20       A   Yes.
21       Q   And I think in response to a couple of those
22  questions, you mentioned that your descriptions were in
23  some respects subjective.  Do you remember that
24  testimony?
25       A   Yes.
```

141

```
1        Q   When you used the word subjective, am I right
2   that what you were trying to suggest, what you were
3   trying to explain, is that these descriptions are rooted
4   in and informed by your experience over the course of 23
5   years in viewing and inspecting residences?
6        MR. ANDERSON:  Objection to form.
7        A   Yes, and specifically based on looking at
8   copper wire, bare copper wire, which, as a home
9   inspector, is an everyday occurrence.
10       Q   Let me ask the question another way just to
11  meet the objection.
12            What is the connection between your experience
13  and your use of the word subjective to characterize some
14  of those descriptions?
15       A   Well, I would want to say subjective, I mean
16  that based on my experience looking at bare copper wires
17  in almost every house that I inspect.  I have an opinion
18  of what a normal copper wire would look like in a house,
19  and based on my experience looking at heavily corroded
20  copper wires in houses that we have discovered have
21  corrosive Chinese drywall, I know what very heavily
22  corroded wire looks like.
23            The use of words in between no corrosion and
24  heavy corrosion are -- they're somewhat subjective.  I
25  haven't created a scale of one, two, three, four, five,
```

36  (Pages 138 to 141)

142

1 six, seven degrees of corrosion, eight degrees, nine or
2 ten degrees. There's some overlap in the area between
3 minor and moderate --
4    **Q Okay. But --**
5    A -- and moderate and heavy.
6    **Q Were the words that you were using to describe**
7 **distinctions between the observations of the corrosion**
8 **informed by your experience?**
9    MR. ANDERSON: Objection to form.
10    A Yes.
11    **Q Mr. Cramer, you, I think, note in several of**
12 **your reports, you note the degree of corrosion in**
13 **certain areas, specifically in areas that are close to a**
14 **source of water, am I right about that?**
15    MR. ANDERSON: Objection to form.
16    A Yes.
17    **Q Okay. What is the significance of the degree**
18 **of corrosion of components that are close to sources of**
19 **water?**
20    MR. ANDERSON: Objection to form.
21    A Well, if the corrosion of exposed metals is
22 heavier near those sources of water, then that leads you
23 to the possibility that the water is the source of --
24 the substance that's causing the corrosion.
25    **Q Was that an observation that was generally**

143

1 **consistent for the houses in which you determined that**
2 **water was the source of the corrosion?**
3    MR. ANDERSON: Objection to form.
4    A Yes.
5    **Q Mr. Cramer, counsel suggested -- when counsel**
6 **was asking you questions about the descriptions of the**
7 **photos that you had prepared based on your experience,**
8 **he suggested that they didn't have value. Do you**
9 **remember that comment?**
10    MR. ANDERSON: Objection to form.
11    A I'm not sure that I do, no.
12    **Q Well, let me ask you this. Can you explain in**
13 **general terms, based on your 23 years of experience and**
14 **your experience in dealing with these kinds of issues,**
15 **what the value is of the descriptions that you prepared**
16 **in connection with your reports in this case?**
17    MR. ANDERSON: Objection to form.
18    A Well, the fact that there is corrosion is
19 really the substance of the matter. The degree of the
20 corrosion is not really all that significant. You,
21 again, expect to find more near water if that's the
22 source. You expect to find more in receptacles and
23 switches if the drywall is the source.
24    But the significance is really that there is
25 corrosion. The rest is just a matter of degrees of

144

1 corrosion. There shouldn't be any corrosion. And when
2 you expose metals to drywall that's not corrosive, in
3 the absence of reactive sulfur gases from well water,
4 you don't get corrosion.
5    **Q When those metals are exposed to reactive**
6 **sulfur gases from well water, you can get corrosion, am**
7 **I right about that?**
8    MR. ANDERSON: Objection to form.
9    A Correct.
10    MR. SULLIVAN: No further questions.
11           REDIRECT EXAMINATION
12 BY MR. ANDERSON:
13    **Q Mr. Cramer, you said that your observations**
14 **about corrosion in these houses was informed by the 23**
15 **years that you've spent as an inspector, right?**
16    A Yes.
17    **Q And in that 23 years as an inspector, how many**
18 **houses, regardless of cause, have you inspected that**
19 **were heavily corroded?**
20    MR. SULLIVAN: Objection to form.
21    A I would say it would be less than a couple
22 dozen.
23    **Q And if a secondary reaction was occurring**
24 **between the hydrogen sulfide and the drywall that was**
25 **causing corrosion, is that something that you have read**

145

1 **about or have any understanding about?**
2    MR. SULLIVAN: Objection, assumes facts not in
3 evidence, calls for speculation.
4    A You would have to be a whole lot more specific
5 than that before I could really answer that question.
6    **Q If sulfur oxidizing bacteria was present in**
7 **the drywall and hydrogen sulfide that was being emitted**
8 **from the water in these houses was reacting, the sulfur**
9 **oxidizing bacteria in the drywall and causing sulfuric**
10 **acid to be caused in the houses, is that a condition**
11 **that you are aware of in any of these homes?**
12    MR. SULLIVAN: Objection to form, assumes
13 facts not in evidence, calls for speculation. He
14 already testified he is not an expert in biology.
15    A Not a question I could answer.
16    **Q So when you say that the cause of the**
17 **corrosion in these homes is hydrogen sulfide being**
18 **emitted from the area, you do so without a background in**
19 **microbiology?**
20    A Correct.
21    MR. ANDERSON: I have nothing further.
22    VIDEOGRAPHER: This concludes this videotaped
23 deposition at 3:28.
24    (The taking of the deposition was
25    concluded at 3:28 p.m.)

37 (Pages 142 to 145)

146

1  RE  : BRUCKER vs NATIONAL GYPSUM
   DEPO OF: MARK CRAMER
2  TAKEN : February 28, 2012
3
4        EXCEPT FOR ANY CORRECTIONS
         MADE ON THE ERRATA SHEET BY
5        ME, I CERTIFY THIS IS A TRUE
         AND ACCURATE TRANSCRIPT.
6        FURTHER DEPONENT SAYETH NOT.
7
         _____
         MARK CRAMER
8
9
10 STATE OF FLORIDA   )
                      ) SS:
11 COUNTY OF HILLSBOROUGH)
12
13     Sworn and subscribed to before me this
14        day of _____, 2012.
15 PERSONALLY KNOWN _____ OR I.D. _____
16
17
         _____
18       Notary Public in and for
         the State of Florida at
19       Large.
20
21 My commission expires:
22
23
24
25

148

1            REPORTER'S DEPOSITION CERTIFICATE
2
3      I, KIM AUSLANDER, Registered Professional
4  Reporter, certify that I was authorized to and did
5  stenographically report the deposition of MARK CRAMER,
6  the witness herein on February 28, 2012; that a review
7  of the transcript was requested; that the foregoing
8  pages numbered from 1 to 152 inclusive is a true and
9  complete record of my stenographic notes of the
10 deposition by said witness; and that this
11 computer-assisted transcript was prepared under my
12 supervision.
13     I further certify that I am not a relative,
14 employee, attorney or counsel of any of the parties, nor
15 am I a relative or employee of any of the parties'
16 attorney or counsel connected with the action.
17     DATED this 2nd day of March, 2012.
18
19
         _____
20       KIM AUSLANDER
         Registered Professional Reporter
21
22
23
24
25

147

1            CERTIFICATE OF OATH OF WITNESS
2
3  STATE OF FLORIDA    )
                       ) SS:
4  COUNTY OF HILLSBOROUGH)
5
6      I, KIM AUSLANDER, Registered Professional
7  Reporter, Notary Public in and for the State of Florida
8  at Large, certify that the witness, MARK CRAMER,
9  personally appeared before me on February 28, 2012 and
10 was duly sworn by me.
11     WITNESS my hand and official seal this 2nd day
12 of March, 2012.
13
14
         _____
15       KIM AUSLANDER, RPR
         Notary Public, State of Florida
16       at Large
17
18 Notary #EE054282
19 My commission expires: 1/10/2015
20
21
22
23
24
25

149

1            INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over carefully
4  and make any necessary corrections. You should state
5  the reason in the appropriate space on the errata
6  sheet for any corrections that are made.
7      After doing so, please sign the errata sheet
8  and date it.
9      You are signing same subject to the changes
10 you have noted on the errata sheet, which will be
11 attached to your deposition.
12     It is imperative that you return the original
13 errata sheet to the deposing attorney within thirty
14 (30) days of receipt of the deposition transcript by
15 you. If you fail to do so, the deposition transcript
16 may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

38  (Pages 146 to 149)

```
                                        150
1              E R R A T A
2
3
4
5        I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE:_____
16   REASON:_____
17   ___ ___ CHANGE:_____
18   REASON:_____
19   ___ ___ CHANGE:_____
20   REASON:_____
21
22   _____    _____
23   WITNESS' SIGNATURE        DATE
24
25
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585