1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION
-------------------------------
CHRIS BRUCKER, TREVER S.
NUTTING, XIOMARA RAVELO,
WILFREDO E. RETANA and
BEATRIX CELSA RETANA,
Individually, and on
Behalf of all others
Similarly situated,                     Case Action No.
                                    2:10-cv-405-FtM-29SPC

          Plaintiffs,


Vs.


LOWES HOME CENTERS, INC.,
A North Carolina
Corporation, and NATIONAL
GYPSUM COMPANY, a
Delaware Corporation,


          Defendants.
-------------------------------

GEORGE BRINCKU AND
BRENDA BRINCKU,

          Plaintiffs,              Case Action No.
                                    2:11-cv-00338-JES-SPC
Vs.

NATIONAL GYPSUM COMPANY,
A Delaware Corporation,


          Defendant.
-------------------------------
                    VIDEOTAPED DEPOSITION OF
                         Richard G. Lewis
                        February 29, 2012
                         Fort Myers, FL
                            8:53 a.m.
Reported By:
Lori L. Bundy, FPR, RPR, CRR, CLR
Job No: 23829

**2**

1  APPEARANCES:
2
3
4
5   For the Plaintiffs:
6       Cuneo Gilbert & LaDuca, LLP
7       507 C Street, N.E.
8       Washington, D.C.  20002
9       (202) 789-3960
10      BY:  WILLIAM H. ANDERSON, ESQ.
11          wanderson@cuneolaw.com
12
13
14  For the Defendant National Gypsum:
15      Morgan, Lewis & Bockius, LLP
16      1701 Market Street
17      Philadelphia, PA  19103-2921
18      (215) 963-5668
19      BY:  THOMAS V. AYALA, ESQ.
20          tayala@morganlewis.com
21
22
23  VIDEOGRAPHER:
24      KEVIN BUNDY, CLVS
25

**3**

1           I N D E X
2   WITNESS:                    PAGE:
3   RICHARD G. LEWIS, PH.D.
    DIRECT EXAMINATION              5
4   BY MR. ANDERSON:
    CROSS-EXAMINATION             138
5   BY MR. AYALA:
    REDIRECT EXAMINATION          144
6   BY MR. ANDERSON:
7
8           E X H I B I T S
9             - - -
10      Description           Page
11  Plaintiffs'   Notice for the deposition in   9
    Exhibit 1       the Brucker, et al., case
12  Plaintiffs'   Notice for the deposition in  10
    Exhibit 2       the Brincku action
13  Plaintiffs'   Report on sulfate-reducing    50
    Exhibit 3       bacteria in environmental
14              samples
    Plaintiffs'   Retana report and appendixes  51
15  Exhibit 4
    Plaintiffs'   Inspection and sampling       51
16  Exhibit 5       report of the Nutting
                    property
17  Plaintiffs'   Inspection sampling report    52
    Exhibit 6       for the Brincku residence
18  Plaintiffs'   Inspection sampling report    53
    Exhibit 7       for the Brucker property
19  Plaintiffs'   Inspection sampling report    53
    Exhibit 8       for the Ravelo property
20  Plaintiff'    Chapter 62-555.315 of the     92
    Exhibit 9       Florida Administrative Code
21  Plaintiffs'   HSA Engineers and Scientists 122
    Exhibit 10      document
22  Plaintiffs'   Consumer Products Safety     133
    Exhibit 11      Commission, summary of
23              contractor's report on
                preliminary microbial
24              assessment on Chinese drywall
25

**4**

1       VIDEOGRAPHER:  This is Video Number 1 of the
2   videotaped deposition of Dr. Richard Lewis taken by
3   the Plaintiffs in the matter George Brincku, et al.,
4   versus National Gypsum Company and Chris Brucker, et
5   al., versus Lowes Home Centers in the United States
6   District Court Middle District of Florida, Fort Myers
7   division, Case Number 2:11 CV 00338 JES SPC and Civil
8   Action Number 2:10 CV 405 FTM 29 SPC.
9       This deposition is being held at 2275 Main
10  Street, Fort Myers, Florida 33901 on February 29th,
11  2012, at approximately 9:23 a.m.  My name is Kevin
12  Bundy from the firm of David Feldman Worldwide, and I
13  am the legal video specialist.  The court reporter is
14  Lori Bundy in association with David Feldman
15  Worldwide.
16      Will counsel please introduce themselves.
17      MR. ANDERSON:  Good morning.  This is Bill
18  Anderson on behalf of the Plaintiffs.
19      MR. AYALA:  Good morning.  Tom Ayala on behalf of
20  New NGC Inc., doing business as National Gypsum
21  Company.
22      For the record, Counsel, can we stipulate that
23  objections except those as to the form of the question
24  are reserved until the time of trial?
25      MR. ANDERSON:  Yes, and just one other point

**5**

1   before we get started.  All of the exhibits that were
2   previously marked, I think, thus far have been passed
3   to Dr. Lewis except Exhibit No. 8, which is right
4   there, and if we want to just put that in his pile.
5       MR. AYALA:  I'm going just to reserve the
6   witness's right to read and sign the deposition, so it
7   doesn't get lost in the shuffle.
8       And as I understand it, this deposition that
9   Dr. Lewis is here to testify at today has been noticed
10  in the case of Brucker versus Lowes Home Centers, et
11  al., as well as the case of Brincku versus National
12  Gypsum Company.
13      And for the sake of efficiency, the parties have
14  agreed to coordinate discovery recognizing that we
15  reserve the right to object to the admissibility of
16  portions of this deposition in another case.
17      MR. ANDERSON:  Agreed.
18      VIDEOGRAPHER:  Will the court reporter please
19  swear in the witness.
20  THEREUPON,
21          RICHARD G. LEWIS, PH.D.,
22  a witness, having been first duly sworn, upon his oath,
23  testified as follows:
24          DIRECT EXAMINATION
25  BY MR. ANDERSON:

2  (Pages 2 to 5)

6

1    Q.  Good morning, Dr. Lewis.  My name is Bill
2    Anderson.  We met a few moments ago, but just formally for
3    the record, and I represent the Plaintiffs in the two
4    actions that Mr. Ayala just referred to.
5        And so when I refer to the Brincku action, will
6    you understand what I mean?
7    A.  Yes.
8    Q.  Okay.  And when I refer to the Brucker action, I
9    mean the action filed by Brucker, Retana, Ravelo, and
10   Nutting?
11   A.  Yes.
12   Q.  And so if I refer to the Brucker action, will you
13   understand what I mean?
14   A.  Yes.
15   Q.  Okay.  If you could please state your name for
16   the record.
17   A.  Richard Briggs Lewis.
18   Q.  And although your counsel, like we already
19   discussed much of this with you in advance, I would like
20   to go over a few of the ground rules for the deposition
21   today.
22       So you understand that you took an oath to tell
23   the truth?
24   A.  Yes.
25   Q.  And although the proceedings might be less formal

7

1    as if we were in court, you understand it's the same oath
2    as if we were in court?
3    A.  Yes.
4    Q.  And if you don't understand a question, you'll
5    tell me?
6    A.  I will.
7    Q.  And if you don't hear a question, you'll let me
8    know?
9    A.  Yes.
10   Q.  Okay.  And so that it will be fair to assume,
11   every time you answer one of my questions today, you'll
12   have heard the question?
13   A.  Yes.
14   Q.  Understood the question?
15   A.  Yes.
16   Q.  And that you're answering truthfully?
17   A.  Yes.
18   Q.  Okay.  If you realize at any point during your
19   testimony today that an answer that you previously gave
20   was either inaccurate or incomplete, you should let me
21   know and you can correct or supplement the answer that
22   you've provided.  Okay?
23   A.  Okay.
24   Q.  All right.  Now, just for the benefit of the
25   court reporter, you realize that today the proceedings are

8

1    being recorded by the court reporter for a transcript?
2    A.  Yes, I realize that.
3    Q.  Okay.  So there are a few things that I would
4    like to go over.  Please make sure your responses are
5    clear and audible, can you do that?
6    A.  I will make every attempt, yes.
7    Q.  Okay.  And you can try to talk slowly for me?
8    A.  Sometimes that's an issue, I'll try to keep it
9    slow.
10   Q.  Okay.  And just like a normal conversation, you
11   need to articulate your response verbally, head nodding
12   and things like that are difficult for the court reporter
13   to record, so you'll be able to answer my questions
14   verbally?
15   A.  Yes.
16   Q.  Okay.  One other point.  Just because a
17   transcript is being made, it's very difficult for the
18   court reporter to record things if you and I talk at the
19   same time.
20       So what I ask is that I will do my best to allow
21   you to finish responding to any question that I pose, and
22   all I ask is that you allow me to finish asking the
23   question; is that fair?
24   A.  Yes.
25   Q.  Okay.  Are you currently on any medications,

9

1    Dr. Lewis?
2        MR. AYALA:  Well, just I object to that question.
3    I think if he -- if you are currently on any
4    medications to affect your ability to testify fairly
5    and accurately today, that would be more appropriate.
6        MR. ANDERSON:  Fair enough.  I'll rephrase.
7    BY MR. ANDERSON:
8    Q.  Dr. Lewis, are you on any medications that would
9    keep you from testifying fully and accurately today?
10   A.  No.
11   Q.  One other point.  If you need a break at any time
12   during the deposition today, just let me know.  The only
13   qualification to that is if there's a question pending, I
14   would ask that you answer the question.  At that point we
15   can take a break.
16       Do you have any questions about the procedure for
17   today's deposition?
18   A.  I don't think so.
19   Q.  Okay.  If we could -- if you could take a look at
20   what the court reporter has marked as Exhibit 1.
21       (Plaintiffs' Exhibit No. 1, Notice for the
22       deposition in the Brucker, et al., case, was marked
23       for identification.)
24   BY MR. ANDERSON:
25   Q.  And do you recognize that document, Dr. Lewis?

3  (Pages 6 to 9)

10

1    A. Yes.
2    **Q. And what is that?**
3    A. My understanding, it's the notice for the
4    deposition in the Brucker, et al., case.
5    **Q. And what do you understand it to mean?**
6    MR. AYALA: Objection to form.
7    THE WITNESS: That there will be a deposition
8    taken at the time and location that's listed on the
9    front page here in regard to the expert opinion that I
10   provided.
11   BY MR. ANDERSON:
12   **Q. Okay. And if you could take a look at what's**
13   **been marked as Exhibit 2.**
14   **(Plaintiffs' Exhibit No. 2, Notice for the**
15   **deposition in the Brincku action, was marked for**
16   **identification.)**
17   BY MR. ANDERSON:
18   **Q. And do you recognize that document, Dr. Lewis?**
19   A. Yes.
20   **Q. Okay. And what is that?**
21   A. It's the notice of deposition as well.
22   **Q. Okay. And in which case?**
23   A. This would be for the Brincku case.
24   **Q. And so as we discussed a little bit prior on the**
25   **record, you understand that your testimony today is in**

11

1    both the Brucker and Brincku matters?
2    A. That's my understanding.
3    **Q. Okay. Great.**
4    **Dr. Lewis, have you been deposed before?**
5    A. Yes.
6    **Q. How many times?**
7    A. On the order of four of five, something like
8    that.
9    **Q. When was the most recent occasion when you were**
10   **deposed?**
11   A. It was for a case that wrapped up -- or the trial
12   was about two weeks ago, and so there were depositions --
13   in fact, there were two rounds of depositions in that case
14   and those probably occurred in early and mid 2011.
15   **Q. And what sort of a case was that?**
16   A. It was a case involving what's referred to as
17   manufactured gas plant waste in the -- prior to 1960, a
18   lot of the downtowns were lit and heated by a thing called
19   manufactured gas, and it would create -- when you produced
20   it, it would create a coal tar and there was a dispute
21   over who was responsible for certain coal tar that was
22   found at a site.
23   **Q. Okay. And prior to that deposition, when was the**
24   **most recent deposition before that?**
25   A. I have listed the four cases. They've been in

12

1    the last five years. The one before that was probably --
2    do you mind if I just look and see my resumé? It will
3    make it easier to get the dates right.
4    **Q. Sure. That's fine.**
5    A. Let's see, okay, in 2009, right, in 2009 -- but
6    there was no deposition. That was simply -- there was no
7    deposition. It went to trial. I testified at trial, but
8    there was no deposition, and that was for the government
9    of Canada. I was an expert for the government of Canada
10   in the Supreme Court of Nova Scotia, I think it's referred
11   to.
12   **Q. Okay. Any of the depositions that you've been --**
13   **that you've sat for, were they in cases concerning**
14   **drywall?**
15   A. No.
16   **Q. Okay. And how many times have you been hired as**
17   **an expert in litigation?**
18   MR. AYALA: Well, just object to the form of that
19   question to the term "expert."
20   THE WITNESS: Early in my career, there was a --
21   I had a partner who did the testifying and that sort
22   of stuff, and I would help put together materials for
23   a case; but in terms of where I was the expert,
24   something on the order of what I mentioned earlier,
25   five times maybe. Four or five times.

13

1    BY MR. ANDERSON:
2    **Q. Okay. And in those cases where you are hired as**
3    **an expert, were you hired by the Plaintiffs or the**
4    **defendants?**
5    A. Generally the defendants. I think -- I know that
6    in the Merco (phonetic) case I think there was a counter
7    suit or something like that, but it's my understanding in
8    those cases it was the defendant.
9    **Q. And so in all of the cases, you've been hired by**
10   **the defendant?**
11   MR. AYALA: Objection to form.
12   THE WITNESS: I believe so.
13   BY MR. ANDERSON:
14   **Q. Dr. Lewis, did you meet with a lawyer about**
15   **today's testimony?**
16   A. Yes.
17   **Q. When?**
18   A. Tom came in yesterday, Mr. Ayala came in
19   yesterday and I spoke with him yesterday.
20   **Q. And how long did you all meet for yesterday?**
21   A. It was for the afternoon. He came in after
22   lunch, and we met for the afternoon.
23   **Q. So four hours?**
24   A. Something like that, around four hours, four and
25   a half hours, something like that.

4 (Pages 10 to 13)

14

1      Q. And was that the only time you spent preparing
2  with National Gypsum attorneys for the deposition today?
3      MR. AYALA: Objection to form.
4      THE WITNESS: We had coffee this morning as well.
5  BY MR. ANDERSON:
6      Q. Okay. And at that meeting yesterday afternoon,
7  who was present?
8      A. Mr. Ayala, myself, and my associate, Dr. Zeke.
9      Q. Aside from Mr. Key (sic) and Mr. Ayala, did you
10  discuss that meeting with anyone else aside from your
11  lawyers?
12      MR. AYALA: Objection.
13      THE WITNESS: No, just the people I mentioned.
14  BY MR. ANDERSON:
15      Q. Did you take any notes at that meeting?
16      A. I probably wrote a couple things on a piece of
17  scratch paper, but I don't know if I have it anymore or
18  not. I didn't take notes in the sense of writing out on a
19  piece of pad; it would have been an idea scratched on a
20  corner of paper.
21      Q. Were you shown any documents at that meeting
22  yesterday?
23      A. No, I think I showed most of the documents. I
24  think I went through my report and shared documents that I
25  had.

15

1      Q. And outside of the reports that you prepared in
2  the Brucker and Brincku cases, did you show any other
3  documents to NG's attorneys yesterday?
4      MR. AYALA: Well, just objection because you're
5      getting into communications between an expert and the
6      attorney, and none of the exceptions apply. I agree
7      that if an attorney shows an expert a document,
8      generally speaking, to be considered in forming his
9      opinion, that that may be discoverable. But I think
10      you're getting too far into communications. Those are
11      privileged under the new rules.
12  BY MR. ANDERSON:
13      Q. I'm not asking about the communications that he
14  had with you; I'm asking about documents. I mean, it's a
15  separate topic?
16  BY MR. ANDERSON:
17      Q. And to be clear, Dr. Lewis, I'm not asking you to
18  disclose any of the conversations, the content of the
19  conversations you had with National Gypsum's counsel. I
20  agree with Mr. Ayala that those conversations and the
21  communications themselves are privileged. I'm asking you
22  if you showed Mr. Ayala any documents outside of your
23  report.
24      A. Yes.
25      Q. And what were those?

16

1      A. I'm just going on my memory here, but there were
2  a number of documents that I located associated with the
3  presence of hydrogen sulfide in well water, and it's kind
4  of well known that it causes corrosion -- not just in
5  Florida, but across the U.S.
6      I think there were documents from Ohio State,
7  from Cornell, from Texas A & M, a number -- I can't
8  initially remember all of them, but there were a number of
9  documents that were prepared by these university outreach
10  programs that talk about the ubiquity of hydrogen sulfide
11  in the ground water environment and the need to remove
12  that hydrogen sulfide or else it would cause corrosion or
13  damage in a home.
14      Q. Okay. Anything else that you can think of?
15      A. I can't recall anymore as I sit here. There
16  would have been documents along that would have been very
17  similar to what I found in here. I think there was
18  something from the Department of Health and Human Services
19  about sulfides that are present in household products.
20      I think there was something from a corrosion
21  science journal that talked about the different type of
22  chemicals, the copper compounds that would be formed on
23  the surface of a -- on the surface of a copper-containing
24  material.
25      Those are the ones that I recall. If there were

17

1  any more, they would be along those lines.
2      Q. And the last one that you referred to, what was
3  that article about again?
4      A. If author -- I can't remember his name. Was Cat
5  Smocker (phonetic) or something like that, and it was
6  basically just related to -- if you look in my report, I
7  talk about a little bit -- I lay out some chemistry on
8  each of the -- kind of startup pages, sorry in the initial
9  sections of my report there's discussion of the different
10  copper compounds, and I think I had that report with me.
11  I shared it.
12      Q. Okay. Now, aside from your reports in this case,
13  did you bring anything else to the deposition today?
14      A. No, these are my reports.
15      Q. Okay. Anything else that you can think of that
16  you reviewed in order to prepare for the deposition today?
17      A. I went through all the material that I had. I
18  also -- I remember looking at the standard methods again,
19  I remember looking at just a number of related documents
20  that would have to do with -- directly do with my report.
21      Q. So did you review documents pertaining to
22  bacteria?
23      MR. AYALA: Objection to the form.
24      THE WITNESS: Standard methods talks about media
25  for bacteria, but it doesn't talk necessarily -- I

5 (Pages 14 to 17)

18

1  mean, it's media for growing bacteria.  Was there
2  anything else that had to do with bacteria?  I don't
3  think so.
4      I reviewed a lot of different things, pick it up
5  and look at it, kind of scan through it, see if it was
6  important so I didn't forget anything, so I would be
7  current.  I also reviewed a number -- this may be what
8  you're asking, a number of depositions as well.
9      So I did -- so I've been reading a lot of
10  documents, many, many, many pages of documents over
11  the last few days.
12  BY MR. ANDERSON:
13      Q.  When you say you reviewed a number of
14  depositions, which depositions were those?
15      A.  Dr. Little, Dr. Miack, Dr. McCarthy -- let me
16  think here.  Is it Mr. Sutton, I believe.  Dr. Straus, is
17  it Mr. Embritt.
18      Q.  Mr. Embritt, sure.
19      A.  I'm not going to recall their names, but there
20  were two folks that were associated -- they were
21  electricians, I think.
22      Q.  Okay.
23      A.  But I don't remember the names.
24      Q.  Would that be Mr. Hardt, H-A-R-D-T?
25      A.  I just don't remember, but there were two

19

1  electricians and they've had their depositions taken
2  recently.
3      Q.  And they were from this litigation?
4      A.  This litigation.  Dr. Odell, Mr. Tuday
5  (phonetic).  I think I'm getting everybody's title right,
6  I hope.
7      Q.  I think you are.
8      A.  Could there be another one or two in there, there
9  could be, but that's what I recall.  If anybody had their
10  deposition taken recently, I think that I have read it in
11  the last week or two.
12      So I've been -- when you asked me do I see a
13  specific thing, I've been doing a lot of reading, and
14  those I would read through one time and if there were
15  parts that were of interest, I might go and look, but it's
16  read through one time.  But that was a lot of material.
17      Q.  Sure.  I agree.  Which expert reports have you
18  read in this case?
19      MR. AYALA:  Well, objection.  Asked and answered.
20  You asked about depositions, sorry.  Strike that.
21  BY MR. ANDERSON:
22      Q.  You can answer.
23      A.  I've read the expert reports of -- oh, and
24  Dr. Hazlar, I didn't mention his deposition, I read his as
25  well.  I read his expert report.  The expert report from

20

1  Mr. Sutton, I believe.  Dr. Straus had an expert report.
2  I read those.  And then I also read the experts,
3  Dr. Little, Dr. Miack, Mr. -- or Dr. Odell, Dr. McCarthy.
4      Basically, what I understand to be the experts
5  involved in this case, I believe, if I haven't named them,
6  that I read their expert report.
7      Q.  So in other words you believe that you've read
8  all of the expert reports from the Plaintiffs' side in the
9  case?
10      A.  Expert reports, I believe, I have.
11      Q.  And --
12      A.  To my knowledge I have.
13      Q.  Okay.  And you believe you've read all of the
14  National Gypsum's expert reports?
15      A.  I believe I have.
16      Q.  Have you spoken to any of the other experts in
17  the litigation that have been hired by National Gypsum?
18      A.  Yes.
19      Q.  With whom have you spoken?
20      A.  On one occasion we visited the National Gypsum
21  plant, and at that plant visit several of the experts were
22  present.
23      Q.  Okay.  If I could stop you for a second and just
24  focus on that visit for a moment.  When did that occur?
25      A.  In the last few months.  Honestly, I can't --

21

1  I've been very busy lately.  It's in the -- if it's good
2  enough, in the last few months.
3      Q.  Okay.  And who was present at that visit?
4      A.  Okay.  Dr. McCarthy was there, I think Dr. Allen
5  is an associate of his and he was there.  Dr. Odell was
6  there.  I was there.  My associate, Dr. Zeke was there,
7  Mr. Pagliaro and Mr. Ayala were there.  I think
8  Mr. McChesney (phonetic) came by, and then Mr. McCreary, I
9  think, guided the tour.  He's the one that guided the
10  tour.
11      And if I'm not forgetting anybody, that's who was
12  there.  And some of those people weren't experts, I guess,
13  but I've kind of named them all, but you asked me about
14  the experts.  I believe I named the experts.
15      Q.  Okay.  How long did that visit last?
16      A.  A few hours, maybe four hours.  Maybe five, maybe
17  three.  Someplace in there.  Let's just say on the order
18  of four hours.
19      Q.  Okay.  Did you conduct any testing at that visit?
20      A.  Nothing that I would refer to as quantitative
21  testing.
22      Q.  How about testing that you wouldn't refer to as
23  quantitative?
24      A.  Well, I --
25      MR. AYALA:  Object to the form of the question.

6  (Pages 18 to 21)

**22**

1    THE WITNESS:  Sorry.
2    MR. AYALA:  Go ahead.
3    THE WITNESS:  Quantitative testing would be
4  things like smelling the air to see if I smelled
5  sulfide, not quantitative.  I didn't have a device, I
6  didn't attempt to measure anything.
7    I would simply, do I smell sulfide in the air.
8  So I would call that qualitative because it's not --
9  it's not quantitative.
10   BY MR. ANDERSON:
11   Q.  And in addition to the smell test, did you
12  conduct any other qualitative testing?
13   A.  Not -- no, not testing.  Not testing, no.
14   Q.  Okay.  Now, when you say that you conducted sort
15  of what appears to be -- what sounds like sort of informal
16  smell testing, where in the plant did you conduct that
17  testing?
18   MR. AYALA:  Objection.  Form.
19   THE WITNESS:  Throughout.  I mean, I just made
20  note as I walked through the plant.  Do I smell
21  anything that smells like sulfide, but I was
22  particularly focused on it in the area where all the
23  drywall -- at the end of the process, where the
24  drywall was being taken -- being stored before it was
25  loaded out.

**23**

1    BY MR. ANDERSON:
2    Q.  How about near the containers or any containers
3  containing pulp?
4    A.  Yes.  I was near the containers containing pulp,
5  and I did not sense any sulfide in that area.
6    Q.  Okay.  And how --
7    A.  Not that my nose is the best nose in the world
8  for sensing sulfide; it's just a personal test I did.
9    Q.  I totally understand.
10   A.  Okay.
11   Q.  How close did you get to that pulp container?
12   A.  I walked up on the scaffolding and looked down
13  into the container.  I don't know if I understand exactly
14  where all the materials -- it's a large device and you
15  have to walk up a series of stairs.  And there's a part at
16  the bottom and I stood next to it at the bottom and I also
17  walked up to it at the top and there was a lid that was
18  opened.  And you could -- it was kind of dark, but I
19  was -- I could have touched it if I attempted to.  Both at
20  the top and at the bottom.
21   Q.  And did you detect any odor when that lid was
22  opened?
23   MR. AYALA:  Objection to form.
24   THE WITNESS:  No.  Nothing that I could identify.
25  Just the drywall smells like a drywall plant.  There's

**24**

1  a lot of bits of dust in the air and things like that.
2    No, there was nothing that would -- nothing like --
3  I've read some things about valeric acid or no strong
4  pungent anaerobic odors.  Nothing like that.
5    BY MR. ANDERSON:
6    Q.  When you say anaerobic odors, what do you mean by
7  that?
8    A.  I mean when an organism is anaerobic, it can
9  produce certain chemicals, things like hydrogen sulfide,
10  for one.  Another one would be the short-chain fatty
11  acids.  Those are the things that typically smell really
12  bad.  Butyric acid, valeric acid, things like that.
13   And I didn't smell anything that smelled like
14  rotting -- you know, rotting vegetation or trash or rotten
15  egg or any of those.  You get the gist, the general --
16  it's a smell of degradation.
17   Q.  And can aerobic organisms produce smells like
18  that as well?
19   MR. AYALA:  Objection.  Lack of foundation.
20   THE WITNESS:  My experience is that they don't
21  produce the same sorts of odors at all -- say water
22  treatment plants, things like that, they tend to
23  produce a more of a musty odor, but it's not that
24  smell of degradation, which I generally associate with
25  anaerobic bacteria.

**25**

1    BY MR. ANDERSON:
2    Q.  Dr. Lewis, is it possible for an aerobic organism
3  to produce hydrogen sulfide?
4    MR. AYALA:  Objection.  Lack of foundation.
5    Beyond the scope of his report.
6    BY MR. ANDERSON:
7    Q.  Go ahead, Dr. Lewis.
8    A.  I haven't -- if I were to study something perhaps
9  I could understand that, but I haven't -- I don't know
10  that as I sit here right now.
11   Q.  Have you ever read anything that suggested that
12  that was the case?
13   MR. AYALA:  Objection.  Same objection.
14   THE WITNESS:  Have I ever read anything?  I've
15  read a lot of things.  I don't recall anything that
16  pertains to that.  My knowledge is associated with
17  aqueous environments.  And in those aqueous
18  environments, in aerobic environments, typically
19  sulfide is not produced in an aerobic environment.
20   But if you were to produce a paper that said
21  something different, I would review the paper and try
22  to understand it.
23   BY MR. ANDERSON:
24   Q.  I guess what I'm asking is if you recall at any
25  point reading any papers that suggested aerobic organisms

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

26

1  could produce hydrogen sulfide?
2      MR. AYALA: Same objection.
3      THE WITNESS: I think one of the Plaintiffs had a
4  paper, which I did not -- I mean, it wasn't with what
5  I was doing; it wasn't my part of the expert opinion,
6  and I seem to remember in the deposition somebody
7  suggesting that maybe that could happen. But
8  that's -- I don't -- I can't testify to that.
9  BY MR. ANDERSON:
10     Q. Okay. Getting back to our discussion a few
11  moments ago before we sort of got sidetracked there for a
12  minute.
13     A. Yes.
14     Q. Conversations that you had with other experts in
15  the case. So you went to this site visit.
16     Have you had discussions with the experts -- any
17  of the experts for National Gypsum aside from on that site
18  visit?
19     A. Yes. When we visited certain houses -- when I
20  visited certain houses, Dr. Odell was at -- there, and I
21  would have talked to him -- not necessarily about the
22  case, but in terms of my information, but I might have
23  asked him questions about what he was seeing in the house.
24     Were there any other experts there? Dr. Odell is
25  the one I remember.

27

1      Q. Okay. So in terms of your conversations with
2  Dr. Odell about what you were seeing in the house --
3      MR. AYALA: Objection. That mischaracterizes
4  what he said.
5  BY MR. ANDERSON:
6      Q. What were those discussions?
7      A. I was interested in what he saw. In other words,
8  did he see blackening of the copper wires.
9      Q. Okay. And at the site visits, were you yourself
10  observing the wires as well?
11     A. On some occasions. I didn't do a thorough
12  examination as did the other folks. I came in for maybe
13  an hour or two, something like that, and I would --
14  mainly -- I was mainly working with Dr. He to get
15  everything set up to test what my report involves.
16     But I certainly would have walked around to see
17  what other people were seeing, but not in the same
18  rigorous fashion. I was there for a much shorter period
19  of time.
20     Q. So you had conversations with the experts at the
21  site visit?
22     A. Yes.
23     Q. And you had conversations with the experts -- you
24  recall specifically Dr. Odell at visits to the Brucker
25  Plaintiffs and the Brincku home?

28

1      A. I went to both those, and I also went to Retana
2  up in -- yes, I went to Retana as well. Brincku, Brucker,
3  and Retana.
4      Q. Okay.
5      A. And they think -- I think Dr. Odell was present
6  at each one of those sites.
7      Q. Okay. And how about the Nutting visit? Did you
8  go to that?
9      A. I did not visit the Nutting house.
10     Q. Who went to the Nutting house on behalf of HSA?
11     A. Dr. He went to each and every one of the houses
12  on behalf of HSA.
13     Q. And did any other personnel from HSA go to the
14  home visits?
15     A. I'm sure that on -- and these folks -- Dr. He
16  went to each one. He was in charge of collecting the
17  data. I'm sure he used Shannon Tucker, who is one of our
18  technicians -- I'm sure he went to one of the sites as
19  well.
20     And then I think on one occasion Dr. Yang, Yuting
21  Yang went to one of the sites to help out. But it was
22  Dr. He that was in charge of collecting the data.
23     Q. And just so I understand sort of the hierarchy,
24  you were the project manager for this case for HSA;
25  correct?

29

1      A. That's correct.
2      Q. And Dr. He was -- would it be fair to say your
3  second in command or --
4      A. Sure, he's an associate, but I would direct the
5  activities in regard to the expert report that we were
6  putting together, yes.
7      Q. Okay. And you say a technician named Shannon
8  Tucker attended some of the home visits?
9      A. That's correct.
10     Q. And do you recall which ones Mr. Tucker attended?
11     A. I saw him at the -- I saw him at the Brincku
12  house. I saw him at the -- I believe I saw him at Retana.
13  And I think I -- I'm sure I saw him -- I know I saw him at
14  Brucker house. So he may have attended all of them.
15     Q. And I apologize for not catching the name. There
16  was an additional doctor that you referenced.
17     A. Dr. Yang.
18     Q. Yang. Okay. And which visits did Dr. Yang
19  participate in?
20     A. The only one that I'm aware that she was there
21  was the Brincku site on the second day, and it may be
22  because Shannon Tucker wasn't available that day. It
23  could be the case.
24     Q. Okay. Can you give me a concept of what
25  discussions you had with the other experts at the site

8  (Pages 26 to 29)

30

1    visit?
2        MR. AYALA: Objection to the form.
3        THE WITNESS: We were there to understand the
4    process. I was there -- I won't say what they were
5    there for. I was there to understand the process. In
6    other words, I wanted to understand how the Gypsum was
7    made, what that process was. Areas where -- just
8    understanding how the materials moved in the
9    environment at that facility. The process.
10   BY MR. ANDERSON:
11       Q.  You indicated before that you didn't conduct any
12   quantitative testing at the National Gypsum visit. Did
13   you, prior to that time, conduct any testing at the Apollo
14   Beach facility?
15       A.  I did not, no.
16       Q.  How about subsequent to your visit?
17       A.  I did not.
18       Q.  Have you ever conducted any testing at the
19   National Gypsum facility?
20       MR. AYALA: Objection. Asked and answered.
21       THE WITNESS: I did not.
22   BY MR. ANDERSON:
23       Q.  Okay. And in conjunction with this litigation,
24   did you conduct any testing of the facilities that provide
25   water to the National Gypsum plant?

31

1        A.  No.
2        Q.  Okay. So on the site visit, the conversations
3    that you had with the other experts you said that you were
4    trying to understand the process for making the Gypsum; is
5    that right?
6        A.  Yes.
7        Q.  Did conversations that you had with the other
8    experts on this visit help inform your understanding of
9    the process? And let me just -- before you respond to
10   that, to the extent that you had conversations with
11   Mr. Pagliaro and Mr. Ayala separately on that day, I'm not
12   asking you to disclose anything related to those
13   conversations. But to the extent that you had
14   conversations in a broader context with the other experts,
15   that's what I would like to learn about.
16       MR. AYALA: Well, you know, to the extent that
17   there were conversations with attorneys and the other
18   experts about trial strategy, then those would be
19   privileged.
20       THE WITNESS: Would you mind asking me exactly
21   what the question is again. I just want to make sure
22   I don't -- you gave me several caveats there.
23   BY MR. ANDERSON:
24       Q.  Sure. In terms of discussion about science
25   related to the cases, if you could give me some concept of

32

1    the discussions you had with the other experts about --
2    let's start with bacteria.
3        A.  Uh-huh.
4        Q.  What conversations did you have with the other
5    experts about bacteria?
6        A.  I don't know if I had any conversations with the
7    other experts about bacteria. Maybe to put this in
8    context, we started out with a walk through the plant, and
9    we started at the one end where the raw material comes in
10   and we walked through and saw every piece.
11       And so the questions all had to do with: What
12   does that do? What does that do? What does this piece
13   work on? How does this all fit together? What are the
14   materials? What goes into this material?
15       And other folks were interested for different
16   reasons because they're all coming from a different piece
17   of this. My piece of it was really hydrogen sulfide
18   coming from well water. So from my point of view, it was
19   valuable, it was very interesting, but it was of somewhat
20   limited value because my work had to do with the hydrogen
21   sulfide from well water coming off into an indoor
22   environment.
23       I don't specifically recall any conversations
24   that somebody said: What about bacteria? As I was
25   walking along, I'm sure I thought to myself -- and I don't

33

1    remember if I said anything to anybody or not -- that the
2    environment that's heated, the heated environment, the
3    kiln, the temperatures, I'm sure I thought to myself,
4    that's a pretty tough environment for bacteria.
5        I mean -- and did I say that to somebody? I
6    could have. I don't recall. But it would have been in an
7    offhand comment, not in a diligent attempt to, you know,
8    reconcile what it was. And I don't recall that I did say
9    that, but I recall thinking it.
10       Q.  Did you make any inquiry about the water that was
11   used at the National Gypsum Apollo Beach plant?
12       A.  Yes.
13       Q.  Okay. And tell me about that.
14       A.  I was interested in all the points at which water
15   came into the process. Not as much for my expert report
16   but just for my general understanding. And the interest
17   was -- the main interest is where does water come into the
18   plant, and what's the nature of that water.
19       And specifically with regard to the kiln, does
20   any water that was of a reclaimed nature -- is it coming
21   into before or after the kiln? That was important to me.
22   I remember thinking that was important to me.
23       Q.  And what responses did you get on that topic?
24       A.  That all the water that's used in the plant comes
25   in -- is in contact with the board before it goes through

9  (Pages 30 to 33)

34

1 the kiln. In other words, the kiln is the final process
2 before it's cut and shipped out. So any materials that
3 end up in the board happen before the kiln.
4    **Q. Did any of the discussions that you had with the**
5 **other experts hired by National Gypsum in the Brucker and**
6 **Brincku cases inform the opinions or conclusions that you**
7 **reached in your report?**
8    MR. AYALA: Objection to form.
9    THE WITNESS: Certainly Dr. Odel's identification
10 of the copper sulfide on the coils was -- I mean, I
11 considered that. I thought that was important.
12 BY MR. ANDERSON:
13    **Q. And why do you say that?**
14    A. Well, because if some of the houses had no signs
15 of copper sulfide at the house, I think that would be
16 important in understanding whether -- give an example.
17    Let's say we found hydrogen sulfide in the
18 water -- well, I'm trying to give a good example here.
19 It's important because it means they're in a class of
20 houses that have blackening of the coils, and I think
21 that's important in terms of categorizing how these sites
22 fit together.
23    In other words, one of them had -- one of the
24 sites in Retana had Chinese drywall in it, so that was
25 important to me. I think that was discovered by --

35

1 Columbia Labs, I think, got the information on that, the
2 elemental sulfur in that.
3    So that's another opinion -- information I would
4 have used from Columbia Labs, but putting these things --
5 did it have Chinese drywall, or did it not have Chinese
6 drywall. Was there a sign of copper sulfide? Was there
7 not a sign of copper sulfide.
8    Was the copper sulfide limited in extent around,
9 say, the wet areas, where you would have showers and where
10 you would use water in a house, that sort of thing.
11    So that sort of information I did consider.
12    **Q. Any other -- so at this point you mentioned**
13 **Columbia Analytical and you mentioned Dr. Odel's work with**
14 **the metallurgy aspect of the litigation.**
15    A. Uh-huh.
16    **Q. Any other experts inform the conclusions or**
17 **opinions you had in this case?**
18    MR. AYALA: Objection to form.
19    THE WITNESS: As we go through the report -- I
20 assume we'll go through the reports, and something
21 else might come to me and I'll bring it up when I do.
22 But I think I relied primarily on the information that
23 we collected.
24    But Columbia Analytical, the copper sulfide. If
25 I think of something as we go through it, I'll let you

36

1 know.
2 BY MR. ANDERSON:
3    **Q. That's fair. Now, was copper sulfide found in**
4 **all five houses?**
5    A. My understanding is that Dr. Odell found copper
6 sulfide in all five houses.
7    **Q. So there was blackening and corrosion in all five**
8 **houses?**
9    MR. AYALA: Objection. Lack of foundation.
10    THE WITNESS: I want to draw a clear line when we
11 start talking about corrosion. I might use the term
12 differently than an expert would. I'm not an expert
13 in corrosion. I don't purport to be an expert in
14 corrosion.
15    To me, I've heard used the word "corrosion"
16 associated with, say, this copper sulfide. When I say
17 corrosion or when I talk about that, I just mean
18 there's a blackening of the coils.
19    And so in regard to the blackening of the
20 coils -- and that's how I'm referring to corrosion --
21 I mean, I don't know if it causes devices to fail.
22 That's way beyond what I know. I can't speak to that.
23 But in terms of that blackening is present or not,
24 when I refer in my report, that's what I mean by
25 corrosion.

37

1    So, yes, my understanding is they did see
2 blackening of the coils in all of the -- in all five
3 homes.
4 BY MR. ANDERSON:
5    **Q. Let's take a step back for a second and just talk**
6 **a little bit about your background --**
7    A. Okay.
8    **Q. -- if we could.**
9    **Where did you attend high school?**
10    A. George Rogers Clark High School in Kentucky.
11    **Q. In Kentucky.**
12    **And where did you complete your undergraduate**
13 **studies?**
14    A. I was in what's called a 3/2 engineering program
15 where I went three years liberal arts and two years to
16 engineering school, so I went to a college called Center
17 College of Kentucky -- Center College. I went there for
18 three years. I got a degree in physics with a minor in
19 math. And then I went to Vanderbilt University for two
20 years and I got bachelor's degree -- bachelor's degree in
21 civil and environmental engineering.
22    And if you would like me to continue --
23    **Q. Go ahead. Thank you.**
24    A. I got my master's and my Ph.D. at the
25 Massachusetts Institute of Technology in civil and

10 (Pages 34 to 37)

38

1    environmental engineering, and that was mainly concerned
2    with the transport and movement of chemicals in the
3    environment.
4        Q.   And if you could --
5        A.   Biologicals as well.
6        Q.   Sure.  What was your dissertation about?
7        A.   It was detection of -- well, my master's degree
8    dissertation was a detection of a thing called alloy
9    sequence, but using polymerase chain reaction, and it was
10   to understand the -- differentiate human and animal
11   sources of pollution in water.
12            And then continuing on with my Ph.D. was using
13   the use of the polymerase chain reaction and what's called
14   rotating membrane ultra filtration -- sorry -- rotating
15   membrane ultra filtration to detect viruses and pathogens
16   in environmental samples.
17       Q.   So that polymerase chain reaction work that you
18   did, that's sort of DNA work?
19       A.   I did both DNA and RNA work, but, yes, it would
20   be associated with that.
21       Q.   So I think we left off at Ph.D. from MIT.  Any
22   other postgraduate studies?
23       A.   No, no postgraduate studies.  I did some work
24   over at Harvard in environmental microbiology and at
25   Harvard Medical School in animal virology.

39

1        Q.   Okay.
2        A.   In other words, I took a class, but it wasn't
3    postgraduate -- well, it was postgraduate.  Yes, it was
4    part of my Ph.D.
5        Q.   Okay.  So the two programs that you did at
6    Harvard, or the two classes that you took, can you
7    describe them just a little bit?
8        A.   Sure.  One was under Ralph Mitchell who was -- at
9    the time, was a well-known microbiologist at Harvard
10   University and I -- because I read his book, I was
11   interested from taking a class from him.
12           So it was a lab course and that we studied the
13   basics of environmental microbiology.  And then the other
14   was Harvard Medical School was animal virology.  It was
15   really a course in understanding viruses in a medical
16   sense, in a disease-causing sense, but how -- the nature
17   of viruses.  I was detecting viruses and pathogens in the
18   environment and my committee wanted me to have a
19   background in animal virology.
20       Q.   Now, you currently work for HSA; correct?
21       A.   That's correct.
22       Q.   And how long have you been there?
23       A.   I started -- it will be 16 years now, I think.
24       Q.   And what's your title now?
25       A.   I'm a principal engineer.  I sit on the board of

40

1    directors.  I also sit on the executive management team
2    for the firm.  I'm the -- there are -- there's another
3    owner that has just about as many shares, but I'm the
4    largest individual shareholder in HSA, but there's another
5    partner that I have that's a significant shareholder as an
6    individual.  And I run the Fort Myers office, and I also
7    do -- my main job is remediation engineer.  I clean up
8    sites.
9        Q.   How many people work for HSA?
10       A.   I think it's between 250 and 270, someplace in
11   there.
12       Q.   And how many people report to you?
13       A.   Well, through the executive management team, I
14   mean, in the board of directors in a sense, but if you're
15   talking about a direct report where I am in charge of
16   their salary and that sort of stuff, something on the
17   order of 30, let's say.
18       Q.   You say that you typically do remediation for
19   site cleanup.  Can you give me a little bit more
20   background in terms of a few of the recent projects you
21   have worked on?
22       A.   Sure.  Just to give just a brief overview so it
23   will put it in context.  Typically, I'm dealing with the
24   movement of chemicals in the environment.  That's -- in a
25   big picture sense, that's what I do.  Someone deposits

41

1    chemicals in the environment, and some regulatory agencies
2    believes that those chemicals shouldn't be where they are
3    deposited and they need to be remediated -- they need to
4    be made safe, basically.  So -- and that safety is defined
5    by the regulatory agency.
6            So my job is to understand -- basically to
7    develop a site conceptual model and understand when -- how
8    something got there, where it got there, how it's moved,
9    did it move into the air, does it move in the water, does
10   it stick to the soil, and then to develop a remedial
11   strategy for understanding how to remediate that to the
12   levels that the state says are safe.
13           So a typical job -- let's think of one that's
14   happened recently.  Oh, writing a report right now where
15   there's a plume of tetrachloroethene -- it's a chemical
16   that's used as a solvent.  That got released into the
17   environment.
18           And my job is -- we just put this report out last
19   week -- is to understand how that chemical moves from
20   where it was released and to understand how it's being
21   degraded in the environment.  Tetrachloroethene will
22   degrade into a series of chemicals, but if it's anaerobic,
23   if the system is anaerobic, the bugs will breathe the TCE
24   and breathe it into a non -- something that's not
25   regulated.

11  (Pages 38 to 41)

42

1    And so understanding how this plume is being
2  degraded by the in situ micro biology and understanding
3  how long it will be before the plume will be cleaned up
4  and we've got regular maintenance reports that I've
5  prepared.
6    So that will be one example. Is that enough?
7    **Q. No, that's good. In terms of the work that you**
8  **were asked to do in this case, what were you asked to do?**
9    MR. AYALA: Objection to form, "this case."
10    MR. ANDERSON: To clarify, just to meet Mr.
11  Ayala's objection.
12  BY MR. ANDERSON:
13    **Q. What were you asked to do in the Brucker and**
14  **Brincku litigation?**
15    A. Right. Initially, my understanding was that they
16  were interested in just understanding Southwest Florida.
17    In other words, I think one of the first
18  questions I got was something -- I don't know if I'm
19  allowed to talk about this or not.
20    MR. AYALA: Object to the --
21  BY MR. ANDERSON:
22    **Q. Just to clarify -- and Mr. Ayala may want to**
23  **still put an objection on the record, but nevertheless,**
24  **I'm not asking you to describe specific communications**
25  **that you had with Mr. Ayala or Mr. Pagliaro or anyone else**

43

1  **at the firm of Morgan Lewis.**
2    **I'm simply asking you, in a broader sense, you**
3  **know, if you could describe to me in general terms what it**
4  **is that you were asked to do and what the scope of that**
5  **work was in the Brucker and Brincku cases.**
6    A. Okay. I think I understand. I'll try to stay
7  within those bounds. My understanding is, is that there
8  was a need for local knowledge of the sulfide conditions
9  in Southwest Florida. Is sulfide common in ground water
10  in Southwest Florida? Those sorts of issues.
11    Then if it were present, is it widely distributed
12  or is it very narrow? Is it consistent? Those sorts of
13  things.
14    I think one of the first things I did was look up
15  a USGS study that showed the sulfide concentrations --
16  there weren't very many sampling points, but there were a
17  few and it showed that Southwest Florida is known to have
18  sulfide.
19    Now, I didn't need that report to know that
20  there's a lot of sulfide in the groundwater in Southwest
21  Florida, but I think the first step was just -- yeah, I
22  have a general knowledge and where I sample ground water,
23  I spent a lot of time with cleaning up ground water as I
24  described.
25    And I'm familiar not -- and because we're talking

44

1  about the degradation of, say, TCE or some other
2  chemical -- I don't want to get too far afield, but TCE
3  degrades at about the same redox level as do the sulfide
4  reducers, so there's some commonalities there.
5    So I have a knowledge of the ground water in
6  Southwest Florida, these aqueous environments, and where
7  you find sulfide. And I think we were interested in
8  that information -- I think that's why I was hired, was
9  because of that information.
10    And then as it progressed, various reports came
11  out, and I would be asked to review the various reports,
12  say the -- a CPSC study or something like that, or review
13  different information. And as different information came
14  to light, I was called upon sporadically to -- you know,
15  when something came available, they would say take a look
16  at this and I would -- and I would take a look at it.
17    And then as time went by, there were expert
18  reports that were done, and I was asked to look at each of
19  those expert reports, and do I have an opinion about this
20  report, that sort of thing. And then did I -- lastly is
21  it occurred to me that in reading the CPSC studies and
22  some of these different documents, that we have a lot of
23  well water in Florida with sulfide in it -- you're seeing
24  copper sulfide on the coils -- it was my recommendation to
25  look at well water.

45

1    You know, it's already in the CPSC documents. It
2  wasn't a great leap that I discovered this or something
3  like that. I mean, it's in the available documents, but
4  in reading those and reviewing those, it made sense.
5    One of the questions was: Are these houses on
6  well water or not?
7    **Q. Were you asked at any point to determine whether**
8  **or not National Gypsum's drywall was itself corrosive?**
9    MR. AYALA: Objection.
10    THE WITNESS: No. No. My expertise is not in
11  understanding whether drywall is corrosive or not. I
12  would rely on somebody else's information for that,
13  but I didn't -- I didn't do any of that work.
14  BY MR. ANDERSON:
15    **Q. And were you asked at any point to determine**
16  **whether hydrogen sulfide being released in these houses**
17  **from water could be causing any sort of secondary reaction**
18  **to the drywall?**
19    MR. AYALA: Just objection to the form.
20    THE WITNESS: No. Just to be clear, my
21  understanding from reading other reports is that
22  hydrogen sulfide will tarnish or blacken copper.
23  Independently, I don't know that. I haven't done
24  testing to know that. It's not -- corrosion or
25  anything to do with blackening is not my area of

12  (Pages 42 to 45)

46

```
1    expertise.
2        But if I'm told that -- or if I can rely upon a
3    report that says there's blackening and that
4    blackening is copper sulfide, I can handle the
5    transport part of it that -- are there sources of
6    hydrogen sulfide in a home?  And what are those
7    levels?  That would be what I provided.
8    BY MR. ANDERSON:
9        Q.  But your focus on determining sources of hydrogen
10   sulfide in these houses was limited to an examination of
11   the water in the homes; right?
12       MR. AYALA:  Objection.  Go ahead.
13       THE WITNESS:  No, no.  We were -- our goal was to
14   find any source of hydrogen sulfide that we could
15   think of, and I did quite a bit of brainstorming on
16   where that could be.
17       Some of the things that I laid out that we were
18   testing were the septic systems, the soil vapor
19   basically, looking for any products -- that's a little
20   tricky, but looking for any products.
21       The other place was sewer gases -- in other
22   words, we have seen -- I'm aware of sites where the
23   pipes have dried out and now that provides -- the
24   water trap usually has water in it.  That when that
25   dries out, that provides a path to the sewer.
```

47

```
1        So I was concerned with thinking of everything
2    that I could think of that would produce hydrogen
3    sulfide in a home.  And I did as good a job as I could
4    to try to think of what those were and try to test
5    them.
6    BY MR. ANDERSON:
7        Q.  Did you find alternative sources of hydrogen
8    sulfide in any of the Brucker or Brincku homes aside from
9    water?
10       A.  Yes.
11       Q.  And what were those?
12       A.  I believe in the Retana home is the Chinese
13   drywall, and -- you said besides well water?
14       Q.  Yes.
15       A.  The only other thing -- you know, I don't know
16   how much it contributed because I didn't do any testing on
17   whether the houses were underpressurized, but we did find
18   some soil vapor that had hydrogen sulfide that could
19   potentially be a source.
20       But I can't do under -- pressurization studies on
21   the house or anything like that to understand as would it
22   actually be pulled under the house, I didn't do that.
23       Q.  Right.  And I think we'll probably get into that
24   a little bit further down the road when you actually have
25   the reports in front of you.
```

48

```
1        A.  Okay.
2        Q.  Okay.  So I just want to make sure I follow.  In
3    the Retana house, hydrogen sulfide, you found that the
4    source was the Chinese -- the corrosive Chinese drywall?
5        A.  That was one of the sources.
6        Q.  And what other sources did you find there?
7        A.  I believe that we found in that house that the
8    hot water heater also contained water likely associated
9    with the cathodic perception, also had hydrogen sulfide.
10       Q.  And how about in the Brucker home?
11       A.  I would like to look at the report.
12       Q.  Okay.  And that's fine.  Dr. Lewis, that's
13   totally reasonable.
14       A.  Okay.
15       Q.  And we can sort of hold off on that stuff --
16       A.  Okay.
17       Q.  -- until you have got the reports in front of
18   you.
19       If you can give me some concept -- aside from
20   your work in this case, have you at any point, prior in
21   your career, studied drywall?
22       MR. AYALA:  Objection to form.
23       THE WITNESS:  I have probably reviewed reports
24   associated with mold, but the mold wouldn't have been
25   exclusively associated with drywall.  But it would
```

49

```
1    have been on anything that was wet in the house,
2    basically, but -- or a leak or something like that.
3        But it wouldn't have been -- I don't recall
4    anything specifically with drywall.  My company does
5    do some of these Chinese drywall surveys and whatnot,
6    and I probably reviewed a report on that, too.  So the
7    presence of Chinese drywall.
8    BY MR. ANDERSON:
9        Q.  So you've reviewed the 51-home study by CPSC?
10       A.  I reviewed that.
11       Q.  And the 10-home study by CPSC?
12       A.  Yes.
13       Q.  And you have reviewed some papers that your firm
14   has put together about Chinese drywall?
15       MR. AYALA:  Objection to form.
16       THE WITNESS:  Yes.  Yes, I've -- I'm sure I've
17   looked at -- it's mostly in a review capacity
18   associated with drywall, yes.
19   BY MR. ANDERSON:
20       Q.  As a result of those reviews, have you reached
21   any conclusions about the causes of corrosion in homes
22   that have the Chinese drywall that is defective?
23       MR. AYALA:  Objection.  Lack of foundation.
24       THE WITNESS:  No, I haven't.  I haven't reached
25   any conclusions about corrosion at all.  It's just
```

13  (Pages 46 to 49)

50

1    outside of what I know.
2    BY MR. ANDERSON:
3        Q. Can we pass to Dr. Lewis what's been previously
4    marked as Exhibit 3?
5            (Plaintiffs' Exhibit No. 3, Report on
6        sulfate-reducing bacteria in environmental samples,
7        was marked for identification.)
8    BY MR. ANDERSON:
9        Q. Dr. Lewis, do you recognize this document?
10   A. Yes.
11       Q. What is it?
12   A. It appears to be -- by thumbing through it, it
13   appears to be a report that I prepared on sulfate-reducing
14   bacteria in environmental samples in the -- let's call it
15   the Southwest Florida area.
16       Q. And is that a full and complete copy of the
17   report?
18   A. I thumbed through it. I mean, I don't have it
19   memorized, what every page was. But it appears -- it
20   certainly appears to be. Let's see, each of the numbered
21   pages to my signature is there.
22       Q. So you don't have any reason to believe that it's
23   not the full and complete report that you prepared?
24   A. I don't have any reason to believe it's not.
25       Q. Okay. If we could pass along to Dr. Lewis what

51

1    the court reporter has previously marked as Exhibit 4.
2            (Plaintiffs' Exhibit No. 4, Retana report and
3        appendixes, was marked for identification.)
4    BY MR. ANDERSON:
5        Q. Which, just for everybody's clarifications
6    purposes is I believe the Retana report and appendixes.
7    But if you could take a look and tell me what that is,
8    Dr. Lewis.
9    A. It appears to be the report that I prepared for
10   the inspection and sampling of the Retana home in
11   Riverview, Florida.
12       Q. Okay. And do you have any reason to believe that
13   that's not a full and complete copy of the report and the
14   appendices?
15   A. Based on its thickness, it certainly appears to
16   be. I'll just check that each of the pages appears to
17   be -- yeah. I'm not seeing any missing pages or anything
18   like that. It appears to be, yes.
19       Q. And if we could pass to Dr. Lewis what has been
20   previously marked as Exhibit 5.
21           (Plaintiffs' Exhibit No. 5, Inspection and
22       sampling report of the Nutting property, was marked
23       for identification.)
24   BY MR. ANDERSON:
25       Q. Dr. Lewis, do you recognize that document?

52

1    A. Yes, I do.
2        Q. And what is it?
3    A. It is, as I said, appears to be the inspection
4    and sampling report of the Nutting property located in
5    Palm Bay, Florida.
6        Q. And do you have any reason to believe that that's
7    not a full and complete color copy of the report that you
8    produced?
9    A. I have no -- I agree that this appears to be that
10   copy, yes.
11       Q. Okay. Can we pass to Dr. Lewis what's been
12   marked as Exhibit 6?
13           (Plaintiffs' Exhibit No. 6, Inspection sampling
14       report for the Brincku residence, was marked for
15       identification.)
16   BY MR. ANDERSON:
17       Q. Dr. Lewis, do you recognize Exhibit 6?
18   A. Yes, I do.
19       Q. And what is that?
20   A. It appears to be the inspection sampling report
21   for the Brincku residence located in Alva, Florida.
22       Q. Do you have any reason to believe that's not a
23   full and complete color copy of the report you produced
24   for the Brincku residence?
25   A. No, I do not.

53

1        Q. Okay. I would like to ask that the court
2    reporter pass what's been marked as Exhibit 7, please.
3            (Plaintiffs' Exhibit No. 7, Inspection sampling
4        report for the Brucker property, was marked for
5        identification.)
6    BY MR. ANDERSON:
7        Q. This question may sound familiar, but do you
8    recognize this document?
9    A. Yes.
10       Q. And what is it?
11   A. It appears to be the inspection sampling report
12   for the Brucker property located in Arcadia, Florida.
13       Q. Okay. And do you have any reason to believe
14   that's not a full and complete color copy of the report
15   that you produced for the Brucker residence in this
16   litigation?
17   A. No -- no, I do not.
18       Q. And finally, I would like to ask that Exhibit 8
19   be passed to Dr. Lewis.
20           (Plaintiffs' Exhibit No. 8, Inspection sampling
21       report for the Ravelo property, was marked for
22       identification.)
23   BY MR. ANDERSON:
24       Q. Dr. Lewis, do you recognize this document?
25   A. Yes.

14  (Pages 50 to 53)

54

1    Q.  And what is it?

2    A.  It appears to be the inspection sampling report

3  for the Ravelo property located in Cape Coral, Florida.

4    Q.  Any reason to believe it's not a full and

5  complete color copy of the report that you produced for

6  the Ravelo property?

7    A.  No.

8    Q.  So at this point, would it be fair to say that

9  you have, in your possession as exhibits, all of the

10  reports in complete and color form for all HSA's work in

11  this litigation?

12    A.  I think so, but -- there was also a hydrogen

13  sulfide study, a well study, and it's an appendix, I

14  believe, to the Brincku, but I'd want to make -- if it's

15  full and complete, it's here.

16    Q.  Well, go ahead and take a minute and just check

17  for it, just so we're certain that there's no confusion

18  about you having ahold of everything.

19    A.  Okay.  Yes.  The well survey is listed as

20  Appendix B in the Brincku report, and so it is here, and

21  hence, these are all missing, but these are all the

22  reports that we produced, yes.

23    Q.  Okay.  Dr. Lewis, if we could take a look for a

24  moment at what's been marked as Exhibit 4, the Retana

25  report.

55

1    Do you see Section 2.1 on page 2?

2    A.  Yes.

3    Q.  Okay.  In that Section 2.1, you identify HSA's

4  experience investigating reports of corrosion; right?

5    A.  Yes.

6    Q.  How many homes, in total, has HSA inspected with

7  the purpose of investigating reports of corrosion?

8    A.  My understanding is that it's on the order of

9  about 150.

10    Q.  Okay.  And how many of those were associated

11  with -- at least originally -- strike that.  Let's start

12  over and clean it up.

13    How many of the homes that HSA has investigated

14  for signs of corrosion were associated with domestic

15  drywall?

16    MR. AYALA:  Objection to form.  Mischaracterizes

17    his testimony.  Go ahead.

18    THE WITNESS:  To my knowledge, none have been

19    associated with domestic drywall.

20  BY MR. ANDERSON:

21    Q.  How many of the homes that HSA has investigated

22  were related to allegations of corrosion associated with

23  domestic drywall?

24    A.  Oh, allegations.  I think around 15.  I think.

25    Q.  Okay.  So would it be fair to say, then, there

56

1  were the five in this case and ten others?

2    A.  It -- yes.

3    Q.  And how many of those 15 were National Gypsum --

4  houses that contained National Gypsum drywall?

5    A.  I know that some of the houses that we went to

6  didn't contain National Gypsum.  I can't remember off the

7  top of my head.  I know one up in Lehigh didn't have any

8  National Gypsum in it, but the other ones, I think,

9  probably did have National Gypsum in them.  I think.  I'm

10  not positive, though.

11    Q.  Okay.  These investigations, were they done at

12  the request of National Gypsum?

13    A.  I think they were done at the request of counsel,

14  I think.

15    Q.  Counsel for National Gypsum?

16    A.  Oh, yes.  Okay.

17    Q.  So did you participate in the investigation of

18  all 15 of these homes?

19    A.  No.

20    Q.  How many did you participate in the investigation

21  of?

22    MR. AYALA:  Just objection to form.  Go ahead.

23    THE WITNESS:  I think I did one of them.

24    MR. AYALA:  Just objection to the form because --

25  BY MR. ANDERSON:

57

1    Q.  Right.

2    MR. AYALA:  "Participate," you know.

3  BY MR. ANDERSON:

4    Q.  And this is not -- I'm not attempting to ask a

5  trick question here.

6    A.  Okay.

7    Q.  I'm just trying to understand what your

8  experience has been with investigating these allegations

9  in homes that contain National Gypsum drywall.

10    So I know that you've been present for --

11    A.  Oh.

12    Q.  -- several of the investigations in this case,

13  which leads me to the conclusion that perhaps you didn't

14  understand the question that I asked, which is probably my

15  fault.  So let me try again.

16    A.  Okay.

17    Q.  How many of the 15 homes did you actively

18  participate in any part of the investigation?

19    MR. AYALA:  Objection to form.

20    THE WITNESS:  If, by "active participation," you

21    mean go to the site, I think it was three of the five

22    and one of the other -- I'm saying roughly 15, so one

23    of the roughly ten.

24    The rest were all attended by Dr. He, and he

25    would have collected information, and I would have

15  (Pages 54 to 57)

58

1  reviewed a report.
2      If it came to the point that -- if we produced a
3  report, I would have reviewed the report.
4  BY MR. ANDERSON:
5      Q.  And did you produce a report for all of the homes
6  of that 15?
7      MR. AYALA:  Objection.
8      THE WITNESS:  If there were -- 15 I'm using as a
9  round number, I think so, yeah.  I reviewed a lot of
10  reports, so I think so.
11  BY MR. ANDERSON:
12      Q.  And in any of those 15 or so homes, did you find
13  National Gypsum drywall to be the source of the corrosion
14  in any of those homes?
15      A.  No.  And, in fact, in a number of the homes
16  didn't show any signs of any corrosion, but of the -- so a
17  number of them didn't show any -- and I think I have
18  listed some of these kind of these concepts we bumped into
19  here.  But some of them didn't have corrosion.  And the
20  ones that had corrosion we did not link to domestic or
21  National Gypsum drywall; that's correct.
22      Q.  Okay.  I just want to follow up on that for a
23  moment here.  So the four of the five homes, in all --
24  well, in four of the five homes in the Brucker and Brincku
25  cases, you identified well water as a source of the

59

1  corrosion.
2      In the other homes, did you identify well water
3  as the source of the corrosion -- any of those?
4      A.  I just don't remember.  I just don't remember.  I
5  know that we did the protocol in terms of going to the
6  house and looking for -- wholistically, looking for any
7  source.
8      Could there have been one with well water?  I
9  don't recall if that were the case.  I don't recall that
10  being the case.  I don't recall finding one with well
11  water, but could it be if we reviewed all the reports,
12  that one of them had that, it could be.  I don't -- but I
13  don't recall it.
14      Q.  So it would be fair to say that all of the homes
15  at -- of all the homes that HSA investigated related to
16  allegations that National Gypsum drywall was causing
17  corrosion, in none of them HSA identified National Gypsum
18  drywall as the source of the corrosion?
19      A.  That's absolutely correct.
20      Q.  Okay.  Dr. Lewis, there's a sentence a couple
21  lines down in the first paragraph that begins with:  Each
22  home.
23      A.  Yes.
24      Q.  Can you read that sentence for me?
25      A.  Yes.

60

1      MR. AYALA:  What page are we on?
2      MR. ANDERSON:  Page 2, still on page 2.
3      THE WITNESS:  Section 2.1, about halfway down, it
4  begins:  Each home was found to have unique
5  characteristics that would render generalizations
6  about the cause of corrosion in each home
7  scientifically indefensible.  For example, HSA --
8  BY MR. ANDERSON:
9      Q.  Just the sentence.
10      A.  Oh, just the sentence.
11      Q.  And that sentence appears in all five of the
12  reports that HSA has put together in this report; right?
13      A.  That's correct.
14      Q.  And if you could turn with me to page 10, and
15  this is Section 7.0, the Conclusion section.
16      A.  Yes.
17      Q.  Actually, if you could -- I'm sorry, but if you
18  could take Exhibit 5, the Nutting report.
19      A.  Yes.
20      Q.  And turn to page 10 for me.  And this is, again,
21  page 10, and it's Section 7, and it's the Conclusion
22  section.
23      A.  Yes, I have turned to that page.
24      Q.  Okay.  Great.  And could you read the sentence
25  that begins:  Therefore.  It's the last sentence of the

61

1  second-to-last paragraph.
2      A.  Yes.
3      Therefore, it is my opinion that the odor, or any
4  copper sulfide corrosion that may be present in the home
5  was caused not by drywall but by potable water in use at
6  the house.
7      Q.  Now, does that sentence appear in all five of the
8  reports save the Retana report?
9      A.  I don't recall.  I mean, we could look at them
10  and see.
11      Q.  Go ahead and take a look.  I mean, I think it's
12  in the same spot in each of the reports, so it will be on
13  roughly page 10 and in Section 7.0.
14      A.  Let's see here.  I'm in the Brincku, and it must
15  be a little bit different.  Oh, but it's on page 13, yeah,
16  I see.
17      Q.  It's the same sentence in Brincku; right?
18      A.  It's the same sentence, right.
19      Q.  And how about in Brucker?
20      A.  Yes, it's there.
21      Q.  Okay.  And how about in Ravelo?
22      A.  Yes.
23      Q.  Okay.  So the Brucker, Retana -- excuse me, the
24  Brucker, Ravelo, Nutting, and Brincku reports all contain
25  the sentence in Section 2.1 --

16  (Pages 58 to 61)

62

1    A. Right.

2    Q. -- that says:  Each home was found to have unique

3    characteristics that would render generalizations about

4    the cause of corrosion in each home scientifically

5    indefensible; right?

6    A. Right.

7    Q. And those four reports:  Brucker, Brincku,

8    Nutting and Ravelo, all contain the sentence in your

9    conclusion that:  Therefore, it is my opinion that the

10   odor of -- or any copper sulfide corrosion that may be

11   present at the property was caused not by the drywall but

12   by the potable water in use at the house.

13   A. That's correct.

14   Q. What I don't follow then is, you know, you're

15   saying at the outset that you can't reach any general

16   conclusions but it seems like you've reached a general

17   conclusion?

18        MR. AYALA:  Hold on.

19   BY MR. ANDERSON:

20   Q. And I'm just trying to understand.

21        MR. AYALA:  Hold on.  Objection because counsel

22   has completely mischaracterized the testimony.  Go

23   ahead.

24        THE WITNESS:  Yeah, I -- you know, there might be

25   an argument with my English, but as I read this, it

63

1    says you can't render a generalization without knowing

2    the individual characteristics.

3        So if you know the individual characteristics --

4    you just wouldn't go to a house and say I haven't been

5    there, I haven't done any testing, I don't have any

6    information; it's the drywall.  I mean, you think that

7    makes sense from a scientific point of view, too.

8        You can't just -- because these sites are

9    complex, you have to gather enough information.  But

10   I'm not suggesting that it's scientifically impossible

11   to know something if you put enough effort into

12   understanding it; that's not what I'm saying.

13   BY MR. ANDERSON:

14   Q. All right.  Well, no, and I'm just trying to

15   clarify here because, you know, is it -- based on the

16   reading that you've done, is it reasonable that in the

17   Chinese drywall they've been able to draw certain

18   generalizations about identifying problem drywall?

19        MR. AYALA:  Objection to form and beyond the

20   scope.  Lack of foundation.

21        THE WITNESS:  I don't want to get into too far

22   with mechanisms with Chinese drywall because that's

23   not my expertise, but I want to make sure I answer

24   your question.  So I've kind of lost the gist of it.

25        Would you mind -- I hate to ask you this, but

64

1    would you mind saying that again, just so I make sure

2    I understand what your question is.

3    BY MR. ANDERSON:

4    Q. Sure.  I'm focused sort of on the sentence in

5    Section 2.1, and I think that this sentence appears in all

6    five of the reports where you say:  Each home was found to

7    have unique characteristics that would render

8    generalizations about the cause of corrosion in each home

9    scientifically indefensible.

10        What I'm asking is, based on what you've read

11   about the Chinese drywall litigation, have they been able

12   to render generalizations about the cause of the corrosion

13   in those homes?

14        MR. AYALA:  Objection to form.  And lack of

15   foundation.  Go ahead.

16        THE WITNESS:  In terms of generalizations, I mean

17   when you have very -- in science, you say the term N

18   equals something -- N equals 1, you have one example.

19   N equals two, you have two examples of it.

20        In a case where you have very low numbers of

21   examples, then by definition you're making a

22   generalization.  You're taking a very small number of

23   observations and deriving something from that.

24        My understanding, in regard to Chinese drywall is

25   that they have thousands of observations and that

65

1    they're using those thousands of observations, which

2    are not -- they're not, as I understand it, saying:

3    Oh, you've got any one characteristic at a house.  Say

4    it has a label of Chinese drywall and they're saying:

5    Oh, okay, now you have corrosive drywall.

6        They're saying we've looked at thousands of sites

7    and we have done statistical analyses on these sites,

8    and that from that statistical analysis we found that

9    these characteristics are associated with corrosion

10   but you still need to show that there's hydrogen

11   sulfide coming off, and you still need to show that

12   there's a jar test.

13        But by the way, I mean, this is not my testimony

14   or what is my expertise.

15   BY MR. ANDERSON:

16   Q. But did you say that you've read the CPSC

17   reports; right?

18        MR. AYALA:  Objection to form.  It

19   mischaracterizes the testimony.

20        THE WITNESS:  I've -- I wouldn't say I perused

21   them, I would say I read them once through, yes.

22   BY MR. ANDERSON:

23   Q. Okay.  And you do talk about, like, for example,

24   let's look -- I mean, if I could direct your attention to,

25   for example, Exhibit 7, the Brucker report.  I believe

17  (Pages 62 to 65)



66

1 that this is consistent across the reports.
2     You talk in Section 2 about -- 2.1, excuse me --
3 about use of an XRF scanner to identify strontium levels
4 in drywall; right?
5     A. Right.
6     Q. And that's a screening tool that's been used in
7 the Chinese wall litigation; right?
8     A. Yes, it is.
9     Q. And HSA has used it, too?
10    A. Yes.
11    Q. So you have some familiarity with the detection
12 of potentially corrosive drywall; right?
13    A. Sorry. I didn't mean to imply that I don't know
14 anything about Chinese drywall. I've read the report,
15 certainly, but I'm not -- I guess what I'm trying to
16 differentiate is being an expert on something versus
17 having read it and implemented something from it.
18    I absolutely feel comfortable with knowing enough
19 about, not just CPSC, but Florida Department of Health and
20 others about their recommendations for how to assess, you
21 know, problematic drywall. I -- absolutely I feel
22 comfortable with that, but in terms of if we get too far
23 into mechanisms or dry chemistry, that's not my expertise.
24    Q. When you say "dry chemistry," what do you mean?
25    A. Without water.

67

1     Q. Okay. All right. I would like to focus again
2 for a second on these 15 or so -- 15 or so investigations
3 that HSA conducted for National Gypsum.
4     When was the first one?
5     A. I don't know. It would have been probably been
6 in 2009, 2010, maybe 2011. Probably -- I don't know.
7 2010, 2011, someplace in there.
8     Q. Did HSAC's work investigating allegations in
9 these homes predate your work for the Brucker and Brincku
10 cases?
11    A. I believe so. I'm not positive, but I believe
12 so. Some of it could have been coincident, but I think it
13 was separate -- not separate, I think it was just before.
14    Q. So from the sounds of things, Dr. He actively
15 participated in all of the reports that HSA has generated?
16    A. He collected the data.
17    Q. Who wrote -- strike that.
18    Who was responsible for writing the 15 or so
19 reports?
20    MR. AYALA: Just objection because it
21 mischaracterizes the testimony. Go ahead.
22    THE WITNESS: I was responsible for the reports.
23 I think Z (phonetic) probably drafted something and
24 gave it to me, but I was responsible for its content,
25 and I was responsible for interpretation of the data.

68

1 Any conclusion in the report, anything that had to do
2 with a decision, would have been me.
3 BY MR. ANDERSON:
4     Q. And aside from the homes in the Brucker
5 litigation and the Brincku house, where were these other
6 homes located in Florida?
7     MR. AYALA: Well, just object to the form of the
8 question. Go ahead.
9     THE WITNESS: I think I remember one in Arizona,
10 I remember several in Alabama, I remember one in
11 Lehigh, one in Cape Coral, and the one in Cape Coral
12 was the well water -- it was well water, it was
13 absolutely well water.
14    We turned on the water and you couldn't be in the
15 room anymore, so there was one with well water in Cape
16 Coral and that was part of the study, and I was
17 actually there for that, yeah. There was.
18 BY MR. ANDERSON:
19    Q. Dr. Lewis, did you request any information from
20 National Gypsum before accepting the work in these cases?
21    MR. AYALA: Objection. It calls for privileged
22 information.
23    MR. ANDERSON: I'm not asking for the information
24 that he received. To be clear, I'm asking him whether
25 he asked for information. I cannot see how that's

69

1 privileged.
2     MR. AYALA: Well, the opposite question -- it's
3 communications between an expert and the attorneys,
4 and it doesn't fall within any of the three exceptions
5 under Rule 26, so it's certainly privileged.
6     MR. ANDERSON: The fact that whether or not Dr.
7 Lewis asked National Gypsum for any information before
8 accepting the work, you're telling me that you believe
9 that that's privileged.
10    MR. AYALA: Because it falls within
11 communications between the expert and the attorney.
12    MR. ANDERSON: I'm not asking for the substance
13 of the communication. I'm not even asking him to tell
14 me what the document was. I'm merely asking him if he
15 asked for any communication in advance of the work.
16    THE WITNESS: When I -- when we began, I didn't
17 know anything about the case, and I want to say this.
18 All the requests were to me for information but very
19 general information.
20    The things -- I don't want to violate whatever
21 we're not supposed to violate, but I was concerned or
22 the things -- the information was, is there sulfur --
23 sulfide in ground water in Southwest Florida.
24    So I didn't need any documents from them to
25 understand that. And then it grew from there. But

18  (Pages 66 to 69)

70

1      the initial part was all one directional of
2      understanding the general Southwest Florida scenario.
3            So I didn't request any documents because it was
4      unidirectional, the information.  Does that -- am I
5      answering your question?
6      BY MR. ANDERSON:
7            Q.  Yes, you are.
8            A.  Okay.
9            Q.  Thank you.  Looking back again at Section 2.1, if
10     we could --
11           A.  And I'm sorry, I've got several reports in front
12     of me.  You're in --
13           Q.  I actually think --
14           A.  2.1 is probably the same.
15           Q.  Yeah, I think there's some minor variations in
16     the first paragraph, although I think the second paragraph
17     in 2.1 is identical in all reports.
18           MR. AYALA:  Let's be clear which one we're
19     looking at.
20           MR. ANDERSON:  I'm looking at Brucker, but --
21           THE WITNESS:  I'll just go ahead and look at
22     Brucker, too, then.
23     BY MR. ANDERSON:
24           Q.  Okay.
25           A.  Yes, I'm there.

71

1            Q.  Okay.  So I just have a couple of questions about
2      XRF scanning and strontium, and first is what do you
3      understand to be the relationship between strontium and
4      corrosion in drywall?
5            MR. AYALA:  Objection.  Lack of foundation.
6            THE WITNESS:  In looking at the various data and
7      reports that are out there, my understanding is that
8      high levels of strontium in drywall correlate with the
9      potential to cause corrosion, which by corrosion I
10     mean blackening of copper and silver.
11     BY MR. ANDERSON:
12           Q.  And do you have any understanding based on the
13     research that you've done about how the strontium got into
14     the drywall?
15           A.  I don't.
16           Q.  And do you have any understanding about what
17     levels or concentrations of strontium have been associated
18     with the corrosive Chinese drywall?
19           A.  My understanding is that not just for corrosive
20     Chinese drywall, for any drywall, that the levels below I
21     think something on the order of 1200, 2,000, in that
22     range, that there was no finish on it, when it's just the
23     drywall material.
24           Below that, no drywall has ever been found to be
25     corrosive, that I'm aware of.  Above that level, I think

72

1      practically all of it has been found to blacken, at least
2      in jar tests and things -- have been found to blacken
3      copper, that thing.
4            Then if there's a facing on it, a paint or a
5      covering, the number -- it's attenuated, the x-ray
6      (phonetic) fluorescence can't necessarily -- it's
7      attenuated somewhat.
8            And, therefore, they use a number around, I
9      think, around 600 for some of the facing on it.  To say
10     above that level there's almost a 1-to-1 correspondence
11     with the presence of this chemical in drywall, and what
12     they're referring to is this corrosion or blackening, and
13     then below that level there's a -- almost a 1-to-1
14     correspondence with not having that effect.  That's my
15     understanding.
16           Q.  Are you aware of any domestic drywall made by any
17     manufacturer that has been found to have strontium levels
18     above the thresholds you just mentioned?
19           A.  I'm not an expert in this area, and I certainly
20     haven't done a peer review to understand that.  I mean,
21     one could go out and look at the literature, I have not.
22     As I sit here today, I'm not aware of any.  That doesn't
23     mean there's not any; I'm just not aware of it.
24           Q.  Okay.  Getting back for a minute, you say that
25     HSA has tested approximately 150 homes total related to

73

1      allegations of corrosion.
2            A.  That's correct.  For insurance companies, right.
3            Q.  Okay.  So I just want to get a little bit of
4      background in that.  So I understand there's 15 or so
5      cases where National Gypsum has been involved --
6            A.  That's right.
7            Q.  And you all have conducted some level of
8      investigation.
9            A.  Uh-huh.
10           Q.  What I would like to ask you a little bit about
11     is the other 135.
12           A.  Okay.  Roughly, right.
13           Q.  Roughly.  Now, were those all allegations of
14     Chinese drywall, those 135?
15           A.  It wasn't allegation, it was that somebody put in
16     an insurance claim, so somebody claimed that there was
17     damage in their home and they -- the folks who did this
18     work went into understand -- did it meet the level of the
19     insurance.
20           This is outside of my area as well, but there are
21     certain things are covered and certain things aren't
22     covered under insurance.  And they were interested in
23     understanding was there coverage or not coverage.  It was
24     a forensic investigation, but not in a lawsuit.
25           To my knowledge, these are not lawsuit issues;

19  (Pages 70 to 73)

74

1    these are for insurance companies.
2       Q.  Okay.  And what was the nature of the
3    investigations in those houses?
4       MR. AYALA:  Objection.  Lack of foundation.
5       THE WITNESS:  To the extent that I know, and I
6    don't know about most of these because I wasn't
7    involved in them, but to my knowledge it was simply to
8    find out if there was a sudden and accidental release,
9    but it's really beyond what I know.
10   BY MR. ANDERSON:
11      Q.  Well, let me ask you a question because your
12   reports seem to reference inspections that HSA has done
13   including inspections that HSA has done in homes with
14   Chinese drywall.  And so what I'm asking you is what
15   knowledge you have about the investigations that HSA has
16   conducted in homes with Chinese drywall.
17      MR. AYALA:  Hold on.  Let me just object because
18   counsel has mischaracterized the report.  Go ahead.
19      THE WITNESS:  When I'm talking about these sites
20   in 2.1 -- is it 2.1?  Yeah, I'm referring to the 15
21   that we did.  Those are the 15 that I'm more aware
22   with, the 150 are -- you asked me the question, so I
23   answered it.
24   BY MR. ANDERSON:
25      Q.  Okay.  So, Dr. Lewis, those 135 or so homes, were

75

1    you at all involved with the creation of the -- whatever
2    reports were made in those cases?
3       A.  No.
4       Q.  So you had no involvement --
5       A.  No.
6       Q.  -- in those?  In preparation for your work in
7    this case, did you review any of that work?
8       A.  No, I had -- Dr. He called the project managers
9    that I knew and asked them did they ever, in any
10   circumstance, come to a conclusion that domestic drywall
11   was responsible for the corrosion that they found in the
12   home in any circumstance, and their response was no.
13      Q.  Okay.
14      A.  That's what I did.
15      Q.  Okay.  And that's fine.  I think this is probably
16   a good spot to take a break.  We've been on the record, I
17   guess, for about an hour and a half?
18      A.  Okay.
19      VIDEOGRAPHER:  Going off the record.  The time is
20   10:55 a.m.
21      (A break was taken.)
22      VIDEOGRAPHER:  Back on the record.  The time is
23   11:11 a.m.
24   BY MR. ANDERSON:
25      Q.  Dr. Lewis, before the break -- well before the

76

1    break, we were discussing some articles that you read in
2    preparation for the deposition.
3       A.  Uh-huh.
4       Q.  You talked about one, I think, from Ohio State?
5       A.  Uh-huh.
6       Q.  And one from Cornell.  Can you tell me a little
7    bit about those papers?
8       A.  Yeah, they were PDFs that the universities had
9    put on their website as I understood, kind of outreach to
10   the community.
11      In other words, if you have well water, you may
12   notice that you'll have corrosion of copper and silver,
13   and here's what you should do about it.  So a few of them
14   were, say, the agricultural branches of the school, that
15   sort of thing.  And they were in Ohio and Indiana.  Purdue
16   was one of them, Texas A & had one.  I think there's one
17   from Cornell.
18      But basically -- my point was it's very broad
19   based and the interest was in helping people understand if
20   they have well water and it has high sulfides in it, that
21   they can expect to see certain outcomes.  And as a result,
22   here's what to do about it, here's how to solve your
23   problem.
24      Q.  And what sort of outcomes were anticipated in
25   these papers if folks had hydrogen sulfide or sulfides in

77

1    their well water?
2       MR. AYALA:  Just -- I object to the form of the
3    question.  Go ahead.
4       THE WITNESS:  The ones that were mentioned were
5    corrosion of copper, blackening of copper, and
6    silvers, I think, was what I specifically remember.
7    BY MR. ANDERSON:
8       Q.  And do you recall anything concerning the amount
9    of time it took for the corrosion to manifest?
10      A.  No.
11      Q.  So to your recollection, you don't know whether
12   it was something that could occur as quickly as the -- as
13   the corrosion occurred in the Brucker, Nutting, Ravelo,
14   and Brincku houses?
15      MR. AYALA:  Objection.  Lack of foundation and
16   object to the form.  Go ahead.
17      THE WITNESS:  I don't know.  When we get into
18   corrosion and timing of things, I know that these
19   referred to as reactive gases, they react relatively
20   quickly.  They tend to have -- they tend to react with
21   the environment, copper and things, but in terms of
22   timing and how fast that occurs on the metal side, I
23   don't have -- I don't have that knowledge.  I don't
24   know that.
25   BY MR. ANDERSON:

20  (Pages 74 to 77)

78

1    Q.  Well, I guess I'm talking about, though -- I
2  mean, we're talking about well water and I'm just sort of
3  trying to get an understanding of in the research you've
4  done is this level of corrosion that we've seen in these
5  houses, is it consistent with the research about sulfides
6  being emitted from well water?
7       MR. AYALA:  I just object to the form of the
8    question to the extent that you lump all the houses
9    together as if they're one concept.
10      THE WITNESS:  The documents to which I'm
11   referring don't go to that level of detail; they just
12   don't supply that information.  They say that you can
13   expect blackening and you can have these issues, but
14   they don't say anything -- they're outreach documents
15   to people that have well water that are experiencing
16   issues, what they can practically do about it.
17      They're not attempting to explain any of the
18   science or any of that sort of thing to the citizens
19   who would then use the information to say:  Oh, I can
20   use a regular aerator; no, I need a forced air
21   aerator; or, no, I need a packed power aerator.
22   Something like that.
23      They're meant to give the public information,
24   not -- they're not meant as -- to give the scientific
25   background to the public.

79

1  BY MR. ANDERSON:
2    Q.  Okay.  Do any of those papers discuss air handler
3  failures in air conditioning?
4    A.  I don't recall it if they did.
5    Q.  Have you, at any point prior to or during your
6  work in the Brucker and Brincku cases, reviewed any
7  peer-reviewed articles concerning corrosion caused by well
8  water?
9       MR. AYALA:  Objection to form.
10      THE WITNESS:  Dr. He brought me one in the last
11   couple of days, that there's a peer-reviewed article
12   talking about sulfide entering a home.  But to be very
13   frank, I was reading a lot of stuff and I didn't have
14   time to go through it in any sort of detail and I
15   don't remember the title of it.
16      I think it was in the Journal of Environmental
17   Engineering, though, but I am not -- I couldn't
18   testify today about any of the information contained
19   in the report.
20 BY MR. ANDERSON:
21   Q.  I guess what I'm trying to understand is, you
22 know, you have in all the reports that you produced in
23 this case, except for the Retana report --
24   A.  Yes.
25   Q.  -- identified the water as the source of the

80

1  corrosion in the homes.
2    A.  Yes.
3    Q.  Is that right?
4    A.  Yes, the -- I want to stay away from "corrosion."
5  I know I used the word "corrosion," but I mean by that the
6  blackening.
7    Q.  Right.  And I guess what I'm asking is whether
8  you've seen any other scientific journals or articles that
9  address what you identified in these cases.
10   A.  I think the literature is replete with examples
11   of the effects of hydrogen sulfide on copper.  I think
12   there's a lot of information about that.  I don't know if
13   there's much -- I mentioned the one article there, but I'm
14   not aware of much information on -- that is in
15   peer-reviewed journals on sulfide coming from well water
16   and causing the damage to the extent that's observed, say,
17   with an air handler failure.
18      I'm not aware of that.  The only thing I caveat
19   that with is hydrogen sulfide doesn't know where it came
20   from.  In other words, it doesn't know that -- it's two
21   hydrogens and a sulfur molecule, so -- reduced sulfur
22   molecule.
23      In other words, there's nothing about that
24   molecule that gives anything about its history.  If I give
25   you a beaker and I have some hydrogen sulfide in it, you

81

1  don't know if it came from well water, you don't know if
2  it came from say Chinese drywall, you don't know if it
3  came from -- it's just hydrogen sulfide.
4      So to the extent that once hydrogen sulfide is
5  present, I think there are a number of articles out there
6  on hydrogen sulfide corrosion of metals.  Not that I'm
7  familiar with that literature, but I know it exists
8  because Dr. Odell had a fair bit of it referred to in his
9  report and those sorts of things.
10   Q.  And you said that sulfur, particularly in
11 Southwest Florida, is a pretty common element to find in
12 well water?
13   A.  Sulfate and sulfide, not -- I just want to
14 differentiate sulfur is an elemental form, and I'm not
15 aware that you find a lot of that in the environment, but
16 sulfate in water and sulfide in water, particularly ground
17 water, is common.
18   Q.  And how about in well water?
19   A.  Well, the well water draws -- the well water is
20 drawn from ground water and hence it would be included.
21 Well water -- the water that is drawn out of a well would
22 be a small subset of all the ground water, if you want to
23 use that.
24   Q.  No, that's good.  I appreciate that.  So if there
25 is a lot of ground water in Southwest Florida that has

21  (Pages 78 to 81)

82

1    sulfate and sulfide in it --
2        A.  Yes.
3        Q.  -- wouldn't you expect to see a lot of writing
4    about well water causing corrosion in homes?  In other
5    words, wouldn't this be something that is very commonly
6    talked about and discussed in articles and studies?
7        A.  I think there are two elements to that.  One is
8    that it is -- in other words, if you look at all those
9    places, all those outreach programs, people reaching out
10   to citizens, it's -- you can't bring it up without the
11   list of outreach programs to help people understand how to
12   keep their materials being corroded by hydrogen sulfide.
13       Now, if you're asking about published studies of
14   well water, I don't know if I know off the top of my head
15   why that wouldn't exist.  One thing I can think of is that
16   if you imagine -- if you imagine that prior to, say, 1960
17   or so, you know, based on the folks I know down here,
18   there weren't a lot of air conditioners down here.
19       In other words, they just didn't air condition as
20   much down here, it wasn't as populated either.  As time
21   went by, specifically say after 2001 with Hurricane
22   Andrew, the building standards, buildings got tighter and
23   tighter and tight.
24       So if you consider that there wouldn't have been
25   a lot of air conditioners early on, and then later

83

1    buildings got really tight -- now, that's one thing.
2        Then another is you got all these homes that are
3    on municipal water.  Well, we wouldn't, unless somehow
4    they had sulfide in municipal water, they wouldn't be
5    part, so you would exclude all of them.
6        So to be in this category with people with well
7    water, you have to tolerate sulfide vapor coming off --
8    sulfide gas coming off your well water.  It's pretty
9    smelly.  And a lot of people wouldn't tolerate it.
10       In other words, long before it caused any tarnish
11   or problem, people would want a solution for it, they
12   would go on the website to try to figure out, you know
13   what can I do about this.  The smell would throw them off.
14       So in other words, a good number of people
15   would -- in other words, it's probably diminishingly small
16   the number of people that could tolerate the odor, and
17   would, therefore, have a lot of these complaints.  You
18   would expect it to be a pretty small number.
19       And just as an aside, the municipal water is
20   typically treated for hydrogen sulfide.  The one over here
21   on Rockville Road, I used to teach a course in
22   environmental chemistry at the local university just to
23   help out, and we'd do a tour of that plant.  And as part
24   of that, there's a huge aerator to flow all the hydrogen
25   sulfide off of the water before they serve it to the

84

1    public.
2        And then if you look also -- and it's in my
3    report as well -- if you look at my report, you'll see the
4    State of Florida actually sets up guidelines for how much
5    sulfite can be in the water because it's -- now, I think
6    they're mainly looking at it from a taste and odor
7    issue -- the odor.  But I think that's what strikes people
8    first, the odor.  So they fix the problem beforehand.
9        You saw a couple of sites, when they run the
10   water, Dr. He -- he had a problem with it and we had to
11   conclude the examination early because it was just
12   overwhelming to him.  The number of people who can
13   tolerate that is probably pretty low, and hence the
14   numbers aren't there.
15       Q.  When you say he couldn't tolerate it, what do you
16   mean by that?
17       A.  Well, the way he described it to me was he
18   just -- it just smelled like hydrogen sulfide and it was
19   really, really smelly and the rotten egg -- and it became
20   overwhelming.  If you look at the concentrations in the
21   air when he was in the room, they're quite high as
22   compared to the odor threshold.  And I think he was
23   just -- he just didn't feel good about being there.
24       Q.  In other words, he was concerned about like from
25   a health perspective?

85

1        MR. AYALA:  Objection.
2        THE WITNESS:  He didn't say that he was concerned
3    from a health perspective.  He just said he didn't
4    want to be in the room anymore.  You know, he's a good
5    guy and he works very hard and he does a good job, but
6    I can't blame him from not wanting to be in there.
7        I've been in, you know, around these homes when
8    the showers are on, and it's really, really smelly,
9    and at some point it's just more than you feel
10   comfortable dealing with.  It's just -- it's
11   irritating.  We're up in the thousands of parts per
12   billion, 2,000.  I mean, there's a lot of hydrogen
13   sulfide.  I personally don't blame him at all.  I
14   understand him.
15   BY MR. ANDERSON:
16       Q.  Of all these outreach documents that you referred
17   to, any of them in Florida?
18       MR. AYALA:  Objection to form.
19       MR. ANDERSON:  Actually, you know, let me
20   rephrase that.
21   BY MR. ANDERSON:
22       Q.  You referred a few moments ago to a number of
23   public outreach documents at universities like Ohio State
24   and Cornell, et cetera.  Have you seen any public outreach
25   documents concerning well water for Florida?

22  (Pages 82 to 85)

86

1    MR. AYALA: Objection to form. Go ahead.
2    THE WITNESS: I have not, but I haven't looked
3  for them. I probably should. This is something that
4  I just did a Google search site equals EDU, so it's
5  going to bring up universities. And this is what came
6  up.
7    You know, on retrospect, I should have put the
8  word "Florida" in there, too, but I didn't do that so
9  I don't have the information you're asking for.
10 BY MR. ANDERSON:
11   Q. Okay. I would like to, if we can, focus on the
12 Brucker report, which is Exhibit No. 7.
13   A. No. 7, yes. This is Exhibit No. 7?
14   Q. Yes, you got it.
15   A. Uh-huh, I do.
16   Q. If you could turn with me to page 7 in Section
17 5.5.
18   A. Yes.
19   Q. And you were mentioning that Dr. He, you know,
20 because it reached a point that it got too unpleasant in
21 one or two instances may have had to cut off the shower
22 test, and I'm not saying specific to the Brucker house, I
23 actually don't think it was here, I think it was in one of
24 the other houses.
25   But it appeared that the timing for the water

87

1  samples was not consistent throughout the houses. And if
2  you could speak to that generally and then we could maybe
3  get into the house specifically?
4    A. Yes, that was based on site conditions, and some
5  instances it was because the water was -- he just couldn't
6  tolerate it any longer and he had to make it more abrupt.
7    The other cases had to do with how much time we
8  had on the site and we had to make an adjustment, a
9  site-specific adjustment. But in general, we tried to
10 stick to a 10- to 20-minute shower -- and, again, some of
11 it had to do with how much time we had at the site, we
12 could only fit so much in and we only had so many hours in
13 the day to do it.
14   But if something had to come up in the field and
15 we had to make an adjustment, that was done. Other things
16 had to do with the readings we were getting. If we got
17 very high readings or lower readings, we might make an
18 adjustment there as well.
19   Q. If you got low readings, what sort of adjustment
20 would you make?
21   A. Well, in terms of the -- specifically the house
22 where we got lower readings was the Brucker house, and
23 what we saw was when we got there -- I was there as well,
24 but when the -- as referred to kind of Dr. He because he
25 was collecting the data, but when he was collecting the

88

1  data initially, we had a relatively high hit in the water.
2  The water had a pretty high hit.
3    Q. Can you find that in the report for us and let's
4  talk about that?
5    A. Yeah, let's look at that. That's a better way to
6  do it. Thank you. So you can see when we arrived that
7  the tap water was -- I'm on Table 6 entitled: Water
8  sample analytical results by hot method and Table 7, hot
9  method analytical results, which would be the lab data.
10   MR. AYALA: I'm sorry. Could you repeat that?
11   THE WITNESS: Yes, Table 6 of the Brucker report.
12   MR. AYALA: Okay.
13   THE WITNESS: And Table 7 -- and one is the hot
14 method which would be Table 6, and the other is the
15 laboratory data, Table 7.
16   MR. AYALA: Okay.
17   THE WITNESS: Can I proceed?
18 BY MR. ANDERSON:
19   Q. Yes, please.
20   A. Okay, yeah. We can see here when we arrive the
21 water was at 10, and the master bathroom cold was at 139
22 and the small bathroom cold was at 93.
23   As we come down the table, and you can go to the
24 next page and see the hot, for Table 7 -- kitchen cold is
25 185, master bathroom cold is 187, and small bathroom cold

89

1  is 171.
2    Now, when we first got there, these were the
3  concentrations we saw, and we all smelled the hydrogen
4  sulfide coming off the water. We then, because we had
5  been to the -- if I remember correctly, we had been to the
6  Brincku house already and so they got the data, they
7  wanted to get -- make sure we had fresh water, so we let
8  some water out of the aerator, and when it returned to
9  its -- at that point, the concentration in the water, if
10 we look at Table 7, the small bathroom shower had dropped
11 to 24 from 185.
12   So the concentration dropped significantly when
13 we lowered that level in the aerator. Dr. He started to
14 do the test, and what he found were the concentrations,
15 while we certainly found hydrogen sulfide -- I'm on Table
16 8 now -- you can see in the shower test in the small
17 bathroom, the small bathroom concentration at the time of
18 the testing was 24, but just a few hours earlier had been
19 up in the 180s, almost 200.
20   Here we're only getting 10, 15, 16, and 19 PPBV,
21 and that's associated with the 24 that we found. When we
22 had arrived earlier, the concentrations had been really,
23 what is that, almost -- from 24 to 200, well, really --
24 let's see here. From 24 to 185, 187, so a factor 6 or
25 something like that -- well, a little more than that.

23  (Pages 86 to 89)

90

1    The concentrations had dropped off, and if you're
2  asking me exactly why those concentrations dropped off, I
3  don't know. I know they were up to 185 when we got there
4  and then when we lowered the amount in the aerator, it
5  dropped off.
6    I have one hypothesis, but I don't have any -- I
7  don't have anything that I think would be -- that I have
8  controls or an experiment or proof or anything like that.
9    Q. What's the hypothesis that you're referring to?
10   A. If you turn to the -- if you turn to the
11  pictures -- let me see if I can find it here. The
12  pictures in this report -- okay. Let's turn to the
13  pictures in the report, and they are in the figures and it
14  will be Figure 4. Figure 4 in this report.
15   Q. Shoot.
16   A. Okay. If you look -- can you see the white film
17  on this bacteria? The white kind of -- there's an arrow
18  pointing to it.
19   Q. I see what you're referring to.
20   A. It's long fibers. It was really unbelievable, I
21  hadn't seen an aerator like this before, but these are all
22  through the tank, all in the bottom. And it's in the
23  tank. It was a little unnerving, but these are kind of
24  floating in the -- as the water moves in the tank. These
25  little tendrils that stick out -- it looked like hair --

91

1  and it extended throughout the tank.
2    One -- now, did I test these bacteria and do I
3  know what they are? I did not. Is the water in here
4  aerobic or anaerobic, I don't know that. But one could
5  hypothesize that there's some -- because this bio film
6  around here, it looks like it's pretty thick to me --
7  could part of that layer be anaerobic and you're actually
8  former hydrogen sulfide in the aerator? It could be.
9    So in other words, just the opposite of Brincku,
10  it could be the case that some of the hydrogen sulfide is
11  coming from bacteria growing because you can see there's
12  ample microbial growth in their aerator.
13    It's really unbelievable how much growth was
14  occurring in there, that maybe we affected the test by
15  lowering the water in the, you know, refreshing it with
16  fresher water. But that being said, I don't have any
17  proof of that. I don't know that for a fact.
18   Q. I would like to focus for a second on page 8 in
19  the report, and it is in Section 6.4, total sulfide
20  measurement in water.
21   A. Page 8? Yes.
22   Q. Okay. So can you read for me starting right
23  after Table 7, the sulfide concentrations?
24   A. The sulfide concentrations were 2,650 microliter
25  in well water and 612 in the water tank, which is higher

92

1  than the Chapter 62-555.315 of the Florida Administrative
2  Code potable water limit for public water systems of 300
3  of total sulfide as shown in Appendix E.
4    Q. I'm going to pass to the court reporter what I
5  would ask her to mark as Exhibit 9.
6    (Plaintiffs' Exhibit No. 9, Chapter 62-555.315 of
7   the Florida Administrative Code, was marked for
8   identification.)
9  BY MR. ANDERSON:
10   Q. Dr. Lewis, do you know what this document is?
11    MR. AYALA: Before you answer, I just want to put
12  an objection on the record about the document because
13  it's not clear that this is a complete version of the
14  document. But go ahead.
15    THE WITNESS: Yes, it's Chapter 62-555.315 of the
16  Florida -- it appears to be of the Florida
17  Administrative Code, yes.
18  BY MR. ANDERSON:
19   Q. And do you recognize that particular Florida
20  Administrative Code provision?
21   A. Yes, this is in -- I think I included it in my
22  report.
23   Q. And do you have any reason to believe that this
24  isn't a full copy of the code provision?
25    MR. AYALA: Objection to form.

93

1    THE WITNESS: Well, it's not a full copy of the
2  code, and -- it appears to be a full copy of that
3  subsection of the code; is that fair?
4  BY MR. ANDERSON:
5    Q. That is fair. Okay. In the sentence you just
6  read, you said the potable water limit for public well
7  water system is what? What's the 300?
8    A. It's under low, it's .3 milligrams per liter of
9  total sulfide. It's under low.
10   Q. Okay.
11   A. And if you -- between .1 and .3 they describe
12  certain treatments, and then if you get up above .3, they
13  describe it as moderate. Potential for impacts without
14  total sulfide removal, that you would have -- they would
15  anticipate moderate potential impacts above .3.
16   Q. Okay. So the unit that you use in your paper on
17  page 8 of the Brucker report, you said it's 300 -- I'm
18  just trying to understand the units.
19   A. Oh, yes.
20   Q. I suspect that it may be the same, and there's
21  decimal places moving, but I'm just trying to understand
22  the units. Because the units that you use in your report,
23  while they may mathematically be the same, I'm just trying
24  to understand the difference.
25   A. You make the record clear, whatever, yes.

24  (Pages 90 to 93)

94

1  .3 milligrams per liter is the same thing as 300
2  micrograms per liter, a microgram being -- a milligram
3  being a thousand micrograms.
4      Q.  Okay.  So this code section, 62-555-3.15, is it
5  fair to say that this section sets forth a process for
6  testing water on homes that are on well water?  I mean,
7  how would you describe this code section?
8      MR. AYALA:  Objection to form.  The code speaks
9  for itself.
10     THE WITNESS:  These are -- under this section,
11 it's meant to direct control of copper pipe corrosion
12 and black water, specifically.  I think they're
13 concerned with odor, and I think they're concerned
14 with -- it says here:  Copper pipe corrosion and black
15 water.
16 BY MR. ANDERSON:
17     Q.  Now, did you -- can you direct your attention to
18 Section 5?  It's actually right on the first page,
19 Dr. Lewis.
20     A.  Oh, I'm sorry.
21     Q.  That's okay.  It's right on the first page.
22     A.  Oh, there it is.
23     Q.  And it begins:  Control of (inaudible) corrosion
24 and black water.
25     All right.  Do you see the sentence that begins

95

1  about midway through the paragraph:  These measurements
2  may be performed?
3      A.  Yes.
4      Q.  Can you read that sentence for me?
5      A.  Yes.
6      These measurements may be performed by an
7  authorized representative of the supplier of water or
8  applicant, but field measurements for dissolved oxygen, pH
9  and turbidity shall be performed following the appropriate
10 procedures in the Department of Environmental Protection
11 standards operating procedures for field activities, DOP,
12 SOP-001/01, as incorporated into Rule 62-160.800 FAC and
13 all other measurements shall be performed using an
14 appropriate method referenced in Subsection 62-550-550
15 parenthetical 1, FAC, or in standard methods for the
16 examination of water wastewater as adopted in rule
17 62555.335 FAC.  If the result for total sulfide exceeds --
18 equals or exceeds .3 milligrams per liter, the applicant
19 shall do the following.
20     Q.  Okay.  This refers to DEP SOP-001/01?
21     A.  Yes.
22     Q.  Is that the method that you all used for
23 determining the amount of sulfide or sulfate in the water?
24     MR. AYALA:  Objection to form.
25     THE WITNESS:  Let me think for a moment.  This

96

1  is -- that's a method for sampling ground water.
2      Do I know as I sit here today we used exactly
3  that method?  We certainly -- on all our ground water
4  sampling, we used DEPSOP 001/01, but you're usually
5  sampling -- if I remember correctly -- and I'm doing
6  this from memory, is that you're sampling from a well,
7  and there's certain requirements for not using bailers
8  and using a pump.
9      These samples were taken from the surface water,
10 so they would have been from the aerator itself and
11 from a spigot.  In other words, we didn't have access
12 to the well to drop a tubing down to sample it.  We
13 had to take the sample from a spigot.
14     So I think they're referring to -- although, you
15 know, to be Frank, I probably need to get DEPSOP
16 001/01 and look at it and see if it has surface water
17 provisions, because we would have met any surface
18 water sampling provisions.  The gloved hands, all that
19 sort of stuff.  We would have met all those
20 provisions.
21     Whether we met the ground water standard method
22 for sampling, we weren't sampling ground -- we
23 couldn't get into the well casing, basically, so you
24 couldn't do ground water sampling.
25 BY MR. ANDERSON:

97

1      Q.  When this talks about water quality ranges in the
2  charge here at the bottom of page 1 of the code provision
3  here, is it talking about that .3 milligrams per liter of
4  total sulfide there?  Is that in the well water itself or
5  is it in the potable water that's already in the house?
6      A.  Oh, it's saying --
7      MR. AYALA:  Objection.
8      THE WITNESS:  Sorry.
9      MR. AYALA:  Objection.  Go ahead.
10     THE WITNESS:  It's saying that if you have that
11 concentration in the well water, you should treat it
12 using one of the methodologies they outline here
13 with -- I don't know if it says it here, but with the
14 assumption that you're treating it to, you know, below
15 that level.
16 BY MR. ANDERSON:
17     Q.  Below what level?
18     A.  The .3 milligrams per liter or 300 micrograms per
19 liter.  I haven't read the rule closely enough to know
20 that it says that, but we could read it and see.  I don't
21 know.
22     Q.  If you need to take a minute to review the rule,
23 that's fine.  I guess what I'm getting to, so that you
24 know, is:  Is the goal of the code provision that the
25 water that gets into the house to be drank is below 300

25  (Pages 94 to 97)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

98

1  micrograms per liter?
2      MR. AYALA:  Objection to form.  Go ahead.
3      THE WITNESS:  That's my understanding, but in
4  order to confirm that -- I'm saying it's above that
5  level of which they're suggesting you should have
6  treatment.
7      If we -- if I need to understand or testify about
8  whether they're requiring inside the home it be -- I
9  need to do some more review, and it might take a
10  while.
11      But as I sit here today, my understanding of it
12  is, which I need to review to confirm, is that they --
13  the department would prefer to have water inside the
14  home be below .3 milligrams per liter.
15  BY MR. ANDERSON:
16      Q.  And did you identify any water in any of your
17  tests inside the Brucker house that was above
18  .3 milligrams per liter?
19      A.  I don't think we did, but let me look and see.
20  It's above .3 in the aerator tank on two occasions, and
21  that aerator tank is connected directly to the house with,
22  to my knowledge, no way for any of the sulfide to get out.
23      In other words, it's not exposed to the air
24  between the aerator tank and inside.  But that being said,
25  on the day we were there at the time we sampled, no, there

99

1  are no samples over 300 micrograms per liter, that is
2  correct.
3      Q.  On the day you sampled at the Brucker house, were
4  there any samples above 200 micrograms per liter inside
5  the house?
6      A.  Inside the house, no.
7      Q.  Let's look for a second at Exhibit No. 5, which
8  is the Nutting report, and let's look at Table 7 and Table
9  8 in the Nutting report.
10      A.  Yes.
11      Q.  And Table 7 and Table 8 in the Nutting report,
12  what do they depict?
13      A.  Table 7 is the water sample, analytical results
14  and the Table 8 is the hydrogen sulfide in air as measured
15  by the Jerome meter.
16      Q.  So let's focus on Table 7 for a minute.
17      What was the lowest sulfide reading you got at
18  any point in your water sample at the Nutting house?
19      A.  All right.  At the Nutting house from Table 7 we
20  see -- it looks like 515.  Am I reading that correctly?
21  515 -- I'm just scanning to see the lowest number, I think
22  it's 515 in the kitchen cold water off of Table 7.
23      Q.  And just so the record is clear, when you say
24  515, what unit are you using?
25      A.  Yes, 515 micrograms per liter.

100

1      Q.  Okay.  And so every reading that you got in the
2  Nutting house was above the threshold of 300 micrograms
3  per liter found in 62-555.315?
4      A.  Yes.
5      Q.  Next, if we could, let's look at Exhibit 6, which
6  is the Brincku house, and if we could find Table 7 in the
7  Brincku house?
8      A.  Yes.
9      Q.  Would it be fair to characterize the results in
10  the Brincku house as having only three results in total
11  that you tested there that were below the reporting
12  threshold in 62-555.315?
13      A.  Yes, if we -- just the caveat that we came out
14  for two days, and on one occasion we refilled the aerator
15  on the second day, but we didn't on the first day, it had
16  stagnated water.  And that stagnated water had
17  considerably lower sulfide.
18      So if we were looking at, you know, in the case
19  where the aerator hadn't been sitting for a long time and
20  was in operation, then only one value, which was
21  associated with the tap water before the heater was
22  refilled, which would still have old water in it.
23      So if you consider after the aerator has been
24  operated, or it's in an operational form, the lowest value
25  was 851.  But if you look at it on the first, as you've

101

1  described, and include values that -- where the aerator
2  had been left unused for -- I don't know exactly how long,
3  but months likely, maybe longer than that, that in that
4  case, the two of the values were below the 300, yes.
5      Q.  Okay.  Turn with me, if you could, in Exhibit 8,
6  the Ravelo report to Table 7.  What's the lowest number of
7  micrograms per liter that you found in any of the samples
8  at the Ravelo house?
9      A.  I believe it's 1820 micrograms per liter in the
10  small bathroom cold sample, if I'm reading it correctly.
11      Q.  Yeah, and just -- this is not a trick question.
12  I think the master bathroom cold, the first one --
13      A.  Oh, you're correct.
14      Q.  Is actually lower?
15      A.  Yes, it's 1730 is the master bathroom cold;
16  that's correct.
17      Q.  Okay.  So would it be fair to say -- and I'm
18  leaving Retana aside for a second -- would it be fair to
19  say that in the Brucker -- or of the Brucker, Ravelo,
20  Nutting, and Brincku samples, the Brucker samples were the
21  lowest that you found?
22      A.  That's correct.
23      Q.  And substantially so; right?
24      MR. AYALA:  Objection to form.
25      THE WITNESS:  They were substantially lower, yes.

26  (Pages 98 to 101)

102

1  BY MR. ANDERSON:
2      Q.  And it was the only house of the homes that you
3  tested save Retana, I think, where -- well, strike that.
4      The Brucker home is the only home that you
5  tested in conjunction with the Brucker and Brincku cases
6  where you found no water samples above the .3 microgram
7  per liter threshold referenced in 62-555.315; is that
8  right?
9      A.  Inside the house; correct?  Because the aerator
10  had higher -- the finished water in the aerator was higher
11  than the 300.
12      Q.  Right.
13      A.  But inside the house.
14      Q.  Inside the house, you had no tests that were
15  above the threshold, and so my question is building from
16  that would it then be your testimony that a house that had
17  levels below the .3 microgram per liter -- sorry.  Strike
18  that.  Let me start over.
19      A.  Sure.
20      Q.  I'm having trouble with the units here.
21      A.  Yeah, a lot of people do.
22      Q.  So would it be your testimony, then, that it
23  would be possible to observe corrosion in a home
24  attributable to the well water even if the total sulfide
25  measurements in the water were below the 300 microgram per

103

1  liter threshold found in the Florida Administrative Code?
2      MR. AYALA:  Objection to form.  Go ahead.
3      THE WITNESS:  I don't think I know that.  In
4  other words, if it relates to corrosion, if you're
5  asking me if something corrodes something, I don't
6  know that.  What I would be able to say is that when
7  we saw the numbers in the 50s, we were getting
8  something like -- I can't remember what the -- we can
9  look at it, but it was 14 or so PPBV in the air, and
10  that's when we're reading 25 in the water.
11      Earlier we read about 187, so I would assume that
12  there would be somewhat of -- my opinion would be that
13  you would have a fairly linear correlation for dilute
14  solutions in the use of Henry's law constant, that
15  what you have is roughly a linear relationship between
16  the concentration of water and the concentration
17  there.
18      So if the water that had the 187 would be to run
19  through a faucet and tested, I would expect it to be 6
20  or 7 times higher.  The hydrogen sulfide that was
21  detected was around 14.  I would expect when the 187
22  went through, or 185 went through, that the
23  concentration in air of hydrogen sulfide associated
24  with that would be 7 or 8 times higher.
25      Now, would that level of hydrogen sulfide cause

104

1  damage in a home?  I don't know that.  I'm not a -- I
2  don't purport to be a corrosion expert.  I just don't
3  know.
4  BY MR. ANDERSON:
5      Q.  Well, I guess my focus is that the Brucker house,
6  in particular, you reach the conclusion that the cause of
7  the corrosion in the house was the water, yet you didn't
8  take any measurements in the house where you found it to
9  be above the limit in the Florida code and I guess I'm
10  trying to understand what the -- what basis is there for
11  that conclusion?
12      A.  Right, right.  I just want to stay away from
13  corrosion.  The blackening, though -- my understanding is
14  that if you consider the level, even the 14 is something
15  on the order of 28 times higher than what's commonly found
16  in homes with Chinese drywall.
17      Now, I realize that's not dissipated through the
18  whole home or anything like that.  But if we consider that
19  the concentration 6 to 8 times higher than that, that's
20  the only source of sulfide except for, I believe, sulfide
21  from soil vapor that we found at that house.
22      I didn't find -- in reading the CPSC report, we
23  did not see corrosion from the domestic drywall.  No sign
24  of corrosion from that -- I say corrosion, but you know
25  what I mean, blackening of the -- so we got no other

105

1  source.  And of all the sources that we measured, when we
2  came to the home, there wasn't sulfide in the home, when
3  we turn on the faucets, sulfide came out.
4      And what I made is the connection between the
5  sulfide at present in the air and the blackening because
6  it was the only source we could find.  The other piece of
7  information that I had was that this home was one of the
8  most lightly -- it had the least level of corrosion, as I
9  understand it, than the other homes.  The other homes had
10  more corrosion.
11      Q.  And how did you come to understand that?
12      A.  I believe that -- well, Dr. He said that when he
13  observed the homes he saw that, and I can't remember if
14  Dr. Odell mentioned that at some point or not.  He might
15  not have.  That might not be in his deposition, but Dr. He
16  certainly said, as he went around the houses, that was the
17  least corroded home.
18      And so that kind of gives an idea that maybe the
19  lower level is -- not maybe, but that the lower level of
20  hydrogen sulfide in the house is causing a lower level of
21  corrosion.
22      Q.  Let's focus for a second of the parts per billion
23  of hydrogen sulfide.
24      A.  Yes.
25      Q.  And you said that -- and I guess we can probably

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

106

1  focus on your report for a second to discuss this.
2      MR. AYALA: Which report?
3      MR. ANDERSON: Brucker 7 and page --
4  BY MR. ANDERSON:
5      Q. Dr. Lewis, in Section 7 of page 9 of the Brucker
6  report?
7      A. Yes.
8      Q. You still, in the last sentence, these
9  concentrations are in excess of the reported value which
10  is commonly associated with defective drywall?
11     MR. AYALA: To defective Chinese drywall.
12  BY MR. ANDERSON:
13     Q. To defective Chinese drywall, I'm sorry, mostly
14  below parts per billion by volume, paren, a median of .59
15  parts per billion of volume, closed paren, according to
16  final report on an indoor environmental quality assessment
17  of residences containing Chinese drywall from January of
18  2010.
19     Now, you said a moment ago that you found H2S
20  readings in the air that were as much as --
21     A. 14, I think. Wasn't it 14?
22     Q. Right.
23     A. Parts per billion volume.
24     Q. So that increase to 14 parts per billion by
25  volume that you found in the Brucker house, that would be

107

1  something that would be temporarily associated with
2  running a shower?
3      A. Yes.
4      Q. Okay. And you did a test at the beginning, and
5  maybe we can turn to Table 9 for a minute. Okay.
6      So looking at Table 9, what was the reading in
7  the shower prior to running the shower?
8      A. Do you mean, when we showed up at the house in
9  the area or just before the shower -- because we had been
10  running water in the area -- there's going to be a little
11  background from where we run the sinks and whatnot.
12     Q. Maybe the best way to ask this, then, is what was
13  the reading in the air of hydrogen sulfide at the Brucker
14  house when you arrived?
15     A. Yeah, it was below .6 PPBV.
16     Q. Okay. --
17     A. Sorry, sorry -- yeah, that's right, below .6
18  PPBV. Do you see it says: Living room 1 upon arrival in
19  Table 9.
20     Q. Right. Just bear with me for one moment, please.
21     A. Sure.
22     Q. And when you say it was below .60 PPBV, is that
23  the laboratory detection limit? Is that the method
24  report? Help me understand why -- are you able to
25  identify a number below that threshold?

108

1      A. No, this is the -- if I'm reading it right, and I
2  see the I list on these others, there's a PQL and an MDL.
3  The PQL is a practical quantitation limit, and the MDL is
4  a method detection limit.
5      The method detection limit, if I understand it
6  correctly, is there's a 95 percent chance above that
7  value, if you get a detection, that it exists, but you
8  can't quantify it. The practical quantitation limit, PQL,
9  above that number, there's a 90 percent chance that the
10  value that you've identified is between -- within a window
11  of concentrations.
12     So below the method detection limit, there is
13  less than a 95 percent chance that it's -- that a reading
14  on that machine that it can be detected. It's below the
15  noise, if you want to think about it like that.
16     Q. Now, the median that you refer to for hydrogen
17  sulfide in the air in the Chinese drywall report
18  referenced on page 9 is .59 parts per billion by volume.
19     And I guess what I'm asking is do you know, as
20  you sit here today, what the reading was upon arrival, or
21  are you saying that it was below that threshold and so you
22  don't know?
23     MR. AYALA: Objection to form.
24     THE WITNESS: Honestly, you lost me. I want to
25  answer your question, but you lost me a little bit.

109

1  .59 would not be detected by a method detection limit
2  at .6 typically.
3  BY MR. ANDERSON:
4      Q. Okay. Maybe a better way of asking this is
5  .60 parts per billion by volume is the method detection
6  limit for the test that you used to identify whether there
7  was hydrogen sulfide in the ambient air in the Brucker
8  house; is that correct?
9      A. That's correct.
10     Q. And below that threshold of .60 parts per billion
11  by volume, you're not able to detect it in the air?
12     A. That's correct. It's below the detection limit
13  of the machine, and so a chemical could be present but you
14  wouldn't detect it with this method.
15     Q. So in other words, the equipment that you had
16  with you when you tested the ambient air at the Brucker
17  house was unable to find hydrogen sulfide in the air upon
18  arrival?
19     MR. AYALA: Objection to form.
20     THE WITNESS: No.
21     MR. AYALA: Mischaracterizes.
22     THE WITNESS: That's not right.
23  BY MR. ANDERSON:
24     Q. Okay. So help me understand.
25     A. We didn't -- this isn't equipment, it's an air

28  (Pages 106 to 109)

110

1  sample. So the equipment is at the laboratory; right?
2      So you take the air sample, and then you send it
3  to the laboratory. These are laboratory analytical data,
4  so there's no equipment that we have at the site; you
5  collect an air sample and then you send it to the
6  laboratory.
7      MR. AYALA: You're referring to Table 9.
8      THE WITNESS: And I'm referring to Table 9.
9  BY MR. ANDERSON:
10     Q.  You're talking about a Tevlar bag?
11     A.  Yes, there's a lung sampler, it's called. What
12 happens is you put the Tevlar bag -- it's evacuated,
13 meaning it doesn't have any air in it. You put that
14 inside the lung sample, and the lung sample creates a
15 vacuum on the outside of the bag.
16     And so the vacuum, the bag is -- I don't know if
17 you've ever seen it. It's not -- it looks like plastic, I
18 mean, if you want to be simple about it. It looks like
19 plastic. And so as the vacuum occurs outside the bag, the
20 bag expands and it will draw an air sample into it.
21     And whatever is in that air sample now gets
22 sealed in the bag, stored with -- it's stored on ice and
23 then sent to the laboratory and then the laboratory has
24 equipment -- you know, off the top of my head, I don't
25 know if this is a GCMS or if it's another methodology, but

111

1  they have a detection device on their side.
2      And if I look, I could -- I know some things
3  about the detection devices that laboratories, use, if it
4  were GCMS or something like that, it's a method by which
5  they can separate all the potential chemicals in the
6  sample and then detect specific chemicals.
7      And the idea being there's an amount below which
8  the device can't measure lower than that. And if you look
9  over time, I bet if you went back, you know, a decade, two
10 decades, the values would have been much, much higher than
11 this. The analytical methods have driven these things
12 lower and lower with time.
13     So .6 PPBV is a pretty low number, it's a part of
14 a part per billion, meaning say one milliliter and a
15 million -- or billion, a billion milliliters. I mean,
16 it's not much.
17     Q.  Right. And so, would it be fair to say that
18 there would be an inverse relationship between the amount
19 of hydrogen sulfide in the air and the -- strike that.
20     Would it be fair to say that there would be a
21 correlation in the relationship between the amount
22 of hydrogen sulfide in the air and the amount of blackening
23 that you would see in any particular house?
24     MR. AYALA: Just objection to the form to the
25 abstract question.

112

1      THE WITNESS: I think it depends on a lot of
2  factors. The air exchange rate in the house, there
3  are a number of things that it would depend upon. But
4  if you had hydrogen sulfide in a jar with copper, I
5  would think that there would be a relationship between
6  it. I don't know if it's a linear relationship or
7  not. That's beyond the scope of what I know.
8      But my understanding is that if you -- if you
9  were to take a jar and put hydrogen sulfide in it, you
10 would get some blackening, and if you put more
11 hydrogen sulfide, you would get some more blackening,
12 but I don't know if at some point the concentration no
13 longer matters because you've already covered up the
14 top layer. I just don't know those sorts of things.
15 BY MR. ANDERSON:
16     Q.  So with respect to the Brucker house, it's your
17 inference from the data that you have that there's less
18 corrosion relative to the other homes because there is
19 less hydrogen sulfide in the water?
20     MR. AYALA: Objection to form.
21     THE WITNESS: Potentially. I didn't write that
22 in my report, but that's -- I think that's not
23 unreasonable. One of the things that I think is
24 important is this .3. I think some people think of
25 these numbers like .3 is a magic number, you know.

113

1      Below .3, nothing bad will happen, so at .299999,
2  no problems. At .3000001, big problems. I just --
3  that's I don't think would be an appropriate way to
4  look at the data. I suspect that you could have
5  .1 milligrams per liter and have problems, depending
6  on the scenario you're talking about.
7      And I suspect you could have, you know, .3 and
8  not have -- or .35 or something, and not have any
9  problems, if you had a lot of air -- if the air were
10 blowing through -- if you were outside for instance.
11 But I haven't done that testing. I don't have any
12 data in front of me. I don't -- it's not that I
13 couldn't understand that. It's just as I sit here
14 today, I haven't set out to understand that.
15 BY MR. ANDERSON:
16     Q.  So the basis for your conclusion that the Brucker
17 house has corrosion or blackening as a result of the well
18 water is based on the notion that you were not able to
19 identify other sources of hydrogen sulfide in the home?
20     MR. AYALA: Objection. Asked and answered.
21     THE WITNESS: But I still answer it, right?
22     MR. AYALA: Yeah.
23     THE WITNESS: Okay. So that's one piece of
24 evidence. It was less, it seemed to make some sense.
25 But the other was that this water is putting

29  (Pages 110 to 113)

114

1  hydrogen sulfide into the air, and that will react.
2  The other thing is that when we did the test -- when
3  we did the test, the value was down to -- on Table 7,
4  the small bathroom shower, the concentration of the
5  water was down to 24.  That 24 micrograms per liter,
6  correlated with 24 PPBV in air.
7      But when we got there, the small bathroom had 171
8  in it.  So what is that, if you multiply by 8, you're
9  at 160 plus some change, so at some place between 7 to
10  8 times higher.
11     Therefore, I should be able to take my 14 and
12  multiply it by 7 or 8 and get the amount of hydrogen
13  sulfide that's been emitted into the air, and
14  that's -- you know, do I know that that specific
15  amount caused a specific amount of corrosion?  No.
16  But it's available to cause corrosion.  And it is the
17  only other sulfide that I could locate in the home.
18 BY MR. ANDERSON:
19     **Q.  If I told you that Mr. Brucker lived in a house**
20 **on that property prior to building the house that's at**
21 **issue in this litigation and that it was on the same well,**
22 **but there was not corrosion in the first house over a**
23 **period of more than a decade, would that cause you to**
24 **rethink your opinion at all in this case?**
25     MR. AYALA:  Objection.  Go ahead.

115

1      THE WITNESS:  I would want to know more about it.
2  I mean, that would be potentially useful information.
3  Did he change out the aerator, because that aerator
4  had all the material in it?  Maybe if there was a
5  change in aerator.  What other changes occurred, was
6  it the same size house, did it have the same air
7  exchange rate?
8      I mean, I think these are the sorts of things --
9  did they measure -- I mean, I suspect they didn't, but
10 if they had data on how much hydrogen sulfide was
11 coming off their water at the house from that
12 location, I think that would all be useful
13 information, you would take that all into account in
14 forming an opinion, sure.
15 BY MR. ANDERSON:
16     **Q.  In terms of your analysis of the Brucker house in**
17 **particular, I just want to make sure that I've already**
18 **gotten this.  And if I've already asked the question in**
19 **some other way, I apologize.**
20     **But in your analysis for potential sources of**
21 **corrosion or blackening, you did not look at any potential**
22 **secondary reaction that the hydrogen sulfide might be**
23 **creating when it combined with any sulfur-oxidizing**
24 **bacteria that may or may not have been in the drywall?**
25     MR. AYALA:  Okay.  First of all, I certainly

116

1  object to the form of the question.  I also object to
2  any question regarding sulfur-oxidizing bacteria
3  because there's simply nothing in the Plaintiffs'
4  complaints in either of these cases with regard to
5  that.
6      Nor is there anything in the timely served expert
7  reports in this case, so any discussion of
8  sulfur-oxidizing bacteria violating the federal rules,
9  it violates the court's case management orders, the
10 parties Rule 26 F report, and I just object to any
11 questions about it.
12     THE WITNESS:  Could you give it to me one more
13 time?
14     (The requested portion of the record was read.)
15     MR. AYALA:  Same objections.
16     THE WITNESS:  Okay.  Not in a quantitative way,
17 but in a qualitative way, I did consider it.  Now,
18 I've looked at the -- I've looked at the different
19 materials that people have put forward, and this
20 wasn't part of my report, but it was -- I didn't
21 include it in my report, but there was -- I did do a
22 qualitative assessment.
23     And what I did was I have looked at what
24 different experts have said in their reports and
25 depositions and whatnot, and what I saw was -- okay,

117

1  you got some wall board.  There's some -- and I
2  haven't been able to see the whole theory laid out.  I
3  mean, I have never seen it all pieced together in one
4  place, so I try to piece it together in my mind so I
5  can do just what you're asking.
6      There's some board.  It apparently has some
7  sulfur-reducing bacteria, but maybe also some kind of
8  later that came out this sulfur-oxidizing bacteria.
9  But this has to live through the kiln.  It has to live
10 through 260 degrees, even spores, this is wet heat
11 inside that board.
12     It's going to be very difficult to imagine how
13 that step -- in other words, you kind of got on that
14 step alone a break where the theory can't stand up.
15 The second is if -- now, I look for sulfate --
16 sulfur-reducing bacteria.
17     If I had known -- if I had known that sulfate
18 oxidizing bacteria were in play, I would look for
19 those two, it would be very easy, I would put an extra
20 sample in the jar, I didn't have that opportunity.
21     But just from my own experience I know that
22 sulfate-oxidizing bacteria are likely to be every bit
23 as ubiquitous as sulfur-reducing bacteria.  So you've
24 got a board that very unlikely anything can survive
25 through that board, and now you've got that on the

30  (Pages 114 to 117)

118

1  wall.
2      If somebody simply walked around in the yard,
3  touched almost anything in the yard, a little bit of
4  dirt, and walked in and put their hands on the wall,
5  there would be sulfate-oxidizing bacteria there.
6      So it's much easier for me to, at least from that
7  piece of it, to say yeah, there could be some sulfate
8  oxidizing bacteria in the wall, but they very likely
9  have come from -- infinitely higher chance they came
10  from outside the house and survived in the kiln.
11      Next, you have got to have liquid water for this
12  theory to work, and I've heard some speculation about
13  this, but to get liquid water, people in HSA have done
14  these mold surveys, and we do see water fairly
15  regularly in these mold surveys in houses and it's
16  usually from an air conditioner that's not working
17  right or it's from a leak.
18      And when we go to fix those things, yeah, we do
19  see the liquid water, but we see mold first.  In other
20  words, mold is less fastidious than the bacteria, so
21  you would see mold growth first, and we didn't see any
22  of that in the house.
23      What you do, though, when you fix the leak or fix
24  the water on the wall because the air conditioner
25  didn't work, you don't take out all the drywall in the

119

1  house, you just take out the boards that are affected.
2      So I can't see how you get this mechanism.
3  There's no liquid water.  But if you did have liquid
4  water, the idea that sulfide could dissolve back into
5  the water, after the fact, is very hard for me to
6  believe, based on what I know about Henry's law
7  constants.
8      And if it did, the time, the conditions, the --
9  all the conditions that would need to be present --
10  I'm not aware of any of those.  I'll leave that to
11  microbiologists.  But I'm not aware of any of those
12  being present.  And then finally, to get the sulfate
13  back off the wall, the Henry's law constant for
14  hydrogen sulfide, it drives it towards the air.
15      But the Henry's law constant for sulfate holds it
16  in the water.  So I did consider it in the -- and then
17  finally just, you know, each one of these things can't
18  really happen -- you can't get it on the wall, you
19  can't get it off the wall.
20      And then, if you go to what I understand from
21  Dr. Odell, is these coils had not -- they didn't have
22  sulfate on the coils, they had sulfide on the coils,
23  was my understanding, so you can't -- I don't know how
24  you get that sulfate back into sulfide on the other
25  side.

120

1      So I did consider that, but there are just so
2  many breaks in the action that it just can't occur, in
3  my mind -- until somebody lays out a theory that makes
4  some sense, I can't -- I can only see what I see in
5  the documents and piece them together.  And in looking
6  at what I've seen, no, that can't -- that can't be.
7  BY MR. ANDERSON:
8      Q.  I want to take a quick break, guys, if we could
9  go off the record.
10      VIDEOGRAPHER:  Going off the record.  The time is
11  12:15 p.m.
12      (A break was taken.)
13      VIDEOGRAPHER:  Back on the record.  The time is
14  12:30 p.m.
15  BY MR. ANDERSON:
16      Q.  Dr. Lewis, can we direct your attention just a
17  minute to Exhibit 3?
18      A.  Yes, yes.  I have Exhibit 3.
19      Q.  Okay.  In connection with this -- and Exhibit 3
20  is the paper that you wrote about sulfur-reducing
21  bacteria; right?
22      A.  Yes.
23      Q.  Okay.  And in conjunction with this litigation,
24  HSA took samples to test for sulfur-reducing bacteria of
25  water; right?

121

1      A.  In sediment in soil, yes.
2      Q.  So how many samples did HSA take?
3      A.  If you'll turn to the Table 1, this shows all the
4  ground water samples we took.  2 will be the surface water
5  samples we took.  Table 3 are the soil samples we took.
6  Table 4 are the sediment samples that were taken.  And
7  then Table 5 shows the controls.
8      So, I mean, I could count them, but they're
9  represented on these tables.
10      Q.  And of those, in how many of the samples did you
11  find no sulfur-reducing bacteria?
12      A.  I think the number would be very low, but let me
13  see.  There was a soil sample from a residential home on
14  Table 3, SS 003.  Again, we're back to this detection
15  limit again, there were less than .31 per gram, so, you
16  know, that's not -- it's not necessarily zero, but it's --
17  and then on the sediment sample from the Caloosahatchee,
18  SD 002 was nondetect, and so those are the ones.
19      Q.  Okay.  And so in terms of water, did you find
20  sulfur-reducing bacteria in every sample that you took?
21      A.  In every sample of -- these are well water
22  samples, and it looks on Table 1, I believe there are ten
23  well water samples, in all ten well water samples there
24  sulfate-reducing bacteria.
25      Q.  And two is surface water; correct?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

122

1    A.  That's correct.

2    Q.  And did you find sulfur-reducing bacteria in the

3  surface water?

4    A.  Yes, the greater than simply means greater than

5  that amount.  That just maxed out the test.

6    Q.  Okay.  So I would like to pass what we'll mark as

7  Exhibit 10.

8        (Plaintiffs' Exhibit No. 10, HSA Engineers and

9        Scientists document, was marked for identification.)

10  BY MR. ANDERSON:

11    Q.  Dr. Lewis, do you know a person named Roxanne

12  Gause?

13    A.  Yes.

14    Q.  And is she a senior environmental engineer at

15  HSA?

16    A.  Yes.

17    Q.  The first page of this document, is that the logo

18  for HSA at the top right corner?

19    A.  Yes.

20    Q.  If you turn to the second page of this document,

21  at the top left-hand corner it says:  Client, HSA

22  Engineers and Scientists.  Right?

23    A.  Yes.

24    Q.  And it says:  Care of Mr. Zeke; right?

25    A.  That's correct.

123

1    Q.  And Dr. Zeke is a coworker of yours; right?

2    A.  He is.

3        MR. AYALA:  Before we go on, let me just object

4  to the use of this document because it's not clear to

5  me that this is a complete document.

6  BY MR. ANDERSON:

7    Q.  Dr. Lewis, do you recognize this document?

8    A.  Not off the top of my head, no.  I mean, it looks

9  like it's lab results from the study that we did, but I

10  don't -- broken up -- I don't see the cover page with --

11  no, I don't know exactly what it is.

12    Q.  Okay.  In Exhibit 3, if we turn to that for a

13  moment --

14    A.  Yes.

15    Q.  -- if you could turn to Table 1?

16    A.  Yes, Table 1.

17    Q.  Do you see in Table 1 where it says GW 003 well

18  water from a residential house?

19    A.  Yes.

20    Q.  And do you see on the first page of Exhibit 10

21  where it refers to a ground water sample as GW 003?

22    A.  No.

23    Q.  On the first page.  The first page?

24    A.  Oh, on the second page.

25    Q.  No, on the cover page.

124

1    A.  Yes.

2    Q.  Okay.  And turning back --

3        MR. AYALA:  But just objection, because there's

4  been no foundation laid that the GW 003 referenced in

5  Dr. Lewis's report as Exhibit 3 is the same as what's

6  being referenced in this apparently incomplete

7  document contained in Exhibit 10.

8  BY MR. ANDERSON:

9    Q.  Dr. Lewis, can you turn to Table 4 in Exhibit 10,

10  please?

11    A.  Yes.

12    Q.  Do you see where it says SD 006 sediment from a

13  ditch?

14    A.  Yes.

15    Q.  And turning back to the cover page on Exhibit 10,

16  does it say sediment SD 006?

17    A.  Yes.

18    Q.  And turning to Table 3 on Exhibit No. 3, do you

19  see where it says SS 003 soil from a residential house?

20    A.  Yes.

21    Q.  And do you see on Exhibit 10 where it says soil

22  sample, SS 003?

23    A.  Yes.

24        MR. AYALA:  Same objection.  Lack of foundation.

25  BY MR. ANDERSON:

125

1    Q.  Dr. Lewis, you directed the sulfur-reducing

2  bacteria examination that is included in Exhibit 3; right?

3    A.  Yes.

4    Q.  And did you direct any of your staff to take

5  samples from the neighbors of the Brinckus?

6    A.  What I directed them to do was to find sampling

7  spots that are available in the area, and Roxanne Gause

8  lives in that area and knows a number of people over

9  there.  I didn't direct her to go to a specific place, but

10  just to find folks that she knew or people that would be

11  willing to let us on their property.  She contacted those

12  people.  I didn't give her a list or anything like that.

13  She knows the community because she lives there.

14    Q.  So as you sit here today, are you or are you not

15  aware of whether or not these samples were taken from the

16  Brincku's neighbors?

17        MR. AYALA:  Objection to form.

18        THE WITNESS:  I don't know -- I don't know

19  Mr. Smart and I don't know -- I know based on the map

20  where the samples are collected, but I don't know -- I

21  don't know more than what the map says.

22  BY MR. ANDERSON:

23    Q.  Well, looking at the map for a second, are you

24  able to identify whether it's in proximity to the location

25  where the Brincku's house is located?

32 (Pages 122 to 125)

126

1    MR. AYALA:  First of all, what map are we talking
2    about.
3    MR. ANDERSON:  I mean, we could use any number of
4    them, but I think we can use the map that includes the
5    GW samples, and I'm not sure, Tom, that there's --
6    it's Figure 1.
7    MR. AYALA:  Okay.  So you're referring to --
8    MR. ANDERSON:  Figure 1 in Exhibit 3.
9    MR. AYALA:  Okay.  Talking about Exhibit 3 here.
10   THE WITNESS:  Is there a question?  I'm sorry.
11   BY MR. ANDERSON:
12   **Q.  Are you able to identify from this map whether**
13   **this sample was taken in proximity to the Brincku's house?**
14   A.  I didn't label the Brincku's house on this
15   report.  Let me see if I can match it together with Figure
16   2.  It looks like there's several oxbows in the river.  It
17   looks as if it's in the vicinity.  I don't know how close,
18   but it looks like it might be in the vicinity, yeah.
19   **Q.  So you said you -- strike that.**
20   **Just so that I mean 100 percent clear, what**
21   **exactly did you direct Ms. Gause to do?**
22   MR. AYALA:  Objection.  Asked and answered.
23   THE WITNESS:  I asked her to use her connections
24   of the community or to find sampling locations, and I
25   don't think it was just her.  I think it was Shannon

127

1    Tucker and also Zeke, some of these Cape Coral samples
2    might be associated with -- Shannon lives over in that
3    area, so they went out and found sampling locations,
4    is my understanding.
5    BY MR. ANDERSON:
6    **Q.  So you have no knowledge, then, as to what**
7    **representations they made to Mr. Smart concerning the**
8    **purpose for their visit?**
9    A.  Oh, no, I don't know that.  I don't know that.
10   **Q.  Did you ever make inquiry about that?**
11   MR. AYALA:  Objection.
12   THE WITNESS:  No.  Roxanne has a really good
13   relationship with a lot of folks.  Some folks I heard
14   about were in the Florida Engineering Society, which I
15   knew, too.  My understanding is she's asking friends
16   of hers and people that she knows and that they gave
17   us access -- inside access to take the samples.
18   BY MR. ANDERSON:
19   **Q.  Would you be upset if you learned that consent to**
20   **take the samples was gained by deception?**
21   MR. AYALA:  Okay.  Objection.  Because counsel
22   has assumed facts that are not in evidence, and calls
23   for speculation.  Lack of foundation.  Go ahead.
24   THE WITNESS:  I would be.  I mean, that's not
25   something that we do at HSA.  We wouldn't set out --

128

1    now, I don't know the exact facts of the case, and I'm
2    not saying anybody deceived anybody, but if I found
3    that to be true, that would be a problem.
4    BY MR. ANDERSON:
5    **Q.  Okay.  So you conducted this review of the**
6    **sulfur-reducing bacteria, and some of the samples you**
7    **would acknowledge were taken from locations at least near**
8    **the Brincku house?**
9    A.  My understanding is that this -- well, we were
10   attempting to understand what was happening in a broad
11   area.  In other words, I don't think this study would have
12   been as valuable if it were too localized.  We wanted
13   things in the general vicinity.
14   If you look, it's basically along the
15   Caloosahatchee, with a point over in Lehigh Acres as well.
16   So the question to be answered is are sulfur-reducing
17   bacteria present in broad areas across the environment of
18   Southwest Florida.
19   **Q.  Now, in examining the theory you had about the**
20   **water being the source of the corrosion or blackening in**
21   **the houses in the Brucker and in the Brincku litigation,**
22   **did you take any samples from the adjacent homes to any of**
23   **the houses?**
24   A.  No, we did not.
25   **Q.  Why not?**

129

1    A.  Well, we didn't have access to those properties
2    for one thing, but for another it just wasn't in the scope
3    of what we were doing.  We were to go examine these houses
4    and understand could we find additional sources of sulfide
5    in these houses.
6    And in terms of finding other houses -- in a
7    sense, every house is going to be different, just like we
8    talked about earlier.  You won't have generalizations.  If
9    we found one house in the neighborhood that was clean,
10   what would that prove?  I mean, it may help a study, but
11   that wasn't in the scope of what we were doing.  Our scope
12   was -- is can we find additional sources of sulfide in
13   these houses.
14   **Q.  So let's take, for example, the Nutting house.**
15   **The Nutting house didn't have an aerator on site, did it?**
16   A.  I believe it had a water softener, but not an
17   aerator.
18   **Q.  Okay.  So using the Nutting house as an example,**
19   **you went into the house, you tested the water, you**
20   **identified certain levels of hydrogen sulfide in the**
21   **water; right?**
22   A.  I didn't, but under my direction it was done,
23   yes.
24   **Q.  Okay.  If you went into their neighbor's house**
25   **and the neighbor had a water softener and no aerator and**

33  (Pages 126 to 129)

130

1  you took test results and you identified levels of
2  hydrogen sulfide that were consistent with those in the
3  Nutting house and you identified corrosion or blackening,
4  would that help support your theory in this case?
5      MR. AYALA:  Just objection for the following
6  reason. It's an improper hypothetical. It assumes
7  facts not in evidence, and not only that it assumes
8  facts that are not ever going to be in evidence
9  because the time for discovery has closed and there's
10  been no expert report from any of Plaintiffs' experts
11  with regard to the particular circumstances of some
12  unidentified neighbors' homes. And so for that
13  reason, the question is improper.
14      THE WITNESS:  Could we either have it read back
15  or you would say it again. I just want to make sure I
16  understood the question.
17  BY MR. ANDERSON:
18      Q.  Just to permit Mr. Ayala to make the same
19  objection, why don't we just read it back.
20      (The requested portion of the record was read.)
21      MR. AYALA:  Objection. Same objection.
22      THE WITNESS:  Okay. It may or may not. It would
23  depend on the site-specific details. I would want to
24  go see that house. Are there other sources of sulfide
25  in the house? Are there other extenuating

131

1  circumstances? Are the two houses similar?
2      But if all things being equal, which they never
3  are -- but if they were, and you found sulfide coming
4  off of the water and you found blackening in the
5  house, that would certainly in my mind -- I think that
6  that would be useful information. I think that having
7  the sulfide in the air and the corrosion, it would be
8  associated with sulfide would be strong evidence of
9  relationship.
10      The other thing is are there other sources of
11  sulfide in the house, I would want to consider that as
12  well. And there might be other things to consider. I
13  mean, it's a hypothetical and I haven't had a chance
14  to think about it, but I would -- yeah, if you've got
15  sulfide coming in the house, the sulfide doesn't know
16  where it's coming from, it doesn't know if it was in
17  the water before, it doesn't know if it's someplace
18  else before.
19      If there's sulfide in the house and there's able
20  to -- and there's blackened copper, I would certainly
21  think -- want to examine that relationship between
22  those two things, sure.
23  BY MR. ANDERSON:
24      Q.  Now, what if the same scenario, except there was
25  no corrosion in the house, would that conversely then cast

132

1  doubt upon your theory?
2      MR. AYALA:  Same objection as the last question.
3      THE WITNESS:  And same answer, I would want to do
4  exactly the same thing. I would want to understand --
5  here's what I understand. If you put copper in a jar
6  with sulfide, you'll get blackening. And everything I
7  have seen indicates that with sufficient, you know,
8  hydrogen sulfide, you will get blackening on the -- so
9  if you said there was a house that had a great deal of
10  hydrogen sulfide coming off into the air and you
11  didn't see blackening, then I would think -- I would
12  want to understand why that was.
13      And the only thing I can imagine is that there's
14  some other extenuating circumstance because when
15  you -- my understanding is that when you have hydrogen
16  sulfide that's exposed to copper, you get this
17  blackening. And it's the nature of it.
18      If you didn't find that, then I would think
19  there's some extenuating circumstance, and I would
20  like the opportunity to try and understand what that
21  extenuating circumstance is.
22  BY MR. ANDERSON:
23      Q.  But you didn't, in conjunction with the Brucker
24  or Brincku cases, test any of the waters for any of the
25  adjacent properties?

133

1      MR. AYALA:  Objection. Asked and answered.
2      THE WITNESS:  Did I -- in this study did we test
3  the water for --
4  BY MR. ANDERSON:
5      Q.  For hydrogen sulfide?
6      A.  Oh, inside the house, no.
7      Q.  Okay. I would like to pass what we'll mark as
8  Exhibit 11.
9      (Plaintiffs' Exhibit No. 11, Consumer Products
10  Safety Commission, summary of contractor's report on
11  preliminary microbial assessment on Chinese drywall,
12  was marked for identification.)
13  BY MR. ANDERSON:
14      Q.  Dr. Lewis, do you recognize this document?
15      A.  I believe I have seen this before. Is this -- I
16  see it's U.S. -- the Consumer Products Safety Commission,
17  summary of contractor's report on preliminary microbial
18  assessment on Chinese drywall. I believe that I have seen
19  this. This is the front pages to a much larger report;
20  correct? On the microbial --
21      Q.  I think it's a staff summary that was prepared of
22  a report that was not produced by the Consumer Product
23  Safety Commission. I think it was produced at their
24  request.
25      A.  Is this the USGS?

34  (Pages 130 to 133)

134

1    Q.  I think it's EH&E.
2    A.  Okay.  They did it, all right.
3    Q.  If you could -- it's only a page and three
4  quarters, I think.  If you could just take a moment to
5  read it.
6    A.  I hate to say I'm not a fast reader.  Sorry.
7    Q.  That's totally fine.
8    A.  And I need glasses.  I'm going to skip the
9  footnote for just a minute.  Yes.  I didn't read the
10  footnote, but I read the rest of it.  And I have seen this
11  at least one other time.
12    Q.  And what do you recognize this document to be?
13    A.  Again, I know this was the preface to another
14  document, and I -- and it says here, EH&E did some testing
15  of it seems ten -- is it ten drywall samples, they found
16  sulfate-reducing bacteria on one domestic board and one of
17  Chinese origin, and the rest of them, they did not detect
18  sulfate -- sulfur-reducing bacteria on the remaining eight
19  boards, if I read it correctly.
20    Q.  Now, did you at any time during the preparation
21  of Exhibit No. 3, your sulfur-reducing bacteria paper, did
22  you review this?
23    A.  I don't recall if I reviewed it before or after,
24  but I've seen it.
25    Q.  Okay.  And in the Conclusions section, the last

135

1  paragraph --
2    A.  Yes.
3    Q.  I'm sorry, Dr. Lewis, I'm still on Exhibit 11.  I
4  should have been more specific.  Sorry.
5    A.  Yes.
6    Q.  Do you see the last paragraph there?
7    A.  Yes.
8    Q.  It says, there are limitations to this study.
9  The culture conditions selected for use are for known
10  species of sulfur-reducing bacteria.  However, this does
11  not exclude the possibility that sulfur-reducing bacterial
12  species that are not known to scientific community may be
13  present in the drywall.
14    Just looking at this conclusion, do you agree
15  with the conclusions that the CPSC staff reached here?
16    A.  Yes.  Not all bacteria are culturable.
17    Q.  Is there anything in the Conclusion section
18  there, those two paragraphs, that you disagree with?
19    A.  Just because they're present doesn't mean they're
20  metabolically active.  I agree with that.  Is there
21  anything else?  I don't see anything that I disagree with.
22    Oh, the mere presence of the colonies doesn't
23  mean they were growing on the board and it doesn't mean
24  they were related to health effects and corrosion of
25  metals.  If I read it correctly, it sounds right.

136

1    Q.  Okay.  Now, this study didn't look at
2  sulfur-oxidizing bacteria, did it?
3    MR. AYALA:  Objection.  Lack of foundation.
4    THE WITNESS:  I'm not aware of any studies that
5  have been done with respect to drywall and sulfate --
6  sulfur-oxidizing bacteria.  No, I'm not aware of any
7  studies that did that.  I'm also not aware in the
8  literature of any theory that proposed
9  sulfur-oxidizing bacteria either.
10    You have sulfide on the coils, so things are
11  looking for things that make sulfide, which would be
12  the sulfur-reducing bacteria, so I'm also maybe not
13  surprised either.
14  BY MR. ANDERSON:
15    Q.  Turning back to Exhibit 10 for a minute, Dr.
16  Lewis.
17    A.  Just for my benefit, 10 is?
18    Q.  Ten is the fax.
19    A.  The fax, yes.  Yes, I've got 10.
20    Q.  Given that you, HSA, was already going to various
21  locations to test for sulfur-reducing bacteria, why didn't
22  you also test for hydrogen sulfide in well water?
23    MR. AYALA:  Well, objection.  It assumes facts
24  not in evidence.
25    THE WITNESS:  We did.  If you look at the report,

137

1  we did -- I believe it's before this when we did a
2  survey of many wells in the area, and they all showed
3  high levels of sulfide.
4  BY MR. ANDERSON:
5    Q.  I guess I mean in the -- and I should have been
6  more clear.  In the locations where you took the
7  sulfur-reducing bacteria, why didn't you take samples of
8  water to test for hydrogen sulfide in those areas?
9    A.  Because we were looking for sulfate --
10  sulfur-reducing bacteria.  We had already done that study.
11  We had already completed a study that showed the entire
12  area around the Brincku house in the water-bearing zone is
13  full of sulfide.
14    I guess we could have done more, but I felt like
15  we had everything we needed there.  I think I have enough
16  in that one report to have a strong opinion that there's
17  sulfide in the water in that region -- in the
18  water-bearing region around the Brincku home.
19    Could we do more?  I guess you can always do
20  more.  I mean, we could have sampled for a lot of
21  different things, but this study, you know, once we
22  understood the sulfide, the next study was to try to
23  understand the ubiquity of sulfur-reducing bacteria.
24    Q.  In your studies related to this litigation, have
25  you seen anywhere where anyone has reached a conclusion

35 (Pages 134 to 137)

138

1  about the mechanics of the cause of corrosion in the homes
2  that have defective Chinese drywall?
3      MR. AYALA: Objection. Lack of foundation. I
4  don't know the scope of his report.
5      THE WITNESS: If it has to do with corrosion, not
6  just noting something that's blackened, that's not my
7  expertise. It's not something that I have done the
8  research about. That's a good question for maybe
9  Dr. Odell or something like that. He's, I believe,
10  reviewed the literature and is more up to speed on
11  that.
12  BY MR. ANDERSON:
13      Q. Dr. Lewis, thank you for your time. At this time
14  I don't have any further questions.
15      MR. AYALA: I just have a couple of questions.
16          CROSS-EXAMINATION
17  BY MR. AYALA:
18      Q. Dr. Lewis, are you aware of any evidence -- have
19  you seen any evidence that demonstrates that
20  sulfate-reducing bacteria have been detected on any
21  National Gypsum-branded drywall?
22      A. No.
23      Q. Okay. And I just -- I may have heard incorrectly
24  earlier. I thought you may have had a slip in the tongue,
25  but in your earlier testimony -- but I just want to be

139

1  clear that that was the case, so correct me --
2      A. That's correct, I'm not aware of anything that
3  says that.
4      Q. Okay. And similarly, I think you were talking
5  fast earlier and you may have had another slip of the
6  tongue when you referred to the term "sulfate-oxidizing
7  bacteria."
8      What did you mean, if that happened?
9      A. If I said that, that's incorrect. Sulfate is the
10  most oxidized form of sulfur. It would be sulfur --
11  sulfate or sulfur-reducing bacteria. And then
12  sulfur-oxidizing bacteria. If I have said that, I spoke
13  incorrectly.
14      Q. Okay. Thanks for clearing that up.
15      Now, one of the things that I understand HSA did
16  as part of its inspection protocol for the five homes at
17  issue in the litigation, and you weren't asked about this
18  today, but was one of those things moisture testing of the
19  drywall in the homes themselves?
20      A. Yes.
21      Q. Okay. And do you recall -- do you recall HSA
22  having performed moisture testing on the drywall from the
23  Plaintiffs' homes?
24      A. Yes. In each home, and it's reported in each
25  report. It's in a specific table each time. I'm just

140

1  going to get a sample --
2      Q. Sure.
3      A. -- report here and share that in any given
4  report -- this happens to be the Brucker report -- but in
5  any given report it's Table 2 entitled: Moisture content
6  in wall board.
7      Q. Okay. And recognizing that the results speak for
8  themselves, in each of your five reports but at a high
9  level, could you characterize the results of the moisture
10  testing that HSA performed?
11      MR. ANDERSON: Objection. Form.
12      THE WITNESS: In each of the houses, we tested
13  moisture at least two to three to four times and wall
14  board in each room, and on every occasion it
15  registered in the green, which means it's a dry
16  condition.
17  BY MR. AYALA:
18      Q. Okay. I noticed in your reports, Dr. Lewis, that
19  HSA also performed a NIOSH method 7903.
20      Do you recall that HSA performed that
21  methodology?
22      MR. ANDERSON: Objection. Form.
23      THE WITNESS: Sure. The air testing, NIOSH.
24  BY MR. AYALA:
25      Q. And why did HSA perform that methodology?

141

1      A. Well, I don't have any NIOSH numbers memorized.
2  Is that just the hydrogen --
3      Q. Here, let me direct your attention to page 7
4  of -- I've got the Brincku report up, page 7 in Section
5  5.3.
6      A. Oh, the sulfur dioxide and organic acid.
7  Certainly, certainly. The reason we did that testing was
8  to -- basically completeness in the CPSC and other
9  documents when they were doing work in houses. They
10  measured -- at that time, they were trying to find out a
11  full range of compounds that might be affecting a house.
12      And some of the compounds that they continued to
13  detect were these. And so we did, too.
14      Q. Understood. And could you explain to us to the
15  extent that a laboratory performing NIOSH method 7903
16  analysis reports a detection of sulfuric acid. What does
17  that mean?
18      A. Well, it means that they detected sulfate in the
19  sample, that there was sulfate in that -- in the sample
20  that they received.
21      Q. Okay. It sounds to me like from your answer that
22  there may be a difference between sulfate and sulfuric
23  acid; is that right?
24      A. Just pH. I mean, a pH of, I think, negative 3,
25  you start to get $H_2SO_4$ as a joined compound, and pH is

36 (Pages 138 to 141)

142

1  below -- not really below that, but above that, you get
2  sulfate, either as HSO4 minus, or is -- if you get a
3  little above, I think, two, pH 2, it's predominant form is
4  SO42 minus.
5      Q.  Okay. That's a helpful clarification. Thank
6  you.
7          In the homes where HSA detected hydrogen sulfide
8  from the soil vapor outside of the homes, could you give
9  us your insight with regard to the potential for hydrogen
10 sulfide from soil vapor outside the homes to enter into
11 the home?
12     A.  Sure. I didn't do any of this testing, but if
13 the home is overpressurized, then you tend to not get
14 vapors from outside the house, in the house.
15         If the house is underpressurized and there are
16 cracks in the floor, you would tend to get vapors coming
17 inside. Most houses do have cracks in the foundation,
18 vapor intrusion is considered a path -- I in fact, did the
19 vapor intrusion study for the State of Florida. This is
20 something you would commonly find.
21         Sometimes a house, if you got the fan in the
22 bathroom on, you'll underpressurize the house, when you
23 turn it off. So these are complex studies. It's not
24 something -- you got the little match test where you got
25 one period of time in one room, whether it's

143

1  underpressurized, or overpressurized.
2          But to really understand if a house is
3  underpressurized or overpressurized, it's a much more
4  complex task. And what generally happens, is some weather
5  patterns with the wind from one direction, or if there are
6  fans on inside the house, it's underpressurized.
7          And on other days, when the air conditioning is
8  on, it would be overpressurized. But I didn't do any
9  testing or anything in any of these houses that would
10 allow me to realize if these houses are underpressurized
11 or overpressurized.
12     Q.  Okay. Understood. Now, the sulfur-reducing
13 bacteria survey that HSA performed and that forms the
14 basis of the report in Exhibit 3, that's been offered here
15 today.
16         When did HSA perform the sampling, the sampling
17 events themselves?
18     A.  The sampling events, just so I'm not going to
19 with my memory here, the samples were collected, it says,
20 September 8, 2011, on or about that date. I mean, there
21 could have been some samples collected a day or two after
22 that, but in general it was November of -- did I get that
23 right? November 2011?
24     Q.  Okay. And I think you may have touched on this
25 before, but I just want to make sure I understand

144

1  correctly.
2          Well, let me ask you this:  Is it fair to say
3  that you were relying on the complaints filed in the case
4  alleging sulfur-reducing bacteria in certain drywall
5  samples when you decided to sample for sulfur-reducing
6  bacteria in Florida?
7      A.  That was the sole reason. I mean, somebody
8  could -- you could be photosynthetic. It could be nitrate
9  reducers or nitrate -- nitrogen oxidizers. It could be
10 iron oxidizers or reducers. I mean, there are huge
11 numbers of microorganisms out there.
12         I picked this one because the complaint said
13 sulfate-reducing bacteria. If it said sulfur-oxidizing
14 bacteria. I mean, it would have been no big deal. I
15 would need one more jar. If I were already out there, I
16 could have tested those, too.
17     MR. AYALA:  No further questions.
18         REDIRECT EXAMINATION
19 BY MR. ANDERSON:
20     Q.  Dr. Lewis, Mr. Ayala asked you some questions a
21 few minutes ago of hydrogen sulfide that you detected in
22 soil vapors; is that correct?
23     A.  That's correct.
24     Q.  And you did detect -- you did detect some
25 hydrogen sulfide in soil vapors at a couple of the

145

1  properties; right?
2      A.  Yes. I'm trying to remember. I believe it was
3  Brucker and Brincku, but that's just my recollection.
4  There might be another, or I might be wrong about one of
5  those, but I recollect that.
6      Q.  And looking for a moment at the Brincku report,
7  which is Exhibit 6, you say as the last sentence in the
8  second-to-last paragraph:  Assuming the existence of a
9  pathway, parens, i.e., if the house is underpressurized,
10 closed parens, the soil vapor also would have contributed
11 to copper sulfide corrosion.
12         To the extent you found hydrogen sulfide in any
13 of the soil vapor samples that you took, you didn't do any
14 follow-up testing to confirm what impact it may or may not
15 have had on any corrosion or blackening in these houses;
16 right?
17     A.  That's correct.
18     MR. ANDERSON:  I have nothing further.
19     VIDEOGRAPHER:  This concludes the deposition.
20 The time is 1:10 p.m.
21
22         (Deposition concluded at 1:10 p.m.)
23
24
25

37  (Pages 142 to 145)

146

1
2  STATE OF _____ )
3                    ) :ss
4  COUNTY OF _____)
5
6
7      I, Richard G. Lewis, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10 do hereby certify it to be a true and
11 correct transcript, subject to the
12 corrections, if any, shown on the attached
13 page.
14
15      _____
16          Richard G. Lewis
17
18
19
20 Sworn and subscribed to before
21 me, this        day of
22          , 2012.
23
24 _____
25      Notary Public

147

1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA )
4  COUNTY OF COLLIER)
5
6      I, the undersigned authority, certify that
7  Richard G. Lewis, Ph.D. personally appeared before me and
8  was duly sworn.
9
10     WITNESS my hand and official seal this 7th
11 day of March, 2012.
12
13
14     _____
             Lori L. Bundy
15           Notary Public - State of Florida
             My Commission No.:  EE 132707
16           Expires:  September 22, 2015
17
18
19
20
21
22
23
24
25

148

1              REPORTER'S DEPOSITION CERTIFICATE
2
3  STATE OF FLORIDA )
4  COUNTY OF COLLIER)
5
6      I, Lori L. Bundy, Certified Court Reporter and Notary
7  Public in and for the State of Florida at Large, certify
8  that I was authorized to and did stenographically report
9  the deposition of Richard G. Lewis, Ph.D.; that a review
10 of the transcript was requested and that the transcript is
11 a true and complete record of my stenographic notes.
12
13     I further certify that I am not a relative, employee,
14 attorney, or counsel of any of the parties; nor am I a
15 relative or employee of any of the parties' attorney or
16 counsel connected with the action; nor am I financially
17 interested in the action.
18
19     DATED this 7th day of March, 2012.
20
21
22     _____
             Lori L. Bundy, FPR, RPR, CRR, CLR
23
24
25

149

1              INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over carefully
4  and make any necessary corrections. You should state
5  the reason in the appropriate space on the errata
6  sheet for any corrections that are made.
7      After doing so, please sign the errata sheet
8  and date it.
9      You are signing same subject to the changes
10 you have noted on the errata sheet, which will be
11 attached to your deposition.
12     It is imperative that you return the original
13 errata sheet to the deposing attorney within thirty
14 (30) days of receipt of the deposition transcript by
15 you. If you fail to do so, the deposition transcript
16 may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

150

```
1              E R R A T A
2
3
4
5        I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE:_____
16   REASON:_____
17   ___ ___ CHANGE:_____
18   REASON:_____
19   ___ ___ CHANGE:_____
20   REASON:_____
21
22   _____      _____
23     WITNESS' SIGNATURE        DATE
24
25
```

39   (Page 150)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585