1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

FT. MYERS DIVISION

---

CHRIS BRUCKER, TREVER S. NUTTING,
XIOMARA RAVELO, WILFREDO E. RETANA
and BEATRIX CELSA RETANA, individually,
and on behalf of all others
similarly situated,

        Plaintiffs,

                              CASE ACTION NO.
vs.                          2:10-cv-00405-FtM-29SPC

LOWES HOME CENTERS, INC., a North Carolina
Corporation, and NATIONAL GYPSUM COMANY,
a Delaware Corporation,

        Defendants.

---

VIDEOTAPED DEPOSITION OF RALPH E. MOON

February 28, 2012

Tampa, Florida

8:40 a.m.

Reported By:
Kim Auslander
Job No: 23827-A

## Page 2

```
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Civil Action No. 2:11-CV-00338-JES-SPC


GEORGE BRINCKU AND BRENDA BRINCKU,

        Plaintiffs,
vs.
NATIONAL GYPSUM COMPANY, a Delaware Corporation,
        Defendant.
_____/

             442 West Kennedy Boulevard
                   Tampa, Florida
                8:40 a.m. to 10:26 a.m.
                  February 28, 2012


       VIDEOTAPED DEPOSITION OF RALPH E. MOON

   Taken on behalf of the PLAINTIFF before Kim
Auslander, RPR, Notary Public in and for the State of
Florida at Large, pursuant to Notice of Taking
Deposition in the above cause.
```

## Page 3

APPEARANCES:

ATTORNEYS FOR PLAINTIFFS

VARNELL & WARWICK, P.A.
20 La Grande Boulevard
The Villages, Florida 32159
BY: BRIAN W. WARWICK, ESQ.
    bwarwick@varnellandwarwick.com

ATTORNEYS FOR PLAINTIFFS

CUNEO GILBERT LADUCA, LLP
507 C Street, N.E.
Washington, D.C. 20002
BY: WILLIAM H. ANDERSON, ESQ.
    wanderson@cuneolaw.com

ATTORNEYS FOR DEFENDANTS

MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103
By: THOMAS SULLIVAN, ESQ.
    tsullivan@morganlewis.com

ALSO PRESENT: GREG SCRIVENER, Videographer

## Page 4

                    I N D E X

Deposition of RALPH MOON               Page No.

Direct Examination by Mr. Warwick         6
Cross-Examination by Mr. Sullivan        54
Redirect Examination by Mr. Warwick      64
Witness Signature Page                   69
Errata Sheet                             70
Certificate of Oath of Witness           71

                      * * *
                   E X H I B I T S
PLAINTIFF'S
No.        Description                  Page No.
Exhibit 1  CV                             20
Exhibit 2  Deposition List                20
Exhibit 3  Report                         28

## Page 5

VIDEOGRAPHER: This is Greg Scrivener. I am the certified legal video specialist. Today's date is February 28th, 2012. The time on the video monitor is approximately 8:40 a.m. This deposition is being held in the offices of Veritext, located at 442 West Kennedy Boulevard, Suite 240, Tampa, Florida 33606.

The caption in this case is Chris Brucker, Trever Nutting, Xiomara Ravelo, Wilfredo E. Retana, and Beatrix Celsa Retana, individually and on behalf of all others similarly situated; and also, George Brincku and Brenda Brincku, Plaintiffs, versus Lowes Home Center, Inc., a North Carolina Corporation, and National Gypsum Company, a Delaware Corporation, Defendants.

At this time, will counsel please introduce themselves for the record, beginning with Plaintiff's counsel.

MR. WARWICK: Brian Warwick on behalf of Plaintiffs this morning.

MR. ANDERSON: William Anderson on behalf of Plaintiffs this morning.

MR. SULLIVAN: Tom Sullivan; Morgan Lewis, on behalf of National Gypsum Company.

VIDEOGRAPHER: This case is in the United

**Page 6**

1  States District Court, Middle District of Florida,
2  Fort Myers Division. The name of our Witness is
3  Ralph E. Moon, Ph.D.
4      Our court reporter is Kim Auslander
5  and she will now swear in the witness,
6  please.
7          RALPH MOON
8      Was called as a witness and, having been first
9  duly sworn and responding, "I do," was examined and
10 testified as follows:
11         DIRECT EXAMINATION
12 BY MR. WARWICK:
13  Q  Good morning, Dr. Moon.
14  A  Good morning.
15  Q  My name is Brian Warwick, and I represent the
16 plaintiffs in this case, and we're going to have a
17 deposition this morning.
18      I have your -- a list of your experience.
19 You've obviously been deposed before?
20  A  Uh-huh, yes.
21  Q  Okay. And so you understand the drill; I'm
22 going to ask you a series of questions this morning. If
23 you don't understand a question, please ask me to
24 rephrase it, I'll be glad to do so. If you answer the
25 question, I'm going to assume that you understood it as

**Page 7**

1  it was asked.
2      If at any time this morning you want to take a
3  break, I'll be glad to do that. Not a big rush, just
4  give me the word and we'll take a break.
5      If we can just start off with just a general
6  overview kind of -- from a general perspective, give me
7  a rundown of your education, please.
8   A  Beginning with college?
9   Q  Sure.
10  A  I went to Western Michigan University in
11 Kalamazoo, Michigan, and I was awarded an undergraduate
12 degree in biology and a minor in chemistry. And then I
13 transferred to the University of South Florida for a
14 masters degree in botany.
15     Then I continued there, and took employment at
16 a research laboratory for a year at the Cover Branch
17 Green Laboratory. Then I went back to graduate school
18 and received a Ph.D in biology. And then after
19 completion of that, I did a post doc in chemistry.
20  Q  Okay. And where did you do the -- receive
21 your biology degree from?
22  A  The initial biology degree was Western
23 Michigan University in Kalamazoo.
24  Q  And your postgraduate chemistry?
25  A  Was at University of South Florida here in

**Page 8**

1  Tampa.
2   Q  Okay. And where are you employed currently?
3   A  HSA Engineers and Scientists in Tampa,
4  Florida.
5   Q  And what is your position with that company?
6   A  I'm the technical director for the science
7  department. I'm a partner in the firm.
8   Q  And what does that company do generally?
9   A  Half of the company does normal environmental
10 consulting for municipalities, business, environmental
11 cleanup, recommendations for remediation.
12     Then the other half -- not that there's
13 distinct halves, but the other part of the revenue comes
14 from the investigation of insurance losses for
15 geotechnical studies, sinkholes, air quality,
16 structural, electrical, accident reconstruction, fire,
17 and so forth.
18  Q  Okay. Prior to being involved in this case,
19 had you done any work on any homes where the complaint
20 was that they had been contaminated or they contained
21 Chinese drywall?
22  A  Yes. We have done work with the sampling of
23 drywall for the presence of constituents that the State
24 of Florida would deem as characteristic as Chinese
25 drywall containing.

**Page 9**

1   Q  Okay. And what did that type of work entail?
2   A  We follow the protocol presented by the State
3  of Florida to evaluate the presence or absence of
4  characteristics of a home that may contain
5  Chinese drywall, so that would include a visual
6  examination, testing of pieces of drywall for evidence
7  of a signature on the back of a Chinese origin,
8  examination of silver, aluminum, different metals that
9  might oxidize in response to exposure to corrosive
10 agents.
11  Q  Okay. Have you yourself been in any of the
12 homes that showed signs of oxidation?
13  A  No.
14  Q  And what was your role in any of that testing
15 that took place by HSA Engineers regarding the
16 Chinese drywall?
17  A  I wrote the protocol, I reviewed the reports
18 and signed them.
19  Q  Okay. And so when you say you wrote the
20 protocol, could you be more specific? I thought you
21 said you followed the protocol by the State of Florida.
22  A  True, but I would provide a checklist for the
23 technician that would go to the home, the areas where we
24 want photography done, some notes about interviewing,
25 what things to ask for, presence or absence of wells,

Page 10

1    swamps, wetlands nearby, that type of thing. That would
2    supplement the questionnaire that the State of Florida
3    provided.
4    Q  Okay. You mentioned just a second ago that
5    part of your protocol was to identify wells or swamps
6    or -- would well water be one of the items you look for?
7    A  Absolutely.
8    Q  Okay. And did any of your reports regarding
9    Chinese drywall lead to the conclusion that the well
10   water was a factor in the corrosion in the home?
11   A  I don't recall that specifically being stated.
12   I'm familiar with the research that supports that
13   opinion, but in my personal experience, I've not dealt
14   with that.
15   Q  Okay. What research are you referring to that
16   says -- that you're familiar with research that supports
17   that opinion?
18   A  I have a colleague that's involved with this
19   litigation who did research in Fort Myers with testing
20   of homes for hydrogen sulfide and whether or not they
21   were on a private well or municipal water supply, so I'm
22   not -- he's not given me that research, I think because
23   that's a part of the litigation, but I know he's been
24   performing that type of work.
25   Q  Okay. But as far as -- I think my question

Page 11

1    was limited to your experience in Chinese drywall cases.
2    A  I see.
3    Q  And in any of those studies that you did or
4    investigations your company did, are you aware that they
5    identified any of the corrosion in any of the homes --
6    first of all, do you know how many homes HSA has tested
7    for complaints regarding Chinese drywall?
8    A  Probably about 150 to 160 homes.
9    Q  And out of those 160 homes, are you aware of
10   HSA identifying the well water as the cause of the
11   corrosion in any of those 160 homes?
12         MR. SULLIVAN: Objection to form. Asked and
13      answered. Go ahead.
14   A  I don't think that the method of reporting
15   intended to identify a particular source of hydrogen
16   sulfide.
17        What it would have done, the report would have
18   said this home is on a private water supply well, and
19   this -- this component, this feature in the home can be
20   a contributing factor, depending upon its proximity in
21   the state to the shoreline, being a wetland area or an
22   area that might have high organic content in the soils.
23   Q  Okay. Now, in your experience at HSA, and
24   generally in the State of Florida, have you seen homes
25   unrelated to Chinese drywall that contained high levels

Page 12

1    of corrosion being identified as blackening of wires
2    inside the walls or blackening of air conditioning coils
3    that were attributed to well water in any of your
4    experience?
5    A  In any of my experiences?
6    Q  Yes.
7    A  Yes.
8    Q  Okay. Tell me about those.
9    A  Well, for about 18 years, I was involved with
10   a study in the Bahamas. It was a pharmaceutical plant
11   that was built over an aquifer, and the plant made
12   pharmaceuticals.
13        It was a compound you've probably used, called
14   Aleve today, it was called Naproxen, and the waste
15   materials from the plant were being discharged to the
16   aquifer, but they weren't making it to the sewage
17   treatment plant. The pipe line had broken, and the
18   subsurface had gone anaerobic.
19        In that circumstance, the electroreceptor for
20   oxygen is not oxygen anymore, it's sulfur, and so the
21   entire plant became a hydrogen sulfide producing
22   facility, to the extent where the telephone lines
23   dissolved, the computers inside the buildings were black
24   with oxidation, and it caused some very serious issues
25   with nearby school children with the smell of hydrogen

Page 13

1    sulfide.
2         So for that period of time, we -- I was the
3    project manager. I served in the capacity to design,
4    direct, manage, and monitor the remediation of soil
5    vapors in groundwater at this facility and to return it
6    back to natural conditions.
7    Q  Okay. I want to come back -- that was in the
8    Bahamas?
9    A  Correct.
10   Q  On what island?
11   A  Grand Bahama.
12   Q  Grand Bahama. I want to come back to that for
13   a second.
14        My question was in the State of Florida; have
15   you seen, you know, in your experience in the building
16   science department, any homes in Florida unrelated to
17   Chinese drywall where the well water has caused the
18   wiring inside the walls, the electrical wiring inside
19   the walls and/or the air handlers to, you know, turn
20   black and/or corrode?
21   A  No, not when it's been attributed to
22   groundwater.
23   Q  Okay. And in your experience about --
24   A  If I can clarify that.
25   Q  Sure.

Page 14

1  A   Is that I didn't go to -- I went to one home
2  that had a previous Chinese drywall concern, and of
3  those other 130 or so, I did not attend, so there may
4  have been others that that was a contributing factor,
5  but since I just went to one, that one did not have a
6  contribution by groundwater.
7  Q   What about HSA, in general, are you aware --
8  and again, I'm actually concerned about -- or asking you
9  about any homes that you've been to in the State of
10 Florida that you saw corrosion of wiring and/or air
11 conditioning coils as a result of well water, and that
12 was unrelated to the drywall.  Do you see what I'm
13 saying?
14 A   Uh-huh.  Well, if you mean my personal
15 experience --
16 Q   Or anything you know of at HSA.
17 A   I can only refer to my colleague's research on
18 the well water in the emissions of hydrogen sulfide, and
19 I know that he did derive a causal relationship, but I'm
20 not personally familiar with his work.
21 Q   Right.  But that's not in this particular
22 case.  This case is obviously related to drywall.  Let
23 me back up a little bit.
24     How long have you been doing work in the State
25 of Florida?

Page 15

1  A   Do you mean just generally work in --
2  Q   Yeah, how long have you resided in Florida?
3  A   Since 19 -- 1970, I think.
4  Q   Okay.  And since 1970, how long have you been
5  with HSA?
6  A   18 years.
7  Q   18 years, okay.  During those 18 years,
8  approximately how many -- how much of your work has been
9  involved in studies of residential homes in any way?
10 A   How much of my work.  Well, in terms of
11 duration, the last 11 or 12 years have been involved
12 with homes, buildings, structures.  Then preceding that,
13 I had some, but I'd say the last 12 years were
14 principally in structures.
15 Q   Okay.  During those 12 years working -- was
16 that work principally within the State of Florida?
17 A   Principally in the State of Florida, correct.
18 Q   And that's what I'm asking about, because you
19 have a specialty here in the State of Florida and have
20 had an opportunity to look at a lot of buildings in the
21 State of Florida during that 12 year period.
22 A   Correct.
23 Q   And prior to being involved in this particular
24 case, had you ever seen corrosion levels or blackening
25 of ground wires in the walls and/or failures and

Page 16

1  blackening of air conditioning coils as you've seen in
2  this case --
3      MR. SULLIVAN:  Objection to form.
4  Q   -- or have seen with the Chinese drywall,
5  or --
6  A   I actually haven't seen it as in this case.
7  Let's see if I can give you a clear answer on that.
8      For the last 11 or 12 years, our work in these
9  structures has dealt principally with water damage and
10 mold.  There hasn't been an emphasis on hydrogen sulfide
11 or its corrosion effects, besides the previous work I
12 did in the Bahamas.
13     The vast majority of homes I've been to were
14 under municipal water supplies, I would say probably
15 90 percent, maybe 95 percent, and honestly, I have
16 not -- I did not think about when I was doing a mold
17 survey whether or not this home is affected by hydrogen
18 sulfide gas.
19 Q   Right.
20 A   So I don't think it was something I gave
21 attention to, because I was directed in a different way;
22 water damage, microbial growth, cause and duration of
23 damage, and so forth.  So it wasn't really something
24 that I was sensitive to at the time.
25 Q   Fair enough.  Are you familiar with the term

Page 17

1  microbial influenced corrosion?
2      MR. SULLIVAN:  Objection.
3  A   I'm familiar with that in terms of types of
4  internal pipe corrosion, because I give a lecture on
5  that topic.
6  Q   Okay.  And what does that term mean to you?
7      MR. SULLIVAN:  Objection.
8  A   Well, in the context that I spoke of it, it's
9  the intersection of microbes by wells that can reside in
10 water supply lines, typically galvanized piping, and
11 causing a localized corrosion effect upon the internal
12 surface of the pipe.
13 Q   And you have done studies of that before?
14 A   Not done studies.  I've just gathered
15 information appropriate to provide a review for
16 insurance adjustors on different types of pipe corrosion
17 and how to recognize it.
18 Q   Okay.  Are you familiar with the pipe
19 corrosion caused by sulfur oxidizing bacteria?
20     MR. SULLIVAN:  Objection to form, foundation.
21 A   Not precisely, no.
22 Q   Okay.  Have you done any investigation or read
23 any literature regarding corrosion caused by sulfuric
24 acid, which is produced by microbiological activity?
25     MR. SULLIVAN:  Objection to form, foundation,

Page 18

1   assumes facts not in evidence.
2   A   No.
3   Q   No?
4   A   No.
5   Q   Let's go back to the study that you did in the
6   Bahamas. You said that the soil had become --
7   A   Anaerobic.
8   Q   Anaerobic. Was the -- what was the cause of
9   the corrosion then in that particular circumstance?
10         MR. SULLIVAN: Objection to form.
11  A   When organic materials are discharged or are
12  present in a subsurface environment, naturally occurring
13  microbes oxidize the organic compounds as a source of
14  energy to grow and reproduce. In the absence of oxygen,
15  the byproduct, rather than being water, like today we're
16  breathing water, we're discharging water, is hydrogen
17  sulfide.
18        And so in that environment, when it's organic
19  rich, oxygen devoid, the microbial population produces
20  hydrogen sulfide, and it is librated from the
21  subsurface, and when it combines with water, it forms
22  sulfuric acid.
23  Q   And what was the result of the sulfuric acid
24  that was created in that circumstance?
25         MR. SULLIVAN: Objection to form. Calls for

Page 19

1   speculation.
2   A   The observation in the Bahamas initially was
3   first very, very strong odors, and corrosion in
4   computers and piping, and eventual dissolution of the
5   phone lines, and that's what prompted the whole project.
6   Q   And what was the name of the facility in the
7   Bahamas?
8   A   Syntex. I think you may have my resume.
9   Q   Certainly, yes.
10  A   I think I have an article I've written on
11  this.
12  Q   Okay.
13  A   Here we go. Aromatic Solvent Bioreclamation
14  in a Highly Anaerobic Aquifer and Groundwater
15  Bioremediation System Design: Bacterial Evaluation
16  Phase. So these were two papers that were published in
17  the National Symposium on hydrogen sulfide emissions
18  from an aquifer.
19  Q   Okay. And just so you have -- that's on page
20  13 of your CV?
21  A   Correct.
22  Q   Okay. Let's just go ahead and have this
23  marked.
24         MR. WARWICK: Can I have this marked, please,
25  ma'am court reporter.

Page 20

1   (Plaintiff's Exhibit 1 marked for
2   identification.)
3   Q   Just for the record, Dr. Moon, do you
4   recognize that document?
5   A   I do.
6   Q   And what is it?
7   A   It's my curriculum vitae.
8   Q   And if you can just flip through that, does
9   that appear to be the entire, current curriculum vitae?
10  A   Yes.
11  Q   Okay. And for the record, was that curriculum
12  vitae attached to the report in this case?
13  A   No.
14  Q   And when was that provided to counsel?
15  A   Why was it?
16  Q   When?
17  A   I printed it out yesterday.
18  Q   Okay.
19  A   I brought it because you guys asked for it.
20  Q   Right. And we just received it this morning
21  though, correct?
22  A   Correct, right.
23         MR. WARWICK: Let me have this marked as
24  Exhibit 2, please.
25         (Plaintiff's Exhibit 2 marked for

Page 21

1   identification.)
2   Q   Just so we can finish this up, do you
3   recognize that document, Dr. Moon?
4   A   I do.
5   Q   What do you recognize it to be?
6   A   It's my list of depositions in the last four
7   years.
8   Q   And was that attached to your original report
9   in this case?
10  A   No.
11  Q   Okay. When was that provided?
12  A   This morning.
13  Q   Okay. Let's go back to the Syntex work you
14  did in the Bahamas just for a couple follow-up
15  questions.
16        You said that there were computers that were
17  corroded based on sulfuric acid; is that correct?
18         MR. SULLIVAN: Objection to form, assumes
19  facts not in evidence, calls for speculation.
20  A   Corrosive materials. I'm not sure if it was
21  specifically sulfuric acid, but corrosive materials,
22  yes.
23  Q   Okay. And what did the corrosion look like in
24  that circumstance?
25         MR. SULLIVAN: Objection to form, calls for

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

**Page 22**

```
 1     speculation.
 2     A    It looked black.
 3     Q    Okay.  Were those computers, were they outside
 4  like in a warehouse or something that was exposed to the
 5  outside environment, or were they inside, like an office
 6  building?
 7     A    Both.
 8     Q    Both.
 9     A    When you work in the Bahamas, the living
10  conditions are sometimes ambient.  Like a laboratory may
11  weigh things prior to use in a chemical facility, or it
12  may be a laboratory that's air conditioned, but both
13  conditions had blackness on the computers.
14     Q    Do either of those papers that you mentioned
15  in your CV discuss the corrosion that you saw?
16     A    No.  The focus of the paper was how to
17  remediate the groundwater that was the source of the
18  hydrogen sulfide.
19     Q    Okay.  And did you ever have a theory, or did
20  you work with any of the other experts in that situation
21  and determine how the sulfuric acid was getting, you
22  know, on the computers, you know, if it wasn't, you
23  know, in liquid form and poured on the computer, how was
24  it causing the corrosion?
25          MR. SULLIVAN:  Objection to form, calls for
```

**Page 23**

```
 1     speculation, assumes facts not in evidence.
 2     A    The source originated from the groundwater,
 3  and hydrogen sulfide vapor was coming through the
 4  ground, so it penetrates the foundations and all the
 5  fenestrations of the building, and it was a very, very
 6  noticeable odor in a quarter mile around the plant.  So
 7  it was coming through the groundwater.
 8     Q    Okay.  Are those circumstances more detailed
 9  in those reports that you mentioned in your CV?
10          MR. SULLIVAN:  Objection to form.
11     Q    The description of the groundwater and the
12  problem in the Bahamas?
13     A    Yes.  There should be maps of the facility
14  where we did our sampling with vapor measurements of the
15  gasses coming up from the groundwater.
16     Q    Okay.  Could you tell me any documents that
17  you reviewed in preparation for your deposition today?
18     A    I looked at my report.  That's basically it.
19     Q    Okay.  Have you been -- had an opportunity to
20  review any other depositions that have been taken in
21  this case?
22     A    I had a snippet, maybe two pages, and I looked
23  at a couple yellow lines that were marked, and I -- it
24  didn't seem to be terribly meaty, the statements made,
25  so I didn't really give them much attention.
```

**Page 24**

```
 1     Q    Do you know who was -- whose deposition that
 2  was?
 3     A    No.
 4     Q    What was it about?
 5     A    It was about someone's comment about my work.
 6     Q    Okay.  In this case?
 7     A    Yes.
 8     Q    Okay.  And you don't remember who was speaking
 9  or --
10     A    No.
11     Q    -- or what they were talking about?
12     A    No.  It was like three pages in the entire
13  deposition with a couple of yellow lines on it.
14     Q    Okay.  And you don't remember anything more
15  specific than that?  What was the topic of that?
16     A    Well, the topic was -- there were a few
17  questions related to my work, and so I was curious how
18  they would view it.
19     Q    Okay.
20     A    And it was fairly modest comments about
21  placement of the tubes in the gypsum and speculation
22  about the melting point being higher than he thought,
23  and I think that's about it.
24     Q    Okay.  Does the name Dick Imbrect ring a bell?
25     A    No.
```

**Page 25**

```
 1     Q    And who provided that document to you?
 2     A    Counsel did.
 3     Q    Okay.  Have you had a chance to review the
 4  deposition testimony of Dr. Strauss in this case?
 5     A    I don't recall.
 6     Q    You don't recall one way or another, or no --
 7     A    I don't think I did.
 8     Q    So if that was the only deposition snippet
 9  that you looked at was the person that was speaking to
10  your work in this case -- I just need to make the record
11  clear -- so you didn't look at any deposition of
12  Dr. Strauss in this case?
13     A    Not that I recall, no.
14     Q    Okay.
15     A    I looked at the gentleman who commented about
16  the temperature being 20 degrees too high in his
17  opinion.
18     Q    Okay.
19     A    I'm not sure who that was.
20     Q    I think it was Imbrect.
21     A    Okay.
22     Q    But as far as you know, you haven't looked
23  at -- what about the deposition of a person by the name
24  of Sam Sutton?
25     A    I have not looked at any official transcript
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

Page 26

1  by anybody named Sam Sutton.
2      Q  How about Dr. Hedular?
3      A  No.
4      Q  So --
5      A  Just that one guy.
6      Q  Just the one guy. Are you aware of the
7  Plaintiffs' theory in this case?
8          MR. SULLIVAN: Objection to form.
9      A  I think --
10         MR. SULLIVAN: Calls for speculation.
11     A  I have to -- I've been personally isolated
12 from everything. I was given a task to do, and that was
13 about it. I would have to speculate on precisely what
14 the theory is. Do you want me to proceed?
15         MR. SULLIVAN: Don't speculate.
16     Q  I don't want you to speculate to anything.
17 What have you been told the Plaintiffs' theory of the
18 case is?
19         MR. SULLIVAN: Objection, to the extent that
20     you're requesting --
21         MR. WARWICK: You're right. I don't want you
22     to --
23         MR. SULLIVAN: No communications between
24     expert and counsel.
25         MR. WARWICK: Correct.

Page 27

1      Q  As far as your understanding, what's your
2  understanding of Plaintiffs' claims in the case?
3      A  Plaintiff thinks that hydrogen sulfide is
4  originated from the product, the gypsum board product.
5      Q  Okay. Are you aware that Plaintiffs' expert
6  has also discussed the presence of hydrogen sulfide --
7  I'm sorry -- sulfuric acid being in the Plaintiffs'
8  homes and actually causing the corrosion?
9          MR. SULLIVAN: Objection to form, calls for
10     speculation, assumes facts not in evidence.
11     A  I didn't know that. In terms of like free
12 hydrogen sulfide?
13     Q  Hydrogen sulfide or sulfuric acid vapors being
14 in the homes and those vapors actually causing the
15 corrosion of the metal components?
16     A  Yeah, I'm not familiar. I haven't been really
17 versed in the details of the origin of the corrosive
18 agent.
19     Q  Okay. So National Gypsum didn't ask you to
20 opine regarding your experience with sulfuric acid
21 corrosion in the Bahamas?
22     A  No.
23         MR. SULLIVAN: Objection to form.
24     Q  Okay.
25         MR. WARWICK: Let's have this marked, please.

Page 28

1          (Plaintiff's Exhibit 3 marked for
2          identification.)
3      Q  I'll hand you that. It's been marked as
4  Plaintiffs' Exhibit 3.
5          Dr. Moon, do you recognize that document?
6      A  I do.
7      Q  What do you recognize it to be?
8      A  It's the report I prepared last December.
9      Q  In this case?
10     A  Yes.
11     Q  Could you flip through, and generally, does it
12 appear to be the entire report?
13     A  It does.
14     Q  Dr. Moon, when were you first contacted with
15 regard to this?
16     A  About -- I was contacted in early November
17 just as a possible expert, and then I was contacted
18 about November 20th or 22nd, maybe 23rd, could you do a
19 test for us.
20     Q  Okay.
21     A  That's it.
22     Q  And what were you asked to do?
23     A  Can you determine the temperature of the
24 gypsum board during its manufacturing.
25     Q  Okay. Were you asked to do anything else

Page 29

1  besides that?
2      A  No.
3      Q  Okay. And so how did you determine -- what
4  qualified you to conduct that type of test?
5      A  Well, I have a minor in chemistry, I have a
6  post doc in chemistry, and my work in graduate school
7  was with an analytical chemist, so I'm familiar with the
8  workings of an analytical chemistry laboratory and the
9  use of temperature point -- or melting point
10 determination is a very common analytical method taught
11 to high school students through graduate school as one
12 criteria to determine purity of a compound.
13     Q  Okay. And if you can just give us a general
14 overview of what is contained in your report.
15     A  The report describes a fairly simple procedure
16 of incorporating five different compounds of differing
17 melting points in ampules, placing them inside a gypsum
18 slurry prior to formation of the gypsum board, tracking
19 it through the manufacturing process physically as it's
20 cooled and then heated, recovering the ampules,
21 observing them relative to whether the compound has
22 melted or not, and the report summarizes the results of
23 five compounds that show that three of the five melted
24 and that the compound that melted at the highest
25 temperature was one that has a certified temperature of

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

```
                                          30
1    237 degrees Fahrenheit.
2       Q  Okay.  Then what are the attachments to the
3    report?
4       A  Well, there's a table that summarizes the five
5    tests we did at the gypsum plant, three different types
6    of products, then my control test at home.
7          Then the other attachment is the certificates
8    of analysis from RTC, which was the supplier for these
9    critical melting point standards, and it substantiates
10   the purity and the melting point of the compounds I
11   purchased.
12      Q  Okay.  And that's -- the rest of the exhibits
13   then are the --
14      A  Then I have photographs.  Sorry.
15      Q  Okay.
16      A  Then the photographs attempt to give kind of a
17   chronology of events.  The first photograph has a sample
18   set, and in each sample is one of the five chemicals,
19   plus a little paper identifying it and its melting
20   point, that is to diminish any confusion, then the
21   insertion of these into the slurry line, then tracking
22   it down a quarter mile strip of gypsum board as it
23   slowly cools and crystalizes, and then marking the board
24   as it follows through the line into the furnace, then
25   its recovery.

                                          31
1          Then the last page or so, you can see the
2    evidence of melting in some of the exemplars following
3    the process, some that clearly have not melted and some
4    that have.
5       Q  Okay.  So basically, your report contains a
6    brief description of the test and your results, and then
7    the table is Exhibit A -- or I'm sorry, the table is not
8    an exhibit, it just says table?
9       A  Right.
10      Q  Then behind the table there are certified
11   documents talking about melting points of the materials
12   used in your experiment for several pages, and then the
13   last section involves photographs taken of the test
14   procedures, correct?
15      A  Right.
16      Q  So that's basically the four components of
17   your report --
18      A  That's right.
19      Q  -- fair to say?
20         Let's go back to the table first.  Who
21   determined which boards or which types of boards would
22   be tested by you during your test?
23      A  It was a function of the manufacturing needs
24   at the time.
25      Q  Okay.

                                          32
1       A  I understand that gypsum board is not just
2    haphazardly just produced, they have to have a client,
3    and so the board is manufactured per a particular
4    client's order, and that can change by the day.
5          In this case, they had three orders to fill,
6    and so I wanted to evaluate the performance, or the
7    testing, on as many as I could, and that's what dictated
8    that.
9       Q  Okay.  Did you select the day that the test
10   would be conducted or did National Gypsum?
11      A  I think it was just based upon availability
12   and the need to obtain the information within the
13   discovery period, or the option -- the window of
14   opportunity, and it just fit my schedule.
15         I don't think I was available on Monday, you
16   know, so I came on Tuesday.
17      Q  Okay.  Were you able to look at the -- any
18   differences or any information in particular to the
19   recipes used -- for lack of a better term -- by National
20   Gypsum for their various products, like the recipe for
21   their fire shield product versus their recipe for
22   half-inch regular drywall?
23         MR. SULLIVAN:  Objection to form.
24      A  No.  They don't talk about that with me.
25      Q  Okay.

                                          33
1       A  It's a secret, their formulations.
2       Q  Well, did they talk about the water content
3    that may be present in one type of board versus another
4    type of board?
5          MR. SULLIVAN:  Objection to form.  To the
6    extent that the question is seeking any formulation
7    of the slurry, I'd ask that -- and, you know, about
8    it -- I'd ask that the transcript be marked
9    confidential to protect any formulation.
10      Q  I'm not talking about any specific
11   formulations.  Don't disclose the specifics of it if you
12   know, I don't think they told you, but to the extent
13   that -- did you inquire, I should say that -- did you
14   inquire whether there were certain board types that
15   contained ingredients that would affect the core
16   temperature?
17      A  No.
18      Q  Okay.  Is that possible?
19      A  Is what possible?
20      Q  Is it possible that certain recipes of the
21   board and the amount of water that was used or the
22   thickness of the board would affect the outcome of the
23   core temperature tests?
24      A  It's my understanding that what's really
25   critical in manufacturing the board is the thickness,
```

9 (Pages 30 to 33)

34

1  because the thickness dictates the duration that it's in
2  the furnace, and so a thicker board goes slower than a
3  thinner board.
4      Q   Right.
5      A   That's about the extent with regard to
6  moisture content that I know.
7      Q   Okay. My question was, is it possible that
8  the different recipes used for the various products that
9  National Gypsum produces would have an effect on the
10 ultimate temperature reached in the core of the product?
11     A   I have no idea.
12     Q   Why didn't you ask them that? For example,
13 let's say something had a much higher water content, and
14 then the evaporation process, as the water is removed
15 from the board, would cause the temperature within the
16 core of the board to remain lower for a longer period of
17 time theoretically; is that correct?
18         MR. SULLIVAN: Objection to form, assumes
19     facts not in evidence.
20     A   Those are interesting questions, but I just
21 didn't -- I didn't really ask them that. You know, when
22 you go to most manufacturing plants, you know, I'm an
23 outsider, and to -- for a one-day walk in and start
24 asking questions about the formulation of their product
25 and how moisture content might -- it sounds like I'm

35

1  from a different company coming in. I just wouldn't do
2  that, and I was not offered the information.
3      Q   Okay. Are you aware that National Gypsum
4  makes regular gypsum wallboard in thicknesses other than
5  a half inch?
6      A   Oh, yeah.
7      Q   Do you know what those are?
8      A   Sure. I had -- during a break time, we walked
9  around, I saw their product, and they make it half inch
10 up to an inch for elevator shafts.
11     Q   Okay. And they make five-eighths inch?
12     A   We tested that, sure.
13     Q   When you tested five-eighths, it was fire
14 shield?
15     A   Right.
16     Q   And fire shield board, you know the general
17 makeup of fire shield board and how it differs from
18 regular wallboard?
19         MR. SULLIVAN: Objection to form.
20     A   Besides the thickness, I don't know much
21 difference.
22     Q   Do you know how much cellulose is present in
23 fire shield board versus how much cellulose is present
24 in regular wallboard?
25         MR. SULLIVAN: Objection.

36

1      A   I am not familiar with that.
2      Q   Did you ask them whether that may affect the
3  temperature results that you were receiving in your
4  tests?
5          MR. SULLIVAN: Objection.
6      A   No, I didn't.
7      Q   Do you know how much air is trapped within the
8  cellulose that is contained within fire shield wallboard
9  versus regular wallboard?
10         MR. SULLIVAN: Objection to form, foundation.
11     A   I'm confused. When you say cellulose, do you
12 mean the paper, or you mean the gypsum itself?
13     Q   First of all, are you aware that there's
14 cellulose used within the gypsum itself?
15         MR. SULLIVAN: Objection to form.
16     A   No.
17     Q   Did you ask that?
18     A   No.
19     Q   Are you aware of a pulp that is used to make
20 certain products?
21         MR. SULLIVAN: Objection to form.
22     A   No. I didn't ask anything about the
23 formulation of the product. We had been through -- our
24 company -- I asked to go through the plant about a year
25 earlier just by coincidence, and we brought through 30

37

1  engineers, because I thought we should know more about
2  how the gypsum board was -- how it was manufactured, and
3  never did, among the engineers asking questions of the
4  poor guy for an hour-and-a-half, did that question come
5  up, and when it did come up about formulation, he said I
6  can't tell you.
7          So when I got there to do this research, I
8  kind of knew in advance that I wasn't in a position to
9  inquire about the formulation of the product, because we
10 had been through the plant before.
11     Q   Okay. But you did realize that you were being
12 asked to testify as an expert in a case where people
13 would rely on your studies?
14     A   True.
15     Q   And that you were testing an exact temperature
16 of the wallboard?
17     A   Right.
18         MR. SULLIVAN: Objection to form.
19     A   I didn't get the impression that the results
20 of determining the temperature would then be predicated
21 on me knowing the composition of the board itself, but
22 rather just what was the temperature this reached during
23 the course of the manufacturing. I did not inquire
24 about the composition.
25     Q   You would agree --

**Page 38**

1    MR. SULLIVAN:  Can we take a quick bathroom
2    break?
3    MR. WARWICK:  Okay.
4    VIDEOGRAPHER:  We are going to go off the
5    record at 9:25.
6    (A short recess was taken.)
7    VIDEOGRAPHER:  We are now going back on the
8    record at 9:38.
9    Q   Dr. Moon, before we took a break, we were
10   talking about the chemical makeup of various products
11   that are manufactured by National Gypsum.
12       We noticed that two of the products that you
13   tested are listed as fire shield board; is that correct?
14   A   Correct.
15   Q   Are you aware whether the fire shield board
16   contains any sort of fire retardant or inhibitor?
17   A   No.
18       MR. SULLIVAN:  Objection to form.
19   Q   Are you aware of whether the fire shield board
20   is -- in fact contains ingredients that can withstand
21   higher temperatures than regular board?
22   A   No.
23       MR. SULLIVAN:  Objection.
24   Q   Did you ask National Gypsum why they had you
25   come test on a day in which fire shield was two of the

**Page 39**

1    five samples of board they were testing that day?
2        MR. SULLIVAN:  Objection.
3    A   No.
4    Q   Would you agree with me that the chemical
5    makeup of a particular product can have an effect on the
6    internal temperature that the product reaches when
7    subject to exterior temperatures?
8        MR. SULLIVAN:  Objection to form, assumes
9    facts not in evidence, calls for speculation.
10   A   I don't know anything about the manufacture of
11   gypsum board with regard to components and how it would
12   affect the temperature.
13   Q   Well, just as a chemist though, would you
14   agree that the chemical makeup of the ingredients in a
15   given substance can have some effect on the temperature
16   that that substance would reach --
17       MR. SULLIVAN:  Objection.
18   Q   -- when exposed to outside temperatures?
19       MR. SULLIVAN:  Same objection; assumes facts
20   not in evidence, calls for speculation.
21   A   That would cause me to speculate -- require me
22   to speculate.
23   Q   Well, to the extent you're here as an expert
24   and a chemist, would you agree with me that the chemical
25   makeup of a given product can affect the temperature of

**Page 40**

1    that product as it's exposed to exterior temperatures?
2        MR. SULLIVAN:  Objection, assumes facts not in
3    evidence.
4    A   I appreciate your question, but I read nothing
5    about that, I have done no research on the topic, so I
6    don't know what the answer would be.
7    Q   Let me ask it this way.  If you put a piece of
8    1-inch thick steel into an oven, and that is a component
9    that will heat up and accept heat readily, correct?
10   A   You mean transfer heat?
11   Q   Steel is a good conductor of heat?
12   A   Heat transfer, yes.
13   Q   So the internal core of a piece of steel may
14   be reached at a different speed than the internal core
15   of a piece of wood that is not generally a conductor of
16   heat.  Would that be fair to say?
17       MR. SULLIVAN:  Objection.
18   A   I don't know.  You speak of wood as compared
19   to steel, and that would depend maybe on the moisture
20   content of the wood, right, so I don't know.
21   Q   Like you said though, it would depend on the
22   moisture content of the wood or the thickness of the
23   steel, so that's what I'm trying to say; there could be
24   variations in the temperature reached internally based
25   on what your -- the ingredients of what you're testing?

**Page 41**

1    A   Well, could implies I would have to speculate
2    on the answer.  I can't speculate on it.
3    Q   So you just don't have an opinion one way or
4    the other?
5    A   I would prefer not to comment on something I
6    know nothing about.
7    Q   Okay.  Let's turn to your report that talks
8    about the glass tubes.
9        Well, first of all, let's talk about the
10   five -- what did you call them here -- chemicals that
11   are called reference chemicals that -- Vanilin and
12   Sorbitol and Acetanilide.  What made you select those --
13   the particular chemicals that you used in your test?
14   A   Well, I wanted to have some chemicals that
15   represented a wide range, and I suspected that the
16   starting point, the boiling point would be good, 180
17   degrees, and then I went roughly by 20 or 30-degree
18   increments to a temperature that seemed really hot to
19   me, 329 degrees, and I did that with the aid of the
20   purchasing agent at the company where I bought it from.
21       I spoke with a representative of RTC, and I
22   had in front of me on my screen all the chemicals they
23   sold and all the melting points.  I said, let's go by 20
24   to 30-degree increments and let's choose some, so he and
25   I went through a list and decided these would be good,

```
                                                    42
 1   and that's how we chose it.
 2       Q    And how did you determine what size the
 3   chemicals would be, the sample sizes?
 4       A    How much?
 5       Q    How much.
 6       A    Okay. Well, when we do melting point tests in
 7   a laboratory, we usually just use a little tiny bit at
 8   the end of a small glass ampule, usually an oil, that's
 9   slowly heated up, and you watch it under a microscope,
10   under a lens. And at a very specific temperature, it
11   transforms from a solid, kind of just really melts and
12   falls apart.
13           In this case, I needed something really
14   obvious. If I put just a little bit in, at the end of
15   the line I may not be able to tell, where is it, you
16   know, so I put in a big glob, enough to easily see it
17   both from a qualitative perspective when I started out
18   and at the end.
19           So I didn't want to have the test have to be
20   second-guessed; did it melt, did it not, where is it,
21   are you sure that's it, so I put about a tenth of a
22   gram, I think, into each one. Yeah. The bottles come
23   with a gram size, gram weight, and so I looked to the
24   volume, and I had about a tenth of a gram in each one,
25   because you can easily see it. It wouldn't cause for

                                                    43
 1   any misunderstanding if it melted or not. That's why.
 2       Q    Okay. And did you -- does the size of the --
 3   were these -- so they were in a solid form when you
 4   received them, correct?
 5       A    Correct.
 6       Q    So how did you break off a piece for -- just
 7   to use one-tenth of a gram?
 8       A    You don't break it off. It comes as, like, a
 9   powder. Imagine you had little viles of, say, salt or
10   sugar or powdered sugar.
11       Q    Okay.
12       A    In that form. So it's in a crystalline form,
13   in a powder form, so I extracted a bit with an
14   alcohol-cleaned aluminum swab, then poured it into an
15   aluminum funnel into the ampule, and that's it.
16       Q    The company that provided you these chemicals,
17   is that RTC?
18       A    Correct.
19       Q    Okay. And did RTC provide you with any
20   instructions as to the minimum amount that should be
21   used to have -- you know, in your tests?
22       A    No.
23       Q    So do you believe that there is a minimum
24   amount that can be used or should be used regarding the
25   accuracy of these tests?

                                                    44
 1            MR. SULLIVAN: Objection.
 2       Q    What made you determine that a tenth of a gram
 3   would be an accurate amount?
 4            MR. SULLIVAN: Objection to form.
 5       A    As I said, I was looking for really obvious
 6   evidence of melting or not melting.
 7            If we were to perform this test analytically,
 8   I used way too much, because normally you just use a
 9   little crystal. But remember, I'm going through a
10   gypsum board manufacturing plant, and so when I --
11   hoping I would find these things in the end, I want
12   really obvious evidence that it melted or not, and they
13   all melted. Three melted and three didn't.
14            And I thought that that would be a fairer
15   judgment, because it would require more heat to melt as
16   much as I put in, if I just put a single crystal in, so
17   I thought that would be a better, fairer way to provide
18   qualitative evidence that it in fact melted.
19       Q    So you selected the five ingredients, then it
20   says you put it in a glass tube, correct, and what did
21   you call that tube, an ampule?
22       A    Yeah. That's another way of describing it, an
23   ampule.
24       Q    Okay. And what was the size of that glass
25   tube?

                                                    45
 1       A    I believe I gave you a dimension. I think
 2   they were 4 inches. Let's see. Yeah. 4 inches in
 3   length, three-eighths inch in outside diameter.
 4       Q    Okay. How much of that 4-inch by
 5   three-eighths inch tube was consumed by the tenth of a
 6   gram of chemical that you would put in the tube?
 7       A    Well, as you can see by the examples here,
 8   photograph 7.
 9       Q    Okay.
10       A    Let's go to photograph 1. You can see that it
11   rolled around inside, you can see -- actually see the
12   tenth of a gram inside each tube in photograph 1, and
13   when you rotate the tube, it covered the whole inside
14   with crystals, so it wasn't necessarily just a clump of
15   it. It coated the sides, and the excess would
16   accumulate at one end or the other depending --
17       Q    So if you tipped the tube up and kind of shook
18   it down, you know, how much of the material would have
19   been taken up by the tube?
20       A    Taken up by the tube, well, it would --
21       Q    How much of the tube would have been taken up
22   by the material, I think is what I should say.
23       A    I see. If you were to pack it all in, it
24   might comprise maybe a quarter to three-eighths of an
25   inch on the bottom, okay.
```

```
                                              46
 1         But, again, it was put in flat, and it would
 2   just lie -- once it jiggled a little bit, it would just
 3   distribute itself across the length of the tube, on the
 4   surface area of the tube, so it would distribute itself
 5   nicely across the uniform interior of the tube.
 6      Q    Okay. But that also infers that there was
 7   some oxygen or air within the tube as well, correct?
 8      A    Sure.
 9      Q    In fact, the amount of air in the tube, if you
10   said that the material took up roughly maybe
11   three-eighths of an inch at the bottom of one tube?
12      A    Yeah. I didn't do that, but I'm estimating
13   the height, yeah.
14      Q    Fair enough. But that would mean that the air
15   took up the other, you know, almost 3 inches of the
16   tube, correct?
17      A    Sure.
18      Q    Why did you select such a large tube with so
19   much air in it for this test?
20      A    Well, it wasn't a matter of how much air. It
21   was a matter of first recovering it and survivability,
22   so I wanted to be able to get through the process and
23   for me to be able to find it.
24         So it would have been nice to have a
25   quarter-inch tube, I would have never found it, so it

                                              47
 1   made sense to have something I could see and that could
 2   be manipulated when you insert it into the slurry, so
 3   it's just a matter of practicality.
 4      Q    Okay. But would you agree that air will heat
 5   up at a faster rate than gypsum material if both are
 6   exposed to the same exterior temperature?
 7         MR. SULLIVAN: Objection.
 8      A    Air has hardly any mass. It would heat up
 9   faster.
10      Q    Okay. And so the diameter of the tube being
11   three-eighths, and the board, some of it being a half an
12   inch, the amount of room between the paper and the tube
13   was how much?
14         MR. SULLIVAN: Objection.
15      Q    Well, maybe if you can --
16      A    There's some pictures here where you can see,
17   like picture 6, where we pull back the paper and peeled
18   it back, and we can see that they're lying flat, and
19   some cases it's against the paper, sometimes it's a
20   little bit lower than the paper, you know.
21      Q    Okay.
22      A    As a matter of fact, you can see some gypsum
23   on top here in the center where it's covering the top of
24   the tube. Do you see that? So there was -- you know,
25   it was somewhat of a distance, some measure of gypsum

                                              48
 1   between the tube and the paper.
 2      Q    Well, if the tube was three-eighths of an inch
 3   and you had it inserted in a half-inch board, then
 4   there's only going to be possibly --
 5      A    A sixteenth of an inch.
 6      Q    -- a sixteenth of an inch on one side or the
 7   other of it, or a thirty-second of an inch on either
 8   side?
 9      A    For the half-inch board, that's correct.
10      Q    In fact, the only board that you tested that
11   was regular drywall was half-inch board that day,
12   correct?
13      A    I don't understand the word regular.
14      Q    Well, in your chart, it lists it as half-inch
15   regular.
16      A    Oh, I see.
17      Q    Okay. Then the two on the bottom are fire
18   shield, correct?
19      A    Correct.
20      Q    And the other half-inch is high strength light
21   is what it's listed as, correct?
22      A    Correct.
23      Q    So the regular board that you tested was test
24   one and test two, correct, and those are both half-inch
25   regular?

                                              49
 1      A    Correct.
 2      Q    So you didn't test any five-eighths inch
 3   regular drywall board during this test, correct?
 4      A    No.
 5      Q    And so we have either a thirty-second of an
 6   inch on one side and the paper directly on the other
 7   side touching the capsules. When you put -- let me ask
 8   this.
 9         When you put the tubes into the slurry, how
10   liquified was the slurry at the time?
11      A    It was --
12         MR. SULLIVAN: Objection to form.
13      A    It was a liquid. It was coming out of a pipe.
14      Q    Okay.
15      A    So it was a liquid.
16      Q    And so you put it in the board when it was,
17   you know, it was easy to place the viles in or --
18      A    Yeah. It was like a real slushy mud, you
19   know.
20      Q    So you didn't have to push them down in there?
21      A    No.
22      Q    It wasn't setting up at the time?
23      A    No.
24      Q    As the board made it through the line, at some
25   point before it enters the oven, do you understand that
```

```
                                                 50                                                        52
 1   the board is flipped over?                         1       MR. SULLIVAN: Objection to form.
 2     A  Sure.                                         2     A  Well, the way we designed it -- I think it's
 3     Q  Okay. And if the tubes -- well, let me first  3   in here -- is the moment it came out, the side where the
 4   ask it this way. Did you allow air -- I mean, did you 4  paper was pushed on top of the gypsum, we marked it as
 5   allow any of the slurry to enter the glass tube?   5   best we can, okay, then we tracked it a quarter of a
 6     A  No.                                           6   mile down. It was cut. We wanted to make sure the
 7     Q  Okay. How did you prevent that from           7   cutter didn't cut where we had put it, because we'd have
 8   happening?                                         8   no idea where it would do that. Then we flipped the
 9     A  Well, the ends were covered with Teflon tape. 9   board over, and they can track it visually, then they
10     Q  Okay. Why did you choose Teflon tape?        10   mark that side again.
11     A  Well, it's a competent product that had good 11     Q  Then you would agree with me that at the time
12   adhesion to the tape, and it has, I recall, precisely a 12 it entered the oven, the viles that had been placed up
13   melting point, but it's pretty high, so I thought it  13 were now facing down as it enters the oven?
14   would survive.                                    14     A  Correct. That's right.
15     Q  Okay. And you believe that the tubes were air 15    Q  All right. Would you agree with me that
16   tight then?                                       16   paper, the paper on the outside of the board is in
17     A  I didn't test to see if it was air tight.    17   contact with the bottom of the oven as it goes through?
18     Q  Okay. Did any of the tubes at the end of the 18     A  Well, it's in contact with the outside air of
19   test contain -- were they breached? Did they contain 19 the oven. I'm not sure about the details about the
20   any gypsum slurry?                                20   furnace itself, but it's definitely the outside of the
21     A  No.                                          21   paper is in contact with the heat, yes.
22     Q  Okay. Then at the time you placed a tube full 22    Q  Okay. And so if the outside of the paper is
23   of air that has sealed ends with Teflon tape into the 23 in contact with the heat and then it's touching the
24   very liquid gypsum slurry, did you notice whether those 24 vile, the glass vile, and the glass vile contains air,
25   tubes floated?                                    25   would you expect the air inside that glass vile to

                                                 51                                                        53
 1       MR. SULLIVAN: Objection to form.               1   increase in temperature quicker than the slurry mixture
 2     A  The process runs at 4 or 5 feet per second.   2   itself in which the vile is placed?
 3     Q  Right.                                        3       MR. SULLIVAN: Objection to form.
 4     A  And you can't tell.                           4     A  Well, you've outlined a hypothesis that has a
 5     Q  Would you expect that a tube filled with air  5   lot of coulds and shoulds and woulds and so forth.
 6   and sealed would float sitting in a liquid substance? 6    Q  Okay.
 7       MR. SULLIVAN: Objection.                       7     A  You've got the assumption that there is no
 8     A  Well, within -- the tubes are added -- well,  8   gypsum between the glass and the paper, which is
 9   to answer your question, yes, a tube of air would float. 9 unlikely, because it's a slurry. It's a wet slurry.
10     Q  Okay. And so you put the tube of air in, and 10        It seems reasonable that there wouldn't be a
11   how long before the paper was added to the top?   11   perfect match of glass to paper alone, there would be
12     A  Well, it was inserted -- if this was where the 12 some gypsum, and the photograph shows there is some
13   two pieces of paper come down on the bottom and the top, 13 gypsum on one side.
14   they're literally inserted right here at 4 feet per 14        And then you've got the issue of the side,
15   second, so right away.                            15   whether or not it was twisted, because we did find some
16     Q  Right away, okay. Then the paper was         16   that had some space and were not perfectly flat, so
17   immediately placed on top?                        17   there must have been some space in it, because when we
18     A  Correct.                                     18   dug them out, we could tell they weren't quite flat.
19     Q  Okay. Now, Dr. Moon, the board is then -- so 19        So the answer is, I don't know. I don't know
20   the tubes are placed in, the paper comes down on top of 20 exactly the issue of the temperature inside the vile,
21   it, then it goes to the cutter -- or not the cutter 21 but keep in mind that we're dealing with a sphere,
22   first. Maybe it is.                               22   right, yeah, we're dealing with the sphere. So here is
23       If the tube is placed in, and then the piece  23   a glass vile, and we're talking about some paper that's
24   of paper is placed on top, before it goes into the oven, 24 in the top and the bottom, right.
25   which side is down?                               25        Now, the vast majority of the tube is not
```

### Page 54

1  exposed to the paper. It's almost all gypsum. See, I
2  guess we had put the -- 95 percent of the surface area
3  of the tube is gypsum, not the paper, so I can't
4  speculate on whether or not that would have an impact or
5  not.
6    Q  Well, right, but the heat in your scenario
7  here, which you have down on top of Exhibit 3, the heat
8  is only coming from this direction and this direction,
9  correct? The heat is not coming from the sides?
10       MR. SULLIVAN: Objection to form.
11    A  But nonetheless, it's still exposed to the
12 matrix, and the vast majority of it's exposed to the
13 matrix of the gypsum. So these are things that I cannot
14 express in a qualitative or quantitative way, because I
15 don't know what the answer is.
16    Q  So you can't tell us sitting here today
17 whether the air -- you would expect the air inside that
18 tube to heat up quicker than the gypsum surrounding the
19 air?
20       MR. SULLIVAN: Objection.
21    A  I cannot give you an answer relative to this
22 scenario. I just could not. If it was a tube alone, I
23 think that there would be certain -- it would certainly
24 heat up, but in the matrix of a wet gypsum slurry, I
25 can't -- I can't speculate on what that might be.

### Page 55

1    Q  Well, you gave us a specific temperature that
2  this manufacturing process was designed to determine. I
3  mean, I guess your test results were designed to specify
4  a temperature reached inside the gypsum core of the
5  drywall, correct?
6       MR. SULLIVAN: Objection to form,
7       mischaracterizes his report and testimony.
8    A  I think I intended to, with the five
9  chemicals, to provide a range.
10   Q  Okay.
11   A  And that's what I think I provided.
12   Q  Okay. And the minimum range that you've
13 determined here is 237 degrees?
14   A  Correct. Could be higher.
15   Q  Fair enough.
16   A  Could be higher.
17   Q  And what I'm trying to find out is if the air
18 inside that tube heated up quicker than the core inside
19 the drywall, could it have reached a high enough
20 temperature to melt the liquid before the rest of the
21 slurry mixture actually got to that same temperature?
22      MR. SULLIVAN: Objection to form.
23   A  You're posing an if. My role is not to
24 speculate as to what could have or what could have
25 happened, so I can only stick with the results, in that

### Page 56

1  among the five tubes, three melted, and the highest one
2  has a very specific melting point, so I'm going to
3  assume that the internal temperature of that gypsum
4  board reached at least 237 degrees Fahrenheit, perhaps
5  higher.
6    Q  Actually, your test results actually measure
7  what the internal temperature was inside that tube,
8  correct?
9       MR. SULLIVAN: Objection.
10   A  It does describe the temperature that those
11 crystals were exposed to, yes.
12   Q  Okay. And so based on that information, you
13 have to then make the assumption that the core
14 temperature, you know, achieved the same temperature,
15 correct?
16   A  Yeah.
17      MR. SULLIVAN: Objection.
18   A  From the point of my research, I concluded
19 that the core temperature of the gypsum board reached at
20 least that temperature, yes.
21   Q  Okay. And that's, you know, that's where, you
22 know -- did you have any opportunity to discuss with
23 anybody at National Gypsum whether they've ever tested
24 the core temperature of their drywall?
25   A  No.

### Page 57

1    Q  Didn't ask them one way or another?
2    A  Some -- I asked them what do you think this
3  could be, and they thought around 200. And I said,
4  well, you know, I'm not sure about that. I think they
5  were giving me the temperature of the slurry maybe
6  coming in, but they never had actually tested, they just
7  didn't know.
8    Q  That's what I mean. Did you find out if they
9  ever did their own testing to see what their core was?
10      MR. SULLIVAN: Objection.
11   A  No.
12   Q  Do you remember asking them specifically, or
13 you just don't know?
14      MR. SULLIVAN: Objection.
15   A  I think that, you know, when I got there to do
16 the work, they were there to assist me. It wasn't a big
17 conversational topic. They knew what I was doing, and
18 they were just really curious, maybe because their day
19 was broken up by something different, but they were more
20 curious than anything.
21      They didn't offer a specific temperature or
22 any previous papers or studies they had done to the
23 plant. Frankly, at the plant, they don't have time to
24 do research. They're in the manufacturing mode. I
25 think if they did anything, it would be at another

Page 58

 1  facility, but not where I was at. They just don't do
 2  research.
 3      Q   What experience do you have to make that
 4  statement?
 5          MR. SULLIVAN: Objection.
 6      A   They have a research branch. Apparently they
 7  have some people that do this at another facility.
 8          But in the conversation I had with the staff,
 9  they're all about manufacturing. They do break tests,
10  they do moisture tests, the final product, they're all
11  about quality assurance, quality control, at least the
12  staff that I was with, not about, I wonder if the
13  crystal structure does this. They don't get into that.
14  They deal with the manufacturing.
15      Q   Okay. But just to be clear, in preparation
16  for your report, or as a check to your test methods, did
17  you ask them if they had any data regarding other
18  testing that had been done previously, either at their
19  research facility or at their headquarters or anywhere
20  else, regarding internal temperature testing of the core
21  of the gypsum board made by National Gypsum?
22          MR. SULLIVAN: Objection to form.
23      A   No.
24      Q   And in preparation for your test, you weren't
25  provided any documents or papers showing --

Page 59

 1      A   No.
 2      Q   -- previous temperature tests?
 3      A   No.
 4          MR. WARWICK: Let's go off the record for just
 5  a few minutes.
 6          VIDEOGRAPHER: We're going to go off the
 7  record at 10:06.
 8          (A short recess was taken.)
 9          VIDEOGRAPHER: We are now going back on the
10  record at 10:14.
11          MR. WARWICK: Dr. Moon, I appreciate your time
12  this morning. At this time, I don't have any more
13  questions.
14          MR. SULLIVAN: I have a few questions.
15              CROSS-EXAMINATION
16  BY MR. SULLIVAN:
17      Q   Dr. Moon, I want to ask you some questions
18  about testimony that you provided in response to some
19  questions from Mr. Warwick about a facility in the
20  Bahamas. Do you remember that testimony?
21      A   Yes.
22      Q   And I think what -- I want to make sure my
23  understanding is correct. My understanding is that you
24  performed certain work at this facility in the Bahamas
25  in which you saw -- which you observed a situation where

Page 60

 1  hydrogen sulfide was off-gassing from water, correct?
 2      A   Correct.
 3      Q   And you were also aware that there was some
 4  corrosion in that area --
 5      A   Yes.
 6      Q   -- is that right?
 7          But you don't -- you didn't perform any
 8  testing or develop any opinions with respect to the
 9  cause of any of that corrosion; is that right?
10      A   There was no testing of the corrosion. It
11  wasn't the focus of the research.
12      Q   Okay. The focus of your work was to remediate
13  the water?
14      A   Correct.
15          MR. WARWICK: I object to form.
16      Q   Was that the focus of your research?
17      A   That was the focus; to define the extent,
18  design a system to recover the vapors, and remediate the
19  grounds rather.
20      Q   So your work did not involve any analysis with
21  respect to what chemicals were causing the corrosion, am
22  I right about that?
23      A   Correct.
24          MR. WARWICK: I object to form.
25      Q   Mr. Warwick asked you some questions regarding

Page 61

 1  your test results, including some questions about your
 2  use of -- or the results with respect to the fire shield
 3  product. Do you remember those?
 4      A   Yes.
 5      Q   Okay. You also ran control testing, right?
 6      A   Yes, I did.
 7      Q   Can you describe the control testing that you
 8  performed?
 9      A   The control testing was done at my house, in
10  an oven. And I took five ampules, each with one of the
11  melting point chemicals in it, and slowly raised the
12  temperature of the oven slightly above the melting
13  point, and observed the melting of each chemical
14  sequentially as I moved up the temperature.
15          So this circumstance had just an open tube
16  exposed to the air, and there was no gypsum associated
17  with that, but the control sample results showed the
18  same sequence of melting at various temperatures.
19      Q   Why did you run the control tests?
20      A   I wanted to confirm that the observations
21  observed in the field could be simulated by analyzing
22  the performance in a laboratory setting, and obtained
23  the same relative melting point in a test controlled
24  situation as compared to in the gypsum board.
25      Q   And what was the significance of those test

16 (Pages 58 to 61)

Page 62

```
1   results --
2   A   Well --
3   Q   -- in your view?
4   A   It confirmed that the temperature required to
5   melt the test chemicals could be simulated at precisely
6   near the -- precisely the same temperature under
7   controlled conditions, so it confirmed that if something
8   melted in the field at 237 degrees, that same
9   temperature could be observed to melt in a controlled
10  situation away from the gypsum.
11  Q   As part of your report, you attached some
12  documents from a company called RTC, right?
13  A   Correct.
14  Q   And can you describe what these are?  They are
15  certificate of analysis -- certificates of analysis,
16  right?
17  A   Correct.
18  Q   And there's a certificate for each chemical
19  that you tested, am I right?
20  A   Yes.  The intent as a reference source for
21  melting point by accompanying the certificate of
22  analysis implies the authenticity, that when they
23  provide a chemical that an appropriate melting point
24  will be met as a standard.  So it provides a way to
25  certify that the observations that this particular
```

Page 63

```
1   chemical melted at various temperatures would be
2   accurate.
3   Q   And each certificate of analysis, the
4   certificate of analysis for each chemical, contained a
5   reference to a melting point, am I right?
6   A   Correct.
7   Q   Were the results that you obtained from the
8   testing of the gypsum -- of the placing the glass tube
9   in the gypsum, the control results, and the melting
10  point identified in the certificates of analysis
11  consistent?
12  A   Yes.
13  Q   What is the significance of that?
14  A   Well, it means that the intent of the study
15  was to determine what temperature the chemical reached
16  inside the gypsum board, and that corresponded to a
17  melting point that was confirmed and accurate as
18  described in the certificate of analysis.
19  Q   Just to be clear, with respect to your report,
20  you were looking at a range of melting points?
21  A   Correct.
22  Q   A range of temperatures at which it could
23  melt, am I right?
24  A   Correct.  Between 180 and -- let's see -- and
25  229 degrees Fahrenheit.
```

Page 64

```
1       MR. SULLIVAN:  No further questions.
2       MR. WARWICK:  Just a quick follow-up.
3              REDIRECT EXAMINATION
4   BY MR. WARWICK:
5   Q   Dr. Moon, the control test that you did at
6   home in your kitchen, did you have the glass tubes
7   sitting on some sort of pan or tray of some sort?
8   A   The ends were supported by a plate.
9   Q   Okay.
10  A   They weren't flat on the plate, but the ends
11  were supported so air was around the tube.
12  Q   Okay.  And when you performed those control
13  tests, they were just of the tubes themselves; they
14  weren't contained any sort of gypsum or any material
15  other than just the plane glass tube with the material
16  in it placed in the oven, correct?
17  A   Correct.
18  Q   Okay.  Did you perform any control tests where
19  the glass tube was placed in a larger portion of gypsum
20  material or some other material similar to gypsum,
21  crushed rock or stone or something, to determine whether
22  the temperature inside the glass tube would be affected
23  based on the material that it was placed into?
24  A   No.
25      MR. SULLIVAN:  Objection to form.
```

Page 65

```
1   Q   Why not?
2   A   The experimental design was based principally
3   on the available product being made the days I was
4   there, and that's dictated by their clients, so my
5   research was based upon the testing for the half-inch
6   and the five-eighths inch only.
7   Q   But I'm talking about when you did the
8   control, the purpose of this test was actually to try to
9   determine what the core temperature of the gypsum board
10  was, correct?
11  A   Correct.
12  Q   So when you did your control tests of just the
13  material substance itself without any gypsum core test,
14  I understand that that was important to find out -- to
15  make sure that the chemicals in fact were going to melt
16  at the temperature they are supposed to melt at, but as
17  far as a control test to determine that the material in
18  which the glass tubes were placed in fact reached the
19  temperature that the glass tubes reached, did you
20  perform any control tests to make that determination?
21      MR. SULLIVAN:  Objection to form.
22  A   No.
23  Q   Why not?
24  A   I don't think I was in the capacity to
25  simulate the circumstances of surrounding the tube with
```

**Page 66**

1  gypsum to do that control.
2  Q  Did you ask National Gypsum if you can have
3  any gypsum material or any material to do those types of
4  tests?
5      MR. SULLIVAN: Objection.
6  A  I think it would be really difficult to
7  simulate the circumstances that we had in the test to
8  place a tube from the slurry to the final product to get
9  an idea about the highest temperatures attained at home.
10     They did not offer to give me some gypsum to
11 resolidify, and I think that there were a lot of
12 variables there that just wouldn't allow me to defend it
13 easily either, in terms of if they gave me a slurry to
14 bring home and put it in a test tube or something with
15 the gypsum. I'm not sure if that would come anywhere
16 near what they simulated in the manufacturing process to
17 what I could do at home.
18 Q  Okay. And in your report, is there a section
19 that talks about those tests you did at home of your
20 control testing?
21 A  Yes.
22 Q  Where is that described?
23 A  It's under calibration test results on page 3,
24 an additional set of five tubes, each contained the
25 chemicals listed, were prepared to confirm their melting

**Page 67**

1  points.
2  Q  Okay. I see that. Thank you. I don't think
3  I asked this question before, I don't think I asked it
4  before, but just to be clear, we said that the tubes,
5  the glass tubes that were selected for this test were
6  about 4 inches?
7  A  In length.
8  Q  4-inch tubes, and they were three-eighths of
9  an inch --
10 A  Correct.
11 Q  -- in diameter?
12    Could you have purchased smaller glass tubes?
13 A  Yes. I asked about that, and she said that --
14 the person I was speaking with, she said, based on my
15 experience, I would be cautious about getting something
16 much smaller because it might break, so I was thinking
17 primarily about survivability of getting it through the
18 process and still finding it and getting through the --
19 when you first insert the tubes into the slurry,
20 followed by the two pieces of paper that come down, you
21 hear a percussive sound as the tubes hit the metal
22 framing. And when I heard that, I was really happy that
23 I had gotten the thicker wall material, because that
24 would have been disastrous if they had broken, but none
25 of them broke.

**Page 68**

1  Q  When you said her, who are you referring to?
2  Who were you talking to?
3  A  The glass manufacturer representative. And I
4  described to her what my intent was, and so she
5  recommended the thicker wall material for survivability.
6  Q  Do you remember what company that was?
7  A  Sure. It should be here.
8     I didn't mention the company that I bought the
9  glass tubing from, but if you need to know that, I have
10 that in my receipts.
11 Q  You just don't know off the top of your head?
12 A  No.
13 Q  Okay.
14    MR. WARWICK: That's all I have for right now.
15    MR. SULLIVAN: No further questions.
16    MR. WARWICK: Thank you for your time, Doctor.
17    VIDEOGRAPHER: This concludes this videotaped
18 deposition at 10:26.
19    (The taking of the deposition was
20    concluded at 10:26 a.m.)

**Page 69**

1  RE    : BRUCKER vs NATIONAL GYPSUM
   DEPO OF: RALPH E. MOON
2  TAKEN : February 28, 2012
3
4       EXCEPT FOR ANY CORRECTIONS
        MADE ON THE ERRATA SHEET BY
5       ME, I CERTIFY THIS IS A TRUE
        AND ACCURATE TRANSCRIPT.
6       FURTHER DEPONENT SAYETH NOT.
7       _____
        RALPH E. MOON
8
9
10 STATE OF FLORIDA  )
                    ) SS:
11 COUNTY OF HILLSBOROUGH)
12
13    Sworn and subscribed to before me this
14 _____ day of _____, 2012.
15 PERSONALLY KNOWN _____ OR I.D._____
16
17    _____
      Notary Public in and for
18    the State of Florida at
      Large.
19
20
21 My commission expires:

```
                                                    70
 1         CERTIFICATE OF OATH OF WITNESS
 2
 3    STATE OF FLORIDA    )
                          ) SS:
 4    COUNTY OF HILLSBOROUGH)
 5
 6         I, KIM AUSLANDER, Registered Professional
 7    Reporter, Notary Public in and for the State of Florida
 8    at Large, certify that the witness, RALPH E. MOON,
 9    personally appeared before me on February 28, 2012 and
10    was duly sworn by me.
11         WITNESS my hand and official seal this 2nd day
12    of March, 2012.
13
14
                _____
15              KIM AUSLANDER, RPR
                Notary Public, State of Florida
16              at Large
17
18    Notary #EE054282
19    My commission expires: 1/10/2015
20
21
22
23
24
25
```

```
                                                    71
 1         REPORTER'S DEPOSITION CERTIFICATE
 2
 3         I, KIM AUSLANDER, Registered Professional
 4    Reporter, certify that I was authorized to and did
 5    stenographically report the deposition of RALPH E. MOON,
 6    the witness herein on February 28, 2012; that a review
 7    of the transcript was requested; that the foregoing
 8    pages numbered from 1 to 74 inclusive is a true and
 9    complete record of my stenographic notes of the
10    deposition by said witness; and that this
11    computer-assisted transcript was prepared under my
12    supervision.
13         I further certify that I am not a relative,
14    employee, attorney or counsel of any of the parties, nor
15    am I a relative or employee of any of the parties'
16    attorney or counsel connected with the action.
17         DATED this 2nd day of March, 2012.
18
19              _____
                KIM AUSLANDER
20              Registered Professional Reporter
21
22
23
24
25
```

```
                                                    72
 1              INSTRUCTIONS TO WITNESS
 2
 3         Please read your deposition over carefully
 4    and make any necessary corrections. You should state
 5    the reason in the appropriate space on the errata
 6    sheet for any corrections that are made.
 7         After doing so, please sign the errata sheet
 8    and date it.
 9         You are signing same subject to the changes
10    you have noted on the errata sheet, which will be
11    attached to your deposition.
12         It is imperative that you return the original
13    errata sheet to the deposing attorney within thirty
14    (30) days of receipt of the deposition transcript by
15    you. If you fail to do so, the deposition transcript
16    may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

```
                                                    73
 1              E R R A T A
 2
 3
 4
 5    I wish to make the following changes,
 6    for the following reasons:
 7
 8    PAGE LINE
 9    ___  ___ CHANGE:_____
10    REASON:_____
11    ___  ___ CHANGE:_____
12    REASON:_____
13    ___  ___ CHANGE:_____
14    REASON:_____
15    ___  ___ CHANGE:_____
16    REASON:_____
17    ___  ___ CHANGE:_____
18    REASON:_____
19    ___  ___ CHANGE:_____
20    REASON:_____
21
22    _____   _____
23    WITNESS' SIGNATURE          DATE
24
25
```