UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FT. MYERS DIVISION

----------------------------x

GEORGE BRINCKU, BRENDA BRINCKU,

Plaintiffs,

VS.

CIVIL ACTION NO. 2:11-CV-00338-JES-DNF

NATIONAL GYPSUM COMPANY, a Delaware Corporation,

Defendants.

----------------------------x

CHRIS BRUCKER, et al.,

Plaintiffs,

VS.

CIVIL ACTION NO. 2:10-CV-405-FTM-20SPC

LOWES HOME CENTERS, INC., et al.,

Defendants.

------------------------------x

VIDEOTAPED DEPOSITION OF ROBERT ODLE
Philadelphia, Pennsylvania
Friday, February 24, 2012
9:27 a.m.

Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
JOB NO. 23825

February 24, 2012
9:27 a.m.

Videotaped Deposition of ROBERT ODLE, held at the offices of Morgan, Lewis & Bockius, LLP, 1701 Market Street, Philadelphia, Pennsylvania, pursuant to notice, before Jennifer Ocampo-Guzman, a Notary Public of the Commonwealth of Pennsylvania.

A P P E A R A N C E S:

Attorneys for Plaintiffs
LEOPOLD-KUVIN
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, Florida 33410
BY: GREGORY S. WEISS, ESQ.
gweiss@leopoldkuvin.com

Attorneys for Defendant National Gypsum
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
BY: THOMAS SULLIVAN, ESQ.
tsullivan@morganlewis.com
CAROLYN F. YEN, ESQ.
carolyn.yen@morganlewis.com

ALSO PRESENT:
HOWARD BRODSKY, Videographer

THE VIDEOGRAPHER: Good morning. Here begins video recording number 1 in the deposition of Robert Odle taken by the plaintiffs in the matter of George Brinkcu, Brenda Brinkcu and Chris Brucker, et al., plaintiffs versus National Gypsum Company, a Delaware corporation, and Lowes Home Centers, et al., defendants, in the United States District Court, Middle District of Florida, Fort Meyers Division.

This deposition is being held at Morgan Lewis, 1701 Market Street, Philadelphia, Pennsylvania, on Friday, February 24, 2012, at approximately 9:27.

My name is Howard Brodsky from the firm of David Feldman Worldwide and I am a legal video specialist. The court reporter is Jennifer Ocampo-Guzman on behalf of David Feldman Worldwide.

Will counsel please introduce themselves.

MR. WEISS: Greg Weiss on behalf of

the plaintiffs.

MR. SULLIVAN: Tom Sullivan of Morgan Lewis on behalf of National Gypsum and for the witness.

MS. YEN: Carolyn Yen, Morgan Lewis, for National Gypsum.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

R O B E R T  O D L E, having been duly sworn, was examined and testified as follows:

EXAMINATION BY
MR. WEISS:

**Q. Doctor, we met a few moments ago. My name is Greg Weiss. I'm an attorney that represents the plaintiffs in this matter. We're here today for your deposition, and before we start I just want to make sure we're on the same page, okay.**

**You need to answer all the questions verbally so the court reporter can take down everything you say today. Okay?**

A. Okay.

**Q. The court reporter will make a transcript of the record, and it's hard for**

her to do that with a head nod. So I would just ask that you answer all the questions verbally as we go through the day. Okay?

A. Okay.

**Q. I'm sure that your lawyer will object to the form of my questions many times throughout the day, but unless he directs you not to answer a question on some basis of privilege, we'll need for you to just go ahead and answer the question. Okay?**

A. Okay.

**Q. It's what we do to preserve the record because we don't have a judge present in the room today. Okay?**

A. Okay.

**Q. I will do my best to allow you to answer your complete question -- to answer my complete question as we go through the day. I ask that you allow me to finish my question. It's common you will anticipate what the rest of my question is, but try and let me finish the question and I will, of course, let you finish the answer. Okay?**

A. Okay.

**Q. If you don't understand my question, please tell me and I'll be happy to rephrase it in a way you do understand it. Okay?**

A. Okay.

**Q. But If you answer my question, I'm going to assume that you understood the question I've asked. Okay?**

A. Okay.

**Q. Is there anything that would prohibit you or inhibit you from giving honest and accurate testimony today?**

A. No.

**Q. Great. Can you tell me your current business address?**

A. 100 Wedgemont Drive, Elkton, Maryland 21921.

**Q. And what business do you work for at that address?**

A. Metallurgical Viability.

**Q. How long have you have worked for Metallurgical Viability?**

A. 1999, so that's 13 years.

**Q. And have you worked for**

Metallurgical Viability from 1999 to the present continuously?

A. Yes, but not always full time.

**Q. Okay. When you weren't working there full time, were you working for someone else?**

A. Yes.

**Q. Who were you working for when you were working part time at Metallurgical Viability?**

A. I worked for Corrosion Testing Labs in Newark, Delaware.

**Q. And that's K-R-O-Z-E-N?**

A. Say that again.

**Q. How do you spell Krozen?**

A. C-O-R-R-O-S-I-O-N.

**Q. Oh, Corrosion, I'm sorry.**

A. Corrosion.

**Q. What years did you work for Corrosion Testing Labs?**

A. Let's see, 2002 to 2005, I believe.

**Q. What was your title at Corrosion Testing Labs?**

A. Manager of the failure analysis

lab.

**Q. Was your title manager of the failure analysis lab continuously from 2002 to 2005?**

A. Yes.

**Q. Did Corrosion Testing Labs -- obviously, beyond corrosion, have any particular area or space they focused on?**

A. We did all the corrosion testing for York International in their copper tubing and their commercial air conditioning units. That was probably 30 percent of the job.

We did a lot of the oil refinery corrosion, Sunoco. And I'm trying to think of the other. Exxon, all the big companies that are along this I-95 corridor.

We did some corrosion for places like AstraZeneca and the pharmaceutical people.

**Q. And what were your responsibilities as the manager of the failure analysis lab?**

A. I usually made initial contact with the customer and tried to scope out, first if, you know, are we the right people to do

the job and/or send them to somewhere else, kind of, you know, give people the idea they can call me and I can help them with the problem, even if it isn't us. Price out the work then assign the work to one of the technicians or engineers working for me and then follow up on, you know, and discuss each job as we -- most of it was failure analysis work, why did this fail, what's the mechanism, what's the remedy. So my job was to, in some ways, was to, you know, make sure that we kept enough work coming in that everybody got paid.

**Q. What is your current title at Metallurgical Viability?**

A. I'm the owner of the company and I also just call myself a metallurgical consultant.

**Q. And have you owned the company since 1999?**

A. Yes.

**Q. From 1999 to the present, have you been employed by anyone other than Metallurgical Viability or Corrosion Testing**

**Labs?**

A. Yes, Dresser Rand.

**Q. Could you spell that?**

A. D-R-E-S-S-E-R, and then a separate word, Rand, R-A-N-D.

**Q. What was your title with Dresser Rand?**

A. Senior corrosion engineer -- oh, no, it's principal corrosion engineer. I'm sorry. That's the job they offered me and I said I wouldn't take that, but I would take the higher position.

**Q. When did you work for Dresser Rand, what years?**

A. It's on my resumé, but I believe it's 2006 to 2010.

**Q. What were you primarily doing as a principal corrosion engineer at Dresser Rand?**

A. I was responsible for hydrogen sulfide corrosion of compressors, going into the field and evaluating equipment that had -- it hadn't always failed, but I mean there was concern about a piece of equipment and I would go inspect it, take samples, evaluate

it, make recommendations.

I also ran the corrosion test work in laboratories trying to evaluate for different regions of H2S pressure and temperature and salt conditions, what would be the right material to use in a given environment.

**Q. What type of equipment were you evaluating for H2S corrosion?**

A. Compressors primarily, high pressure compressors.

**Q. And in what types of environments were these high pressure compressors such that they had H2S corrosion?**

A. Like in Wyoming Exxon has a plant up there that they take natural gas out of the ground and it has like ten percent H2S in it. They compress it, remove the H2S and during that process, the equipment is exposed not only to the H2S, but there's saltwater that comes up with the gas and you get a little bit into the compressors. So when they had a shutdown, I would go up there and suit up and go into this, you know, into the

compressors to inspect them.

**Q. Okay. Other than Dresser Rand and Corrosion Testing Labs from 1999 to the present, did you have any other employer other than Metallurgical Viability?**

A. Everything else has been contract work or consulting work.

**Q. Through Metallurgical Viability?**

A. Yes, yes.

**Q. How about prior to 1999, where were you employed?**

A. Fluor Daniel from 1995 to 1999.

**Q. What was the name of the company?**

A. It's now called Fluor. It used to be Fluor Daniel, F-L-U-O-R. They're the largest engineering company in the US.

**Q. And what was your title at Fluor Daniel?**

A. Principal process engineer.

**Q. What were your responsibilities as a principal process engineer?**

A. It varied a lot, but I would work with clients that were either building a new plant and work with their process people to

make sure that we're designing the plant correctly or I would actually be in a plant that's having problems, like a copper smelter in Peru. I worked in the electrolytic copper circuit there and the zinc circuit. And I'd go in and try to help the owner make decisions that improved profitability. So I would go, you know, get a grasp of the technology and then, you know, with the literature and my knowledge of the field, try to help advise them on what direction they needed to be moving to make the plant profitable.

**Q. Prior to your employment at Fluor Daniel, for whom did you work?**

A. This is going to be long, because I've worked for like 15 companies.

**Q. Maybe it would be easier if you just take me through from your work history briefly, if there is something interesting I'll take a note and we can go back to it, but if you just give me the list.**

A. Okay. I'm 64 now. I started when I was 19 working at a copper smelter in El

Paso as an engineering assistant while I went to college working with copper sulfides, smelting.

Worked on a master's there and then did electrolytic copper refining. Went to Ohio State and got a Ph.D. and worked on deoxidation of copper. Got out of school and went to a secondary copper smelter Southwire. Worked with electrolytic copper refining, copper smelting. Then went to Amax, worked at a nickel refinery and also had a small copper circuit and a cobalt circuit which I worked in.

Also there which is relevant, we used hydrogen sulfide to remove metal impurities from solution. That's my first commercial use of H2S. Went through, you know, copper, Anaconda copper and R&D department.

Eventually ended back up in a wastewater treatment company where we used metal -- we used sulfides to treat wastewater. And set up a circuit using hydrogen sulfide to make copper sulfide, to

recover it from some waste material.

And also helped, you know, with making new wastewater treatment products. So a lot of that was sulfide chemistry.

And then went from --

**Q. What was the name of the wastewater treatment company?**

A. Southern -- I think it's Southern Wastewater Treatment.

**Q. Where was that located?**

A. Carlton, Georgia.

**Q. Okay.**

A. Then ended up Fluor Daniel, Fluor Daniel.

**Q. Okay. Do you recall what year you worked for Southern Wastewater in Carlton, Georgia?**

A. '89 to -- no, that wouldn't -- it's '91 to '95.

**Q. Okay. Have you given a deposition previously?**

A. No.

**Q. Never? Have you given trial testimony previously?**

A. No, I've been on about a half dozen legal cases and whenever I turn my report in, it's ended.

**Q. Okay. Tell me about the half dozen legal cases you've been on.**

A. Let's see if I can remember them all.

**Q. What was the most recent, prior to this one?**

A. Corrosion Testing Labs. And it was with, I'm trying to think of the name of the chemical company that was in Baton Rouge.

**Q. Do you know approximately what year this was that you did the report for Corrosion Testing Labs?**

A. It was probably in the last year there.

**Q. So 2005 was the last time you gave a report for purposes of litigation?**

A. Yes.

**Q. Do you recall what the issue was in that case?**

A. An evaporator at a -- it was in a plant that made Freon. They had a corrosion



of a piece of equipment and it leaked and caused an explosion and someone was killed.

**Q. And for whom did you do the report?**

A. For the chemical company whose name I can't remember at the moment.

**Q. Were they the defendant in the case?**

A. Yes, they were being sued by --

**Q. The person who -- the estate of the person who was killed?**

A. Yeah.

**Q. How about -- so you told me about half dozen, the most recent was 2005, what was the one prior to 2005, the next prior?**

A. I did one on, I'm not going to remember the name of any of these companies, but it was a man lift where the bolts broke in the man lift and the -- it was for a government agency in Delaware. The man lift broke. I don't remember if the person died but he was certainly injured. And I looked at all the bolts that had failed and had recently had a maintenance done and so there was a question of why the maintenance was

done and the lift still failed.

**Q. And you were working on behalf of the company that owned the lift?**

A. Yes.

**Q. So the defendant in the case.**

**Do you recall what year that was?**

A. It was probably '94.

**Q. How about the next prior?**

A. I'm not too sure of which of these in order.

**Q. Sure.**

A. But there was a -- it was a wrist in someone's hand, they had an implant, and I only worked on that one a little while and it was turned over to someone else that worked cheaper.

**Q. We'll get to your rates in a minute. We're not there yet.**

**So this was a litigation over an implanted wrist.**

A. I'm trying to remember exactly, but it was some bone in the forearm that had been, had some kind of --

**Q. Prosthetic?**

A. -- prosthetic implant that it failed.

And the other person actually was probably more qualified to work on it.

**Q. And were you working on behalf of the manufacturer of the prosthetic?**

A. Yes. And the manufacturer and, you know, the doctor and the whole, you know, the side that put the --

**Q. Sure. The defendants in the case?**

A. Yes.

**Q. Okay. What other cases can you recall, do you recall what year that was?**

A. That's actually possibly pretty close, somewhere between '94 and '95, it's right in there.

**Q. Okay.**

A. I just realized I started a case with some implants, screws in a guy's back after I left Corrosion Testing Lab, but I worked on it for a couple months and then the guy never paid me so I quit working.

**Q. Okay.**

A. So I don't know if that counts or

not.

**Q. I'm more interested in cases where you actually completed a report.**

**So do you recall -- you've told me three where you've done a report, do you recall the other three, you said about a half dozen.**

A. I actually think there's only one more and I'm trying to remember what that was about.

I don't remember. I might if I went back to, stared at old resumés and stuff.

**Q. Did you bring any documents with you today?**

A. No. I -- I put everything on my Kindle, but I found out I can't use my Kindle here, but I've got a pretty good grasp on my reports.

**Q. Well, I have your reports, I'm not concerned about that. I just didn't know if you brought any of the documents you relied on in putting together your report.**

A. No.

22

**Q. Did you bring your billing file for the billing you've done in this case so far?**
A. No.
**Q. Do you have a billing file for this case?**
A. I could construct it. I have the Excel spreadsheets that I track that type of stuff in so I could sort and come up with the billing.
**Q. Okay. I've marked as Exhibit 1 your Notice for Deposition.**
**(Exhibit 1, Notice of Videotaped Deposition, marked for identification, this date.)**
**Q. And there is no -- I don't need to go over that with you. I want you to describe for me what's in your file, I have your reports. So other than your reports, what other items in your file, like a correspondence file, or what other documents would be in your file other than the reports?**
A. You mean like e-mails and that type of stuff?
**Q. Is there an e-mail file for this case?**
A. Per se, no, but I've got e-mails. I mean --
**Q. Sure.**
A. -- obviously. And again that, you know, e-mails, nothing has been erased.
**Q. Other than e-mail correspondence and an Excel spreadsheet, is there anything else contained in your files relating to this litigation other than these reports?**
A. I've read all the government reports on the Chinese drywall and the -- just in general all literature I could find on.
**Q. When you say the government reports, you read the CPSC studies?**
A. Yes.
**Q. Have you read the Florida study as well?**
A. Yes.
**Q. Have you read any other government reports other than the two CPSC studies and the Florida study?**
A. Does that include the one that was

23

done by the Fireman's, where they looked at the sprinklers? I don't know if that's in the Florida reports.
**Q. Well, I'm asking, as you sit here today, I'm not asking what you relied on in your report, I'm just asking what's physically in your file is really what I'm trying to get at. So I assume you're telling me that the CPSC reports in hard copy are in your file?**
A. I don't keep anything hard copy.
**Q. Okay. You keep an electric file?**
A. Yes.
**Q. Okay. So in your electrons you have the two CPSC reports, you have the Florida report. Are there any other reports that you're keeping electronically that you would consider to be a part of your file in this matter?**
MR. SULLIVAN: Objection to form.
A. I could look in there and those are the ones that I remember, but I couldn't say with certainty that there's not other papers in there.

24

The references that are in my report, I -- I think those are in there, but I don't even think all of those are in there. I think I read some of those online through, you know, the science, you know, you can pull them up online and read them.
**Q. When you say the reports that you referenced, these are the --**
A. Scientific references.
**Q. The five references that you make in the last page of your report?**
A. Yes.
**Q. Can you tell me what portion of your work relates to litigation in terms of a percentage?**
A. Over the last, over what time span?
**Q. Well, currently, what portion, what percentage of your work relates to litigation?**
A. Probably, this is the only one, and this is probably 40 percent of what I've done the last --
**Q. The last 12 months?**
A. -- the last 18 months, that kind

25

of...

**Q. So to be clear on the record, for the last 18 months 40 percent of your work has been this litigation?**

MR. SULLIVAN: Objection to form.

A. I'd have to go do the math, but it's that or lower.

**Q. Okay. So prior to the last 18 months, let's say over the last five years, how, what percentage of your work has been devoted to litigation-related studies?**

A. I would say somewhere under 10 percent.

**Q. How about for your career, what percentage of your work has been related to litigation?**

A. Probably under 5 percent.

**Q. Other than this matter, have you done any other drywall-related litigation support?**

A. No.

MR. SULLIVAN: Objection.

**Q. Other than this matter, have you**

**done any other work that related to drywall?**

MR. SULLIVAN: Objection to form.

**Q. Have you ever been found not qualified to provide an expert opinion?**

A. No.

**Q. In the other litigation matters you've been involved with, have you previously worked with this law firm more than most?**

A. No.

**Q. Who first made contact with you to be an expert in this matter?**

A. It was someone from this firm and there were several people in the room. It was a conference call, and I think Jack from National Gypsum was in the room, but he wasn't the primary person I was talking to. It was the older lawyer that works with Tom.

**Q. Jim Pagliaro?**

A. I think that's the first person that called.

MR. SULLIVAN: Not that I'm calling Jim older, for the record, when he reads this transcript, I am not characterizing

Jim as older, just older relative to Tom Ayala and Tom Sullivan.

A. I get a lot of calls from people asking me about work, and probably, you know, 20 percent of them actually result in work. I mean, you talk to people.

**Q. Sure.**

**Did you know any of the lawyers you spoke with prior to that call?**

A. No.

**Q. Did you -- did they tell you how they came to find you as a potential expert?**

MR. SULLIVAN: Objection.

A. No. I figured it out but, no.

**Q. What did you figure out? How did they come to find you as a potential expert witness?**

MR. SULLIVAN: I'm just going to object to the extent that your question is seeking any communications between the lawyers and the expert. I don't think that one did, but go ahead.

A. I don't know what you call them, but they're middle people, a search agency

had contacted me and asked if I was interested in work. And so, I mean, the standard answer is yes.

**Q. Okay. So you had given your name to a company who collects and creates a directory of experts and that company connected you with this case; is that right?**

A. Yes.

**Q. When was that first -- I'm not asking the substance of that conversation, when was that first phone call that you had?**

A. It was approximately, it was the last trip my wife made to Wisconsin and I was in a hotel in Wisconsin. What was that trip? I would guess that it was about May, June, 2010.

**Q. And have you been engaged in this litigation continuously since that call until today? Or at some point close after that call until today?**

A. Probably, you know, a couple of months after that. When you say "continuously," it's -- you know, you might work a lot one month, and not work any the

next month, so.
**Q. Sure. Have you ever had a meeting with any of the other experts who are working on this case?**
MR. SULLIVAN: Objection.
A. We go out --
**Q. You can answer.**
A. We go as a team to the houses.
**Q. Other than the trips that you made to inspect the houses which you made personally; is that right?**
A. Yes.
**Q. Have you had any other meetings with any of the other experts in person?**
A. We commonly toured the facility of National Gypsum together.
**Q. So other than the inspections of the houses and the tour of the National Gypsum facility, have you had any other meetings with the other experts?**
A. No. I've had phone calls, if you count that.
**Q. Well, that was my next question. Have you had calls between you and the other**

experts?
A. Yes, in particular Mark that --
MR. SULLIVAN: Objection.
**Q. Mark Kramer?**
**How frequently have you had calls with Mark Kramer?**
A. It was typically right before we're going to go do an inspection and we're trying to get coordinated who is bringing what.
**Q. Okay.**
A. Where we're meeting and I mean it's mostly logistics.
**Q. Other than for logistics, have you had calls with any of the other experts?**
A. I don't think so.
**Q. After the call that you had in May of 2010 -- strike that.**
**Let me ask the question a different way.**
**What were you asked to do in this case as an expert?**
MR. SULLIVAN: Objection to form. Go ahead.
A. They originally didn't ask me to do

anything. They were inquiring about my expertise. And with regards to copper and sulfur, and then I think the first thing they asked me to do is go look at --
MR. SULLIVAN: Objection, you're not to disclose any communications between the lawyer and you. Counsel has asked you a question about -- and I'll object to the form to make it clear for the record -- counsel asked you a question about what you've been asked to do for purposes of the expert report.
MR. WEISS: Let me refine the question, it might be easier.
**Q. I'm not asking what was the conversation. I'm asking what was the objective of what you were doing in this case.**
A. Evaluate the corrosion in houses that potentially had a problem with, with corrosion.
**Q. And in terms of that, do you consider yourself expert in corrosion?**
A. Yes.

**Q. Do you consider yourself expert in -- well, other than corrosion --**
A. I mean corrosion is a subject that's huge.
**Q. Sure.**
A. I have niches that I've very good at.
**Q. What niches are you very good at in corrosion?**
A. Chemical processes, copper sulfides, they kind of interface between process engineering and material selection and corrosion mechanism in chemical systems.
**Q. Do you consider yourself expert in anything other than the subject matters you set forth just now?**
A. Yes.
MR. SULLIVAN: Objection.
**Q. What else do you consider yourself expert in?**
A. Extracted metallurgy and primarily, again, back to copper, copper smelting, sulfide chemistry. They're sister areas.
Chemical processing in general I'm



pretty strong in. I mean they're all, from a theoretical viewpoint, exactly the same subject. From an outsider's viewpoint, they're different subjects, but they're all metal chemistry.

**Q. Okay. Other than the subjects within metal chemistries that you just discussed, do you consider yourself an expert in any other areas?**

A. No.

**Q. So tell me or describe for me what you've done in this case in order to make the reports that we're about to talk to today?**

MR. SULLIVAN: Objection to form. When you say "this case," you mean --

MR. WEISS: Sure. Let me clarify the question.

**Q. Tell me what you've done in either the Brinkcu or the Brucker case in order to prepare the reports that we're here to talk about today. Take me through the process.**

A. First we set up a protocol, which I'll be talking in answering your question. We take a trip to the house, typically arrive

early in the morning, take a stroll around the house and just get the lay of the land, the size of the house, you know, what's in the area, just get a comprehensive view of what we're dealing with. And in Florida we have to work with an electrician.

**Q. Why do have you to work with an electrician in Florida?**

A. It's just the law, if you cut copper wire and mess with the contacts, you have to have an electrician.

**Q. Go ahead. I'm sorry.**

A. So, you know, first fill in the electrician on the protocol and what he's going to be doing. Then we kind of map out a plan to go through every single room of the house, in general pulling at least the covers off of three outlets in each room and in the smaller houses, you know, all the outlets, kind of -- you are typically allowed one day to do it. So you've got to plan your time out well.

Would go -- kind of set up a game plan of how we're going to physically go

through the house. And our primary focus were the wall outlets, but we tried to look at any metal that was exposed in the entire house.

And we take, typically take the cover off, take photographs of the outlet like it looks, then take and cut off quarter inch to a half inch copper wire, usually off the ground wire, and the exception to that is if the electrician told me there is not enough wire to put this back together and we're going to get in trouble here, so. But that didn't happen very often.

So we go through each room putting a label up on that outlet. Put the same label on the bag, cut a piece of the wire from the ground wire, put it in the bag, seal it up, make a note of where the sample was taken from and take a picture of where it's from and then go to the next outlet around the house.

And then as Mark Kramer got, like, the air condition system taken apart or -- he's pretty good about scoping the whole

house and knowing everything that's there. He would call my attention that I've got this open, can you stop. And we go, you know, deal with the air conditioning unit or if there's some coils on a back of refrigerator to look at. There was something, you know, unusual outside or in the attic, Kramer was more or less the kind of the scout, I mean he does building inspections and he knows how to take stuff apart and where stuff is, so.

And then my job was to take the wire samples and also to go in places, for instance; like in a bathroom that had a blackened valves say under the toilet, I would go take scrapings and put that into a bag and label it.

And then once these were all gathered, the samples were taken to Corrosion Testing Labs and we used EDX, energy dispersive x-ray fluorescence to do elemental analysis of the three spots on the copper wire and three, three different particles in the scrapings.

I then took all the evidence that

was collected and tried to look for, you know, patterns in the corrosion and looked at the chemical analysis, figure out, you know, what elements, what compounds were there. Color is real important in copper. I mean the color tells you a lot.

Then form an opinion on, you know, what, you know, were the wires blackened, was there corrosion, not corrosion, you know, places where nothing happened. Write my opinions down on what caused the corrosion.

**Q. And are those opinions what's contained in your report?**

**Prior to finalizing your report --**

**(Discussion off the record.)**

MR. WEISS: I will ask the question again to be clear.

**Q. Were those opinions what's contained in your report?**

A. Yes.

**Q. Prior to finalizing your opinions that are contained in your report, did you speak to any of the other experts regarding their opinions?**

MR. SULLIVAN: Objection, form.

A. I wanted to know the data that they got from the environmental samples and that kind of stuff and I was typically just given a copy of their report.

**Q. Did you have possession of the other expert reports prior to finalizing your report?**

MR. SULLIVAN: Objection, form.

A. I don't know if I had the final version but I had, yes.

**Q. And likewise did you provide a version of your report to the other experts for their review?**

A. I was usually the last one, so. I don't know if they got it before or after and I don't actually for a fact know they got it. I turn it over to the lawyers and I don't know what they do with it.

**Q. Did -- I'm sorry.**

**Prior to creating a file version of your report, did you provide a draft of it or a version of it to the lawyers?**

MR. SULLIVAN: Objection.

A. Yes.

**Q. Did they provide you feedback on the draft, I'm not asking what the feedback was, I'm asking if they provided feedback?**

MR. SULLIVAN: Objection.

A. Yes.

**Q. Do you still have a copy of the draft report that was created and given to the lawyers?**

A. I might have some of them. As a rule I try to keep, I delete things as I go, and I keep, I usually keep the last three, but they're, typically, you know, the last three are just wordsmithing and commas and that kind of stuff.

**Q. Did you incorporate the feedback that you got from the lawyers into your final report?**

MR. SULLIVAN: Objection.

A. When I agreed with it.

**Q. Do you still have a copy electronically or otherwise of the correspondence that you got back with the feedback?**

A. It was all verbal.

**Q. Did you review any deposition transcripts prior to finalizing your report?**

A. No. I've reviewed them after, I mean the last couple of days.

**Q. Are all of your opinions in this matter contained in your reports?**

A. Yes.

**Q. Which depositions did you review after you finalized your report?**

A. Stalic (phonetic), Stoley (Phonetic).

**Q. Hazlar.**

A. I read that one too. It starts with an S.

**Q. Straus?**

A. Straus, Straus, Straus.

**Q. So you read the Straus and Hazlar depositions. Did you read any others?**

A. Yes, a lady that's a, that wrote a book called MIC, micro-influence corrosion.

**Q. Okay.**

A. I don't know the lady's -- Little or something like that.

**Q. Sure. So other than the deposition transcripts of Little, Hazlar and Straus, did you read any other deposition transcripts?**

A. I had another one. I don't think I read it.

**Q. Did you review any other expert reports after you finalized your opinions?**

A. No.

**Q. Did anything in the Little, Hazlar or Straus deposition transcripts change your opinion in this case?**

MR. SULLIVAN: Objection to form.

A. No.

THE WITNESS: Sorry.

MR. WEISS: It's okay.

MR. SULLIVAN: Can we take a quick restroom break?

MR. WEISS: Sure. Let's go off the record.

THE VIDEOGRAPHER: The time is 10:12. We are off the record.

(A brief recess was taken.)

(Exhibit 2, Corrosion Evaluation of Brinku House, marked for

identification, this date.)

(Exhibit 3, Corrosion Evaluation of Ravelo House, marked for identification, this date.)

(Exhibit 4, Corrosion Evaluation of Nutting House, marked for identification, this date.)

(Exhibit 5, Corrosion Evaluation of Retana House, marked for identification, this date.)

(Exhibit 6, Corrosion Evaluation of the Brucker House, marked for identification, this date.)

THE VIDEOGRAPHER: The time is 10:21. We are on the record.

BY MR. WEISS:

**Q. Okay. So continuing with your depo I want to turn towards the reports you prepared in this case and I've marked them as we discussed as exhibits for the record. Okay?**

**So first, I would like for you to look at Exhibits 2 through 6 which are, I believe, copies of the reports made in the**

case and just confirm for me that these are true and accurate copies of your reports.

Number 2 is Brinkcu. Number 3 is Ravelo. Number 4 is Nutting. Number 5 is Retana and number 6 is Brucker.

A. Okay. It's got the right conclusion page.

**Q. Talk to my secretary, if it doesn't.**

A. Ravelo has the right conclusion page.

Nutting has the right conclusion page.

Retana has the right conclusion page.

Brucker report seems to be missing the data from the Corrosion Testing Lab.

**Q. Other than the data from the Corrosion Testing Lab is the Brucker report complete?**

A. Yes, the Brucker report seems to be complete.

MR. SULLIVAN: I'm just going to object to the Brucker report to the

extent that it's missing data, but as long as we can agree that it had data in it and it's not there.

MR. WEISS: I'm sure it has data. It's in the same format as all the other reports. Yeah, we can agree to that.

**Q. In terms of the reports, I think this might make it a little bit easier for your deposition today. I believe the initial sections of the reports, of all five of these reports, are identical in terms of the "Background" section, "Blackening of Copper Surface By Sulfidation, Corrosion and House Inspection, Necessity of House Inspections," comma, "Personal Experience," and the first paragraph, "House Inspection"; is that right?**

A. I believe they're identical. I haven't done a word-by-word comparison, but I believe they are.

**Q. So I want to get into the language of the reports then individually. So you can take any of the reports since it's identical language.**

**And let's start with the section**

"Blackening of a Copper Surface By Sulfidation."

A. Okay.

**Q. In the first paragraph, let's start a little above that. Tell me what -- in the, background section, what is sulfide corrosion?**

A. It would be the reaction of copper with a reactive sulfur gas to the extent that the copper, copper wire, copper whatever it is, function is deteriorated.

**Q. And what are reactive sulfur gases?**

A. The most common is the H2S carbonyl sulfide, carbon disulfide. You could also have vapors of metal sulfides.

**Q. And in terms of your report, you state that the presence of sulfide corrosion you considered evidence for reactive sulfur gases. So does that mean if you observe sulfide corrosion in the home, that that's an indicator of the presence of a reactive sulfur gas.**

MR. SULLIVAN: Objection to form.

A. Yes.

**Q. What other causes of sulfide corrosion could there be other than a reactive sulfur gas?**

MR. SULLIVAN: Objection to form, assumes facts not in evidence.

A. I mean it doesn't necessarily have to be a gas. I mean you could take sodium sulfide, for instance, in a wet environment and put it on a copper and it would react. Anything that's, you know, less noble -- I mean it's thermodynamic so anything that's less stable than copper sulfide, that's a sulfide will react in a -- I don't know how familiar you are with thermo but it says, you can look at two compounds and with thermodynamics tell what compounds will react with copper and which ones won't.

**Q. Will H2SO4 react with copper?**

A. Actually not very well. Sulfuric acid.

**Q. Uh-huh.**

A. If you look at an electrolytic copper refining, you put copper in vats of acid and it just sits there.

**Q. In an aerobic environment will H2SO4 react with copper?**

MR. SULLIVAN: Objection to form, assumes facts not in evidence, calls for speculation.

A. Copper oxide will react with sulfuric acid.

**Q. Back to this paragraph, you state, "The lack of sulfide corrosion would be considered as evidence that reactive sulfuric gases has not been present on the premises."**

**So if you find sulfide corrosion that's indicative of a reactive sulfuric acid in the homes you're inspecting?**

A. Yes.

**Q. If you don't find sulfide corrosion, then that's indicative to you that there has not been a reactive sulfide gas in the home?**

MR. SULLIVAN: Objection, form.

A. Yes.

**Q. In all of the homes that you investigated -- well, let me back up for a second.**

The homes that you personally visited for the purposes of these reports were Ravelo, Nutting, Retana, Brucker and Brinkcu; is that right?

A. Yes.

**Q. Did you go into any other homes for the purposes of this investigation?**

A. I don't know what you mean by "this investigation." I've been in other homes.

**Q. I'm sure you've been in other homes. Have you been in other homes where you were looking for the presence of sulfide corrosion as evidence of the presence of a reactive sulfur gas?**

MR. SULLIVAN: Objection to form.

A. Yes.

**Q. When was that, was it the same time you looked at these homes?**

A. Well, the first one I went to look at was in Arizona.

**Q. Okay. Is that the Yee home?**

**Other than the Yee home and the homes that you went into in Florida, have you been in any other homes?**

A. Yes.
**Q. Tell me where those homes were located.**
A. Alabama, I think there was either two or three. Arizona.
**Q. Other than the Yee house?**
A. No, just the Yee.
**Q. Okay.**
A. I was just trying to get my traveling in my head.
And Florida. So that's five, six, seven, eight, I feel like I'm missing one, but I can remember eight right at the moment.
**Q. Okay. Of the eight homes you've been in then to look for sulfide corrosion, five were the ones you went, that we're talking about today in this case?**
MR. SULLIVAN: Objection to form.
**Q. One was the Yee home in Arizona and there were two homes in Alabama?**
MR. SULLIVAN: Objection.
You need to answer for the record.
A. Yes.
THE WITNESS: When you do the

objection, it throws me off.
MR. WEISS: It throws both of us off.
**Q. In terms of the homes in Alabama, did you do the same type of study that you did for these homes?**
A. Yes.
**Q. Was that on behalf of National Gypsum?**
A. Yes.
**Q. Were those cases that were in litigation?**
MR. SULLIVAN: Objection.
A. I don't know.
**Q. Were your findings in the Alabama home the same as your findings in the five reports we're here to discuss today?**
MR. SULLIVAN: Objection to form.
A. No.
**Q. What were your findings in the Alabama homes?**
A. Much less blackening of the copper. It was in a trace level. It was questionable whether there was actually H2S present.

**Q. How about for the home in Arizona, the Yee house, were your findings the same as these reports?**
A. No.
MR. SULLIVAN: Objection to form.
A. No, no.
**Q. Were your findings more like the ones in the Alabama home?**
A. Yes.
**Q. For the same reason?**
MR. SULLIVAN: Objection to form.
A. Arizona was completely clean.
**Q. Do you still have your reports from the Alabama homes?**
A. Yes, yes.
(Discussion off the record.)
**Q. So back to your report then, I want to move forward for a moment to the part, to the section, "Necessity of House Inspections, Personal Experience."**
**Are you with me on that?**
A. Yes.
**Q. And in your first paragraph there you state, "I've now participated in almost a**

dozen evaluations of houses claimed to have corrosion purportedly associated with drywall and observed the variety and uniqueness of circumstances that exist on each site."
In that sentence are you referring to the eight homes we've just discussed?
A. Yes.
MR. SULLIVAN: Objection to form.
A. Yes, but I think the numbers actually, I did this yesterday and came up with nine, and I'm missing one of my fingers.
**Q. Is the ninth home, do you recall if the ninth home is in Alabama?**
A. I believe it is, but I'm not certain.
**Q. Okay. And your finding for the ninth home was the same as the other Alabama homes we've talked about?**
MR. SULLIVAN: Objection to form.
A. I believe so.
**Q. So the nine homes that we're talking about are comprised of the Arizona home, two or three Alabama homes and the five Florida homes; is that right?**

54

A. Yes.
**Q. So in the next paragraph where you state, "I've been on several inspections of homes claimed to have had copper sulfide corrosion caused by drywall, only to find no sulfide corrosion or even blackening by sulfidation."**
**Do you see that sentence?**
A. Yes.
**Q. That's not the case for the five homes you were in Florida, right?**
MR. SULLIVAN: Objection, form.
A. Correct.
**Q. In all the homes you went into for the Brinkcu and Brucker litigation you did find sulfide corrosion or blackening by sulfidation, right?**
MR. SULLIVAN: Objection to form.
A. I found blackening in all homes.
**Q. The next sentence reads, "In several cases, the copper was in pristine condition," that doesn't apply to the Florida homes you were in, right?**
MR. SULLIVAN: Objection.

55

A. Correct.
**Q. The next sentence where you state, "Even when blackening of the copper has been" -- "has occurred" -- I'm sorry, I'll start the sentence over.**
**"Even when blackening of the copper has occurred, that in itself does not permit the conclusion that the copper has been exposed to reactive sulfur gas or that the copper sulfide" -- "or that copper sulfide is formed on copper."**
**That also doesn't apply to the five Florida homes, right?**
A. After the fact, before you go look at something, it can be black for reasons other than copper sulfide. But if you're asking me after I've looked at the houses in Florida all of those had copper sulfide on the wires.
**Q. Right. And you found in all these homes that there was reactive sulfide gas in the house?**
A. Yes.
**Q. I want you to take Exhibit 2, which**

56

**is the Brinkcu home. I think you're now in 6.**
A. I think it's one at the bottom.
**Q. It probably is. I think they were kind enough to give you a binder clip which I ran out of.**
A. Okay.
**Q. In the Brinkcu house on, starting on page 6 begins the pictures that you took of the Brinkcu home.**
A. You guys need a better printer.
**Q. In terms of the pictures in the home and going back to this paragraph blackening, the first paragraph of blackening of a copper surface by sulfidation. You state, "Eventually a copper sulfide layer is replaced by a green to light colored coating of basic copper sulfate. The patina, as it is called, can be very resistant to further corrosion."**
**In the Brinkcu home --**
MR. SULLIVAN: Objection. Where are you referring to?
MR. WEISS: The paragraph, the

57

first paragraph of blackening of a copper surface by sulfidation.
A. I'm familiar with it.
**Q. Okay. Can you point out for me in the pictures from the Brinkcu home where a copper sulfide layer has been replaced by a green to light colored coating of basic copper sulfate?**
A. I'm not sure I can on the quality of your pictures.
I'm not sure of this because your pictures are fuzzy.
But figure 16 there's some, on your picture it looks white, but I think if you had a better quality printout, you could see that some of this white has a light green tint to it.
**Q. Okay. Other than 16?**
A. I think we could find others.
MR. SULLIVAN: Take your time.
A. Look on sample 28.
**Q. 28 of the --**
A. I'm sorry, figure 23. The sample numbers and the figure numbers don't match

up.

**Q. Why is that, why do the sample and figure numbers don't match up?**

A. Because I have pictures other than samples.

**Q. Okay. Figure 22?**

A. Figure 23.

**Q. 23. Okay.**

A. You can see, it looks, you can see the green a little bit more here, but some of that, those -- now you need to look at this real, in real time to be 100 percent certain, because sometimes colors don't, don't reproduce perfectly.

**Q. And that could be some kind of paint as opposed to a patina?**

MR. SULLIVAN: Objection.

A. I mean it could be, it could be something, you know, like gypsum on there, but I believe this is actually a basic copper sulfate that the sulfide is oxidized right there.

**Q. Okay. Any other pictures in the Brinkcu home where you see that?**

A. I think figure 21 would also show that. I think to do much more than that we need to pull it up my computer screen.

Oh, here figure 33. Originally copper sulfide is black-black and then it starts this.

**Q. And you're indicating the wire that goes across the center of the picture as not being as black as the other wires?**

A. And if you pulled this up on a computer screen where it was nice and sharp it would be easier to see.

Or -- that's enough.

**Q. Do you have any other examples from this one where you find a clear picture of the greenish patina?**

A. There's not much there on figure 35, but it's -- I'm less certain of that one.

Based on your pictures that's about as good as I can do.

**Q. Well, in essence, you conclude in almost all of your commentary to the figures in these reports that there is a presence of copper sulfide as opposed to copper sulfide**

having been replaced by copper sulfate; is that right?

MR. SULLIVAN: Objection to form.

A. The predominant material on the wires was copper sulfide.

**Q. Now, if we can go back to this paragraph, or the section entitled "Blackening of Copper Surface by Sulfidation."**

**In the second paragraph you have a sentence I want to understand.**

A. Okay. If I can find it. Okay.

**Q. The sentence, the first sentence of that second paragraph, "Train and all have shown that the rate of the sulfide corrosion dictated by the cationic diffusion of copper ions through layers of both copper oxide and copper sulfide with the rate of coating growth greater than" -- "than" -- sorry -- "greater in for sulfide films."**

**I'm reading it as it's written there.**

A. Obvious grammar error there.

**Q. Right.**

Can you explain to me what that means?

A. If you look at a copper surface, it gets exposed to air, it will always get a layer of CU2O on it and that's that reddish copper color that you see is cuprous oxide.

When it's exposed to H2S you also get a layer of copper sulfide, that's on top of the cupric oxide layer.

Now for the sulfur and the copper to get in contact with each other the copper has to diffuse through that oxide layer and the sulfide layer to get to the surface where the H2S is. And it does it as solid oxide ions. I mean it's, it's a, obviously, it's a slow process. It's solid material and it's -- so this is saying that the diffusion through the copper sulfide layer is faster than the diffusion through the copper oxide layer. I'll say it again.

The diffusion of the ions is faster through copper sulfide than it is through copper oxide.

**Q. Okay.**

62

A. Which is another way of saying that it's -- the oxide is a little bit more of a protective layer.

**Q. Okay. In the homes you looked at for the purposes of this case, the five homes you were in, that had actually occurred, right?**

MR. SULLIVAN: Objection to form.

**Q. She needs your verbal answer.**

A. Yes.

**Q. What controls the rate of sulfide or oxide film growth?**

MR. SULLIVAN: Objection to form.

A. You're looking at a, you know, a gradient of copper ions going in one direction and sulfide ions going in the other direction. It depends on circumstances, for instance, if you had a very high concentration of H2S, then the rate would be limited by the diffusion in those layers and that's what he's saying in this, that it's the diffusion through that solid layer that's rate limiting under the conditions that he looked at.

63

**Q. Well, under the conditions that you looked at in these homes there was that penetration through the layer, correct?**

A. Yes.

**Q. In terms of the equations or I should say the reactions that you've listed in this same paragraph, blackening of copper surface by sulfidation, all of those reactions involve water, don't they?**

A. Yes. Moisture.

**Q. Right. Does that mean that moisture is a requirement in order to have the corrosion?**

A. It's much faster. It's a very slow process if it's completely dry. For instance, in a desert.

**Q. For instance, in Arizona where you looked at the homes.**

**But in an environment like Florida, are there conditions such that there is adequate moisture to cause corrosion?**

MR. SULLIVAN: Objection to form.

**Q. Or to cause the reaction to accelerate, I should say?**

64

MR. SULLIVAN: Objection to form.

A. There is adequate moisture. I mean by the fact that it's there.

**Q. Even in a temperature below the dew point, can there be a condition created where there's a condensed layer of moisture on a metal surface in a home?**

MR. SULLIVAN: Objection to form.

A. By definition when you say something is below the dew point, you're saying that moistures on that surface.

**Q. Right. So the answer is yes?**

A. Yes.

**Q. After the reactions that you've described, these four reactions, the first sentence of the next paragraph. I'll let you read it.**

A. "The rate of growth of CU2O is greater than CU2S under the condition since CU2O is more thermodynamically favored compound."

**Q. What does that mean?**

A. This is saying that whenever you're growing CU2S in an atmosphere that contains

65

moisture CU2O is actually growing simultaneously with the CU2S and is actually growing faster and especially at lower moisture content.

**Q. Okay. So in a lower moisture content CU2O, you believe, will grow faster than CU2S?**

MR. SULLIVAN: Objection to form.

**Q. Do I understand that right?**

A. Let me go back and make sure my memory is correct.

It's saying at high humidity the growth of -- it's saying the rate of CU2O -- I've actually said that wrong -- is higher at the high humidity and a lower humidity the CU2O slows down more than the copper sulfide slows down.

**Q. Okay. In the CU2O formation or the rate of growth of CU2O being greater than CU2S that's true in the long term, right? I mean and what you're saying is over, you know, a million years that that's what would happen, but that's not necessarily true in the immediate term, is it?**

66

MR. SULLIVAN: Objection to form, assumes facts not in evidence.
A. I'm trying to understand exactly what you're asking me.
MR. SULLIVAN: Well, do you understand the question?
THE WITNESS: Run that question by me one more time.
MR. WEISS: Sure.
**Q. Your principle here that the rate of growth for CU2O is greater than CU2S because CU2O is the more thermodynamically favored compound, that principle, I understand that's true in the long term. Eventually that's what will happen but in the immediate term that's not necessarily true, is it?**
MR. SULLIVAN: Objection to form.
A. I mean you've got to define the conditions under -- which are your, you know, asking that question. If you put a purulent, you know, an atmosphere that was 100 percent H2S and put copper in it, well, obviously, copper sulfide is going to grow faster in

67

that environment than in an environment where, you know, there's a very low partial pressure of H2S and a higher pressure of oxygen. So I mean the two are always competing with each other and there's a lot of factors that determine which one wins out.
**Q. The one that forms first is going to have the least restriction on further formation, right?**
MR. SULLIVAN: Objection to form.
A. Copper oxide is always present on copper wire, it comes out of the factory that way. So the one that forms first is copper oxide. I mean when it gets made at -- I've worked at wire manufacturing facilities and they actually get a very heavy coating of copper oxide that they clean off the copper rod that is made into wire so the first one it arrives at the house with copper oxide on it.
**Q. Well, go ahead, I'm sorry.**
A. So I mean that -- now say your question again with that information.
**Q. Well, sure, I mean nonetheless, you**

68

**found copper sulfide on these wires?**
A. Yes.
**Q. On almost all the wires in the house. So clearly there is an environment in these homes in Florida that does allow for, if not promote the growth of copper sulfide?**
MR. SULLIVAN: Objection to form.
A. Copper sulfide grew on all the wires, I agree with that.
**Q. I'm not asking you for the cause of why it grew, I'm saying that it did grow, in fact --**
A. Yes, I'm agreeing with you.
**Q. Right. And you found that in all five of the homes that you were in?**
A. Yes. That's not in dispute, most of the wires had copper sulfide on them.
**Q. And while there might have been some variation I guess in that home where there was more copper sulfide in a particular room or on a particular wire than another, nonetheless they all did have copper sulfide growth in the home?**
MR. SULLIVAN: Objection to form.

69

A. All the samples I took had copper sulfide on them.
**Q. There was no home you went in in Florida that did not have copper sulfide somewhere?**
A. That's correct.
**Q. Apart from this litigation and we've talked about the eight or nine homes you went into --**
A. Let me clarify something.
**Q. Uh-huh.**
A. There were spots on the copper wires that did not have copper sulfide.
**Q. Sure. But somewhere in the copper in all of the homes you went to in Florida you did find some copper sulfide?**
A. Yes.
**Q. In, other than these eight or nine homes we discussed previously that you've been in for the purposes of this litigation, have you ever as a part of any study or test or research that you've done been in homes for the purposes of looking for copper sulfide?**

MR. SULLIVAN: Objection to form.
A. No.
**Q. Have you done any other studies or research or testing to look at corrosion in residential homes?**
MR. SULLIVAN: Objection to form.
A. I think the answer is yes in copper piping.
**Q. Okay.**
A. And copper tubing inside of houses.
**Q. Okay. What was the source, if you know, of that corrosion?**
A. Oxygen in the water, the poor water quality.
**Q. Okay. Where were those homes located?**
A. Well, I was working at Corrosion Testing Lab and so our circle was Pennsylvania, New Jersey, Delaware, Maryland, that kind of, and if you kind of draw -- -
**Q. Mid-Atlantic or Northeast?**
MR. SULLIVAN: Objection to form.
A. Both.
Draw a 100-mile circle around

Newark, Delaware. I mean, that's -- the majority would come from that area.
Now we were, we did copper corrosion and copper tubing for York International. Most of those were industrial but occasionally we got something in from a private residence. And looking at the corrosion and the air conditioning systems for York.
**Q. Okay. So as I understand it then in a residential setting there is two times, other than the purposes of this litigation, where you have looked at corrosion in homes, once while you were at Corrosion Testing Labs and once while you were at York?**
MR. SULLIVAN: Objection.
**Q. Or at some point while you were at York?**
MR. SULLIVAN: Objection, mischaracterizes his testimony.
A. I've looked at it a lot more than -- I've looked at hundreds of copper tubing. I would say 90 percent of that was industrial applications, very, less than

10 percent, and I don't know what that number is exactly, have been copper tubing that's associated with houses. I usually work for industrial clients.
**Q. Sure. In the 10 percent that you have looked in a residential setting at corrosion, did you find copper sulfide corrosion at the levels that you found -- I'm sorry. Let me state that question over because I know I will get an objection and you'll disagree too.**
**In the studies that you've done of copper sulfide or copper sulfide corrosion in a residential setting other than what you've done in this litigation, did you find copper sulfide to the extent you found it in the five homes you inspected in Florida?**
MR. SULLIVAN: Objection, form.
A. No.
**Q. So would you agree with me then the most copper sulfide you found in a residential setting was the copper sulfide you found for purposes of the study you did in this case?**

A. Yes.
MR. SULLIVAN: Objection, form.
**Q. Let's turn to the next section, "Corrosion in House Inspections."**
**The first sentence you stated there, in the last section of the sentence, you state, "The copper sulfide layer has to form to such an extent that results in the deterioration of the properties of copper."**
A. Where exactly are you?
**Q. In "Corrosion in House Inspections."**
A. Okay.
**Q. Well, I'm sorry, there isn't one lead in sentence that's in italics, but I'm in the first sentence of the second paragraph really.**
A. What's your question?
**Q. Explain to me what the deterioration of the properties of copper means?**
A. It would depend on the piece, you know, what the function of the copper is, but most of what we've been talking about is

copper wiring. So as long as copper wiring is still able to carry electricity in its cross-section is not diminished it's still doing its job. So just because it has a, you know, copper oxide layer or a copper sulfide layer on the outside does not imply that it's not doing its job. And so, you know, at the point that it's still doing its job and it's just, it's been blackened by this definition I would not call that corrosion. Corrosion has -- people use the term pretty carelessly.

**Q. Okay. I want to understand a little bit better. I understand your proviso that corrosion has been used carelessly. But air conditioning coils are made of copper, right?**

A. Yes.

**Q. And air conditioning coils can fail based on copper sulfide growth and eventual corrosion, right?**

MR. SULLIVAN: Objection.

A. It's possible, under the right conditions.

**Q. Okay. Look at Exhibit 4 for me,**

for a second and specifically I'm page 4 of your report.

A. Exhibit 4, which?

**Q. Exhibit 4 is the Nutting report.**

A. The Nutting report, okay.

Can I write on the top of these the name?

**Q. Sure. I don't mind you writing on them at all.**

A. Nutting report, okay. What page, please?

**Q. Page 4, in the pictures, so after the boilerplate stuff, where --**

A. Okay.

**Q. In the garage where there's a picture of the air handler coil?**

A. Yes.

**Q. Is that a coil that's been corroded to -- I'm sorry is that a coil that's corroded?**

MR. SULLIVAN: Objection to form.

A. It's a coil that's been blackened. If I remember correctly, the actual sulfide layer on this was actually pretty low.

**Q. So if the coil is blackened to the point that it leaks is that still not corrosion?**

MR. SULLIVAN: Objection to form.

A. If the coil leaks, I would call that corrosion.

**Q. Okay. So can we agree then if there is copper sulfide growth to the extent that an air conditioning coil leaks then there has been corrosion?**

MR. SULLIVAN: Objection to form.

A. You've made one little jump there. It could have copper sulfide on the coil and leak and that not necessarily be the cause of the leak. But it also could be the cause of the leak.

**Q. Okay.**

A. I mean it could be, it could be a bad solder joint.

**Q. Right. Barring other causes, assume for purposes of my question, you know, satisfactory workmanship in manufacturing the coil, the air conditioning coil, if there's blackening, for example, the blackening**

that's here and there's a leak, isn't it more likely than not that there's actual copper sulfide corrosion in the AC coil?

MR. SULLIVAN: Objection to form, assumes facts not in evidence, calls for speculation.

A. Blackening, you can have -- cupric oxide is black, copper sulfide is black, both the cuprous and the cupric form of sulfide. So if you had a coil that's black and you don't have evidence that sulfur is present and it leaked, it could be -- it doesn't necessarily mean it's copper sulfide. You have to confirm that you've got, you know, copper sulfide on that. And actually, if you wanted to confirm that, you know, it had leaked, you would do a cross-section of the coil and, you know, do a metallurgical mount and look at it and say I've got copper sulfide penetration through the cross section of the coil.

So, yes, it could be determined, but you can't just because it's black say it's black and it's leaking, it does not

necessarily follow that that came from copper sulfide. And then even if you say there's copper sulfide present, it's a little bit of jump of faith to say that that failure was caused by the copper sulfide without examining the, you know, the failure in detail.

**Q. But you did find copper sulfide in all these homes, right?**

A. Yes.

**Q. And you found copper sulfide on the air conditioning coils that weren't coated with some kind of marine layer, right?**

MR. SULLIVAN: Objection to form.

A. Yes, I found some copper sulfide.

**Q. Okay. In your experience with York, which is an air conditioning manufacturing company, and you said you did have some instances to investigate residential issues that arose, did you ever find copper sulfide corrosion on air conditioning cooling coils?**

MR. SULLIVAN: Objection to form.

A. I found not -- I found it on the

water side of the tubes but it wasn't really, it wasn't the same type of, it was another mechanism.

**Q. Sure. So in your experience though as a metallurgist in this industry, the first time you saw copper sulfide in the manner you found in these five homes was when you actually went to these five homes?**

A. The first time --

MR. SULLIVAN: Objection to form.

A. The first time I found it on a copper wire.

**Q. Okay. First time you found it on the outside of any C cooling coil?**

A. Yes.

**Q. In the italicized portion of the paragraph that we were looking at before we turned to the pictures, which is the Corrosion and House Inspection section of the --**

A. Which report are we back on?

**Q. In any of them. I'm looking at the boilerplate Corrosion and House Inspection sections.**

A. Okay.

**Q. You state, "Corrosion is defined as the destruction or deterioration of a material because its chemical or electrochemical reaction with its environment."**

**Would you agree with me it's possible that copper sulfide corrosion -- I'm sorry. I apologize. This is why you're the engineer and I'm the lawyer.**

**Would you agree with me that copper sulfide can cause corrosion to the extent that it could destroy or deteriorate the copper material in a residential home?**

MR. SULLIVAN: Objection to form.

A. It's possible to have copper corrosion by copper sulfide.

**Q. And it's possible that that copper corrosion could cause failure of a system?**

A. Yes.

**Q. And one potential failure could be the failure of an AC coil?**

MR. SULLIVAN: Objection to form.

A. Yes.

**Q. That is a failure, right, in your standard, the failure of any C coil?**

MR. SULLIVAN: Objection to form.

A. A hole in a tube that's confirmed to be caused by copper sulfide penetration, you know, through the proper, you know, metallurgical techniques, you know, that is possible.

**Q. That is a failure?**

MR. SULLIVAN: Objection to form.

A. Yes.

**Q. Okay. And so when in this section you discuss "the cross-section of the copper or copper involved is relatively large such found in copper pipes or tubing and most copper wiring, the probability of loss and function by the levels of hydrogen sulfide could be found in habitable houses low."**

**That's a long sentence. I want to focus on that for a second.**

**You're assuming here that hydrogen sulfide is the cause of copper sulfide blackening.**

MR. SULLIVAN: Objection.

A. I believe there's, you know, good evidence that it's the primary gases involved in it.

**Q. Okay. And you state that if there is enough hydrogen sulfide to cause corrosion that likely the house would be uninhabitable?**

MR. SULLIVAN: Objection to form, assumes facts not in evidence.

A. I mean that's a little bit, you know, subjective. But all of these houses had, you know, hydrogen sulfide in them, they had blackening, the houses were not -- a couple of these houses were not very habitable, and there was still no evidence of corrosion of the copper wiring. There was blackening. I did not see any, you know, diminishing of cross-section. There was not, certainly nothing obvious where you'd have a, you know, a thinning of the copper wiring.

**Q. Let's start with the Brinkcu home for a second in terms of that. In the Brinkcu home you admit in your report that you don't know how long the AC coils that were in the house had been in the house,**

right?

A. That's correct.

MR. SULLIVAN: Objection to form.

**Q. And you, to me, that means you understood that the AC coils had been replaced previously, did you understand that?**

MR. SULLIVAN: Objection to form, assumes facts not in evidence.

A. It's an assumption on my part.

**Q. Okay.**

A. But I don't have the facts to support that.

**Q. Sure. If the facts were that the AC coils in the Brinkcu home had been replaced three times within two years, because they had leaked, and when they were removed they, there was observable copper sulfide blackening, but they were three separate coils manufactured three separate times, obviously, would it be more likely than not that corrosion caused the failure of those AC coils?**

MR. SULLIVAN: Objection to form, assumes facts not in evidence, calls for

speculation.

A. I would, you know, normally in my job I would be hired to look at those kind of coils, take them into a lab, and simply dissect them and come back with an opinion. And, otherwise, you know, you might as well get a layperson, because if I don't use the, you know, the tools of my trade, then your opinion is as good as mine. So I mean I don't have enough facts, but there is, you know, there is a lot of history there but it's not impossible that that was, you know, that you get damage by copper -- copper sulfide.

**Q. Okay. So it's possible that the copper sulfide caused corrosion to the extent that the AC coils failed?**

MR. SULLIVAN: Objection to form, calls for speculation.

**Q. Right?**

A. Yeah, but I would like to, you know, get my hand on some of these coils and get to the bottom of it. I mean it's, as a scientist, yes.

**Q. As a general principle, though, you would agree with me that it's possible for copper sulfide corrosion to cause the failure of an AC coil?**

MR. SULLIVAN: Objection to form, same objections.

A. Yes.

**Q. And if on three separate occasions air conditioning coils in a home within two years failed by virtue of leaking and those coils when removed were black to the extent that you've taken pictures of the same kind of black, would that make it more likely than not that those coils were actually corroded as opposed to blackening?**

MR. SULLIVAN: Objection to form. Assumes facts not in evidence, calls for speculation.

A. I've looked at a lot of, you know, copper coils for York and, you know, the rule is you don't jump to conclusions until you take something apart. I mean we were paid as an impartial third party. We took something into a lab, and York let us make the call.

Why did this thing fail. And people's opinion coming in to these cases, you know, it's not surprising York had one opinion and the customer had a different opinion. We looked for the facts as, you know, the evidence that was there, rendered opinion and York stood by that opinion because it was based on, you know, a detailed analysis. So, you know, that's a kind of environment that I'm comfortable saying, you know, I've seen copper coils put into a unit and they're not crimped, crimped right, and you can get a batch -- we had some titanium tubes that had a whole succession of failures and it was the same manufacturing problem at the plant for every, you know, every single tube and we eventually went back into the manufacturing plant, and, you know, traced it back to a manufacturing problem.

But coming to the table people had a lot of opinions about why that tubing was failing, and they collect a lot of evidence from their, you know, what they see. So, you know, it's -- it's a little bit of guesswork

what you're asking me. I mean it's --

**Q. Well, in your experience --**

MR. SULLIVAN: Can we take a break?

**Q. Sure. No, that's fine. I'll withdraw my question. We can take a break.**

THE VIDEOGRAPHER: Here ends video recording number 1. The time is 11:19. We are off the record.

(A brief recess was taken.)

THE VIDEOGRAPHER: Here begins video recording number 2. The time is 11:40. We are on the record.

BY MR. WEISS:

**Q. Okay. Doctor, we were looking at the Corrosion and House Inspection section of your report before our break, and we were talking about this first paragraph, first full paragraph, about the levels of hydrogen sulfide that could be found in habitable house is low.**

**Are you with me in the report, the last sentence of that first, well --**

A. Are you on the page with the Necessity of House Inspections.

**Q. Above that, right, in the Corrosion and House Inspection.**

A. Okay.

**Q. And I had a question and we kind of got off the topic so I want to just follow up a little bit.**

**I understand this last sentence, if the cross-section of the copper or copper involved is relatively large, such as found in copper pipes or tubing or in most copper wiring, then the probability of a loss in function by levels of hydrogen sulfide could be found in habitable house is low.**

**So we had a long discussion about loss in function and what that means. What I want to understand though is, within a home if -- well, let me put it differently.**

**If copper sulfide corrosion caused an air conditioning coil to leak would that be a loss in function?**

A. Yes.

**Q. Would the presence of copper sulfide on the surface of a conductor effect current distribution in an electrical device?**

MR. SULLIVAN: Objection to form.

A. It depends on what that electrical device is.

**Q. But it's possible depending on the electrical device that the presence of copper sulfide on the surface of the conductor --**

MR. SULLIVAN: Objection.

A. Like if you had a 10-gauge wire, no. I mean, if you had a big fat wire, the odds that you're going to get damage on a big, you know, on a large diameter copper wire --

**Q. Right. But on a small gauge wire your answer is yes?**

MR. SULLIVAN: Objection to form. Assumes facts not in evidence, calls for speculation.

A. You're saying you could damage a small gauge wire enough to cause loss of function. Yes, that would be possible.

**Q. Right. So, for example, like in a diode or a transistor, things with small wires, you could have a loss in function just from the presence of copper sulfide?**

MR. SULLIVAN: Same objections.
A. Yes, it's possible.
**Q. Did you take any cross-sections of copper tubing from any of the homes that you were in?**
A. No. We were not allowed to do destructive things to the houses.
**Q. The next paragraph under "Corrosion and House Inspections," that's a paragraph that you quote a study. Is that right?**
A. Yes.
**Q. And the study that you're quoting relates to Chinese manufactured drywall; is that right?**
A. Yes.
**Q. If the mechanism of corrosion in the homes at issue in this case is different than the mechanism causing corrosion in homes with reactive Chinese manufactured drywall, would you agree with me then that this paragraph isn't relevant to these cases?**
MR. SULLIVAN: Objection, form.
A. You put a big if the mechanism isn't the same, so you're going to need to

tell me what mechanism is different for me to have an opinion.
**Q. Tell me what the mechanism is in Chinese drywall?**
MR. SULLIVAN: Objection, form, foundation.
A. You're talking about what happens to the copper wiring when the Chinese wallboard -- refine your question a little bit.
**Q. Sure. What is the cause of corrosion in homes with reactive Chinese drywall that's the basis of this quote?**
MR. SULLIVAN: Objection to form, calls for speculation, seeks facts not in evidence.
A. Hydrogen sulfide gas was present and it reacted with the copper wires.
**Q. So your opinion is then hydrogen sulfide gas in homes with Chinese drywall is the cause of the copper sulfide corrosion in those homes?**
MR. SULLIVAN: Objection to form, mischaracterizes testimony.

A. It's an important part of the corrosion or the blackening of copper wire.
**Q. In Chinese drywall homes is there corrosion or is there only blackening?**
A. I --
MR. SULLIVAN: Objection, calls for speculation, seeks facts not in evidence.
A. I haven't -- I don't have any firsthand experience and I believe they often use the term corrosion carelessly in most of the government reports.
**Q. Okay. So in the CPSC reports the term corrosion is used carelessly, potentially it was just blackening?**
MR. SULLIVAN: Objection to form.
A. I mean I don't have firsthand knowledge, so, but it's obvious they're careless about how they use the term corrosion so you have to take it with a grain of salt.
MR. SULLIVAN: Objection to form.
**Q. In your opinion what other than the hydrogen sulfide in homes with reactive**

**Chinese drywall causes blackening or corrosion?**
MR. SULLIVAN: Objection to form, calls for speculation.
A. They have postulated that formaldehyde had synergistic effects. I have not, you know, studied their data enough to have an opinion if I believe they're correct or not.
**Q. Are you aware of any other potential cause other than hydrogen sulfide or formaldehyde that could be causing blackening or corrosion in homes with reactive Chinese drywall?**
MR. SULLIVAN: Objection to form, calls for speculation, assumes facts not in evidence.
A. The formaldehyde, per se, doesn't cause the corrosion. It may assist, but you have to have something that has sulfur in it if you're going to have sulfide corrosion. So I mean I am not aware of the other two gases they commonly check for carbonyl sulfide and carbon disulfide, but those are

usually in very low quantities.

**Q. So then do I understand your opinion to be that the main cause of corrosion in homes with reactive Chinese drywall is hydrogen sulfide?**

MR. SULLIVAN: Objection to form, mischaracterizes testimony, calls for speculation.

A. I believe that's a primary driver.

**Q. Okay. And it's also your opinion that the primary cause of the corrosion in the five homes you went into in Florida -- strike that.**

**It's also your opinion that the primary cause of the copper sulfide growth in the homes that you went into in Florida is hydrogen sulfide?**

MR. SULLIVAN: Objection to form.

A. Yes.

**Q. However, if the cause of the corrosion of the homes you went into in Florida is from some other source than hydrogen sulfide or some other reaction involving something -- let me start the**

question over. I apologize.

When you reviewed this report that you quote in Corrosion and House Inspections regarding Chinese manufactured drywall, did you find any conclusion as to the actual cause of the corrosion in those homes in this report in which you rely in your report?

MR. SULLIVAN: Objection to form.

A. My general impression is their level of expertise is lower than mine. So I read what they had to say, as lawyers say taken under advisement. And your question is, did they find --

**Q. You're quoting this report in your report, right?**

A. Yes.

**Q. So you relied on this report in part to form your opinions in this case?**

MR. SULLIVAN: Objection to form.

A. The word "rely" I'm not --

**Q. So you did not rely on this report to form your opinions in this case?**

MR. SULLIVAN: Objection to form.

A. I'm trying to understand what

exactly when you say rely. I looked at the data they collected and found that to the most part to be, to be consistent with my knowledge on the subject.

**Q. But you didn't necessarily agree with all their conclusions?**

MR. SULLIVAN: Objection to form.

A. The word, I mean the red flag is all their conclusions I never agree with all of what anybody says.

**Q. Okay. So you did not agree with all their conclusions?**

MR. SULLIVAN: Objection to form, mischaracterizes testimony.

A. I would have to go back and review it again, but on a picky scientist thing I'm sure I could find a few little points that I didn't think they had enough basis for their opinions and I had opinions in addition to their opinions. So I would say they had less opinions on the subject than I had. So I mean I'm not -- do I agree with everything anybody says, no, I did not.

**Q. Okay. My question was specific as**

to this study that you've quoted, and I understand your answer to be, you did not agree with everything that was in the study?

MR. SULLIVAN: Objection to form, asked and answered.

A. I agreed with, the part I quoted I agreed with.

**Q. Okay. But not all of the study?**

MR. SULLIVAN: Objection to form, mischaracterizes testimony.

A. It's been a while since I read that report, but I'll go back to I don't agree with all of anything I read. I mean it's just general nature of who I am.

**Q. In the quote that you have used, it states, "The rate and depth of attack are relatively small compared to the safety factors typically used in design and material selection for structural applications where maintaining mechanical strength is critical to preventing failure."**

**Are air conditioning cooling coils manufactured for a structural application?**

MR. SULLIVAN: Objection to form,

foundation.

A. There's -- their primary function is to transfer heat. There's a certain structural integrity required to carry out the function of their primary function of transferring heat, so the answer is they have a structural requirement, yes.

**Q. Okay. So if they're manufactured for a structural application and they leak by virtue of copper sulfide corrosion, then would you agree with me that the rate and depth of attack are significant, right?**

MR. SULLIVAN: Objection, assumes facts not in evidence, calls for speculation.

A. I haven't seen, actually seen a coil that failed by copper sulfide. So this is, you know, reportedly some coils failed by, you know, copper sulfide corrosion. I mean so when someone gives me that kind of information, I take it under advisement and I write it down on the background condition that this person's opinion was so and so. But I delay my opinion until I've got the

coil in my hand and let me loose in a metallurgy lab.

MR. WEISS: That doesn't answer my question. May I ask the court reporter to read back my question.

(A portion of the record was read.)

MR. SULLIVAN: Same objection. Objection to form, assumes facts not in evidence, calls for speculation.

A. If that happened, it would be a structural, structural damage.

**Q. So in contrast to the quote here, that the rate and depth of attack are relatively small compared to the safety factors, in that case, on the assumption that the corrosion had caused the leak in an AC coil the rate and depth of attack would be significant?**

MR. SULLIVAN: Objection to form.

A. What you're pointing out is that this disagrees with hearsay evidence.

**Q. I'm not pointing out anything other than my question, which is if an AC coil failure occurred because of copper sulfide**

corrosion, then the rate and depth of attack is significant?

MR. SULLIVAN: Objection to form, assumes facts not in evidence.

**Q. Is that right?**

MR. SULLIVAN: Calls for speculation.

A. If such an event really occurred then you've by definition defined that it -- you've said it's failed by this mechanism, therefore, yes, you had a structural failure. I mean it's a circular statement you're making. I mean you're assuming the answer and then coming back around with it.

**Q. Well --**

A. You see what I'm saying? Your logic is kind of goofy.

**Q. I'm not, I'm not here to argue with you. I'm here to ask questions. Okay. I think you did give me the answer to the question, so I'm not going to ask you the question again.**

**Do you agree with me that there could be an electrical component failure**

caused by corrosion without being a structural failure caused by corrosion or are they one and the same?

MR. SULLIVAN: Objection to form.

A. We're talking copper coils right now?

**Q. Well, within a residential setting wherever there is copper sulfide corrosion.**

MR. SULLIVAN: Objection.

MR. WEISS: You know what, let me start the question again. It's a poor question. Let me withdraw it. I think you've already answered that. It's a bad question.

**Q. Let's go to the next section, the "House Inspections and Personal Experience."**

**We covered some of this.**

**In the five homes you went into in this case, you found at minimum blackening by sulfidation, right?**

MR. SULLIVAN: Objection, form.

A. Yes, we found blackening of copper by sulfidation in all five homes.

**Q. You state, "The discoloration of**

102

copper wires does not in itself decrease copper's ability to carry electricity."

This is on the next page. The first full paragraph.

Well, copper blackening caused by copper sulfide could cause, could affect copper's inability to carry electricity, couldn't it?

MR. SULLIVAN: Objection to form, calls for speculation, assumes facts not in evidence.

A. In extreme cases.

**Q. Did you find any wires -- let me start the question over.**

**In the five homes that you went to for this litigation, did you find any copper wires that were covered with black paint as opposed to having copper sulfide growth?**

A. Not to my knowledge. But I -- there's a lot of blackening that wasn't sampled, so.

**Q. You don't have any sampling that shows that there was wires covered with paint as opposed to copper sulfide?**

103

A. I do not.

MR. WEISS: Why don't we take our lunch break. Why don't we take 45 minutes and then -- well, we can go off the record.

THE VIDEOGRAPHER: The time is 12:03. We are off the record.

(Lunch recess taken at 12:03 p.m.)

104

A F T E R N O O N S E S S I O N

(Time noted: 12:45 p.m.)

R O B E R T O D L E, resumed.

EXAMINATION (Cont'd.)

BY MR. WEISS:

THE VIDEOGRAPHER: The time is 12:45. We are on the record.

**Q. Doctor, let's go back to the report, you can use any one in the generic language that we're talking about and in the Necessity of House Inspections, Personal Experience, which is the last section -- well, step away from the report for a second.**

**Have you ever done studies regarding corrosion caused by hydrogen sulfide from well water specifically?**

MR. SULLIVAN: Objection to form.

A. No.

**Q. Are you aware of any studies that show well water having sufficient amounts of hydrogen sulfide to cause corrosion, copper sulfide corrosion in any setting?**

MR. SULLIVAN: Objection to form.

A. I mean my science mind is saying

105

hydrogen sulfide doesn't know whether it's in the well water or tap water, so, you know, to me you have to define well water in terms of, you know, its salt content, its hardness, that kind of stuff, and that it could be equivalent to water taken out of someone's tap. So I mean well water is not a very scientific term. I mean, so...

**Q. Do you know what I mean when I refer to well water?**

A. Most water in this country is well water. I mean it's -- you're talking about well water, I assume, that comes out of a person's house, next to his house versus water that the city takes out of a well and sends to his house.

**Q. That's correct, that's what I'm referring to, water that comes out of an individual well in a house. Okay. So do you understand what I'm referring to there?**

A. Yes.

**Q. In that regard, are you familiar with aware of any study that shows copper sulfide corrosion in a home has been caused**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

by hydrogen sulfide in an individual well outside the home?

A. I would say --

MR. SULLIVAN: Objection to form.

A. I would say what we did is more or less a study along those lines.

**Q. Your study does not appear to be a published study, right?**

A. No.

**Q. So do you know of any peer reviewed published study that shows copper sulfide corrosion is caused by well water drawn from a well outside of an individual home?**

MR. SULLIVAN: Objection to form.

A. No.

**Q. Okay. Now your study shows copper sulfide corrosion can be caused by well water drawn from a well outside of a home, right?**

A. Yes, in four out of the five cases, yes.

**Q. And so your opinion is in four out of the five cases there is copper sulfide corrosion in the home caused by hydrogen sulfide in the well water outside the home?**

A. There's hydrogen sulfide blackening of the copper wire in four of the five homes.

**Q. That wasn't my question.**

**So earlier I asked you if there was a study and you said my study is the one, these five homes show that copper sulfide corrosion can be caused by a personal well and --**

A. Okay.

**Q. I'm following up on that. So I want to be clear --**

A. I -- I was careless with the use of the word "corrosion."

**Q. Okay. So in your opinion the copper sulfide blackening in the house has been caused by hydrogen sulfide that originates in the wells outside the houses?**

A. Yes.

**Q. Are you aware of any professionally published peer reviewed study that finds that same conclusion?**

MR. SULLIVAN: Objection, form.

A. No.

**Q. Have you ever personally observed**

other than these five homes that you went in, copper sulfide blackening or corrosion caused by well water?

A. I'm trying to remember what our source of water was at Southern Water Treatment. I mean we had -- we had copper blackened by the water that had hydrogen sulfide in it. Now my memory is not clear where that water came from, so I mean I'm guessing since it was in Greenville County it was water furnished from the city and not a well. So if that memory is correct, then no.

**Q. I'm not --**

A. I'm trying to --

**Q. Sure.**

**Would it change your opinion as to well water being the cause of the copper sulfide blackening in the homes that the homes on either side of each home you inspected using wells drawn from the same aquifers do not have any blackening of the copper in the homes?**

MR. SULLIVAN: Objection to form, assumes facts not in evidence, calls for

speculation.

A. My speculation would be they have good aerators.

**Q. I didn't ask for your speculation. I asked if it would change your opinion if the homes on either side of each home you inspected which have wells drawn from the same aquifer lacked any copper sulfide growth or blackening or corrosion, would that change your opinion as to the cause of the copper sulfide blackening in these homes?**

A. No.

MR. SULLIVAN: Same objections.

A. No.

**Q. Would it change your opinion if an electrician from Southwest Florida who has made thousands of house calls to homes in Southwest Florida has never seen copper sulfide blackening except for in the five homes you inspected?**

MR. SULLIVAN: Objection to form.

A. No, because the electrician I worked with said just the opposite.

**Q. Which electrician did you work**

with?

A. What was his name? I have his picture.

**Q. The electrician you worked with in this litigation who went with you on these inspections? Yes? I need you to say yes.**

A. Yes.

**Q. And your testimony today is the electrician who accompanied you on these investigations was that he's seen this kind of copper sulfide corrosion inside other homes in Southwest Florida?**

MR. SULLIVAN: Objection to form.

A. Yes.

**Q. Tell me what he said.**

A. A group of electricians were sitting around talking about all the places they've seen black copper wire, I mean in the state, which Mark and the electrician, I mean it was, they were having a conversation. I was just listening and they were talking that they had seen the blackening in a lot of places.

**Q. Did they quantify a lot?**

MR. SULLIVAN: Objection to form.

A. No. I mean they were just giving examples to each other of things they'd seen.

**Q. Did you speak to them any further about it?**

A. No, I just, I paid attention to what they were saying.

**Q. Did they differentiate between copper wiring inside the home versus outside the home?**

A. My impression is they were talking about copper wire inside the home, but I don't remember that detail.

**Q. Okay. So I'll ask my initial question again which is: If -- let me back up for a second.**

**Have you read the deposition transcripts of any of the electricians that were in on your inspections? I believe earlier you did not mention that, so.**

A. No.

**Q. Okay. Would it change your opinion that the cause of the copper sulfide blackening or corrosion in the five homes you**

inspected was caused by well water if the electrician who was with you on the inspection testified that having made thousands of house calls as an electrician in Southwest Florida to homes that were on well water, he had never seen copper sulfide blackening or corrosion inside those homes?

MR. SULLIVAN: Objection, form. Calls for speculation, mischaracterizes evidence.

A. No.

**Q. Okay. Do you have an idea of what percentage of homes in Southwest Florida are on individual wells like the ones you inspected?**

A. No.

**Q. For all the homes that you inspected for purposes of this litigation, the five reports that we're looking at now, do you agree with me that each home had some type of blackening of the copper, some copper surfaces inside by sulfidation?**

A. Yes.

**Q. Do you agree with me that each home**

you reviewed had the presence of copper sulfide within the home?

A. I think I just heard the same question again but yes.

**Q. Okay. Do you agree with me that copper sulfide blackening, if the reactive process continues, will corrode copper?**

MR. SULLIVAN: Objection, form.

A. How long?

**Q. Will it ever corrode copper?**

MR. SULLIVAN: Objection, form.

A. Eventually.

**Q. Let's turn --**

A. I might point out that at Brinkcu that it looks like the corrosion had stopped.

**Q. Let's turn to Brinkcu. Is that what you have in front of you?**

A. Yes, it is.

**Q. On page 10 of the Brinkcu report, I'm in the picture section, not the boilerplate.**

**Figure 14 shows a float rod in the toilet, do you see that picture?**

A. Yes.

114

**Q. Is that corrosion?**
A. Yes.
**Q. Do you know if that float rod was submerged in water or above the water?**
A. It's above the water.
**Q. So I guess you did observe some corrosion within the Brinkcu home?**
A. You asked if I -- you're making a jump that this is completely sulfidation that's causing this corrosion.
**Q. My question before was, was this corrosion and you said yes?**
A. Yes.
**Q. And so and this corrosion was in the Brinkcu home?**
A. But it was not necessarily caused by sulfidation.
**Q. That wasn't my question. My question was confirming that there was corrosion that you observed inside the Brinkcu home?**
A. I thought you said corrosion by sulfidation.
**Q. I did not.**

115

A. Okay.
**Q. But we agree there is some corrosion in the sulfide that is pictured in figure 14, right?**
A. Yes.
**Q. What is the cause of the corrosion in figure 14?**
A. It's probably, first it's in a tough environment because it's being alternately wetted and dried and there's splashing and that's actually more difficult on most things to have periodic wet, you know, you get moisture and then you get it exposed to oxygen, and in this case you also get it exposed to hydrogen sulfide, so you're getting a combination of oxygen and hydrogen sulfide and water and that's -- that's a tough environment for -- for something that's wetted that often.
**Q. In your experience as a metallurgist have you observed a float rod like the one pictured in figure 14 that's corroded in that manner in any other setting other than the Brinkcu house?**

116

MR. SULLIVAN: Objection to form.
A. I've had float rods in my own home break, I've never paid much attention to them.
**Q. But that wasn't my question. My question was: Have you observed a float rod in any other setting other than the Brinkcu home where the rod itself was corroded to that extent?**
MR. SULLIVAN: Objection to form.
A. I would say no.
**Q. On page 16 of the Brinkcu report, there's a picture of the air conditioning cooling coil.**
A. Page 16?
**Q. Yeah, figure 18, I'm sorry, it's the air handler, I said cooling coil.**
**Do we agree that you don't know how long the particular set of cooling coils or AC -- sorry. Strike that.**
**Let me start the question over and you don't have to look at a picture for it.**
**Can we agree for all of the homes that you inspected that you have no knowledge**

117

as to when the particular AC cooling coil was put in the home on the day you inspected it?
A. This is true.
**Q. And potentially the cooling coil could have been the third or fourth replacement and had been in the home for six months, potentially it could have been in the home for a year, we just don't know?**
A. It could have been there 10 years.
**Q. On page 17 where there is four pictures of copper pipe samples in a wallboard, do you know when that board was placed in the home?**
A. I know on this board, as you can see in picture, figure 30, it says 3rd November 2010.
**Q. Do you have any idea who wrote that?**
A. No.
**Q. Do you have any idea when it was actually written?**
A. I asked Brinkcu is that, when was it put into the house and he pointed, I mean I don't -- it wasn't a very definitive

answer, but I took his arm waving to mean that that was when it was put in. I mean I don't -- I -- admittedly it was a vague response. And so I tried to get him to tell me who put the copper into the house and when he did it.

**Q. Did you remove any of the copper pipes from the sample board?**

A. I moved some of them, like this picture 30, I moved that little --

**Q. Painter's tape?**

A. -- painter's tape down and pulled it out so I could see under the edge of where it was and then put it back like I found it.

**Q. Did you actually pull the copper out of the board to look at the other side?**

A. I pulled it out far enough to see where it was underneath and did I see all the backside, no.

**Q. On page 19, you have figure 35, which is an outlet ground wire from the hall bathroom upstairs. Do you see that picture?**

A. Yes.

**Q. You describe the copper sulfide**

blackening on this case as some blackening. I note in your report you're very intentional about some blackening or heavy blackening or moderate blackening. Would you agree with me that the blackening that you see pictured in figure 35 is some of the least copper sulfide blackening on any of the wires you examined in the Brinkcu home?

MR. SULLIVAN: Objection to form.

A. I would say it's in the lower quartile of the blackening.

**Q. Let's turn to Exhibit 4, which is the Nutting house. On page 4, figures 3 and 4, you have pictures of the air handler from the Nutting garage, and in your description you state that "the ambient air in the garage has a small amount of reactive sulfuric gases."**

**Do you see that?**

A. Yes.

**Q. Do you describe the blackening in -- of the air handler as significant?**

MR. SULLIVAN: Objection, form.

A. No, I think it senses very little

sulfur, most of this is copper oxide.

**Q. Do you see the rust marks where the copper tubing attaches to --**

A. Yes, it's water and oxygen.

**Q. Sure. Does water normally leak out of an AC cooling tube?**

MR. SULLIVAN: Objection to form, calls for speculation.

A. You don't know that that's leaking out of that tube.

**Q. So the fact that the rust is located on that site doesn't necessarily mean it's leaking from that tube?**

MR. SULLIVAN: Objection to form. Assumes facts not in evidence, calls for speculation.

A. That's correct.

**Q. What color would you suspect -- bad question, let me start over.**

**Normally what color would the AC tube that's black in this picture be, from the factory?**

MR. SULLIVAN: Objection to form.

A. Before it's installed?

**Q. Uh-huh.**

A. All copper starts out, out of the factory with this, you know, reddish copper color.

**Q. And how long would you expect copper in a normal environment in a residence to maintain its reddish color?**

A. Until the first time it --

MR. SULLIVAN: Objection, calls for speculation.

A. The first time it gets hot.

**Q. Okay. In a Florida environment like the one you were in for these homes would you expect to see copper tubing in air conditioning cooling coils to be a reddish color or would you expect them to be a black color?**

A. I would expect them to be a blend of the two. Coils get hot. I mean they're job is to get heat out of the house and the coils get hot. So coils very often in air conditioning get a black color from turning to copper oxide. So it's not uncommon at all to see blackening of coils.



122

**Q. Would you expect to see blackening of air conditioning cooling coils in a home without a source of hydrogen sulfide within the first two years of a new cooling coil being installed?**

MR. SULLIVAN: Objection to form, assumes facts not in evidence, calls for speculation.

A. If copper coils are running hot it doesn't take them very long to get black from making copper oxide. So, yes.

**Q. And Florida is hot, right?**

A. Yes.

**Q. So in Florida you would expect that cooling coils in most air conditioners in that environment within a few years would be black?**

MR. SULLIVAN: Objection, calls for speculation.

A. It depends on how they're designed, how hard they're being running. For instance, if they're oversized in a house, you'd be less likely to get, you know, hot than one that's undersized. So I mean

123

there's a lot of factors that determine how fast something gets black. But I've seen black copper coils in a lot of air conditioners so I mean I'm not, it's not shocking. I mean and in this case, the analysis showed that it was very little sulfur present.

**Q. But my question to you earlier was -- well, let me back up.**

**I understand you to say that, I understand your opinion to be that if an air conditioner is run in a hot environment, because it's hot -- it's --**

A. I said if the coils get hot and if the coils get hot, one of the factors is if the environment is hot.

**Q. Okay. Is the environment being hot the primary factor for a coil being hot?**

MR. SULLIVAN: Objection to form.

A. I don't know if that's the primary. I mean I don't design air conditionings, but you've got a heat load on that coil and if you're putting a lot of heat out of that tube it gets hot. And if it gets hot, I do know

124

that when you get copper hot in the presence of oxygen that it makes copper oxide. So the fact that it's got copper oxide on it says that got hot. That would be some forensic evidence to say that it got hot.

**Q. Could copper oxide cause an AC cooling coil to fail?**

MR. SULLIVAN: Objection to form, calls for speculation.

A. It's very uncommon but it's possible.

**Q. What conditions would be required for copper oxide to cause an AC coil to fail?**

A. It has to run hot for --

MR. SULLIVAN: Objection to form, calls for speculation.

A. -- a long time.

**Q. What's a long time?**

A. Probably at least months.

**Q. So the AC coil would have to run hot for months constantly for it to fail based on copper oxide?**

MR. SULLIVAN: Objection to form.

A. Does it always have to be

125

constantly, you know, it depends on the, how extreme the overheating is.

**Q. Can you look at Exhibit 5 at page 20, figures 38, 39?**

A. The same report?

**Q. Exhibit 5, which is Retana.**

A. Okay. Retana.

**Q. On page 20.**

A. Retana, here's Brucker. Here's Retana.

Let's see, Retana is the Chinese drywall.

**Q. Figure 38, 39 does that show copper sulfide growth?**

MR. SULLIVAN: Objection, form.

A. It had very little sulfur in the analysis, so and it had a lot of very strong oxygen peak so most of this is again copper oxide.

**Q. Okay. And is this copper that's been oxidized or blackened to the point of failure to where we could call it corrosion?**

A. No.

MR. SULLIVAN: Objection, form.



**Q. Can you turn back to the picture of the Nutting house we were just looking at on page 29, I'm sorry, figure 3 and 4 on page 4, sample 29.**

A. Okay.

**Q. Is there a difference in the blackening in the Nutting air conditioner that we're looking at in figure 3 and 4 as opposed to the Retana air conditioner we're looking at in figures 38 and 39?**

MR. SULLIVAN: Objection to form.

A. It depends on which copper you look at. I mean there's some pretty black pieces of copper in the Retana house. The one that's front and center that's catching your eye is nice and red. But if you look over to the sides you can find some pretty dark copper.

**Q. And is that copper black for the same reason the copper in the Nutting house is black?**

MR. SULLIVAN: Objection, form.

A. They're both black because there's copper oxide, cupric oxide, which is black.

**Q. Is the cause of the cupric oxide in the Retana house the Chinese drywall?**

MR. SULLIVAN: Objection.

A. No.

**Q. What's the cause of the cupric oxide in the Retana house?**

A. Oxygen in the air and the copper tubing get hot.

**Q. Okay. So in the Retana house cupric oxide is caused solely by hot cooling coils?**

A. And oxygen --

MR. SULLIVAN: Objection, form.

A. And the presence of oxygen.

**Q. And that's why it's blackened and rusting?**

A. Heat and oxygen turn copper into cupric oxide.

**Q. Is it the same -- is that the same reason why in the Nutting house in figures 3 and 4 there's blackening, cupric oxide?**

A. Yes.

**Q. And is that the same reason in the Ravelo home on page 5 in figure 6 the air handler coils are black?**

A. Ravelo. Let's see, Ravelo, that's the one that has -- if I remember right the sulfur content on those coils was higher. I would have to go back and look again.

Ravelo. What?

**Q. Page 5, figure 6.**

A. It says here that for whatever reason a sample was not taken.

**Q. Do you see in figure 6 that the cooling coils are black?**

A. Yes.

**Q. Have you made a determination if that's cupric oxide or copper sulfide?**

A. I didn't do an analysis so I can't tell just by looking.

**Q. Do you know the mechanism that would have caused the coils in figure 6 to be black?**

MR. SULLIVAN: Objection.

A. I didn't do an analysis so I don't know the mechanism.

**Q. Okay. You earlier stated that you looked at copper refrigerator tubing when you inspected some of these homes, right?**

A. I took, yes, I looked at and took pictures.

**Q. Why did no pictures of copper refrigerating tubing make it into your report?**

A. Because most of those are painted. The part that's underneath the refrigerator is usually it has this black enamel coating on it, so, I don't remember actually ever seeing any bare copper wire from a refrigerator.

**Q. In these homes?**

A. I actually don't remember seeing bare copper wire in any refrigerator, but the Ravelo house, I believe, is the house that I looked at that -- I'm not sure if that's the right house -- but it was enameled. You know, how these little coolers, if you look at the back of most of these little refrigerators the coils are covered with black enamel.

**Q. Right, but my question was you earlier stated that when Mark Kramer was**

taking you through the home he was showing you the reverse face of refrigerators so as to see the copper tubing, so did you find any copper sulfide corrosion on the copper tubing?

A. I didn't find any bare copper tubing on the back of the refrigerators, it doesn't mean we didn't look at them, it just -- the copper wasn't -- I don't remember seeing any bare copper tubing.

**Q. Okay. In the Retana home you did find copper sulfide growth, right?**

A. Inside, Retana is the one with the Chinese drywall.

**Q. Exhibit 5, the one with Chinese drywall.**

A. Yes.

**Q. And the copper sulfide corrosion in the Retana home, in your opinion, was caused by the Chinese drywall?**

MR. ROBINSON: Objection, form.

A. It was caused by, you know, it's always, there's evidence that hydrogen sulfide has been there. And the source of

some of that hydrogen sulfide was the Chinese drywall.

**Q. So it's one of the causes of the corrosion in the home?**

MR. SULLIVAN: Objection to form.

**Q. Yes, I'm sorry, it's one of the sources of the corrosion in the home?**

MR. SULLIVAN: Objection, form.

A. The Chinese drywall was one of the sources of hydrogen sulfide.

**Q. And hydrogen sulfide is the cause of the corrosion in your opinion?**

MR. SULLIVAN: Objection, form.

**Q. Is that right?**

A. Yes.

MR. SULLIVAN: Calls for speculation.

**Q. In the other four homes you went in there was no Chinese drywall; is that right?**

A. Not to my knowledge, we did not find any.

**Q. Yet you did find copper sulfide growth in those homes, right?**

A. Both in the homes and outside of

the homes.

**Q. And the copper sulfide growth inside the other four homes you went was similar to the copper sulfide growth that you found in the Retana home, wasn't it?**

MR. SULLIVAN: Objection to form.

A. Hydrogen sulfide doesn't know where it comes from.

**Q. That wasn't my question. My question was --**

A. It's an answer though. I mean that's an answer. You don't understand the answer, okay.

MR. SULLIVAN: Let him ask the question.

**Q. It's my deposition, not yours.**

A. Okay.

**Q. My question was, in the four homes that you inspected that weren't the Retana home, you found copper sulfide growth similar to the copper sulfide growth you found in the Retana home, right?**

A. Yes.

MR. SULLIVAN: Objection to form.

**Q. In the Brucker house, if you can, or the Brucker report, which is 6, can you look at --**

A. That's the one with the dogs.

**Q. -- page 10.**

A. That's the house that had corrosion in the water closet outside.

**Q. I'm sorry?**

A. The Brucker, the way I remember that one is it's the one that had corrosion in the, around the water closets, the aerator outside.

**Q. Let's look at figure 16, which is of the outdoor panel in that closet. Do you see figure 16?**

A. Yes.

**Q. Is there copper sulfide growth on the ground wire in that outdoor panel?**

A. Yes.

**Q. Is it to the same extent as the copper sulfide growth you found inside the house?**

MR. SULLIVAN: Objection, form.

A. It would fit, I mean there's a

 134

spectrum and it fits inside the spectrum of wires that we saw.

**Q. Okay. Well, let's look at page 4, figure 2.**

**You agree with me that the copper sulfide growth in figure 2, the outlet in diner, I guess dining room, is greater than the copper sulfide growth pictured in figure 16, wouldn't you?**

A. Yes.

MR. SULLIVAN: Objection to form.

A. Yes, but about the same as in figure 18 and 19.

**Q. How about in figure 6, the laundry ground wires and power panel. You would agree with me that the copper sulfide growth and blackening on those wires is greater than that found in figure 16 the outdoor panel, right?**

MR. SULLIVAN: Objection, form.

A. Yes, but less than figure 18.

**Q. On page 7, figure 13, you would agree with me that the copper sulfide blackening or growth on the ground wire in**

135

master bedroom is greater than that in figure 16, right?

MR. SULLIVAN: Objection, form.

A. Yes, but less than figure 18 and 19.

**Q. And figure 14, the ground wire in master hallway exhibits greater copper sulfide growth or blackening than figure 16, right?**

MR. SULLIVAN: Objection, form.

A. Yes, but less than figure 18 and 19.

MR. WEISS: Just give me a moment to look through my notes. Okay.

THE VIDEOGRAPHER: The time is 13:25. We are off the record.

(A brief recess was taken.)

THE VIDEOGRAPHER: The time is 13:33. We are on the record.

BY MR. WEISS:

**Q. Dr. Odle, do you agree with me that localized corrosion could occur below the sulfide scale?**

MR. SULLIVAN: Objection to form.

136

A. I have no experience with seeing localized corrosion under a sulfide scale.

**Q. Is it possible?**

A. So that's a hypothetical, so from a science viewpoint, it's not a very useful question, but anything is possible.

**Q. So it is possible localized corrosion could occur below a sulfide scale?**

MR. SULLIVAN: Objection to form, mischaracterizes his testimony.

A. I think it's unlikely but anything is possible, yes.

**Q. What are you charging per hour for your work in this case?**

A. When I work out of my house, 140 an hour, when I -- like right here is 250 an hour.

**Q. Okay. And how many hours have you billed to this case in the 18 months you've been working on it?**

A. I wouldn't say it's about 750.

**Q. 750 hours, does that include today?**

A. That number is not that precise, so probably not.

137

**Q. Okay. And this is your only current litigation matter that you've been working on?**

A. Yes.

**Q. And it's the only litigation matter you've been working on for the last 18 months?**

A. Yes.

MR. WEISS: Okay. All right. I have nothing further.

MR. SULLIVAN: I have a few questions.

EXAMINATION BY

MR. SULLIVAN:

**Q. Dr. Odle, Mr. Weiss just asked you some questions about your compensation, and your testimony, you testified that you spent about 750 hours over the last 18 months, just so the record is clear, is that for all -- your work on all the cases not just the Brinkcu case, correct?**

A. That's correct, it's for every -- since starting out in Arizona until now.

**Q. Okay. And so that's, that's for**

houses apart from the ones that have been, that have been the subject of your reports so far?

MR. WEISS: Object to the form, you can answer.

A. Yes.

**Q. So more than, more than the five houses that we've been talking about here?**

A. The approximate, I think we decided it's about eight or nine houses that I've looked at.

**Q. Okay. Mr. Weiss -- I'm sorry, Dr. Odle, I want to ask you some questions about your experience. Okay?**

**What experience, can you describe your experience in working with copper, just briefly?**

A. I started out in a -- it spanned two general, let's see, actually, three scientific areas. I started out in a copper smelter pyrometallurgy, I moved to and worked at two different hydrometallurgical copper facilities where we did refining of copper in aqueous systems, sulfuric acid based systems.

**Q. Okay. Can I stop you right there just for a second, I apologize for interrupting, but can you put in plain English what that work is? What were you doing there?**

A. My job was to understand the chemistry of the process and when the QC on the process, any QC was missed, my job was to go in and understand how we were operating the facility based how we should have been operating the facility to understand the chemistry and bring the process back into conformance.

**Q. What was the process?**

A. There were -- I've worked in about a dozen different copper processes. The one that was the most informative was I worked at a, the largest hydrometallurgical facility in the US at Amax where we started out with copper sulfide, nickel sulfide and cobalt sulfide and refined that copper to pure copper, nickel and cobalt and ammonium sulfate. And in that process we also, part of our purification is we added hydrogen

sulfide to the solution to remove copper as copper sulfide from solution.

**Q. And what is a hydro, what's a hydrometallurgical plant?**

A. It's a chemical processing plant that uses wet chemistry to refine a metal.

**Q. So you are refining a metal into copper, am I right about that?**

MR. WEISS: Object to the form. You can answer.

A. In a particular plant we started out with metal sulfides and refined them into pure metals.

**Q. And what were you doing to do that, what were you using to do that?**

A. Sulfuric acid was the solution, most of the time the solution was sulfuric acid and we actually dissolved, reacted the sulfides with oxygen in an autoclave and put the copper into solution and then took it back out of solution at the other end.

**Q. What was your experience with hydrogen sulfide?**

A. We found that we couldn't get the

solutions at the end as pure as we needed to, for instance, we also made ammonium sulfide at that plant. We had trace metals in there. We made a process where we brought in hydrogen sulfide in tankers and bubbled that through the solution to react with the metal impurities, including copper, and you inject the hydrogen sulfide and you get, you know, black particles that form that are copper sulfide and then you can filter those out.

**Q. So based in part at least on this experience, you've had occasion to observe the effect of hydrogen sulfide on copper?**

A. Yes, there and two or three other jobs also.

**Q. And what were those other jobs?**

A. I worked at a wastewater treatment plant where we used sulfides to remove impurities from solution. And in this case we used, usually use sodium sulfide but you use also sodium bisulfide. When you put those in water they actually release hydrogen sulfide ions, HS minus ion and H ion. So it's actually hydrogen sulfide is actually in

solution. And then you take that to someone's plant and you inject it into their wastewater plant and it makes metal sulfides that precipitate from solution, that come out of solution. So you use it, you actually use hydrogen sulfide to make primarily -- and our customers had copper that had to be taken out of solution. That -- that plant whenever you have hydrogen sulfide in water, H2S is always offgassing, that plant was, everything in there that was copper was always blackened. I mean it's just the nature of being there.

**Q. Okay. And when you say the H2S was offgassing. What was it offgassing from?**

A. Water.

**Q. And is there -- what other experience have you had, similar experiences have you had?**

A. I've had -- I'm having a brain dump here. Oh, I built a plant where we took copper hydroxide sludges, injected hydrogen sulfide and made the copper into copper sulfide and then we sold that to a smelter. So we actually -- and we did experiments

there where we would dissolve the sludges with sulfuric acid and it makes a copper sulfate and then you take that solution and you put sulfide into that solution and you can see the black particles of copper sulfide form. We filtered that out and sold it. So we actually used that, the hydrogen sulfide reaction with copper and learned how to do that well so that we could make a product.

**Q. And was the hydrogen sulfide in that instance offgassing from water?**

A. Yes, and it offgassed, made everything in the place that's copper black. It makes the individual working in that area, you know, smelly. I mean it's a -- it's not a good work environment.

**Q. Okay. So what was your, you wrote a dissertation for your Ph.D., what was your dissertation?**

A. It was electrochemical method of taking oxygen out of copper.

**Q. And --**

A. And my master's was electrolytic refining of copper.

**Q. Have your various work experiences with copper and experience in observing hydrogen sulfide offgas from water informed your reports in this matter, or in these matters and your opinions in these matters?**

A. Yes. I mean it's I've spent, you know a lot of time working with -- with copper and a lot of it with sulfide chemistry where I deliberately wanted to make copper sulfide, so -- so I learned, you know, the conditions under which you could make hydrogen sulfide.

**Q. Okay.**

A. And that's also why I got hired at Dresser Rand because my experience with, you know, with compressors and their corrosion, they recognized that my experience in, you know, working with hydrogen sulfide was useful.

**Q. Okay. I want to turn your, direct to attention to Exhibit 2.**

A. What job.

**Q. Exhibit 2 was --**

MR. WEISS: Brinkcu.

**Q. -- Brinkcu.**

**And this part of, and I think this language may be found in some of your other reports, but it's on page, it's the third page of the document. It's Exhibit 2 which is, I believe this one here.**

A. Okay.

**Q. And under the heading "Necessity of House Inspections, Personal Experience," you say "Based on my experiences a site specific inspection and evaluation are required in order to investigate such a claim of corrosion or even a claim of blackening by sulfidation."**

**Do you see that?**

A. Yes.

**Q. Can you explain why that's important to do a site specific inspection and evaluation?**

A. Well, the -- I found that a layman when he's describing or claiming to have blackening of his copper wires can, you know, be actually looking at things that, you know, range from no blackening to blackening the

146

whole spectrum. And it's also, their opinion about where the hydrogen sulfide and its source is usually not based on anything but speculation. So both the source and the amount of blackening and the cause of the blackening is pretty much unreliable from, you know, what you're getting from the homeowners.

And even the inspector's reports, there's a great deal of variation. Some of them do a pretty good job describing what they see, some of them will look at, you know, copper oxide on a coil, they'll look at blackening on a coil and make an assumption about what it is without any kind of facts.

**Q. Would you agree that there are a lot of factors that can be involved in trying to reach a determination about the source of blackening?**

MR. WEISS: Object to the form.

You can answer.

A. The whole thing actually requires, you know, disciplines, you know, scientific method type approach, where you collect all

147

the data, you try to not jump to conclusions and you have to systematically go through a lot of data and see what it collectively tells you. And it -- and what it tells you is much different from one house to the next. Both in regards to source and what, you know, what's actually happened in the house.

**Q. Am I correct then that if you're trying to compare blackening of components between different houses that you would need to look at the individualized facts with respect to each house before reaching any --**

MR. WEISS: Object to the form.

You can answer.

**Q. -- conclusions about whether the blackening is similar?**

A. It's -- it's -- it's a difficult job even as a scientist trying to figure out what's going on in these houses and systematically compare different houses is not a trivial undertaking. I've tried to come up with some, you know, like magic rating number. And I've, you know, it's not that easy. I mean it's just, there's so much

148

variation between the houses. I mean these houses have, you know, a lot of variation.

**Q. As a matter of the scientific method, is it important to you to make sure that you consider the individualized facts and circumstances of each particular house?**

MR. WEISS: Object to the form.

You can answer.

A. I mean being a scientist, it, you know, I take pride in trying to get all the evidence I can get together before I form an opinion and I try to make that evidence be as much as possible first-hand and not, I would call it hearsay, but reportedly so and so happened, because that's -- you get a lot of misinformation when you walk into a place now.

**Q. And let me ask the question another way.**

**Why is it important for you as a scientist to consider the facts with respect to particular homes --**

MR. WEISS: Object to the form.

You can answer.

149

**Q. -- before reaching an opinion?**

A. Because, you know, even as good as I think I am, if I don't follow a disciplined approach to something I can reach the wrong conclusions. And I try to get all the assumptions on the table, all the facts on the table and get where all those facts are pointing and do it in a, you know, a systemic scientific method. It's kind of a work quality issue. If you don't use a disciplined approach, you get -- you get the wrong answer.

**Q. And is an important part of that scientific method to look at each individual residence, for example?**

MR. WEISS: Object to the form.

You can answer.

A. I mean if you look at -- the same claims was made about the house in Arizona as was made about the Brinkcu house was made about the Retana house, and here's an example in Arizona where the claims are we have blackening of a wire, there is no blackening.

Retana makes claim that there is,

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

you know, blackening and it's domestic drywall. Well, it turns out there is Chinese drywall there.

Ravelo makes claims it's the wallboard, but they have, you know, water even on the outside of the house and in puddles that H2S is emanating from. So, you know, if you look at the variation between one extreme where they're making the exact same claims and there is no corrosion and no blackening to the other extreme where they're, you know, claiming it to be wallboard but ignoring the fact that H2S is literally coming out of the ground around their house, those are very different physical setups in very different environments and even within the Florida houses there's quite a different variation in the individual circumstances.

**Q. I believe you testified in response to a question by Mr. Weiss that one or two of the houses was uninhabitable; do you recall that?**

A. I mean whether something is

habitable or not is, you know, more of a personal opinion than a -- the Ravelo house, I wouldn't want to live there.

**Q. Now, why did you think, you know, what made you think of that? What were the circumstances?**

MR. WEISS: Object to the form, you can answer.

A. You turn on the water, water faucet or the shower and the smell it reminded me of when I used to work in the factory where we used H2S.

**Q. Were there any circumstances outside the residence --**

MR. WEISS: Object to the form, you can answer.

A. In the Ravelo house --

**Q. -- existed of that condition?**

A. In the Ravelo house Zeke and I were out in the backyard and they were watering their yard and they had puddles of water and Zeke had to actually walk away because he couldn't, he couldn't deal with the smell and he was trying to take a reading and he had to

come back. So I mean that's -- I don't know, I just don't think that's a good place to live.

**Q. Dr. Odle, you testified that you reviewed the CPSC 51 home study.**

**Did that study, that study drew a distinction between causation and association, correct?**

MR. WEISS: Object to the form.

MR. SULLIVAN: Let me rephrase that.

Let me rephrase the question.

**Q. What distinction did the CPSC make between causation and association in that study?**

A. They said there was an association between the H2S and the blackenings of the houses, which they called corrosion of the water.

**Q. Okay. So you understood that to mean they weren't reaching a conclusion of causation; am I correct?**

MR. WEISS: Object to the form.

A. I assume that was -- yes, I agree

with what you just said.

MR. SULLIVAN: Okay. No further questions.

MR. WEISS: Few questions.

EXAMINATION BY

MR. WEISS:

**Q. First, the Brucker home was currently being lived in at the time you inspected it, right?**

A. Yes.

**Q. And it was obvious to you that a family of four was living in the home while you were there, right?**

A. Yes.

**Q. The Brucker home was habitable, right?**

A. It was what?

**Q. Habitable?**

A. Yeah, it wasn't -- it wasn't so bad there. I mean I didn't smell -- H2S was not as -- that was one of the better houses and the Brinkcu house, those are both better houses.

MR. WEISS: Nothing further.

THE VIDEOGRAPHER: Here ends video recording number 2 and this concludes the video recorded deposition of Dr. Robert Odle taken by the parties on Friday, February 24, 2012. The time is 13:57 and we are going off the record.

(Time noted: 1:57 p.m.)

JURAT

I, ROBERT ODLE, the witness herein, the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

______________________
ROBERT ODLE

Subscribed and sworn to before me this ___ day of __________, 2012.

______________________________
NOTARY PUBLIC

CERTIFICATE

COMMONWEALTH OF PENNSYLVANIA )
ss:
COUNTY OF PHILADELPHIA )

I, JENNIFER OCAMPO-GUZMAN, a Certified Real-Time Shorthand Reporter and Notary Public within and for the Commonwealth of Pennsylvania, do hereby certify:

That ROBERT ODLE, the witness whose deposition is hereinbefore set forth, was duly sworn and that such deposition is a true record of the testimony of such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of March 2012.

______________________________
JENNIFER OCAMPO-GUZMAN, CRR, CLR

INDEX

| WITNESS | PAGE |
|---|---|
| ROBERT ODLE | |
| BY MR. WEISS | 5, 153 |
| BY MR. SULLIVAN | 137 |

EXHIBITS

| DESCRIPTION | PAGE |
|---|---|
| Exhibit 1, Notice of Videotaped Deposition | 22 |
| Exhibit 2, Corrosion Evaluation of Brinku House | 42 |
| Exhibit 3, Corrosion Evaluation of Ravelo House | 43 |
| Exhibit 4, Corrosion Evaluation of Nutting House | 43 |
| Exhibit 5, Corrosion Evaluation of Retana House | 43 |
| Exhibit 6, Corrosion Evaluation of the Brucker House | 43 |

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

E R R A T A

I wish to make the following changes, for the following reasons:

PAGE LINE

___ ___ CHANGE:__________________________

REASON:__________________________________

___ ___ CHANGE:__________________________

REASON:__________________________________

___ ___ CHANGE:__________________________

REASON:__________________________________

___ ___ CHANGE: __________________________

REASON:__________________________________

___ ___ CHANGE: __________________________

REASON:__________________________________

___ ___ CHANGE: __________________________

REASON:__________________________________

__________________________ _____________

WITNESS' SIGNATURE DATE