1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

------------------------------

CHRIS BRUCKER, TREVER S.
NUTTING, XIOMARA RAVELO,
WILFREDO E. RETANA and
BEATRIX CELSA RETANA,
Individually, and on
Behalf of all others
Similarly situated,

       Plaintiffs,

V.                        CA No. 2:10-cv-405-FtMSPC

LOWES HOME CENTERS, INC.,
A North Carolina
Corporation, and NATIONAL
GYPSUM COMPANY, a
Delaware Corporation,

       Defendants.

------------------------------

GEORGE BRUNCKU AND
BRENDA BRINCKU,

       Plaintiffs,

Vs.                     CA No. 2:11-cv-00338-JES-SPC

NATIONAL GYPSUM COMPANY,
A Delaware Corporation,

       Defendant.

------------------------------

    VIDEOTAPED DEPOSITION OF MICHAEL TUDAY,
a witness herein, called by the Plaintiffs for
examination, in accordance with the Federal Rules of
Civil Procedure, taken by and before Ann Medis,
Registered Professional Reporter and Notary Public in
and for the Commonwealth of Pennsylvania, at the offices
of Morgan Lewis & Bockus LLP, 1701 Market Street,
Conference Room G, Philadelphia, Pennsylvania  19109, on
Friday, February 17, 2012, commencing at 9:35 a.m.


Job No: 23817

**Page 2**

1
2    APPEARANCES:
3
4
5
6    Counsel for the Plaintiff
7      CUNEO GILBERT & LADUCA, LLP
8      507 C Street, N.E.
9      Washington, DC  20002
10     202.789.3960
11     BY:  WILLIAM ANDERSON, ESQ.
12      wanderson@cuneolaw.com
13
14    Counsel for the Defendants
15     MORGAN LEWIS & BOCKIUS, LLP
16     1701 Market Street
17     Philadelphia, Pennsylvania  19103
18     215.963.5719
19     BY:  THOMAS V. AYALA, ESQ.
20     tayala@morganlewis.com
21
22    ALSO PRESENT:
23     Thomas Whitaker, Videograper
24
25

**Page 3**

1        * I N D E X *
2  MICHAEL TUDAY         PAGE
3  EXAMINATION BY MR. ANDERSON     5
4  EXAMINATION BY MR. AYALA    217
5
6    * INDEX OF TUDAY EXHIBITS *
7  NO.    DESCRIPTION      PAGE
    Exhibit 1  Brucker Plaintiffs' Notice of    9
8       Videotaped Deposition of Michael Tuday
9    Exhibit 2  Brinku Plaintiffs' Notice of    9
       Videotaped Deposition of Michael Tuday
10
    Exhibit 3  CAS Laboratory Report, 12/21/11, RE:  135
11      Final Brincku Report, signed by M. Tuday
12   Exhibit 4  CAS Laboratory Report, 12/21/11, RE:  135
       Brucker / 6077 NW Pine Level St.
13      Arcadia, FL 34266, signed by M. Tuday
14   Exhibit 5  CAS Laboratory Report, 12/21/11, RE:  135
       Nutting / 3245 Reed Rd, SE, Palm Bay,
15      Mims, FL, signed by M. Tuday
16   Exhibit 6  CAS Laboratory Report, 12/21/11, RE:  135
       Ravelo / 1010 N.E. 12th Terrace, Cape
17      Coral, FL 33909, signed by M. Tuday
18   Exhibit 7  CAS Laboratory Report, 12/21/11, RE:  135
       Retana / 11412 Mountain Bay Dr.
19      Riverview, FL. 33569, signed by M. Tuday
20
21      - - - -
22
23
24
25

**Page 4**

1      THE VIDEOGRAPHER:  This is Tape No. 1 of
2  the videotaped deposition of Michael Tuday, taken
3  by the plaintiffs' attorneys in the matter of
4  Chris Brucker, Trevor S. Nutting, Xiomara Ravelo,
5  Wilfred E. Retana, and Beatrix Celsa Retana versus
6  Lowe's Home Center, Inc. and National Gypsum
7  Corporation in the court of the US District Court,
8  Middle District of Florida, Fort Meyers Division.
9    The deposition is being held at Morgan Lewis,
10  Philadelphia, Pennsylvania.  Today's date,
11  February 17, 2012.  Time on the record is 9:35.
12    My name is Robert Whitaker.  I'm from the
13  firm of David Feldman Worldwide.  The court
14  reporter is Ann Medis in association with David
15  Feldman.
16    Will counsel please state their appearance
17  for the record.
18      MR. ANDERSON:  Mr. Whitaker, if I might.
19      THE VIDEOGRAPHER:  Yes.
20      MR. ANDERSON:  One point.  I believe
21  that this deposition is being conducted in both
22  the Brucker action and the Brincku action.
23      THE VIDEOGRAPHER:  I'm sorry.
24      MR. ANDERSON:  You don't have that.
25      MR. AYALA:  That's my understanding as

**Page 5**

1  well, that this deposition has been noticed for
2  the purposes of the -- what we call the Brucker
3  action and also what we call the Brincku action.
4      MR. ANDERSON:  Okay.  In that case, my
5  name is William Anderson.  I'm here representing
6  the plaintiffs in both the Brincku and the Brucker
7  actions.
8      MR. AYALA:  Good morning.  Tom Ayala
9  here on behalf of New NGC, Inc., doing business as
10  National Gypsum Company.
11    Before we get started, can you stipulate that
12  objections are reserved except as to the form of
13  the question?
14      MR. ANDERSON:  Yes.
15      THE VIDEOGRAPHER:  The court reporter
16  will please administer the oath.
17      MICHAEL TUDAY,
18  having been first duly sworn, was examined
19  and testified as follows:
20     EXAMINATION
21  BY MR. ANDERSON:
22    **Q.  Good morning, Mr. Tuday.**
23    A.  Good morning.
24    **Q.  We met just a couple of moments ago but**
25  **just to go over it again, my name is William**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

6

1  Anderson and I represent the plaintiffs in the
2  Brincku and Brucker actions in their cases against
3  National Gypsum.
4       I have a bit of a cold, so if -- if you
5  should have any difficulty hearing me, you know,
6  just please ask me to repeat.
7       But if you would, could you please state your
8  full name and title for the record.
9       A.  My name is Michael Tuday.  My last name
10  is spelled T-U-D-A-Y.  And my title is director of
11  research and development.
12       Q.  I suspect that your counsel has probably
13  already discussed much of this with you; but I'd
14  like to go over just a few of the ground rules for
15  today's deposition, if that's okay.  One of the
16  ground rules is that -- the court reporter is
17  taking down the testimony today, and she's not
18  able to record physical gestures.  So to the
19  extent that you can, if you can answer audibly so
20  that she can take it down for the record, that
21  would be helpful.  Can you do that?
22       A.  Yes.
23       Q.  Okay.  And you understood that you took
24  an oath to to tell you the truth today, right?
25       A.  That's correct.

7

1       Q.  And although today will be relatively
2  informal, you understand that it's the same oath
3  that you would take if you were in court before a
4  judge?
5       A.  I understand.
6       Q.  Okay.  And if you don't understand a
7  question, you'll tell me?
8       A.  I will.
9       Q.  And if you don't hear a question, you'll
10  let me know?
11       A.  I will.
12       Q.  So it's fair to assume that each time
13  you answer one of my questions today, you heard
14  the question?
15       A.  Yes.
16       Q.  Understood the question?
17       A.  Yes.
18       Q.  And are answering truthfully?
19       A.  Yes.
20       Q.  If at any point you realize that your
21  response to an earlier question was inaccurate or
22  incomplete, you should let me know so that you can
23  correct or supplement your answer.
24       A.  I will make every effort.
25       Q.  Just as a courtesy, I'll do my best not

8

1  to cut you off when you're talking; and all I
2  would ask is in that in return, you extend me the
3  same courtesy, the reason being it's very
4  difficult for the court reporter to record the
5  conversation if we both talk at the same time.
6  Can you do that?
7       A.  I can.
8       Q.  Okay.  Mr. Tuday, are you currently on
9  any medications?
10       A.  No.
11       Q.  Is there anything that might keep you
12  from testifying fully and accurately today?
13       A.  Nothing that I'm aware of.
14       Q.  And if you need a break, just let me
15  know; and I'll do my best to accommodate you, the
16  only qualification being that if there's a
17  question pending, I'd ask that you answer the
18  question.  And at that point, we'd take a break.
19  Is that okay?
20       A.  That's agreeable.
21       Q.  All right.  Do you have any questions
22  about the procedure today?
23       A.  I do not.
24       Q.  Okay.  I'm going to pass to the court
25  reporter -- I'm going to ask her to mark as

9

1  Exhibit 1 and 2.  And they are -- I'm going to
2  pass them to you as well.  They are the deposition
3  notices.
4       (Tuday Exhibits 1 and 2 were marked.)
5       MR. ALAYA:  Is this for me?
6       MR. ANDERSON:  Yeah.
7       MR. ALAYA:  Which is 1, and which is 2?
8       MR. ANDERSON:  Brucker is 1, and Brincku
9  is 2.
10  BY MR. ANDERSON:
11       Q.  Mr. Tuday, have you seen the Brucker
12  notice before I handed it to you this morning?
13       A.  I am not sure.
14       Q.  Okay.  Well, this deposition notice was
15  served by my co-counsel, Brian Warwick, on
16  National Gypsum's lawyers.  And if you could take
17  a moment to review Exhibit 1, and note that the
18  copies are double-sided.  And Exhibit No. 2 is the
19  Brincku deposition notice that was also issued for
20  you.
21       And if I may ask, what do you understand
22  these notices to mean?
23       A.  It is my understanding that I am to be
24  subject of an oral and videotaped deposition in
25  the matter of these -- both the Brincku and the

3  (Pages  6 to  9)

**10**

1 Brucker actions.
2     **Q. Great. And, Mr. Tuday, have you ever**
3 **been deposed before today?**
4     A. Yes, I have.
5     **Q. How many times?**
6     A. Approximately 15.
7     **Q. When most recently?**
8     A. I -- it's -- I cannot recollect exactly,
9 but it would be somewhere on the order of about
10 eight years ago.
11     **Q. And what was that deposition taken in**
12 **connection with?**
13     A. That was connected to a -- a lawsuit
14 regarding a product or misapplication of a paint
15 product.
16     **Q. What was the name of that case?**
17     A. I can't recall the plaintiff, but the
18 defendant was Sherwin-Williams.
19     **Q. And were you employed by the defendant**
20 **in that case?**
21     MR. AYALA: Objection to form, the term
22 "employed."
23     A. I don't recall.
24 BY MR. ANDERSON:
25     **Q. Let's back up. In the case in which you**

**11**

1 were deposed eight years ago, were you hired as an
2 expert in that case?
3     A. I was not.
4     **Q. What role did you play in that case?**
5     A. My employer, which is a laboratory, had
6 performed analysis of samples related to the case;
7 and I was called to testify to the work that was
8 done and the validity of the results.
9     **Q. And you noted that there are 14 other**
10 **depositions that you have participated in, or**
11 **roughly 14 other depositions. How many of those**
12 **were in your capacity as an expert?**
13     MR. AYALA: Objection to form. It's
14 vague, ambiguous.
15 BY MR. ANDERSON:
16     **Q. You can answer.**
17     A. I'm thinking approximately four.
18     **Q. And what were those cases?**
19     A. One that I can recall -- this is over a
20 31-year career so -- and one that comes to mind
21 is -- it was a group of homeowners suing a
22 developer and -- related to environmental
23 pollution in a neighborhood called the Oxnard
24 Dunes in Ventura County, California.
25     **Q. And in that action, did you testify as**

**12**

1 an expert on behalf of the plaintiffs or on behalf
2 of the defendants?
3     A. On behalf of the defendants.
4     **Q. And in the other three actions, did you**
5 **testify on behalf of the plaintiffs or the**
6 **defendants?**
7     A. The defendants.
8     **Q. So all of your testimony as an expert in**
9 **your career has been on behalf of defendants; is**
10 **that accurate?**
11     A. That's accurate.
12     **Q. Mr. Tuday, did you meet with a lawyer**
13 **about today's testimony?**
14     A. I did.
15     **Q. With whom did you meet?**
16     A. I met with Tom Ayala and also jim
17 Pagliaro of Morgan Lewis.
18     **Q. How many times have you met with**
19 **Mr. Ayala and Mr. Pagliaro?**
20     A. Once with Mr. Ayala yesterday and once
21 with Mr. Pagliaro.
22     **Q. And when did that meeting occur?**
23     A. May of 2010. Or was it May of 2011?
24 I'm trying to recall that.
25     **Q. When you met with Mr. Pagliaro, how long**

**13**

1 did you-all meet?
2     A. One day.
3     **Q. A full day?**
4     A. Yes.
5     **Q. Did you meet in California?**
6     A. No. North Carolina.
7     **Q. And where in North Carolina did you**
8 **meet?**
9     A. The Charlotte area.
10     **Q. Did you meet at a National Gypsum**
11 **facility?**
12     A. I did.
13     **Q. And what facility was that?**
14     A. That was the headquarters in Charlotte,
15 and we also toured one of the gypsum drywall
16 plants.
17     **Q. Which one?**
18     A. One in North Carolina, in that general
19 area.
20     **Q. Was anyone else present during that**
21 **meeting with Mr. Pagliaro?**
22     A. Yes.
23     **Q. Who was that?**
24     A. One would be the -- one of the
25 vice presidents of National Gypsum. It was Sam

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

14

1 Shepherd.
2    **Q. Did you discuss the meeting with**
3 **Mr. Pagliaro with anyone else?**
4    A. Outside of National Gypsum?
5    **Q. Yes.**
6    A. Only my colleagues at my place of
7 employment.
8    **Q. Did you take any notes during the**
9 **meeting with Mr. Pagliaro?**
10    A. I don't believe so.
11    **Q. Were you shown any documents?**
12    A. I don't recall.
13    **Q. Did you bring any documents with you to**
14 **the meeting with Mr. Pagliaro?**
15    A. I did not.
16    **Q. Did you bring -- it appeared that you**
17 **did. Did you -- did you bring documents --**
18    MR. AYALA: Objection.
19 BY MR. ANDERSON:
20    **Q. No, no, no. Excuse me. Did you bring**
21 **documents to the deposition today? I'm sorry. I**
22 **just needed to finish the question.**
23    A. Yes.
24    **Q. What documents were those?**
25    A. Just handwritten notes.

15

1    **Q. And when did you take those notes?**
2    A. This morning.
3    **Q. There appeared to be some additional**
4 **documents that you had on the table earlier. What**
5 **were those?**
6    A. There was --
7    MR. AYALA: Just objection to the extent
8 that those documents may be privileged.
9    A. Okay. Documents that related to expert
10 reports.
11 BY MR. ANDERSON:
12    **Q. And which documents were those?**
13    A. Can I just check that real quick?
14    **Q. Sure.**
15    MR. AYALA: Why don't we go off the
16 record.
17    MR. ANDERSON: That's fine.
18    THE VIDEOGRAPHER: Off the record at
19 9:49.
20    (There was a discussion off the record.)
21    THE VIDEOGRAPHER: On the record, 9:50.
22    MR. ANDERSON: Thank you. I'm going to
23 request that I be permitted to review the notes
24 and the papers that Mr. Tuday brought with him to
25 the deposition today.

16

1    MR. AYALA: Okay.
2    MR. ANDERSON: Thank you. You know, for
3 purposes of keeping the ball rolling here, I'd
4 like to continue; and then at the break, I'd like
5 the opportunity to review that stuff. Is that
6 okay with you?
7    MR. AYALA: Okay. To the extent that he
8 wants to refer to those notes during the
9 deposition, he can do that; right?
10    MR. ANDERSON: That's not a problem.
11    MR. AYALA: Why don't you just hold on
12 to those.
13    THE WITNESS: Thank you.
14 BY MR. ANDERSON:
15    **Q. Mr. Tuday, what was the purpose of**
16 **taking the notes this morning? Was it to refresh**
17 **your recollection about the meeting you conducted**
18 **or some other reason?**
19    A. We had compiled five reports that were
20 submitted to Morgan Lewis in these matters, one
21 for each of the plaintiffs; and they're just notes
22 taken from those reports.
23    **Q. I see.**
24    A. So it was our own work, of which I was
25 the author.

17

1    **Q. Essentially it was a summary, then, of**
2 **the reports, to help you remember everything that**
3 **the reports contained; is that right?**
4    A. Well, in the matter of the Brincku case,
5 the report is 684 pages long, so not much of a
6 summary.
7    **Q. Right. Now, have you read the expert**
8 **reports of any of the other experts in this case?**
9    A. Part of them.
10    **Q. Which expert reports have you read?**
11    A. John McCarthy.
12    **Q. And what was that report about?**
13    MR. AYALA: Objection. Lack of
14 foundation. He testified he only read part of it.
15    A. Related to a summary of the different
16 scientific matters related to these actions,
17 including what's relevant is our own testing that
18 was conducted at the laboratory that I'm employed
19 at.
20 BY MR. ANDERSON:
21    **Q. When did you read Mr. McCarthy's report?**
22    A. This week, part of it.
23    **Q. As a percentage of the report, what**
24 **percentage of the report did you read?**
25    MR. AYALA: Objection to form.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

18

1    A.  Probably about 10 percent.
2  BY MR. ANDERSON:
3    Q.  Can you tell me what you gleaned from
4  that 10 percent?
5    A.  Yes.  It was scientific data and
6  opinions rendered with regard to biological
7  testing.
8    Q.  What other expert reports have you read
9  in this case?
10    A.  I've reviewed some of the data that was
11  generated by RealTime Laboratories.
12    Q.  Did you read all of the RealTime
13  Laboratories reports?
14    A.  I did not.
15    Q.  Which ones did you read?
16    A.  I've looked at a lot of documents in the
17  last couple of weeks, but they were reports
18  related to sulfur-reducing bacteria in drywall.
19    Q.  How about defense-expert reports?  Did
20  you read any of the other defense-expert reports?
21    A.  I glanced at -- very, very briefly at
22  the report that was from HSA.
23    Q.  And my understanding is HSA provided
24  reports on each of the plaintiff's houses.  Do you
25  recall which plaintiff's reports you reviewed?

19

1    A.  No, I don't.
2    Q.  And as a percentage, could you say --
3  estimate for me what -- what percentage of the HSA
4  report that you read you read -- you read?
5    MR. AYALA:  Objection to form.
6    A.  Again, probably about 10 percent.
7  BY MR. ANDERSON:
8    Q.  Mr. Tuday, why did you read the McCarthy
9  report?
10    A.  The company that I work for, my
11  employer, and Dr. McCarthy's company,
12  Environmental Health & Engineering, has maintained
13  a professional relationship for over 20 years; and
14  the firm Environmental Health & Engineering was
15  the prime contractor for a lot of the work that
16  was -- that was performed for the Consumer Product
17  Safety Commission, of which our data is included
18  in.
19    Q.  Now, how about the HSA report?  Why did
20  you read that?
21    A.  I wanted to look at some of the data
22  that was presented relative to the detection of
23  hydrogen sulfide in the well water, as well as
24  water samples and air samples that were collected.
25  I believe it's the Brincku one.

20

1    Q.  In terms of the age in these reports,
2  you didn't conduct any biological testing, did
3  you?
4    A.  No, I did not.
5    Q.  So why would that testing be relevant
6  for -- for you to review?
7    MR. AYALA:  Objection.
8    A.  Certainly.  As a -- in those matters as
9  an expert witness I was asked my opinion on the
10  prospect of potential biological mechanism for
11  corrosion of drywall -- I'm sorry --
12  drywall-related corrosion.
13  BY MR. ANDERSON:
14    Q.  I understood what you meant.
15    And what was your response to that question?
16    A.  Can you clarify?  I'm sorry.
17    Q.  Yeah, sure.  Let me -- let me rephrase.
18  You said that you were asked your opinion on the
19  potential for biological, I guess -- well, strike
20  that.
21    You read the McCarthy report because you were
22  posed a question about the impact of biological
23  agents in corrosion caused by drywall; is that
24  right?
25    A.  That's correct.

21

1    Q.  Okay.  And -- and what was your response
2  to that question?
3    A.  The -- allow me, if I can, to kind of
4  give you a broader answer for some context.
5    Q.  Sure.
6    A.  The company that I work for, I've been
7  involved in testing related to drywall since
8  February of 2008; and the laboratory that I work
9  for developed many of the protocols that were used
10  for measurement and to look for unique markers and
11  other compounds or corrosive agents from drywall
12  that had been imported from China that was deemed
13  to be corrosive, sometimes referred to as "Chinese
14  drywall."  And in formulating the methods and
15  protocols, I conferred with literally several
16  dozen experts in the field.
17    Q.  When you say "in the field," what --
18  what field?
19    A.  Field of materials testing, the field of
20  analytical chemistry, fields of microbiology,
21  fields of corrosion, and collaborated with other
22  scientists and peers that were not employed in my
23  company to look for potential mechanisms of what
24  was causing the corrosion.
25    Q.  And what did you conclude with respect

6  (Pages 18 to 21)

22

1   to the potential for biological agents that cause
2   drywall to corrode in Madelyn homes?
3       A.  I do not believe that there's a
4   biological -- or a significant biological
5   component that is causing corrosion in drywall and
6   that the -- the information put forth by some of
7   the experts in here was not, to me, scientifically
8   viable.
9       Q.  And what do you mean specifically?
10  Which -- which reports do you view as not
11  scientifically viable?
12      A.  Primarily the reports from RealTime
13  Laboratories.
14      Q.  Are there any other reports that you
15  view as not scientifically viable?
16      A.  In this matter?
17      Q.  Yes.
18          MR. AYALA:  Just objection to the lack
19  of foundation to the extent it hasn't been
20  established that he's reviewed every single report
21  issued in this matter.
22  BY MR. ANDERSON:
23      Q.  You can answer.
24      A.  No, I think that's pretty much it.
25  That's pretty much it.

23

1       Q.  Have you read any of the other expert
2   reports prepared for National Gypsum in the
3   Brucker and Brincku cases?
4           MR. AYALA:  Objection to form.
5       A.  I have glanced at the report that was --
6   I'm trying to recall the gentleman's name.  It's a
7   Eastern European name.
8   BY MR. ANDERSON:
9       Q.  Zed?
10      A.  Zed.
11      Q.  For simplicity's sake, Zed?
12      A.  Yes, that --
13          MR. AYALA:  Well, for the record, let's
14  say what it is.
15  BY MR. ANDERSON:
16      Q.  You mean the plaintiffs' report?
17      A.  Correct.  I'm sorry.
18      Q.  Okay.
19      A.  The plaintiffs' report.
20      Q.  And you mean the one done by I -- think
21  it's Zednek Hejlar?
22      A.  That's correct.
23      Q.  My question, though, was a little bit
24  different.  And my question was:  Have you
25  reviewed any of the other expert reports prepared

24

1   by the experts employed by National Gypsum?
2           MR. AYALA:  Objection to form.
3       A.  Let me think.  Again, I've looked at a
4   lot of documents recently.  Let's see.  I
5   mentioned McCarthy.  I mentioned HSA.  No, I have
6   not.
7   BY MR. ANDERSON:
8       Q.  At or around the time that you prepared
9   the expert reports in this case, did you speak
10  with any of the other experts employed by National
11  Gypsum in this action?
12          MR. AYALA:  Objection to form.
13  You can answer.
14      A.  Yes.  Representatives from Environmental
15  Health & Engineering.
16  BY MR. ANDERSON:
17      Q.  Who from EH&E did you speak with?
18      A.  Jack McCarthy.
19      Q.  Anyone else?
20      A.  I believe Ted Mia.
21      Q.  Anyone else?
22      A.  I believe Joseph Allen could have been
23  on the call.  It was a conference call.
24      Q.  Joseph --
25      A.  Allen, A-L-L-E-N.

25

1       Q.  How long was that call?
2       A.  I'm estimating probably 45 minutes.
3       Q.  Was that the only call you had with
4   EH&E?
5       A.  Well, I've had many calls with EH&E
6   since we worked very closely on drywall-related
7   matters for the government.
8       Q.  And are you currently working on any
9   drywall-related matters for the government?
10      A.  A lot of our work is ongoing.  There's
11  been several reports issued by the Consumer
12  Product Safety Commission, and there's always new
13  aspects of it.
14      Q.  When you spoke with EH&E, can you -- can
15  you ballpark for me that conversation that you
16  referred to a minute ago?  Can you ballpark for me
17  when that occurred?
18      A.  Within the last month.
19      Q.  Again, my question was a little bit
20  different that, though, because what I asked
21  you was at or around the time that you prepared
22  the reports that were submitted in this
23  litigation.
24      A.  Oh, I'm sorry.  No.
25      Q.  So you did not speak with EH&E about the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

26

1 reports that you prepared in this litigation
2 before or while they were being prepared?
3     A.  Correct.  I did not.
4     Q.  Let's back up a little bit, and let's
5 focus just on your background a little bit.
6     A.  Certainly.
7     Q.  So where did you complete your
8 undergraduate studies?
9     A.  I have a bachelor's of chemistry from
10 the State University in New York at Oswego.  I do
11 not have any -- hold any advanced degrees.
12     Q.  And when did you graduate from SUNY
13 Oswego?
14     A.  May, June 1980.
15     Q.  You said you do not hold any
16 postgraduate degrees?
17     A.  I do not.
18     Q.  And what's the name of your current
19 employer?
20     A.  I have a new employer, and it is --
21 they're called ALS Environmental.
22     Q.  Must be pretty new.  How long have you
23 been with ALS?
24     A.  Well, I'm still part of -- it's still
25 doing business as Columbia Analytical Services,

27

1 but the acquired Columbia Analytical Services in
2 November 2011.
3     Q.  I see.  Okay.
4     A.  So nothing's essentially changed other
5 than who write my -- signs my paycheck.
6     Q.  Fair enough.  And what is your current
7 title?
8     A.  Director of research and development.
9     Q.  How long have you held that position?
10     A.  I'm thinking about since 2004.
11     Q.  And what was your title before that?
12     A.  Laboratory director.
13     Q.  And how long did you hold that title?
14     A.  Since June of 1988.  I'm sorry.
15 July 1988.
16     Q.  And when did you first become employed
17 by CAS, if I may -- Columbia Analytical Services
18 is the name of the company that -- that you worked
19 for?  Yes?
20     A.  Yes.
21     Q.  Okay.  Would it be okay if I refer to
22 Columbia Analytical Services as CAS?
23     A.  That's fine.
24     Q.  And you'll know what I mean when I say
25 CAS?

28

1     A.  Yes, I will.
2     Q.  Okay.  When did you first become
3 employed by CAS?
4     A.  April in 1994 when Columbia Analytical
5 Services acquired Performance Analytical.
6     Q.  Okay.  And when did you first become
7 employed by Performance Analytical?
8     A.  July 18, 1988.
9     Q.  So it sounds like you graduated from
10 college in 1980 and you started with Performance
11 in 1988.  What did you do in that intervening
12 eight years?
13     A.  I had been continuously employed as an
14 analytical professional, analytical chemist, first
15 with the firm in Syracuse, New York, called the
16 Bryan & Gehr Engineers.
17     Q.  And were you employed with that firm for
18 the entire eight years between college and when
19 you started with Performance?
20     A.  No.  I only held that position for about
21 approximately nine months.
22     Q.  Okay.
23     A.  Then I relocated from New York to
24 California, and I was employed by a environmental
25 laboratory firm called West Coast Technical

29

1 Services in Cerritos, California.
2     Q.  And how long were you employed there?
3     A.  They changed ownership to -- they were
4 acquired by a company called IT Corporation, so I
5 was there from September 19 -- I'm sorry --
6 September 1980 to, I'm guessing, around June 1984.
7     Q.  And then where did you go to work?
8     A.  I relocated to Ventura County, and I
9 took a position as a analytical chemist for
10 Rockwell International.  Rockwell International,
11 that division of Rockwell International -- that's
12 the aerospace company -- was later acquired by a
13 company called Combustion Engineering.
14     Q.  Okay.
15     A.  And we did business as a couple of
16 different entities.  One was called Environmental
17 Monitoring & Services, Incorporated; and then
18 later it was CE Environmental, for Combustion
19 Engineering Environmental.
20     Q.  Okay.  In your current job as the
21 director of research and development, what are
22 your responsibilities?
23     A.  Bringing on new technology, developing
24 new methods, developing new applications, and
25 finding new markets for looking at the testing of

8  (Pages 26 to 29)

30

1    environmental samples and materials.
2        Q.  And who do you report to, Mr. Tuday?
3        A.  I currently report to a lab manager.
4    Her name is Kelly Horiuchi, H-O-R-I-U-C-H-I.
5        Q.  And how many people report to you?
6        A.  Currently, three.
7        Q.  How many people are employed by CAS?
8        A.  Well, before they were acquired,
9    approximately 400.
10       Q.  I'd like to ask you a general -- a
11   relatively broad question, which is:  What were
12   you asked to do in this case?
13           MR. AYALA:  Objection to form.
14   BY MR. ANDERSON:
15       Q.  You can answer.
16       A.  Okay.  I was asked to -- the laboratory
17   that I work for was asked to test samples of what
18   I was told was National Gypsum products and other
19   products that were taken from homes by which there
20   were complaints in the materials; namely, the
21   National Gypsum drywall.
22       Q.  And what did you understand the
23   complaints to be about?
24       A.  What I understood the complaints to be
25   about was that -- the complainants were describing

31

1    phenomena that were starkly similar to the
2    phenomena that was caused by the faulty and
3    corrosive imported drywall from Canada -- I'm
4    sorry -- from China.
5        Q.  And when were you first approached to
6    work on this case?
7        A.  I think early 2010.
8        Q.  What background do you have in studying
9    drywall, Mr. Tuday?
10       A.  I'm an analytical chemist that one of
11   the specialties is chemical analysis of materials,
12   particularly with regard to reduced sulfur
13   compounds, odorous compounds, volatile and
14   semi-volatile organic compounds, and a variety of
15   materials, one subset of which is building
16   materials, including drywall.
17       Q.  When did you conduct your first study on
18   drywall?
19       A.  It all started in about February of
20   2008.
21       Q.  And how did that -- how did that happen?
22       A.  I received a phone call from a Mr. Paul
23   Harrison.  And Paul Harrison is, I believe, a
24   principal in a company called Suncoast
25   Environmental in South Florida.  Mr. Harrison

32

1    described to me samples of drywall that were taken
2    out of a home by which he was consulting on and
3    that these samples of drywall had a peculiar,
4    disagreeable, and foul odor.  Mr. Harrison wanted
5    us to test samples of this drywall for odorous
6    compounds, particularly reduced sulfur compounds.
7        Q.  And how did you go about testing those
8    samples?
9        A.  Since we had conducted many different
10   tests of various types of materials, one of the
11   technologies that we've employed is -- is
12   utilizing what's called simulated environmental
13   chambers.  And so what we were trying to do is
14   reproduce the phenomenon that Mr. Harrison had
15   described whereby he had samples of drywall in a
16   Ziploc bag that he had moistened with a spray
17   bottle and exposed to sunlight over several days;
18   later taking those samples, opening up the Ziploc
19   bag and doing what we would refer to in the
20   business as a "nasal appraisal."
21       Q.  I see.  And when Mr. Harrison conducted
22   this nasal appraisal, I suspect that the drywall
23   smelled bad?
24           MR. AYALA:  Objection to form.
25       A.  He described to me that -- that it -- it

33

1    had a very foul and disagreeable odor.
2    BY MR. ANDERSON:
3        Q.  Did he provide any further description
4    of what the odor was or what it smelled like?
5        A.  Yes.
6        Q.  Okay.  And what was that?
7        A.  That was a sulfurous odor.
8        Q.  Like that of a match?
9        A.  Actually, no.  He -- in -- in dry form
10   he -- he said that it was like a match or like a
11   firecracker, like a burnt firecracker or like a
12   match; but in wet form, it had a much more intense
13   and much more disagreeable odor.
14       Q.  I see.  So did you conduct testing on
15   the samples that Mr. Harrison gave to you?
16       A.  The laboratory that I work for did, yes.
17       Q.  And were you, for lack of a better word,
18   in charge of that investigation?
19       A.  I was.
20           MR. AYALA:  That's okay.
21   BY MR. ANDERSON:
22       Q.  And what testing did you conduct on that
23   drywall?
24       A.  Essentially what we did was we tried to
25   reproduce the work that was done by Mr. Harrison,

9 (Pages 30 to 33)

34

1   and we encapsulated the drywall into glass jars
2   and exposed them to sunlight after they were
3   moistened with a spray bottle with deionized
4   water.
5       Q.  Did you spray the drywall directly with
6   the water?
7       A.  I did not, but one of our chemists and
8   analysts did.
9       Q.  And why would you spray the --
10  drywall with water?  What was -- what was it that
11  you were trying to simulate?
12      A.  We were trying to repeat the test
13  conditions that Mr. Harrison -- it wasn't our idea
14  to spray the water.
15      Q.  Do you have an understanding of what
16  condition Mr. Harrison was attempting to mimic
17  when he sprayed the drywall with water?
18          MR. AYALA:  Objection.  Calls for
19  speculation.
20      A.  No.  I couldn't answer that.
21  BY MR. ANDERSON:
22      Q.  Did he tell you why he sprayed the --
23  the drywall with water?
24      A.  If he did, I don't recollect the reason.
25      Q.  Could it potentially be that the

35

1   environment in South Florida is humid?
2          MR. AYALA:  Objection.
3       A.  It's a possibility.
4   BY MR. ANDERSON:
5       Q.  How many samples did you test for
6   Mr. Harrison?
7       A.  Less than five.
8       Q.  And so you say one of the tests that you
9   conducted was using this glass jar and moistening
10  and sunlight?
11          MR. AYALA:  Objection.
12  BY MR. ANDERSON:
13      Q.  Did -- did you --
14          MR. ALAYA:  Misstates the testimony.
15  BY MR. ANDERSON:
16      Q.  Did you conduct any other testing?
17      A.  No, other than the chemical analysis of
18  the contents of that jar, the gas inside the jar.
19      Q.  And did you identify any gas inside the
20  jar?
21      A.  Yes, we did.
22      Q.  And what gas did you identify?
23      A.  We identified elevated levels of two
24  compounds.
25      Q.  And which were those?

36

1       A.  Carbon disulfide and carbonyl sulfide,
2   BCS2 and COS, capital C, capital O, capital S.
3       Q.  Did you identify any other compounds?
4       A.  No.
5       Q.  So would it be accurate to say that
6   Mr. Harrison told you exactly what kind of testing
7   he want -- wanted conducted and you conducted that
8   testing according to his specifications?
9       A.  That's correct.
10      Q.  Is that typically the case?
11      A.  I'm sorry.  Let me -- I'm sorry.  Let me
12  rephrase that.  He told us how to conduct the test
13  conditions as far as the sample treatment, which
14  is encapsulating the sample and then heating it
15  up, allowing it to incubate, so to speak.
16          The choice of the analytical technique
17  that -- that we utilized was based on negotiating
18  a scope of work with Mr. Harrison based our
19  knowledge and expertise.
20      Q.  But in terms of the protocol with
21  respect to use of the spray bottle, that was
22  determined by Mr. Harrison; is that correct?
23      A.  Absolutely, yes.
24      Q.  Do you typically permit your clients to
25  determine the testing that you conduct?

37

1          MR. AYALA:  Objection to form.
2   BY MR. ANDERSON:
3       Q.  Is that how that process usually occurs?
4       A.  No.  But if that's what they request,
5   we'll do it, whether or not it's something we
6   often -- we will advise a client as to whether we
7   think that their ideas of how to do the -- conduct
8   the sample or sample preparation is -- is prudent
9   or not.
10          But, you know, after making -- after
11  communicating that information to a client, if a
12  client still wants to go ahead and do something,
13  we -- we have no objection to doing it with the
14  understanding that -- that they understand that
15  it's not necessarily our idea or the protocol
16  didn't originate from us.
17      Q.  Did you advise Mr. Harrison about any
18  concerns with the protocol that he suggested for
19  testing the -- drywall?
20          MR. AYALA:  Objection.
21      A.  I don't recall the conversation.  It was
22  back in 2008.
23  BY MR. ANDERSON:
24      Q.  And do you know what the country of
25  origin was for the drywall that you tested for

10  (Pages 34 to 37)

38

1   Mr. Harrison?
2       A.   Not at the time we had the samples.
3       Q.   Do you now know?
4       A.   I suspect that those samples originated
5   from China.
6       Q.   And why do you suspect that?
7       A.   Because -- again, this is going to be a
8   little lengthy answer.  But what we concluded was
9   the test results that we supplied to Mr. Harrison
10  where we detected elevated levels of carbon
11  disulfide and carbonyl sulfide -- we did not feel
12  that the test results reflected the odor of the
13  samples and that what we detected was not what was
14  causing the odor.
15      Q.   Can you help me understand what that
16  means?
17      A.   Okay.  I certainly can.  I personally
18  did sniff tests on the samples, as did several of
19  our chemical analysts.  I am familiar with the
20  odor of carbon disulfide as it's used as a common
21  laboratory solvent.  I'm also familiar with the
22  odor of carbonyl sulfide, which is described in
23  the literature.  And what I smelled was not
24  consistent with either of those substances.
25      Q.   And what -- what compounds was the odor

39

1   consistent with?
2       A.   Well, we did not know at the time.
3       Q.   And do you now know?
4       A.   We've done exhaustive studies of samples
5   of corrosive drywall that was imported from China;
6   and the odor is actually attributable to many
7   different compounds, including reduced sulfur
8   compounds, such as hydrogen sulfide, and also more
9   complex molecules, such as analogues of the
10  compound tetrahydrothiophene, larger sulfides and
11  disulfides, and other ring-structure
12  sulfur-containing compounds, as well as other
13  organic compounds, such as organic acids and other
14  volatile organic compounds.
15      Q.   Which organic acids are you referring
16  to?
17      A.   Primarily acetic acid.
18      Q.   What other acids?
19      A.   I believe formic acid, selenic acid, and
20  valeric acid.
21      Q.   Valeric acid.  And so you identified
22  valeric acid in the sample that Mr. Harrison sent?
23      A.   No.
24      Q.   Not subsequently either?
25      A.   We did no further testing for him on

40

1   that matter.
2       Q.   Okay.  So when you say that you
3   identified valeric acid, what samples are you
4   referring to there?
5       A.   Several different types of samples that
6   were submitted to our laboratory that the stamped
7   identification on the paper of the drywall clearly
8   indicated that the country of origin was from
9   China.
10      Q.   I want to get back to that, but I sort
11  of want to move progressively through the
12  experience that you've had with -- with drywall.
13  And so in February 2008, you do this testing for
14  Mr. Harrison.  What comes next in terms of your
15  experience with drywall testing?
16      A.   I began to receive an increasing number
17  of reports, primarily originating out of South
18  Florida, of people that had complaints about odor
19  of -- emanating from a drywall product that was
20  imported from China.
21          And at first there was no report of this
22  product causing corrosion; but as the time elapsed
23  through the year 2008 and into 2009, we started
24  receiving reports of corrosion of copper metal,
25  predominantly in the coils -- the copper coils of

41

1   air conditioning units and that -- we received
2   complaints not only from Florida but also in
3   Virginia, Louisiana, and Mississippi.
4       Q.   I'm curious, though.  After the
5   February 2008 testing you conducted for
6   Mr. Harrison, what was the next sample or set of
7   samples that you tested?
8       A.   I couldn't tell you exactly but we -- we
9   had received calls from other consulting companies
10  in South Florida and also from homeowners, and
11  there was a series of samples that were submitted
12  to our laboratory for testing.
13      Q.   Ballpark it for me, if you could.  After
14  February of 2008, what's the first sample that you
15  tested after that?  Roughly, when did that occur?
16      A.   I'm probably thinking April or May of
17  that year.
18      Q.   So a few months later, you got
19  additional samples.
20      A.   Uh-huh.
21      Q.   And where did those samples come from?
22      A.   Mainly South Florida.
23      Q.   Was there a particular environmental
24  company that submitted them to you?
25      A.   There were several but I -- you know,

11  (Pages 38 to 41)

42

1  I -- as far as the actual chronology, I -- I
2  couldn't recollect.
3      Q.  Okay.  So the tests that you conducted
4  for Mr. Harrison, was it a single sample?
5      A.  No.  It was approximately four or five
6  samples.
7      Q.  Okay.  So four to five samples in the
8  glass jar, spray, heat, incubate?
9      A.  Correct.
10     Q.  How many days?
11     A.  I believe it was two, two or three days.
12     Q.  And that was the only testing that you
13  conducted on the samples that Mr. Harrison
14  submitted in February 2008?
15     A.  That's right.
16     Q.  Next set comes in.  What testing do you
17  conduct on -- on those samples?
18     A.  Some of the tests that we conducted were
19  actually air samples taken from homes that had the
20  suspected defective product.  The samples were
21  collected in a sampling device, or container,
22  called the Tedlar bag -- that's T-E-D-L-A-R -- a
23  trademark of DuPont Corporation.  And those
24  samples were submitted to us for analysis of
25  reduced sulfur compounds.

43

1      Q.  I want to understand the capture
2  process, because the -- the Tedlar bags, you
3  collect the sample, and then you have a relatively
4  short window to test it; is that right?
5      A.  What's recommended is that the samples
6  be analyzed within a span of, say, 24 hours,
7  depending on which protocols are employed.
8      Q.  And did you use the protocol that
9  required you to test it within 24 hours?
10     A.  The -- the protocol that we used was
11  a -- a slight modification of an ASTM method
12  called D5504.
13     Q.  And what specifically was that process
14  you used?
15     A.  It's analysis using gas chromatography
16  with a sulfur chemiluminescence detector, using a
17  direct injection chromatographic technique.
18     Q.  Now, this technique, was this one that
19  you recommended; or was this one that the client
20  wanted you to employ?
21         MR. AYALA:  Objection to form.
22  BY MR. ANDERSON:
23     Q.  Go ahead.
24     A.  The client wanted us to analyze samples
25  for reduced sulfur compounds or sulfur-containing

44

1  compounds.  That choice of methods was the most
2  sensitive method that was available.
3      Q.  Okay.  I guess the question that I'm
4  asking, though, is:  Did you recommend that
5  technique for testing those samples?
6      A.  Well, not all the calls came to me.
7  Some of the calls came to some of my other
8  coworkers that were -- that are project managers,
9  and it was -- it's been a method that had been
10  employed for analysis of a variety of different
11  air samples, but which -- many of which are
12  unrelated to supposedly or allegedly defective
13  drywall, but a test or variance of a test that
14  we've been performing for over 20 years in our
15  laboratory.
16     Q.  Would it be accurate to say that
17  employees of CAS recommended this particular
18  protocol for testing the drywall?
19     A.  Yes, that would be accurate.
20     Q.  So roughly April or May of 2008, you
21  test these samples, using the Tedlar bags?
22     A.  Some of them were also -- were also
23  drywall samples.
24     Q.  Okay.  Great.  What did you do with the
25  drywall samples?

45

1      A.  Fairly similar to what we did for
2  Mr. Harrison.
3      Q.  When you say "fairly similar," what
4  process did you use to test those samples?
5      A.  They were encapsulated in a jar, but a
6  difference was instead of spraying the samples
7  with deionized water, it was to place those
8  samples on a platform and add water to the bottom
9  of it, underneath the platform, by which a piece
10  of drywall would be suspended on the platform
11  that's made out of inert substance, like Teflon,
12  and then to heat those samples in a hot room.
13     Q.  Why the variation in technique in terms
14  of exposure to water for the samples?
15     A.  It was something you alluded earlier,
16  and that was to simulate the hot -- hot, humid
17  environment in South Florida.
18     Q.  Approximately how many samples did you
19  test during the period in April or May of 2008?
20     A.  It wasn't many.  It was less than a
21  dozen.
22         MR. AYALA:  Take a break?
23         MR. ANDERSON:  Sure.
24         THE VIDEOGRAPHER:  Off the record,
25  10:35.

12  (Pages 42 to 45)

46

1    (There was a discussion off the record.)
2    THE VIDEOGRAPHER:  This is Tape No. 2 of
3  the videotaped deposition of Michael Tuday.  We're
4  on the record at 10:49.
5    Go ahead, sir.
6  BY MR. ANDERSON:
7    Q.  Mr. Tuday, before we took a break, you
8  were talking about a second series of testing that
9  you did in April or May of 2008; and I think you
10  discussed jar testing.
11    A.  Uh-huh.
12    Q.  Correct?
13    A.  That's correct.
14    Q.  And you discussed air sample analysis;
15  right?
16    A.  That's correct.
17    Q.  Did you do any other testing on the
18  samples in that April, May 2008 timeframe?
19    A.  Not that I'm aware of.  I -- I'm pretty
20  certain that we did not.
21    Q.  All right.  So we've got the February.
22  We've got the April, May.  What comes next in your
23  studying of drywall experience and sample testing?
24    A.  Okay.  As the year progressed, we kept
25  getting more and more calls.  And there was

47

1  reports of this phenomenon of this -- an
2  association of this product from just drywall that
3  was imported from China, with the corrosion of
4  copper; namely, the copper coils from the air
5  conditioning and HVAC units, but also blackening
6  of copper plumbing, copper pipes, and also
7  electrical wiring, especially from electrical
8  outlets, and also the junction boxes in the -- in
9  the breaker boxes.
10    And as the reports kept coming in, a thought
11  occurred to me and I was struck by how odd this
12  phenomenon seemed and so it piqued my curiosity as
13  a scientist.  And so I really started to
14  contemplate what could cause this to happen
15  because, to me, it seemed like a very, very
16  unusual phenomena.  I had never heard of such a
17  thing.  How could drywall cause copper to corrode,
18  especially if the copper is nowhere near the
19  drywall at different points in time?
20    So I started taking, as a scientist, personal
21  interest in this with no other thought in mind
22  than to try to see if I could elucidate or solve a
23  puzzle or solve part of it.  So as these reports
24  started coming in and then, also, we were seeing
25  some information on, say, different reports from

48

1  the Internet, newspaper articles, press articles,
2  and starting to see this as -- as possibly a large
3  scale phenomenon, I took that personal interest
4  and I decided to conduct a series of experiments
5  in my laboratory that weren't paid, they didn't
6  originate from clients, that most of this work
7  that was done was after hours on my own time.
8  And so what I started to do --
9    Q.  If I can interrupt you for just one
10  second so --
11    A.  Please.
12    Q.  If you could tell me just time-wise,
13  when you did you start doing this independent
14  testing?
15    A.  Probably in the early part of 2009.
16    Q.  Okay.  All right.  So six or seven
17  months elapse.  You're hearing about things that
18  are going on with this.  It's piqued your
19  intellectual curiosity and you sort of take an
20  independent interest and in early 2009 you start
21  doing testing on your own time?
22    A.  Uh-huh.
23    Q.  What testing was that?
24    A.  Well, originally what we started to do
25  was -- I started to place pieces of drywall in

49

1  jars with copper tubing, and what we did was we
2  used just quarter-inch copper tubing that was
3  about 2 inches in length that I would purchase
4  from, say, like a home -- big-box -- Home Depot
5  store, or something.  And I -- what I would do is
6  I would sand down the surface with really fine
7  sandpaper to remove any potential lubricants or
8  dirt that might have accumulated on the surface of
9  this copper so that it would have a shiny luster
10  and sheen to it, then to place different pieces of
11  drywall that we had obtained, some of which had
12  stamps from -- as the country of origin being
13  China, and placed them in jars, add some water to
14  the bottoms, suspend them over a Teflon platform
15  and then stick them in a -- in a room of 37
16  degrees or 98 degrees Fahrenheit to see what would
17  happen.
18    And then what I started to do was -- I wanted
19  to look at noncorrosive pieces of drywall; and
20  since there hadn't been any reports out of
21  California of this phenomenon, I thought that
22  would be probably a safe bet if we just purchased
23  drywall from a big-box store in California.  So we
24  went to the Home Depot and purchased a, you know,
25  four by -- a 4 by 8 sheet of drywall that was --

13  (Pages 46 to 49)

50

1  it was Sheetrock.
2      Q.   And do you know who manufactured the --
3  I guess -- strike that.
4      So essentially you used what you would refer
5  to as a "control sample" from a big-box store in
6  California?
7      A.   We didn't know at the time that it was a
8  control sample.  It just seemed like at the point
9  in time, that that would make it a good control
10  sample.
11      Q.   In other words, you hypothesized that
12  this would probably be a good control sample?
13          MR. AYALA:  Objection.
14      A.   But -- but, yes, I did.
15  BY MR. ANDERSON:
16      Q.   Okay.  And who was the manufacturer of
17  that sample?
18      A.   Well, Sheetrock is the tradename of the
19  United States Gypsum Company; but it could have
20  been any domestically produced drywall product.
21      Q.   And that's what I was getting that.  I
22  just wanted to confirm that it was, in fact, a
23  domestic sheet of drywall that you used as the
24  control.
25      A.   Correct.  We had not received any

51

1  reports of any problems associated with any
2  domestically produced products.
3      Q.   So in early 2009, you had not heard of
4  any domestic drywall being in any way corrosive or
5  defective?
6      A.   Corrosive and defective are two
7  different things.
8      Q.   Okay.  So let's break that out.  In 2009
9  you had not heard of any domestic drywall being
10  corrosive.  Is that fair to say?
11      A.   That's absolutely correct.
12      Q.   Okay.  By early 2009 had you heard of
13  any domestic drywall being defective?
14          MR. AYALA:  Objection.  Calls for a
15  legal conclusion.
16      A.   We were in the process -- we had already
17  been in the process of -- of testing various types
18  of building material for different chemical
19  analysis, but none of the chemical analysis was
20  related to corrosivity or blackening of copper.
21  BY MR. ANDERSON:
22      Q.   That's not exactly what I'm asking.
23  What I'm asking is:  Were you at that point -- and
24  if the answer is no, the answer's no.  Were you at
25  that point aware of any problems with domestic

52

1  drywall?
2      A.   Well, since we had received samples --
3  various samples from different domestic drywall
4  manufactures for an analysis, I could only surmise
5  that the reason it was being sent to us was there
6  was a suspicion that there were problems
7  associated with it.
8      Q.   Okay.  So by early 2009, you had had
9  both Chinese and domestic samples submitted to you
10  for testing?
11      A.   We had had domestic samples submitted to
12  us years back, way before 2009, as part of our
13  practice of doing materials testing analysis.  But
14  it was also different -- other types of materials,
15  things like fiberglass insulation, paints and
16  adhesives and coatings, plywood/wood products.
17      Q.   Fair enough.  I'd like to focus, though,
18  on -- on drywall, if we could.
19      A.   That's fine.
20      Q.   What testing did you do of domestic
21  drywall from 2000?
22      A.   Predominantly simulated environmental
23  chamber testing, primarily for volatile organic
24  chemicals.
25      Q.   And for which domestic companies did you

53

1  do that testing?
2      A.   I don't know whether I'm at liberty to
3  say that.  Our clients are confidential.
4      Q.   Did you do any of that testing for
5  National Gypsum?
6      A.   Not prior to 2009, no, not that I'm
7  aware of.
8      Q.   Without identifying the names of the
9  companies, the domestic companies for which you
10  conducted chamber testing --
11          MR. AYALA:  Just to the extent it
12  mischaracterizations the testimony.  But go ahead.
13  Objection.  Go ahead.
14  BY MR. ANDERSON:
15      Q.   Let me start again.  You indicated that
16  you, your company, CAS, did testing on domestic
17  drywall prior to 2009 in chamber studies; correct?
18      A.   Let me rephrase that, my answer
19  previously.  There were samples submitted from
20  domestic drywall -- companies that produced
21  domestic drywall.  We weren't informed as to the
22  origin of those products, so they could have been
23  made outside of the United States.
24      One of the aspects of environmental and
25  analytical laboratories is that the overwhelming

14  (Pages 50 to 53)

54

1    majority of samples that are submitted to us are
2    what's called "blind." So we don't have any
3    information on them. I would say that these
4    products certainly would fall into that category.
5    We didn't have any information on them. But the
6    companies were recognizable national companies.
7    **Q. And did the -- the samples that you**
8    **received from them bear markings that would have**
9    **been consistent with domestic drywall?**
10        MR. AYALA: Objection to form and lack
11    of foundation.
12    A. Can you repeat that? I'm sorry.
13    BY MR. ANDERSON:
14    **Q. Sure. Did the samples that you tested**
15    **prior to 2009 that were submitted by domestic**
16    **manufactures bear markings indicative of them**
17    **being made here in the United States?**
18        MR. AYALA: Same objection.
19    A. Most of the samples that we received
20    from -- since the work was highly confidential in
21    nature, most of the samples that we received, if
22    not all of them, didn't have any recognizable
23    markings whatsoever for the purposes of we weren't
24    supposed to know that information. I would assume
25    that was part of the reason.

55

1    BY MR. ANDERSON:
2    **Q. Without divulging the identity of the --**
3    **the domestic companies that manufacture drywall**
4    **that submitted these samples to you prior to 2009,**
5    **did any of your chamber testing of those samples**
6    **identify volatile organic compounds in the**
7    **drywall?**
8        MR. AYALA: Objection.
9    A. Well, yes. As far as I know, all -- all
10    drywall has chemicals inside of it.
11    BY MR. ANDERSON:
12    **Q. Did any of those samples have detectable**
13    **H2S?**
14    A. No.
15    **Q. So prior to 2009, you had not tested any**
16    **drywall that was domestic or that you believed to**
17    **be domestic that had hydrogen sulfide?**
18    A. Well, let me give you a better answer.
19    At that point in time, we didn't have -- we didn't
20    have an accurate mechanism for testing hydrogen
21    sulfide, using environmental chambers, due to the
22    fact that hydrogen sulfide is an extremely
23    reactive and difficult compound to analyze for.
24    So had it been present in any of these
25    samples, we wouldn't have known because we didn't

56

1    have the ability to test for it. But, again,
2    neither did any of our peers in this industry.
3    **Q. You referred earlier to the nasal**
4    **appraisal.**
5    A. Yes.
6    **Q. Do you remember that?**
7    A. Yes, I do.
8    **Q. And I don't want to mischaracterize your**
9    **testimony, but it seems to me that what you said**
10    **before was that some of the smells that you**
11    **identified in the Chinese samples were that of**
12    **hydrogen sulfide.**
13        MR. AYALA: Objection.
14    A. Okay. That's not exactly what I said.
15    BY MR. ANDERSON:
16    **Q. Okay. If you could clarify it, that**
17    **would be great.**
18    A. What I said was that the odor of Chinese
19    drywall either when in dry form or when it becomes
20    moist or wet in soaking, is a complex -- is due to
21    a complex mixture of chemicals and that it's the
22    aggregate of the mixture of chemicals that form
23    that unique odor.
24    Hydrogen sulfide has an extremely distinctive
25    odor. The odor of hydrogen sulfide is the odor of

57

1    rotten eggs. So when an egg rots, it emits
2    hydrogen sulfide. So when you are smelling odor
3    of rotten egg, you are smelling hydrogen sulfide.
4    **Q. In that time prior to 2009, did you ever**
5    **detect a rotten-egg smell from any sample that was**
6    **domestic?**
7    A. Not that I recall.
8    **Q. Okay. So let's get back to where you**
9    **were in early 2009. You're conducting independent**
10    **research, chamber testing, after hours of -- what**
11    **kind of drywall are you testing?**
12    A. Well, at that point in time, we started
13    to accumulate samples from these clients. And so
14    what we -- one of the things that we did was we
15    started to try to assemble information on
16    commonality of samples that were complaints or
17    from complaint locations or, if they were
18    submitted blindly to us, samples that had obvious
19    and unambiguous markings as far as the origin
20    coming from China or samples that when we would
21    smell the sample of drywall, that it would have a
22    foul odor to it. And, also, the -- the samples of
23    drywall from China had other distinctive
24    characteristics that were not generally found in
25    domestically produced drywall; namely, being kind

15  (Pages 54 to 57)

58

1  of a grayish color and that when it was broken --
2  it was scored and broken apart, it was extremely
3  brittle so it would break into pieces, whereas,
4  quote -- I'm sorry -- quote-unquote normal drywall
5  would score and snap and break cleanly.
6      Q.  So in terms of the evolution of your
7  testing process for chamber testing, now you've
8  sort of added copper to the mix -- is that
9  right -- copper tubing?
10     A.  That's right, uh-huh.
11     Q.  Okay.  So tell me about that process.
12  Tell me how many tests you conducted in early
13  2009, independently.
14     A.  At first it was probably 50 or so but --
15  and -- but -- and some of it was conducted with
16  drywall, and then some of it was conducted without
17  any drywall whatsoever.  The drywall samples, what
18  we did was we -- like I said, we would take a
19  32-ounce jar that had a Teflon-lined lid on it,
20  place a Teflon platform at the bottom of the jar,
21  add 3 milliliters of deionized water,
22  nonsulfur-containing water, and then we would
23  place approximately 2-1/2-by-3-inch piece of
24  drywall cut into this rectangular shape with paper
25  attached, everything, and then into that jar,

59

1  suspended it in the cover, we would place a piece
2  of -- I'm sorry -- piece of copper tubing
3  approximately 2 inches -- and it would be
4  quarter-inch tubing -- the copper tubing having
5  been sanded to remove lubricants and particulates
6  and dust and dirt.
7      And then what we would do is place that in
8  a -- a hot room, 98 degrees Fahrenheit, 37 degrees
9  Centigrade.  And what we discovered was that in
10  some of the pieces of drywall, that after about
11  two weeks, after about 14 days, we would start
12  seeing kind of a visual darkening and blackening
13  of the copper tubing, primarily at first where the
14  cut marks were on the ends.  And as that time
15  progressed, at about 21 days or so when we
16  observed the samples, we would notice a
17  significant blackening, sometimes kind of a
18  black -- what appeared to be a black powdery
19  substance.  Sometimes it was somewhat iridescent.
20  So it was either black or gray or a combination of
21  black and gray with iridescent qualities to it.
22      And in some of the them, some of the other
23  ones, we also did a -- control samples that had
24  the water, the copper, but no drywall whatsoever, the
25  that some of the samples of drywall with -- the

60

1  jars with the drywall in it looked identical to
2  the control, or the negative control, that didn't
3  have any drywall in it, just -- just copper
4  exposed to moist or humid environment at a higher
5  temperature.
6      Q.  Just so I'm clear, why -- why were you
7  exposing the -- the drywall and the copper to this
8  humid environment?
9      A.  Because we -- most of the reports that
10  we were getting were coming from either South
11  Florida or Louisiana or Mississippi and, in some
12  cases, Virginia, which all have, you know,
13  considerable humidity and -- and temperature
14  variations that -- where there's -- there a hot
15  period of the -- of the year, where we felt that
16  some -- that -- that it would simulate a hot,
17  humid day that would be uncharacteristic of
18  the climate in South Florida, especially close to
19  the coastal areas where a lot of these complaints
20  were coming from.
21     Q.  That makes sense to me.
22      Why did you use deionized water in the
23  testing?
24     A.  Because we wanted to use water that had
25  no known impurities in it -- in it.

61

1      Q.  But you recognized that the water in the
2  homes where the drywall came from would not be
3  deionized water; right?
4      MR. AYALA:  Objection.
5      A.  I didn't even really think -- I'm sorry.
6  Go ahead.
7      I didn't even -- it wasn't even something
8  that would be a consideration, because we were
9  talking about not the water in the homes, but the
10  actual atmospheric environment.
11  BY MR. ANDERSON:
12     Q.  Well, wouldn't some of the humidity, or
13  water in the air, in these humans be the product
14  of the water source in the house?
15      MR. AYALA:  Objection.  Lack of
16  foundation.  Speculation.
17     A.  It wasn't even something that I -- you
18  know, that I had thought about.  We were just
19  trying to to simulate even the outdoor
20  environment.  So there wasn't a lot of thought
21  given to whether or not it was simulating an
22  indoor environment.  So, therefore, you know, the
23  use of the deionized water would be representative
24  of -- of, you know, just outdoor ambient humidity.
25

16  (Pages 58 to 61)

62

1    BY MR. ANDERSON:
2        Q.  So you were testing drywall that
3    typically is used indoors.  You were deliberately
4    testing it with what you conceived to be an
5    outdoor environment?
6            MR. AYALA:  Objection.
7        A.  Not -- well, what I'm -- what I'm
8    getting at is we -- when you're doing a scientific
9    experiment, what you want to do is you want to
10   control variables; so you want to have the fewest
11   amount of variables present so that when a
12   phenomenon is produced, you can rule out that it
13   came from multiple different sources.  So you want
14   your -- you want your test conditions, when
15   you're -- when you're designing an experiment, to
16   indicate, okay, we're only testing one variable.
17   And that one variable was the drywall, and nothing
18   else.
19   BY MR. ANDERSON:
20       Q.  Did you ever conduct subsequent testing,
21   having concluded that testing, using the water
22   that would actually be found in those
23   environments?
24       A.  No, we never did.  No.
25       Q.  And so to date, you've never done this

63

1    chamber testing, utilizing water from the house
2    where the sample is taken?
3            MR. AYALA:  Objection.  Asked and
4    answered.
5        A.  No, we never did any testing like that.
6    It didn't make any sense to us to do that.
7    BY MR. ANDERSON:
8        Q.  And why is that?
9        A.  Because what we were trying to do was we
10   were trying to determinate -- we were trying to
11   determine the association of the copper corrosion
12   with the presence of this defective or corrosive
13   drywall.  And that was -- that was the scope of
14   what we were trying to ascertain so that we could
15   develop unique tests, chemical tests -- what we
16   were trying to do was -- what I was trying to do,
17   and my colleagues -- but it was my thought and
18   idea -- was wouldn't it be beneficial to the
19   scientific community to devise chemical and
20   analytical tests that could use chemical markers
21   as a predictor of whether or not a particular
22   piece of drywall would be corrosive.  That's what
23   I was trying to do.
24       Q.  But if you were really trying to isolate
25   the factors, then why would you have created a

64

1    humid environment?
2        A.  Because part of the phenomenon of what's
3    going on is we didn't -- we didn't -- all the
4    reports of this domestic -- I'm sorry.  All the
5    reports of this corrosive drywall were reported in
6    areas where the climate was hot and humid during
7    certain parts of the year, and never in, like, a
8    desert or arid climate, like Arizona or
9    California.  There were no reports of it.  Even
10   though I would probably speculate that some of
11   this drywall that was originated in China probably
12   was installed in some of these areas, that
13   phenomenon of corrosion just didn't occur.  So
14   there seem to be a connection, in my mind, with it
15   being in a moist, hot, humid environment.
16       Q.  I follow that.  I guess what I don't
17   understand is if you're attempting to mimic the
18   humid environment, why wouldn't you attempt to
19   mimic the water that's in that environment, rather
20   than this deionized water?
21       A.  Oh, okay.
22           MR. AYALA:  Objection.  Asked and
23   answered.
24       Go ahead.
25       A.  That's fine, that's fine.

65

1        There could be hundreds of different
2    conditions of water.  There's no water that's
3    representative of -- of those areas as a whole,
4    you know, that the quality of the water --
5    depending on, you know, the location, the water
6    company, whether it's a domestic well or whether
7    it's -- whether it's piped-in water, and then the
8    quality of that water -- varies considerably from
9    location to location.  So there was no -- there
10   was no such thing as representative water.
11   BY MR. ANDERSON:
12       Q.  No, but I alluded to this in my earlier
13   question.  Someone's already submitting a sample
14   of the drywall.  Why not have them submit a sample
15   of the water so that you could test it in a -- in
16   an environment that is more closely -- similar to
17   the environment that's actually in the home?
18           MR. AYALA:  Objection.
19       A.  Because we weren't testing the water.
20   We were trying to test the drywall to see if the
21   drywall was defective.
22   BY MR. ANDERSON:
23       Q.  In your opinion as a scientist, is it
24   possible that there could be chemicals or
25   compounds or -- strike that.

17  (Pages 62 to 65)

66

1    Is it possible that components of the water
2  could affect the reaction with the drywall?
3       MR. AYALA: Hold on. Objection. Calls
4  for speculation. The witness hasn't been offered
5  in this area. Object to the question.
6       A.  Well, one phenomenon that is clearly
7  documented in literature is that irrespective of
8  the drywall, you can have water-quality problems
9  that are going to cause the same type of
10 phenomenon as this defective drywall.
11      I myself lived in a home in Camarillo,
12 California, where a water supply from our local
13 water company had a high hydrogen sulfide content
14 in it -- this was in the home I lived in -- so
15 that each and every time I turned on the tap or
16 turned on the shower, I would get the distinctive
17 odor of hydrogen sulfide gas in my house.
18 BY MR. ANDERSON:
19      Q.  Did you identify corrosion in your home?
20      A.  Yes, I did.
21      Q.  Did you have to replace your air handler
22 at all, your air conditioning system?
23      A.  Where I lived in California, we didn't
24 have any air -- we didn't have any air
25 conditioning in the house.  We didn't have any air

67

1  conditioners in the house.  I lived at the coast.
2       Q.  When did you notice this corrosion in
3  your home in California?
4       A.  It was in the 1980s.
5       Q.  Did you do a -- ever do any testing on
6  that corrosion?
7       A.  No, I did not.
8       Q.  Did it create any mechanical failures,
9  that you're aware of, in the home?
10      A.  It caused --
11      MR. AYALA: Objection.
12      THE WITNESS: Oh, I'm sorry.
13      MR. ALAYA: Go ahead.
14      A.  Not that I'm aware of.  What it -- what
15 it -- it did do -- and this -- this condition only
16 persisted for a fairly short period of time, until
17 the water company switched to a different well.
18      But what we did notice, my wife at the time
19 and I, was that the copper pipes in our house were
20 turning black.
21 BY MR. ANDERSON:
22      Q.  Okay.  I want to get back to the 50
23 samples you've tested on your own time, the
24 roughly 50 samples you've testified on your own
25 time.

68

1       Q.  What percentage of those samples were of --
2  of Chinese origin?
3       A.  Well, originally, of those first 50
4  samples, I would probably say two-thirds of them
5  were submitted to us as likely problem samples;
6  but also mixed in, because we do receive some
7  samples blindly, we -- what was also mixed in to
8  try to see if it would confound our -- any tests
9  that we were performing were samples from other
10 sources that weren't suspected to be corrosive.
11      Keep in mind at that point in time, no one
12 really understood what was going on; and, also,
13 many of the samples that we received where we did
14 this copper-jar test and the copper showed the
15 blackening or -- or signs of corrosion, we had no
16 idea whether or not that piece of drywall came
17 from -- originated from China, because in many
18 case, they were submitted to us blindly.
19      Q.  Did you identify any samples of Chinese
20 origin that didn't corrode the copper in that
21 50-set sample?
22      A.  I can't recall of that 50-set sample;
23 but subsequent, you know, after that, we were
24 sent -- we were sent samples that originated in
25 China that, no, it did not cause any corrosion.

69

1  And there's a very logical explanation for it.
2  It's not all Chinese drywall is corrosive.  That's
3  why I don't like the term "Chinese drywall,"
4  because it only refers to a certain subset of
5  drywall that was manufactured and originated from
6  China.
7       Q.  Did you ever identify any domestically
8  manufactured drywall that caused corrosion?
9       A.  Domestically as in --
10      Q.  As in manufactured in the United States.
11      A.  In the United States?
12      Q.  Yes.
13      A.  No, I have not, not -- not knowingly,
14 not from the United States.
15      Q.  What do you mean when you say "not
16 knowingly"?  I suspect I know, but I'm not
17 certain.  Could you clarify?
18      A.  Well, part of what we did when we
19 started to expand our testing was we certainly
20 wanted to include, as part of our test matrix,
21 samples of domestically produced drywall or -- or
22 at least that was labeled as originating from
23 drywall manufacturers that sell product -- that
24 manufacture product in the United States.
25 And so -- and part -- and part of what we

18  (Pages 66 to 69)

70

1  were doing with our test matrix is we started to
2  solicit samples of domestically produced drywall
3  from some of our clients -- some of those clients
4  were people like builders and developers, home
5  builders -- to obtain samples that were -- that
6  were marked with -- with markings from -- from
7  United States manufacturers.
8      And so we started to assemble a collection of
9  these pieces of drywall; and when we tested those
10 pieces of drywall, never once, not even once, did
11 we ever get a positive result for the corrosion
12 test.
13     **Q. Once the 50-set sample is completed,**
14 **what's the next set of testing you do related to**
15 **drywall?**
16     A. Well, concurrent with that, another
17 thing that we did was we conducted tests -- I
18 designed some experiments -- to try to look at --
19 what I would try to -- from the process of
20 elimination, what a different corrosive -- or
21 potentially corrosive agents -- when it was
22 exposed to the copper under the same conditions as
23 our copper-jar test -- whether or not it would
24 produce the same phenomenon that we were seeing in
25 the defective product that was imported from

71

1  China.
2      So what we essentially did was -- I -- I
3  personally set up a jar test, but didn't include
4  any drywall, but included exposure to different
5  chemicals.
6      **Q. Can you tell me more about those tests?**
7      A. Certainly. What we did was -- again, we
8  had two different types of experiments, ones that
9  were conducted with water added and some that were
10 done dry. And then what we did was we added
11 chemicals -- certain chemicals, some of which were
12 liquids at temperature -- room temperature, some
13 of which were gases, some of which were solids.
14     **Q. Okay. You piqued my curiosity. What**
15 **gases, liquids, and other chemicals did you add to**
16 **these samples?**
17     A. Okay. Much of this work is summarized
18 in a presentation that I -- podium presentation
19 that was conducted in --
20     **Q. Back in 2009?**
21     A. -- November 2009 at the International --
22 I'm sorry -- the Scientific Symposium on Corrosive
23 Imported Drywall that was -- it was -- that
24 symposium was organized by a toxicologist for the
25 Florida Department of Health. His name is David

72

1  Kraus. And I was one of the invited -- one of the
2  very few invited speakers at that. And so we
3  presented some of our work, and what it -- what we
4  showed in that presentation was pieces of copper
5  that had been exposed to different chemicals. And
6  I'll go through the chemicals with you.
7      **Q. That would be fantastic.**
8      A. Okay. So what we did was we -- on gases
9  we used hydrogen sulfide, sulfur dioxide, carbonyl
10 sulfide, carbon monoxide, carbon disulfide, which
11 is a liquid.
12     **Q. All right. I want to stop you there for**
13 **one second.**
14     A. Go ahead.
15     **Q. H2S; right?**
16     A. Yes.
17     **Q. S02?**
18     A. SO2.
19     **Q. COS?**
20     A. Yes.
21     **Q. CO?**
22     A. Yes.
23     **Q. What's next?**
24     A. Okay. So then -- those were the gases.
25 Then what we did was we also used liquids; and

73

1  some of those liquids were carbon disulfide, CS2,
2  formic acid, acetic acid, sulfuric acid.
3      **Q. Okay. Formic acid, acetic acid,**
4  **sulfuric acid. Any valeric acid?**
5      A. No.
6      **Q. Butyric acid?**
7      A. No.
8      **Q. Okay. Any other -- any other liquids?**
9      A. If I -- if I recall any others, I'll --
10 but right now I -- I don't recall, so I'll keep
11 thinking. But we also used solid materials as
12 well.
13     **Q. What solid materials did you use?**
14     A. We used crushed pyrite, which is iron
15 sulfide, also known as --
16     **Q. FES?**
17     A. FES2. And also -- also known as fool's
18 gold. That was obtained from Ward Scientific
19 Services, which is -- they provide minerals to
20 classrooms. The origin of that iron disulfide was
21 from Peru. And then also just elemental sulfur,
22 sulfur yellow powder that was obtained from the
23 Aldrich Chemical Company.
24     **Q. Okay. And what would the -- what would**
25 **the elemental sulfur -- what would be the short**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

74

1    form for that one?  Just S?
2        A.  Well, yes, S.  But I'll -- I'll get into
3    that, also.  It's a little more complex than that.
4        Q.  Okay.
5        A.  But, yes, it's the element sulfur.
6        Q.  Okay.  Any other solid materials?
7        A.  Oh, let's see.  No, just -- okay, the --
8    just the different -- a different -- again,
9    different samples of -- we used our -- our
10   negative control, which was this Sheetrock that
11   had been purchased in the Simi Valley Home Depot
12   store.
13       Q.  I'm sorry.  What was purchased in the
14   Simi Valley?
15       A.  This Sheetrock.
16       Q.  Okay.
17       A.  So it was -- we were using crushed
18   gypsum at that point in time; and prior to that,
19   all of our jar testing was just done with
20   rectangular pieces with paper.
21       Q.  So why the changeover to crushed as
22   opposed to --
23       A.  Just wanted to -- we just wanted to try
24   a lot of different things.
25       Q.  You talked about a variety of gases,

75

1    liquids, and solids here.  Did any of the gases,
2    liquids, or solids cause no discernible corrosion?
3        A.  Yes, the sulfuric acid.
4        Q.  Caused no discernible corrosion at all?
5        A.  None whatsoever.
6        Q.  And why is that?
7            MR. AYALA:  Objection.
8        A.  I couldn't tell you why it is.  All we
9    tried to do was the observation.  We were looking
10   for likely culprits.  I'm not a corrosion expert.
11   And I didn't have any prior knowledge of it.  I
12   was actually surprised by that result.
13   BY MR. ANDERSON:
14       Q.  Why were you surprised?
15           MR. AYALA:  Objection.  Lack of
16   foundation.  Calls for speculation.
17       A.  Well, because sulfuric acid, H2SO4, is
18   generally corrosive to other metals like -- like
19   iron, steel -- I'm sorry -- iron and, you know,
20   other -- other metals and alloys.
21   BY MR. ANDERSON:
22       Q.  All right.  So how many samples were
23   tested for the 32-page, I think, PowerPoint that
24   you presented at the symposium?
25       A.  The symposium -- what I was primarily

76

1    going for at that particular point in time was to
2    do a very controlled and very limited experiment
3    of seven samples, four known Chinese -- I'm
4    sorry -- four known pieces of drywall that
5    originated from China and three samples of
6    North-American-produced drywall.
7        Q.  Okay.  When you say
8    "North-American-produced drywall," were those
9    three samples all produced in the United States
10   or --
11           MR. AYALA:  Objection.  Lack of
12   foundation.
13   Go ahead.
14       A.  Okay.  I can't say that for certain.
15   One of them was labeled with a Mexican drywall
16   company.
17   BY MR. ANDERSON:
18       Q.  Okay.  And the other two?
19       A.  One was the Sheetrock, and I'm not sure
20   what the third one was.  It could have been
21   National Gypsum, but I couldn't say that for
22   certain.
23       Q.  Okay.
24       A.  But all of these samples were -- were
25   labeled with -- with back stamps on the paper.

77

1        Q.  Okay.  Now, the symposium is finished.
2    What's the next round of testing that you do on
3    drywall?
4        A.  Oh.  Well, prior to that -- this is
5    probably the most significant part, is what
6    happened in early 2009 and throughout 2009.  As --
7    we wanted to devise, like I said before,
8    previously, a reliable chemical test that could
9    identify a unique marker, chemical marker, that
10   could predict whether or not a piece of particular
11   piece of drywall would exhibit the phenomenon of
12   corrosion.
13       And so what we did was -- I got the lab
14   personnel together, and I issued a challenge.  And
15   my challenge was that we were to take samples of
16   known corrosive drywall and known noncorrosive
17   drywall -- and let me -- let me clarify how that
18   was determined.  The copper-jar test was the sole
19   determinant on whether or not a piece of drywall
20   was corrosive or not.
21       So what I'm trying to say is when we
22   placed -- when we placed the piece of drywall in
23   with the piece of copper tubing, added
24   3 milliliters of water at the bottom, and then
25   placed it in the -- in the hot room, if after 21

20  (Pages 74 to 77)

78

1  days the copper turned black or exhibited signs of
2  corrosion, it was -- we deemed it corrosive.  If
3  it didn't, and it looked like -- and it looked
4  like just the piece of the copper tubing with the
5  water and no drywall, then it was deemed
6  noncorrosive.  That was -- that was my decision.
7  So the corrosion test was the sole determinant on
8  whether or not a piece of drywall was corrosive.
9      So then what we did was I issued a -- kind of
10 a challenge to laboratory personnel for us to do
11 every type of test that we were capable of doing
12 in our laboratory at the time to determine what is
13 the chemical -- what is -- what, if any, chemical
14 difference between these two sets of samples were.
15     And we made a discovery; and it was a very,
16 very significant discovery.  We performed a
17 testified called "direct thermal absorption."  So
18 what we did was we took these pieces of -- pieces
19 of drywall, some known corrosive, some not.  We
20 crushed it, removed the paper so that all it is is
21 crushed gypsum; and we packed glass tubes with
22 portions -- small portions of the crushed gypsum,
23 so one of the -- one of many tests that we did.
24     But the one that actually kind of, like, was
25 the money shot was that we -- we did this direct

79

1  thermal absorption.  We compared the -- and so we
2  thermally desorbed it; and then we performed
3  analysis using an instrument called a gas
4  chromatograph mass spectrometer, or GCMS for
5  short.  And GCMS is a combination, or hybrid, of
6  two instruments.
7      The gas chromatograph performs separation of
8  multiple -- a mixture of multiple compounds that
9  travel through a 60-meter or 30-meter capillary
10 column that's coated with a substrate -- and
11 that's called a liquid phase -- that when the
12 mixture is injected into the -- into the column at
13 one end and then heated up and temperature
14 programmed, but the different various components
15 in that mixture will separate into different
16 bands, that when they exit the exhaust or effluent
17 end of that column, they separate -- they -- they
18 come out at different times, so they'll come out
19 as pure compound alluding into narrow bands into
20 our detector.
21     And the way that separation is measured, is
22 measured using a parameter called retention time.
23 So that's how long -- so the -- so the mixture is
24 injected all at once simultaneously.  And say it
25 has a hundred -- a mixture of a hundred different

80

1  chemicals.  That column, that 60- or 30-meter
2  column with the coated liquid phase, will separate
3  those different chemicals and in different bands
4  that each chemical, based on certain properties,
5  will exit that column at different times in a
6  relatively pure form.  So each one will separate
7  into what we call "peaks."  So that's that --
8  that's the gas chromatographic side.
9      The mass spectrometer is a very powerful
10 detection device that takes that gas that's
11 formed, that comes out of the exhaust from the
12 chromatographic column, and subjects it to a
13 current of electron beams that will cause the
14 chemical compounds to break apart and fragment
15 into different ions.  Ions are just pieces of --
16 pieces or parts of that entire chemical formula.
17     And controlling the conditions in the mass
18 spectrometer, it will produce, in many cases, a
19 completely unique and recognizable chemical
20 structural fingerprint known as a "mass spectrum."
21     And so what we can do is we can recognize a
22 chemical by a structural fingerprint or a mass
23 spectrum and the way -- the way it fragments.
24 It's a extremely powerful detection device.  And
25 we can either do a quantitative analysis, using a

81

1  standard of the compounds that we're looking
2  for -- for instance, one of our standards in our
3  laboratory has a mixture of over a hundred
4  different volatile organic compounds that we do a
5  quantitative analysis -- or, conversely, if
6  it's -- if it's something that we don't have in
7  our standard, what we can do is we can take that
8  produced mass spectrum, this chemical structural
9  fingerprint, and perform what's called a library
10 search algorithm on it, which searches a spectral
11 library from the National Institute of Standards &
12 Technology that contain over 180,000 compounds,
13 and do a best spectrum match to match the
14 fingerprint that way.  It's -- it's one of the
15 most commonly used techniques out there.
16     Q.  And the big discovery was that you
17 identified SE?
18     A.  What we saw was in this thermal
19 desorption analysis, one of the chromatograms,
20 again, I alluded to before is pretty much every
21 single of piece of drywall, regardless of origin,
22 will have chemicals in it other than the calcium
23 sulfate dihydrate which composes the gypsum.  So
24 it will -- it will contain various -- and it could
25 be at varying levels, sometimes extremely low

21  (Pages 78 to 81)

82

1  level, but recognizable detections of volatile
2  organic compounds.
3      Now -- so what we determined was we saw an
4  enormous amorphous, very poorly shaped, very
5  broad, gigantic peak at the end of this
6  chromatographic run.  And when I looked at the
7  mass spectrum of that, I recognized it immediately
8  without even having to do a library search for
9  something that I had encountered 15, 20 years
10  back.  And it was the absolutely unique spectrum
11  of an allotrope of elemental sulfur called
12  orthorhombic cyclooctasulfur, or S8.
13      And in the practice of performing mass
14  spectrometry, there was probably -- and I've been
15  doing this for 30 years, and one of my areas of
16  specialty is the interpretation of mass spectra.
17  I've -- I've literally taught hundreds of people.
18  I've lectured on it.  I've taught courses in it.
19  One of the most recognizable spectra in all of
20  mass spectrometry is the spectrum of orthorhombic
21  cyclooctasulfur.
22      Q.  Okay.  So I want to go back for a sec to
23  the jar testing.
24      A.  Yes.
25      Q.  The insertion of the copper tubing into

83

1  the jar testing, is that something that you
2  completely came up with on your own?
3      A.  Yes.
4      Q.  So there wasn't a governmental agency
5  doing that prior to you doing it, that you're
6  aware of?
7          MR. AYALA:  Objection.  Lack of
8  foundation.
9      A.  There very well could have, but I wasn't
10  aware of it.  I was just a curious scientist
11  trying to find a simple way to perform a test that
12  would give me a result that would be unambiguous
13  and easy to interpret.
14  BY MR. ANDERSON:
15      Q.  So would it be accurate to say, then,
16  that you believe that corrosion in that
17  environment after 21 days is easy to interpret?
18          MR. AYALA:  Objection.  Lack of
19  foundation, and vague.
20      A.  But I'll answer it.
21      Since I stated before that I'm not an expert
22  in corrosion, what we called it was -- we
23  didn't -- we called it either "blackening" or
24  "corrosion."  So the phenomenon of blackening and
25  the -- and the phenomenon of corrosion, in some

84

1  cases, depending on a number of variables -- like,
2  for instance, what's in that sample of drywall
3  that could cause a corrosion phenomenon to occur
4  based on the quantities of chemicals -- is that if
5  the sample turned black or started to turn black,
6  it was either blackening, slash, corrosion -- in
7  some cases you could visually look at it with the
8  naked eye, and you could see pitting occurring on
9  the surface of that copper tubing, which I
10  would -- which I interrupted as corrosion, and I
11  think most people would as well.  So there were
12  holes being formed in the surface of that copper
13  tubing.
14  BY MR. ANDERSON:
15      Q.  All right.  And I guess what I'm
16  focusing on is you said that you were looking for
17  a test where the results would be easy to
18  interpret.
19      A.  Yes.  That's what I stated.
20      Q.  And you found that this copper corrosion
21  chamber testing fit that description?
22      A.  Yes.  And like I said, I used it as the
23  sole determinant as to whether or not a piece of
24  drywall -- a particular piece of drywall exhibited
25  that property, and not any other knowledge or lack

85

1  of knowledge.  So I called -- I called the sample
2  "corrosive" or "defective" if it turned black or
3  it -- or actually pitted and corroded.  And if it
4  didn't, and it looked like the control, I
5  called -- I called it -- I referred to it as
6  "noncorrosive."
7      Q.  And is it possible that a piece of
8  drywall could actually cause corrosion, but not
9  come up positive in your test?
10          MR. AYALA:  Hold on.  Objection.  Lack
11  of foundation.  Beyond his qualifications, and it
12  calls for speculation.
13      A.  I don't know.
14  BY MR. ANDERSON:
15      Q.  I mean, you have established a test by
16  which you make a clear-cut distinction between
17  corrosive and noncorrosive drywall; is that
18  correct?
19          MR. AYALA:  Objection.
20      A.  What I'm calling -- what I'm calling
21  corrosive and noncorrosive, but not necessarily
22  what's factually corrosive and noncorrosive.
23  BY MR. ANDERSON:
24      Q.  So in other words, you're saying your
25  definition of corrosive or noncorrosive is

22  (Pages 82 to 85)

86

1  subjective?
2      MR. AYALA: Objection. Misstates his
3  testimony.
4      A.  What I'm saying is that the test result
5  would give me -- it would -- the test result would
6  give me an unambiguous indication that there was
7  something defective about that piece of drywall.
8  Now, whether you want to refer it as the drywall
9  was corrosive or it wasn't -- or not, or just it
10 blackened the copper, that's really all I was
11 concerned with, because that was the reports that
12 were coming from South Florida on the condition.
13     And at that point in time, I hadn't seen any
14 with my own eyes.  I hadn't been to these homes,
15 but I saw numerous photographs.  I had since,
16 subsequently, been to homes where this phenomenon
17 had occurred.
18 BY MR. ANDERSON:
19     Q.  So you've done on-site visits to homes
20 that exhibit corrosion?
21     A.  That's correct.
22     Q.  How many homes have you seen like that?
23     A.  Probably about a dozen.
24     Q.  And where were those located?
25     A.  They were located in the upper Ninth

87

1  Ward of New Orleans, Louisiana.
2      Q.  Have you ever done any home inspections
3  of homes exhibiting signs of corrosion in Florida?
4      A.  I have not.
5      Q.  How about in Mississippi?
6      A.  No.
7      Q.  Are you able to tell in the testing that
8  you do when you use the gas chromatograph mass
9  spectrometer -- would you be able to distinguish
10 between drywall that's manufactured from natural
11 gypsum as opposed to drywall that's manufactured
12 through flue-gas desulfurization?
13     A.  No, I would not.
14     Q.  So there's no chemical distinction that
15 you can draw between them?
16     MR. AYALA: Objection.
17     A.  There's no -- okay.  There's no chemical
18 test that we performed in the scope of what we
19 were doing with the drywall.
20     Are there chemical tests that would
21 determine?  Quite possibly the difference between
22 what we call synthetic or flue-gas
23 desulfurization, or FGD, gypsum with naturally
24 mined gypsum, there -- there could very well.
25

88

1  BY MR. ANDERSON:
2      Q.  So as you sit here today, do you know
3  what percentage, if any, of the Chinese drywall
4  samples you tested were FGD versus actually mined?
5      A.  As a matter of fact, no, I wouldn't.
6  However, I've -- like I've stated before, I
7  collaborated with many, many experts and -- and
8  individuals and other scientists.  I read hundreds
9  of documents.  I've read academic papers.  I've
10 attended symposia.  I've attended lectures.  I've
11 attended workshops.  I've spoken with a variety of
12 people in -- in many, many disciplines.
13     And when I try to evaluate information that's
14 given to me, I try to do it with a very, very
15 skeptical eye.  And what I concluded from what I
16 would like to refer to as a scientist as "multiple
17 lines of evidence," that the only real plausible
18 explanation for the Chinese drywall phenomena is
19 that those -- that -- is that material comes out
20 of a mine and it's not flue-gas desulfurization
21 gypsum.
22     Q.  Okay.  So you're saying that the source
23 of the problem with the Chinese drywall, in your
24 view, is bacterial?
25     MR. AYALA: No. Objection.

89

1      A.  No, absolutely not.
2  BY MR. ANDERSON:
3      Q.  Clarify it.
4      MR. ANDERSON:  If you could read that
5  back.
6      I'm confused because I thought that's what he
7  said?
8      MR. AYALA: He said material.
9  BY MR. ANDERSON:
10     Q.  Oh, material.
11     A.  The material came out of a -- was mined.
12     Q.  Okay.  Okay.  I wasn't trying to put
13 words in your mouth, honestly.
14     A.  Yeah.
15     Q.  Maybe it's the head cold.  I thought you
16 said bacterial.
17     Okay.  So it's your belief that all of the
18 corrosive drywall that you've been composed to --
19 and you're not a hundred percent certain about it,
20 but you believe that the Chinese drywall that
21 you've seen that's corrosive is naturally mined?
22     MR. AYALA: Objection. Form.
23     Go ahead.
24     A.  That's fine.  That is -- that is my
25 opinion based on the review, the collaboration,

23  (Pages 86 to 89)

90

1 and numerous conversations with experts looking at
2 these academic articles; but I have no firsthand
3 factual knowledge of that. And since I'm a
4 laboratory chemist, that's what I deal in. The
5 work that we performed with regard to Columbia
6 Analytical Services' involvement strictly was
7 performing measurements that are documentable and
8 backed up by fact or phenomenon or measurement and
9 not by opinion.
10 BY MR. ANDERSON:
11     Q. Okay.
12     A. But it was my -- it is my opinion, based
13 on what I've read, what I've been exposed to, and
14 using a scientific eye to what would be plausible
15 and make the most sense logically and -- and
16 using -- using powers of reason, that the only
17 plausible explanation for this phenomenon is that
18 the -- is that this product is mined.
19     Q. So you were focused on measurements that
20 were documentable; is that right?
21     A. Yes.
22     Q. So how did you measure the amount of
23 corrosion that you identified on the copper tubing
24 in your chamber test?
25     MR. AYALA: Objection.

91

1     A. It was a qualitative measurement, not a
2 quantitative measurement. The chemical analysis
3 was quantitative.
4 BY MR. ANDERSON:
5     Q. But in terms of identifying the
6 corrosion on the copper and thus differentiating
7 between your definition of corrosive and
8 noncorrosive, it required a qualitative judgment
9 about whether or not you were able to recognize
10 blackening on the copper?
11     MR. AYALA: Objection.
12 Go ahead.
13     A. That's fine. Although we didn't perform
14 some test measurements ourselves, using our
15 laboratory, like I said, we collaborated with a
16 number of individuals that were working on this
17 phenomenon, understanding -- having a better
18 understanding of this phenomenon scientifically,
19 was that many of these samples that were coming
20 out of these locations were tested, using other
21 means not in our laboratory, for the presence of
22 what was on the surface of what appeared to be
23 what we were calling "blackened" or "corroded"
24 copper.
25

92

1 BY MR. ANDERSON:
2     Q. And is there a way that you've seen to
3 quantify the amount of that blackening?
4     MR. AYALA: Objection.
5     A. The amount of the blackening?
6 BY MR. ANDERSON:
7     Q. Yes.
8     MR. ALAYA: Objection.
9 Go ahead.
10     A. I don't have any firsthand knowledge.
11 Again, there were chemical tests that were
12 performed that -- and from what -- from the
13 information that I read in reports and numerous
14 reports from very highly credible sources and
15 people that were colleagues that I've worked with
16 for a number of years -- is that the surface
17 chemicals on that surface of copper was copper
18 sulfide and copper oxide.
19 BY MR. ANDERSON:
20     Q. In this case, though, you conducted what
21 you referred to as "jar corrosion testing"; right?
22     A. That's what I referred to it as, yes.
23     Q. But you didn't actually measure the
24 amount of corrosion that you saw on the copper?
25     A. Quantitatively? No, I did not. It was

93

1 either a positive or a negative or a undetermined.
2     Q. Now, how would you define an
3 "undetermined"?
4     A. What we would do is -- we had a panel of
5 chemists that when we had a result that we felt
6 didn't have a very clear explanation of what we
7 were seeing, where the results weren't dramatic,
8 like a dramatic -- where there was discoloration,
9 but it didn't, in the mind's eye, look at the --
10 what would be considered typical of the samples,
11 we would call in a panel of our chemists
12 independently to observe what we were seeing, and
13 try to render an opinion. And in some cases, we
14 couldn't really tell; but those cases were
15 extremely small, less than one percent.
16     Q. So in this scenario, you would bring
17 chemists in to look at this -- what did you refer
18 to this particular type of sample as?
19     MR. AYALA: Just objection to the form.
20 Go ahead.
21     A. Okay. I guess I would call it
22 ambiguous, but I would call it -- what did we --
23 we had a term for it. I'm trying to remember what
24 the term was. Undetermined.
25

24 (Pages 90 to 93)

94

BY MR. ANDERSON:

1  Q.  Okay.  And I think actually that's the
2  phrase that you used before.
3  So essentially the samples fell into three --
4  the copper corrosion samples fell into three
5  categories?
6  A.  That's correct.
7  Q.  Corrosive, corrosion?
8  A.  Blackening.
9  Q.  Undetermined; right?
10  A.  Yes.
11  Q.  And noncorrosive; right?
12  A.  Right.  That's correct.  But, again, as
13  I stated, the amount of -- the -- the population
14  of the results that we produced that was what we
15  considered undetermined was less than one percent
16  of the total population of all of the tests that
17  we conducted.
18  Q.  All right.  So how many scientists
19  would -- how many chemists would be in this panel
20  that would look at these undetermined?
21  A.  Up to five.
22  Q.  Okay.  And over the course of your
23  testing of drywall, you said one percent but --
24  A.  Approximately.

95

1  Q.  -- how many samples would you say fell
2  into this "undetermined" category?
3  A.  Well, like I said, less than -- less
4  than, say, one percent.  We probably conducted --
5  we conducted somewhere between 2500 and 3000
6  different tests over the -- over, you know, the
7  period between 2008 and -- actually, I think we
8  started looking at the database in early 2009, is
9  when we started to compile it.  So we didn't even
10  include the 2008 samples -- and, say, a point in
11  time in 2011.  That work is still ongoing.
12  Q.  Right.
13  A.  We still receive samples almost on a
14  daily basis.
15  Q.  I believe it.  You didn't start actually
16  using the copper in your testing until 2009;
17  right?
18  A.  It was sometime between late 2008 and
19  early 2009.
20  Q.  Okay.  So you say you tested 2500 to
21  3,000 samples during this period from '09 through
22  '11?
23  A.  Right.
24  Q.  And one percent of them came out
25  undetermined; right?

96

1  A.  Approximately.
2  Q.  So we're talking 25 or 30 samples?
3  A.  That's right.  It would have been no
4  more than that.
5  Q.  Okay.  And each of those samples would
6  have been, I guess, for lack of a better word,
7  looked at by a panel of up to five chemists?
8  A.  That's correct.
9  Q.  And in those scenarios what would happen
10  if the panel was unanimous in their view that it
11  either was corroded or wasn't corroded?  Would it
12  no longer be undetermined at that point?
13  A.  That's correct, because we had people
14  whose job function was to perform -- to perform
15  these jar corrosion -- prepare the jar corrosion
16  samples, put them in the hot room, and then do the
17  observations and then later on, in preparation of
18  a report, taking the digital photographs that were
19  included as the documentation in our reports.
20  And these people did, you know, hundreds of
21  these.  And every once in a while, that "I'm just
22  not too sure about this result.  I want another
23  opinion."  And then that's when we would assemble
24  a group of people that had also done this type of
25  test, because there were multiple that were doing

97

1  this.
2  Q.  So ultimately in those undetermined
3  situations, it was the subjective view of each
4  chemist on the panel of whether it was corrosive
5  or noncorrosive?
6  MR. AYALA:  Objection.
7  Go ahead.
8  A.  That's fine.  You can use the term
9  "subjective."  Yes.
10  BY MR. ANDERSON:
11  Q.  Okay.
12  A.  I mean, it's a combination of objective
13  and subjective.  We're observing; and then we're
14  trying to determine based on our experience,
15  looking at other samples that we had received,
16  whether or not a test for the jar corrosion was
17  conclusive or not.
18  Q.  Right, because you're not actually doing
19  any sort of testing on the surface of the copper
20  to determine quantitatively how much or what
21  compounds are present; right?
22  A.  Well, we determined, by definition, that
23  the jar test was simply a qualitative analysis and
24  that we relied on the actual chemical analysis of
25  both the unique marker that we discovered and then

25  (Pages 94 to 97)

98

1  subsequent analysis that we developed in an
2  environmental -- simulated environmental chamber
3  test, looking at a corrosive agent.
4      Q.  And I want to talk about the S8 and
5  we're going to get there but there's a few things
6  I want to cover before we get there.
7      In the testing that you conducted in the
8  Brucker and Brincku actions, was there any testing
9  that was not reported?
10     A.  No.  It was all reported.
11     Q.  This 25 to 30 undetermined, were any of
12  them from the samples provided in the Brucker or
13  Brincku actions?
14     A.  None of them.  And neither were they
15  from the other actions related to National Gypsum.
16     Q.  The other actions related to National
17  Gypsum?
18     A.  Nutting, Retana, Ravelo.
19     Q.  And just so we're clear, because, you
20  know, I probably should have specified before,
21  when I say the plaintiffs from the Brucker action,
22  I'm referring to all of the plaintiffs in the
23  Brucker action.  And by that I mean --
24     A.  Okay.
25     Q.  -- Brucker, Nutting, Retana, and Ravelo.

99

1      A.  Okay.
2      Q.  I'm not -- I just want to make sure that
3  you and I are on the same page and that we're --
4      A.  Right.
5      Q.  -- we're not talking around each other.
6      A.  Yeah.  Not a single one of these samples
7  were inconclusive or even close to inconclusive.
8  They were extremely unambiguous --
9      Q.  Okay.
10     A.  -- negatives.
11     Q.  Now, the undetermined samples, were they
12  a hundred percent Chinese?
13     A.  No.  We have no way of knowing that.
14     Q.  So they were sufficiently blind that you
15  didn't know the country of origin of any of those?
16     A.  Many of them, we did know; and they were
17  Chinese.
18     Q.  Do you have any idea why they would sort
19  of fall into that middle category?  Do you have
20  any concept of why that might be?
21         MR. AYALA:  Objection.  Calls for
22  speculation.
23     A.  It is speculation, but probably the most
24  likely explanation would be how much of these
25  corrosive-agent or marker compounds were present

100

1  in a particular piece of drywall.
2  BY MR. ANDERSON:
3      Q.  And let's talk about that for a second,
4  because you used the disjunctive there that I want
5  to follow up on.  All right?  You said that have
6  S8 or --
7      A.  Corrosive agent.
8      Q.  Right.
9      A.  Uh-huh.
10     Q.  Do you have any evidence to suggest that
11  the S8 itself causes corrosion?
12     A.  Do I have any evidence?
13     Q.  Yes.
14     A.  The S8 itself -- it's not simply a
15  yes-or-no answer.
16     Q.  Go ahead.
17     A.  Okay.
18         MR. AYALA:  Before you answer, objection
19  to the form because it's -- it's an ambiguous
20  question.
21     But go ahead.
22     A.  Okay.  I'm not going to -- right for the
23  moment -- I'll get back to the S8, but what I'm
24  going to talk about is part of the tests that we
25  did when we were trying to determine what kind of

101

1  corrosive agents would be in there, or as we used,
2  crushed pyrite, fool's gold, or iron disulfide.
3      In iron disulfide cases, iron disulfide over
4  time would cause the copper to turn black.  And
5  then when we investigated that phenomenon, was
6  iron disulfide itself corrosive, one of the things
7  that we did was we did extended chamber tests on
8  it, which means we chambered some iron disulfide
9  in that environment and we sampled it periodically
10 to see what -- the off gas of that, since iron
11 disulfide is a solid at room temperature.
12     And we determined that over time what would
13 happen is we would see various types of chemicals,
14 depending on the amount of time it was incubated.
15 And so over time, we saw we saw -- we saw hydrogen
16 sulfide.  We saw carbonyl sulfide.  We saw carbon
17 disulfide.  And then incubated over a long period
18 of time, it all seemed to change to the
19 predominant species with sulfur dioxide.
20     Now, is the iron disulfide corrosive; or is
21 the gases -- that off gas from that corrosive?
22 Clearly, we know that the -- that some of the
23 gases -- that off gas can be corrosive,
24 particularly hydrogen sulfide.
25     So is the sulfur -- the elemental sulfur

26  (Pages 98 to 101)

102

1   itself corrosive?  I couldn't answer that
2   question.  But if you expose copper to elemental
3   sulfur for a long enough period of time, the
4   copper will eventually turn black.  When you
5   expose copper to hydrogen sulfide, it will turn
6   black almost immediately.
7   BY MR. ANDERSON:
8     **Q.  I guess what I'm getting at is it seems**
9   **that you've established what you believe is a**
10   **strong correlation between the presence of S8 and**
11   **a positive in your corrosion test; is that right?**
12     A.  It may have been -- it might have
13   originated from me, but there are several
14   adherents to this, including the U.S. government,
15   the Consumer Product Safety Commission, the
16   Florida Department of Health, and numerous
17   researchers that have taken my work and the work
18   of others and have absolutely agreed and adopted
19   that test as a generally accepted test.
20     **Q.  I hear you.  That's not exactly the**
21   **question that I'm asking.  You've identified a**
22   **correlation between the presence of S8 and**
23   **corrosion in your jar testing; is that correct?**
24     A.  Yes.  But it happened over time.  Okay.
25   How things start -- I'm sorry.

103

1     **Q.  I don't mean to interrupt you.  I mean,**
2   **I understand that it was an evolution; but I'm**
3   **sort of going somewhere here and if -- if you**
4   **could just say yes --**
5     A.  Yes.
6     MR. AYALA:  But if you've got -- I mean,
7   but if you've got an explanation for your answer,
8   then go ahead.
9     THE WITNESS:  Yeah, certainly.
10     A.  When we did that initial test where
11   we -- we had, like, that lightbulb moment when we
12   did the thermal desorption analysis and we saw the
13   orthorhombic cyclooctasulfur giant peak, we saw
14   something that was present in samples that turned
15   the copper black, but wasn't present in samples
16   where the copper didn't turn.  That's always --
17   and so then what we -- and so since there are many
18   variables in -- in explaining scientific
19   phenomena, we wanted to know if that was unique or
20   not; at that point in time, an equal one.  We had
21   a population of one sample.  I mean, it was two
22   samples.  One was positive; one was negative.
23   So we thought, Well, I think we might be onto
24   to something, but we need to investigate this
25   further.  As responsible scientists, the more data

104

1   points you have, the more strongly the association
2   is.  So what we endeavored to do was develop a
3   fairly rapid test.  We knew that thermal
4   desorption test wasn't going to be the way to go
5   because even though we detected that compound, the
6   way we detected it was -- it would have been very,
7   very difficult for us to do any kind of production
8   on multiple samples.
9     As that -- at that point in time, I
10   instructed the laboratory to develop a fast,
11   accurate, and reliable method for doing
12   quantitative analysis of orthorhombic
13   cyclooctasulfur or elemental sulfur, and we
14   developed the gas -- we developed two techniques.
15   One was a quantitative GCMS analysis, or gas
16   chromatography mass spectrometry; and then second
17   one was a less expensive, but equally or even more
18   reliable test for doing quantitative measurement,
19   using a gas chromatograph with an electron capture
20   detector.
21     And so we -- so what we had -- so at that
22   point in time, we developed a platform by where we
23   could generate multiple sample analyses.  And then
24   what -- the idea that I had was to assemble what
25   would eventually become an extremely comprehensive

105

1   and probably the largest database of its kind in
2   the world related to this phenomenon based on
3   these sample results to develop what appeared to
4   be a phenomenon into a highly reliable
5   association.
6     And so what we did was we started to perform
7   multiple analyses -- the jar chamber test, the
8   test for orthorhombic cyclooctasulfur or elemental
9   sulfur, and then a third test that we developed
10   which was a simulated environmental chamber test
11   for a known corrosive gas, hydrogen sulfide -- and
12   what we did was we used a combination of all
13   these -- of these tests to assemble a database to
14   measure associations of the -- how reliable the
15   test -- test results were going to be.
16     Little did we know that, you know, over years
17   we were going to develop something so
18   comprehensive that it would, you know, have over a
19   thousand data points in it, correlating these
20   tests, and that it was the basis of that database
21   that we assembled that caused these tests that we
22   developed in our laboratory to be adopted by these
23   federal and state agencies.
24   BY MR. ANDERSON:
25     **Q.  Is it possible to isolate S8?**

27 (Pages 102 to 105)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

106

1        MR. AYALA:  Objection to form.
2    BY MR. ANDERSON:
3        Q.  In other words, you talked about your
4    presentation at the symposium and you talked about
5    gases, liquids, and solids.
6        Is there a way to take S8 and put it into a
7    chamber test?
8        A.  Yes.
9        Q.  And would it be in a gas or liquid or
10   solid state?
11       A.  It's in a solid state.
12       Q.  And have you ever put S8 in a chamber
13   test with copper?
14       A.  Yes.
15       Q.  And what happened?
16       A.  Over time, usually greater than 21 days,
17   though, it will eventually turn the copper black;
18   but it wouldn't do so within the 21 days that we
19   would see with these defective drywall samples.
20       Q.  On average, how long would you say that
21   that would take?
22       A.  We didn't do that many -- we didn't have
23   a lot of test data because it wasn't something
24   that we were really interested in pursuing.  So I
25   don't have an answer for you; but if we took

107

1    enough samples, we -- you know, we could, in
2    absolute certainty or in reasonable scientific
3    certainty, measure that phenomenon.  But almost
4    all of our research was self-funded by Columbia
5    Analytical Services and so our research and
6    development efforts were directed towards the
7    objective of finding a reliable chemical marker,
8    finding a reliable test for the generation and
9    off-gas hydrogen sulfide, a known corrosive gas,
10   and then having, you know, a fairly
11   straightforward and easy-to-understand jar
12   corrosion, slash, blackening test that when
13   results are presented to someone that has
14   absolutely no background in science, that
15   anyone -- a homeowner, someone that doesn't work
16   in the industry -- could look at those test
17   results and be able to interpret them the same way
18   we are.
19       Q.  How many S8 -- excuse me.  How many S8
20   chamber tests did you conduct?
21       A.  S8 chamber tests?
22       Q.  Yes.
23       A.  As far as I know, two.
24       Q.  Two.  And when were those?
25       A.  Early -- mid -- mid-2009, and then the

108

1    other one started in September of 2010.
2        Q.  So would it be fair to say, then, that
3    utilizing the techniques you've identified for
4    corrosion testing, if you were to place S8 in a
5    chamber test, it would be -- it would come up as a
6    noncorrosive?
7        MR. AYALA:  Objection.
8        A.  It would corrode over time, but not over
9    the -- not necessarily over the 21-day period.
10   BY MR. ANDERSON:
11       Q.  I just want to make sure we're clear
12   here, though --
13       A.  Sure.
14       Q.  -- because you have a jar-corrosion
15   testing technique that you use and if the
16   corrosion had not occurred on the 20 -- by the
17   21st day, you define that as noncorrosive; is that
18   correct?
19       A.  That's --
20       MR. AYALA:  Objection.  What are we
21   talking about?  Drywall?
22       MR. ANDERSON:  I'm asking him questions.
23   If you want to object to the form, you can object
24   to the form.
25       A.  If we're measuring drywall --

109

1        MR. AYALA:  Objection to form.
2        A.  In the context of drywall, we are making
3    a determination that it's -- by our definition,
4    our own definition, it's nondefective or non --
5    it's not causing blackening or what -- we used the
6    term "corrosive," but you could easily use another
7    term.
8    BY MR. ANDERSON:
9        Q.  So by your 21-day standard, the S8 would
10   be considered noncorrosive?
11       MR. AYALA:  Objection.
12       A.  I don't think we could conclude that,
13   because we didn't do enough testing and it's --
14   the sample population is too small to make a --
15   draw a conclusion like that.
16       MR. ANDERSON:  Let's -- let's stop here
17   because they need to switch the tape.
18       THE VIDEOGRAPHER:  Off the record,
19   12:12.
20       (There was a discussion off the record.)
21       THE VIDEOGRAPHER:  This is Videotaped
22   Deposition No. 3 of Michael Tuday.  We're on the
23   record at 1:17.
24       Go ahead, sir.
25

28  (Pages 106 to 109)

110

BY MR. ANDERSON:
Q. Mr. Tuday, before the break, we were talking about the correlation between S8 and corrosion stemming from drywall. And I want to focus back on that for a second because we were talking about the chamber testing and I want to make sure that I understand the -- the rules for your chamber testing.
Now, obviously your chamber testing, by definition, involves drywall; is that right?
MR. AYALA: Just objection to form as to the ambiguity of "chamber testing." I'm not sure which one you're talking about.
BY MR. ANDERSON:
Q. Jar corrosion testing. Let me rephrase that.
A. Jar corrosion testing.
Q. So your jar corrosion testing, when it is defining corrosive or noncorrosive, always has drywall; is that right?
A. With the caveat of the exception that during that experimental phase when we were trying to task different corrosive-type chemicals with exposure, we were essentially using a variant of the jar test. But in every other context, that's

111

what we've used it for.
Q. Now, the variant that you were talking about was the -- was the testing that you did in advance of the symposium that you appeared at in 2009; is that right?
A. That's correct.
Q. And did you use a 21-day rule for determining whether there was corrosion or noncorrosion with that series of tests?
MR. AYALA: Objection to form.
Go ahead.
A. No, we did not, mainly because with some of the materials that we use -- some of the chemicals, for instance -- when we introduce hydrogen sulfide gas into a chamber with -- with shiny copper, the reaction to blackening was immediate, was within less than five minutes.
BY MR. ANDERSON:
Q. Is that right? Less than five minutes?
A. Less than five minutes.
Q. Okay. Let me ask you a question. Did you ever take drywall that had tested negative for corrosion and attempt to introduce any of the chemicals in your symposium presentation?
A. Can you ask that one more time?

112

Q. Sure. So you had a series of samples that came out negative for corrosion; right?
A. Yes.
Q. Okay. And those samples of drywall that came out negative for corrosion, did you ever take one of those samples and introduce any of the gases, liquids, or solids used in your symposium testing to see if that would have any impact on corrosion results?
A. Yes, I did.
Q. I would like to hear about that. When did you do that?
A. Just prior to the symposium in 2009.
Q. Okay. How many samples did you test?
A. How many samples did I test?
Q. For this particular --
A. Only one.
Q. And what was that?
MR. AYALA: I'm sorry. So the record is clear, could you just try not to talk over each other, guys?
I just object to the form at this point because it's very unclear what question he's answering.
A. What sample?

113

BY MR. ANDERSON:
Q. Yes.
A. The negative control.
Q. And the negative control that you used was a sheet of -- or a sample of Sheetrock that you bought from a big-box store in California?
A. That's correct.
Q. So you took this known negative control, and what did you introduce into your jar-corrosion testing?
A. Elemental sulfur.
Q. Okay. When you say "elemental sulfur," just so that I'm sure that we're on the same page, do you mean S8?
A. Yellow sulfur, elemental sulfur. That includes S8.
Q. And did you add 3 milliliters of deionized water?
A. We didn't do a -- we didn't do the jar test.
Q. Okay. What test did you do?
A. We did a simulated environmental chamber test.
Q. Okay. And can you describe the test that you conducted and what the results were?

29 (Pages 110 to 113)

114

1    A.  We prepared four samples.  Three of
2  those samples had pulverized negative control in
3  it.
4    Q.  Okay.
5    A.  One did not.
6    Q.  One did not what?
7    A.  Have any drywall in it.
8    Q.  At all?  Okay.
9    A.  No.
10    Q.  Okay.  Go ahead.
11    A.  To approximately 50 grams of the crushed
12  gypsum in the negative control -- what did I add?
13  It was a few grams, maybe 2 to 5 grams of
14  elemental sulfur; I believe 3 milliliters of
15  deionized water on one.  The other one had just
16  the crushed gypsum, the negative control, and the
17  sulfur, but no water.
18    Q.  Okay.
19    A.  The third one had the crushed gypsum,
20  water, and no sulfur.
21    Q.  Okay.  Let me make sure that I follow.
22  I think I do.  You got three samples that
23  contained pulverized gypsum.  One of the samples
24  has pulverized gypsum and elemental sulfur only;
25  is that right?

115

1    A.  Correct.
2    Q.  The second sample has pulverized gypsum,
3  elemental sulfur, and water.
4    A.  That's correct.
5    Q.  And the third sample has pulverized
6  gypsum and water, but no elemental sulfur?
7    A.  That's correct.
8    Q.  Okay.  And then there's a fourth that
9  has elemental sulfur and water, but no pulverized
10  gypsum.
11    A.  That's absolutely correct.
12    Q.  Okay.  What happened?
13    A.  We placed them in the chamber, evacuated
14  the chamber, added our control layer, which was
15  outdoor air.  And we put them in the hot room for
16  between 48 and 72 hours; and we tested them, using
17  that reduced sulfur analysis.
18    Q.  And what did you find?
19    A.  We found that the two samples that had
20  the gypsum and the elemental sulfur, we detected
21  emissions of hydrogen sulfide gas.  And the sample
22  that had the crushed gypsum and the water, there
23  was no hydrogen sulfide gas.  And then the chamber
24  that had the elemental sulfur and the water, but
25  no gypsum, did not -- we did not detect hydrogen

116

1  sulfide.
2    Q.  Okay.  Let me make sure that I follow
3  the results.  No drywall, water, elemental sulfur,
4  no hydrogen sulfide?
5    A.  That's correct.
6    Q.  Gypsum, water, elemental sulfur,
7  hydrogen sulfide?
8    A.  That's correct.
9    Q.  Gypsum, water, no hydrogen sulfide?
10    A.  Correct.
11    Q.  And, finally, gypsum, elemental sulfur,
12  no water, hydrogen sulfide?
13    A.  That's correct.
14    Q.  Having seen the problem drywall and
15  recognizing that there seemed to be a correlation
16  between the human environments of Florida and
17  Mississippi and Louisiana and the presence of this
18  corrosion, what were your thoughts on why you were
19  seeing the hydrogen sulfide in the sample that
20  didn't have any water?
21    MR. AYALA:  Objection.
22  Go ahead.
23    A.  The sample that didn't have the --
24  didn't -- didn't have -- contain the water had
25  much lower concentrations of hydrogen sulfide gas.

117

1  BY MR. ANDERSON:
2    Q.  Do you recall what the concentrations
3  looked like?
4    MR. AYALA:  Objection.
5  Go ahead.
6    A.  The data was presented at a podium
7  presentation at the American Industrial Hygiene
8  Conference in Denver in 2010.  I believe it was
9  June.
10  BY MR. ANDERSON:
11    Q.  I guess the question that I'm asking,
12  though, is do you -- you pointed out that the dry
13  versus wet -- I'm using that to define the -- the
14  sample that had pulverized gypsum with elemental
15  sulfur with water -- we'll call that wet -- and
16  the one that had elemental sulfur, pulverized
17  gypsum, and no water -- we'll call that dry.
18  So if I understand what you've said
19  correctly, you're saying that wet had a much
20  higher concentration of hydrogen sulfide when you
21  measured it?
22    A.  It -- it had a --
23    MR. AYALA:  Objection.
24  Go ahead.
25    A.  It had a higher concentration.

30  (Pages 114 to 117)

118

1   BY MR. ANDERSON:
2       Q.  Do you recall anything about the -- the
3   delta between the two?
4           MR. AYALA:  Objection.
5       A.  I don't recall what the data is in the
6   proceedings or it was in the -- was in the podium
7   presentation.
8   BY MR. ANDERSON:
9       Q.  So you've done these tests with
10  elemental sulfur.  And when you say "elemental
11  sulfur," you said -- I didn't fully grasp what you
12  said before.  You said it's got S8 in it.
13      Are there other sulfur compounds in that
14  elemental sulfur beyond the S8?  Can you help me
15  understand that?
16      A.  Okay.  Sulfur is an element, and sulfur
17  has atomic number 16 and has a formula weight of
18  32.  So it's -- it's -- it's -- it's Element
19  No. 16 on a chemical periodic table.  Sulfur comes
20  in different forms, physical forms.  They're
21  called allotropes.  An allotrope is defined as an
22  element that has more than one form to it,
23  physical form.
24      And to give you probably the best correlation
25  would be to look at the element carbon.  So we

119

1   look at -- carbon is -- carbon 12.  And what we
2   find is it has different forms.  Like, one form of
3   carbon is a diamond.  So a diamond would be an --
4   would be an allotrope -- allotropic form of
5   carbon.  Likewise, if you look at something like
6   coal or charcoal or graphite, those are also
7   different forms based on -- on crystalline
8   structure.
9       So analogous to that, the element sulfur has
10  different forms based on its -- its structure, and
11  so there are several different allotropes in
12  sulfur.  The most predominant allotrope of sulfur
13  is the orthorhombic cycloocta species.  However,
14  there is a -- a heptasulfur, a hexasulfur, a
15  pentasulfur, and going on down.  There are also
16  forms without the element sulfur.
17      Q.  If you put that -- if you put that
18  elemental sulfur in a chamber that contained
19  oxygen, would it bind with the oxygen to create
20  additional compounds, like SO2 and things like
21  that?
22          MR. AYALA:  Objection.
23      A.  We didn't do that testing.
24  BY MR. ANDERSON:
25      Q.  I'm just saying would it naturally occur

120

1   in that environment?
2           MR. AYALA:  Objection.
3       A.  I --
4           MR. ALAYA:  Calls for speculation.
5       A.  Yeah, I -- I don't have any firsthand
6   knowledge of that phenomena.
7   BY MR. ANDERSON:
8       Q.  I want to get back for a second.  So you
9   did two chamber tests with S8, but no drywall.
10  Strike that.
11      Did you do any jar-corrosion testing with S8?
12      A.  They were jar-corrosion tests.  They
13  weren't -- they weren't chamber tests.
14      Q.  Okay.  So in mid-2009 you did a
15  jar-corrosion test with S8 and water and copper
16  with no drywall; is that correct?
17      A.  That's correct.
18          MR. AYALA:  Objection to the form,
19  first.
20      A.  But, yes, it was one of several
21  different chemical analyses, that exposure test
22  that we did.
23  BY MR. ANDERSON:
24      Q.  Okay.  And you did a similar test in
25  September of 2010?

121

1           MR. AYALA:  Objection to form.
2       Go ahead.
3       A.  There was a second test that was -- a
4   sample that these jars were prepared in, yes.
5   BY MR. ANDERSON:
6       Q.  You commented before that you only have
7   done those two tests with S8.  And I'm curious if
8   you could explain to me why only those two tests.
9       A.  Sure, I would be happy to.  Okay.  In
10  determining that the elemental sulfur was a
11  chemical marker for the corrosive drywall, there
12  was -- it didn't make any sense to do a chamber
13  test for elemental sulfur since elemental sulfur
14  is a solid.
15      What we're trying to measure with the chamber
16  test is we're trying to measure emissions, and
17  emissions are in the form of a gas.  That's why
18  when we were putting together the tests, we were
19  looking for visual evidence, using the
20  jar-corrosion test.  We were looking for a unique
21  chemical marker, which is elemental sulfur, which
22  is a solid, that is contained in the solid drywall
23  that was corrosive.  So then we did -- then we
24  did a third test that measured a corrosive agent,
25  which is a gas.  The corrosive agent that we were

31 (Pages 118 to 121)

122

1  measuring was hydrogen sulfide.
2      Q.  Sure, I follow.
3      A.  So it's a test for a gas.
4      Q.  When you say the S8 is a marker, what do
5  you mean by the term "marker"?
6      A.  What I mean by the term "marker," it was
7  something completely unique to samples that had a
8  positive result in the jar-corrosion test and
9  never present statistically, with statistical
10  relevance, in samples of drywall that were
11  noncorrosive.
12      And just to -- just to summarize how strong
13  that association that we created, in doing 1192
14  separate tests, 99.3 percent of the time when we
15  detected elemental sulfur, the jar-corrosion test
16  was positive for corrosion.
17      Conversely, when the elemental sulfur was not
18  detected, 99.1 percent of the time we didn't see
19  any corrosion.  It's really overwhelming.  I mean,
20  I can't think of any other tests that I'm aware of
21  that have such a strong association that are, to
22  me, irrefutable proof of the reliability of that
23  marker.  I think it was demonstrated beyond a
24  reasonable doubt.
25      Q.  But it's establishing a correlation, not

123

1  causation; correct?
2      MR. AYALA:  Objection.  Objection.
3      A.  The -- the aim in -- in formulating that
4  test was the correlation, was to be able to do a
5  test, a chemical test, and knowing that the result
6  of that test would indicate, with almost
7  certainty, that that piece of drywall that we were
8  testing was going to be corrosive.
9      So it was something that was a unique
10  determinant in being ability predict, in doing a
11  number of applications, a chemical test that
12  was -- that would eliminate any variables, in like
13  doing in-home testing, from antagonists like
14  contaminated well water, contaminated tap water.
15  So it would take those other variables out of the
16  equation.  That's part of the usefulness of it.
17      Another thing is it could be used by
18  manufacturers of drywall product, or gypsum, as a
19  quality control check that their product is not
20  going to be corrosive.  And that test has been
21  adopted in a -- in a very large way in the -- in
22  the domestic drywall industry, the test that --
23  the test that we develops in our laboratory.
24  BY MR. ANDERSON:
25      Q.  But as you sit here today, you're not

124

1  telling me that it's impossible for drywall to
2  cause corrosion if it doesn't test positive for
3  S8.
4      MR. AYALA:  Objection.  Beyond the
5  scope.  Lack of foundation.
6      A.  Well, of course not.  No one can say
7  things like that with any certainty.  If I was --
8  if I were to say something like that, I wouldn't
9  be much of a scientist.  However, the
10  correlation -- the association of those two tests
11  is so overwhelming -- overwhelmingly strong that
12  using that evidence was enough to cause entities
13  like the federal government, the Consumer Product
14  Safety Commission, the Florida Department of
15  Health, Housing and Urban Development to adopt
16  those tests as a standard for predicting or
17  looking -- or doing measurements to determine
18  whether a gypsum product was corrosive or not.
19  BY MR. ANDERSON:
20      Q.  Have you encountered any studies that
21  provide an explanation for the causation of how
22  the Chinese drywall corrodes or --
23      MR. ALAYA:  Objection.  Form.
24  BY MR. ANDERSON:
25      Q.  Have you encountered any studies that

125

1  provide an explanation of how Chinese drywall is
2  defective, causes corrosion in copper?
3      MR. AYALA:  Same objection.
4      A.  The work that was done by -- that was
5  done for the Consumer Product Safety Commission,
6  the work that was done at Lawrence Berkeley
7  National Laboratories, the work that was done by a
8  group at Environ International in Tampa all
9  indicate that at least a significant corrosive
10  agent is the off-gassing of hydrogen sulfide gas.
11  BY MR. ANDERSON:
12      Q.  But I guess what I'm asking is a little
13  bit different than that.  Are you aware of why
14  this corrosive drywall, as you've defined it,
15  corrosive drywall, is off-gassing hydrogen
16  sulfide?
17      MR. AYALA:  Objection.  Lack of
18  foundation.
19      A.  I don't believe anybody has actually
20  determined that.
21  BY MR. ANDERSON:
22      Q.  So CPSC has not figured out why the
23  Chinese drywall is off-gassing H2S, to your
24  knowledge?
25      MR. AYALA:  Objection.  Calls for

32 (Pages 122 to 125)

126

1  speculation. Lack of foundation.
2      A.  Yeah, I couldn't speculate on that.  I
3  don't --
4  BY MR. ANDERSON:
5      Q.  Well, you -- you've have read the CPSC
6  reports; correct?
7      A.  Uh-huh.  I've read several of them.
8      Q.  Okay.
9      A.  I read a lot of documents, also.
10     Q.  Okay.  So you've read the '51 home
11 study; is that right?
12     A.  Yes, quite a while ago.  Yes.
13     Q.  And did you read the ten home domestic
14 drywall study that CPSC --
15         MR. AYALA:  Objection.  Form.
16 Mischaracterization.
17     A.  I'm familiar with it, but not terrible
18 familiar.
19 BY MR. ANDERSON:
20     Q.  Well, what I'm trying to figure out,
21 Mr. Tuday, is that -- you know, you've been
22 working on this since February of 2008.  And you
23 told me, yourself, that you've spoken to dozens of
24 experts, you've read hundreds of papers.
25     I'm asking you, as you sit here today, can

127

1  you tell me how it is that the Chinese drywall
2  that is corrosive is off-gassing hydrogen sulfide?
3  Can you explain the science to me?
4          MR. AYALA:  Objection to form.  Lack of
5  foundation.  Beyond the scope of his reports.
6      Go ahead.
7      A.  The actual elucidation of the chemical
8  mechanism has never been fully explained, as far
9  as I know, with absolute certainty.  There
10 certainly are ideas that are put forth as to
11 causes, but I deal in scientific fact that's --
12 that is verifiable through data and a scientific
13 explanation of fact rather than speculation.
14     Had I -- several people in the industry, or
15 scientists, that studied this problem have their
16 own opinions and, at certain times, have shared it
17 with each other, but until such time that these
18 opinions can turn into indisputable facts as far
19 as elucidating the chemical mechanism -- we would
20 all like to see that.  And it's something that I,
21 myself, had ideas on how to test, but has never
22 been able to get funding for it, as has several
23 other researchers.
24 BY MR. ANDERSON:
25     Q.  I want to focus for a second on a -- on

128

1  a term that you just used just -- and I think it's
2  a useful one -- which is the chemical mechanism.
3  Okay?  Let me make sure I understand.  When you
4  say the chemical mechanism that causes the
5  corrosion, essentially what you're talking about
6  is what's happening scientifically that's causing
7  this drywall to corrode the copper.  Is that an
8  accurate representation of what you mean when you
9  say "chemical mechanism"?
10         MR. AYALA:  Objection.  Form.
11     Go ahead.
12     A.  Well, there's more to it.  Based on a
13 review of the literature, within the overwhelming
14 majority of the scientific community that have
15 studied this, the following information is -- what
16 is popularly believed to be happening is that this
17 gypsum product, this drywall, originated from
18 China in a mine that was mined in the -- in the --
19 essentially in one area in the Shandong province.
20 Government representatives from the Consumer
21 Product Safety Commission, and scientists, had
22 visited that mine in that area and have done a
23 tour of China.  And by that, they pretty much
24 dismissed, to their minds, to their satisfaction,
25 any theories that this Chinese drywall phenomenon

129

1  is attributable to flue-gas desulfurization
2  gypsum, phosphogypsum that's used in fertilizer.
3  There has been speculation early on -- even from,
4  like, an MIT professor -- that this gypsum
5  originated from the incineration of hazardous
6  waste.
7      And, likewise, it's -- they've also, in
8  general belief -- do not believe that there's a
9  credible biological mechanism that would explain
10 this phenomenon.  I'm talking about the
11 overwhelming majority of serious scientists that
12 have been examining this problem since it's become
13 known.
14 BY MR. ANDERSON:
15     Q.  But as we sit here today, you cannot
16 point me to even one peer-reviewed study that
17 explains the chemical mechanism that causes the
18 corrosion from the defective Chinese drywall?
19         MR. AYALA:  Objection to form.  Beyond
20 the scope of his reports, and lack of foundation.
21     Go ahead.
22     A.  I've already stated that.
23 BY MR. ANDERSON:
24     Q.  You've already stated what?
25     A.  That the chemical mechanism is not

33 (Pages 126 to 129)

130

1  completely understood.  There are parts and pieces
2  to it.  But a complete and utter explanation
3  that's backed up by fact of measurement and data
4  has not been completed yet.  We're all hoping that
5  some day as this -- since this testing is still
6  ongoing, that there will be a thorough
7  understanding of that mechanism, but it's -- the
8  work is still ongoing.
9      Q.  You said a few minutes ago that you had
10  some ideas for how you would do the testing, but
11  you don't necessarily have funding to do it.
12      A.  Um-hum.
13      Q.  What are you thinking?
14          MR. AYALA:  Objection.
15      A.  It's not important, what my opinion is;
16  and, therefore, I have -- I have refrained from
17  trying to state any of that publicly because it
18  doesn't mean anything.  It's not important.
19  BY MR. ANDERSON:
20      Q.  Well, you said, yourself, that you
21  created the copper corrosion test, the jar copper
22  corrosion test has been adopted by the federal
23  government and the Florida Department of Health as
24  the standard test for corrosion; right?
25      A.  I've stated that the three tests that

131

1  were -- that were created, especially the -- the
2  sulfur -- I'm sorry -- orthorhombic
3  cyclooctasulfur marker test has been adopted.  The
4  jar corrosion test -- other people have done jar
5  corrosion tests over the years.  There's nothing
6  really special or unique about it.  It's just a
7  very simple way that wasn't anything -- any
8  brilliant, you know, thought on my part.  It was
9  just something simple that just about anybody
10  would have been able to think of as a simple way
11  to demonstrate a reliable phenomenon, reproducing
12  a reliable phenomenon.
13      There's nothing particularly brilliant about
14  that.  Other people did similar things.  There
15  were -- there were researchers -- I'm sorry.
16  Scientists at, like, Environ International did the
17  same thing.  There were people at other -- and
18  there academic institutions that did similar
19  things; probably people at other laboratories,
20  other than Columbia Analytical Services, that did
21  the same thing.  I'm just not aware of that.
22      Q.  But you independently arrived at using
23  that methodology to test for corrosion?
24      A.  I used that methodology to determine
25  whether or not a particular piece of drywall had

132

1  the properties of corrosion and blackening so that
2  I could further test to determine unique marker
3  and corrosive agents as far as gaseous emissions
4  from that drywall.
5      Q.  Okay.  You were the first one to do
6  the -- or to recognize that the S8 was a unique
7  marker.  Would that be fair to say?
8          MR. AYALA:  Objection.
9      Go ahead.
10      A.  I don't even know that factually.  I
11  know that what I did was I arrived on that
12  independent of -- of any input from any -- any
13  other individuals.
14  BY MR. ANDERSON:
15      Q.  Are you aware of any other laboratory
16  that utilized that testing before you did?
17      A.  Before I did?  No.
18      Q.  Are you aware of any laboratory that
19  utilized that testing after you did?
20      A.  Looking for orthorhombic
21  cyclooctasulfur?
22      Q.  Yes.
23      A.  Yes.
24      Q.  And what laboratories?
25      A.  Well, there was work done by the group

133

1  out of -- out of Environ International in Tampa
2  that, I believe, used a laboratory, Air Toxics
3  Limited -- and I believe they're in Folsom,
4  California -- and they essentially developed,
5  along with Environ, a -- an alternate type method
6  using a different analytical method for looking at
7  elemental sulfur.
8      Q.  I want to talk about a chemical that
9  is -- is, I think, referenced in a significant
10  amount of the literature; and that is, strontium.
11  Can you tell me about what observations you've
12  made about the presence of strontium in the
13  Chinese drywall?
14          MR. AYALA:  Objection.  Lack of
15  foundation, and it's beyond the scope of his
16  report.
17      Go ahead.
18      A.  What was widely -- okay.  What was
19  widely reported is that gypsum that's mined from
20  China tends to have higher levels, or
21  concentrations, of the element strontium.
22      However, it's not unique to China.  Gypsum
23  that's mined through many different parts of the
24  world also contained high concentrations of
25  strontium, and even gypsum mines here in the

34  (Pages 130 to 133)

134

1    United States contain -- can contain high levels
2    of strontium. There's nothing unique about
3    strontium as far as its connection to this
4    corrosion phenomenon.
5    BY MR. ANDERSON:
6        Q.  And there's no peer-reviewed studies,
7    that you're aware of, that establish a causal link
8    between the strontium and the corrosion of the
9    drywall, are there?
10       MR. AYALA:  Objection.  Lack of
11   foundation.  Beyond the scope of his -- his
12   reports in this litigation.
13       A.  It is believed that, by mainstream
14   scientific thought, that the strontium is just --
15   that -- that high levels of strontium detected in
16   Chinese drywall is just coincidental, but has
17   no -- or is not understood to have a mechanism in
18   the -- in the corrosion.
19       There was early reports that a gas called
20   strontium sulfide played a role, and that was
21   in -- in the early part where it was fair widely
22   publicized.  But for the best of my knowledge,
23   that -- that link was further -- not -- when it
24   was investigated further, really didn't have any
25   relevance to the situation.

135

1    (Tuday Exhibits 3 - 7 were marked.)
2    BY MR. ANDERSON:
3        Q.  I see.  I'd like to, if I could, ask
4    you -- what's been marked -- what the court
5    reporter has marked as Exhibits 3, 4, 5, 6 and 7.
6    In the interest of saving a few trees, these are
7    the initial portions of the five reports that you
8    created in this litigation.  And if I could, I'd
9    like to take them one at a time.
10       MR. AYALA:  All right.  Before he --
11   before you do that --
12       MR. ANDERSON:  Sure.
13       MR. ALAYA:  -- let me just place an
14   objection on the record that each of the documents
15   that Mr. Anderson just offered is, in fact, an
16   incomplete document and it's certainly vague to --
17   and ambiguous to refer to a so-called initial part
18   of it when it's an incomplete portion of the
19   document.
20       With that being said, continue.  I'm not -- I
21   object to the use of an incomplete version of the
22   documents.
23   BY MR. ANDERSON:
24       Q.  Okay.  Moving forward --
25       MR. AYALA:  Oh, I'm sorry.  And

136

1    particularly so given that the first page of the
2    document says that the results -- quote, "The
3    results are intended to be considered in their
4    entirety and apply only to the samples analyzed
5    and reported herein," end quote.  Okay.
6        (Tuday Exhibit 3 was marked.)
7    BY MR. ANDERSON:
8        Q.  All right.  Do you recognize Exhibit
9    No. 3, Mr. Tuday, which -- which is the -- the
10   final Brincku report.  If you want to use a pen
11   just to write on the -- on the top of it just so
12   you can identify between them more easily --
13       A.  What I was handed was Ravelo and Retana.
14       Q.  The other three are right here.
15       A.  Oh, I'm sorry.  Okay.  This is not the
16   final Brincku report.  The final Brincku report
17   had 684 pages to it.
18       Q.  Okay.  All right.  Can you tell me if
19   this is the first 24 pages of the final Brincku
20   report?
21       A.  This is the first 24 pages of what we
22   refer to as our enhanced report.  It was
23   additional information aside from the actual
24   chemical testing.
25       Q.  Okay.  And on the last page of that

137

1    document, does it say at the bottom "24 of 684"?
2        A.  The copy I have, it does, yes.
3        Q.  Okay.  Do you have any reason to believe
4    that the document that I've given you is not a
5    true and accurate copy of the first 24 pages of
6    that report?
7        A.  Let me look it over real quick.
8        Q.  Sure.  Take your time.
9        MR. AYALA:  Just objection as well
10   because the document was produced in color form.
11   This is not in color form of the document either.
12   I just have a continuing objection to the use of
13   any incomplete reports in questioning an expert
14   witness about an expert report in litigation.
15       Go ahead.  Continue.
16       A.  Aside from Mr. Ayala's comment on the
17   lack of color in the report as the original did,
18   which is fairly significant in being able to
19   interpret it, what I'm looking at here appears to
20   be authentic.
21   BY MR. ANDERSON:
22       Q.  Okay.  Let's move on to what we've
23   marked as Exhibit 4, which is Brucker.
24       MR. AYALA:  Same objection.
25       MR. ANDERSON:  Noted.

35  (Pages 134 to 137)

138

1  BY MR. ANDERSON:
2    Q.  Now, this says on the last page "23 of
3  23."  Is this a true and correct copy of your
4  report dated December 21, 2011, the Brucker
5  report?
6    A.  Well, this -- again, with the
7  following -- with the caveat that it's not in
8  color, it -- it looks authentic as far as being
9  the 23 pages.
10    But, again, what's missing, as far as
11  relevance, is the actual raw data and lab results,
12  including the results of analysis forms that were
13  included in a report that was submitted to Morgan
14  Lewis.
15    Q.  Okay.  And the reports themselves, the
16  portions that I've provided, they do not contain
17  conclusions that were reached utilizing the raw
18  data; right?
19    MR. AYALA:  Objection.
20    A.  Yes, that's -- that is true.
21  BY MR. ANDERSON:
22    Q.  Okay.  All right.  Let's move forward.
23  Exhibit No. 5 is the Nutting report?
24    MR. AYALA:  Same objection.
25

139

1  BY MR. ANDERSON:
2    Q.  Can you please review that?  Does that
3  contain an accurate, albeit not color, copy of the
4  first 25 pages, numbered 1 through 25, of the
5  Nutting report?
6    A.  Same answer, which is the first 25
7  pages, aside from the lack of color, appear
8  authentic; but, again, the context is -- in order
9  to really understand this report, is also to be
10  able to look at the actual lab report and the
11  results of analysis that aren't given in this.
12    Q.  Okay.  Next, Exhibit 6, the Ravelo
13  report?
14    MR. AYALA:  Same objection.
15  BY MR. ANDERSON:
16    Q.  And that's 1 through 24.  And it does,
17  in fact, say on the last page "24 of 24"; correct?
18  So when you say it's an incomplete report, by your
19  own pagination, that is all 24 of the 24 pages
20  referenced at the bottom of that; correct?
21    MR. AYALA:  Objection.  Mischaracterizes
22  a report that was produced in litigation.
23    A.  As far as the pagination, yes.  I
24  mean -- but, again, this was essentially an
25  addendum to the original report that included

140

1  additional information.  And without the
2  accompanying raw data and results of analysis,
3  it's -- it's not complete.  And the statement that
4  we have right here on that first cover page about
5  "Results are to be considered in their entirety
6  and apply to only samples and analyzed and
7  reported herein" is a statement that we take
8  extremely seriously in our laboratory.
9  BY MR. ANDERSON:
10    Q.  Okay.  Do you have any reason to believe
11  that this is not an accurate copy, albeit not in
12  color, of the 24 pages of the Ravelo report?
13    MR. AYALA:  Objection.  Mischaracterizes
14  the testimony.
15    A.  It appears to be -- it appears to be
16  authentic.  However, one of the things that I
17  cannot determine from looking at this is whether
18  some of these interpages come from this report or
19  another one since they're not -- they're not
20  referenced as being Ravelo, or necessarily
21  referenced as being Ravelo, or has our unique
22  service request identifier on it.
23  BY MR. ANDERSON:
24    Q.  Well, let me ask you this question:  Did
25  you, in the final report that you provided to

141

1  Mr. Ayala, provide that information on each page?
2    A.  The report that I provided to Mr. Ayala
3  was in digital form, so it was a complete file.
4    Q.  Okay.  But if he were to print that or I
5  were to print that, would the unique identifier
6  that you're referring to be listed on the page?
7    A.  No.
8    Q.  Okay.  So do you have any reason to
9  believe that this is not an accurate copy of
10  pages 1 through 26 of the Retana report?
11    A.  It -- it -- it appears to be.
12    Q.  Okay.
13    A.  Okay.
14    Q.  Thank you.
15    All right.  Mr. Tuday, have you been to any
16  of these residences?
17    A.  I have not.
18    Q.  Have you seen photographs of any of
19  these residences?
20    A.  I have.
21    Q.  And where did you see photographs of the
22  residences?
23    A.  I've --
24    Q.  Actually, strike that.
25    A.  Go ahead.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

142

1      Q.  I just want to -- let's take it one at a
2  time.
3      A.  Okay.
4      Q.  It will be a little bit less complicated
5  that way.
6      Have you seen photographs of the Brincku
7  residence?
8      A.  I can't recall if I have.  There's a
9  possibility I have.
10      Q.  And where would you have seen them?
11      MR. AYALA:  Objection.  Calls for
12  speculation.
13      A.  We've been working with National Gypsum
14  and Morgan Lewis for, you know, quite some time
15  now.  You know, there have been a lot of
16  documents.  We have talked to different
17  individuals at both Morgan Lewis and at National
18  Gypsum.  Some of them had been to these, at least
19  the Brincku home, had described --
20      MR. AYALA:  Just objection to the
21  extent --
22      MR. ANDERSON:  And obviously -- look, to
23  be clear, Tom, I'm not --
24  BY MR. ANDERSON:
25      Q.  I'm not asking you, Mr. Tuday, to tell

143

1  me what conversations you had in private with
2  National Gypsum's counsel.  I'm not --
3      A.  Sure.
4      Q.  -- asking you to give me that
5  information.
6      But to the extent that you're aware, are you
7  aware that there's corrosion in the Brincku home?
8      MR. AYALA:  Objection.  Calls for
9  speculation.  Lack of foundation.  Lack of
10  personal knowledge.
11      A.  I don't have any firsthand knowledge of
12  that.
13  BY MR. ANDERSON:
14      Q.  So as you sit here today, under oath
15  you're telling me that you have never seen any
16  picture of the Brincku home that shows any
17  corrosion?
18      A.  No, that's not what I'm saying.
19      Q.  Okay.  So what are you saying, then?
20      A.  I'm saying I may have seen photographs
21  of one or more of these homes; but in my
22  recollection, I wouldn't know where or which ones
23  are which.  I've been shown many hundreds of
24  photographs of homes that have been affected by
25  corrosion phenomenon; and I can't, in my mind's

144

1  eye, connect them to the Brincku home or any of
2  these other residences.
3      Q.  But you produced a 684-page report for
4  the Brincku home; and you're telling me that you
5  haven't seen any photographs, or anything?  You
6  don't have any knowledge of whether or not the
7  house has corrosion in it?  Is that what you're
8  saying to me?
9      MR. AYALA:  Hold on a minute.
10      Objection.  Mischaracterizes the -- the
11  expert report which, for the record, is not even
12  here today; and beyond the scope of the expert
13  report.  Okay.
14      A.  Okay.  No, I'm -- for one more time,
15  that's not what I'm saying.  What I'm saying is --
16  you're asking me if I've seen photographs from
17  these homes; and there's a very strong possibility
18  that, yes, I have.
19      I know why they did the testing.  It's
20  painfully obvious.  But as far as -- you know, I
21  would be not telling you the truth if I told you I
22  had recollection of what a photograph looked like
23  from the Brincku home or the Ravelo home or the
24  Brucker home.
25

145

1  BY MR. ANDERSON:
2      Q.  When you say it's painfully obvious why
3  they do that testing, what do you mean?
4      A.  Well, there's -- there's no question, in
5  that mind, that the reason this action is -- is
6  going forth is that the particular homeowners are
7  alleging that the National Gypsum products were
8  the cause of the corrosion that was found in
9  their -- in their residences.  Otherwise, none of
10  this testing would occur.
11      Q.  So you're aware that corrosion was found
12  in all five of these residences?
13      MR. AYALA:  Objection.
14      A.  I --
15      MR. ALAYA:  Hold on.
16      Objection.  Lack of personal knowledge.
17  Calls for speculation.  He already testified he
18  wasn't there.  He can't recall any photos.
19  There's absolutely no foundation for this, no
20  foundation for him to testify about this.
21      A.  Right.  And I guess what I'm saying is
22  that -- say that one more time, please.  Repeat
23  that.
24      (The record was read back.)
25      MR. AYALA:  Same objection.  Lack of --

37  (Pages 142 to 145)

146

1    absolutely no foundation for the question, and
2    lack of personal knowledge and calls for
3    speculation, and it's beyond the scope of his
4    export report.
5        A. I am aware that there were reports of
6    corrosion found in these residence, in one or more
7    of these residence. However, I am not aware that
8    there is corrosion, because I haven't seen it
9    myself; nor can I recollect photographs taken in
10   any of these homes as far as a unique
11   recollection. There's no doubt, in my mind, that
12   there were reports of corrosion that have been
13   stated and have been communicated to me, but I
14   don't have any firsthand knowledge of it.
15   BY MR. ANDERSON:
16       Q. I understand. It appears to me that if
17   you look at the first sentence of the Brincku
18   report -- can you read that first sentence?
19       MR. AYALA: Object to the
20   characterization of this document as the Brincku
21   report.
22       A. "Enclosed please find the final enhanced
23   report for samples submitted to our laboratory on
24   June 9, 2010."
25

147

1    BY MR. ANDERSON:
2        Q. Okay. While the dates vary, would it be
3    fair to say that all of the reports begin with --
4    all five of the reports begin with that sentence?
5        MR. AYALA: Objection. Vague.
6    Go ahead.
7        A. Aside from the dates?
8    BY MR. ANDERSON:
9        Q. Yes.
10       A. Yes, they begin with that sentence.
11       Q. When you say that it's a final enhanced
12   report -- all five of them are referred to final
13   enhanced reports -- what does that mean?
14       A. What we were asked to do was we were
15   asked to look at the results of analysis.
16       Typically when we engage with a client for
17   doing laboratory testing services, samples are
18   submitted to our laboratory; and what we do is we
19   perform testing. It could be chemical testing; it
20   could be jar corrosion testing. And what we
21   provide is a laboratory report that includes the
22   results, but they're simply the results and
23   possibly accompanying data.
24       So what it is, is we're looking at testing
25   results. And they're generally summarized in a

148

1    form called "Results of Analysis." And it will
2    list a parameter that we're testing for, like
3    elemental sulfur or hydrogen sulfide or reduced
4    sulfur gases or speciated volatile organic
5    compounds or atmospheric gas analysis that lists a
6    parameter and a result, and then maybe things like
7    qualifiers.
8        The reports can be as simple as just listing
9    results. Other reports can list results and
10   results of quality assurance -- quality control
11   tests that are also performed. And some of the --
12   and some of the reports can also include other
13   items such as the raw analytical data, things like
14   copies of chromatograms, reconstructed iron
15   chromatograms, tuning -- GCMS tuning data, things
16   that are called the surrogate recovery results,
17   chain-of-custody forms, our own internal log-in
18   documentation, et cetera.
19       Now, those would be what I would consider our
20   typical work product. Those would not be enhanced
21   reports. What was requested in this case was
22   actually an opinion -- I'm sorry -- to render some
23   conclusionary remarks, based on the results of
24   analysis -- some conclusionary remarks that
25   correspond to an interpretation of a situation --

149

1    not a situation -- interpretation of the meaning
2    of the sample results and documentation and
3    foundation/explanation of why we came to those
4    conclusions.
5        Q. Okay. So let's -- let's start with
6    Brincku. What conclusions were you able to reach
7    based on the data and testing that you took in in
8    Brincku?
9        MR. AYALA: Objection. Asking for a
10   conclusion from an incomplete copy of the expert
11   report that he submitted in this litigation.
12   BY MR. ANDERSON:
13       Q. Mr. Tuday --
14       A. Yes.
15       Q. -- can you turn with me for a moment to
16   page 23 of the Brincku report?
17       A. Yes.
18       Q. What's the name of that section at the
19   middle of that page, the last two paragraphs?
20   What is that section called?
21       MR. AYALA: Just before you answer that,
22   again, objection to the characterization of this
23   document as the "Brincku report" because it's an
24   incomplete copy of what, in fact, was submitted by
25   Mr. Tuday and Columbia Analytical as their Brincku

38 (Pages 146 to 149)

150

1   report. Okay.
2       A. It states "Conclusions."
3   BY MR. ANDERSON:
4       Q. Okay.
5       A. And it's underlined and boldened.
6       Q. Are these an accurate representation of
7   the conclusions that you reached in the Brincku
8   case?
9       A. In the context of the 684-page report?
10  Yes, it is.
11      Q. Okay. Can you describe for me what
12  conclusions you reached on the Brincku house?
13      A. I can read this, if you'd like.
14      Q. Well, if you could summarize for me.
15      A. That essentially the conclusions -- the
16  conclusions that I reached and the interpretation,
17  or result, is since all of the samples, 147
18  separate samples of drywall that were submitted to
19  our laboratory -- we conducted analysis for
20  orthorhombic cyclooctasulfur, or S8, using the
21  techniques and protocols that we had developed in
22  our laboratory and that every single one of them,
23  without exception, were found to be not detectable
24  above our method reporting limit, along with two
25  additional complementary pieces of information

151

1   which -- well, more than two -- is that since
2   there was a subset of those 147 samples that
3   represent roughly 10 percent, or 15 additional
4   samples -- I'm sorry -- a subset of that 147
5   samples, we conducted further analyses on a new --
6   on 15 of those 147 samples, representing
7   approximately 10 percent of what was submitted;
8   that we did confirmatory analysis of the
9   orthorhombic cyclooctasulfur, utilizing another
10  technique, utilizing our gas chromatography mass
11  spectrometry test, which is both a quantitative
12  and qualitative analysis that; that we performed
13  the jar corrosion test and found every single one
14  of them; and if you were to refer to the 684-page
15  report, that there is well-documented photo
16  documentation of the -- that summarizes the jar
17  corrosion tests, as well as doing analysis for
18  reduced sulfur compounds, using our
19  chromatographic technique that utilizes the sulfur
20  chemiluminescence detector; that based on the
21  entirety of all of these results being not
22  detectable, that we concluded that those 147
23  samples that were considered to be representative
24  of the drywall taken from the Brincku home where
25  special consideration was given on the locations

152

1   of the drywall in proximity to the home that were
2   selected, that we concluded that the drywall that
3   was tested was clearly not corrosive.
4       Q. Did you do any bacterial testing --
5       MR. AYALA: Objection to form.
6   BY MR. ANDERSON:
7       Q. -- of the Brincku samples?
8       MR. ALAYA: Objection to form.
9       A. No, we did not. We did not conduct
10  bacterial testing in our laboratory.
11  BY MR. ANDERSON:
12      Q. So the most that can be said is not that
13  it's noncorrosive. It's that it was noncorrosive
14  in the tests you undertook?
15      MR. ALAYA: Objection. Argumentative.
16  Go ahead.
17      A. No, I would disagree with you.
18  BY MR. ANDERSON:
19      Q. Okay.
20      A. And the data that we presented to the
21  scientific communities that has been, again,
22  adopted -- and made several references by
23  governmental agencies, governmental scientists,
24  state agencies, and the majority of the scientific
25  community -- to have a firm belief or

153

1   understanding that these tests -- these test
2   results utilized in these tests are adequate to
3   conclude that drywall is not corrosive; that there
4   is overwhelming agreement and that there's
5   overwhelming opinion throughout the scientific
6   community that the origin of the corrosion
7   phenomenon is based on a chemical phenomenon
8   that's not entirely understood, and not a
9   bacteriological phenomenon; that there are very
10  few adherence in the community, credible
11  adherence, that purport that there's a
12  bacteriological origin related to the corrosion
13  drywall -- the corrosive properties of drywall
14  that was imported from China.
15      Q. Well, are we talking about drywall
16  that's imported from China or just drywall more
17  generally?
18      A. Well, drywall more generally.
19      Q. When you say that you don't believe
20  there's any credibility in the -- the bacteria
21  explanations concerning corrosiveness in the
22  National Gypsum drywall, do you say that based on
23  having reviewed or researched the issue?
24      A. I base that on what I have researched.
25  And to put it simply stated, as proposing an

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

154

1  explanation based on presence of large colonies of
2  sulfur-reducing bacteria in drywall is not
3  plausible if for no other reason simply for the
4  fact that these bacteria cannot thrive in the
5  drywall media because it is, as the name implies,
6  dry and that it needs a certain amount of humidity
7  and moisture in order to survive.  That is my
8  understanding; and that's the understanding that's
9  been stated in a lot of reports, including the
10  reports from the Consumer Product Safety
11  Commission.
12       **Q.  In other words, just to make sure that I**
13  **follow, are you referring to the aerobic/anaerobic**
14  **issue or --**
15       MR. AYALA:  Just for the record,
16  objection.  Beyond the scope of this witness'
17  report.
18       MR. ANDERSON:  Tom, he testified that he
19  believes that he's done testing that clearly
20  indicates that this drywall is not corrosive and
21  I'm simply probing the issue of alternative
22  theories of what might cause this issue and he
23  clearly has knowledge of it.
24       MR. AYALA:  Objection again.  Objection
25  for the record.

155

1       Go ahead.
2       A.  I have stated that my occupation is --
3  I'm a professional analytical chemist.  I'm not a
4  microbiologist, and I'm not a specialist in -- in
5  bacteria, anaerobic or aerobic.  However, with
6  that stated, many of the samples that we obtained
7  in our laboratory originate from either biological
8  sources, be there -- be them biogenic or
9  anthropologically derived by genic sources, such
10  as municipal solid-waste landfills, composting
11  facilities, wastewater treatment plants,
12  confined-animal feeding operations, all of which
13  have emissions of reduced sulfur compounds related
14  to biological activity, whereas in all of these
15  conditions, that there is enough moisture in that
16  environment for these type of organisms to survive
17  and -- and thrive.
18  BY MR. ANDERSON:
19       **Q.  When you say "these type of organisms,"**
20  **you're referring to sulfur-reducing bacteria?**
21       A.  That's correct.
22       **Q.  What about sulfur oxidizing bacteria?**
23       MR. AYALA:  Objection.  Same objection.
24  Beyond the scope of his report.
25       A.  Again, that's not -- that's not really

156

1  within the scope of my training, expertise, and
2  knowledge.
3       However, that being stated, in environments
4  where there is anaerobic conditions and moisture,
5  high levels of moisture, these -- it is well-known
6  that these type of -- that sulfur-reducing
7  bacteria can thrive.
8       And to give you an example is a type of
9  landfill that's called the construction and
10  demolition debris landfill.  One of the types of
11  materials that is placed in these underground
12  vaults is drywall and gypsum and that because of
13  rainfall and the availability of moisture, that
14  these anaerobic species can thrive and convert to
15  gas -- corrosive gases, such as hydrogen sulfide,
16  at extremely high concentrations, but without the
17  moisture, it can't happen.  These types of -- if
18  we look at construction and demolition debris
19  landfills in extremely arid areas, we don't have
20  that phenomenon occurring.
21  BY MR. ANDERSON:
22       **Q.  I guess what I'm looking for -- and**
23  **you're talking -- you've again gone back to**
24  **sulfur-reducing bacteria, but you haven't**
25  **addressed sulfur-oxidizing bacteria.**

157

1       **And I guess what I'm looking for is either**
2  **you're telling me that you don't have expertise in**
3  **sulfur-oxidizing bacteria and, therefore, you**
4  **can't speak to whether it could be causing**
5  **corrosion in these homes, or you're saying you do**
6  **have expertise.  And if that's the case, I'd like**
7  **to know was it that sulfur-oxidizing bacteria**
8  **can't be the one -- the cause of the corrosion in**
9  **these homes?**
10       MR. AYALA:  Okay.  Now, before you --
11  first of all, let me object.  The question has
12  gotten so far afield, outside the scope of the
13  expert reports in this case, and indeed the
14  questioning has gotten outside the scope of the
15  complaint in this case, because a thorough review
16  of the complaint reveals that the term
17  "sulfur-oxidizing bacteria" appears nowhere in the
18  complaint that was filed in either the Brucker
19  litigation or the Brincku litigation.
20       So not only is this beyond the scope of his
21  report, not only is there a lack of foundation but
22  this isn't even reasonably likely to lead to the
23  discovery of admissible evidence because there's
24  nothing in the complaint in this -- in either of
25  these cases about sulfur-oxidizing bacteria.

40  (Pages 154 to 157)

158

1    So I have a continuing objection to the line
2  of questioning and to any testimony about it.
3    A.  If I can make this clear, nothing in any
4  of the literature that I've reviewed related to
5  this corrosion phenomenon has even mentioned the
6  term.  As far as I know, it hasn't even been
7  discussed within our community.  And there's a lot
8  of data out there and a lot of reports.
9  BY MR. ANDERSON:
10   **Q.  We talked a few moments ago about the**
11 **conclusions that you reached in the Brincku house.**
12       MR. AYALA:  Objection to the testimony.
13   Go ahead.
14   Mischaracterizes the testimony.
15 BY MR. ANDERSON:
16   **Q.  I'd like you to turn with me, if you**
17 **could, for a moment to the Brucker report; and if**
18 **you could, turn to page 4 of that report.**
19       MR. AYALA:  Objection to the
20 characterization of the Brucker report because
21 it's an incomplete copy of what Columbia produced
22 in the litigation.
23       MR. ANDERSON:  I think at this point, it
24 might make sense to just stipulate to a continuing
25 objection there because it's just going to make

159

1  this take a lot longer.
2       MR. AYALA:  Fair enough.  I'll stipulate
3  to it.
4  BY MR. ANDERSON:
5    **Q.  Okay.**
6    A.  Yes.
7    **Q.  Do you see on page 4 where it indicates,**
8  **in bold and underlined, "Conclusions"?**
9    A.  Yes, I do.
10   **Q.  Okay.  Can you summarize for me, just as**
11 **did you for the Brincku house -- can you summarize**
12 **for me what conclusions you reached about the**
13 **Brucker house?**
14       MR. AYALA:  Again, I need to object to
15 the question based on a lack of foundation and the
16 characterization -- and the characterization.
17 I'll leave it at that.
18   A.  Okay.  Keeping in mind that these
19 conclusions are also based on information that's
20 not presented here, which is the results of
21 analysis, including photo documentation of jar
22 corrosion tests, raw-data chromatographs related
23 to analysis of the orthorhombic cyclooctasulfur
24 analysis, and the result of analysis that indicate
25 these parameters to -- for the S8 to be not

160

1  detectable above the method reporting limit,
2  coupled with the corrosion jar test being
3  conclusively negative, as documented by the
4  digital photographs that are included in another
5  original report that this --
6  BY MR. ANDERSON:
7    **Q.  But these are -- go ahead.**
8    A.  I'm sorry.
9    **Q.  I don't mean to interrupt you.  Go**
10 **ahead.**
11   A.  That these seven samples that were
12 submitted -- these seven samples of drywall --
13 that these seven samples of drywall were proven to
14 be noncorrosive.
15   **Q.  Okay.  And just so we're clear, I mean,**
16 **the "Conclusions" section of this document that**
17 **are referring to were written by you; right?**
18   A.  That's correct.
19   **Q.  Okay.  So these conclusions were drawn**
20 **based on all of the data that were included in**
21 **your original report; correct?**
22       MR. AYALA:  Just objection because --
23 and I know I've got a continuing objection.  The
24 problem is the whole report isn't here.
25       MR. ANDERSON:  But I'm not asking him,

161

1  Tom, questions about the raw data.  I'm merely
2  asking for the conclusions that he reached.  And
3  the fact that we're -- I'm constantly being
4  interrupted, when all you need to do is put a form
5  objection on the record to preserve your
6  objection, it's just slowing this whole process
7  down.  You put a continuing objection on the
8  record.
9    These are conclusions that he has
10 acknowledged he wrote down.  I'm not asking him
11 questions about the raw data without having -- him
12 have the ability to review it.  I'm merely asking
13 him questions about the "Conclusion" section and
14 asking him to summarize what he concluded.
15       MR. AYALA:  But what you're assuming,
16 without showing the witness a complete copy of the
17 document, is that the hundreds of pages that
18 you've omitted from each of these Columbia
19 reports -- you're assuming that they don't contain
20 any conclusions in them.  And I don't know that
21 that's a fair assumption to make because I don't
22 have the -- you didn't give us the complete
23 document to review.  So that's my objection.
24       MR. ANDERSON:  All right.  Well, it's
25 noted for the record.  Nevertheless, this is a

41  (Pages 158 to 161)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

162

1  "Conclusion" section that your expert drafted.
2       MR. AYALA: It's a "Conclusion" section
3  of a fraction of the expert report.
4  BY MR. ANDERSON:
5       Q.  Let me ask you a question, Dr. --
6  Mr. Tuday.  Is there an additional "Conclusion"
7  section in the full report?
8       A.  A general "Conclusion" section?  Now,
9  there is a -- the results of analysis are
10  summarized.
11       Q.  But what I'm asking is a more direct
12  question than that.  Is there any other section in
13  the entirety of the report that is called a
14  "Conclusions" section?  Either there is or there
15  isn't.  It's a yes or no answer.
16       A.  A "Conclusion" section?
17       Q.  Yes.
18       A.  No, there is not.  However, there are
19  results of analysis that list results of the
20  tests, clearly showing and demonstrating test
21  results where there's no positive result for;
22  whereby if someone outside of this room were to
23  look at this -- reports in their entirety, that
24  having looked at that entire report, including the
25  raw data, that even before they got to my

163

1  conclusions, that most reasonable people that work
2  in my line or profession would have reached their
3  own -- the same conclusions just based on the
4  other work that had been presented.
5       If I could expanded on that and clarify that,
6  one of the things I've done throughout my career
7  is I review other laboratories' reports -- that's
8  reports that are generated by laboratories that
9  are not Columbia Analytical Services -- and that
10  I'm asked to comment and reach conclusions based
11  on looking at the piece that's not included here,
12  which is the actual results of analysis, the
13  laboratory report, not the enhanced report, but
14  the laboratory report.
15       Q.  I understand what you're saying.  But
16  would you need to look at that raw data to know
17  that you didn't find any corrosion in these test
18  results, or could you look at the "Conclusion"
19  section that you drafted and see that same answer?
20       A.  Well, I can; but what I'm saying is the
21  demonstrative evidence that leads to those
22  conclusions are based on the photo documentation
23  of the jar corrosion test, which is a very
24  important piece of information that one would look
25  at to make an evaluation, because they can see

164

1  that, and without that documentation, without that
2  permanent record that's included in the digital
3  photography, that all one would be looking at is
4  somebody's word of reaching a conclusion.
5       Q.  Fair enough.
6       A.  And that's not our -- the way we
7  practice our discipline.
8       Q.  Sure.  I can appreciate that.
9       Let's move on, if we can, to Exhibit No. 5,
10  which is the Nutting report.
11       A.  Um-hum.
12       MR. AYALA:  Same objection.
13  BY MR. ANDERSON:
14       Q.  Can we go to page 4 of that?
15       A.  Yes.  I'm there.
16       Q.  Can you summarize for me briefly what
17  conclusions you reached based on all of the data
18  that you collected, raw and non-raw data, for the
19  Nutting house?
20       MR. AYALA:  Same objection.
21       A.  The conclusion that we reached is, based
22  on the entirety of the results and the
23  documentation, is that I concluded that the
24  drywall samples that were submitted -- and there
25  were in this case seven samples -- could not cause

165

1  corrosion.
2  BY MR. ANDERSON:
3       Q.  But two of the seven samples came up
4  positive for hydrogen sulfide; is that right?
5       A.  That is correct.
6       Q.  Could you read for me in that first
7  paragraph the sentence that begins "The negative
8  copper corrosion"?
9       A.  "The negative copper corrosion results
10  corroborate the elemental sulfur results,
11  suggesting the low-level hydrogen sulfide
12  detections were an anomaly."
13       Q.  When you say "an anomaly," what do you
14  mean by that?
15       A.  What I mean by "anomaly" is that what
16  we -- that these results were not typical of what
17  we found overall in looking at noncorrosive
18  drywall samples.
19       Q.  When you say that they're not typical of
20  what you found in noncorrosive drywall samples,
21  can you explain what you mean by that?
22       A.  Certainly.  Okay.  If you would be so
23  kind as to turn to page 7 of 25.
24       Q.  Certainly.
25       A.  And, again, this is black and white

42  (Pages 162 to 165)

166

1 but --
2    Q.   And the numbers are there, and, you
3 know, I freely grant you this is not in color and
4 I understand the point you're making.
5    A.   Okay.  In the analysis of a population
6 of 728 drywall samples that were submitted to
7 Columbia Analytical Services from a wide variety
8 of sources, mostly blind, in the cases, 404 of
9 which we conducted tests for both elemental sulfur
10 and hydrogen sulfide gas that added those 404
11 sample results in which the elemental sulfur was
12 positive in 96.8 percent of those cases, the
13 hydrogen sulfide was also detected; and,
14 conversely, in the 324 samples where the elemental
15 sulfur was negative, in 96.9 percent of the cases,
16 the hydrogen sulfide was also negative; that
17 looking at that trend where we have, respectively,
18 3.2 percent in one scenario and 3.1 in the other,
19 that the detection of two samples -- that the
20 detection of two samples out of seven for having
21 any positive results for hydrogen sulfide do not
22 fall into that general pattern.  However, if I can
23 go on --
24    Q.   Certainly.
25    A.   -- we further explain, in order to

167

1 clarify what -- the seeming anomaly, is that for
2 the two cases where we do have a positive
3 detection of hydrogen sulfide, the quantities that
4 we're detecting are significantly below any
5 results for hydrogen sulfide that were obtained
6 where elemental sulfur was detected positively,
7 but furthermore -- and this is the important
8 part -- in those 3.2 and 3.1 percent of the cases
9 where one's positive and one's negative, that the
10 mean concentrations of those ten population
11 points -- that the mean concentration of hydrogen
12 sulfide in the two samples that were detected in
13 the Nutting house are significantly below the mean
14 population where hydrogen sulfide was detected but
15 elemental sulfur was not.
16    Q.   Okay.  I think I follow that.
17    And I guess the question is:  What was the
18 detect level for hydrogen sulfide in those S8
19 positive samples?
20    MR. ALAYA:  Well, object.
21 BY MR. ANDERSON:
22    Q.   And let me clarify if it's not clear.
23 Okay?  What you said is that --
24    A.   In the S8 positive samples for -- okay,
25 what's the mean detect of the S8 or the mean

168

1 detect of the hydrogen?
2    Q.   Not mean detect.  What's the -- if I
3 understand what you're saying, what you're saying
4 is that you did detect hydrogen sulfide, but it
5 was at a low level; correct?
6    A.   That's correct.
7    Q.   In the samples from --
8    A.   Two of the seven.
9    Q.   Right.  Two of the Nutting samples, you
10 identified low detects for hydrogen sulfide?
11    A.   Right.  In there also stated that those
12 detects are very, very close to our method
13 reporting limit.
14    Q.   Right.
15    A.   Therefore, that -- by that statement it
16 is saying that there's some uncertainty in those
17 results -- that there's some uncertainty in those
18 results because the quality of the hits that we
19 detect are so close to our reporting limit, that
20 they're very close to being not detectable.
21    Q.   I understand.  In the 728 samples that
22 you reference on page 7 of 25 here -- in those 728
23 samples, was the method -- I'm sorry.  What's the
24 term that you used?  The method detect?  The
25 method --

169

1    A.   Method reporting limit.
2    Q.   Right.  Was the method reporting limit
3 the same for the Nutting samples as it was for the
4 remainder of the 728 samples?
5    A.   Yes, it is.
6    Q.   Okay.  So it's the same.
7    MR. ANDERSON:  Let's stop there for a
8 second.
9    THE VIDEOGRAPHER:  Off the record, 2:39.
10 (There was a recess in the proceedings.)
11    THE VIDEOGRAPHER:  This is Tape No. 4 of
12 the videotaped deposition of Michael Tuday.  We're
13 on the record at 2:54.
14    Go ahead, sir.
15 BY MR. ANDERSON:
16    Q.   Okay, Mr. Tuday.  When we went for our
17 break, you were talking about the threshold for
18 your testing of hydrogen sulfide, and you were
19 saying that you refer to the threshold as the --
20    A.   Method reporting limit.
21    Q.   Method reporting limit.  Let me write
22 that down so I don't have to ask you anymore.
23    Now, you said that the method reporting limit
24 for hydrogen sulfide was the same across all of
25 the -- all of the 728 samples referenced on page 7

43 (Pages 166 to 169)

170

1   of the Nutting report; is that right?
2       A.  That's correct.
3       Q.  Okay.  And among the 324 samples that
4   were negative for S8, only 3.1 percent were
5   detects for hydrogen sulfide?
6       A.  That's correct.
7       Q.  Okay.
8       A.  Above the method reporting limit.
9       Q.  But in the sampling that you conducted
10  in the Nutting house, two of the seven were
11  negative for S8, but positive detects above the
12  method reporting limit for hydrogen sulfide?
13      MR. ALAYA:  Just objection.
14  Go ahead.
15      A.  That's correct.
16  BY MR. ANDERSON:
17      Q.  Okay.
18      A.  And I also stated that earlier.
19      Q.  So, then, it would be fair to say that
20  in your overall sample, while it was only
21  3.1 percent in this sample set of seven, it was
22  almost 29 percent?
23      MR. ALAYA:  Objection to form.
24  Go ahead.
25      A.  Yes.  That's the same calculation -- the

171

1   same number I calculated.
2   BY MR. ANDERSON:
3       Q.  Did that disturb you at all?  Did you
4   think it was odd?
5       A.  Well, we referred to --
6       MR. ALAYA:  Objection.
7   Go ahead.
8       A.  Okay.  We referred to it in this written
9   report as an anomaly, which is, by definition,
10  something that we're finding odd and out of place.
11  So in order to perform an interpretation on
12  that to bring it into context, there are further
13  comments that -- and further clarifications that
14  where we do have those two detects out of the
15  seven samples, that those actual detectable hits
16  of hydrogen sulfide are very close to this method
17  reporting limit and when compared not to the
18  concentrations of hydrogen sulfide that are
19  detected where the elemental sulfur is also
20  detected, but to compare them to those
21  approximately ten samples that populate -- very
22  small population of ten samples that comprise the
23  3.1 percent, that the mean of those ten samples --
24  the mean concentration of hydrogen sulfide in
25  those ten samples is 24.2 parts per billion in the

172

1   analysis, but in all of the reports and -- the
2   ones that you've mentioned so far and the one that
3   you appear to be going on to mention, that in all
4   of the cases where we have these low-level
5   reported concentrations of hydrogen sulfide, that
6   those concentrations -- the detectable hits range
7   between 10 parts per billion and approximately
8   17 1/2, still significantly below the mean
9   concentration of the -- of the samples where
10  hydrogen sulfide was detected, but elemental
11  sulfur was not.
12  So I'm clarifying that although, yes, one
13  piece of information state -- is looking at a hit
14  ratio of 29 percent, that when you examine that
15  closer and more inherently, that those actual hits
16  are very close to being insignificant and what we
17  call "in the grass."
18  BY MR. ANDERSON:
19      Q.  And when you say "in the grass," what do
20  you mean by that?
21      A.  Okay.  It's typical analytical protocols
22  as part of a laboratory quality assurance program,
23  especially a laboratory like ourselves, which
24  holds multiple national certifications -- we have
25  a quality assurance program which stipulates

173

1   action that, you know, that are required as good
2   laboratory practice.  And some of those principles
3   of quality assurance are things like we're running
4   now what's called a multi-point calibration.  We
5   established what's called a linear range of
6   analysis, that what we call our method reporting
7   limit is also consistent with the lowest standard
8   concentration of an actual gas of hydrogen sulfide
9   that we analyze when we're doing these
10  measurements.
11  So instead of reporting something based on a
12  parameter that's known as "signal noise ratio," we
13  have an actual quantitative result at the lowest
14  concentration that we're reporting.  That's the
15  hallmark of a -- of a good quality laboratory, is
16  that they -- they conduct those kind of practices.
17  Now, at our Columbia Analytical Services
18  Simi Valley laboratory, we do work using the gas
19  chromatograph with the sulfur chemiluminescence
20  detecter.  We have three such instruments.  And at
21  any given point in time, there are minor
22  fluctuations in the sensitivity of these three
23  instruments.
24  Now, they have to meet minimum criteria; but
25  if you're looking at a chromatographic analysis on

44 (Pages 170 to 173)

174

1  one instrument, you might have a peak that
2  exhibits a signal-to-noise ratio of 10 whereas the
3  actual peak height is ten times the noise level.
4  On a given day, that signal-to-noise ratio might
5  be significantly less. And so on a particular
6  given day, depending on fluctuations in the
7  instrument, which is common to this type of
8  detector -- as a matter of fact, well-documented
9  in chemiluminescence detectors -- the hits at 10
10  might -- or at 10 ppb might not be as strong.
11     Q.  Are you saying that you are concerned
12  about the accuracy of the test?
13     A.  I am. But that -- what is -- okay. So,
14  for instance, we calibrate the instrument. And
15  the lowest level of our calibration is 10 parts
16  per billion. If we have a hit of like 10.5 parts
17  per billion, it might actually be 9.5 parts per
18  billion. It will be calculated as 10 parts per
19  billion, but there is a range of uncertainty in
20  any laboratory test.
21     Q.  And with this device, what would that
22  range of uncertainty be?
23     A.  That range is going to vary at the
24  location of a positive result within what's called
25  the "dynamic range." And the dynamic range is

175

1  defined as your low standard, which defines your
2  method reporting limit, and your highest standard,
3  which is the highest concentration of hydrogen
4  sulfide that we're injecting to establish our
5  calibration curve, that reportable hits as
6  positive should fall within that range between low
7  and high.
8     Q.  I guess that's not exactly what I'm
9  asking. And maybe it's because there's not a
10  clear answer here.
11     But what I'm asking you is: What is the
12  potential deviation? And let me give you an
13  example. I live in Washington, D.C. I tend to
14  pay a lot of attention to politics. If I read the
15  results of a poll, it may say plus or minus
16  four percent, right? And that's to take into
17  consideration the number of people that they've
18  spoken to and the demographics that they've looked
19  at, et cetera.
20     I guess that I'm looking for you to do is
21  give me some concept in this testing of what that
22  deviation could be from the norm.
23     MR. ALAYA:  Object to the form of the
24  question.
25     Go ahead.

176

1     A.  Okay. I'm not going to be able to give
2  you an exact answer because I don't -- I don't
3  have the information in front of me. But -- but I
4  can kind of paraphrase it that hopefully the
5  principle will be understood.
6     In different tests, one of the things that is
7  defined in a quality assurance program, generally
8  speaking, in certain established tests are looking
9  at precision and accuracy targets. And sometimes
10  those targets are stated unambiguously, reflecting
11  a hit that might be detected at a midpoint of a
12  concentration range.
13     It might say that a particular method has a
14  precision of plus or minus 20 percent or plus or
15  minus 30 percent. So if you had a hit at, let's
16  say, 100 parts per billion, that hit could be 70
17  parts per billion or it could be 130 parts per
18  billion. I'm stating about this particular test.
19     However, such a generalized statement is
20  often misleading because what happens is your
21  precision and accuracy is actually going to
22  deviate between where you are on your calibration
23  curve. If you're very close to your lowest
24  standard, your precision and accuracy is actually
25  going to be noticeably worse than it would be at

177

1  your midpoint or even at close to the upper point
2  of your dynamic range.
3     So I can't answer your question exactly, but
4  in a possible explanation of why we're seeing what
5  we're calling these -- what I've been referring to
6  as anomaly as -- in looking at the associated raw
7  data that was generated, I'm not entirely certain
8  that I'm convinced that these results were really
9  above 10 parts per billion.
10  BY MR. ANDERSON:
11     Q.  So if I understand your testimony, you
12  can't tell me what the deviation is, but you
13  question whether these results are accurate?
14     A.  At that concentration level. And this
15  is something that is common to all laboratories,
16  is that -- I want to make sure I phrase this
17  correctly. The -- the protocols that are being
18  followed -- based on, like, certain certifying
19  regulatory bodies that certify and regulate
20  laboratories -- will state that even if you have
21  a -- looking at a chromatogram and you have
22  interpreted uncertainty about that, that the rules
23  of how we have to report our data are firm and
24  that we're compelled to report a positive result
25  because that's what's in our analytical protocol,

45 (Pages 174 to 177)

178

1    our standard operating procedure.
2        Q.  So in this instance, you followed your
3    procedure; is that right?
4        A.  Yes, that's correct.
5        Q.  And you have no reason to believe that
6    you didn't calibrate the devices properly prior to
7    these tests?
8        A.  I reviewed that personally and, yes,
9    they were calibrated properly.
10       Q.  And using the method reporting limit
11   that you established for all 728 of the tests
12   referenced on page 7, you got two of seven
13   positives for hydrogen sulfide?
14       A.  Um-hum.
15       Q.  Can you say yes?
16       A.  Oh, yes.  Yes, we did.
17       Q.  Okay.  Now, we talked before about the
18   variety of gas liquid and solid testing that you
19   did.  I got the impression that the most corrosive
20   of the gas liquid solids that you tested was the
21   hydrogen sulfide.  I'm not trying to put testimony
22   in your mouth, but would you say that that's
23   accurate?
24       A.  Yes, I would say that that's accurate.
25   That's what my observation was.

179

1        Q.  And you said that -- and this sort of
2    struck me.  You said that when copper is exposed
3    to hydrogen sulfide, it can blacken in as fast as
4    five minutes; is that right?
5            MR. ALAYA:  Objection.  Lack of
6    foundation.
7            Go ahead.
8        A.  That's fine.  I can answer that.
9    BY MR. ANDERSON:
10       Q.  May I assume it's a higher
11   concentration?
12       A.  It's a -- it's concentration-dependent.
13   And so at a lower concentration, similar to what
14   we see in these simulated chamber analyses for
15   these sulfur gases, yeah, the concentration of
16   hydrogen sulfide that we're detecting in these
17   samples is much, much lower.
18       What we were trying to demonstrate in this
19   materials exposure analysis was just the potential
20   for a particular substance to cause a change in
21   the appearance of the copper that it's being
22   exposed to.
23       Q.  Can you give me some concept or frame of
24   reference for what the concentration of hydrogen
25   sulfide would look like in that environment where

180

1    it could corrode as quickly as five minutes?
2            MR. ALAYA:  Just before you answer, I
3    object to the question to the form of this
4    question.
5            Go ahead.
6        A.  I believe in this particular exposure
7    experiment -- and, again, I don't have an absolute
8    recollection; but I believed it was somewhere on
9    the order of a thousand parts per million.
10   BY MR. ANDERSON:
11       Q.  Okay.  And the test results that we are
12   talking about here in the Nutting test are parts
13   per billion; is that right?
14       A.  Let me clarify.  Yes, the -- if you look
15   at -- okay.  There's two types of units that
16   are -- that have been reported.
17       Q.  Help me understand that.
18       A.  Okay.  The hydrogen sulfide results that
19   are reported in the explanation given here in this
20   enhanced report is based on the amount, the
21   concentration that we saw in the gas, the gas that
22   was measured in the environmental chamber, but not
23   the final calculated amount that was listed in the
24   actual laboratory reports, which were calculated
25   on a different basis.  This is a part per billion

181

1    by volume, is what's being discussed here, which
2    is a gas unit.
3        So what we're looking at here, just to
4    clarify, technically, for the record, is when
5    we're looking at a part per billion by volume --
6    and it is abbreviated ppbv.  What we're looking at
7    is that there is one nanoliter of hydrogen sulfide
8    gas in a liter of air.
9        Q.  Okay.  Make sure I remember from high
10   school what nano means, or from Apple.  Is it one
11   millionth; right?
12       A.  No.  It's one billion.
13       Q.  One billion.
14       A.  One times ten to the minus nine.
15       Q.  Okay.  All right.  So a ppbv would be
16   one billionth of a liter of, in this instance,
17   hydrogen sulfide in a volume of air of one liter?
18       A.  That's correct.
19       Q.  Okay.  How does that basis for
20   comparison of -- what would be the -- how would I
21   translate that to what you were talking about with
22   the thousand parts per billion in the rapid
23   corrosion you were referring to?
24       A.  Okay.  Let me just -- I wanted to finish
25   the one thought about the units because it is

46 (Pages 178 to 181)

182

1 significant because, you know, these reports
2 are -- the results that are included in the other
3 part of the report that's not given in this
4 summary are reported in different units. And
5 those units are micrograms per kilogram. That's
6 micrograms -- not -- you won't find it here.
7     Q.  Okay.  I think the S8 was reported in
8 micrograms per kilograms?
9     A.  Milligrams per kilograms.
10     Q.  Right.  Okay.
11     A.  But for the purposes of clarification on
12 just this enhanced report, the units that we chose
13 to give the hydrogen sulfide concentrations
14 context were the parts per billion by volume. And
15 the reason that is, is because that's -- that
16 reporting limit won't change. It's fixed and
17 static, whereas the reporting limit on the
18 mass-per-mass unit, which is what's reported in
19 the actual sample test results that were submitted
20 to Morgan Lewis, based on the elemental -- I'm
21 sorry -- the environmental chamber analysis for
22 hydrogen sulfide emissions, were based on using a
23 mass of drywall and how much mass of hydrogen
24 sulfide we detected.  So it's a mass-per-mass or
25 weight-per-weight relationship.  So it's a

183

1 microgram per kilogram.  So it would be a
2 microgram of hydrogen sulfide per kilogram of
3 gypsum.
4     Q.  Okay.  So a thousandth of a gram; is
5 that correct?
6     A.  A microgram is a -- I'm sorry -- is a
7 tenth to the minus six million.
8     Q.  Okay.  All right.  So micro, milligram,
9 and nano.  Okay.  I apologize.
10     A.  A microgram per kilogram.
11     Q.  Right, right, right.  I realize --
12     A.  That's a thousand grams.  So it's a true
13 part per billion.
14     Q.  I understand.
15     A.  Right.  So they're both parts per
16 billion, but one is expressed as a volume unit and
17 one is expressed as a mass unit.
18     And the reason we chose to do that in this
19 enhanced report is the reporting limit for the
20 chamber exposure test is going to vary based on
21 the amount of drywall we used to put in the
22 chamber.
23     And lots of times that was determined by how
24 much sample we received from the client.  So
25 that's going to vary.  So in order to be looking

184

1 at apples to apples, we chose to make this
2 explanation in the ppb units, which is what we
3 taught at the instrument level --
4     Q.  I understand.
5     A.  -- not the calculated result.  So I just
6 wanted to clarify that.
7     Q.  Okay.  I think I understand.  It was to
8 provide a standardized unit.
9     I'm not sure that you answered the other
10 question that I asked, which was when you said
11 that it sort of wasn't apples-to-apples comparison
12 when you were talking about parts per billion with
13 respect to that rapid corrosion that you referred
14 to and the levels of hydrogen sulfide that were
15 detected in the Nutting samples.
16     MR. ALAYA:  Just objection to -- that
17 mischaracterizes the testimony.
18     Go ahead.
19     A.  Okay.  Okay.  So what I'm getting to is
20 that in that rapid exposure test, which was just
21 to see if a particular substance would cause a
22 change -- I'm not going to say corrosion, but a
23 change -- in the surface on the copper tubing,
24 that what we utilized was a very high
25 concentration gas of hydrogen sulfide at, I

185

1 believe -- and I don't -- I don't know -- I don't
2 know whether I'm completely accurate with it, but
3 what I -- what my recollection is it was somewhere
4 on the order of a thousand parts per million.
5 Okay.  And a thousand parts per million is roughly
6 one percent by volume.  Not roughly.  It is.  It's
7 one percent.  I'm sorry.  Point -- I'm sorry -- a
8 tenth of a percent by volume, 0.1 percent by
9 volume.
10 BY MR. ANDERSON:
11     Q.  I follow you.
12     A.  10,000 parts per million is equal to
13 one percent.
14     Q.  Okay.  Thank you.
15     I'd like to turn, if we can, to Exhibit 6,
16 which is the Ravelo report.
17     MR. ALAYA:  Same objection.
18     MR. ANDERSON:  Thank you.
19 BY MR. ANDERSON:
20     Q.  If you can, could you turn to page 4 of
21 24, please.
22     Let's put that one aside for one minute.  I'd
23 like to actually go to 7, which is Retana.
24     MR. ALAYA:  Same objection.
25

47 (Pages 182 to 185)

186

1  BY MR. ANDERSON:
2      Q.  I'd like to go to page 4 of Retana, if
3  you could.
4      A.  Yes.
5      Q.  Could you read the third sentence of the
6  second paragraph?
7      A.  "This sample did have a low-level
8  hydrogen H2S detection slightly above the
9  reporting limit.  However, the results appear to
10  be a laboratory anomaly due to the fact that the
11  jar corrosion test was also determined to be
12  negative.
13      Q.  You got another anomaly in the Retana
14  house?
15      A.  That's correct.
16      Q.  Okay.  And how many samples did you test
17  from the Retana house?
18      A.  A total of 11 samples.
19      Q.  Okay.  If you would, can you turn with
20  me to page five of the report.  Excuse me.  Page 7
21  of the report.  I'm a little bit confused.  This
22  one seems to refer to there being seven samples
23  instead of 11.  I'm on page 7.  As I indicated
24  before, I'm on page 7.
25      A.  Let me look this over for a moment.

187

1  However what makes this particular report unique
2  when compared to the other reports in that if you
3  look at the sample descriptions of the samples
4  that were submitted from the laboratory, that
5  there was -- clearly and unambiguously samples
6  were marked as being -- having an origin from
7  China.
8      Q.  I follow that, but it looks to me like
9  someone cut and pasted the portion from Nutting
10  that appears on page 7 of the Nutting report and
11  cut pasted it identically into the Retana report.
12  And if you could help me understand what the
13  distinction is there, I'd appreciate it.
14      MR. ALAYA:  Just objection to the
15  characterization of the document.  Particularly
16  objection to the characterization of the document
17  that's showing the witness that's all part of the
18  document that is an incomplete version.
19      A.  In this particular case, it would be
20  extremely helpful if I had the other part of the
21  report and I could verify what you're saying,
22  whether that's accurate or not really quickly.
23  Let me just study this for a moment.
24  BY MR. ANDERSON:
25      Q.  Take your time.

188

1      MR. ANDERSON:  Tom, just to be clear, I
2  have a jump drive that's got the full report on
3  it.  I didn't carry it from Washington, D.C., four
4  copies of these thousands of pages of reports.
5  And I understand your concern about that, and I
6  want to be fair here.  If you want to take a few
7  minutes and print full copies of these two reports
8  in color so that we can get to the bottom of why
9  these reports appear to have identical narratives
10  in them, that's fine.  I have no problem with
11  that.
12      MR. ALAYA:  I view it as the examiner's
13  obligation to bring full and complete documents to
14  a deposition that has been noticed in a federal
15  court litigation.  I'll leave it at that.
16  Plaintiffs noticed the deposition today.  Today is
17  the date of the deposition.  The deposition is
18  noticed of an expert in a litigation in the United
19  States District Court, and one would expect an
20  examiner who noticed the deposition to bring a
21  full and complete copy of the expert reports
22  provided by the expert witness who is here to be
23  deposed today.
24      A.  I'm almost done.  Are you ready?
25

189

1  BY MR. ANDERSON
2      Q.  Yes.
3      A.  Based on my inspection of this, I would
4  have to agree that what you stated earlier is
5  actually what I'm seeing as well, that there
6  appears to be an error in this report on page 7 of
7  26, and that this Figure 3, where it starts as
8  Figure 3 would indicate that there were -- let's
9  see how many.  It's stating there are two of seven
10  samples.  Wait.  I'm sorry.
11      It's stating that five -- five of seven
12  samples displayed positive corrosion in the jar
13  corrosion test.  Five of seven samples.  Five of
14  seven samples had positive hits in the jar
15  corrosion test as well as the elemental sulfur
16  test.  Those five samples -- I'm sorry -- five
17  samples, not out of seven -- five samples out of
18  11 had positive results for the jar corrosion test
19  and also for the elemental sulfur, and it should
20  not have said of seven.  It should state of 11.
21      Those five samples in each case are samples
22  that are identified from the Retana house as
23  having sample identities as number one, China
24  dining room, number three, China Venture Supply,
25  number six, Chinese D/W, number ten, Chinese foyer

48 (Pages 186 to 189)

190

1    wall, and number eleven, Chinese foyer wall, where
2    all three tests are positive.
3        However, there appears to be from my looking
4    at this only one anomalous hydrogen sulfide
5    detection that's reported, and that would be on a
6    sample that's labeled garage NGC, and that would
7    be Retana sample number four where there was a low
8    level hit for hydrogen sulfide.
9        Now, again, the explanation that was given
10   related to the other reports is still the same,
11   that this is a low level hit that generally is
12   viewed as anomaly, whereas the concentration of
13   hydrogen sulfide that's reported falls below the
14   mean value for the population of samples where the
15   elemental sulfur was not detected, but hydrogen
16   sulfide was detected positive.  So I think the
17   sample summaries are -- that there's an error in
18   that.
19       Q.  So which report did you say you think
20   there's an error in the sample summary?
21       MR. AYALA:  Just again, I object because
22   the witness is being asked out of context about a
23   paragraph from an incomplete document and has no
24   way to verify using the rest of his report the
25   context for that paragraph.

191

1    BY MR. ANDERSON:
2        Q.  Well, let's talk about that for a second
3    because I think that's a reasonable question to
4    ask.  I'd like to go through each of the reports
5    in turn.  Let's start with No. 3.  No. 3 is an
6    excerpt of the Brincku report.  It is the first 24
7    pages of the Brincku report.  It is not provided
8    in color.
9        Now, on page 2 in the summary section, it
10   says Columbia Analytical analyzed 147 samples from
11   the Brincku home for orthorhombic cyclooctasulfur
12   elemental sulfur S8.  So there were 147 samples in
13   the Brincku house that were tested; correct,
14   Mr. Tuday?
15       A.  For the elemental sulfur using the
16   technique that employs gas chromatography with
17   electron capture detection.
18   BY MR. ANDERSON:
19       Q.  How many of those samples were tested
20   for hydrogen sulfide emission.
21       A.  15.
22       Q.  Turn with me, if you would, to page 7.
23   Is that paragraph identical the paragraph that
24   appears in -- and you can take your time to check
25   it out -- is that the same identical paragraph

192

1    that appears in the Retana report?
2        MR. AYALA:  Again, objection, and I
3    object to the insinuation that the paragraph on
4    page 7 is discussing any of the samples from the
5    plaintiffs' homes because it's an incomplete
6    report, and there's no foundation to support that.
7        A.  It's referring to Figure 3, and Figure 3
8    has no context in any of the homes.  It's just
9    talking about the overall database with
10   relationship to -- the relationship of elemental
11   sulfur with hydrogen sulfide emissions.
12   BY MR. ANDERSON:
13       Q.  Well, I'm not sure if I agree with that.
14   Where it says here five out of seven samples, if
15   you would follow with me.  It's about midway down.
16   Do you see where it says that?
17       A.  Yeah, I'm seeing that.
18       Q.  Is that the exact same paragraph that
19   appears in the Retana report on page 7?
20       A.  It appears to me to be identical.
21       Q.  You said that there were 15 samples
22   tested for hydrogen sulfide in the Brincku home?
23       A.  Yes.  All 15 were not detectable for
24   hydrogen sulfide.  So yes, part of this is
25   relevant, and it looks like part of it does have

193

1    some confusion related to what was detected in --
2    let me just see.
3        No.  There doesn't appear to me to be any --
4    this looks like it was done intentionally, and
5    what it's saying is -- it's saying 3.2 percent of
6    the time, 13 samples where S8 was detected and
7    hydrogen sulfide was not, the jar corrosion test
8    was performed on seven samples.  Five out of the
9    seven samples displayed positive corrosion in the
10   jar corrosion test while two of the seven samples
11   displayed a negative concentration.
12       Again, this isn't talking about test samples
13   that were from any of these homes.  This is
14   talking about looking at the population of how
15   many samples where one test came out positive and
16   the other one came out negative, and it's just
17   quantifying the number of samples.
18       Q.  Turn with me, if you would, to the
19   Brucker Exhibit 4 -- excuse me.  I apologize --
20   the Ravelo exhibit which is --
21       A.  I'm sorry.  Retana?
22       Q.  Ravelo.
23       MR. AYALA:  I'm sorry.  What page?
24       MR. ANDERSON:  We are going to go to
25   page 4.

49 (Pages 190 to 193)

BY MR. ANDERSON:

Q. Can you read the fourth sentence of the first paragraph for me?

A. Starting with while?

Q. Yes.

A. "While six samples displayed low level detected hydrogen sulfide emission results, slightly above the reporting limit, all Ravelo samples were deemed negative for the copper corrosion test."

Q. If you could, turn to page 2. That indicates that 13 samples were tested in the Ravelo home; correct?

A. A total of 13 samples.

Q. Were all 13 of those samples tested for hydrogen sulfide?

A. According to the first paragraph on page 2, the first sentence right under the term Laboratory Report. So what this is stating on page 4 is that these 13 samples contain low level detectable hydrogen sulfide. However, given the entirety of the analytical results, my opinion was still that the -- in the entirety of the tests that were done, that these results still indicate and demonstrate that these 13 samples were

noncorrosive.

If you look at page 10 of 24, and this goes back to something we had discussed earlier, there's a graphical depiction of these six positive hydrogen sulfide hits, and in every single case, these six hits are below that -- if you look at the right-hand bar on the bar graph, that these six -- that these six hydrogen sulfide positive hits in between the goal posts in the bar graph are all at concentrations that are significantly less than the mean concentration of the 13 samples where S8 was measured as being negative and hydrogen sulfide was being measured as positive. That would be the 3.1 percent of the time based on large data set.

Q. So would it be fair to say then that in this instance here, nearly half of the Ravelo results are anomalous with respect to testing for hydrogen sulfide?

A. Yes. That's what we stated, and that's my opinion.

Q. Do these results in any way undermine the correlation between the positive S8 and the detection of hydrogen sulfide?

MR. AYALA: Objection. Form.

A. That's fine. Since it was determined that these six low level hits were what we called unusual occurrences or anomalies, that further explanation and clarification was deemed necessary in order to put the significance of these hits in context with all the tests that were done overall, where I conclude very confidently that all the samples that were reported were noncorrosive. And that is being that yes, there are six hits of hydrogen sulfide, but that those concentrations that are detected between ten parts per billion and roughly 17.5 parts per billion are significantly less than any of the hydrogen sulfide reports that were detected as being positive in samples in the large database where we saw the same trend, that it was well below the mean of those, of that population of samples.

Now, if you go back to the logic that I use when I devised these tests, what I stated was that the elemental sulfur test, which is the indicator chemical for whether or not a piece of drywall will be corrosive or not, is the single most reliable and is the single most reliable parameter in determining whether or not there's a prediction of whether a piece of drywall will be corrosive

and that all of those negative tests on all of these reports is consistent with what we observed in the photo documentation of the jar corrosion tests.

The test that was employed for the analysis of hydrogen sulfide was meant to be a secondary analysis that would demonstrate that there's a positive detection of a corrosive agent. However, the reason that I chose the elemental sulfur test as the most reliable test is because the concentrations of elemental sulfur in the drywall samples are generally measured in the parts per million, which are milligrams per kilogram, whereas the hydrogen sulfide emissions tests are measured in the parts per billion, and that the hits that we received, that we saw in the database for elemental sulfur are robust hits.

The Florida Department of Health made a determination or set a guideline that hits of elemental sulfur above the concentration of ten milligrams per kilogram would be defined by the case definition as corrosive, whereas our reporting limit for that same test is actually half of that or five so that there's very little gray area of ambiguity, because that test is so

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

198

1  sensitive, whereby the hydrogen sulfide analysis
2  method at the very, very fringe of the
3  reportability has some uncertainty to it.  And
4  that's why we chose it as being a secondary test.
5  And that when we had hits that were positive for
6  the elemental sulfur, usually the hits for
7  hydrogen sulfide that were associated with those
8  samples were also very robust, whereas the mean
9  concentration in that database, the mean
10  concentration was 124 parts per billion.  So
11  that's 12.4 times higher than our method reporting
12  limit.
13  BY MR. ANDERSON:
14      Q.  Wait a second.  I thought the mean was
15  24.
16      A.  No.  The mean is 24 when the two tests
17  don't agree with each other.  But when the two
18  tests agree with each other, and this is the left
19  side goal post, it's saying mean hydrogen sulfide
20  concentration for S8 is greater than the method
21  reporting limit, that the mean concentration is
22  124 ppb.
23      And that if you look at statistics of mean,
24  median, coefficient and variation, minimum and
25  maximum, you can see here, for instance -- okay,

199

1  for all detected hydrogen sulfide values -- this
2  is page 9 of 24 in the Ravelo report -- there's a
3  Figure 5A, and then there's a table that goes with
4  it.  We have a population of 433 samples where
5  we've done at least two tests.  We've done an
6  elemental sulfur test, and we've done a hydrogen
7  sulfide test, and a lot of those tests also
8  included other compounds, other reduced sulfur
9  compounds.  That when both of them were positive,
10  the hydrogen sulfide results, generally speaking,
11  were considerably above our method reporting
12  limit, and then there was no ambiguity.
13      There is a minimum value of 10.1, but there
14  weren't a large population of hits that were in
15  that range.  They were generally considerably
16  higher.  The mean is 124 ppb or like, I said, 12.4
17  times greater than our method reporting limit.
18  The median or the middle of that is 61 parts per
19  billion.
20      So in these six hits we're talking about in
21  the Ravelo home, all these hits are populated, but
22  they're all cluttered very, very close to the
23  reporting limit of 10 ppb.
24      Q.  When you said before that because of
25  calibration, it could actually be lower than the

200

1  threshold?
2      A.  Um-hum.
3      Q.  But it could actually be even higher
4  than it was; right?
5      A.  It's a possibility, but keep in mind
6  that one of the functions that I perform in the
7  laboratory is I perform a function that's called
8  an intuitive review, which is looking at the
9  results in the entirety.  And some of the things
10  that I look at when results are being reported is
11  I'm looking at the quality of the hits.
12      Now, we might be, like I said, given the
13  rules that generally an environmental laboratory
14  has to follow within the certifying bodies, that
15  even if we didn't want to report of a positive
16  report based on like looking at a visual
17  inspection, some of those rules will compel us to
18  report that, because they want to err on the side
19  that we're not trying to hide anything.  The
20  results are the results.  We may not necessarily
21  agree with them, but they're all done using the
22  same ground rules.
23      Q.  I follow, and I can appreciate that.
24      A.  I know that's a terribly wordy
25  explanation, but that's essentially what happens.

201

1      Q.  Because I think if one looks at this,
2  they see that you have a pretty clean correlation
3  between negative for S8 and negative for hydrogen
4  sulfide, and the results particularly with Ravelo
5  but also with, I guess, Brucker really sort of run
6  against that percentage.
7          MR. AYALA:  Objection.  Go ahead.
8      A.  What you're saying -- I understand what
9  you're stating and I can understand that
10  explanation, but my clarification on this was that
11  yes, on the surface it would appear that way, that
12  it would go against what we've been purporting to
13  say fits this predictable model, is that when you
14  look at it closely and you realize some of these
15  hits that are reported and they do show up not in
16  every report, but in at least half of them --
17      Q.  Three.
18      A.  Three of the five, right, that it
19  reflects the difference in the level of confidence
20  in the quantitative ability for us to measure
21  hydrogen sulfide at concentrations that approach
22  this method reporting limit.  The reason, again,
23  that's why we chose the hydrogen sulfide emission
24  test as a secondary analysis.  It's kind of like a
25  confirmatory analysis, but the primary analysis

51 (Pages 198 to 201)

202

1  was and always was designed to be the elemental
2  sulfur because of the robustness of the method.
3      When we get hits and you look at a
4  chromatogram, you're looking at a flat line with
5  a bump on it that even at concentrations that
6  approach the method reporting limit, you can look
7  at a chromatogram and go yeah, there's the peak,
8  whereas, if you're looking at a hydrogen sulfide
9  chromatogram, the sulfur chemiluminescence
10  detector has a lot of noise associated with it.
11  And that's what we're referring to as being in the
12  grass.
13      Like I said, there is variation in that
14  particular type of detector that is well known by
15  users of the chemiluminescence detector.  It's
16  kind of the nature of the beast that it's a noisy
17  detector and sometimes things look like peaks,
18  that may be peaks, but they may be smaller peaks
19  than what they are actually integrated as.
20      Q.  Does the fact that there was corrosion
21  or there is corrosion in these houses have any
22  impact on your view of these results?
23      MR. AYALA:  Objection.  Lack of
24  foundation.  Calls for speculation and assumes
25  facts not in evidence.

203

1      THE WITNESS:  Is there a way we can go
2  off the record for just a minute with you, or is
3  that not appropriate?
4  BY MR. ANDERSON:
5      Q.  What I ask is that you answer the
6  question now and then you can take a break if you
7  want.
8      A.  Oh, no.  That's okay.  I can answer the
9  question now.  We've analyzed a lot of samples of
10  drywall samples that were submitted to us from
11  residents that were located in south Florida.  And
12  in many cases -- and I'm not talking about samples
13  that I have absolute knowledge of from these
14  circumstances and these homes -- is that in many
15  cases, I would get calls from homeowners that were
16  saying yeah, my neighbor has this Chinese drywall
17  and I think I have it, too.  And we would test
18  some samples only to find out that their samples
19  were negative, and then in doing interviews with
20  these homeowners, only to find out that that
21  particular area where they lived or that community
22  was impacted by high levels of hydrogen sulfide
23  gas dissolved in their water supplied to their
24  home and that the corrosion that they were
25  appearing to see, which was real corrosion, was

204

1  not, in fact, from based on the results of
2  analysis of the drywall, most likely being caused
3  by having anything to do with the drywall, but it
4  was very highly probable -- again, I didn't have
5  all the facts -- but highly probable that that
6  corrosion that they're observing that is real
7  corrosion was most likely attributable to high
8  hydrogen sulfide levels in the home water service.
9      Q.  Can you direct me to any peer-reviewed
10  studies that address hydrogen sulfide presence or
11  corrosion in homes as the result of the water?
12      MR. AYALA:  Hold on.  Hold on.
13  Objection.  Lack of foundation.  It's beyond the
14  scope of the report, and it's beyond -- there's a
15  lack of foundation, period.  Go ahead.
16      A.  Well, I wouldn't necessarily call it a
17  peer-reviewed study, but I have personal
18  experience in it because it happened to me, and to
19  me that's very relevant and I saw it with my own
20  eyes.  We didn't have Chinese drywall in our home.
21      The house was built many, many years ago.  We
22  had corrosion phenomena that was located -- that
23  was located in areas of the house that were nearby
24  water taps or showers, and we didn't see that same
25  corrosion in other areas of the house that weren't

205

1  near the water supplies.  I mean, I lived with
2  this.  Again, it didn't last for more than, you
3  know, a period of months or less than a year.  But
4  it was enough for me to make that association.  It
5  was real clear to me what was going on here.  And
6  I didn't need to look at any peer-reviewed studies
7  to draw that conclusion.
8  BY MR. ANDERSON:
9      Q.  But that's really anecdotal; right?
10      A.  Absolutely anecdotal.
11      Q.  And it's one example; right?
12      A.  But anecdotal evidence, although maybe
13  not provable by fact, can also be strong evidence
14  in the minds of the people that are experiencing
15  something.  But I wasn't trying to demonstrate a
16  fact that this was happening and trying to prove
17  it to someone else.  I wasn't trying to sue my
18  water company for giving me bad water.
19      But to clarify that also, is that I had
20  several conversations with consulting engineers,
21  industrial hygienists from different consulting
22  bodies in that general vicinity, including the
23  folks at Environ International, and that wasn't
24  just limited to them but others, that was telling
25  me the same thing, that the corrosion in some of

52  (Pages 202 to 205)

206

1    these homes in their opinion was being caused by
2    the water supply and not by the drywall.
3        Q.  You say that though having not been to
4    any of the homes in Florida; right?
5        A.  I've stated I have not been to any of
6    the homes in Florida.
7        Q.  Okay.
8        A.  So even what I'm saying now, it's not my
9    opinion.  It was what was told to me in multiple
10   conversations with different individuals that
11   obviously hadn't been speaking with one another.
12   So when you look at evaluating even anecdotal
13   evidence, if you employ the principle of multiple
14   lines of evidence, it seems to be fairly strong
15   and convincing and compelling.
16       Q.  You mentioned that you when you first
17   met with Mr. Pagliaro, you toured a National
18   Gypsum drywall facility; is that right?
19       A.  That's correct.
20       Q.  Did you conduct any investigation into
21   the manufacturing process of National Gypsum?
22           MR. AYALA:  Objection to the form.  Go
23   ahead.
24       A.  An investigation?  No.  The purpose of
25   my visit was more observational to gain kind of a

207

1    generalized knowledge of the -- not an in-depth or
2    expert's knowledge, but a generalized knowledge of
3    how the product was manufactured, looking at the
4    facility, looking at the level of effort and the
5    level of care and professionalism.  And also one
6    of the -- when we drove around, we actually looked
7    at the -- I believe we looked at the Duke Energy
8    plants that were nearby that were supplying that
9    National Gypsum plant with the spent scrubber
10   material from the flue gas desulfurization process
11   that was formed into the gypsum product.
12       I had never been to a drywall manufacturing
13   facility before.  So I wasn't familiar other than
14   what I had read and researched on my own, but I
15   can tell you that what I came away with was I was
16   amazed at -- I could have eaten off the floor of
17   that plant, and that's not what I would have
18   envisioned.  I would have thought that it would
19   have been filthy with dust everywhere.  And it
20   left an impression in speaking with the plant
21   manager at the time, and I don't recall his name,
22   but what struck me was the level of care and
23   professionalism that was employed -- I'm just
24   speaking at that plant and what I saw, and I can't
25   extrapolate that to other National Gypsum

208

1    facilities but also speaking with the individuals,
2    and how conscientious they were based on what was
3    told to me as how seriously they took some of
4    these complaints and they specifically mentioned
5    the Brincku matter.
6    BY MR. ANDERSON:
7        Q.  Did you tour the Apollo Beach facility?
8        A.  No, I did not.
9        Q.  Would it be fair to say that the metrics
10   that you used for testing in this case were drawn
11   predominantly from the Chinese drywall
12   investigations?
13           MR. AYALA:  Objection to form.  Vague.
14       A.  Yes.  The tests were developed to
15   respond -- they were developed considerably
16   earlier than any involvement I had with National
17   Gypsum.  And to the best of my knowledge, that it
18   was my presentation at that symposium that led to
19   National Gypsum's interest in having me
20   participate in looking at their matter.
21   BY MR. ANDERSON:
22       Q.  One of the criteria for the Florida
23   Department of Health techniques that you employed
24   for all five of these tests, isn't one of the
25   tests or isn't one of the elements of the test

209

1    whether or not the drywall says Made in China on
2    it?
3        A.  According to the Florida Department of
4    Health?
5        Q.  Yes.
6        A.  Yes.  But I'm not sure I understand any
7    relevance in that to this situation.  Because
8    those set of instructions weren't for people like
9    myself.  They were for homeowners, and they were
10   trying to look at meeting case criteria.
11       Q.  And so would it be fair to say that you
12   believe the markers present for problem drywall in
13   the Florida Department of Health and CPSC studies
14   are an important indicator for problem drywall in
15   this case?
16       A.  Please define the word "problem."
17       Q.  Corrosive drywall.
18       A.  State that one more time.  That the
19   indicators...
20       Q.  Sure.  Do you believe that the markers
21   employed by CPSC and the Florida Department of
22   Health to identify corrosive Chinese drywall are
23   important indicators for problem drywall or
24   potentially corrosive drywall in this case?
25       A.  As far as the case criteria markers?

53  (Pages 206 to 209)

210

1  Q.  Yes.
2      A.  The case criteria markers is the not
3  necessarily demonstrating that there's corrosive
4  drywall.  It's kind of a screening process to
5  determine if there may be corrosive drywall.  And
6  I agree with those markers, presence of corrosion,
7  looking at labels, off odors in the house, things
8  of that nature that could be employed by someone
9  that might suspect that they're living in such a
10  house, but all it is, it's a screening process to
11  go to the next step to get further clarification.
12      Q.  How about the S8 marker in particular,
13  do you believe that that is equally relevant with
14  domestic drywall as it is with the Chinese
15  drywall?
16      A.  As far as predicting corrosivity?
17      Q.  Yes.
18      A.  I absolutely believe that.  I believe
19  that it's a completely reliable marker.
20      Q.  Other than the Brincku home that was
21  tested as part of the CPSC ten home study, as you
22  sit here today, can you tell me any other drywall
23  from National Gypsum's Apollo beach plant that was
24  tested as part of any CPSC study?
25      MR. AYALA:  Objection.  Lack of

211

1  foundation and calls for speculation.
2      A.  I have no information on that.  There
3  might be information out there, but I don't know
4  of anything personally firsthand.
5  BY MR. ANDERSON:
6      Q.  So you said earlier that it's your
7  understanding that the Chinese board that is
8  causing corrosion is mined gypsum from Shandong;
9  right?
10      A.  What I stated was that in my
11  communication with scientific experts, government
12  experts and the volumes of information that I
13  had -- what I had gleaned from volumes of
14  information, that according to multiple sources,
15  including government representatives that actually
16  toured gypsum mines in China, that it would be
17  difficult to come to any other conclusion and that
18  in that period of time where there was a great
19  deal of uncertainty and there was a lot of
20  information that was being hosted on the internet
21  from a variety of sources that had multiple
22  explanations for this phenomenon, that pretty much
23  from day one is that this corrosive drywall that
24  was imported from China, that in looking at --
25  that I always believed that it had to be mined

212

1  product.
2      Although I didn't have any factual basis for
3  that opinion, it was what I had always felt was
4  the most logical explanation that employed reason,
5  and that all the other explanations to me just
6  didn't ring true.  When you looked at the variety
7  of sources, some of them to me, for lack of a
8  better word, appeared to me to be xenophobic
9  towards what's well documented problems with
10  several types of products that have been imported
11  from China, some that had appeared to be of
12  nefarious origin and some that appeared to be
13  totally innocent and unintentional.
14      Q.  Do you have any reason to believe that
15  the elemental sulfur that's been found in the
16  Chinese board was not in the originally mined
17  material?
18      MR. AYALA:  Objection.  Calls for
19  speculation.
20      A.  There's no other explanation to me other
21  than it was there all along.
22  BY MR. ANDERSON:
23      Q.  Could the same be said of the strontium?
24  Do you have any reason to believe that the Chinese
25  manufacturers would have been adding strontium to

213

1  the mined gypsum?
2      A.  No.  I believe the strontium that's
3  detected in overall higher concentrations, let's
4  say the mean strontium that is representative of
5  looking at multiple mine locations in North
6  America is of natural origin.
7      Q.  Do you know where National Gypsum's
8  Apollo Beach plant gets its gypsum from?
9      MR. AYALA:  Hold on.  Objection.  Lack
10  of foundation.  Calls for speculation.
11      A.  I don't know that.
12  BY MR. ANDERSON:
13      Q.  If it's different source material than
14  the National Gypsum drywall, then what scientific
15  basis do you have to believe that the markers for
16  the defective Chinese board would be applicable to
17  National Gypsum's drywall?
18      MR. AYALA:  Objection to form.
19      A.  Again, you go back to the particular
20  period of experimentation that I and my staff had
21  conducted.  We weren't interested per se at
22  looking at what was the origin of a particular
23  board since we knew that many of our samples came
24  to us blind with no explanation, even whether or
25  not that those samples that were submitted came

54  (Pages 210 to 213)

214

1  from a house that was experiencing -- residents or
2  other type of structure that was experiencing
3  corrosion problems or not. In the overwhelming
4  majority of the cases, we had no prior knowledge
5  of the origin of it, and that we wanted to develop
6  tests that were completely objective that would
7  work in every circumstance without regard to
8  having additional information.
9      And that if you look at entirety of the work,
10  that was part of the reason why we assembled such
11  a comprehensive database, was to try to be able to
12  have overwhelming amounts of data that would form
13  a trend that as more data points were added to
14  that database, that the reliability and certainty
15  of those associations would just increase.
16  BY MR. ANDERSON:
17      Q.  Would it be fair to say that you believe
18  that the only rational conclusion for the presence
19  of elemental sulfur is that it was in the mine
20  material at the time it was mined?
21          MR. AYALA: Objection. Beyond the scope
22  of the report. Lack of foundation. Calls for
23  speculation.
24      A.  It is speculation. And some of the
25  things that I'm stating here are opinions and not

215

1  necessarily fact. Again, if you follow logic of
2  reason, one of the phenomenon we saw was that
3  there were -- again, if you look at like some of
4  the reports from the Consumer Product Safety
5  Commission, they tested multiple types of drywall
6  products that originated from China.
7      So it wasn't necessarily one brand. I mean
8  one of the ones that was reported on more than any
9  of the other one was the drywall that was by the
10  Knauf company, Knauf Tiengen. However, there were
11  stated probably at least ten different brand names
12  of drywall that were other than the Knauf that
13  exhibited the same behavior.
14      Therefore, if you follow the logic, it would
15  seem extremely unlikely that all these
16  manufacturers or makers of the drywall product
17  would all be adding elemental sulfur to their
18  product. That would seem kind of outlandish.
19  BY MR. ANDERSON:
20      Q.  I don't disagree with you, but I guess
21  I'm left reaching the inescapable conclusion that
22  utilizing the methodology that you've used, unless
23  the mine itself has elemental sulfur in it, then a
24  sample could never test positive for corrosion
25  using your approach.

216

1          MR. AYALA: Objection. Beyond the scope
2  of the report. Lack of foundation. Calls for
3  speculation.
4      A.  If there were mines located in North
5  America where the same general type of phenomenon
6  were occurring, drywall that was made out of that
7  gypsum that was mined and had elemental sulfur in
8  it, would exhibit the exact same properties.
9  BY MR. ANDERSON:
10      Q.  I disagree with you. I guess what I'm
11  saying though is: Is it your view that without
12  the elemental sulfur, you can't have the
13  corrosion?
14          MR. AYALA: Objection.
15      A.  What I'm stating is that based on
16  analysis of -- based on the analysis of literally
17  thousands of samples all showing the same general
18  predictable behavior and pattern, that I can't be
19  led to any other conclusion.
20  BY MR. ANDERSON:
21      Q.  Has anyone from National Gypsum
22  discussed with you any of the problems with
23  bacteria at National Gypsum plants?
24      A.  No.
25          MR. AYALA: For the record, objection

217

1  because it assumes facts not in evidence.
2          MR. ANDERSON: I think I'm all set, Tom.
3  If you have some questions, you want to take a
4  break.
5          MR. AYALA: Yeah. Let's take a break.
6          THE VIDEOGRAPHER: Off the record, 4:13.
7  (There was a discussion off the record.)
8          THE VIDEOGRAPHER: This is the videotape
9  deposition Tape No. 5 of Michael Tuday. We are on
10  the record at 4:20. Go ahead, sir.
11              EXAMINATION
12  BY MR. AYALA:
13      Q.  Mr. Tuday, just so the record is clear,
14  am I correct that you were asked questions today
15  about Columbia Analytical laboratory's analysis of
16  drywall samples from the following five homes
17  which have been referred to as the Brincku home
18  No. 1, the Retana home No. 2, the Ravelo home No.
19  3, the Nutting home No. 4, and the Brucker home
20  No. 5; is that correct?
21      A.  That's correct.
22      Q.  Mr. Tuday, with respect to the analyses
23  that Columbia performed on the drywall, did you
24  form an opinion with respect to whether or not the
25  samples from the homes I just mentioned are

55 (Pages 214 to 217)

218

1  corrosive?
2    A.  Yes.  I did form an opinion.
3    **Q.  What is that opinion, sir?**
4    A.  My opinion was in every case that the
5  samples that were provided to the laboratory were
6  not -- did not fit the profile of corrosive
7  drywall.
8    **Q.  Sir, you were asked questions about the**
9  **theoretical mechanism by which corrosion can**
10 **occur.  Do you recall that?**
11   A.  Yes, I do.
12   **Q.  My question for you, sir, is simply**
13 **this:  When you performed a corrosion test and**
14 **specifically your jar corrosion test on the**
15 **samples at issue in the litigation, regardless of**
16 **whatever the mechanism could potentially**
17 **theoretically be, were those samples corrosive**
18 **based on the results of your tests?**
19   A.  Using the visual inspection protocol
20 that we developed, all of the samples when
21 compared to a known sample of negative control or
22 a noncorrosive sample, that from my observation,
23 they looked identical to the noncorrosive control
24 and did not appear to be similar in any way to the
25 positive corrosive control.

219

1    **Q.  By the way, when you performed corrosion**
2  **testing in the jar on the samples for the**
3  **plaintiffs' drywall in the litigation, did you**
4  **grind up the drywall samples before you put them**
5  **in the jar?**
6    A.  In the corrosion test?
7    **Q.  Correct, sir.**
8    A.  No, we did not.
9    **Q.  Did you mix the drywall samples with**
10 **water, make them physically come into contact with**
11 **water?**
12   A.  No, we did not.
13   **Q.  Did you cause the copper sample to come**
14 **into contact with water?**
15   A.  No, we did not.
16   **Q.  Why not, sir?**
17   A.  Well, if we were to wet down the actual
18 drywall sample, it wouldn't be representative of
19 any condition I know of that's utilized in the
20 home.  I don't know of anyone that wets down their
21 drywall; therefore, it would be nonrepresentative
22 of the conditions.
23   **Q.  Sir, you were asked questions about the**
24 **very first time you had been called on to look at**
25 **a drywall sample, and I recall that may have been**

220

1  2009; is that correct?
2    A.  Corrosive drywall sample?
3    **Q.  No, sir.  The very first time you were**
4  **asked to look at a drywall sample and I believe**
5  **there was a claim that it had an odor to it.**
6  **Maybe somebody, Mr. Harrison.**
7    A.  Right.  That was in February 2008.
8    **Q.  Thank you.  Thank you.  I recall you**
9  **described the -- you were asked questions about**
10 **the composition of the odor, and I believe you**
11 **described it as a very complex composition; is**
12 **that right?**
13   A.  In the dry form, not as much as when the
14 sample becomes soaked in water.  The odor
15 characteristics change.  But, yes.
16   **Q.  Among the numerous constituents that you**
17 **referenced, one of those was valeric acid.  Do you**
18 **recall that?**
19   A.  I recall that I mentioned a few organic
20 acids, and valeric acid was probably among them.
21   **Q.  Did you do any testing of that drywall**
22 **to confirm the presence of any organic acids**
23 **including, but not limited to, valeric acid?**
24   A.  We tested in preparation for the
25 experiment that was described in the November 2009

221

1  Tampa symposium, that doing analysis for a
2  speciated group of organic acids were one of the
3  methods we employed.
4    **Q.  Based on your testing, have you**
5  **concluded that valeric acid is a marker for**
6  **corrosive drywall?**
7    A.  I have concluded that based on the
8  information that we gleaned from the testing, that
9  valeric acid had no bearing in whether or not a
10 particular sample was corrosive to copper.
11   **Q.  Have you ever smelled valeric acid?**
12   A.  I have.
13   **Q.  How would you describe the smell?**
14   A.  The short chain organic acids, valeric
15 acid, isovaleric acid, butyric acid, have
16 generally a vomitous odor.  Also it's been
17 described as kind of a sweaty gym sock odor.
18   **Q.  When you talked about your experience**
19 **with the well water in the home that you lived in,**
20 **you were referring to your personal observations**
21 **and census of the phenomenon; is that correct?**
22   A.  Yes, that was correct.
23   **Q.  That's all I have.**
24     MR. ANDERSON:  Just a couple of
25 questions.  Then we'll be done.

56 (Pages 218 to 221)

222

RE-EXAMINATION

BY MR. ANDERSON:

Q.  Just in response to your answers concerning the valeric acid, you said the valeric acid smells like sweaty gym socks?

A.  Well, that group of acids, butyric, valeric, isovaleric tend to have odor characteristics of like a vomitous odor, a sweaty gym sock odor and also like a dumpster odor. Those are the descriptions that have been used frequently.

Q.  What samples, remind me, did you identify valeric acid in?

A.  I didn't really get into that, but when we did the -- when we presented the results of the experiments that we did in the November 2009 symposium, we had tested four samples of corrosive drywall whose origin was from China, that was documented and labeled, but he also looked at three noncorrosive samples that were from manufacturers in North America.

Q.  Say that again.  I didn't completely follow.

A.  There were four corrosive samples all whose origin was from China, imported from China

223

and marked, and then there were three samples that were noncorrosive whose origin was from companies that produce drywall products in North America.

Q.  That was the one where there was one from Mexico?

A.  And two of the United States.

Q.  Did all seven of those test positive for the valeric acid?

A.  I can't say factually.  My recollection is that most of them did test positive for acids in that group.

Q.  Did those samples all smell?

A.  No.

Q.  So they had valeric acid, but they didn't smell?

A.  Well, the drywall that was imported from China had characteristic burnt fire cracker, burnt match odor to it when dry and what I would describe as petrochemical refinery type odor when they were in wet form.

Q.  Did National Gypsum make you aware of any issues that they had in any of their plants with valeric acid?

A.  No.

MR. AYALA:  Objection.

224

A.  I can answer that.  The answer is, no.

BY MR. ANDERSON:

Q.  Did you they make aware of any problems that they had in drywall manufacturing in their plants with butyric acid?

A.  No.

Q.  That's all.

RE-EXAMINATION

BY MR. AYALA:

Q.  Just real quick, Mr. Tuday, I think we established -- am I correct you testified earlier that you have -- you, in fact, have not concluded that valeric acid is a marker for corrosive drywall; is that correct?

A.  I have not seen a conclusive association with the presence of valeric acid and the phenomenon of drywall-caused corrosion.

Q.  Mr. Tuday, have you seen such an association with respect to butyric acid?

A.  In association with corrosion?

Q.  Correct.

A.  I'm not aware of any.

Q.  With respect to strontium, Mr. Tuday, sitting here today, can you tell us that you've reviewed all the CPSC literature on the presence

225

of strontium in drywall samples?

A.  I have looked at quite a body of it, but there's a lot out there, and I might not have paid as particularly close attention since in the testing that we did on measuring strontium in drywall samples, we did not find the strontium to be a reliable marker.

Q.  Mr. Tuday, I'd like you to assume that Environmental Health & Engineering has also performed testing with respect to strontium in a number of drywall samples as part of their work for the CPSC.  Would you agree, sir, that Environmental Health & Engineering would be in the best position to interpret the results of the studies that they've done?

MR. ANDERSON:  Objection.  Form.

A.  I have a great deal of confidence in their ability.  In general, their staff are excellent, if not outstanding scientists, but they also have access to resources that are scientifically formidable.

MR. AYALA:  That's all I have.

MR. ANDERSON:  Thank you.

THE VIDEOGRAPHER:  Off the record 4:32.

MR. AYALA:  We'll read and sign.

57 (Pages 222 to 225)

226

1          (Whereupon, at 4:32 p.m., the taking of
2   the instant deposition ceased.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

228

1   COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE
2   COUNTY OF PHILADELPHIA        )  SS:
3        I, Ann Medis, Registered Professional
4   Reporter and Notary Public in and for the
5   Commonwealth of Pennsylvania, certify the witness,
6   MICHAEL TUDAY, was by me first duly sworn to
7   testify to the truth; the foregoing deposition was
8   taken at the time and place stated herein; and the
9   said deposition was recorded stenographically by
10  me and reduced to printing under my direction, and
11  constitutes a true record of the testimony given
12  by said witness.
13       I certify the inspection, reading and signing
14  of said deposition were NOT waived by counsel for
15  the respective parties and by the witness.
16       I certify I am not a relative or employee of
17  any of the parties, or a relative or employee of
18  either counsel, and I am in no way interested
19  directly or indirectly in this action.
20       IN WITNESS WHEREOF, I have hereunto set my
21  hand and affixed my seal of office this 23rd day
22  of February, 2012.
23
24  _____
25        NOTARY PUBLIC

227

1
2   STATE OF _____ )
3                           ) :ss
4   COUNTY OF _____ )
5
6
7        I, MICHAEL TUDAY, the witness
8   herein, having read the foregoing
9   testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15  _____
16       MICHAEL TUDAY
17
18
19
20  Sworn and subscribed to before
21  me, this        day of
22            , 2012.
23
24  _____
25     Notary Public

229

1       INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over carefully
4   and make any necessary corrections. You should state
5   the reason in the appropriate space on the errata
6   sheet for any corrections that are made.
7        After doing so, please sign the errata sheet
8   and date it.
9        You are signing same subject to the changes
10  you have noted on the errata sheet, which will be
11  attached to your deposition.
12       It is imperative that you return the original
13  errata sheet to the deposing attorney within thirty
14  (30) days of receipt of the deposition transcript by
15  you. If you fail to do so, the deposition transcript
16  may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

58  (Pages 226 to 229)

230

```
 1            E R R A T A
 2
 3
 4
 5       I wish to make the following changes,
 6    for the following reasons:
 7
 8    PAGE LINE
 9    ___ ___ CHANGE:_____
10    REASON:_____
11    ___ ___ CHANGE:_____
12    REASON:_____
13    ___ ___ CHANGE:_____
14    REASON:_____
15    ___ ___ CHANGE:_____
16    REASON:_____
17    ___ ___ CHANGE: _____
18    REASON:_____
19    ___ ___ CHANGE: _____
20    REASON:_____
21
22    _____    _____
23     WITNESS' SIGNATURE          DATE
24
25
```

59  (Page 230)