1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

GEORGE BRINCKU, BRENDA       )
BRINCKU,                     )
                             )
        Plaintiffs,          )
                             )
VS.                          ) CIVIL ACTION NO.
                             ) 2:11-CV-00338-JES-DNF
NATIONAL GYPSUM COMPANY,     )
a Delaware Corporation,      )
                             )
        Defendants.          )


------------------------------


CHRIS BRUCKER, et al.,       )
                             )
        Plaintiffs,          )
                             )
VS.                          )CIVIL ACTION NO.
                             )2:10-CV-405-FTM-20SPC
LOWES HOME CENTERS, INC.,    )
et al.,                      )
                             )
        Defendants.          )

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

J.S. SUTTON

FEBRUARY 2, 2012

*********************************************************

Job # 23743

**2**

1  ORAL AND VIDEOTAPED DEPOSITION OF J.S. SUTTON,

2  produced as a witness at the instance of the Defendant

3  New NGC., Inc., doing business as National Gypsum

4  Company, and duly sworn, was taken in the above-styled

5  and numbered cause on the 2nd day of February, 2012,

6  from 9:17 a.m. to 4:40 p.m., before Susan Eddins Brown,

7  CSR in and for the State of Texas, reported by machine

8  shorthand, at the law offices of Morgan, Lewis &

9  Bockius, LLP, 1717 Main Street, Suite 3200, Dallas,

10  Texas  75201, pursuant to Notice, the Federal Rules of

11  Civil Procedure and the provisions stated on the record

12  or attached hereto.

**3**

1  A P P E A R A N C E S
2
FOR THE PLAINTIFFS:
3
  VARNELL & WARWICK, P.A.
4  20 La Grande Boulevard
  The Villages, Florida  32159
5  352-753-8600
  352-753-8606
6  By: Brian W. Warwick, Esq.
    bwwarwick@aol.com
7
8  LANDSKRONER GRIECO MERRIMAN, LLC
  1360 West 9th Street
9  Suite 200
  Cleveland, Ohio  44113
10  216-522-9000
  By: Jack Landskroner, Esq.
11    jack@lgmlegal.com
12
FOR THE DEFENDANT New NGC., INC.,
13  doing business as NATIONAL GYPSUM COMPANY:
14
  MORGAN, LEWIS & BOCKIUS, LLP
15  1701 Market Street
  Philadelphia, PA  19103-2921
16  215-963-5719
  215-963-5001
17  By: Thomas V. Ayala, Esq.
    tayala@morganlewis.com
18
19
20
21  ALSO PRESENT:
22  Mr. Phil Hall - Legal Video Specialist
23
24
25

**4**

1  INDEX
2              PAGE
3  Appearances          3
4  J.S. SUTTON
5    Examination by Mr. Ayala      7, 220
6    Examination by Mr. Warwick      193
7
8  Signature and Changes        226

  Reporter's Certificate        228
9
10
11  EXHIBITS
12
EXHIBIT
13  NUMBER   DESCRIPTION        IDENTIFIED
14
  Exhibit A - Notice of Deposition in Brincku case    28
15
  Exhibit B - Notice of Deposition in Brucker case    28
16
  Exhibit C - RealTime Laboratories report on
17    Brinku home        28
18  Exhibit D - RealTime Laboratories report on
    Retana home        36
19
  Exhibit E - RealTime Laboratories report on
20    Ravelo home        37
21  Exhibit F - RealTime Laboratories report on
    Nutting home        40
22
  Exhibit G - RealTime Laboratories report on
23    Brucker home        42
24  Exhibit H - RealTime Laboratories report on
    Brucker home, 1-17-12      43
25

**5**

1  Exhibit I - Case Management and Scheduling Order
    in Brincku case        46
2
  Exhibit J - Case Management and Scheduling Order
3    in Brucker case        48
4  Exhibit K - Material from API RP38, Third Edition,
    December 1975        77
5
  Exhibit L - Page from Difco & BBL Manual, Second
6    Edition, refers to nutrient broth 234000  97
7  Exhibit M - BD & BBL Nutrient Broth Quality Control
    Procedures Revision 9, January 2011    99
8
  Exhibit N - Extraction of photos in RealTime labs
9    Exhibits C through G      105
10  Exhibit O - Article entitled "Isolation of
    Sulfur-Reducing And Oxidizing Bacteria
11    Found in Contaminated Drywall"    118
12  Exhibit P - Document entitled "U.S. Consumer Product
    Safety Commission Staff, Summary of
13    Contractors Report      129
14  Exhibit Q - Document with header from Strategic
    Diagnostics, Inc. entitled
15    "RapidChek II SRB Detection System  145
16  Exhibit R - Resume of Mr. Sutton      187
17  Exhibit S - Document titled, John Samuel Sutton
    Legal Fee Schedule      189
18
19
20
21
22
23
24
25

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

**6**

1      PROCEEDINGS
2
3          THE VIDEOGRAPHER: Today is Thursday,
4  February 2nd, 2012. We're located at the law office of
5  Morgan, Lewis in downtown Dallas, Texas. Our purpose is
6  to take the oral deposition of Sam Sutton, relative to
7  case styled George Brinku and Brenda Brinku versus
8  National Gypsum Company, a Delaware corporation.
9  The Certified Shorthand Reporter providing stenographic
10  transcription is Susan Brown. My name is Phil Hall of
11  Accurate Evidence on behalf of David Feldman.
12  Counsel, at this time, would you please state your
13  individual appearances for the record.
14          MR. AYALA: Hi. Good morning. Tom Ayala
15  on behalf of New NGC, Inc., doing business as National
16  Gypsum Company. And for the record, this deposition has
17  been noticed in the case of Brinku versus National
18  Gypsum Company, as well as the case of Brucker versus
19  Lowe's Home Centers and National Gypsum Company, caption
20  No. 210-CV-405 pending in -- both matters, actually, are
21  pending in the United States District Court for the
22  Middle District of Florida.
23          MR. LANDSKRONER: Jack Landskroner for
24  the Plaintiffs.
25          MR. WARWICK: Brian Warwick, also for the

**7**

1  Plaintiffs.
2          THE VIDEOGRAPHER: Thank you. The time
3  is 9:18 a.m.
4          Ms. Brown, would you please swear in the
5  witness.
6          MR. LANDSKRONER: Tom, just for the
7  record, do you want to stipulate that objections other
8  than as to form are waived -- other than when it goes to
9  trial?
10          MR. AYALA: Yes. Thank you. Did --
11  let's stipulate they're reserved --
12          MR. LANDSKRONER: They're reserved until
13  the time of trial, other than as to form. Thank you
14  very much. I started off slowly this morning.
15          J.S. SUTTON,
16  having been first duly sworn, testified as follows:
17          EXAMINATION
18  BY MR. AYALA:
19      Q. Good morning. My name is Tom Ayala. I'm
20  going to be asking you some questions today. Could you
21  please state your name for the record.
22      A. Sam Sutton.
23      Q. Is it Mr. Sutton, is that okay?
24      A. Yeah, that's fine.
25      Q. Okay. Do you -- do you hold any degrees, Mr.

**8**

1  Sutton, such as a Ph.D.?
2      A. No, sir.
3      Q. Okay. Mr. Sutton, by whom are you employed?
4      A. RealTime Laboratories, Inc.
5      Q. Okay. And how long have you been employed
6  there?
7      A. A little bit less than a year.
8      Q. Okay. Do you still hold employment with a
9  company called Embark Scientific?
10      A. We're -- I'm an owner of Embark, but we're in
11  the process of shutting it down.
12      Q. Okay.
13      A. So, it's not operational, I guess, is the best
14  way to put it.
15      Q. Okay. Why is Embark Scientific being shut
16  down?
17      A. We decided to terminate services and have been
18  in the process of selling assets.
19      Q. And why is that?
20      A. It was internal determination that we wanted
21  to do that.
22      Q. Who else held ownership in Embark Scientific,
23  aside from you?
24      A. My wife.
25      Q. Mr. Sutton, you understand you're here today

**9**

1  to give testimony under oath in connection with a case
2  called Brinku versus National Gypsum Company, another
3  case called Brucker versus Lowe's Home Centers and
4  National Gypsum Company.
5      A. Yes.
6      Q. Okay.
7          (Exhibits 1, 2 marked; remarked A, B)
8  BY MR. AYALA:
9      Q. I'm showing you, Mr. Sutton, what's been
10  marked for identification as Exhibit 1, which is a
11  Notice of Deposition in the Brinku action, and
12  Exhibit 2, which is a Notice Of Deposition in the, the
13  Brucker action.
14          Have you ever given a deposition before?
15      A. No, sir.
16      Q. Okay. Just a couple of ground rules, for
17  really, the consideration of the court reporter and
18  folks who are reading the record that the court reporter
19  transcribes. If you could, wait until I finish asking
20  my question before you answer it, and I promise to do my
21  best to wait until you are finished answering before I
22  ask my question. One thing is that, for the record and
23  the court reporter's purpose, you will need to answer
24  verbally instead of nodding your head.
25      A. Okay.

3  (Pages 6 to 9)

10

1    Q.  If you don't understand a question, feel free
2  to tell me, I'll be happy to try to rephrase it.  If you
3  answer the question, I'll assume you understood it.
4  Okay?
5    A.  Okay.
6    Q.  Have you taken any medications today that you
7  believe may impair your ability to give complete,
8  accurate and truthful testimony?
9    A.  No, sir.
10    Q.  Is there any other reason you can think of
11  that would impair your ability to give complete,
12  accurate and truthful testimony today?
13    A.  No, sir.
14    Q.  Mr. Sutton, have you ever been involved in a
15  civil or criminal action?
16    A.  Civil.
17    Q.  Okay.  What was -- what was your involvement
18  in the action?
19    A.  It was a internal lawsuit with one of the
20  companies that I owned -- had ownership in that was
21  related to assets.
22    Q.  You would describe it as a business dispute?
23    A.  Yes.  Yes.
24    Q.  Who was the opposing party in that dispute?
25    A.  I -- it's ongoing.  I can't really disclose

11

1  anything regarding that.
2    Q.  Is -- are you a party to a -- a civil action
3  that has been filed in a court of law?
4    A.  Yeah.
5    Q.  Okay.  And you understand that that's a matter
6  of public record, correct?
7    A.  Yes.
8    Q.  Okay.  So, that being said, are you the
9  plaintiff or defendant in the action?
10    A.  Defendant.
11    Q.  Who is the plaintiff in the action?
12    A.  Mendol Works, Inc.  Mendol Works, Inc.
13    Q.  Okay.  How do you spell that?
14    A.  M-E-N-D-O-L, Works, W-O-R-K-S.
15    Q.  And is the civil action in relation to Embark
16  Scientific?
17    A.  Yes, sir.
18    Q.  And what is -- what is or was the relationship
19  between Embark Scientific and the plaintiff in the civil
20  action?
21    A.  Basically, we had purchased assets from them
22  and then there's been a dispute over the payment of
23  those assets and -- along those lines.
24    Q.  Where is that action pending?
25    A.  In Travis County.

12

1    Q.  In Travis County, Texas?
2    A.  Austin.
3    Q.  Travis County, Austin, Texas.
4    A.  Yeah.
5    Q.  Now, aside from this litigation, sir, have you
6  ever performed laboratory work that you understood would
7  be used by another expert for his or her testimony in a
8  legal proceeding?
9        MR. LANDSKRONER:  Objection.
10    If you know.
11        THE WITNESS:  Not -- I don't know.  I
12  mean, it's -- it's a possibility, but I don't know for
13  sure.  I mean, my role in laboratories have been
14  basically to process samples and report results.
15  BY MR. AYALA:
16    Q.  Okay.  Now, with respect to this litigation,
17  sir, is it your understanding that the laboratory
18  testing that you performed or that RealTime Laboratories
19  performed and the results that were reported are being
20  relied on by another expert in this case?
21    A.  Can you ask that again?
22    Q.  That's fair.  Is it your understanding, sir,
23  that in -- in connection with this litigation, you have
24  performed laboratory testing that one or more experts on
25  behalf of plaintiffs have relied on?

13

1    A.  Yes, yes.
2    Q.  And who would those experts be, as far as you
3  know?
4    A.  David Straus, Dennis Hooper, and to my
5  knowledge, that's all.
6    Q.  Okay.  Is it your understanding that Dennis
7  Hooper is a testifying expert in this case?
8        MR. LANDSKRONER:  Objection.
9        THE WITNESS:  I know he is being deposed.
10  That's all I know.  I don't know what his overall
11  involvement in the case is.
12  BY MR. AYALA:
13    Q.  Have you performed laboratory work, sir, for
14  Dennis Hooper in the past for the purpose of his giving
15  expert testimony in any other litigation?
16    A.  I performed services for Dennis Hooper in the
17  past for payment, based on a contract for services.
18  What he did with those results, I have no idea.
19    Q.  Okay.  What was the nature of those services?
20    A.  The services started back as early as 2004.  I
21  had a consulting service and that consulting service, I
22  provided assay development services.  So, basically,
23  develop tests and this was done for, you know, multiple
24  clients.  He had a need for some mold targets to be
25  developed.  I developed approximately 25 targets and

4  (Pages 10 to 13)

14

1 those assays have still been in use for RealTime, those
2 targets we now use for clinical processing.
3     Q.  Okay.  And when you say those, is it "assay
4 targets"?
5     A.  Yes, it's assays.  So, like, an assay is used
6 to, basically, determine what, you know -- say there's
7 somebody who's interested in a specific target, you
8 develop an assay to determine that that target's there.
9     Q.  Okay.  And when you use the term "target,"
10 you're referring to a target microorganism?
11     A.  It could be anything.  It could be mold, it
12 could be bacteria, it could be plant, it could be human,
13 it's all the same technology.  It's -- basically, my
14 background is dealing with DNA.  I'm a molecular
15 biologist by trade.  And any -- I mean, as I'm sure that
16 you see in the news, anything can be drilled down to DNA
17 and you can target specific portions of that DNA to
18 confirm what the organism is.
19     Q.  Okay.  And take, for example, humans.  Am I
20 correct that you could develop an assay that would test
21 for DNA to detect whether the target DNA is of any
22 human?
23     A.  That, I haven't worked with.  What I can say
24 is that you can develop an assay that will target a
25 specific mutation in a genome.  I'm not familiar with,

15

1 you know, typing of people and what you have seen, you
2 know, as far as the Human Genome Project and all that.
3 What I deal with is specific areas of interest:
4 mutations, specific targets, be it, like I said,
5 bacteria, molds.  We also do mouse genome typing, and
6 mouse genome typing is the same technology except we're
7 looking for mutations in mice that have been, basically,
8 genetically engineered.
9     So, the idea, to boil it down is, basically,
10 you're looking for a target.  The DNA gives you a --
11 gives you information, and that's what you're looking
12 for.  And it's pretty common in the industry.
13     Q.  Mr. Sutton, when were you first retained to
14 perform testing for this litigation?
15     A.  I never was retained.  I was an employee at
16 RealTime Laboratories and performed my duties as an
17 employee of RealTime Laboratories, which is to process
18 any samples that the company contracts with, and provide
19 results for those samples.
20     Q.  Okay.  Is it your -- is it your understanding
21 that you have not been retained by Mr. Landskroner
22 and/or Mr. Warwick and any of the other attorneys that
23 represent the plaintiffs in this litigation we're here
24 to talk about today?
25     MR. LANDSKRONER:  Objection.

16

1     Go ahead.
2     THE WITNESS:  It's my understanding that
3 I am being deposed to describe what goes on in the
4 laboratory and what my role in that is.
5 BY MR. AYALA:
6     Q.  Okay.  Are you being -- have you -- you or
7 RealTime Laboratories received compensation from
8 plaintiffs' counsel in this litigation to perform the
9 testing that you performed?
10     A.  I have not.  I don't know if RealTime
11 Laboratories has, other than paying for the samples to
12 be processed.
13     Q.  Do you have a legal fee schedule, sir?
14     A.  RealTime Labs has asked for $250 for my time,
15 an hour.
16     Q.  And is it your understanding that RealTime
17 labs is entitled to $250 an hour for the testimony
18 you're giving here today?
19     A.  That's my understanding.
20     Q.  Okay.  Have you consulted with the plaintiffs'
21 attorneys in this litigation?
22     A.  They --
23     Q.  Without getting into what you discussed.
24     A.  Since it's my first deposition, they went
25 through the process and told me.

17

1     Q.  Yeah, but without -- without getting into what
2 your attorneys told you, or what your specific
3 discussions have been, I'm just trying to get a sense of
4 --
5     A.  Yes, there was a deposition preparation.
6     Q.  Okay.  When did you first have communications
7 with the plaintiffs' attorneys in this litigation?
8     A.  I had never met Jack until yesterday, or
9 talked to him.  Brian, I met probably summer of 2011,
10 one time.
11     Q.  Where did you meet them -- when you said --
12     A.  At RealTime Laboratories.
13     Q.  Okay.  And when you say "Brian," you mean
14 Brian Warwick?
15     A.  Warwick.  Sorry.
16     Q.  Have you met or had communications with any
17 other individuals who you understood to be attorneys for
18 the plaintiffs in this litigation?
19     A.  There was somebody with you, but I don't
20 remember his name, when you came to the lab.
21     Q.  Okay.  So, one other person?
22     A.  Yes, but I have no idea who that was.
23     Q.  Aside from the time in the summer of 2011 when
24 you communicated with Mr. Warwick, have you communicated
25 with Mr. Warwick any other times?

5 (Pages 14 to 17)

18

1    A.  I have been copied on the e-mails regarding
2  timing for the deposition.  Other than that, I can't
3  recall any.
4      Q.  Okay.
5          (Exhibits 3 - 8 marked.)
6  BY MR. AYALA:
7      Q.  Mr. Sutton, I'm showing you now documents that
8  have been previously marked as, respectively, Exhibits
9  3, 4, 5, 6, 7, and 8.
10         And, for the record, I will identify Exhibit 3
11  as a report from RealTime Laboratories dated
12  November 16, 2011, regarding, quote, "The Brinku Home
13  Lab Work Conducted On Samples Received By RTL On
14  April 26, 2010."
15         Mr. Sutton, do you recognize Exhibit 3?
16     A.  Yes, sir.
17     Q.  Okay.  And this may be a little bit difficult
18  because the exhibit doesn't have page numbers.  But your
19  signature is at the end of the report, correct?
20     A.  Yes, sir.
21     Q.  Okay.  And I assume by your signature on
22  Exhibit 3, you take responsibility for the content of
23  Exhibit 3, correct?
24     A.  The signature and the service lab certifies
25  the results.

19

1      Q.  Okay.  And I take it also, that by your
2  signature, you take responsibility for the contents of
3  what's in this report, correct?
4      A.  Yes.  But the signature certifies that all
5  SOPs, standards operating procedures, all controls,
6  everything met with compliance in the laboratory for the
7  results.
8      Q.  Okay.
9      A.  And that's common in any service lab.
10     Q.  Okay.  And did you -- did you author this
11  report?
12     A.  No.
13     Q.  Okay.  Who authored this report?
14     A.  Dennis Hooper authored the report.
15     Q.  With regard to Exhibit 3, did you have any --
16  did you author any part of Exhibit 3?
17     A.  No.
18     Q.  Okay.  Why did you sign a report that you
19  didn't author -- that you didn't author?
20         MR. LANDSKRONER:  Objection.  Asked and
21  answered.
22     Q.  You can answer.
23     A.  Okay.  It's common.  There's reports that go
24  out all the time.  We -- reports aren't always authored
25  specific for a -- for a particular sample.  So, what

20

1  happens is, the reports are put together, I review the
2  data, I review the controls, I make sure we're in
3  compliance with everything internal, standard operating
4  procedures and everything, then I sign off on the
5  results.
6      Q.  Did you have discussions with Mr. Hooper about
7  whose signature was to go on the report identified as
8  Exhibit 3?
9      A.  No.
10     Q.  Okay.  So, tell me how it came to be that that
11  report made its way onto your desk and you signed it?
12     A.  Reports make their way onto my desk every day
13  in a service company.  We process clinical samples, we
14  process environmental samples; reports go out
15  constantly.
16     Q.  Okay.
17     A.  And I review the results, I sign off on them.
18  Dr. Hooper, as medical director, can sign off on
19  clinical results but, according to state regulations, I,
20  as a designee can also sign off on those reports.  So,
21  we're the two people that can sign reports in the
22  company.
23     Q.  Okay.  Let's talk about that.  What is Dennis
24  Hooper's role at RealTime Laboratories?
25     A.  He's the medical director.

21

1      Q.  And what is your formal title and position at
2  RealTime Laboratories?
3      A.  Vice president of laboratory operations.
4      Q.  Okay.  And do you report to Mr. Hooper?
5      A.  No, sir.  I report to David Murcott, the CEO.
6      Q.  Okay.  Does Mr. Hooper report to you?
7      A.  No.
8      Q.  Does Mr. Hooper report to the CEO?
9      A.  No.
10     Q.  No?
11     A.  The medical director has to be separate from
12  the lab.  I'm not sure exactly how that's all set up, to
13  be honest, but I know that he does not report to Dave
14  Murcott and he definitely doesn't report to me.
15     Q.  Okay.  Did you perform any of the testing that
16  formed the basis of the report that is Exhibit 3?
17     A.  Yes.
18     Q.  Okay.  Which testing did you perform?
19     A.  I would have performed the DNA testing.  So,
20  basically, the extractions and the PCR.  I would have to
21  look back.  I may have performed the enzyme test, I
22  don't know.  Once again, there's tons of samples that go
23  through.
24     Q.  What would you have to look back at?
25     A.  I'd have to look back at the signature logs

6  (Pages 18 to 21)

22

1 and see who was processing the samples.
2     Q.  Okay.  Would there also be signatures on the
3 actual result reports contained in Exhibit 3?
4     A.  Technicians don't have to sign off on the
5 results.  Basically that -- I may perform work, one of the
6 med techs may perform work; and what happens is, those
7 results migrate to the laboratory supervisor.  I review
8 the results, I review the controls, and, if everything
9 passes our standard operating procedure, we sign it out.
10    Q.  Okay.  In what laboratory, other than RealTime
11 Laboratories, are you aware of where the technician who
12 performs the work doesn't actually put his or her
13 signature on the results?
14    A.  On the report?
15    Q.  On the results of the test.
16    A.  Oh, the signature would be on the results.
17 But not necessarily on the report.
18    Q.  Okay.  I'm talking about the results.  Let's
19 look at the results of Exhibit 3 real quick.  If you go
20 to -- if you go to Exhibit 4 of Exhibit 3 --
21    A.  Okay.  Okay.
22    Q.  The first page indicates that -- the first
23 page is titled "Thiobacillus Report Form, Environmental,
24 Date of service 04-26-2010, Sample Type Number 1
25 Drywall."

23

1         Do you see that?
2     A.  Um-hum.
3     Q.  Okay.  At the bottom, there's a line that says
4 "Technician's Initials."
5     A.  Okay.
6     Q.  Okay.  What does that say?
7     A.  It says DH.
8     Q.  Okay.  What does DH indicate to you?
9     A.  That's the initials for Dennis Hooper.  And if
10 the report says that he did the work for that, then he
11 did the work for that.
12    Q.  Okay.  Page 2 says "Thiobacillus Report Form,
13 Environmental, Date Of Service 4-26-2010, Sample Type
14 Number 2 Drywall."  There is a set of initials at the
15 bottom of that page.  What does that say?
16    A.  DH.
17    Q.  And DH would be for Dennis Hooper?
18    A.  Uh-huh.
19    Q.  And that would suggest to you that Dennis
20 Hooper performed the DNA testing on Exhibit 3, the
21 Brinku results, correct?
22    A.  Yes.
23    Q.  Okay.  Next page is "Thiobacillus Report Form,
24 Environmental, Date Of Service 4-26-2010, Number 3
25 Drywall"?

24

1     A.  Um-hum.
2     Q.  Initials at the bottom, what are they?
3     A.  DH.
4     Q.  DH for Dennis Hooper, correct?
5     A.  Um-hum.
6     Q.  And that indicates that Mr. Hooper performed
7 the DNA testing for sample type Number 3, correct?
8     A.  Uh-huh.
9     Q.  And the next page, lab results report form
10 related to Number 4 drywall.  And Mr. Hooper's initials
11 are at the bottom of that, correct?
12    A.  Um-hum.
13    Q.  Indicating that Dennis Hooper performed the
14 DNA testing on sample Number 4?
15    A.  Yes.
16    Q.  Okay.  Finally, if you go to the next page,
17 sir, this page is titled "Sulfur-Reducing Bacteria
18 Report, Environmental."
19    A.  Um-hum.
20    Q.  Date of report is November 4th, 2011.
21        Do you see that?
22    A.  Yes.
23    Q.  Okay.  At the bottom, there's a line for
24 technician's initials, but no one has initialled.
25    A.  That should have been.

25

1     Q.  Okay.  It should have been initialed?
2     A.  Uh-huh.
3     Q.  Sitting here today, can you tell us who
4 performed the testing that forms the basis of the
5 sulfur-reducing bacteria report, dated 11-4-2011?
6     A.  Based on these forms, Dennis Hooper did.
7     Q.  Aside from looking at the Sulfur-Reducing
8 Bacteria Form, which has no initials on it, do you have
9 any personal knowledge that indicates that Dennis Hooper
10 performed the testing that forms of basis of the
11 November 4, 2011, Sulfur-Reducing Bacteria Report?
12    A.  Do I have any personal knowledge of it?
13    Q.  Correct.
14    A.  I would just have to go by the initials.  I
15 mean, that was in 2010.
16        MR. WARWICK:  Tom, just to clarify, I
17 believe that the -- the results on this Exhibit 5, here,
18 is just a chart showing --
19        THE WITNESS:  The results.
20        MR. WARWICK:  -- the prior four results
21 pages.
22        THE WITNESS:  That's the way I was
23 looking at it.
24        MR. WARWICK:  Is that the same document
25 we're looking at?

7  (Pages 22 to 25)

26

1   BY MR. AYALA:
2       Q.  Well, we'll need to talk about that on the
3   record, so --
4       A.  Oh, okay.
5       Q.  Looking at the Sulfur Reducing Bacteria
6   Report, Environmental -- and we're still talking about
7   Exhibit 3 here for Brinku -- the Sulfur-Reducing
8   Bacteria Report lists a table of results, correct?
9       A.  Yes.
10      Q.  Is it your understanding, sir, that the table
11  of results listed in the November 4, 2011,
12  Sulfur-Reducing Bacteria Report, are simply a
13  reproduction of the test results from the
14  April 26, 2010, reports we just looked at?
15      A.  Hold on just a second.  (Reviewing document.)
16  Based on the information I have here, yes.
17      Q.  Okay.  Okay.  Sir.  Let's look at --
18          MR. AYALA:  Let's go off the record for a
19  minute.
20          THE VIDEOGRAPHER:  We're off the record
21  at 9:47 AM.
22              (Off the record.)
23          (Exhibits 1 through 8 remarked
24              as Exhibits A through H)
25          THE VIDEOGRAPHER:  Back on the record.

27

1   BY MR. AYALA:
2       Q.  Okay.  Mr. Sutton, we're now back on the
3   record.  You're still under oath.  Do you understand
4   that?
5       A.  Yes.
6       Q.  Okay.
7       A.  I would like to clarify --
8       Q.  Just a minute.  Just a minute, if you would.
9          MR. LANDSKRONER:  Just a minute.
10          MR. AYALA:  For clarity of the record,
11  the two Notices of Deposition in this action were
12  previously marked Exhibits No. 1 and 2, respectively.
13  They have now been remarked as Exhibits A and B.
14          In addition, the Brinku report, dated
15  November 16, 2011, subject line, quote, "Brinku Home Lab
16  Work Conducted On Samples Received By RTL On April 26,
17  2010," previously marked as Exhibit 3, has now been
18  marked as Exhibit C, in order to clarify the record
19  going forward.
20  BY MR. AYALA:
21      Q.  Let's start here, Mr. Sutton.  I'm showing
22  you --
23      A.  Uh-huh.
24      Q.  -- what's previously been marked as Exhibit 3
25  and is now marked as Exhibit C.

28

1       A.  Okay.
2       Q.  The November 16, 2011, RealTime Laboratories
3   Brinku report.
4          Do you see that?
5       A.  Yes.
6       Q.  Okay.  Mr. Sutton, do you recognize this
7   document?
8       A.  Yes.
9       Q.  Okay.  And you have signed this document with
10  your signature, correct?
11      A.  Yes.  Yes.
12      Q.  Okay.  And you accept responsibility for the
13  contents of this document, correct?
14      A.  I certified the results.
15      Q.  Okay.  So, that's a "yes?"
16      A.  Yes.  I certified the results.
17      Q.  When you -- did you also -- what did you do to
18  satisfy yourself that the contents of this report were
19  complete and accurate?
20      A.  You go -- I go through the data, I look at my
21  controls, make sure they're -- are in, or in appropriate
22  ranges, and, at that point, I certify the data.  I
23  certify the report.  And then, it's -- it can be sent to
24  whatever client.
25      Q.  Okay.  And it's --

29

1       A.  This process is no different than any other
2   process in the lab.
3       Q.  Okay.  And it's your understanding, sir, that
4   you are here to testify today in this litigation
5   regarding the contents of Exhibit C, correct?
6          MR. LANDSKRONER:  Objection.
7          THE WITNESS:  I can testify in regards to
8   what was done in the laboratory and how it relates to
9   what's in Exhibit C.
10  BY MR. AYALA:
11      Q.  Okay.  And you signed Exhibit C, correct?
12      A.  Yes.
13      Q.  Mr. Hooper didn't sign Exhibit C, did he?
14      A.  No.
15      Q.  And nobody else's signature is on Exhibit C,
16  correct?
17      A.  No.
18      Q.  Now, you wanted to clarify something?
19      A.  Yes.
20      Q.  Okay.
21      A.  So, you asked if the chart here, I'm not sure
22  what this is labeled, this --
23      Q.  Okay.  Let's just identify it.  It is
24  Exhibit 5 to Exhibit C.
25      A.  Okay.

8  (Pages 26 to 29)

30

1    Q.  Okay.  And for the record, Exhibit 5 to
2  Exhibit C is a, quote, "Sulfur-Reducing Bacteria Report
3  Dated November 4, 2011."
4    A.  Yes.
5    Q.  Okay.
6    A.  You had asked previously if this was just a
7  compilation of the results that are up in front here.
8  Basically, what the Brinku case, Embark Scientific was
9  contracted to do -- to basically process these 5
10 targets, because Embark Scientific designed the assays.
11 We provided the results to RealTime Laboratories.
12     At that time, RealTime Laboratories, I'm
13 guessing since Dennis Hooper signed these, certified and
14 ran the results at the lab.  This composition here, the
15 chart -- Exhibit 5 -- shows enzyme results, corrosion
16 results and culture results.
17     At this point, early on in 2010, only the DNA
18 was run, maybe the culture.  I'm not aware of -- I'm not
19 sure about the culture.  These were done later for
20 completeness sake.
21    Q.  When you is say "these," what are you
22 referring to?
23    A.  The enzyme test and the corrosion tests.
24    Q.  Okay.  And Mr. Hooper performed those tests,
25 correct?

31

1    A.  I don't know about that.  It could be --
2    Q.  Okay.  You don't know who performed it?
3    A.  I actually don't.  It could have been one of
4  our technicians, it -- I know -- it could have been me
5  since it's in 2011:  There should be a signature there,
6  there should be an initial there.
7    Q.  And there is not, correct?
8    A.  Yes.
9    Q.  Mr. Sutton, when you testified that Embark
10 Scientific designed the assays, when you say that, do
11 you mean that Embark Scientific designed the DNA primer
12 and probe sets for the following organisms:
13 Thiobacillus caldus, Sulfobacillus thermosulfidooxidans,
14 Thiobacillus thiooxidans, Thiobacillus ferrooxidans, and
15 Leptospirillum ferrooxidans.
16    A.  Yes.  They were designed at -- with our --
17 through our contract with RealTime Laboratories.  And
18 then the -- I guess the assay was implemented at
19 RealTime Laboratories, much like the mold assays that we
20 used in the clinical side.
21    Q.  Do you use the term "assay," and primer and
22 probes interchangeably?
23    A.  Primer and probe are part of an assay.  So, if
24 you're going to do a -- a real -- we're talking about
25 RealTime PCR, here.  If you're going to do a RealTime

32

1  PCR assay, basically, that is two primers and one probe.
2  In our case, we use a hydrolysis probe with a FAM 44 and
3  a BH1 quencher, black hole quencher.
4    Q.  Are you aware that Dennis Hooper has applied
5  for a patent on the DNA assays that Embark Scientific
6  designed?
7    A.  I was aware of the mold.  I don't know if I
8  was aware of the SRB.  It may have been mentioned to me,
9  I don't know.  I don't know if I was aware of that or
10 not.
11    Q.  Okay.
12    A.  We were in the business of, basically,
13 contract service.  We weren't in the business of
14 intellectual property.
15    Q.  Okay.  So, I'd like you to assume that in May
16 of 2011, Dennis Hooper applied for a patent on the DNA
17 assays for the organisms that we just listed.
18    A.  Uh-huh.
19    Q.  Assuming that to be the case, do you or Embark
20 Scientific claim any ownership right in that patent, if
21 it's issued?
22    A.  No.  No.
23    Q.  Okay.  Do you have an understanding of whether
24 or not the patent has, in fact, been issued?
25    A.  I have no idea.

33

1    Q.  Okay.  Mr. Sutton, I'll direct your attention
2  to what's been marked as Exhibit D.  And, for the
3  record, Exhibit D is a RealTime Laboratories, Inc.
4  report dated September 26, 2011.  The subject line is
5  "Retana Home, Inspection and Lab Work Conducted on
6  Samples Taken on January 25, 2011."
7    A.  Uh-huh.
8    Q.  Do you recognize this document, sir?
9    A.  Yes.
10    Q.  And your signature is on this document?
11    A.  Yes.
12    Q.  Okay.  Nobody else's signature is on the
13 document?
14    A.  No.
15    Q.  And you understand, you're being offered --
16     MR. WARWICK:  Let's just clarify.  When
17 you say "nobody's signature," there are some exhibits
18 and such that have initials and stuff on there so --
19     THE WITNESS:  Yeah.  Just the report.
20     MR. WARWICK:  -- when you say "the
21 report," itself, you mean the first three pages or
22 whatever?
23 BY MR. AYALA:
24    Q.  That's fair.  Your signature is on the report,
25 sir, correct?

9  (Pages 30 to 33)

34

1     A. Um-hum.
2     Q. And nobody else's signature is on the report,
3  correct?
4     A. No.
5     Q. Nobody else's signature is on the report; is
6  that correct?
7     A. Yes.
8     Q. And you accept responsibility for the contents
9  of this report, sir?
10    A. I certify the results for the report.
11    Q. So, that's a yes?
12       MR. LANDSKRONER: Objection.
13       THE WITNESS: Yes, I certify the results.
14  As you can tell, this is a form letter.  If you look
15  back here at the results, those are specific to the
16  assays.  There might be some changes in the form letter.
17  BY MR. AYALA:
18    Q. Okay.  Sir --
19    A. The report that goes out to a client contains
20  this and the results.  That's the report.  This is a
21  explanation of what is done in the lab; processes,
22  et cetera, a little bit of a background for
23  understanding.  But we're in the process -- we're in the
24  business of providing results to a client, not
25  diagnostics, not speculation.  We give a yes or a no.

35

1     Q. Okay.  Is it your understanding that you're
2  being offered here today in this litigation to testify
3  about the contents of Exhibit D?
4        MR. LANDSKRONER: Objection.
5        THE WITNESS: I'm here to testify about
6  what we do in the lab.  If that is related to this
7  report and what we do, we can discuss the individual
8  portions of that.  My job is actually lab operations.
9  It's, basically, to make sure all the different tests
10  that we run are run properly and that the results go out
11  properly.
12  BY MR. AYALA:
13    Q. Mr. Sutton --
14    A. Uh-huh.
15    Q. -- did you author Exhibit D?
16    A. No.
17    Q. Who authored Exhibit D?
18    A. I would assume Dennis Hooper.  It's, like I
19  said, a form letter.
20    Q. Did you author any part of Exhibit D?
21    A. No.
22    Q. Okay.  Did you perform any of the testing that
23  forms the basis of Exhibit D?  Feel free to take a look
24  through it.
25    A. Okay. (Reviewing document.)  I can't say.  I

36

1  don't know whether I did or not.
2     Q. Okay.
3     A. The information is not here for me to make
4  that determination.
5     Q. And you don't have an independent recollection
6  of --
7     A. No, I don't.
8     Q. Okay.  Let's look at Exhibit E, sir, which,
9  for the record, Exhibit E is a report dated
10  September 26, 2011.  The subject line is "Ravelo Home,
11  Inspection And Lab Work Conducted On Samples Taken On
12  April 25th, 2011."
13       Do you see that?
14    A. Yes.
15    Q. Do you recognize this document?
16    A. Yes.
17    Q. And your signature is on the report that is
18  Exhibit E, correct?
19    A. Yes.
20    Q. And no one else's signature is on Exhibit E,
21  correct?
22       MR. LANDSKRONER: Objection, to "the
23  report."
24  BY MR. AYALA:
25    Q. And no one else's signature is on the report

37

1  that is Exhibit E, correct?
2     A. That's not exactly correct.  I do sign off on
3  the results, but as you saw, what accompanies this is
4  the actual results for the testing that was done --
5     Q. Understood.
6     A. -- there very well may be initials.
7     Q. Okay.  Understood.  So, for the record,
8  Exhibit E contains a report and then Exhibit E also
9  appends exhibits to that report, correct?
10    A. Okay.  Hold on just a second.  Yes.
11    Q. Okay.  Now, with respect to the report portion
12  of Exhibit E, is your signature and only your signature
13  on the report?
14    A. Yes.
15    Q. Did you author Exhibit E?
16    A. No.
17    Q. But I take it, by your signature on the report
18  in Exhibit E, that you accept responsibility for the
19  contents of Exhibit E, correct?
20    A. I certified the results that the lab produced.
21    Q. So, that's a yes?
22       MR. LANDSKRONER: Objection.
23       THE WITNESS: That I certified the
24  results, yes.
25  BY MR. AYALA:

10  (Pages 34 to 37)

38

1    Q.  Have you reviewed the report in Exhibit E?
2  Strike that.
3         Let me ask you this:  Did you review the
4  report in Exhibit E before you signed it?
5    A.  Yes.
6    Q.  Okay.  And what steps did you take, sir, to
7  ensure that the contents of the report in Exhibit E were
8  accurate and complete?
9    A.  I read through and made sure that, generally,
10  it described -- which, it is a background -- described
11  what we did in the laboratory.  What the client is
12  mostly interested in is the results.  So, this gives a
13  background as to what happened, how we did it, that sort
14  of thing, an overview, and then the results are the
15  results --
16    Q.  Okay.
17    A.  -- positive, negative.
18    Q.  Okay.  Is it accurate to say that the report
19  in Exhibit E describes the procedures that RealTime
20  Laboratories performed on the samples that are the
21  subject of Exhibit E?
22    A.  It describes an overview or a truncated
23  summary of the procedures that was performed.  The
24  actual procedures are standard operating procedures that
25  are, you know, multiple pages long --

39

1    Q.  Okay.
2    A.  -- to perform the tests.
3    Q.  Okay.  But when you say that the report in
4  Exhibit E provides an overview or a summary of the
5  procedures that were performed in the lab --
6    A.  Uh-huh.
7    Q.  -- is it accurate to say that the report in
8  Exhibit F provides a summary of the procedures that were
9  performed on the samples that are the subject of Exhibit
10  E?
11    A.  Yes.  A summary, yes.
12    Q.  Okay.  And -- okay.  That's fair.
13         Let's go to the document that's been marked as
14  Exhibit F, which, for the record, is a report of
15  RealTime Laboratories, Inc. dated September 26, 2011.
16  The subject line is "Nutting Home, Inspection And Lab
17  Work Conducted On Samples Taken On April 28, 2011."
18         Do you see that?
19    A.  Yes, sir.
20    Q.  Do you recognize this document?
21    A.  Yes, sir.
22    Q.  Do you see that Exhibit F, the Nutting report,
23  is divided into a report and then exhibits that are
24  appended to that report?
25    A.  Yes.

40

1    Q.  Okay.  And your signature is on the report and
2  only your signature, correct?
3    A.  Yes.
4    Q.  And you accept responsibility for the content
5  of Exhibit F?
6         MR. LANDSKRONER:  Objection.
7         THE WITNESS:  I certify the results.
8  BY MR. AYALA:
9    Q.  Did you review the report in Exhibit F before
10  you signed it?
11    A.  Yes.
12    Q.  Did you review the results in Exhibit F before
13  you signed the report?
14    A.  Yes.
15    Q.  What, if anything, did you do to satisfy
16  yourself that the contents of Exhibit F were accurate
17  and complete?
18    A.  The contents of the whole report or the
19  appendices?
20    Q.  Let's start with the report.
21    A.  The report, as stated earlier, is a summary of
22  what we do in the laboratory.  So, as long as it's
23  giving the client, whoever that may be, an idea of what
24  was done on the testing, that's sufficient, and as long
25  as that's accurate.  On the appendices, I look, once

41

1  again, at controls and make sure that they're in,
2  basically, the range that we need them to be, be it a
3  positive control, negative control or what have you.  At
4  that point, I certified the results and it's sent to the
5  clients.
6    Q.  Okay.  And the report in Exhibit F is not only
7  a summary of what the laboratory does generally but it's
8  a summary of what the laboratory -- the procedures that
9  the laboratory performed on the samples that are the
10  subject of Exhibit F, correct?
11    A.  Yes.
12    Q.  Okay.  Let's look at Exhibit G, sir.  For the
13  record, Exhibit G is a report of RealTime Laboratories,
14  Inc. dated September 26, 2011, subject line is "Brucker
15  Home Inspection And Lab Work Conducted On Samples Taken
16  On May 11, 2011."
17         Do you see that?
18    A.  Yes, sir.
19    Q.  Do you recognize this document?
20    A.  Yes, sir.
21    Q.  And you will see this document, Exhibit G, is
22  divided into a report and then exhibits that are
23  appended to that report.
24         Do you see that?
25    A.  Yes.

11  (Pages 38 to 41)

42

1    Q.  And your signature and only your signature is
2  listed on the report, correct?
3    A.  Yes.
4    Q.  Did you review Exhibit G and its exhibits
5  before you signed it?
6    A.  Yes, sir.
7    Q.  And what, if anything, did you do to satisfy
8  yourself that the contents of the Exhibit G were
9  complete and accurate?
10    A.  I made sure the summaries reflected what we
11  did in the laboratory and I looked at the controls for
12  each sample that we tested and made sure that they were
13  within our standard ranges and reported the results.
14    Q.  I direct your attention to what's been marked
15  Exhibit H.  For the record, Exhibit H is a document
16  dated January 17, 2012.  The subject line is "Brucker
17  Home Inspection And Lab Work Conducted On Samples Taken
18  On November 17, 2011."
19        Do you see that?
20    A.  Yes, sir.
21    Q.  Okay.  Do you recognize this document?
22    A.  Yes, sir.
23    Q.  Do you see that this document is divided into
24  a report and then exhibits that are appended to that
25  report?

43

1    A.  Yes.
2    Q.  And your and only your signature is listed on
3  the report of Exhibit H, correct?
4    A.  Yes.
5    Q.  Did you review the contents of Exhibit H
6  before you signed it?
7    A.  Yes.
8    Q.  And what, if anything, did you do to satisfy
9  yourself that the contents of Exhibit H are complete and
10  accurate?
11    A.  I made sure it reflected what we performed in
12  the laboratory.  I made sure that the samples that were
13  processed, the controls were in the standard ranges and
14  the results were reported.
15    Q.  Do you need to take a break?  You all right?
16    A.  My throat is getting kind of dry.
17        MR. LANDSKRONER:  Let's take a break.
18        THE VIDEOGRAPHER:  Off the record,
19  10:12 AM.
20        (Recess taken.)
21        THE VIDEOGRAPHER:  We are back on the
22  record at 10:21 AM.
23  BY MR. AYALA:
24    Q.  Okay.  Back on the record.  Mr. Sutton, you're
25  still under oath; understand?

44

1    A.  Yes, sir.
2    Q.  Okay.  We have been talking about Exhibits C
3  through H?
4    A.  Uh-huh.
5    Q.  Which, to summarize, are the RealTime
6  Laboratories, Inc. reports that have been generated for
7  the litigation, correct?
8    A.  It was generated for the samples that were
9  processed.
10    Q.  Okay.
11    A.  The litigation -- I mean, as far as I know, I
12  guess it was -- I mean, we processed the samples for the
13  results --
14    Q.  Okay.
15    A.  -- to rephrase.
16    Q.  I'll represent to you that the plaintiffs in
17  the litigation have served to the defendant in the
18  litigation Exhibits C through H in connection with their
19  expert disclosures.  You don't have any basis to dispute
20  that, correct?
21    A.  No.
22    Q.  All right.  To summarize, the RealTime
23  laboratory reports in Exhibits C through H are each
24  divided into two parts; the first part being a report
25  and the second part being exhibits to the respective

45

1  report, correct?
2    A.  Yes.  I would say it's a report with the
3  results.
4        But yes, in this setting, it's appendices.
5    Q.  Okay.
6    A.  We don't really call them appendices in the
7  lab, per se.
8    Q.  So, I'll try it this way:  Would it be
9  fair to say the, that Exhibits C through H, the RealTime
10  laboratory reports, are divided into two parts, the
11  first being the report themselves --
12    A.  Uh-huh.
13    Q.  -- and the second part being the results
14  appended to each report, which are shown in the exhibits
15  to each report; is that correct?
16    A.  Yes.
17    Q.  Okay.  Mr. Sutton, you did not personally
18  author any of the RealTime Laboratories reports
19  contained in Exhibits C through H, correct?
20    A.  No, and I don't personally author any reports
21  at RealTime.
22    Q.  Okay.  I just need you to listen carefully to
23  the question because the record is not going to be clear
24  if you don't.
25        The question is:  Mr. Sutton, you did not

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

46

1    personally author any of the reports that are contained
2    in Exhibits C through H; is that correct?
3        A.  Correct.
4            MR. LANDSKRONER:  Objection.
5    BY MR. AYALA:
6        Q.  And in fact, Dennis Hooper is the author of
7    each of the RealTime Laboratories reports identified as
8    Exhibits C through H, correct?
9        A.  Correct.
10           MR. AYALA:  Let's mark this as I.
11           (Exhibit I marked.)
12   BY MR. AYALA:
13       Q.  Mr. Sutton, I'm showing you a document that's
14   been marked as Exhibit I, which, for the record, is
15   "Case Management And Scheduling Order In The Case Of
16   Brinku Versus National Gypsum Company."  It is docket
17   entry No. 149 and it was filed on August 26, 2011.  Do
18   you recognize this document, sir?
19       A.  I've never seen it, no.
20       Q.  Okay.  You've never seen this document,
21   correct?
22       A.  Huh-uh.
23       Q.  Okay.  If you turn to Page 2 of the document,
24   specifically paragraph E, it reads, "Disclosure Of
25   Expert Testimony.  On or before the date set forth in

47

1    the above table for the disclosure of expert reports,
2    the party shall fully comply with Federal Rule Of Civil
3    Procedure 26(a)(2), and 26(e)."
4        The next page, "Expert testimony on direct
5    examination at trial will be limited to the opinions,
6    bases, reason, data and other information disclosed in
7    the written expert report disclosed pursuant to this
8    order.  Failure to disclose such information may result
9    in the exclusion of all or part of the testimony of the
10   expert witness."
11       And, Mr. Sutton, before I ask you about that,
12   I will show you what's been marked as Exhibit J, which,
13   for the record, is a Case Management And Scheduling
14   Order dated October 5th, 2011, docket entry 76, in
15   Brucker versus Lowe's Home Center.  And, if you look at
16   Page 2 of Exhibit J, paragraph E, it has the exact same
17   disclosure of expert testimony paragraph that I just
18   quoted to you from Exhibit I.  Okay?
19       A.  Okay.
20       Q.  The question for you is:  Have you ever seen
21   Exhibit I or Exhibit J before?
22           MR. LANDSKRONER:  Objection.
23           THE WITNESS:  No, sir.  No, sir.
24   BY MR. AYALA:
25       Q.  Have you ever had discussions with anybody

48

1    about the contents of paragraph E to either Exhibit I or
2    Exhibit J?
3            MR. LANDSKRONER:  Objection.
4            THE WITNESS:  No.
5    BY MR. AYALA:
6        Q.  Mr. Sutton, are you familiar with the
7    multi-agency government investigation of reports of
8    corrosive drywall in the United States?
9        A.  The multi-agency, no.  I mean, other than what
10   we have -- what you hear on the news and I, guess -- I
11   was aware of the Chinese drywall.
12       Q.  Okay.  What's your understanding of the
13   Chinese drywall situation?
14       A.  Basically, a contaminant has been found or
15   identified in the drywall that causes issues for the
16   homeowners.  That's my understanding.  We were in a
17   peer-reviewed paper where my contribution was, as stated
18   earlier, developing assays to detect the DNA of specific
19   organisms.  That -- it was a contract that we were asked
20   to go after specific targets.
21       Q.  Mr. Sutton, what is your understanding of the
22   contaminant or contaminants in imported Chinese drywall?
23           MR. WARWICK:  Objection to the form.
24   BY MR. AYALA:
25       Q.  You can answer.

49

1        A.  My understanding, to be totally honest, is
2    back at a molecular level.  It's just another target to
3    design an assay for.  Of course, as anybody who watched
4    the news, I realize that there's reports of odor and
5    what have you, but as far as the microbiology behind
6    that, I don't have that level of expertise.
7        Q.  Okay.  If government investigators have
8    identified elemental sulfur as the marker or
9    contaminated -- contaminant for corrosive Chinese
10   drywall, do you dispute that?
11           MR. LANDSKRONER:  Objection; foundation.
12           THE WITNESS:  I don't know.  I would have
13   to look at the literature.  I mean, I -- I don't know.
14   I would have to look at the relevant literature and make
15   a -- make a determination.  And once again, that's
16   outside of my role in -- at RealTime Laboratories and
17   outside of my role as a molecular biologist.
18       Q.  Okay.  So, it's fair to say you have not
19   reviewed reports of the CPSC concerning its
20   investigation of corrosive drywall in the United States?
21       A.  I reviewed the one portion regarding
22   molecular.  I did not review the whole paper --
23       Q.  Okay.
24       A.  -- where they were discussing the molecular
25   techniques.  That's probably been four or five months

13  (Pages 46 to 49)

50

1  ago -- I mean, I don't know exactly how long, but it's
2  been a while.  I don't really remember the details of
3  that.
4      Q.  Okay.  And the report you're referring to is
5  the September 2011 report of the U.S. Geological Survey?
6          MR. WARWICK:  Objection.
7      A.  I can't confirm or deny that.  I don't know.
8  I was --
9      Q.  Okay.  Aside from the report you just
10  referenced, have you reviewed any other reports of the
11  CPSC concerning its investigation of corrosive drywall?
12     A.  No.
13     Q.  Okay.  Have you reviewed any reports of the
14  EPA concerning its investigation of corrosive drywall?
15     A.  No.
16     Q.  Have you ever reviewed any reports of the
17  Florida Department Of Health concerning its reports of
18  corrosive drywall?
19     A.  No.
20     Q.  Have you reviewed any reports of Lawrence
21  Berkley National Laboratory concerning its investigation
22  of corrosive drywall?
23     A.  No.
24     Q.  Have you reviewed any reports of Sandia
25  National Laboratory concerning its investigation and

51

1  testing regarding corrosive drywall?
2      A.  No.
3      Q.  Have you reviewed any reports of the National
4  Institute Of Standards And Technology regarding its
5  investigation of corrosive drywall and metals?
6      A.  No.
7      Q.  Okay.  You talked briefly, I think you told us
8  your title at RealTime Laboratories.  Could you just
9  remind me that what that is?
10     A.  It's vice president of laboratory operations.
11     Q.  Describe, if you will, Mr. Sutton, your
12  responsibilities as vice president of laboratory
13  operations?
14     A.  As the title suggests, laboratory operations.
15  And that includes making sure that the laboratory runs
16  efficiently; hiring, of course there's other people
17  involved in that, as well; but, making sure that the
18  tests are certified; making sure that we're up to state
19  regulatory standards; participating in any audits that
20  we have periodically; verifying results; verifying
21  controls, the controls being related to this case, the
22  four tests would be RealTime PCR, culture, enzyme and
23  corrosion.
24          Each one of those tests has a positive control
25  which was acquired from American -- ATCC, so American

52

1  Type Culture Collection, which has all these organisms.
2  We run those, make sure that we have that positive.  We
3  also run a negative control, make sure there is no
4  contamination.  We run an internal control where we
5  introduce DNA to make sure that the extraction is
6  running all the way through.  This is specific for DN --
7  the RealTime PCR, and there's similar controls on the
8  enzyme and culture and corrosion.
9          Culture, once again, we use ATCC organisms
10  specific for these, grow them up, make sure that they
11  grow up.  Once again, we have negative controls and that
12  would be negative drywall controls, that would be
13  negative media controls, and make sure that those don't
14  grow anything.
15          With the enzyme tests, same thing.  We run
16  positive known organisms to make sure that they show the
17  blue color in the enzyme test.  We run negatives to make
18  sure that they don't.  So, that's how all these are
19  controlled.  Corrosion, the same way.  We run positive
20  corrosion tests and negative corrosion tests.
21          My job isn't necessarily to hands-on do all of
22  that, which I do sometimes, but my job is to make sure
23  that those controls are in compliance with our standard
24  operating procedures.  If they aren't, if we have a run
25  where they aren't in compliance, we will repeat the run

53

1  and make sure that they're in compliance before we
2  report the results.  It's identical to the way we run in
3  the clinical lab.  And, so --
4      Q.  Okay.  So, how long has RealTime labs been in
5  operation?
6      A.  You know, that, I don't know.
7      Q.  How many employees does RealTime Laboratories
8  have?
9      A.  Let's see.  Four.  And that doesn't count
10  Dr. Hooper because I don't think he is classified as an
11  actual employee.
12     Q.  Okay.  So, that would be you --
13     A.  Hold on a second.  Let me make sure I'm right,
14  here.  No, five, total; not counting Hooper.
15     Q.  How many offices does RealTime Laboratories
16  have?
17     A.  Physical addresses or offices in the building?
18     Q.  Physical addresses.
19     A.  One.
20     Q.  How many offices in the building?
21     A.  Four, and, you know, there's labs -- I mean,
22  most of it's labs.
23     Q.  Okay.  Let's talk about your testing
24  procedures.  Now, in connection for -- in connection
25  with your work for the plaintiffs in this litigation,

14  (Pages 50 to 53)

54

1  you performed four different testing methodologies,
2  correct?
3      A.  Correct.
4      Q.  You performed an API RP38 culture.  For the
5  record that's an American Petroleum Institute
6  Recommended Practice 38 culture test, correct?
7      A.  Yes.
8      Q.  You performed a RapidChek II Sulfate-Reducing
9  Bacteria Test, correct?
10     A.  Yes.
11     Q.  You performed RealTime polymerase chain
12 reaction, also known as RT PCR testing, using
13 proprietary DNA probes from RealTime Laboratories,
14 correct?
15     A.  Yes.
16     Q.  And you performed corrosion testing, correct?
17     A.  Yes, sir.
18     Q.  And when I say that you performed these four
19 tests, I mean we have established that --
20     A.  Under direct supervision.
21     Q.  -- RealTime Laboratories has performed those
22 tests, and those test methodologies form the basis of
23 Exhibits C through H, correct?
24     A.  Yes.
25     Q.  Okay.  Aside from the four test methodologies

55

1  we just discussed, are there any other test
2  methodologies that RealTime labs performed on the
3  plaintiffs' drywall samples?
4      A.  No.
5      Q.  Now, Exhibits C through H, the RealTime labs
6  reports, list five bacteria:  Thiobacillus caldus;
7  Sulfobacillus thermosulfidooxidans; Thiobacillus
8  thiooxidans; Thiobacillus ferrooxidans; and
9  Leptospirillum ferrooxidans, correct?
10     A.  Yes.
11     Q.  Did RealTime Laboratories test for any
12 bacteria on the plaintiffs' drywall samples other than
13 the five I just listed?
14     A.  No.
15     Q.  Okay.  Okay.  Did RealTime Laboratories
16 perform a test for elemental sulfur on the plaintiffs'
17 drywall samples?
18     A.  Not to my knowledge.
19     Q.  Okay.  Did RealTime Laboratories perform x-ray
20 fluorescence testing on the plaintiffs' drywall samples?
21     A.  Not to my knowledge.
22     Q.  Okay.  Did RealTime Laboratories perform
23 chamber testing of the air in proximity to any of the
24 drywall samples that were analyzed for this litigation?
25     A.  Not to my knowledge.

56

1      Q.  Okay.  Did RealTime Laboratories perform ASTM
2  Standard Test Method D55-0408 on the plaintiffs' drywall
3  samples?
4      A.  What was that again?
5      Q.  ASTM Standard Test Method D55-0408?
6      A.  If we did, I don't know that number.  I don't
7  recognize that name.
8      Q.  Okay.  Did RealTime Laboratories perform gas
9  chromatography testing on the plaintiffs' drywall
10 samples?
11     A.  Not to my knowledge.
12     Q.  Did RealTime Laboratories perform the Most
13 Probable Number technique in Method 9240, Iron and
14 Sulfur Bacteria, as published in Standard Methods for
15 Examination of Water and Wastewaters, 20th Edition,
16 1998?
17         MR. LANDSKRONER:  Objection.  Foundation.
18         MR. WARWICK:  Objection.
19         THE WITNESS:  I have no idea what that
20 is, so not to my knowledge.
21 BY MR. AYALA:
22     Q.  Okay.  Did RealTime Laboratories test the pH
23 of the plaintiffs' drywall samples?
24     A.  No.
25     Q.  Did RealTime Laboratories test the porosity or

57

1  permeability of the plaintiffs' drywall samples?
2      A.  Not to my knowledge.
3      Q.  Okay.  Did RealTime Laboratories perform
4  epifluorescence microscopy on the plaintiffs' drywall
5  samples?
6      A.  Not to my knowledge.
7      Q.  Did RealTime Laboratories apply gamma
8  radiation to sterilize any of the plaintiffs' drywall
9  samples?
10     A.  Not to my knowledge.
11     Q.  Okay.  Now, the four corners of the reports in
12 Exhibits C through H, the RealTime laboratory reports,
13 do not contain any opinions about the alleged cause of
14 corrosion to metals in any particular home environment,
15 correct?
16     A.  Not to my knowledge.
17     Q.  Okay.
18         Mr. Sutton, you've never been to the Brinku
19 plaintiff's house that is at issue in this litigation,
20 correct?
21     A.  No.
22     Q.  Mr. Sutton, you've never been to the Brucker
23 plaintiff's house that is at issue in this litigation?
24     A.  No.
25     Q.  Mr. Sutton, have you ever been to the Retana

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

58

1    plaintiff's house that is at issue in this litigation?
2        A.   No.
3        Q.   Have you ever been to the Ravelo plaintiff's
4    house that is at issue in this litigation?
5        A.   No.
6        Q.   Have you ever been to the Nutting plaintiff's
7    house that is at issue in this litigation?
8        A.   No.
9        Q.   Have you ever been to National Gypsum's
10   manufacturing facility located at Apollo beach, Florida?
11       A.   No.
12       Q.   Have you ever to National Gypsum's
13   manufacturing facilities located in either Tampa,
14   Florida, Westwego, Louisiana, or Savannah, Georgia?
15       A.   No.
16       Q.   Do you agree, Mr. Sutton, that laboratory
17   experiments are more reliable when they represent
18   conditions of a sample in-situ than when they do not?
19           MR. LANDSKRONER:  Objection.
20           MR. WARWICK:  Objection.
21           THE WITNESS:  That's too broad of a
22   question to answer.  I can speak to what we do in the
23   lab.  I can't speak in generalities about a comment like
24   that.
25   BY MR. AYALA:

59

1        Q.   Mr. Sutton, would you agree that a laboratory
2    test that represents the conditions of a sample in a
3    home is more reliable than a laboratory test that does
4    not represent the conditions of sample in the home?
5            MR. LANDSKRONER:  Objection.
6            THE WITNESS:  Not necessarily.  It
7    depends on what the test is, what you're looking for and
8    what you're trying to achieve and get out of the
9    results.
10   BY MR. AYALA:
11       Q.   Does RealTime Laboratories aim to perform
12   tests that do not represent conditions of samples out in
13   the field?
14       A.   RealTime Laboratories aims to do the tests
15   that we offer for our customers who purchase that test.
16   So, if they would like to have a RealTime PCR test
17   performed, we will take the sample that they send to us,
18   we'll put it through our processes, extract the DNA,
19   perform our QC, use our controls that are specific to
20   that target, and report the result as negative or
21   positive --
22       Q.   Okay.
23       A.   -- and that's the same thing for the other
24   tests as well.
25           MR. AYALA:  Objection.  Move to strike as

60

1    nonresponsive.
2    BY MR. AYALA:
3        Q.   Let's talk about the American Petroleum
4    Institute Recommended Practice 38 Culture Method.  That
5    was one of the methods that RealTime Laboratories
6    performed on the plaintiffs' drywall samples, correct?
7        A.   That's how we cultured it, yes.
8        Q.   Okay.  Did RealTime Laboratories apply APR --
9    strike that.
10           Did RealTime Laboratories apply API RP38,
11   using the same test procedures with respect to each
12   drywall sample it tested for the plaintiffs?
13       A.   We used API RP38 culture to culture the
14   drywall and the paper, per our standard operating
15   procedures.  Whether it matches the API procedures, I'm
16   not sure.
17       Q.   Okay.  The question, sir --
18       A.   Uh-huh.
19       Q.   -- is this:  RealTime Laboratories performed
20   either API RP38 culture method step-by-step or some
21   variant of API RP38 culture method, correct?
22       A.   Yes.  We used RP38 culture to culture the
23   drywall, yes.
24       Q.   Okay.  So, the question is:  With respect to
25   the plaintiffs' drywall samples --

61

1        A.   Uh-huh.
2        Q.   -- was RealTime Laboratories' performance of
3    API RP38 the same?
4        A.   You mean, between each --
5        Q.   Was the methodology --
6        A.   Yes, it's standard operating procedure, yes.
7        Q.   Okay.  Okay.  Now, with respect to API RP38
8    culture, RealTime Laboratories, on the plaintiffs'
9    drywall samples, obtained powder and paper from drywall,
10   correct?
11       A.   Yes.
12       Q.   And the drywall specimens were accepted in a
13   sterile biohazard plastic bag; is that right?
14       A.   Yeah, per our collection SOP.
15       Q.   The paper was removed from the drywall
16   carefully to ensure no drywall core material was present
17   on the paper; is that right?
18       A.   To the best as possible, yes.
19       Q.   Okay.  Tell me, please, how is -- how exactly
20   did you accomplish removing the paper from the drywall?
21       A.   We removed it.  There is always a little bit
22   of drywall attached, but not very much, and we try to
23   minimize that as much as possible.  And then that goes
24   in one culture media and then the other goes in the core
25   culture media.

16  (Pages 58 to 61)

62

1    Q.  Okay.  What exactly does RealTime Laboratories
2   do to remove the paper from the core of the drywall?
3    A.  It's removed with sterile tweezers and
4   scissors.  And then the core is crushed and
5   approximately 3 grams is used in the -- in the core
6   culture media and then the paper, I think, is
7   5 millimeters by 5 millimeters, is put in the paper
8   culture media, as we are doing --
9    Q.  Okay.  Okay.  I just want to -- I just want
10   you to answer the question that's asked, okay?
11    A.  Okay.
12    Q.  We'll take it one step at a time.  We'll get
13   to -- we're going to go through the whole procedure.
14    A.  Okay.
15    Q.  But, just right now, we're talking about the
16   removal of the paper.  Are the laboratory technicians at
17   the RealTime Laboratories, or did they, on the
18   plaintiffs' drywall samples, handle the drywall samples
19   with their hands?
20    A.  No.
21    Q.  Okay.
22    A.  Gloved hands in a sterile room.
23    Q.  Okay.  Now, after the paper was removed from
24   the drywall core, the drywall was then crushed in a
25   biohazard bag until it was powder, correct?

63

1    A.  Yes, sir.
2    Q.  Okay.  How did RealTime Laboratories crush the
3   drywall?
4    A.  With a mallet.
5    Q.  With a kind of mallet?
6    A.  Just a mallet, a hammer-type device, yeah.
7    Q.  And the laboratory technicians would just --
8    A.  Well, they wouldn't take a full swing, but
9   it's (indicating) like that, and just crush it up.  You
10   don't need a lot of material.  You only need, like,
11   3 grams and it's pretty easy to get that loose --
12    Q.  Okay.
13    A.  -- and crushed up enough.
14    Q.  What did RealTime Laboratories do to sterilize
15   the mallet, if anything, before crushing the drywall?
16    A.  The mallet never comes in contact.  But, all
17   of those are in an extraction room, which is separate
18   from the lab, and it's the same room we do our clinical
19   extractions and the same precautions are taken.
20    Q.  Okay.  So, the mallet actually is not
21   sterilized; is that correct?
22    MR. LANDSKRONER:  Objection.
23    THE WITNESS:  No.
24   BY MR. AYALA:
25    Q.  Is the mallet sterilized?

64

1    A.  The mallet is not sterilized, per se, but it's
2   in a clean room.  So, we don't necessarily sterilize the
3   mallet.  So, the drywall is in a contained package in a
4   clean room and then it's crushed.
5    Q.  Okay.  What kind of package is the drywall
6   in -- was the drywall in when it was crushed?
7    A.  It's plastic, biohazard bag.
8    Q.  Okay.  And is that, basically, a Ziploc bag?
9    A.  It's thicker than a Ziploc bag.
10    Q.  Okay.  Now, the next step of the API RP38
11   culture was a 5 millimeter by 5 millimeter portion of
12   paper was placed in media generated in accordance with
13   recommendations put forth by the American Petroleum
14   Institute, API RP38, Edition 1975, correct?
15    A.  Correct.
16    Q.  And, in Exhibits C through H, RealTime labs
17   has reproduced a summary of API RP38, correct?
18    A.  Yes.
19    Q.  All right.  Now, so right now, we're talking
20   about the API RP38 culture of drywall paper of the
21   plaintiffs' samples.
22    A.  Uh-huh.
23    Q.  And as I understand it, the culture media was
24   overlaid with two milliliters of sterile mineral oil; is
25   that right?

65

1    A.  That's correct, for the paper medium.
2    Q.  Okay.  Okay.  Why was the sterile mineral oil
3   put on the culture media?
4    A.  To create an anaerobic situation, is my
5   understanding.
6    Q.  Okay.  The culture media is put into a tube,
7   correct?
8    A.  Yes.
9    Q.  Okay.  And on the plaintiffs' drywall samples,
10   the media with the paper was put into the tube and the
11   tube was closed tightly to ensure no oxygen exchange,
12   correct?
13    A.  Yes.
14    Q.  All right.  And then the tube was incubated at
15   37 degrees Celsius for up to 21 days, correct?
16    A.  Yes.
17    Q.  Okay.  So, how long were the samples incubated
18   at 37 degrees?
19    A.  The way it works for these culture readings
20   is, at 7 days we look to see if there's a positive.  If
21   there's a positive, we'll mark that down.  If there's a
22   negative, we go all the way to 21 days to make sure that
23   the negative is truly a negative.  And as we're doing
24   this, every time we inoculate these, we make -- we take
25   ATCC samples for the organism, ST, and inoculate it and

17  (Pages 62 to 65)

66

1 make sure that that grows; and we also do a negative
2 control and make sure that that doesn't grow.
3 　　Q. Okay. But on the plaintiffs' drywall samples,
4 you basically look at the tube after 7 days, if it was
5 positive, you stop the test, and if it is negative
6 you --
7 　　A. No, we would keep everything --
8 　　Q. -- would continue up for 21 days?
9 　　A. -- in there for 21 days, and re-check. But we
10 would mark the positives down and we would wait to make
11 sure that the negatives are negative.
12 　　Q. Okay.
13 　　A. Now, I will say I don't read the cultures.
14 A -- one of our microbiologists do. And, in our case,
15 Dr. Hooper reads those, because I'm a molecular
16 biologist.
17 　　Q. Okay.
18 　　A. Dennis Hooper.
19 　　Q. Now, the next step of API RP38 is, Dennis
20 Hooper would read the cultures and look for the presence
21 of black precipitate throughout the vial, which was
22 interpreted as positive for SRB --
23 　　A. Um-hum.
24 　　Q. -- sulfur-reducing bacteria, correct?
25 　　A. Yes.

67

1 　　Q. Now, describe black precipitate?
2 　　A. The tube is black. There's not really any
3 second guessing it. It turns black.
4 　　Q. Okay. What is the precipitate inside the
5 tube?
6 　　A. I guess that's the particulate matter that's
7 in there, I'm assuming. I'm not a microbiologist, but
8 it's the growth that's in the tube.
9 　　Q. Okay. Describe -- when you say black
10 precipitate was throughout the vial, what do you mean,
11 throughout the vial?
12 　　A. There's no other way to say it, it's just
13 black.
14 　　Q. Does that mean the entire vial is covered --
15 　　A. In some cases.
16 　　Q. -- in black?
17 　　A. But there is no mistaking it, it turns black.
18 　　Q. When the reports say that "black precipitate
19 throughout the vial is interpreted as positive for SRB,"
20 are there different levels of positive?
21 　　A. No. We look for a positive or negative
22 result.
23 　　Q. Okay. Have you or Dennis Hooper used the term
24 "weak positive" or "strong positive" in the past?
25 　　A. I believe early on they did. I don't -- I

68

1 don't know in what scenario that was used. I think I
2 have seen that, though.
3 　　Q. Okay. How do you define a weak positive for
4 SRB?
5 　　A. I can't define it. I mean, I would -- I would
6 assume that they saw black precipitate throughout the
7 vial. So, you're look -- talking about a conical tube
8 that's -- it's this size (indicating), and the paper is
9 put in it. And you'll see the particulate matter all
10 through the liquid. At the same time, we check our
11 controls and make sure the positive control is black and
12 the negative control is clear and that's how we go. We
13 check against the positive control and we check against
14 negative control --
15 　　Q. Okay.
16 　　A. -- which are specific for ST.
17 　　Q. Okay. But sitting here now, you can't define
18 what a weak positive would be?
19 　　A. You'd have to ask the person who called it a
20 weak positive. I'm assuming that's Dr. Hooper. I don't
21 know that for sure.
22 　　Q. Now, the RP38 standard addresses
23 sulphate-reducing bacteria; is that correct?
24 　　A. What was the first part again?
25 　　Q. API RP38 --

69

1 　　A. API RP38? I know that -- this gets into the
2 pathways and this is outside of my area. I know that
3 some of the organisms are SOBs, which is
4 sulfur-oxidizing bacteria, and some are sulfur-reducing
5 bacteria. I'm not really up on that. I mean, I know
6 which organisms that we process with DNA and which ones
7 are SOBs and SRBs.
8 　　Q. Okay. What's your understanding of the
9 difference between a sulphate-reducing bacteria and a
10 sulfur-reducing bacteria?
11 　　A. I don't really have an understanding of that.
12 That gets into micro.
13 　　Q. Step 3 of API RP38 culture test says, "In the
14 same manner," which refers to paragraph 2,
15 "approximately 3 grams of crushed gypsum core sample is
16 added to a core media preparation."
17 　　Do you see that?
18 　　A. What page are we on, again?
19 　　Q. Well, there are no page numbers --
20 　　A. Okay. Hold on. Hold on just a second.
21 　　Q. -- in the RealTime Laboratories report.
22 　　A. I'll catch up with you.
23 　　Q. Well, you know what, let's just back up a
24 minute.
25 　　A. Okay. I think I'm where you are.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

70

1    Q.  That's all right.  Just, back on the -- on the
2  paper culture test, real quick, when we were talking
3  about black precipitate throughout the vial being
4  interpreted as positive for SRB --
5    A.  Uh-huh.
6    Q.  -- you would agree with me, Mr. Sutton, that
7  Exhibits C through H do not include any photos of the
8  reported black precipitate, or any other data for us to
9  evaluate?
10    A.  I would agree.
11    Q.  Okay.  Now, on to step 3.  Step 3 of RealTime
12  Laboratories culture test says, "In the same manner,"
13  meaning the same manner as step 2, the paper culture
14  test, "approximately 3 grams of crushed gypsum core
15  sample is added to a core media preparation."
16    Do you see that?
17    A.  Yes, sir.
18    Q.  Okay.  Now, the core media preparation for the
19  gypsum core is a different media than was used for the
20  paper, correct?
21    A.  Correct.
22    Q.  Okay.  Why is that?
23    A.  You'll have to ask the microbiologist.
24    Q.  Which microbiologist would I have to ask on
25  that?

71

1    A.  Either David Strauss or Dennis Hooper.
2    Q.  Okay.  Whose decision was it to use a
3  different culture media for the crushed gypsum core than
4  was used for the drywall paper?
5    A.  I'm not aware of whose decision it is.  I know
6  that that's our standard operating procedure and that's
7  what we follow in the lab.
8    Q.  Okay.  Okay.  Now, on the gypsum core culture
9  test, the media, the culture media was closed with a
10  screw cap and again incubated in a like manner as in
11  number 2, above --
12    A.  Uh-huh.
13    Q.  -- correct?  Was that --
14    MR. LANDSKRONER:  You need to say --
15    THE WITNESS:  Yes.
16    MR. LANDSKRONER:  -- yes or no, so the
17  record is clear.
18    THE WITNESS:  I'm sorry.  Yes.
19  BY MR. AYALA:
20    Q.  Okay.  So, with respect to the culture media
21  and the culture test on the gypsum core samples, the
22  tubes were incubated at 37 degrees Celsius for up to
23  21 days, correct?
24    A.  Yes.
25    Q.  And I take it RealTime labs checked the tubes

72

1  after 7 days but kept the culture media in the tubes for
2  21 days --
3    A.  For 21 days, yes.
4    Q.  Okay.  Let's try not to talk over each other.
5  I know, sorry, it's hard.
6    A.  Sorry.
7    Q.  Now, in RealTime labs' culture of the gypsum
8  core, the presence of turbidity and/or black color was
9  interpreted as positive for SRB, correct?
10    A.  Correct.
11    Q.  All right.  What is turbidity?
12    A.  Cloudiness.  The only way I can describe it
13  is, it looks like something is growing in the liquid, in
14  the media itself.
15    Q.  What color is turbidity?
16    A.  It can be variant -- various colors.
17    Q.  Okay.  Now, turbidity can -- was interpreted
18  as positive for SRB for the gypsum culture test,
19  correct?
20    A.  Yes.
21    Q.  Now, even if there wasn't turbidity, black
22  color was interpreted as a -- as positive for SRB as
23  well, correct?
24    MR. WARWICK:  Objection.
25    THE WITNESS:  I would say it's probably

73

1  turbidity and black color, but I would have to look at
2  the standard operating procedures on that.
3  BY MR. AYALA:
4    Q.  Okay.  But you -- but the reports, in Exhibits
5  C through H, say that the presence of turbidity and/or
6  black color was interpreted as positive for SRB,
7  correct?
8    A.  Yes.
9    Q.  And sitting here today, you don't have any
10  basis to dispute that?
11    A.  No.
12    Q.  Okay.  Now, as with the paper culture tests
13  performed on plaintiffs' drywall samples by RealTime
14  Laboratories, the gypsum core culture test performed by
15  RealTime Laboratories also did not include any data or
16  photos for us to evaluate, correct?
17    A.  Yes.
18    And just like the paper media, the core media,
19  we run positive --
20    Q.  Okay.  Okay.  We'll get there, though.  We'll
21  get there.
22    There's no question pending.
23    Now, unlike RealTime Laboratories' paper
24  culture test on plaintiffs' drywall samples, RealTime
25  Laboratories' gypsum core culture tests was not

19 (Pages 70 to 73)

74

1    performed under anaerobic conditions, was it?
2        A.  No.
3        Q.  Okay.  And why not?
4        A.  Because our standard operating procedures said
5    to set it up the way that we set it up.
6        Q.  Okay.  And who made the decision to perform
7    the gypsum culture test in aerobic conditions?
8        A.  My understanding is, it's taken from the
9    petroleum industry, but the decision would have been
10   made with one of our microbiologists that works with the
11   company, either Dennis Hooper or David Straws.
12       Q.  Okay.  And so, David Strauss is an employee of
13   RealTime Laboratories?
14       A.  I believe he's a consultant.
15       Q.  Okay.  What's your understanding of his
16   consulting arrangement with RealTime Laboratories?
17       A.  He consults regarding molds, mycotoxins, and
18   these targets that we're discussing today, anything
19   related to microbiology and that sort of thing.
20       Q.  And David Strauss is compensated by RealTime
21   Laboratories for his consulting work?
22       A.  I'm not privy to that.
23       Q.  Okay.  Now, Step No. 4 of RealTime
24   Laboratories culture test says "Negative controls as
25   well as positive controls are incubated side by side the

75

1    specimens to ensure quality control of the test
2    procedures."  Did I read that correctly?
3        A.  Yes, sir.
4        Q.  Okay.  And now, with respect to Exhibits C
5    through H, the RealTime Laboratories reports do not
6    include any photos or data of the negative and positive
7    controls for the plaintiffs' drywall samples, correct?
8        A.  Correct.
9        Q.  The fifth step reported in the RealTime labs
10   reports on the plaintiffs' drywall samples says,
11   "Reduced-sulfur gas is interpreted in either one or both
12   of the tubes as gas bubbles present in the media";
13   correct?
14       A.  That's what it says.
15       Q.  Okay.  Now, you will agree that Exhibits C
16   through H do not include any photos or data representing
17   gas bubbles in the media used on the plaintiffs'
18   samples, correct?
19       A.  Correct.
20       Q.  What is a reduced-sulfur gas?
21           MR. WARWICK:  Object to form.
22           MR. LANDSKRONER:  Objection.
23           THE WITNESS:  I'm not aware of any of the
24   pathways related to microbiology.  As I stated earlier,
25   I'm a molecular biologist and a laboratory operations

76

1    person.
2    BY MR. AYALA:
3        Q.  Okay.  How many different types of
4    reduced-sulfur gas exist?
5            MR. LANDSKRONER:  Objection.
6            THE WITNESS:  I don't know.
7    BY MR. AYALA:
8        Q.  What's the difference between sulfur and
9    sulfate?
10           MR. LANDSKRONER:  Objection.
11           THE WITNESS:  I'm not -- I'm not
12   qualified to go down this road into microbiology or
13   pathways.
14   BY MR. AYALA:
15       Q.  Okay.  You will agree with me that Exhibits C
16   through H don't report any gas bubbles anywhere in the
17   culture media, correct?
18       A.  Not that I have seen.
19       Q.  And RealTime Laboratories did not perform any
20   testing of the air in the tubes used for the culture
21   tests on plaintiffs' drywall samples, correct?
22       A.  No.  Correct, yes.  Correct.
23       Q.  Okay.  You doing all right?
24       A.  Yeah.
25           MR. AYALA:  Oh, okay.

77

1            What exhibit are we on?
2            THE REPORTER:  K, I believe.
3            MR. AYALA:  K?  Yeah, I think you're
4    right.
5            (Exhibit K marked.)
6        Q.  Okay.  Mr. Sutton, I'm showing you what's been
7    marked as Exhibit K, which, for the record, is a
8    document entitled "API Recommended Practice For
9    Biological Analysis of Subsurface Injection Waters," At
10   the top, it says "API RP38, Third Edition,
11   December 1975."
12           Do you see that?
13       A.  Uh-huh.
14       Q.  Do you recognize this document?
15       A.  No, sir.
16       Q.  Okay.  Have you ever seen API RP38's
17   Recommended Practice For Biological Analysis Of
18   Subsurface Injection Waters before?
19       A.  No.
20       Q.  Okay.  But, you'll agree that the Exhibits C
21   through H, RealTime Laboratories reports, these exhibits
22   purport to have applied API RP38 revised edition 75,
23   correct?
24       A.  That's what it says.
25       Q.  Okay.  And if I represent to you that this

20  (Pages 74 to 77)

78

1  document, Exhibit K, which states on it, API RP38, Third
2  Edition, December 1975, is, in fact, a memorialization
3  of the API RP 38, 1975 edition, you don't have any basis
4  to dispute that, correct?
5      A.  Not at this time.
6      Q.  Okay.  Now, looking at the title of this
7  document, Exhibit K, this is not a standard for testing
8  drywall, correct?
9      A.  Correct.
10     Q.  In fact, it's a standard for analyzing
11  subsurface injection waters, right?
12     A.  That's what it says.
13     Q.  What are subsurface injection waters?
14         MR. LANDSKRONER:  I have no idea.
15         THE WITNESS:  I have no idea.
16  BY MR. AYALA:
17     Q.  Okay.  Now, Exhibits C through H each state
18  that API RP38 is a, quote, "gold standard for industry";
19  is that right?
20     A.  That's what it says.
21     Q.  Okay.  Now, when the RealTime lab reports
22  refer to API RP38 as a gold standard for the industry,
23  they're referring to the petroleum industry, correct?
24     A.  Yes.
25     Q.  And not the drywall industry, right?

79

1          MR. LANDSKRONER:  Objection.
2          THE WITNESS:  As far as I know.  I --
3  BY MR. AYALA:
4      Q.  Okay.  Are you aware that API RP38 has been
5  withdrawn as a recommended practice by the American
6  Petroleum Institute?
7      A.  No.
8      Q.  Okay.
9          MR. LANDSKRONER:  Objection.
10  BY MR. AYALA:
11     Q.  Before you signed -- before you reviewed and
12  signed the reports in Exhibits C through H, did you do
13  any investigation or research to confirm whether or not
14  API RP38 was a recommended practice by the American
15  Petroleum Institute at the time that the plaintiffs'
16  samples were analyzed?
17         MR. LANDSKRONER:  Objection.
18         THE WITNESS:  That's not my job.  What I
19  did confirm is that we followed our standard operating
20  procedure for culture of the drywall, which was,
21  evidently, adapted from this document that I have never
22  reviewed.
23  BY MR. AYALA:
24     Q.  Okay.  Looking at Exhibit K, under section 1
25  titled "Examination For Microorganisms," under the

80

1  scope, paragraph 2, it says "These procedures are
2  intended to reveal the number and types of
3  microorganisms present in a particular water sample,"
4  correct?
5      A.  That's what it says.
6      Q.  All right.  Now, in looking at the sampling
7  methods, beginning with paragraph 4, API RP38 states
8  "The following sampling techniques should be adhered to:
9  A, a clean sterile bottle will be used."
10         Now, what's your understanding of how the
11  plaintiffs' drywall samples were sampled?
12     A.  How they were sampled?  There is a procedure
13  for that.  My understanding is that we had a team that
14  was vetted by the company to go out and -- to these
15  homes and collect samples using, I think, it's a 2- to
16  4-inch drill bit that's cleaned with water and then
17  sterilized with ethanol between samples.  And then fill
18  out all the location and all of that information that's
19  in the, in the procedure and then ship it to us with a
20  chain of custody in a biohazard bag.  I believe that's
21  the gist of it.
22     Q.  Okay.  Now, paragraph B of API RP38 says that
23  the tap should be allowed to flow at least three minutes
24  at the sampling rate prior to taking the sample.  Now,
25  that just wouldn't apply to RealTime Laboratories'

81

1  sample collection methodology because drywall --
2      A.  Well, it wouldn't apply, which is why the
3  procedure was adapted from this.  It's not this
4  procedure.
5      Q.  Right.  Okay.  Now, letter C, paragraph C says
6  "The sample should be taken in such a manner as to
7  preclude contamination from external sources."
8          Now, you weren't present when the samples were
9  collected, correct?
10     A.  No, sir.
11     Q.  Okay.  Paragraph D of API RP38 says, "The
12  time, date, temperature and appearance of the water
13  should be recorded at the time of sampling and this
14  information should be included with the sample."
15         Now, RealTime Laboratories has a sample
16  collection procedure for drywall, correct?
17     A.  Correct.
18     Q.  Would you agree that noting the temperature of
19  the drywall at the time it is sampled is not part of
20  RealTime labs' procedure?
21     A.  I would agree.
22     Q.  Okay.  And upon RealTime labs' receipt of the
23  plaintiffs' drywall samples, it did not record the
24  temperature of the drywall samples, correct?
25     A.  That's correct.

21  (Pages 78 to 81)

82

1    Q.  It says, API RP38 paragraph E says "The
2  samples should be handled in such a manner as to avoid
3  radical changes in temperature between type of sampling
4  and time for examination of sample."
5        Now, RealTime labs' procedure was to have the
6  samples shipped, usually by FedEx, correct?
7    A.  Yes.
8    Q.  Okay.  And you just don't have a basis, one
9  way or another, to know the conditions that the samples
10  were subject to when FedEx shipped them?
11    A.  No.
12    Q.  Okay.  Now, the maximum time between sampling
13  and examination, under API RP38 paragraph F, should not
14  exceed 24 hours.
15        Is the 24-hour time limit in API RP38 part of
16  RealTime labs' procedures for the plaintiffs' drywall?
17    A.  No.
18    Q.  Okay.  The samples -- API RP38, paragraph F,
19  says "The samples should be cultured as soon as
20  possible."  Do you agree with that?
21    A.  I'm not a microbiologist, so --
22        MR. LANDSKRONER:  Objection.
23  BY MR. AYALA:
24    Q.  Okay.
25    A.  I will state that this is referring to water

83

1  and not drywall.
2    Q.  Yes, I agree.  Now, if an examination of the
3  samples cannot be initiated within the 24-hour period
4  under API RP38 --
5    A.  Um-hum.
6    Q.  -- the following statement should be included
7  in the report:  "These results do not necessarily
8  represent the actual microbial content of the water at
9  the time of sampling?"
10        You would agree that Exhibits C through H do
11  not contain such a statement, correct?
12        MR. LANDSKRONER:  Objection.
13        THE WITNESS:  Correct.
14  BY MR. AYALA:
15    Q.  Now, looking at Exhibit 6, or what I should
16  say is the API RP38 media, laboratory general media of
17  RealTime Laboratories, which is contained in an exhibit
18  of RTL's reports for this litigation, correct?
19    A.  Correct.
20    Q.  All right.  Now, when I say "RTL," I'm
21  referring to RealTime labs, I'm just trying to shorten
22  it.
23    A.  Yes.
24    Q.  Now, RTL modified API RP38 for purposes of
25  analyzing plaintiffs' drywall samples, correct?

84

1    A.  Correct.
2    Q.  All right.  So, under RTL's version, modified
3  version of API RP38 it says "Media generated
4  from" --generate -- "Media generated following
5  recommendations put forth by the American Petroleum
6  Institute, API RP38 method," and then it lists a
7  formula.  Okay?
8        Do you see that?
9        MR. LANDSKRONER;  Where are you at, Tom?
10        THE WITNESS:  I'm not seeing it.
11        MR. LANDSKRONER:  Which one of the
12  exhibits?
13        MR. AYALA:  Try Exhibit 8.
14        THE WITNESS:  What does it look like?
15        MR. LANDSKRONER:  I got it.  Exhibit 8 to
16  the Brinku report.  I think it's 6 on the other reports.
17  Are you there?
18        THE WITNESS:  I think so, yes.
19  BY MR. AYALA:
20    Q.  Okay.  Now, the -- in Exhibits C through H,
21  the exhibit titled "API RP38 Media Laboratory Generated
22  Media," at the top of the page, lists the word
23  "formula."
24    A.  Uh-huh.
25    Q.  Do you see that?

85

1    A.  Yes.
2    Q.  What does that formula -- what does the word
3  "formula" refer to?
4    A.  In a laboratory, a formula, in this sense, is
5  like a recipe.  So, you use these components to create
6  the media.
7    Q.  Okay.  And so, is it correct to say that, with
8  respect to RTL's culture testing on plaintiffs' drywall
9  paper samples, RealTime labs used a formula consisting
10  of the following:  Distilled water, sodium lactate,
11  yeast extract, magnesium sulfate, die potassium,
12  hydrogen phosphate, anhydrite, sodium chloride, ascorbic
13  acid, ferrous aluminum sulfate, and iron powder?
14    A.  Ferrous ammonium sulfate, but, yes.
15    Q.  Thank you.
16        Now, if you look back at API RP38, which is
17  Exhibit K, and you look at Page 4 of Exhibit K,
18  particularly paragraph 18, paragraph 18 describes a
19  medium of the -- to be used for counting
20  sulfate-reducing bacteria.
21        Do you see that?
22    A.  Yes.
23    Q.  And the ingredients, or the formula, for the
24  API RP38 medium in Exhibit K are the same as RTL's
25  formula with two exceptions.  And those two exceptions

22  (Pages 82 to 85)

86

1    are API RP38, that formula contains agar?
2        A.  Uh-huh.
3        Q.  And RTL's formula does not.
4        Do you see that?
5        A.  Yes.
6        Q.  And, RTL's formula contains iron powder but
7    API RP38's formula does not, correct?
8        A.  Yes.
9        Q.  Okay.  What's your understanding of the reason
10   for RTL's modifying API RP38's sulfate-reducing bacteria
11   formula?
12       A.  The agar is common in laboratories.  This
13   media was made to be solid and on a plate.  That's what
14   the agar does, it makes it like a gelatin-type
15   consistency.  If you leave the agar out, you still have
16   the same reagents, but it's a liquid medium, or media, I
17   mean.
18       As far as the iron powder, I assume that's
19   needed for growth.  I don't know.  That gets into
20   microbiology.
21       Q.  Okay.  Why did RTL want to use a liquid medium
22   instead of a solid medium?
23       A.  Basically, to be able to immerse the samples
24   in the media, and --
25       Q.  Okay.  All right.  Looking on RTL's modified

87

1    API RP38, under method 1 it says "SRB in drywall back
2    paper --
3        Method one says "SRB in drywall back paper
4    presence/absence."  What does "presence/absence," mean
5    there?
6        A.  I guess, my interpretation would be whether
7    it's present or absent, like it's a presence or absence
8    test, positive or negative.
9        Q.  Okay.  So, step 1 of RTL's method 1 of the
10   culture test performed on the plaintiffs' drywall paper
11   is to dissolve the formula ingredients with gentle
12   heating, correct?
13       A.  Yes, sir.
14       Q.  And then step 2 was to adjust the pH of the
15   culture medium to 7.3, correct?
16       A.  Yes.
17       Q.  Okay.  Why was that done?
18       A.  That's what the procedure says to do.
19       Q.  Of the five microorganisms listed in Exhibits
20   C through H, tell me which, if any, of those organisms
21   is capable growing in a pH of 7.3?
22       A.  Well, I know for sure that ST is capable of
23   growing in a pH of 7.3.
24       Q.  And what is ST?
25       A.  Sulfobacillus thermosulfidooxidans.

88

1        Q.  Okay.  And what peer-reviewed literature do
2    you rely on to support your assertion that ST can grow
3    in a pH of 7.3?
4        MR. LANDSKRONER:  Objection.
5        THE WITNESS:  The fact that we ordered
6    that exact organism from ATCC and inoculated in that
7    medium, grew it, took it on through, detected it with
8    PCR with the specific probe for that organism; also took
9    it through to the enzyme test, detected it with the
10   enzyme test.
11       Q.  But I asked you what peer-reviewed
12   literature you can identify, sitting here today, to
13   support your assertion that ST can grow at a pH of 7.3?
14       MR. LANDSKRONER:  Objection.
15       THE WITNESS:  I'm telling you that, from
16   experience --
17       MR. AYALA:  Okay.  Okay.
18       THE WITNESS:  -- I've seen that --
19       MR. AYALA:  But, nonresponsive because
20   what I asked you --
21       THE WITNESS:  I haven't seen a
22   peer-reviewed paper to answer your question.
23   BY MR. AYALA:
24       Q.  Okay.  Okay.  Now, step 3 of the culture test
25   performed on the plaintiffs' drywall paper was to

89

1    autoclave 15 minutes at 15 psi steam pressure, correct?
2        A.  Yes, sir.
3        Q.  All right.  And step 4 was to cool the media?
4        A.  Yes, sir.
5        Q.  Step 5 was to dissolve iron salts in the
6    media, correct?
7        A.  Yes, sir.
8        Q.  Now, underneath step 5, the reports list SRB
9    drywall back paper testing, correct?
10       A.  Yes.
11       Q.  So, after you create the media, you dispense
12   -- you dispensed 10 milliliters of media into each test
13   tube, correct?
14       A.  Correct.
15       Q.  All right.  And then you added enough iron
16   powder to cover the bottom of each test tube, correct?
17       A.  Correct.
18       Q.  All right.  Did you measure the amount of
19   powder?
20       A.  No.  It's just enough to go right down to the
21   bottom of a conical tube.
22       Q.  Okay.  So, you eyeballed it, right?
23       A.  It's a pinch, basically.
24       Q.  All right.  Step 3 was, you added 5 millimeter
25   by 5 millimeter of drywall back paper to the tube,

23  (Pages 86 to 89)

90

1  correct?
2      A.  Yes.
3      Q.  And then you overlaid the media with two
4  milliliters of mineral oil, correct?
5      A.  Correct.
6      Q.  You seal the tube cap?
7      A.  Correct.
8      Q.  And then 6 says you incubate it at 37 degrees
9  Celsius up to 28 days, correct?
10     A.  Correct.
11     Q.  Now, earlier in your report, it said that you
12 incubated the sample for 21 days?
13     A.  In practice, we incubate it 21 days.
14     Q.  Okay.  So -- so --
15     A.  I can't really --
16     Q.  So, step 6 is incorrect -- is stated
17 incorrectly here?
18         MR. LANDSKRONER:  Objection.
19         THE WITNESS:  Yeah.  Or a typo.
20 BY MR. AYALA:
21     Q.  Okay.  And when it says that the samples were
22 incubated at 37 degrees Celsius up to 28 days for
23 4 weeks, that was incorrect?
24         MR. LANDSKRONER:  Objection.
25         THE WITNESS:  Correct.

91

1  BY MR. AYALA:
2      Q.  Now, step 7 says that the presence of black
3  precipitate throughout the vial was determined as
4  positive for SRB, correct?
5      A.  Correct.
6      Q.  Now, API RP38, by contrast, directs the
7  laboratory to look for intense black colonies, correct?
8      A.  Well, I'm not seeing that, but --
9      Q.  What's your understanding of the difference
10 between black precipitate and intense black colonies?
11     A.  Well, a -- intense black colonies is going to
12 be throughout the liquid.  Any coloration, say from what
13 you have added or whatever, all that's going to be at
14 the bottom.  If there is any iron or anything like that,
15 it's heavy and going to sink down to the point.  These
16 are conical tubes that go down to a point.
17     Q.  What is a colony?
18     A.  A colony is a group of bacteria or group of
19 organisms.
20     Q.  Can a colony be observed with the naked eye?
21     A.  In some cases.
22     Q.  Can a colony be distinguished from black
23 precipitate with the naked eye?
24     A.  You're exhausting my experience with
25 microbiology.

92

1      Q.  Okay.
2          THE VIDEOGRAPHER:  2 minutes.
3          MR. AYALA:  All right.  Let's stop.
4          THE VIDEOGRAPHER:  We're off the record
5  at 11:33 AM.  This is the end of disk 1.
6          (Recess taken.)
7          THE VIDEOGRAPHER:  This is the beginning
8  of disk 2.  We're back on the record at 11:42 AM.
9  BY MR. AYALA:
10     Q.  Mr. Sutton, back on the record.  You're under
11 oath.
12     A.  Yes.
13     Q.  Okay.  I would like to talk with you, sir,
14 about RealTime Laboratories method 2 of the culture test
15 performed on plaintiffs' drywall samples.
16         Looking at the exhibits of RealTime
17 Laboratories API RP38 as modified, RealTime labs
18 performed a culture test on bacteria in drywall gypsum
19 core, presence or absence, correct?
20     A.  Yes.
21     Q.  And by presence or absence in the RTL reports,
22 that indicates that the culture tests sought to identify
23 the presence or absence of bacteria, correct?
24     A.  Correct.
25     Q.  It did not seek to quantify the bacteria,

93

1  correct?
2      A.  Correct.
3      Q.  And on ATR -- pardon me.  On RTL's culture
4  test of the paper samples for plaintiffs' drywall,
5  similarly, it did not seek to quantify the bacteria,
6  correct?
7      A.  Correct.
8      Q.  Now, looking at RTL's method 2, the culture
9  test for drywall gypsum core, the reports list the
10 formula for the culture medium as beef extract, Peptone,
11 sodium chloride, and distilled water, correct?
12     A.  Correct.
13     Q.  And, specifically, the RTL reports note that
14 BD Difco nutrient broth, RAF234000 was used for beef
15 extract and Peptone, correct?
16     A.  Correct.
17     Q.  Now, looking at the steps that RTL performed
18 on the plaintiffs' drywall samples for the gypsum core
19 culture methodology, step 1 was to dissolve the culture
20 media ingredients with gentle heating; is that right?
21     A.  Correct.
22     Q.  Step 2 was to adjust the pH to 7.0?
23     A.  Yes.
24     Q.  And step 3 was to add 10 millimeters of the
25 culture media into each test tube, correct?

24  (Pages 90 to 93)

94

1    A. Correct.

2    Q. Step 4 was to autoclave the test tube

3  15 minutes at 15 psi steam pressure; is that right?

4    A. Yes.

5    Q. And step 5 was to cool the culture media,

6  right?

7    A. Correct.

8    Q. Now, after performing those 5 steps, RTL went

9  on to conduct the drywall gypsum core culture testing,

10  correct?

11    A. Correct.

12    Q. So, step 1 of the gypsum core portion of the

13  culture testing was to add a small amount of crushed

14  gypsum core to sample 2, correct?

15    A. Correct.

16    Q. Okay. How much crushed gypsum core was added

17  to each tube?

18    A. I believe it was 3 grams.

19    Q. Okay. The report here does not indicate that

20  it was 3 grams, though, right?

21    A. Correct.

22    Q. All right. Step 2 was to close the tube cap,

23  right?

24    A. Correct.

25    Q. Now, step 3 was to incubate at 37 degrees

95

1  Celsius for a minimum of 5 days.

2    Do you see that?

3    A. Yes.

4    Q. Now, in contrast to RTL's paper culture test

5  on the plaintiffs' drywall samples, which incubated for

6  up to 21 days, why did RTL's gypsum core culture testing

7  incubate only for 5 days?

8    A. In practice, it incubates up to 21 days as

9  well. I'm not sure why that's written that way.

10    Q. You're not sure why --

11    A. I'm not sure why that is stated that way.

12  Once again, it's checked at 7 days and then incubated

13  out to 21 days. As far as the significance of that, you

14  would have to ask a microbiologist.

15    Q. Okay. So, you're not sure why step 3 says

16  "incubate for a minimum of 5 days"?

17    A. Correct.

18    Q. All right. Now, step 4 states that the

19  presence of turbidity in the tubes was interpreted as

20  positive for bacteria, correct?

21    A. Correct.

22    Q. Now, with respect to the gypsum core culture

23  test on the plaintiffs' drywall samples, the presence of

24  turbidity was not interpreted as positive for

25  sulfate-reducing bacteria, was it?

96

1    MR. WARWICK: Object to form.

2    MR. LANDSKRONER: Objection.

3    THE WITNESS: Can you repeat that?

4  BY MR. AYALA:

5    Q. Okay. With respect to RTL's gypsum core

6  testing on the plaintiffs' drywall samples,

7  specifically, the culture testing on the gypsum core,

8  the reports say that the presence of turbidity was

9  interpreted as positive for bacteria; is that right?

10    A. Correct.

11    Q. The report does not say that the presence of

12  turbidity was interpreted as positive for

13  sulfate-reducing bacteria, correct?

14    MR. LANDSKRONER: Objection.

15    THE WITNESS: That's correct.

16  BY MR. AYALA:

17    Q. And the report also does not say that the

18  presence of turbidity was interpreted as positive for

19  sulfur-reducing bacteria, correct?

20    MR. LANDSKRONER: Objection.

21    THE WITNESS: Correct.

22  BY MR. AYALA:

23    Q. And the report also does not say that the

24  presence of turbidity was interpreted as positive for

25  sulfur-oxidizing bacteria, correct?

97

1    MR. LANDSKRONER: Objection.

2    THE WITNESS: Correct.

3    (Exhibit L, marked.)

4  BY MR. AYALA:

5    Q. Mr. Sutton, I'm showing you a document that's

6  been marked as Exhibit L, which, for the record, is a

7  page from the Difco & BBL Manual, Manual Of

8  Microbiological Culture, Second Edition. And

9  specifically, the page refers to a nutrient broth,

10  nutrient broth 234000.

11    Do you see that?

12    A. Yes, I do.

13    Q. Okay. And in Exhibits C through H, the

14  RealTime lab reports for this litigation, they note that

15  the nutrient broth performed on the gypsum culture tests

16  for plaintiffs' drywall samples was BD Difco nutrient

17  broth RAF 234000.

18    Do you see that?

19    A. Yes.

20    Q. Okay. Now, looking at the Difco manual,

21  Exhibit L, it states that the intended use of the

22  nutrient broth -- strike that.

23    It states that "The nutrient broth is used for

24  the cultivation of many species of non-fastidious

25  microorganisms." Did I read that correctly?

25  (Pages 94 to 97)

98

1      A. Correct.

2      Q. And then it goes on to state that, under the

3   "Summary and Explanation," the last sentence, that the

4   nutrient broth is one of several nonselective media

5   useful in routine cultivation of use of microorganisms;

6   is that right?

7      A. Correct.

8      Q. And then again under "Principles of this

9   Procedure" it says "This relatively simple formulation

10  supports the growth of non-fastidious microorganisms due

11  to its content of Peptone and beef extract."

12     Do you see that?

13     A. Correct.

14     Q. And finally, under "Procedure," it states,

15  "Inoculate tubes of the broth medium with the test

16  samples. Inoculate tubes for 18 to 24 hours at 35 plus

17  or minus 2 degrees Celsius in an aerobic atmosphere."

18     Do you see that?

19     A. Yes.

20     Q. And in fact, the inoculation performed during

21  the gypsum culture tests of plaintiffs' drywall samples

22  was performed, in fact, in an aerobic atmosphere,

23  correct?

24     A. Correct.

25     Q. And, just looking at Exhibit -- the document

99

1   that's been marked as Exhibit M, which is BD & BBL

2   Nutrient Broth Quality Control Procedures Revision 9,

3   January 2011, the introduction there states, "Nutrient

4   broth is a general-purpose medium for the cultivation of

5   non-fastidious bacteria." Did I read that correctly?

6      A. Correct.

7      Q. Okay. Mr. Sutton, sitting here today, can you

8   identify any reports authored by the government agencies

9   involved in investigating corrosive drywall that utilize

10  the API RP38 test method to test drywall?

11     A. Not to my knowledge.

12     Q. Okay. And can you identify any peer-reviewed

13  publications discussing the use of API RP38 test method

14  on drywall products?

15     A. Not to my knowledge.

16     Q. Can you identify any peer-review -- strike

17  that.

18     Can you identify any state or Federal Court

19  that has allowed an expert to testify to a jury about

20  the use of API RP38 test method on drywall products?

21     MR. LANDSKRONER: Objection.

22     THE WITNESS: I have no knowledge of

23  that.

24  BY MR. AYALA:

25     Q. And, are you aware of any standard-setting

100

1   bodies such as ASTM, National Institute of Standard

2   Technology, or ISO that has validated API RP38 as an

3   appropriate test method for drywall products?

4      MR. LANDSKRONER: Objection.

5      THE WITNESS: I'm not aware of that.

6   BY MR. AYALA:

7      Q. Okay. Let's talk about the corrosion testing

8   performed on plaintiffs' drywall samples by RealTime

9   labs.

10     Now, the RealTime lab reports for the

11  litigation, Exhibits C through H, describe a methodology

12  for corrosion testing that was performed on the

13  plaintiffs' drywall samples, correct?

14     A. Correct.

15     Q. And that procedure or methodology was

16  performed in the same way, with respect to each of the

17  plaintiffs' drywall samples, correct?

18     A. That's correct.

19     Q. Okay. So, looking at the reports, the RTL

20  reports state that, under "Corrosion Testing," they

21  state that this procedure involves taking 3 grams of

22  crushed drywall -- of crushed gypsum powder from the

23  specimen and placing the power in a sterile biohazard

24  bag with 0.5 milliliters of distilled water -- sorry --

25  distilled purified water and a 3-inch piece of copper

101

1   wiring placed in the bag, as well, correct?

2      A. Correct.

3      Q. Am I correct that RealTime Laboratories mixed

4   the gypsum powder of the plaintiffs' drywall samples in

5   a bag with water?

6      A. Yes, with water just for moisture. 0.5 mils

7   is not much water.

8      Q. Okay. In fact, the water was in contact with

9   the gypsum powder, correct?

10     A. Correct.

11     Q. The copper wiring that RealTime labs placed

12  into the bag with the water and the gypsum powder, was

13  the copper wiring in contact with the water/powder

14  mixture?

15     A. I would assume.

16     Q. Okay. The methodology for RealTime labs in

17  the reports, Exhibits C through H state, "The bag is

18  then sealed and incubated for 21 days, as well, at

19  37 degrees Celsius," correct?

20     A. Correct.

21     Q. Okay. Now, when the bags were sealed on the

22  plaintiffs' drywall samples, was the air inside the bags

23  extracted from the bags?

24     A. The excess air was extracted, not vacuumed

25  out, if that's what you're -- it's not -- we didn't

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

102

1  create a vacuum, if that's what you're asking.
2  　Q.  Okay.  How did RealTime labs extract the air
3  from the bags?
4  　A.  The excess air we just scooted out like you
5  would on any -- I mean, a biohazard bag, which is
6  similar to a -- like a Ziploc bag, and we just got the
7  excess air out.  We didn't vac -- we didn't create a
8  vacuum and extract all the air.
9  　Q.  Okay.  So, the -- the reports, Exhibits C
10  through H, state that the results were interpreted as
11  positive if there was, quote, "dark corrosion," end
12  quote, on the wire; is that right?
13  　A.  Correct.
14  　Q.  Okay.  Define "dark corrosion."
15  　A.  Is there a picture associated with the -- in
16  one of the appendices with the report?
17  　Q.  Okay.  So, let me ask you this, without
18  reference to a photograph, sitting here today, are you
19  able to define what the reports mean by "dark
20  corrosion?"
21  　A.  It's dark corrosion.
22  　Q.  So, you define dark corrosion as dark
23  corrosion?
24  　A.  Yes.
25  　Q.  And nothing else?

103

1  　A.  It's what it is.  I mean, it's black, I mean,
2  it's a discoloration, a dark discoloration as compared
3  to the negative control.
4  　Q.  Okay.  The methodology goes on to state, in
5  Exhibits C through H, that drywall manufactured by U.S.
6  Gypsum was purchased at a local home improvement store
7  in the Dallas area and was used as the control drywall.
8  Okay.
9  　　Couple of questions on that.  The U.S. Gypsum
10  drywall was used as a positive control or a negative
11  control or both?
12  　A.  Negative control.
13  　Q.  Okay.  Okay.  What testing did you perform on
14  the U.S. Gypsum sample before deeming it a negative
15  control?
16  　A.  It would have been cultured and PCR would have
17  been run on it.
18  　Q.  Okay.  Did you test it for any reduced-sulfur
19  gases?
20  　A.  No.
21  　Q.  Did you test it for elemental sulfur?
22  　A.  Not to my knowledge.
23  　Q.  Did you test it for strong-tint content?
24  　A.  Not to my knowledge.
25  　Q.  Okay.  The methodology in the reports,

104

1  Exhibits C through H, goes on to state that the
2  U.S. Gypsum drywall was purchased as a 12-inch by
3  12-inch cut segment of drywall on or about
4  September 10th, 2009, and the specimen, which I presume
5  refers to the U.S. Gypsum sample, has been held in a
6  sterile biohazard bag after sampling was conducted; is
7  that correct?
8  　A.  I would assume so.  But it's not stated here.
9  　Q.  Okay.  Who purchased the U.S. Gypsum drywall
10  in -- on September -- or about September 2000 --
11  September 10th, 2009?
12  　A.  I'm not sure.  I know it wasn't me.
13  　Q.  Okay.  Do you know where the U.S. Gypsum
14  drywall sample was purchased from?
15  　A.  No.  Which store, no.
16  　Q.  Okay.  Do you know what type of drywall
17  product it was, other than a U.S. Gypsum brand name?
18  　A.  What I see in the lab is basically crushed and
19  I mean, we -- we have --
20  　Q.  Okay.  So, no?
21  　A.  -- I would imagine it's just drywall.
22  　Q.  Okay.  So, you don't know what type of drywall
23  it is?
24  　A.  No, not exactly.
25  　Q.  Okay.  Now, the corrosion testing -- strike

105

1  that.
2  　　Now, in Exhibits C through H, the RealTime lab
3  reports for the litigation, in the report's discussion
4  of the corrosion testing methodology, there's no
5  discussion of the use of a positive control, is there?
6  I'm looking at the corrosion testing methodology.
7  　A.  Oh, the methodology?  (Reviewing document.)
8  No.  Well, it says "Results are interpreted as positive
9  if there is a dark corrosion on the wire, positive and
10  negative controls of corroded copper wire."
11  　　So, that's in the exhibit; so, that's showing
12  that there were positive and negative controls used, if
13  there is a picture of them --
14  　Q.  Okay.  Well, let's talk about that.
15  　　Would you agree that the RealTime lab reports
16  in Exhibits C through H do not contain any photos that
17  could allow us to see the actual plaintiffs' drywall
18  samples during the corrosion testing?
19  　A.  Correct.
20  　Q.  Okay.
21  　　(Exhibit N marked.)
22  　Q.  Okay.  Mr. Sutton, I'm showing you what's been
23  marked as Exhibit N, which, for the record, is simply an
24  extraction of the photo -- each of the photos in
25  RealTime labs Exhibits C through G.

27  (Pages 102 to 105)

106

1      A.  Okay.

2      Q.  There is no photo for Exhibit H, which is the

3  January 7, 2012, report.  There is no photo included in

4  Exhibit N for that January 17, 2012, report.  But you're

5  welcome to look along at Exhibit H at the photo.  There.

6      Now, is it fair to say that -- well, first of

7  all, for the record, Exhibit N, as I noted, represents

8  photos taken from the RealTime lab reports in Exhibits C

9  through G.  These photos all have the same title in

10  Exhibit N, which is "Copper Wire Exposed to Domestic

11  Drywall."

12      Would it be fair to say that all of the photos

13  listed in Exhibit N are the same photo?

14          MR. LANDSKRONER:  Objection.

15  BY MR. AYALA:

16      Q.  Do you know, one way or another?

17      A.  I don't know for sure.  They appear to be.

18  But, I don't know for sure that they are.

19      Q.  Who took the photos in the RealTime lab

20  reports Exhibits C through H?

21      A.  These were taken by Dennis Hooper.

22          THE VIDEOGRAPHER:  Excuse me, Counselor,

23  you have lost your microphone.

24  BY MR. AYALA:

25      Q.  Okay.  Now, looking at the photos in Exhibit

107

1  N, are you able to tell us whether any of these photos

2  shows copper samples that were placed in a bag with any

3  of the plaintiffs' drywall samples?

4          MR. LANDSKRONER:  Objection.

5          THE WITNESS:  I can't confirm that --

6          MR. AYALA:  Okay.

7          THE WITNESS:  -- from these pictures.

8  BY MR. AYALA:

9      Q.  In looking at the photos -- just looking at

10  the photos in Exhibit N, there is no way for us to

11  determine what the copper wiring in these photos was

12  exposed to or when or under what conditions.  Just by

13  looking at the photos, you can't tell that, can you?

14          MR. WARWICK:

15          MR. LANDSKRONER:  Objection.

16          THE WITNESS:  Not just by looking at the

17  photos, but it's in combination with the report that

18  describes what happened.

19  BY MR. AYALA:

20      Q.  Now, the photos in Exhibit N and in the

21  RealTime lab reports, Exhibits C through H, are actually

22  photos of positive and negative controls; is that

23  correct?  Is that your understanding?

24      A.  That's my understanding.

25      Q.  They're not photos of copper wiring that has

108

1  been placed in a bag with any of the plaintiffs' drywall

2  samples, correct?

3      A.  As far as I know.

4      Q.  Okay.  The photos in the RealTime lab reports

5  use the term, "oxidized" sample and "non-oxidized

6  example" -- pardon me.

7      The photos in the RealTime lab reports use the

8  terms "oxidized example" and "non-oxidized example"; is

9  that right?

10      A.  That's what it says.

11      Q.  Okay.  What does "oxidized example" mean in

12  the context of these photos?

13          MR. LANDSKRONER:  Objection.

14          THE WITNESS:  The way I would interpret

15  it is that there is a discolorization leading to a dark

16  color as compared to the non-oxidized example.

17  BY MR. AYALA:

18      Q.  Okay.  Define "oxidized?"

19      A.  I'm not a microbiologist, nor do I have

20  pathways.  So, I will leave that to the microbe people.

21      Q.  Am I correct that the RealTime lab reports in

22  Exhibits C through H do not report any metallurgical

23  analysis to characterize the chemical composition of the

24  copper wire shown in these photos?

25          MR. LANDSKRONER:  Objection.

109

1          THE WITNESS:  Not to my knowledge.

2  BY MR. AYALA:

3      Q.  And, so the record is clear, let me ask it

4  this way:  Do the RealTime laboratory reports, in

5  Exhibits C through H, state that RealTime laboratory

6  performed any metallurgical analysis to define chemical

7  composition of the copper wires shown in their photos?

8          MR. LANDSKRONER:  Objection.

9          THE WITNESS:  No.

10  BY MR. AYALA:

11      Q.  Okay.  Now, Mr. Sutton, looking at the photos

12  in the RealTime lab reports, Exhibits C through H, are

13  you able to tell, with your naked eye, whether the

14  copper wiring in the photos has copper sulfide or copper

15  oxide?

16          MR. LANDSKRONER:  Objection.

17          THE WITNESS:  I can't tell from a

18  picture.

19  BY MR. AYALA:

20      Q.  Okay.  When did RealTime Laboratories first

21  begin performing corrosion testing?

22      A.  I don't know.

23          MR. LANDSKRONER:  Objection.

24  BY MR. AYALA:

25      Q.  Okay.  When did you first become aware of

28  (Pages 106 to 109)

110

1    corrosion testing performed by RealTime Laboratories?
2        A.  Probably May of 2011.
3        Q.  What references did RealTime Laboratories rely
4    on when developing its corrosion testing?
5            MR. LANDSKRONER:  Objection.
6            THE WITNESS:  I wasn't involved in the
7    developing of it.
8    BY MR. AYALA:
9        Q.  Okay.  Who was?
10           MR. LANDSKRONER:  Objection.
11           THE WITNESS:  I believe Dennis Hooper,
12   but I'm not sure.
13   BY MR. AYALA:
14       Q.  Okay.  Now, nothing in RealTime lab's expert
15   reports, Exhibits C through H, indicate that any of the
16   drywall samples that RealTime Laboratories evaluated for
17   the plaintiffs was exposed to liquid water in the home;
18   is that correct?
19           MR. LANDSKRONER:  Objection.
20           THE WITNESS:  As far as I know.
21   BY MR. AYALA:
22       Q.  Okay.  Has RealTime Laboratories ever
23   performed corrosion testing for any of the government
24   agencies that were involved in investigating corrosive
25   drywall in the United States?

111

1            MR. LANDSKRONER:  Objection.
2            THE WITNESS:  Not to my knowledge.
3    BY MR. AYALA:
4        Q.  Are you aware of any government agency or
5    standard-setting body that has validated RealTime
6    Laboratories corrosion testing methodology on drywall?
7        A.  No.
8        Q.  Okay.
9            MR. AYALA:  Let's go off the record.
10           THE VIDEOGRAPHER:  We're off the record
11   at 12:15 PM.
12           (Recess taken.)
13           THE VIDEOGRAPHER:  Back on the record at
14   1:02 PM.
15   BY MR. AYALA:
16       Q.  Okay.  Back on the record.
17       Mr. Sutton, you're still under oath?
18       A.  Yes.
19       Q.  Let's talk about the DNA testing that RTL
20   performed by RealTime polymerase chain reaction on the
21   plaintiffs' drywall samples.
22       First of all, RTL's PCR testing detects DNA,
23   correct?
24       A.  Yes.
25       Q.  Okay.  And every living organism has DNA; is

112

1    that right?
2        A.  That's true.
3        Q.  Dead organisms have DNA as well, correct?
4        A.  That's true.
5        Q.  Okay.  PCR testing of DNA does not provide
6    a -- an indication of whether the DNA detected is dead
7    or alive; is that correct?
8        A.  That's correct.
9        Q.  Okay.  And with respect to RTL's testing, PCR
10   testing of the plaintiffs' drywall samples, to the
11   extent that RTL's testing reports a positive detection
12   for a particular organism's DNA, RTL's reports and
13   results do not indicate whether that DNA is dead or
14   alive, correct?
15       A.  Specific to the DNA testing, it does not.  But
16   the other tests support that it is alive.
17           MR. AYALA:  Objection, nonresponsive.
18   BY MR. AYALA:
19       Q.  The question -- the question is:  With respect
20   to RTL's PCR testing of the plaintiffs' drywall samples,
21   to the extent the PCR testing indicates that DNA was
22   detected, the PCR testing does not indicate whether the
23   DNA was dead or alive, correct?
24       A.  That's correct.
25           MR. LANDSKRONER:  Objection.  Asked and

113

1    answered.
2    BY MR. AYALA:
3        Q.  Mr. Sutton, is it fair to say that RealTime
4    Laboratories' DNA testing on the plaintiffs' drywall
5    samples was not performed on those drywall samples in
6    the condition they were in as received by RealTime
7    Laboratories?
8            MR. WARWICK:  Objection.
9            MR. LANDSKRONER:  Objection.
10           THE WITNESS:  They were performed --
11   basically, RealTime Laboratories has to have a prior
12   step --
13   BY MR. AYALA:
14       Q.  Okay.  But, But --
15       A.  -- which is an extraction step.
16       Q.  But just -- the question is:  With respect to
17   RealTime labs' PCR testing on the plaintiffs' drywall
18   samples, RealTime Laboratories was not performing PCR on
19   plaintiffs' unenriched drywall samples; would that be
20   fair to say?
21       A.  It wasn't performed on un-extracted drywall.
22       Q.  When RealTime Laboratories performed a culture
23   test on drywall samples, would it be fair to say that
24   the results of the culture tests on plaintiffs' drywall
25   samples are culture-enriched drywall samples?

29  (Pages 110 to 113)

114

1    A. "Culture enriched." What do you mean by that
2  term?
3    Q. You don't understand that term, "culture
4  enriched?"
5        MR. LANDSKRONER: Objection.
6        THE WITNESS: I want a clarification on
7  what you meant by "culture enriched."
8  BY MR. AYALA:
9    Q. Okay. I'll rephrase the question.
10       With respect to the plaintiffs' drywall
11 samples that were received by RealTime Laboratories, is
12 it accurate to say that RealTime Laboratories did not
13 perform PCR testing on those drywall samples in their
14 as-received condition?
15   A. I can't say yes or no to that, the way it's
16 worded.
17   Q. Okay.
18   A. I --
19   Q. I'll rephrase it.
20       Before RealTime Laboratories performed PCR
21 testing on plaintiffs' drywall samples, RealTime
22 Laboratories crushed the samples into a powder, correct?
23   A. Correct.
24   Q. And, with respect to gypsum core, RealTime
25 samples cultured the gypsum core, in an anaerobic

115

1  medium, correct?
2    A. Yes.
3    Q. And only after culturing the core powder in an
4  anaerobic general-bacteria medium did RealTime
5  Laboratories perform PCR testing on the gypsum core
6  samples, correct?
7    A. After it was established that we could get the
8  same organism directly from the drywall without culture.
9        MR. AYALA: Objection.
10   Q. You're not listening to the question.
11   A. I'm listening to the question.
12   Q. Okay. Here is the question: Before --
13       MR. WARWICK: He is trying to answer your
14 question, and he was saying before that step that they
15 did it out of the drywall, which was exactly your
16 question.
17       MR. AYALA: Huh-uh. No, no.
18 BY MR. AYALA:
19   Q. Here is the question, okay?
20   A. There is two parts to what you're trying to
21 ask --
22   Q. No, but there's no -- there's no pending
23 question right now.
24       The question is very simply this: When
25 RealTime labs received plaintiffs' drywall samples at

116

1  the lab, was the very first test methodology that
2  RealTime Laboratories performed PCR testing on those
3  samples?
4    A. In some cases, it was.
5    Q. Okay. We'll talk about it in the results?
6    A. Okay.
7    Q. We'll talk about it in the results.
8    A. Okay.
9    Q. Now, by the way, with respect to the reports
10 in Exhibits C through H, sitting here right now, are you
11 able to say which plaintiff's samples you tested and
12 which plaintiff's samples someone else from RealTime
13 labs tested?
14   A. Not sitting right here.
15   Q. Okay. Now, on the -- on RTL's DNA testing
16 procedure, the reports in Exhibits C through H state
17 that "Control samples consisted of samples of
18 U.S.-manufactured drywall not exuding H2S and SO2, were
19 purchased from a local building supply store and sampled
20 in the same manner as the contaminated drywall
21 sections."
22       Did I read that correctly?
23   A. Yes.
24   Q. Okay. Now, RealTime Laboratories did not do
25 any testing for H2S and SO2 of the control samples; is

117

1  that correct?
2    A. Not to my knowledge.
3    Q. Okay. Well, let me ask it this way so the
4  record is clear: To your knowledge did RealTime
5  Laboratories perform any testing for H2S or S02 on the
6  control samples used for its PCR testing?
7    A. No.
8    Q. Okay. Thank you.
9        Now, in Exhibits C through H, the RTL reports
10 state that "Although there are thousands of different
11 species of SRDs, RTL selected five organisms that were
12 predominantly reported peer-reviewed in the literature
13 and were available through ATCC, as well."
14       Did I read that correctly?
15   A. Yes.
16   Q. Okay. Can you identify the peer-reviewed
17 literature that is referenced in that paragraph?
18   A. I didn't identify the samples. I only
19 developed the assay for the samples.
20   Q. Okay. So --
21   A. So, the answer is no.
22   Q. Now, with regard to RTL's PCR testing in
23 Exhibits C through H, do the PCR tests report quantities
24 of the bacteria detected?
25   A. No, they don't.

30  (Pages 114 to 117)

118

1    Q.   Are you aware of any government agency
2    involved in investigating corrosive drywall that has
3    approved or adopted RTL's RealTime PCR testing method
4    for drywall?
5    A.   No.
6    Q.   Are you aware of any standard-setting bodies
7    such as ASTM, NIST or ISO, or others, that have adopted
8    RealTime Laboratories' RealTime PCR methodology for
9    analyzing drywall?
10   A.   Not for analyzing drywall, but Realtime's PCR
11   is standard in the industry and accepted.
12   Q.   What industry were you referring to?
13   A.   Clinical, biotech, pharmaceutical. Pick one.
14   Q.   RealTime Laboratories' DNA probes and primers
15   are proprietary to RealTime Laboratories; is that
16   correct?
17   A.   Yes.
18        (Exhibit O marked.)
19   Q.   Okay. Mr. Sutton, I'm showing you what's been
20   marked for identification purposes as Exhibit O, which,
21   for the record, is an article entitled "Isolation of
22   Sulfur-Reducing And Oxidizing Bacteria Found in
23   Contaminated Drywall" dated -- well, it's got a
24   publication date of February 5, 2010, in the
25   International Journal Of Molecular Sciences.

119

1         Do you see that?
2    A.   Yes.
3    Q.   Do you recognize this document?
4    A.   Yes.
5    Q.   And, in fact, you are listed as one of the
6    authors of the document, correct?
7    A.   Yes, I was a contributor.
8    Q.   Okay. What was your contribution to this
9    article?
10   A.   We designed the assays and, in the paper, we
11   describe the assay design, the --
12   Q.   When you say "we" --
13   A.   Embark Scientific. So, it was designed at
14   Embark Scientific.
15   Q.   So, you and who else at Embark Scientific
16   designed the assays?
17   A.   This was me.
18   Q.   Okay. So, you designed the assays. Okay.
19   So, other than designing the assays that -- well, first
20   of all, you designed the assays that were discussed in
21   Exhibit O, correct?
22   A.   Correct.
23   Q.   And, other than designing those assays, what
24   other contribution did you make to this article?
25   A.   I designed the assays, described how that was

120

1    done, showed the validation and optimization for
2    precision, specificity, just the general
3    accepted-in-the-industry ways to optimize and validate
4    assays.
5    Q.   Okay. Did you write any portion of this
6    report?
7    A.   No. The data that I provided was put in.
8    Q.   Did you review this report before it was
9    published?
10   A.   I'm sure I did. That's getting a little bit
11   of time on it. I think that's 2009 that this all was
12   happening.
13   Q.   Who wrote the report?
14   A.   I believe it was a collaborative effort,
15   actually. I really don't know.
16   Q.   Okay. So, if I were to ask you what were the
17   respective roles of the various listed authors here,
18   what would your answer be?
19   A.   Do you want to go through them?
20   Q.   Sure. What was Dennis Hooper's role in
21   writing this article?
22   A.   He was the one that came up with the idea and
23   contracted me to do the assay development. And that --
24   David Strauss, as you know, was the microbiologist and
25   bacteriologist. John Shane, I have no idea. Kaye

121

1    Killburn, I have no idea. Vince Bolton is an owner and
2    I'm not sure what contribution he had.
3    Q.   He is an owner of what, Vince Bolton?
4    A.   I guess MS -- I guess RealTime Laboratories.
5    That's right. That's my understanding.
6    Q.   Okay.
7    A.   And then Dr. Guilford, I'm not sure what he
8    contributed, but he is a consultant that has been
9    involved with RealTime periodically.
10   Q.   Okay. Now, I presume when you allow your name
11   to be used as an author of the report, you want to make
12   sure that the document is accurate and complete,
13   correct?
14   A.   Yes, and the science in it is.
15   Q.   Okay. Now, it's listed here an author to whom
16   correspondence should be addressed, and there is an
17   e-mail address that says, MSCMD at Cox, C-O-X, dot net.
18   Whose e-mail is that?
19   A.   I have no idea. I don't see where you're
20   looking at here. Hold on. (Reviewing document.)
21        MR. LANDSKRONER:  Bottom of that section
22   right there. Look at the bottom of that section.
23        THE WITNESS:  Okay. I don't know.
24   BY MR. AYALA:
25   Q.   Okay. If you look at the number 1 on the

31  (Pages 118 to 121)

122

1    first page where it says "RealTime Laboratories, LLC"?
2        A.  Yes.
3        Q.  It's got an address listed of 13016 B Street,
4    #203, Dallas, Texas?
5        A.  Yes.
6        Q.  Is that the address of RealTime Laboratories?
7        A.  It was the old address, the previous lab.
8        Q.  Okay.  Do you know when RealTime Laboratories
9    moved from the old address to the new one?
10       A.  I believe it's been about a year and a half.
11       Q.  Okay.  Do you know why it moved?
12       A.  More space.
13       Q.  Okay.  Were you involved in submitting the
14   article in Exhibit O for publication?
15       A.  Outside of my contributing information and to
16   putting it together, I didn't have anything to do with
17   submitting it, the actual act of submitting it.
18       Q.  Okay.
19       A.  I'm sure that we all were sent copies to
20   review before.  That's pretty standard.
21       Q.  Are you aware of whether this journal charged
22   a fee to publish the article?
23       A.  I have no idea.
24       Q.  Did you pay any money, personally, in
25   connection with publication of the article?

123

1        A.  No.
2        Q.  Okay.  And you're not aware of whether any of
3    the other authors, or anybody else, paid money to the
4    journal to get it published?
5        A.  I have no idea.
6        Q.  Are you aware of who, on behalf of the
7    International Journal of Molecular Sciences reviewed the
8    article in Exhibit O before it was published?
9        A.  No.
10       Q.  Okay.  And do you see, here, from the first
11   page that the article in Exhibit O indicates that --
12   above the line, just immediately above the line -- it
13   indicates that the journal was -- that the article was
14   received by the journal on January 22, 2010.
15       Do you see that?
16       A.  Yes.
17       Q.  The article was accepted by the journal on
18   January 29, 2010, a week later.
19       Do you see that?
20       A.  Uh-huh.
21       Q.  And then just 1 week later on
22   February 5th, 2010, the article was published.
23       Do you see that?
24       A.  Yes.
25       Q.  Now, under the abstract, a portion of it says

124

1    that "Specific DNA probes and primers have been
2    designated and patented that detect a specific iron and
3    sulfur-reducing bacteria."
4        Do you see that?
5        A.  Yes.
6        Q.  Sitting here today, are you aware of any
7    patents of the DNA probes and primers discussed in this
8    report?
9        A.  I think there is a patent pending or -- I'm
10   not sure what the status is of that.
11       Q.  Okay.  Now, if you look at Page 648 of Exhibit
12   O, under the introduction, the very first line says,
13   "Corrosive imported drywall refers to drywall imported
14   into the United States from China from 2004 to 2007."
15       Do you see that?
16       A.  Uh-huh.
17       Q.  Okay.  And then, later on in the paragraph,
18   the article states "That the organisms in this study
19   produce hydrogen sulfide and sulfur dioxide."
20       Do you see that?
21       A.  Yes.
22       Q.  Okay.  And then there is a reference to No. 8
23   and 9, footnote 8 and 9?
24       A.  Okay.
25       Q.  Do you see that?  I'd like you to go to

125

1    footnote 8 and 9, if you would.
2        A.  Okay.
3        Q.  Okay.  So, footnote 8 is an OSHA fact sheet on
4    hydrogen sulfide?
5        Do you see that?
6        A.  Yes.
7        Q.  And footnote 9 is an article is from K. H.
8    Killburn entitled, "Evaluating Health Effects From
9    Exposure To Hydrogen Sulfide."
10       Do you see that?
11       A.  Yes.
12       Q.  Okay.  Have you read either of those
13   references?
14       A.  No.
15       Q.  Okay.  And, if I were to represent to you that
16   neither of those references discusses any of the
17   organisms that are addressed in Exhibit O, would you
18   have any basis to dispute that?
19           MR. LANDSKRONER:  Objection.
20           THE WITNESS:  I have no idea.  I have
21   discussed my role in this.
22   BY MR. AYALA:
23       Q.  Now, in the bottom paragraph on Page 648, of
24   Exhibit O?
25       A.  Okay.

32  (Pages 122 to 125)

126

1    Q.  It notes that "All work was conducted on
2 either American-type culture collection, ATCC, New York,
3 New York, cultures, or DNA obtained directly from ATCC."
4    See that?
5 A.  Uh-huh.
6    Q.  Now, who obtained the cultures from ATCC?
7       MR. LANDSKRONER:  Objection.
8       THE WITNESS:  I have no idea.  I was not
9 a part of RealTime at that point.  Samples were provided
10 to Embark.
11 BY MR. AYALA:
12    Q.  All right.  Now, let's go to Page 650.  Now,
13 you see under Table 1 on Page 650, Table 1 indicates
14 that "Bacterial Organisms and the Strains Used to Create
15 the DNA Probes and Primers."
16    Do you see that?
17 A.  Yes.
18    Q.  Now, the first organism listed in Table 1 is
19 Thiobacillus, and then in parentheses, (Actinobacillus
20 caldus).  Okay.  Can you tell us what actinobacillus is?
21 A.  I am not a microbiologist.  I have no idea.
22    Q.  Okay, now, on Page 650 of the report, I should
23 say Page 650 of Exhibit O, and carrying over to 651, the
24 article notes that, "Thiobacillus ferrooxidans was
25 detected in all 25 samples tested" and, in fact, the

127

1 article was referring to 25 samples of drywall from,
2 quote, "homes with known contaminated drywall."
3    Do you see that?
4 A.  Uh-huh.
5    Q.  And so according to the article in Exhibit O,
6 the organism that was contaminating drywall and
7 reportedly causing it to be corrosive was Thiobacillus
8 ferrooxidans; is that right?
9 A.  According to these results.
10    Q.  Okay.  Is it accurate to say that with respect
11 to Exhibits C through H, the RTL reports for the
12 plaintiffs' drywall in this litigation, Thiobacillus
13 ferrooxidans was not detected in any of the samples?
14 A.  No.
15 Q.  Okay.
16 A.  But --
17    Q.  Hold on.  Hold on.  You answered the question.
18       MR. LANDSKRONER:  Is there more to your
19 answer?
20       THE WITNESS:  Yes.
21       MR. LANDSKRONER:  Okay, well go --
22       THE WITNESS:  I just, I mean, after it
23 was determined, when we started processing the samples
24 that we weren't -- originally we tested for five.  After
25 it was determined that we weren't finding these other

128

1 organisms, we tested for the organisms that were -- we
2 were detecting, which was the Sulfobacillus, or --
3       MR. AYALA:  Okay.
4       THE WITNESS:  -- the sulfo --
5       MR. AYALA:  Okay.
6       THE WITNESS:  -- the ST.
7 BY MR. AYALA:
8    Q.  Okay.  So, here is the question for you:
9 Could you show us where, in Exhibits C through H, RTL's
10 reports for the plaintiffs' drywall samples in the
11 litigation, where in any of these reports is there a
12 reported detection of the bacterium Thiobacillus
13 ferrooxidans?
14       MR. LANDSKRONER:  Objection.
15       THE WITNESS:  I think I just said that
16 they did not detect Thiobacillus ferrooxidans in the
17 reports that -- I haven't seen -- we didn't detect that
18 organism.
19 BY MR. AYALA:
20    Q.  Okay.  Okay.  And again, just to close the
21 loop on this, looking at Page 654 in Exhibit O, in the
22 conclusions, the report of the authors including
23 yourself, is that the significant organism in
24 contaminated drywall was determined to be Thiobacillus
25 ferrooxidans.

129

1       MR. LANDSKRONER:  Objection.
2 BY MR. AYALA:
3    Q.  Did I read that correctly?
4 A.  For Chinese drywall, yes, that's correct.
5       (Exhibit P marked.)
6 MR. AYALA:
7    Q.  Mr. Sutton, I'm showing you what's been marked
8 as Exhibit P, which, for the record, is a document
9 entitled "U.S. Consumer Product Safety Commission Staff,
10 Summary of Contractors Report."
11    Quote:  "The uses of epifluorescent microscopy
12 and quantitative polymerase chain reaction to determine
13 the presence/absence and identification of
14 microorganisms associated with domestic and foreign
15 wallboard samples," end quote?
16    And for the record, this document really has
17 two parts.  The first part is titled as I just read:
18 Second part, a couple of pages in, is titled "The Use of
19 Epifluorescent Microscopy In Quantitative Polymerase
20 Chain Reaction to Determine the Presence/Absence and
21 Identification of Microorganisms Associated With
22 Domestic and Foreign Wallboard Samples," and listed as
23 the author is Dale Warren Griffin, PhD, MSPH, U.S.
24 Geological Survey.
25    Do you see that?

33  (Pages 126 to 129)

130

1    A. Uh-huh.
2    Q. Do you recognize this document, Mr. Sutton?
3    A. I believe this may be the document that I had
4  seen a few pages up. I haven't read it in its entirety.
5    Q. Okay. Now, as a member of a laboratory that
6  performs PCR testing on drywall samples, do you have an
7  interest in following the government study on PCR
8  testing of drywall samples?
9    A. A lot of times industry doesn't because
10  industry is usually further ahead than the government.
11    Q. And your basis for saying what is what?
12    A. Well --
13    Q. Well, let me ask you this -- strike that.
14    You haven't read the report in Exhibit P,
15  correct?
16    A. Not in its entirety.
17    Q. Okay. Well, let's walk through it. Let's go
18  to Page 3 of the report -- actually, let's go to Page 4.
19    On Page 4, the USGS reports that it performed
20  epifluorescent microscopy on drywall samples.
21    Do you see that?
22    A. Page 4?
23    Q. Yes.
24    MR. WARWICK: Actually, we're referring
25  to page -- numerical Page 4, but that's not actually the

131

1  fourth page of the exhibit, correct?
2    MR. AYALA: That's right. The page
3  numbered 4.
4    THE WITNESS: I found it. I found it.
5  BY MR. AYALA:
6    Q. Okay. You see that?
7    So, the USGS reports performing epifluorescent
8  microscopy on drywall samples?
9    MR. LANDSKRONER: Objection.
10    THE WITNESS: Yes.
11  BY MR. AYALA:
12    Q. Okay. Let me ask you this: Does RealTime
13  Laboratories have an epifluorescent microscope?
14    A. No, not to my knowledge.
15    Q. Okay. Now, on page -- on the page that's
16  numbered 6, "The USGS reports that it performed direct
17  and culture-based analysis using quantitative polymerase
18  chain reaction."
19    Do you see that?
20    A. Yes.
21    Q. What's your understanding of the difference
22  between direct and culture-based analyses using
23  quantitative -- using any PCR analysis?
24    A. Quantitative polymerase chain reaction
25  specifies that you're getting a quantity of whatever is

132

1  there.
2    Q. Okay. Now, RealTime Laboratories did not
3  perform quantitative polymerase reaction on the drywall
4  samples listed in Exhibits C through H, correct?
5    A. No, the assay was designed as a qualitative
6  PCR assay.
7    Q. Okay. In the context of PCR analysis, what's
8  the difference between a direct and a culture-based
9  analysis?
10    A. I would say -- I mean, I haven't read this
11  paper so this is out of context, but I would assume that
12  direct is taking DNA directly from the drywall, and
13  culture is taking it from the culture.
14    Q. Okay. Now, is it fair to say that in RealTime
15  Laboratories' reports, in Exhibit C through H, on
16  plaintiffs' drywall samples, the reports do not contain
17  any results of direct PCR analysis on the drywall
18  samples?
19    MR. LANDSKRONER: Objection.
20    THE WITNESS: That's not correct for all
21  of them.
22  BY MR. AYALA:
23    Q. Okay. Let's do this then: Could you identify
24  for me which of the results of the plaintiffs' samples
25  in this litigation are reported as direct PCR analysis

133

1  results? Which ones? Which one are you looking at
2  there?
3    A. I need to -- give me a second. (Reviewing
4  documents.) Okay. I believe I'm on the right one,
5  Exhibit C.
6    Q. Okay.
7    A. These results were from drywall directly.
8  They were later processed from culture in this result.
9    Q. Okay. Show me where -- okay. First of all,
10  you're referring to Exhibit C which is RTL's Brinku
11  report, and Exhibit 4 to the -- to Exhibit C.
12    Do you see that?
13    A. Uh-huh.
14    Q. Now, I would like you to show me where in
15  Exhibit 4 does it say that the PCR results were on
16  uncultured drywall samples. Where does it say that in
17  the actual document? Show me.
18    A. It does not say that on Exhibit 4.
19    Q. Okay. Now, did you perform the testing that
20  formed the basis of Exhibit 4?
21    A. I performed the testing, the original testing
22  for the Brinku case.
23    Q. Okay. So, if you look at the technician's
24  initials on Exhibit 4, which, by the way, Exhibit 4 is
25  the test results, the technician's initials are Dennis

34  (Pages 130 to 133)

134

1  Hooper; is that right?
2      A. For that -- for the report there, it is.
3      Q. Okay.
4      A. That particular report --
5      Q. So -- hold on. There is no question pending.
6          MR. LANDSKRONER: Do you want finish your
7  answer?
8          MR. AYALA: No, no, no. There's no
9  question pending.
10         MR. LANDSKRONER: You asked him a
11 question. Do you want to read it back? He can answer
12 it.
13         (Record read.)
14         MR. AYALA: Okay. Good.
15         MR. LANDSKRONER: Was there more than to
16 that answer?
17         MR. AYALA: The answer is done.
18         MR. LANDSKRONER: If you had more -- if
19 not.
20         THE WITNESS: It'll come back up, trust
21 me.
22 BY MR. AYALA:
23     Q. Mr. Sutton, is it your standard practice to
24 perform testing on drywall samples and issue a report on
25 those samples and let somebody else put their signature

135

1  on the test results?
2      A. Yes --
3      Q. That is? Okay.
4      A. -- in this case.
5      Q. Okay. All right. That's the answer?
6          MR. WARWICK: Let him answer your
7  question.
8          MR. LANDSKRONER: Not your answer, Tom,
9  his answer. Go ahead and finish your answer.
10         THE WITNESS: This particular case was
11 outsourced to Embark. The answers for that particular
12 report were provided to Dr. Hooper who, since he
13 purchased the service, can report it out as his results.
14 Later, if you go back in here and you see these other
15 results, it was repeated with culture, enzyme,
16 corrosion, and -- what am I missing -- well, all four
17 tests that we did.
18 BY MR. AYALA:
19     Q. Okay.
20     Mr. Sutton, where in Exhibit C does the report
21 indicate -- does the RealTime Laboratories report
22 indicate that the testing was done -- strike that.
23     Mr. Sutton, where, in Exhibit C, the RealTime
24 Laboratories report, does this report indicate that the
25 testing of the Brinku drywall samples was performed by

136

1  any entity other than RealTime Laboratories? Where does
2  it say that in the report?
3      A. It does not say that. But in this case --
4  you're going to have to ask Dr. Hooper about that. I
5  was not involved at that point.
6      Q. Okay. Now, on Page 6 of the USGS report, the
7  USGS indicates that it utilized a sulfate-reducing broth
8  base on a number of samples including paper tape, chips
9  and filler and rock samples.
10     Do you see that?
11     A. Where are you now?
12     Q. I'm sorry. Page 6 under -- Page 6 of the USGS
13 report.
14         MR. LANDSKRONER: Top of the page.
15         THE WITNESS: Okay.
16 BY MR. AYALA:
17     Q. Okay. So, now, on Page 6 of the USGS report,
18 the USGS indicates that it utilized a sulfate-reducing
19 broth base in connection with its cultures of a number
20 of samples including paper tape, chips and filler and
21 rock sub-samples.
22     Do you see that?
23     A. Yes.
24     Q. Okay. Now, just in contrast, RealTime
25 Laboratories testing, as reflected in Exhibits C through

137

1  H on plaintiffs' samples, did not use a sulfate-reducing
2  broth base on the gypsum core samples; is that right?
3          MR. LANDSKRONER: Before you answer, let
4  me object.
5      You're asking him about sentences out of a
6  document that is an article that he has not read in its
7  completion, so --
8      But to the extent that you can answer, go
9  ahead. I just don't want it taken out of character
10 without having read the full report. But go ahead, if
11 you can.
12         THE WITNESS: I don't want to comment. I
13 don't even know what that is, so --
14 BY MR. AYALA:
15     Q. Okay. So --
16     A. I can't sit here and read this in this
17 situation and come to conclusions.
18     Q. Okay. All right. On Page 6 of the USGS
19 report, the USGS indicated that it utilized ATCC 13541,
20 desulfovibrio desulfurican, a known SRB, as a positive
21 control.
22     Do you see that?
23     A. Uh-huh. Yes.
24     Q. In Exhibits C through H, the RealTime
25 Laboratories reports on plaintiffs' drywall samples, RTL

35 (Pages 134 to 137)

138

1    utilized Geotrichum as a positive control, correct?
2        A.  No, they used that as an internal control.
3    That's different.
4        Q.  Okay.  What species of Geotrichum did RTL
5    utilize as an internal control?
6        A.  I have no idea.
7        Q.  Why did RTL utilize -- well, let me
8    back up.  Geotrichum is a fungus, correct?
9        A.  Uh-huh.
10       Q.  It's not a bacteria, correct?
11       A.  Correct.
12       Q.  Okay.  Why did RTL utilize a fungus as an
13   internal control instead of a sulfate-reducing bacteria
14   as an internal control?
15       A.  The whole idea of an internal control is to
16   provide evidence that the process is working from
17   extraction all the way through PCR, and so you want to
18   actually use an organism that's very different from the
19   organism you're testing for, so there's no cross-over
20   between the DNA.  And that's why you use something
21   that's far off from your target.  It -- basically an
22   internal control proves a negative is a negative.
23       Q.  Okay.  If you look at Page 6, still --
24       A.  Okay.
25       Q.  -- of the USGS report, bottom of the page, a

139

1    few lines up, it indicates that the USGS performed
2    SRB-specific QPCR.
3        Do you see that?
4        A.  Okay.
5        Q.  What is SRB-specific QPCR?  Can you describe
6    that?
7        A.  I would ask you the same question, because it
8    doesn't give an organism here.  Specific to what?  An
9    SRB or the thousands of different SRBs that there are.
10   If these are universal primers and probes, then they're
11   not specific to one individual organism.  But, I'm not
12   seeing where an organism is listed.
13       Q.  Okay.  Are you aware that there is a PCR
14   method capable of detecting any SRB?
15       A.  That would be using universal primers and
16   probes, which aren't specific to any individual.
17       Q.  Okay.
18       A.  And no, I'm not aware of specific assay but
19   that's common in any target.
20       Q.  In your mind, Mr. Sutton, is there a
21   difference between a universal assay and an SRB-specific
22   assay?
23       A.  Yeah.  I mean -- what you're saying, a
24   universal and an SRB-specific, in this context, is the
25   same thing.  An organism specific, be it ST organism

140

1    specific assay is specific for that organism.  And in my
2    experience, universal assays can have more crossover
3    with DNA that you're not interested in.
4        Q.  Okay.  Mr. Sutton, would you agree that
5    sulfate-reducing bacteria are a class of many thousands
6    of different species of bacteria?
7        A.  I think that's stated in the report.
8        Q.  And do you agree with that?
9        A.  Yeah, there is a lot of them.
10       Q.  Okay.  And the question I have for you is, are
11   you aware that there is a PCR method that is designed to
12   detect SRB as a class?
13       A.  I'm not aware, specifically, to that assay.  I
14   know in other target groups there are such things as
15   universal assays, which is what you're describing.  In
16   my experience, those assays have some tendency to not be
17   specific for SRBs, because what they're doing is,
18   they're designing their assays in common areas in the
19   DNA genome.
20       Q.  Okay.
21       A.  And what happens is you may pick up Drosophila
22   in combination with SRBs.
23       Q.  Okay.  So --
24       A.  So, there's no way to be sure what you're
25   seeing is an SRB by the universal.

141

1        Q.  Mr. Sutton, tell us if you would, what
2    particular experiences you've personally had in
3    performing SRB-specific PCR?
4        A.  SRB-specific PCR?
5            MR. LANDSKRONER:  Objection.
6    BY MR. AYALA:
7        Q.  Yeah, SRB as a class, just specific --
8        A.  It would just be related to these assays that
9    we've been discussing.
10       Q.  Okay.  Well, when you say that, you mean it
11   would be related to the assays for the five organisms
12   identified in Exhibits C through H?
13       A.  Yes.  But it's identical to the fungal targets
14   that we -- it's the same technology, it's the same
15   development, it's the same validation that's utilized by
16   every lab in -- molecular lab in the United States.
17       Q.  Mr. Sutton, have you ever performed
18   SRB-specific QPCR as is shown in the USGS report?
19       A.  If you're asking if I've -- we're getting into
20   some nomenclature here and it needs to be clear.  QPCR
21   can be nomenclature for just RealTime PCR, and it also
22   can mean quantitative RealTime PCR which is meaning you
23   have a number of organisms.
24           Are you talking about having a number of
25   organisms or are you talking about just general RealTime

36  (Pages 138 to 141)

142

1   PCR?
2       Q.  Mr. Sutton, have you performed any PCR testing
3   designed to detect SRB as a class, as opposed to any
4   particular species of SRB?
5       A.  No.
6           THE WITNESS:  Would it be possible to
7   take five?
8           MR. AYALA:  Oh, sure.
9           MR. LANDSKRONER:  Sure.
10          THE VIDEOGRAPHER:  We're off the record
11  at 1:55 PM.
12          (Recess taken.)
13          THE VIDEOGRAPHER:  Back on the record at
14  2:01 PM.
15  BY MR. AYALA:
16      Q.  Okay.  Mr. Sutton, we're back on the record
17  and you're still under oath, okay?
18      A.  Yes, yes.
19      Q.  Is it accurate to say, sir, with respect to
20  Exhibits C through H, RTL's reports on the plaintiffs'
21  drywall samples and, in particular, with respect to
22  RTL's PCR testing, that RTL did not send any of its
23  samples to an outside lab for direct DNA sequencing?
24      A.  That's not accurate.
25      Q.  Okay.  Could you show me -- well, let me --

143

1   would you agree that nowhere in reports C through H --
2       A.  I'll agree with that.
3       Q.  Okay.  Well, let me ask it.
4       A.  I'm sorry.
5       Q.  Would you agree that, nowhere in Exhibits C
6   through H, which are RealTime Laboratories' reports on
7   plaintiffs' drywall samples, do the reports state that
8   the results of any -- of plaintiffs' drywall samples
9   were sent to an outside lab for direct DNA sequencing?
10      A.  I'll agree with that.
11      Q.  Okay.  Mr. Sutton, let's talk about the enzyme
12  testing performed by RealTime Laboratories on
13  plaintiffs' drywall, okay?
14      A.  Okay.
15      Q.  Exhibits C through H indicate that RTL
16  performed a RapidChek II SRB detection system on
17  plaintiffs' drywall; is that right?
18      A.  Yes.
19      Q.  Okay.  Was RTL's -- were RTL's procedures for
20  performing the RapidChek II enzyme tests on plaintiffs'
21  drywall, the same with respect to each of the samples
22  analyzed?
23      A.  Yes.
24      Q.  Okay.  Now, your reports indicate that the
25  RapidChek kit was designed for the petroleum industry;

144

1   is that correct?
2       A.  Yes.
3       Q.  And can you identify any peer-reviewed
4   literature supporting the use of RapidChek -- the
5   RapidChek kit on drywall specifically?
6       A.  No.
7       Q.  Is it accurate to say that RapidChek,
8   including the RapidChek methodology performed by RTL on
9   the plaintiffs' drywall samples, detect an enzyme called
10  APS reductase?
11      A.  That's correct.
12      Q.  Okay.  Mr. Sutton, are you aware of whether
13  the APS reductase enzyme is common to bacteria other
14  than sulfate-reducing bacteria?
15      A.  I'm not sure.  That dives into microbiology,
16  once again.
17      Q.  Okay.  Fair enough.  Now, the reports in
18  Exhibits C through H, they summarize the RapidChek
19  methodology, correct?
20      A.  Yes.  Yes, they do.
21      Q.  You would agree that there are no photographs
22  included in Exhibits C through H that illustrate the
23  actual enzyme testing on the plaintiffs' drywall
24  samples, correct?
25      A.  There's no pictures, that's correct.

145

1       Q.  Okay.  When RealTime labs performed enzyme
2   testing on plaintiffs' drywall samples, was that testing
3   performed on the drywall samples in the condition that
4   they were in when RealTime Laboratories received them?
5       A.  The test was performed from culture.
6       Q.  Okay.  Okay.  It wasn't clear to me from the
7   report.
8           And when you say "the test was performed from
9   culture," do you mean that the enzyme test was performed
10  from culture of the paper or culture of the gypsum?
11      A.  It was a mixture of the two cultures.
12      Q.  Okay.  It was a mixture of the two cultures.
13  And you would agree there's nothing in Exhibits C
14  through H that spells out exactly how the enzyme
15  methodology was performed on plaintiffs' drywall
16  samples?
17      A.  (Reviewing document.)  I agree.
18          (Exhibit Q marked.)
19  BY MR. AYALA:
20      Q.  Mr. Sutton, I'm showing you what's been marked
21  as Exhibit Q, which, for the record is a document with a
22  header from Strategic Diagnostics, Inc. entitled
23  "RapidChek II SRB Detection System."
24          Do you see that?
25      A.  Yes.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

146

1    Q.  Do you recognize this document?
2    A.  Yes.
3    Q.  Okay.  So you have seen it before?
4    A.  Uh-huh.
5    Q.  Mr. Sutton, does Exhibit Q memorialize the
6  methodology of the RapidChek procedures that were
7  employed by RealTime labs on plaintiffs' drywall
8  samples?
9    A.  Yes.
10    Q.  Okay.  In looking at Page 1 of Exhibit Q, you
11  see here that there's a photograph that appears to list
12  the various components of the test kit; is that right?
13    A.  Yes.
14    Q.  Is this photograph an accurate depiction of
15  the RapidChek test kit?
16    A.  Yes, it is.
17    Q.  Okay.  And do you see in Exhibit Q where there
18  is a RapidChek II color card?
19    A.  Yes, I do.
20    Q.  Okay.  Did RealTime Laboratories utilize the
21  color card when analyzing plaintiffs' drywall samples?
22    A.  Yes, we did.
23    Q.  Okay.  And would you agree that Exhibits C
24  through H, RTL's reports of plaintiffs' drywall samples,
25  does not include an image of the color card with respect

147

1  to plaintiffs' drywall samples?
2    A.  That's correct.
3    Q.  Okay.  If you will look at Page 3 of Exhibit Q
4  under step 6 for "Interpreting Results," it basically
5  indicates that the operator of the test is to match the
6  membrane color with the color card so that the color
7  card actually assists in interpreting the results,
8  correct?
9    A.  That is correct.
10    Q.  Now, also under step 6 of Exhibit Q -- step 6
11  indicates that the speed of the enzyme color reaction
12  for this step is affected by the ambient temperature.
13    Do you see that?
14    A.  Yes.
15    Q.  Is it accurate to say that Exhibits C through
16  H do not indicate the temperature of RTL at the time
17  plaintiffs' drywall samples were being tested?
18    A.  The reports don't indicate the temperature,
19  but since we are a clinical laboratory, the temperature
20  is logged and maintained per our regulations, the
21  clinical regulations.  So, we can confirm that we are in
22  that temperature range and we know how long to go on the
23  incubation time.
24    Q.  Step 6 of Exhibit Q directs the operator of
25  the test to allow the proper time to elapse when

148

1  performing the enzyme test.
2    Do you see that?
3    A.  Yes, I do.
4    Q.  Would you agree that Exhibits C through H,
5  RTL's reports on the plaintiffs' drywall samples, does
6  not document the amount of time that elapsed during the
7  enzyme test; is that correct?
8    A.  It's not documented on the report, that's
9  correct.
10    Q.  Okay.  On Page 3 of Exhibit Q, it indicates
11  that "The color card will continue to darken unless the
12  enzyme reaction that creates the color is halted.  The
13  color of the membrane can be permanently fixed, if
14  desired, using the stop solution.  To preserve the
15  membrane for future examination, and the color reaction,
16  by squeezing 10 drops of the stop solution onto the
17  membrane, this prevents continued color development to
18  an inaccurate darker shade of blue."
19    And then it indicates that "Even samples
20  containing no SRB will begin to develop blue color after
21  about five minutes after the appropriate color
22  incubation time has elapsed.  So, reading or stopping
23  the color development at the proper time is very
24  important."
25    Did I read that correctly?

149

1    A.  Yes, you did.
2    Q.  Is it accurate to say that Exhibits C through
3  H, RTL's reports for the plaintiffs' drywall samples, do
4  not indicate whether RTL stopped the color development
5  using the solution referenced in Exhibit Q?
6    A.  It's true that it's not in the report, but in
7  all cases, it was read at 10 minutes and that's where
8  having the temperature logged in the lab was important,
9  because we could verify that and make sure that it was
10  read at the appropriate time.  None of -- none were
11  stopped.
12    Q.  Is it accurate to say that in Exhibits C
13  through H, RTL's reports on the plaintiffs' drywall
14  samples, do not specify a quantification of the enzymes
15  reported in the plaintiffs' results?
16    A.  That is correct.  However the cards are marked
17  and retained.
18    Q.  Mr. Sutton, are you aware of any peer-reviewed
19  article which discusses use of RapidChek II SRB enzyme
20  test for SRB and drywall?
21    A.  No, I'm not.
22    Q.  Are you aware of any government agency
23  involved in investigating corrosive drywall that has
24  adopted or approved the use of RapidChek II as a test
25  method on drywall samples?

38  (Pages 146 to 149)

150

1    A.  I'm not aware.

2    Q.  Are you aware of any standard-setting body

3  such as ASTM, ISO or NIST, or other standard-setting

4  body, that has approved RapidChek II SRB detection

5  system as a method for testing drywall?

6    A.  I'm not aware.

7    Q.  Mr. Sutton, I'd like to direct your attention

8  to Exhibit C, RTL's report of testing regarding the

9  Brinku home.

10    A.  Okay.

11    Q.  The first page of the report indicates that

12  the letter is a report of the results of samples

13  obtained from MIT University and an individual named

14  Colin Landon.

15      Do you know who Colin Landon is?

16    A.  No, I don't.

17    Q.  Okay.  Have you ever had any conversations

18  with Colin Landon?

19    A.  No, I have not.

20    Q.  Okay.  Now, Exhibit C indicates that the

21  samples were sent by priority USPS on April 25, 2010,

22  received by RealTime Laboratories on April 26, 2010, and

23  the samples were labeled numbers 1 through 4, with the

24  name Brinku on each sample.

25      Do you see that?

151

1    A.  Yes, I do.

2    Q.  The report also indicates that there were no

3  other identifying marks on the samples.

4      Do you see that?

5    A.  Actually, I'm not seeing that.  (Reviewing

6  document.)  Okay, yes, I see that.  Okay.

7    Q.  Okay.  Exhibit C does not indicate what kind

8  of package the samples were received in, correct?

9    A.  According to this.  I would like to point out

10  this was before I was at RealTime labs, April 26, 2010.

11  I just want to --

12    Q.  That's fair.  Although you have signed your

13  signature to the Exhibit C, correct?

14    A.  To certify the results, yes.

15    Q.  Mr. Sutton, in Exhibits C through H, in the

16  report section of each of those exhibits, your signature

17  appears on each of those reports, correct?

18    A.  Correct.

19    Q.  And, although you've testified today that your

20  signature appears for the purpose of, quote, "certifying

21  the results," you would agree there is nothing in

22  Exhibits C through H themselves that indicates that your

23  signature is limited in some way to -- for any purpose,

24  right?

25      MR. LANDSKRONER:  Objection.

152

1      THE WITNESS:  Every reference laboratory

2  I have been ever been to, and associated with other

3  laboratories, this is the way it's done.  You don't

4  prepare your own reports.  You're provided reports, you

5  review the results, you make sure they're up to your

6  standard operating procedures, all your controls are in

7  check, and then you sign the report.  I get a stack of

8  these, and you go through and you review them.  And this

9  is no different than any other.

10  BY MR. AYALA:

11    Q.  Exhibits C through H, Mr. Sutton, you're

12  aware, are you not, are being offered for use in a

13  United States District Court.  Are you aware of that?

14    A.  I'm aware now.

15    Q.  Okay.  So, to cut through a couple of these

16  questions, it's fair to say that you have no independent

17  knowledge of how the samples that form the basis of

18  Exhibit C were collected, correct?

19      MR. LANDSKRONER:  Objection.

20      THE WITNESS:  As to C, that's correct.

21  BY MR. AYALA:

22    Q.  And you have no independent knowledge of the

23  condition that the samples that form the basis of

24  Exhibit C were in when they were received by RealTime

25  Laboratories, correct?

153

1      MR. LANDSKRONER:  Objection.

2      THE WITNESS:  That's correct.

3  BY MR. AYALA:

4    Q.  Did you have any discussions -- by the way,

5  Dennis Hooper authored the report that is Exhibit C,

6  correct?

7    A.  I believe so, yes.

8    Q.  Did you have any discussions with Mr. Hooper

9  before you signed the report?

10      MR. WARWICK:  Objection.

11      THE WITNESS:  I may have.  I don't know.

12  He is in the same building with me.

13  BY MR. AYALA:

14    Q.  Okay.  Okay.  Now, Exhibit C indicates that

15  the request for Mr. Landon was to test each sample for

16  the DNA probe for Thiobacillus ferrooxidans.

17      You see that?

18    A.  Yes.

19    Q.  And no other history or requests were

20  communicated to RTL; is that right?

21      MR. LANDSKRONER:  Objection.

22      THE WITNESS:  Yes.

23  BY MR. AYALA:

24    Q.  The report states that, at the time of the

25  acceptance of the specimens in April 2010, RTL was only

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

154

1   performing cultures for SRB bacteria and RealTime
2   polymerase chain reaction studies using proprietary
3   probes and primers.
4         Do you see that?
5      A.  Yes.
6      Q.  So, in other words RTL -- Exhibit C states
7   that RTL was, in fact, the entity that was performing
8   RealTime polymerase chain reaction studies.  That's what
9   the report says, at least, right?
10     A.  That's what the report says.
11     Q.  But that's an inaccurate statement, correct?
12        MR. LANDSKRONER:  Objection.
13        THE WITNESS:  I don't know I'd go as far
14  as inaccurate.  I can't attest to what was being done
15  when I wasn't there.
16  BY MR. AYALA:
17     Q.  Okay.
18        MR. AYALA:  Go off the record for a
19  minute.
20        THE VIDEOGRAPHER:  Off the record,
21  2:29 PM.
22        (Recess taken.)
23        THE VIDEOGRAPHER:  Back on the record at
24  2:36 PM.
25  BY MR. AYALA:

155

1      Q.  Okay.  Mr. Sutton, talking about Exhibit C,
2   the RealTime labs report for the Brinku home, Page 1 of
3   the report indicates that, in fact, two reports have
4   been generated on the Brinku samples by RTL.
5         Do you see that?
6      A.  Yes.
7      Q.  Now, the first report by RTL is contained in
8   Exhibit 4 to the Brinku report.
9         Do you see that?
10     A.  Yes.
11     Q.  Okay.  Page 1 of Exhibit 4 is entitled,
12  "Thiobacillus Report Form," and indicates that the date
13  of service is April 26, 2010.
14        Do you see that?
15     A.  Yes.
16     Q.  And the sample type listed on Page 1 is No. 1
17  drywall.
18        Do you see that?
19     A.  Yes.
20     Q.  Now, the date of the report is May 20, 2010.
21        Do you see that?
22     A.  Yes.
23     Q.  And all five organisms -- all five target
24  organisms are listed as non-detected, right?
25     A.  Yes.

156

1      Q.  Dennis Hooper's initials are on the bottom of
2   Page 1?
3      A.  Yes.
4      Q.  Okay.  Now, going to the next page of
5   Exhibit 4, the Brinku report, this next page refers to
6   sample type No. 2 drywall.
7         Do you see that?
8      A.  Yes, I do.
9      Q.  And Dennis Hooper's initials are at the bottom
10  of that, as well?
11     A.  Yes.
12     Q.  All right.  Now, the next page of Exhibit 4 is
13  also entitled "Thiobacillus Report Form" and indicates
14  sample type No. 3, DNA testing Thiobacillus, and Dennis
15  Hooper's initials are at the bottom of that page as
16  well, correct?
17     A.  Yes.
18     Q.  And finally, the last page of Exhibit 4 notes
19  that the sample type is No. 4 drywall, and has Dennis
20  Hooper's initials on the bottom as well.
21        Do you see that?
22     A.  Yes, I do.
23     Q.  Now, is it accurate to say that none of the
24  report forms listed in Exhibit 4 of the Brinku report
25  list a positive or negative control result?

157

1      A.  That is true.
2      Q.  Okay.  Is it also accurate to say that none of
3   the drywall samples referenced in Exhibit 4 are
4   referenced as National Gypsum drywall samples?
5      A.  That is true.
6      Q.  Okay.  Would it also be accurate to say that
7   none of the report forms in Exhibit 4 list testing
8   results for enzyme testing?
9      A.  That is true.
10     Q.  And the results in Exhibit 4 don't list
11  results for RapidChek testing?
12     A.  True.
13     Q.  And the results in Exhibit 4 don't list the
14  results for culture testing of paper?
15     A.  True.
16     Q.  And the results listed in Exhibit 4 do not
17  list the results of culture tests for drywall core,
18  correct?
19     A.  True.
20     Q.  The results listed in Exhibit 4 do not
21  indicate a quantity of DNA detected, correct?
22     A.  That is true.
23     Q.  And the results in Exhibit 4 do not indicate
24  whether any DNA detected is living or dead, correct?
25     A.  True.

40  (Pages 154 to 157)

158

1    Q.  Okay.  Let's look at Exhibit 5 to the Brinku
2  report.  Now, Exhibit 5 is entitled, "Sulfur-Reducing
3  Bacteria Report Environmental."
4       Do you see that?
5    A.  Yes.
6    Q.  And Exhibit 5 contains a table that lists
7  positive or negative results of four test methodologies
8  and those four would be the culture results, APS enzyme
9  results, lab corrosion results and RTL DNA results.
10  Okay?
11    A.  Yes.
12    Q.  Now, the first question I have is, with
13  respect to the culture results -- I'm sorry, let's back
14  up even further.
15       If you would look up at Exhibit 5 at the
16  accession numbers, the accession numbers list five
17  drywall samples; is that right?
18    A.  Yes.
19    Q.  And there is no indication from the report of
20  whether the five drywall samples that form the basis of
21  the report were, in fact, National Gypsum samples; is
22  that right?
23    A.  That's true.
24    Q.  Is there any indication in the report in
25  Exhibit 5 of where in the Brinku home the drywall

159

1  samples were taken from?
2    A.  No.
3    Q.  The date of service listed on Exhibit 5 is
4  April 26, 2010.
5       Do you see that?
6    A.  Yes.
7    Q.  And the date of the report is listed as
8  November 4th, 2011, which is more than 17 months after
9  the date of service.
10       Do you see that?
11    A.  Yes.
12    Q.  Now, going back to the first page of Exhibit
13  C, the Brinku report, where the report indicates that on
14  April 26, 2010, RealTime Laboratories received four
15  samples from Colin Landon, correct?
16    A.  Yes.
17    Q.  Are the four samples that RTL received from
18  Colin Landon on April 26, 2010, the same four samples
19  that are listed in RTL's report Exhibit 5?
20    A.  It would be the same drywall samples that were
21  brought in, a different sampling from that.
22    Q.  Okay.  And in addition to the four samples
23  initially received by RTL on April 26th, 2010, for the
24  report in Exhibit 5, RTL also utilized an additional
25  control sample which appears to -- is reported to have

160

1  come from Home Depot in Dallas, Texas.
2       Do you see that?
3    A.  Yes.
4    Q.  Now, RealTime Laboratories has published --
5  well, strike that.
6       RealTime Laboratories has included in at least
7  some of its reports for the litigation, a protocol for
8  collecting drywall samples; is that right?
9    A.  I believe so.  Let me find it.  (Reviewing
10  documents.)  Well, I don't have it.
11    Q.  Let me try another one.  Exhibit 2.
12    A.  That one?
13       MR. LANDSKRONER:  Exhibit E has it.
14       THE WITNESS:  Okay.  I got it.
15  BY MR. AYALA:
16    Q.  Okay.  So, am I correct that RealTime
17  Laboratories has included in some of its reports in the
18  litigation, a document entitled "Drywall Sample
19  Collection and Methodology"?
20    A.  Yes, that's correct.
21    Q.  And that's a document that was created by
22  RealTime Laboratories, right?
23    A.  It appears to have been.
24    Q.  Okay.  Now, if you look at the section of the
25  document under the heading, "Samples to Be Collected,"

161

1  the document directs a sampler to "collect six, 4-inch
2  core samples, with three taken from known or suspected
3  problem drywall areas, if possible.  Samples be to be
4  collected from target locations based on labeling
5  indicative of Chinese drywall, T. G. Naff Plasterboard,
6  TGANCO, Ltd., and/or close proximity to blackened
7  copper.  If labeled Chinese drywall is identified,
8  collect three such samples for testing and three random
9  samples."
10       Do you see that?
11    A.  Yes.
12    Q.  And then, at the bottom of that paragraph, the
13  RealTime labs document states, "To avoid damaging vapor
14  barriers present within the homes, samples will not be
15  collected from any bathroom or laundry room locations."
16       Do you see that?
17    A.  Okay.
18    Q.  Okay.  Now, going back to Exhibit 6, the
19  Brinku RealTime labs report -- pardon me -- Exhibit C,
20  the Brinku RealTime labs report and, specifically,
21  Exhibit 5 to that Brinku report, you would agree there
22  are a total of three samples that reportedly came from
23  the Brinku home.
24       Do you see that?  Three drywall samples?
25    A.  Yes.

41  (Pages 158 to 161)

162

1  Q.  Does Exhibit 5 include any photos of the
2  samples?
3      A.  No.
4      Q.  And does it -- Exhibit 5 include any data or
5  documentation underlying the positive or negative
6  results?
7      A.  No.
8          THE VIDEOGRAPHER:  2 minutes.
9  BY MR. AYALA:
10     Q.  And Exhibit 5 includes a notation of positive
11 for lab corrosion results but there are no photographs
12 to permit us to evaluate that, right?
13     A.  That's correct.
14     Q.  And again, none of the technicians from
15 RealTime labs has initialed the Exhibit 5, correct?
16         MR. LANDSKRONER:  Objection.
17         THE WITNESS:  Correct.
18 BY MR. AYALA:
19     Q.  Now, with respect to the culture results that
20 are reported in Exhibit 5, looking at these culture
21 results, can we determine whether they are results of a
22 culture of the paper or whether they report results of
23 the culture of the gypsum?
24     A.  The methodology is to mix the two cultures
25 together.

163

1          THE VIDEOGRAPHER:  1 minute.
2      A.  Oh, no.  I'm sorry.  I'm sorry.  I was
3  thinking about the wrong test.  Positive would be
4  determined as it's described, the positive result,
5  whether it's the black color or the turbidity, it does
6  not designate core or paper here, you're correct on
7  that.
8          THE VIDEOGRAPHER:  Counsel, we need to
9  change the tape.
10         MR. AYALA:  That's fine.
11         THE VIDEOGRAPHER:  We're off the record
12 at 2:51 PM.  This is end of disk 2.
13         (Off the record.)
14         THE VIDEOGRAPHER:  We're back on the
15 record at 2:53 PM.  This is the beginning of disk 3.
16 BY MR. AYALA:
17     Q.  Back on the record, still under oath, okay?
18     A.  Yes.
19     Q.  Mr. Sutton, looking at Exhibit 5 to the RTL
20 Brinku report and, specifically, the column that
21 reports positive or negative results for RTL DNA
22 results.
23     A.  Okay.
24     Q.  Are we able to tell from looking at this
25 report whether the RTL DNA results that are reported in

164

1  Exhibit 5 -- strike that.
2          Are we able to tell from looking at Exhibit 5
3  whether the RTL DNA testing on the Brinku samples was
4  performed on a culture of paper or whether it was
5  performed on a culture of gypsum core?
6      A.  Not from the report.
7      Q.  Did RealTime labs perform DNA testing on
8  Brinku's drywall samples more than once?
9      A.  Yes.
10     Q.  Okay.  Now, looking at the RTL DNA results,
11 the results indicate three positives in the column,
12 three positive results in the column, correct?
13     A.  Yes.
14     Q.  Okay.  Now, is it accurate to say that RTL's
15 DNA testing results reported as positive for particular
16 microorganisms do not tell us when, where, or how the
17 microorganisms got on to the drywall?
18         MR. LANDSKRONER:  Objection.
19         THE WITNESS:  The report doesn't say
20 that, no.
21 BY MR. AYALA:
22     Q.  I direct your attention, Mr. Sutton, to
23 Exhibit D, which, for the record, is RealTime
24 Laboratories' report for the Retana home dated
25 December 26, 2011, okay?

165

1          The report states that this letter is a report
2  of the inspection, sampling and testing results RTL
3  reviewed on the home of Retana located in Riverview,
4  Florida which was sampled on January 25th, 2011, and
5  sent to RealTime Laboratories.
6          Do you see that?
7      A.  Yes, I do.
8      Q.  Now, if you go to the next page, the report
9  indicates that the premises were inspected by Dennis
10 Hooper, M.D., PhD and placed in appropriate containers,
11 as well as documented on the COC by Dennis Hooper, and
12 then it states that "All samples were transported to
13 Texas under COC by personal courier, Hooper, to RealTime
14 Laboratories in Carrollton, Texas."
15         Do you see that?
16     A.  Yes.
17     Q.  Now, if you look under "Sampling Description"
18 on the same page, the heading "Sampling Description,"
19 the bottom of the first paragraph of the report states
20 that, "Samples were transported to the lab by utilizing
21 FedEx, in every instance documenting time and date of
22 transport on the COC form."
23         So, the question I have for you is:  Were the
24 Retana samples transported by FedEx or did Dennis Hooper
25 personally transport them?

42  (Pages 162 to 165)

166

1    A. I wasn't at RealTime labs at this point in
2  time.
3    Q. Okay. So, you just, you don't know?
4    A. I don't know.
5    Q. Mr. Sutton, are you aware of any enzyme
6  testing performed on the Retana drywall samples?
7    A. I'm aware that it was tested.
8    Q. Okay. Why wasn't it reported?
9    A. It says here, "Enzyme Results" that it was NA
10 for -- on Exhibit 9.
11   Q. Okay. What does NA indicate to you?
12   A. It's, basically, if you refer back to the
13 sheet, which, I don't know what exhibit it is, it's the
14 instructions for the quick check.
15   Q. Um-hum?
16   A. NA is the first section that says that there
17 is no antibody.
18   Q. Okay. So -- no, NA indicates that there is no
19 antibody?
20   A. Yes.
21   Q. Okay. I see.
22   A. And it's the first section of the card.
23   Q. Now, if you look at Exhibit 1 of the Retana
24 report of RealTime Laboratories, Exhibit 1 is a document
25 of RealTime Laboratories entitled "Pretreatment Sample

167

1  Collection, Chain of Custody Form."
2    A. I'm here.
3    Q. Are you there?
4    A. Yeah.
5    Q. Okay. Now, the report indicates -- or
6  Exhibit 1 indicates that a sample was collected from the
7  garage of the Retana home and from the bathroom of the
8  Retana home on January 26, 2011.
9      Do you see that?
10   A. I can't quite make it out, but --
11     MR. LANDSKRONER: Maybe my copy is
12 better.
13     THE WITNESS: I was on the wrong one.
14 Sorry about that.
15     MR. LANDSKRONER: Flip back on the other
16 page.
17     THE WITNESS: Okay. Yes.
18 BY MR. AYALA:
19   Q. Okay. Now, is it fair to say you're not
20 familiar with the chain of custody of -- in the
21 collection of the drywall samples for the Retana report?
22   A. That's fair to say.
23   Q. Okay. Now, if you go to Exhibit 9 of the
24 Retana report, Exhibit 9 is RealTime Laboratories,
25 quote, "Sulfur-Reducing Bacteria Report."

168

1      Do you see that?
2    A. Yes.
3    Q. Exhibit 9 is -- the date of the report is
4  May 3rd, 2011, and the date of service is listed as
5  January 26, 2011.
6      Do you see that?
7    A. Yes, I do.
8    Q. So, it appears that more than 90 days elapsed
9  from the date of service to the date of the report.
10     Do you see that?
11   A. Yes, I do see that.
12   Q. The report indicates that drywall from various
13 areas in the home were sampled, under "Sample Type"?
14   A. Yes.
15   Q. In fact, there were two drywall samples from
16 the Retana home taken, correct?
17   A. Yes.
18   Q. And here it says, more clearly, that one
19 sample was taken from the garage and one sample was
20 taken from the bathroom mirror.
21     Do you see that?
22   A. Yes.
23   Q. Now, under the "Procedure" heading of
24 Exhibit 9, the procedure indicates that four tests were
25 performed: Culture by API RP38; corrosion test; RTL per

169

1  DNA testing?
2    A. Uh-huh.
3    Q. Actually it only lists three procedures?
4    A. Yes.
5    Q. It doesn't list the enzyme test. Okay? But
6  -- but we know from -- well, at least the column in
7  Exhibit 9 reports results for an enzyme test.
8      Do you see that?
9    A. Yes.
10   Q. Now, let me ask you this: When RealTime
11 Laboratories was performing testing on the Retana
12 samples, in what --
13     Let me ask it this way: In what order were
14 the four test methodologies performed?
15   A. In what order?
16   Q. In what order?
17   A. I don't know, specifically, to the Retana
18 test, but --
19   Q. Is there a standard practice?
20   A. Yes.
21   Q. Okay.
22   A. The drywall is cultured.
23   Q. First?
24   A. Exactly. And, like I said, just to be
25 complete, there is positive and negative controls

43 (Pages 166 to 169)

170

1  cultured with that.  That material -- now, the next
2  steps can be in different orders but some of that
3  material was taken for PCR and some of the positive and
4  negative controls as well.  And then some of that
5  material is also taken to do the enzyme test.  And then
6  the corrosion test is usually set up at the same time
7  the culture test is.
8      Q.  Okay.  And the positive and negative controls
9  you just referenced are not actually reported in
10  Exhibits C through H, correct?
11     A.  That's true.
12     Q.  Okay.  Now, looking at Exhibit 9 to the Retana
13  report, the column that reports on culture results, is
14  this column reporting on culture results of the paper
15  samples from Retana or culture results of the gypsum
16  core from Retana?
17     A.  It doesn't specify.
18     Q.  Okay.  And you don't have any personal
19  knowledge of --
20     A.  Not specific to this --
21     Q.  Okay.
22     A.  -- sample.
23     Q.  Okay.  Now, the -- Exhibit 9 to the Retana
24  report lists laboratory corrosion results but there are
25  no photos for us to evaluate that, correct?

171

1      A.  Correct.
2      Q.  Now, the -- in Exhibit 9 of the Retana report,
3  there are DNA results listed.  Do those DNA results --
4      Let me ask it this way:  Does the -- was the
5  DNA testing that RTL performed on the Retana samples
6  performed on cultures of paper samples or cultures of
7  Retana's gypsum samples?
8      A.  In the case of DNA samples, a portion of each
9  culture is taken and extracted together.
10     Q.  Okay.  So --
11     A.  You file a -- the target -- the culture for
12  the paper and the culture for the gypsum, a portion of
13  that is taken and extracted together.
14     Q.  Okay.  And so, looking at the results of
15  Exhibit 9, specifically, the DNA results, we can't tell
16  from looking at this report whether the DNA reported as
17  detected came from the paper sample culture or from the
18  drywall sample culture, correct?
19     A.  Not from the report.
20     Q.  Okay.  And you don't have any independent --
21     A.  No.
22     Q.  -- recollection?
23     A.  Not of this, specifically.
24     Q.  Okay.  Now, looking at Exhibit 9, there's
25  nothing on Exhibit 9, which is the results of testing of

172

1  the Retana samples, that indicates that the samples
2  tested were, in fact, National Gypsum samples, correct?
3      A.  Correct.
4      Q.  And the RealTime Laboratories DNA results
5  listed in Exhibit 9 don't give any indication of when
6  the organisms that were reportedly detected got onto the
7  drywall, correct?
8      A.  Correct.
9      Q.  Let's go to Exhibit E.  So, for the record,
10  Exhibit E is a RealTime Laboratories report of analysis
11  of samples from the Ravelo home dated
12  September 26, 2011.  Okay.  Looking at Exhibit 9 of the
13  Ravelo report, Exhibit 9 is a RealTime Laboratories
14  quote, "Sulfur-Reducing Bacteria Report," listing
15  location as the Ravelo home in Cape Coral, Florida.  The
16  Exhibit 9 for the Ravelo home lists three drywall
17  samples on the report, correct?
18     A.  Yes.
19     Q.  And there is nothing in the report to indicate
20  that those drywall samples are National Gypsum drywall
21  samples, correct?
22     A.  Not that I see.
23     Q.  The samples -- if you look at the next exhibit
24  from SKYETEC, appear to have been collected on
25  April 25th, 2011.

173

1      Do you see that?
2      A.  Yes.
3      Q.  Exhibit 9 reports the date of service as
4  May 5th, 2011.
5      Do you see that?
6      A.  Yes.
7      Q.  And, then the date of the report is a little
8  over 70 days later on July 31, 2011?
9      A.  Yes.
10     Q.  Okay.  Now, there are no positive or negative
11  controls reported in Exhibit 9 to the Ravelo report,
12  correct?
13     A.  Correct.
14     Q.  And there are no -- with respect to the
15  laboratory corrosion results, there are no photos for us
16  to evaluate, correct?
17     A.  Correct.
18     Q.  With regard to the culture results in
19  Exhibit 9, are these culture results of the paper
20  culture for Ravelo samples or of the drywall cultures
21  for Ravelo samples?
22     A.  It doesn't specify.
23     Q.  And you don't have any independent knowledge
24  of that?
25     A.  No.

44  (Pages 170 to 173)

174

1    Q.   Okay.  Okay.  So, with respect to the DNA
2    results, the DNA testing on the Ravelo samples, was the
3    DNA testing performed on cultures of the paper samples
4    from Ravelo or cultures of the drywall samples from
5    Ravelo?
6    A.   So, I just realized that I misspoke a while
7    ago.
8    Q.   Okay.
9    A.   I was thinking the enzyme test.  For DNA we
10   extract separately core and paper.  For the enzyme test
11   we combine to do the enzyme test.
12   Q.   Okay.
13   A.   So, I'm sorry about that.
14   Q.   Thanks for clarifying.
15        Now, with respect to the Retana samples in
16   Exhibit 9, was the DNA testing performed on the Retana
17   samples performed on cultures of the Retana paper
18   samples or on cultures of the Retana drywall samples?
19   A.   They would have been performed on both.
20   Q.   Okay.  With respect to the DNA results
21   reported on Exhibit 9 for Ravelo, is Exhibit 9 reporting
22   results of DNA testing on the paper culture samples of
23   Ravelo or the drywall culture samples of Ravelo?
24   A.   That's not stated in the report.
25   Q.   And you don't have any independent knowledge

175

1    of that?
2    A.   No, sir.
3    Q.   Okay.  Now, the -- the Ravelo -- the results
4    on the first Ravelo sample indicate a positive culture
5    result, a positive enzyme result, a positive DNA result,
6    and a negative corrosion result.
7         Do you see that?
8    A.   Yes, sir.
9    Q.   I'm not sure whether we covered this all, so
10   I'll ask just in case.  The corrosion results listed for
11   Ravelo, Exhibit 9, there are no photos included for us
12   to evaluate, correct?
13   A.   No.
14   Q.   And there are no positive or negative control
15   results reported, correct?
16   A.   No.
17   Q.   And, in fact, with respect to Exhibits C
18   through H in the RealTime Laboratories' reports on the
19   plaintiffs' drywall, there are no positive or negative
20   controls reported in the result reports?
21   A.   I don't believe so.
22   Q.   Okay.  All right.
23   A.   But if the controls are out, they wouldn't be
24   reported.
25   Q.   I'm sorry?

176

1    A.   If the controls aren't correct, they will not
2    be reported.
3    Q.   Now, I'll ask this question, too, with respect
4    to the DNA results that are reported in these -- in
5    Exhibits C through H, the RealTime Laboratories test
6    results on the plaintiffs' drywall, to the extent that
7    RealTime Laboratories is -- has reported a positive
8    detection of a microorganism -- strike that.
9         With respect to Exhibits C through H, RTL's
10   reports of the plaintiffs' drywall samples, to the
11   extent that RTL has reported a positive detection of DNA
12   for a target organism, the DNA test result does not
13   indicate when or where or under what circumstances the
14   DNA got onto the drywall sample, correct?
15        MR. LANDSKRONER:  Objection.
16        THE WITNESS:  Yes, that's not in the
17   report.
18   BY MR. AYALA:
19   Q.   Okay.  Let's go to Exhibit F, Nutting.
20   Showing you Exhibit F, Mr. Sutton, which is, for the
21   record, a RealTime laboratory report dated
22   September 26th, with regard to the Nutting home.  Okay.
23   Looking at Exhibit 9 to the Nutting report, the
24   Exhibit 9 to the Nutting report is a document from
25   RealTime Laboratories titled "Sulfur-Reducing Bacteria

177

1    Report" and lists the location as Nutting.
2         The report for Nutting, and particularly
3    Exhibit 9, lists three drywall samples, correct?
4    A.   Yes.
5    Q.   Okay.  Exhibit 9, the test results for
6    Nutting, do not indicate that the drywall samples tested
7    were National Gypsum drywall samples, correct?
8    A.   Correct.
9    Q.   If you look at the SKYETEC report on the next
10   exhibit, it indicates that the drywall samples were
11   collected on April 28, 2011.
12        Do you see that?
13   A.   Yes.
14   Q.   And the date of service listed on Exhibit 9 is
15   May 10, 2011, 13 days after collection.
16        Do you see that?
17   A.   Yes.
18   Q.   And then the report is July 31, 2011.  Okay?
19   A.   Okay.
20   Q.   Now -- now, in -- let's see.  With respect to
21   the corrosion testing, Exhibit 9 to the Nutting report
22   does not include any photos for us to evaluate, correct?
23   A.   Correct.
24   Q.   All right.  And there are no positive or
25   negative controls reported in Exhibit 9; is that right?

45 (Pages 174 to 177)

178

1    A. Correct.
2    Q. With regard to the culture test results listed
3  in Exhibit 9 of the Nutting report, are these culture
4  results, results of testing of the Nutting paper samples
5  or the results of culture testing of the Nutting gypsum
6  core samples?
7    A. It does not specify.
8    Q. And you do not have any independent knowledge
9  of that?
10   A. No.
11   Q. Okay. With respect to Exhibit 9's report of
12  the Nutting DNA testing, was RTL's DNA testing of the
13  Nutting samples, testing of the paper culture samples or
14  testing of the gypsum core culture samples?
15   A. It doesn't specify.
16   Q. And you don't have any independent knowledge
17  of that?
18   A. No.
19   Q. Okay. I direct your attention, Mr. Sutton, to
20  Exhibit G, which I'll identify for the record as
21  RealTime Laboratories' reports regarding the Brucker
22  home dated September 26, 2011. If you go to Exhibit 9,
23  Mr. Sutton, of the Brucker report, Exhibit 9 is a
24  RealTime Laboratories "Sulfur-Reducing Bacteria Report,"
25  lists the location of the Brucker home in Arcadia,

179

1  Florida.
2    Q. Do you see that?
3    A. Yes.
4    Q. Exhibit 9 to the Brucker report, to the
5  September 26th Brucker report, lists three drywall
6  samples.
7    Q. Do you see that?
8    A. Yes.
9    Q. Now, Exhibit 9 does not give any indication
10  that those samples are National Gypsum drywall samples,
11  correct?
12   A. Correct.
13   Q. If you look at the SKYETEC report on the next
14  page, it indicates that drywall samples were collected
15  on May 11, 2011.
16   Q. Do you see that?
17   A. Yes.
18   Q. And looking at Exhibit 9 to September 26th
19  Brucker report, it lists the date of service as May 8,
20  2011, and the date of the report as July 31, 2011,
21  correct?
22   A. May 18th.
23   Q. Thank you. So, the date of service was
24  May 18, 2011, and the date of the report was July 31,
25  2011?

180

1    A. Correct.
2    Q. Okay. Now, the report in Exhibit 9 does not
3  report any positive or negative control results,
4  correct?
5    A. Correct.
6    Q. And it lists lab corrosion results, but there
7  are no photos for us to evaluate, right?
8    A. Correct.
9    Q. All right. The culture results reported in
10  Exhibit 9 of the September Brucker report, were those
11  culture results of the Brucker paper samples or the
12  Brucker gypsum core samples?
13   A. It doesn't specify.
14   Q. And you don't have any independent knowledge?
15   A. No.
16   Q. And with respect to the DNA testing of the
17  Brucker samples, was the DNA testing performed on
18  cultures of the Brucker paper samples or cultures of the
19  Brucker gypsum core samples?
20   A. It doesn't specify.
21   Q. And you don't have any independent knowledge
22  of that?
23   A. No.
24   Q. I direct your attention to Exhibit H, please.
25  Exhibit H is a RealTime Laboratories report dated

181

1  January 17, 2012, regarding the Brucker home. Exhibit
2  H, Mr. Sutton, is RealTime Laboratories' second report
3  of evaluation of samples from the Brucker home, correct?
4    A. Correct.
5    Q. And the samples of drywall that form the basis
6  of Exhibit H are different samples from the drywall from
7  Brucker that forms the basis of Exhibit G, correct?
8    A. Yes.
9    Q. Okay. Now, I direct your attention to
10  Exhibit 9 of the 2012 Brucker report, which is a
11  RealTime Laboratories "Sulfur-Reducing Bacteria Report."
12   Q. Do you see that?
13   A. Yes.
14   Q. And Exhibit 9 reports on four drywall samples,
15  correct?
16   A. Correct.
17   Q. Okay. There is no indication from Exhibit 9
18  that the four drywall samples listed in the report are
19  National Gypsum drywall samples; is that right?
20   A. That's correct.
21   Q. Now, there are no positive or negative
22  controls reported with respect to the Brucker samples,
23  right?
24   A. Correct.
25   Q. And there are laboratory corrosion results

46 (Pages 178 to 181)

182

1    listed but there are no photos for us to evaluate,
2    correct?
3         A.  Correct.
4         Q.  Now, with respect to the culture results in
5    Exhibit -- in this Exhibit 9, are these culture results
6    of the Brucker paper samples or culture results of the
7    Brucker drywall samples?
8         A.  It does not specify.
9         Q.  And you don't have any independent knowledge
10   of that?
11        A.  Not from this.
12        Q.  Or from any --
13        A.  Well, in all these reports, in relation to the
14   culture results, the enzyme results, and the RTL DNA
15   results, there are records that say this was from --
16   well, I mean, the records exist, it's just not noted on
17   the reports.
18        Q.  Okay.  So, your expert reports do not --
19        A.  They don't specify what you were asking.
20        Q.  They don't specify whether the culture reports
21   from the Brucker home are of the Brucker paper samples
22   or of the Brucker gypsum core samples, right?
23        A.  That's correct.
24        Q.  Now, with respect to the DNA testing of the
25   Brucker samples in the 2012 Brucker report --

183

1         A.  Okay.
2         Q.  -- was that DNA testing performed on cultures
3    of the Brucker paper samples or cultures of the Brucker
4    gypsum core samples?
5         A.  The report doesn't specify.
6         Q.  Okay.  And you don't have independent
7    knowledge of that?
8              MR. LANDSKRONER:  Objection.
9              THE WITNESS:  Not from this.
10   BY MR. AYALA:
11        Q.  Okay.  Mr. Sutton, is it accurate to say that
12   -- strike that.
13             MR. AYALA:  Let's take a break.
14             THE WITNESS:  That sounds good.
15             THE VIDEOGRAPHER:  We're off the record
16   at 3:33 PM.
17             (Off the record.)
18             THE VIDEOGRAPHER:  Back on the record at
19   3:44 PM.
20   BY MR. AYALA:
21        Q.  Mr. Sutton, back on the record and you're
22   still under oath, okay?
23        A.  Okay.
24        Q.  The RealTime laboratory reports for the
25   litigation contained in Exhibit -- I believe it's listed

184

1    as Exhibit 8 in most of the reports, would you take a
2    look at -- for the record, which exhibit are you looking
3    at from the front page?
4         A.  H.
5         Q.  H?  Okay.  I'll grab that.  Now, for the
6    record -- okay.  Exhibit H -- Exhibit 8 to Exhibit H is
7    a document that has a header of, Exhibit 8, "Bacterial
8    Organisms and the Strains Used to Create DNA Probes and
9    Primers."  And Mr. Sutton, it appears that the table of
10   bacteria and the various strains listed here are
11   reprinted or at least the same table from the Hooper
12   report of 2010 --
13        A.  As best as I can tell, yes.
14        Q.  -- correct?  Okay.
15             Now, there is a note at the bottom of Exhibit
16   -- of Exhibit 8 that reads, "Tests were initially
17   conducted on domestic drywall to determine which
18   organism in Exhibit 8 was predominant.  After
19   determination that Sulfobacillus thermosulfidooxidans
20   was noted to be the only positive organism from the
21   list, all domestic drywall was only tested for this
22   organism."
23             Okay.  Do you see that?
24        A.  Yes.
25        Q.  I have a few questions about that.  When

185

1    Exhibit 8 notes that tests were initially conducted on
2    domestic drywall to determine which organism in
3    Exhibit 8 was predominant, when did those tests occur?
4         A.  I'm not sure, exactly, a date on that.  It
5    would have been around the time frame of the paper.
6    They give a ballpark of that but I'm not sure exactly
7    when it was.
8         Q.  When you say "around the time frame of the
9    paper," do you mean around the time that the Hooper 2010
10   article was published?
11        A.  Yeah, it would have been, you know, before
12   that, of course, but I'm not sure exactly when that was.
13        Q.  Okay.  Who conducted the testing on the
14   domestic drywall that's referenced in Exhibit 8?
15        A.  I did some of it at Embark and then some of it
16   was also done at RealTime labs.
17        Q.  How many domestic drywall samples were sampled
18   -- strike that.
19             How many domestic drywall samples were tested
20   as part as the -- as part of the testing referred to in
21   Exhibit 8?
22        A.  I don't recall.
23        Q.  Ballpark -- can you give a ballpark?
24        A.  Not really, because I don't remember -- you
25   know, I'm not sure what was done at Embark and what was

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

186

1  done -- it's been too long ago.
2      Q.  Okay.  Do you recall what brands of domestic
3  drywall were tested as part of this testing?
4      A.  No.
5      Q.  Okay.  Do you recall what type of drywall
6  products were tested as part of this testing in
7  Exhibit 8?
8      A.  One more time?  I didn't get --
9      Q.  What type of drywall products -- and I could
10  be more specific:  Whether, for example, the drywall was
11  ceiling board, half-inch board, 5/8s board, fire shield
12  board, XP board, that sort of thing?
13      A.  I'm not sure.  My part in this, as I said
14  earlier when we were discussing the paper, was I
15  designed the assays off of ATCC cultures.  RealTime
16  Laboratories acquired the drywall.  And then, later on,
17  we did the testing of the drywall, as well, once the
18  assays were developed, specifically for the targets from
19  ATCC.
20      Q.  Okay.  So, then -- okay.  So, in light of your
21  testimony just now, it's fair to say that you don't have
22  personal knowledge of where the drywall samples came
23  from?
24      A.  No, no.
25      Q.  Because RealTime Laboratories acquired those

187

1  and you weren't at RealTime labs, yet?
2      A.  Exactly.
3      Q.  Okay.  And it's fair to say that, with respect
4  to Exhibits C through H, the RTL reports of plaintiffs'
5  drywall, the testing of domestic drywall that's listed
6  in Exhibit 8, the results are not disclosed in these
7  reports, correct?
8      A.  Correct.
9      Q.  Okay.  All right.  A few more things.  We're
10  almost done.  Okay.
11          (Exhibit R, S marked.)
12  BY MR. AYALA:
13      Q.  Mr. Sutton, I'm showing you a document that's
14  been marked as Exhibit R.  Do you recognize this
15  document, sir?
16      A.  Yes.
17      Q.  Okay.  What is it?
18      A.  A resume.
19      Q.  And whose resume is it?
20      A.  Mine.
21      Q.  Is Exhibit R, Mr. Sutton, a fair and accurate
22  representation of your education, work history, and
23  publications?
24      A.  Yes.
25      Q.  Okay.  And your resume lists teaching

188

1  experience, spring 2008, as an adjunct faculty member at
2  Texas State University.  What subject were you teaching,
3  sir?
4      A.  I developed a mod -- basically what it says,
5  clinical laboratory sciences.  It's the course that
6  med -- med techs take.
7      Q.  Okay.
8      A.  And I developed the course and taught the lab
9  portion of it.
10      Q.  Were you teaching at Texas State just in the
11  spring of 2008?
12      A.  That's correct.
13      Q.  Just a minute.  I will show you what's been
14  marked as Exhibit S, as well, Mr. Sutton.  Do you
15  recognize that document, sir?
16      A.  Never seen this document.
17      Q.  Okay.  For the record, Exhibit S is a document
18  that says "John Samuel Sutton, Legal Fee Schedule."
19          Do you see that?
20      A.  Uh-huh.
21      Q.  John Samuel Sutton in Exhibit S; refers to
22  you, sir?
23      A.  Sam.  Yes.  Sam Sutton is what I go by.
24      Q.  Okay.  Do you have any understanding of who
25  generated this document?

189

1      A.  Evidently somebody at RealTime Laboratories,
2  to compensate for my time, which, I'm supposed to be at
3  work right now, so --
4      Q.  But you don't know who at RealTime labs
5  generated this document?
6      A.  Not specifically, no.  It could have been Dave
7  -- Dave Murcott.  It could have been Dennis Hooper, I'm
8  not sure which one did.  It would have been either one
9  of those two, though.
10      Q.  Got you.  And you didn't have any
11  conversations with either one of them about this
12  document, correct?
13      A.  No.
14      Q.  Does RealTime Laboratories have any
15  certifications from the American Industrial Hygiene
16  Association?
17      A.  I'm not familiar with the certifications, so I
18  can't speak to that.
19      Q.  As director of laboratory operations at
20  RealTime labs, are you generally familiar with the
21  various types of testing that RealTime Laboratories does
22  for different industries?
23      A.  Oh, you mean like all the testing that's
24  done --
25      Q.  Yes?

48 (Pages 186 to 189)

190

1    A.  -- for services?
2    **Q.  Yes.**
3    A.  Yes.
4    **Q.  So, what I'm trying to get a sense of is,**
5    **based on your experience at RealTime labs, could you**
6    **give me your best percentage estimate of the amount of**
7    **testing of clinical samples that RealTime labs does**
8    **versus the amount of environmental samples?**
9    A.  This is a guess, but I would say 80 percent
10   clinical.
11   **Q.  Okay.  Since your time at RealTime**
12   **Laboratories, sir, has RealTime labs ever had its -- its**
13   **air or its lab space monitored for the presence of**
14   **sulfate-reducing bacteria?**
15   A.  No.
16   **Q.  Okay.  What, if any, investigation or testing**
17   **has RealTime labs done during your time there to**
18   **eliminate sulfate-reducing bacteria from its laboratory?**
19   A.  We run negative controls, and if it was in the
20   laboratory, it'll show up in the negative controls.
21   That's PCR, it's -- you know, that's what it does.  It
22   detects things.  So, that's why you have to run your
23   negative controls.  So --
24   **Q.  Okay.  Let me make sure we're communicating.**
25   A.  Okay.

191

1    **Q.  My question relates to the actual air in the**
2   **laboratory and the actual lab space of RealTime**
3   **Laboratories.  The question is:  What, if any,**
4   **investigation or testing has RealTime Laboratories done**
5   **during your time there to just eliminate**
6   **sulfate-reducing bacteria from its laboratory?**
7   A.  There has not been any air sampling, or
8   testing of air sampling in the lab, to my knowledge.
9   **Q.  Okay.  And so, RealTime Laboratories also**
10   **hasn't had any air or lab space monitored during your**
11   **time for the presence of sulfur-reducing bacteria?**
12   A.  That's true.  However, all testing is
13   separate.  We have a clean extraction room separate from
14   where the drywall is kept.  We have a clean PCR room
15   separate from where the extraction takes place.
16   Everything is separated in clean rooms that are bleached
17   down every day.  And that's a requirement, clinically,
18   as well.
19   **Q.  Okay.  So, has RealTime Laboratories done any**
20   **testing during your time there to confirm that either**
21   **sulfate-reducing bacteria or sulfur-reducing bacteria or**
22   **sulfur-oxidizing bacteria are not present in its**
23   **laboratory?**
24   A.  Not specifically, for the way you're putting
25   it, no.  But controls are put in place to protect

192

1    contamination issues.
2    **Q.  Has RealTime Laboratories, during your time**
3   **there, ever had its air or lab space monitored for**
4   **Hydrogen Sulfide in the air?**
5   A.  No.
6    MR. LANDSKRONER:  Objection.
7   BY MR. AYALA:
8    **Q.  And during your time there, has RealTime**
9   **Laboratories had its air monitored for any**
10   **reduced-sulfur gas in the air?**
11   A.  No.
12   **Q.  Okay.  All right.  I have no further**
13   **questions, but just two things I need to say for the**
14   **record.**
15    MR. AYALA:  For the sake of efficiency,
16   I've asked questions about Mr. Sutton's Brucker report
17   dated January 17, 2012.  Of course, National Gypsum has
18   a pending motion to strike that report and other reports
19   stemming from it.
20    And so for the sake of efficiency, I've
21   questioned Mr. Sutton about the report, but I've done so
22   without any intention of prejudicing National Gypsum's
23   pending motion to strike the report, as untimely, for
24   the reasons stated in the motion.  And I have a
25   continuing objection to the report and any evidence that

193

1    purports to rely on it.
2    In addition, in a good-faith effort to
3   minimize the litigation costs and voluntarily coordinate
4   discovery, I have questioned Mr. Sutton in this
5   deposition about his testing methods and results
6   pertaining to drywall in five separate homes.  But, I am
7   expressly reserving National Gypsum's right to object to
8   the admissibility of evidence generated today as it
9   relates to any particular plaintiff's claim.  Okay.
10    MR. WARWICK:  Okay.
11    MR. LANDSKRONER:  We have a couple of
12   questions to ask now.
13    EXAMINATION
14   BY MR. WARWICK:
15   **Q.  Mr. Sutton --**
16    MR. WARWICK:  Does it matter which
17   microphone we pick up?
18    THE VIDEOGRAPHER:  No.  Just --
19    MR. AYALA:  I want my own.
20   BY MR. WARWICK:
21   **Q.  Mr. Sutton, we've talked about four types of**
22   **tests today.  We talked about the culture test, the**
23   **enzyme test, the DNA test, and corrosion test, right?**
24   A.  Correct.
25   **Q.  Is there a reason that, earlier this morning**

49 (Pages 190 to 193)

194

1  you were asked a question about live DNA versus dead
2  DNA?
3      A. Yes.
4      Q. And you started to answer about how you know
5  that there is live DNA present because of the four tests
6  combined. Could you follow up on that answer?
7      A. Yes. One, the cultures are growing. And we
8  run controls, we -- have acquired the Sulfobacillus
9  thermosulfidooxidans control, the ST -- sorry -- we
10  acquired ST from ATCC. We have used that as a positive
11  control and grown it up -- and -- in combination with
12  the samples in this case. And those -- that material is
13  processed all the way through DNA. And the DNA system
14  that we use is specific for the organism that we're
15  testing for and we are detecting it, not only in the
16  ATCC that we grow up in the culture, but we're also
17  detecting it in the samples from the homes.
18      If it didn't grow, we wouldn't detect it, if
19  it wasn't present. It's growing in the culture. We
20  also use the other tests, the corrosion tests and the
21  enzyme tests to show that there's live organisms in
22  there. So, all of these tests support the DNA results
23  and...
24      Q. And so, let's talk for a minute about the
25  culture tests. Have you personally conducted the test

195

1  yourself, or witnessed someone else conducting it at
2  RTL?
3      A. I have done both, yes.
4      Q. And you mentioned earlier, is the method used
5  for the culture test common in the industry?
6      A. The method used for culture?
7      MR. AYALA: Objection to form.
8  BY MR. WARWICK:
9      Q. At RealTime labs?
10      A. Yes.
11      Q. You mentioned earlier that RealTime
12  Laboratories does about 80 percent --
13      A. Clinical.
14      Q. -- clinical. Is the methodology used for the
15  drywall testing for culture the same as you use in the
16  clinical side?
17      A. Similar for when we grow up molds and things
18  like -- I mean, it's basically growing up an organism.
19  And we use those as controls in our clinical tests, yes.
20      Q. Okay. And so, the methods you use --
21      A. Exactly.
22      Q. -- you're obviously you're looking for a
23  different --
24      A. Exactly.
25      Q. And, who are some of the clients that RealTime

196

1  Laboratories uses on the clinical side or has?
2      A. Physicians?
3      Q. Yes. Not specific ones, but just the types.
4  Physicians are one, so the doctors hire you?
5      A. Well, we have infectious disease physicians,
6  we have allergy physicians. I mean, it's just -- I
7  mean, I think we even have opthalmologists that use
8  clinical services.
9      Q. Okay. Do some of those clinical services use
10  DNA of RealTime Laboratories?
11      A. Yes.
12      Q. And, would those procedures be similar to the
13  procedures developed by RealTime labs to test drywall?
14      MR. AYALA: Objection to form.
15      THE WITNESS: The procedures are
16  identical, the targets are different.
17  BY MR. WARWICK:
18      Q. When you say "the targets are different," what
19  exactly do you mean?
20      A. In the case of the clinical samples, we're
21  looking for -- for instance, one of our targets is
22  Aspergillus Niger. So, we're looking for that
23  particular organism. For the sulfur-oxidizing and
24  reducing bacteria, we're looking for ST. But how you
25  get that, be it extraction in the PCR, it's the same

197

1  methodology and you will find this methodology used in
2  other labs in all the industries: clinical,
3  pharmaceutical, and biotech.
4      Q. Okay. And the doctors and physicians that you
5  do work for in RealTime labs and hospitals they work
6  for, they rely on those test results from RealTime labs
7  regularly?
8      A. Yes.
9      Q. You mentioned that there are, specifically, in
10  the culture test, you mentioned earlier today that there
11  are positive controls for the culture test. And you
12  also mentioned that there are two different types of
13  culture tests, the culture test for the paper and the
14  culture test for the gypsum?
15      A. Correct.
16      Q. Do you have a recollection personally of --
17  out of these five homes for these five people, whether
18  any of those ever came up positive for a culture test on
19  the paper?
20      A. I have no recollection for that specifically,
21  no.
22      Q. Okay. I mean -- one way or another?
23      A. I don't recall -- I don't recall anything
24  coming up. My recollection is most of these -- or all
25  of these came up for core. Like I said, the data is --

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

198

1  it exists, so that is something that could be looked at.
2      Q.  Okay.  How is the data kept or maintained back
3  at the office?
4      A.  It's basically, a positive is noted for
5  whatever culture the positive was in.
6      Q.  I mean, what kind of form is it on?  Is it in
7  a book or is it written -- put in a computer?  How is
8  that data collected.
9      A.  It's written in a form, yes.
10     Q.  Okay.  So there would be data for both the
11  paper and the gypsum?
12         MR. AYALA:  Objection.
13         THE WITNESS:  Yes.
14  BY MR. WARWICK:
15     Q.  Yes?
16     A.  Yes.
17     Q.  And when you said there are positive controls
18  run, could you explain that process --
19         MR. AYALA:  Objection.
20  BY MR. WARWICK:
21     Q.  -- for when positive controls are run on the
22  culture test!  Let's start with gypsum, just walk us
23  through that process?
24     A.  Okay.  There are a couple of positive
25  controls.  We will use drywall that we know has

199

1  previously been contaminated.  So, it's something that
2  we've tested prior.  So, that'll be one way that we do a
3  positive control.  And, in addition to that, we have
4  ATCC-purchased organism as a positive control.
5         And then, in addition to that, we have a
6  negative control.  A negative control goes to show that
7  the media is fine, there is no contamination.  When we
8  look at these, we want to see that there is no growth in
9  the media on the negative control.
10        And then on the positive controls, of course,
11  we're looking to see that there is growth as described
12  in the report.
13     Q.  Okay.
14     A.  Those -- those controls follow the sample
15  through the DNA process as well.  They're also run in
16  combination with the DNA.
17     Q.  Okay.  And are those controls run for each
18  sample or sample set?
19     A.  Yeah.
20     Q.  So, there is two --
21     A.  Yeah.  So, say, what would happen, say, this
22  is just a for instance, but say there was five drywalls
23  that we were going to set up culture on.  We would set
24  up the five cultures; we would set up a positive
25  control, a negative control, and then all of that would

200

1  be processed through DNA together.
2      Q.  Okay.  So, for each group -- now, would that
3  be per house or per set you're sampling that day?
4      A.  It would be whatever we happen to sample that
5  day, that would be a positive control for --
6      Q.  Okay.
7      A.  So --
8      Q.  And all those reports being that the bad
9  drywall positive control, the ATCC positive control, the
10  negative control and then the sample results will all
11  have been --
12     A.  Processed through DNA.
13     Q.  -- processed and written down somewhere?
14     A.  Exactly.
15     Q.  And that's back at RealTime labs?
16     A.  Yes.  And then it --
17     Q.  And who has -- don't interrupt me so she can
18  get both of us.
19     A.  Okay.
20     Q.  Who has possession of those documents back at
21  RealTime labs?
22     A.  They're just at RealTime laboratory.  I mean,
23  it's at the offices.
24     Q.  Like in the file cabinet somewhere?
25     A.  Yeah, exactly.

201

1      Q.  Okay.  The second part of the report that
2  talks about testing that we talked about here, and I
3  think it's Exhibits C through H -- is that right? -- the
4  second test that the report talks about is corrosion
5  testing?
6      A.  Yes.
7      Q.  Okay.  Have you personally conducted either a
8  corrosion test or witnessed someone else conduct a
9  corrosions test?
10     A.  I have witnessed it.  I've never personally
11  conducted it.
12     Q.  Okay.  Are you familiar with the method that
13  they use to conduct the test?
14     A.  Yes.
15     Q.  Okay.  Are there any positive or negative
16  controls run on the corrosion test in RealTime
17  Laboratories?
18         MR. AYALA:  Objection.
19         THE WITNESS:  Yes.
20  BY MR. WARWICK:
21     Q.  Okay.  Could you explain the process for the
22  positive control?
23     A.  Basically, we use contaminated drywall that's
24  been proven to be contaminated through previous
25  experiments for the positive control.

51 (Pages 198 to 201)

202

1     And then for the negative control we use
2  uncontaminated drywall. We use the same copper in both
3  in the water -- the sterilized water, and process it
4  with the actual live samples from people who we're
5  contracting with.
6     **Q. Okay. And so, that, in order to, to make sure**
7  **that your test methods are accurate, if I understand you**
8  **correctly, each time you test for the -- you perform the**
9  **corrosion test, does the positive piece of copper wire**
10 **in the positive control baggy, does it turn black?**
11    A. Yes.
12        MR. AYALA: Objection.
13 BY MR. WARWICK:
14    **Q. And you run that control each time you do the**
15 **test, you didn't just run it one time --**
16    A. Yes.
17    **Q. -- and then be done with it? Which is it?**
18    A. Each time.
19    **Q. You also mentioned that there were negative**
20 **controls run. What do you use for a negative control,**
21 **just the -- just the clean drywall?**
22    A. Just the clean drywall board or the crushed
23 drywall.
24    **Q. And do you know whether the corrosion test is**
25 **done on paper or just gypsum?**

203

1     A. I believe it's just the core.
2     **Q. We're going to walk through the controls used**
3  **on the DNA samples, as well. What are the positive**
4  **controls that you use when you run a set of drywall**
5  **samples for the DNA tests?**
6         MR. AYALA: Objection.
7         THE WITNESS: Okay. We use positive
8  controls from the culture, and we use a negative control
9  from the culture that was processed with the samples.
10 So, that's two samples that are run.
11 BY MR. WARWICK:
12    **Q. Okay. Start back further in the process.**
13 **When you first start to test the drywall for DNA, when**
14 **you say negative cultures, so, that means you take the**
15 **set --**
16    A. Yes, so basically -- okay.
17    **Q. -- run through that. Thanks.**
18    A. Yeah. We take the samples that I just
19 referred to, the positive control and the negative
20 control, and the samples that we're processing. We
21 perform the extraction procedure. During the extraction
22 procedure we introduce an internal control to all of the
23 samples.
24    **Q. Okay. Stop right there. So, what is the**
25 **extraction process?**

204

1     A. The extraction process is a modified Quiagen
2  extraction.
3     **Q. In English.**
4     A. Quiagen is a company that does extraction kits
5  and it's common in most laboratories. We do a
6  pre-liasys before, so it's -- basically these organisms
7  have an extremely thick cell wall. So, you have to do a
8  pretreatment. So, the pretreatment is treatment with
9  liasys enzyme, B-beading, and then, at that point, after
10 you go through those steps -- and also we added in an
11 internal control. I said that before.
12    **Q. What is an internal control?**
13    A. Geotrichum, or Geo for short.
14    **Q. What's the purpose for that?**
15    A. It's basically to show that the extraction
16 works. So, in the end, when you take it all the way
17 through PCR, it shows that a negative is truly a
18 negative, because there was no issue with the extraction
19 all the way through.
20    **Q. You mentioned earlier today that you**
21 **intentionally pick a --**
22    A. Organism.
23    **Q. -- organism that is different from the**
24 **organism you're testing for so that you don't get a**
25 **false positive; is that right?**

205

1     A. Exactly. Exactly.
2     **Q. And so, that's why you chose -- what is that**
3  **called?**
4     A. Geotrichum. But we call it Geo, for short, in
5  the lab.
6     **Q. Okay. Because it's a different and easily to**
7  **distinguish -- easily distinguished from the**
8  **sulfur-oxidizing or sulfur-reducing.**
9     A. Exactly. And we have a RealTime PCR assay
10 specific to that target.
11    **Q. Okay. And is that process of the controls,**
12 **both positive and negative from the cultures, is that**
13 **something you use on the clinical side, as well?**
14    A. Yes.
15    **Q. Same methodology?**
16    A. Yes.
17    **Q. And that methodology is accepted by doctors**
18 **and physicians that you work for?**
19    A. Yes. So, to continue with your question on
20 the --
21    **Q. Yeah.**
22    A. So, we do the pretreatment, we do the Quiagen
23 extraction, and at the end of the Quiagen extraction,
24 you have DNA, purified DNA for the positive control,
25 negative control and whatever samples. All of those

52 (Pages 202 to 205)

206

1 also have the Geo in them, as well, and that's been
2 extracted at the same time. Those samples are taken to
3 run RealTime PCR on them. RealTime PCR also has
4 additional controls on top of that. These are what are
5 referred to as "PCR assay controls."
6     Q. Okay.
7     A. They are purchased DNA for whatever target
8 that we're running.
9     Q. Okay. Could you explain what you mean by
10 that --
11     A. So --
12     Q. -- purchased from who and how does it work?
13     A. So, Sulfobacillus we purchase from ATCC. We
14 have that in the PCR room as one of our positive
15 controls, DNA, all ready DNA. So, it's a control that
16 doesn't have to go through the extraction process, I
17 guess, is the best way to put it.
18     So, in the end, when you run your assay, you
19 have your samples, you have a positive assay control,
20 which is the ATCC DNA that you run, that should --
21     Q. Okay. Let me just say, let's say -- I'm just
22 trying to get a total here -- so, you're running, let's
23 say, for this day you're running three samples, okay?
24     A. Okay.
25     Q. Okay. So, that would be three samples that

207

1 you're looking for the DNA in --
2     A. Yes.
3     Q. -- right?
4     A. Yes.
5     Q. And then what else do you have besides the
6 first three samples? Take me through --
7     A. You have a positive assay control which is the
8 DNA that I just discussed.
9     Q. Okay. And then?
10     A. And you have a positive culture control. You
11 have a negative culture control. And you have a
12 no-template control. And let me just explain what a
13 no-template control is: A no-template control is a
14 reaction where you just run the PCR reagents. You don't
15 introduce any DNA at all.
16     Q. What's the purpose of doing that?
17     A. To show that there is no contamination in the
18 DNA reagents -- I mean, in the PCR reagents.
19     Q. Okay. So, if some bacteria floated through
20 the air and contaminated the lab itself, it would show
21 up in that?
22     A. Exactly.
23     MR. AYALA: Objection to form.
24 BY MR. WARWICK:
25     Q. So that would be -- on three samples, that

208

1 would require you to have three samples, one, two,
2 three, and four additional control.
3     A. Yeah. And then we also run a separate assay
4 for Geo. And the Geo -- let's say that one of the
5 drywall samples that we ran is negative. Well, you
6 could ask, is it negative because there was some
7 inhibition upstream or some issue with the extraction,
8 was there no DNA there.
9     Q. Right. Meaning that if it came up for the Geo
10 as well, it would mean --
11     A. You would have to start over, re-do the
12 process.
13     Q. And, would that Geo then, searching for the
14 Geo DNA -- what do -- do you have to do that on all
15 three, four, five, six -- seven of the prior?
16     A. You do -- you do the Geo run on the actual
17 home samples or the core samples.
18     Q. Okay.
19     A. And then did -- you also run its positive
20 controls, and positive and negative controls.
21     Q. Okay. So, that would be, just so I'm clear,
22 that would be another, the Geo would cause you to do
23 another full seven? Which would be the three samples,
24 plus you do the Geo through all the other positives and
25 negative controls as well?

209

1     A. Yes, exactly.
2     MR. AYALA: Objection.
3 BY MR. WARWICK:
4     Q. So, of that, that would be a total of 14 --
5     A. Roughly, I have lost count.
6     Q. Point taken, being that -- I have three from
7 the samples themselves, from the homes?
8     A. Uh-huh.
9     Q. And then you would have a positive DNA, a
10 positive culture, a negative culture, a no-template, and
11 then you have -- and that's 7 --
12     A. Okay.
13     Q. -- and then you have a whole another set of
14 them for the Geo?
15     A. Geo, yes. Okay.
16     MR. AYALA: Objection.
17 BY MR. WARWICK:
18     Q. So, of those 14 results, only three of them
19 that pertain to the actual samples for the ST bacteria
20 you are looking for would be relevant, correct?
21     A. Yes --
22     MR. AYALA: Objection.
23     A. -- exactly.
24 BY MR. WARWICK:
25     Q. Would it be confusing to have on the report

53 (Pages 206 to 209)

210

1    all of those different samples --
2            MR. AYALA: Objection.
3    BY MR. WARWICK:
4        Q. -- or different controls listed separately?
5        A. It's, it's not typical, the report results.
6            MR. AYALA: Objection.
7        I mean the controls.
8        Q. Is that why --
9        A. The way that these are controlled is a
10   requirement, clinically.
11       Q. Right. But I'm just explaining -- trying to
12   explain why all those many controls are not separately
13   listed on your report page for the results or the
14   results page.
15           MR. AYALA: Objection.
16           THE WITNESS: I mean, we can't report it
17   if they're not in, so --
18   BY MR. WARWICK:
19       Q. Right. And if you did get a negative, you
20   would either do what?
21           MR. AYALA: Objection.
22   BY MR. WARWICK:
23       Q. Meaning, if one of your controls did not
24   return results as planned?
25       A. We would repeat the run.

211

1        Q. Okay. Earlier this morning, since we're on
2    the DNA, briefly we talked about that you actually did
3    some of the testing in the Brinku home early on or from
4    the Brinku home?
5        A. Uh-huh.
6        Q. Before you became an employee of RealTime
7    labs. Do you remember that?
8        A. Yes. I only found out it was the Brinku stuff
9    later on, but --
10       Q. Okay. And at that time, had you performed
11   many assays on American drywall?
12       A. We were in the process of developing the assay
13   and we had gotten to the point where the assay was
14   efficient and had been validated and so those were some
15   samples that we ran after it was validated. And those
16   were all from drywall extractions, extracted directly
17   from drywall.
18       Q. That's what I was going to ask you. Can you
19   tells us about the process? When you say we "extracted
20   that directly from the drywall," what exactly was that
21   process that you went through?
22           MR. AYALA: Objection.
23           THE WITNESS: Basically, the process,
24   just in a nutshell, is you take drywall and a 50 mil
25   conical tube, and you mix it with PBS.

212

1    BY MR. WARWICK:
2        Q. What's PBS?
3        A. Phosphated buffered -- I can't remember.
4        Q. What's its purpose?
5        A. It's just a buffer. It's something that's
6    common in labs to dilute in and that sort of thing.
7    Phosphate buffer solution -- solution, I believe, or
8    something like that.
9        Q. Okay.
10       A. Anyway, we -- basically we would agitate it,
11   and then we would take samples of that and process that
12   through the pre-extraction, very similar to what I just
13   described with the liasys enzyme and all that kind of
14   stuff. And we would -- we would actually migrate
15   multiples of that through the pre-extraction, which is
16   liasys enzyme, B-beading and what have you. And then
17   all of those samples would actually be introduced to the
18   Quiagen column and then processed down to DNA.
19       So basically we started with a lot of material
20   and then brought it down into a little column and then
21   concentrate it down to DNA. And that's what we got our
22   original results on. And that is in our standard
23   operating procedures today, that process, if we chose to
24   do it.
25       What we found was when we did the same drywall

213

1    with culture, we got the same result and didn't have to
2    do 15 of these things down to one. So it was more of a
3    processing solution.
4        Q. Okay. But you didn't -- how many times did
5    you perform the test before you decided that it was just
6    as accurate to use cultures?
7            MR. AYALA: Objection.
8            THE WITNESS: I don't recall how many
9    times but it would have been quite a few. I don't
10   recall.
11   BY MR. WARWICK:
12       Q. It was more than a couple?
13           MR. AYALA: Objection.
14           THE WITNESS: Oh, yeah. Yeah.
15   BY MR. WARWICK:
16       Q. Okay. Are there other methods of testing for
17   DNA that also use a culture to test for the DNA rather
18   than test the material directly? Is that common in the
19   industry?
20           MR. AYALA: Objection.
21           THE WITNESS: Yeah, it's real common.
22   Common.
23   BY MR. WARWICK:
24       Q. Is it common in the clinical setting?
25       A. Yes.

54 (Pages 210 to 213)

214

1      MR. AYALA: Objection.
2  BY MR. WARWICK:
3      Q.  Are there clinical testing that RealTime labs
4  does that uses a culture to search for DNA?
5      MR. AYALA: Objection.
6      THE WITNESS: We do spore cultures, yeah.
7  BY MR. WARWICK:
8      Q.  Okay.  And those are accepted by the
9  physicians that you do work for?
10     A.  Uh-huh.
11     Q.  Let's talk about the enzyme testing that
12 RealTime labs does in your reports.  Have you personally
13 conducted the enzyme test or witnessed others conducting
14 that test?
15     A.  I've witnessed and performed it.
16     Q.  And does RealTime labs test the paper for the
17 enzyme test or the gypsum or both?
18     A.  Both, for that.
19     Q.  And they test them separately?
20     A.  No, for the enzyme test, it's together.
21     Q.  Okay.  Walk me through that process of how
22 they -- of how it's tested together.  Do they separate
23 the materials first?
24     A.  No.  They, basically, you have the core media
25 and you have the paper media.  The original starting

215

1  sample amount, I believe, is 10 mils, so you take five
2  from each, five mils from each, put it in the sample
3  tube and process through the experiment, and, you know,
4  record the results on the card.  And the cards are all
5  retained and the quantity is circled on the cards.
6      Q.  Okay.  So, let's go through that.  Where are
7  those retained back at RealTime Laboratories?
8      MR. AYALA: Objection.
9      THE WITNESS: At RealTime, in a file
10 cabinet or something.
11 BY MR. WARWICK:
12     Q.  Okay.  And, when you say "the cards," are you
13 talking about those colored cards?
14     A.  Yes.
15     Q.  And one of those colored cards comes with each
16 test?
17     A.  Yes.
18     Q.  So, each time, a RealTime labs technician
19 would do what with those charts?
20     MR. AYALA: Objection.
21     THE WITNESS: When you're processing a
22 sample, we write the session number at the bottom of the
23 card, and basically, if you're doing multiples of them,
24 they're lined up in front of the thing.  You do the
25 test, and when it comes to the detection, you match it

216

1  up with the color, you circle which color, which amount
2  matches, and that's pretty much the test.
3      Q.  And that test is a timed test, correct?
4      A.  Yes, it is.
5      Q.  And does RealTime labs routinely follow those
6  times?
7      MR. AYALA: Objection.
8      THE WITNESS: Yes, it was monitored at
9  10 minutes based on the temperature logged in the lab.
10 BY MR. WARWICK:
11     Q.  And those -- that information is also kept
12 in --
13     A.  Yeah, we have to keep that for clinical regs.
14     Q.  Okay.  Is that enzyme type testing, is -- is
15 there any testing that RealTime labs does on the
16 clinical side that would be similar to that enzyme type
17 testing?
18     MR. AYALA: Objection.
19     THE WITNESS: Not really.
20 BY MR. WARWICK:
21     Q.  What about any kind of testing on the clinical
22 side that you have to interpret the color?
23     THE WITNESS: Yeah, there --
24     MR. AYALA: Objection.
25     THE WITNESS: -- is Elisa, there's a --

217

1  that's a type of test, but it uses an instrument to
2  detect different colors.  It's not something you do by
3  eye.
4      Q.  Okay.  What about when you have to determine
5  turbidity on the clinical side or black precipitate?
6      MR. AYALA: Objection.
7  BY MR. WARWICK:
8      Q.  Do you do that on the culture?
9      A.  No.
10     Q.  You don't do that?
11     A.  No.
12     Q.  How do you determine a positive -- if you are
13 doing a culture test over on the clinical side?
14     A.  You look for growth and then take that out and
15 process it through the PCR.
16     Q.  Do you know the time when RealTime labs first
17 started using the enzyme test?
18     A.  I really don't.
19     Q.  Were they already using it when you started
20 working there full time?
21     A.  Yes, there were some there.
22     Q.  Do you know whether they were -- were you --
23 do you know which exhibit is the Retana exhibit, the
24 Retana report, off the top of your head?
25     MR. AYALA: D.  Here is the D.

55  (Pages 214 to 217)

218

1    Q. Do you have the D in front of you?
2    A. Yes.
3    Q. Do you know approximately when you began
4  working at RealTime labs?
5    A. It was early May of 2011. I honestly can't
6  remember the exact start date.
7    Q. If you go to the second page of this -- in the
8  "Summary and Conclusions" section of this report for
9  Retana. It says there at the end, the last sentence, it
10 says "Samples from the Retana home were tested using
11 these three parameters."
12   A. Uh-huh.
13   Q. And then, if you go over to the results page,
14 which is Exhibit 9, it lists three parameters. I know
15 you said earlier -- well, first go ahead and check on
16 that, Exhibit 9. Three parameters of Exhibit 9 tests
17 for would be the culture results, the lab corrosion
18 results and the DNA results, correct?
19       MR. AYALA: Objection.
20       THE WITNESS: Yes.
21 BY MR. WARWICK:
22   Q. That could be --
23       MR. AYALA: Objection. Leading.
24 BY MR. WARWICK:
25   Q. Do you know whether the -- test results

219

1  page for the bacteria report, it talks about the date of
2  service of 1-26-11. Last page. It says "Date of
3  Service" is 1-26-11, right?
4    A. Yes.
5    Q. In January of 2011, that was prior to you
6  starting work in May?
7    A. Yes, it was.
8    Q. Okay. So, as you sit here today, can you tell
9  us whether or not RealTime labs was actually performing
10 the enzyme test in January of 2011?
11       MR. AYALA: Objection.
12       THE WITNESS: I don't know.
13 BY MR. WARWICK:
14   Q. Could it be possible --
15       MR. AYALA: Objection. Sorry. I will
16 let you finish.
17 BY MR. WARWICK:
18   Q. -- that the term NA used on that last page
19 could be nonapplicable?
20       MR. AYALA: Objection.
21       THE WITNESS: Yeah, in retrospect.
22       MR. WARWICK: Do you have anything else?
23       MR. LANDSKRONER: No.
24       MR. WARWICK: I don't have any more
25 questions.

220

1       MR. AYALA: Okay. Just -- just a couple
2  of follow-ups.
3       FURTHER EXAMINATION
4  BY MR. AYALA:
5    Q. First, I object to that entire line of
6  questioning regarding positive and negative controls,
7  which were not contained in the expert reports, they
8  were not reported in the expert reports. Those expert
9  reports were due November 18, 2011, more than two months
10 ago. And the same objection applies to the undisclosed
11 reported testing of samples from the Brinku home.
12       With regard to the culture tests that RealTime
13 labs performed on the plaintiffs' drywall, gypsum core
14 samples, RealTime labs performed the gypsum core culture
15 tests at a pH of 7.0, correct?
16   A. Yes. I'm sorry. Yes.
17   Q. And the culture medium that was used for
18 RealTime labs gypsum core culture was a liquid medium,
19 correct?
20   A. That is correct.
21   Q. The culture medium used for the gypsum core
22 culture tests on plaintiffs' samples used a general
23 bacteria nutrient broth; is that correct?
24   A. From the document you showed me earlier, yes.
25   Q. Okay. The gypsum core culture samples that

221

1  were -- strike that.
2       The gypsum core culture testing performed on
3  plaintiffs' drywall, was performed -- was it performed
4  at room temperature?
5    A. Okay. One more time? I'm sorry. I'm sorry.
6    Q. I'll actually rephrase the question. At what
7  temperature was the gypsum core culture media incubated?
8    A. 37 degrees.
9    Q. 37 degrees Celsius, correct?
10   A. Yes. Yes.
11   Q. At what temperature did the DNA testing on
12 plaintiffs' drywall samples occur?
13       MR. WARWICK: Object to form.
14       THE WITNESS: At what temperature did --
15 do what now?
16   Q. Okay. When RealTime Laboratories performed
17 DNA testing on plaintiffs' drywall samples, what was the
18 temperature of the samples?
19   A. The DNA that had been extracted would have
20 been at room temperature when we performed the test.
21 Prior to performing the test, it would have been at
22 minus 20 degrees Celsius.
23   Q. Okay. Now, with regard to Exhibits C through
24 H and particularly the RealTime Laboratories test result
25 pages, none of those pages has your initials on it,

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

222

1  correct?
2      A. I don't know. I don't believe so.
3      Q. Okay.
4      A. I don't know for sure, though.
5      Q. And there is no other indication in Exhibits C
6  through H that you actually carried out any of the four
7  RTL testing methodologies on plaintiffs' drywall
8  samples, correct?
9      A. Based on these reports, yes.
10     Q. Okay. Based -- sitting here today, based on
11 your personal knowledge, apart from the 2010 reported
12 testing on the Brinku samples, were you involved in the
13 testing of any of the -- well, let me ask it this way.
14     Let me just ask -- let me do it like this:
15 Looking at Exhibit C, the Brinku report, Exhibit 5 to
16 the Brinku report, is a report dated November 4th, 2011;
17 did you perform any of the testing that formed the basis
18 of Exhibit 5?
19     A. Sitting here now, I don't know.
20     Q. Okay. And -- okay. With regard to the
21 testing of the Retana home, sitting right now, do
22 you know whether you performed --
23     A. I do not.
24     Q. -- any of the testing? Okay. Do you know
25 whether you performed any of the testing that forms the

223

1  basis of the Ravelo report?
2      A. I don't.
3      Q. Okay. Do you know whether you performed any
4  of the testing that forms the basis of the Nutting
5  report?
6      A. I don't, no.
7      Q. Do you know whether you performed any of the
8  testing that forms the basis of either of the Brucker
9  reports?
10     A. I don't, no.
11     Q. Now, putting aside for the moment DNA testing,
12 when RealTime Laboratories performed culture testing,
13 did any of the culture test results identify
14 Sulfobacillus thermosulfidooxidans in the test results?
15     A. It was confirmed by DNA.
16     Q. Okay. Okay. That's not my question. Putting
17 aside the DNA, okay, if you're just looking at the
18 culture tests --
19     A. But no culture can tell you a specific
20 organism.
21     Q. Okay. That's the answer then.
22     The enzyme testing that RTL performed on
23 plaintiffs' drywall samples, does that enzyme testing
24 permit identification of a particular species of
25 bacteria?

224

1      A. It's designed for SRBs.
2      Q. Okay. Does the enzyme testing results
3  performed on plaintiffs' drywall samples identify any
4  particular species of SRB?
5          MR. LANDSKRONER: Objection.
6          THE WITNESS: No.
7  BY MR. AYALA:
8      Q. Okay. And the enzyme testing results don't
9  identify any particular species of sulfur-oxidizing
10 bacterium either, correct?
11         MR. LANDSKRONER: Objection.
12         THE WITNESS: Not exactly. Not a
13 specific one, no.
14 BY MR. AYALA:
15     Q. Okay. So I need to ask it again so the record
16 is clear: Does the enzyme testing that RealTime
17 Laboratories performed on plaintiffs' drywall samples
18 identify any particular species of sulfur-oxidizing
19 bacteria?
20         MR. LANDSKRONER: Objection.
21         THE WITNESS: The test identifies the
22 presence of APS reductase. That's what the test
23 identifies. That's been related to these organisms that
24 you're talking about. As far as a specific organism,
25 no.

225

1          MR. AYALA: Okay. I have no further
2  questions.
3          MR. LANDSKRONER: Thank you.
4          MR. WARWICK: We're done. We're going to
5  read and sign.
6          THE VIDEOGRAPHER: We're off the record
7  at 4:40 p.m. This is the end of disk 3.
8          (Deposition concluded 4:40 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

226

1
2     STATE OF _____ )
3                             ) :ss
4     COUNTY OF _____ )
5
6
7          I, J.S. SUTTON, the
8     witness herein, having read the foregoing
9     testimony of the pages of this deposition,
10    do hereby certify it to be a true and
11    correct transcript, subject to the
12    corrections, if any, shown on the attached
13    page.
14
15          _____
16              J.S. SUTTON
17
18
19
20    Sworn and subscribed to before
21    me, this        day of
22                , 2012.
23
24    _____
25          Notary Public

227

1     STATE OF TEXAS   )
      COUNTY OF DALLAS )
2
3         I, Susan Eddins Brown, Certified Shorthand Reporter
4     in and for the State of Texas, hereby certify that the
5     foregoing deposition of J.S. SUTTON, was
6     reported stenographically by me at the time and place
7     indicated, said witness having been placed under oath by
8     an officer, and that the deposition is a true record of
9     the testimony given by the witness.
10        I further certify that I am neither counsel for nor
11    related to any party in this cause and am not
12    financially interested in its outcome.
13        Given under my hand on this the 9th, day of
14    February, 2012.
15
16
          _____
17        Susan Eddins Brown
          Texas CSR 1092
18        Expiration Date: 12-31-13
19        David Feldman Worldwide
          450 Seventh Avenue, Suite 500
20        New York, NY 10123
          212-705-8585
21        Firm Registration No. 521
22
23
24
25

228

1                INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over carefully
4     and make any necessary corrections. You should state
5     the reason in the appropriate space on the errata
6     sheet for any corrections that are made.
7         After doing so, please sign the errata sheet
8     and date it.
9         You are signing same subject to the changes
10    you have noted on the errata sheet, which will be
11    attached to your deposition.
12        It is imperative that you return the original
13    errata sheet to the deposing attorney within thirty
14    (30) days of receipt of the deposition transcript by
15    you. If you fail to do so, the deposition transcript
16    may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

229

1                     E R R A T A
2
3
4
5         I wish to make the following changes,
6     for the following reasons:
7
8     PAGE LINE
9     ___ ___ CHANGE:_____
10    REASON:_____
11    ___ ___ CHANGE:_____
12    REASON:_____
13    ___ ___ CHANGE:_____
14    REASON:_____
15    ___ ___ CHANGE:_____
16    REASON:_____
17    ___ ___ CHANGE:_____
18    REASON:_____
19    ___ ___ CHANGE:_____
20    REASON:_____
21
22    _____   _____
23    WITNESS' SIGNATURE          DATE
24
25

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585