1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

FT. MYERS DIVISION

-----------------------------------------------
CHRIS BRUCKER, TREVER S. NUTTING,
XIOMARA RAVELO, WILFREDO E. RETANA
and BEATRIX CELSA RETANA, individually,
and on behalf of all others
similarly situated,


          Plaintiffs,

                                        CASE ACTION NO.
vs.                                 2:10-cv-00405-FtM-29SPC

LOWES HOME CENTERS, INC., a North Carolina
Corporation, and NATIONAL GYPSUM COMANY,
a Delaware Corporation,


          Defendants.
-----------------------------------------------

VIDEOTAPED DEPOSITION OF:

Mark Williams

February 16, 2012

9:10 a.m.

Quarles & Brady, LLP
1395 Panther Lane
Naples, FL



Reported By:
Lori L. Bundy, FPR, RPR, CRR, CLR
Job No: 23672

**2**

```
1   APPEARANCES:
2      For the Plaintiff:
3         Leopold-Kuvin, P.A.
4         2925 PGA Boulevard, Suite 200
5         Palm Beach Gardens, FL  33410
6         (561) 515-1400
7         BY:  GREGORY S. WEISS, ESQ.
8            gweiss@leopold-law.com
9
10     For the Defendant National Gypsum:
11        Morgan, Lewis & Bockius, LLP
12        1701 Market Street
13        Philadelphia, PA  19103-2921
14        (215) 963-5668
15        BY:  THOMAS SULLIVAN, ESQ.
16            tsullivan@morganlewis.com
17        CAROLYN F. YEN, ESQ.
18            carolyn.yen@morganlewis.com
19
20     Videographer:      KEVIN BUNDY, CLVS
21
22
23
24
25
```

**3**

```
1              I N D E X
2   WITNESS:                      PAGE:
3   MARK WILLIAMS
    DIRECT EXAMINATION              6
4   BY MR. SULLIVAN:
    CROSS-EXAMINATION            157
5   BY MR. WEISS:
    REDIRECT EXAMINATION         162
6   BY MR. SULLIVAN:
7
8              E X H I B I T S
9              - - -
10            Description           Page
11  Defendants'    Notice of deposition    6
    Exhibit 1
12  Defendants'    Chart                8
    Exhibit 2
13  Defendants'    Revised version of the chart  8
    Exhibit 3
14  Defendants'    Revised projected cost    9
    Exhibit 4      summary
15  Defendants'    Rate schedules for 2012  12
    Exhibit 5
16  Defendants'    Expert report        22
    Exhibit 6
17  Defendants'    Working file of deponent  28
    Exhibit 7
18  Defendants'    Article              49
    Exhibit 8
19  Defendants'    Florida professional   139
    Exhibit 9      coalition for Chinese
                   (reactive) drywall
20  Defendants'    Imported problematic drywall  142
    Exhibit 10     identification strategies and
21                 remediation guidelines
22  Defendants'    Summary of identification  148
    Exhibit 11     guidance for homes with
23                 corrosive from problem
                   drywall, (March 2011)
24
25
```

**4**

```
1   (EXHIBITS
    CONTINUED)
2
3   Defendants'    Summary of identification  148
    Exhibit 12     guidance for homes with
4                  corrosive from problem
                   drywall (September 2011)
5   Defendants'    Derelle estimate       157
    Exhibit 13
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
1        VIDEOGRAPHER:  My name is Kevin Bundy of David
2   Feldman Worldwide.  The date today is February 16th,
3   2012, and the time is approximately 9:10 a.m.  This
4   deposition is being held at the office of Quarles &
5   Brady located at 1395 Panther Lane, Naples, Florida
6   34109.
7        The caption of the case is Chris Brucker, et al.
8   Versus Lowes Home Centers, et al., in the United
9   States District Court, Middle District of Florida,
10  Fort Myers Division.
11       The name of the witness is Mark Williams.
12       At this time the attorneys will identify
13  themselves and the parties they represent, after which
14  our court reporter, Lori Bundy of David Feldman
15  Worldwide, will swear in the witness and we can
16  proceed.
17       MR. WEISS:  Greg Weiss on behalf of the
18  Plaintiffs.
19       MR. SULLIVAN:  Tom Sullivan with Morgan Lewis on
20  behalf of defendant National Gypsum Company.
21  THEREUPON,
22            MARK WILLIAMS,
23  a witness, having been first duly sworn, upon his oath,
24  testified as follows:
25       THE WITNESS:  I do.
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

6

1      DIRECT EXAMINATION
2  BY MR. SULLIVAN:
3      Q.  Good morning, Mr. Williams.
4      A.  Good morning.
5      Q.  Mr. Williams, I have marked as Exhibit 1 a notice
6  of your deposition in this matter.
7          (Defendants' Exhibit 1, Notice of deposition,
8          was marked for identification.)
9  BY MR. SULLIVAN:
10      Q.  Just for the record.
11          Mr. Williams, how many times have you been
12  deposed before?
13      A.  About 110, something like that.
14      Q.  Okay.  So you're very familiar with the process
15  then?
16      A.  I am.
17      Q.  Are there -- is there any reason that you're not
18  able to give me complete answers to my questions today?
19      A.  Well, some of the projects that I have worked on
20  include confidentiality statements, so depending on your
21  question, I may not be able to answer it as completely as
22  you would like.  But I'll certainly endeavor to answer it
23  as fully as possible.
24      Q.  Okay.  But there are no other reasons that you
25  can think of?

7

1      A.  No.
2      Q.  Okay.  Mr. Williams, your original report
3  contained a chart regarding projected costs.
4          Do you recall that?
5      A.  Yes.
6      Q.  And that chart was blank; correct?
7      A.  Largely.  I mean --
8      Q.  Let me rephrase the question.  There are no
9  damages numbers or no number -- dollar figures that
10  corresponded to any of the items in that chart?
11      A.  Correct.
12      Q.  Correct?
13          And that was the chart that you submitted with
14  your report; correct?
15      A.  Yes, my November report.
16      Q.  Okay.  And at some point -- last night we
17  received, at about 7:00, a chart that contained dollar
18  figures?
19      A.  Yes.
20      Q.  For those items.
21          At what point in time did you receive the
22  information that was ultimately included in the chart that
23  we received last night?
24      A.  Well, it began with my examining the property on
25  Monday and then working on all those numbers for the

8

1  balance of Monday, Tuesday and Wednesday, until late
2  yesterday afternoon.
3      Q.  Okay.  So I'm going to mark -- I've marked as
4  Exhibit 2 the chart that we received last night.
5      A.  Okay.
6          (Defendants' Exhibit 2, Chart, was marked for
7          identification.)
8  BY MR. SULLIVAN:
9      Q.  Okay.  I have marked as Exhibit 3 a chart,
10  another chart, version of the chart that you brought with
11  you this morning.
12      A.  Yes.
13      Q.  Okay.
14          (Defendants' Exhibit 3, Revised version of
15          the chart, was marked for identification.)
16  BY MR. SULLIVAN:
17      Q.  Can you confirm that -- that that's the one you
18  brought?
19      A.  Yes, it's easy to do it because what you're
20  calling Exhibit 3 includes the word "revised" in the
21  header.
22      Q.  Okay.  So we'll call that the revised version.
23  Okay?
24      A.  Yes.
25      Q.  And now there's also another version of the chart

9

1  that includes notations by you; right?  That's what I
2  marked here as Exhibit 4.
3      A.  Yes, it includes -- well, first of all, Exhibit 4
4  is the revised projected cost summary, so it's the same
5  document as Exhibit 3.  However, Exhibit 4 has handwritten
6  notes in the margin, which is -- are my notes, giving
7  certain page references to an estimating guide that was
8  used to prepare this.
9          (Defendants' Exhibit 4, Revised projected
10          cost summary, was marked for identification.)
11  BY MR. SULLIVAN:
12      Q.  Okay.  Can you note for me on Exhibit 3, using --
13  using a pen and just circling the changes, the differences
14  between Exhibit 3 and Exhibit 4?
15      A.  It would take me a few minutes.  It might be
16  faster if I maybe at a break could get you that, but
17  there's ten items that I found late yesterday afternoon
18  that had been estimated with the 2011 guide, and actually
19  it should have been with the 2012 guide since that's our
20  calendar year.  And so when I discovered that I basically
21  had those changes made, and they are reflected in
22  Exhibit 3 and 4.
23      Q.  Okay.  How did you -- how did it come about that
24  you realized there were errors in Exhibit 2?
25      A.  Well, we were, of course, pressured to try to get

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

10

1   it out yesterday, and so the review process for me hadn't
2   been fully completed.  And it was late in the afternoon
3   when the person who had been helping me on this
4   assignment, her name is Laura Lefler, came to me and said
5   she realized that some of the numbers that had been put
6   into the chart, which is Exhibit 2, were, in fact, from
7   the 2011 guide, not from the 2012.
8        And so I debated whether to just let it go as it
9   was or not, and so I asked that -- decided it was prudent
10  to try and get the changes in, so Laura basically made
11  those revisions.
12     **Q.  Okay.  And you hadn't been to the property to**
13  **perform the analysis that informs the dollar figures in**
14  **these charts until Monday, you said?**
15     A.  Correct.
16     **Q.  And that's -- and you served your report -- your**
17  **report was initially prepared in, what, November?**
18     A.  Yes.
19     **Q.  Okay.**
20     A.  The one without the analysis, without the
21  numbers.  It was just showing a procedural direction for
22  essentially establishing cost.
23     **Q.  Is that what you refer to your report, that's the**
24  **tool that you -- you described?**
25     A.  Yes.

11

1     **Q.  All right.  You can put those aside for a minute.**
2     **When were you -- when were you retained by**
3  **Plaintiffs' counsel in this matter, Mr. Williams?**
4     A.  Sometime in the fall, late fall.
5     **Q.  Approximately how long before the time you**
6  **prepared your report was it?**
7     A.  Not much, a few weeks, probably.
8     **Q.  Did you ask to go out and -- look at the**
9  **property at that time?**
10     A.  No.  What I understood the first step, which was
11  what I did for the November report, was to offer an
12  overall approach as opposed to a specific costing for one
13  or more than one dwelling.
14     **Q.  When you say an overall approach, an overall**
15  **approach to what?**
16     A.  How we would assemble information to establish a
17  project cost for repair.
18     **Q.  Okay.  And there's nothing that would have**
19  **prevented you at that point from looking at the property**
20  **and developing actual cost figures; correct?**
21     A.  Not that I know of.  I didn't ask to do that.  I
22  just was preparing an overview.
23     **Q.  Okay.  I'm going to mark as Exhibit 5 the rate**
24  **schedule.  I think it's also a list of deposition**
25  **testimony.**

12

1        (Defendants' Exhibit 5, Rate schedules for
2    2012, was marked for identification.)
3  BY MR. SULLIVAN:
4     **Q.  Do you recognize this document, Mr. Williams?**
5     A.  Yes.
6     **Q.  And what is it?  What is Exhibit 5?**
7     A.  It's a document that was prepared by my office
8  that basically sets out the rate schedules for 2012, the
9  terms of payment, and other terms for providing the
10  services.  And then appended to the back of that is a list
11  of projects where I have provided testimony to -- for a
12  deposition, arbitration or a trial for the past four
13  years.
14     **Q.  Okay.  And on Exhibit 5 there are different**
15  **dollar amounts there, depending upon, I guess -- who's --**
16  **who's doing what; right?**
17     A.  Correct.
18     **Q.  And are you charging it, I take it, at the**
19  **principal rate of $250 an hour?**
20     A.  Yes.
21     **Q.  Is that the rate that's still in effect right**
22  **now?**
23     A.  Yes.
24     **Q.  Are you also -- is there also somebody providing**
25  **technical support?**

13

1     A.  Yes.
2     **Q.  For 60 to $120 an hour?**
3     A.  Correct.
4     **Q.  And is there somebody providing project support**
5  **as well?**
6     A.  Yes.
7     **Q.  And approximately how much have -- have you**
8  **billed, Mr. Williams, in dollar amount as principal?**
9     A.  Well, I think there's only one bill that's been
10  sent out for the work-to-date, and I think that total bill
11  was 5,000 and some dollars.
12     **Q.  Okay.**
13     A.  So there's certainly going to be further bills
14  for the work that was done this week, but I can't off the
15  top of my head tell you what that is.
16     **Q.  Okay.  Approximately how many hours did you spend**
17  **on it?**
18     A.  All day Monday, probably some good part of
19  Tuesday and Wednesday, and then today.
20     **Q.  Okay.**
21     A.  I'm not sure -- I guess it's a question of who
22  does get billed for today.
23     **Q.  When were you first asked to do the work that you**
24  **started on Monday?**
25     A.  Sometime late last week.

4  (Pages 10 to 13)

14

1     Q.  So you have -- you've submitted an invoice for
2 the work that you -- and I'll call your team -- did on the
3 November report?
4     A.  Yes.
5     Q.  Right?  But you have not submitted an invoice for
6 the work that you did this past week?
7     A.  Correct.
8     Q.  Okay.
9     A.  It's too early, too soon.
10     Q.  Can you give me a ballpark what that amount would
11 be, just based on your hours estimate?
12     A.  Should it include today?  Who pays for today, I
13 guess.
14     Q.  Excluding -- exclude today.
15     A.  Okay.  Probably somewhere between 6 and $8,000.
16     Q.  Okay.  And is your -- is the rate that you charge
17 for testimony also $250 an hour?
18     A.  Yeah, same rate for everything.
19     Q.  Did you work for Mr. -- performed work for
20 Mr. Weiss or Mr. Weiss' firm before?
21     A.  No.
22     Q.  How -- do you have an understanding of how it was
23 that you were first called about this case?
24     A.  Mr. Warwick first contacted me regarding this
25 case.

15

1     Q.  Okay.  Who is Mr. Warwick?  Sorry.
2     A.  He's an attorney.
3     Q.  And did you know -- did you know Mr. Warwick
4 before this?
5     A.  I met him, I think, once.
6     Q.  And how did you meet him?
7     A.  He was aware of some remedial work that our firm
8 was involved with.
9     Q.  When you say remedial work, do you mean the
10 actual work doing the -- I mean, what was your role in
11 that job?
12     A.  I was both the architect of record, as well as
13 the -- what I would call the program manager for carrying
14 that work out.
15     Q.  Okay.  How many times have you met with -- met in
16 person with Plaintiffs' counsel regarding this case?
17     A.  Zero.
18     Q.  How many times have you spoken to them on the
19 phone?
20     A.  Probably three times with Mr. Warwick, going back
21 to late October or November, and I think I have spoken
22 with Mr. Weiss two or three times in the last week.
23     Q.  What did you do, if anything, to prepare for your
24 deposition today?
25     A.  Largely I was preparing the estimate and working

16

1 to basically develop what the cost for the repair would
2 be, so it was mostly focusing on what we have identified
3 as Exhibits 2, 3, and 4.
4     I did skim through and reread my report from last
5 November.  Of course I spent a good deal of time
6 consulting with an estimating guy that we use, so I would
7 say it was mostly related to developing costs to get
8 ready.
9     Q.  Did you -- were there materials that you
10 considered, written materials that you considered in the
11 preparation of your report, or in the preparation of this
12 chart?  I know you mentioned --
13     A.  Yes.
14     Q.  -- the estimator guide.  Were there others?
15     A.  Yes.  I have considered -- excuse me, Judge
16 Fallon's written document that is -- I think he calls it a
17 finding of fact or something like that because that
18 largely lays out a procedure for -- maybe I shouldn't say
19 a procedure, but a scope for what should be done for
20 dealing with these types of problems.
21     Q.  Unless -- unless I missed it, I didn't see any
22 list in your report or citations in your report to
23 materials or documents that you considered.  Am I correct
24 about that?
25     A.  I believe you're correct.

17

1     Q.  And why is that?
2     A.  I guess at the time I didn't think to put it in,
3 if that's something that's important, I'm sure it could be
4 produced.
5     Q.  Okay.  Are you aware that that's required by Rule
6 26?
7     A.  No.
8     Q.  Are you familiar with what Rule 26 is?
9     A.  No.
10     Q.  Are you familiar with requirements regarding
11 the -- strike that.
12     Are you familiar with the rules regarding
13 experts, legal experts?
14     MR. WEISS:  Objection to form.
15     You can answer.
16     THE WITNESS:  To some degree.  It's not something
17 I've made a habit of memorizing, but I know in other
18 projects I've been asked to be sure to include certain
19 documents that I consulted.
20 BY MR. SULLIVAN:
21     Q.  Okay.
22     A.  So I have had that experience in the past, but I
23 think really, as this started last fall, one was I wasn't
24 putting numbers particularly on the project, and, two, I
25 don't really think I was dealing with the exact basis for

5  (Pages 14 to 17)

18

1   how I got to my methodology. I -- I refer to it as my
2   overall experience.
3      **Q. Okay. So when you served your initial report,**
4   **you didn't feel that you had the exact basis, exact**
5   **factual basis that would be required to complete the --**
6   **the chart that was submitted in connection with that**
7   **report; is that correct?**
8      MR. WEISS: Objection to form.
9      You can answer.
10     THE WITNESS: I hadn't visited any properties to
11  basically establish the actual cost, if that's what
12  you're saying. I didn't know what you meant by "exact
13  factual basis," but I hadn't visited the property. I
14  felt frankly, and I still do today, that with a
15  sufficient amount of time we could develop a
16  methodology, so it really wouldn't even be necessary
17  for a person like myself to visit the property, that
18  we can collect this data through a survey sheet. And
19  that was a large part of what I was trying to convey
20  in that November document.
21  BY MR. SULLIVAN:
22    **Q. But you haven't developed such a methodology; am**
23  **I right?**
24     MR. WEISS: Objection to form.
25     THE WITNESS: To the extent that it's described

19

1   in the November report, that's as far as it's gone. I
2   would -- for such a methodology, I would take it
3   further, or in absence of that, go and see the site
4   myself or have someone under my direction see it. So
5   in lieu of trying to develop that document for this
6   particular deposition, I went to see the property
7   myself on Monday.
8   BY MR. SULLIVAN:
9     **Q. And that's presumably you felt that it was**
10  **necessary to go see the site in order to provide the**
11  **relevant factual basis for your conclusions?**
12    A. Yeah, in this particular instance. But I
13  continue to believe that there's a way that a methodology
14  can be established that would not require that to always
15  be done.
16    **Q. Okay. We'll talk a little bit about that later.**
17  **We talked a little bit about -- well, let me ask you this.**
18  **Would you agree that it's important for an expert's report**
19  **to contain the relevant factual information on which an**
20  **expert's conclusions are based?**
21     MR. WEISS: Objection to form.
22     You can answer.
23     THE WITNESS: It depends on exactly what the
24  report is covering. I think, again, when I go back to
25  what the overall objectives were, as I understood

20

1   them, for my report for last November, it was to
2   establish the first portion of what would be done to
3   have a methodology that you could use to collect such
4   data, which would allow you to put pricing on these
5   types of properties without having to go to see every
6   single one.
7   BY MR. SULLIVAN:
8     **Q. But in the Brincku case, I mean, you apparently,**
9  **presumably felt that that methodology would not be**
10  **sufficient because you did go and visit the property on**
11  **Monday; correct?**
12     MR. WEISS: Objection to form.
13     You can answer.
14     THE WITNESS: Yeah, I think where we're kind of
15  missing each other is I do believe that the
16  methodology would have been appropriate for Brincku,
17  if I had had a little more time. But given the fact
18  that I only had a few days to do this prior to today's
19  deposition, I wasn't about to try to develop a
20  methodology and then try to implement it, because I
21  think what you would do as part of that methodology is
22  you would take some test properties and you would
23  develop the methodology, and then as a principal I
24  would oversee that methodology and check to see how
25  it's working, so I wouldn't just kind of throw it out

21

1   there for the first time for a deposition on Thursday.
2   BY MR. SULLIVAN:
3     **Q. Right. So you -- you hadn't done any -- you**
4  **hadn't considered any test properties when you served your**
5  **report in November?**
6    A. Correct.
7    **Q. Correct?**
8    A. Yeah.
9    **Q. So that methodology, you feel you didn't have**
10  **time to develop a -- an appropriate methodology for the**
11  **Brincku case; correct?**
12     MR. WEISS: Objection to form.
13     You can answer.
14     THE WITNESS: Well, again, I think the
15  appropriate methodology has been laid out in my
16  report, but to actually implement the appropriate
17  methodology is going to take a little more than I had
18  in three days, essentially.
19  BY MR. SULLIVAN:
20    **Q. Well, I guess what I'm sort of getting at is this**
21  **is a different methodology now. I mean, you went to the**
22  **Brincko -- Brincku home, you inspected it, you have got**
23  **concrete numbers based on your observations there.**
24    A. Correct.
25    **Q. Correct?**

6 (Pages 18 to 21)

22

1    A.  Yes.

2    Q.  So that's -- that's not consistent with -- am I

3   correct that that's not the same methodology that you were

4   describing in your November report that you think is

5   possible?

6        MR. WEISS:  Objection to form.

7        You can answer.

8        THE WITNESS:  It's a variation on the methodology

9   in that I personally collected the data.  I think with

10   a bit of time I can have this into a form where a

11   homeowner, or someone with some lesser skill than my

12   skill, can collect the same data.  Frankly, it's not

13   rocket science.

14  BY MR. SULLIVAN:

15   Q.  Okay.  But in order to develop that

16  methodology -- well, strike that.

17        The methodology that you describe in your -- in

18  the November report, we'll just mark that now --

19   A.  Okay.

20   Q.  -- so we can refer to it.

21   A.  Okay.

22        (Defendants' Exhibit 6, Expert report, was

23   marked for identification.)

24  BY MR. SULLIVAN:

25   Q.  Mr. Williams, do you recognize what I've marked

23

1   as Exhibit 6 as the report that you served, or that

2   counsel served and you prepared on November 17th, 2011?

3    A.  Yes, this is my report.

4    Q.  Okay.  And how long do you -- you -- you said --

5   let me ask you again, and I apologize if I've asked this

6   already, but how long did you spend preparing this report?

7    A.  I don't remember off the top of my head.  I think

8   that the total invoice for not only my time but time of

9   other people that assisted with it was under $6,000.

10   Q.  Okay.  And can you describe for me just in

11  general terms right now what you were trying to accomplish

12  in this report?

13   A.  Sure.  I think it's pretty well laid out in

14  there.  It says right in the first paragraph:  "The

15  purpose of this activity is to establish a real world

16  procedural frame work, which would enable counsel and

17  homeowners to plan for necessary remediation with the

18  expectation that these procedures could be further

19  expanded to serve as a cost reference guide for such

20  repairs."

21   Q.  Okay.  And I think what I understand that you're

22  -- you're telling me is that you didn't feel that you had

23  sufficient time to appropriately develop the methodology

24  that you're describing in the first paragraph.

25   A.  Well, I wouldn't say it exactly that way.  I

24

1   didn't have sufficient time to basically take it to the

2   next step, implement it, check it, probably check it, you

3   know, the second time, and then be prepared to testify

4   about it for today.

5        The methodology that I used essentially for

6   collecting the data and preparing the estimate is what I

7   would expect this methodology would have.  It's just that

8   you don't want to do that in the three-day period for a

9   deposition.  It's -- it's something that really needs to

10   be carefully developed and checked.

11   Q.  Okay.  Now, in other words, you didn't have the

12  confidence that you could rely on the methodology you're

13  describing in your report, you didn't have the confidence

14  that it would generate -- strike that.

15        That's not a well-phrased question.  Because you

16  didn't have time to do those things that you just

17  described, you weren't confident that the methodology that

18  you're describing in the report would give you reliable

19  numbers for purposes of this case --

20        MR. WEISS:  Objection to form.

21  BY MR. SULLIVAN:

22   Q.  -- the Brincku case; correct?

23        MR. WEISS:  You can answer.

24        THE WITNESS:  What I was not confident about is

25   that I could outline the methodology and implement it

25

1   and check it in the time that I had.  I barely had

2   time to do everything, more or less, myself.  You

3   know, if there had been a little more time in there,

4   yes, I think I could have outlined this further and

5   implemented it.  But when I basically had the

6   discussion late last week that this was something that

7   I should be moving towards for this Thursday, it was

8   very tight time wise to do it.  I wasn't about to be

9   doing something where if I checked it and found that

10   there was a glitch I would be coming today and saying,

11   well, I'm sorry, it's not done.  I had to have it done

12   for today.

13  BY MR. SULLIVAN:

14   Q.  Uh-huh.  But, I mean, tell me why -- why do you

15  feel it was necessary then to go visit the property on

16  Monday?

17   A.  Because then I wouldn't have any chance of

18  missing something in the process.  I saw it with my own

19  eyes, I know what I saw, I could implement that in the

20  estimating process.

21   Q.  Okay.

22   A.  I believe that a procedure can be set up without

23  having to have a principal of a firm do this, but I

24  wouldn't try to do it in a three-day stretch to get that

25  done and then to be able to check the work.

7  (Pages 22 to 25)

26

1    Q.  You just weren't confident that you could
2    accomplish that in this case because this methodology --
3    the methodology wasn't, you know, to appoint where you had
4    sufficient confidence in it; right?
5        MR. WEISS:  Objection to form.
6        THE WITNESS:  Confidence keeps coming up as a
7    word, but it's also checking.  There has to be a means
8    when you're developing something like this that you
9    check your methodology to make sure that it's going to
10   provide you with reliable data, and the best way to
11   have reliable data is to absolutely do it all
12   yourself.  Unfortunately, you know, the world
13   generally doesn't work around one person doing
14   everything themselves, particularly when you have lots
15   of houses involved.
16   BY MR. SULLIVAN:
17       Q.  And you felt the best way to get the reliable
18   data in time for today was actually go look at the
19   property?
20       A.  That's right.
21       Q.  Okay.
22       A.  I think if I had more time, I could have
23   continued to set up the methodology, put it in place,
24   checked it, and then been satisfied.
25       Q.  Okay.  But to give yourself the comfort that you

27

1    wanted, you wanted to go take a look at the property with
2    your own eyes?
3        A.  Correct.
4        Q.  And when you went to the property, what did you
5    do?
6        A.  I spent about four hours there.  I went room by
7    room, recording information and photographing it, and I've
8    got roughly 470 something photographs of conditions on the
9    property.  That's my visual way of taking notes.  It could
10   be handled other ways, which I think is part of what this
11   methodology would consider doing, but it was largely a
12   visual examination of what conditions were there so that I
13   could basically be sure that I was pricing something that
14   would be equivalent to what is there.
15       Q.  Okay.  So you wanted to make sure that the
16   prices, the dollar figures that you put on particular
17   items were consistent with what you observed in the house?
18       A.  Correct.  And a broader picture, I think that can
19   be done through a methodology that is well defined.
20       Q.  And you brought with you today -- this is your
21   file?
22       A.  It is.
23       Q.  -- I take it?  And is that everything that
24   relates to the Brincku case?
25       A.  Yes, yes.

28

1    Q.  Can I take a look at it?
2        A.  Sure.
3        Q.  So it looks like there's a videotape in here, a
4    folder called appliances, one called contact sheets,
5    another folder with -- containing legal documents.  It
6    looks like there's a number of pictures?
7        A.  Right.
8        Q.  And are these blueprints, drawings?
9        A.  Yes, they are.
10       Q.  And this is the 2012 National Renovation and
11   Insurance Repair Estimator?
12       A.  It is.
13       Q.  Can we mark this as Exhibit 7?
14           (Defendants' Exhibit 7, Working file of
15       deponent, was marked for identification.)
16       THE WITNESS:  I think initially Exhibits 3 and 4
17   were in that Redwell as well.
18   BY MR. SULLIVAN:
19       Q.  Okay.  So you looked at blueprints of the Brincku
20   property; right?
21       A.  Yes.
22       Q.  And you took, I think you said, more than 400
23   photos?
24       A.  Yes, they're in there.
25       Q.  Did you walk -- you walked through the house

29

1    yourself, I take it?
2        A.  Yes, in great detail.
3        Q.  And you made a videotape?
4        A.  No, that's something that the -- Mrs. Brincku, I
5    guess it was, gave to me.  That's one of their appliances,
6    and it happens to be a combination of a range and a
7    refrigerator.  I was not particularly familiar with that
8    product, and so she said you can borrow this, this is a
9    videotape about this particular appliance.
10       Q.  Okay.  So you felt in this case that -- I mean,
11   these materials that you reviewed here, that you
12   considered here, were all significant for purposes of
13   developing the numbers that are contained within Exhibits
14   2, 3 and 4?
15       A.  Generally, yes.  I mean, there's probably some
16   extraneous things in there, too, but those are largely the
17   materials I would rely on.
18       Q.  The blueprints were helpful for that purpose?
19       A.  To a degree, yes.  I can do it without
20   blueprints.  We certainly have had other projects where we
21   haven't had any drawings, but if somebody has them it's a
22   nice document to review.
23       Q.  And the photos were important?
24       A.  Yes.
25       Q.  Did you take notes?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

30

1    A.  I took some notes, but the information was
2    transferred, for instance, into one of the documents in
3    there.  For instance, I recorded all the cabinet sizes in
4    the kitchen because I wasn't sure if I was going to price
5    all new cabinets or not for the kitchen, and I used that,
6    my notes then to have another document made in our office
7    which basically summarizes all that information.
8        Q.  So your notes are not in what's been marked as
9    Exhibit 7?  Or they are?
10    A.  They've been transferred to that, so that's --
11    that's the whole file at this point.
12        Q.  And how many pages of notes did you take?
13    A.  I had a couple pages of yellow sheets that
14    basically are recorded on the photographs that are in
15    there of the kitchen, and I had a couple what I would call
16    survey forms, and that information has all been placed in
17    these estimating documents, so these estimating documents
18    essentially supercede these sheets.
19        Q.  I don't see your notes in here.  Maybe you want
20    to take a look and identify them for me.
21    A.  Sure.  Well, I don't see them.  What I was
22    referring to is -- I think it was two pages where
23    dimensions of cabinets were transferred from the field
24    information to photographs that had basically cabinetry
25    shown so that I can refer to the size and the

31

1    configuration of the cabinetry for pricing purposes.
2        Q.  Is it possible to have your office fax those over
3    or e-mail them?
4    A.  Yeah.
5        Q.  And why -- why did you feel it was important to
6    take notes on those issues?
7    A.  Well, there's a -- there's a lot of dimensions
8    involved with cabinetry, and so I basically took notes so
9    I could remember for pricing purposes.
10        Oh, I bet it's in this file sitting here in front
11    of me.  Here we go.
12        Q.  So maybe what we can do, unless there's an issue,
13    maybe you want to put that in --
14    A.  Yeah.  Yeah.
15        Q.  -- in there.  And just let the record -- do you
16    want me to do it?  That way I can do it on the record.
17        Let the record reflect that Exhibit 7 now
18    includes a file called WBD report, which in turn includes
19    Mr. Williams' notes from his inspection and his report and
20    some building inspection report by Mark Cramer services,
21    and an estimate from Derelle, Inc.
22        So, Mr. Williams, it looks like I'm referring to
23    your photos of the kitchen, and the kitchen cabinets.  And
24    these contain -- you have marked these photos up with
25    arrows and included notes about the dimensions of the

32

1    cabinets?
2    A.  Correct, and the types of either doors or
3    drawers.
4        Q.  And where they are in relation to appliances;
5    right?
6    A.  Exactly.
7        Q.  And the size of the appliances?
8    A.  Yes.
9        Q.  Right?  It's true, isn't it, that cabinets are
10    going to be different from house to house; right?
11    A.  Yes, but by doing that type of thing, you can
12    very quickly, or more accurately, get pricing for what's
13    there.  In other words, you don't want to just say this is
14    an overall length of this; you want to say, you know, this
15    is a 30-inch cabinet, this is a 21-inch cabinet, this is a
16    six-inch cabinet, because that's how cabinets are sold.
17        Q.  People have different size appliances in their
18    house; correct?
19    A.  Yeah, they generally fall into certain range, but
20    that is correct.
21        Q.  And that also depends, I know, sometimes on the
22    age of the house?
23    A.  Right.
24        Q.  Right?  Because of the older houses the
25    appliances tend to be older or can be older and smaller?

33

1    A.  Right.
2        Q.  -- than newer construction; right?
3    A.  Within the last ten years they're pretty standard
4    within a certain range.  I mean, houses that are a ten
5    older, yes, you can find some variations, but if you say
6    within the last ten years, appliances fall within certain
7    general ranges.
8        Q.  Okay.  I mean, construction -- strike that.
9        Over the years isn't it true that there's also
10    been a lot of changes in terms of size of homes and the
11    way homes are constructed?
12    A.  It depends on, again, you say over the years.
13    Over the last ten years it's been pretty consistent.  If
14    you say over the last 50 years, sure, there's been some
15    real changes.
16        Q.  What about the last 15 years?
17    A.  I think it's still pretty consistent.
18        Q.  Last 20?
19    A.  It starts to be a little less consistent, yeah.
20        Q.  Okay.  20 years ago it would be like 1990?
21    A.  Yeah.
22        Q.  Basically.
23    A.  Yeah.
24        Q.  You went out to visit the house.  Were you by
25    yourself when you went out to visit the house on Monday?

9  (Pages 30 to 33)

34

1    A.  I was except for Mr. and Mrs. Brincku were there
2    certain times with their son.
3        Q.  Okay.  And you're -- you're a trained architect?
4    A.  I am.
5        Q.  Am I right about that?
6    A.  Yes.
7        Q.  Can you -- where did you go to college,
8    Mr. Williams?
9    A.  Virginia Polytech.
10        Q.  And any graduate training?
11    A.  No, it's a five-year program.
12        Q.  And that is you got a bachelor in architecture?
13    A.  Yes.
14        Q.  Okay.  And I take it you learned to develop and
15    read blueprints?
16    A.  Yes, even long before college.
17        Q.  Okay.  And you're a registered architect in a
18    number of states?
19    A.  Yes.
20        Q.  I have a -- a copy of your CV.  I think it is
21    attached to your report there.  Is that the most
22    up-to-date version?
23    A.  I would have to look.  I think I'm now registered
24    in Rhode Island as well.  I'm not sure if that's on the
25    copy you have because that was sometime late fall, and I

35

1    think most recently I received my registration for the
2    state of Maryland.
3        Q.  Okay.
4    A.  So I think I have 17 states now.
5        Q.  So a more accurate copy of your CV would include
6    Maryland and Rhode Island?
7    A.  Yes.
8        Q.  Are there any states that are listed on your CV
9    that were attached to your report that you're no longer
10    registered in?
11    A.  Not that I know of.  I think those are active.
12        Q.  Why didn't you send out -- you mentioned that you
13    have somebody who assists you with technical support?
14    A.  Yes.
15        Q.  Right?  Why didn't you send that person out to
16    the property on Monday?
17    A.  Because in the expectation of further developing
18    this process down the road, I wanted to personally see
19    this and test out some of the ideas I had for collecting
20    data, so I'm -- I'm using this as another step in the
21    development process.
22        Q.  The development -- the development process toward
23    a protocol?
24    A.  Or a freestanding methodology, yeah.
25        Q.  Okay.  You haven't done any testing of your

36

1    protocol so far, have you?
2    A.  No.
3        Q.  You -- you describe your visit on Monday as a
4    step in the development of it?
5    A.  Right.
6        Q.  So this is -- clearly it's not developed yet?
7        MR. WEISS:  Objection to form.
8        You can answer.
9        THE WITNESS:  Well, the ideas and procedures are
10    all outlined in November, but where we are today is
11    translating from what was in November on this overall
12    general outline to a more specific outline which is
13    part of what you have marked here in front of me,
14    Exhibits 2, 3 and 4.
15    BY MR. SULLIVAN:
16        Q.  But 2, 3 and 4, again, they are based on your
17    personal observations; correct?
18    A.  Well, they are also based on this.  In other
19    words, the starting point is basically this scope of work
20    document that's in my November report.  Having gone to the
21    property and seen it, I then refined it to what's sitting
22    in front of us in 2, 3 and 4.
23        Q.  Okay.  And your November -- your November report,
24    that's -- fair to say that's an outline of what a
25    freestanding protocol might look like?

37

1    A.  That's right, it's a starting point.
2        Q.  And I take it your -- your point is that
3    ultimately what you hope to develop is a freestanding
4    protocol that would generate the same numbers that you
5    were able to generate as a result of your personal
6    inspection?
7    A.  Yes.
8        Q.  Okay.  But just to be clear, again, the protocol
9    was not yet to a point where you could rely on that -- to
10    get -- where you felt you could rely on it to give you
11    those kinds of -- the same kinds of numbers that you got
12    when you went out to visit the -- the property yourself
13    because you didn't feel that you had sufficient time to
14    develop it?
15        MR. WEISS:  Objection to form.
16        You can answer.
17        THE WITNESS:  It's -- it's largely time driven
18    because you can expect in developing a new protocol
19    you're going to have some things where you say, well,
20    okay, this wasn't covered thoroughly enough, we need
21    to collect this data.  You just wouldn't do that in a
22    three-day period, in preparation for a deposition.  I
23    -- you know.
24    So -- so time is one of the key factors.  I think
25    we have the knowledge, we have the experience, we got

10  (Pages 34 to 37)

38

1     the ideas of how to do it; all those things are in
2     front of us in a very viable way, but time was
3     critical.
4 BY MR. SULLIVAN:
5     **Q.  Time has got to be critical because you need --**
6 **isn't it true you're going to need to develop a thresh --**
7 **a certain number of test properties to be able to develop**
8 **this freestanding protocol?**
9     MR. WEISS:  Objection to form.  You can answer.
10     THE WITNESS:  There's some piece of that, but the
11     main thing for me is to be able to try the protocol,
12     review it, look at it, and basically probably
13     accomplish the repairs and then see, within that frame
14     work, how good is your protocol.
15 BY MR. SULLIVAN:
16     **Q.  I think you described your visit, though, on**
17 **Monday, as part of a step in the development process of a**
18 **protocol?**
19     A.  Yes.
20     **Q.  What do you mean by that?**
21     A.  Well, basically I have further ideas now from
22 that as to how I would collect data, or how I would have a
23 homeowner collect data, or someone who is less skilled
24 than I am collect the data.
25     **Q.  Okay.  And that's an important point because**

39

1 **you're a trained architect, and the people that your**
2 **protocol will ultimately rely on for data are not trained?**
3     A.  That's correct, but it's, again, as I said
4 earlier, it really -- it's not rocket science, it's pretty
5 straightforward, very straightforward.
6     MR. SULLIVAN:  Can we take a quick break?
7     THE WITNESS:  Sure.
8     VIDEOGRAPHER:  Going off the record.  The time is
9     10:00 a.m.
10     (A break was taken.)
11     VIDEOGRAPHER:  Back on the record.  The time is
12     10:07 a.m.
13 BY MR. SULLIVAN:
14     **Q.  Mr. Williams, your -- your business is called**
15 **Williams Building Diagnostics; right?**
16     A.  Yes.
17     **Q.  And that originally -- you originally operated in**
18 **Pennsylvania; is that right?**
19     A.  Yes.
20     **Q.  And you opened a Florida office?**
21     A.  Yes.
22     **Q.  When did you open the Florida office?**
23     A.  I think it was approximately 2006.
24     **Q.  Why did you open an office in Florida?**
25     A.  My son was part of a baseball program, and so he

40

1 was relocating to Florida and he was in the latter years
2 of high school.  And both my wife and I had the thought
3 that one of us should be with him as opposed to just
4 putting him in the dormitories, and so we moved to
5 Florida.
6     **Q.  Okay.**
7     A.  We kept the Pennsylvania office and it still has
8 a number of people there.
9     **Q.  Where do you spend most of your time?**
10     A.  Florida.
11     **Q.  And what do you spend most of your time working**
12 **on?**
13     A.  Most of my work is centered on buildings that
14 have water-related problems, and our service areas
15 generally break into the analysis of the problems and then
16 the repair of buildings.
17     **Q.  And how much of your time is spent relating to**
18 **drywall investigations, issues, or, you know, litigation?**
19     A.  Fairly small percentage.  We've had several that
20 we've worked on, not in the causation area, but in the
21 repair.  So it's -- it's not certainly the biggest
22 percentage of my daily practice.
23     **Q.  Okay.  When you say several, how many?  How many,**
24 **ballpark?**
25     A.  Well, officially I've looked at three or four.

41

1 Unofficially, I have looked at probably another half
2 dozen.  By unofficially, I've been asked to take a look at
3 them, but there was no engagement for services.  So
4 probably all told, 10 to 12 I've been involved with.  And
5 the primary issue that I've been involved with is repair
6 not in causation.
7     **Q.  Okay.  And have you testified in depositions or**
8 **at trial before relating to drywall issues?**
9     A.  No.
10     **Q.  Have you previously testified regarding the**
11 **protocol that you described in your report?**
12     A.  Not specific to drywall.  It's the same type of
13 protocol we've used for essentially other matters, so I've
14 not had to testify about any of that relative to drywall.
15     **Q.  Have you developed a freestanding -- what you've**
16 **called this freestanding protocol, which is described in**
17 **your report, in other matters?**
18     A.  Yes, but not exactly the same.  It had to do with
19 the type of cladding that was on exteriors of houses, and
20 we were hit with a wave of these in the '90s, and after
21 seeing a number of them ourselves, meaning myself -- or my
22 partner is my wife in the firm.  She has a similar kind of
23 educational background and experience.
24     We work towards developing a way to develop
25 developing costs that would allow you to put those out

11  (Pages 38 to 41)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

42

1   there and a scope of work without having to personally go
2   see the properties.
3       Q.  Okay.  And for how many properties that has been
4   used?
5       A.  Oh, hundreds and maybe a thousand.  There was --
6   there was a lot of them.
7       Q.  So you -- you've used that protocol without going
8   out to visit those properties?
9       A.  In not all instances but in many, yes.
10      Q.  And in the instances where you did choose to
11  visit the properties, why did you do that?
12      A.  Generally because there was some additional
13  concern besides just the cladding issues, and so if there
14  was something that was a further concern at the property,
15  we were frequently asked to go to look at what that
16  concern might be.
17      Q.  Okay.  So, I mean, what you're describing in your
18  report is -- okay, I'll call it a freestanding model.
19      A.  Yes.
20      Q.  Okay.  And you have attempted to use that model
21  in the context of cladding problems?
22      A.  Analysis and repairs, yes.
23      Q.  Okay.  But that model in that context has not
24  been sufficient to accommodate every problem that may come
25  up; correct?

43

1       MR. WEISS:  Objection to form.
2       You can answer.
3       THE WITNESS:  Correct because particularly in the
4   cladding side we would occasionally encounter
5   properties where deterioration had occurred to such a
6   point that there would be a structural issue and
7   someone would have to look at it for those reasons.
8   And occasionally there was something else that would
9   come up that the client would ask us to take a further
10  look at what was there.
11      The overall goal was to set up something, and
12  it's similar to this Exhibit 2, 3 and 4, has the same
13  kind of general format with the scope of work, the
14  quanties, the labor, the materials, and the sub things
15  that are there, which allow you to produce numbers.
16  And so that general approach was used for these houses
17  that needed to be considered for recladding or repair.
18  In some cases it wasn't recladding, it was a repair of
19  the existing cladding.
20  BY MR. SULLIVAN:
21      Q.  How much of your time do you spend performing
22  expert services in litigation versus work as an architect?
23      A.  Well, the numbers probably give you some notion.
24  Overall I think it's low, but we've been in practice in
25  this unique area for almost 26 years.  And in 26 years

44

1   I've been deposed I think about 100, 110 times, so, you
2   know, maybe four depositions a year on average.  So the
3   real essence of our practice is evaluating building
4   problems and then putting together a package to repair
5   them.  Sometimes we are what I would call the program
6   manager where we get the contractor and put all the pieces
7   together, sometimes people take a scope of work and
8   pricing and they just go off and do their own thing.
9       Q.  Now, why do people hire you to do the scope of
10  work and pricing rather than just use a contractor?
11      MR. WEISS:  Objection to the form.
12      You can answer.
13      THE WITNESS:  Generally --
14  BY MR. SULLIVAN:
15      Q.  Or some other building professional?
16      MR. WEISS:  Same objection.
17      You can answer.
18      THE WITNESS:  In terms of contractor, it's
19  generally because they're looking for an independent
20  point of view.  As a licensed professional, if I seal
21  a set of documents and even maybe make very detailed
22  recommendations, it may not even require a sealing, I
23  am the entity that's responsible for the health,
24  safety, and welfare in the words of Pennsylvania, the
25  first state I was registered in, of the entity, the

45

1   users, and even in some cases the general public.
2       The second reason is -- and a lot of people are
3   out there making recommendations but they don't
4   necessarily have that same liability for their
5   recommendations.  I mean, anybody can recommend just
6   about anything, but unless you're a licensed
7   professional, you really don't have the same
8   responsibility to the general public or to the client.
9   BY MR. SULLIVAN:
10      Q.  But in terms of the ability to actually prepare
11  the scope of work and to put together an estimate, there
12  are other people who are capable of doing that; correct?
13      A.  There are, but to the extent they're construction
14  based, they're not necessarily going to pursue it from an
15  objective point of view.  There can be a conflict of
16  interest if it's someone who is actually doing the work.
17      Q.  So if I understand you correctly, the difference
18  between you and another building professional in terms of
19  being able to -- in terms of what you can offer when you
20  prepare the scope of work in an estimate is you're able
21  to -- you think you're independent and free of a conflict
22  of interest?
23      A.  Yes.
24      Q.  And, two, that you provide -- as a licensed
25  professional you provide some measure of protection to the

12  (Pages 42 to 45)

46

1    consumer or to the public?
2       A.  Yes.
3       Q.  -- by virtue of that?
4       A.  Yes.
5       Q.  Okay.  And are those the only -- in terms of
6    preparing the scope of work and estimates, are those the
7    only two differences that would distinguish you from
8    another building professional?
9       MR. WEISS:  Objection to form.
10      You can answer.
11      THE WITNESS:  Well, certainly three, which maybe
12   should be one, is the vast experience that I have and
13   my firm has.  I mean, we were directly selected to
14   work on the white house.  That was a tremendous
15   accolade for us, and it was because of our level of
16   experience and understanding about building-related
17   problems.
18      You know, we have also worked on historical
19   properties, but our day-to-day work is essentially new
20   construction that has a problem.  By "new" I mean less
21   than ten years old.
22   BY MR. SULLIVAN:
23      Q.  But in pricing and preparing scopes of work,
24   there are other building professionals who have been doing
25   this for just as long as you; right?

47

1       MR. WEISS:  Objection to form.
2       You can answer.
3       THE WITNESS:  I would say certainly, yes.  I
4    can't say that they would have the same depth of
5    experience that I have.  I mean, I'm sure some of them
6    do, but it's a pretty small group when you get down to
7    it because we see a certain group in the circle that
8    we travel in, and this isn't to be taken lightly
9    because if the repair is not correct, the homeowner
10   will potentially have future problems.  And so it's
11   got to be taken very seriously.
12   BY MR. SULLIVAN:
13      Q.  And as part of your -- it's part of your
14   independent -- it's part of the independent perspective
15   that you offer, and because you're licensed you would not
16   want to recommend that somebody remediate unless that were
17   necessary; right?
18      MR. WEISS:  Objection to form.
19      You can answer.
20      THE WITNESS:  Correct.  We don't casually
21   recommend remediation.  You've got to, you know,
22   carefully study it and make sure that you understand
23   what the repair should be and what it will entail and
24   the implications of the repair.
25   BY MR. SULLIVAN:

48

1       Q.  Okay.  There's got to be a problem, in other
2    words, first?
3       A.  Yes.
4       Q.  Is it fair to say that your November -- the
5    report that you prepared in November, you were describing
6    a potential model, you weren't giving an opinion; correct?
7       MR. WEISS:  Objection to form.
8       You can answer.
9       THE WITNESS:  Well, I think I gave opinions as
10   well, because I think in there is the opinion that
11   this model could be applied to houses with corrosive
12   drywall.  So if I was just simply laying out an
13   opinion, I think it would be a different report.  But
14   the report is -- my opinion is that there's a way --
15   in fact, again, I think it's right in the first
16   paragraph that I previously read in the record, so I
17   won't repeat it.  But it's -- it's more than just
18   laying out a model.
19   BY MR. SULLIVAN:
20      Q.  But once the model is developed, you think it
21   could be applied; that's what you're saying?
22      MR. WEISS:  Objection to the form.
23      You can answer.
24      THE WITNESS:  Well, I think portions of the model
25   are already at work here in the documents that are in

49

1    front of us.  It's that I would want to run it through
2    some more paces before I would put it into large scale
3    application.
4    BY MR. SULLIVAN:
5       Q.  It wasn't a final model?
6       A.  Not a final model.  It's got to be checked and
7    implemented.
8       Q.  You wouldn't want to apply a model that wasn't
9    final to all the drywall cases; right?
10      A.  No, and I wouldn't want to try to implement it in
11   three days before a deposition.  I think, you know, just
12   this piece this week has helped quite a bit.  What I would
13   do is go back and extract things from it and then I think
14   it could be ready for applying to, you know, a group of
15   houses.  And then you would check that and then you would
16   apply it to a larger group of houses.
17      Q.  Okay.  I marked as Exhibit 8 an article that I
18   believe you prepared for the Virginia lawyer.
19      A.  Well, I prepared it in conjunction with Bill
20   Thurston.
21      (Defendants' Exhibit 8, Article, was marked
22   for identification.)
23   BY MR. SULLIVAN:
24      Q.  You recognize this, though, as the document you
25   prepared?

13  (Pages 46 to 49)

50

1    A.  Yes.
2    Q.  And this is -- this is an article that addresses
3  the role of the expert witness in building failure cases?
4    A.  Yes.
5    Q.  And in this article you talked about
6  qualifications of the expert witness, standard of care,
7  project documents, code ordinances, standards, and full
8  consideration of fact- -- relevant factual variables;
9  correct?
10    A.  Yes.
11    Q.  Who is Mr. Thurston?
12    A.  Mr. Thurston is an attorney that I had worked
13  with in Virginia.
14    Q.  And what kind of matters did you work with him
15  on?
16    A.  I'm trying to remember.  It's been quite a while.
17  As I recall, it was a brick building that had some
18  problems with cracking and it was in Virginia.  Can't
19  recall much more about it than that.  It was quite a while
20  ago.
21    Q.  If you turn to page 19?
22    A.  Okay.
23    Q.  You write there with respect to the Dalbert case:
24  "The Supreme Court held that the previous standard for
25  admission of expert testimony, that the expert opinion

51

1  based on a scientific technique is inadmissible unless the
2  technique is generally accepted as reliable in the
3  scientific community has been superceded by federal rules
4  of evidence.  The rules, according to Dalbert, require an
5  inquiry on whether the expert will testify to the
6  scientific knowledge that will assist the trier of fact to
7  determine a fact in issue.  That inquiry included the
8  examination of whether the theory or technique can be and
9  has been tested, whether it has been subjected to peer
10  review, what the known or potential rate of error may be,
11  and finally, the general acceptance of the theory or
12  technique.  The overarching subject is the scientific
13  validity, and thus the evidentiary relevance in the
14  reliability of the principles that underlie proposed
15  submission."
16    Do you see that?
17    A.  Yeah.  I correct one thing you said, that I had
18  written.  Actually, this is something that Mr. -- this
19  particular part is something that Mr. Thurston had written
20  because I wouldn't be able to tell you about whatever it
21  was, Dalbert versus Merrill Dow Pharmaceuticals, so this
22  is coming from the attorney, not from me.
23    Q.  He prepared this portion of it, you're saying?
24    A.  Yeah.
25    Q.  But that Mark F. Williams, that's your name at

52

1  the top; right?
2    A.  Well, it's in conjunction with Mr. Thurston, I
3  mean, we're both listed.
4    Q.  You coauthored it; right?
5    A.  Well, yes, and he wrote the sections particularly
6  about the law.  I don't have knowledge about the law.
7    Q.  Okay.  Did you have an opportunity to see a
8  draft?
9    A.  Sure.
10    Q.  Okay.  On page 2 of your report --
11    A.  Okay.
12    Q.  -- you write at the time of it -- "However, at
13  the time of this writing and in light of what is currently
14  known, WBD believes the drywall remediation protocol
15  provided herein is the most comprehensive and practical
16  approach for remediating the adverse effect of corrosive
17  drywall within a realistic and cost effective manner."
18    Do you see that?
19    A.  Yes.  Yes.
20    Q.  Was there any support for that statement?  You
21  didn't site any articles, did you?
22    A.  Well, it's largely based on Judge Fallon's
23  finding of fact, his document.  In other words, it didn't
24  necessarily start this way, but we realized that as we
25  came up with our repair scope and protocol, that it

53

1  happened to be consistent with what was decided in, I
2  think it was in Virginia, and then published by that
3  particular finding of fact or whatever it's called.
4    Q.  What -- what testing supports that statement?
5    A.  Well, if you look at the scope of work that is
6  mentioned in Judge Fallon's document, that's consistent
7  with the scope of work that we're using.
8    Q.  No, I think my question is what testing do you
9  believe supports the conclusion that your model, your
10  proposed model here is the most comprehensive and
11  practical approach for remediating the adverse effects of
12  corrosive drywall in a realistic and cost effective
13  manner?
14    A.  It's the fact that it's consistent with Judge
15  Fallon's written statement.  It's also the fact that we
16  have done several of these properties, and we have
17  followed up with a corrosion sensor to see if, in fact,
18  the corrosion has been arrested.
19    Q.  Okay.  What testing -- what testing have you
20  done, though, of the protocol, testing?
21    A.  Well, if you look at the protocol, that's
22  something that goes back into the '90s when we basically
23  were trying to address these types of things with houses
24  that had cladding problems.
25    Q.  But you told me that this was a different

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

54

1   protocol than the cladding protocol?
2       A.  Well, the tests are different because one is
3   inside the house and the other is outside.  So if you look
4   at the protocol in its broadest sense, you collect data,
5   you basically analyze the data, you put it into a form
6   where you develop the scope of work.  You identify what
7   the costs are, you test your costs against published
8   things such as the estimating guide that I have included
9   today, and we normally test it with a local contractor if
10  we can find one to get numbers.  So that's -- that's the
11  procedure, and that's the same procedure that's being used
12  here on the drywall.
13      Q.  When you say test, did you have a testing
14  protocol where there's specific criteria that you were
15  testing?  What -- what were you testing for?  Or are you
16  just describing -- or are you just describing the fact
17  that your testing is your experience?
18      A.  Well, it's testing in two senses; one is -- maybe
19  three.  One is overall experience, two is as a model, can
20  you do this and make it work on a regular basis, and we
21  certainly found that to be the case in our work on these
22  houses in the late '90s -- mid-to late '90s.  And then
23  testing in the field sense is, in the late '90s we did
24  testing by installing certain sensors so that we could
25  evaluate whether the repair had addressed where the water

55

1   was coming in.  In terms of the corrosive drywall, we have
2   used sensors to determine whether the corrosion has been
3   arrested.
4       Q.  But I'm -- I'm talking about your model?
5       A.  My what?
6       Q.  Your model.
7       A.  Right.
8       Q.  Your proposed model.
9       A.  Right.
10      Q.  I'm not talking about testing you have done on a
11  structure?
12      A.  Right.
13      Q.  Have you published any testing criteria that
14  would test your model?
15      A.  I have not, but I have basically used a similar
16  kind of model for the houses that were done in the mid to
17  late '90s.  So basically it was tested as a means to move
18  forward on a group of dwellings where decisions had to be
19  made about how to repair them.
20      Q.  Has the model that you were using in the late
21  '90s ever been peer reviewed?
22      A.  Well, I think discussions about how we did it
23  have been included in presentations and articles have been
24  peer reviewed.
25      Q.  What's your understanding what a peer reviewed

56

1   journal is?
2       A.  It's largely something that your peers basically
3   have an opportunity to review and offer comments and then
4   basically before it is published you either have to adjust
5   what you're saying to their comments or convince them that
6   you're correct.  So there's an opportunity to either
7   modify what you're putting forward or convince them of the
8   value of what you've said.
9       Q.  And have you ever submitted your proposed model
10  in written form to a peer review board for comment?
11      A.  Well, it's too early on the corrosive drywall.
12  It's, you know, it's too early in the process.  But I
13  would have to say that in terms of the houses we did,
14  which are -- this protocol is based on, I mean, it's --
15  it's basically this is just another iteration of what we
16  were doing in the mid to late '90s.  That was reviewed by
17  any number of people because there were a number of
18  parties that had to pay for repairing those houses.
19          And so people had to buy in that it was going to
20  be the -- a reasonable approach so that there was an
21  appropriate amount of money that was collected to fix
22  those houses.
23      Q.  But did you submit the model that you were using
24  in the late '90s to any peer reviewed journal?
25      A.  I think it was part of some presentations that

57

1   became papers that were peer reviewed but I would have to
2   go back and look because it's been quite a while.  Off the
3   top of my head I can't think of that, but it's certainly,
4   just by the fact that it was used so heavily was accepted
5   as an approach.  I mean, it became the way that these
6   cases were settled and repaired.
7       Q.  What was the known or potential error rate of the
8   model that you were using in the late '90s?
9       A.  I don't think that I could give you that as a
10  specific number.  I can tell you this, though, in terms of
11  all the properties that were repaired, none of them have
12  ever come back to us as being an insufficient repair.  So
13  I guess we can look at it that way and say it was
14  100 percent successful.
15      Q.  Well maybe they -- if they felt they had an
16  insufficient repair, they wouldn't go back to you, would
17  they?
18      A.  Oh, I think they would.  As a design
19  professional, they would be standing at my door.
20      Q.  Did you test -- did you perform any test that
21  included a method for testing a known or potential error
22  rate on the -- for the model that you were using in the
23  late '90s?
24      A.  Well, the test would be essentially field tests
25  of the conditions and some properties, where, in fact, we

15  (Pages 54 to 57)

58

1  still do that today with our water-related projects, where
2  sensors are used to collect data to make sure that the
3  property is performing properly. So it's not testing of
4  the methodology specifically, but indirectly it's testing
5  the methodology because if there's a failure in the
6  remedial work, that's going to be in part a reflection of
7  the methodology.
8      Q. Have you -- have you done anything to test the
9  known or potential error rate of the model for purposes of
10  use in the drywall in drywall cases?
11     A. No.
12     Q. How would you test it -- strike that.
13        How would you test for an error rate in the
14  drywall -- in drywall cases?
15     A. Well, I guess I shouldn't have said no to the
16  previous question, because we did, in fact, in two houses
17  that had been repaired put corrosion sensors in there to
18  make sure that the corrosion had been completely arrested.
19  So there was a follow-up, and that's -- that's mentioned
20  as one of the items. I think it's item five in my
21  protocol. So I do have that as an experience. It hasn't
22  been published, but certainly it's the reasonable starting
23  point to support that the protocol that I've used is --
24  has validity.
25     Q. But let's be clear. I mean the purpose of your

59

1  model, right, is to be able to generate a cost estimate?
2      A. Well, that's part of it. The other part is to
3  make sure that home owners have a satisfactory repair to
4  the problems that have occurred. So -- so you have -- you
5  have two components. I mean, the overarching thing is
6  that the buildings have to be fixed and the homeowner has
7  to basically end up with a property that's usable. And
8  you basically are developing cost estimates and scopes of
9  work as one tool to get the homeowner to the ultimate
10  spot, which is an acceptable dwelling.
11     Q. But let's focus on the work that you're doing.
12  You're -- you're doing the cost estimates and scopes of
13  work, you're not doing the actual repair; correct?
14     A. Correct, but we, as part of being a program
15  manager, have monitored the work and approved or rejected
16  pay applications. It's similar to just about any project
17  that's getting repaired where we're involved with the
18  drawings and specifications and the field verification
19  that it's being done.
20     Q. Are there -- are there any written -- is there
21  any written or published testing that you have done to
22  establish a known or potential error rate, either with
23  respect to cost estimates and scopes of work, or the
24  repairs?
25     A. Not in terms of something that's been published,

60

1  no.
2      Q. Have you developed internally a written test
3  protocol to determine the issue of known or potential
4  error rate?
5      A. No. It's too new.
6      Q. Had you done that in the 1990s?
7      A. I don't think we ever did a written document, but
8  we basically had follow-up with some percentage of the
9  projects where we were able to either see the remedial
10  work or monitor the remedial work and make sure that the
11  scope of work that had been determined was an appropriate
12  scope for the work that had to be done. Essentially --
13     Q. But you were doing the work before you knew what
14  the known or potential error rate was?
15        MR. WEISS: Objection to form.
16        You can answer.
17        THE WITNESS: Yes, we had to do a certain amount
18     of work to have an understanding of what the error
19     rate might be.
20  BY MR. SULLIVAN:
21     Q. So the model that you were using in the cladding
22  -- in the cladding context in the late '90s, you were
23  developing that as you went; right?
24     A. Right.
25     Q. You didn't know the -- you had not developed a

61

1  known or potential error rate prior to the use of that
2  model; correct?
3      A. Correct.
4      Q. And you have not done that in the drywall -- with
5  respect to drywall either; correct?
6      A. Correct. However, we have the benefit now in
7  time of seeing how we developed those scopes and how that
8  was conducted with this type of estimating procedure to
9  know that we can apply those types of things and be
10  successful in doing this type of work for the corrosive
11  drywall houses.
12     Q. And have you tracked that data in your office
13  from -- from prior projects?
14     A. Well, in some projects, yes, where basically we
15  come up with a scope and repair a set of documents and an
16  estimate, and then basically we're involved with the
17  construction. And actually for our first two corrosive
18  drywall houses we did because we came up with a scope and
19  a prediction, and then the work was done, and it fell
20  within our scope and our prediction for cost. And then we
21  basically did some monitoring of the final product.
22     Q. Can you describe for me the kinds of statistical
23  analysis that you would need to perform to develop a known
24  or potential error rate for your model in the drywall
25  cases?

16 (Pages 58 to 61)

62

1    A.  Not off the top of my head.  I would think that
2   what you would want is a bigger body, a bigger pool of
3   houses.
4    Q.  Can you describe for me the kinds of statistical
5   analysis that you would need to perform -- you would have
6   needed to perform to develop a known or potential error
7   rate for your model in the cladding cases?
8    A.  Well, I think what you would have to do is look
9   at how close the scope of work matched the actual work
10   that was done, and how close did your projections for
11   costing match the actual costing that was done, and then
12   how successful was it.
13       I can tell you where we have moisture sensors in
14   buildings, we have no known failure rates for any houses
15   that were remediated for water -- or not just houses,
16   commercial buildings -- that were remediated.  So I can't
17   tell you statistically what it is, other than I would have
18   to say our success rate in terms of remediating the
19   projects for water is 100 percent success.  We have had no
20   known failures.
21    Q.  And the ability to match the actual work done in
22   relation to the cost projections is important for the sake
23   of the consumer; right?
24       MR. WEISS:  Objection to form.
25       THE WITNESS:  Yes, and there's also going to be,

63

1   for instance, in our estimating at this point, we have
2   numbers in for various things.  There will always be
3   some things that will be a little more or less
4   expensive.
5       What you're trying to do is see whether the
6   overall result is basically at the price point that
7   you predicted, because a particular line item will
8   come and go, as far as its cost.  It's just a means of
9   getting you to the overall price point.
10   BY MR. SULLIVAN:
11    Q.  Okay.  But just to tie this up, you're not
12   prepared, you're not at the point where you're able to
13   perform any statistical analysis to the drywall context
14   that would give you a known or potential error rate for
15   your ability to project actual costs?
16       MR. WEISS:  Objection to form.
17       You can answer.
18       THE WITNESS:  I think that's generally correct,
19   but I think that the work that I've done to date tells
20   me that we're doing quite well in this general area,
21   that -- would you like to have more case studies to
22   expand your pool?  Yes.
23       But that aside, since, you know, this is a new
24   area, I mean, we would all love to be able to turn to
25   page 64 of some textbook and say exactly here's the

64

1   answer, but what's happening is this is a new and
2   emerging area.  And so you apply the best thinking and
3   the best procedures that you have used, and then you
4   basically work your way through it.
5   BY MR. SULLIVAN:
6    Q.  Okay.  What number of case studies would you
7   consider statistically significant?
8       MR. WEISS:  Objection to form.
9       You can answer.
10       THE WITNESS:  It depends a little bit on how
11   different they are, because if you have let's say a
12   dozen case studies that are very similar, that may be
13   enough.  If you have a dozen case studies that are
14   very different, then that may not be enough.  So I
15   think I would need to know a little more about what's
16   the -- what's the universe?  What are we talking
17   about?
18   BY MR. SULLIVAN:
19    Q.  On page two you say that your -- the insights
20   that you have gained through experience can be applied to
21   a large -- quote, "the large population of similar
22   residential properties that will need corrosive drywall
23   repairs in the near future."
24       Do you see that?
25    A.  Yes.

65

1    Q.  How do you go about -- I mean, in order for your
2   model to work, it's got to account for differences between
3   different residences; correct?
4    A.  Correct.
5    Q.  And what statistical analysis would you run to
6   ensure that your model can do that?
7    A.  Well, probably what I would do, and I'm not sure
8   it's a statistical analysis, per se, what I would do is
9   get a body of houses, I don't know exactly how many that
10   is at the moment, you know, is it 12, is it 25, is it 50?
11   I don't know exactly.  But it depends on how different
12   they are, as we said earlier.  And I would apply the
13   knowledge that we have for how we've approached these
14   types of problems in the '90s and then how we did it on
15   the first couple houses, and how we did it on the Brincku
16   residence, and I would basically come through with a
17   projection for what those houses should cost.
18       I would then probably get local information from
19   the contractor, or a set of contractors that I have
20   confidence in, and see what they think in terms of my
21   costing.  To the extent possible, then, I would pick some
22   of those houses that would represent the range, from being
23   small and large and simple and complicated so you, you
24   know, take maybe a half a dozen properties and I would
25   take those properties, have them done, and take that data

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

66

1  and apply it back to what we had predicted to say what
2  were the costs.
3      Q.  And are you capable of, based on your training
4  and experience -- based on your training and experience of
5  performing all of this work you just described?
6      A.  Yes, not the physical construction, although on
7  some projects we have been asked by clients to actually be
8  remedial contractors, and on some water-related projects
9  we have physically performed some of the flashing work
10  because they weren't sure they could get a contractor to
11  do everything we thought was necessary.
12      So regrettably, in some projects we have become
13  contractors.  It's not my desire in life, but everything
14  else that I described we can do, other than I would not
15  personally seek to do the remedial work.
16      Q.  Are you an expert in statistics?
17      A.  No.
18      Q.  An expert in modeling?
19      A.  Probably not, but I know how we have modelled and
20  how we've gone about essentially solve problems that have
21  involved modeling.
22      Q.  So this is all -- all this work you would need to
23  do in order to make sure that the model that you're
24  proposing is reliable?
25      MR. WEISS:  Object to the form.

67

1      THE WITNESS:  I can't say all of it, but I would
2  start with a further analysis of some additional homes
3  and getting contractor pricing on those, and I think
4  that would go a long ways to telling you that the
5  model is -- is working.
6      The final proof in the pudding, if you will, is
7  to actually do the work but I think you could set it
8  up and essentially test your expectations by having
9  the work estimated or bid by contractors who are
10  willing to do the work.
11  BY MR. SULLIVAN:
12      Q.  Have you compared your proposed model to any
13  other similar kinds of models?
14      A.  Yes.  Again, going back to Judge Fallon's
15  decision or statement of fact, whatever it's called,
16  basically our scope is nearly identical to that which he
17  has published; two is what came out of that Virginia trial
18  was a cost range for what the work should cost, and our
19  costing turns out to be very close, maybe slightly less
20  than what they proposed.
21      Q.  Now, when you say Judge Fallon's model, he
22  wasn't -- or he was not setting forth a statistical or
23  mathematical or scientific model; correct?
24      A.  No, but what he set forth is a model for moving
25  forward for repairing the houses.  I mean, it's embodied

68

1  in that document you're looking at.
2      Q.  Okay.  What you're referring to is the document
3  that was in your file.  It's captioned In re:  Chinese
4  Manufactured Drywall Products Liability Litigation, United
5  States District Court, Eastern District of Louisiana,
6  Findings of Fact and Conclusions of Law; right?
7      A.  Yes.
8      Q.  Okay.  Just to be clear, he wasn't putting
9  together a scientific model?
10      A.  No, but he basically gives you a construction
11  model of what needs to be done to address these problems.
12  You know, there's no statistical analysis in there.
13      Q.  Okay.  And there's no published, known or
14  potential error rate in there; right?
15      A.  Correct.
16      Q.  It hasn't been peer reviewed, has it?
17      A.  I don't know who would peer review a judge's
18  statement of fact, or whatever it's called, finding of
19  fact.
20      Q.  Well, really, it hasn't been peer reviewed
21  because it's not a scientific publication; right?
22      A.  That's my understanding, yeah, that it's not a
23  scientific publication.
24      Q.  And back to your article on page 19.
25      A.  Okay.

69

1      Q.  The Virginia Lawyer article.  You write, you and
2  your coauthor wrote:  "Visual examination of photo
3  documentation, for example, assist in overall
4  understanding of pertinent project issues.  Field tests,
5  using standard or tailored methodologies may be deemed
6  necessary.  Data should be carefully collected to ensure
7  that applicable test procedures are performed at the
8  appropriate time and under proper circumstances."
9      I take it you were saying there basically that
10  you need to examine what the site actually looks like;
11  right?
12      A.  Yes.
13      Q.  And as I understand your proposed model, that's
14  the step that you're trying to eliminate; right?
15      A.  No, I'm just saying that the collection of that
16  data can be done by someone either as a homeowner or
17  someone basically that's close to the property.
18      Q.  Somebody that doesn't have professional training?
19      A.  Correct.  You know, you're kind of mixing apples
20  and oranges here a bit.  What this was talking about is
21  essentially causation in this article, because we're
22  talking about how do you determine what's going on in a
23  building.  What I'm talking about is taking raw data,
24  which is what are materials that were used in the house,
25  is the baseboard three and a half inches high or is it six

18  (Pages 66 to 69)

70

1   inches high? Those are all basically data points that can
2   be collected without a whole lot of training, or any
3   training. It's basically what you need is a checklist and
4   ability to get some photographs or video; that's different
5   than what this is talking about.
6        This is talking about establishing causation in
7   the article; I'm not talking about establishing causation
8   on these houses.
9        Q. And, in fact, your model actually assumes that
10  causation has been demonstrated.
11       A. That's right.
12       Q. Right?
13       A. That's right. So it's -- it's an important
14  distinction. I don't think that the paragraph you just
15  read is directly applicable to the instant cases in front
16  of us.
17       Are we close to a -- a logical break point?
18       MR. SULLIVAN: We can take a break.
19       THE WITNESS: I mean, I don't know if you --
20       MR. SULLIVAN: That's fine.
21       You can take a break whenever you want.
22       THE WITNESS: I like one hour.
23       VIDEOGRAPHER: Going off the record. The time is
24  10:56 a.m.
25       (A break was taken.)

71

1        VIDEOGRAPHER: Back on the record. The time is
2   11:01 a.m.
3   BY MR. SULLIVAN:
4        Q. Mr. Williams, on page one of your report, you
5   talk about corrosive drywall?
6        A. Yes.
7        Q. What is corrosive drywall?
8        A. It's --
9        Q. Well, let me strike that. Let me back up.
10       Are you aware there's a definition of corrosive
11  drywall?
12       A. Not off the top of my head, no, I just used it as
13  a means to describe a wall board that seems to promote
14  corrosion.
15       Q. Or are you aware of a definition of problem
16  drywall? Are you aware of one?
17       A. No.
18       Q. Are you aware the Florida Department of Health
19  has published a set of criteria for identifying --
20       A. I -- I have seen that.
21       Q. -- corrosive or problematic drywall?
22       A. Yes.
23       Q. And do you know what those criteria are?
24       A. Not off the top of my head. I really haven't
25  focused on the causation side, so it's not something I've

72

1   spent any time really significance on.
2        Q. But your -- your model will apply to only
3   corrosive drywall; right?
4        MR. WEISS: Objection to form.
5        You can answer.
6        THE WITNESS: Well, someone has to make that
7   judgment besides me.
8   BY MR. SULLIVAN:
9        Q. Okay. Do you --
10       A. And -- and they're going to say we want to have
11  this house repaired and they'll be reasons for that that
12  will be beyond my involvement.
13       Q. Do you accept, for purposes of your model that
14  you have articulated here, the definition by the State of
15  Florida of corrosive drywall?
16       MR. WEISS: Object to the form.
17       THE WITNESS: I can't say that I do. In the
18  cases we've been involved with it's been predetermined
19  that the drywall is going to be removed because of
20  some corrosive quality, so I wasn't in this in any way
21  trying to establish causation or scope of what is
22  corrosive drywall. Someone basically said this
23  drywall is going to be taken out.
24  BY MR. SULLIVAN:
25       Q. But it's an assumption you're making for purposes

73

1   of your model?
2        A. Yes.
3        Q. So how do you -- how do you understand, I mean,
4   what materials have you considered or referred to in order
5   to determine that the assumption that you're making is
6   reliable?
7        A. I think that's all causation. Someone basically
8   has said this drywall is a problem and it's going to be
9   removed. What I'm doing is saying here's how we go about
10  getting it done.
11       Q. And you talked about Judge Fallon's opinion?
12       A. Right.
13       Q. And his opinion was in a Chinese drywall case;
14  right?
15       A. Correct.
16       Q. So his opinion, these findings of fact and his
17  conclusions that you relied on, that was a case that
18  involved imported Chinese drywall?
19       A. Correct.
20       Q. On page four of your report, under the section
21  that says Procedures and Insights for Remediating
22  Corrosive Drywall in Dwellings --
23       A. Right.
24       Q. -- you write: "Having completed remediation of
25  several of these homes, we find that determining the cost

19 (Pages 70 to 73)

74

1  of remediation for corrosive drywall homes can be
2  challenging because construction variables specific to
3  each home can skew project costs."
4  A.  Yes.
5  Q.  What do you mean by that?
6  A.  Well, I think I go on to explain it down below.
7  I mean, I can either read it to you or paraphrase it.
8  Q.  If you just describe briefly in your own words.
9  A.  Yeah.  One of the features, for instance, is if
10  it's a two-story home and it has a stair, then the
11  question is whether the drywall goes behind the stair
12  stringers, and if it does, you need to make provisions to
13  get the drywall out.  And obviously, if you have a
14  one-story home that doesn't have a stair, you don't have
15  that condition.
16  So if someone was just to say, here's a home and
17  it's 2500 square feet, and here's another home and it's
18  2500 square feet, give me a price for these, I would say
19  that's not enough information.  You really need to know
20  more about the details of the individual home.
21  Q.  Now, that's one example.  What would be other
22  examples of variables?
23  A.  The --
24  Q.  It seems to me that there are a lot.
25  A.  Sure.  The quality level of the various interior

75

1  finishes.  You could have anything from, as in this
2  Brincku house, a three and a half inch baseboard that's a
3  standard off-the-shelf baseboard, to having very high-end
4  baseboards that are say a six-inch baseboard that might be
5  a natural finish on cherry.  So it's those types of things
6  that dramatically affect the cost, and it would be my
7  expectation, and we have started this, and what we've done
8  both previously and also for this most recent house, to
9  identify those types of things.
10  And I think with, you know, a little more review
11  and development, you can put that together, and you can
12  start to classify even appliances in terms of what grade
13  are they, what were the general details for how trim
14  needs -- like a baseboard meets a casing around a door
15  because there's different costs associated with, for
16  instance, in Brincku the doors had a square medallion
17  where the jam trim met the head trim.  That's easier for a
18  carpenter to do, so it affects your thinking.
19  So you would have a series of things that the
20  homeowners would simply record and report on a survey data
21  sheet, and that would then allow you to generate your
22  costing.
23  Q.  So I mean there's going to be difference in
24  finish work?
25  A.  That's right.

76

1  Q.  Going to be difference in molding?
2  A.  Right.
3  Q.  Going to be difference in baseboards?
4  A.  Right.
5  Q.  Difference in appliances, difference in size of
6  floor plans?
7  A.  Right.
8  Q.  Different levels of houses?
9  A.  Right.
10  Q.  Different quality of workmanship?
11  A.  Yeah.
12  Q.  There are going to be -- there are an
13  overwhelming number of differences, it sounds like?
14  MR. WEISS:  Objection to form.
15  You can answer.
16  THE WITNESS:  In my world it's not overwhelming
17  because I'm a construction professional.  I see it as
18  a large list that can be defined, and someone can
19  basically say, yes, I have this, no, I don't have
20  that, and that's what you need to know in order to
21  reasonably put together pricing.
22  BY MR. SULLIVAN:
23  Q.  Okay.  So you can take this large list.  Now --
24  strike that.
25  How will -- if I understand this correctly, your

77

1  survey -- you will need to develop a survey data sheet
2  that will account for all these -- all of the types of
3  variations that we have discussed?
4  MR. WEISS:  Objection to form.
5  You can answer.
6  THE WITNESS:  Yes.
7  BY MR. SULLIVAN:
8  Q.  I'm sorry, that was a yes; right?
9  A.  Yes.
10  Q.  How do you model that?
11  A.  Well, you have basically what's called a scope of
12  work, all right, and the modeling occurs with how much of
13  a particular scope do you have.
14  So as you see in Exhibits 2, 3 and 4, there's a
15  quantity, so you have to have some idea of how much of
16  that do you have.  And I -- I always start with further
17  action just so that it's clear.  We're either storing it
18  because we're going to reuse it or we're discarding it.
19  Okay?  So you're making a judgment as to what is going to
20  happen to that component.
21  Then the quantity, and that's, you know,
22  sometimes a number, sometimes it's an allowance, depending
23  on what your experience tells you, for instance, okay, I
24  think we're going to have to have three dumpsters at this
25  job and let's say $500 a pull.  Normally they charge you

20  (Pages 74 to 77)

78

1   more to drop the dumpster off, and they charge you less to
2   come and empty it, and then they charge you to come and
3   pick it up at the end, you know.
4        So there's things that are based on experience
5   that are in the model.  And then basically you've got your
6   labor costs.  Sometimes those things are available to you
7   in a reference guide, sometimes they're things that you
8   have to rely on your past experience to do.
9        **Q.   Okay.  So let's just take -- let's take one of**
10  **the things, and we can talk more about this chart later,**
11  **but in terms of trying to determine how it is that your**
12  **model can account for the variations that you've**
13  **identified, how does the model accommodate differences in**
14  **quality?**
15       A.   Well, you -- we'll basically have some
16  qualitative means, for instance, that trim that I
17  described to you, most commonly when you have that little
18  square rosette where the jam meets the head, it's because
19  you didn't necessarily have somebody that could
20  consistently make mitered corners.  They can use a chop
21  saw, so that tells you immediately when you see that,
22  there's a certain quality level that's -- that's coming
23  here.  A three and a half inch wood base that's painted
24  tells you a different quality level than standing and
25  running trim that's done out of cherry, you know.

79

1        So you basically are going to have to get some
2   photographs, and you're going to have to have some sheets
3   filled in with certain information identified, and that's
4   the survey data.
5        **Q.   But -- and there's no -- there's no column in**
6   **your chart that reflects anything about quality?**
7        A.   Correct.
8        **Q.   There's no quality column; right?**
9        A.   Correct.  Currently, yeah.  Because that's
10  something I'm processing when I go to see it.
11       **Q.   When you're -- you're using the -- you talk about**
12  **the mitered corners, I think --**
13       A.   Right.
14       **Q.   -- at the Brincku house that you saw, you saw**
15  **those corners and you understood that that required I**
16  **think you called it a, what, a chop saw to do?**
17       A.   Yeah, well, sometimes terminology -- don't read
18  too much word in the "chop."  There's an electric miter
19  box that's used, but it takes more time and skill to make
20  a mitered corner than it does to just chop it off and to
21  have a block that you put in.  So --
22       **Q.   And you and -- sorry.  Go ahead.**
23       A.   So -- so those things are all key to someone,
24  such as myself, who knows construction.  You can put
25  together that universe of things, and you will be able to

80

1   use that, then, to make a judgment as to what the quality
2   level is, plus with some photographs.
3        **Q.   You need pretty detailed photographs of the**
4   **property, I take it, to pick up that kind of detail;**
5   **right?**
6        A.   In some areas.  I have -- video is okay, too, but
7   what you're going to need to describe to that person who's
8   collecting that data, that you want at least a few
9   close-up shots of the following things, because that's
10  going to tell you a lot.  So, you know, they don't
11  obviously all have to be detailed.  You can see in my
12  photos they're not all detailed.  If I had more time I
13  would have taken less photos, it's one of those kind of
14  ironic things because the photos are the fastest way to
15  get the information, so as I was running late on the
16  assignment, I basically just started taking a lot of
17  photos, so I had some record of what was there.
18       **Q.   You took the photos because you were feeling**
19  **rushed to get it done?**
20       MR. WEISS:  Objection to form.
21       You can answer.
22       THE WITNESS:  Well, I was expecting that I was
23  going to be out of there by noon, and at noon I was
24  still working, and so basically I said, you know what
25  I can do here is just get more photos.

81

1   BY MR. SULLIVAN:
2        **Q.   Okay.  And the variations in quality of the**
3   **different kinds of components and stuff that we've**
4   **discussed, those are going to lead to variations in cost;**
5   **right?**
6        A.   They are, yeah.
7        **Q.   And how does your model work to reliably estimate**
8   **costs given the potential for wide variation in quality?**
9        A.   Okay.  And I think we were there a minute ago.
10  I'll try again.
11       It's through a combination of the survey data
12  sheet and the photographs or the video, you'll be able to
13  establish that.
14       **Q.   And -- but, again, I mean, that hasn't been**
15  **tested, you haven't had enough data yet to determine what**
16  **the error rate for that would be, to determine the**
17  **different range of variation in potential cost, you**
18  **haven't gathered enough data to be able to assess, you**
19  **know, what cost estimates would be for different time**
20  **periods; right?**
21       A.   Well, I have collected enough data to be sure
22  enough that I can tell you that I could make this work.  I
23  haven't made a scientific study out of it, but I am
24  confident that this procedure could be put in place and be
25  made to work.

21  (Pages 78 to 81)

82

1   Q.  So right now, I mean, this is a hypothesis;
2   right?
3       MR. WEISS:  Objection to form.
4       THE WITNESS:  It's more than a hypothesis, I've
5   done it on a number of houses and had good results.
6   BY MR. SULLIVAN:
7   Q.  But I mean your -- your model, I mean in terms of
8   being able to reliably predict estimates.
9   A.  A hypothesis to me is when you say, this is an
10  idea I have and hypothetically here's how it would work.
11  I'm past that.  Here's an idea I have, I've already
12  implemented it and tested it to a degree.  I haven't done
13  a scientific study, but it's much more than a hypothesis.
14  Q.  Okay.  You're -- you're -- you're in the testing
15  process?
16  A.  Yes.
17      MR. WEISS:  Object to the form.
18  BY MR. SULLIVAN:
19  Q.  Okay.  Do you plan to have -- strike that.
20      Do you plan to have your model peer reviewed?
21  A.  It's possible.  I hadn't really given it a whole
22  lot of thought.  The first thing is to probably push it a
23  little further down the road, but it certainly could be
24  peer reviewed.
25  Q.  What journals would you send it to to be peer

83

1   reviewed?
2       MR. WEISS:  Objection to form.
3       THE WITNESS:  Well, the most common outlet for us
4   is ASTM, and you may have noticed on my CV that I
5   chaired an ASTM group for a while.  I was actually
6   given an award from ASTM for the work that I did, so
7   that's most likely the venue that it would go to.
8   BY MR. SULLIVAN:
9   Q.  On page five of your report, you say:  "The
10  accuracy of estimated remedial cost is related to the
11  specificity of the survey data obtained."
12  A.  Yes.
13  Q.  What do you mean by that?
14  A.  Well, it's going to be important to have someone
15  come back on the survey data sheet filling in all the
16  blanks and not say I don't feel like filling this in.
17  There has to be a complete record of the information in
18  order for you to do the work.  Now, if somebody comes back
19  and says my house is 2500 square feet, here it is, that's
20  not going to be enough.
21  Q.  So in other words the data that the survey data
22  sheet reflects is only going to be as good as the
23  information that somebody is putting in?
24  A.  Correct.  And I would never look at the survey
25  data sheet by itself.  It has to be done in conjunction

84

1   with photographs or video.
2   Q.  What -- what sort of tool does your model have to
3   ensure that people will not abuse the process of filling
4   out the survey data sheet by essentially including
5   information that would leave to over estimate -- strike
6   that.  That's a terrible question.
7   A.  I think I understand what you're saying.  How do
8   you know they're telling you the truth.
9   Q.  How do you know people aren't over estimating --
10  the cost of their components?
11  A.  Yeah.  And I eluded to it in other places in the
12  report.  It's my expectation that there would be some
13  amount of work that you would do with a local contractor,
14  and the information that's provided on the survey data
15  sheet would come to a processing place, you would digest
16  it, compile it, and once you're close on what you think
17  the costs are, I think you would have someone who is
18  familiar with that general area visit the house as a
19  contractor type and would basically do a quick review.
20  They basically would be writing a short proposal for what
21  their costs would be for coming in to do the house, and so
22  you have that as a meaning to check against your
23  estimating.  And we try to do that as much as we can on
24  our projects, and what we find is that you can get a
25  pretty good comfort level by having someone independently

85

1   take a look at it.
2   Q.  But you testified earlier that one of the
3   differences between you and other types of building
4   professionals was that the other types of building
5   professionals, like contractors, weren't necessarily
6   conflict free; right?
7   A.  Right.
8   Q.  So there's nothing to prevent a contractor from
9   also over estimating?
10  A.  That's correct, but see, what the difference is
11  by having your survey data sheet, whoever is doing this
12  work, would basically prepare a scope of work and it's
13  going to be based on that.  And what you're going to do
14  then is have a check -- and, you know, this Brincku house
15  was a good example.  They happen to have drawings, a great
16  thing, because you can basically see if they tell you
17  there's 27 doors, you can count the doors.  Okay?
18  Sometimes you will have drawings, sometimes you won't.
19      For houses that have been built in the last 10 or
20  15 years, you're likely to have drawings somewhere, if
21  it's not with the homeowner, it's filed with the county
22  because that's pretty common today.  But to get back to
23  your question is a combination survey data sheet, other
24  data you collect, similar to drawings, you then can
25  basically give a scope to a general contractor, you don't

22  (Pages 82 to 85)

86

1  tell them what your price is, you just tell them what the
2  scope is, and then you basically get some information back
3  and you see how close these things line up. If they're
4  way off, then, you know, you're going to have to look
5  further, but my experience is they'll be pretty close.
6      Q.  But you want them -- I mean, one of the checks on
7  this process or on your model is to have another building
8  professional or contractor go up and take a look; right?
9      A.  That's right. It's just that you're not relying
10  them for the only price, you're basically pricing it
11  independently so that you have your own view on it and
12  that's used in addition to this, you know, local
13  contractor's view.
14     Q.  But isn't that the exact step that your model is
15  attempting to, you know, take away?
16     A.  No, because --
17     Q.  Not having somebody go up there?
18     A.  No, because basically -- ultimately the house is
19  going to get fixed, and so you may as well have a dialogue
20  with somebody -- the same thing happened on these
21  claddings. There were companies that basically emerged to
22  either repair or reclad the houses, and so as we got
23  information about the houses and what we thought had to be
24  done, you could get a second set of eyes to basically look
25  at what's there, so you're not relying necessarily just on

87

1  one thing. It's -- it's a means to check the overall and
2  get further insights.
3      Q.  So there's going to be -- you're going to want
4  the survey data sheet filled out by the homeowner?
5      A.  Yes.
6      Q.  Ideally you would have drawings, you would have
7  photos?
8      A.  Yes.
9      Q.  You would have a contractor check it, you need
10  all of these things; right?
11     A.  Yeah, by check it, what I'm saying is you're not
12  giving the contractor the homeowner survey data sheet.
13  You're giving them a scope that you've developed for this
14  house because that's the easiest thing. Contractors are
15  familiar with that, you know, type of thing. They're not
16  -- they're not creating the scope. The scope is there,
17  they're going to walk through and say, yeah, I see this,
18  okay, yeah, and they're going to be able to tell you
19  pretty easily whether it's in a ballpark, you know, of
20  this or that dollar wise.
21         So you're really getting double pricing. You're
22  getting some protection, you know, and there's going to be
23  some cases where you can't do that and you're going to
24  say, well, okay, I'm going to go -- I'm going to rely on
25  what I have here from the owner. You may at that point

88

1  have someone that's a lesser expensive type person, home
2  inspectors, okay, they're plentiful. They could basically
3  go and check the quanties as well, if necessary.
4      Q.  You describe a drywall remediation protocol on
5  pages 6 and 7 of your report.
6      A.  Okay.
7      Q.  It contains five phases; correct?
8      A.  Yes.
9      Q.  The first phase is what you call the
10  predemolition process?
11     A.  Right.
12     Q.  And just to be clear, you wouldn't recommend the
13  predemolition process unless there were problematic
14  drywall in the house; right?
15     A.  Yeah, presumably there's some evidence and some
16  connect to causation.
17     Q.  And how did you go about developing this process?
18  Did you consider certain documents, the materials, or did
19  you develop this on your own?
20     A.  Developed it on my own. It's the process that we
21  used essentially for the first couple repairs that we've
22  done.
23     Q.  Have you reviewed any -- considered any guidance
24  issued by the State of Florida or the CPSC relating to
25  drywall remediation process?

89

1      A.  I've seen some, and, you know, there's some
2  things that they've said which I don't necessarily agree
3  with as a professional. But, you know, I went about on
4  the houses we were involved with saying what is it that I
5  would want to see as a responsible professional.
6      Q.  Okay. So you considered some of those in
7  connection with developing the process described here in
8  your report; right?
9      A.  Yeah, I think the report is largely describing
10  the processes that we've taken, and after having been
11  involved with that, I have seen some Florida documents, so
12  I can't say that those documents were considered by any
13  means before we did our -- our work initially.
14     Q.  Do you know if they were or they weren't, you
15  just don't remember?
16     A.  I don't think they were. I don't think we
17  basically -- that wasn't the genesis of how we figured out
18  what should be done.
19     Q.  Okay. Just because part of the trouble -- you
20  haven't provided a list of materials that you've
21  considered in preparing your report and your model?
22     A.  Right. And I could -- if -- if that's something
23  that, you know, is requested, I could go back and do that.
24         What I did was I drew upon my experience and the
25  work that we did, and that's what this is based on.

23  (Pages 86 to 89)

90

1    Q.  And what were the portions of the Florida
2    guidance that you -- what were the issues in the Florida
3    guidance that you disagree with?
4        A.  The main one that comes to mind is that initially
5    the recommendations said that all electrical wiring should
6    be removed, and I agreed with that as a position.  And
7    that was published, I think, in 2009/2010 in a remediation
8    document that I think is referenced in Judge Fallon's
9    statement, or his paper.  I think Florida came out
10   sometime later and said, you may not need to replace all
11   the wiring, that they left it as -- it was no longer
12   mandatory.  I think it became an option, and for me it was
13   still mandatory.  I didn't -- I wouldn't say that it's,
14   you know, an option not to replace the wiring when you see
15   what's happened to a lot of it and realize that the cost
16   to get to it is so expensive, it doesn't make economic
17   sense to leave it there, realizing that it's evidencing
18   problems.
19       Q.  Now, you have a statement on page two of your
20   report where you say, "WBD does not currently recommend or
21   support a partial repair approach for these residences."
22       A.  Right.
23       Q.  And by these residences, you mean residences that
24   contain corrosive or problematic drywall?
25       A.  Right.

91

1    Q.  What support -- what literature do you site to
2    support that recommendation?
3        A.  I don't have any literature off the top of my
4    head.  I can only say, again, coming back to the document
5    that was authored by Judge Fallon, he basically went for
6    the comprehensive approach in his decision, and -- and
7    that's what we've done as well.
8        Q.  All right.  So you're relying and you talked a
9    lot about the Judge Fallon decision, you're relying on
10   this legal document; right?
11       A.  Well --
12       Q.  For a number --
13       A.  To some extent, but I'm also relying on the fact
14   that I'm a licensed professional, and I know that at the
15   end of the day, someone is relying upon my judgment for
16   their health, safety and welfare.  I mean, that's
17   basically, as a licensed professional, what you are
18   obligated to protect.
19       Q.  All right.  Without inspecting the residences,
20   how can you make a determination in your report?  How can
21   you state in your report that you don't currently
22   recommend or support a partial repair approach?
23       A.  Well, on everything I've worked on so far, it's
24   been very clear, and I'm sure it would show up in the
25   photographs when you give them the list of what you want

92

1    about the kind of corrosion that I've seen.  So there's --
2    there's been no question in my mind from the conditions
3    that present themselves that you would do something less
4    than that.  I suppose if the day came when somebody sent
5    you photographs and there's no corrosion, then, yes, you
6    would say, that's like when I told you there's instances
7    in our past work where there was a structural requirement,
8    you know, you had to go and look at it.  In that case if
9    somebody sent you photographs and there's no evidence of
10   corrosion, I would say this is one we have to go look at.
11       Q.  What if you had any corrosion in the home you
12   would support a total repair?
13           MR. WEISS:  Objection to form.
14           You can answer.
15   BY MR. SULLIVAN:
16       Q.  Total remediation?
17           MR. WEISS:  Object to the form.
18           You can answer.
19           THE WITNESS:  At this point I think I would have
20   to know more about what you mean by "any."  I would
21   have to see photographs of if -- if it's one area that
22   has some corrosion, I would have to see what is that?
23   Is that representative of just that one condition, or
24   is, in fact, that representative of multiple areas.  I
25   mean, I would have to see that.  I have not yet

93

1    encountered a house where we have found that.
2    BY MR. SULLIVAN:
3        Q.  And that's part of my point.  You would need to
4    see photographs.  How can you make a statement --
5        A.  Yeah.
6        Q.  -- that you don't currently recommend or support
7    partial repair approach of these residences without
8    knowing exactly the state of -- the nature of the
9    corrosion, location of the corrosion?
10       A.  Right.
11       Q.  The amount of corrosion?
12           MR. WEISS:  Objection to form.
13           You can answer.
14           THE WITNESS:  Well, I think it comes down to a
15   couple of things.  One is I've allowed for there's
16   going to be photographs in this process, we have to
17   have photographs or video to see what's going on.  Two
18   is, if you get something back that doesn't show that
19   there's any problem, that's going to go in the
20   category of somebody has to look at this because
21   you're not going to remediate a property where there's
22   no problem.  To date I haven't encountered that.
23   Every one of these I have seen has had a problem
24   somewhere, whether it's been one we've been engaged on
25   or not, and the problems have been generally pretty

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

94

1    extensive.
2    BY MR. SULLIVAN:
3        Q.   But it's possible that you would not recommend a
4    total remediation in some instances?
5        MR. WEISS:  Object to the form.
6        THE WITNESS:  If basically there was no evidence
7    of a problem, I would want to have more information,
8    probably personally or have someone from my office see
9    it.
10   BY MR. SULLIVAN:
11       Q.   Is if there is no evidence of the problem the
12   only situation where you wouldn't recommend a total
13   remediation?
14       A.   Or if it's like they send you photographs and say
15   this is the only area, we have one area, then I think you
16   would want to look at it.  Again, I have not encountered
17   that to date.  Every property I have seen and been
18   involved with has had evidence throughout.
19       Q.   Exhibits -- why don't we work with Exhibit --
20   probably Exhibit 4 if you could?
21       A.   Okay.
22       Q.   And just so the record is clear, Exhibit 4 is the
23   version of the -- is this what you would call the survey
24   data sheet?
25       A.   No.

95

1        Q.   What would you call this document?
2        A.   This is basically --
3        Q.   I've been calling it a chart?
4        A.   Yeah, well, this is basically our scope of work
5    and our estimating matrix.
6        Q.   Okay.
7        A.   The -- the survey data sheet has not been
8    prepared to the point that it's, you know, part of any of
9    this.  This is basically what happens after the survey
10   data sheet when you process that information, you look at
11   it.
12       Q.   Okay.  But the -- for purposes of the model that
13   you described in your report, the survey data sheet is
14   really the first step; right?
15       A.   That's right.
16       Q.   And at what stage are you in the development of
17   the survey data sheet?
18       A.   I've taken a quick pass at it and was not
19   convinced that I was ready for sending it out to be
20   utilized, and so I acted on this project by going out and
21   seeing it myself.
22       Q.   And you write on page five of your report:
23   "Central to WBD's remediation planning direction is the
24   completion of its survey data sheet for each individual
25   home"; right?

96

1        A.   Right.
2        Q.   So the idea is that once the survey data sheet is
3    completed, you would be able to provide this to the
4    homeowner to fill out?
5        A.   That's right.
6        Q.   And what -- what does the draft of your survey
7    data sheet currently look like?  Do you have one in draft
8    form?
9        A.   Not that I'm willing to present, no.
10       Q.   Why aren't you willing to present it?
11       A.   Because it's not ready for presentation.
12       Q.   What does the draft have in it?
13       A.   It has the various rooms that you would -- you
14   would go room by room to fill it out, and it has the
15   components as in floor, base, wall and ceiling, and you're
16   identifying what the finishes are and the general size of
17   things.  So, for instance, you know, if you have a wood
18   baseboard, how tall is it?  It's three and a half inches.
19   Is it painted or stained?  It's painted.  That kind of
20   thing.
21       Q.   How long is it right now, the survey data sheet?
22       A.   It's a couple sheets.
23       Q.   Now, you considered the survey data sheet in
24   preparing your report; right?
25       A.   I did.

97

1        Q.   And --
2        A.   But in the November report it was more the idea
3    of it.  It was subsequent to the November report that I
4    actually put down some ideas on the survey data sheet.
5        Q.   So you wrote the November report before you
6    started the survey data sheet?
7        A.   Right, and I explained that, I think, in the
8    report.  I say that, you know, central to this would be a
9    survey data sheet.  I didn't say, you know, it's something
10   that's been prepared yet.
11       Q.   Oh, when you said that, you meant it wasn't ready
12   yet?
13       A.   Correct, yeah.
14       Q.   And how -- how much time so far have you spent
15   developing the survey data sheet?
16       A.   Limited.  I don't know.  Someone in my office
17   probably worked on it for part of a day and I worked on it
18   for a few hours.
19       Q.   But that's -- this -- the survey data sheet is a
20   central aspect of your model?
21       A.   It is, yes.
22       Q.   And what are you going to include -- are you
23   going to -- do you intend to run survey data sheets
24   through statistical sampling methods?
25       A.   Not until we implement them for a few houses and

25  (Pages 94 to 97)

98

1    see how they work. I mean, you know, once you have it and
2    it's up and running, then you would decide, are you going
3    to do some kind of statistical analysis of it. But until
4    you have it, you basically are relying on going and
5    looking at it, and that's what I did for this particular
6    house.
7       Q. So without the survey data sheet, you're --
8    you're not really working with your model for purposes of
9    the Brincku home, are you?
10      A. Oh, I think --
11         MR. WEISS: Object to the form.
12         THE WITNESS: -- I'm very much working with the
13      model. I basically did those types of things that
14      will be on the survey sheet just by my experience and
15      my intuition, go out there and look at these things,
16      collect the data, get photographs of them, and that
17      becomes, basically, what's used for developing this
18      pricing.
19   BY MR. SULLIVAN:
20      Q. But you haven't completed the survey data sheet,
21   so how do you know that everything that you've looked at
22   is going to be accommodated by the survey data sheet that
23   you ultimately end up preparing?
24      A. I don't think I understand your question.
25      Q. All right. Well --

99

1       A. You accommodate it by the fact that I've done
2    this for so many years, this type of work, that when I
3    look at something, I'm not just looking at it. I mean,
4    for you, you probably look at a wall and say, it looks
5    like a wall. I look at a wall and say, Oh, I got wood
6    base that's got a cove on the top. I mean, I'm seeing it
7    in a completely different world than you are. What I'm
8    trying to get to is get that world into a quantifiable
9    sheet that basically then can be filled out.
10      Q. Okay. And you're -- you're assuming that the
11   inspection that you did of the Brincku home on Monday will
12   incorporate all the types of considerations that will
13   ultimately be reflected by your survey data sheet?
14         MR. WEISS: Objection to form.
15         You can answer.
16         THE WITNESS: "All" and "ultimately" are not
17      words that in my vocabulary. It has enough of the
18      right elements, as do the other houses that I've done,
19      that I'm confident that this can be put together. As
20      you encounter more things over time, you will modify
21      to some degree what you're doing. It's that other
22      column that gets filled in. We had the same
23      experience in doing the exterior of these houses, we
24      started, we modified, we refined, you know, and that's
25      -- that's kind of the entire loop as a process.

100

1    You're constantly collecting information, feeding
2    back, modifying until you get the tools so it
3    absolutely works. But it can work.
4    BY MR. SULLIVAN:
5       Q. But you haven't tested it yet?
6       A. No, I think we've talked about that a few times.
7    I think I have tested it, I really have. I haven't done a
8    scientific test on it, but as I answered earlier, I've
9    tested the procedure, I've also tested the results. I
10   have experience that says that the predictions that we
11   have made in terms of cost are accurate and the repairs
12   work.
13      Q. So just for ease of reference I'll call Exhibit 4
14   the estimator chart; is that fair?
15      A. That's fine. I think we called it projected cost
16   summary.
17      Q. Okay. I'll call it the cost summary then, how
18   about that?
19      A. Perfect.
20      Q. Okay. How -- how did you go about preparing this
21   document?
22      A. I took the materials that were in the report, the
23   November report, and they were based on my experience,
24   this matrix, okay, that's pages at the back of that
25   report, I don't know if they're separately numbered, but

101

1    you'll see some of the same categories are in there.
2    And --
3       Q. Are there any categories in your report that are
4    not in Exhibit 4?
5       A. There may be. I didn't make the ultimate
6    comparison of those two. Again, you know, this was a
7    pretty good assignment to get a request at the end of one
8    week to be doing it for completion on Wednesday the next
9    week. I mean, that's -- in my world that's moving pretty
10   fast with something that's relatively new. So, you know,
11   you could go line by line and say, okay, this is on here,
12   it's not on here, I haven't done that.
13      Q. You haven't checked it?
14      A. I haven't compared the two. I have checked it,
15   that's how I discovered the cost issues, so it was
16   checked. But it wasn't basically -- there wasn't a
17   comparison made to find out the difference between the
18   scope of work where it started and the scope of work where
19   it is on Exhibit 4.
20      Q. Okay. The -- the cost summary in your report
21   identifies sources. Do you see that?
22      A. Exhibit 4?
23      Q. Uh-huh.
24      A. Yes.
25      Q. Exhibit 4 identifies sources, and so does the

26  (Pages 98 to 101)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

102

1  version in your report?
2      A.  Right.
3      Q.  Pages 6 and 7.  The version in the report has a
4  bullet point under sources for subcontractor estimates,
5  drywall/insulation, plumbing, electrical, doors and trim.
6  Do you see that?
7      A.  No, what are you looking at?  I'm looking at
8  Exhibit 4, it's not on there.
9      Q.  If you look at your report, page --
10     A.  Oh, okay.
11     Q.  -- seven, bottom of page seven.
12     A.  Yeah, I thought you were talking about this.
13     Q.  Oh, sorry.
14     A.  Right.  Okay.
15     Q.  Your Exhibit 4 does not have the bullet point for
16  subcontractor estimates; right?
17     A.  That's because I did not personally get
18  subcontractor pricing for the Brincku residence.
19     Q.  Okay.  But you think it's important -- in your
20  report you think that's an important consideration; right?
21     A.  Well, I did that through a contractor who got
22  subcontractor pricing for me.
23     Q.  Okay.  So --
24     A.  It's not independently in my work product, but
25  it's independently in their work product.

103

1      Q.  Are you relying on estimates for purposes of
2  Exhibit 4?
3      A.  No, this is basically work product based on
4  experience and the cost estimating manual.  At a similar
5  breakneck speed I asked the contractor who we have worked
6  with to give me pricing for this house without seeing the
7  house.
8      Q.  Okay.
9      A.  That's the Derelle.
10     Q.  So Derelle -- and this document is in your file,
11  this is an estimate from Derelle, Inc., in Clermont,
12  Florida?
13     A.  Right.  And -- and Derelle basically was given
14  the drawings and basically the list of these things
15  without telling him quanties or pricing.  All right?  So
16  that he had my menu, and the photographs, never saw the
17  house.
18     Q.  Okay.  And when did you send that information to
19  Derelle?
20     A.  Monday when I came back from seeing the house,
21  the photographs went to him, and I think we received the
22  drawings maybe on Friday.  So the drawings were probably
23  sent on Friday, but I don't think he looked at it until
24  Monday.
25     Q.  Okay.  And when did you receive the estimate?

104

1      A.  Yesterday afternoon.
2      Q.  At about -- at 1:54?
3      A.  Yeah, say two p.m.
4      Q.  And what did you do with this estimate?
5      A.  I basically had a copy made for me and put it in
6  the file.  I looked at it, you know.  I was curious to see
7  what numbers had been come up with.  But Derelle basically
8  talked with some of their subs, so we have some sub
9  pricing in there, as I would have suggested be done in my
10  report.
11     Q.  So how are you -- how did you use this to prepare
12  Exhibit 4?
13     A.  I used it as a means, late yesterday, to cross
14  check to see whether I was in the ballpark.  My number is
15  higher than Derelle, but I think I have a few more things
16  in there than he does.
17     Q.  He's got a total of $197,716?
18     A.  Correct.
19     Q.  In terms of remediation costs?
20     A.  Yes.
21     Q.  And he reviewed the photos?
22     A.  Yes.
23     Q.  He reviewed the drawings?
24     A.  Yes.
25     Q.  He talked to you?

105

1      A.  And someone in my office.
2      Q.  And someone in your office.  And he reviewed the
3  list of items on your scope of work?
4      A.  Right.
5      Q.  And he talked to the subcontractor?
6      A.  That's right.  So I've done part of what I was
7  telling you in the report, and I think verbalized earlier
8  today, which is to have the work should be done, which is to have a second
9  set of eyes on it to come up with a check.
10     Q.  And tell me who is Derelle?  What's your
11  relationship to Derelle?
12     A.  They are a specialty contractor that does mostly
13  single family type of work, and they have done the repairs
14  for us on two homes so far.
15     Q.  So you have a working relationship with them?
16     A.  Well, I mean, I don't know what you mean by
17  working relationship.  There were two projects that they
18  did based on our scope of work that we reviewed their
19  work, signed off on their work, and did all the pay
20  applications for their work.  They did the pay aps, we
21  reviewed them and approved them.  So we have worked with
22  them.
23     Q.  Okay.  Why don't I make a copy of the Derelle
24  estimate at a break and we'll use it as a separate
25  exhibit.

27  (Pages 102 to 105)

106

1      Do you know what contractors Derelle talked to?
2      A.  Not off the top of my head.  I could find out,
3  but not as I sit here right now.
4      Q.  You didn't talk to any subcontractors?
5      A.  No.
6      Q.  And were these subcontractors in the area of the
7  Brincku home?
8      A.  I believe some were.  There was -- it was
9  intended that they would talk to someone in the Fort Myers
10  area.
11      Q.  Okay.  And the purpose of that, I take it, was to
12  try to generate some accurate labor costs --
13      A.  Some local pricing.
14      Q.  -- and material costs?
15      A.  Yeah, yeah.  I mean, what I was trying to do in
16  this is see if we could get in the same ballpark, and we
17  are.  And we have had that experience with them on other
18  projects, so I have a confidence that this house could be
19  remediated for something in the order of 200 plus thousand
20  dollars.
21      Q.  Now, Derelle provides an estimate, I think we
22  said, 197,716; right?
23      A.  Yes.
24      Q.  Exhibit 2, which is the version that you, sir,
25  prepared, sent to us last night, you totalled the

107

1  remediation costs at $230,344.35; right?
2      A.  Correct.
3      Q.  And between last night and this morning it got
4  more expensive because, as listed in Exhibit 4, it's now
5  $231,881.39?
6      A.  Correct.
7      Q.  Okay.  So the difference between -- we'll call it
8  the $231,000 number and the $197,000 number, that's about
9  $34,000?
10      A.  Correct.
11      Q.  $34,000 difference between your cost estimate as
12  reflected in Exhibit 4 and the Derelle estimate?
13      A.  Correct.
14      Q.  Okay.  So that's about a 20 percent or so
15  difference, just ballpark?
16      A.  Well, it's probably like 15, 200,000, plus 15 is
17  30; right?  20,000?  Yeah, 30,000 on top of 200, is 230.
18  So it's a 15 percent difference.
19      Q.  You put in a number for using an architect or
20  program manager?
21      A.  Correct.
22      Q.  Right.  Why do you need to use an architect or
23  program manager?
24      A.  Well, my experience on problem buildings, someone
25  will need to, at the very least, sign off on what the work

108

1  is, and in my experience on these, one of the two houses
2  that we did, we had to have a sealed set of drawings for
3  the county.  And so there was requirement either to have
4  an architect or a PE provide a set of documents that would
5  be sealed.  And so the big difference between Derelle and
6  my work, our office's work, is a ten percent cost for
7  those services.  Derelle has nothing in there, and he
8  basically will, you know, most likely not take the
9  responsibility of a design professional because he's not a
10  design professional.
11      Q.  What does the term "allow" mean under the
12  quantity column in Exhibit 4?
13      A.  It means that I used my experience, looked back
14  at other projects, did my best judgment on it.  So it's
15  more of an allowance than it is -- it's not a hard number.
16  You'll see some of the numbers are hard numbers because
17  they come out of the estimating guide.  Other numbers,
18  either the estimating guide doesn't include it, or I would
19  have some experience to say, this is what I think, you
20  know, you should allow for that particular item.
21      Q.  You're guesstimating based on your experience?
22      MR. WEISS:  Objection to form.
23      THE WITNESS:  Yeah, it's more than guesstimating.
24  I think guesstimating has a little bit of a negative
25  connotation, it's a professional judgment based on my

109

1  overall experience.
2  BY MR. SULLIVAN:
3      Q.  And so the record is clear, Exhibit 4, the cost
4  summary chart, it has nine columns; right?
5      A.  Yes.
6      Q.  And going from left to right on the sheet, the
7  first is scope of work?
8      A.  Yes.
9      Q.  Second is further action?
10      A.  Yes.
11      Q.  Third is quantity?
12      A.  Yes.
13      Q.  Fourth is unit?
14      A.  Yes.
15      Q.  Five is labor unit cost?
16      A.  Yes.
17      Q.  Six, total labor cost?
18      A.  Yes.
19      Q.  Seven, equipment, material and unit cost?
20      A.  Right.
21      Q.  Eight is total equipment and material cost?
22      A.  Yes.
23      Q.  And the last is line total?
24      A.  Right.
25      Q.  And in the scope of work, is this -- the items

28 (Pages 106 to 109)

110

1  listed under the scope of work column, does this represent
2  everything that you believe would need to be done at the
3  Brincku residence, assuming there were problematic drywall
4  there?
5      A.  At the moment.  It's always subject to further
6  revision if I were to learn something new, and also for
7  us, when we have like a particular scope of work, that's
8  not the only place that that shows up when you actually go
9  to do the work.  This is for estimating purposes, but in
10 order to tell the contractor what to do under a particular
11 scope, there would be further definition either on a set
12 of drawings or a specification is the way we handle it.
13     Q.  Okay.  Getting back to your model for a second,
14 we talked about the fact that you would consider having a
15 contractor go out after you've received a survey data
16 sheet from the homeowner to check?
17     A.  Correct.
18     Q.  Right?  Now, in this instance, for example,
19 Derelle has got a $197,000 estimate and your project cost
20 summary has about $231,000?
21     A.  Correct.
22     Q.  So just for the sake of the question, that's
23 about a 15 percent difference?
24     A.  Right.
25     Q.  How, as you're in the drafting process of your

111

1  survey data sheet, how will you consider this difference
2  for purposes of developing that?
3      A.  Well, the first thing is Derelle doesn't have any
4  ability in there, doesn't put any number in there for
5  preparing documents for carrying out the work.  So you
6  can't say that these two things are absolutely able to be
7  compared because what I've indicated is something that's
8  going to be closer to the true cost for a couple reasons.
9  So in terms of the survey data sheets, what you're going
10 to have to do is try and identify those things that the
11 homeowner can help, you know, identify that go into this
12 kind of format because I think these nine columns are the
13 correct columns as to, you know, what are we doing with
14 the plumbing fixtures, okay, you know, well, they're going
15 to be stored.  And actually some of them are being
16 trashed, so there's -- there's a mix there.
17     But the point is that you would look at the
18 project in terms of these activities, and that's going to
19 give you a costing.  And so you went back into your survey
20 data sheet by saying, okay, well, if I know I've got to
21 remove the plumbing fixtures, one of the things on the
22 survey data sheet is going to be, tell me what plumbing
23 fixtures are in your powder room.  Does it say Eljer on
24 the toilet?  Does it say American Standard?  Do you see a
25 model number?  You know, that type of thing.

112

1      Q.  But essentially there's a 15 percent discrepancy
2  between the work that you did and the Derelle estimate;
3  right?
4      A.  Well, I can't say it's a discrepancy because
5  Derelle didn't include all the things that we would tell a
6  client they're going to need in order to do the project.
7  Derelle can't basically just go and do the work based on
8  this written document.  There's -- there needs to be
9  drawings and specifications, in some cases sealed because
10 I have encountered that where the county actually required
11 it, and so Derelle doesn't have that because that's not
12 part of what he is doing.  Someone else is providing that,
13 plus the other thing is that Derelle does not have,
14 obviously, anything in his number for any kind of third
15 party review.
16     Somebody will need to, maybe the homeowner is
17 going to assume that role, somebody is going to need to
18 sign off that the work that Derelle or someone else is
19 saying they did, they actually did, because you're going
20 to have pay applications.  The pay applications will say,
21 I did these kinds of things, pay me this amount of money.
22 Someone has to make a judgment as to whether that's
23 correct.
24     Q.  Okay.  So for purposes of your model, right,
25 you're going to need to sort through all these kinds of

113

1  issues to resolve any discrepancy or -- resolve any --
2  resolve any difference between estimates; right?  Because
3  you're going to have the estimate that's generated as a
4  result of the survey data sheet?
5      A.  Right.
6      Q.  And you're going to have the contractor estimate
7  that ultimately is designed to be a check on that; right?
8      A.  Right.
9      Q.  And then you're going to have to work through
10 differences in terms of how those estimates are generated;
11 right?
12     MR. WEISS:  Object to the form.
13     You can answer.
14     THE WITNESS:  Well, I guess what you're saying is
15 in the event the numbers don't line up perfectly, you
16 have to understand how they're different.  You know
17 immediately, if you have a third party involved to
18 prepare documents, it's going to be different than a
19 contractor's estimate because they don't provide those
20 services.  So you can say, you can immediately take
21 whatever number you get from the contractor and some
22 amount of money has to be added on top of that for
23 basically documents and construction administration.
24 That's -- that's a no-brainer.
25     Somebody has to do the work.  Now, maybe the

29  (Pages 110 to 113)

114

1  homeowner is going to do it, but somebody basically
2  has to do the work because that's not the work the
3  general contractor does.  Somebody has to basically
4  oversee and make sure that the work is done to some
5  standard.  Okay?
6      That's your biggest difference between the two.
7  The other difference is probably in that I'm
8  estimating heavier on some of these things just
9  because that's where I am right now.  You'll see that
10  Derelle doesn't have any contingency.  You'll also see
11  that we say that there should be a contingency in the
12  number.  I think it's very reasonable to have a five
13  percent contingency, so if you look at --
14  BY MR. SULLIVAN:
15      Q.  What's a -- sorry.
16      A.  Yeah, so if you look at Derelle, let's say in
17  round numbers, Derelle's number is 200,000.  In round
18  numbers, my number is 210,000.  That's very believable
19  that I'm carrying five percent in there for the fact that
20  I'm trying to try to give myself a little elbow room
21  things that are contingencies.  Derelle is putting it
22  together like he's bidding the job, but he hasn't even
23  seen it yet.  He's never been on site.
24      He may come back and see it and say, hey, I need
25  a little more money.  Well, I think I've got it in there.

115

1      Q.  Where is the five percent contingency in your --
2      A.  I'm just saying overall, if you look at it, I'm
3  five percent higher than Derelle.  And I find that's very
4  believable, because as I'm putting numbers together, I'm
5  not doing it like I'm bidding the job.  He's doing it like
6  he's getting ready to bid the job.  I mean, he's saying,
7  okay, this is what I would do.  But somewhere there has to
8  be a contingency because things won't be exactly as
9  planned.  So I would explain the difference as 200,00 and
10  210,000 as a five percent contingency.  To me that's very
11  believable.
12      Q.  Why don't we take -- it's now a good time to take
13  a lunch break.
14      A.  Okay.
15      VIDEOGRAPHER:  Going off the record.  The time is
16  12:06 p.m.
17      (A break was taken.)
18      VIDEOGRAPHER:  Back on the record.  The time is
19  12:55 p.m.
20  BY MR. SULLIVAN:
21      Q.  Okay.  Mr. Williams, over the lunch break, you
22  took Exhibit 4 and marked with a check the items listed in
23  the scope of work that, for which you revised estimates
24  last night; correct?
25      A.  Correct.

116

1      Q.  So for each dollar amount on Exhibit 4 that has a
2  check mark, that's a new number compared to what was in
3  Exhibit 2?
4      A.  Correct.
5      Q.  Okay.  And, Mr. Williams, you just asked to look
6  at some photographs that were contained in the file.  What
7  photographs were you -- were you looking at?
8      A.  I was looking at photographs that were in the
9  master bedroom area.
10      Q.  And why were you looking at those photographs?
11      A.  I was basically looking at the proximity of one
12  of the fixtures in the ceiling to the exterior soffit.
13      Q.  And what fixture was that?
14      A.  It's a ceiling light fixture.
15      Q.  And I'll hand you the photographs.  Can you
16  identify for me the photographs that you were considering
17  there?
18      A.  I just found another one.
19      Q.  Can you identify them by number, please?
20      A.  Yes.  These are sequentially numbered in my photo
21  package.  It's photograph 346, 3 -- 345 first, 346, and
22  then 398 and 399.
23      Q.  Can I see the photographs, please?
24      A.  Yeah.
25      Q.  And what -- what are the -- can identify for

117

1  me what these are photos of?
2      A.  They're photos of the light fixture, and more
3  particularly, the junction box that is near the exterior
4  wall in the master dressing room.
5      Q.  Okay.  And why did you want to look at these?
6      A.  I was trying to refresh my memory about the
7  amount of corrosion that I saw at those fixtures.
8      Q.  How did that relate to the opinions that you're
9  offering in your report and to the scope of work?
10      A.  Well, we're replacing all the fixtures, but it
11  occurred to me that that particular fixture had
12  demonstrated some of the worst corrosion that I saw in the
13  house, and probably even on other projects.  And it was of
14  interest in that regard.
15      Q.  And what made you think about that?
16      A.  The fact that we were talking earlier about the
17  issue that a homeowner would photograph, at our direction,
18  conditions that had corrosion, and that I would expect and
19  want something like that to be captured in the survey data
20  sheets.
21      Q.  What made you look at those pictures in
22  particular?
23      A.  Well, Mr. Brincku, when he took me through the
24  house, pointed that out as a condition that he thought was
25  probably the most severe in the house.

30  (Pages 114 to 117)

118

1  Q.  And where in your -- on your scope of work do you
2  address that?
3     A.  Well, all the light fixtures and all the wiring
4  being replaced, so it's being addressed as part of the
5  overall.  But it's the kind of thing that if I saw a
6  picture of it, would certainly trigger a very real concern
7  in my mind.
8     Q.  So that would be -- would that be item 17?
9     A.  I think it actually shows up in more than one
10  place.  But, yes, item 17 is one place.  That's taking out
11  the fixtures and then there's an item for taking out the
12  wiring.
13    Q.  When you say it shows up in more than one place,
14  what do you mean?
15    A.  Well, there is -- this is broken down in scope
16  where you have removal of certain things, and so it would
17  show up in item 17 and item 29 because that's removing the
18  wiring, and then it would show up in the reinstallation,
19  which is in item 41 and item 75.
20    Q.  Okay.  And -- and was that the only purpose that
21  you were looking at those pictures for, was because you
22  mentioned Mr. Brincku identified it?
23    A.  Well, it was the primary thing.  I was thinking
24  about examples in the house that really illustrated
25  corrosion, and that's probably the most significant one.

119

1     Q.  Okay.  And you're not -- you're not providing an
2  opinion with respect to of any alleged
3  corrosion; correct?
4     A.  That's correct.
5     Q.  You haven't tested any of the alleged corrosion?
6     A.  No.
7     Q.  You're providing an opinion only with respect to
8  alleged damages; right?
9     A.  That's right.
10    Q.  And that assumes that there's been corrosion
11  that's been caused by problem drywall?
12    A.  Well, it assumes there's corrosion caused by
13  something.  Okay?  In other words, I'm not dealing with
14  causation, so I'm -- I'm even broader than your question.
15    Q.  Right.  But in your model, your report, assumes
16  corrosive drywall?
17    A.  It does, yes.
18    Q.  Okay.  So just so the record's clear, your
19  statement of damages that's reflected in your project cost
20  summary --
21    A.  Right.
22    Q.  -- that assumes that there's been corrosion if
23  there's been damage caused by problem or corrosive
24  drywall?
25    A.  Yes.

120

1     Q.  Mr. Williams, in your report on page five --
2     A.  Okay.
3     Q.  -- you write --
4     A.  Wait now.
5     Q.  Sorry.  I'll give you a second, sir.
6     A.  Okay.
7     Q.  You write, "However, if certain initial survey
8  information is collected, analyzed and locational factors
9  are applied, an estimate can be established which will be
10  more accurate than the "general range" remedial cost
11  approach."
12    A.  Right.
13    Q.  Period.  Can you identify any source in the
14  literature that supports that statement?
15    A.  Well, it's -- I can't say it's based on
16  literature.  I mean, what it's based on is doing the
17  estimate based on a combination of the guide, as well as
18  working with a contractor who has local expertise.
19    Q.  Okay.  And so I presume the general range
20  remedial cost approach is an alternative approach?
21    A.  Right.
22    Q.  -- to the one that you've done here?
23    A.  Yeah, I set that up in the previous page, I
24  think.
25    Q.  Okay.  And can you --

121

1     A.  Page four.
2     Q.  Can you just explain for the record what the
3  general range remedial cost approach is?
4     A.  Well, you could say based on, again, I think
5  Judge Fallon's document includes it, that to remove the
6  drywall and repair these houses is roughly $86 a square
7  foot, I think the conclusion that they reach.  So you
8  could just say, well, let me take every house and all I
9  need to know is how many square feet are involved and then
10  I'll multiply it by 86.  So that's the general range,
11  okay, that they're talking about.  But you can refine it
12  further and it may be either below or above that number,
13  depending on the project specific conditions.
14    Q.  Okay.  Have you -- have you run a general range
15  remedial cost approach here?
16    A.  Well, I made a quick comparison.
17    Q.  Where is that?
18    A.  Just in my head.  I did some quick numbers to see
19  what -- what the ranges were like.
20    Q.  Okay.  And how do you know that the numbers
21  reflected on Exhibit 4 are more accurate than the numbers
22  that you would get under the general remedial cost
23  approach?
24    A.  Because the house has been examined, quantities
25  have been taken off, there's been a further examination of

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

122

1  the overall construction. So, you know, it's more than
2  just saying well, the house is, let's see, 2500 square
3  feet, or I think it's 2535, and then the garage is 500 and
4  something, so I recall. 2355, sorry, I had that a little
5  reversed.
6      So, you know, you basically would -- if you were
7  doing a general cost range, you would say 2355 times $86,
8  and you would take some portion of the garage, you
9  wouldn't take the full value. So you would take half of
10 the garage, so 267 square feet on top of the 2355 would
11 give you some number, you multiply that times your $86 a
12 square foot. That would give you a general cost range.
13     Q.  Okay. Now, there are two approaches that you
14 have, and you have your approach here; right?
15     A.  Right.
16     Q.  That's reflected in Exhibit 4, and you've got the
17 general range remedial cost approach; right?
18     A.  Right.
19     Q.  And you've made a statement in your report that
20 the method that you go through in Exhibit 4 will be more
21 accurate than the general remedial cost approach?
22     A.  Correct.
23     Q.  Now, what is the benchmark by which you make --
24 that provides the support for that statement that your
25 approach is the more accurate one?

123

1      A.  Well, it's because the general cost range isn't
2  considering the specific factors at this house; it's just
3  saying, well, Judge Fallon said $86 a square foot, you
4  know. So when you go and look at the house, you actually
5  are seeing the physical conditions and you're putting a
6  price on repairing those conditions.
7      Q.  Now, Judge Fallon, he's in Louisiana; right?
8      A.  He is, as I understand it.
9      Q.  Okay. And they have presumably different labor
10 costs there?
11     A.  Right.
12     Q.  Different material costs?
13     A.  Right.
14     Q.  Okay. But when you say that your approach is
15 more accurate --
16     A.  That's right.
17     Q.  -- right? Presumably you have a bench mark in
18 mind; right? How do you measure -- how do you compare
19 whether one thing is more accurate than another?
20     A.  Well, the one that is based on the project
21 specific information is going to be more accurate. In
22 other words, Judge Fallon didn't say, let me look and see
23 for the Brinckus, you know, he basically gave some number.
24     What we did is we went out specifically, you
25 know, I personally surveyed, looked at the house, recorded

124

1  the information, then we took it back and applied it to
2  our cost summary matrix, and so this is as close as I can
3  get for this particular house.
4      Q.  So is it a -- is it a more accurate way of saying
5  it, that you considered more factors?
6      A.  Yes.
7      Q.  Not necessarily that your approach is the more
8  accurate?
9          MR. WEISS: Objection to form.
10         THE WITNESS: Well, it's going to be more
11 accurate with the inclusion of more factors.
12 BY MR. SULLIVAN:
13     Q.  And what testing have you done to determine that?
14     A.  My overall experience. Anytime that you can
15 apply the specific conditions to your pricing, you're
16 going to get a more accurate result than if you just say,
17 well, let's see the house is 2600 square feet times some
18 number that's an average for all kinds of houses; you're
19 going to get a more accurate result.
20     Q.  Are there any published authorities that support
21 your statement there?
22     A.  Oh, I'm pretty sure there are. I think the
23 estimating guides even tell you that -- you know, you can
24 say something is worth so many dollars per square foot,
25 but when you actually dissect it and cost or estimate each

125

1  particular item, that's a much more accurate way to go.
2      Q.  Can you identify one publication for me?
3      A.  Not off the top of my head, but I'm sure if
4  that's -- again, we can make the list. If that's
5  something that you want, I'm sure it's out there because, I
6  mean, otherwise people wouldn't do detailed estimates,
7  they would just say, let me just apply this square footage
8  cost against everything. And the square footage cost is
9  just to get you sort of in the ballpark. If that's --
10 that's something that's required, somebody direct me and
11 I'll find it.
12     Q.  But I was curious as to what support you had for
13 making the statement in the report.
14     A.  Okay. Well, I would say it's my overall
15 experience, it's the understanding in the industry that if
16 you're trying to make an accurate statement about cost,
17 you would want to find out exactly what the conditions are
18 and price those conditions.
19     Q.  How many times have you testified as a punitive
20 expert in damages -- on damages?
21     A.  A lot. Most of our projects involve damages, and
22 I've had various court and arbitration appearances about
23 costs and damages.
24     Q.  Has your -- have any of your opinions on damages
25 ever been excluded under Daubert or State evidentiary

32 (Pages 122 to 125)

126

1   rules?
2       A.  No, I've been qualified not only in the area of
3   diagnostics but in the area of repair and in the area of
4   costing repairs.
5       Q.  If you look at Exhibit 4 --
6       A.  Okay.
7       Q.  Take -- take items 11 through 19, for example.
8       A.  Okay.
9       Q.  How did you determine whether to discard these
10  items, allow these items, keep these items, or store them?
11      A.  Well -- okay.  Most of them are discard, and
12  anything that has an electrical component to it, we have
13  recommended on other work they be discarded because we
14  can't predict how long an item like that will last after
15  its been subjected to corrosion.  Further support for that
16  is under -- in published materials by I think both Fallon
17  -- Fallon and State of Florida.  They tell you that when
18  it comes to, I think, thermostats and smoke detectors, you
19  know, there's really no option, you got to replace them.
20      Q.  Now, you didn't review the State of Florida
21  guidance, though, before you prepared this scope of work?
22      A.  Not this particular document, but in the past I
23  have.
24      Q.  Did you review the CPSC guidance regarding
25  remediation of homes that contain drywall?

127

1       A.  Sometime ago.  I didn't do it this past week for
2   this particular assignment.
3       Q.  So you -- that's another document you considered;
4   right?
5       A.  Yes.  It's -- it's part of my overall background
6   and experience.
7       Q.  Did you consider -- do you know what the National
8   Association of Home Builders is?
9       A.  Yes.
10      Q.  Did you consider the National Association of Home
11  Builders document regarding imported problematic drywall?
12      A.  Yes, it was published sometime ago, as I recall.
13      Q.  Are there any other documents that you have
14  considered in connection with preparing your report other
15  than those we have discussed here today?
16      A.  Well, it's -- you know, it's kind of like the
17  universe of all my experience and things that would lead
18  to my experience.  Now, as I sit here I think we've
19  touched on the highlights, but it's not to say that
20  there's not something else I won't think of that I'll
21  consider.  It's certainly possible.
22      Q.  Now, when you prepared Exhibit 4, did you have
23  this -- I mean, I'm just trying to understand the process.
24  Were you in the home, did you have this document with you
25  in the home?

128

1       A.  No.  What I did was I went room by room and
2   basically made judgment about certain things, took
3   photographs of certain things, took certain notes, some of
4   which you have seen are transferred on to those photos of
5   the kitchen, and then I came back to the office and took
6   those things and said, okay, what are we going to do about
7   these items.  So I began Monday afternoon and worked
8   through it for the balance of the week until last night.
9       Q.  And under quantity, take item number 22, for
10  example, remove baseboard?
11      A.  Right.
12      Q.  You have a number there 860?
13      A.  Right.
14      Q.  What does that represent?
15      A.  Linear feet, if you look in the next column, it
16  has unit.  So there's 860 --
17      Q.  Okay.  I see.
18      A.  -- linear feet of baseboard.
19      Q.  And that's baseboard, you measured 860 feet of
20  baseboard?
21      A.  Yeah, it was taken off the drawings, the
22  architectural drawings.  What I did was when I was on site
23  confirmed that the architectural drawings that were used
24  for construction were reasonable to rely upon.  I checked
25  certain key dimensions to see that I had a confidence in

129

1   them.
2       Q.  And, you know, if you don't have drawings, what
3   would you have to do to come up with a reasonably reliable
4   number for linear feet of baseboard?
5       A.  Well, probably the easiest way would be to take a
6   measuring tape and just measure around the perimeter.  You
7   take a rolling wheel and just go around the perimeter.
8       Q.  The perimeter of each floor?
9       A.  Or of each room, yeah.
10      Q.  In each room in the house?
11      A.  Yeah, baseboard's generally continuous, so you
12  basically just work your way around until you get back to
13  the starting point.
14      Q.  What's your basis for believing that the Brincku
15  home, assuming remediation were necessary, would require
16  three dumpsters?
17      A.  My overall experience.  There's normally one in
18  the beginning that's taking the first material, there's
19  one in the middle that's taking sort of the latter part of
20  the -- the deconstruction, and then there's one during the
21  construction process.
22      Q.  Okay, and how big are the dumpsters?
23      A.  30 cubic yards, CY.
24      Q.  Can you get bigger ones than that?
25      A.  Probably, but that's what I've on other jobs.

33  (Pages 126 to 129)

130

1 That's what I estimated.
2     Q.  And, again, just refresh my recollection, please.
3 What -- what do you mean by allow?  I know I asked you
4 that before.
5     A.  Right.  What that is, is I'm drawing upon my
6 experience, and I'm saying, okay, for temporary toilets
7 you're going to have, you know, one on the job site and,
8 you know, you're going to allow, basically $500 for
9 something like that.  You're probably going to have it
10 there for six months.
11     Q.  Can you explain to me what -- what happens in the
12 demolition process that -- that's you're ripping things
13 out, I take it?
14     A.  Correct.
15     Q.  And so these numbers here in the line total
16 reflect the amount of money you think it would take to
17 remove the items listed under demolition process?
18     A.  Right.  And they fall into two categories, one
19 category is allow, which means I'm drawing upon my
20 experience or a previous job.  I might say, okay, well,
21 what did it cost us on that job.  And then the second one,
22 which is the ones where you see there's more numbers
23 filled in under labor unit cost and total labor, and then
24 there's a little handwritten number on the right-hand
25 side, those are coming directly out of the estimating

131

1 guide.
2     Q.  Coming out of the two -- 2012 estimating guide in
3 your file?
4     A.  Yes.
5     Q.  The cleaning process, what -- what are you doing
6 there?
7     A.  Well, there's several things.  One is there's
8 cleaning that has to take place every day and during the
9 day, and so what you're trying to do is get the drywall
10 and other materials wrapped up and -- so there's a
11 vacuuming process that takes place.  And so that's the
12 preliminary shop -- shop vac is something that's going on
13 through the whole process.  Then what we've done is once
14 everything has been removed, we then shop vacced all the
15 surfaces to get the remainders because there's always
16 something that's still on the studs or stuck to the walls
17 somewhere.  And then once that is done, we basically have
18 done a Hepa vacuum process, and the reason we have waited
19 to do the Hepa vac is because the shop vacs are more
20 capable of removing the bulk material.
21     So when you get down to the Hepa vac, you're
22 taking a much, you know, or the finer particulate off of
23 the materials, and then there's a wipe down and spray and
24 clean process that we've used with a chemical that allows
25 you to get the residual that you didn't get with the

132

1 vacuuming.
2     Q.  And the rebuild process, I take it that's the new
3 construction?
4     A.  Yes.  Or remedial construction.  That's putting
5 it all back together.
6     Q.  And for the items listed in the scope of work,
7 you have -- how do you know that in terms of quality the
8 items listed here approximate what had been in the home?
9     A.  Based on my experience, looking at the home and
10 then picking things that are commensurate with that, and
11 in some cases, as I looked at it a little further last
12 night, I have actually come up a little short.  The
13 number, for instance, on the ceiling insulation, as I
14 recall, was not quite right.  It's a little too low,
15 but --
16     Q.  Wait, wait a minute.  What number is that?
17     A.  I'm trying to remember if it was in 49 that I saw
18 it, or it might have been in the removal.  I think it was
19 actually in the removal.
20     Q.  So is this another -- another error?
21     A.  It's basically -- I guess you can say it's an
22 error.  It's the number that's posted here is actually a
23 little bit low.
24     Q.  And at 49 you think?
25     A.  Well, let me just look and see here.  I think it

133

1 might be 33.  I can have the guide to look on page 216.
2     MR. SULLIVAN:  Why don't we go off the record a
3 second.
4     VIDEOGRAPHER:  Going off the record.  The time is
5 1:22 p.m.
6     (A break was taken.)
7     VIDEOGRAPHER:  Back on the record.  The time is
8 1:22 p.m.
9     THE WITNESS:  The point that I was making on item
10 33 is that there are, let's see, the unit price there
11 was $0.47, and that's for removing an R 19.  I think
12 actually there was an R 30 up there, so it should have
13 been $0.55.
14 BY MR. SULLIVAN:
15     Q.  All right.  Now, what are you basing that on?
16     A.  As I recall, when I poked my head up into the
17 attic space, I think it was an R 30 insulation, not an R
18 19, and when you look in the estimating guide, you'll see
19 that basically removing an R 19 is shown as $0.47, so
20 simply what happened was when the number was put on the
21 matrix, it was not basically picked up as being $0.55,
22 which is the actual R 30.
23     Q.  Okay.
24     A.  So we're talking about $0.08 difference over the
25 square footage.

34 (Pages 130 to 133)

134

1    Q.  Okay.  So just so the record is clear, when you
2  use the term R 30 and R 19, what are you referring to?
3    A.  That's an insulation value.  So R 30 is thicker
4  and therefore costs more money to remove it than an R 19.
5  But you know, it's that type of thing that's going to
6  happen in the estimating process, you're talking about
7  $0.08 over some square footage, so I'm -- I'm not
8  especially worried about that because it generates a
9  fairly small number.  The main thing you want to be sure
10  is that you've got all the big components and that they're
11  in in a realistic number.
12    Q.  Okay.  And was there a photo that you took of
13  that insulation to -- on which you're basing your change
14  on?
15    A.  Yeah.  If you can hand it to me.  It was really
16  off my recollection, but I did take some photos up there
17  in the attic, so I might be able to find it.  The photos
18  in the attic do not identify a specific R value, but it
19  looks to me as though the thickness, which is what my
20  recollection was, is that the Batt insulation up there was
21  more than a six-inch thickness.  So that's how I got to
22  where I am.
23    Q.  So are you -- you're now saying, based on --
24  you're now saying that at line 33 the number under labor
25  unit costs should be $0.55?

135

1    A.  I can't say without seeing some written number on
2  the insulation, but my recollection from being up in the
3  attic was it was thicker than an R 19.  So my point about
4  it is that you're going to have some of those things.
5  You're going to have some come and go on -- on each topic
6  area.  The main thing you're trying to do is get to -- be
7  sure you have the big topics included when you get to a
8  number that is a number that you can do the job for.
9    Q.  Okay.  But you don't believe that it's necessary
10  to revise your report on that?
11    A.  I wouldn't at this point, no.  I think it's a
12  pretty subtle fine point, but -- and that happens on most
13  projects somewhere because you -- you gather information,
14  you apply it, but there's always something else that may
15  be learned.  On the other hand, in the big picture, that's
16  not what we're worried about in these things.  What we're
17  trying to do is, you know, if somehow we came in that this
18  was $150,000 project and really it's somewhere between 200
19  and 250,000, that's what you're trying to find out.
20    Q.  And if you went -- if you went there and took
21  a look at the insulation in the attic, you would be able
22  to determine whether it was the R 19 or the R 30; right?
23    A.  Correct.  Or is it possibly two layers of R 19 up
24  there?  I mean, you know, there's -- there's variations,
25  and you can see in my photographs they're in some places

136

1  two layers.  Is that because somebody displaced it over?
2  You know, I don't know.  But what we're talking about when
3  you come right down to it is a number of $1,106.  Maybe it
4  should be $1,200, you know.
5    Q.  Yeah, in this particular instance, but obviously
6  given the number of different kinds of components in
7  homes, the fact that there is a lot of variation among
8  homes and the number, you know, and then a number of
9  homes, that can lead to wide variations potentially;
10  correct?
11    A.  Well, unless you have checks in the process, and
12  that's why I did what I did as far as getting numbers from
13  the contractor, because you now have two sources that are
14  telling you that the numbers are very close.  I mean
15  basically we're within like five percent of each other
16  once you take care of the fees for the architecture and
17  the program management.
18    Q.  And for purposes, though, of your model, this
19  would be an issue that you would have to address through
20  some sort of statistical analysis of error rate or known
21  or potential error rate; right?
22    MR. WEISS:  Objection to form.
23    You can answer.
24    THE WITNESS:  Yeah, I don't see it that way
25  because there are -- in construction there's always

137

1  going to be variables, just how you approach it will
2  be a variable.  But what you're getting to is what's a
3  reasonable value for repairing the house, and that's
4  what I think the model is intended to do is to get to
5  that reasonable model.  You could, you know, look at
6  any number of conditions and they'll come and go, but
7  as long as you get to that which is a reasonable
8  number, that's the value of the repair.
9  BY MR. SULLIVAN:
10    Q.  Explain to me why you use the 2012 guide, the
11  2012 -- what's it called?
12    A.  National Renovation and Insurance Repair
13  Estimator.  Because that's the current guide.
14    Q.  You're supposed to use the guide for the current
15  calendar year, for the current year in which you're
16  doing the --
17    A.  When you're expected to do the work, yeah.  We
18  aren't fortunate enough to know yet what the prices will
19  be for 2013.
20    Q.  Did you -- can I just look at the guide for a
21  second?
22    A.  Sure.
23    Q.  When you prepared the numbers in your statement
24  of work, did you look at the time and materials charts for
25  drywall materials at pages 100 to 104?

35  (Pages 134 to 137)

138

1    A.  Yes.
2    Q.  And where -- where is that reflected on here?
3    A.  Well, it's reflected in my general understanding
4  of what's going on, and then basically my pricing is based
5  on a previous job in this Fort Myers area.
6    Q.  What line number would that be at?
7    A.  Well, I'm looking for it right now.  It's in a
8  couple places.  It's in 54 and 55.
9    Q.  Did you prepare work papers with this?  Was there
10  a draft of this, were there calculations that were done
11  that were then put into this?
12    A.  There were takeoffs that were done, yeah.
13    Q.  Do you have those?
14    A.  No, they were just entered directly in the chart
15  once the takeoff was done.
16    Q.  When you say a takeoff, what do you mean?
17    A.  It's basically an estimating means for getting
18  the square footage, so there's 8,755 square feet,
19  approximately, of walls, and then there's 2,355 square
20  feet of ceiling areas.
21    Q.  Sorry.  Maybe the word takeoff was just throwing
22  me off.  Is that a --
23    A.  That's an estimating --
24    Q.  -- an estimating tool?
25    A.  Term of art.  So, in other words, when you do a

139

1  takeoff, you basically measure and project how much area
2  is on a various plain or continuous linear dimension.
3    Q.  And is that a hard copy document?  Is it
4  something you do on your computer?
5    A.  No, it was done basically by looking at the
6  drawings, preparing numbers, and then entering them
7  directly into this chart.
8    Q.  Okay.  So there were no documents in between your
9  calculations and this?  You did calculations and entered
10  them right on this?
11    A.  Yeah, yes.
12    Q.  Okay.  So just so the record is clear, there are
13  no work papers behind this; right?  No work sheets?
14    A.  Correct.  All the information was entered
15  directly on this.
16    MR. SULLIVAN:  I don't know what exhibit we're up
17  to.
18    MR. WEISS:  Nine.
19    COURT REPORTER:  Nine.
20    (Defendants' Exhibit 9, Florida professional
21    coalition for Chinese (reactive) drywall, was marked
22    for identification.)
23  BY MR. SULLIVAN:
24    Q.  Mr. Williams, do you recognize Exhibit 9 as the
25  document prepared by Florida Professional Coalition for

140

1  Chinese (Reactive) Drywall?
2    A.  Yes.
3  BY MR. SULLIVAN:
4    Q.  This is the guidance document that you have
5  considered at some point?
6    A.  Yes.
7    Q.  Page seven, the guidance document, it's in the
8  third paragraph down, it states that:  "Additionally,
9  contractors were moving ahead with the tear-out of these
10  homes with no guidance."
11    Do you see that?
12    A.  Not yet.  Which part of the paragraph is it?
13    Q.  It's actually the first line of the -- it's
14  really sort of the third paragraph on page seven.
15    MR. WEISS:  It's the first full paragraph.
16    MR. SULLIVAN:  Sorry.
17    THE WITNESS:  Oh, the first full paragraph.
18  Yeah, I'm sorry.  Got it.  I was looking down at the
19  third paragraph for some reason.
20  BY MR. SULLIVAN:
21    Q.  It says:  "Additionally, contractors are moving
22  ahead with the tear-out of these homes with no guidance.
23  In many cases the demolition is uncontrolled in reactive
24  materials being left behind in the home.  The expense to
25  remove the drywall requires the move-out of the occupants.

141

1  There is no assurance to either the contractor or the
2  occupant that the materials were removed properly and that
3  other materials were not damaged as a result of the
4  uncontrolled manner to which it has been done.  There is a
5  need for guidance in the industry."
6    A.  Right.
7    Q.  What part do you have -- what steps in your
8  protocol respond to that kind of concern?
9    A.  Well, the in houses we've done, when the drywall
10  was torn out as part of that fee that's added at the end,
11  either me, personally, or persons from my firm have been
12  on site to make sure that the protocol is established in
13  the field for how to take it down.  So there's a check
14  that occurs the day that you start taking it out, and
15  there's an overview as to how it should be done and what
16  should be avoided.
17    Q.  Okay.  And that's built into your model already?
18    A.  That's right.  Well, it's in my estimate in that
19  fee at the end.  It's part of the program management
20  that's on Exhibit 4, the ten percent.  You know, it's not
21  built into the contractor's number because he didn't
22  include that.
23    Q.  This guidance document does not provide for an
24  architect to be on site?
25    A.  Yeah, it could be somebody else, but it should be

36  (Pages 138 to 141)

142

1  a licensed professional, an architect or engineer,
2  somebody who will be professionally responsible.
3      Q.  I'll mark as Exhibit 10 the NAHB document on
4  Imported Problematic Drywall Identification Strategies and
5  Remediation Guidelines.
6      A.  Okay.
7          (Defendants' Exhibit 10, Imported problematic
8      drywall identification strategies and remediation
9      guidelines, was marked for identification.)
10 BY MR. SULLIVAN:
11     Q.  Is this a document you're familiar with?
12     A.  Yes, I've seen it before.
13     Q.  And this is a document you considered in
14 preparing your report?
15     A.  Yes.
16     Q.  So this -- this document outlines strategies for
17 partial remediation; correct?
18     A.  It does, yes.
19     Q.  And it's your position still that corrosive
20 drywall should not be partially remediated, that you
21 believe -- you recommend that there should be total
22 remediation?
23     A.  That's correct.
24     Q.  Okay.  So there are no circumstances that under
25 which other than a situation where there was no corrosive

143

1  drywall, right, there are no other -- there are no
2  situations in which you would consider partial
3  remediation?
4      A.  Well, I think we talked about it earlier, and I
5  said if there's some information that is presented in the
6  process I would certainly consider it.  If there's no
7  evidence of corrosion, you know, certainly it could be
8  considered.  But for all the houses I've seen, the
9  problems have been throughout the house.  I haven't
10 encountered that case study yet where it's only basically
11 in some limited part of the house.
12     Q.  And what's -- is there a -- what's the scientific
13 basis behind that decision not to do partial remediation?
14 What are you -- what are you --
15     A.  Well, in my experience all of the projects we've
16 worked on have had some part of the house that has
17 evidenced corrosion in all areas.  So I have yet to see
18 one where we don't have evidence of corrosion throughout
19 the house.  You know, if they exist, we certainly would
20 consider that.
21     Q.  When you say throughout the house, you mean to
22 every single component, or do you mean -- what do you
23 mean?
24     A.  Every room has some corrosion somewhere.
25     Q.  And what would be the basis for not just

144

1  remediating the corroded components?
2      A.  Well, it goes to causation, so I probably won't
3  go too far into it, but it appears as though the problems
4  are occurring because of a reaction between the wall board
5  and something that's going on with moisture, and if
6  there's a room that's going to be forever dry, I guess you
7  could consider that room, but in my experience,
8  particularly in Florida, most rooms are exposed to
9  moisture at some point in their lives.  The windows are
10 open, you know, rain showers, whatever.  So I'm still
11 looking for the case study that shows me that there's some
12 part of the house that's not reacting.
13     Q.  Okay.  So why don't we change the tape?
14         VIDEOGRAPHER:  Going off the record.  The time is
15     1:42 p.m.
16         (A break was taken.)
17         VIDEOGRAPHER:  Back on the record.  The time is
18     1:50 p.m.
19 BY MR. SULLIVAN:
20     Q.  Another question about Exhibit 4, Mr. Williams.
21     A.  Okay.
22     Q.  You have identified page numbers in the 2012
23 National Renovation and Insurance Repair Estimator that
24 you have looked at to calculate the amounts in the line
25 total column for certain items; correct?

145

1      A.  Correct.
2      Q.  What are you using as support for the amounts
3  listed for which you don't identify page numbers?
4      A.  Well, you'll see that basically it says allow,
5  and that's based on my experience or a previous job.  So
6  I'm basically pulling a number from my direct recent
7  experience or something that I would estimate based on my
8  overall experience.
9      Q.  Okay.  But what about, for example, you know,
10 lines 54, 55, 56.  You have estimates there, there's no
11 identification of allow where are you getting the dollar
12 figures.
13     A.  I think that came from the estimator, either that
14 or it came from another one of our projects.  I could
15 check.
16     Q.  Now, are you looking at documents in connection
17 with other projects to generate these numbers or --
18     A.  Experience.  In other words, what did it cost us
19 to do it on this project.
20     Q.  And were those projects in the same area as the
21 Brincku residence?
22     A.  One was Fort Myers area, the other was in Central
23 Florida.
24     Q.  Did you do any comparison in terms of costs of
25 labor, cost of materials, to make sure the numbers --

37 (Pages 142 to 145)

146

1   these numbers were accurate?
2       A.  That's why I went back to Derelle and asked them
3   for pricing as well.  So I used my judgment in past
4   projects, and then asked Derelle.  At some point I, again,
5   haven't had time.  I could probably do a lineup to see
6   what we think versus Derelle.
7       Q.  So do you think you could make the estimates in
8   Exhibit 4 more accurate if you had more time?
9       MR. WEISS:  Objection to form.
10      You can answer.
11      THE WITNESS:  I can't say they're going to be
12  more accurate, because the most accurate is when you
13  do the work.  Okay?
14  BY MR. SULLIVAN:
15      Q.  Right.  Prior to the time that you -- in light of
16  the fact that you gotta -- you gotta -- there's been no
17  work that's been done, with more time you would be able to
18  generate more accurate numbers; right?
19      MR. WEISS:  Objection to form.
20      You can answer.
21      THE WITNESS:  Well, I could say with more time I
22  would probably generate different numbers, but I can't
23  say they're more accurate.  I'm -- I'm satisfied en
24  ought to see what we have and what Derelle has, and
25  we're in the same ballpark.  We have a really good

147

1   idea what this particular house is going to take to
2   remediate it.  I think it also says that by using this
3   process we can get very, very close to a real number.
4       The actual number is going to be dependent upon a
5   lot of factors at the time you do the work.  You never
6   know that the final number until you do the work, but
7   for a planning point of view, you get real close.
8   And, you know, it may be slightly over, slightly
9   under, you know.  It's going to be a function of the
10  market conditions when you do the work.
11  BY MR. SULLIVAN:
12      Q.  When you prepare cost estimates, when you
13  prepared cost estimates in other projects, do you
14  typically get a second estimate from a contractor?
15      A.  If we can.
16      Q.  A third estimate sometimes?
17      A.  Only if it seems like there's something really
18  off.  We try to see what the resolution might be as to why
19  there is a real difference.
20      Q.  Do you keep any data that tracks, you know, the
21  difference -- the different -- the differences between the
22  estimates you provide and the difference in what the
23  contractors you get the second bid from?
24      A.  I can't think of any -- I mean, we don't do like
25  a data base or anything like that.  The normal acid test

148

1   is if you get into the project and all of a sudden the
2   numbers aren't working out, how come.  But we're generally
3   very, very close.  We are considering a variety of factors
4   and using our experience to put numbers on them.
5       Q.  We'll mark as Exhibit 11 -- this is a document
6   entitled Summary of Identification Guidance For Homes With
7   Corrosive from Problem Drywall as of March 18, 2011.
8       (Defendants' Exhibit 11, Summary of
9   identification guidance for homes with corrosive from
10  problem drywall, (March 2011), was marked for
11  identification.)
12  BY MR. SULLIVAN:
13      Q.  Do you see that?
14      A.  Yes.
15      Q.  Have you seen this document before?
16      A.  I believe I have, yes.  This is the USPSC.
17      Q.  You know what, can I have that one back, please?
18      A.  Okay.
19      Q.  Because I want to show you the one from --
20      A.  Previous one.
21      Q.  -- September 15th, 2011, which is the later one.
22      MR. WEISS:  Just mark the new one as 12.  This is
23  12.
24      MR. SULLIVAN:  That's 12.
25      (Defendants' Exhibit 12, Summary of

149

1   identification guidance for homes with corrosive from
2   problem drywall (September 2011), was marked for
3   identification.)
4   BY MR. SULLIVAN:
5       Q.  You can stick 11 to the side, if you want.
6       A.  Okay.
7       Q.  If you look -- let me back up.
8       You have seen this document before, Mr. Williams?
9       A.  I have, yeah.  Yeah.
10      Q.  On page three, if you look under Other Building
11  Materials and Contents, that section, the second sentence
12  says:  "Staffs of CPSC and HUD do not have a scientific
13  basis to believe that emissions from the problem drywall
14  require replacement of non problem drywall, wood studs,
15  flooring, cabinetry or other household components and
16  fixtures that may have been exposed to the drywall
17  emissions."
18      A.  Right.
19      Q.  Do you see that?  You don't have a scientific
20  basis to disagree with that statement, do you?
21      A.  No, I have a professional experience, which would
22  say if I'm the professional responsible for what I know
23  today about this issue, I would replace it all, or, you
24  know, I say replace it all, but for instance, we don't
25  replace tile flooring, okay, we haven't done it in the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

150

1  past. Well, I guess on one project we did on one area,
2  but generally not.
3        Cabinetry, if it can be cleaned, you make a
4  judgment call, and we have done that and we have reused
5  cabinetry. So you make a judgment call based on what's
6  there.
7        Q.  But your -- your decision to -- your
8  recommendation for total remediation is not based on any
9  scientific basis, it's based -- correct?
10       MR. WEISS:  Objection to form.
11       THE WITNESS:  It's based on -- it's based on my
12  overall experience, and when we've said remove
13  everything in our report, we're talking about removing
14  all drywall, unless somebody can prove that the
15  drywall can stay.  But we're not removing all of the
16  sub components.  In other words, we certainly don't
17  remove all the wood studs, flooring.  If it's soft and
18  absorptive, yes, for flooring, but, you know, if it's
19  hard and can be cleaned, no.  Cabinetry, depends.  If
20  the cabinetry can be cleaned, it can be reused.  All
21  the light fixtures in our projects have had to go.
22       So, you know, I think maybe there's a little bit
23  of disconnect between the two of us on when we said in
24  our report -- where is it?  "WBD does not currently
25  recommend or support a partial repair approach," we're

151

1  talking about a partial repair of the drywall.
2        We are, you know, partially repairing the
3  components, if the components are hard and can be
4  cleaned, then you can reuse them, and not damaged in
5  some other way.  I mean, we have had problems with
6  some damage occurring during the construction process,
7  which is almost inevitable.
8  BY MR. SULLIVAN:
9        Q.  So you're -- when you use the -- just so we're
10  clear, why don't you define for me what you -- what you
11  consider to be partial remediation.
12       A.  In the context of our report, what I was thinking
13  when we were doing that is not -- a partial would be
14  leaving some amount of the drywall behind that may be the
15  corrosive type drywall.  In other words, we wouldn't
16  support a repair where corrosive drywall is left behind;
17  you want to remove it.
18       Q.  Okay.  And a total remediation would be what?
19       A.  Well, I guess a total remediation would be if you
20  tore everything out of the house 100 percent, you know.
21       Q.  Every -- all the drywall?
22       A.  No, everything, studs -- in other words, I'm in
23  essence agreeing with much of what's written here because
24  we are not, in our work, removing woods studs, they're
25  just being cleaned.  Flooring, it depends on the type of

152

1  flooring.  If it's basically a hard flooring and can be
2  cleaned, that's fine.  Cabinetry is a mixed bag, sometimes
3  yes, sometimes no.  Depends on what it's like.  And other
4  household components and fixtures, well, fixtures,
5  basically we're removing all fixtures.  I haven't seen
6  evidence to leave fixtures.  And "other household
7  components" is kind of broad, but I think in all of our
8  projects, all of the appliances have had to be removed and
9  replaced.
10       Q.  So one area where you disagree with the CPSC
11  guidance is with respect to the fixtures?
12       A.  Yes.  Yeah, I don't think we have left any
13  fixtures behind in our work.
14       Q.  But there's no scientific basis behind that
15  disagreement; correct?
16       A.  I guess not scientific.  It's probably a
17  professional disagreement in that I don't know who from
18  the CPSC will be the responsible party if something fails
19  in a couple years.  Does the homeowner call CPSC and say,
20  we followed your recommendations and it didn't work out?
21  They'll say, well, we're revising our recommendations like
22  we've done how many times already.  I mean, you know, just
23  look at the history of these things and they've -- they've
24  revised them.
25       I'm looking at it in terms of a licensed

153

1  professional intending to protect the safety and welfare
2  of the owners and the public.
3        Q.  And -- and you're looking at it from the
4  perspective of a licensed professional, that you don't
5  want to have the public -- somebody from the public to
6  come back after you and blame you; right?
7        A.  Absolutely.
8        MR. WEISS:  Objection to form.
9        THE WITNESS:  That's reasonable because as a
10  design professional, part of your licensing mandate is
11  to protect the individual or the public.  So if you're
12  hired, it's your project, you should be looking out
13  for the protection of the individual and the public.
14  BY MR. SULLIVAN:
15       Q.  But you're also looking out for yourself?
16       A.  Sure, but -- and as part of that there is nobody
17  at the CPSC that you would come back to and say, and they
18  would say, oh, gee, if you look at the history of this we
19  changed our minds and we issued this next document.  I
20  mean, it's -- it's an ongoing thing with these folks.
21       What you do know is that there have been real
22  problems and the pieces that I think are pretty much, for
23  me, indisputable, are things that are electrical in nature
24  because they will be affected.
25       Q.  So it would be safer for you to recommend

39 (Pages 150 to 153)

154

1  remediation of all fixtures, for example, because there is
2  a less of a chance when you do that that the homeowner
3  will sue you?
4      MR. WEISS: Objection to form.
5      You can answer.
6      THE WITNESS: The number one objective is to make
7  the homeowner whole, and basically what is the safest
8  thing for them. The secondary issue is my
9  professional liability, but why would the homeowner
10 not be made whole on something that's a problem? They
11 have to be. And if you're asking them to take a risk,
12 then either they should have the opportunity to take
13 the difference in the money and say I'll take my risk
14 and take my money and invest it or, you know, go to
15 Disney World, but you shouldn't be asking the
16 homeowner to take a risk for something that is at this
17 point undefined.
18 BY MR. SULLIVAN:
19     Q. Okay. But it's not a science -- the problem that
20 you are identifying, it's not defined as a scientific
21 problem?
22     A. It is not defined today as a scientific problem,
23 there's not enough that's known. And it's quite simple,
24 and I think we indicated in the report, that someday our
25 procedures and recommendations may be modified. I -- I

155

1  certainly think that that could happen, but on the other
2  hand, for where we are today in helping to safeguard an
3  owner's safety and well being on a problem project, I
4  couldn't, as a professional, recommend that they accept
5  something significantly less.
6      Q. Okay.
7      A. Now, we do, as I say, we do compromise on things
8  that are hard surface things that we know can be cleaned.
9  I don't have a problem with that, but fixtures, no, I
10 don't see that.
11     Q. Okay. But just to be clear, your -- your
12 recommendation for a total remediation versus partial is
13 not a scientific recommendation?
14     MR. WEISS: Objection to form.
15     THE WITNESS: That's right, it's a professional
16 judgment, which I don't see how the CSPC -- CPSC --
17 can offer that professional guidance.
18 BY MR. SULLIVAN:
19     Q. Okay. The more -- presumably the greater number
20 of fixtures that are remediated, the higher fee estimate
21 is going to be; right?
22     A. Could be, yeah. Depends on what kind of fixtures
23 and how you're buying them.
24     Q. Okay. And you have billed into your -- your cost
25 summary ten percent for overhead; right?

156

1      A. That's right.
2      Q. Ten percent for profit?
3      A. That's for the contractor, yes.
4      Q. And ten percent for the architect -- architect;
5  right?
6      A. The program manager. It could be an engineer.
7  It needs to be a licensed professional, I think.
8      Q. And that ten percent built in there for the
9  architect program manager is -- includes, or is ten
10 percent of what the profit amount that the contractor
11 would receive?
12     A. That's right. It's ten percent is a normal in
13 the industry. It's basically ten percent of the
14 construction cost.
15     Q. Okay. I don't have any further questions right
16 now. I'm just going -- I'll go through my stuff and make
17 sure I don't have anything else. I don't know if you want
18 to take a break.
19     MR. WEISS: I have a few questions, so why don't
20 I start while you're looking through.
21     MR. SULLIVAN: Sure.
22     MR. WEISS: Could I have the Derelle estimate?
23     MR. SULLIVAN: Maybe you should mark this as a
24 separate exhibit.
25     MR. WEISS: Yes, why don't we mark it as 13. Is

157

1  that what we're up to?
2      COURT REPORTER: Yes.
3      (Defendants' Exhibit 13, Derelle estimate,
4  was marked for identification.)
5      CROSS-EXAMINATION
6  BY MR. WEISS:
7      Q. Mr. Williams, I have a few questions to follow
8  up.
9      In terms of the Derelle estimate, did that
10 include -- let me start that over.
11     In terms of the Derelle estimate, did you request
12 Derelle conduct the cleanup in accordance with the
13 protocol set out in your report as a part of this
14 estimate?
15     A. Yes, in other words --
16     Q. Go ahead.
17     A. I have worked with them in the past, and so they
18 know without ever seeing the document, because I didn't
19 provide them -- I considered the documents for this case
20 to be confidential in nature, so I did not give Derelle a
21 copy of the document. But, yes, they would have included
22 that.
23     Q. And would they have included, for example, the
24 line item that you have in the Brincku home remediation
25 estimate for air scrubbers? Is that something they would

40 (Pages 154 to 157)

158

1   have?
2     A.  Yes.  And that's one of those items that until
3   you get into it, you don't know exactly what you're going
4   to need.  It may be less, it may be more, but based on all
5   the work, that seems to be a reasonable number.
6     Q.  Okay.  In terms of the Brincku estimate that
7   we've been referring to, Exhibits 3 and 4 today, did you
8   take a conservative approach to get the final number
9   that's provided for in that report?
10     MR. SULLIVAN:  Objection.
11  BY MR. WEISS:
12     Q.  To be the lowest number that you could get to by
13   virtue of reusing items that could be reused and only
14   throwing out those items that in your professional opinion
15   needed to be thrown out?
16     MR. SULLIVAN:  Objection.
17     THE WITNESS:  Yes.
18  BY MR. WEISS:
19     Q.  Did you apply the methodology that you laid out
20   in your protocol report in generating the principal cost
21   summary for the Brincku home?
22     A.  Yes.
23     Q.  And in doing so, do you believe within a
24   reasonable degree of scientific certainty, that the
25   Brincku home could be remediated at the cost you provide

159

1   in your projected cost summary?
2     MR. SULLIVAN:  Objection.
3     THE WITNESS:  Yes.
4  BY MR. WEISS:
5     Q.  In preparing Exhibit 3 and Exhibit 4 using the
6   protocol that you had developed in this case, did you --
7   well, let me ask the question differently.
8     Did you forecast what the number might have been
9   for the Brincku home before you actually went to the home
10   and prepared this projected cost summary?
11     MR. SULLIVAN:  Objection.
12     THE WITNESS:  In very broad terms, based on other
13    projects, but I didn't get nearly so close until I did
14    the work.
15  BY MR. WEISS:
16     Q.  In the other two projects that you were talking
17   about that dealt with corrosive drywall, did you apply the
18   same protocol that you've opined to in this case?
19     A.  Yes.
20     Q.  And did you develop that protocol independent of
21   Judge Fallon's protocol and then later found out upon the
22   release of Judge Fallon's protocol that they were very
23   similar?
24     MR. SULLIVAN:  Objection.
25     THE WITNESS:  Yes.  So today we say it's Judge

160

1   Fallon's because it gets a little more credibility, I
2   think, but we basically did what we thought was needed
3   and later found that it was supported by Judge
4   Fallon's document.
5  BY MR. WEISS:
6     Q.  And you developed that protocol based on your
7   experience and education?
8     MR. SULLIVAN:  Objection.
9     THE WITNESS:  Yes.
10  BY MR. WEISS:
11     Q.  After you conducted the protocol -- I'm sorry.
12   Strike that.
13     After you remediated the two homes with corrosive
14   drywall that you just discussed, what test did you use to
15   determine if there was still corrosion occurring in the
16   house?
17     A.  We used a corrosion meter that gets hooked to a
18   series of copper coupons, and I'm trying to think of the
19   name of it.  It escapes me at the moment.  I could get it
20   for you or I might think of it.  But what you do is you
21   hang the coupons in different places in the house, and
22   then you periodically take the meter and plug it in and
23   you basically take readings, and it tells you how much
24   corrosion has occurred since the last time you took the
25   reading.  And it was fascinating to see because we

161

1   installed them in the one house as the work was being
2   done, the airing out was taking place, and everything was
3   being cleaned, and we could see how the corrosion
4   basically -- the rate of corrosion dropped way down, so we
5   got everything cleaned up and then basically everything
6   installed and then basically there was no evidence, or
7   there's probably always a little something on the scale,
8   but compared to where it was, they just completely dropped
9   out.  So, any way, it was just -- it was reassuring to me
10   because I didn't want to be doing a project and then find
11   out that somehow we had left something behind.
12     Q.  And was that a generally accepted method for
13   testing what amounts of corrosion were occurring in a home
14   in your industry?
15     MR. SULLIVAN:  Objection.
16     THE WITNESS:  Well, it's being used by other
17   consultants, one particular gentleman who has done
18   work down in the New Orleans area with the concerns
19   down there.
20  BY MR. WEISS:
21     Q.  Is the 2012 national renovation and insurance
22   repair estimator a generally accepted manual used in your
23   industry?
24     A.  Absolutely.
25     Q.  The Derelle estimate that you provided earlier,

41 (Pages 158 to 161)

162

1  was that a basis for your opinion or a check on your
2  opinion?
3      A.  It was a check.
4      MR. SULLIVAN:  Objection.
5      THE WITNESS:  It was a check on the opinion.
6  BY MR. WEISS:
7      Q.  Did applying the principles in your protocol to
8  the Brincku home and developing the projected cost summary
9  in any way change your opinion regarding the ability to
10  apply the protocol to a large number of homes to
11  remediate?
12      MR. SULLIVAN:  Objection.
13      THE WITNESS:  No, it's gotten us one step closer.
14      MR. WEISS:  I have nothing further.
15          REDIRECT EXAMINATION
16  BY MR. SULLIVAN:
17      Q.  A couple of questions.
18      Mr. Williams, have you -- is your methodology
19  federally approved?
20      A.  No, I haven't sought to obtain that.  I think
21  it's consistent with, again, the Judge Fallon document, so
22  I guess in that regard there's some maybe federal
23  standings because that was a multidistrict litigation
24  document; right?  But I haven't sought to submit it to
25  someone for approval.

163

1      Q.  You haven't sought to submit it to the Federal
2  Trade Commission for approval, for example, have you?
3      A.  No.
4      Q.  Mr. Weiss asked you a question regarding whether
5  your model -- I forget what the exact phrase he used was,
6  but whether --
7      A.  A reasonable degree of scientific certainty.
8      Q.  Yeah, that part.
9      A.  That one.
10      Q.  Whether it was accurate to a reasonable degree of
11  scientific certainty.  You agreed earlier, however, that
12  you had not tested your model; right?
13      A.  Well, there hasn't been a study made with a
14  statistical analysis, but what I can say is within the
15  industry that we work, meaning the construction industry
16  and the repair of buildings industry, it has proven to be
17  a reasonable model for determining what to do and how to
18  do it and what it should cost.
19      Q.  It has not been subject to scientific testing;
20  right?
21      A.  Correct, but that doesn't mean that it doesn't
22  have a reasonable degree of scientific certainty.  There's
23  two different questions, I think.
24      Q.  Has your model been -- your model been generally
25  accepted?

164

1      A.  Well, I guess I haven't tried to test it.  It's
2  been generally accepted by our firm, and it's generally
3  been accepted by the people that we've worked for.
4      Q.  But, again, a critical component of your model is
5  a survey data sheet; correct?
6      A.  That's right.
7      Q.  And that's not even done yet; right?
8      A.  No, but the essence of it is built into what
9  we've done.  The actual formalization of it is sitting
10  down and saying, okay, what is it that I need to ask
11  somebody to record, and that can be done; it just hasn't
12  been.
13      Q.  But you would agree with me that the survey --
14  the survey data sheet that's the lynchpin of the model
15  because that is what the homeowner is supposed to use
16  without the presence of a professional to fill out the
17  information that then will provide the basis for the
18  estimate; correct?
19      MR. WEISS:  Objection to form.
20      You can answer.
21      THE WITNESS:  Yeah, I can't say it's the
22  lynchpin.  There are other ways, you know, if there
23  was some serious objection to doing a survey data
24  sheet, I can imagine other ways to acquire the data.
25  BY MR. SULLIVAN:

165

1      Q.  Okay.  Well, let me just use your -- your word.
2  The survey data sheet is central to your remediation
3  model; correct?
4      A.  That's right, but there are other ways you can do
5  it, too.
6      Q.  Mr. Weiss asked you some questions about methods
7  used to determine whether there was corrosion taking place
8  in projects you remediated; right?
9      A.  Yes.
10      Q.  And he asked you whether those methods have been
11  generally accepted.  But that's a different issue, you
12  would agree, than whether the estimates that you provided
13  for those properties have been generally accepted, that
14  protocol?
15      MR. WEISS:  Objection to form.
16      You can answer.
17  BY MR. SULLIVAN:
18      Q.  That you used to form those estimates have been
19  generally accepted?
20      A.  Can you tell me again what you're trying to split
21  apart?  The estimates versus the scope of work, or --
22      Q.  Well, your model relates to -- it's a model for
23  providing remediation estimates; right?
24      A.  That's right.
25      Q.  That's a different issue than whether a

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

166

1   particular course of remediation works to prevent
2   corrosion; correct?
3       MR. WEISS: Objection to form.
4       You can answer.
5       THE WITNESS: I think I understand. What you're
6   saying is that the course for preventing the
7   remediation, in other words, who prescribes that
8   course, or that course that is prescribed by somebody
9   is different than basically preparing an estimate. So
10  if somebody basically comes up with a different course
11  for remediation, you would have a different estimate;
12  is that it?
13  BY MR. SULLIVAN:
14      Q. Let me try it again. I think that maybe -- I
15  think I'm just being unclear.
16      Your model is a model for the preparation of
17  remediation estimates?
18      A. Yes.
19      Q. Okay. That -- the model is not intended to
20  address whether the work that's ultimately done is
21  preventing corrosion; right?
22      MR. WEISS: Objection to form.
23      You can answer.
24  BY MR. SULLIVAN:
25      Q. That's assumed in your model?

167

1       A. That's right.
2       Q. Okay.
3       MR. SULLIVAN: Let's go off the record for two
4   minutes.
5       VIDEOGRAPHER: Going off the record. The time is
6   2:20 p.m.
7       (A break was taken.)
8       VIDEOGRAPHER: Back on the record. The time is
9   2:22 p.m.
10  BY MR. SULLIVAN:
11      Q. Mr. Williams, just to -- to be clear, 4, with
12  respect to Exhibit 4 --
13      A. Okay.
14      Q. -- any -- for any item that doesn't have a
15  reference to the 2012 Insurance Guide -- strike that.
16      It looks to me like the labor unit costs -- the
17  labor unit costs are based on the 2012 Insurance Guide
18  with the exception of -- well, strike that.
19      I'm sorry. Let me ask you a different -- similar
20  question. How did you go about determining labor unit
21  costs?
22      A. The estimate basically has two distinct ways of
23  approaching the cost. In the one way, in one method, you
24  find some task that's listed in the scope of work that
25  you're lucky enough to find something in that guide.

168

1   Example, item 12, remove water heater, and there's been
2   enough interest in removing water heaters that the
3   National Renovation and Insurance Estimator will put a
4   number on it. And so you can basically turn to it and
5   find it and say, there it is. Okay?
6       Now, the ones that don't fit so neatly into that
7   are things like, well, what if I, you know, I'm renting
8   dumpsters for this job, how many dumpsters might I need?
9   That's a judgment call you're going to have to make with
10  what's required. So you know, I make that call, and it
11  could be based on what did we do on the last job, or it
12  could be based on, yeah, I think, three should be enough.
13  So that's really -- there's two distinct things, one is
14  purely based on your experience and you making a judgment on
15  your experience, or, two, you can say, oh, look, we found
16  it, they are removing interior air handlers.
17      Now, sometimes, you know, I look at the guide and
18  I say, they can't be serious. I mean, you can't do that
19  for that amount of money, and they say, well, I don't know
20  if I want to rely on that or not. A lot of times I just
21  get it down so that we have something to work from and see
22  where do I come out overall.
23      Q. All right. But those are the only two sources
24  that you've relied on to prepare --
25      A. Yes.

169

1       Q. -- the estimates in Exhibit 4?
2       A. Yes.
3       Q. Right?
4       A. Yes.
5       Q. There are no others?
6       A. Correct. Now, other under circumstances, like I
7   said in the November report, we might get prices from
8   subcontractors because I didn't have time to get
9   subcontractors into my office to talk to them about stuff,
10  I said to Derelle, can you get me some numbers and talk to
11  some subs. So he did his own number, I mean, he's doing
12  it like he's bidding the job. That's his, you know, daily
13  stuff.
14      Q. Okay. But you could get some -- you could get
15  these estimates from subcontractors, too; right?
16      A. You could, yeah.
17      Q. And am I correct that the more subcontractors you
18  asked for estimates the more likely you would be to
19  identify a -- an accurate estimate?
20      MR. WEISS: Objection to form.
21      THE WITNESS: Not necessarily, and it depends on
22  how busy the sub is, does the sub have any interest at
23  all in doing this work, what's availability of
24  materials and manpower. So having more subcontractor
25  numbers doesn't necessarily produce a more refined

43 (Pages 166 to 169)

170

1  number.  What you want to do is get as close as you
2  can, for me, with your overall experience and say,
3  this is what it would cost this last time, is there
4  any reason why I can't get something close to that?
5  No.  We bought it for that, we estimated it this, we
6  bought it for that, it was installed and it all worked
7  out, so that's -- you know, we got confidence in that.
8      With the subcontractors, what we like to do is
9  get a general contractor who has good relationship
10  with subs that aren't going to just keep throwing out
11  numbers, because you want a realistic number from a
12  real world sub, not somebody that's going to be just
13  saying, well, if I get this it's going to be a
14  windfall or, gee, I got to get this to stay in
15  business because neither one of those are subs that
16  you want.
17  BY MR. SULLIVAN:
18      Q.  Okay.  And you didn't get any of those numbers,
19  those kind of numbers from contractors before you prepared
20  this Exhibit 4?
21      A.  Correct.  I basically asked Derelle to get what
22  they could.
23      Q.  After you prepared Exhibit 4?
24      A.  No, we prepared concurrently because there wasn't
25  enough time to be after.  We both started essentially on

171

1  Monday afternoon and by Wednesday night we were done.
2      Q.  Did you have Derelle's before you finalized this?
3      A.  I was close.  We had basically a number, and I
4  was actually just a little bit lower when I got Derelle's,
5  and my number went up.  And I told you, part of it was the
6  2012 estimator and part of it was I had forgotten an item
7  or two, so my number basically went up slightly.
8      Q.  Okay.  I don't have any more questions.
9      MR. WEISS:  We'll read.
10     MR. SULLIVAN:  Oh, one request on the record.
11  Can I get a list of materials that you considered?
12     THE WITNESS:  If that's what you want.
13     MR. WEISS:  No, we'll provide it.  Of course.
14     VIDEOGRAPHER:  This concludes the deposition.
15  The time is 2:29 p.m.
16
17     (Deposition concluded at 2:29 p.m.)
18
19
20
21
22
23
24
25

172

1
2  STATE OF _____ )
3                         ) :ss
4  COUNTY OF _____ )
5
6
7      I,  Mark Williams, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15     _____
16
17        Mark Williams
18
19
20  Sworn and subscribed to before
21  me, this          day of
22         , 2012.
23
24     _____
25        Notary Public

173

1        CERTIFICATE OF OATH
2
3  STATE OF FLORIDA)
4  COUNTY OF COLLIER)
5
6      I, the undersigned authority, certify that MARK
7  WILLIAMS personally appeared before me and was duly sworn.
8
9      WITNESS my hand and official seal this _____
10  day of _____, 2012.
11
12
13     _____
        Lori L. Bundy
14     Notary Public - State of Florida
        My Commission No.:  EE 132707
15     Expires:  September 22, 2015
16
17
18
19
20
21
22
23
24
25

44  (Pages 170 to 173)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

174

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA)
COUNTY OF COLLIER)

    I, Lori L. Bundy, Certified Court Reporter and Notary
Public in and for the State of Florida at Large, certify
that I was authorized to and did stenographically report
the deposition of MARK WILLIAMS; that a review of the
transcript was requested and that the transcript is a true
and complete record of my stenographic notes.

    I further certify that I am not a relative, employee,
attorney, or counsel of any of the parties; nor am I a
relative or employee of any of the parties' attorney or
counsel connected with the action; nor am I financially
interested in the action.

    DATED this _____ day of _____, 2012.


        _____
        Lori L. Bundy, FPR, RPR, CRR, CLR

---

175

INSTRUCTIONS TO WITNESS

    Please read your deposition over carefully
and make any necessary corrections. You should state
the reason in the appropriate space on the errata
sheet for any corrections that are made.
    After doing so, please sign the errata sheet
and date it.
    You are signing same subject to the changes
you have noted on the errata sheet, which will be
attached to your deposition.
    It is imperative that you return the original
errata sheet to the deposing attorney within thirty
(30) days of receipt of the deposition transcript by
you. If you fail to do so, the deposition transcript
may be deemed to be accurate and may be used in court.

---

176

E R R A T A

    I wish to make the following changes,
for the following reasons:

PAGE LINE
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____

_____   _____
WITNESS' SIGNATURE         DATE

---

45  (Pages 174 to 176)