**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

GEORGE BRINCKU and                          Civil Action No. 2:11-cv-338-FtM-29SPC
BRENDA BRINCKU,

      Plaintiffs,

vs.

NATIONAL GYPSUM COMPANY,  a
Delaware Corporation,

      Defendant.
_____/


**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT, NATIONAL
GYPSUM COMPANY'S MOTION TO EXCLUDE EXPERT REPORTS AND
TESTIMONY OF PLAINTIFFS' EXPERT WITNESSES DAVID C. STRAUS
AND JOHN SAM SUTTON**

## **TABLE OF CONTENTS**

INDEX OF EXHIBITS .................................................................................................... iii

TABLE OF AUTHORITIES ............................................................................................ v

INTRODUCTION ........................................................................................................... 1

SUMMARY OF THE ARGUMENT ............................................................................... 1

I.   DAUBERT STANDARD FOR EXPERT TESTIMONY ........................................ 2

A.   Plaintiffs Experts are Competent and Qualified ........................................... 3

B.   Plaintiffs Theory is Supported by Established Science ................................. 5

C.   The Unique Corrosion Pattern Identifies Defective Drywall ....................... 9

D.   RTL Testing Methods are Well Established ................................................ 12

    i.   The Culture Test is a Valid Method for Determination of the Presence of
Bacteria. ..................................................................................................... 14

    ii.   The Enzyme Test is a Valid and Recognized Test to Determine Whether
Specific Bacteria are Present in the Sample. ............................................. 15

    iii.   The DNA Tests are a Valid and Recognized Method for Identifying Specific
Bacteria. ..................................................................................................... 17

    iv.   The Corrosion Tests are a Valid and Recognized Method for Identifying
Specific Bacteria. ....................................................................................... 23

E.   Samples Tested by RTL Were Collected in a Valid and Reliable Manner .............. 24

II.   TIMING OF EXPERT REPORTS .......................................................................... 25

    A.   Plaintiffs Were Not Operating in Bad Faith ...................................... 26

    B.   Straus's Amended Theory Will Not Disrupt the Trial ................................. 27

    C.   National Gypsum Failed to Cure the Prejudice ............................................ 27

    D.   No Prejudice to National Gypsum................................................................ 28

III.   STRAUS MAKES ASSUMPTIONS THAT ARE RELIABLE .............................. 29

CONCLUSION.............................................................................................................. 29

## INDEX OF EXHIBITS

**_Exhibit No._**                                                                   **_Page(s)_**

1       J.S. Sutton Deposition Transcript…………………………  3, 4, 14, 20, 22, 23

2       J.S. Sutton Resume……………………………………………...3, 18

3       Real Time Laboratory's Certificate of Registration……………………………...3

4       Deposition Notice for Dennis Hooper…………………………………………4

5       David C. Straus, Ph.D. Deposition Transcript……………………..4, 5, 7, 26, 27

6       David C. Straus, Ph.D. Curriculum Vitae…………………………………….. 4

7       Dennis G. Hooper, et al., _Isolation of Sulfur Reducing and Oxidizing Bacteria_
        _Found in Contaminated Drywall_, International Journal of Molecular Sciences,
        Feb. 5, 2010……………………………………………………………5, 17,18

8       _Confidential To Be Filed Under Seal-_  Internal Email of NG managers, BS#
        NG00067313…………………………………………………………………… 6

9       David C. Straus, Ph.D 3/15/12 Reports for all Plaintiffs…………………..6, 7, 28

10      Okabe, et al., _Succession of Sulfur-Oxidizing Bacteria in the Microbial_
        _Community on Corroding Concrete in Sewer Systems,_ Applied and
        Environmental Microbiology, Nov. 27, 2006…………………………………… 8

11      Theodore Myatt Deposition Transcript………………………………8, 19, 28, 29

12      Brenda Joyce Garr Little, Ph.D Deposition Transcript………………8, 14, 28, 29

13      Cliff Hardt Deposition Transcript…………………………………………… 10

14      CPSC Identification Guidance for Homes with Corrosion from Problem Drywall
        as of March 18, 2011……………………………………………………………10

15      Robert Odle Deposition Transcript……………………………………………...1, 11

16      _Confidential To Be Filed Under Seal-_Real Time Laboratory's Standard Operating
        Procedure for Culture Procedure……………………………………………14, 15

17      Real Time Laboratory Reports for all Plaintiffs………………...14, 15, 17, 18, 23

**_Exhibit No._**                                                                                   **_Page(s)_**

18        CPSC Report on Microbiological Assessment…………………………………15

19        RapidChek®II SRB Detection System by Strategic Diagnostics Inc…………... 16

20        Dale Warren Griffen, Ph.D., MSPH, *The Use of Epifluorescent Microscopy and*
          *Quantitative Polymerase Chain Reaction to Determine the Presence/Absence*
          *and Identification of Microorganisms Associated with Domestic and Foreign*
          *Wallboard Samples,* U.S. Geological Survey Report, Sept. 14, 2011……...17, 18

21        Real Time Laboratory Data Sheets for all Plaintiffs………………………... 17, 24

22        *Confidential To Be Filed Under Seal*-Real Time Laboratory's Standard Operating
          Procedures on Drywall Nucleic Acid Extraction (Adapted from the Qiagen
          DNeasy Tissue Kit)……………………………………………………………17, 18

23        *Confidential To Be Filed Under Seal*-Real Time Laboratory's Standard Operating
          Procedure on Sulfur Reducing and Oxidizing Bacteria Detection Utilizing Real-
          Time PCR…………………………………………………………………………22

24        Michael Tuday Report for Plaintiff Brucker…………………………………… 23

25        *Confidential To Be Filed Under Seal*-Real Time Laboratory's Standard Operating
          Procedure on Corrosion Testing of Drywall………………………………… 23

26        Real Time Laboratory's Copper Wire Sample re Exposure to Domestic
          Drywall…………………………………………………………………………23

27        Mark Cramer Report for Plaintiff Brucker………………………………...24

28        Correspondence and Test Results from Dr. Harold Larson and Professor Thomas
          W. Eager of MIT to Brincku Plaintiffs re Cause of Corrosion in Their Home…27

29        David C. Straus, Ph.D. 11/17/11 Reports for all Plaintiffs and 1-24-12 Amended
          Report for Plaintiff Brucker……………………………………………… 28

# TABLE OF AUTHORITIES

**Cases**

Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311-12 (11th Cir. 1999).................1, 2

Ambrosini v. Labarraque, 101 F.3d 129, 141 (D.C.Cir.1996)...........................................2

Bagley v. Home Depot U.S.A., Inc., 2011 WL 1884146 (M.D. Fla. Jacksonville (May 8, 2011)..........................................................................................................................12

Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d, 1311, 1317 (9th Cir. 1995).9, 16

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596, 113 S.Ct. 2786, 2798 (1993) ....................................................................................................................passim

Leathers v. Pfizer, Inc., 233 F.R.D. 687, 691-92 (N.D. Ga. 2006)..............................3, 15

Maiz v. Virani, 253 F.3d, 641, 666 (11th Cir. 2001) .........................................................2

Newman v. GHS Osteopathic Inc., 60 F.3d 153 (3d Cir.1995)........................................26

Porchia v. Design Equip. Co., a Div. of Griffith Laboratories, 113 F.3d 877, 882 (8th Cir. 1997) ......................................................................................................................27, 28

Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341-42 (11th Cir. 2003)...................................................................................................................2, 13, 14

Rider v. Sandoz Pharmaceuticals Corp., 295 F.3d 1194, 1197 (11th Cir. 2002)...........3, 5

Siharath v. Sandoz Pharm. Corp., 131 F.Supp.2d 1347, 1351 (N.D.Ga.2001) .................3

Smith v. Jacobs Eng'g Group, Inc., 4:06CV496-WS/WCS, 2008 WL 4264718 (N.D. Fla. Mar. 20, 2008)...............................................................................................................26

**Rules**

Fed. R. Civ. P. 26 ......................................................................................................25, 26

Fed. R. Civ. P. 26(e)(2)...................................................................................................25

Fed. R. Civ. P. 26(a)(3)...................................................................................................25

Fed. R. Civ. P. 37 ...........................................................................................................25

Fed. R. Civ. P. 37(c)(1)...................................................................................................25

**Treatises**

29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure;*
   *Evidence* § 6265 (West 1997) ......................................................................................3

**INTRODUCTION**

At this stage of the litigation, "the judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311-12 (11th Cir. 1999)(quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596, 113 S.Ct. 2786, 2798 (1993).

Essentially, both parties agree that Plaintiffs' home has severe corrosion.  (See, e.g. Exh. 15, pp. 54, 113).  Plaintiffs believe that the corrosion is caused by a specific strain of bacteria within the drywall, while National Gypsum contends that the corrosion is caused by the well water at Plaintiffs' home.  For the reasons set forth below, the motion should be denied and this case should proceed to a trial on the merits.

**SUMMARY OF THE ARGUMENT**

Microbiologically Influenced Corrosion (MIC) refers to a mode of corrosion incorporating microbes that react and cause the corrosion or influence other corrosion processes of metallic materials.  MIC causes corrosion to fire sprinkler systems, wastewater treatment plants, ocean vessels, mining equipment, materials used in the petroleum industry and a wide variety of other circumstances.  MIC is well-documented and understood within the scientific community.  Plaintiffs contend that the corrosion

1

taking place is their home, is the result of a specific strain of sulfur oxidizing bacteria and microbial influenced corrosion that generates sulfuric acid.

Plaintiffs' experts presented this theory through reports and reliable testing methods. NG seeks to prevent this testimony from reaching the jury. Because each challenged expert meets the requirements of <u>Daubert</u>, the motion must be denied.

## I.  DAUBERT STANDARD FOR EXPERT TESTIMONY

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1341-42 (11th Cir. 2003). Indeed, "[a] district court's gatekeeper role under <u>Daubert</u> 'is not intended to supplant the adversary system or the role of the jury.'" <u>Maiz v. Virani</u>, 253 F.3d, 641, 666 (11th Cir. 2001)(quoting <u>Allison v. McGhan</u> 184 F.3d 1300, 1311 (11th Cir.1999)). To the contrary, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. at 596, 113 S.Ct. at 2798.; <u>see also</u> <u>Ambrosini v. Labarraque</u>, 101 F.3d 129, 141 (D.C.Cir.1996) ("By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.").

Under <u>Daubert</u>, expert testimony is admissible if: (1) the expert is competent and qualified to testify regarding the subject matter of his testimony; (2) the methodology by which the expert reached his conclusions is sufficiently reliable; and (3) the expert, through scientific, technical or specialized expertise, provides testimony that assists the

trier of fact to understand the evidence or determine a fact in issue.  Leathers v. Pfizer, Inc., 233 F.R.D. 687, 691-92 (N.D. Ga. 2006).

### A.     Plaintiffs Experts are Competent and Qualified

Regarding the first Daubert element, the expert must be "competent and qualified by knowledge, skill, experience, training, or education to render the opinion."  Siharath v. Sandoz Pharm. Corp., 131 F.Supp.2d 1347, 1351 (N.D.Ga.2001), aff'd sub nom. Rider v. Sandoz Pharmaceuticals Corp., 295 F.3d 1194, 1197 (11th Cir. 2002). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question .... Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony not its admissibility.  Thus, Rule 702 takes a liberal approach to expert witness qualification."  29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure; Evidence § 6265 (West 1997).

Mr. Sam Sutton is the Vice President of laboratory operations at Real Time Labs ("RTL") in Carrollton Texas.  (Exh. 1, p. 21).  Mr. Sutton has a bachelor degree in biology and has extensive experience in the creation and establishment of DNA sampling protocols for several companies including Real Time Laboratories, S&S BioConsulting, LLC, The Methodist Hospital, and Lark Technologies.  (Exh. 1, p. 187; Exh. 2, pp. 2-3).  Mr. Sutton even helped to establish highly sophisticated DNA testing protocol used by Pfizer Pharmaceutical Company at its United Kingdom division.  (Exh. 2, pp. 2-3).

RTL is a licensed laboratory recognized by the Center for Medicare and Medicaid Services and is licensed to accept and perform testing on human specimens. (Exh. 3).  RTL routinely performs clinical culture and DNA testing for medical doctors,

hospitals and other clinical applications.  (Exh. 1, pp. 195-197).  RTL used the same or similar techniques and methodologies to test the drywall samples at issue in this case as it does in its clinical protocols.   (Exh. 1, pp. 195-197).

As the VP of Laboratory Operations at RTL, Mr. Sutton is familiar with the standard operating procedures used by RTL and he is qualified to sign and did sign the RTL reports related to the testing that was conducted in this case. (Exh. 1, pp. 20-43). Furthermore, Mr. Sutton only testified to the testing methods and test results obtained by RTL in connection with samples taken from Plaintiffs' home.  (Exh. 1, pp. 20-43).  Mr. Sutton does not opine as to the meaning or interpretation of those results.  (Exh. 1, pp. 34-35).

To the extent that other employees of RTL may be more familiar with the particular protocols used by RTL, like Dr. Dennis Hooper, NG originally noticed him for deposition but then, without prompting, cancelled. (Exh. 4).  Now, NG challenges Mr. Sutton and argues that Dr. Hooper should have been presented for deposition.  NG should not benefit from their discovery gamesmanship.

Thus, Mr. Sutton's education, background and title at RTL make him competent and qualified to render expert opinions in this case.

Dr. David Straus is a well known microbiologist and a professor of Microbiology at Texas Tech University.  (Exh. 5, pp. 16-17; Exh. 6).  Dr. Straus has published dozens of scientific papers in peer-reviewed journals, has authored textbook chapters, and has testified as an expert in approximately 50 cases during his distinguished career. (Exh. 5, p. 8; Exh. 6).  In this case, Dr. Straus testified about the known characteristics of the specific strain of bacteria that was found to exist in the NG drywall samples taken from

Plaintiffs' home.  Dr. Straus is qualified and competent to testify in this matter regarding the bacteria and its characteristics based upon his education, background and experience.

Dr. Straus and Mr. Sutton are co-authors, along with several others, of a 2010 peer reviewed paper published in the International Journal of Molecular Sciences titled *Isolation of Sulfur Reducing and Oxidizing Bacteria Found in Contaminated Drywall*. (Exh. 5, p. 53; Exh. 7).  A similar (but not identical) protocol used in the peer-reviewed study regarding contaminated drywall was used in this case.

Accordingly, Dr. Straus is also fully competent and qualified to testify regarding the topics at issue in this case.

### B. Plaintiffs' Theory is Supported by Established Science

Regarding the second <u>Daubert</u> element, in order to be reliable, expert testimony must be supported by scientific knowledge. The Court explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedure of science.  Similarly the word 'knowledge' connotes more than subjective belief or unsupported speculation." <u>Daubert</u>, 509 U.S. at 590, 113 S.Ct. 2786. It set forth four non-exhaustive criteria for determining whether expert testimony is based on reliable scientific knowledge: (1) whether the theory can and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error associated with the theory; and (4) whether the theory or methodology employed is generally accepted in the field. <u>Daubert</u>, 509 U.S. at 593-95; <u>Rider</u>, 295 F.3d at 1197.

Plaintiffs' theory of liability is that NG drywall from its Apollo Beach plant contained excessive bacterial contamination resulting from a pulp slurry added by Defendant to its drywall during the production process.  (<u>See</u> P's Opp to SJ at pp. 2-3).

Plaintiffs contend the drywall was manufactured without the biocide necessary to kill bacteria growing in its pulp mixer (*Confidential* Exh. 8 *To Be Filed Under Seal*), and that the bacteria, Sulfobacillus Thermosulfidooxidans ("ST" or "ST Bacteria"), is a sulfur oxidizing bacteria which generates sulfuric acid through a metabolic process when exposed to hydrogen sulfide ("$H_2S$").  (Exh. 9, p. 4).  The sulfuric acid produced by the ST bacteria corroded and continues to corrode the metal components within Plaintiffs' home.

Specifically, Dr. Straus's theory of the case is set forth in his report as follows:

> The finding of ST in the drywall of this home is highly significant because these organisms are known to convert sulfides to sulfuric acid (5, 6, 7). This finding is of great significance because extensive corrosion of copper components is one of the findings in this home and said corrosion would be consistent with exposure to sulfuric acid.

> ST which was the primary SOB found in this home has been shown to convert $H_2S$ to sulfate (8). A quotation from that paper (8) reads … "The moderately thermophilic *S. thermosulfidooxidans* strain 41 was capable of actively oxidizing the sulfide sulfur of concentrate to sulfate ($SO_4^{-2}$) ". A personal communication from Dr. D.E. Rawlings (who is one of the world's experts on SOB) states "ST can oxidize sulfides to sulfates. If the sulfur source is hydrogen sulfide ($H_2S$), the sulfur will be in the form of sulfuric acid (which is dihydrogen sulfate or $H_2SO_4$) "(9). This is very relevant because the defense expert report from Dr. John F. McCarthy (December 22, 2011) states that "These test results offer clear evidence that the air in the Nutting house is impacted by elevated levels of hydrogen sulfide present in the water supplying the house".

> I did not have access to Dr. McCarthy's report when I issued my initial report in this matter. Therefore I did not

realize that there was much more $H_2S$ in this house than I could have reasonably anticipated. The fact that the ST found in the home has the ability to convert the $H_2S$ from the water (as described by Dr. McCarthy) to sulfuric acid would account for the corrosion (blackening of copper components) observed in this house. Sulfuric acid is one of the most corrosive substances known (10). Thus the finding of ST in the National Gypsum drywall offers a reliable scientific explanation for the presence of the corrosion of the copper components found in this home.

All of my opinions have been expressed to a reasonable degree of scientific certainty.

(Exh. 9, p. 4; Exh. 5, pp. 114-115).

Dr. Straus' sulfuric acid corrosion theory satisfies <u>Daubert</u> because it is well documented by others within the scientific community.  In particular, the same bacterial based corrosion regularly occurs in sewer systems and has been well studied.   A Japanese peer-reviewed paper published in *Applied and Environmental Microbiology* in 2006 describes the same corrosion process as follows:

In sewer systems and wastewater treatment facilities where high concentrations of hydrogen sulfide, moisture, and oxygen are present in the atmosphere, the deterioration of concrete is caused mainly by biogenic acid (i.e., sulfuric acid) and is known as microbial induced concrete corrosion.   The biogenic acid is generated by various species and complex mechanisms. The general mechanism for sulfuric acid-caused corrosion of sewer systems has been described in the literature.  In the first step, hydrogen sulfide ($H_2S$) is produced by sulfate reducing bacteria under anaerobic conditions in sewer pipes.  The hydrogen sulfide enters the sewer atmosphere by volatilization and dissolves in the condensate on the sewer crown.  Finally, sulfur-oxidizing bacteria (SOB) oxidize the dissolved $H_2S$ and

other sulfur compounds to sulfuric acid, which corrodes the
concrete.[1]

(Exh. 10, p. 2).

This is precisely the same theory that is involved in this case.  This theory is
neither novel nor controversial.  In fact, both of NG's microbiologists agreed with the
basics of the theory.  (Exh. 11, pp. 136-138; Exh. 12, pp. 218-220).  NG's expert, Dr.
Little, explained what she called the "sulfuric acid corrosion cycle" in her own words as
follows:

> BY MR. WARWICK:
>
> Q.   Do you have any experience in that area?
>
> A.     I have -- I have reviewed the literature on that, and I
> understand the full sulfur cycle that is involved in that.
>
> Q.     Right.  And if you could, just briefly explain the full cycle
> -- sulfur cycle that is involved in that process.
>
> A   In a sewer?
>
> Q   Yes.
>
> A   The problem with sulfur-oxidizing bacteria in sewer is the
> following:  The sewers are most often not filled with water.
> They're only partially filled.  So the water at the bottom is full of
> organic material.  And there are anaerobic zones in this organic-
> rich water where sulfate-reducing bacteria reduce the sulfate to
> hydrogen sulfide.  The hydrogen sulfide is converted to a gas.
> The gas makes its way to the crown of the sewer, where the
> sulfate-reducing --where the sulfur-oxidizing bacteria inhabit.
> They oxidize the hydrogen sulfide to sulfuric acid.  The -- the
> concrete is basic, essentially; and the acid degrades the concrete.

(Exh. 12, pp. 214-217).

Expert testimony that is "based directly on legitimate, preexisting research
unrelated to the litigation provides the most persuasive basis for concluding that the

---

[1] Okabe, et al., *Succession of Sulfur-Oxidizing Bacteria in the Microbial Community on Corroding
Concrete in Sewer Systems,* Applied and Environmental Microbiology, Nov. 27, 2006.  (Exh. 10, p.2).

opinions expressed were derived by the scientific method." <u>Daubert v. Merrell Dow</u> <u>Pharmaceuticals, Inc.</u>, 43 F.3d, 1311, 1317 (9th Cir. 1995) (internal quotations omitted). Because microbial based corrosion caused by sulfur oxidizing bacteria is a well established scientific theory, Plaintiffs' theory of the case satisfies the <u>Daubert</u> standards.

### C.       The Unique Corrosion Pattern Identifies Defective Drywall

Furthermore, the unique corrosion pattern found in Plaintiffs' home is consistent with defective drywall and consistent with exposure to sulfuric acid.  Unlike other product liability cases where a plaintiff's damages could have been caused by a variety of unrelated issues, the heavy blackening and repeated failures of air conditioning systems found in Plaintiffs' home is particularly indicative of exposure to defective drywall.  While many homes in Florida are on well water that contains varying levels of hydrogen sulfide, no expert in this case or otherwise has ever shown blackening of copper components and certainly not a failure of multiple air conditioning coils in the pattern of Plaintiffs' home that has been linked to any cause other than defective drywall.  While NG likes to use many of the Chinese Drywall studies to distinguish its drywall in this case, NG cannot deny that the pattern of corrosion in Plaintiffs' home is entirely consistent with exposure to defective drywall.

NG's own experts must agree that the Plaintiffs' home has signs of unique corrosion.  The local Florida electrician who worked on NG's inspection team explained the unusual corrosion found in Plaintiffs' home as follows:

BY MR. GARY:

Q.   I understand.  Okay.  So the hundreds of other homes you've seen, you have never seen it -- the blackened wires except in these now five homes; correct?

A.   Yes.

(Exh. 13, p. 29).

Although the CPSC and the Florida Department of Health (and the experts they hired who are now working for NG) have not been able to determine the actual cause of the corrosion caused by Chinese Drywall, they have identified a particular pattern of corrosion.  The CPSC protocol describes defective drywall corrosion pattern as follows:

Step 1: Threshold Inspection

Visual inspection5 must show:
(a)  Blackening of copper electrical wiring and/or air conditioning evaporator coils; and

(Exh. 14, p. 2).

NG's metallurgist expert also agreed that the type of corrosion found in Plaintiffs' home is consistent with sulfuric acid exposure.

Q. In an aerobic environment will $H_2SO4$ react with copper?

A. Copper oxide will react with sulfuric acid.

Q. Back to this paragraph, you state, "The lack of sulfide corrosion would be considered as evidence that reactive sulfuric gases has not been present on the premises."  So if you find sulfide corrosion that's indicative of a reactive sulfuric acid in the homes you're inspecting?

A. Yes.

. . .

Q. So in the next paragraph where you state, "I've been on several inspections of homes claimed to have had copper sulfide corrosion caused by drywall, only to find no sulfide corrosion or even blackening by sulfidation."  Do you see that sentence?

10

A. Yes.

Q. That's not the case for the five homes you were in Florida, right?

MR. SULLIVAN: Objection, form.

A. Correct.

Q. In all the homes you went into for the Brinkcu and Brucker litigation you did find sulfide corrosion or blackening by sulfidation, right?

MR. SULLIVAN: Objection to form.

A. I found blackening in all homes.

Q. The next sentence reads, "In several cases, the copper was in pristine condition," that doesn't apply to the Florida homes you were in, right?

MR. SULLIVAN: Objection.

A. Correct.

Q. The next sentence where you state, "Even when blackening of the copper has been" -- "has occurred" -- I'm sorry, I'll start the sentence over. Even when blackening of the copper has occurred, that in itself does not permit the conclusion that the copper has been exposed to reactive sulfur gas or that the copper sulfide -- or that copper sulfide is formed on copper. That also doesn't apply to the five Florida homes, right?

A. After the fact, before you go look at something, it can be black for reasons other than copper sulfide. But if you're asking me after I've looked at the houses in Florida all of those had copper sulfide on the wires.

Exh. 15, pp. 48, 54-55.

Thus, Plaintiffs' theory shows the presence of a microbial based corrosion caused by ST Bacteria metabolizing the $H_2S$ within the home to generate sulfuric acid that corrodes the metal components of the home. The unique pattern of corrosion found in Plaintiffs' home indicates that the cause of the corrosion is the drywall.

Simply because there may be an alternative theory for the corrosion (well water according to NG), does not mean that Plaintiffs' experts should be excluded. The jury in this case will have to decide for itself whether the corrosion in Plaintiffs' home was caused by the drywall as Plaintiffs assert or by the well water as Defendant asserts. Both sides should be allowed to present the alternative theories of liability and the jury will ultimately decide which theory to adopt.

In <u>Bagley v. Home Depot U.S.A., Inc.</u>, 2011 WL 1884146 (M.D. Fla. Jacksonville (May 8, 2011) (slip op.), Judge Toomey allowed the plaintiff's expert to opine as to one of two alterative theories for a ladder collapsing on the plaintiff. In denying the defendants' <u>Daubert</u> challenge the Court held:

> As in Schmude, Dr. Morse's "opinion as to how the ladder failed was not subjected to scientific testing or submitted for peer review or publication." However, Dr. Morse "was able to show one way in which [the accident happened]." <u>Id.</u> As in Schmude, Defendant will have an opportunity to demonstrate that the accident was not caused by a defect and, then, "based on its own consideration of the evidence, the jury may decide which explanation to adopt."

Id. at *5.

This Court should follow the well-reasoned analysis adopted by Judge Toomey and allow the evidence to go to the jury.

**D.     RTL Testing Methods are Well Established**

NG next challenges the testing conducted by RTL because those tests are the basis for Dr. Straus's opinion. In doing so, NG cannot challenge the methods generally because they are all well established. Instead, NG focuses primarily on the specifics of each test and its opinion as to how each should have been performed. This type of challenge does not meet the <u>Daubert</u> standard because it focuses on issues subject to

each scientist in conducting his own research rather than whether the theory has been readily accepted by the scientific community.

NG's challenges to the manner in which RTL conducted these well known tests go to the weight of the proffered evidence rather than its admissibility.  In <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1345 (11th Cir. 2003), the Eleventh Circuit explained the distinction between challenging the underlying scientific theory and challenging the manner in which the expert interpreted or applied the underlying scientific theory.  The former is a valid ground for exclusion of the expert's testimony while the latter is not.  The Court explained this distinction as follows:

> Quiet does not argue that it is improper to conduct a CFD study using the sorts of aerodynamic data that Frank employed, but rather that the specific numbers that Frank used were wrong. Thus, the alleged flaws in Frank's analysis are of a character that impugn the accuracy of his results, not the general scientific validity of his methods.
> The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination. *See generally Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Maiz,* 253 F.3d at 667. Indeed, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1188 (9th Cir.2002); *see also id.* ("Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice."); *Cummings v. Standard Register Co.,* 265 F.3d 56, 65 (1st Cir.2002) (holding that "whatever shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony"); *In re TMI Litig.,* 193 F.3d 613, 692 (3d Cir.1999) (" 'So long as the expert's testimony rests upon "good grounds," it should be tested by the adversary process—competing expert

> testimony and active cross-examination—rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic.] weigh its inadequacies.' " (quoting *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 85 (1st Cir.1998))); *Wilmington v. J.I. Case Co.,* 793 F.2d 909, 920 (8th Cir.1986) ("Virtually all the inadequacies in the expert's testimony urged here by [the defendant] were brought out forcefully at trial.... [T]hese matters go to the weight of the expert's testimony rather than to its admissibility.").

Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1345 (11th Cir. 2003).

### i.   The Culture Test is a Valid Method for Determination of the Presence of Bacteria.

NG challenges the culture test methods used by RTL.  The purpose of the culture

method used by RTL is described as follows:

> The purpose of this procedure is to describe how to culture for Sulfur Reducing, Iron Reducing, Sulfur Oxidizing, and iron Oxidizing Bacteria and how to interpret the results of such culture techniques.  The procedure is adapted from the American Petroleum Institute (API):  API RP 38 Method (Revision/Edition: 75; Chg:   REIS; Date:   03/00/82) "Recommended practice for biological analysis of subsurface injection waters".  The procedure is modified to adapt to powder material such as that seen in crushed drywall samples.

(*Confidential* Exh. 16 *To Be Filed Under Seal*, Exh. 17, p. 3).

Mr. Sutton testified that the method used by RTL to test for bacteria in drywall is

the same general method used by RTL to test for bacteria in human and other samples

provided to RTL.  (Exh. 1, pp. 195-197, 213-214).  Because culture tests are routinely

used by virtually every hospital in the country and have been long accepted in the

scientific community for everything from cancer biopsies to strep-throat, NG focuses on

what it believes are inadequacies of RTL's methods.

14

First, NG argues that RTL used the wrong liquid medium for its culture test. (See Dkt. 172, p. 16).  However, as NG's experts attested, there is no established culture method that is to be used to test for bacteria in drywall.  (Exh. 12, p. 106).  Accordingly, RTL selected an established method for searching for sulfur reducing bacteria in the petroleum industry known as API RP 38.   (*Confidential* Exh. 16 *To Be Filed Under Seal*; Exh. 17, p. 3).  NG's assertions that this method was inappropriate for culturing drywall challenged the alleged inadequacies in the manner in which RTL performed the culture rather than the propriety of culture testing itself.  Accordingly, this argument goes to the weight of the RTL culture test rather than its admissibility.  Quite Tech, *supra*.

In addition, the culture method used by RTL is nearly identical to the culture methods used by Environmental Health and Engineering, Inc. as listed in the CPSC report touted repeatedly by NG.  (Exh. 18; see also Exh. 76 to NG Brief).  While Plaintiffs do not believe that the actual results of any Chinese Drywall testing are relevant to this case, the method used for culture testing in that setting indicates that the methodology used by RTL complies with industry standards.  Leathers v. Pfizer, Inc., 233 F.R.D. 687, 691-92 (N.D. Ga. 2006).  Therefore, the culture method used by RTL was adequate.

### ii.  The Enzyme Test is a Valid and Recognized Test to Determine Whether Specific Bacteria are Present in the Sample.

In addition to growing bacteria from NG drywall samples in culture media, RTL also tested the drywall samples for the presence of a specific enzyme known to be produced by sulfur reducing and sulfur oxidizing bacteria.  (Exh. 17, pp. 5-6).  This is

not a RTL test, but a "test kit" called the Rapid Chek®II SRB Detection System sold by

Strategic Diagnostics Inc. and is designed to quickly and easily determine the presence

of sulfur reducing or sulfur oxidizing bacteria in liquid or solid substances.  (Exh. 19).

While NG argues that the RapidChek enzyme test is not appropriate for testing drywall,

the test itself does not limit its effectiveness to any particular substance.  Specifically,

the RapidChek®II data sheet states as follows:

> The RapidChek®II SRB Detection System applies
> immunoassay technology to detect sulfate-reducing
> bacteria (SRB).  This kit offers several advantages over
> traditional methods of SRB detection using cell culture
> techniques.  These include immediate, accurate results, the
> ability to process solid and semi-solid samples, and the
> ability to detect all SRB, including SRB not able to grow in
> some standard media….
>
> The RapidChek®II SRB test employes purified antibodies
> to detect the enzyme adenosine-5' –phosphosulfonate
> (APS) reductase which is common to all strains of SRB.
> This method for detecting and quantifying SRB is covered
> under U.S. Patent No. 4,999,286, owned by Strategic
> Diagnostic Inc.

(Exh. 19).

Because the RapidChek Enzyme Test is an independently developed test for

detecting the presence of live sulfur reducing or sulfur oxidizing bacteria, the test easily

passes the Daubert standard.  (Exh. 19).  The RapidChek Enzyme Test comes from the

petroleum industry, which is without question one of the most sophisticated and well-

funded of all industries in the world.  In fact, upon remand of Daubert, the Ninth Circuit

added that expert testimony "based directly on legitimate, preexisting research unrelated

to the litigation provides the most persuasive basis for concluding that the opinions [ ]

expresse[d] were 'derived by the scientific method.'"  Daubert II, 43 F.3d at 1317.

16

NG's other objections to the RapidChek®II enzyme test conducted by RTL focus on the manner in which RTL performed the RapidChek test.  Specifically, NG argues that the test should have been run on the drywall core material directly rather than by dissolving the drywall material in a sterile media.  NG also challenges the accuracy of the results obtained because although the RTL report explains that it follows the time constraints dictated by the test protocol, it did not provide the actual technicians notes verifying the darkness of the color obtained.  (See Dkt 172, pp. 18-19).

First, RTL provided the same level of detail provided in the reports of the CPSC and the other experts in this case.  (Exh. 20, p. 6; *See also* Exh. 68 to Dkt. 172).  Second, RTL provided the underlying data sheets that were requested by NG.  (Exh. 21, pp.15-16).  Each of these sheets show the specific results for each RapidChek®II enzyme test performed and the results coincide with the results reported in the RTL expert reports. (Exh. 17, p.11).  Regardless, these objections are "of a character that impugn the accuracy of [RTL's] results, not the general scientific validity of [its] methods" and thus should be addressed through cross examination rather than stricken under <u>Daubert</u>.  The RapidChek®II enzyme test satisfies the <u>Daubert</u> standard and should not be stricken.

### iii.  The DNA Tests are a Valid and Recognized Method for Identifying Specific Bacteria.

Next, NG challenges the DNA testing done by RTL.  Mr. Sutton designed and implemented the RTL DNA test using a well established methodology called Polymerase Chain Reaction ("PCR".)  (Exh. 7 p. 652-653; Exh. 17, pp. 4-5; *Confidential* Exh. 22, *To Be Filed Under Seal*).

The DNA test employed by RTL uses the same basic test methodology (PCR) that was used by the U.S. Geological Survey ("USGS") in the Chinese Drywall paper touted repeatedly by NG.  (Exh. 20, p. 6-7; <u>see also</u>, Exh. 68 to Dkt. 172).  The USGS and RTL both obtained samples from culture broth and extracted DNA using the same "DNeasy Blood and Tissue Kit's gram + bacteria extraction protocol."  (Exh. 7, p. 652-653; Exh. 17, pp. 4-5; Exh. 20, p. 6-7; <u>see also</u> Exh. 68 to Dkt 172; *Confidential* Exh. 22, *To Be Filed Under Seal*).  Like the USGS, the DNA probe employed by RTL utilized known bacteria samples obtained from the American Type Culture Collection ("ATCC") to identify specific strains of bacteria.  (Exh. 7, p. 652-653; Exh. 17, pp. 4-5; Exh. 20, p. 6-7; <u>see also</u> Exh. 68 to Dkt 172; *Confidential* Exh. 22, *To Be Filed Under Seal*).  The only distinction between the method used by RTL and USGS is that RTL was searching specifically for the genus Sulfobacillus Thermosulfidioxidans.  It is disingenuous for NG to advocate in favor of this DNA testing method when used by the USGS, but against it when utilized by RTL.

Furthermore, Mr. Sutton has created similar DNA probes for The Methodist Hospital, Texas Medical Center and Pfizer Pharmaceutical Company.  (Exh. 2, pp. 2-3).

NG's experts recognize PCR as an appropriate and widely accepted test method. Dr. Myatt testified regarding PCR as follows:

> Q.   Right.  When you did that process, how were you able to ensure that the DNA that you did find was metabolically active DNA and not some dead cells that just happened to be in the environment that you were testing from?
>
> MR. AYALA:  Objection to form.
>
> A.   You can't.  That's a limitation of PCR in general.

Q.    Right.   And so all PCR testing has that limitation, whether it's done by the plaintiffs, the defendants, the USGS or anybody else, right?

A.   Correct.

Q.    And how often, in your experience, is PCR testing utilized in the bacteria field in general?

MR. AYALA:  Objection to form.

A.   I mean I think it's used a lot.  I mean I think the key is that PCR is one technique, and then you can utilize other techniques like epifluorescent to get at this issue of was there any active growth in that particular environment.

(Exh. 11, pp. 125-126).

Accordingly, the PCR method used by RTL to detect DNA specific to ST Bacteria is a valid scientific method that has been used by the scientific industry for years.  The method itself easily passes muster under Daubert.

NG makes multiple objections to RTL's DNA test:  Two objections focus on the foundation of the scientific theory and two focus on the manner in which RTL performed its test.  First, NG admits that Realtime Polymerase Chain Reaction ("PCR") is "designed to detect DNA of organisms," but then argues that this method is not reliable because it can detect DNA from both living and dead organisms.  (Dkt. 172, pp. 19-20).  This is true of all DNA testing.  However, it does not make DNA inherently unreliable.

First, the DNA test is only one of four tests conducted by RTL which, when viewed together, show that the bacteria at issue was alive (culture test); active (enzyme test); and metabolizing (corrosion test).  The DNA test is used to identify with particularity the species of bacteria (ST Bacteria) growing within the drywall samples

taken from Plaintiffs' home.  When all tests are viewed together they completely support the microbial based corrosion model discussed above.  (Exh. 1, pp. 193-198).

Second, RTL's DNA test is performed on the culture results rather than the raw drywall itself in order to reduce the chance of detecting dead cells.  As explained above, RTL first cultures the drywall in a sterile media.  Then the DNA testing is run on the bacteria growing in the culture.  (Exh. 1, pp. 193-198).  This method nearly eliminates the chances of obtaining DNA from a dead bacteria.  When the results are viewed in combination with the other samples, and viewed with the other homes, (12 in total), then the results become more and more significant.  In other words, if RTL had only found ST bacteria in one sample from a single home, then the results would be more limited. Because RTL found DNA specific to ST Bacteria in multiple samples taken from each of Plaintiffs homes in this case and in the Brucker case, the results paint a much clearer picture of the cause of the corrosion.

Third, NG makes the ridiculous argument that the DNA test should be stricken because RTL patented the technology.  If this argument held true, then virtually every pharmaceutical company in the world would have its test methods stricken from litigation.  There has been no testimony from any qualified expert in this case that the patent obtained by RTL for its PCR test methods cannot be recreated in litigation or through peer reviewed study.  Indeed, NG never asked Plaintiffs' counsel for permission to perform the same test in connection with this litigation.  As such, this argument is nothing more than a red herring.

Next, NG argues that RTL should not have separated the paper from the drywall core when testing the drywall, and it argues that the DNA tests results could have

included false positives.  (Dkt. 172, pp. 19-20).  This argument ignores the extensive steps taken by RTL to prevent false positives.  Mr. Sutton explained how RTL conducts it controls to ensure reliability as follows:

> Q.   And when you said there are positive controls run, could you explain that process --
>
> MR. AYALA:  Objection.
>
> BY MR. WARWICK:
>
> Q.   -- for when positive controls are run on the culture test? Let's start with gypsum, just walk us through that process?
>
> A.   Okay.  There are a couple of positive controls.  We will use drywall that we know has previously been contaminated.  So, it's something that we've tested prior. So, that'll be one way that we do a positive control.  And, in addition to that, we have ATCC-purchased organism as a positive control.  And then, in addition to that, we have a negative control.  A negative control goes to show that the media is fine, there is no contamination.  When we look at these, we want to see that there is no growth in the media on the negative control. And then on the positive controls, of course, we're looking to see that there is growth as described in the report.
>
> Q.   Okay.
>
> A.   Those -- those controls follow the sample through the DNA process as well.  They're also run in combination with the DNA.
>
> Q.   Okay.  And are those controls run for each sample or sample set?
>
> A.   Yeah.
>
> Q.   So, there is two –
>
> A.   Yeah.  So, say, what would happen, say, this is just a for instance, but say there was five drywalls that we were going to set up culture on.  We would set up the five cultures; we would set up a positive control, a negative control, and then all of that would be processed through DNA together.

21

Q.   Okay.  So, for each group -- now, would that be per house or per set you're sampling that day?

A.   It would be whatever we happen to sample that day, that would be a positive control for –

Q.  Okay.

A.  So --

Q.   And all those reports being that the bad drywall positive control, the ATCC positive control, the negative control and then the sample results will all have been --

A.  Processed through DNA.

Q.   -- processed and written down somewhere?

A.  Exactly.

Q.  And that's back at RealTime labs?

A.  Yes.  And then it --

Q.   And who has -- don't interrupt me so she can  get both of us.

A.  Okay.

Q.   Who has possession of those documents back at RealTime labs?

A.   They're just at RealTime laboratory.  I mean, it's at the offices.

Q.  Like in the file cabinet somewhere?

A.  Yeah, exactly.

(Exh. 1, pp. 197-200).

In addition, the Standard Operating Procedures of RTL set forth not one but three sets of controls that are conducted for each drywall sample being tested.  (*Confidential* Exh. 23, *To Be Filed Under Seal*, p.3).

As set forth above, three sets of controls are run for each drywall sample being tested to make certain that the DNA is reading from the sample and not from some outside source.  False positives would be detected as the negative control sample would come back positive indicating contamination.  (Exh. 1, pp. 197-200).  As a result, the DNA testing conducted by RTL follows a well established protocol and includes sufficient controls which make the testing reliable.  NG's arguments to the contrary are without merit.

### iv.  The Corrosion Tests are a Valid and Recognized Method for Identifying Specific Bacteria.

RTL's corrosion test is the equivalent of the "jar test" that was conducted by Columbia Analytical Services and is touted by NG's expert, Dr. Michael Tuday.  (Exh. 24, p. 4).  Instead of placing the drywall sample into a jar with water in a dish as Dr. Tuday did, RTL placed a piece of copper wire and drywall core material from NG drywall samples into a sterile plastic bag along with a small amount of water in order to mimic the humid conditions of Florida homes.  (Exh. 17, p. 3; *Confidential* Exh. 25, *To Be Filed Under Seal*).   The RTL technician then reported the findings as either "positive" or "negative" for corrosion based on a visual comparison of the wire to photographs of copper wire exposed to known reactive and non-reactive drywall.  (Exh. 26).

NG argues that this test is unreliable because the RTL lab technician reported the results based on his visual review of the wire rather than providing photographs of each of the actual copper wires.   This argument fails for three reasons.  First, this complaint addresses the manner in which the results were provided rather than the scientific

method underlying the test.  Such issues are to be raised on cross examination at trial rather than as a basis for excluding the entire test under <u>Daubert</u>.  <u>See</u> <u>Daubert</u>, 509 U.S. at 596, 113 S.Ct. at 2798 (The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.)

Second, lab technicians routinely report test results based upon their own visual confirmation.  For example, blood test results are routinely provided as "positive" or "negative" for a given disease without actually providing the treating physician with the actual slide showing the diseased cells.  A qualified lab technician stating that, in his opinion, the copper wire appeared black and corroded is more reliable than NG's "expert", Mr. Cramer, attesting in his report that the corrosion in Plaintiffs' home was "light corrosion" or "dark corrosion" or "no corrosion."  (Exh. 27, pp.5-40).

Third, after NG complained, RTL provided NG with actual photographs of the copper wires showing the corrosion found on each sample.   (Exh. 21, pp. 9-13).  Accordingly, this test mimics a nearly identical test advocated by NG and any arguments to the contrary should be rejected.

### E.   Samples Tested by RTL Were Collected in a Valid and Reliable Manner

The reliability of the sample collection methods used by RTL are also challenged by NG.  Specifically, NG asserts that the drywall samples should have been kept refrigerated rather than at room temperature.  Plaintiffs' experts disagree and believe that the samples should be kept in the same condition that they would have been in Plaintiffs' home, which is at room temperature.  This challenge should be resolved via cross examination of the expert witness as it focuses on the way the tests were conducted rather than the foundation of the methodology itself.  Such issues go to the

weight of the evidence rather than its admissibility.  See Daubert, 509 U.S. at 596, 113 S.Ct. at 2798.

## II.    TIMING OF EXPERT REPORTS

NG makes repeated arguments throughout its brief that Dr. Straus should not be permitted to testify regarding sulfuric acid corrosion caused by ST Bacteria because, they claim, his report can never be amended or supplemented.  (See Dkt. 172, p. 29). This argument ignores the established protocol for amending expert reports pursuant to Rule 26(e)(2).

> **(e) Supplementing Disclosures and Responses.**
>
> **(2)** *Expert Witness.* For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2).

Rule 26(a)(3) states that "Unless the court orders otherwise, these disclosures must be made at least 30 days before trial."  Because Plaintiffs disclosed Dr. Straus's amended report "at least 30 days before trial," they are in compliance with Rule 26.

NG ignores Rule 26, and argues that Dr. Straus is prohibited from amending his report pursuant to Fed. R. Civ. Proc. Rule 37.  However, the extreme sanction of striking the amended expert report pursuant to Rule 37(c)(1) only applies if the amendment was done "without substantial justification."  The following factors are to be used to guide the Court in determining whether the delayed disclosure was "justified": (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability

of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.  Smith v. Jacobs Eng'g Group, Inc., 4:06CV496-WS/WCS, 2008 WL 4264718 (N.D. Fla. Mar. 20, 2008) report and recommendation adopted, 4:06 CV 496 WS, 2008 WL 4280167 (N.D. Fla. Sept. 12, 2008) (citing Newman v. GHS Osteopathic Inc., 60 F.3d 153 (3d Cir.1995).  Each factor will be addressed in reverse order.

### A.      Plaintiffs Were Not Operating in Bad Faith

As this Court is aware, Plaintiffs were not permitted to present any rebuttal witnesses in this case.[2]  (See Dkt. 163).  The first time Plaintiffs became aware that the Plaintiffs' home had elevated levels of $H_2S$ was when those results were reported by Dr. Lewis well after Dr. Straus's initial report had been provided.  Because $H_2S$ is known to be a substance oxidized by ST Bacteria, this newly discovered evidence provided additional support for Plaintiffs' theory.  Prior to this newly disclosed evidence, Dr. Straus was unaware that the homes contained elevated levels of $H_2S$.  (Exh. 5, pp. 137-138).  Rule 26 required him to explain his new opinion at his deposition, which he did, and then he amended his report to take into account this new information.  Because the amendment at issue was in direct relation to the expert reports issued by NG it cannot be said the Plaintiffs were operating in bad faith.  To the contrary, Plaintiffs reacted to the new information as quickly and as professionally as possible.  If experts are not allowed to amend their reports in response to newly discovered evidence, then section (e) of Rule 26 is rendered impotent.

---

[2] Plaintiffs have filed a Motion Challenging Magistrate Judge's Recommendation that Rebuttal Experts be denied.  See Dkt. 166.

Furthermore, before any expert reports were produced in this case, Plaintiffs produced a letter from Dr. Harold Larson and Professor Thomas W. Eagar of Massachusetts Institute of Technology which stated that **sulfuric acid** was the cause of the corrosion in the Brincku home.  (Exh. 28).  It is therefore preposterous for NG to assert that it was blindsided by Plaintiffs' sulfuric acid theory.

**B.     Straus's Amended Theory Will Not Disrupt the Trial**

It is patently clear from the detailed arguments made by NG in its Motion to Strike and its Motion for Summary Judgment that it is fully capable of challenging Dr. Straus' sulfuric acid theory.  Because the theory is merely a continuation of the same theory centered on the presence of the same ST Bacteria found to be in NG drywall, the trial plan will not change in any significant manner.  This factor weighs in favor of allowing Straus to testify regarding sulfuric acid.

**C.     National Gypsum Failed to Cure the Prejudice**

When Dr. Straus explained that he wished to expand upon his prior report based on information obtained from reading the expert report of Dr. McCarthy, counsel for NG simply put its objection on the record and decided to ask only about the timeliness of the disclosure.  (Exh. 5, pp. 151-152).  After the deposition, NG made no attempt to depose Straus again or to file amended expert reports.  When Dr. Straus filed his amended reports explaining the sulfuric acid conclusion again, NG again chose not to re-take his deposition although Plaintiffs would have been glad to produce him.  Instead, NG filed motions seeking to prevent the testimony from coming to light.  (See Dkt. 172).

In <u>Porchia v. Design Equip. Co., a Div. of Griffith Laboratories</u>, 113 F.3d 877, 882 (8th Cir. 1997), the Eighth Circuit Court of Appeals addressed a similar motion to

exclude an expert for failing to provide a timely expert report.  The Court refused to strike the expert based, in part, on the fact that the party opposing the expert had failed to take reasonable steps to correct any perceived prejudice:

> Initially, we note that <u>Porchia</u> did not enlist the District Court's assistance to obtain expert witness information, to request additional time to prepare for these expert witness depositions, to re-depose an expert witness when previously undiscovered information became available, or to obtain a written report from Stork's vocational rehabilitation expert. Moreover, <u>Porchia</u> has not demonstrated how he was prejudiced by these alleged discovery abuses. We find that the District Court's handling of these discovery issues did not amount to an abuse of discretion, much less a gross abuse of discretion.

<u>Id.</u>

The same rationale holds true here where NG made the tactical litigation decision to object to the amended testimony rather that than take another deposition in order to address the theory head on.

**D.    No Prejudice to National Gypsum**

Finally, National gypsum could not have been prejudiced by Dr. Straus' amendment because the amendment was only a further clarification of his prior report. (Exh. 9; Exh. 29).  As stated briefly above, Plaintiffs' theory of this case has always been that the corrosion in their home is caused by off gassing caused by ST Bacteria. Not any bacteria, but ST Bacteria specifically.  That fact has never changed.

National Gypsum's own experts stated clearly in reports issued *prior* to Dr. Straus' deposition that ST bacteria is a "sulfur oxidizing bacteria" and that it "oxidizes reduced sulfur compounds."  (Exh. 11, pp. 17-29).  NG's experts on microbial based

corrosion testified at deposition that they knew that sulfur oxidizing bacteria like ST, oxidize $H_2S$ and produce sulfuric acid.  (Exh. 11, pp. 137-138; Exh. 12, pp. 214-217).

Because there was no prejudice to NG, Straus should be permitted to fully testify to all relevant matters in this case.

## III.     STRAUS MAKES ASSUMPTIONS THAT ARE RELIABLE

The last argument made by NG is that Straus' theory is generally unreliable for a number of reasons.  (*See* Dkt 172, pp. 31-40).  NG challenges his expert conclusions and opinions based on the testing methods described above.  For example, NG challenges Dr. Straus regarding whether the ST Bacteria can be active and metabolizing, and the ubiquitous nature of bacteria in general.  However, these arguments attack, once again, the expert's ultimate opinion rather than the methodologies used to reach those opinions. As such, these arguments are not properly addressed through a motion to exclude expert reports and testimony, but should be addressed on cross examination at trial.  See Daubert, 509 U.S. at 596, 113 S.Ct. at 2798.

## CONCLUSION

This is the first case of its kind.  When peoples' homes are infected with toxic drywall they cannot live in them anymore.  If they have the means, they move out and rent another home for their family.  Often, this causes them to fall behind on their mortgage payments because they simply cannot afford to pay a mortgage and rent simultaneously.  A trial of this case will determine whether the NG drywall is causing Plaintiffs' home to prematurely corrode and fail.  As with any expert intensive case the experts in this case do not agree.  But, it is circumstances such as this where a jury

should decide whether it is more likely than not that the corrosion is caused by the

drywall.  Plaintiffs' experts should be allowed and this case should proceed to trial.

DATED:  April 16, 2012.                    **VARNELL & WARWICK, P.A.**


ROBERT D. GARY                             /s/ Brian W. Warwick
JORI BLOOM NAEGELE                         Brian W. Warwick, Esq.
GARY, NAEGELE & THEADO, LLC                Fla. Bar No. 605573
446 Broadway                               VARNELL & WARWICK, P.A.
Lorain, OH  44052-1740                     20 LaGrande Boulevard
Telephone:  (440) 244-4809                 The Villages, Florida 32159
Facsimile:  (440) 224-3462                 Telephone: (352) 753-6800
rdgary@gmail.com                           Facsimile: (352) 753-6806
JBNaegele@gmail.com                        bwarwick@varnellandwarwick.com


JACK LANDSKRONER                           THEODORE J. LEOPOLD
LANDSKRONER GRIECO                         Fla. Bar. No. 705608
MERRIMAN, LLC                              GREGORY S. WEISS
1360 West 9th Street                       Fla. Bar No. 163430
Suite 200                                  LEOPOLD~KUVIN
Cleveland, OH  44113                        2925 PGA Blvd., Suite 200
Telephone: (216) 522-9000                  Palm Beach Gardens, Florida 33410
Facsimile:  (216) 522-9007                 Telephone: (561) 515-1400
jack@lgmlegal.com                          Facsimile: (561) 515-1401
                                           tleopard@leopoldkuvin.com
                                           gweiss@leopoldkuvin.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this ___16th___ day of April, 2012, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system and that a true and correct copy of the foregoing has been furnished via electronic mail, to:

Christopher J.M. Collings
ccollings@morganlewis.com
MORGAN LEWIS & BOCKIUS
5300 Wachovia Financial Center
200 South Biscayne Blvd.
Miami, FL  33131

James D. Pagliaro
jpagliaro@morganlewis.com
Thomas V. Ayala
tayala@morganlewis.com
Kristofor T. Henning
khenning@morganlewis.com
MORGAN LEWIS & BOCKIUS
1701 Market Street
Philadelphia, PA  19103

*Attorneys for National Gypsum Company*

/s/ Brian W. Warwick_____