# EXHIBIT 5

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

GEORGE BRINCKU, BRENDA          )
BRINCKU,                        )
                                )
        Plaintiffs,             )
                                )
VS.                             ) CIVIL ACTION NO.
                                ) 2:11-CV-00338-JES-DNF
NATIONAL GYPSUM COMPANY,        )
a Delaware Corporation,         )
                                )
        Defendants.             )


-----------------------------


CHRIS BRUCKER, et al.,          )
                                )
        Plaintiffs,             )
                                )
VS.                             )CIVIL ACTION NO.
                                )2:10-CV-405-FTM-20SPC
LOWES HOME CENTERS, INC.,       )
et al.,                         )
                                )
        Defendants.             )

********************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
DAVID C. STRAUS, Ph.D.
FEBRUARY 3, 2012
********************************************************


Reported By:
Susan Eddins Brown, CSR
Job No: 23746

6

1          P R O C E E D I N G S

2

3          THE VIDEOGRAPHER:  Today is Friday,

4    February 3rd, 2012.  We're located at the law office of

5    Morgan & Lewis in Dallas, Texas.  Our purpose is to take

6    the oral deposition of David Straus relative to the case

7    styled George Brinku and Brenda Brinku versus National

8    Gypsum Company, a Delaware corporation.

9          Counsel, at this time, would you please state

10   your individual appearances for the record?

11         MR. AYALA:  Good morning, Tom Ayala on

12   behalf of New NGC, Inc., doing business as National

13   Gypsum Company.

14         For the record, this deposition today of

15   Dr. Straus has been noticed in the case of George Brinku

16   and Brenda Brinku versus National Gypsum as well as the

17   case of Brucker versus Lowe's Home Centers and National

18   Gypsum Company.

19         MR. WARWICK:  Brian Warwick and

20   Jack Landskroner today on behalf of the Plaintiffs in

21   the case.

22         THE VIDEOGRAPHER:  Thank you.  The time

23   is 9:13 a.m.  It is -- our certified shorthand reporter

24   providing a stenographic transcript is Susan Brown.  My

25   name is Phil Hall of Accurate Evidence on behalf of

7

1    David Feldman.

2          Ms. Brown, would you please swear in the

3    witness.

4          DAVID C. STRAUS, Ph.D.,

5    having been first duly sworn, testified as follows:

6          THE VIDEOGRAPHER:  Again, the time is

7    9:14 a.m.  We're on the record.

8               EXAMINATION

9    BY MR. AYALA:

10        Q.  Good morning, Dr. Straus.

11        A.  Good morning.

12        Q.  My name is Tom Ayala.

13            We haven't met before, correct?

14        A.  Correct.

15        Q.  I am going to be asking a few questions today.

16            Have you given depositions before?

17        A.  Yes.

18        Q.  Just a couple of ground rules, I won't get

19   into them in too much detail since you're seasoned in

20   this process.

21            For the courtesy of the court reporter and

22   those reading the transcript, if you could just wait

23   until I finish asking my question before you answer and

24   I'll try to do the same.  Answer verbally, of course,

25   for the record.

8

1          If you don't understand a question, just tell

2    me.  I'll be happy to rephrase it.  And if you answer

3    it, I'll assume that you understood it.

4          Have you taken any medications today that you

5    believe may impair your ability to give accurate and

6    complete testimony?

7        A.  No.

8        Q.  Okay.  Any other reason you can think of as to

9    why you wouldn't be able to give accurate and complete

10   testimony?

11        A.  No.

12        Q.  Okay.  Approximately how many times have you

13   testified in depositions before, Dr. Straus?

14        A.  Depositions and court cases, this is my 50th.

15        Q.  Okay.  If you -- if you could, categorize at

16   a -- at a high level the subject matter of the

17   proceedings that you've been involved in as a -- as a

18   testifying expert in the past.

19        A.  If I could?

20        Q.  Yes, sir.

21        A.  You would like to know what subjects I

22   testified on.

23        Q.  Yes.

24        A.  The vast majority are mold cases.

25        Q.  Okay.  Any others?

9

1        A.  No.  There were -- there were a couple of food

2    poisoning cases at the beginning of my career doing

3    this, but 95 percent-plus has been mold cases.

4        Q.  Okay.  Dr. Straus, when -- when did you become

5    an expert in this case?  When were you retained by the

6    Plaintiffs in this case?

7        A.  To be honest with you, I don't recall exactly

8    the date, but it was -- it may have been six or

9    nine months ago, something like that.

10        Q.  Okay.

11        A.  I don't -- I don't remember the date.

12        Q.  Okay.  How is it that you became an expert,

13   sir?

14        A.  They asked me if I would.

15        Q.  Okay.  Who specifically?

16        A.  Mr. Warwick.

17        Q.  Okay.  Did you have discussions with

18   Dennis Hooper about becoming an expert in this case?

19        A.  Yes.

20        Q.  When did those occur?  Just -- I'm not trying

21   to have a memory game with you.

22        A.  Yes.  Six to nine months ago.

23        Q.  Okay.  And to the extent you recall, what

24   generally -- did he contact you?

25        A.  I think he told me he was involved in a -- a

14

1  I'm showing you what's been previously marked as
2  Exhibits C through H, which for the record are the
3  reports of RealTime Laboratories in connection with this
4  litigation.
5       Have you seen those reports before, sir,
6  Exhibits C through H?
7  A.  (Reviewing documents.)  I haven't seen these
8  specific ones, but I have seen copies of these.  So I
9  guess the answer to your question is yes.
10  Q.  Okay.  Thank you.  If you would, hold on to
11  those.  Dr. Straus, now I'm showing you what --
12  documents that have previously been marked as Exhibits V
13  through AA.  Dr. Straus, if you would, if you could go
14  through -- let's talk about V, Exhibit V.
15       Do you recognize this document, sir?
16  A.  Yes.
17  Q.  Okay.  What is it?
18  A.  It's the report that I wrote to Mr. Warwick
19  regarding the Brinku house.
20  Q.  Okay.  And a couple of pages in, David C.
21  Straus is signed.
22       That's your signature, right, sir?
23  A.  Yes.
24  Q.  Okay.  Let's identify Exhibit W for the
25  record, please.

15

1  A.  W is a report that I wrote to Mr. Warwick
2  regarding the Retana house.
3  Q.  Okay.  And you signed that report as well,
4  correct?
5  A.  Yes.
6  Q.  Okay.  Let's identify Exhibit X, please.
7  A.  X is a report that I wrote to Mr. Warwick
8  regarding the Ravelo house.
9  Q.  Okay.  And you signed that as well?
10  A.  Yes.
11  Q.  Let's identify Y, please.
12  A.  Y is a report that I wrote to Mr. Warwick on
13  the Nutting house.
14  Q.  And you signed that report as well?
15  A.  Yes.
16  Q.  I know there are a lot of documents.
17       How about Exhibit C, can you identify that?
18  A.  Exhibit C is a report that I wrote to
19  Mr. Warwick on the Brucker house.
20  Q.  Okay.  And you signed that report as well?
21  A.  Yes.
22  Q.  And then Exhibit double -- AA?
23  A.  Yes.  This is a report that I wrote to
24  Mr. Warwick which was a revised report on the Brucker
25  house.

16

1  Q.  Okay.  And you signed that as well?
2  A.  Yes.
3  Q.  Now, Dr. Straus, in Exhibits V through AA,
4  your reports for -- in connection with this litigation,
5  you summarized test methodologies and results performed
6  by RealTime Laboratories, correct?
7  A.  Correct.
8  Q.  Okay.  Was the basis for your summary of the
9  test results and -- and the testing methodologies simply
10  your review of RealTime Laboratories' reports for the
11  litigation?
12  A.  Yes.
13       MR. WARWICK:  Object to form.
14  BY MR. AYALA:
15  Q.  Okay.  Dr. Straus, did -- did you personally
16  conduct any of the testing that -- that is discussed in
17  the RealTime Laboratory reports for the litigation at --
18  and -- and your reports as well?
19  A.  No.
20  Q.  Okay.  Did you witness any of that testing?
21  A.  No.
22  Q.  Okay.  Dr. Straus, I think you mentioned
23  before, please correct me if I'm wrong, you described
24  yourself as a mycologist?
25  A.  Well, the overall term is a microbiologist.

17

1  Q.  Okay.
2  A.  But my research in the last 15 years or so has
3  focused on mycology.
4  Q.  Okay.  What is a "microbiologist," sir?
5  A.  Microbiologist is not a small microbiologist.
6  What it means is, is microbiologists use microscopes to
7  look at small things.
8  Q.  And among those small things that
9  microbiologists look at are microorganisms, right?
10  A.  Yes.
11  Q.  And among those microorganisms are bacteria,
12  correct?
13  A.  Correct.
14  Q.  Bacteria -- what are "bacteria"?
15  A.  Bacteria are single-celled organisms that are
16  alive, and we call them "prokaryotes," which means they
17  don't have a true nucleus.
18  Q.  Approximately how many different types of
19  bacteria are there?  Give your best estimate.
20  A.  Well, I don't imagine that anyone knows for
21  sure.  But there are 100,000 different species of fungi,
22  and I would guess easily in the millions.
23  Q.  Are bacteria ubiquitous in the environment?
24  A.  Yes.
25  Q.  Are they in this room with us right now?

5  (Pages 14 to 17)

50

1    Q.  RealTime Laboratories performed four testing
2  methodologies.
3        Are you aware of that, sir?
4    A.  Yes.
5    Q.  And specifically -- what I'm -- what I'm
6  specifically referring to is that RTL performed four
7  testing methodologies on the Plaintiffs' drywall samples
8  in this litigation, correct?
9    A.  Yes.
10    Q.  One of those methodologies was the Recommended
11  Practice 38 published by the American Petroleum
12  Institute, correct?
13    A.  Correct.
14    Q.  Why don't we look at that.  I'll offer it as
15  an exhibit.
16        MR. LANDSKRONER:  Wasn't that marked
17  yesterday?
18        MR. AYALA:  Actually, yes, it was.  It
19  was.  Thank you.  Here it is.
20        MR. LANDSKRONER:  Okay.
21  BY MR. AYALA:
22    Q.  Okay, Dr. Straus.  I'm showing you what's been
23  marked Exhibit K.  Just for the record, I'll identify it
24  as a document entitled API recommended practice for
25  biological analysis of subsurface injection waters.  And

51

1  it's dated December 1975.  Do you see that?
2    A.  Yes.
3    Q.  Okay.  Have you seen this document before,
4  sir?
5    A.  No.
6    Q.  Just on the face the document, this is a
7  standard -- strike that.
8        On the face of the document, it's a
9  recommended practice for biological analysis of
10  subsurface injection waters.  Do you see that?
11    A.  Yes.
12    Q.  Okay.  Are you aware of any peer-reviewed
13  literature that reports on the use of API 38 to analyze
14  drywall samples?
15    A.  To analyze drywall samples --
16    Q.  Yes, sir.
17    A.  -- in specificity, then no.
18    Q.  Okay.  Are you familiar at all with the
19  government's investigation of drywall in the United
20  States over the last few years?
21    A.  When -- when you say "drywall," are you
22  talking about domestic drywall or Chinese drywall?
23    Q.  Both.
24    A.  I -- I read things in the -- in the papers and
25  magazines and things like that.  So that's where I have

52

1  gotten most of my information.
2    Q.  Okay.  I gather from your response that you
3  haven't read every single report that this -- Consumer
4  Product Safety Commission or other agencies have
5  published on their investigation of any drywall in the
6  United States?
7    A.  Well, I did read the Consumer Protection
8  Service -- or Safety Agency -- or whatever it's called.
9  I did read that report, if that's the one you're
10  referring to.
11    Q.  Okay.  And I'll just represent that they've
12  actually -- the CPSC has published multiple reports
13  regarding its investigation of drywall.  The EPA has
14  published some, Florida Department of Health and some
15  national laboratories like Lawrence Berkley National Lab
16  and Sandia National Labs and the National Institute of
17  Standards and Technology as well.
18        Is it fair to say that you haven't read all of
19  those reports that I just mentioned?
20    A.  It's fair to say, yes.
21    Q.  Are you aware, sir, that the American
22  Petroleum Institute has actually withdrawn API RP-38 as
23  a recommended practice?
24    A.  I was not aware of that until I read
25  Dr. Little's report where she stated such.

53

1        MR. AYALA:  Okay.  Okay.  Let's take a
2  quick break.
3        THE VIDEOGRAPHER:  We're off the record
4  at 11:15 a.m.
5        (Recess taken.)
6        THE VIDEOGRAPHER:  We're on the record,
7  11:21 a.m.
8  BY MR. AYALA:
9    Q.  Dr. Straus, I have just handed you what's --
10  what's been previously marked as Exhibit O.
11        Do you recognize this document, sir?
12    A.  Yes.
13    Q.  And what is it?
14    A.  It's a paper published in the International
15  Journal of Molecular Sciences in 2010, and do you need
16  me read me the title and the authors?
17    Q.  If you would, just -- if you would, just the
18  title for the record.
19    A.  The title of this article is Isolation of
20  Sulfur Reducing and Oxidizing Bacteria Found in
21  Contaminated Drywall.
22    Q.  Okay.  And there -- am I correct there are
23  seven authors listed?
24    A.  Yes, you are correct.
25    Q.  And David C. Straus is one of the listed

14  (Pages 50 to 53)

114

1   have never seen any studies on the effect of heat on
2   spore formation.
3   BY MR. WARWICK:
4       Q.  By itself?
5       A.  Yes.
6       Q.  Okay.  But if the heating process removed its
7   food or water source or its water source, would that be
8   a condition that would lead to forming spores?
9           MR. AYALA:  Objection.
10      A.  That's why bacteria forms spores is when they
11  lose their food and water source.
12  BY MR. WARWICK:
13      Q.  Earlier this morning Mr. Ayala asked you about
14  some copper corrosion.  And you asked him whether he
15  wanted your opinion on general corrosion or specific to
16  copper corrosion.  And at that time he limited your
17  response to copper corrosion only.  Do you remember
18  that?
19          MR. AYALA:  Objection.  It misstates the
20  testimony.  Go ahead.
21      A.  Yes, I remember.
22  BY MR. WARWICK:
23      Q.  Do you have an opinion with regard to the
24  general corrosion in the homes that are at issue here?
25      A.  Yes.

115

1       Q.  And what is that opinion?
2       A.  That because the -- and I'll just abbreviate
3   and call the organism "ST" -- because ST is an SOB and
4   SOBs are known to produce sulfuric acid when it is
5   exposed to hydrogen sulfide, my opinion is this
6   corrosion in the home is due to -- in part or
7   completely, due to sulfuric acid production.
8       Q.  And when you said earlier that the ST
9   bacteria, you're referring to Sulfobacillus
10  thermosulfidooxidans?
11      A.  Thiooxidans, yes.
12      Q.  And what category of bacteria -- and we'll
13  just call that "ST" for ease on my -- on my part.  So
14  the ST bacteria, is that a aerobic or anaerobic
15  bacteria?
16      A.  It's aerobic bacteria.
17      Q.  And is the condition of bacteria in the
18  Plaintiffs' homes an aerobic or an anaerobic
19  environment?
20          MR. AYALA:  Objection to form.
21      A.  When you say in the homes --
22          MR. AYALA:  Lack of foundation.
23          THE WITNESS:  -- I'm assuming you mean in
24  the drywall, or do you mean in the homes -- I'll answer
25  it that way.

116

1   BY MR. WARWICK:
2       Q.  I mean as the drywall sitting inside the
3   Plaintiffs' homes, would the drywall itself be in an
4   aerobic or anaerobic environment?
5       A.  Well, I would assume that it's an aerobic
6   environment because Dr. McCarthy performed an
7   experiment -- or Mr. McCarthy, I don't know which he
8   is -- performed an experiment where he showed gas
9   diffusing into the drywall.  And he said that oxygen
10  would diffuse into the drywall exactly the same way as
11  gas would.
12      Q.  Okay.  And does ST bacteria require oxygen, in
13  fact, to live?
14      A.  It's an aerobe, yes, so it does.
15      Q.  What else does a -- does an ST bacteria need
16  in order to live?
17      A.  Probably some form of liquid water and a
18  carbon source.
19      Q.  When you need liquid water, do you mean it
20  actually has to be submersed in water?
21      A.  No, just -- just water.  It doesn't have to be
22  completely submerged.  It just needs access to water.
23      Q.  Okay.  What about moisture in the air?
24          MR. AYALA:  Objection to form.
25      A.  If the moisture in the air condenses on the

117

1   drywall surface and makes the surface wet, then that
2   would be a supply of water.
3   BY MR. WARWICK:
4       Q.  Like -- what about the moisture level in a
5   home in South Florida?
6           MR. AYALA:  Objection to form.
7   BY MR. WARWICK:
8       Q.  Would that be a high enough moisture content
9   in your expert opinion?
10      A.  Well, I have to admit, I don't know the
11  humidity levels in Southwest Florida.  Maybe -- maybe
12  you can -- what is the average humidity in the day?  I
13  don't know.  I don't know the answer to that.
14      Q.  It depends on the day, but at times it can
15  get -- if it's raining out, it --
16          MR. AYALA:  Is that a question?
17      A.  All right.  If it's -- if it's raining, that's
18  100 percent humidity.
19  BY MR. WARWICK:
20      Q.  Right.  Would that be a sufficient amount?
21      A.  Oh, yes, 100 percent humidity would.
22  100 percent humidity is rain.
23      Q.  Right.  Okay.  Is there a -- is there a
24  threshold, like if it's below 10 percent humidity, for
25  example, can you quantify it?

30  (Pages 114 to 117)

134

1      Q.  So based on that assumption, would it be
2  likely that all five of these homes were randomly
3  infected with Sulfobacillus thermosulfidooxidans
4  bacteria?
5          MR. AYALA:  Objection, lack of
6  foundation.
7      A.  I would say that it would be unlikely.
8          MR. WARWICK:  I need to take just
9  two minutes.
10         And do you want to do follow-up now, or do you
11  want to wait five minutes?
12         MR. LANDSKRONER:  Why don't you take a
13  break so I can leave.
14         MR. WARWICK:  Let's take a break.  I
15  think Jack's going to leave and go off the record.
16         THE VIDEOGRAPHER:  We're off the record
17  at 3:05 p.m.
18            (Recess taken.)
19         THE VIDEOGRAPHER:  We're back on the
20  record at 3:17 p.m.
21         FURTHER EXAMINATION
22  BY MR AYALA:
23      Q.  Hi, Dr. Straus.
24      A.  Hi, Mr. Ayala.
25      Q.  Dr. Straus, you issued five expert reports in

135

1  connection with this litigation on November 17, 2011.
2         And those expert reports, for the record, are
3  identified as Exhibits V, W, X, Y, and Z, okay; is that
4  correct?
5      A.  Yes.
6      Q.  You would agree with me, Doctor, that the
7  reports you issued on November 17th do not articulate
8  your -- your theory with regard to sulfuric acid
9  production from bacteria, correct?
10         MR. WARWICK:  Object to form.
11     A.  I would agree with that, but they do
12  articulate the ST organism as being the problem
13  organism.
14  BY MR. AYALA:
15     Q.  Okay.  Now, we established earlier that the
16  RealTime Laboratories testing did not permit you to
17  quantify the number of ST bacteria detected, correct?
18     A.  Correct.
19     Q.  And so sitting here today, sir, you can't tell
20  us whether the drywall samples that reportedly showed a
21  detection of DNA for ST had a single ST bacterium or
22  more than one ST bacterium, correct?
23     A.  I cannot enumerate how many ST organisms were
24  in the drywall.
25     Q.  Okay.  And you issued another expert report,

136

1  sir, just about a week ago, on January 24th, 2012, which
2  is identified as Exhibit AA, correct?
3      A.  Yes.
4      Q.  And would you agree with me, sir, that your
5  new theory --
6          MR. WARWICK:  Objection.  Sorry.
7  BY MR. AYALA:
8      Q.  -- regarding sulfuric acid is not included in
9  Exhibit AA, correct?
10     A.  Correct.
11     Q.  Okay.  And so -- so today is the first time
12  you've articulated your new theory --
13         MR. WARWICK:  Object to form.
14  BY MR. AYALA:
15     Q.  -- in -- in the litigation, correct?
16     A.  Yes.
17     Q.  Now, when we were speaking earlier, you
18  testified that you were not offering an opinion with
19  regard to corrosion of copper in the Plaintiffs' homes;
20  is that correct?
21     A.  Correct.
22     Q.  Okay.  And I -- and I think you've even
23  offered an opinion that -- or I think you even testified
24  that you were not offering an opinion with regard to
25  corrosion of metals in Plaintiffs' homes, correct?

137

1          MR. WARWICK:  Object to form.
2      A.  Well, if I said -- if I said that, then that's
3  what I meant, yes.
4  BY MR. AYALA:
5      Q.  Okay.
6      A.  I can't remember that.
7      Q.  So help me understand, Doctor, with regard to
8  the Brinku property, which you've never been to, what is
9  it in the Brinku property that you claim is being
10  corroded as a result of ST?
11     A.  Can I -- can I talk about the Brucker
12  residence because I just happen to have that in my hand.
13     Q.  Sure.  Let's talk about each of them.  Okay?
14     A.  Okay.  I'll have to dig out the Brinku, but
15  Mr. Brucker feels -- I'm sorry.  I'll wait until you get
16  to it, the second page of my -- my revised January -- or
17  the first one.
18     Q.  Okay.
19     A.  I didn't change anything but that additional
20  information I have.
21         Do you see the first paragraph on the second
22  page?
23     Q.  I do.  The first full paragraph?
24     A.  First full paragraph where it says,
25  Mr. Brucker feels that the house is corroding at a very

138

1  rapid pace. So I am testifying about corrosion in
2  general, not -- not to the specific metal or specific
3  anything, but corrosion in general referring to this.
4      Also, Dr. McCarthy, one of the things that
5  caught my eye when he was talking about the amount of
6  hydrogen sulfide -- hydrogen sulfide in the air being in
7  the water, that led me -- because what he said in his
8  report was that there's much more corrosion in this
9  house than can be explained by the hydrogen sulfide in
10 the water.
11     And that got me to thinking that there is much
12 more hydrogen sulfide in this house than I ever thought
13 there was because before, I didn't really feel that
14 there was much hydrogen sulfide in the house if it was
15 coming from SRBs. If it was coming from the water where
16 there is a tremendous amount of hydrogen sulfide, then I
17 began to think in terms of the more hydrogen sulfide
18 that there is in the house, the more sulfuric acid is
19 going to be produced. And I'm thinking, everyone's
20 talking about -- for example, this guy's saying the
21 house is corroding at a very rapid pace. I put two and
22 two together.
23     Q. Okay. Have you done any testing of the air in
24 any of the Plaintiffs' homes?
25     A. No.

139

1      Q. Okay. Have you -- are you aware of any
2  testing, sir, in connection with the litigation that has
3  detected sulfuric acid in any of the Plaintiffs' homes?
4      A. No.
5      Q. Okay. I would like you to assume, sir, that,
6  in fact, the air in each of the Plaintiffs' homes has
7  been tested specifically for the presence of sulfuric
8  acid, and each of those test results is a nondetect.
9  Okay?
10     Will you assume that for the purposes of our
11 discussion?
12     A. Sure.
13     Q. Okay. Would you agree that those test results
14 would be inconsistent with the theory that you've
15 articulated today?
16     A. Well, certainly inconsistent with the theory
17 that I articulated. The obvious question is, were those
18 tests done correctly, and obviously I don't know.
19     Q. Sure. Right. Okay.
20     Sir, are you aware of any peer-reviewed
21 literature -- well, let me ask you this.
22     I take it you haven't published your theory
23 with regard to ST -- your new theory that you
24 articulated today -- you haven't published that in any
25 peer-reviewed journal, correct?

140

1      A. Correct.
2      MR. WARWICK: Objection.
3      A. But it is well known that sulfur-oxidizing
4  bacteria do convert hydrogen sulfide into sulfuric acid.
5  So the -- that pathway is not in question. That's well
6  known.
7  BY MR. AYALA:
8      Q. Can you -- can you tell us how many sheets of
9  drywall are in each Plaintiffs' homes?
10     A. No.
11     Q. Can you tell us what type of corrosion -- let
12 me ask you this, sir.
13     Could you define "corrosion" for us?
14     MR. WARWICK: Object to form.
15     A. Corrosion is essentially the wearing away of
16 metals and -- and really any substance, but I guess
17 metals in particular, by a chemical reaction.
18 BY MR. AYALA:
19     Q. Okay. Do you agree that there are many
20 different forms of corrosion?
21     MR. WARWICK: Object to form.
22     A. I'm sure there are.
23 BY MR. AYALA:
24     Q. Okay. And so I understand correctly, your
25 theory that you've articulated today is not that any

141

1  particular metal in any particular Plaintiff's home has
2  been corroded by sulfuric acid but just that sulfuric
3  acid is corrosive?
4      MR. WARWICK: Object to form. Misstates
5  his testimony.
6      A. Yes, it is. There's no question about that.
7  Sulfuric acid is extremely corrosive.
8  BY MR. AYALA:
9      Q. But you haven't offered an opinion that
10 sulfuric acid has caused corrosion to a particular metal
11 or any metal in any of the Plaintiffs' homes; is that
12 correct?
13     A. I would say that's correct, yeah. I'm
14 speaking in general terms addressing, as I say, what --
15 for example, what Mr. Brucker says, that the house is
16 corroding at a very rapid pace, and -- and I thought,
17 this is -- this is the explanation.
18     Q. Okay. Now, you testified earlier, sir, that
19 ST -- and we agree that that's Sulfobacillus
20 thermosulfidooxidans -- you testified that ST requires
21 liquid water in order to -- well, in order to oxidize;
22 is that correct?
23     A. Yeah. Probably in order to form any chemical
24 reaction, it's going to need water of some type.
25     THE VIDEOGRAPHER: Less than two minutes.

36  (Pages 138 to 141)

150

1    Q.  Yes.  Second sentence of that paragraph?
2    A.  That paragraph only had one sentence.  So
3  maybe we're looking at different reports.  This is
4  Retana.
5    Q.  Okay.  I apologize.  I have Exhibit Y which is
6  the Nutting residence.  I'll just give it -- Exhibit Y.
7    A.  Okay.  Okay.  These data -- this sentence
8  says, These data also support the theory that the
9  sulfur-like odor and corrosion problems reported in the
10  Nutting residence are related to the presence of
11  National Gypsum drywall in the home.
12    Q.  And that sentence is immediately following the
13  one that says the test results show that the SRB and the
14  SOBs are in the drywall.  Correct?
15    A.  Correct.
16      MR. WARWICK:  I don't have anything
17  further.
18      MR. AYALA:  Okay.
19          FURTHER EXAMINATION
20  BY MR. AYALA:
21    Q.  Okay.  Now, that sentence you just read, sir,
22  you didn't include that in your Brinku report, did you?
23    A.  I have to look at the report.
24    Q.  Let's look at Exhibit C.  I'm sorry -- yeah,
25  Exhibit C.  No, Exhibit V -- Exhibit V is your Brinku

151

1  report.
2    A.  V.  Okay.  This might be it right here.  Yeah.
3  You're correct.  That sentence is not there.
4      MR. AYALA:  Okay.  No further questions.
5  Thanks, Doctor.
6      THE VIDEOGRAPHER:  We're off the record
7  at 3:47.  This is the ends of Disk 3.
8      (Off the record.)
9      MR. AYALA:  Let's go back on the record
10  just for a second.
11      THE VIDEOGRAPHER:  The time is 3:50 p.m.
12  We're back on the record.
13      MR. AYALA:  Just for the record, for the
14  sake of efficiency, I've asked questions about
15  Dr. Straus's report of January 24, 2012.  I have done so
16  without intention of prejudicing NGC's pending or right
17  to move to strike that report as just untimely beyond
18  the case management deadlines in the case.  And I have a
19  continuing objection to the report and any evidence that
20  purports to rely on it.
21      In addition, in a good faith effort to
22  minimize litigation costs and voluntarily coordinate
23  discovery, I questioned Dr. Straus about his testing
24  methods -- strike that.
25      I've questioned Dr. Straus about each of the

152

1  five separate homes at issue in the litigation, but I
2  expressly reserve National Gypsum's right to object to
3  the admissibility of evidence as it relates to any
4  particular Plaintiff's claim.
5      And I also just want to make a request for the
6  documents that were brought today as well, just a copy
7  of those -- the documents that were brought by
8  Dr. Straus.
9      MR. WARWICK:  Okay.  Just so we're --
10  just so we're clear, by "documents," you mean the papers
11  that he brought with him today?
12      MR. AYALA:  Yes.  That's it.  Thanks.
13      THE VIDEOGRAPHER:  We're off the record
14  at 3:53 p.m.
15        (Deposition concluded 3:53 p.m.)

153

1
2  STATE OF _____ )
3                            ) :ss
4  COUNTY OF _____ )
5
6
7    I, DAVID C. STRAUS, Ph.D., the
8  witness herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15
16    _____
17    DAVID C. STRAUS, Ph.D.
18
19
20  Sworn and subscribed to before
21  me, this       day of
22         , 2012.
23
24  _____
25    Notary Public