# EXHIBIT "A-1"

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   FT. MYERS DIVISION

 3

 4   CHRIS BRUCKER, TREVER S. NUTTING,
     XIOMARA RAVELO, WILFREDO E. RETANA
 5   and BEATRIX CELSA RETANA,
     individually, and on behalf of all
 6   others similarly situated,

 7                        Plaintiffs,
                                            Case No.
 8   vs.                                    2:10-cv-405-FtM-29SPC

 9   LOWES HOME CENTERS, INC., a North
     Carolina Corporation, and NATIONAL
10   GYPSUM COMPANY, a Delaware
     Corporation,
11
                          Defendants.
12   _ _ _ _ _ _ _ _ _ _ _ _ _ _ /

13

14       VIDEOTAPED
         DEPOSITION OF:   PATRICK MACARY
15
         DATE:            January 30, 2012
16
         TIME:            9:08 a.m. to 1 p.m.
17
         PLACE:           201 N. Franklin Street, Suite 3400
18                        Tampa, Florida 33602

19       REPORTED BY:     BETH L. SHANKS, RPR, CRR
                          Notary Public, State of
20                        Florida at Large

21       VIDEOGRAPHER:    JOHN BARLOW

22

23

24

25                     Pages 1 to 142
```

```
 1            THE VIDEOGRAPHER:  Off the video record at 9:16.
 2       (Pause.)
 3            THE VIDEOGRAPHER:  We are back on the video
 4       record at 9:17.
 5  BY MR. LANDSKRONER:
 6       Q.   Okay.  Mr. Macary, in terms of your position
 7  overseeing production in the mill, what did that involve?
 8       A.   It was overseeing the personnel that operated the
 9  mill and coordinating the production of stucco, which would
10  have been our product at the mill.
11       Q.   And is that stucco product from raw gypsum, or
12  was it byproduct gypsum?
13       A.   It was at times both and at times just one or the
14  other.
15       Q.   And how long did you hold the position as mill
16  supervisor at the Tampa plant?
17       A.   I transferred over to the Apollo Beach plant in
18  late 2000, so just about 2 1/2 -- about 2 1/2 years.
19       Q.   And when you transferred to Apollo Beach, did you
20  do so to assist in the opening of that plant?
21       A.   That's correct.
22       Q.   And that -- I understand, if I'm correct, that
23  site inspection began in 1999, the plant opened in 2001; is
24  that correct?
25       A.   Yeah, we were -- I got hired in in 2000.  Our
```

```
 1   first board we produced was January 2001.
 2        Q.   Okay.  And what position were you hired in at the
 3   Apollo Beach plant?
 4        A.   Mill quality and environmental.
 5        Q.   Environmental what?
 6        A.   Environmental coordinator.
 7        Q.   And tell me what that job entailed.
 8        A.   That is assembling all the environmental
 9   documents required for the administration of the plant.
10        Q.   Would that include, for example, reporting to
11   governmental authorities about emissions, things along those
12   lines?
13        A.   Yes, it would, to a certain extent.  We have
14   consultants and we have environmental services and corporate
15   as well.  So some things get farmed out in different areas.
16        Q.   So would you also deal not only the external
17   side, you know, for third parties outside the plant, but
18   also internal in terms of the management of the MSDS sheets
19   or the potential environmental effects of the raw materials
20   that you would use in production?
21             MR. AYALA:  Objection to form.  Just compound.
22        A.   I don't know how to answer that.
23   BY MR. LANDSKRONER:
24        Q.   Yeah.  So you dealt with external issues; third
25   parties, governmental issues.  Did you also deal internally
```

```
 1     Q.   Understood.  Okay.  Can you give me an example of
 2  some of the end users that you are familiar with that
 3  National Gypsum board goes to?
 4     A.   I don't have too much personal familiarity with
 5  end users.  I know generic; residential builders, commercial
 6  builders, laminators, manufactured homes.
 7     Q.   Okay.  As the quality control supervisor,
 8  regional supervisor for quality control, is it incumbent
 9  upon you to know what the inherent risks are in the
10  production of your drywall product?
11          MR. AYALA:  Objection.  Form.
12     A.   Can you define "risk"?
13  BY MR. LANDSKRONER:
14     Q.   The -- any potential danger that would be
15  associated with the production of your product.
16          MR. AYALA:  Objection to form.
17     A.   You are going to have to be a little more
18  specific with "potential danger."  You mean as far as
19  structural integrity?
20  BY MR. LANDSKRONER:
21     Q.   That may be one example.  I mean, that's a good
22  way to start.  What are the inherent risks or what are the
23  concerns that you are drawn to or you are required to
24  observe and look out for as the quality assurance director?
25          MR. AYALA:  Objection to form.  Assumes facts not
```

1   Q.   Yes.
2   A.   -- physical dimensions, structural integrity, and
3   then for the various specialty properties for the various
4   specialty boards.
5   Q.   Do you monitor the drywall, or are there any
6   specs that apply to the chemical makeup of the product?
7   A.   There are some requirements of how much gypsum is
8   required to be in the board, and there are limitations and
9   amounts for different additives, depending on which product
10  you are referring to.  And many of these are stipulated in
11  our Underwriters Laboratory file that we have for that
12  product.
13  Q.   Are there any specifications or requirements that
14  you must adhere to with regard to the amounts of bacterial
15  presence in the board?
16       MR. AYALA:  Objection to form.
17  A.   There are -- our specifications are listed for
18  those chemical add -- ingredients, but there is no
19  specification for bacteria.
20  BY MR. LANDSKRONER:
21  Q.   Does National Gypsum test or monitor the
22  bacterial content of its drywall?
23       MR. AYALA:  Objection to form.
24  A.   We -- no.  We test for all of our physical
25  properties, but we don't test for bacteria, no.

```
 1  BY MR. LANDSKRONER:
 2      Q.   And is that true not only at the Apollo Beach
 3  plant but companywide?
 4           MR. AYALA:  Objection to form.  It's beyond the
 5      scope.
 6      A.   I am not familiar with any testing for bacteria
 7  at our plants.
 8  BY MR. LANDSKRONER:
 9      Q.   Okay.  Mr. Macary, if a run of board at the
10  Apollo Beach plant does not meet the standards of UL or the
11  internal standards of National Gypsum or the ASTM specs, is
12  it considered defective?
13      A.   Is it considered defective?  I wouldn't use the
14  word "defective."
15      Q.   Okay.  Would you --
16      A.   I would use the word of "off specification."
17      Q.   Would you mark it an off-specification product?
18  Would you sell an off-specification product?
19      A.   That's not my double responsibility.  My role is
20  to advise the plant manager.
21      Q.   And what do you advise the plant manager if a
22  product is off specs?
23      A.   I advise him of the product and the value and its
24  relation to reported specifications.
25      Q.   And then you leave it to the manager to determine
```

```
 1        A.    Yeah.
 2        Q.    Okay.  And what is that?  What is petrification
 3   of pulp?
 4        A.    It just starts to spoil.  You have a lot of
 5   organic material in there.  And if it's kept stagnant for a
 6   long period of time, it will start to decompose and smell.
 7        Q.    What smell --
 8        A.    I'm not sure if it's going to decompose or not.
 9   I mean, that's just a word I'm using here.
10        Q.    What does it smell like?
11              MR. AYALA:  Objection to form.  It assumes facts
12         not in evidence.
13        A.    Putrid pulp just -- I will call it an "unpleasant
14   odor."  As far as actually have I had my nose in it, not
15   really.  Let me think back.  What does it smell like?
16        Q.    Yeah.  Give me an idea.
17        A.    I don't know.  Like vomit.
18        Q.    Okay.  Do you know what causes the smell?
19        A.    No --
20              MR. AYALA:  Objection.
21        A.    -- I don't.
22              MR. AYALA:  Can we take a break?  I need to use
23         the restroom.
24              MR. LANDSKRONER:  Sure.
25              THE VIDEOGRAPHER:  Off the video record at 9:54.
```

BY MR. LANDSKRONER:

Q. And you can answer. You can tell me again. Let's start there.

A. Okay. We were talking about that. And exactly why it petrifies, I don't have personal knowledge of that.

Q. Okay. Have you ever had cause to investigate that as the quality manager at the plant?

A. Not at the Apollo Beach plant, no, I have not.

Q. Are you aware of anyone at National Gypsum in terms of quality management that has sought to investigate the cause of the smell of the pulp?

A. There have been a couple occasions of smelly board --

Q. Okay.

A. -- that has been determined to be due to not purify -- not preserving the pulp.

Q. Okay. And let's talk about that. First of all, what is "smelly board"?

A. Smelly board would be board that has a slight odor to it.

Q. And an odor of what?

MR. AYALA: Objection. Lack of foundation.

A. An odor of stinkiness.

BY MR. LANDSKRONER:

Q. Okay. Could you -- could you elaborate a little

1  bit of what type of smell you are speaking of?
2          MR. AYALA: Lack of foundation and lack of
3      personal knowledge.
4  BY MR. LANDSKRONER:
5      Q.  Go ahead. From your experience.
6      A.  Trying to inhibit putrification of the pulp is an
7  industrywide practice. If you don't, it could result in
8  some smelly board. That's just common industry knowledge.
9  It's why the pulp is preserved. I have only had one
10 occasion to smell that, and that was at our Long Beach
11 plant.
12     Q.  Okay. And what did it smell like in your
13 experience?
14     A.  Vomit.
15     Q.  When was that that -- if you recall?
16     A.  I'm going to say it was 2004, 2005.
17     Q.  And was the smelly board board that was end-
18 product board, board that had already been produced and was
19 ready for market or had been shipped to market?
20     A.  Yes.
21     Q.  Okay. And so it had already been through the
22 production process and a completed product, and then the
23 board still smelled?
24         MR. AYALA: Objection. Lack of foundation and
25     lack of personal knowledge.