BEFORE THE
DIVISION OF MEDICAL QUALITY
MEDICAL BOARD OF CALIFORNIA
DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA

In the Matter of the Accusation Against:

DENNIS GLENN HOOPER, M.D.

Physician's and Surgeon's Certificate No. G-54464

              Respondent

OAH No: L2003120570

Case No: 06-2001-120995

## DECISION

The attached Proposed Decision is hereby accepted and adopted by the Division of Medical Quality of the Medical Board of California, Department of Consumer Affairs, as its Decision in the above entitled matter.

This Decision shall become effective at 5:00 p.m. on January 11, 2006.

DATED  December 12, 2005

DIVISION OF MEDICAL QUALITY
MEDICAL BOARD OF CALIFORNIA

Steve Alexander
Chair, Panel A
Division of Medical Quality

BEFORE THE
MEDICAL BOARD OF CALIFORNIA
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of Accusation Against:<br><br>DENNIS G. HOOPER, M.D.,<br>2613 Sir Percival Lane<br>Lewisville, CA 75056<br><br>Physician's and Surgeon's<br>   Certificate Number G54464<br><br>                          Respondent. | Case No. 06-2001-120995<br><br>OAH No. L2003120570 |

## PROPOSED DECISION

This matter came before Samuel D. Reyes, Administrative Law Judge, Office of Administrative Hearings, in Los Angeles, California, on August 22, 23, 24, and 25, 2005.

Ismael A. Castro, Deputy Attorney General, represented complainant Ron Joseph, Executive Director of the Medical Board of California (Board).

J. Grant Kennedy, Attorney at Law, represented respondent.

Complainant seeks to discipline respondent's medical license on grounds of alleged gross negligence, repeated negligent acts, and incompetence in connection with the care and treatment provided to six patients. Respondent denies most of the allegations and argues for continued licensure.

Oral and documentary evidence, and evidence by oral stipulation on the record, was received at the hearing. The record was left open for the parties to submit additional evidence and argument. On September 7, 2005, complainant submitted an amended cost declaration, which document has been marked for identification as Exhibit 25. Respondent objects to the receipt of Exhibit 25 and to the award of costs of investigation and prosecution. Objections to the receipt of Exhibit 25 are overruled and the document is received in evidence; arguments regarding costs are resolved in connection with findings of fact and conclusions of law. On September 19, 2005, respondent filed a Closing Statement, which document has been marked for identification as Exhibit Y. On October 20, 2005, complainant submitted a Post Hearing Brief, which document has been marked for identification as Exhibit 26. The matter was submitted for decision on October 20, 2005.

## FACTUAL FINDINGS

### Parties and Jurisdiction

1.  Complainant filed the Accusation in his official capacity.

2.  On March 25, 1985, the Board issued Physician and Surgeon's Certificate Number G 54464 to respondent. The certificate has been in effect since then and expires on November 30, 2006, unless renewed. It has not been previously disciplined.

3.  Respondent obtained a doctorate in microbiology from the University of California, Davis, in 1982. He received his medical degree in 1983 from the University of Nevada in Reno, Nevada. During the year following his graduation from medical school, he completed a one-year internship in flexible medicine at the Naval Hospital in San Diego, California. He thereafter completed a four-year residency in anatomic and clinical pathology at the same institution. He is a Diplomate of the American Board of Pathology.

4.  Respondent spent 25 years in the United States Navy, from 1976 until 2001, sixteen of which years were on active duty. He retired in 2001 with the rank of Captain. He remained in the Department of Pathology at the Naval Hospital at the conclusion of his residency and was department chairman from 1989 to 1995. During his tenure as chairman, respondent oversaw the work of 20 staff pathologists and 8 residents. While the majority of his duties were administrative, respondent remained active in the clinical practice of pathology by retaining day-to-day supervision over the blood bank and by spending one day per month in the pathology rotation. After leaving active duty in 1995, respondent opened a laboratory and performed consulting work for other laboratories, primarily conducting quality assurance and engaging in research projects.

5.  On February 28, 2000, respondent was hired as a Physician Specialist in the Department of Pathology at Martin Luther King, Jr./Charles R. Drew Medical Center (King/Drew or Hospital). King/Drew is operated by the County of Los Angeles (County). He was hired and well-received by Laboratory Director and Acting Chair of the Department of Pathology, Irene Gleason-Jordan, M.D. (Gleason). Respondent hoped to engage in research involving patients suffering from Acquired Immunodeficiency Syndrome and/or Human Immunodeficiency Virus.

6.  Respondent testified that working at King/Drew presented a number of challenges for him, some of which impacted his ability to properly discharge his duties. He stated that Dr. Gleason ran the department with an "iron fist" and installed many strict rules regarding case-handling. He cited as examples Dr. Gleason's requirement that all reports be issued in "final" and her reluctance to allow outside consultations. In this regard, Dr. Gleason or the other manager, Frank Salem, M.D. (Salem) had to review the case and the pathologist had to have at least a tentative diagnosis before referral to outside laboratories.

Respondent also decried the lack of a formal peer review system, although his testimony and that of the other King/Drew pathologist who testified, Timothy F. Dutra, M.D. (Dutra), established that informal peer review took place as deemed necessary by the physicians. However, friction developed between respondent and other pathologists, which, in respondent's view, made it difficult for him to obtain timely peer review of his cases. As a result, respondent generally relied on the two administrators, Drs. Gleason and Salem, for peer review.

### General Specimen Handling

7. In the case of some patients, tissue was obtained during surgical procedures and frozen during surgery for analysis by pathologists. If specimens were obtained for subsequent microscopic analysis, the pathologist received the "gross specimen," dictated a description for subsequent inclusion in the written report, and placed the tissue sample in one or more cassettes. The gross sample was then sent to technicians, or, as respondent described them "the histology laboratory," for slicing, chemical treatment, and placement on glass slides. The transcribed gross specimen description and the glass slides were thereafter returned to the pathologist for microscopic analysis, diagnosis, and issuance of a report. Respondent estimated that the transcribed reports typically arrived after the slides, usually three to seven days after dictation.

### Standard of Care Regarding Diagnosis

8. Both parties submitted well-qualified pathologists as experts. Complainant called Lowell W. Rogers, M.D. (Rogers) and respondent called David M. Posey, M.D. (Posey). They are certified by the American Board of Pathology in anatomical and clinical pathology and Dr. Posey holds an additional certification in forensics pathology from said body. Both have extensive experience in the fields of anatomical and forensic pathology. Dr. Rogers is presently Director of Anatomic Pathology at Long Beach Memorial Medical Center. Dr. Posey has a private practice in which he performs substantial forensic pathology work.

9. The experts agreed that the standard of care requires a pathologist conducting microscopic analysis of a specimen to be able to differentiate between carcinoma and the absence of carcinoma.

### Patient H.S.[1]

10. The patient, a 28-year-old man with a history of anemia, provided a peripheral blood smear for analysis on April 17, 2000, to rule out carcinoma.

11. The specimen was submitted to the Hospital's Pathology Department for analysis. Respondent analyzed the specimen and prepared his report. He diagnosed "reactive lymphs" and noted "no blasts," findings denoting the absence of carcinoma.

---

[1] Initials have been used to preserve the patients' privacy.

3

12. The patient returned for a bone marrow core biopsy and another pathologist, Brian Yee, M.D. (Yee), issued a report on April 21, 2000. The report was based on analysis of concurrent bone marrow and peripheral specimens, which were obtained after the sample analyzed by respondent. Dr. Yee found "occasional undifferentiated blasts" in the peripheral blood sample and noted that "the marrow cavity is nearly entirely occupied with malignant cells consistent with blasts." In his opinion, these findings "most likely represent an acute leukemia."

13. The specimen actually examined by respondent appears to have been lost and was not available to the expert witnesses for examination. Dr. Rogers nevertheless opined that the blasts observed by Dr. Yee were "likely" present in the peripheral blood specimen evaluated by respondent four days earlier. Inasmuch as a pathologist must be able to differentiate between blast cells and lymphs, he concluded, respondent failed to recognize the blasts and thus deviated from the standard of care.

14. Dr. Posey testified that some peripheral smears can show blasts while others taken on the same day may not show them, depending on blood sampling. In this case, he noted, the blasts may not have been evident on the April 17, 2000 slides despite Dr. Yee's findings four days later. In his opinion, it is impossible to render an accurate assessment about the standard of care without reviewing the actual slides in question.

15. Dr. Posey's testimony, which was not directly contradicted by Dr. Rogers, is credited. In fact, Dr. Rogers' use of the term "likely" indicates lack of medical certainty. Thus, in the absence of the slides reviewed by respondent, complainant has not established a deviation from the standard of care.

## Patient V.J.

16. The patient, a 74-year-old woman with recurrent blood in the urine, presented to the Hospital on June 27, 2000, for a urine cytology, microscopic analysis of the urine. In a report dated July 3, 2000, respondent reported no carcinoma findings, diagnosing instead "Occasional unremarkable transitional cells, unremarkable squamous cells, and occasional red cells."

17. Dr. Rogers examined the same specimen and identified clearly malignant cells in portions of the specimen and markedly atypical cells in other portions. Dr. Rogers acknowledged that urine cytology is not an easy area of analysis, but noted that there is a significant difference between normal tissue, as respondent found, and cancerous tissue. In his opinion, ninety-five percent of all pathologists would have concluded the specimen was at least suspicious for carcinoma.

18. Dr. Posey's analysis was consistent with Dr. Rogers'. He found atypical urothelial cells suggestive of malignancy in one slide and malignant cells consistent with transitional cell carcinoma in another slide. In his opinion, the deviations from the standard of care were minor.

4

19. An August 8, 2000 bladder biopsy, performed by another physician, revealed carcinoma invasive into deep muscle.

20. Respondent agreed he misdiagnosed the patient's condition. Respondent testified he told Dr. Gleason that cytopathology was not his area of expertise. Respondent did not recall the details of this case, but it appears he sought peer review from Dr. Mohammed and he received a note from Dr. Salem about concerns with the report after its issuance.

Patient T.D.

21. T.D., a 58-year-old man, presented to the Hospital on September 27, 2000, for a prostate needle biopsy to rule out carcinoma of the prostate gland.

22. Respondent received one slide for examination and diagnosed chronic prostatitis in a final report dated October 4, 2000. He made the following comment: "If clinically indicated, a re-biopsy is strongly suggestive with a follow-up."

23. Respondent testified that despite his benign report he suspected prostate cancer. He sought to obtain results of another prostate test likely administered, the blood test for prostate-specific antigen or PSA, to correlate with his findings, but was unable to obtain those results. He also did not hear from the physician regarding the suggested re-biopsy and on October 6, 2000, asked Dr. Gleason to review the case, noting his inability to obtain the PSA results or to speak to the surgeon. On October 20, 2000, respondent repeated his request for Dr. Gleason to review the case, expressing his belief that carcinoma might be present.

24 Respondent testified on direct examination that it was customary for only one slide to be prepared in prostate biopsy cases, but conceded on cross-examination that Dr. Gleason instructed pathologists to obtain as many slides as necessary for diagnosis. In this case, despite his concern about the initial diagnosis, respondent did not seek to have additional slides made. At the hearing, respondent testified he should have insisted on additional slides to examine deeper levels of the prostate tissue. Respondent further testified that the Hospital subsequently changed the practice so that three slides were routinely made which included deeper cuts into the tissue specimen.

25. Drs. Gleason and Salem reviewed the case and caused two additional slides to be prepared from deeper tissue in the original specimen. Drs. Gleason and Salem examined the slides and issued an addendum pathology report dated February 7, 2001, concluding that adenocarcinoma of the prostate, "Gleason grade $3 + 4 = 7$," was present.

26. Drs. Rogers and Posey examined the same two slides analyzed by Drs. Gleason and Salem and arrived at the same diagnosis of adenocarcinoma of the prostate. Respondent agreed at the hearing that the two additional slides showed carcinoma.

5

27. The original slide examined by respondent was not available for the experts to review and Dr. Posey made no assessment of respondent's evaluation because of this unavailability. Unlike the case of H.S. involving peripheral blood analysis, discussed above, Dr. Posey expressed no opinion about the appropriateness of evaluating respondent's performance based on the later slides. Dr. Rogers, on the other hand, opined that because of the extensive carcinoma involvement apparent in the two available slides evidence of its presence must have been apparent in the more superficial tissue examined by respondent. Dr. Rogers' testimony is more persuasive in light of the undisputed evidence of carcinoma in the same specimen examined by respondent. Respondent himself told Dr. Gleason he suspected carcinoma, which is partially corroborative of Dr. Rogers' opinion. Further, in the existing circumstances, which include respondent's own suspicions, respondent failed to take necessary steps to ensure he made the correct diagnosis, namely, directing preparation of additional slides. Accordingly, respondent deviated from the standard in failing to diagnose the presence of carcinoma.

### Patient O.G.

#### December 12, 2000

28. The patient, a 57-year-old woman, had a history of peptic ulcer disease with multiple prior endoscopies and biopsies. On December 12, 2000, she presented to the Hospital complaining of abdominal pain. Two tissue specimens were removed from her stomach for analysis, one from an irregular-appearing gastric scar and one from the pyloric stricture.

29. a. Respondent made the following diagnosis with respect to the first sample, which he labeled "gastric biopsy:" "Atypical glandular cells with severe dysplasia, cannot rule-out malignancy."

   b. With respect to the second sample, the "pyloric biopsy," respondent likewise concluded: "Atypical glandular cells with severe dysplasia, cannot rule-out malignancy."

   c. Respondent wrote in the "Comment" section of the pathology report: "This case is discussed with Dr. Salem of the Department of Pathology at Martin Luther King, Jr. Hospital." No details are contained in the report regarding the consultation with Dr. Salem. Respondent explained that he followed protocol at the Hospital and that placement of another physician's name indicated peer review and concurrence with the diagnosis.

30. Dr. Rogers disagreed with respondent's diagnoses, noting that no malignancy was present or suggested. Dr. Rogers only found "severe reactive changes." Dr. Posey did not express an opinion, as he did not have the slides available for review. He did not opine regarding whether the reported cellular abnormalities were significant to lead respondent to suspect, or prevent him from ruling out, malignancy. Dr. Rogers' testimony, which was not contradicted, is sufficient to establish a deviation from the standard of care.

February 2, 2001

31. The patient's underlying condition did not improve and she returned to the Hospital on February 2, 2001, reporting nausea and vomiting. Three new tissue specimens were obtained and sent to the pathology laboratory for analysis.

32. a. Respondent diagnosed poorly differentiated adenocarcinoma in two of the samples, labeled "stomach biopsy" and "duodenal biopsy." With respect to the third, called "gastric biopsy," respondent found severe chronic inflammation of the gastric mucosa, but no carcinoma.

b. He wrote the following comment in the pathology report: "This case is discussed with Dr. Gleason-Jordan of the Department of Pathology, Dr. Martin Luther King Hospital. The case is also discussed with Dr. Michael Madievsky on 2/7/01."

33. Drs. Rogers and Posey agreed that the biopsies did not reveal the presence of dysplasia or malignancy. Rather, the tissue revealed regenerative/reactive changes consistent with ulceration. In their opinion, respondent's misdiagnoses constituted deviations from the standard of care. Dr. Posey described the deviation as "major" and Dr. Rogers as "substantial."

March 13, 2001

34. On March 13, 2001, the patient underwent a partial gastrectomy. Analysis of sections of tissue frozen during surgery, performed by another pathologist, indicated that the removed tissue's margins were clear of tumor.

35. After surgery, respondent received for analysis stomach tissue measuring 17 centimeters (cm) in length by 7 cm in width. His diagnosis, contained in a pathology report deemed final on March 27, 2001, was "Suspicious for Paneth Cell Carcinoma." In the comments section of the pathology report, respondent wrote: "This tumor is sent for consultation to the AFIP [Armed Forces Institute of Pathology]. This case was discussed with Dr. Gleason-Jordan of the Department of Pathology, Martin Luther King Medical Center."

36. Respondent testified he could not rule out carcinoma because of the presence of pink granules, which could be indicative of several conditions, including carcinoma. His conversations with the surgeon added to his suspicions. In respondent's view, the case was complex and he wanted to send it to an outside laboratory for analysis. He showed the slides to Dr. Gleason, who thought it might be Paneth Cell Carcinoma, an extremely rare cancer. Despite not being sure it was Paneth Cell Carcinoma, respondent agreed with Dr. Gleason's designation to ensure that the case was sent out to AFIP for analysis.

37. On March 26, 2001, the slides were sent to AFIP. On April 13, 2001, AFIP informed respondent that it found no carcinoma in the slides submitted, diagnosing instead "Mucosal ulcer and fibrosis of the muscularis propria with inflammatory infiltrate containing eosinophils and mast cells."

7

38. Despite the AFIP report finding no carcinoma, respondent continued to have doubts regarding the absence of carcinoma. He sent the slides to Dr. Chandrasoma at the University of Southern California School of Medicine and Dr. Chandrasoma interpreted them as depicting eosinophilic gastritis. Respondent also submitted the case for discussion by the "tumor board," a meeting of Hospital specialists from different disciplines. The case was discussed on May 31, 2001, but it was not established what, if any, suggestions respondent received at this meeting.

39. On his own initiative, respondent made further slides from the stomach tissue obtained on March 13, 2001. After analysis of the new slides, respondent diagnosed "Poorly-differentiated adenocarcinoma with invasion in the lamina propria and submucosa." His findings were contained in an Addendum Report dated June 14, 2001.

40. In the Addendum Report, respondent wrote that the tumor was most "probably" a "T1." This classification refers to the tumor's initial tissue penetration stage, as respondent had not observed penetration into muscle tissue. At the hearing, he testified that he wrote "probably" because there were some indications that the tumor had progressed to the "T2" stage, but that he was not concerned about the equivocation as the same treatment is given for a tumor in either stage.

41. Dr. Rogers opined that respondent violated the standard of care in several respects. In his opinion, respondent misdiagnosed a benign inflammatory condition as probable Paneth Cell Carcinoma. While he agreed that the second set of slides showed adenocarcinoma, he testified that it was a T2b or T3 stage tumor because it had penetrated muscle and opined that respondent's failure to properly diagnose the proper stage constituted a deviation from the standard.

42. Dr. Posey testified that respondent ultimately arrived at the correct diagnosis of carcinoma, but committed a minor error in failing to conclude that the tumor had penetrated the muscle tissue. In his opinion, respondent took appropriate steps to resolve his doubts in what was obviously a difficult case.

43. The expert testimony establishes that respondent misdiagnosed an inflammatory condition as a rare cancer on March 27, 2001. He is responsible for the diagnosis on the pathology report and, despite his reservations, assigned a diagnosis of "suspicious for Paneth Cell Carcinoma."

44. The experts also agree, and it is found, that respondent misdiagnosed the extent of progression of the carcinoma observed in the second set of slides, which failure constitutes a deviation from the standard of care.

45. Dr. Rogers further opined that the delay in the preparation of the Addendum Report constitutes a deviation from the standard of care. Dr. Posey's contrary testimony is credited, as it was not unreasonable for respondent to seek outside review before deciding to create additional slides for further analysis.

Patient J.W.

46. On March 6, 2001, the patient, a 40-year-old woman with a history of Depo-Provera use and breakthrough bleeding, underwent an endometrial biopsy at the Hospital to rule out carcinoma.

47. On March 7, 2001, respondent received two gross specimens, one he labeled "endometrial biopsy" and another he labeled "endocervical curettings." The first consisted of multiple, gray-tan to reddish-brown fragments of soft tissue admixed with mucus blood with aggregate dimensions of 0.4 cm by 0.4 cm by 0.2 cm. The second specimen consisted of multiple reddish-brown irregular fragments of soft tissue admixed with mucous and hemorrhage with aggregate dimensions of 0.4 cm by 0.4 cm by 0.2 cm. Each specimen was totally enclosed in one cassette. The specimens were collectively given case number "S01-1138." As was his custom, respondent dictated the "gross description" portion of his pathology report consistent with the foregoing observations and submitted it for typing.

48. The two cassettes were submitted to the histology section for processing. Respondent testified that he received three slides back from histology, one for the "endometrial" sample ("A") and two for the "endocervical" sample ("B1 and B2"). The tissue in the endocervical slides measured 1.4 cm by 1.4 cm by 0.2 cm, which respondent suspected was too large for endocervical tissue. Respondent failed to find endometrium or endocervical tissue in slide "B2." He also noted a small portion of what appeared to be brain tissue in the "B2" slide, but assumed it was a "floater" not properly part of the specimen. Respondent had not received his typed "gross description" to verify he received the same specimens he released to histology. Because the surgeon needed the analysis on a priority basis respondent did not wait for the typed gross description and looked at the Histology Log to verify that he had the correct tissue. The Histology Log listed two cassettes, listed as "A" and "B2," and three imbedded blocks, which information correlated with what respondent received.

49. On March 13, 2001, respondent dictated a diagnosis of "benign endocervical tissue" with respect to the first, endometrial biopsy specimen ("A"), and a diagnosis of "malignant spindled cell tumor with secretory endometrium" for the second, "endocervical curettings" sample ("B1" and "B2"). The malignancy had been found in the "B2" slide of the specimen. However, respondent suspected labeling error and issued the following cautionary comment: "It appears the specimens were reversed on the bottles and mislabeled prior to receipt in the laboratory. The spindled cell tumor appears to be stromal in origin. The specimen is sent to IMPATH for immunohistochemistry. The case is reviewed and discussed with Dr. Gleason-Jordan . . . and Dr. Joshua Berger of the Department of OB/GYN." The pathology report was deemed final on March 14, 2001.

50. At the hearing, respondent stated that he was concerned about mislabeling when he noticed brain tissue in the purported endocervical specimen. He also thought that the cervix was an unlikely place for this type of tumor. He reviewed the matter with Dr. Gleason, who agreed that stromal carcinoma was rare in the endocervix and authorized the referral to IMPATH, an outside laboratory.

51. On March 16, 2001, IMPATH pathologists issued a diagnosis of "malignant mixed mullerian tumor of endometrium," another type of carcinoma than reported by respondent. Respondent discussed the findings with the surgeon, Joshua Berger, M.D. (Berger), and dictated an Addendum Report on March 19, 2001, deemed final on March 22, 2001, conforming his diagnosis of the endocervical curettings specimen to IMPATH's diagnosis.

52. On March 19, 2001, the patient underwent a total hysterectomy with bilateral salpingo-oophorectomy.[2] Pathologist Hezla Mohamed, M.D., thereafter analyzed the entire extracted uterus, tubes, ovaries, and cervix and found no evidence of malignancy. Her report was finalized April 18, 2001.

53. Both experts agreed that respondent misdiagnosed J.W. as having a malignant spindled cell tumor, which misdiagnosis falls below the standard of care. They described the deviation as "major."

54. Dr. Rogers testified that pathologists are responsible for verifying the correctness of the specimens they analyze. In this case, Dr. Rogers noted, the excessive amount of tissue and the unusual diagnosis should have alerted respondent that he had analyzed the wrong tissue. Dr. Posey did not directly disagree with Dr. Rogers' opinion. He testified that the physician should resolve any perceived mix-up before issuing a final report; he also stated that a physician should not be blamed for mislabeling failure that stems from a "systems failure." Regardless of the experts' partial disagreement regarding a physician's initial duty, respondent himself suspected he had received mislabeled specimens, as noted in his report. Once he became suspicious, both experts agreed, respondent had the duty to investigate the matter before issuing a final report. Respondent's obligation was to ensure that his analysis was based on the correct specimen. In this case, respondent issued two final reports, one of which was an "Addendum Report," without fully resolving the mislabeling issue. Independent of any failure by others in the Hospital, respondent failed to adequately inquire into the mislabeling before issuing the final reports. His failure constitutes a deviation from the standard.

55. Respondent acknowledges that he misdiagnosed the patient's condition. Respondent testified that he suspected the mix-up and took some steps to resolve the matter. However, he conceded that he did not do enough follow-up and stated that he was part of the system failure that led to the misdiagnosis.

### Patient C.J.

56. The mislabeled specimen involved in the case of patient J.W. actually belonged to patient C.J. The patient was a 54-year-old man who underwent a brain tumor biopsy at the Hospital on March 6, 2001, the same day the specimen for J.W. was obtained. A frozen section

---

[2] Respondent testified that Dr. Berger reported that the patient was so tired of the bleeding that she planned to undergo a hysterectomy regardless of the results of the biopsy. Neither Dr. Berger nor J.W. testified and respondent's hearsay testimony is insufficient to establish the truth of matters asserted therein.

specimen of C.J.'s brain tissue was submitted to another pathologist during surgery and its interpretation led to further surgery to remove the tumor.

57. On March 7, 2001, respondent received three specimens for post-surgery analysis, which were collectively labeled "S01-1158." He dictated a gross description of the specimens and submitted the specimens to the histology section.

58. Respondent thereafter received two specimens from the histology section but did not realize that one was missing (the one erroneously sent with J.W.'s specimens). Once respondent received the transcription of the dictated gross description, he realized that one specimen was missing from this case, although it was unclear when he received the transcription. Despite this realization, however, respondent did not take steps to correct the pathology report in the case of patient J.W.

59. Respondent issued a report, finalized on March 13, 2001, diagnosing malignant meningioma in C.J.'s brain. His diagnosis was correct and within the standard of care.

## Negligence and Gross Negligence Findings

60. Complainant established that respondent deviated from the standard of care in failing to diagnose patient V.J.'s carcinoma (factual finding numbers 16 through 20), in failing to diagnose patient T.D.'s carcinoma (factual finding numbers 21 through 27), in incorrectly diagnosing suspected carcinoma in the specimens of patient O.G.'s stomach tissue obtained on December 12, 2000 (factual finding numbers 28 through 30), in incorrectly diagnosing carcinoma in the specimens of patient O.G.'s tissue obtained on February 2, 2001 (factual finding numbers 31 through 33), in misdiagnosing the progression of carcinoma in the specimens of patient O.G.'s stomach tissue obtained on March 13, 2001 (factual finding numbers 34 through 44), and in incorrectly diagnosing carcinoma in patient J.W. (factual finding numbers 46 through 55), each of which deviations from the standard constitutes negligence.

61. Complainant further established that the deviations from the standard of care involving the misdiagnosis of patient O.G.'s condition based on analysis of specimens obtained on February 2, 2001 (factual finding numbers 31 through 33), and the misdiagnosis of patient J.W.'s condition (factual finding numbers 46 through 55) rose to the level of gross negligence.

## Incompetence

62. The deviations from the standard of care set forth in factual finding numbers 16 through 44 and 45 through 55 establish that respondent lacks the requisite level of knowledge in the practice of pathology.

Other Evidence Offered in Mitigation and Rehabilitation

63. Dr. Posey testified that the practice of pathology is not error-free and that a one to two percent error rate is only achieved with a valid quality assurance program. By this measure, respondent notes, he is practicing within the standard since the foregoing patient cases constitute a miniscule percent of the overall cases he reviewed. This argument, however, ignores the qualitative nature of the established deviations from the standard of care, some of which rise to the level of gross negligence. Moreover, it was not shown that these cases constitute an appropriate sample from which to derive an acceptable error rate. Accordingly, the argument is rejected and the evidence offered in its support is not deemed persuasive or appropriate to mitigate the deviations from the standard.

64. Respondent submitted the declarations of Vincent Bolton, M.D. (Bolton), James Andrew Hinds, Jr., and William J. Rea, M.D. (Rea). These individuals attest to respondent's good character. Dr. Bolton, who has known respondent since medical school and has worked with him, and Dr. Rea, who has worked with respondent since 1999, further attested to respondent's medical knowledge and skill.

65. Respondent cooperated in the Board's investigation.

Costs

66. a. Complainant incurred costs of investigation and enforcement in this matter in the amount of $28,555.78, or $17,486.25 in Attorney General charges, $8,869.53 in investigators' costs, and $2,200 in expert review costs.

b. In light of the violations established, only a fraction of the allowed costs, 80 percent or $22,844.62, constitutes the reasonable costs of investigation and enforcement.

Other Allegations and Arguments

67. Except as set forth in this Decision, all other allegations in the accusation, and all other arguments by the parties, lack merit or constitute surplusage.

LEGAL CONCLUSIONS

1. Cause exists to discipline respondent's certificate pursuant to section 2234, subdivision (b), in that he engaged in gross negligence, by reason of factual finding numbers 31 through 33, 44 through 55, 60, and 61.

2. Cause exists to discipline respondent's certificate pursuant to section 2234, subdivision (c), in that he engaged in repeated negligent acts, by reason of factual finding numbers 16 through 44, 45 through 55, and 60.

3. Cause exists to discipline respondent's certificate pursuant to section 2234, subdivision (d), for incompetency, by reason of factual finding numbers 16 through 44, 45 through 55, and 63.

4. The reasonable costs of investigation and enforcement pursuant to section 125.3 are $22,844.62, by reason of factual finding number 66 and legal conclusion numbers 1 through 3.

5. Except as specifically set forth in this Proposed Decision, no other allegations of gross negligence, repeated negligent acts, and incompetence have been found to constitute cause for discipline, by reason of factual finding numbers 10 through 15, 45, 59, and 67.

6. All evidence presented in mitigation and rehabilitation has been considered in light of the violations established. In brief, the violations involved several patients and several different conditions over a nine-month period. Respondent's misdiagnoses involved both false positives and false negatives. Although he faced challenges in the performance of his work, each matter alleged to constitute grounds for discipline involved respondent's exercise of independent clinical judgement, for which he is responsible. On the other hand, two patients, V.J. and O.G., presented particularly difficult cases. Respondent had good intentions and engaged in communication and other activity in order to resolve doubts about prior diagnoses. He is board-certified in pathology and had a long career as a pathologist in the Navy. His administrative duties in the Navy and research-oriented focus after leaving the Navy, which reduced the time devoted to the clinical practice of pathology, likely played a part in respondent's misdiagnoses. Nevertheless, the established shortcomings must be addressed for the protection of the public. On balance, the Order that follows is necessary and sufficient for the protection of the public.

## ORDER

Certificate No. G 54464 issued to respondent Dennis G. Hooper, M.D., is hereby revoked. However, the revocation is stayed and respondent's certificate is placed on probation for five (5) years upon the following terms and conditions.

1. <u>Clinical Training/Assessment Program.</u> Within 60 calendar days of the effective date of this Decision, respondent shall enroll in a clinical training or educational program equivalent to the Physician Assessment and Clinical Education Program (PACE) offered at the University of California - San Diego School of Medicine (Program).

The Program shall consist of a Comprehensive Assessment program comprised of a two-day assessment of respondent's physical and mental health; basic clinical and communication skills common to all clinicians; and medical knowledge, skill and judgment pertaining to respondent's specialty or sub-specialty, and at minimum, a 40 hour program of clinical education in the area of practice in which respondent was alleged to be deficient and which takes into account data obtained from the assessment, Decision, Accusation, and any

other information that the Division or its designee deems relevant. Respondent shall pay all expenses associated with the clinical training program.

Based on respondent's performance and test results in the assessment and clinical education, the Program will advise the Division or its designee of its recommendation(s) for the scope and length of any additional educational or clinical training, treatment for any medical condition, treatment for any psychological condition, or anything else affecting respondent's practice of medicine. Respondent shall comply with Program recommendations.

At the completion of any additional educational or clinical training, respondent shall submit to and pass an examination. The Program's determination whether or not respondent passed the examination or successfully completed the Program shall be binding.

Respondent shall complete the Program not later than six months after respondent's initial enrollment unless the Division or its designee agrees in writing to a later time for completion.

Failure to participate in and complete successfully all phases of the clinical training program outlined above is a violation of probation.

If respondent fails to complete the clinical training program within the designated time period, respondent shall cease the practice of pathology within 72 hours after being notified by the Division or its designee that respondent failed to complete the clinical training program.

After respondent has successfully completed the clinical training program, respondent shall participate in a professional enhancement program equivalent to the one offered by the Physician Assessment and Clinical Education Program at the University of California, San Diego School of Medicine, which shall include quarterly chart review, semi-annual practice assessment, and semi-annual review of professional growth and education. Respondent shall participate in the professional enhancement program at respondent's expense during the term of probation, or until the Division or its designee determines that further participation is no longer necessary.

Failure to participate in and complete successfully the professional enhancement program outlined above is a violation of probation.

2. <u>Practice Restriction</u>. Respondent shall not engage in the clinical practice of pathology unless all of his final diagnoses are reviewed by a licensed and competent physician, who is not on probation with the Board. This restriction shall be removed upon successful completion of the Program, except that the Program may modify the restriction, subject to Division approval, during respondent's participation in the Program.

3. <u>Notification</u>. Prior to engaging in the practice of medicine the respondent shall provide a true copy of the Decision in this matter to the Chief of Staff or the Chief Executive Officer at every hospital where privileges or membership are extended to

14

respondent, at any other facility where respondent engages in the practice of medicine, including all physician and locum tenens registries or other similar agencies, and to the Chief Executive Officer at every insurance carrier which extends malpractice insurance coverage to respondent. Respondent shall submit proof of compliance to the Division or its designee within 15 calendar days.

This condition shall apply to any change(s) in hospitals, other facilities or insurance carriers.

4. <u>Supervision of Physician Assistants</u>. During probation, respondent is prohibited from supervising Physician Assistants.

5. <u>Obey All Laws</u>. Respondent shall obey all federal, state and local laws, all rules governing the practice of medicine in California and remain in full compliance with any court ordered criminal probation, payments, and other orders.

6. <u>Quarterly Declarations</u>. Respondent shall submit quarterly declarations under penalty of perjury on forms provided by the Division, stating whether there has been compliance with all the conditions of probation. Respondent shall submit quarterly declarations not later than 10 calendar days after the end of the preceding quarter.

7. <u>Probation Unit Compliance</u>. Respondent shall comply with the Division's probation unit. Respondent shall, at all times, keep the Division informed of respondent's business and residence addresses. Changes of such addresses shall be immediately communicated in writing to the Division or its designee. Under no circumstances shall a post office box serve as an address of record, except as allowed by Business and Professions Code section 2021(b).

Respondent shall not engage in the practice of medicine in respondent's place of residence. Respondent shall maintain a current and renewed California physician's and surgeon's license.

Respondent shall immediately inform the Division or its designee, in writing, of travel to any areas outside the jurisdiction of California which lasts, or is contemplated to last, more than thirty (30) calendar days.

8. <u>Interview with the Division or its Designee</u>. Respondent shall be available in person for interviews either at respondent's place of business or at the probation unit office, with the Division or its designee upon request at various intervals and either with or without prior notice throughout the term of probation.

9. <u>Residence or Practice Outside of California</u>. In the event respondent should leave the State of California to reside or to practice respondent shall notify the Division or its designee in writing 30 calendar days prior to the dates of departure and return. Non-practice is

15

defined as any period of time exceeding 30 calendar days in which respondent is not engaging in any activities defined in sections 2051 and 2052 of the Business and Professions Code.

All time spent in an intensive training program outside the State of California which has been approved by the Division or its designee shall be considered as time spent in the practice of medicine within the State. A Board-ordered suspension of practice shall not be considered as a period of non-practice. Periods of temporary or permanent residence or practice outside California will not apply to the reduction of the probationary term. Periods of temporary or permanent residence or practice outside California will relieve respondent of the responsibility to comply with the probationary terms and conditions with the exception of this condition and the following terms and conditions of probation: Obey All Laws; Probation Unit Compliance; and Cost Recovery.

Respondent's license shall be automatically cancelled if respondent's periods of temporary or permanent residence or practice outside California totals two years. However, respondent's license shall not be cancelled as long as respondent is residing and practicing medicine in another state of the United States and is on active probation with the medical licensing authority of that state, in which case the two year period shall begin on the date probation is completed or terminated in that state.

10. <u>Failure to Practice Medicine – California Resident</u>. In the event respondent resides in the State of California and for any reason respondent stops practicing medicine in California, respondent shall notify the Division or its designee in writing within 30 calendar days prior to the dates of non-practice and return to practice. Any period of non- practice within California, as defined in this condition, will not apply to the reduction of the probationary term and does not relieve respondent of the responsibility to comply with the terms and conditions of probation. Non-practice is defined as any period of time exceeding 30 calendar days in which respondent is not engaging in any activities defined in sections 2051 and 2052 of the Business and Professions Code.

All time spent in an intensive training program which has been approved by the Division or its designee shall be considered time spent in the practice of medicine. For purposes of this condition, non-practice due to a Board-ordered suspension or in compliance with any other condition of probation, shall not be considered a period of non-practice.

Respondent's license shall be automatically cancelled if respondent resides in California and for a total of two years, fails to engage in California in any of the activities described in Business and Professions Code sections 2051 and 2052.

11. <u>Completion of Probation</u>. Respondent shall comply with all financial obligations (e.g., cost recovery, restitution, probation costs) not later than 180 calendar days prior to the completion of probation. Upon completion successful of probation, respondent's certificate shall be fully restored.

16

12. <u>Violation of Probation.</u> Failure to fully comply with any term or condition of probation is a violation of probation. If respondent violates probation in any respect, the Division, after giving respondent notice and the opportunity to be heard, may revoke probation and carry out the disciplinary order that was stayed. If an Accusation, or Petition to Revoke Probation, or an Interim Suspension Order is filed against respondent during probation, the Division shall have continuing jurisdiction until the matter is final, and the period of probation shall be extended until the matter is final.

13. <u>Cost Recovery.</u> Within 180 calendar days from the effective date of the Decision or other period agreed to by the Division or its designee, respondent shall reimburse the Division the amount of $22,844.62 for its investigative and prosecution costs. The filing of bankruptcy or period of non-practice by respondent shall not relieve the respondent of his obligation to reimburse the Division for its costs.

14. <u>License Surrender.</u> Following the effective date of this Decision, if respondent ceases practicing due to retirement, health reasons or is otherwise unable to satisfy the terms and conditions of probation, respondent may request the voluntary surrender of respondent's license. The Division reserves the right to evaluate respondent's request and to exercise its discretion whether or not to grant the request, or to take any other action deemed appropriate and reasonable under the circumstances.

Upon formal acceptance of the surrender, respondent shall within 15 calendar days deliver respondent's wallet and wall certificate to the Division or its designee and respondent shall no longer practice medicine. Respondent will no longer be subject to the terms and conditions of probation and the surrender of respondent's license shall be deemed disciplinary action.

If respondent re-applies for a medical license, the application shall be treated as a petition for reinstatement of a revoked certificate.

15. <u>Probation Monitoring Costs.</u> Respondent shall pay the costs associated with probation monitoring each and every year of probation, as designated by the Division, which may be adjusted on an annual basis. Such costs shall be payable to the Medical Board of California and delivered to the Division or its designee no later than January 31 of each calendar year. Failure to pay costs within 30 calendar days of the due date is a violation of probation.

DATED: 11/08/05

SAMUEL D. REYES
Administrative Law Judge
Office of Administrative Hearings

17