# In The Matter Of:

*Chris Brucker v.*
*Lowes Home Centers, Inc.*

---

*Jeffrey McChesney*
*November 18, 2011*

---

*Michael Musetta & Associates, Inc.*
*One Tampa City Center, Suite 3400*
*201 North Franklin Street*
*Tampa, Florida 33602*
*Phone:  (813) 221-3171; Fax:  (813) 225-1714*

Original File 111811McChesney.txt

Min-U-Script® with Word Index

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                 FT. MYERS DIVISION

 3
    CHRIS BRUCKER, TREVER S. NUTTING,
 4  XIOMARA RAVELO, WILFREDO E. RETANA
    and BEATRIX CELSA RETANA,
 5  individually, and on behalf of all
    others similarly situated,        Case No.
 6                   Plaintiffs,    2:10-cv-405-FtM-29SPC

 7  vs.

 8
    LOWES HOME CENTERS, INC., a North
 9  Carolina Corporation, and NATIONAL
    GYPSUM COMPANY, a Delaware
10  Corporation,

11                  Defendants.
                                     /
12  - - - - - - - - - - - - - - - -

13        VIDEOTAPED
14        DEPOSITION OF:    JEFFREY McCHESNEY

15        DATE:            November 18, 2011

16        TIME:            9:10 a.m. to 1:39 p.m.

17        PLACE:           One Tampa City Center
                           Suite 3400
18                         Tampa, Florida

19        PURSUANT TO:     Notice by counsel for
                           Plaintiffs for purposes of
20                         discovery, use at trial
                           or such other purposes
21                         as are permitted under
                           the Florida Rules
22                         of Civil Procedure

23        BEFORE:          PAMELA KINGSBURY, RPR
                           Notary Public, State of
24                         Florida at Large

25                         Pages 1 to 157
```

---

Page 2

```
 1  APPEARANCES:

 2        BRIAN WARWICK, ESQUIRE
          Varnell & Warwick, P.A.
 3        20 La Grande Boulevard
          The Villages, Florida 32159
 4        (352) 753-8600
              And
 5        ROBERT GARY, ESQUIRE
          Gary, Naegele & Theado, LLC
 6        446 Broadway
          Lorain, Ohio 44052
 7        (440) 244-4809
              Attorneys for Plaintiffs
 8
          THOMAS AYALA, ESQUIRE
 9        Morgan, Lewis & Bockius, LLP
          1701 Market Street
10        Philadelphia, Pennsylvania 19103
          (215) 963-5000
11            Attorney for Defendant National Gypsum Company

12  ALSO PRESENT:  NEIL JOHNSON, VIDEOGRAPHER
```

```
13        INDEX                              PAGE

14  DIRECT EXAMINATION BY MR. WARWICK            3

15  CROSS-EXAMINATION BY MR. GARY               78

16  REDIRECT EXAMINATION BY MR. WARWICK        112

17  CROSS-EXAMINATION BY MR. AYALA             127

18  FURTHER REDIRECT EXAMINATION BY MR. WARWICK 145

19  CERTIFICATE OF OATH                        154

20  REPORTER'S CERTIFICATE                     155

21  READ AND SIGN LETTER                       156

22  ERRATA SHEET                               157

23        EXHIBITS              ID'd      MARKED

24  1 -  Spec Sheet              118        153

25  2 -  Spec Sheet              120        153
```

---

Page 3

1    THE VIDEOGRAPHER: This is the videotaped
2 deposition of Jeff McChesney, 30(b)(6) witness for
3 National Gypsum Company held in the matter of Brucker
4 v. National Gypsum and Brincku v. National Gypsum
5 Company. We are located at the offices of
6 Michael Musetta & Associates located at
7 201 North Franklin street, Suite 3400, Tampa, Florida.
8 The date is November the 18th, 2011. The time is
9 9:10 a.m.
10    Counsel please introduce themselves beginning
11 with Plaintiff.
12    MR. WARWICK: Brian Warwick and Bob Gary on
13 behalf of the plaintiffs.
14    MR. AYALA: Good morning. Tom Ayala on behalf of
15 New NGC, Inc., doing business as National Gypsum
16 Company.
17    THE VIDEOGRAPHER: Court reporter will now swear
18 the witness.
19    JEFFREY McCHESNEY,
20 the witness herein, being first duly sworn on oath, was
21 examined and deposed as follows:
22    THE WITNESS: I do.
23    DIRECT EXAMINATION
24    BY MR. WARWICK:
25 Q.  Good morning, Mr. McChesney.

---

Page 4

1 A.  Good morning.
2 Q.  My name is Brian Warwick, and I represent several
3    plaintiffs in a couple of lawsuits against National Gypsum.
4    MR. AYALA: I'm sorry. Before we get started
5    formally, can we just stipulate on the record that
6    objections are reserved except as to form?
7    MR. WARWICK: Yes.
8    MR. AYALA: Okay.
9    MR. WARWICK: I appreciate that, Tom. It'll make
10    things go a lot faster this morning.
11    BY MR. WARWICK:
12 Q.  Mr. McChesney, could you please state your name
13    for the record and spell it, please.
14 A.  Jeffrey, J-e-f-f-r-e-y, middle name S, as in
15    Scott, McChesney, M-c-C-h-e-s-n-e-y.
16 Q.  And have you ever been deposed before?
17 A.  I have not.
18 Q.  Okay. It's going to be a series of questions
19    that I'll be asking you. If you answer the question, I'm
20    going to assume that you understood it. If you don't
21    understand the question, you'd like me to clarify it, I'd
22    be happy to do so. Don't be afraid to have me ask it another
23    way. Sometimes it'll be clear in my mind but not when it
24    comes out. So feel free -- I'd be glad to clarify whenever
25    necessary.

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 5

1     Could you please tell us the name of your
2   employer.
3   A.   It's National Gypsum Company.
4   Q.   And what's your current title?
5   A.   Plant manager at our Apollo Beach, Florida plant.
6   Q.   How long have you been in that position?
7   A.   Seven, seven and a half years.
8   Q.   Have you been the plant manager since the plant
9   opened?
10  A.   I have not.
11  Q.   Okay.  Who was the plant manager before you?
12  A.   Terry Peterson.
13  Q.   How long has the plant been in operation?
14  A.   It came up in production at the end of 2000.
15  Q.   So that would be almost 12 years old?
16  A.   Correct.
17  Q.   Let's step back just a minute and -- could you
18  tell me your education.  Could you list all the post-high
19  school degrees that you have.
20  A.   I have a bachelor of science degree in mining
21  engineering from Michigan Technological University.
22  Q.   Okay.  And how about any other special training
23  in the drywall industry other than on-the-job training?
24  A.   None.
25  Q.   Okay.  And how long have you been employed by

Page 6

1   National Gypsum?
2   A.   27 years.
3   Q.   What was your first job with National Gypsum?
4   A.   I started as a mining engineer with the company.
5   Q.   Where were you located?
6   A.   In Medicine Lodge, Kansas.
7   Q.   And was the mining that you did in that position
8   mining for gypsum?
9   A.   That is correct.
10  Q.   And was the mine located in Kansas?
11  A.   It was.
12  Q.   Okay.  And the plant was also located in Kansas?
13  A.   That's correct.
14  Q.   Did you work at the mine or at the plant?
15  A.   I worked at the mine.  It was a quarry.
16  Q.   What was your primary duty as a mining engineer
17  at that time?
18  A.   Helped oversee operations, planning of the mining
19  activities at the mining quarry.
20  Q.   Did you have any oversight regarding the quality
21  of the gypsum being mined?
22  A.   I mean -- no.  I mean, we -- it was an open pit.
23  We drilled and blasted the gypsum.
24  Q.   Okay.  And did you crush it at the plant and then
25  take it over and crush more --

Page 7

1   A.   We crushed it at the quarry site.
2   Q.   After you were a mining engineer in Kansas, what
3   was your next position with the company?
4   A.   I was a quarry manager for the company at our
5   quarry in Arizona, Winkelman, Arizona.
6   Q.   How long were you in that position?
7   A.   A little over two years.
8   Q.   What were your general duties in that position as
9   quarry manager?
10  A.   I oversaw the operation, the quarry operation.
11  It wasn't a big quarry, but I was the manager of the
12  facility.
13  Q.   And that quarry, was that owned by National
14  Gypsum?
15  A.   Correct.
16  Q.   And it provided gypsum -- was it a gypsum mine?
17  A.   Gypsum, yes, for --
18  Q.   For drywall?
19  A.   Correct.
20  Q.   And after you were in the Arizona mine, what was
21  your next position with the company?
22  A.   I had an opportunity to go into our manufacturing
23  facility at Phoenix, our plant in Phoenix, kind of in a
24  developmental training position to start learning the
25  manufacturing side of the business.

Page 8

1   Q.   Do you remember what year that was?
2   A.   '89, I believe.  Late '88, early '89, I believe.
3   Q.   What were your duties as -- in that position?
4   A.   I -- basically, it was just a learning capacity.
5   I shadowed people in their jobs.
6   Q.   Did you have any opportunity to shadow people in
7   the quality control section of the plant?
8   A.   Primarily the production end of it.
9   Q.   So when we talk today about quality control
10  versus production, you don't -- you think those two are
11  different areas?
12  A.   Maybe you can clarify that.
13  Q.   Sure.  As we're talking today, if I'm asking
14  about a quality control process, in your own mind -- I'm
15  just trying to figure out how I should ask you the question.
16      So if you believe the quality control occurs
17  after the board is manufactured, then I'll --
18  A.   It's all -- it works hand in hand.
19  Q.   Okay.  So there's quality control measures
20  throughout the process?
21  A.   Sure.
22  Q.   Okay.  And after the -- how long were you -- what
23  was your next position at the -- with National Gypsum?
24  A.   Production manager at our Rotan, Texas plant.
25  Q.   Do you remember what year that was?

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 9

1  A.   1990, late 1990.
2  Q.   Okay.  So you got into the manufacturing process
3    in '88 or '89; and by '90, you were in the position of
4    production manager?
5  A.   That's correct.
6  Q.   Was that -- what type of drywall is made at that
7    Texas plant?  Meaning, was it green board or ceiling board,
8    or did they make various types --
9  A.   Made various types of board.
10 Q.   Was the production facility in the Texas plant
11   mined gypsum, or was it synthetic gypsum?
12 A.   There was a quarry there.
13 Q.   How long were you in that position?
14 A.   As production manager?  Two years.
15 Q.   What was your next position?
16 A.   Plant manager.
17 Q.   At the same --
18 A.   At the same facility, yes.
19 Q.   What were your job duties as plant manager?
20 A.   Oversee the quarry as well as the production
21   facility of that plant?
22 Q.   As your position as plant manager, would you have
23   oversight over the quality control process?
24 A.   Yes.
25 Q.   Okay.  And after you were the plant manager of

---

Page 10

1    the Texas plant, what was your next position with National
2    Gypsum?
3  A.   Plant manager of our Shoals, Indiana plant.
4  Q.   Is that plant a natural gypsum plant or a --
5  A.   There a mine there on site.
6       MR. AYALA: What time frame are we talking about?
7       THE WITNESS: Pardon me?
8       MR. WARWICK: Well, I can ask --
9       BY MR. WARWICK:
10 Q.   When you went to -- do you remember the year that
11   you went to the Shoals, Indiana plant?
12 A.   It was in 1996.
13 Q.   What were your job duties as plant manager of the
14   Shoals plant?
15 A.   Basically oversaw plant operations and mine
16   operations.
17 Q.   So they had both the plant and the drywall
18   manufacturing facility at the same location?
19 A.   The plant and the mine -- the mine was on site,
20   and the plant was right there, yes.
21 Q.   Okay.  And your job was to oversee both of those?
22 A.   Correct, as -- I mean, there -- I had department
23   managers within the plant that -- I say it was over the
24   mine.  I had a mine manager, and he had mine supervisors as
25   well; but ultimately, it was under my control.

---

Page 11

1  Q.   Right.  Both sides, the production side and the
2    mine side reported to you, correct?
3  A.   Correct.
4  Q.   And after the Shoals, Indiana, what was your next
5    position?
6  A.   I was the plant manager at our Fort Dodge, Iowa
7    plant.
8  Q.   Do you remember what year that was?
9  A.   2000.
10 Q.   How long were you in that position?
11 A.   Four years.
12 Q.   And was that plant a natural gypsum plant, or was
13   it mined?
14 A.   We had a quarry there.
15 Q.   And in Shoals, Indiana, was the quarry on site?
16 A.   Shoals was an underground mine there on site in
17   Shoals.  At Fort Dodge, the quarry, it was a few miles
18   outside of town but I think five or six miles away from the
19   plant.
20 Q.   Okay.  But did your job duties as the plant
21   manager govern both the quarries as well as manufacturing?
22 A.   Correct.  Yes.
23 Q.   Then when did you -- where did you go when you
24   left the Fort Dodge plant?
25 A.   I came down to Apollo Beach.

---

Page 12

1  Q.   Based on -- you said you were there for four
2    years, so what year was that?
3  A.   That I came down here?  It was late April, early
4    May of '04.
5  Q.   And what was your job title when you began at the
6    Apollo Beach plant?
7  A.   Plant manager.
8  Q.   And you're still in that position?
9  A.   That is correct.
10 Q.   Does National Gypsum have any other drywall
11   plants within the state of Florida?
12 A.   It does.
13 Q.   Okay.  Where are those located?
14 A.   We have a -- it's a closed facility here in Tampa
15   on Commerce Street.  I think it's 6110 Commerce Street.
16 Q.   And how long has that been closed?
17 A.   I believe it was May of 2008, is when the plant
18   was closed.
19 Q.   Why was that plant closed?
20 A.   The downturn in our business.
21 Q.   Was that a -- was the drywall that was made --
22   what do you call that separate facility?  Do you call it the
23   Commerce Street --
24 A.   We call it the Tampa plant, yeah.
25 Q.   Was the Tampa plant making drywall from mined

---

Michael Musetta & Associates, Inc. (813) 221-3171

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 13

1  gypsum, natural gypsum, or from synthetic gypsum?
2      MR. AYALA: What time frame are we talking about?
3      BY MR. WARWICK:
4  Q.  When it was closed in 2008.
5  A.  Both.
6  Q.  Did you ever have an opportunity to work in that
7  particular plant, the Tampa plant?
8  A.  Right. No. I oversee that facility right now
9  but just within the last year.
10  Q.  Okay. So if you came in 2004 and it was closed
11  in 2008, you oversaw the operation of the Tampa plant for
12  approximately four years, correct?
13  A.  Tampa? No. I just -- there was a plant manager
14  at the Tampa plant. He retired after the plant was
15  closed --
16  Q.  I see.
17  A.  -- and they just need somebody to keep an eye on
18  the facility.
19  Q.  Okay. All right. I misunderstand. Thank you.
20      What was the name of that plant manager of the
21  Tampa plant?
22  A.  When it closed?
23  Q.  When it closed.
24  A.  Tim Jones.
25  Q.  Do you know how long he had been in that

Page 14

1  position?
2  A.  I'm not for sure, but I want to say maybe two or
3  three years.
4  Q.  Are you aware of where National Gypsum obtained
5  the natural gypsum for that particular mine -- I mean --
6  A.  For that plant.
7  Q.  -- for that plant?
8  A.  Yes.
9  Q.  Where?
10  A.  Halifax, Nova Scotia. Actually, Milford Station
11  is where our quarry is.
12  Q.  How would the gypsum material be brought from
13  that Nova Scotia facility?
14  A.  By ship.
15  Q.  And where did -- if you know the not natural
16  gypsum, where was that from?
17      MR. AYALA: Objection to form.
18      BY MR. WARWICK:
19  Q.  At the Tampa plant, you said it made drywall from
20  both natural gypsum and synthetic --
21  A.  Synthetic, correct.
22  Q.  The origin of the synthetic gypsum that you used
23  in the Tampa plant, do you know where that came from?
24  A.  Yes. It came from TECO's Big Bend operation.
25  Q.  Is that the same place that the Apollo Beach

Page 15

1  facility gets its synthetic gypsum?
2  A.  That is correct.
3  Q.  Do you know whether the Tampa production facility
4  had separate operations for synthetic and natural gypsum
5  running in the same plant?
6  A.  Are you saying, did they run them separately?
7  Q.  Yeah. I'm wondering if a certain -- if they had
8  a production line of machines that would make the drywall
9  that was set up and only used natural gypsum, and then did
10  they have a separate set of equipment that only ran
11  synthetic gypsum?
12  A.  No. It's my understanding that the material was
13  blended.
14  Q.  Blended material. Okay.
15      Do you know whether National Gypsum is still
16  mining the quarry in Nova Scotia?
17  A.  Yes, they are.
18  Q.  And where does the gypsum that is mined now go
19  to?
20  A.  Our plants along the Eastern Seaboard.
21  Q.  None of it comes to the Apollo Beach plant?
22  A.  That is correct.
23  Q.  Do you have any knowledge about the blending
24  procedure that was used at the Tampa plant?
25  A.  None whatsoever.

Page 16

1  Q.  If you had to find out about that, who would you
2  ask?
3  A.  The retired plant manager.
4  Q.  Tim Jones?
5  A.  Yeah.
6  Q.  Do you know if any of the employees that work at
7  the Apollo Beach plant now used to be employed in management
8  positions at the Tampa plant?
9  A.  Yes.
10  Q.  Okay. Do you know if any of those managers would
11  have knowledge regarding that blending process that are
12  still employed?
13  A.  The Tampa plant was primarily a rock plant. It
14  got its material from Halifax. It was late in the game
15  before that plant shut down that they started using -- as I
16  understood, started using FGD material as well. And so as
17  far as people that are over at our plant that used to work
18  there, none of the people were there when that blending
19  activity took place as far as supervisors go.
20  Q.  Right. Okay.
21  A.  Yeah.
22  Q.  Do you know Tim Jones personally?
23  A.  Yeah.
24  Q.  Is he still in the Tampa area?
25  A.  I don't believe so.

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 17

1 Q.  Do you happen to know where he is?
2 A.  I think he's in Texas.  He did live in the
3   Brandon area; but when he retired, I believe he moved to
4   Texas.
5 Q.  Okay.  So other than the Apollo Beach and the
6   Tampa plants, does National Gypsum have any other
7   manufacturing facilities for drywall within the state of
8   Florida?
9 A.  We don't.
10 Q.  Okay.  And where is the next closest plant to the
11   state of Florida?
12 A.  If my geography is right, I would say it's
13   probably Savannah, Georgia.
14 Q.  Do you know if that plant uses FGD gypsum or
15   natural gypsum?
16 A.  Halifax rock.
17 Q.  Okay.  And the plant that manufactured a
18   particular board from National Gypsum, are you able to tell
19   which plant it came from based on markings on the board?
20 A.  Yes.
21 Q.  Okay.  And what would be the markings for
22   Apollo Beach?
23 A.  There's a -- on the back of all of our board, we
24   put a date, a time, and a plant code stamp on the back of
25   the board; and for Apollo Beach, the number is 23.

Page 18

1 Q.  Do you happen to know what the plant code was for
2   the Tampa plant?
3 A.  I don't.  Each plant has its own number.  I can
4   probably tell you the plants that I used to work at, what
5   they were, but --
6 Q.  All right.  How about -- do you happen to know
7   what the Savannah, Georgia plant would be?
8 A.  I don't.
9 Q.  Okay.  I assume there's a book --
10 A.  There is.
11 Q.  -- a list somewhere?
12 A.  Correct.
13 Q.  Where would that -- where would you go to look
14   for that?
15 A.  In our specifications.
16 Q.  Okay.  Can you be more specific.  I assume
17   National Gypsum has lots of things that could qualify as
18   specifications.
19 A.  It's our internal specifications.  There's
20   printing requirements, and I believe in there there's a page
21   that actually shows the numbers and the plants that --
22 Q.  It's called the internal printing requirements?
23 A.  Yeah.  Something to that nature or printing on
24   the back of the board or something.  I don't recall exactly
25   what the nomenclature was on this spec, but --

Page 19

1 Q.  If we focus on the Apollo Beach plant for a
2   moment, are there -- what different types of board are made
3   at the Apollo Beach plant?  When I say "types," I'm talking
4   about different thicknesses as well as, like -- I know
5   there's a moisture resistant board --
6 A.  Correct.
7 Q.  -- a green board or --
8 A.  Right.  Yeah.
9 Q.  What types of --
10 A.  Well, as far as thicknesses go from the thinnest
11   to the thickest, we produce a three-eighths thickness, half
12   inch, and five-eighths.  As far as different boards -- I'll
13   try to recall the boards that we produce, but we make a
14   half-inch thick ceiling board.  We make a half-inch
15   high-strength light board.  Our -- probably our largest
16   volume board is half-inch tapered edge regular board along
17   with five-eighths fire shield tapered edge board.
18     We produce both half-inch and five-eighths XP,
19   which is our moisture resistant board.  We produce
20   Sta-Smooth soffit board, Kal-Kor board.
21 Q.  Say that again.
22 A.  Kal-Kor, K-a-l, dash, K-o-r.  We produce a
23   five-eighths exterior sheathing.  We produce both half-inch
24   and five-eighths 54-inch wide board.  We produce a
25   high-abuse product.

Page 20

1 Q.  Okay.
2 A.  I think that's -- I think that's kind of
3   everything.  I may have missed something in there but --
4 Q.  That's a pretty good list.
5     You mentioned that you have -- your highest
6   volume board was something you referred to as regular board.
7 A.  Yeah.  Half-inch TE regular.
8 Q.  And what is the -- is there a brand name of that
9   National Gypsum --
10 A.  Gold Bond building products.
11 Q.  And would Gold Bond be on some or all of these
12   different products?
13 A.  I believe it's on all of our products, on our
14   bundling tape.
15 Q.  When you say "bundling tape," you're talking
16   about the end tape?
17 A.  The end tapes, yes.
18 Q.  And can that regular board, because it's
19   half-inch, also be used as ceiling board; or is that only
20   for walls?
21 A.  Yeah.  We have -- our half-inch high-strength
22   ceiling board is a separate product.
23 Q.  Okay.  And that has a paper backing as opposed to
24   a fiberglass backing?
25 A.  Correct.

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 21

1  Q.  Okay.  We talked a few minutes ago about how
2  there's markings on the back of the board for the run code
3  and the date.  Is there anything on those markings that
4  would tell you which type of board it is, being that it's
5  regular or if it were the high-tensile ceiling board or
6  something else?
7  A.  Our fire shield products have a UL stamp on the
8  back of them, which designates them as, you know, fire rated
9  products.  We also will tape on -- inside on the face of the
10  board in the taper, there will be some nomenclature in there
11  as well.  You know, each product has specific printings.  I
12  don't recall specifically what each product has as far as,
13  you know, the very specific printing.  Typically, it's a
14  date and time, the manufacturing code, and I believe it's --
15  "Made in the USA" is typically what -- or "NGC made in the
16  USA."
17  Q.  Okay.  But if you saw a board, you could kind of
18  read those numbers --
19  A.  That's what we look for.  I mean, we ask what's
20  the code.  And, you know, that's what we look for, is the
21  manufacturing date, the time, and the plant code.
22  Q.  Okay.  And if you were able to have the
23  manufacturing date, the time, and the plant code, you could
24  go back and track more details about that particular
25  manufacturing process?

---

Page 22

1  A.  That is correct.
2  Q.  Okay.  The plant was up and running when you took
3  the position as plant manager, correct?
4  A.  That is correct.
5  Q.  And do you know how the equipment that was
6  used in the Apollo Beach plant was selected?
7  A.  We have a sister plant in -- outside of
8  Pittsburgh, Pennsylvania; and the plant is fairly close in
9  size.  I believe size-wise, we're about the same.  So I'm --
10  I believe the equipment that was used for the most part at
11  our Shippingport -- Shippingport, Pennsylvania, was the same
12  that was put in Apollo Beach.
13  Q.  So they liked the system they had in
14  Pennsylvania, so they bought a similar system or --
15  A.  Correct.  Right.  They're not identical.  I mean,
16  you go in the plant; they're not identical.  But, you know,
17  as far as the footprint of the plant goes and the general
18  layout, they're very similar.
19  Q.  And is the plant in Pennsylvania -- what was the
20  name of it in Pennsylvania?  Ship --
21  A.  Shippingport.
22  Q.  Shippingport, Pennsylvania.
23  A.  Yeah.  It's outside of Pittsburgh.
24  Q.  Is that an FGD gypsum plant, or is it a natural
25  gypsum?  Do you know?

---

Page 23

1  A.  FGD.
2  Q.  Do you know where that plant gets its material?
3  A.  Yes.  First Energy.
4  Q.  For the equipment that was used, is there a
5  manufacturer of the drywall equipment itself?
6  A.  I know there were different companies used for
7  different equipment in the plant.
8  Q.  Okay.  So that's what I was asking, if it was an
9  integrated piece made by one company or if there was --
10  A.  No.
11  Q.  -- different -- like the oven, for example, would
12  be made by one manufacturer and other parts --
13  A.  I believe the kiln we made.  The company made our
14  kiln, National Gypsum Company.  We have a production
15  engineering group out in Arizona.
16  Q.  If you wanted to see or obtain a copy of the
17  schematics that would list the details of the different
18  equipment that's in the Apollo Beach plant, where would
19  those be located?
20  A.  Probably in our corporate office.
21  Q.  You don't have one in your office?
22  A.  We have -- I mean, we have some as-built
23  drawings; but whether they're the finals, I couldn't tell
24  you.  I mean, we do have some drawings at their plant, but
25  we always go to our corporate office if we need information

---

Page 24

1  on equipment.
2  Q.  Okay.  The corporate office would also have lists
3  of the equipment that was purchased for the Apollo Beach
4  plant?
5  A.  That's correct.
6  Q.  When you say "corporate office," which
7  specific --
8  A.  Charlotte, North Carolina.
9  Q.  And I didn't say this at the beginning of the
10  deposition, which is my mistake.  But if you need a break at
11  any time, feel free to just ask me.  If you need to get a
12  water --
13  A.  Thank you.
14  Q.  -- stretch your legs, just let me know.
15      Are you familiar with the calcination process at
16  the Apollo Beach plant?
17  A.  Yes.
18  Q.  And are you personally familiar with the
19  manufacturing process at the Apollo Beach plant?
20  A.  Yes.
21  Q.  And do you have any -- what is your
22  understanding -- let me rephrase that.
23      Are you familiar with the FGD process used at the
24  TECO Big Bend power plant?
25  A.  You know -- I mean, I have a general

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 25

1  understanding.
2  Q.  Okay.  Just so that we're on the same page today,
3  could you explain your understanding of the -- in a general
4  way -- the FGD process used in the Big Bend plant?
5  A.  The gases from the coal combustion are scrubbed.
6  In these scrubbing towers, they get sprayed with a liquified
7  limestone mist.  There's oxidation headers in there.
8  There's a chemical reaction that takes the sulfur oxides and
9  converts it to gypsum within -- then the material is
10  dewatered and dried, and we take it as a caked material.
11  Q.  Have you ever personally witnessed the operation
12  at the Big Bend plant?
13  A.  When I first came to Apollo Beach, I had an
14  opportunity to go over -- I had a -- I had kind of a general
15  tour of the Big Bend plant.  You know, did I see everything?
16  I couldn't tell you whether I did.  It's a huge facility.
17  Q.  Right.
18  A.  But I did have an opportunity to see some of it.
19  Q.  Okay.  How long was that trip?  Just one day?
20  A.  No.  I was over there, I believe, maybe an hour
21  and a half or so.
22  Q.  Okay.  That's the only time you've been to the
23  plant?
24  A.  No.  I've been over there on other occasions for
25  meetings but not as far as, you know, actual tours of the

---

Page 26

1  plant.
2  Q.  Do you have a contact person at TECO regarding
3  the quality control of the material you receive?
4  A.  I have a contact person.  Her name is
5  Vicky Jones.  I believe she is -- I don't know her official
6  title, but it deals with the sales of the by-product gypsum.
7  And Vicky is who I communicate with.
8  Q.  Okay.  So if you had a problem at your plant with
9  the gypsum you were receiving from the plant, it would be
10  Vicky who you would --
11  A.  I would contact Vicky first, yes.
12  Q.  Okay.  Do you know what her title is?
13  A.  No.  I don't think she's -- no.  She's -- I don't
14  know -- sales of, you know, by-products or something.
15  Q.  Okay.  And what percentage of the drywall
16  manufacture at the Apollo Beach plant is created with FGD
17  gypsum?
18  A.  Are you talking right now?
19  Q.  Sure.  Let's start right now.
20  A.  Pardon me?
21  Q.  Yeah.  Let's start with currently.
22  A.  100 percent.
23  Q.  How long has it been at 100 percent?
24  A.  Since mid 2007.
25  Q.  And prior to 2007, what was the percentage, if

---

Page 27

1  you know?
2  A.  We blended Halifax rock with the FGD.  The
3  percentage varied depending on the day, the moisture content
4  of the FGD we were getting from TECO.
5  Q.  So you said that the FGD gypsum is delivered to
6  the plant in cake form?
7  A.  Well, it's a -- yeah.  I say -- it gets
8  dewatered.  It comes off as a cake material.  It's very
9  loose, unconsolidated material that they pick up with a
10  front-end loader and load into haul trucks which get dumped
11  at our plant.
12  Q.  Okay.  So just so I can wrap my head around that,
13  is it moist like snow?  You could pack it?
14  A.  It depends on the moisture content of the
15  material.  But typically, yes, you can take it and -- you
16  know, press hard enough, you might be able to --
17  Q.  Make, like, a snowball?
18  A.  I mean, the product comes in anywhere between an
19  8 percent moisture content to, you know, 14, 15 percent.
20  Q.  And when the natural gypsum is delivered, when it
21  was being used, does that come in a moist form as well, or
22  is it --
23  A.  It was ground up -- I mean, it was crushed rock
24  that was delivered in a haul truck and now -- it was rock.
25  Q.  Okay.  I didn't know if they wetted it to

---

Page 28

1  create -- keep the dust down or something like that.
2  A.  No.
3  Q.  So it comes in dry?
4  A.  Correct.
5  Q.  How is it shipped to the plant, the drywall
6  plant, from Big Bend?
7  A.  The FGD?
8  Q.  Correct.
9  A.  We have a contract carrier that will haul the
10  material in, I'd say, a 25-ton end dump truck.  So they --
11  Big Bend loads the material with a front-end loader into
12  these trailers, and then they just drive from the Big Bend
13  plant to our location.
14  Q.  Okay.  Are those enclosed trailers or just kind
15  of like a big dump truck?
16  A.  Big dump truck.  Well, not big.  I mean, they're
17  not big; big, but they're, you know, a 25-ton dump truck.
18  Q.  Okay.  Big enough.
19      When it arrives at -- let me ask you this:  Do
20  you know how Big Bend stores the material prior to shipment?
21  Is it in a shed?  Is it underground?  Is it outside?  Is
22  it --
23  A.  It's outside.
24  Q.  Outside?
25  A.  Yeah.

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 29

1 Q.   Are there any restrictions or requirements
2   regarding how long the material sits outside before it's
3   delivered to your plant?
4 A.   Not that I'm aware of, no.  I mean, we -- most of
5   the time as they're making it, we're taking it.  Yeah.  But
6   they have storage piles outside that -- it can be at any
7   given time that they may load from these piles as well.  So
8   is there -- I don't know what their practice is over there
9   but -- yeah.
10 Q.   So it wouldn't be usual for it to sit outside for
11   a day or two before it's shipped or longer than that even?
12 A.   Correct.
13 Q.   And so if it were to rain, that stuff would get
14   wet?
15 A.   Yes, it could get wet.  Yeah.
16 Q.   And the Big Bend plant is on the -- it's right on
17   the water, right?
18 A.   That's correct.
19 Q.   On Tampa Bay?
20 A.   In fact, you can see it on that map right there.
21 Q.   I think we can see it out the window, actually,
22   all the way across.
23 A.   Okay.  Sure.  There it is.  Yeah.
24 Q.   I thought that was appropriate for the deposition
25   today.

Page 30

1 A.   Yeah.
2 Q.   Friends from Pennsylvania down can see the
3   beautiful bay.
4     MR. AYALA: It's a gorgeous view.
5     MR. WARWICK: It's got to be better here today
6   than in Pennsylvania.
7     BY MR. WARWICK:
8 Q.   So it shows up in these 25-ton dump trucks --
9 A.   Correct.
10 Q.   -- at the Apollo Beach plant.  And the dump truck
11   dumps it outside, or does it come inside into, like, an
12   enclosed area?
13 A.   The material comes in.  We have a dome structure
14   that we store the FGD.  Typically, they will back up a ramp
15   and dump into a hopper, which will transfer the material up
16   inside the dome.
17 Q.   Okay.  And is the dome just for storage, or does
18   any processing of the FGD gypsum take place within the dome
19   structure?
20 A.   Storage.
21 Q.   When a truck shows up from the TECO plant, is
22   there any testing that's done on the material before it's --
23 A.   Offloaded?
24 Q.   -- offloaded?
25 A.   No.  After it's offloaded.

Page 31

1 Q.   Okay.  What tests are you -- could you describe
2   that test for me.
3 A.   Out in our dome, we test the moisture content of
4   the material coming in.
5 Q.   Is there a point at which the moisture content
6   would be too high that you refuse the product?
7 A.   Correct.
8 Q.   What --
9 A.   17 percent.
10 Q.   How often do you have to return it because the
11   moisture content is too high?
12 A.   I'm not sure we have at all this year.  Yeah.
13 Q.   What about any other tests that are run at that
14   time within the dome other than a moisture content test?
15 A.   That's it.
16 Q.   Okay.  So as far as contaminants within the
17   material, you don't test for that at that point?
18     MR. AYALA: Object to form.
19     THE WITNESS: Contaminants?
20     BY MR. WARWICK:
21 Q.   For example, if there were arsenic that came out
22   of the coal through the combustion process that was in that
23   particular FGD gypsum, you don't have any way to test for
24   that at that point?
25 A.   The only testing we do out there is for the

Page 32

1   moisture content.
2 Q.   At any point during the process, do you -- does
3   National Gypsum test the FGD gypsum for the percentage of
4   organic material within the gypsum?
5     MR. AYALA: Objection to form.
6     THE WITNESS: We test for moisture, and we test
7   for chlorides and PH of the FGD.
8     BY MR. WARWICK:
9 Q.   But as far as, like, analyzing how much of it
10   were organic material versus -- you know, other than gypsum?
11     MR. AYALA: Objection to form.
12     BY MR. WARWICK:
13 Q.   You don't have any tests for that?
14 A.   We just test for those items that --
15 Q.   Okay.  Do you know whether the power company
16   tests its slurry and whether -- this would include both when
17   it's a limestone slurry, which I understand it to be prior
18   to going up in the flue gases and linking with the chemical
19   reactions that cause it to become FGD gypsum -- so either
20   when it's in the limestone slurry form or when it's in --
21   after it falls from the stacks into the hopper that collects
22   it as a gypsum slurry, do you know if they test it for any
23   bacteria?
24 A.   I don't know.
25 Q.   Do you know whether the Big Bend power plant has

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

**Page 33**

1 a procedure where they actually add sulfur-reducing bacteria
2 to the slurry?
3   MR. AYALA: Objection to form.
4   THE WITNESS: I'm not aware of what they do over
5 there.
6   BY MR. WARWICK:
7 Q.  Would it surprise you to know that they actually
8 add bacteria to the slurry?
9   MR. AYALA: Objection to form.
10   THE WITNESS: I don't have a comment, I guess,
11 either way on that.  I mean, I'm not familiar with,
12 you know, their operation.
13   BY MR. WARWICK:
14 Q.  But you didn't have any other knowledge that they
15 were adding bacteria to the slurry intentionally until I
16 just told you that?
17   MR. AYALA: Objection to form.
18   THE WITNESS: I mean -- you know, I don't know
19 whether that's right or wrong.
20   BY MR. WARWICK:
21 Q.  Okay.  And the FGD, which just for the record I
22 guess we should clarify, stands for flue gas
23 desulfurization.
24 A.  That's correct.
25 Q.  I don't think we clarified that earlier.

**Page 34**

1     The flue gas desulfurization used at the Big Bend
2 plant is designed so that sulfur dioxide is trapped in the
3 limestone rather than going into the atmosphere; is that
4 your understanding?
5 A.  I believe that, yeah.
6 Q.  Kind of basic --
7 A.  Yeah.
8 Q.  Do you have any idea of the source of the water
9 that they use at the TECO plant to make their limestone
10 slurry?
11 A.  I don't.
12 Q.  If you wanted to find that out, do you have any
13 idea who you'd contact at the plant?
14 A.  I'd probably start with Vicky Jones.
15 Q.  Do you know whether -- when you were on that tour
16 of the TECO facility, did you see any cooling ponds?
17 A.  No.  I mean, I don't believe so.  I mean, cooling
18 ponds for --
19 Q.  Any type of reclaimed water.  I'm trying to
20 figure out if you -- never mind.
21 A.  Like I say, it's seven years ago that I had an
22 opportunity to tour that facility; but I don't recall seeing
23 it.
24 Q.  I know you told me that National Gypsum only
25 tests for moisture content, chlorides, and PH of their

**Page 35**

1 gypsum.
2 A.  That's what we do at the plant.
3 Q.  At the plant?
4 A.  Correct.
5 Q.  Do you do any tests to detect any types of
6 bacteria within the material?
7   MR. AYALA: Objection to form.
8   THE WITNESS: Those are the tests that we run
9 right there.
10   BY MR. WARWICK:
11 Q.  And just to be clear, none of those cover
12 bacteria as far as you know?
13   MR. AYALA: Objection to form.
14   THE WITNESS: Like I say, we test for the
15 chlorides; we test the moisture content and the PH of
16 the material.
17   MR. AYALA: Calls for expert testimony.
18   MR. WARWICK: Well, not if it's a regular test
19 that he runs.
20   BY MR. WARWICK:
21 Q.  Does the Apollo Beach plant run any tests for
22 arsenic in the gypsum?
23   MR. AYALA: Objection to form.
24   THE WITNESS: Like I said, those are the tests
25 that we do at the plant for the FGD.

**Page 36**

1   BY MR. WARWICK:
2 Q.  And none of those include arsenic, correct?
3   MR. AYALA: Objection to form.
4   THE WITNESS: Chlorides and PH and the moisture
5 content, yeah.
6   BY MR. WARWICK:
7 Q.  Okay.  And you said earlier that you were
8 familiar with the calcination process at the Apollo Beach
9 plant?
10 A.  Uh-huh.  (Indicates affirmatively).
11 Q.  Is the calcination process the first step in the
12 manufacturing of wallboard?
13 A.  Yeah.  I would say so.  Yeah.  Right.
14 Q.  That's kind of --
15 A.  Right.  Yeah.
16 Q.  -- how I understand it.  You get the material,
17 and then you have to go through the calcination process?
18 A.  Right.
19 Q.  Okay.  So let's talk about that first, because I
20 think it kind makes the most sense to start at the
21 beginning.
22 A.  Okay.
23 Q.  So you said when the FGD gypsum is delivered from
24 the power plant, it has some moisture in it between -- I
25 think you said 8 and 14?

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 37

1  A.  Yeah.  Somewhere in there.
2  Q.  And what type of calcination system is used at
3  the Apollo Beach plant?
4  A.  Flash calcination.
5  Q.  And would that be a kettle-type calciner or a
6  horizontal rotary?
7  A.  No.  It's a -- it's actually done in our imp
8  mill, i-m-p, imp mill.  It's a flash calcination.
9  Q.  Okay.  Could you describe that process for me.
10  A.  There's a -- the mill has a 30 million BTU
11  burner, natural gas-fired burner which -- the material falls
12  through this heat source, and that's where the calcination
13  takes place.  And from there, it gets ground up in the imp
14  mill, impact mill; and then the material is in an air-swept
15  mill.  And the material goes through a classifier where
16  the -- if the particle size is too big, it gets sent back to
17  the mill itself and reground until the proper particle size.
18      It will then go into a cyclone where the material
19  will fall out.  It goes through a rotary valve at that
20  point.  It goes from -- well, it's the stucco, as we call
21  it.  That's what we use to manufacture the drywall.
22  Q.  Okay.  So during this process, if I can
23  understand it, the material is put on some sort of conveyer
24  belt or --
25  A.  Yeah.  As it comes into the mill, it will

Page 38

1  actually -- we have four imp mills in our mill building, and
2  the raw FGD gets fed to -- there's small little silos which
3  have an arm that sweeps the bottom of it.  And this material
4  will discharge on a weigh belt, and that weigh belt will
5  feed the material to --
6  Q.  The burner?
7  A.  -- the burner.  Correct.
8  Q.  So there's four different burners?
9  A.  Correct.
10  Q.  And then after it falls through the burner, do
11  you know how long the materials --
12  A.  The actual --
13  Q.  -- within the burner --
14  A.  It's a very quick process, literally, you know --
15  I mean, granted, it's a heated, air-swept system.  Probably
16  seconds, you know, that the material goes through this flash
17  calcination process.
18  Q.  Okay.  And the burner that is within each of
19  those flash calcination systems, is it a single-point
20  burner?  Is it a flue with, you know, multiple --
21  A.  It's a radial -- I believe it's a radial burner.
22  I haven't looked at the actual design on the inside, but
23  they're -- I'm certain they're 30 million BTU burners.
24  Q.  Okay.  And then the air-swept system, then, is
25  that system -- the air being blown through that system, is

Page 39

1  it hot air?
2  A.  It -- well, it is hot air off of the burners.  I
3  mean, it's a closed-loop system.
4  Q.  That's what I was wondering, if the heat helps to
5  turn it, or does it all turn by fans or something?
6  A.  Yeah.  There's big fans, 200 horse motor-driven
7  fans that produce the air flow through the mills.  But
8  you've got the heat source as well as the air-swept.  That's
9  what moves the material through, you know, which helps the
10  separation of the particles.  You know, we size the material
11  and --
12  Q.  Right.  And the sizing process, I assume there's,
13  for lack of a better term, a screen or something where the
14  small enough particles can go through it, which is good; and
15  then the ones that are too big --
16  A.  It's actually veins.  It's just openings in this
17  classifier.  That's a part of the imp mill that determines
18  the size.
19  Q.  Are there any requirements by the Apollo Beach
20  plant for the size of the particles that they're getting
21  from the --
22  A.  There's a specification range from TECO, yes.
23  Q.  Okay.  Do you know what that specification range
24  is?
25  A.  It's in the contract.  It's in microns.  I think

Page 40

1  it's a range of 30 to 50 micron.  I don't know if that's
2  the -- 50 percentile has to be in the 30- to 50-micron
3  range.
4  Q.  Okay.  And then do you also measure by microns
5  the diameter of the material that you need it to be for it
6  to make drywall?
7  A.  Right.  We -- in the mill operation, we will
8  sample the material, and we'll run sieve analysis on it,
9  make sure it complies with our specifications.
10  Q.  After the calcination process?
11  A.  Correct.  Yes.
12  Q.  If it's between 30 and 50 microns from the TECO
13  plant, do you happen to know what it would be in microns at
14  the production point after calcination?
15  A.  Not -- we've got records.  We actually run
16  MicroTrack analysis of what each of these mills produces,
17  and there's -- you know, that material is available.  I
18  can't tell you right off the top of my head what it is.
19  You're saying for the stucco?
20  Q.  Correct.
21  A.  Yeah.
22  Q.  I just wondered how much smaller it becomes after
23  it comes into --
24  A.  It gets ground up, I mean, in the impact part of
25  the mill, yes.

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 41

1 Q.  But the grinding process occurs after the heating
2   process, correct?
3 A.  Heat -- I mean, the heat is right there.  The
4   mill is right there.  I mean, as it's falling, it hits the
5   heat.  Then it goes right into the impact part of it.
6 Q.  That's how I understood it.
7     MR. AYALA: Is now an okay time to take a break?
8     MR. WARWICK: Sure.  Yeah.  That's about an hour.
9   Let's go ahead and go off the record.
10    THE VIDEOGRAPHER: Request to go off the record.
11  Going off the record at 10:08 a.m.
12    (Brief recess taken.)
13    THE VIDEOGRAPHER: Back on the record at
14    10:18 a.m.
15    BY MR. WARWICK:
16 Q.  Okay.  We were, I think, through the majority of
17  the calcination process --
18 A.  Okay.
19 Q.  -- when we took a break.  The raw material goes
20  through the flash burner?
21 A.  Right.
22 Q.  And then it's through a series of screens or --
23 A.  Veins.
24 Q.  -- veins, that you called it, so that it gets to
25  the right size.  And then it's crushed in that process to

---

Page 42

1   the correct --
2 A.  Calcined.  I mean, it hits the high
3   temperatures -- you know, typically, that's 1250,
4   1300-degree temperatures.  And then immediately those
5   particles are ground, and then up they go to the classifier.
6   And it's -- there's no moving parts in this.  You know, it's
7   the air-swept -- and based on particle size, it will get
8   separated.  The finer material goes up into the cyclone
9   and --
10 Q.  The heavier stuff falls out?
11 A.  Falls out, that's exactly right.  Yeah.
12 Q.  So for my own clarification, the stucco can be
13  two kinds of plaster: Something called hemihydrate or
14  anhydrite?
15 A.  Anhydrite.
16 Q.  Anhydrite; is that correct?
17 A.  Yeah.  Typically it's -- we refer to it as
18  calcium sulfate hemihydrate and calcium sulfate anhydrite.
19 Q.  Okay.  And the drywall is made from which?
20 A.  It can be -- you know, in an ideal world, it's
21  all calcium sulfate hemihydrate, which is $CSO4$, one half
22  $H2O$.
23 Q.  Right.  You said CAS24?
24 A.  $CSO4, 2H2O$.
25 Q.  That's the chemical?

---

Page 43

1 A.  Correct.
2 Q.  And that interests me because -- at what point
3   does it reach that chemical state?  Is that before --
4 A.  The one-half $H2O$?
5 Q.  Yes.
6 A.  It takes place -- I mean, we're driving off --
7   ideally, we're driving off three quarters of that water
8   molecule as it hits that heat.  No that there's heat
9   throughout the entire mill; but, yes, it's getting that
10  direct heat source.
11 Q.  But it doesn't reach that chemical state until
12  it's been through the --
13 A.  It falls out -- when it falls out of that
14  cyclone, it's stucco right there.
15 Q.  Okay.  But prior to the calcination process, it
16  wouldn't be, correct?
17 A.  It would be calcium sulfate dihydrate, which is
18  gypsum.
19 Q.  Well, I had part of it right in my mind.
20    So once it leaves the calcination process, it
21  goes up in the -- what did you call it?  Cyclone?
22 A.  That's where it -- that's still part of the imp
23  mill process.  That's where the material is collected.  It
24  goes through a rotary valve.  It's sealed, so -- and the
25  material drops into a screw conveyer, and the screw conveyer

---

Page 44

1   takes it to a silo.
2 Q.  So the screw conveyer takes it to a silo prior to
3   the production steps?
4 A.  That's correct.  There's actually -- we've got
5   several silos.
6 Q.  Okay.  So if we're through with the manufacturing
7   process, we've got the -- now, you call that stucco at that
8   point?
9 A.  Correct.
10 Q.  So the stucco is being stored in various silos --
11 A.  Correct.
12 Q.  -- and you now want to manufacture some drywall?
13 A.  Correct.
14 Q.  What is the first step, then, of getting the raw
15  material from the silos to the production location within
16  the mill?
17 A.  The silos have big rotary valves on the bottom of
18  it that will feed the material -- feeds it to a screw, to an
19  elevator.  The elevator dumps it on a conveyor belt which
20  takes it to our actual board side of things.  The stucco
21  then goes into another silo.
22    The bottom side of this silo has drag chains.
23  There's three drag chains which actually pull the stucco
24  out, drops it into a screw conveyer.  A screw conveyer takes
25  it above our wet end operations.  It gets metered, and then

---

Min-U-Script®          Michael Musetta & Associates, Inc. (813) 221-3171          (11) Pages 41 - 44

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 45

1  metered into the actual process.
2  Q.  And I'm just curious:  If it's very fine and if
3  it's dry at this point, isn't it just falling all over the
4  place?
5  A.  No.  They're all closed conveyors.  There's dust
6  collection on all of the conveyors as well.
7  Q.  All right.  That makes more sense.  The -- okay.
8     So then you said, we're going to go over to the
9  wet side of the production?
10 A.  The actual -- where the board is being
11 manufactured.
12 Q.  Okay.  And so once the stucco is then -- you said
13 it was spread out and measured so that you have the
14 appropriate amount of stucco on the -- is it a conveyor belt
15 at that point?
16 A.  Yeah.  It goes across a weigh belt which feeds,
17 you know, the exact tonnage to -- based on the product that
18 we're running.
19 Q.  Okay.  So if you're running a thicker board,
20 obviously you need more material?
21 A.  Right.  Correct.
22 Q.  Okay.  And so once that process is complete so
23 you have the correct amount of stucco --
24 A.  That's correct.
25 Q.  -- what is the next step of the process?

Page 46

1  A.  Stucco along with other ingredients all come
2  together at what we call the wet end of our operation.
3  Q.  Okay.  Now when you say "other ingredients," what
4  specifically are you referring to?
5  A.  There are other ingredients that -- for each
6  product that we make, we put different ingredients into -- I
7  mean, it's just not stucco that goes into it, you know.
8  Like, with our fire shield products, we put fiberglass in
9  there or vermiculite; or, you know, we have accelerators
10 that we put in.  One that we actually make is called ball
11 mill accelerator.
12 Q.  Ball mill?
13 A.  Ball mill accelerator.  We have -- we use potash.
14 And, I mean, there's a whole list of different products.
15 Based on the board that we're producing, they have different
16 products that have different quantities of products in it.
17 Q.  Okay.  And where would the list of those
18 additional products be located?
19 A.  They're in our production records.
20 Q.  So does the -- I'm going to call it the recipe.
21 A.  Right.
22 Q.  You have a recipe for a particular type of board.
23 So if you're making green board, I assume there's some sort
24 of mold inhibitor that's added to the gypsum so that when
25 you make the green board, it's -- you know, it doesn't mold?

Page 47

1     MR. AYALA: Objection to form, to the term.
2     THE WITNESS: We don't make green board anymore.
3  I mean, we make an XP product.
4     BY MR. WARWICK:
5  Q.  Okay.
6  A.  Yeah.
7  Q.  And does that recipe change daily, or is it a set
8  recipe --
9  A.  It can vary.  Yeah.  I mean -- but we try to
10 stick to a standard recipe and -- yeah.  It's not to say
11 that, you know, we may not have a little bit more of this in
12 the product this time than we did, say, last week when we
13 ran it.  I mean, it's kind of a, you know, living,
14 breathing -- you know, it can change.  We try to stick to --
15 you know, we've got budgeting quantities of these raw
16 materials, but they can be tweaked here or there.
17 Q.  And so you would have a record, then, of the
18 particular recipe that was used on a given day?
19 A.  Correct.  Yes.
20 Q.  So if you had a board from a house, you could go
21 back and look at the records for the recipe that was used on
22 that board on that day?
23 A.  That's correct, yeah.
24 Q.  Okay.  So where does the water that Apollo Beach
25 uses come from?

Page 48

1  A.  Hillsborough County.
2  Q.  And so you're just -- it's a well, or is it from
3  the city water?
4  A.  It's reclaimed water that we get from
5  Hillsborough County.
6  Q.  Okay.  And when you say it's "reclaimed water,"
7  what do you mean?
8  A.  It's their designation of water.  When the plant
9  was being considered for construction, water -- we're a big
10 consumer of water.  And in order to put a facility there,
11 they had to insure that they had a water source.
12    And originally, the plan was, we were going to
13 use potable water for Apollo Beach.  The decision was made
14 to make the plant -- it was during the construction phase,
15 as I understand, that the County came back to National
16 Gypsum Company and said, Hey, you guys, you know the
17 quantities of water you're looking at, we can't supply you
18 with potable water.
19    I think at that time, from what I was told, there
20 was a drought in Florida.  And there was a big concern
21 about, you know, our company consuming potentially up to
22 500,000 gallons of water a day, potable water.  I guess the
23 other thing, you know, the growth in Florida and
24 particularly in Hillsborough County with people coming in,
25 there was a big concern.

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 49

1   So during the construction phase, they came back
2   to our company and said, Hey, we would like you guys to use
3   reclaimed water as opposed to potable water. We can't
4   supply enough potable water for you guys, so -- and at that
5   time, I don't believe that there was actual reclaimed water
6   available for -- but the County made the commitment and put
7   the necessary lines in to provide that water.
8   Q.   So the -- who is responsible for collecting that
9   water and cleaning it, for lack of a better term?
10  A.   The County is. I mean, there are -- I believe
11  there are government standards that they comply with as far
12  as the water quality. It's -- I think there are federal
13  requirements on reclaimed water that they have to comply.
14  You know, our concern was what was the chloride issue for us
15  with the water. You know, we had people from our corporate
16  office come down and met with the people from the
17  Hillsborough County Water Department extensively on this,
18  you know, evaluated the water.
19     It was what we ended up -- and I don't know
20  exactly as far as the time and date. I do know we ran with
21  potable water early on before they were able to actually get
22  the reclaimed water up and running, but the big concern was
23  chlorides with us and --
24  Q.   And when you say "chlorides" -- I hate to
25  interrupt, but are you saying that in order to purify the

Page 50

1   water, clean the water, they use chlorine in the process?
2   Is that -- when you say "chloride," is that one of the
3   chlorides?
4   A.   I'm not sure what -- you know, in their cleaning
5   of the water -- our concern is chloride salts. In our
6   manufacturing process, it can have a negative impact on the
7   bonding characteristics of the gypsum crystals to the paper
8   on the -- so that's our concerns with chlorides.
9   Q.   So is the -- if I'm understanding correctly,
10  Hillsborough County operates a facility that produces water
11  only for the plant?
12  A.   No. It -- facilities -- as I understand it,
13  there's several facilities in Hillsborough County that they
14  operate. It's used for industrial application. It's used,
15  as I understand, you know, for golf courses for watering. I
16  mean, there are other --
17  Q.   Sure. And that's what I was wondering, if the
18  particular system where the Apollo Beach plant gets its
19  reclaimed water from is a particular location of the city
20  water within close proximity to the plant.
21  A.   I couldn't tell you where the -- I mean, they've
22  got a labyrinth of, you know, lines throughout Hillsborough
23  County. And I don't even know how many sites they have as
24  actual production sites for reclaimed water. But I just
25  know that the water that we get, it's -- we can't drink it,

Page 51

1   but it's -- I mean, we're in it all day long.
2      We've been running since 2001 with -- I think it
3   was in '01. Early '01 is when they finally were able to get
4   reclaimed. But I think we -- that first year, we used both
5   potable and reclaimed water in combination until they had
6   the facility.
7   Q.   Does the plant require the City or the County to
8   provide testing of the water quality?
9   A.   They test -- I mean, as part of it, they test
10  their water to -- like I said, to these government
11  standards. You know, I've read online -- I mean, they've
12  been recognized as, you know, top in their -- in that field
13  as far as, you know, producing reclaimed water.
14  Q.   Right. And I realize that they do that and they
15  have their own internal qualifications --
16  A.   Right.
17  Q.   -- their own internal testing.
18     Do you ask that they provide any of that testing
19  to you at the Apollo Beach plant?
20  A.   Me specifically? No.
21  Q.   Or anybody? Do you know if any tests come from
22  the water?
23  A.   I don't know for sure. Yeah.
24  Q.   But you don't know of any right now? There could
25  be, but you don't know of any; is that what you're saying?

Page 52

1   A.   I know annually there's a report that's sent to
2   us. My quality manager gets the report. But what it
3   actually spells out, I mean, I don't know.
4   Q.   Okay. What's the name of your quality manager?
5   A.   Patrick Macary.
6      MR. AYALA: M-a-c-a-r-y.
7      THE WITNESS: M-a-c-a-r-y.
8      BY MR. WARWICK:
9   Q.   And he's still with the company?
10  A.   Uh-huh. (Indicates affirmatively).
11  Q.   So do you know that -- do you know whether there
12  is any water quality tests run on the water as it comes out
13  of the tap from Hillsborough County in the plant itself?
14  A.   All our tap water is potable water.
15  Q.   Well, when I say -- I meant into the production
16  facility where the reclaimed water is coming in.
17  A.   Yeah. We test the water daily for our chlorides
18  and PH, yeah.
19  Q.   Okay. And who does that testing?
20  A.   It's in our lab department. It's -- we have a
21  lab technician as well as Pat.
22  Q.   Does Pat preside over that department?
23  A.   Correct.
24  Q.   And that's where those tests would be kept, and
25  it's a daily test?

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 53

1 A. Correct.
2 Q. Do you know whether that test is conducted at
3 various times during the day or once a day?
4 A. Random. It's random. It's a random test during
5 the day. I mean, our lab people are there on -- we call it
6 a day shift.
7 Q. Okay. And so there's no requirement, for
8 example, that it be done every two hours or religiously
9 throughout the day or anything like that?
10 A. No. When -- National Gypsum Company, when they
11 were told that they were going to have to use reclaimed
12 water, the concern, as I mentioned, was chlorides in this
13 reclaimed water. And one of the things that the County
14 suggested, if we had these concerns with the chlorides --
15 and our contract stated that, you know, if the chloride
16 content exceeded 220 parts per million, that we could go to,
17 you know, a combination of potable water.
18     There was a -- or is a well on our property
19 that -- you know, we could supplement our water usage with
20 that. But the suggestion was made maybe, you know,
21 installing a reverse osmosis system to treat a portion of
22 the reclaimed water. The idea, if we found ourselves in the
23 position where the chloride content got high, that if we
24 treated a portion of it and blended that with the reclaimed
25 water, that it would lower the composite chloride content to

---

Page 54

1 something under the 220 parts per million.
2     And so the company invested in a reverse osmosis
3 system. I believe it was, like, late '01, early '02,
4 started using the system. And actually by -- so early
5 '02 -- by middle '02, the system was no longer needed. We
6 actually -- the quality of the water, I mean from my
7 perspective, has been great. And, you know, my whole tenure
8 here, we've never run the RO system.
9 Q. Okay. Now, do you know whether the reclaimed
10 water contains -- do they use any sea water?
11 A. I have no idea, no.
12 Q. So the sources of wherever the County gets that
13 water, you don't know?
14 A. I don't know.
15 Q. Do you have any contact at the County water
16 department that you would --
17 A. I have a name. You know, I don't even know who
18 the gentleman is, to be honest with you. We had last
19 year -- and I don't recall the month and time, but we were
20 contacted by the County that they were going to shut us off
21 on reclaimed water. It was for a two-and-a-half-day period
22 of time. And that was my first dealing with anybody at the
23 water department.
24     And during that time, our production schedule has
25 been that -- we've been down to two and three days a week of

---

Page 55

1 operation that -- it didn't have a big impact on us. For a
2 day and a half, we switched over to potable water and used
3 that instead.
4 Q. Has the County water department ever contacted
5 you and said, you know, we've got a problem with our
6 treatment; and for whatever reason, it's not meeting our
7 standards, so don't use it?
8 A. No. I mean -- no. I have not. I have not been
9 contacted at all.
10 Q. Okay. Other than testing for the PH and
11 chlorides, do you do any testing for anything else of the
12 reclaimed water?
13     MR. AYALA: Objection to form.
14     THE WITNESS: No. We test for chlorides and PH.
15     BY MR. WARWICK:
16 Q. Just to be specific, you don't -- I know you've
17 answered it, but I just need to clarify. You do no
18 testing -- of the water used in the production of the
19 drywall that comes from reclaimed water from the City of
20 Hillsborough County, you do no testing for
21 sulfur-reducing bacteria?
22     MR. AYALA: Objection to form.
23     THE WITNESS: We just test for chlorides and PH.
24     BY MR. WARWICK:
25 Q. Okay. So we're back to the manufacturing

---

Page 56

1 process. You -- we've -- depending on which board you're
2 going to make, you have a specific amount of material that
3 is delivered, and you have some different ingredients that
4 are added to the recipe depending on the type of board
5 you're making, and now comes the point to add the water; is
6 that correct?
7 A. Correct.
8 Q. Okay. Could you walk me through that next step,
9 then, please.
10 A. The dry ingredients come in contact with the wet
11 ingredients at our wet end, particularly at what we call our
12 pin mixer. And all the ingredients -- it's like a big
13 mixer, is what it is. It's a horizontal mixer with pins in
14 it, materials. The wet and dry all come together. This
15 thing is turning at 330 revolutions per minute. It's
16 roughly a five-foot, four-and-a-half-foot diameter mixer,
17 maybe a foot in thickness, 8 to 10 inches in thickness.
18     All the ingredients come together very -- it's
19 like an in/out side discharge. The material gets extruded
20 on the face paper. The back paper comes down and gets
21 sandwiched to make the core of the board.
22 Q. And it goes then between a couple of rollers, I
23 presume, to --
24 A. It's actually what we call our forming plate.
25 It's a stationary plate where the caliper is established,

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 57

1  the thickness.
2  Q.  And I'm just interested:  Is it -- when it's a
3  side discharge, it has to be fairly liquid, then, to
4  discharge?
5  A.  It's a slurry.
6  Q.  Is it a slurry meaning thick as a milkshake or
7  thick as Play-Doh?  I mean, you can stuff Play-Doh through
8  toothpaste.
9  A.  No.  It's more liquid than it's anything.
10 Q.  Okay.
11 A.  I mean, it's a slurry.  It's like -- I don't know
12 your definition of a milkshake; but, I mean, it's a slurry.
13 Q.  Okay.
14 A.  Yeah.
15 Q.  And so the slurry goes through the forming plate,
16 and then what's the next step?
17 A.  Well, in the forming plate, not only are we
18 setting the caliper of the board; but when we make board,
19 we're actually making it upside down.  The face of the paper
20 is down.  I say the "face" -- if you were to hang drywall on
21 the wall, what you're looking at is actually face down.
22      The slurry gets laid out onto the face paper, the
23 back of the face paper.  The edges of the paper are brought
24 up at the forming plate.  The top paper comes down.  There's
25 a bead of adhesive that is put on that helps seal that edge.

Page 58

1      It goes through the forming plate, which is
2  roughly 17, 18 inches wide, the width of the board.  It
3  comes out.  The board is then on our first forming belt.  We
4  have shoe bars along this belt that -- and this is a very --
5  if you press on the back of the board, it gives.  I mean,
6  it's still very loose; and so we're holding the edges
7  together as this board is moving down the line.
8      We have a combination of six conveyor belts that
9  will transport the board down to our knife area.  At the
10 knife area, the board is hard enough that we're able to cut
11 it into lengths.
12 Q.  Let me just interrupt you.  Because it hasn't --
13 I haven't heard you say anything about going through any
14 oven or heat process.
15 A.  Not yet.
16 Q.  So the hardening of it is caused by the
17 accelerators that you put in?
18 A.  No.  I mean, it's -- the stucco -- when we make
19 the stucco over in the mill -- you know, I had mentioned
20 about hitting these 1250- to 1300-degree temperatures.  That
21 stucco temperature as it comes out of that imp mill, roughly
22 320 to, say, 340 degrees in temperature, that gets put in
23 the silo.  By the time we see it at the wet end, the stucco,
24 typically temperatures that we run with our stucco run about
25 220 to 230 degrees stucco temperature.

Page 59

1      We combine that with the waters, and we actually
2  chill our water.  And our water temperature, roughly
3  48 degrees -- 42 to, say, 48-degree water temperature.  So
4  that's slurry temperature, and we measure the slurry
5  temperature on the deck.  That's one of the things we
6  measure.  It typically runs somewhere between 103 degrees to
7  maybe 110 degrees.
8      So from that point all the way down to the knife,
9  that board is getting warmer, and it's the actual gypsum
10 crystals growing that's generating this heat.  And it's
11 setting up, and the crystals are growing.  And that
12 temperature is rising, you know, from a temperature of, say,
13 105 degrees at the slurry temperature as it comes out of the
14 mixer.  You know, by the time it gets down to the knife, I
15 mean, we're 130, 140 degrees.
16      But that board is -- it's hard enough that, you
17 know, we cut it.  And the integrity of the board is such
18 that -- I mean, we then -- we flip the boards over.  It
19 transfers -- it's called our wet transfer area.  The board
20 goes in; it gets flipped over; face is now up.  And we will
21 then take two boards at a time, and we'll actually go
22 into our kiln where we -- where we'll dry the board.
23      We have a 12-deck -- there's 12 individual decks
24 that's a 4-zone dryer, meaning there are four separate
25 zones.  When I say "separate," there are four zones that

Page 60

1  have their own heat supply to them, and each zone -- we run
2  different temperatures in each one of those zones.
3  Q.  So each board or set of boards goes through each
4  of the four zones?
5  A.  That's correct.  On each of the decks -- we
6  load -- down at the wet transfer, we cut the board -- I
7  mean, we make boards anywhere from 6 foot 8 inches long to
8  as long as -- close to 16 feet in length.  Our typical board
9  could be either an 8-foot or a 12-foot board.  That's our
10 most standard length.  So we'll actually cut 24 -- if we're
11 making 12s or 8s, we actually cut 24-foot-length board at
12 the knife.  So we send these 24-foot lengths, two side by
13 side into each deck.  We load each deck.
14      And it's just a continuous process.  It's a -- we
15 call it a tipple table that actually indexes.  As we're
16 cutting them, as they're transferring, these boards are
17 going into each one of these decks.  And so then, you know,
18 that's when the -- by the time that board hits the kiln,
19 that temperature -- we're estimating that board temperature
20 being somewhere around 150, 155 degrees.
21      You know, it enters the kiln; and immediately,
22 that temperature in that kiln -- you know, they're seeing
23 300 degrees immediately.  And we're going to -- in that
24 first to second zone, we're going to take that temperature
25 up.  I mean, it can get as high as 600 to 650 degrees in

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 61

1   those first -- you know, into the first zone, beginning of
2   the second zone, they are the temperatures that we'll see.
3        Then it will be a gradual cooling down. You
4   know, by the time that board exits the kiln, we try to
5   target a temperature somewhere in the 205- to 212-degree
6   temperature range. Probably more close to 208 is what we
7   probably see. Those are exit temperatures.
8   Q.  Okay. And do you know roughly how long that
9   takes to go through, first zone to the fourth zone?
10  A.  You know, it varies. It's a factor of our -- the
11  speed with which we run. And a typical -- and I'll just use
12  half-inch regular board as an example. I mean, we may run
13  half-inch board at 480 foot a minute. The kiln will run at
14  1/24th that speed. If you think about it, we're -- you
15  know, we've got 12 decks. You're putting two boards in at a
16  time, so it's 1/24th the speed.
17       So that determines how fast that board actually
18  goes through the dryer. But, you know, for the most part,
19  it's somewhere between 50 minutes to a little over an hour
20  that that board is actually in the dryer depending on the
21  speed. All our products, we don't all run them at the same
22  speed.
23  Q.  Right. And the speed could also be adjusted
24  based on, you know, how much you want to make that day,
25  correct?

Page 62

1   A.  Typically. But, you know, we have -- every year
2   we go through a budgeting process where they establish, you
3   know, benchmarks for products, you know, the speed, the
4   board, the machine up time, all of this. And we have
5   standards that we run and if we don't run to certain
6   standards, it's viewed negatively. We're -- so we pay very
7   close attention to the speeds that we run.
8   Q.  What would be the fastest you could run it
9   through the kiln?
10  A.  Since I've been there, 485 foot is the fastest
11  that I have seen; but I believe they've been over 500 foot
12  with my predecessor.
13  Q.  And could you -- when you say "over 500 foot," I
14  understand that in your lingo --
15  A.  500 foot a minute.
16  Q.  Right. That clearly means something to you
17  because you can tell --
18  A.  Right.
19  Q.  What does that mean to the time in the oven? Can
20  you tell me the difference?
21  A.  Like I say, it wouldn't -- you know, if I had a
22  calculator -- 500 divided by 24 -- the kiln is roughly 700
23  foot in length, so --
24  Q.  That helps.
25  A.  Yeah. I mean, I'm guessing it's probably

Page 63

1   about -- I would say maybe 46, 47 minutes in the dryer, you
2   know, at 500 foot.
3   Q.  Do you ever measure the internal core temperature
4   of the drywall when it's in the kiln?
5   A.  No. We don't have any means to measure that.
6   There has been work done in our company in the past using
7   thermal couples. Nothing done here at our plant.
8   Q.  Okay. And speaking of your plant -- that's one
9   of the questions I had.
10       Do you know if there are other National Gypsum
11  plants in the country that use reclaimed water?
12  A.  I don't know. I don't know.
13  Q.  Do you know of any -- let's say it that way. Are
14  you aware of any other than Apollo Beach that you personally
15  know use reclaimed water?
16       MR. AYALA: Objection.
17       THE WITNESS: I just don't know. I mean, I would
18  hate to say one way or the other. I mean, I know we
19  do, but I don't know of -- I don't know. I mean, I
20  just don't know.
21       BY MR. WARWICK:
22  Q.  There could be, but you personally don't know of
23  any?
24  A.  Well, I just don't know either way.
25  Q.  So -- okay. When you said that there was some

Page 64

1   work done by National Gypsum using thermal couplings to
2   determine the internal temperature of the board, you're not
3   aware of any of that testing being done at the Apollo Beach
4   facility?
5   A.  Correct.
6   Q.  When the materials are in a slurry form and it's
7   in that mixer --
8   A.  Mixer.
9   Q.  -- pin mixer, I think is what you called it --
10  A.  Correct.
11  Q.  -- and you come to the end of the day or the end
12  of a shift, what is -- what happens to the material that's
13  in process at that time?
14  A.  When we shut down, you know, the tail end of that
15  board, we -- you know, as it's going down the line, we stop
16  running that tail end. Obviously, it's kind of dragging
17  along. I mean, at a point -- and the operator, knife
18  operator, knows when that tail end is coming. They -- you
19  know, he's watching. He'll make a determination as to
20  what -- the last piece of board that goes in the kiln.
21       The rest of it goes out in overhead reject where
22  we'll -- it goes through a kind of a grinder that will grind
23  the material up, and it falls into a bunker.
24  Q.  Okay. And so would there be any situation where
25  the slurry mixture would sit in the mixture --

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 65

1 A.  Mixer?
2 Q.  Yeah -- in the mixer overnight?
3 A.  No.  Absolutely not.
4 Q.  Okay.  And you clean that out every night?
5 A.  Right.  Yeah.  Well, I mean, when we shut down,
6   it's -- we run a continuous process.  I mean, when we start
7   the plant up -- say we're running three days a week.  I
8   mean, we'll start up on a Monday and, you know, maybe run
9   until the end of Wednesday; and then we shut down.  I mean,
10   we don't start it up one day, shut it down that day, start
11   it up the next day, shut it down.  We don't.  It's a
12   continuous process.
13 Q.  Okay.  And you run it until you're out of
14   material, and then you clean all the equipment and --
15 A.  Yeah.  We run it until we -- you know, until
16   the -- you know, the determination as to what our schedule
17   is going to be -- we usually make that decision come
18   Wednesday morning if we need to run further into the week
19   based on the orders that are at hand.
20 Q.  But as far as the days that you have off -- let's
21   say -- you said you're only working three days.  So if
22   you're three days in production and four days off, during
23   those four days, there's no slurry mixture mixed up
24   anywhere?
25 A.  Correct.

Page 66

1 Q.  Okay.  Are you familiar with a system called a
2   Nox drying system, N-o-x?
3 A.  No.
4 Q.  Okay.  Jeff, I'd like to change focus here a
5   little bit, then, from -- well, one more thing.  Let's do
6   this first.
7 A.  Okay.
8 Q.  You said that at the end of a run, you may have
9   some material that runs through the system but it -- before
10   it gets to the knife, it's --
11 A.  Right.
12 Q.  -- discharged.
13 A.  We'll determine what the last piece of good board
14   that we can actually sell -- you know, run through the dryer
15   and sell, yeah.
16 Q.  Okay.  And the rest of the remaining material
17   is -- what happens to that?
18 A.  It gets -- it goes up a reject valve, goes
19   through what we call a star chopper.  It will chop this
20   material up.  That material is -- it falls into a bunker.
21   We'll take the material out of the bunker.  We'll load it
22   in -- we have a small dump truck.  That material is taken
23   back to our dome where -- it gets put in our dome.  We'll
24   then reuse that material.  We'll blend it in with the FGD
25   material.

Page 67

1 Q.  Okay.  Now, when that goes through -- you said it
2   went to the reject chute?
3 A.  It goes up a reject belt.  There's a belt, yeah.
4   All it is -- instead of going and making the transfer, this
5   paddle comes up; and it goes to a belt that takes it to this
6   chopper and dumps it in this bunker.
7 Q.  And does it have the paper on it at that point?
8 A.  It does, yeah.
9 Q.  And so it goes through the chopper with the paper
10   on it?
11 A.  Uh-huh.  (Indicates affirmatively).
12 Q.  And the paper is not removed first or anything?
13 A.  No.
14 Q.  It goes through the chopper and -- how small are
15   the particles that it chops?  I mean -- not exactly, but is
16   it fairly small or --
17 A.  It can be like this to this.  I mean --
18 Q.  So it just breaks it up --
19 A.  Breaks it up.  Right.
20 Q.  It doesn't make it a fine powder?
21 A.  Right.  No.  Just breaks it up.
22 Q.  All right.  And that is -- if I understood you
23   correctly, the knife is prior to the kiln?
24 A.  Correct.
25 Q.  Because this is still material that hasn't

Page 68

1   been --
2 A.  Dried.
3 Q.  -- dried?
4 A.  That's correct.
5 Q.  And so it's moist at that point still?
6   MR. AYALA: Objection to form.
7   THE WITNESS: It has not gone through the dryer.
8   BY MR. WARWICK:
9 Q.  Right.  Meaning it's got a higher moisture
10   content because it was slurry, you know, a few minutes ago;
11   but it may be hard enough to go through the knife but --
12 A.  Right.
13 Q.  -- hasn't been dried -- okay.
14   And so that material goes through the reject
15   belt, and that's taken back to the dome --
16 A.  Correct.
17 Q.  -- where the rest of the raw material is kept?
18 A.  Uh-huh.  (Indicates affirmatively).
19 Q.  Is there any sort of procedure that -- first of
20   all, do you have a name for that type of product when it's
21   in that state?
22 A.  We call it wet waste.
23 Q.  Okay.  Wet waste.  Perfect.  I knew you'd have a
24   name for it.
25   Okay.  So you take the wet waste back to the

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 69

1  dome. What happens to it when it's back in the dome?
2  A.  We will take that material -- we have what we
3  call a Norba crusher, N-o-r-b-a.  And that material gets
4  dumped in the Norba crusher, and then we will blend it back
5  in with the material going -- the FGD going over to the
6  mill.
7  Q.  Okay.  And is there a certain percentage --
8  A.  We -- you know, it depends on whether we've got
9  material available to blend back in or not.  But I believe
10  this year it's, like, a little over one percent.
11  Q.  So you wouldn't go ahead and make a run of, you
12  know, three days worth of boards out of all wet waste?
13  A.  No.
14  Q.  Okay.  And speaking of wet waste, does the
15  Apollo Beach plant collect any other sort of recycled waste,
16  waste meaning other board from outside of its plant?
17  A.  No.
18  Q.  Meaning that -- you know, there are some drywall
19  facilities who take scrap drywall from construction sites.
20  A.  Okay.  We don't.
21  Q.  Okay.  Do you know whether the Tampa plant ever
22  took construction debris?
23  A.  I don't know.  I don't believe they did, but I --
24  you know, I don't believe so.
25  Q.  And so the only recycling that you would do of

---

Page 70

1  material would be your wet waste from within the plant
2  itself; is that correct?
3  A.  And dry waste.  If there's any board that goes
4  through the kiln that, say, there's something -- you know,
5  there's something that -- we can't put it in the warehouse.
6  You know, if it gets damaged or if there's something, you
7  know, dimensionally wrong with it, we'll call it.  And that
8  material will end up going back through the system as well.
9  Q.  Okay.  And does it go through that --
10  A.  Norba crusher?
11  Q.  -- Norba crusher?
12  A.  That is correct.  Typically, if it's a unit of
13  board being -- say a 34-piece unit board as an example,
14  we'll take it out there.  And our loader operator, he'll
15  actually break it up with the front end loader; and then
16  we'll scoop it up and put it into the Norba crusher.
17  Q.  And when it goes into the Norba crusher, just to
18  be clear, it has the paper on it?
19  A.  Correct.
20  Q.  And the -- you said that there would be other
21  reasons to cull the board that didn't meet quality control
22  for any given reason.  Could you give me some examples of
23  reasons why --
24  A.  You know, if we -- there's -- you know, if we
25  had, say, end peel on the board, maybe that day we had some

---

Page 71

1  high chlorides or whatever and it impacted the -- you know,
2  the bond of the paper to the -- we'll call it.  You have
3  dimensional issues.  If it's damaged -- you know,
4  occasionally we'll get material that we have to actually
5  pull out of stock because somebody ran into it with a fork
6  truck or whatever, that kind of stuff.
7  You know, it makes a corner and goes into the
8  kiln.  I mean, we -- our expectations are that that board is
9  going to come out of the kiln and it's going to go into the
10  warehouse as quality product.
11  Q.  Speaking of that, is there any testing you do
12  after the board leaves the kiln for -- well, let's say the
13  ingredients or the quality of the structure of the board
14  itself, meaning the --
15  A.  Structural integrity of the board?
16  Q.  Not the structural integrity.  More or less
17  the -- you know, for bacteria or for --
18  MR. AYALA:  Objection to form.
19  BY MR. WARWICK:
20  Q.  -- any sort of foreign contaminants or
21  contamination within the board itself after it's been all
22  the way through the process?
23  A.  You know, we -- when the board comes out of the
24  kiln, you know, we're handling that board immediately.
25  We're sampling the board.  We have people that are taking

---

Page 72

1  samples of that board and running tests on it as far as
2  physical dimensions -- we're handling the board.  I mean,
3  these are our quality checks that we do to make sure that,
4  you know, the board by all accounts is a quality product
5  that we put in the warehouse.
6  Q.  Well, that's exactly what I was assuming you
7  would do.  And I was just wondering, is when you pull out a
8  sample, is any of the testing that you do designed to test
9  the makeup of the material versus just the integrity and the
10  smoothness and the, you know, structural-type elements?
11  MR. AYALA:  Objection to form.
12  THE WITNESS:  You know, I mean, I don't know what
13  specifically you're looking for.  But, I mean, just
14  the fact that, you know, we're handling this
15  product -- I mean, our operators are right there with
16  this product.  You know, if there's anything that is
17  questionable about that product, believe me, it
18  gets -- I mean, red flags go up.  I mean, as far as
19  actual we do this test or this test, you know, our
20  tests are -- you know, we're testing --
21  BY MR. WARWICK:
22  Q.  And let me just give you an example.  Let's say
23  that the material that was delivered from the Big Bend plant
24  had a tremendously high level of arsenic.  For whatever
25  reason, the coal that they were burning that particular time

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 73

1  had huge amounts of arsenic in it that translated into the
2  gypsum and then translated into the board. And obviously
3  from a visual inspection of that board, you wouldn't be able
4  to tell if it had a large degree of arsenic --
5      MR. AYALA: Objection to form. Argumentative.
6      BY MR. WARWICK:
7  Q.  But would there be a way -- but a test of the
8  chemical makeup of it, meaning that, okay, we're going to
9  test the gypsum itself at this end result to see if it
10 meets, you know, our standards with regard to the components
11 of the material itself, did you do anything like that?
12     MR. AYALA: Objection to form.
13     THE WITNESS: You know, we --
14     MR. AYALA: -- and calls for expert testimony.
15     THE WITNESS: You know, we -- our testing is --
16 you know, when that board comes out, you know, the lab
17 is involved in testing. Our dry end people are
18 involved in testing. But it's -- you know, there are
19 physical tests of the board, you know, structural
20 integrity, those types of tests.
21     BY MR. WARWICK:
22 Q.  Okay. And that's all I'm trying to get an answer
23 to. I think you've answered it. But when you say the lab
24 is involved, that leads me to believe, well, are there some
25 other tests that they're doing on it besides structural, or

---

Page 74

1  is all the tests you do at that end strictly based on the
2  structural and -- you know.
3  A.  I mean, you know, we run a lot of different
4  products. I mean, some of our products -- you know, XP,
5  we'll check for the moisture resistance of the board; so
6  that's a test that we do.
7  Q.  And at that point, you don't do any tests to
8  determine if there's any bacteria within the board?
9      MR. AYALA: Objection to form.
10     THE WITNESS: I mean, those are the tests that we
11 do.
12     BY MR. WARWICK:
13 Q.  So that would be a "no"? You don't --
14     MR. AYALA: Objection to form.
15     THE WITNESS: I mean, I don't -- as far as what
16 sort of specific tests are -- I have no idea. I mean,
17 as far as -- I mean, you're saying for bacteria. I'm
18 not aware of bacteria tests.
19     BY MR. WARWICK:
20 Q.  Have you ever heard of a test called a rapid
21 check test? It's a test that they use in the petroleum
22 industry for sulfur reducing bacteria?
23 A.  I'm not familiar with it.
24 Q.  Okay. Are you aware of consumer complaints
25 regarding corrosion in homes within the south primarily that

---

Page 75

1  have been blamed on National Gypsum drywall?
2      MR. AYALA: Objection to form.
3      THE WITNESS: I'm aware of a complaint that's
4  there, yeah.
5      BY MR. WARWICK:
6  Q.  Okay. And when I say "complaint," there's the
7  legal complaint that's filed in court; and then there's
8  simply, you know, consumer complaints. A consumer will call
9  and say, I think I've got a problem with my drywall. Right
10 now I'm just talking about complaints from the consumers
11 directly, a letter or a telephone call making the allegation
12 that the drywall from National Gypsum within their home is
13 causing corrosion. Are you aware of those complaints?
14 A.  I mean, I have talked to our director of quality
15 in Charlotte, you know, related to recent complaints about
16 corrosion, yes.
17 Q.  Okay. Who is that?
18 A.  Jack Walker.
19 Q.  If I'm not mistaken, Jack is the guy that came --
20 goes out and he actually meets with homeowner?
21 A.  Right.
22 Q.  And he's in Charlotte?
23 A.  Correct.
24 Q.  Do you know what his title is?
25 A.  I believe he's director of quality. I believe.

---

Page 76

1  Q.  Okay. But as far as you meeting with any of the
2  homeowners, you have not?
3  A.  You know, I've been in Jack's company on two
4  different occasions where -- actually gone out to two
5  different sites.
6  Q.  Okay. And what were the names of those people?
7  Do you remember?
8  A.  The Brincku home, and I believe it was
9  Dan Williams over in Seminole.
10 Q.  That was the name of the homeowner?
11 A.  I believe, yeah. Mr. Williams, I think.
12 Q.  And do you remember what town Mr. Williams' home
13 was in? In Seminole County but --
14 A.  It was over in St. Pete somewhere. It was a
15 mobile home park.
16 Q.  It was a mobile home that the drywall was in?
17 A.  Well, he had a mobile home; but he added an
18 addition on the home.
19 Q.  Okay.
20 A.  I think that's called Seminole over there. I'm
21 not real familiar with St. Pete, but I met Jack over there.
22 Q.  Okay. But that's the only two houses you've been
23 to?
24 A.  Yeah.
25 Q.  Have you reviewed any written complaints from

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 77

1  consumers other than the lawsuits?
2  A.   No.  I mean, I've seen some of the documents
3  related to the lawsuits, yes.
4  Q.   And Bob and I represent the Brinckus, and we
5  represent a number of other people that are involved in
6  what's called the Brucker litigation.  In addition to those
7  two lawsuits, are you aware of any other lawsuits against
8  National Gypsum alleging defective board currently?
9  A.   My discussions with Jack -- he shared with me
10  that he's gone out on different -- you know, he gets a call
11  from a consumer saying, I've got an issue, can you come take
12  a look.  You know, he shared with me that, yes, he's gone
13  out on different occasions.  But as far as particular -- who
14  the homeowner was and so forth, I have no idea.
15  Q.   Jack would be the one to find out about those
16  type of things?
17  A.   Oh, yeah.  Yeah.
18  Q.   Are you aware of any complaints from either your
19  employees or drywall contractors for what has been
20  classified as maybe smelly board?
21  A.   From Apollo Beach?
22  Q.   Correct.
23  A.   No.
24       MR. WARWICK: I think it's probably a good time
25  for us to take a break.

Page 78

1       THE VIDEOGRAPHER: Going off the record at
2  11:15 a.m.  Conclusion of Tape 1.
3       (Brief recess taken.)
4       THE VIDEOGRAPHER: This is November the 18th,
5  2011.  The time is 11:36 a.m.  We're back on the
6  record with Tape 2 of the deposition of
7  Jeff McChesney, 30(b)(6) witness for National Gypsum
8  Company.
9       CROSS-EXAMINATION
10  BY MR. GARY:
11  Q.   Mr. McChesney, my name is Bob Gary.  I'm one of
12  the plaintiffs' lawyers here, and I'm going to be asking you
13  some questions now --
14  A.   Okay.
15  Q.   -- on a slightly different topic.
16  A.   Okay.
17  Q.   What I'd like to discuss with you, issues
18  regarding how you manage your inventory control, how you
19  track production records, how you track the drywall after it
20  leaves the plant.  Are these issues that you're generally
21  familiar with?
22  A.   Yes.
23  Q.   All right.  And I understand that one of the
24  systems is called the run code; is that correct?
25  A.   The run code as far as what?

Page 79

1  Q.   Well --
2  A.   The back of the board?
3  Q.   The back of the board.
4  A.   Correct.
5  Q.   You stamp the back -- what do you call the stamp
6  you put on the back of the board?
7  A.   It can be referred to as different things, but
8  time/date stamp, run code, that's fine.  Run code --
9  Q.   Whatever you call it --
10  A.   Yeah.
11       MR. AYALA: Just for the record, guys, if you can
12  wait until he's done asking the question and you can
13  wait until he's done answering --
14       THE WITNESS: I'm sorry.
15       BY MR. GARY:
16  Q.   Go ahead.
17  A.   Yes.  Run code, fine.
18  Q.   What is indicated on the run code?
19  A.   It is a date, time, manufacturing plant number,
20  made in the USA.  It can have the underwriter's laboratory
21  stamp depending on the product.  But as far as the run code
22  itself, yes; it's typically just -- when we talk about run
23  code, it's the date, time, and the plant code.
24  Q.   When you say the time, that's broken down into
25  minute segments?

Page 80

1  A.   It is.
2  Q.   Why is it broken down into minute segments?
3  A.   So that we can track it.
4  Q.   So you can literally track your product from
5  minute to minute?
6  A.   That's correct.
7  Q.   And it's also -- as we said, 23 is Apollo Beach?
8  A.   That is correct.
9  Q.   So whenever we see the stamp 23, we know that
10  that product was manufactured at Apollo Beach?
11  A.   That's correct.
12  Q.   And every single piece of board that comes out of
13  Apollo Beach has one of those stamps on it?
14  A.   Yes.
15  Q.   Now, the stamp does not indicate the type of
16  drywall that's being manufactured; is that correct?
17  A.   Correct.
18  Q.   So you don't know whether it's mined, raw
19  material, or flue -- made from flue gas -- the flue gases?
20       MR. AYALA: Objection to form.
21       THE WITNESS: By looking -- are you saying by
22  looking at the run code?
23       BY MR. GARY:
24  Q.   Yes.
25  A.   I would have to go back through the production

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 81

1  records based on the run code time and date.
2  Q.  Because -- well, you would know from a certain
3  point forward that Apollo Beach was only making FGD drywall?
4  A.  Correct.
5  Q.  So that's how you would tell?
6  A.  Right.
7  Q.  All right.  And you're -- of course, you're aware
8  that at one time, congress wanted to change those rules or
9  looked into changing those rules?
10     MR. AYALA: Objection to form.
11     THE WITNESS: I'm not aware.
12     BY MR. GARY:
13  Q.  All right.  So -- but other than looking at the
14  plant code, there's no way to determine the raw material
15  used in the manufacture of the drywall --
16     MR. AYALA: Objection to form.
17     BY MR. GARY:
18  Q.  -- is that correct?
19  A.  I guess -- could you -- I don't quite follow the
20  way --
21  Q.  My question is:  The only clue as to the type --
22  whether it's FGD drywall or any other type of drywall is the
23  time that the drywall was manufactured as indicated in the
24  run code and the plant?
25  A.  That's what we would use.

Page 82

1  Q.  There's nothing else available on the run code?
2  A.  Correct.
3  Q.  And in addition to run codes, you utilize bar
4  codes; is that correct?
5  A.  Our packaged board on the end tapes have bar
6  codes on them.  I don't know when we started with bar codes;
7  but, yes, they're there now.
8  Q.  And as long as you've been at the plant, have
9  they been using barcodes?
10  A.  That, I can't -- I mean, like I say, I don't know
11  whether all of our products have bar -- I don't know when
12  they started putting bar codes on all of our products, on
13  the bundling tape.
14  Q.  Can you recall a time when there was not bar
15  codes?
16  A.  Oh, yeah.
17  Q.  When was that?
18  A.  I mean, a specific date and time?  No, I can't.
19  I mean, I can recall in the past when bundling tape didn't
20  have bar codes on it.  But as to when it actually started, I
21  don't know that exact date.
22  Q.  And bar codes have become a pretty sophisticated
23  way of tracking product; is that correct?
24     MR. AYALA: Objection to form.
25     THE WITNESS: I would -- I don't know.  I guess

Page 83

1  it is, yes.
2     BY MR. GARY:
3  Q.  And do your raw materials that you purchase also
4  have bar codes associated with them?
5  A.  I don't know the answer to that.  I mean, if they
6  do, they're not there.  I mean, we don't have any bar code
7  scanning at our facility.
8  Q.  You -- so you're saying you don't do any bar code
9  scanning at the facility?
10  A.  That's correct.
11  Q.  Do -- are you involved in the drywall
12  arrangements -- excuse me.  Strike that -- arrangements for
13  the drywall to be shipped to the distributor or to the
14  retailer?
15  A.  Am I personally involved?
16  Q.  Yes.  Do you supervise that?
17  A.  One of the areas in our plant is the warehouse
18  department where the board gets shipped out, and I have a
19  department manager that oversees that.  And he reports to my
20  production manager or reports to me, so -- yes, it's under
21  my plant.
22  Q.  Under your plant.  Okay.
23     And do you use the bar codes to regulate your
24  inventory?
25  A.  We don't use the bar codes.

Page 84

1  Q.  Do you use the bar codes to -- so you -- as plant
2  manager, you don't use the bar codes at all?
3  A.  No.
4  Q.  And so what is the purpose of putting the bar
5  codes?
6  A.  My understanding of the purpose of the bar code
7  is for the end user.  And I believe the initiative was
8  primarily directed towards our mass merchandisers, the
9  Lowe's and the Home Depots and so forth.  They wanted that
10  availability to scan bundles of board as they sold them from
11  their stores.  Now, maybe some other customers as well; but
12  that was my understanding of why we put bar codes on the
13  bundle tape.
14  Q.  Do you know if National Gypsum has a system that
15  works in conjunction with its purchasers of its product?
16     MR. AYALA: Objection to form.
17     BY MR. GARY:
18  Q.  Do you understand the question?
19  A.  No.  You lost me.
20  Q.  You can link bar codes together so my bar code
21  will be consistent with your bar code, and there's internal
22  systems that can be devised.  To your knowledge, is there
23  such a system that National Gypsum utilizes?
24  A.  I'm not aware of anything related to the bar
25  codes.

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 85

1  Q.  In our -- so you don't use the bar codes to
2    determine level of product that goes into the mix?
3  A.  No.
4  Q.  So how do you do that, then?
5  A.  As far as the recipe?
6  Q.  The recipe, yeah.
7  A.  It's -- I guess -- let me understand the
8    question.  You want to know, how do we know how much
9    material we're putting in --
10 Q.  Yes.
11 A.  -- each product?
12 Q.  If you don't use -- you have to use some way to
13   track that.  How do you track that?
14 A.  We have feeders that -- I mean, we track the
15   products based on lot numbers or raw materials.  We track
16   that.  We record those on a daily basis with our production
17   runs.  So if it's a bagged product, we know what lot number
18   was used that day for that product as an example for one of
19   our -- maybe one of our products.  So we track that.  Our
20   operators, as they use the product, they write down the lot
21   numbers.
22 Q.  And that would -- and you could tie -- you tie
23   that back to the -- what we're calling the run code?
24 A.  Correct.
25 Q.  So the -- if you had the run code, you then could

Page 86

1    go look at the lot numbers, and that would tell you the
2    recipe for the product?
3  A.  If you wanted to know on this particular day,
4    this particular time, we were interested in, say, a raw
5    material -- I'll say potash --
6  Q.  Okay.
7  A.  -- what was the lot number at this time, we would
8    be able to go back in our system and track what the lot
9    number for that given time frame of that potash for this
10   vendor.  We can track that back.
11 Q.  How long do you retain those records?
12 A.  Whatever our record retention policy states, but
13   I don't know that right offhand.  But it's a production
14   record.  I'm sure we have it for a while.  I don't know
15   what --
16 Q.  A while being --
17 A.  I don't know.  I don't know --
18 Q.  You keep them, is the bottom line?
19 A.  We follow our company's record retention policy,
20   yes.
21 Q.  Okay.  So as I understand what you're telling me
22   is that if you have the run code number, you can go into the
23   records of National Gypsum and determine the formula that
24   was made to make that particular run code?
25 A.  That's correct.

Page 87

1  Q.  And since the run codes vary from minute to
2    minute, how often -- and maybe you can't answer this
3    question or maybe it's a silly question.  If it is, you'll
4    forgive me, because I don't know anything about making
5    drywall.
6      How long would you normally have a run before you
7    would change the formula?  As a --
8  A.  It can -- I mean, we -- you know, all of our raw
9    materials that are fed, we track them.  You know, we write
10   them down.  You know, if the operator at the wet end, he
11   needs to, you know, tweak something a little bit, needs to
12   move the head around a little bit, he might adjust it here
13   or there.  It just varies.  I mean, it varies on the -- you
14   know, the ingredient that's going into it may be adjusted a
15   little bit, but we tend to follow a basic recipe on all of
16   our products.
17 Q.  Okay.  So if I'm interested in --
18 A.  Pardon me.  For each of our products.  I don't
19   want to say --
20 Q.  We're talking about either Gold Bond or Grid
21   Marks, one specific type --
22 A.  Well, like, I'm talking about a board.  I mean,
23   maybe it's a half-inch regular versus five-eighths versus
24   high-strength ceiling board versus XP or whatever.  They
25   each have their own --

Page 88

1  Q.  We're talking the same thing.  Just so I
2    understand, for one specific type of product -- let's say
3    it's half-inch Gold Bond; is there such a thing?
4  A.  Half-inch regular TE.
5  Q.  Okay.  So we're talking about that for purposes
6    of the exam.
7  A.  Yeah.  Okay.
8  Q.  So --
9  A.  We would have a general recipe that we would
10   follow.
11 Q.  All right.  So if I have the minute, day, date
12   and plant, how -- and I've got the baseline formula, how
13   would I determine when the formula changes?
14 A.  Any time that operator makes a change, it's
15   recorded.  He'll write it down.  So if he adjusts
16   something -- say he adds 10 more pounds of stucco into -- at
17   a given time, he will notate that, write the time down when
18   he made that change.
19 Q.  And where is that record -- how is that record
20   maintained?  Is that a computer record?  You don't write
21   that in a big notebook?
22 A.  It is.  It's a production sheet that sits at the
23   wet end that all of these ingredients -- and there's all
24   these different time slots that -- if he makes an
25   adjustment, he'll mark the time down.  If this raw material

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 89

1  gets adjusted, he'll notate what that new value is and put
2  it in there.
3  Q.   Okay.  And where is -- how is that record
4  maintained?  Is it maintained in, like, a big ledger; or
5  does it go into a computer system?
6  A.   Every day that -- those records are retained as
7  production records that get -- we file them.  We have them
8  at our plant.
9  Q.   Are they in, like, hard paper form?
10  A.   Yeah.
11  Q.   They're not -- they don't go into a computer
12  system?
13  A.   Just recently this year, we've looked at having
14  the operators enter that stuff into the computer.  But, you
15  know, they're still doing both actually.
16  Q.   Okay.  So there's -- you're in a transition?
17  A.   We're trying to get into the 20th century.
18  Q.   As we all are, particularly those of us that are
19  older than these guys.
20      So I can also -- tell me how I would tell from
21  the run code the number of square feet that were produced in
22  that run code.  Volume, I'm talking.
23  A.   You've got a -- run code gives you a minute -- I
24  mean, that board you're looking at says this is the time
25  when it was run.  I mean, if it's a four-foot piece of

Page 90

1  board -- you know, here again, you would have to go back to
2  our production records to say, well, how fast were they
3  running.
4  Q.   Okay.
5  A.   So if I'm interested in a one-minute time frame,
6  you need to know how fast we're running -- so say we're
7  running 400 foot a minute.  You multiply that times 4 feet.
8  That tells you we ran 1600 square feet of board in that
9  minute.
10  Q.   Okay.  So --
11  A.   Or one point, yeah, you know.
12      MR. AYALA: Whatever the math is.
13      THE WITNESS: Whatever the math is, yeah.
14      BY MR. GARY:
15  Q.   Whatever the math is.
16  A.   Right.
17  Q.   So the point being -- if I'm interested in a
18  particular run code, I can determine the speed -- the
19  production speed?
20  A.   Correct.
21  Q.   And from that, I can determine the number of
22  square feet that were run with that run code?
23  A.   If I -- if you asked me on this given date, this
24  time, you know, I would look back at our records and say,
25  Well, we ran that product at 450 foot a minute.  It was four

Page 91

1  foot wide.  You know, I can tell you, if we were making
2  half-inch 12s, how long we actually cut half-inch 12-foot
3  board.
4  Q.   Okay.  And you could tell me how much of that
5  board was made until there was a change of the formula?
6  A.   Fair, yeah.
7  Q.   And once -- and if we're still using the same
8  example, that board that we've now identified would have a
9  bar code on it?
10  A.   If it made it to the dry end and we packaged it,
11  unitized it, put bundling tape on it, it would have --
12  probably have a bar code on it.  Whenever that -- whenever
13  we start it -- I mean, I can't tell you when we started
14  putting bar codes on all of our tape.
15  Q.   But presuming there was a bar code --
16  A.   Yeah.
17  Q.   Okay.  So then now we've got -- we've identified
18  a particular run and a volume, and it's got a bar code on
19  it.
20  A.   Correct.
21  Q.   All right.  Presuming it has bar code.
22  A.   Right.
23  Q.   Okay.  So with that bar code, we can now tell
24  where it went?
25      MR. AYALA: Objection to form.

Page 92

1      BY MR. GARY:
2  Q.   Is that a --
3  A.   I don't know where it went.
4  Q.   I understand that.  I'm not saying you know where
5  it went.  But the bar code itself is a method of tracking
6  the distribution of the product, is that correct, if you
7  know?  If you know?
8  A.   Not by National Gypsum Company.  I mean, we don't
9  track our board based on bar code.
10  Q.   Okay.  How do you track your board?
11  A.   We -- our only means of tracking board is -- I
12  mean, we produce it.  It has the date and time stamp on the
13  back.  If it's a good product, it goes into our warehouse.
14  We ship it based on -- we utilize a first-in, first-out
15  inventory.  And based on the orders that come in, we load
16  first-in, first-out.  But I mean, as far as every load that
17  goes out, do we record the production date/time stamp of
18  that board on that trailer?  We do not.  We don't.
19  Q.   Okay.  So here's my question:  You -- you're in
20  the business of selling drywall, not of keeping it?
21  A.   Correct.
22  Q.   So an order comes in for drywall from -- let's
23  say it comes from Lowe's; the order is filled based on
24  first-in, first-out?
25  A.   Right.

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 93

1  Q.  Now, how would you determine -- how would you
2   identify the first-in board?
3  A.  That's what my warehouse manager does.
4  Q.  Okay.  So somebody who does that?
5  A.  Correct.
6  Q.  And generically speaking, how does he do that?
7  A.  He's the one who puts together our daily cut
8   list.  And as we identify the products that we're going to
9   run, he also will identify what loading -- or bays in our
10   warehouse he wants our production guys to put that board.
11   So he'll actually specify, you know, this board goes into
12   this bay.  And from that, he then will dictate to his
13   employees, who are the drivers, that they utilize this
14   first-in, first-out.
15      And every day he updates -- he's got a white
16   board that he keeps in his department that the operators --
17   his fork truck operators -- say if you're loading half-inch
18   8s today or half-inch 12s or whatever the product is, this
19   is your bay assignment.  And these guys all write these bay
20   assignments down.
21      So as they're getting orders to load throughout
22   the day -- you know, I've got a load of -- a straight load
23   of half-inch 12s today.  I'm going to look at my list; and
24   Gary, my warehouse manager, says, Take board from Warehouse
25   Bay B21.  And so they will load board out of B21 that day.

Page 94

1  Q.  Okay.  What's Gary's last name?
2  A.  Bennett.
3  Q.  Gary Bennett.  And Mr. Bennett will know, based
4   on the first-in/first-out, what's in Bay Number 12 --
5      MR. AYALA: Objection to form.
6      BY MR. GARY:
7  Q.  -- is that correct?
8  A.  I don't know.  I mean, he's the one who does the
9   first-in, first-out.  He keeps track of it however -- you
10   know, I haven't sat down with Gary and said, Explain to me
11   exactly the mechanics that go into making sure that the --
12  Q.  But that's the system --
13  A.  That's the -- I mean, that's what we do.
14  Q.  Okay.  And what -- and so once Bay 12 is sent out
15   to Lowe's in our example -- we're talking the half-inch Gold
16   Bond?
17  A.  Right.
18  Q.  What sort of records are maintained to show that
19   happened?  Now Bay 12 is empty.
20  A.  It will get loaded right back up.  Once we empty
21   the bay, it gets loaded right back up.  Because, you know,
22   we've got a finite floor space.  And, you know, when we
23   empty bays, we're putting board right back in that bay.  And
24   that's reflected on Gary's cut list, you know.
25  Q.  So in order for this system to work, you have to

Page 95

1   know when the board was made, when the board goes out.  You
2   have to know those two pieces of information, correct?
3      MR. AYALA: Objection to form.
4      THE WITNESS: I'm going to guess that's what the
5   guy does, yeah.
6      MR. AYALA: We don't want you to guess.
7      THE WITNESS: Okay.  I don't know.
8      BY MR. GARY:
9  Q.  Is that your understanding of how the system
10   works?  You keep track of when it was manufactured, and
11   then --
12  A.  He records when -- yes.  I mean, it's on our cut
13   list that the board went into these bays on this date.  You
14   know, it gets loaded out at -- on a day in the future when
15   that bay gets depleted, well, then board goes back in that
16   bay.  That's my understanding.
17  Q.  All right.  That's fine.  So in order to know
18   when the board was manufactured, would they rely on the run
19   code numbers on the first-in/first-out system?
20  A.  I don't know how he tracks that.
21  Q.  We can ask him.
22  A.  Yeah.
23  Q.  Okay.  But would you -- based -- as plant
24   manager, would you -- is it reasonable to assume that they
25   would rely on the run codes or some other information they

Page 96

1   could rely on?
2  A.  You know, the run code is on the back of the
3   board; and our board is stacked ten units high in the
4   warehouse.  You know, I do not believe Gary goes to the
5   warehouse looking for these -- you know, the run codes.  He
6   knows what board is in there and when it was made.
7  Q.  So basically, somehow it's communicated to the
8   person who maintains your inventory when the board was made
9   so it can be -- keep the first-in/first-out system running?
10  A.  Correct.
11  Q.  And you're not sure exactly what that
12   communication is; is that what you're telling me?
13  A.  I mean, the intricate details of it, I don't
14   know.
15  Q.  Even the general details, what are the -- what do
16   you know?
17  A.  Just what I described to you.
18  Q.  Okay.  So what you described was, they have a
19   system of keeping track of first-in, first-out.  Is there
20   anything more specific?
21  A.  No.
22  Q.  Okay.  That's fine.
23      All right.  So then is -- Mr. Bennett is
24   responsible for seeing that the customer receives the
25   product?

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 97

1  A.   We load it, he -- we get -- receive the orders
2  from the customers.  We make sure that the product gets
3  loaded on a trailer.  Once it gets loaded on the trailer,
4  it's the responsibility of the carrier to get the board to
5  the customer.
6  Q.   Okay.  And the carrier then would have records
7  showing delivery?
8  A.   Correct.
9  Q.   And are those records showing delivery returned
10  to National Gypsum?
11  A.   I believe so because -- I believe so, yeah.
12  Q.   And you retain those records?
13  A.   Yes.
14  Q.   Now, the -- now, in terms of the scheduling of
15  production, is the -- I take it you're familiar with the
16  scheduling of production?
17  A.   Yes.  I have a general understanding of it, yes.
18  Q.   I suspect it's more than a general understanding.
19      Do you schedule production based on orders?  Is
20  that how it's done?
21  A.   Correct.
22  Q.   And how far ahead do you schedule your
23  production?
24  A.   We can schedule -- it depends on the products.
25  We put product families out there.  We run on what we call a

---

Page 98

1  product wheel, and this wheel is a 30-day wheel.  We don't
2  specifically detail 30 days out that we're going to be
3  running half-inch 12s and we're going to run it for three
4  hours.  We don't do that.  We -- that -- we put a -- we
5  categorize products into families, and we say we're going to
6  make this family of board, you know, three weeks out.  And
7  that board may be, you know, half-inch TE family.  So it
8  could be half-inch.  It could be half-inch high-strength
9  ceiling board.  It can be half-inch light.  I mean, that's
10  what we do.
11      So as we get closer -- those -- that wheel or
12  that -- that's there for the salespeople to place orders
13  against that production.  So if we put out that we're going
14  to run 12 hours of this half-inch family, they can enter
15  orders against that time.  So -- and that's how -- that's
16  how the production is established.
17  Q.   What does that wheel actually look like
18  physically?  If I looked at it, what would I see?
19  A.   It's just a calendar.  I mean, it's like a daily
20  calendar that says, Hey, we're going to run -- and I -- Gary
21  handles all of that.  Gary Bennett handles all of that.  You
22  know, we just have to keep -- we have to keep this wheel
23  moving so that -- you know, every day has potential for
24  orders to come in that they know that they can commit to.
25  The salespeople can commit to orders somewhere out in the

---

Page 99

1  future and know with good reliability that I can tell my
2  customer, Hey, if you want board, you know, three weeks out
3  on this date, I can get it for you because the plant is
4  saying they're going to be making this board at that date.
5  Q.   What is the normal period of time from
6  manufacture to delivery?
7      MR. AYALA: Objection to form.
8      THE WITNESS: It can vary.
9      BY MR. GARY:
10  Q.   What about an average?  What are we talking
11  about?
12  A.   It depends on the board.  I mean, some boards are
13  high-volume boards.  Some boards -- some boards, we only run
14  them every, you know, eight weeks.  So, I mean, we can
15  produce product and have it sit there for, you know, eight
16  weeks.
17  Q.   And what kind of board would sit there for eight
18  weeks?
19  A.   54-inch board.  I mean, when we run 54-inch
20  board, we incur downtime to shut our machine down, to
21  convert it over to be able to make the 54-inch board.
22  Q.   You mean the width --
23  A.   The width of the board is 54 inches wide versus
24  48 inches wide.  So we've got to make some changes, and we
25  incur downtime.  So then we start up on the product -- what

---

Page 100

1  you don't want to do is incur this downtime and then run the
2  product for an hour or two and then take another downtime.
3  I mean, we can literally consume five hours of downtime to
4  run this product, so --
5      Like with 54, if we're going to go to it -- in
6  the past, we used to shut down to go to 54.  And we'd stay
7  on it for 24 to 36 hours running 54, and we would put that
8  volume of board in the warehouse.  Right now -- I mean,
9  since business has been slow in the last few years, that
10  volume of board has dropped to where we try to do it in
11  eight to ten hours.  But still, that product may sit.  We
12  make eight to ten hours of this product, and it may sit out
13  there for eight weeks.
14  Q.   And I take it that any board could wind up
15  sitting for a period of time depending on how the sales and
16  productions --
17  A.   Correct.
18  Q.   Any board?
19  A.   That's correct.
20  Q.   And the board that's in -- where is the board
21  stored that's being warehoused?  Where do you keep it?
22  A.   At our plant.
23  Q.   You have your own warehouses?
24  A.   It's all part of -- it's all under the same roof.
25  Q.   And is this a Gary Bennett operation as well?

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 101

1  A.  It is.
2  Q.  Okay.  So he knows how much board he's got there
3  on hand?
4      MR. AYALA: Objection to form.
5      THE WITNESS: At any given time -- we know what
6  our inventory of board is on any given day.  Yes, we
7  can say, you know, in total square footage of board.
8      BY MR. GARY:
9  Q.  And you know how long the board has been there?
10 A.  No.
11 Q.  When you say -- I don't mean you.  I mean that --
12 would Mr. Bennett know?
13     MR. AYALA: Objection.
14     THE WITNESS: No.  I don't believe so, no.  I
15 mean, you know, -- you mean if we say we've got six
16 million feet of board in that warehouse, are you
17 asking -- I mean, in that six million feet, can you
18 tell me when this board was --
19     BY MR. GARY:
20 Q.  No.  Not --
21 A.  Okay.  I'm sorry.  Tell me what --
22 Q.  I can see where you could see that was the
23 question.  I guess I -- since the board is stored in bays --
24 so if you've got, you know, Bay Number 7, you might know
25 that the board has been in Bay Number 7 for four weeks.  You

Page 102

1  wouldn't know exactly which piece of board, but you would
2  know -- you can trace it back --
3  A.  Yes.  There's traceability.  Gary would be able
4  to --
5  Q.  Okay.  And are there storage requirements for the
6  board to prevent it from getting mold or any other -- you
7  know, getting it wet or --
8  A.  It's a covered warehouse.  You know, it's a dry
9  environment.  Our -- it's a nice warehouse.
10 Q.  So it's kept inside, is the bottom line?
11 A.  It's kept inside.
12 Q.  Is there ever an occasion where you have to store
13 your board outside?
14 A.  There is not.
15 Q.  On the -- were you -- you were working for
16 National Gypsum during the period, say, 2003 to 2007?
17 A.  Correct.
18 Q.  But not at Apollo Beach?
19 A.  No.  I came to Apollo Beach in, like, late April
20 of '04.
21 Q.  Are you -- and in the drywall industry generally,
22 those were very unusual times because of supply and demand
23 issues; is that a fair statement?
24 A.  I don't know what you mean.
25 Q.  Well, that was -- there was a big building boom

Page 103

1  going on, and wasn't the company pretty much running full
2  tilt?
3  A.  Yes.  Correct.
4  Q.  And when I say "full tilt," are we talking --
5  what does that mean?  24 hours a day?
6  A.  24/7.
7  Q.  You were running 24/7 in that period of time?
8  A.  Correct.
9  Q.  And do you know where the drywall was being
10 stored during the period of time you were running 24/7?  Do
11 you know?
12 A.  At Apollo Beach?
13 Q.  Yes, Apollo Beach.
14 A.  In our warehouse.
15 Q.  Was there ever a time that there wasn't room in
16 the warehouse and it was stored somewhere else that you know
17 of?
18 A.  I was told that -- and I don't know the time --
19 but that board was placed at an outside warehouse.
20 Q.  What is an outside warehouse?
21 A.  Let me clarify.  In a warehouse that --
22 Q.  Off site?
23 A.  Off site.  Thank you.
24 Q.  So you actually ran out of warehouse space, and
25 you rented warehouse space from somebody else during that

Page 104

1  period of time?
2  A.  I don't know what the reasoning was behind it.
3  Yes.
4  Q.  All right.  So there were obviously storage
5  issues during that period of time?
6      MR. AYALA: Objection to form.
7      THE WITNESS: No.  I don't know what the reason
8  was.
9      BY MR. GARY:
10 Q.  Okay.  And so we could obviously -- I assume
11 those records are also maintained by National Gypsum?  If
12 there was off-site storage, there would have been invoices
13 and billings and so on?
14     MR. AYALA: Objection to form.
15     THE WITNESS: I don't know.
16     BY MR. GARY:
17 Q.  Who would maintain -- who maintains -- who is the
18 person who maintains the records for Apollo Beach, the kinds
19 of records we're talking about?
20 A.  Which are --
21 Q.  Billing invoices for storage that was -- or
22 shipping records, invoices to and from, shipping companies
23 for transport of raw material, where are those records
24 maintained?
25 A.  I don't know.  I don't have the specific details

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 105

1  on shipping records, who maintains them and so forth. I
2  don't know.
3  Q.  Okay.  The question is:  Are those -- and maybe
4  you don't know -- are those records maintained at corporate,
5  or are those records maintained at Apollo Beach?
6  A.  I don't know.  I mean, I don't know.
7  Q.  You don't know; you don't know.
8  A.  Yeah.  I don't know.
9  Q.  Who would be somebody who would know?
10 A.  About --
11 Q.  Records.
12 A.  We have somebody in Charlotte that handles
13 records retention, and I don't know who that is, but I would
14 say somebody in our corporate office that oversees records
15 retention could answer that.
16 Q.  Do you ordinarily ship your records from
17 Apollo Beach to corporate?
18 A.  No.
19 Q.  So whatever records you have, you keep on site?
20 A.  Correct, based on our records retention policy.
21     MR. GARY: Okay.  Could -- counsel, could we see
22 that record retention policy at some point?
23     MR. AYALA: You've already got it.
24     MR. GARY: Okay.  We've got it.
25     MR. WARWICK: We've got a lot of stuff.

---

Page 106

1     BY MR. GARY:
2  Q.  And the billing records for drywall orders, are
3  those records maintained at corporate or at Apollo Beach?
4  A.  Which records now?
5  Q.  Billing records.  Somebody sends in an order --
6  A.  You mean an invoice?  Is that what you're --
7  Q.  Is that what you call it?  Invoice?
8  A.  We don't deal with invoicing at the plant.  We
9  get a bill of lading document.  And so we generate a --
10 based off of an order, bill of lading, we generate a load
11 diagram for that order; and that's the document that we
12 retain.
13 Q.  All right.
14 A.  So it shows who the customer is, what the
15 customer ordered, how we loaded it on a trailer, and that's
16 what we retain.
17 Q.  So as I understand what you're saying, this
18 information would come from sales?
19 A.  Correct.
20 Q.  So who would sales contact in order to place an
21 order?
22 A.  If --
23 Q.  Poorly phrased question.  I know.  I'll rephrase
24 it.
25 A.  Okay.

---

Page 107

1  Q.  And just so you -- I'm trying to understand how
2  it works --
3  A.  Okay.
4  Q.  -- so forgive me if I'm clumsy here.
5  A.  That's all right.
6  Q.  The sale goes out to, you know, the ABC
7  contractor; and he says, I want 10,000 square feet or
8  whatever.  So how is that order communicated to the plant?
9  A.  Typically the way the system works is, the
10 customer will tell our salesman, or the customer may just
11 call our customer service center direct and place an order
12 with a customer service representative saying, I want this
13 this, this, this, this; when can you get it to me.  That's
14 communicated, an order is generated, we see the order come
15 in.
16 Q.  The order comes in from what you called the sales
17 center?
18 A.  Yes.
19 Q.  Where is the sales center located?
20 A.  Charlotte, North Carolina.
21 Q.  So then your obligation is to fill that order?
22 A.  Correct.
23 Q.  And is it the sales center that maintains the
24 records of the sale, or do you also retain a separate set?
25 A.  We just have the bill of lading document.

---

Page 108

1  Q.  Which shows who the customer is?
2  A.  Correct, and what we loaded, what was the order.
3  Q.  And if the customer had any specific
4  requirements, is that --
5  A.  It could be put on there.  Say, if they had a
6  load time or delivery time that they wanted material to be
7  delivered, they may put that on there in a -- there's a
8  field there where they can add comments.
9  Q.  Okay.  So the record of who requested the product
10 is maintained -- it would be at Apollo Beach in the form of
11 the information coming from the sales center?
12 A.  Correct.
13 Q.  And it would be at the sales center, and however
14 the salesperson who made the sales --
15 A.  And I have no knowledge of that.
16 Q.  I understand.  And to know that, we would need to
17 talk to the salesperson?
18 A.  Right.
19 Q.  And then at the plant, you have some sort of
20 record of shipping that would show the order was filled?
21 A.  Correct.
22 Q.  And we would know who received the order by
23 virtue of the -- where it went?
24 A.  Right.
25 Q.  Okay.  Now, if the order is received -- let's say

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 109

1  it's received by our ABC builder and he for some reason
2  feels that the order does not comply with his requirements.
3  What happens -- how would that be communicated, or would it
4  not be communicated to the plant?
5    MR. AYALA: Objection to form.
6    THE WITNESS: If there's an issue -- say they
7  didn't get -- you know, I asked for 500 pieces, and
8  you gave me 480 pieces. They would typically contact
9  the customer service center again and advise them of
10 an issue.
11   BY MR. GARY:
12 Q.  And the customer service center would keep
13 that -- they would keep those records, not you?
14 A.  Yeah. We wouldn't have it.
15 Q.  What if there was a complaint about the quality
16 of the board, where would that go?
17 A.  You mean in the scenario where they offloaded
18 board or what?
19 Q.  Let's say the board had mold on it or it
20 doesn't -- we won't use that example. We'll use -- let's
21 say the board was supposed to be, you know --
22 A.  It was damaged?
23 Q.  It was damaged for some -- damaged in the
24 shipment for whatever reason. Who would that be
25 communicated to?

Page 110

1 A.  It would more than likely start with the
2  salesman. You know, customer service center would be
3  notified. They may or may not contact the plant. The
4  salesman would be notified at some point.
5    If there was a damage issue with the board, that
6  board or that issue would be communicated back to the plant.
7  Typically, our quality manager would be notified. If it was
8  a loading damage issue, not only would he be notified, but
9  Gary Bennett would be notified that, hey, you've got a
10 service issue here.
11 Q.  Are complaints that are made about product
12 retained at the plant?
13 A.  If it's a formal complaint that's filed, yes.
14 Q.  Who retains those records?
15 A.  Pat would have those.
16 Q.  Who is --
17 A.  Pat Macary, my quality manager.
18 Q.  Okay. And the plant -- I mean, drywall is, by
19 virtue of its product -- its nature, heavy stuff. So is it
20 fair to say that the plant services, generally speaking, a
21 specific geographic area?
22 A.  You know, for the most part, yes. I mean, our
23 shipments primarily stay in the state of Florida. It's not
24 to say that we don't ship outside of the state of Florida.
25 Q.  What percentage of your product, if you know, is

Page 111

1  sold and shipped in the state of Florida?
2 A.  I don't know.
3 Q.  Is it the vast majority?
4 A.  Yeah. Yes, I would say so.
5 Q.  Why would there be product shipped outside the
6  state of Florida?
7 A.  Could be that customers that maybe were serviced
8  from another plant, that the product isn't available at the
9  other plant, and we're the backup plant or could be a backup
10 plant. So they don't have it, the customer needs it here,
11 we're going to ship it to them.
12 Q.  And does National Gypsum have a specific backup
13 plant for -- do you have a backup plant if you don't have
14 product?
15   MR. AYALA: By "you," you mean Apollo Beach?
16   MR. GARY: I mean Apollo Beach, yes.
17   THE WITNESS: I believe there is. I mean, if --
18 I think all of our plants have secondary plants that
19 if for whatever reason we're out of product or
20 whatever, that sales can go to this alternate plant
21 to --
22   BY MR. GARY:
23 Q.  What is your alternate plant?
24 A.  I don't know. I don't know what it is.
25 Q.  Who would know?

Page 112

1 A.  Sales or customer service center. I think that's
2  part of their -- you know, if they get a call from a
3  customer saying, I want a load of this product, they're to
4  go to the primary plant. And if the primary plant doesn't
5  have it, well, in order to not tell that customer, No, I
6  can't get it for you, they'll go to the alternate plant and
7  see if the product is available there. And if it is, they
8  order -- they take the order, and the product gets shipped
9  to comply with when the customer needs it.
10 Q.  And I take it your records would enable you to
11 determine which product was sold in Florida, which product
12 was sold outside of Florida?
13 A.  It would just be based on the customer. I mean,
14 the bill of lading document where --
15 Q.  Just a matter of looking at the records?
16 A.  Right. Yeah.
17   MR. GARY: Let me talk to Brian for a moment.
18   MR. WARWICK: Let's go off the record.
19   THE VIDEOGRAPHER: Going off the record at
20 12:19 p.m.
21   (Brief recess taken.)
22   THE VIDEOGRAPHER: Back on the record at
23 12:33 p.m.
24   REDIRECT EXAMINATION
25   BY MR. WARWICK:

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 113

1 Q.   Jeff, there's just a few follow-up questions that
2   I had regarding a few documents that I didn't understand
3   some of the terms.
4 A.   Okay.
5 Q.   One of the terms that I read about was something
6   called dunnage, d-u-n-n-a-g-e. Are you familiar with that
7   term?
8 A.   Yes.
9 Q.   What does it mean?
10 A.   Dunnage is -- they're the spacers that are
11   actually used to -- when you unitize board to warehouse it,
12   it divides the units, so it put -- dunnage -- or risers are
13   another terminology that is used.
14 Q.   And they're made from pieces of the same drywall?
15 A.   They're made from drywall, correct.
16 Q.   And -- okay.  So any talks about the use of
17   dunnage in recycling, you would just recycle it the same way
18   you do other pieces of finished drywall?
19       MR. AYALA: Objection to form.
20       THE WITNESS: We make our own dunnage at the
21   plant, and we -- you know, we make the cubes; and then
22   we use them at the dry end for putting in the
23   warehouse.  That same dunnage gets loaded on the
24   trailer and gets shipped to the customer.
25       So as far as -- I'm sorry.  What did you refer to

Page 114

1   it as?
2       BY MR. WARWICK:
3 Q.   I was wondering if the dunnage, because it's made
4   from drywall, if it ever gets returned to the recycle
5   process similar to whatever defective boards would.
6 A.   We -- you know, our dunnage that we make at the
7   plant, it goes -- it gets used at the dry end.  We don't
8   take dunnage and recycle it back into our process.
9 Q.   Okay.  Are you familiar with a product known as
10   Busan 1009 or --
11 A.   Yes.
12 Q.   What is -- what do you understand that product to
13   be?
14 A.   It's a product that is used in the -- mix it in
15   with the pulp that we generate usually on extended
16   downtimes.
17 Q.   Okay.  When you say "the pulp," we haven't talked
18   about pulp today.  We talked about slurry but not about
19   pulp.  Can you explain what the pulp is.
20 A.   Pulp is water -- it's one of the wet ingredients
21   that goes into the manufacture of the board.  It's water.
22   It's -- we add paper in with it.  I believe -- 150 pounds of
23   paper I believe is our pulp makeup.  There's starch that
24   goes into it.  There's boric acid that goes into it.
25 Q.   Okay.  If I'm understanding you, then, is the

Page 115

1   pulp added to the gypsum at some point during the process?
2 A.   The mixer, at the mixer, the wet --
3 Q.   At the mixer.  So when earlier we talked about
4   the gypsum --
5 A.   Hits the --
6 Q.   -- hits the other ingredients, would pulp be one
7   of those other ingredients?
8 A.   That's correct.
9 Q.   And when you said that you believe it's
10   150 pounds, could you follow that thought out.  Pounds
11   per --
12 A.   We make a -- it's a batch.  We have a -- it's
13   called a hydrapulper.  And this hydrapulper will receive,
14   like, 4900 gallons of water.  It'll have the 150 pounds of
15   paper.  It has starch in it.  It has -- we put dextrose in
16   it, we put boric acid in it, and it's blended up.
17 Q.   Okay.  And what's the purpose of adding the pulp
18   mixture to the gypsum?
19 A.   It's a wet ingredient.  It creates -- the fiber
20   creates flexibility.  If you've ever handled drywall, it's
21   not like a piece of steel.  It will bend and flex, and it
22   gives you flexural strength as well.
23 Q.   And in what amounts -- you mentioned that it's
24   4900 gallons and 150 pounds of paper.  First off, where does
25   the paper come from?

Page 116

1 A.   Trim paper.  We get big rolls of paper in that --
2   you know, for the face and back paper.  And, you know,
3   usually the outer wraps get nicked and damaged and whatever.
4   And so we'll trim that off, and then we'll roll it up, and
5   we'll put it in the hydrapulper.
6 Q.   Okay.  So that's a product you make yourself?
7   You don't get it from somewhere else?
8 A.   Correct.
9 Q.   And the paper, you buy the paper that you put in
10   the drywall?
11 A.   We have -- National Gypsum Company has -- we have
12   three paper plants that we get supplied with paper.  And at
13   times, we will actually use paper from an outside supplier,
14   Caraustar Paper.  Yeah.
15 Q.   Okay.  Is there anything peculiar or particular
16   about National Gypsum paper that would allow you to identify
17   National Gypsum board by looking at just the paper itself?
18 A.   I don't know of anything that would -- yeah --
19   no.
20 Q.   I've also seen some boards that have holes in the
21   paper.
22 A.   Really?
23 Q.   Does the Apollo Beach plant -- meaning on the
24   backing paper, they have little, like, score marks almost to
25   let the heat out or something.  I don't know but --

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 117

1  A.  You know, I haven't seen that.  I mean, I've
2  heard about years ago scoring the edge of the back paper,
3  but I haven't seen that.
4  Q.  It's something -- it's not something you do at
5  Apollo Beach?
6  A.  No.
7  Q.  Now, when you make the pulp and you add the
8  Busan 1009, what's the purpose of adding that particular
9  product?
10  A.  We shut down at the end of the week.  We will add
11  this product into our last beater batch.  It's supposed to
12  help against, you know, the pulp getting smelly.
13  Q.  Okay.  And this morning we talked about how --
14  that you run the gypsum through continuously until you run
15  out --
16  A.  Correct.
17  Q.  -- and then you clean everything, and you shut
18  down --
19  A.  Right.
20  Q.  -- and you do something different.
21  A.  Uh-huh.  (Indicates affirmatively).
22  Q.  Do you do the same thing with the pulp mixture,
23  or is there some situations where the pulp mixture is
24  stable?
25  A.  That's what -- we have a usage tank.  When we

Page 118

1  make pulp, it gets transferred over to a usage tank, and
2  that's what we treat at the end of our production run, say,
3  for the week.
4  Q.  Okay.  So there will be some pulp left over, and
5  you just treat it with this Busan?
6  A.  Right.
7  Q.  And it's a microbicide, correct?
8  A.  I don't know the correct terminology or whatever.
9  But if you're looking at the spec --
10  Q.  Okay.  I'm going to show you a document that's
11  listed as Bates Number NG00410220.  And it's a document
12  from -- 2009 appears at the top.  It's dated.  Do you
13  recognize that document?
14  A.  I mean, it looks like, yeah, a spec page, one of
15  our spec pages.
16  Q.  Okay.  And from that spec page, can you determine
17  whether or not the Busan 1009 is a microbicide?
18  A.  Let me read it here.  It says it right here,
19  "Busan 1009 is an emulsifiable microbicide concentrate which
20  is readily dispersed in water" -- "dispersible in water."
21  Q.  Okay.  Are you familiar with -- when you talk
22  about it keeps the pulp from becoming smelly, do you know
23  what chemically is happening within the pulp to cause the
24  odor?
25  A.  I mean, I think that there's a -- I don't know if

Page 119

1  my terminology is correct, but it's -- hydrogen sulfite gas
2  is what generates the smell.
3  Q.  Are you aware that the hydrogen sulfite gas is
4  being produced by a sulfur reducing bacteria?
5  A.  No.  I'm not aware what -- I mean, I'm not a
6  chemist.
7  Q.  I was just wondering if -- is there a given
8  amount of the Busan 1009 that should be added on a regular
9  basis or -- how do you tell how much of that stuff to put
10  in?
11  A.  It's based off of the -- I believe it's based off
12  of the quantity of pulp that you want to treat.
13  Q.  And do you -- are you aware of any tests that are
14  run on the pulp mixture to determine the effectiveness of
15  the biocide before or after the addition of the biocide?
16  A.  No.
17  Q.  Okay.  So as far as you know, the plant doesn't
18  actually do a test to see if the biocide or the Busan is
19  working?
20      MR. AYALA: Objection to form.
21      THE WITNESS: No.  It's just added.  Material is
22  added.
23      BY MR. WARWICK:
24  Q.  Okay.  And that is something that you would add
25  regularly to the pulp mixture?

Page 120

1  A.  On a shutdown situation where the plant was going
2  to be down for an extended period of time, yes.
3  Q.  Okay.  And at the beginning of this spec, it says
4  anything more than 24 hours.
5  A.  Uh-huh.  (Indicates affirmatively).
6  Q.  Okay.  And you've used that product throughout
7  your tenure at the Apollo Beach plant; is that correct?
8  A.  That's correct.
9  Q.  I'm going to show you a second document here,
10  which is a National Gypsum document, Bates Stamp Number
11  00410180.  It's a little bit older document, so take a look
12  at that, if you would.  Have you had a chance to review it?
13  Do you recognize it?
14  A.  It appears to be the spec for TECO's by-product
15  gypsum, yeah.
16  Q.  And that particular document, could you tell me
17  the date on that, please.
18  A.  March the 25th of '96.
19  Q.  Obviously, that was before you came to the
20  Apollo Beach plant?
21  A.  Uh-huh.  (Indicates affirmatively).
22  Q.  Does -- is there a current spec sheet or a spec
23  sheet -- let me rephrase that.
24      How often do the spec sheets come out?
25  A.  I don't know.  I mean, usually there's a change

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 121

1   or something that will generate, you know, receiving new
2   spec sheets.
3   Q.   Okay.  And the reason I was asking about this
4   particular spec sheet is that it talks about impurity
5   limitations on the by-product gypsum from TECO.
6   A.   Okay.
7   Q.   As far as we can tell from this document, the
8   by-product gypsum from TECO is the same by-product gypsum
9   used at the Apollo Beach plant today, correct, meaning from
10  the same plant?
11  A.   I -- yes.  I would -- I guess that's correct,
12  yes.  I mean, TECO -- yeah.  By-product gypsum --
13  Q.   And because it was in '96, it was before
14  Apollo Beach, it actually references the Tampa plant?
15  A.   Uh-huh.  (Indicates affirmatively).
16  Q.   There's a list of impurities at the bottom.  It
17  says "impurity limitations," and it lists several
18  different -- I don't know if I want to say ingredients --
19  but items that are only allowed in certain quantities to be
20  within the slurry -- or within the gypsum.  Do you know if
21  there's a similar limitation on the by-product gypsum that's
22  produced to Apollo Beach today?
23  A.   You mean does this spec right here -- are
24  these -- do these still apply to today?
25  Q.   A, whether there are specs that apply today; and,

---

Page 122

1   B, whether they're the same.
2   A.   There are specs.  I mean, there's a spec in our
3   spec book for, you know, TECO's by-product gypsum.  Whether
4   it's this exact one, I don't know.
5   Q.   And you said there's a spec in your spec book.
6   A.   Yeah.
7   Q.   Where do you keep your spec book?
8   A.   In the lab.
9   Q.   In the lab.  Okay.
10  A.   Right.
11  Q.   And that would be the lab -- and you told me
12  before the name of the guy that runs the lab.
13  A.   Patrick Macary.
14  Q.   Okay.  And each time the spec is changed, there
15  would be a new spec added.  And do you know if they keep the
16  old specs in there, or do they take them out?
17  A.   I don't know.  Yeah.  I don't know.
18  Q.   One of my questions is, because of the impurity
19  limitations that are listed on this spec sheet, it would
20  seem that there has to be some sort of testing to measure
21  the amount of impurities that's in the gypsum being produced
22  by Big Bend.
23       MR. AYALA: Objection to form.
24       BY MR. WARWICK:
25  Q.   And so I believe, did you tell me this morning,

---

Page 123

1   that you didn't do any testing of the gypsum when it's
2   received as to the quality of the ingredients in it, only as
3   to the moisture content and the chlorides.
4   A.   Correct.
5   Q.   Okay.  So how would National Gypsum determine
6   whether any of these maximum limitations for impurities were
7   exceeded?
8   A.   Samples would be sent to our research department
9   to have it analyzed.
10  Q.   Okay.  And how often is that done?
11  A.   I don't know if it's done on any regular basis.
12  I don't know if there's a routine to that.
13  Q.   Okay.  Who would know?
14  A.   I don't know if -- maybe somebody in our research
15  department might know, I mean, that does analytical testing.
16  Q.   Okay.  Who is in charge of the research
17  department at Apollo Beach?
18  A.   No.  I'm saying at our research department in
19  Charlotte.
20  Q.   But if it pertained to TECO by-product gypsum
21  that was delivered to Apollo Beach --
22  A.   Right.  I'm saying we would --
23  Q.   -- who would send the sample?  Who would collect
24  it and send the sample?
25  A.   Probably Pat.

---

Page 124

1   Q.   Okay.  But from reading this particular spec as
2   to the impurity limitations for the by-product gypsum from
3   TECO, can you determine from -- the spec itself doesn't tell
4   you how to measure that, correct?
5   A.   No.
6   Q.   Okay.  Would your spec book normally have a
7   procedure for such testing?
8       MR. AYALA: Objection to form.
9       THE WITNESS: Well, it lists test methods here.
10  I don't know if they necessarily apply to everything,
11  but there are test methods listed here.  I don't know
12  what those test methods say.
13       BY MR. WARWICK:
14  Q.   Okay.  Are you aware of a book or a procedure or
15  manual or something that would list the test methods?
16  Because it does list NGC test methods.
17  A.   Right.  Those are -- would be specification -- in
18  the specification books.
19  Q.   Okay.  Do you know whether the rate that National
20  Gypsum pays for the by-product gypsum it receives from TECO
21  varies, or is it set?
22  A.   It's an established -- we -- every year, we tell
23  them what we project we're going to take as far as material
24  for the coming year.  And typically, our contract says
25  minimum of 550,000 wet tons of material.  And there are

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 125

1   three pricing structures for that material.
2   Q.   What are the pricing structures?  What delineates
3   between one or the other?
4   A.   It's just quantity take.  It gets -- zero tons to
5   350,000 tons is this rate, 350 to 500 is this rate, 500 to
6   550 is this rate.
7   Q.   The more you take, the cheaper you get it?
8   A.   Yeah.  And I don't have the exact -- yeah.
9   Q.   Okay.  But you don't get a cheaper rate based on
10   the quality of the --
11   A.   No.
12   Q.   -- product, then?
13   A.   No.  They will credit us based on the moisture
14   content of the gypsum.
15   Q.   Is that the reason if it goes above that
16   17 percent limit?
17   A.   Right.  Actually, between 10 and 17 percent is
18   when the moisture credit applies.
19   Q.   But there's no credit for any type of impurities?
20   A.   No.
21   Q.   Okay.  We talked this morning about the kiln
22   that -- in fact, I think you said that National Gypsum
23   actually built that particular --
24   A.   I believe so, yes.
25   Q.   Has that kiln been in use at the Apollo Beach

---

Page 126

1   plant since the beginning, since it was --
2   A.   Yes.
3   Q.   Okay.  There has been no change to the kiln?
4   A.   No.
5   Q.   Are you aware of any testing or any studies that
6   were conducted by National Gypsum to determine what changes
7   were needed to the manufacturing process, if any, to use
8   reclaimed water as opposed to potable water?
9       MR. AYALA: Objection to form.
10       THE WITNESS: Like I said before, the chlorides
11   were the concern.  You know, the County attested to
12   the quality of the water.  I mean, it's published
13   documentation.  Our corporate people met with them;
14   they tested the water.  Yeah, it complied.  I mean --
15   but the chlorides were our concern as far as --
16       BY MR. WARWICK:
17   Q.   But other than the chlorides, you didn't --
18   you're not aware of any additional testing or procedures
19   that had to be changed specially just because of this
20   reclaimed water?
21   A.   No, I'm not aware of anything.
22       MR. WARWICK: Okay.  I think that's it, guys.  Go
23   off the record.
24       THE VIDEOGRAPHER: Going off the record at
25   12:53 p.m.

---

Page 127

1       (Brief recess taken.)
2       THE VIDEOGRAPHER: Back on the record at
3   12:56 p.m.
4   CROSS-EXAMINATION
5   BY MR. AYALA:
6   Q.   Good afternoon, Mr. McChesney.
7   A.   Good afternoon.
8   Q.   I'm just gathering myself, looking at my notes
9   here.
10       Mr. McChesney, you were recently asked questions
11   about the pulp used in the manufacturing process for
12   drywall; do you recall that?
13   A.   Yes, I do.
14   Q.   And you referenced instances of smell coming from
15   the pulp; do you recall that?
16   A.   Yes.
17   Q.   If you could, give a ballpark of how many
18   instances over the last ten years you're aware of, as
19   National Gypsum's representative, of smell coming from the
20   pulp.
21       MR. WARWICK: Objection to form.
22       THE WITNESS: I don't know of any at Apollo
23   Beach.  Yes.
24       BY MR. AYALA:
25   Q.   And so are you personally aware -- do you have

---

Page 128

1   any personal knowledge of any instances of smell coming from
2   pulp at other plants?
3   A.   Yes, I am.  Yes.
4   Q.   How many?
5   A.   Two instances.
6   Q.   And what instances are those?
7   A.   National City, Michigan plant and our Waukegan,
8   Illinois plant.
9   Q.   Okay.  Have you ever worked at Waukegan or
10   National City?
11   A.   I have not.
12   Q.   Okay.  So I just want to make sure I'm clear.
13   I'm asking about your personal knowledge, what you've seen
14   or heard.
15   A.   I just observed some documents relating to that.
16   Q.   Okay.  So am I correct in saying that you have
17   never seen or heard -- you have never observed an instance
18   or sensed an instance of smelly board at any National Gypsum
19   plant; is that correct?
20       MR. WARWICK: Objection to form.
21       THE WITNESS: That's correct, yes.
22       BY MR. AYALA:
23   Q.   Are you aware of any testing of smell coming from
24   the pulp in terms of air sampling to determine the nature of
25   the smell?

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 129

1  A.  Of board?
2  Q.  Of the pulp?
3  A.  Of the pulp.  At Apollo Beach, no.
4  Q.  You testified, if I recall correctly, that there
5  may have been hydrogen sulfide coming off of the pulp; is
6  that correct?
7  A.  Yes.
8  Q.  Do you have any personal knowledge of that?
9      MR. WARWICK: Objection to form.
10     THE WITNESS: I guess I -- you lost me.  I'm
11  sorry.
12     BY MR. AYALA:
13  Q.  How -- what's the basis of your testimony that
14  there was hydrogen sulfide coming off the pulp?
15  A.  It was a request by our corporate office to make
16  sure that we treat our pulp.
17  Q.  Okay.  So you received a request from your
18  corporate office to make sure you treat your pulp?
19  A.  Right.
20  Q.  When was that?
21  A.  In 2008, I believe.
22  Q.  And what was the basis of the request?
23  A.  That they were going to put in a stand-alone feed
24  system for Busan to treat pulp.
25  Q.  Are you aware of any document from corporate

Page 130

1  identifying hydrogen sulfide as the basis for the need to
2  treat the pulp with Busan?
3  A.  I'm trying to recall here.  Specific document
4  from our corporate, is that what you're saying?
5  Q.  Any specific document identifying hydrogen
6  sulfide -- a confirmation that hydrogen sulfide is the
7  source of the smell?
8  A.  I guess I don't recall a specific document.
9  Q.  Is it possible, Mr. McChesney, that you were
10  mistaken when you testified that hydrogen sulfide was the
11  source of the smell?
12     MR. WARWICK: Object to form.
13     THE WITNESS: Yeah.  I mean -- yes.  I guess I
14  could have been, yes.
15     BY MR. AYALA:
16  Q.  And so we're clear, what, if any, personal
17  knowledge do you have of smelly board instances or air
18  sampling to determine the composition or the source of a
19  smell?
20     MR. WARWICK: Okay.  Hold on.  Just to clarify,
21  you said "smelly board" meaning finished board?  Are
22  you talking the pulp?
23     MR. AYALA: Thank you for that.
24     THE WITNESS: I'm not aware of any at
25  Apollo Beach as far as, you know, personally detecting

Page 131

1  any smelly board at our plant, me personally.
2      BY MR. AYALA:
3  Q.  And you reviewed documents -- did you review
4  documents in preparing for this deposition that discussed
5  instances of smell coming from the pulp at any
6  National Gypsum plant?
7  A.  Yes, I did.
8  Q.  Did those documents -- did any of those documents
9  that you reviewed identify the type of smell such as a
10  rotten egg smell, for example?
11  A.  Yes.
12  Q.  Did any of those documents identify the chemical
13  composition of the air?
14  A.  No.
15  Q.  Did any of those documents identify the source of
16  the smell?
17  A.  No.
18  Q.  Did any of those documents confirm that hydrogen
19  sulfide was the source of the smell?
20  A.  No.
21  Q.  We -- you testified about National Gypsum's
22  procedures and practices for analyzing water at
23  Apollo Beach; do you recall that?
24  A.  Correct.
25  Q.  And who did you say performs testing on that

Page 132

1  water --
2  A.  At Apollo Beach?
3  Q.  -- at Apollo Beach?
4  A.  Our lab technician.
5  Q.  What is her name?
6  A.  Kathy Shaw.
7  Q.  When, if at all, has Ms. Shaw reported to you any
8  instances of smell coming from the water?
9  A.  None.
10  Q.  Who at the Apollo Beach plant handles the TECO
11  FGD gypsum when it comes in?
12  A.  We have an operator out in the dome that, you
13  know, will receive the trucks in.  Ms. Shaw will take
14  samples of material as well and -- as well as the dome
15  operator himself.
16  Q.  Any of the people -- well, let me ask you this
17  way: When, if at all, have any of the people who handle the
18  FGD gypsum from TECO reported to you any instances of smell
19  coming off of the gypsum?
20  A.  Never have.
21  Q.  When, if at all, have the people who handle the
22  finished drywall at any time during your tenure at
23  National Gypsum's Apollo Beach plant reported to you a smell
24  coming off of the finished drywall?
25  A.  Never have.

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 133

1  Q.  Mr. McChesney, which National Gypsum plants are
2  you aware of that supply drywall to Florida?  Could you just
3  list them for us.
4  A.  Well, us, when Tampa was running; the Tampa
5  plant; our Savannah, Georgia plant; our Westwego, Louisiana
6  plant.  We may have gotten some finished products from our
7  Shoals, Indiana plant or Rotan, Texas plant as well,
8  laminated finished products.
9  Q.  You were asked questions about natural gypsum
10  rock coming from National Gypsum's Halifax, Nova Scotia
11  quarry.  Can you tell us, how long has National Gypsum used
12  natural gypsum rock from the Halifax quarry for use in the
13  manufacture and sale of drywall?
14  A.  I believe 70 or 75 years.
15  Q.  And how long -- so I understand, how long has the
16  Apollo Beach facility been producing and selling drywall?
17  A.  Since, I believe, the end of December of 2000.
18  Q.  If you could, give us a sense of approximately
19  how much drywall National Gypsum's Apollo Beach plant has
20  produced since it's been making and selling drywall products
21  since 2000.
22  A.  I believe it's in excess of six billion square
23  feet of drywall.
24  Q.  Tell us, if you would, roughly how many homes in
25  Florida would six billion square feet of drywall fill,

---

Page 134

1  average-sized homes.
2  MR. WARWICK: Objection to form.
3  THE WITNESS: I believe close to 600,000 homes.
4  BY MR. AYALA:
5  Q.  Okay.  So National Gypsum has been selling
6  drywall products for the last 11 years, enough to fill close
7  to 600,000 homes.
8  When is the first time that National Gypsum has
9  received a complaint alleging that one of its drywall
10  products has caused corrosion in a home?
11  A.  I believe it was 2009.
12  Q.  And what was the nature -- who did that claim
13  come from?
14  A.  The Brinckus.
15  Q.  When is the first time National Gypsum has become
16  aware of an allegation that one or more of its drywall
17  products contains sulfur reducing bacteria or sulfate
18  reducing bacteria as has been alleged in this case?
19  A.  I believe that time frame, 2009.
20  Q.  Are you aware of the dates on which the
21  complaint -- the legal complaints in this case were filed?
22  A.  No.  The specific dates, no, I'm not.
23  Q.  If I represented to you that the Brucker case was
24  filed in March of 2011 and the Brincku case was filed
25  sometime in 2010, would you have any reason to quarrel with

---

Page 135

1  that?
2  A.  No, I would not.
3  Q.  You testified about the process by which -- the
4  circumstances under which National Gypsum came to use
5  reclaimed water supplied by Hillsborough County for use in
6  the manufacturing process.  Do you recall that?
7  A.  Yes.
8  Q.  Could you take us through, if you would, the
9  steps that National Gypsum undertook -- what steps, if any,
10  National Gypsum undertook with regard to ensuring that the
11  water was suitable to make quality wallboard.
12  MR. WARWICK: Objection to form.
13  THE WITNESS: Samples -- I mean, as far as with
14  the use of reclaimed water, I know samples were
15  submitted to our research department and I believe an
16  outside lab as well.
17  BY MR. AYALA:
18  Q.  Do you recall the name of that lab?
19  A.  I believe it was Nowco.
20  Q.  And at the time that National Gypsum agreed to
21  use reclaimed water from the County, what was
22  National Gypsum's understanding with regard to the
23  County's -- whether the County was going to process, treat,
24  disinfect the water?
25  A.  That it was treated.  The water was treated, and

---

Page 136

1  it complied with state and federal regulations on reclaimed
2  water.
3  Q.  And how, if at all, was that understanding
4  memorialized in any document?
5  A.  I believe in the contract that we have with the
6  County.
7  Q.  What, if any, representations by the County are
8  you aware of with regard to pathogens in the water supplied
9  by Hillsborough County?
10  MR. WARWICK: Objection to form.
11  THE WITNESS: I'm not aware of any.
12  BY MR. AYALA:
13  Q.  And just because you're not personally aware of
14  them doesn't mean they don't exist, correct?
15  A.  Correct.
16  MR. WARWICK: Objection to form.
17  BY MR. AYALA:
18  Q.  You testified about your tour of the Big Bend
19  plant when you joined the Apollo Beach facility.  Are you
20  the only person at National Gypsum who's toured the Big Bend
21  plant?
22  A.  No.
23  Q.  You were asked about complaints alleging that
24  National Gypsum drywall has caused corrosion in homes.  In
25  the course of preparing for this deposition, who did you

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

Page 137

1  speak with about complaints of the kind I just described?
2  A.  I spoke with Jack Walker, our director of quality
3  in Charlotte.
4  Q.  And did you review documents related to
5  complaints?
6  A.  We did.
7  Q.  As National Gypsum's representative, what's your
8  understanding of the amount of times that Jack Walker has
9  been out in the field to investigate complaints?
10 A.  Jack told me that, you know, he could recall
11 going out to visit 20 or 25 different locations that had
12 alleged issues with drywall.
13 Q.  When National Gypsum has investigated assertions
14 regarding corrosions in homes and, in fact, visited the
15 homes, have there been instances where they visited the home
16 and the home turns out not to have any National Gypsum
17 drywall?
18 A.  That's correct.
19 Q.  Have there been instances upon visitation where
20 there's no corrosion in the home observed?
21      MR. WARWICK: Object to form.
22      THE WITNESS: That's correct.
23      BY MR. AYALA:
24 Q.  Do you know -- can you tell us any examples of a
25 home, in fact, that you've been in?

Page 138

1  A.  Well, this Williams' home that I visited with
2  Jack Walker, I mean -- yeah.
3  Q.  What has National Gypsum found in its experience
4  visiting homes with regard to the different types of board
5  present in homes?
6  A.  Have found, you know, other producers of drywall
7  in these homes.
8  Q.  Have any of those producers been -- have any --
9  has National Gypsum seen board with a China label on it?
10 A.  Jack has reported that, yes.
11 Q.  During the time frame of 2003 to 2007, could you
12 give us a sense of how long finished drywall manufactured at
13 the Apollo Beach plant typically would have sat in the
14 warehouse before it was shipped out.
15 A.  You know, depending on the product -- but it
16 would have been a very short period of time.  I mean, we
17 were shipping between 3.2 to 3.4 million square feet of
18 wallboard every day.  This was Monday through Friday.  You
19 know, we were running seven days a week.  That board would
20 not have sat very long.
21 Q.  Ballpark in terms of -- if you could, ballpark it
22 for us in terms of the number of days you would expect it
23 to --
24 A.  Some of that would have been less than a week,
25 two or three days would have been gone.  Maybe some of it,

Page 139

1  you know, a week to ten days.
2  Q.  And if someone had a question about where drywall
3  with a particular run code was shipped, what kind of
4  document would you look at to determine that information?
5  A.  I mean, I guess you would look at -- from the
6  date it was produced, given that time frame, what we
7  thought -- you know, if it was two, three days or five days,
8  we would have had to look at all the customers that received
9  board during that time frame to try to track the --
10 Q.  And what documents would you look at to determine
11 what customers received that board?
12 A.  The bill of lading document.
13 Q.  And since the litigation was filed, have you been
14 asked to collect bill of lading documents for production in
15 the litigation with respect to particular dates of
16 production?
17 A.  I have been, yes.
18 Q.  And have you, in fact, supplied those documents?
19 A.  I have.
20 Q.  And -- strike that.
21      And by the way, when National Gypsum sells its
22 finished drywall products, who -- what kind of customers
23 does National Gypsum have?
24      MR. WARWICK: Objection to form.
25      THE WITNESS: We --

Page 140

1      BY MR. AYALA:
2  Q.  Who are the customers?
3  A.  We sell to distributors, to mass merchandisers,
4  manufactured housing customers.  Yeah.
5  Q.  Does National Gypsum sell product directly to
6  homeowners?
7  A.  We do not.
8  Q.  What, if any, control does National Gypsum have
9  over the selection of the type of product that goes into any
10 given house?
11 A.  We don't.
12 Q.  What, if any, control does National Gypsum have
13 over the conditions of storage that one of National Gypsum's
14 customers places its drywall in?
15 A.  We have no control over that.
16 Q.  What, if any, control does National Gypsum have
17 over the conditions of installation and maintenance in any
18 given home?
19 A.  No control over that.
20 Q.  You were asked questions about documents showing
21 ingredients that would have been in use at the time that a
22 particular drywall was made.  Do you recall that?
23 A.  I do.
24 Q.  And what were the documents you referenced that
25 you would look to to identify that information?

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 141

1 A.   Production reports to show the quantity of
2 materials used, core mix report. You know, daily we track
3 lot numbers for raw materials used.
4 Q.   In the course of the litigation, have you been
5 asked to identify and retrieve production log reports on
6 particular days of production?
7 A.   I have.
8 Q.   And have you done that and supplied those
9 documents?
10 A.   I have.
11 Q.   And during the time period of 2003 to 2007, what
12 was the percentage of complaints in relation to the amount
13 of board produced for the Apollo Beach plant?
14 A.   Very, very low.
15 Q.   If you could, put a percentage on it,
16 approximately.
17 A.   Our percent -- product as viewed -- compared to
18 complaints would have been 99.99 -- actually out to the
19 third decimal place, I believe. We just didn't have
20 complaints.
21 Q.   Does National Gypsum as an entity offer a plant
22 of the year award?
23 A.   They do.
24 Q.   Has Apollo Beach ever won that plant of the year
25 award?

---

Page 142

1 A.   We have. We've won it five times.
2 Q.   How many years during the time period of 2003 to
3 2007 did National Gypsum's Apollo Beach plant win that
4 award?
5 A.   Four out of the five years.
6 Q.   And that award is given on an annual basis?
7 A.   That is correct.
8 Q.   What is the relevance, if any, of quality-related
9 complaints to the receiving of that award?
10 A.   It's a key element of the criteria. It's
11 quality -- plants with the lowest percent defective value
12 the -- also, there's an annual quality audit that's done of
13 the facilities, and the audit score as well as a quality
14 committee that reviews the plant's performance, those three
15 things factor into who gets the award.
16 Q.   Are you aware of any testing by an independent
17 laboratory called Buckman Laboratories with regard to the
18 pulp of National Gypsum's manufacturing operations?
19 A.   I did see a document where they had tested the
20 pulp at one of our locations, other locations.
21 Q.   And what was the -- what gave rise to the
22 Buckman Laboratories' testing?
23 A.   A complaint of smelly board.
24 Q.   And what is your understanding of what
25 Buckman Laboratories did at National Gypsum's request with

---

Page 143

1 regard to testing?
2 A.   I believe they took samples, board samples as
3 well as pulp samples.
4 Q.   What, if anything, did Buckman Laboratories
5 report with regard to the presence or absence of sulfate
6 reducing bacteria in the pulp?
7 A.   They did not find any.
8 Q.   Did they -- and what, if anything, did they
9 report with regard to the presence or absence of sulfate
10 reducing bacteria in the board?
11      MR. WARWICK: Object to form. Just to clarify,
12 are you talking about Apollo Beach?
13      MR. AYALA: Well, I'll ask.
14      BY MR. AYALA:
15 Q.   I'll ask this: So with regard to the Buckman
16 analysis, tell us, if you would, what plant supplied the
17 pulp sample and the board sample for analysis?
18 A.   It was our National City, Michigan plant.
19 Q.   And so to finish that question I was asking
20 previously, what, if anything, did Buckman Laboratories
21 report with regard to the presence or absence of sulfate
22 reducing bacteria in the board sample?
23 A.   They didn't find any.
24 Q.   And so we're clear, has National Gypsum's
25 Apollo Beach plant had any instances of smell -- rotten egg

---

Page 144

1 smell coming from the pulp?
2 A.   No.
3 Q.   Has National Gypsum's Apollo Beach plant had any
4 complaints with regard to smell coming from board?
5      MR. WARWICK: Object to form.
6      THE WITNESS: There was a -- I believe it was in
7 '08, middle of '08 where, I believe, Pat was contacted
8 by a salesman that -- he said he had a complaint of
9 smelly board. As I recall, Pat got a sample from the
10 salesman. He could not detect any off smell from the
11 board.
12      As I recall, they put the sample in a closed-in
13 container. They used -- we have an air monitor,
14 hand-held air monitor. One of the gases that it will
15 detect is hydrogen sulfide. And as I recall, there
16 was no detection whatsoever with that sample.
17      BY MR. AYALA:
18 Q.   In the report you referred to in August 2008, was
19 there any complaint of corrosion associated with that
20 report?
21 A.   None.
22 Q.   Other than -- was the August of 2008 report
23 asserting a smell, the first report that Apollo Beach had
24 received alleging such a thing?
25 A.   Yes.

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 145

1    MR. AYALA: I have no further questions.
2    MR. WARWICK: I just have a couple. You can just
3  stay there. I'll ask him from here. We'll just stay
4  on the record. It should just take a minute.
5    FURTHER REDIRECT EXAMINATION
6    BY MR. WARWICK:
7  Q.  You mentioned earlier that you received a letter
8  or instruction from corporate that there should be an
9  automatic Busan applicator --
10 A.  Right.
11 Q.  -- placed into the system in 2008?
12 A.  Uh-huh. (Indicates affirmatively).
13 Q.  And who came -- how was that unit installed?
14 A.  There was a representative from -- actually, the
15  equipment was sent to our facility, and a gentleman from
16  Buckman came to give a presentation to our staff. We
17  actually had the equipment hooked up when he arrived.
18 Q.  Okay. So they sent you the equipment first, and
19  you guys hooked it up, and then they came down --
20 A.  Right. Talked -- yeah.
21 Q.  Okay. And Buckman is Buckman Chemical?
22 A.  I believe that's what they're called, yeah.
23 Q.  Actually, they manufacture the Busan --
24 A.  I believe so, yes.
25 Q.  Did they also recommend the equipment for

---

Page 146

1  application?
2  A.  It was just a -- yeah. It wasn't our equipment.
3  Whatever it was, however it was specced, it just showed up.
4  Q.  And so the new system, how does that work to add
5  the Busan?
6  A.  Physically how does it work?
7  Q.  Yes.
8  A.  It's -- we've changed from their system. We put
9  in our own system.
10 Q.  How was it done -- let's talk about first in
11  2008, then we'll talk about the change.
12 A.  Okay. It was barrel holder, a pump with a dial
13  that you set and, I believe, every -- you know, it would
14  pump for a certain period of time, and then it would shut
15  off.
16 Q.  Okay. And did you set that -- or did somebody at
17  the plant set the amount of Busan to add based on the volume
18  of the pulp?
19 A.  Yeah. Buckman said, here is what you should have
20  based on the pulp that you use.
21 Q.  Okay. And how was that amount determined?
22 A.  It was what -- Buckman set the amount. I mean,
23  as far as the quantity that you use, yes, they established
24  that.
25 Q.  And the pulp, you said, is kept in a big mixer?

---

Page 147

1  A.  Kept in a tank. It's made in a mixer and pumped
2  to a tank.
3  Q.  Okay. Does that tank have a lid on it? Is it
4  sealed?
5  A.  Uh-huh. (Indicates affirmatively). It's -- no.
6  It's got a vent pipe on it at the top.
7  Q.  Okay. Does the vent pipe go through the ceiling,
8  or is it vented into the open, into the plant?
9  A.  Into the storage room where the tank sits.
10 Q.  So it's in the open air?
11 A.  Right.
12 Q.  With the employees and everybody else --
13 A.  It's in a room that's -- a big room that our
14  tanks sit in.
15 Q.  Because we talked about having the smell. And
16  I'm wondering if the fumes from the pulp, whatever they are,
17  are just released into the plant or if they go out some
18  stack somewhere to the outside?
19    MR. AYALA: Objection to form. Assumes facts not
20  in evidence.
21    THE WITNESS: You know, the tank is in this room.
22  It's a big -- huge -- it's a big room. Yeah.
23    BY MR. WARWICK:
24 Q.  Right. But the tank is closed?
25 A.  You know, I believe there's a hatch at the top of

---

Page 148

1  the --
2  Q.  Certainly you would have to have access to it.
3  But your lawyer -- or National Gypsum's lawyer asked you a
4  little while ago if you personally ever smelled the pulp for
5  odors of rotten eggs. And in order to -- what would you
6  have to do in order to actually smell the pulp if it's in a
7  closed tank?
8  A.  You would have to pump it out.
9  Q.  Okay. Have you ever done that?
10 A.  The pulp is -- when we start up, the pulp is one
11  of the wet ingredients that come into -- you know, when we
12  make the board.
13 Q.  Right. But we talked earlier that when those
14  things are pumped into the process, they're all enclosed
15  tubes or whatnot or --
16 A.  Piping.
17 Q.  -- piping, and then they get mixed in with the
18  gypsum and whatnot. So have you ever taken an opportunity,
19  either before the change of 2008 or after, to go personally
20  take a sample of the pulp and smell it?
21 A.  We calibrate our feed systems quarterly, and pulp
22  is one of the feed systems that is calibrated. And in order
23  to do that, you pump from the tank. And, you know, it's a
24  timed -- so much material -- you weigh it. So yes, the
25  material is -- I mean, it gets pumped into a --

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 149

1 Q.  I'm familiar that somebody may have done that at
2 your plant.  However, counsel asked you if you personally
3 have had an opportunity to smell that pulp; and that's what
4 I'm asking you about.  Because it doesn't seem like the head
5 of the company would be down there doing that job himself;
6 is that correct?
7 A.  Correct.
8 Q.  Now, before you added the automatic Busan system,
9 how was Busan added?
10 A.  Manually.
11 Q.  Okay.  When?  How did you know when to add it?
12 A.  It was added on shutdowns.
13 Q.  And then how was the amount added to be
14 determined?
15 A.  Based on the amount of pulp that was in the pulp
16 holding tank.
17 Q.  Is there a measuring device located -- a device
18 to tell you exactly how much pulp is in the tank at any
19 given --
20 A.  There's a level indicator, yes.
21 Q.  And was there -- would there be a document
22 discussing how much Busan was added to that mixture at any
23 given time?
24 A.  I don't know.
25 Q.  Who would know?

Page 150

1 A.  Pat possibly.
2 Q.  Okay.  Whose job would it be to add the Busan
3 manually before the automatic system was put in?
4 A.  It was our production manager.
5 Q.  Okay.  Who would that be?
6 A.  Rex Gulick.
7 Q.  Could you spell his last name.
8 A.  G-u-l-i-c-k.
9 Q.  You also talked about smelling the pulp or having
10 exposure to the odors in the pulp at your other plants
11 you've worked at when counsel was asking you questions.
12 A.  Uh-huh.  (Indicates affirmatively).
13 Q.  Just to clarify, none of the other plants that
14 you've worked at use reclaimed water, correct?
15 A.  That I worked at?  No.  One was city water, well
16 water --
17 Q.  No reclaimed water?
18 A.  Not at those plants, no.
19 Q.  Your counsel also asked you at the end there
20 about your discussions with quality control from corporate.
21 What was his name again, the person that you talked to about
22 the complaints?
23 A.  Jack Walker.
24 Q.  Jack Walker, yes.  And you stated that you had
25 been to homes that had corrosion problems but that when you

Page 151

1 got there, they didn't contain National Gypsum.  I think the
2 Williams' house was --
3 A.  Williams, yeah.
4 Q.  And he also mentioned that there was an occasion
5 where there was Chinese wallboard found in the home; is that
6 correct?
7 A.  I haven't personally observed it.  Jack had --
8 Q.  Told you about it?
9 A.  -- conveyed that to me, yes.
10 Q.  But you were at the Brincku house, correct?
11 A.  Correct.
12 Q.  And as far as you know, no board manufactured by
13 anybody except National Gypsum was present in that home,
14 correct?
15 A.  That is not correct.
16 Q.  You found board made by other manufacturers?
17 A.  That is correct.
18 Q.  Okay.  Who were they?
19 A.  I believe it was US Gypsum and Georgia Pacific.
20 Q.  Really?
21 A.  Yeah.
22 Q.  Okay.  Do you know the amount?
23 A.  No.
24 Q.  Do you know whether the automatic Busan system
25 was required by the company to be added on all systems in

Page 152

1 the country?
2 A.  I believe so, yes.
3 Q.  And do you know who made that decision?
4 A.  I don't know.
5 Q.  You said that you received a report or a
6 letter --
7 A.  Yeah.
8 Q.  -- that talked about you're going to have to add
9 this to the system.
10 A.  Right.
11 Q.  Do you remember who wrote that document?
12 A.  It may have been our director of purchasing.
13 Q.  Who was that?
14 A.  Ray Syracuse.
15 Q.  Where is he located?
16 A.  Charlotte.
17 Q.  He's called the director of purchasing?
18 A.  Yeah.
19 Q.  In that document, did he explain why the
20 automatic Busan pump was being added?
21 A.  No.  I don't believe so, no.
22 Q.  Did you ever have an opportunity to discuss it
23 with anybody at corporate why that system was added?
24 A.  No.  I guess -- it was my understanding that, you
25 know, our business was falling off, and all these plants

---

Chris Brucker v.
Lowes Home Centers, Inc.

Jeffrey McChesney
November 18, 2011

---

Page 153

1   that were running 24/7 are now going to be down for periods
2   of time.  That's my understanding.
3   Q.  Okay.  And biocide was necessary because it would
4   be down inside that hole?
5   A.  Busan.  Right.
6       MR. WARWICK: That's all I have.
7       MR. AYALA: No further questions.
8       THE VIDEOGRAPHER: If that's all there is, that
9   concludes this deposition at 1:39 p.m.
10      (Concluded at 1:39 p.m.)
11  (Plaintiffs' Exhibit Nos. 1 and 2 were marked for
12  identification.)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 155

1                   REPORTER'S CERTIFICATE
2
3   STATE OF FLORIDA
4   COUNTY OF HILLSBOROUGH
5
6       I, Pamela Kingsbury, RPR, Notary Public, certify
    that I was authorized to and did stenographically report the
    deposition of JEFFREY McCHESNEY; that a review of the
    transcript was requested; and that the transcript is a true
7   and complete record of my stenographic notes.
8
9       I further certify that I am not a relative,
    employee, attorney, or counsel of any of the parties, nor am
    I a relative or employee of any of the parties' attorney or
10  counsel connected with the action, nor am I financially
    interested in the action.
11
12
13      Dated this _____ day of December, 2011.
14
15
16
                        _____
17                       Pamela Kingsbury, RPR
18
19
20
21
22
23
24
25

---

Page 154

1                 CERTIFICATE OF OATH
2
3   STATE OF FLORIDA
4
5   COUNTY OF HILLSBOROUGH
6
7       I, the undersigned authority, certify that
8   JEFFREY McCHESNEY personally appeared before me and was
9   duly sworn on November 18, 2011.
10
11  WITNESS my hand and official seal this 18th day of November,
12  2011.
13
14
15
16                      _____
17                       Pamela Kingsbury, RPR
18                       Notary Public - State of Florida
19                       My Commission Expires:  7/18/14
20                       Commission No. DD 993687
21
22
23
24
25

---

Page 156

1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2                   FT. MYERS DIVISION
               Case No. 2:10-cv-405-FtM-29SPC
3
    CHRIS BRUCKER, TREVER S. NUTTING,
4   XIOMARA RAVELO, WILFREDO E. RETANA
    and BEATRIX CELSA RETANA, individually,
5   and on behalf of all others similarly situated,
6                           Plaintiffs,
7   vs.
8   LOWES HOME CENTERS, INC.,
    a North Carolina Corporation,
9   and NATIONAL GYPSUM COMPANY,
    a Delaware Corporation,
10
                            Defendants.
11  _____/
12  IN RE:  DEPOSITION OF:  JEFFREY McCHESNEY
            TAKEN:  NOVEMBER 18, 2011
13      DATE TRANSCRIPT DISTRIBUTED:  DECEMBER ___, 2011
14  TO:  THOMAS AYALA, ESQUIRE
15      The transcript has been completed regarding the
    above-referenced deponent.
16
        The errata page is located at page 157 where changes
17  can be made.  On this errata page, please have the witness
    note the page numbers and line numbers of the changes.
18  Kindly return to Pamela Kingsbury, Michael Musetta &
    Associates, One Tampa City Center, Suite 3400, Tampa, FL
19  33602.
20      The errata, once received, will be forwarded to all
    ordering parties as listed below.
21
        Thank you.
22
23
                        _____
24                       Pamela Kingsbury, RPR
25  cc:  BRIAN WARWICK, ESQUIRE

---