1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA


--------------------------------------------
CHRIS BRUCKER, TREVER S. NUTTING,
XIOMARA RAVELO, WILFREDO E. RETANA
and BEATRIX CELSA RETANA, individually,
and on behalf of all others
similarly situated,


              Plaintiffs,

                                    CASE ACTION NO.
vs.                                 2:10-cv-00405-FtM-29SPC

LOWES HOME CENTERS, INC., a North Carolina
Corporation, and NATIONAL GYPSUM COMANY,
a Delaware Corporation,


              Defendants.
--------------------------------------------

VIDEOTAPED DEPOSITION OF CHRIS BRUCKER

Henderson Franklin

1715 Monroe Street

January 25, 2012

9:09 a.m. to 1:15 p.m.




Reported By:
Lori L. Bundy, FPR, RPR, CRR, CLR
Job No: 23646

**2**

1    APPEARANCES:
2    For the Plaintiff:
3        Leopold-Kuvin, P.A.
4        2925 PGA Boulevard
5        Suite 200
6        Palm Beach Gardens, FL  33410
7        (561) 515-1400
8        BY:  GREGORY S. WEISS, ESQ.
9            gweiss@leopold-Law.com
10
11
12   For the Defendant National Gypsum:
13       Morgan, Lewis & Bockius, LLP
14       1701 Market Street
15       Philadelphia, PA  19103-2921
16       (215) 963-5668
17       BY:  KRISTOFOR T. HENNING, ESQ.
18           khenning@morganlewis.com
19
20
21
22   Videographer:     KEVIN BUNDY, CLVS
23
24
25

**3**

1                INDEX
2    WITNESS:                    PAGE:
3    CHRIS BRUCKER
     DIRECT EXAMINATION              5
4    BY MR. HENNING:
5
6              EXHIBITS
7                - - -
8              Description      Page
9    Defendants'    Notice of deposition    5
     Exhibit 1
10   Defendants'    Receipt              8
     Exhibit 2
11   Defendants'    Document with Bates numbers   111
     Exhibit 3      Brucker 1 through 4
12   Defendants'    First set of interrogatories   115
     Exhibit 4
13   Defendants'    Class action complaint      121
     Exhibit 5
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1        VIDEOGRAPHER:  This is Video Number 1 of the
2    videotaped deposition of Chris Brucker taken by the
3    defendant in the matter of Chris Brucker, et al.,
4    versus Lowe's Home Centers, et al., in the United
5    States District Court, Middle District of Florida,
6    Fort Myers Division, Civil Action Number 210 CV 405
7    FTM 29 SPC.
8        This deposition is being held at 1715 Monroe
9    Street, Fort Myers, Florida 33902 on January 25th,
10   2012, at approximately 9:11 a.m.
11       My name is Kevin Bundy from the firm of David
12   Feldman Worldwide, and I'm the legal video specialist.
13   The court reporter is Lori Bundy in association with
14   David Feldman Worldwide.  Will counsel please
15   introduce themselves.
16       MR. WEISS:  Greg Weiss on behalf of Chris
17   Brucker.
18       MR. HENNING:  Chris Henning for National Gypsum
19   Company.
20       VIDEOGRAPHER:  Will the court reporter please
21   swear in the witness.
22   THEREUPON,
23            CHRIS BRUCKER,
24   a witness, having been first duly sworn, upon his oath,
25   testified as follows:

**5**

1        DIRECT EXAMINATION
2    BY MR. HENNING:
3       Q.  Mr. Brucker, we met just a minute ago off the
4    record.  Let me just introduce myself on the record.  My
5    name is Kris Henning.  I'm from the law firm of Morgan,
6    Lewis & Bockius.  We represent National Gypsum Company.
7        You know you're here for your deposition today
8    regarding a lawsuit you and others files about some
9    drywall; is that correct?
10      A.  Correct.
11       MR. HENNING:  I'm going to ask the court reporter
12   to mark this document as Exhibit 1.
13       (Defendants' Exhibit 1, Notice of deposition,
14   was marked for identification.)
15   BY MR. HENNING:
16      Q.  While we're doing that, Mr. Brucker, a couple
17   ground rules that will help us move it along more smoothly
18   today.  This isn't an endurance test.  If you want to get
19   up and stretch your legs, just say so, and I'll
20   accommodate you as best we can.
21       If you don't understand one of my questions,
22   please say so, and I'll do what I can to rephrase it or to
23   repeat it to you.  And if you have any questions during
24   the deposition, feel free to shout and we'll address them
25   as we move along.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

6

1    A.  Okay.
2    Q.  Do you have Exhibit 1 in front of you?
3    A.  Yes.
4    Q.  Have you seen that document before?
5    A.  Yes.
6    Q.  What do you understand it to be?
7        MR. WEISS:  Objection to the form.  You can
8    answer.  Just so you know, I might object to the form
9    of some of the questions, but unless I tell you not to
10   answer the question, you can still answer.  Give me a
11   moment to get my objections on the record.
12       THE WITNESS:  Okay.
13       MR. WEISS:  Go ahead.
14   BY MR. HENNING:
15   Q.  I'm sorry.  What do you understand Exhibit 1 to
16   be?
17   A.  This is the notice of the video deposition for
18   today.
19   Q.  And you understand you're appearing here today
20   pursuant to this notice; is that right?
21   A.  Yes.
22   Q.  Have you ever been deposed before, Mr. Brucker?
23   A.  No, I don't believe so.
24   Q.  Have you ever testified in court?
25   A.  No.

7

1    Q.  Have you ever been a plaintiff in a lawsuit
2    before this one?
3    A.  No.
4    Q.  Have you ever been the defendant in a lawsuit?
5    A.  No -- yes, I have been.
6    Q.  How many times?
7    A.  Once that I know of.
8    Q.  What was the nature of that matter?
9    A.  I'm a correctional officer by my job, and I used
10   to transport for a -- I worked for the Department of
11   Corrections, and I worked for a unit that transported the
12   sexual violent predators around the state of Florida.
13       And one of the residents had brought a lawsuit
14   against myself and, if I remember correctly, approximately
15   20 staff and the Department of Corrections.
16   Q.  What was the nature of that allegation?
17   A.  The nature was due to the inmate -- or the
18   resident, the way he was restrained, he tried to claim
19   that he was held against his will at the facility.  Some
20   of the parties in there he claimed -- I can't remember all
21   of what was in there.
22   Q.  Do you know how that ended up being resolved?
23   A.  I know it was going to the federal court in Fort
24   Myers, and then I never heard no more about it.
25   Q.  Do you remember when that came about?

8

1    A.  Initially, I think he filed in 2000 or 2001, and
2    I think the case dissipated -- I left the Department of
3    Corrections in 0 -- 2007, and I believe the case was
4    dissipated sometime before then.
5    Q.  You never went to any trial in any event?
6    A.  No, sir.
7    Q.  And it sounds like you don't know whether there
8    was a trial?
9    A.  I don't.
10   Q.  Do you know whether you had a lawyer representing
11   you and perhaps the other defendants in the case?
12   A.  I believe anytime that a lawsuit is brought
13   against the State, they have -- automatically have lawyers
14   that defend their staff and themselves as well.
15   Q.  Do you remember who that was in that case?
16   A.  I have no idea.
17   Q.  Do you remember the inmate's name or the
18   resident's name?
19   A.  Frank Enriquez.
20   Q.  And you weren't deposed in that case, were you?
21   A.  No.
22   Q.  Mr. Brucker, I'm going to ask the court reporter
23   to mark this document as Exhibit 2.
24       (Defendants' Exhibit 2, Receipt, was marked
25   for identification.)

9

1    BY MR. HENNING:
2    Q.  Mr. Brucker, have you had a chance to take a look
3    at Exhibit 2?
4    A.  Yes.
5    Q.  Do you recognize that document?
6    A.  Yes.
7    Q.  What is it?
8    A.  It looks like my initial receipt from the
9    purchase of the drywall from Lowe's.
10   Q.  And this is the receipt for the purchase of the
11   drywall that's the subject of your lawsuit?
12   A.  Yes.
13   Q.  And as best you can tell, is this an accurate
14   copy of that receipt?
15   A.  Yes.
16   Q.  Are the handwritten marks on there yours?
17   A.  No, those looks to be like a store clerk.  One
18   says a manager and then the returns at the top, the
19   circles with the Rs, 7R6.
20   Q.  Are any of the handwritten marks on there yours?
21   A.  Huh-uh, no.
22   Q.  The receipt shows a purchase on May 26, 2006.
23       Is that the date you bought the drywall?
24   A.  I believe it is, yes.
25   Q.  Did you pay for it with your credit card?

3  (Pages 6 to 9)

10

1    A.  Yes.

2    Q.  Was that a credit card in your name only or more

3 than one name?

4    A.  No, it would be my name only.

5    Q.  And did you then pay the credit card bill that

6 included this purchase?

7    A.  Well, this would have been my debit card, so

8 it's --

9    Q.  Okay.  And where did the -- what account did the

10 payment come out of?

11    A.  It would be my checking account.

12    Q.  And was that account held only by you at the time

13 of the purchase?

14    A.  Yes.

15    Q.  So nobody other than you contributed to the

16 purchase of the drywall?

17    A.  No.

18    Q.  Was anybody with you at Lowe's when you bought

19 the drywall?

20    A.  No.  This I purchased, you know, over the phone,

21 and then they took my credit card number and then made a

22 delivery.

23    Q.  Okay.  Do you remember who you talked to over the

24 phone?

25    A.  No.

11

1    Q.  Regardless of who by name it was, tell me how

2 that conversation went.

3    A.  I mean, I would have called and, you know,

4 asked -- you know, told them what I needed some drywall,

5 if they had in stock, and, you know, they would have

6 said yes and I would have given them my address and

7 delivery.

8    Q.  And how much you wanted?

9    A.  Right.

10    Q.  Do you remember any other discussion about the

11 drywall?

12    A.  No.

13    Q.  Did you ask for a particular kind of drywall?

14    A.  Well, the 4-by-12, you know, which is the larger

15 sheets, 4-by-8 or 4-by-12.  So 4-by-12 is a larger sheet.

16    Q.  Did you ask for a particular manufacturer's

17 drywall?

18    A.  No.

19    Q.  Did Lowe's propose any particular manufacturer's

20 drywall?

21    A.  No.

22    Q.  At the time you made the call, did you have any

23 idea who manufactured drywall?

24    A.  No.

25    Q.  Had you bought drywall before?

12

1    A.  I may have in my lifetime, not -- never that

2 much.

3    Q.  Did you ever install drywall before you made this

4 call?

5    A.  No.

6    Q.  Was it just one phone call to Lowe's?

7    A.  I don't remember.

8    Q.  Did you call anybody else to investigate your

9 purchase of drywall?

10    A.  No.

11    Q.  You didn't look anywhere else?

12    A.  Oh, yeah, I have -- depended on who had it, you

13 know, I would have called other places.

14    Q.  What other -- for this purchase, did you call

15 anybody before Lowe's to look for drywall?

16    A.  I may have called Home Depot, but I don't

17 remember.

18    Q.  Do you remember calling anybody else?

19    A.  I don't remember now.

20    Q.  Now that we're talking about it just for a

21 minute, do you remember whether you, in fact, did call

22 Home Depot?

23    MR. WEISS:  Object to the form.  You can answer.

24    THE WITNESS:  I don't know.

25 BY MR. HENNING:

13

1    Q.  Just some reason you ended up buying from Lowe's?

2    A.  Yes.

3    Q.  Why did you end up buying from Lowe's?

4    A.  Well, I mean, they -- you know, they had it, you

5 know, they had drywall.

6    Q.  Am I right you just asked for a particular size

7 and amount of drywall; is that right?

8    A.  Right.

9    Q.  They told you they had it?

10    A.  Right.

11    Q.  And you said:  Go ahead and send it to me?

12    A.  Yeah.

13    Q.  Okay.  What else did you buy at the same time?

14    A.  Well, it says:  OSB All-Purpose Mix, and then

15 some corner bead, joint tape, and that looks to be it on

16 the receipt.

17    Q.  What's the All-Purpose Mix?

18    A.  That would have to be like the plaster.

19    Q.  Did you talk about this purchase with anybody

20 other than Lowe's to help you figure out what you needed?

21    A.  No, I don't recall.

22    Q.  How did you know what you needed to buy here, to

23 order from Lowe's on this receipt?

24    A.  Well, you would have to figure up your square

25 feet of your room.

4  (Pages 10 to 13)

14

1    **Q.  At the time of the call, had you planned to**
2  **install the drywall?**
3    A.  No.
4    **Q.  This other stuff on the receipt, in addition to**
5  **the drywall, is that all stuff that you need to install**
6  **it?**
7    A.  I don't know if that would have been all that I
8  needed or not.
9    **Q.  In any event, is that why you bought the stuff to**
10  **be able to install the drywall?**
11    A.  Yes.
12    **Q.  All right.  You said you weren't sure; maybe**
13  **there's other stuff you needed to install the drywall; is**
14  **that right?**
15    A.  Yeah, I don't know.
16    **Q.  As you sit here today, have you come to learn**
17  **whether there was more than what you bought on that day**
18  **that was needed to install the drywall?**
19    A.  If there was more than what's needed on this
20  receipt?
21    **Q.  Yeah.  More than you bought from Lowe's.**
22    A.  Not that I recall.
23    **Q.  So do you know whether what was used to install**
24  **the drywall -- in addition to the drywall itself,**
25  **obviously -- is listed here on this receipt?**

16

1    **Q.  Did he tell you why he was recommending Service**
2  **Drywall?**
3    A.  I don't recall now.  It was probably, you know,
4  he heard that they done good work.
5    **Q.  Do you know whether they had done work for him?**
6    A.  I don't know.
7    **Q.  Do you remember when you reached out to your**
8  **cousin for a recommendation?**
9    A.  It would have been somewhere around the same time
10  as me, you know, purchasing the drywall products.
11    **Q.  Do you know whether it was before or after you**
12  **bought it?**
13    A.  I don't.
14    **Q.  Did you do any investigation into Service Drywall**
15  **other than your conversation with your cousin?**
16    A.  No.
17    **Q.  Who individually, if you can remember, actually**
18  **did the installation from Service Drywall?  Who were the**
19  **names of the guys who actually did it?**
20    A.  I don't know.
21    **Q.  Do you remember how many there were?**
22    A.  When they put it in, it was four or five guys.
23    **Q.  Did you supervise that process?**
24    A.  You mean was I there?
25    **Q.  Were you there?**

15

1    A.  Yes.
2    **Q.  Do you know whether there was anything used to**
3  **install the drywall that's not listed on this receipt?**
4    A.  Not that I know of.
5    **Q.  You didn't install it; right?**
6    A.  I didn't install it.
7    **Q.  Who installed it?**
8    A.  I hired some guys out of -- I believe they're
9  Fort Myers, Service Drywall of Florida.
10    **Q.  How did you come to hire them?**
11    A.  Through my cousin.  I have a cousin that lives in
12  Fort Myers.
13    **Q.  Did he work for them?**
14    A.  Huh-uh, no.
15    **Q.  What did you do, call your cousin and he**
16  **recommended them?**
17    A.  Yeah, it was a recommendation, word of mouth.
18    **Q.  From your cousin?**
19    A.  Yes.
20    **Q.  From anybody else?**
21    A.  No.
22    **Q.  Who is your cousin?**
23    A.  Kelly Landis.
24    **Q.  He or she?**
25    A.  He.

17

1    A.  Yeah, for -- yeah.  For the hanging, I was there.
2    **Q.  Were you there for everything they did?**
3    A.  Probably for most of it.
4    **Q.  Was there at least some parts where you weren't**
5  **there?**
6    A.  Yeah.
7    **Q.  When you were there, were you working on other**
8  **parts of the house?**
9    A.  Not that I recall.
10    **Q.  Were you just watching these guys?**
11    A.  Yeah.
12    **Q.  And did you give them any instruction on what to**
13  **do?**
14    A.  No.
15    **Q.  Did you know how to install drywall at the time?**
16    A.  Probably a basic, basic knowledge.
17    **Q.  It sounds like not enough to be comfortable doing**
18  **it yourself; is that fair?**
19    A.  Right.
20    **Q.  That's why you went with these guys?**
21    A.  Right.
22    **Q.  So did you give them any instruction on what to**
23  **do?**
24    A.  No.
25    **Q.  Did they ask you any questions about what to do?**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

18

1      A.  No.
2      Q.  Did they tell you they needed more materials than
3  you had bought from Lowe's to install it?
4      A.  I don't recall.
5      Q.  Do you recall them ever going on their own and
6  getting more materials than you had bought from Lowe's?
7      A.  No, they wouldn't have done that because the
8  agreement I had with them is, you know, I would provide
9  the material.  They were just going to hang it and then
10  finish it, put a texture on it.
11     Q.  Okay.  Did you have a written agreement with
12  them?
13     A.  It was not like a contract, if that's what you
14  mean.
15     Q.  I mean, did you have any document that in your
16  view showed your agreement with Service Drywall?
17     A.  They just give me a receipt of paid -- you know,
18  when they were done I paid them, but that was -- you know,
19  there was no like a written, you know, they were going to
20  do, you know, certain things or, you know, it was like a
21  verbal, you know, I wanted it hung and finished and
22  textured and then I would pay them for that work that they
23  did.
24     Q.  And did you discuss what you wanted them to do
25  with someone from Service Drywall?

19

1      A.  Say again.
2      Q.  Did you tell them what you expected them to do?
3  In other words, did you tell them all I want you to do is
4  hang the drywall and finish it?
5      A.  Yeah, they knew.  I mean, I want it hung and, you
6  know, finished and then textured so I could paint it.
7      Q.  How much did you pay them?
8      A.  I don't recall without looking at the receipt.
9      Q.  Do you think you still have a receipt of your
10  payment to them?
11     A.  I may have.
12     Q.  Do you remember how you paid them?
13     A.  I believe them was cash.
14     Q.  Can you estimate more or less than a thousand
15  dollars?
16     A.  It would have been more than a thousand dollars.
17     Q.  More than two?
18     A.  Yeah, it was probably three or four.
19     Q.  Was it your idea to pay them in cash?
20     A.  I don't know whose idea it was.  I think that's
21  the way I paid them.
22     Q.  Do you remember any discussion between you and
23  Service Drywall about how they should be paid?
24     A.  No.
25     Q.  Did you ever talk to Service Drywall or any

20

1  employee of Service Drywall after the drywall was hung?
2      A.  No.
3      Q.  In your view, did they do a good job?
4      A.  Yeah.
5      Q.  Any problems with their work?
6      A.  They had to come back and do some touchup stuff,
7  but nothing -- you know, nothing major.
8      Q.  Nothing that gave you any concern about the
9  quality of their work?
10     A.  No.
11     Q.  Have you heard of anyone using them after you?
12     A.  I don't know.
13     Q.  Have you recommended them to anyone else?
14     A.  No.
15     Q.  When you -- tell me when, if you can remember,
16  Mr. Brucker, the drywall was delivered.
17     A.  I don't remember.  It would have been probably
18  not too long after I paid for it, but I don't remember
19  when.
20     Q.  Within a matter of days?
21     A.  I don't know.
22     Q.  Were you there when it was delivered?
23     A.  Yeah, I was there.
24     Q.  And where was it delivered?  What was the
25  address?

21

1      A.  My address.
2      Q.  Can you give us that for the record?
3      A.  My address, 6077 Northwest Pine Level Street
4  Arcadia, Florida 34266.
5      Q.  And that's the house with the drywall that's the
6  subject of your lawsuit; right?
7      A.  Right.
8      Q.  So if we move forward today and I talk about your
9  house, unless we agree separately that I'm talking about
10  something else, can you and I agree that that's what we're
11  talking about -- I don't need to give you the address
12  every time?
13     A.  That's fine.
14     Q.  Was anyone else at your house when it was
15  delivered?
16     A.  My girlfriend may have been there.  I don't know
17  if anybody else.  My girlfriend may have been there, I
18  don't know about anybody else.
19     Q.  I assume it was delivered on some kind of truck?
20     A.  Yeah.  They delivered it on to the ground in
21  front of the house.
22     Q.  Do you remember what kind of truck it was,
23  whether it was closed or open?
24     A.  It was probably -- I can't remember.  I'm
25  assuming it was a flat-bed semi, but I can't remember.

6  (Pages 18 to 21)

22

1    Q.  And 115 sheets; is that right?
2    A.  Okay.
3    Q.  Sorry.  115 sheets; is that what they delivered?
4    A.  Whatever is on this receipt, yeah, 115.
5    Q.  Can you give us a sense of how much room it took
6    up?  That's a lot.
7    A.  It's a lot.  Two pretty tall stacks.
8    Q.  Can you estimate how high those stacks were?
9    A.  I don't know.  Maybe -- I don't know, maybe
10   three, four feet maybe.  That's a lot.
11   Q.  Did you look at it when they delivered it?
12   A.  Well, yeah.  I mean, you see it sitting there.
13   Q.  Did you look at it to make sure it looked good to
14   you?
15   A.  I mean, you kind of look at it to make sure it
16   ain't busted up, you know.
17   Q.  And was any of it busted up?
18   A.  Not that I recall.
19   Q.  Was there anything about the drywall that made
20   you believe it wasn't suitable for use in your house?
21   A.  It looked like drywall.
22   Q.  You didn't look at each piece, I assume?
23   A.  No.
24   Q.  What did you do to inspect it?
25       MR. WEISS:  Objection to form.  You can answer.

23

1        THE WITNESS:  I mean, I just looked at it.  I
2    don't know how to, you know, inspect drywall.  I just
3    looked at it sitting there.
4    BY MR. HENNING:
5    Q.  Was it in the piles -- excuse me.
6        Was it in the piles when you looked at it?
7    A.  Yes.
8    Q.  Did you take any pieces out of the pile to look
9    at it?
10   A.  Well, it had to be walked into the house because
11   Lowe's doesn't deliver it, you know, inside of a physical
12   address.  They just deliver it out front, and then it's up
13   to you to, you know, get it where you want it.
14       So of course you're walking in the house so it
15   doesn't get ruined by the weather.
16   Q.  How soon after it was delivered did you get it
17   all in the house?
18   A.  Pretty much immediately.  I mean, I called
19   over -- I had an aunt and uncle that came over and helped
20   me and we walked the sheets in to the front living area of
21   my house and stacked it up.
22   Q.  All of it?
23   A.  All of it.
24   Q.  Didn't leave any of it outside?
25   A.  No.

24

1    Q.  And you say you didn't want to leave it outside
2    because -- I -- I don't mean to put words in your mouth --
3    I think you said so it wouldn't get ruined by the weather?
4    A.  Yeah.  If you leave it outside, you know, if the
5    dew gets on it or if it was the rain or anything, it would
6    ruin it.
7    Q.  What did you think would happen if it rained on
8    it?  How would it be ruined?  Could it be used at all?
9        MR. WEISS:  Objection to form.  You can answer.
10       THE WITNESS:  If it gets rained on, I don't -- I
11   assume you couldn't use drywall.
12   BY MR. HENNING:
13   Q.  What made you think that at the time?
14   A.  Made me think what?
15   Q.  Why did you think that at the time if it got
16   rained on you couldn't use it?
17   A.  I'm just -- I mean, drywall, it's like plaster,
18   you know, or something like that so it can't get wet.
19   It's not like wood.  You can't leave it outside.
20   Q.  What state -- when the drywall is delivered, I
21   take it your house was being built, you were building it;
22   right?
23   A.  Yes.
24   Q.  What state was the drywall in, how far along?
25   A.  It had -- you know, it was built -- you know, all

25

1    the walls on the roof was on, doors and windows was in it;
2    just the inside wasn't finished.  It was framed, but the
3    inside wasn't -- you know, it wasn't finished off.
4    Q.  All the walls were up, I think you said.  The
5    exterior walls, were they all up?
6    A.  Exterior walls were up and the interior framing
7    was either done or probably close.
8    Q.  The roof was on, you said?
9    A.  Yeah, the roof was on.
10   Q.  So it couldn't get wet from rain?
11   A.  No.
12   Q.  Was it all closed up, or could air get through
13   the house in the state it was in when the drywall was
14   delivered?
15   A.  No, it's all closed up.  There's windows in the
16   house.
17   Q.  Did Lowe's deliver exactly what you ordered?  You
18   mentioned some return notices up here on the receipt.
19   A.  I believe they brought what I needed.
20   Q.  You didn't have to take anything back to them or
21   get them to fix some mistake?
22   A.  Well, I took what's on the receipt back.
23   Q.  Why did you do that?
24   A.  Probably didn't need what was on there.
25   Q.  Tell me if I'm reading this right.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

26

1      It looks like you took some drywall back?
2   A. Uh-huh.
3   Q. And was that just because you had more than you
4 needed?
5   A. I believe it was.
6   Q. Did you determine you had more than you needed,
7 or was that a Service Drywall decision?
8   A. I don't recall. It's probably just what was left
9 over, but I don't know.
10   Q. Did you take back the All-Purpose Mix?
11   A. Yes.
12   Q. Why is that?
13   A. It's probably just left over. That's what I
14 assume.
15   Q. Looks like -- tell me if I'm reading this right.
16      It looks like from the receipt you bought 20
17 containers of it?
18   A. Yes.
19   Q. And it looks like maybe you took back six; is
20 that what you read?
21   A. Uh-huh.
22   Q. Again, that's just left over? Was that just left
23 over after you were done?
24   A. I believe it was.
25   Q. And the same thing for the corner bead?

27

1   A. I believe so.
2   Q. What is corner bead?
3   A. Corner bead is -- if I remember right, it's like
4 a metal strip that goes on the corners over drywall when
5 you're trying to finish it.
6   Q. So you got some of your money back when you
7 returned that stuff; is that right?
8   A. Uh-huh.
9   Q. Any chance you remember how much you got back
10 without us doing the math here?
11   A. I have no idea. I would have to figure it up,
12 too.
13   Q. Mr. Brucker, before -- I'm sorry. I'll ask a
14 different question.
15      Who have you sued in your lawsuit?
16   A. It would be Lowe's.
17   Q. Anybody else?
18   A. Well, and National Gypsum Company.
19   Q. When is the first time you heard of National
20 Gypsum Company?
21   A. Probably I guess maybe when this lawsuit started.
22 I don't know.
23   Q. Was it before or after you bought the drywall?
24   A. Well, that would have been after.
25   Q. Was it before or after the drywall was installed?

28

1   A. Well, that would have to be after, too.
2   Q. When the drywall was delivered, was there any
3 markings on it?
4   A. I don't recall.
5   Q. At any time did you ever notice any markings on
6 the drywall?
7   A. I know there is now, you know --
8   Q. I'm sorry. Go ahead. I didn't mean to cut you
9 off.
10   A. I know there is now.
11   Q. When did you first come to know that there were
12 markings on it?
13   A. Well, through -- you know, through my attorney's
14 office when they have like inspections done, you know, and
15 then they -- and they say there's numbers on them and
16 stuff like that.
17   Q. Is that how you came to know that you had at
18 least some National Gypsum drywall in your house?
19   A. Yeah.
20   Q. From report from your lawyers?
21   A. Yes.
22   Q. Before you bought the drywall from Lowe's, did
23 you see any advertisements from National Gypsum?
24   A. Not that I recall.
25   Q. Before you bought the drywall from Lowe's, did

29

1 you see any communication in any form from National
2 Gypsum?
3   A. Not that I recall.
4   Q. How about Lowe's? Before you bought it, did you
5 see any advertisement about drywall from Lowe's?
6   A. Not that I remember.
7   Q. Before you bought it, did you see any statement
8 from anyone about the drywall you were going to buy?
9   A. I don't think so.
10   Q. Any pamphlet, in-store flyer, anything?
11   A. I mean, I'm sure it's sometime in, you know, if
12 anybody goes in any kind of, you know, home store like
13 that, I mean, you know, you see things a lot that you
14 probably don't -- it's not like what you're going out to
15 look for that certain thing.
16   Q. Sure.
17   A. I mean, I don't know, though.
18   Q. Do you remember ever seeing any statements about
19 drywall?
20   A. Not specifically.
21   Q. In any form at all, whether specifically or some
22 other way, do you recall any statement about drywall you
23 saw before you bought this?
24      MR. WEISS: Object to the form. You can answer.
25      THE WITNESS: No.

8  (Pages 26 to 29)

30

BY MR. HENNING:

1  Q.  How about oral statements?  Did anybody tell you
2  anything about drywall before you bought this drywall from
3  Lowe's?
4  A.  No.
5  Q.  Mr. Brucker, did you consider the purchase of
6  your drywall part of the purchase of your new house?
7  MR. WEISS:  Objection to form.  You can answer.
8  THE WITNESS:  Okay.  Say one more time.
9  BY MR. HENNING:
10  Q.  Sure.  Did you consider the purchase of your
11  drywall part of the purchase of your new house?
12  MR. WEISS:  Objection to form.  You can answer.
13  THE WITNESS:  Yes.
14  BY MR. HENNING:
15  Q.  Did the drywall come with any documents from
16  Lowe's when it was delivered?
17  A.  Probably receipt.
18  Q.  Anything else you can remember?
19  A.  I don't remember.
20  Q.  Do you remember any instruction manuals on how to
21  install it?
22  A.  I don't remember.
23  Q.  Do you remember anything like a user guide?
24  A.  No.

31

1  Q.  Do you remember any warranty or anything?
2  A.  No.
3  Q.  Do you know whether your drywall came with a
4  warranty?
5  A.  I don't know.
6  Q.  Was that important to you when you bought it
7  whether it did or didn't come with a warranty?
8  A.  I don't know whether that is important or not.
9  You know, if you -- I needed drywall.
10  Q.  Mr. Brucker, do you know anything about how
11  drywall is made?
12  A.  I do not.
13  Q.  Have you ever heard the term "synthetic drywall"?
14  A.  I have now.
15  Q.  What do you understand it to mean?
16  A.  That it's man-made.  I mean, other than that, not
17  really.  I don't really understand it.  Just through, you
18  know, what the attorneys have told me.
19  MR. WEISS:  To the extent he asks you questions
20  that involve questions we've had, you're not supposed
21  to testify about that.  Okay?  So other than
22  conversations that we've had, which you're not going
23  to repeat during your deposition, you can answer the
24  questions.
25  BY MR. HENNING:

32

1  Q.  Yeah.  I don't want to know what you and
2  Mr. Weiss talked about.  Do you have any knowledge about
3  what synthetic drywall is that didn't come from your
4  lawyers?
5  A.  No.
6  Q.  Do you know where the drywall you bought from
7  Lowe's was made?  Just answer that one yes or no.  We'll
8  deal with this issue.
9  A.  Yes.
10  Q.  Where was it made?  Do you know the answer to
11  that question, separate and apart from a conversation with
12  your lawyers?
13  A.  No.  That was told to me by --
14  Q.  I'm sorry.  You can finish.  I didn't mean to cut
15  you off.
16  A.  I didn't know until I was advised of where.
17  Q.  Okay.  So you don't have any knowledge about
18  where it was bought -- where it was made, excuse me.  That
19  didn't come from your lawyers?
20  A.  No.
21  Q.  Do you know whether your drywall you bought from
22  Lowe's is synthetic drywall?
23  A.  I don't know.
24  Q.  Does that matter one way or the other for you for
25  purposes of your lawsuit?

33

1  A.  No.
2  Q.  Whose idea was it to file a lawsuit?
3  MR. WEISS:  Objection to form.  You can answer.
4  THE WITNESS:  Originally I had a previous
5  attorney prior to Mr. Weiss's office.  You know, I
6  seek, you know, help.  I knew I had a problem but I
7  didn't know, you know.  And the attorney's office that
8  I had contacted was the initial one on my -- that was
9  representing me on my behalf.
10  BY MR. HENNING:
11  Q.  Was it their decision?
12  MR. WEISS:  Objection to form.
13  THE WITNESS:  I guess at the end, I guess it's my
14  decision.  I mean, they can't make a decision for you.
15  So it would be my decision.
16  BY MR. HENNING:
17  Q.  When did you make the decision to file the
18  lawsuit?  And if it's easier for you, a date is fine, but
19  if it's easier for you by reference to how soon before or
20  after the lawsuit was filed is fine, too?
21  MR. WEISS:  Object to the form.  You can answer.
22  THE WITNESS:  Okay.  Say your question one more
23  time.
24  BY MR. HENNING:
25  Q.  Sure.  When did you decide to file the lawsuit?

9  (Pages 30 to 33)

34

1    A.  I don't recall the exact year, and I don't recall
2   if my initial -- my first attorneys, if they filed the
3   initial or if they were like getting information -- or if
4   Mr. Weiss's office, I'm not sure, which one.
5    Q.  Which one actually filed?
6    A.  Right.
7    Q.  What's the name of the first lawyer you went to?
8    A.  I don't recall.
9    Q.  Was it somebody here in Fort Myers?
10   A.  I think they were in Miami.
11   Q.  Why did -- did you seek them out?
12   A.  They were -- their name was recommended to me by
13  someone, and I don't remember exactly who it was.
14   Q.  Whoever it was that recommended -- were you
15  discussing the need for a lawyer for any reason?
16   A.  Yeah, I would have had to told them, you know,
17  what problem I was having.
18   Q.  What did you say?
19   A.  Exactly at that time, I don't recall.
20   Q.  Did you tell them you thought you had a problem
21  with your drywall?
22   A.  Oh, yeah.  I would have said I was having
23  problems, but what I exactly said, I don't know now.
24   Q.  How about can you remember whether you told them
25  you thought it was a problem with your drywall?

35

1    A.  Yeah, but at that time, a lot of people were
2   having problems with, you know, Chinese drywall and, you
3   know, you've seen the problems of I thought maybe I might
4   have had, so I would have had, you know, probably
5   explained, you know, what you were looking for.
6    Q.  Mr. Brucker, when did you first suspect you had a
7   problem with your drywall?
8    A.  Probably about after the first year I was in the
9   house.
10   Q.  And if I remember correctly, you moved in about
11  September 2006; is that right?
12   A.  September of '06.
13   Q.  So maybe September, '07 you first suspect you
14  have a drywall problem?
15   A.  Uh-huh.  Well, at that time I didn't know I had a
16  drywall problem.  I mean, you know, in exactly September I
17  didn't know I had a drywall problem, but that's when I
18  first started having problems, I believe, with my AC.  And
19  then that, you know, kind of started it.
20   Q.  When did you first suspect that your problems, in
21  your mind, were with your drywall?
22   A.  Well, the AC broke.  Then, of course, you call
23  your AC guy out and then they look at it, determine
24  there's a clog in the evaporator coil, and then at that
25  time -- it was not very long after that, you know, you

36

1   would start seeing things on the news and the problems
2   that people were having, and then that point I
3   started looking to see if I had these same problems.
4        And then, you know, if they said you have
5   problems with AC, you know, if you -- your wires are
6   turning black and stuff like this, you know, you may have
7   a problem.
8        So I started to look to see if I had a problem.
9   And then, you know, it looks like I was having some of the
10  same issues, and then that's when I started wondering if I
11  did or if I didn't.  I didn't know.
12   Q.  Was there any particular thing you saw on the
13  news that caused you to start looking at your drywall and
14  your wiring to see whether you had a similar problem that
15  was being reported?
16   A.  Well, you know, you would see -- they would talk
17  about the symptoms of a house, so I started looking to see
18  if my house had the same types of symptoms.
19   Q.  Any way to estimate when you started seeing these
20  things in the news?  What was going on in the building of
21  your house?  Was it, for instance, around the time you
22  were getting the AC fixed?
23       MR. WEISS:  Objection to form.  You can answer.
24       THE WITNESS:  I don't recall.  It was probably
25  somewhere around there, but I don't remember exactly

37

1   when.
2   BY MR. HENNING:
3    Q.  Did you suspect that the drywall was the source
4   of your problem before you got the AC repaired?
5    A.  Did I believe the drywall was a problem before?
6    Q.  Yeah.
7    A.  No.
8    Q.  Was there somebody about the AC repair, or your
9   conversations with the AC repairman, that led you to
10  suspect the drywall might be a source of your problem?
11   A.  That's probably part of it, too, because when I
12  took the evaporator coil, all it was -- like it was black,
13  it was black color and it looked like it had, I don't
14  know, soot or something on it.
15       And he may have said that, you know, something to
16  the effect that the drywall and then, you know, you see
17  the news thing and they see the same thing, you know, the
18  AC fails and your stuff turns black.
19   Q.  Can you remember, as specifically as you can,
20  what it is the AC guy says to you about drywall?
21   A.  I can't recall now.  That's several years ago.
22   Q.  Had you seen anything on the news about drywall
23  causing problems before the AC guy mentioned it to you?
24   A.  One more time.
25   Q.  Had you seen anything on the news about drywall

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

38

1    problems before the AC guy mentioned it to you?
2    A. I don't recall.
3    Q. Is it fair to say the AC guy saying, "hey,
4    there's been problems with drywall" is the first time the
5    lightbulb went off in your head and say, hey, maybe that's
6    what I got?
7    A. I don't know.
8    Q. When the AC guy told you that he had seen some
9    connection between drywall and problems, did you think
10    that maybe that's what you had?
11    A. At the time I don't know, you know, whether I had
12    it or not.
13    Q. Did it at least cause you to think: Hey, I ought
14    to look into that?
15    A. Yeah, probably.
16    Q. And was that -- that conversation with the AC
17    guy, did that happen the first time he came out?
18    A. I don't remember.
19    Q. How many times did he come out?
20    A. At least probably three or four over the years.
21    Q. Is there any way for you to remember during which
22    time he mentioned the drywall?
23    A. It would have had to have been, you know,
24    probably initially.
25    Q. Probably the first time?

39

1    A. But I don't recall specifically, exactly.
2    Q. Sounds like -- do you think it was more likely
3    the first time he came out?
4    MR. WEISS: Objection to form.
5    THE WITNESS: I don't know.
6    BY MR. HENNING:
7    Q. Do you remember the guy's name?
8    A. I don't remember his name. I know the company.
9    Q. What's the company?
10    A. All American.
11    Q. Were they here in Fort Myers?
12    A. No, they're in Sarasota.
13    Q. Mr. Brucker, have you become involved in a
14    settlement, a drywall settlement, with Lowe's?
15    A. Yes.
16    Q. What's your involvement in that settlement?
17    A. I'm the person that sued them.
18    Q. And have you received any money from that
19    settlement yet?
20    A. No.
21    Q. How much do you expect to receive?
22    A. I believe it was 100,000.
23    Q. What steps do you have to take, if any, to get
24    the $100,000?
25    A. I don't understand what you mean.

40

1    Q. Is there anything you have to do, or is there
2    just going to be a check coming for 100,000 bucks?
3    MR. WEISS: Objection to form.
4    THE WITNESS: I don't know.
5    BY MR. HENNING:
6    Q. Have you ever heard the term "incentive payment"?
7    A. Yes.
8    Q. Are you getting an incentive payment from the
9    Lowe's settlement?
10    A. I believe I am.
11    Q. Do you know how much that is?
12    A. I believe it was 20,000.
13    Q. And so it sounds like you expect to get from that
14    settlement some more on top of that 20; is that right?
15    MR. WEISS: Objection to form.
16    BY MR. HENNING:
17    Q. Do you expect to get anything more from that
18    settlement beyond that 20?
19    MR. WEISS: Objection to form.
20    THE WITNESS: No.
21    BY MR. HENNING:
22    Q. Where did the 100 come from?
23    A. The hundred, I believe, is like -- like a cap, I
24    guess, on the agreement that was made.
25    Q. So you get the 20 and am I right that you can try

41

1    to get more?
2    MR. WEISS: Objection to form. You can answer.
3    THE WITNESS: Not that I know of. I think that's
4    the agreement that was made with the attorneys.
5    BY MR. HENNING:
6    Q. So you don't expect to try to get anything more
7    than the 20?
8    MR. WEISS: Objection to form.
9    THE WITNESS: Not that I'm aware of, no.
10    BY MR. HENNING:
11    Q. Do you know whether other drywall purchasers from
12    Lowe's can get any money from that settlement?
13    A. I believe they can. It's a class action, so, you
14    know, there are other people as well as myself, and the
15    way I understood it, there's certain like guidelines or
16    criteria or something that you have to meet depending on
17    what your problem is.
18    Q. Sure. You can put some kind of evidence in to
19    what your problem was and depending on what you show, you
20    might be able to get different levels of compensation; is
21    that how you understand it?
22    A. Yes.
23    Q. But you don't intend to try to show your problem
24    and get additional compensation beyond the 20; is that
25    right?

11 (Pages 38 to 41)

42

```
 1        MR. WEISS:  Objection to form.
 2        THE WITNESS:  I mean, the way I understand it,
 3   the agreement was made, like there's no -- I don't
 4   know how you put it, but, you know, like going back
 5   again.  You made an agreement.
 6   BY MR. HENNING:
 7        Q.  If you are able to try and get more through the
 8   Lowe's settlement, will you do that?
 9        MR. WEISS:  Objection to form.
10        THE WITNESS:  I think you made an agreement,
11   that's -- I mean, the way I understand it, you make an
12   agreement, and then that's it.
13   BY MR. HENNING:
14        Q.  I understand.  I'm asking you a hypothetical --
15        A.  I don't know what you mean.
16        Q.  Well, I'm asking you to assume for the moment
17   that you are able to try to get more, assume that with me
18   for the moment.  If that's true, would you try to get
19   more?
20        MR. WEISS:  Objection to form.  You can answer.
21        THE WITNESS:  No, that's it.
22   BY MR. HENNING:
23        Q.  Are you involved in any other drywall settlement?
24        A.  Besides this one?
25        Q.  Besides the Lowe's one?
```

43

```
 1        A.  There's this one and then National Gypsum; that's
 2   it.
 3        Q.  Okay.  Any settlement, I mean, we don't have a
 4   settlement, nil settlement, you're involved in other than
 5   the Lowe's one?
 6        A.  No, that's it.
 7        Q.  When do you expect to get the 20?
 8        A.  I don't know.  I haven't been told anything about
 9   that.
10        Q.  And your drywall that's part of your settlement
11   with Lowe's is the same drywall you are suing about here;
12   is that right?
13        A.  It's the same.
14        Q.  You mentioned Chinese drywall earlier,
15   Mr. Brucker.  What do you know about any litigation about
16   Chinese drywall?
17        MR. WEISS:  Objection to form.  To the extent you
18   can answer the question without divulging
19   conversations you've had with any of your lawyers, you
20   can answer.
21        THE WITNESS:  I don't know a whole lot about the
22   Chinese litigation.
23   BY MR. HENNING:
24        Q.  Do you know whether you had Chinese drywall in
25   your house?
```

44

```
 1        A.  Whether I do or I don't?
 2        Q.  Yeah.
 3        A.  I don't believe I do.
 4        Q.  Mr. Brucker, the drywall you bought from Lowe's
 5   that's the subject of this case, it never went outside
 6   Florida; right?
 7        MR. WEISS:  Objection to form.  You can answer.
 8   BY MR. HENNING:
 9        Q.  Fair point.  From the time you got it, it never
10   went outside of Florida; is that right?
11        A.  The time I got what?
12        Q.  From the time you got the drywall that's the
13   subject of this case, it never went outside of Florida; is
14   that right?
15        A.  The drywall that was delivered to my house?
16        Q.  Yeah.
17        A.  No.
18        Q.  When you bought the drywall, did you have any
19   expectation of what state's rules would govern any fight
20   you had with any manufacturer about the drywall?
21        MR. WEISS:  Objection to form.  You can answer.
22        THE WITNESS:  Okay.  Say it again.
23   BY MR. HENNING:
24        Q.  Sure.  When you bought the drywall, did you have
25   any expectation of what state's law would govern any fight
```

45

```
 1   you had with the manufacturer about the drywall?
 2        MR. WEISS:  Objection to form.  You can answer.
 3        THE WITNESS:  I don't know.
 4   BY MR. HENNING:
 5        Q.  You didn't have any expectation one way or the
 6   other?
 7        MR. WEISS:  Objection to form.  You can answer.
 8        THE WITNESS:  No.
 9   BY MR. HENNING:
10        Q.  Mr. Brucker, do you think you've suffered any
11   personal injuries from the drywall?
12        MR. WEISS:  Objection to form.  You can answer.
13        THE WITNESS:  I do notice that myself and some of
14   my family have like sinus problems.
15   BY MR. HENNING:
16        Q.  Do you think that's attributable to the drywall?
17        A.  I think it may have.
18        Q.  What makes you think that?
19        A.  You know, they say that the -- you know, homes
20   that are affected with, you know, bad drywall, people get,
21   you know, sometimes have respiratory problems and issues,
22   didn't pay attention to the fact of until after that was
23   explained, and then it kind of seemed like, you know, we
24   were having problems.  But at the time didn't know, you
25   know, that may be associated with that.  You know.
```

12  (Pages 42 to 45)

46

1    Q.  Have you gone to the doctor for any medical
2    treatment?
3        A.  Not for a specific, you know, sinus issue.  Take
4    over the counter.
5        Q.  Anything other than sinus issues that at least
6    you think might be attributable to the drywall?
7        A.  No.
8        Q.  Did you consider going to a doctor?
9        A.  Normally just take over-the-counter medication,
10   you know, to try to, you know, help with the, you know,
11   your symptoms or whatever.
12       Q.  Did you consider going to a doctor in this case?
13       A.  I haven't went to a doctor for that.
14       Q.  I mean, did you think about it and decide, no, or
15   you never thought about it?
16       A.  Didn't think about it at that point.
17       Q.  Whatever over-the-counter medication you take,
18   does it help you?
19       A.  Yeah, it helps with the symptoms when you're
20   having, you know -- when you're having problems.
21       Q.  What is it that you're taking?
22       A.  Over-the-counter would be just like sinus
23   medications.
24       Q.  Can you remember the name?
25       A.  Like Dayquil Sinus, something like that, Zyrtec.

47

1        Q.  Are you -- do you take that now?
2        A.  When needed.
3        Q.  When did you first start taking it for sinus
4    issues?
5        A.  I don't remember the exact, you know, when, what
6    day, or nothing like that.
7        Q.  Can you remember about how long after you were in
8    your house?
9        A.  No.
10       Q.  Do you know, Mr. Brucker, whether your sinus
11   issues you mentioned are part of this lawsuit?
12       A.  I don't know if they are.
13       Q.  Do you want them to be?
14       MR. WEISS:  Objection to form.  You can answer.
15       THE WITNESS:  I don't think they are.
16   BY MR. HENNING:
17       Q.  If they're not, do you know whose decision it was
18   to make it that way?
19       A.  Well, inevitably, I mean, it's my decision.
20       Q.  You made that call?
21       A.  I believe I must have.
22       Q.  Do you remember when?
23       A.  No.
24       Q.  Do you remember whether that's been the case ever
25   since the lawsuit was first filed?

48

1        A.  I think it may have -- the way I understand it, I
2    mean, this is for, you know, the drywall repair and stuff
3    like that of the house.
4        Q.  And not for personal entries?
5        A.  Not for medical.
6        Q.  You still live in the house, right, Mr. Brucker?
7        A.  Yes.
8        Q.  I think we said since September of '06; is that
9    right?
10       A.  Uh-huh.
11       Q.  Have you considered leaving?
12       A.  Yes, just not able to afford to -- you know,
13   because you still got to pay your mortgages and your
14   property taxes and stuff like that, not able to afford to
15   pay, you know, my house bills now and then a separate
16   house.
17       Q.  Is there any other reason you haven't left?
18       A.  No.
19       Q.  Do you have any children, Mr. Brucker?
20       A.  I have two.
21       Q.  How old are they?
22       A.  8 and 5.
23       Q.  And have they lived in the house continuously
24   since September of '06?
25       A.  Yes.

49

1        Q.  Do you think it's not safe in the house?
2        A.  I don't know.
3        Q.  Is there any other information you would like to
4    make that decision, whether it's safe or not?
5        A.  I don't know whether it's, you know, safe or
6    unsafe, as far as, you know, their health issues.
7        Q.  If it was unsafe for your kids, would you stay
8    there?
9        MR. WEISS:  Objection to form.  You can answer.
10   BY MR. HENNING:
11       Q.  Fair point.
12       If you thought it was unsafe for your kids, would
13   you stay there?
14       A.  I would say I would try to do anything I could to
15   try to find other means, you know, if I could.
16       Q.  Do you think it's unsafe for your kids?
17       A.  I don't know.
18       Q.  Do you think it might be?
19       A.  Maybe.
20       Q.  Have you done anything to learn more about
21   whether it could be unsafe for your kids?
22       A.  Well, there's been different, you know -- I have
23   had an air inspection done.
24       Q.  What did that show, if you know?
25       A.  I didn't get the actual results.  That was done

13  (Pages 46 to 49)

50

1    by the Consumer Products Safety Commission.
2        **Q.  So you don't know what it showed?**
3        A.  What the results were of that, no.
4        **Q.  Have you done anything to follow up to try to**
5    **fine out?**
6        A.  That information was provided to my attorney.
7        **Q.  But you don't know the results?**
8        A.  No.
9        **Q.  Is that something you would want to know to**
10   **determine if it's safe in the house for your kids?**
11       MR. WEISS:  To the extent you can answer your
12       question without revealing any attorney/client
13       discussion, you can.
14       THE WITNESS:  Yes.
15   BY MR. HENNING:
16       **Q.  Mr. Brucker, did you ever contact National**
17   **Gypsum?**
18       A.  I don't think so.
19       **Q.  Do you know whether anyone on your behalf**
20   **contacted National Gypsum before the lawsuit was filed?**
21       A.  Before the lawsuit was filed?
22       **Q.  Yeah.**
23       A.  No.
24       **Q.  You don't think so?**
25       A.  I don't think so.

51

1        **Q.  Did you ever consider contacting National Gypsum**
2    **once you found out that you had at least some National**
3    **Gypsum drywall in your house?**
4        A.  Well, I was -- no, because I was under -- I had
5    an attorney.
6        **Q.  And by then you just left things to them; is that**
7    **right?**
8        A.  Yeah, went by their advisement.
9        **Q.  Did you want to contact National Gypsum?**
10       MR. WEISS:  To the extent you can answer the
11       question without revealing attorney/client
12       conversation, you can.
13       THE WITNESS:  I believe I was just -- you know, I
14       went by my attorney's advisement in that they were
15       supposed to -- any contact that was made was, you
16       know, supposed to be through them.
17   BY MR. HENNING:
18       **Q.  Would you have expected they would have contacted**
19   **National Gypsum before they sued them?**
20       A.  I don't know if they would have or not.
21       **Q.  Mr. Brucker, do you recall that the lawsuit was**
22   **first filed just against Lowe's?**
23       A.  I don't remember if it was just against them or
24   if it was both.  I don't remember.
25       **Q.  Mr. Brucker, have you done anything to try to fix**

52

1    what you consider to be the problem in your house?
2        A.  No, I don't have the money to tear it all out.
3        **Q.  That's what you think would be necessary?**
4        A.  I think so.
5        **Q.  What makes you think that?**
6        A.  Well, there's been standards put out on like the
7    Product Safety Commission that says, you know, if you have
8    bad drywall that has to be taken out, there's certain
9    guidelines.
10       **Q.  Is that something you keep track of, the**
11   **government statement's about drywall?**
12       A.  Yeah, I look at stuff like that.
13       **Q.  You mention CPSC.**
14       **Did you look anywhere else for that kind of**
15   **information?**
16       A.  Pretty much there, it's a government entity, you
17   know.
18       **Q.  Did you ever look at the CPSC website?**
19       A.  I have.
20       **Q.  Do you get information from CPSC in any other**
21   **way?**
22       A.  What do you mean?
23       **Q.  You say you keep track of what the CPSC has to**
24   **say about drywall and sometimes from the website.**
25       **Is there any other way what you figure out what**

53

1    the CPSC has to say on the subject?
2        A.  No, just by the website.
3        **Q.  Did you ever see anything on there about how you**
4    **tell whether it's the drywall or some other source that's**
5    **causing your problem?**
6        MR. WEISS:  Objection to form.  You can answer.
7        THE WITNESS:  Not that I remember.
8    BY MR. HENNING:
9        **Q.  Have you taken any bids or estimates into how**
10   **much it would cost to fix your house?**
11       A.  Yes.
12       **Q.  Did you get any bids or estimates?**
13       A.  Yes.
14       **Q.  How many did you get?**
15       A.  I believe it was, I think, two.
16       **Q.  Can you tell me who they're from?**
17       A.  Without looking at it, I don't remember the name.
18       **Q.  Were those written estimates you got?**
19       A.  Yes.
20       **Q.  Do you still have them?**
21       A.  They were provided to my attorney.
22       **Q.  Do you remember when you got them?**
23       A.  I don't remember exactly when.
24       **Q.  Do you remember what was going on at the time**
25   **when you got them?  Were you in the house?  Presumably**

14  (Pages 50 to 53)

54

1  you've been in the house for a while?
2      A.  Yeah, right.  It was in -- I believe one was
3  within the last year, but I don't remember exactly, you
4  know, like what month or when.
5      Q.  Did you ask for an estimate?
6      A.  Yes, I did.
7      Q.  Why did you ask for an estimate?
8      MR. WEISS:  To the extent you can answer that
9  question without revealing attorney/client
10  conversation, you can.
11  BY MR. HENNING:
12      Q.  Let me ask it this way:  Was there some reason
13  you asked for the estimate separate and apart from a
14  reason that came from a conversation with your lawyers?
15      A.  No.
16      Q.  It wasn't your idea then?
17      A.  No.
18      Q.  And is that true for both estimates?
19      A.  Yes.
20      Q.  And you only got two; right?
21      A.  I believe it was.
22      Q.  Do you remember what the -- what figures you got
23  back?
24      A.  I don't recall without looking at them.
25      Q.  Can you ballpark it?  Was it more than $50,000?

55

1      A.  Yeah.
2      Q.  Was it more than a hundred?
3      A.  Yeah.
4      Q.  Was it more than 150?
5      A.  I don't know if it was more than 150.
6      Q.  Now we've been talking about it, does it jog your
7  memory at all about what the numbers came back to be?
8      A.  It was -- I remember it was over 100, but I don't
9  remember how much.
10      Q.  Were they both pretty much the same?
11      A.  No, I don't believe so.
12      Q.  Can you remember how much higher one was than the
13  other?
14      A.  I don't remember.
15      Q.  Do you remember what work the estimate said would
16  be necessary?
17      A.  The estimate would have been for, you know,
18  remediation as far as just tearing the drywall out and --
19  you know, and then replacing it.
20      Q.  Do you remember whether there was any other work
21  included in those bids or estimates?
22      A.  Besides the tearout and replacement?  No.
23      Q.  Mr. Brucker, do you want to take a couple
24  minutes?
25      A.  Yeah, this cold is getting me.

56

1      VIDEOGRAPHER:  Going off the record.  The time is
2  10:14 a.m.
3      (A break was taken.)
4      VIDEOGRAPHER:  Back on the record.  The time is
5  10:20 a.m.
6  BY MR. HENNING:
7      Q.  Mr. Brucker, do you know George or Brenda
8  Brincku?
9      A.  I do not.
10      Q.  Have you ever talked with either one of them?
11      A.  I have not.
12      Q.  Are you aware of any litigation they're involved
13  in?
14      A.  My understanding is I believe they're represented
15  by Mr. Weiss's office as well.
16      Q.  Okay.  Do you know anything about their
17  litigation separate from anything you learned from
18  Mr. Weiss or your lawyers?
19      A.  No.
20      Q.  In addition to Mr. Weiss, can you name any other
21  lawyers representing you in this case?
22      A.  Well, he's part of -- my understanding, he's part
23  of a firm.  I don't know if the other lawyers are working
24  on this.  I have always talked to him.
25      Q.  Do you know whether there's anybody else

57

1  representing you?
2      A.  Not that I know of.
3      Q.  Mr. Brucker, where did you get the money to build
4  your house?
5      A.  Part of it was from a loan, and then the other
6  part of it, my previous house was destroyed by Hurricane
7  Charley, and there was some money left over after the
8  mortgage was paid, so I had a little bit of money there
9  plus a loan.
10      Q.  What money -- insurance money?
11      A.  Yes, insurance money.
12      Q.  So two sources of insurance money and a loan?
13      A.  And a loan from the Small Business
14  Administration.
15      Q.  Any other source of money to build your house?
16      A.  Huh-uh.
17      Q.  Where was your prior house?
18      A.  Same property.
19      Q.  Okay.  Did you buy the property back before your
20  first house?
21      A.  The other house was there.
22      Q.  You bought an existing house?
23      A.  Existing, yes, existing house.
24      Q.  And that house was unfortunately destroyed?
25      A.  And that house was destroyed by Hurricane

15  (Pages 54 to 57)

58

1  Charley.
2      Q.  And you built the house right in the same place?
3      A.  Yeah, just moved over a little bit on the
4  property, yeah.
5      Q.  Okay.  How much was the loan?
6      A.  It was right around 70,000.
7      Q.  Do you remember when you got it?
8      A.  I don't know.  Maybe -- because I think the
9  hurricane was '04, so it was probably '04, without
10  looking.
11     Q.  You say that's about 70,000?
12     A.  I think about 70,000.
13     Q.  And how much in insurance money?
14     A.  Probably somewhere around 30 or 35.
15     Q.  Call it roughly in total about 100 grand?
16     A.  100 and a little bit.  I used some of my savings.
17  I had a little savings, but a little bit more than that.
18     Q.  How much of your own savings did you use?
19     A.  Exactly, I don't remember.
20     Q.  How many documents about the loan -- do you have
21  a loan agreement with the Small Business Administration?
22     A.  Yeah.
23     Q.  Did you have a small business?
24     A.  No, I don't have a small business.
25     Q.  Do you know how you were eligible to get that

59

1  loan?
2      A.  I don't.
3      Q.  You just heard they were loaning money?
4      A.  I don't remember how I got in contact with them.
5  It's like -- you know, it's like a regular anybody else's
6  home loan.
7      Q.  Is it secured by the house?  Is it a mortgage?
8      A.  It's secured by my property.  I had to put the
9  property up as collateral.
10     Q.  Do you have a written loan agreement?
11     A.  Yeah.
12     Q.  Do you still have it?
13     A.  Yeah.  That house isn't paid off.
14     Q.  I mean do you still have the actual document?
15     A.  Oh, I don't know.  I may have.
16     Q.  Do you know what the terms of the loan are?
17     A.  It's 30 years.
18     Q.  Do you know what the best rate is?
19     A.  It's three point something percent.
20     Q.  Do you know, sitting here today, how much you've
21  paid back, if any?
22     A.  Exactly, I don't know.
23     Q.  Can you ballpark it?
24     A.  I've been paying my normal payments since, but I
25  don't know.

60

1      Q.  What is your normal -- is it a monthly payment?
2      A.  Monthly payment.
3      Q.  What is your normal monthly payment?
4      A.  It's 304.
5      Q.  And has it been the same ever since you got the
6  loan?
7      A.  It's fixed, yeah.
8      Q.  So from whenever you got it, you paid 304 a
9  month?
10     A.  Yeah.
11     Q.  Okay.  What company did the insurance money come
12  from?
13     A.  That was Foremost.
14     Q.  I'm sorry if I asked you this:  Do you remember
15  how much of your savings you've used?
16     A.  I don't recall.
17     Q.  Can you ballpark it more or less than ten?
18     A.  Less than ten.
19     Q.  Less than five?
20     A.  I don't know if it was less than five.  It was
21  less than ten because I wouldn't have had that much money
22  in there.  I don't recall exactly.
23     Q.  And did that cover, the hundred and change -- did
24  that cover purchasing all the materials you needed?
25     A.  Yeah.  I built the house with that.

61

1      Q.  And did it cover whatever payments you needed to
2  make to other folks, like Service Drywall or anybody else?
3      A.  Yeah, that would have been completed.
4      Q.  Was there anything left out of the hundred and
5  change after you bought all the materials you needed and
6  paid anybody else you needed to do work?
7      A.  There may have been.  There may have been.  I
8  don't know how much.
9      Q.  All right.  Let's break it apart.  Do you think
10  there was some left over?
11     A.  There may have been, but I don't know.
12     Q.  So did you end up having to really use your
13  savings?
14     MR. WEISS:  Objection to form.  You can answer.
15     THE WITNESS:  I would have probably used some of
16  my savings; I just don't know how much.
17  BY MR. HENNING:
18     Q.  Did you keep track of all your expenditures?
19     A.  Yeah, for the most part.
20     Q.  Do you have a file somewhere that would show how
21  much you paid in materials and subcontracting work to get
22  the house built?
23     A.  I probably still have some of that because I had
24  to -- with the loan, you had to provide receipts of your
25  expense, it's kind of like you would get draw money, so,

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

62

1  you know, you don't just get the whole lump sum of the
2  loan. It goes in stages.
3         You got to go so far -- you have to show what you
4  spent, and then you get the next draw and you go again.
5     Q.  Do you keep whatever document exchange you've had
6  with Small Business Administration?
7     A.  My monthly receipts?
8     Q.  You know, your submission to them and any letters
9  or notices they sent back to you.  Do you keep that stuff?
10    A.  I keep my monthly -- you know, my monthly
11  statement.
12    Q.  Do you get anything from them periodically?
13    A.  Just my monthly statement usually.
14    Q.  So 70 is the total, am I right?  You haven't
15  actually yet borrowed a total of 70, or did you borrow a
16  total of 70?
17    A.  That was a total.
18    Q.  Okay.
19    A.  Yeah, but I'm saying you don't get that all at
20  once.
21    Q.  Sure.
22    A.  They don't just give you that.
23    Q.  I think you said earlier you haven't done
24  anything to try to fix what you see to be the problem in
25  your house; is that right?

63

1     A.  I have not.
2     Q.  So you haven't spent any money doing that?
3     A.  No.
4     Q.  Do you plan to?
5     A.  Yeah, I plan to, you know, hopefully get it
6  fixed.
7     Q.  I assume that one source of funds you hope to use
8  is something from this lawsuit; is that right?
9     A.  Yes.
10    Q.  Is there any other source of funds you're
11  thinking about?
12        MR. WEISS:  Objection to form.  You can answer.
13        THE WITNESS:  At this time I don't have any other
14  means.
15  BY MR. HENNING:
16    Q.  Are you still working as a corrections officer?
17    A.  Corrections deputy for Charlotte County Sheriff's
18  Office.
19    Q.  How long have you been there?
20    A.  About four and a half years.
21    Q.  And before that, I think you said in the
22  corrections department where?
23    A.  DeSoto CI.
24    Q.  And how long were you there?
25    A.  Almost ten and a half.

64

1         MR. WEISS:  Years.
2         THE WITNESS:  Years, ten and a half years, I'm
3  sorry, ten and a half years.
4  BY MR. HENNING:
5     Q.  That's all right.  That takes us back to kind of
6  mid or late 90s?
7     A.  1997.
8     Q.  Is that when you started -- I'm sorry, I missed
9  the place you were for ten and a half years?
10    A.  DeSoto Correctional Institution.
11    Q.  Okay.  And did you have more than one title there
12  or more than one position there?
13    A.  No.  I was a correctional officer.
14    Q.  And where you are now, what would you say --
15  could you give me your title again now?
16    A.  My official title is correctional deputy, first
17  class.
18    Q.  Why did you leave to go for the new job four and
19  a half years ago?
20    A.  Pay raise.
21    Q.  Your decision to leave?
22    A.  Yes.
23    Q.  Ever any discipline during your career as a
24  correctional officer?
25        MR. WEISS:  Objection to form.  You can answer.

65

1         THE WITNESS:  Yes, I was there for probably a
2  couple years, and I was wrote up for allegedly
3  sleeping on duty.
4  BY MR. HENNING:
5     Q.  Is that the only discipline you ever got?
6     A.  Yes.
7     Q.  Were you sleeping on duty?
8     A.  No.
9     Q.  Have you ever been arrested?
10    A.  No.
11    Q.  Have you ever been convicted of a crime?
12    A.  No.
13    Q.  What's your current salary?
14    A.  That should be right around 48,000 a year.
15    Q.  Has that gone up during the four and a half years
16  you've had your current job?
17    A.  Yeah, a little bit.
18    Q.  Do you remember what you started at in the new
19  job?
20    A.  About 43.
21    Q.  And where were you -- where did you max out at
22  the DeSoto Correctional Institution?
23    A.  I think when I left it was like 33.
24    Q.  During those about 15 years, was your income --
25  your jobs the only source of income from you?

17  (Pages 62 to 65)

66

1    A.  Yes.
2    Q.  You didn't get any money from anywhere else?
3    A.  No, that was my only job.
4    Q.  Without going year by year at DeSoto, can you
5    estimate what your average salary was during your time
6    there?
7        MR. WEISS:  Objection to form.  You can answer.
8        THE WITNESS:  I don't know.  Maybe 30, 31.  I
9    don't know.
10   BY MR. HENNING:
11   Q.  Where did you start when you first took that job?
12   A.  I was 20-something.  I don't remember exactly.
13   Like 26 maybe.
14   Q.  And you say you topped out at 33, I think you
15   said?
16   A.  About 33.
17   Q.  Mr. Brucker, did you gather up any tax returns
18   you have and give to your lawyers?
19   A.  I don't remember if I had to or not.
20   Q.  You don't recall one way or the other getting
21   ahold of tax returns?
22   A.  I don't remember.  I remember I was required, you
23   know, to provide several documents.  I don't remember if
24   that was one of them or not.
25   Q.  We have several tax return documents from you

67

1    that were produced by your lawyers.
2        Do you know whether you have your 2006 tax
3    return?
4    A.  If I provided them, you know, what they have is
5    what I would have been provided.
6    Q.  It looks like from the other documents we have,
7    you usually have somebody do your taxes; is that right?
8    A.  Sometimes I did, yeah.
9    Q.  Has it been the same person for the past number
10   of years?
11   A.  Jackson Hewitt did it the last few years.
12   Q.  Any way for you to remember who did it, if not
13   you, in 2006?
14   A.  I don't know.
15   Q.  If we had 2004 and 2005 and 2007, do you think it
16   would be the same person?
17   A.  Yeah, it may be.  I mean, I don't know.
18   Q.  But it sounds like you -- if you had your 2006
19   tax return, you would have given it to your lawyers?
20   A.  Yeah.  I'm assuming must not be in there.
21   Q.  At least I don't see it.
22   A.  Oh.
23   Q.  Ever take any tax deductions having to do with
24   the building of your house?
25   A.  Have I taken a what?

68

1    Q.  Tax deduction.
2    A.  Tax deduction for building of my house?
3    Q.  Yeah.
4    A.  I don't know what you mean by that.
5    Q.  I take it then you probably didn't; right?  Not
6    something you're familiar with?
7    A.  Not -- no.
8    Q.  Have you ever been self-employed?
9    A.  No.
10   Q.  Ever had your own business?
11   A.  No.
12   Q.  Mr. Brucker, so after the drywall is installed in
13   your house, at some point things go wrong; is that right?
14   A.  Right.
15   Q.  What's the first thing you remember going wrong?
16   A.  Well, the AC.
17   Q.  And I think we said -- I think you said earlier
18   that's about a year after you were in the house?
19   A.  If I remember correctly.
20   Q.  Tell me how you came to figure out that the AC
21   just stopped working one day.
22   A.  Hot.  The house was hot.
23   Q.  And it wasn't working?
24   A.  It was just running, but it was hot in there.  It
25   was like September, it was pretty hot in Florida, so I

69

1    remember the house being hot.  I believe I must have got
2    home from work or something, but it was just stifling hot
3    and the AC was running, so I, you know, got ahold of the
4    AC company.
5    Q.  Was it pushing warm air through the vents?
6    A.  It was running, but, you know what I'm saying, it
7    was blowing, but it was hot.  It was hot in there.
8    Q.  I mean, put your hand up to the vent, was it cold
9    air coming out?
10   A.  I mean my vents are way -- I mean, they're high
11   in the ceiling.  I just know it was hot in the house.  You
12   could hear it running, you could hear -- like AC, you
13   know, sucking through your vent, you know, through the
14   intake, you could hear it running.
15   Q.  And you call the AC guy out and we talked about
16   who that was and the company earlier, and what does he do?
17   A.  Well, he sends somebody out -- I remember he
18   checked it.  He said that it was out of like freon.  I
19   don't remember exactly what he said.  It was like the gas
20   that's inside, the refrigerant.
21       So he went inside and checked, pulled out the --
22   pulled apart the inside of the air conditioner, and then
23   that's when he said, well, you know, that he had found the
24   problem.
25   Q.  So he told you it was out of the refrigerant?

18   (Pages 66 to 69)

70

```
 1      A.  Yeah.
 2      Q.  Did he say that had anything to do with why it
 3  wasn't working?
 4      A.  Yeah, I mean, that's why it was hot, it was out
 5  of refrigerant.
 6      Q.  And then, I'm sorry, I cut you off -- then he
 7  also looked at the coil?
 8      A.  He pulled apart the inside air conditioner on the
 9  inside part, inside the house, and then, you know, he
10  found the problem there.  And he had to come back -- he
11  didn't take it out then, because if I remember right, they
12  had to order -- it was a new evaporator coil.
13          So he put refrigerant in back in the AC system
14  enough to get it by, but when he brought the evaporator
15  coil, that's when he said the refrigerant had leaked out
16  from the evaporator coil.  So then when they pulled it
17  out, it was all black.
18      Q.  So just putting more refrigerant in would get you
19  through a little while, but he said it was not -- that's
20  not the permanent solution?
21      A.  They had to get a new evaporator coil.
22      Q.  Do you remember how long that took?
23      A.  I don't remember.
24      Q.  Were you standing with him when he was looking at
25  the AC unit?
```

71

```
 1      A.  Yeah, he's in my laundry room.
 2      Q.  Did he show you the coil?
 3      A.  When he took it out.  Yeah, when he took it out.
 4      Q.  Describe what it looked like to you.
 5      A.  It was, like, black.  Looked like it had soot all
 6  over it.
 7      Q.  Had you seen anything like that before inside
 8  your house, in any other metal parts?
 9      A.  Not after the first time, no.  You know, that was
10  the first time.  I do remember him, whoever the AC guy
11  was, saying it wasn't supposed to look like that?
12      Q.  And did he say whether, you know, he had seen
13  other of these?
14      A.  I don't remember that.  I remember him saying it
15  wasn't supposed to look like that, and then, you know, he
16  said it should have been like a shiny copper color.
17      Q.  Now that we've been talking a little more, do you
18  think this is the time he mentions the drywall?
19          MR. WEISS:  Objection to form.  You can answer.
20          THE WITNESS:  I don't know.  It may have been.  I
21  don't know.
22  BY MR. HENNING:
23      Q.  You say the AC unit was in the laundry room; is
24  that right?
25      A.  The inside one is.
```

72

```
 1      Q.  And you have the outside AC units?
 2      A.  Right.
 3      Q.  And he was looking at the laundry room part?
 4      A.  Yeah, when he took the evaporator coil out.
 5      Q.  Did he do anything to the outside unit?
 6      A.  That's where he put the refrigerant in at.
 7      Q.  Anything -- did he tell you there was anything
 8  else wrong with the outside part other than out of
 9  refrigerant?
10      A.  I don't recall.
11      Q.  How big is the laundry room where the inside unit
12  was?
13      A.  It's not very big in there.
14      Q.  Is it still in the same place?
15      A.  Same spot.
16      Q.  Is there a washer and dryer in there?
17      A.  Uh-huh.
18      Q.  Are they next to each other, on top of each
19  other?
20      A.  Next to each other.
21      Q.  And where is the AC unit compared to the washer?
22      A.  It's first.
23      Q.  It's closer to the washer than it is to the
24  dryer?
25      A.  It's closer to the door.
```

73

```
 1      Q.  Is the AC unit the same distance from the washer
 2  as it is to the dryer?
 3      A.  No, it's closer to the washer.  The washer is
 4  first, then the dryer -- you go in, it's -- the evaporator
 5  coil is in the closet, then the washer, then the dryer.
 6      Q.  Okay.  The water feeding the washer, that doesn't
 7  go through that closet; right?
 8      A.  No.
 9      Q.  Is there any water going into that closet?
10      A.  Hot water heater.  Hot water is in there and the
11  AC handler is in that closet.
12      Q.  You got a well; right?
13      A.  I have a well.
14      Q.  Does the water feed into the hot water heater
15  come from the well?
16      A.  Yeah, same water.  The whole house has the same
17  water.
18      Q.  Sure.  So he comes back with a new evaporator
19  coil; is that right?
20      A.  Right.
21      Q.  And installs that?
22      A.  Right.
23      Q.  Did he install that himself?
24      A.  The AC company installed it, yeah.
25      Q.  Yeah, you didn't do that?
```

19  (Pages 70 to 73)

74

1      A.  No.
2      Q.  Did that seem to solve the problem at the time?
3      A.  At the time, yeah, they put new evaporator coil
4  in, they have to put new refrigerant in again because I
5  guess when you take it out, of course, all the pipes are
6  open, so then they recharge it and then that's it.
7      Q.  How much did you pay for that?
8      A.  That was under warranty.
9      Q.  After you saw the evaporator coil that was black
10  when he showed it to you, did that cause you to go start
11  looking around your house at other metal components?
12      A.  I started looking at that stuff, you know,
13  after -- you know, of course I seen this stuff on the news
14  and then at whatever time I had talked to you, know, one
15  of the AC techs, you know, sparked my interest, and then
16  that's when I would have started looking at things
17  throughout the house to see if I had a problem other than
18  maybe just besides a faulty AC.
19      Q.  Let's stick to the AC for a moment, and we'll
20  come back to whatever else you saw.
21      A.  Okay.
22      Q.  At some point did you have another problem with
23  the AC unit?
24      A.  Yeah, almost like a year later, almost exactly
25  same thing, same problem.

75

1      Q.  You called the same AC guys?
2      A.  Same company.
3      Q.  And they came out.  Was there anything different
4  about the second time than the first time?
5      A.  Same problem.  Evaporator coil had failed again,
6  black, and the -- they said the refrigerant had leaked out
7  at the evaporator coil, so then the same thing had to
8  happen again, they had to recharge it, order the part,
9  part comes in, come back out, fix it, recharge it, then
10  it's fixed again.
11      Q.  Was that under warranty, too?
12      A.  Yeah, that was under warranty again.
13      Q.  So no out-of-pocket expense for you?
14      A.  Huh-uh.
15      Q.  The closet where he's working with the evaporator
16  coils, was that like a wood closet?
17      A.  Yeah, it's framed.  It's framed.
18      Q.  Is there drywall in the closet?
19      A.  It's all drywalled.
20      Q.  In the closet?
21      A.  And it's got bi-fold doors on it.
22      Q.  Okay.  Do you remember whether -- between the
23  first repair and the second repair is that when you
24  started looking around your house for other things, or was
25  it only after the second repair?

76

1      A.  Yeah, it would have been then, and then shortly
2  after that, like after I thought maybe I had a problem,
3  then that's when I called the insurance company.
4      Q.  Okay.  So was it shortly after you, in your mind,
5  concluded you might have a problem that you called the
6  insurance company?
7      A.  Right.
8      Q.  And when you called the insurance company, did
9  you think it was a drywall problem?
10      A.  At that time, I didn't know.  You know what I'm
11  saying?  I mean, I had heard the stuff on the news and
12  stuff like that, but I didn't know if that's what my
13  problem was or if it was something else.
14      Q.  At the time you called the insurance company, you
15  had heard about drywall stuff; is that right?
16      A.  Right.
17      Q.  And you had by then, am I right, had a
18  conversation with the AC repair tech about drywall?
19      A.  Right.
20      Q.  And did you tell the insurance company that you
21  thought it was a drywall problem?
22      A.  Yeah, when I called.
23      Q.  Okay.
24      A.  Yeah.
25      Q.  Do you remember when you called the insurance

77

1  company?
2      A.  I don't remember.
3      Q.  Were you at your new job or your old job?
4      A.  I would have probably been at my new job by then,
5  yeah.
6      Q.  Do you have any documents about the AC repairs?
7      A.  Yeah.
8      Q.  Whatever documents you had about that, if you
9  give them to your lawyers?
10      A.  I have.
11      Q.  Okay.  So after the second repair, then what
12  happens next?
13      A.  Are you talking about to the next repair?
14      Q.  Yeah, is there a next repair?
15      A.  Yeah, there's a next repair.
16      Q.  Is there more than three?
17      A.  Well, I'm on the third evaporator coil I have in
18  there now.  It was about a year later again, somewhere
19  around a year later, I don't remember exactly, about a
20  year later, same problem again.
21          So they come out, they say the same problem
22  again, and then -- but they said -- then what they did is
23  instead of getting the same evaporator coil, you know,
24  they recharged them up and they ordered one, but then the
25  one they got was dipped in some kind of a coating.

20  (Pages 74 to 77)

78

1      They said that would try to protect it from any
2  outside air, anything getting to it to the coil, like a
3  protective coating.  They put that in the house, and
4  that's what's in there now.
5      Q.  Any problems since then?
6      A.  Luckily, no.
7      Q.  Do you remember when that happened?
8      A.  The last coil was probably sometime in '09, late
9  '09, if I remember correctly.
10     Q.  Was the third repair a warranty repair, too?
11     A.  Luckily, it was.
12     Q.  So those three repairs, while inconvenient to
13 you, had no out-of-pocket expense?
14     A.  No.  I had purchased an extended warranty when I
15 bought the AC and stuff from the company.
16     Q.  Where did you go buy the AC units?
17     A.  All American.
18     Q.  How much was the extended warranty?
19     A.  I don't remember exactly.  Somewhere around
20 $1,000, but I don't remember exactly what it was.
21     Q.  Do you have the documents about your purchase of
22 the AC units?
23     A.  I should have.
24     Q.  Do you remember what the term or the length of
25 the -- was there a standard warranty on the AC stuff?

79

1  Presumably if you bought an extended warranty, right,
2  there was some standard warranty?
3      A.  Yeah, standard.  What the length of it was, I
4  don't remember.
5      Q.  How did you decide where you were going to buy
6  the AC stuff?
7      A.  You mean how did I pick that company?
8      Q.  Yeah.
9      A.  That was referred to me by my aunt.  My aunt knew
10 the owners of the company.
11     Q.  Did she say anything about them -- good, bad, she
12 had a good experience?  What did she say about them?
13     A.  She didn't have any words.  She just said that
14 knows them.  They're friends of hers.
15     Q.  Mr. Brucker, we've talked a little bit about the
16 air conditioning units.
17     Is there any other property in your house or
18 parts of your house that you think have been harmed by the
19 drywall?
20     A.  You mean any other things that are corroded?
21     Q.  Corroded or any form of damage that you think has
22 anything to do with the drywall?
23     A.  Well, I know like -- you know, my wires, I've
24 seen those like in the wall, you know, the copper pipes
25 and stuff underneath my sinks and stuff are black, turning

80

1  colors and stuff.
2      I have seen the copper lines that go to my
3  refrigerator for the water, they're turning colors,
4  fittings like, you know, anything that's, you know, like
5  shiny has got like, you know, looks like pit marks and
6  stuff like in them.
7      Q.  What do you mean by pit marks?
8      A.  Like black -- I don't know, like black pit marks.
9      Q.  Circles?
10     A.  Yeah.  Jewelry, jewelry turns black, gold,
11 silver.
12     Q.  Any of your jewelry?
13     A.  My girlfriend's jewelry.
14     Q.  How about any of yours?
15     A.  I don't have a whole lot -- I'm not -- like I
16 have like a necklace and a ring.  Mostly hers -- mostly
17 hers is the one that's corroded really bad.
18     Q.  Whatever limited amount of jewelry you have, is
19 that fine, or is that corroded, too, you think?
20     A.  You know, it is like -- like tarnished or
21 something, but not as much as hers.  You know, the
22 smaller, you know, jewelry like earrings and smaller
23 necklaces and stuff, where there were pictures taken of
24 that.  I don't know if you have that.
25     Q.  Sure.  What about your jewelry?  Is every piece

81

1  of your jewelry, you think, tarnished?
2      A.  I don't recall.  Not like hers.  Hers are a lot
3  worse.
4      Q.  Even though you think the extent of hers is
5  worse, does every piece of your jewelry have some tarnish
6  on it, you think?
7      A.  Yeah, but not like hers.  The smaller stuff is
8  worse.
9      Q.  Sorry.  I cut you off.  You were identifying any
10 other places you'd seen damage that you think are
11 attributed to the drywall?
12     A.  Just, you know, some of the light fixtures, like
13 if they're shiny, like a chrome color or something, same
14 thing, black pit marks.  I've had like electrical failures
15 in there with my fire alarms.  They just go off by
16 themselves.
17     Q.  What makes you think that has anything to do with
18 the drywall?
19     A.  I don't even know any other reason why they would
20 fail.
21     Q.  You checked the batteries?
22     A.  I changed all the batteries, like in the middle
23 of the night.  It happens, you know, sometimes in the
24 middle night where it would just go off at 3:00 in the
25 morning.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

82

1    Q.  Are yours grounded with batteries and --
2    A.  Grounded battery backup.
3    Q.  I'm sorry I cut you off.  Anything else?
4    A.  Several coffee pots, they just quit.  They last
5    probably somewhere upwards of six months, and they just
6    quit.  And the ones that are digital are worse.
7    Q.  So you've been replacing coffee pots every six
8    months?
9    A.  At least.
10   Q.  How many have you gone through?
11   A.  I don't know exactly how many.  A lot.
12   Q.  Any other places or property you've seen damaged,
13   you think, by the drywall?
14   A.  I don't know.  I can't recall.  Just mostly like
15   I said the wires, the fire alarm stuff, the coffee pot,
16   jewelry, anything that's like copper color is, you know,
17   black, tarnished and stuff.
18   Q.  Have you ever seen anything similar outside your
19   house?
20   A.  No.
21   Q.  No place?
22   A.  Huh-uh.  I don't have jewelry sitting outside,
23   you know what I mean.
24   Q.  Have you got any pipes outside?
25   A.  Yeah, there's piping, but there's nothing

84

1    Q.  How about in the shower?
2    A.  I can't see inside the wall.
3    Q.  What about the fittings and the fixtures in the
4    shower?
5    A.  They kind of look like the bathrooms light look,
6    they got the black pitting marks and stuff.
7    Q.  The stuff in the bathroom, does that look worse
8    to you than in other parts of the house?
9    A.  All looks kind of the same.
10   Q.  Let's go off the record for a second.
11   VIDEOGRAPHER:  Going off the record.  The time is
12   10:57 a.m.
13   (A break was taken.)
14   VIDEOGRAPHER:  Back on the record.  The time is
15   11:12 a.m.
16   BY MR. HENNING:
17   Q.  Mr. Brucker, you mentioned during our last
18   exchange that you called the insurance company.  Why did
19   you do that?
20   A.  Well, I mean, you know, I thought I may have had
21   a problem with, you know, the drywall, so I thought, you
22   know, if I did have a problem and I had to get repairs
23   done, you know, I thought you had to file homeowner's
24   insurance.
25   Q.  Who is your insurance company?

83

1    corroded.
2    Q.  No fittings?
3    A.  My other house is over there.  You know, I lived
4    in the original house before that house was destroyed.
5    Q.  And you have never saw any of this over there?
6    A.  Never.
7    Q.  Do you see, your words, corrosion -- what do you
8    mean by corrosion?  The pit marks and stuff turning black,
9    anything else?
10   A.  Yeah.  That's what I take it as corrosion.  It's
11   black, it's tarnishing, it doesn't look like it's supposed
12   to look.
13   Q.  Is it the same all throughout your house, or do
14   you see it more in one place than another?
15   A.  I don't believe I have noticed it on more than
16   one or the others.  Pretty much the whole house.
17   Q.  You don't see it more in bathroom, in sinks?
18   A.  I haven't noticed it more in one area or the
19   other.
20   Q.  Some of the places you've noticed it, I think you
21   said, at least one place was the copper lines for the
22   water feeding the refrigerator; is that right?
23   A.  Yeah, behind the refrigerator.
24   Q.  And copper pipes in the sink?
25   A.  Under the sinks.

85

1    A.  State Farm.
2    Q.  Do you have any documents about -- did you submit
3    a claim to State Farm?
4    A.  Submitted a claim.
5    Q.  Do you have any of those documents?
6    A.  Yeah, I should have provided them, I think, to
7    Mr. Weiss.
8    Q.  Whatever you have about that claim and that
9    action with State Farm, have you given those to your
10   lawyers?
11   A.  I believe I have.
12   Q.  Do you remember when you submitted the claim?
13   A.  Maybe '07, '07 or maybe early '08.  Late '07 or
14   early '08, if I remember right.
15   Q.  So a year, year and a half after you moved into
16   the house?
17   A.  If my memory -- if I remember correctly.
18   Q.  What did they say back?  What did the insurance
19   company say back?
20   A.  They ended up denying my claim.
21   Q.  Why?
22   A.  One of the exclusion -- I think pollution
23   exclusion.  I think it was a pollution exclusion, I think,
24   is what the term they used.  Some sort of an exclusion in
25   the policy.

22  (Pages 82 to 85)

86

1    **Q.** Did they send you a letter?
2    **A.** A denial letter, yeah.
3    **Q.** Did you turn that over to your lawyers?
4    **A.** I believe I did.
5    **Q.** Did you appeal or take any steps after you got
6    the denial to try to change their mind?
7    **A.** No.
8    **Q.** Was there anybody helping you do that?
9    **A.** Helping me do what?
10    **Q.** Submit a claim to the insurance company?
11    **A.** No, I just -- I did it.
12    **Q.** At the time you didn't have a lawyer; is that
13    right?
14    **A.** No, it was after that, I believe.
15    **Q.** How did you first come in -- I asked you the name
16    of the first lawyer. I couldn't quite remember that. Am
17    I remembering correctly you said that person was
18    recommended by a friend of yours?
19    **A.** That the attorney was recommending me?
20    **Q.** Yeah.
21    **A.** I don't know if it was a friend of mine. It was
22    recommended by somebody, but I don't remember -- I don't
23    remember who it was recommended to me by.
24    **Q.** And then did you reach out and contact that
25    lawyer?

87

1    **A.** I called them.
2    **Q.** Okay. How did you first come in contact with
3    Mr. Weiss's office?
4    **A.** Through that attorney's office. It was like a
5    referral.
6    **Q.** When you submitted the claim to State Farm, is
7    there a place where you had to describe the problem?
8    **A.** I don't know if it was -- I don't remember if it
9    was written. I had to, you know, tell them what I thought
10    the problem was, and then they sent somebody out to do
11    like their own, you know, investigation of the problem or
12    like -- I don't know if it was a claims adjuster or what,
13    but somebody came out. So then they --
14    **Q.** I'm sorry. I cut you off. Go ahead.
15    **A.** They went around the house and, you know, they
16    looked at evaporator coil, they looked at wires in my wall
17    and like underneath my sinks and areas where there was,
18    you know, pit marks and corrosion and copper was turning
19    color.
20    And then after that -- I don't remember how long,
21    but after that they sent me the denial letter and saying
22    what exclusion it was and the reason of why.
23    **Q.** Did you submit a written claim to State Farm, or
24    did you do this over the phone?
25    **A.** I don't remember if it was written. I know I

88

1    called them and they sent somebody out. I don't remember
2    if there was any written claim or not.
3    **Q.** Do you remember when they came out?
4    **A.** Sometime after I called them.
5    **Q.** Is that the only claim you've ever made to State
6    Farm for your house?
7    **A.** I think so, yeah.
8    **Q.** Did you ever complain to anybody else about your
9    drywall?
10    **A.** Complain to anybody else about my drywall?
11    **Q.** Yeah. I mean, was your claim to State Farm based
12    on the drywall?
13    **A.** Based on the drywall.
14    **Q.** And you told them you thought it was bad?
15    **A.** Yeah, I thought maybe, you know, having a
16    problem.
17    **Q.** Have you made any statements to anybody else
18    about your drywall?
19    **A.** To who? I don't understand what you mean.
20    **Q.** Anybody else, the CPSC?
21    **A.** Yes, yeah, they come in.
22    **Q.** Anybody in the press?
23    **A.** Well, part of this has got to do with between me
24    and Greg.
25    MR. WEISS: To the extent --

89

1    THE WITNESS: The press.
2    MR. WEISS: -- you can answer a question that
3    doesn't involve a conversation where it's just you and
4    me, you can answer the question. If you had -- and I
5    had a conversation with a third party that wasn't a
6    lawyer, you can tell them about that conversation.
7    THE WITNESS: There was a press -- like I don't
8    know if it's a -- what it is, if it's a magazine or I
9    don't know what it is, but there's some kind of
10    article or -- with, I believe it's ProPublica.
11    BY MR. HENNING:
12    **Q.** Okay. Any other press or media other than
13    ProPublica?
14    **A.** No.
15    **Q.** How about did you ever contact anyone for
16    property tax relief?
17    **A.** The county.
18    **Q.** Is there anybody else you can remember making
19    statements to you about your drywall?
20    **A.** Not that I recall at this time.
21    **Q.** Let's take them one at a time. How many times
22    have you talked to somebody at ProPublica?
23    **A.** I talked to him on the phone.
24    **Q.** Just once?
25    **A.** Just the once, I believe, yeah, it was like -- it

23  (Pages 86 to 89)

90

1  was a three-way call. I believe it was a three-way call.
2  **Q. With Mr. Weiss and the reporter?**
3  A. Yes.
4  **Q. Well, I shouldn't assume that. Was it a**
5  **reporter?**
6  A. I guess. Whoever the representative was of that
7  company or magazine or whatever it is.
8  **Q. When you were talking to them, did you think it**
9  **was a reporter?**
10  A. I knew it was for whatever that is, and I'm not
11  sure whether it's like a magazine or a journal. I'm not
12  exactly sure what that is. I don't remember at this time.
13  **Q. Did you reach out to them, to ProPublica?**
14  A. Through the attorney's office.
15  **Q. Was it your idea to talk to them?**
16  A. I didn't know about them initially.
17  **Q. Was it your idea to talk to them?**
18  A. No, it was through my attorney's office.
19  **Q. Do you remember the name of the person you spoke**
20  **with?**
21  A. I don't now. He introduced himself, but I don't
22  remember it now.
23  **Q. Did you ever see any documents from ProPublica?**
24  A. I don't get anything from them.
25  **Q. Whether you get it or not, have you seen it out**

91

1  and about?
2  A. Never have.
3  **Q. Can you remember when you had this conversation,**
4  **either by date or what was going in your house with the**
5  **lawsuit, if that's easier for you?**
6  A. It's been a while ago. I don't know how long
7  ago.
8  **Q. Tell me about that conversation. Did they ask**
9  **you questions? Did you give a statement? What happened?**
10  A. They asked me questions, if I remember correctly,
11  you know, about the house, you know, kind of like, you
12  know, when things had happened and, you know, what has
13  happened and, similar to kind of what you asked me today,
14  like what have I seen and, you know, like a time line, I
15  guess, almost.
16  **Q. Did you get any money from them?**
17  A. I don't get nothing from them.
18  **Q. Did you ever see any article or written document**
19  **published by them saying, hey, here is what Chris Brucker**
20  **told us?**
21  A. I seen it on the Internet, online.
22  **Q. Do you still have that?**
23  A. No, I didn't print it out.
24  **Q. When you read it, did you make sure that they got**
25  **your story right, and they got right what you told them?**

92

1  MR. WEISS: Objection to form. You can answer.
2  THE WITNESS: I don't know if I read it to see
3  whether it was right or not, just read document.
4  BY MR. HENNING:
5  **Q. When you read it, did you see anything that**
6  **caused you to say: Hey, that's not what I said?**
7  A. I'm not remembering anything now that stood out
8  at that time.
9  **Q. As far as you can recall --**
10  A. It's been a while ago.
11  **Q. Am I right that as far as you can recall, they**
12  **reported correctly what you told them?**
13  MR. WEISS: Objection to form.
14  THE WITNESS: I believe for the most part, yeah.
15  BY MR. HENNING:
16  **Q. So I think you mentioned Mr. Weiss, you and the**
17  **reporter were on this call. Anybody else?**
18  A. No.
19  **Q. Do you remember whether the reporter asked**
20  **Mr. Weiss for a statement?**
21  A. Asked him for a statement?
22  **Q. Yeah.**
23  A. I don't know.
24  **Q. I mean, while you were on the phone?**
25  A. No. They just introduced who they was, I

93

1  remember that.
2  **Q. Let's move on to the county. You went to them**
3  **for property tax relief; is that right?**
4  A. Uh-huh.
5  **Q. When did you do that?**
6  A. I don't remember how long. It's been a while for
7  that, too. I don't remember what year it was. Probably
8  '0 -- maybe '09/'10.
9  **Q. Was that after the last of the AC repairs?**
10  A. If I remember right, it was. I don't remember
11  exactly. If I remember correctly, it was.
12  **Q. Do you know whether it was after the lawsuit was**
13  **filed?**
14  A. Yeah, the lawsuit had been filed by then.
15  **Q. Do you know when the lawsuit was filed?**
16  A. Exactly when, I don't know exactly when.
17  **Q. Do you have an estimate of when?**
18  A. See, I don't really know -- I don't recall
19  whether or not my first attorney or Mr. Weiss's office is
20  the one that initially filed it because I had the other
21  attorney for a while. And it didn't seem like a lot was
22  happening; that's when they referred me to Mr. Weiss's
23  office, but I don't remember if that other law firm had
24  filed anything or if it was the like just gathering
25  information. I don't know.

24  (Pages 90 to 93)

94

1    **Q.  Do you have any documents about your exchange**
2  **with the county seeking property tax relief?**
3    A.  No, they came out -- two guys came out from the
4  county, and they looked around the house and I don't
5  remember if they sent me any -- they might have sent me a
6  document, I don't remember.  I do remember them denying
7  any tax relief, and the reason was because I have, I
8  guess, like tax relief now due to Hurricane Charley
9  because my house was destroyed during Hurricane Charley.
10  So they told me that there was no discount that I would be
11  offered from the county.
12    **Q.  Because you were already getting one?**
13    A.  I guess getting one.  There was some -- I don't
14  know if there's some state law or something that went into
15  effect after Hurricane Charley with people that were
16  affected.  And due to that, that I was not offered
17  anything.
18    **Q.  At least -- let's talk at least about what they**
19  **told you, whether there's some state rule about that you**
20  **and I don't know.  What is it they told you about why you**
21  **wouldn't get property tax relief?**
22    A.  Because of that.
23    **Q.  Okay.  And that's the only reason they gave you?**
24    A.  That's the only reason they gave me.
25    **Q.  What prompted you to try to get property tax**

95

1  relief?
2    A.  I think it was through advisement through the
3  attorney's office.
4    **Q.  Okay.  And it was because of the drywall?**
5    A.  Right, because like your house is like a loss,
6  like you've had a loss or something with your house, that
7  you may be eligible for some kind of tax relief because
8  your house would not be, I guess, at its value.  You have
9  to add the depreciated value with all the problems.
10    **Q.  And you told the county folks you thought you had**
11  **a problem with the drywall?**
12    A.  Right.
13    **Q.  Sorry.  Were there any documents exchanged, or**
14  **was this totally by phone and somebody came out and looked**
15  **at the place?**
16    A.  I called them and they have to set up like a
17  time, like a meeting.  They come out, they sent two guys
18  out, they were there for a while.  Like I said, they
19  looked around, and I don't remember if they sent me
20  something in the mail, like the denial, or if they told me
21  verbally.
22    **Q.  If you had something in writing, did you give it**
23  **to your lawyers?**
24    A.  I'm sure I would have.
25    **Q.  How about Lowe's?  Did you ever go back to Lowe's**

96

1  **when you thought you had a problem with the drywall?**
2    A.  At first.  At first before I had -- before I had
3  an attorney, I did.  I called.  There's like a -- I think
4  it was a customer service number, and I don't remember --
5  I think I might have called the office first, and then
6  they gave me another number, like a headquarters number.
7  And I called that, and didn't really get anywhere with
8  that phone call.
9    **Q.  Did you ever end up talking with anybody at**
10  **Lowe's?**
11    A.  There was somebody, like I guess a customer
12  service rep, I'm assuming that's what they are.  And they
13  ask you like -- basically what your problems are with
14  their product or, you know, stuff like that.
15    **Q.  Do you remember how long after you had the**
16  **drywall you made that call?**
17    A.  I don't remember how long after that because it
18  would have been after that I would have, you know, like
19  after the first AC problems and stuff like that, you know,
20  when I started suspecting I had a problem, it would have
21  been after that, but I don't know exactly when.
22    **Q.  And I forget what you said, did anyone ever get**
23  **back to you from Lowe's?**
24    A.  No.
25    **Q.  I think you also mentioned that you talked to the**

97

1  CPSC about your drywall; is that right?
2    A.  Right.
3    **Q.  Can you remember when that was?**
4    A.  I don't remember if it was '08, latter part of
5  '07 or '08.  I don't remember exactly.  It's been going
6  for several years.  Kind of hard to remember exactly when.
7    **Q.  Did you reach out and contact them?**
8    A.  I did.
9    **Q.  By phone?**
10    A.  I don't remember if it was by phone or by the
11  Internet.  Because I believe on the Internet you could
12  like put in your house residence and stuff like that.  And
13  then they would contact you.
14    **Q.  Did someone from the CPSC come out to the house?**
15    A.  They did.
16    **Q.  How many times?**
17    A.  Probably twice they did a two-week study.  I
18  think it was a two-week study at my house.
19    **Q.  And are you aware of what, if any, conclusions**
20  **they came to about your drywall?**
21    MR. WEISS:  Objection to form.  You can answer.
22    THE WITNESS:  I don't think they formed -- like
23  their purpose is to form any conclusions.  They take
24  the data and, you know, the data that comes in like
25  this packet because they wouldn't tell me whether I

25  (Pages 94 to 97)

98

1    did or didn't have -- they wouldn't confirm or
2    nothing.  They just did a study.
3    BY MR. HENNING:
4        Q.  What did you expect would happen when you called
5    them?
6        A.  Well, I thought maybe they could tell me, you
7    know, they could tell me, you know, what problems I'm, you
8    know, what I was having and, like I said, they did the
9    study.  I remember they left these things at my house,
10   like left one in my living room, one in my bedroom, one
11   outside.
12       It had -- it was like a stand and it had like
13   different pieces of metal hanging on this stand and
14   different -- and then some other stuff, had stuff hanging
15   all around it.
16       And then whatever information they get off of
17   that, then they turn that into a written form of
18   information, I guess, what they say.  They did the same --
19   they had this gun-looking thing they put on the wall
20   different places of the house, and they kept writing, but
21   I don't know what they were writing.
22       Q.  Did you ever go back to them and say, hey, what
23   did you find in my house?
24       A.  I did ask one of the guys, and they said they
25   don't -- they just take the information in the house.

99

1    They're not allowed to say one way or the other.
2        Q.  Had you seen any lawyer, retained any lawyer when
3    you contacted CPSC?
4        A.  I don't know if I had a lawyer then yet or not.
5        Q.  To your knowledge, anyone else other than you
6    communicate with the CPSC about your house?
7        A.  Not that I know of, no.
8        Q.  Did you ever smell any unusual odor in your
9    house?
10       A.  I haven't.
11       Q.  Is that true for the entire time you've lived
12   there?
13       A.  Yeah.  I mean, I've never noticed a distinct
14   smell.
15       Q.  Have you ever smelled something that you felt was
16   a sulfur smell?
17       A.  No.
18       Q.  Mr. Brucker, did you have to -- I assume you had
19   to redig the well when you were building your house?
20       A.  No.  Same well.
21       Q.  Same well from the first house?
22       A.  That's the same well from the first house.
23       Q.  How about --
24       A.  Same water.
25       Q.  How about the same well -- was it the same well

100

1    pump from the first house?
2        A.  I have never changed it.
3        Q.  So that stuff didn't get destroyed in the
4    hurricane?
5        A.  No, the stuff that's there is the same stuff that
6    was there when I bought the place.
7        Q.  Same well, same pump?
8        A.  Same aerator tank.
9        Q.  How about the pipes feeding the water into the
10   house from the well, from the pump?  Were they new or from
11   the first house?
12       A.  Well, no, those are different because you have to
13   feed the house.  PVC pipe.
14       Q.  Do you know what kind of pipe was there
15   originally in the first house?
16       A.  PVC pipe.
17       Q.  You replaced it with the same kind of PVC pipe?
18       A.  It's still there.  Like the original PVC pipe
19   that went to the house, the original house, goes left from
20   the pump.  It's still there.  The pipe that goes to my
21   house goes to the right to my house, now.  That's new
22   pipe, and it's PVC pipe.
23       Q.  The pipe that goes left to where the old house
24   was, is that -- doesn't lead anywhere, it's not connected
25   to the end at anything; right?

101

1        A.  The water spigot now.
2        Q.  Okay.
3        A.  It was plumbed into the house, but the house is
4    gone.  So now there's a water spigot there.
5        Q.  What do you mean by that, water spigot?
6        A.  Water turn-off valve.
7        Q.  Okay.  You mention the same aerator tank.  What's
8    an aerator tank?
9        A.  It's an aerator tank, maybe, I don't know,
10   four -- four feet tall or so, maybe three-foot around
11   water sprays from the top of the tank, fills that tank up,
12   and then water is feed to whatever you're supplying water
13   to.
14       Q.  In your case, your house?
15       A.  In my case, my house.
16       Q.  What's the purpose of an aerator tank?
17       A.  I guess to aerate the water.
18       Q.  Do you know whether -- have you ever learned that
19   there's sulfur in the water in this area of Florida?
20       A.  I think most of Southwest Florida has sulfur
21   water.
22       Q.  Does the aerator tank, in your view, have any
23   role to deal with that?
24       A.  I think so.
25       Q.  What do you think its job is to do to deal with

26  (Pages 98 to 101)

102

1  it?
2          MR. WEISS: Objection to form. You can answer.
3          THE WITNESS: Basically the aerate -- you know,
4      to aerate the water, so, you know, and in this area,
5      if you have sulfur water, if you're not on a city
6      well, city-supplied water, then people will have an
7      aerator tank there to aerate the water. So if there's
8      any smell in the water, it aerates it before it's
9      supplied to your home.
10  BY MR. HENNING:
11     Q. Did you ever smell anything unusual out at the
12  tank?
13     A. No.
14     Q. Is the tank enclosed?
15     A. It's enclosed.
16     Q. In what kind of a shed?
17     A. Enclosed in a shed. It's got doors.
18     Q. Anything else in the shed other than the aerator
19  tank?
20     A. The well pump.
21     Q. Do you know how old the well pump and the aerator
22  tank are?
23     A. I don't. They were there when I bought the
24  original house.
25     Q. Who did you buy the original house from, do you

103

1  remember?
2     A. Rose Kowalski.
3     Q. Take a shot at spelling that.
4     A. Let's see, it's K-O-W-A-L-S-K-I.
5     Q. Do you have any -- before you bought the original
6  house, do you have any idea what was done, if anything, to
7  maintain the aerator tank?
8     A. Before I bought the house?
9     Q. Yeah.
10    A. I don't know.
11    Q. From the time you bought the first house until it
12  was destroyed, what did you do, if anything, to maintain
13  the aerator tank?
14    A. What do you mean by maintaining it?
15    Q. Did you ever have to repair it?
16    A. No, no repairs.
17    Q. Ever notice anything wrong with it?
18    A. No.
19    Q. Is there any kind of routine maintenance
20  checkup-type stuff you did on it?
21    A. No, it's just a tank. It's fiberglass, just like
22  fiberglass tank.
23    Q. How about the well pump? Have you ever done
24  anything to do routine maintenance on the well pump?
25    A. No.

104

1     Q. No?
2     A. Still the same one.
3     Q. Did you ever see any corrosion out by the well
4  pump in the fittings out at the aerator tank?
5     A. No.
6     Q. When is the last time you were out there and
7  looked at the aerator tank and the well pump?
8     A. I don't know.
9     Q. Have you ever gone out and looked at it?
10    A. Not for any reason. Probably weed-eated around
11  it. You know, like mow grass and weed-eated around it.
12    Q. Is that when it's closed in the shed?
13    A. Yeah, it's all closed in.
14    Q. When is the last time you ever looked inside the
15  shed and the aerator -- or the aerator tank and the well
16  pump, sorry.
17    A. I don't know. I'm sure I've been in there
18  periodically different times for something, but not for
19  any general purpose. Put electric in there to the house.
20  It was like -- you know, there's like a panel, put that in
21  there.
22    Q. Did you do that when you were building the new
23  house?
24    A. Yeah, supply electricity from -- that way, like
25  you put electrical cutoffs and switches, shutoffs and

105

1  stuff in there, put that in there.
2     Q. Do you remember when that was, what stage of the
3  building of your house?
4     A. It would have been after the doors and windows
5  and all that stuff, so it was before the plumbing was put
6  in. You know, it was right before plumbing was put in.
7     Q. And that was you; you did that. That wasn't
8  something you subcontracted out to put the electrical box
9  in the same tank with the --
10    A. A friend of mine helped me put that electrical
11  box in. I dug all the water lines, put the water lines
12  in.
13    Q. Were you the one actually in the shed with the
14  aerator tank and the well pump, putting the electrical box
15  in?
16    A. Yeah, me and my friend.
17    Q. When you were in there, did you look at the
18  aerator tank and the well pump?
19    A. I don't recall.
20    Q. When you were in there, did it smell funny?
21    A. I don't remember any smells.
22    Q. When you were building the new house, you didn't
23  even consider you not having the aerator tank; right?
24    A. When I was building the new house, did I do what?
25    Q. Did you even not consider having the aerator

27  (Pages 102 to 105)

106

1  tank?
2      A.  It was just there.  It was all there, all hooked
3  up, you know, that's what was working before, that's what
4  was -- you know, so I didn't go in there and change
5  anything.
6      Q.  Were there other houses with wells around yours?
7      A.  All of them.
8      Q.  Does everybody have an aerator tank?
9      A.  I don't know what they have.
10     Q.  Have your kids lived in the house continuously
11  the whole time you have?
12     A.  Uh-huh -- well, no, because I -- you know what
13  I'm saying, I had the house before my son was born.
14     Q.  I'm sorry, I mean the new house.
15     A.  Yeah.
16     Q.  So he wasn't born yet?
17     A.  No.
18     Q.  Okay.  At least for his entire life he's lived in
19  the house?
20     A.  Yeah.
21     Q.  You mentioned you had two kids.  What are their
22  names?
23     A.  Emily and Bryant.
24     Q.  Emily.  How old is Emily when y'all moved into
25  the new house?

107

1      A.  Three.
2      Q.  And how long after you moved into the new house
3  until your son was born?
4      A.  He was born September 13th of '06, and I got the
5  final CO on I think the same day.  Either the same day or
6  day or two after.  It was right close.
7      Q.  So you all moved in pretty close to the day he
8  was born?
9      A.  Well, kinda sorta.  He was at an all-children's
10  hospital for a while, so it took a little while to get him
11  back.
12     Q.  Sure.
13     A.  But we were there -- I mean, when he come home,
14  he's been there his whole life.  He hasn't been anywhere
15  else.
16     Q.  Are you married, Mr. Brucker?
17     A.  I am not.
18     Q.  You mentioned you live with your girlfriend.
19  What's her name?
20     A.  Angela.
21     Q.  Is Angela the mother of both your kids?
22     A.  Yes.  My daughter is my stepdaughter.
23     Q.  Okay.
24     A.  From her previous.
25     Q.  Do you claim your kids as dependents for tax

108

1  purposes?
2      A.  I do not.
3      Q.  Why is that?
4      A.  She claims them.
5      Q.  Okay.  Mr. Brucker, are you aware of any
6  testing -- let's step back.
7          You already testified you're aware of some
8  drywall samples taken from your house; is that right?
9      A.  Right.
10     Q.  Are you aware of the results of any testing on
11  your drywall?
12         MR. WEISS:  To the extent you can answer the
13     question without revealing attorney/client privileges,
14     you can.
15         THE WITNESS:  Okay.  Results being.
16  BY MR. HENNING:
17     Q.  Do you know whether your drywall was tested?
18     A.  Yes.
19     Q.  And for now, answer this question yes or no.
20         Do you know whether there were any results from
21  that test or those tests?
22     A.  Yes.
23     Q.  And do you have any knowledge of those results
24  that doesn't come from your lawyers?
25     A.  No.

109

1      Q.  Have you seen any reports about the testing of
2  your house or the testing of your drywall?
3      A.  What do you mean?
4      Q.  Have you seen any documents saying -- here's the
5  results of the testing of Chris Brucker's drywall?
6      A.  Yes, I believe I have.
7      Q.  Do you remember what they said?
8      A.  There's a lot of -- if I remember right, there
9  was a lot of, like, terms and stuff in there that I really
10  don't know what they mean.
11     Q.  Have you ever heard the term "sulfur-reducing
12  bacteria"?
13     A.  Through my attorney.
14     Q.  Does that have any meaning to you?  What does
15  that term mean to you, if anything?
16     A.  I don't know.  It doesn't mean -- it's just a
17  term.
18     Q.  Mr. Brucker, in your own mind, what if anything
19  do you think the problem is with your drywall?
20     A.  I think the problem with drywall is whatever is
21  in there, whatever is in it is causing a problem in the
22  house, with the corrosion and stuff.
23     Q.  In your own mind, do you have any more specific
24  view of what the problem is with your drywall?
25     A.  I don't know.  I'm not a --

28  (Pages 106 to 109)

110

1    Q.  We would have to talk to the experts for that?
2    A.  Yeah.
3    Q.  Mr. Brucker, had you ever built a house before?
4    A.  No.
5    Q.  Have you ever helped anyone build a house before?
6    A.  Yeah, I have.
7    Q.  What made you decide that you would build this
8    time?
9    A.  Cost.  I had a minimal amount of money to work
10   with.  I had some help from family members of mine that,
11   you know, has done construction work.  So, you know, I
12   took their help and what little money I had and built the
13   home that I got now.
14   Q.  How long did it take you from beginning to end?
15   A.  A year.
16   Q.  Started September '05?
17   A.  Uh-huh.
18   Q.  Were you working continuously until September of
19   '06?
20   A.  Yes, I did.
21   Q.  And when did you do it?
22   A.  My off time from work and on the weekends when I
23   was off.
24   Q.  You had to get a bunch of permits; correct?
25   A.  Uh-huh.

111

1    Q.  How did you figure out what permits you needed?
2    A.  Well, you can go to the county.  I mean, they
3    pretty much tell you.
4    Q.  I'm going to ask the court reporter to mark this
5    document as our next exhibit.
6    COURT REPORTER:  This is number 3.
7    MR. HENNING:  I should say this next collection
8    of documents we'll identify for the record.
9    (Defendants' Exhibit 3, Document with Bates
10   numbers Brucker 1 through 4, was marked for
11   identification.)
12   BY MR. HENNING:
13   Q.  Mr. Brucker, given what we marked as Exhibit 3
14   which is a four-page document, four pages put together,
15   Brucker 1 through 4 are the Bates numbers.
16   A.  Uh-huh.
17   Q.  I'm referring to those little numbers at the
18   bottom right there.  Can you take a quick look at this?  I
19   want to know whether these are all the permits you got
20   from the house?
21   A.  It looks like it.
22   Q.  And is there a separate well permit that you
23   otherwise need to get -- but since yours was already
24   there, or was there no such thing, as far as you know?
25   MR. WEISS:  Objection to form.  You can answer.

112

1    THE WITNESS:  I don't know.
2    BY MR. HENNING:
3    Q.  So you went to the county and asked what permits
4    you need to build a house?
5    A.  I mean, I went in there and, you know, I wanted
6    to build a house, they pretty much told me what I needed,
7    then there's a fee you got to pay and then there's certain
8    inspections you got to pass.
9    Q.  When the house was fully up, someone else came in
10   to inspect it?
11   A.  The county.
12   Q.  And were there any documents created about that
13   inspection?  Did you get something from them that says,
14   hey, you're good to go?
15   A.  You have a job box out front they have to sign
16   off, you know, that they come a certain date and if you
17   passed or if you don't pass, they got to come back to
18   reinspect if for some reason you don't pass.
19   Q.  Did you pass every time?
20   A.  All except the roofing one.  The bottom shingle
21   is supposed to be caulked with tar, and I hadn't put no
22   tar on.  So I had to go back and lift the bottom tab
23   shingle up and put tar underneath.  It was something to do
24   with the wind code.
25   Q.  Is that the only one you had to fix to get

113

1    passed?
2    A.  That was it.
3    Q.  Can you look at the first page of this Exhibit 3.
4    Do you see where it says valuation there kind of
5    toward the top right?
6    A.  Okay.
7    Q.  Valuation $95,700, do you see that?
8    A.  Yes.
9    Q.  Do you know what that is?
10   A.  I'm assuming the value of the property at the
11   time.
12   Q.  With your house on it?
13   A.  I don't know if that's with the house or not.
14   Q.  Did you submit documents to the county to get
15   these permits?
16   A.  You have to have an engineer permit and I know
17   there's an engineering permit.  There's some other stuff,
18   but I don't remember now what it was.
19   Q.  Do you remember whether you had to tell anyone
20   what you valued the property at with your house on it?
21   A.  I don't remember.
22   Q.  Are you aware of any appraisals done to your
23   property to appraise the value of your home?
24   A.  Yeah, you get a property appraisal.
25   Q.  Have you ever seen it and do you know what your

29 (Pages 110 to 113)

114

1  house is appraised at?
2  A. I have, but I don't know what it's appraised at.
3  Q. How about do you know whether it's appraised at
4  more or less than you spent to build it?
5  A. I'm assuming more.
6  Q. I take it you have never tried to sell your
7  house?
8  A. I have not.
9  Q. Do you know what kind of aerator tank you have?
10  A. It's fiberglass.
11  Q. How about a brand or company name? Do you know
12  anything about that?
13  A. No, I don't.
14  Q. And since it was existing from when you bought
15  the first house, you don't have any idea how old it is?
16  A. I don't.
17  Q. Same for the well pump?
18  A. I don't.
19  Q. We'll go to our next --
20  A. Can I use the restroom real quick?
21  MR. HENNING: Yeah, sure.
22  VIDEOGRAPHER: Going off the record. The time is
23  11:52 a.m.
24  (A break was taken.)
25  VIDEOGRAPHER: Back on the record. The time is

116

1  A. Yes.
2  Q. Did you go through it and make sure everything
3  was accurate before you signed that verification?
4  A. I believe I did.
5  Q. And everything was accurate?
6  A. I believe so.
7  Q. We already talked about ProPublica and other
8  statements you've made. Did you ever post anything online
9  about your drywall?
10  A. No.
11  Q. Ever make any videos of it?
12  A. No.
13  Q. Mr. Brucker, would you mind turning to
14  interrogatory number 12, which is on page 10.
15  Do you see response there to number 12?
16  A. Okay.
17  Q. Do you see the last sentence there that the
18  drywall was painted with Behr paint?
19  A. Yes.
20  Q. Did you paint the drywall?
21  A. Yes, I did.
22  Q. How did you decide what you would do and what you
23  would subcontract out?
24  A. Basically, based on whether or not either I
25  thought I could do it personally myself, or if I had, you

115

1  12:42 p.m.
2  BY MR. HENNING:
3  Q. Mr. Brucker, we have given you a document marked
4  as Exhibit 4. Do you recognize that document?
5  A. Yes.
6  (Defendants' Exhibit 4, First set of
7  interrogatories, was marked for identification.)
8  BY MR. HENNING:
9  Q. Do you mind flipping to the last page of the
10  document? Do you see where it says there verification?
11  It says what?
12  Q. Verification. Do you see that at the top?
13  A. Oh, on the back.
14  Q. Yeah, sorry. It's a double-sided copy.
15  A. Okay.
16  Q. Do you see that?
17  A. Uh-huh.
18  Q. Is that your signature there?
19  A. It is.
20  Q. What do you recognize this document to be?
21  A. This is first set of interrogatories.
22  Q. Information you provided in response to requests
23  from National Gypsum?
24  A. Okay.
25  Q. Have you seen these before today?

117

1  know, family members that, you know, knew that area of
2  what needed to be done, if they could help me.
3  Q. Do you still have the paint?
4  A. Do I still have the Behr paint?
5  Q. Yeah.
6  A. I may have some of it left over.
7  Q. Can you recall any more specifically what kind of
8  paint it was, what color, latex? Do you remember anything
9  more about it?
10  A. I have pink in my daughter's room, blue -- a
11  light blue in my son's. The rest of the house is all
12  painted one color, it's like a light tan, like maybe a
13  sand color. It's really light.
14  Q. Did you get that paint at Lowe's, too?
15  A. No, I believe I got that at Home Depot.
16  Q. Do you think you still have some of each of the
17  colors you put up?
18  A. I may have. I would have to look. I may have.
19  Q. I take it it was indoor paint?
20  A. Yeah, I assume it would be indoor paint.
21  Q. After it was installed, did you do anything else
22  in the drywall?
23  A. You mean after painting it?
24  Q. Yeah.
25  A. Huh-uh, no.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

118

1    Q.  And put aside for the moment people coming in and
2  taking pieces out for testing.  Are you aware of anybody
3  doing any of your drywall after it was up and painted?
4    A.  No, just the testing.
5    Q.  Do you know whether, when the drywall service
6  guys put it up, it was in the same condition as it was
7  when it was delivered to?
8    A.  What do you mean, same condition?  They just pick
9  it up off the pile and nailed it or screwed it up.
10    Q.  And they didn't do anything else to it?
11    A.  Huh-uh.  Well, they textured it.
12    Q.  What do you mean by that?
13    A.  They had like -- it's like a hopper, they had a
14  machine come to the back of the house and like on air you
15  put the gallons of plaster in it and then sprays it on to
16  the wall, it's a texture.  That's how they texture the
17  wall.
18    Q.  Do they need water to do that?
19    A.  I don't know if you need water or not.
20    Q.  Did you watch them do it?
21    A.  Spray it on there in the house?  Yeah.
22    Q.  When they were doing it, was there any water
23  feeding what they were doing?
24    A.  I don't recall.
25    Q.  Did they bring whatever it was they were spraying

119

1  on the drywall with them?
2    A.  No, it's them buckets, buckets that's on the
3  receipt.
4    Q.  Okay.  If you're looking at the receipt there,
5  can you tell me which one?
6    A.  The 20-bucket, the All-Purpose Mix.
7    Q.  Okay.  You don't remember whether they mixed that
8  with water to do what they were doing?
9    A.  I don't remember.  I remember them spraying it on
10  and it looked like a big plastic spatula and like they
11  spray it on and they take the spatula and they rub it over
12  the spray they just sprayed on.  They call -- that finish
13  is called knock-down.
14    Q.  Can you describe the tool they were using to
15  spray?
16    A.  It had air to it, and then like I say, it's like
17  a big -- this big jug like hopper, they call it like a
18  hopper, big jug sitting on top of this gun, they put the
19  stuff on there and when you pull the trigger on the spray
20  gun, air sprays it, it like splatters it, like splatters
21  on the wall.  And they take the spatula and they knock it
22  down.
23    Q.  And did you know they were going to do that
24  before you bought the drywall?
25    A.  Yeah, that was -- I wanted the wall to be

120

1  textured.
2    Q.  What made you decide that?
3    A.  I just liked textured over flat.
4    Q.  Had you seen it somewhere else?
5    A.  I had.
6    Q.  Was it in your old house?
7    A.  No, I -- no, but I have seen it other places.
8    Q.  Mr. Brucker, do you know whether the Service
9  Drywall folks are licensed contractors in Florida?
10    A.  I don't know.
11    Q.  Did you subcontract anything else out for the
12  house other than the drywall installation?
13    A.  Plumbing, the block from the foundation up.  I
14  think that's it.
15    Q.  Did you dig the foundation yourself and do the
16  foundation yourself?
17    A.  I did.
18    Q.  When you got the permits from the county to build
19  the house, did you have to tell them that you were going
20  to subcontract out pieces of it?
21    A.  No.  The only requirement by the county, you
22  could pull your owner/builder permit, but you have to
23  have -- there's certain inspections you have to pass.
24    You have to build the house to the same code as
25  the general contractor or anyone else and you only have a

121

1  certain amount of time.  You only have, I think, up to a
2  year total to build.
3    If it goes over beyond that, I believe you have
4  to file for an intention and give a reason.
5    Q.  Mr. Brucker, what do you want to get from the
6  lawsuit?
7    MR. WEISS:  Object to the form.  You can answer.
8    THE WITNESS:  The only thing I was really looking
9  to get was my house, you know, fixed and put back in
10  the shape that it should be in.
11  BY MR. HENNING:
12    Q.  We spent a good bit of time this morning talking
13  about your interaction with the CPSC.  Did you ever talk
14  to any other government body about your house and drywall?
15    A.  Well, the County.
16    Q.  For the property tax?
17    A.  Right.
18    Q.  Any other reason -- I mean, any other time?
19    A.  I don't recall so.
20    Q.  I'll give you another document.
21    COURT REPORTER:  No. 5.
22    (Defendants' Exhibit 5, Class action
23  complaint, was marked for identification.)
24  BY MR. HENNING:
25    Q.  I'll give you as much time as you like to

31 (Pages 118 to 121)

122

1  familiarize yourself with the document.
2      Do you recognize this?
3      A. Yeah, it says the class action complaint from me
4  to Lowe's.
5      Q. Have you seen this before today?
6      A. Yeah, I believe I have.
7      Q. And did you look through it to make sure
8  everything at least about you was right?
9      A. I believe so.
10     Q. Did you find anything that you thought wasn't
11 accurate?
12     A. Not to my knowledge at this time.
13     Q. Did you authorize the filing of this complaint?
14     A. Yes.
15     Q. Do you see the title of it says Class Action
16 Complaint?
17     A. Right.
18     Q. What do you understand class action to be?
19     A. Kind of the way it was explained to me was that
20 basically, there's several people that have like the same
21 problem and instead of, you know, everybody taking their,
22 you know, like if you had a lawsuit, if everybody clogging
23 up the courts and different court systems, you're down to
24 one court with one decision that affects everybody.
25     Q. Would you mind flipping to paragraph 47 of the

123

1  exhibit, which is on page 9?
2      A. Okay.
3      Q. Do you see there where it says Mr. Brucker is the
4  class representative?
5      A. I do.
6      Q. What do you understand class representative to
7  mean?
8      A. Basically I'm sort -- I'm representing myself,
9  but I'm representing many other individuals that's in the
10 same action that I'm in.
11     Q. Are there any duties you understand that you have
12 as a class representative?
13     A. I don't know what you mean, duties.
14     Q. Is there anything in your mind a class
15 representative has to do?
16     A. I don't know what you mean. I guess not.
17     Q. Do you want to be a class representative?
18     A. I don't know whether if I do or don't want to be.
19 I understand that I am.
20     Q. Do you have an opinion one way or the other
21 whether you want to be?
22     A. I don't have an opinion one way or the other.
23     Q. Would it matter to you if you were or were not?
24     A. I don't know the class representation of me being
25 the class rep if -- you know, what matters to me the most

124

1  is my house being fixed with the problem. You know, I
2  understand I'm the class representative and I'm -- I guess
3  kind of representing people that's under me. And I'm fine
4  with that, but if I was not that class representative, I'm
5  fine with that as well.
6      Q. Would you do anything differently as it pertains
7  to your lawsuit if you were a class representative than if
8  you weren't?
9      MR. WEISS: Objection to form. You can answer.
10     THE WITNESS: I think I would do just what I've
11 done up to this point, nothing different either way.
12 BY MR. HENNING:
13     Q. And how about going forward? Would you do
14 anything different if you were a class representative than
15 if you were not?
16     MR. WEISS: Objection to form. You can answer.
17     THE WITNESS: One more time, please.
18 BY MR. HENNING:
19     Q. Sure. I think I said how about going forward
20 would you do anything different if you were a class
21 representative than if you were not?
22     MR. WEISS: Same objection. You can answer.
23     THE WITNESS: I probably would do the same I am
24 now and go with advisement from counsel.
25 BY MR. HENNING:

125

1      Q. Do you know whether your lawyers have told us
2  that you don't want to be a class representative?
3      MR. WEISS: Objection to form.
4      THE WITNESS: I don't know.
5  BY MR. HENNING:
6      Q. If they did, would that have been correct?
7      MR. WEISS: Objection to form.
8      THE WITNESS: Okay. The first question is.
9  BY MR. HENNING:
10     Q. Sure. The question is do you know whether your
11 lawyers have told us that you don't want to be a class
12 representative?
13     MR. WEISS: Objection to form. You can answer.
14     THE WITNESS: I don't know. I don't know what
15 they did or didn't tell you.
16 BY MR. HENNING:
17     Q. And then the next question was if they did, would
18 that have been incorrect?
19     MR. WEISS: Objection to form. You can answer.
20     THE WITNESS: I don't know.
21 BY MR. HENNING:
22     Q. Was there ever a time you didn't want to be a
23 class representative?
24     A. No.
25     Q. You always wanted to be one?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

126

1    A. It wasn't whether I wanted to be one or not. I
2 don't know, you know, if I was picked or what, but if my
3 case was first, I don't know.
4    Q. Was it your decision to be a class
5 representative?
6    A. I mean, I think the ultimate judgment is mine,
7 whether I am or if I'm not, I guess. I don't even know if
8 I -- you know, if it comes down to if you want to be or if
9 you don't want to be, you know. Like I say, I don't know
10 the specifics of, like I say, if my case was first and
11 that's why I am or if there's another reason. I don't
12 know that.
13    Q. Whatever the reason that you're identified as
14 one --
15    A. It's okay that I am, you know, and it's okay if I
16 was not. You know, I don't understand.
17    Q. Well, I mean, being a class representative means
18 something; right?
19    A. Yeah.
20    Q. What do you understand it to mean?
21    A. That I'm representing not myself but also
22 speaking for others as far as that deals with this case.
23    Q. And you're fine either way, whether you do that
24 or you don't?
25    A. I'm -- yeah, you know, if I'm the class

127

1 representative and I'm okay with that.
2    Q. And I think we -- I got us off track in followup
3 on the question was, was it your decision to be one?
4    A. To pick it?
5    Q. Was it your decision to be a class
6 representative?
7    A. I don't understand. I didn't -- you know, I
8 didn't ask my lawyer can I be a class representative
9 because I never been in litigation, so I didn't know
10 nothing about that.
11    Q. Did you know before today that you were a class
12 representative?
13    A. Yes.
14    Q. When did you first learn that?
15    A. I don't know. It's been a while ago.
16    Q. Do you think it was around the time this was
17 filed?
18    A. I don't know if I was a class rep then or not.
19    Q. Mr. Brucker, would you flip to paragraph 34,
20 please, which is on page 7?
21    A. Okay.
22    Q. You can take a second and just read it to
23 yourself, if you could.
24    A. Okay.
25    Q. First of all, do you believe the allegations in

128

1 paragraph 34 are correct?
2    A. Yes.
3    Q. You and I have already talked about your air
4 conditioning units. Is there any building materials or
5 items in your home that you haven't already identified
6 that you think have been affected by your drywall?
7    A. Not at this time.
8    Q. And have you spent time looking through your
9 house to find anything that you think was affected by the
10 drywall?
11    A. Sure.
12    Q. That's important to you; right?
13    A. Right.
14    Q. Before we look at the exhibit, Mr. Brucker, do
15 you know if your house had any drywall in it that was not
16 National Gypsum drywall?
17    A. I don't know. I think every piece that was ever
18 found through any of the inspections was all National
19 Gypsum's product.
20    Q. Do you know whether there was any that wasn't
21 able to be identified?
22    A. No, I don't.
23    Q. You mentioned as a class representative you were
24 speaking for others. How would you define the group that,
25 in your mind, you're speaking for?

129

1    MR. WEISS: Objection to form. You can answer.
2    THE WITNESS: How would I?
3 BY MR. HENNING:
4    Q. Who are the others you think you're speaking for?
5    MR. WEISS: Same objection. You can answer.
6    THE WITNESS: Other people that are affected with
7 drywall from National Gypsum and Lowe's.
8 BY MR. HENNING:
9    Q. Would it matter to you where the drywall was
10 made?
11    A. No.
12    Q. It's just everyone that bought National Gypsum
13 drywall from Lowe's?
14    MR. WEISS: Objection to form. You can answer.
15 BY MR. HENNING:
16    Q. In your opinion?
17    A. I guess.
18    Q. Yes?
19    MR. WEISS: Objection to form. You can answer.
20    THE WITNESS: You said that everybody --
21 BY MR. HENNING:
22    Q. Yeah, let me just ask you. How would you define
23 the group of others you think you're suing for?
24    MR. WEISS: Objection to form. You can answer.
25    THE WITNESS: How would I?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

---

130

1    MR. WEISS:  Just give me a second to put the
2  objection on the record.  You can answer the question.
3  You just have to give me a second to put the objection
4  on the record.
5    THE WITNESS:  Okay.
6    MR. WEISS:  It's tough for the court reporter.
7    THE WITNESS:  What do you mean by "define"?  What
8  do you mean?
9  BY MR. HENNING:
10    **Q.  Who are the others you're speaking for?**
11    A.  You're saying do I know them.
12    **Q.  No, not personally.  How would you describe the**
13  **group of others you think you're speaking for?**
14    MR. WEISS:  Objection to form.  You can answer.
15    THE WITNESS:  I don't know how I would describe
16  them.  I guess they have the same problem that I have.
17  They're having the same problems that, you know, they
18  bought product from them and they're having the same
19  or similar problems that I may be having.
20  BY MR. HENNING:
21    **Q.  Okay.  Would the group include people who aren't**
22  **having problems?**
23    A.  I'm assuming it wouldn't.
24    **Q.  Would the group, in your mind, include people who**
25  **bought National Gypsum drywall that wasn't made the same**

---

131

1  **place yours was made?**
2    A.  I guess they could have.  I don't know where
3  these -- I don't know where these people live.
4    **Q.  Let's look now at Exhibit 6 that you have in**
5  **front of you.**
6    **Do you recognize this document?**
7    A.  Yes.
8    **Q.  What is it?**
9    A.  The third amended class action complaint.
10    **Q.  Have you seen this before today?**
11    A.  I believe I may have.
12    **Q.  Do you see on the first page the list of other**
13  **folks in addition to you?**
14    A.  Right.
15    **Q.  Above plaintiffs there.**
16    **Do you know any of those people?**
17    A.  I do not.
18    **Q.  Have you spoken to any of them?**
19    A.  I have not.
20    **Q.  Have you communicated with any of them in any**
21  **way?**
22    A.  I have not.
23    **Q.  Do you know anything about their drywall**
24  **circumstances?**
25    A.  No, sir, I do not.

---

132

1    **Q.  Have you talked to anyone else who has National**
2  **Gypsum drywall who's having a problem?**
3    A.  I have not.
4    **Q.  Have you seen -- outside of the complaint, have**
5  **you seen anything online, on the news, anywhere, of anyone**
6  **else who has National Gypsum drywall having a problem?**
7    A.  I have not.
8    **Q.  When do you think you saw this document?**
9    A.  I don't know how long ago.
10    **Q.  Whenever it was, did you do the same thing you**
11  **testified you did for the original, look at it and make**
12  **sure everything was correct, at least as it's described to**
13  **you?**
14    A.  Yeah, read over it.
15    **Q.  Mr. Brucker, do you have any knowledge apart from**
16  **conversations you've had with your lawyers as to how the**
17  **drywall in your house was identified as National Gypsum**
18  **drywall?**
19    A.  Outside of conversations with Greg?  No.
20    **Q.  Did you ever seen "National Gypsum" on the**
21  **drywall, the words "National Gypsum" on the drywall?**
22    A.  During inspection.
23    **Q.  Ever seen it before that?**
24    A.  Before the inspection?
25    **Q.  Yeah.**

---

133

1    A.  No.
2    **Q.  Do you mean the inspections that came about as**
3  **part of the lawsuit as opposed to State Farm insurance or**
4  **the other guys?**
5    A.  Right.
6    **Q.  Is there a garage attached to that house?**
7    A.  No, sir.
8    **Q.  Mr. Brucker, we've talked about giving documents**
9  **to your lawyers on some particular issues during the day.**
10    **Have you made a search for any documents you have**
11  **about your drywall and given them to your lawyers?**
12    A.  Search about drywall?
13    **Q.  Did you look for any drywall-related documents**
14  **you have?**
15    A.  I've already given whatever I have with drywall
16  to them.
17    **Q.  So you made some effort to find everything you**
18  **had about drywall?**
19    A.  Yeah, that would have been, like, my receipt
20  from, you know, having to put up and stuff like that.
21    **Q.  Yeah, any documents --**
22    A.  That's pretty much all I had pertaining to dry
23  walls -- that and the receipts.
24    **Q.  Okay.  And whatever you had about your drywall,**
25  **you have given to your lawyers?**

34  (Pages 130 to 133)

134

1    A.  Yes.
2    Q.  Is there any place you think you haven't looked
3  where you think you might have documents about your
4  drywall?
5    A.  No.
6    Q.  Mr. Brucker, where did you go to high school?
7    A.  I went to two.  Sarasota High School and DeSoto
8  County High School.
9    Q.  When did you graduate from high school?
10    A.  2004 -- I mean 1990 -- wait a minute.  1994.  I'm
11  sorry.
12    Q.  Did you go on to any formal education after that?
13    A.  I did.  I got a two-year degree from Manatee
14  College in criminal justice.
15    Q.  Takes you to about 1996; is that right?
16    A.  Took me a little longer than that.  I was working
17  full-time.  I graduated in -- I believe it was 2000.
18    Q.  Were you working as a corrections officer as you
19  were going?
20    A.  I was.
21    Q.  And where were you working during school?
22    A.  DeSoto Correctional Institution.
23    Q.  Same place we talked about earlier?
24    A.  Uh-huh.  I started college before I actually got
25  the job, started college in '96.

135

1    Q.  Have you ever been married?
2    A.  No, I have not.
3    Q.  Mr. Brucker, you expect to receive anything --
4  any money in return for being the class representative?
5    A.  No, I don't expect it.
6    Q.  Have you ever been offered anything?
7    A.  In the first case, the Lowe's case, I was.
8    Q.  As part of the settlement we discussed?
9    A.  Part of the settlement agreement.
10    Q.  Do you know when you're scheduled to get that
11  $20,000 payment in the Lowe's settlement?
12    A.  I do not know.
13    Q.  We talked a little bit about how you went to the
14  first lawyer and ended up with Mr. Weiss and his
15  colleagues.  Now we've been talking about it a little
16  more, do you remember the first lawyer's name?
17    A.  I don't.  I would have to look back in my
18  paperwork or something to try to find it.
19    Q.  Is that how it came to be -- is that how you came
20  to be a plaintiff in this case after you went to the first
21  lawyer you contacted by Mr. Weiss?
22    MR. WEISS:  Objection to form.
23  BY MR. HENNING:
24    Q.  Let me just ask you, how did you come to be a
25  plaintiff in this case?

136

1    A.  From one lawyer to Mr. Weiss's office?
2    Q.  How did you come to be a plaintiff in this case?
3    A.  Well, initially through my first attorney and
4  then I was referred to Mr. Weiss's office and then --
5    Q.  And then what happened after that?
6    A.  Well, through litigation until now.
7    Q.  Did you reach out to Mr. Weiss's office?
8    A.  Well, I did.  I was referred to him by the
9  previous attorney, and then talked to them on the phone
10  and then I was -- I don't know how it was done, but I went
11  from one lawyer to the next lawyer.
12    Q.  By the time you went to the first lawyer -- well,
13  what prompted you to go to the first lawyer?
14    A.  Well, I was denied a claim through the
15  homeowner's insurance, so, you know, I had to proceed
16  further, ended up contacting that lawyer's office to see
17  if they could provide me any assistance and then went from
18  there.
19    Q.  Greg, if you don't mind, why don't you give me
20  five minutes to look through my notes and I think that's
21  it.
22    MR. HENNING:  Sure.  Certainly.
23    VIDEOGRAPHER:  Going off the record.  The time is
24  1:12 p.m.
25    (A break was taken.)

137

1    VIDEOGRAPHER:  Back on the record.  The time is
2  1:16 p.m.
3    MR. HENNING:  I don't have any more questions.
4  Thank you for your time, Mr. Brucker.
5    THE WITNESS:  Thank you.
6    MR. WEISS:  We'll read.
7    VIDEOGRAPHER:  This concludes the deposition.
8  The time is 1:16 p.m.
9
10    (Deposition concluded at 1:16 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

35  (Pages 134 to 137)

138

1
2  STATE OF _____ )
3                ) :ss
4  COUNTY OF _____ )
5
6
7        I, CHRIS BRUCKER, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10 do hereby certify it to be a true and
11 correct transcript, subject to the
12 corrections, if any, shown on the attached
13 page.
14
15        _____
16            CHRIS BRUCKER
17
18
19
20 Sworn and subscribed to before
21 me, this        day of
22           , 2012.
23
24 _____
25      Notary Public

140

1            REPORTER'S DEPOSITION CERTIFICATE
2
3  STATE OF FLORIDA   )
4  COUNTY OF COLLIER  )
5
6        I, Lori L. Bundy, Certified Court Reporter and Notary
7  Public in and for the State of Florida at Large, certify
8  that I was authorized to and did stenographically report
9  the deposition of Chris Brucker; that a review of the
10 transcript was requested and that the transcript is a true
11 and complete record of my stenographic notes.
12
13       I further certify that I am not a relative, employee,
14 attorney, or counsel of any of the parties; nor am I a
15 relative or employee of any of the parties' attorney or
16 counsel connected with the action; nor am I financially
17 interested in the action.
18
19       DATED this 31st day of January, 2012.
20
21
22       _____
           Lori L. Bundy, FPR, RPR, CRR, CLR
23
24
25

139

1            CERTIFICATE OF OATH
2
3  STATE OF FLORIDA )
4  COUNTY OF COLLIER )
5
6        I, the undersigned authority, certify that Chris
7  Brucker personally appeared before me and was duly sworn.
8
9        WITNESS my hand and official seal this 31st
10 day of January, 2012.
11
12
13       _____
           Lori L. Bundy
14       Notary Public - State of Florida
           My Commission No.: EE 132707
15       Expires: September 22, 2015
16
17
18
19
20
21
22
23
24
25

141

1            INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over carefully
4  and make any necessary corrections. You should state
5  the reason in the appropriate space on the errata
6  sheet for any corrections that are made.
7        After doing so, please sign the errata sheet
8  and date it.
9        You are signing same subject to the changes
10 you have noted on the errata sheet, which will be
11 attached to your deposition.
12       It is imperative that you return the original
13 errata sheet to the deposing attorney within thirty
14 (30) days of receipt of the deposition transcript by
15 you. If you fail to do so, the deposition transcript
16 may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

36  (Pages 138 to 141)