1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

---

CHRIS BRUCKER, TREVER S. NUTTING,
XIOMARA RAVELO, WILFREDO E. RETANA
and BEATRIX CELSA RETANA, individually,
and on behalf of all others
similarly situated,

        Plaintiffs,

vs.
                          CASE ACTION NO.
                          2:10-cv-00405-FtM-29SPC

LOWES HOME CENTERS, INC., a North Carolina
Corporation, and NATIONAL GYPSUM COMANY,
a Delaware Corporation,

        Defendants.

---

VIDEOTAPED DEPOSITION OF XIOMARA RAVELO

Henderson Franklin

1715 Monroe Street

January 26th, 2012

9:02 a.m. to 11:34 a.m.

Reported By:
Lori L. Bundy, FPR, RPR, CRR, CLR
Job No: 23648

**Page 2**

APPEARANCES:
For the Plaintiff:
    Gary, Naegele & Theado, LLP
    446 Broadway
    Lorain, OH  44052-1797
    (440) 244-3462
    BY:  ROBERT D. GARY, ESQ.

For the Defendant National Gypsum:
    Morgan, Lewis & Bockius, LLP
    1701 Market Street
    Philadelphia, PA  19103-2921
    (215) 963-5668
    BY:  KRISTOFOR T. HENNING, ESQ.
    khenning@morganlewis.com

Videographer:    KEVIN BUNDY, CLVS
Interpreter:     BEATRICE T. VIETRI

**Page 3**

INDEX
WITNESS:                              PAGE:
XIOMARA RAVELO
DIRECT EXAMINATION                      5
BY MR. HENNING:

EXHIBITS

Description                          Page
Defendant's Exhibit 1   Notice of deposition   7
Defendant's Exhibit 2   Document               11
Defendant's Exhibit 3   Document               11
Defendant's Exhibit 4   Verification           53
Defendant's Exhibit 5   Document               55
Defendant's Exhibit 7   Document               58

**Page 4**

VIDEOGRAPHER: This is video number one of the videotaped deposition of Xiomara Ravelo taken by the defendant in the matter of Chris Brucker, et al. Versus Lowe's Home Center, et al. In the United States District Court, Middle District of Florida, Fort Myers Division, civil action number 210-CV-405-FTM-29SPC. This deposition is being held at 1715 Monroe Street, Fort Myers, Florida 33902 on January 26th, 2012, at approximately 9:02 a.m.

My name is Kevin Bundy from the firm of David Feldman Worldwide and I'm the legal video specialist. The court reporter is Lori Bundy in association with David Feldman Worldwide. Will counsel please introduce themselves.

MR. HENNING: Chris Henning for the defendant National Gypsum Company.

MR. GARY: Bob Gary for the plaintiffs, and I'm here pursuant to the stipulation regarding the Brincku Brucker counsel being permitted to interchange for depositions; is that correct?

MR. HENNING: That's fine.

VIDEOGRAPHER: Will the court reporter please swear in the interpreter and the witness.

THEREUPON,
    BEATRICE T. VIETRI,

**Page 5**

the interpreter, having been first duly sworn, upon her oath, translated as follows:

THEREUPON,
    XIOMARA RAVELO,
a witness, having been first duly sworn, upon her oath, testified as follows:

DIRECT EXAMINATION
BY MR. HENNING:

Q. Ms. Ravelo, my name is Kris Henning. I'm from the law firm of Morgan Lewis and Bockius in Philadelphia, Pennsylvania. We're here for a deposition today in a lawsuit you and others brought about some drywall. Do you understand that?

A. Yes.

Q. Ms. Ravelo, have you ever had your deposition taken before?

A. No.

Q. Have you ever sued anyone before this case?

A. No.

Q. Let me give you a few ground rules that will help us move along more smoothly today. You'll have to answer questions out loud so the court reporter can take them down. Okay?

A. Yes. I am a little bit hoarse.

Q. Fair enough. If during the course of the

**Page 6**

1  deposition today you'd like to take a break to get a drink
2  of water, stretch your legs, please just say so and I'll
3  accommodate you.
4      A.  That's fine.
5      Q.  If you don't understand one of my questions,
6  please say so and I'll try to fix whatever the problem is.
7  Okay?
8      A.  Okay.
9      Q.  Things will work better today if we're not all
10 talking at one time.  So if you'll wait till my question
11 comes to you through Beatrice to answer, I will likewise
12 wait to ask you another question until your answer is
13 finished.  Okay?
14     A.  That's fine.
15     Q.  Ms. Ravelo, from time to time today I'll give you
16 some documents as exhibits to your deposition.
17     A.  Okay.
18     Q.  Take as much time as you'd like to read each one
19 that I may give you.  Ms. Ravelo, are you able to read
20 English at all?
21     A.  No.
22     Q.  Would you mind taking a look at Exhibit 1, I take
23 it, then, you've never seen this document before?
24     A.  I don't know if it's the one that I brought with
25 me today.

**Page 7**

1      (Defendant's Exhibit 1, Notice of deposition,
2      was marked for identification.)
3  BY MR. HENNING:
4      Q.  In any event, do you understand you're here today
5  pursuant to a request from National Gypsum Company for
6  your deposition?
7      THE INTERPRETER:  Please repeat for the
8      interpreter.
9  BY MR. HENNING:
10     Q.  Sure.  In any event, do you understand you're
11 here today pursuant to a request from National Gypsum
12 Company for your deposition?
13     A.  Uh-huh.
14     Q.  If you'll answer out loud either yes or no, that
15 will help the court reporter.
16     A.  Can you repeat the question?
17     Q.  Sure.  Do you understand that you're here today
18 pursuant to a request from National Gypsum Company for
19 your deposition?
20     A.  Yes.
21     Q.  Ms. Ravelo, what's your address?
22     A.  1010 Northeast 12th Terrace, Cape Coral, Florida
23 33909.
24     Q.  How long have you lived there?
25     A.  Like three years and something.

**Page 8**

1      Q.  Is that the only address that is the subject of
2  your lawsuit?
3      A.  Yes.
4      Q.  You don't live anywhere else?
5      A.  No.
6      Q.  And you're not suing over drywall in any other
7  location than that one; is that right?
8      A.  No.
9      Q.  Ms. Ravelo, have you ever heard of problems with
10 Chinese drywall?
11     A.  Yes.
12     Q.  What have you heard?
13     A.  That it affects a lot.
14     Q.  What do you mean by "affects a lot"?
15     A.  Well, the economical, the emotional, and
16 everything.
17     Q.  When did you first hear of problems with Chinese
18 drywall?
19     A.  Now after I'm in this process.
20     Q.  Do you mean the lawsuit?
21     A.  Uh-huh, yes.
22     Q.  Do you know whether you have Chinese drywall in
23 your house?
24     A.  Well, yes.
25     Q.  To your knowledge, do you believe you have

**Page 9**

1  Chinese drywall in your house?
2      A.  Yes.
3      Q.  When did you first come to believe that you had
4  Chinese drywall in your house?
5      A.  It's been some time ago because the outlets for
6  electricity were failing.
7      Q.  Can you estimate how long after you moved into
8  your house you first believed you had Chinese drywall?
9      A.  It was around 2010.
10     MR. GARY:  Let me enter an objection.  Counsel
11 is -- understands that the witness does not speak
12 English, and it's apparent that the drywall and
13 Chinese drywall is being used, from her understanding
14 of it, in a different sense that you are asking the
15 question.  You have not asked her about manufacturer,
16 National Gypsum.  I just want to make that clear for
17 the record.
18     MR. HENNING:  Fair enough.
19 BY MR. HENNING:
20     Q.  Ms. Ravelo, what did you mean by Chinese drywall?
21     A.  I know it as Chinese sheetrock.
22     Q.  Do you believe that Chinese sheetrock is made in
23 China?
24     A.  Well, that's what they say.  I don't know.  I'm
25 not qualified for that.

**Page 10**

1  Q. Sure. Let me ask more generally. What did you
2  mean by your testimony that you believe anyway you have
3  Chinese drywall in your house?
4      MR. GARY: Objection. I think it would help if
5   you would clarify what you're asking -- you use the
6   term "Chinese drywall." Otherwise we'll just be going
7   down the same path. But it's your call.
8  BY MR. HENNING:
9  Q. Ms. Ravelo, have you ever heard the term "Chinese
10 drywall"?
11 A. No.
12 Q. Never heard it before today?
13 A. Well, yes, that's what's happening with my house
14 with everything.
15 Q. Ms. Ravelo, do you have any idea who made the
16 drywall in your house?
17 A. No.
18 Q. Are you aware of any lawsuits against
19 manufacturers who made Chin -- drywall in china?
20 A. They have spoken to me of things that have
21 happened, but I have never had that experience.
22 Q. What do you mean you've never had that
23 experience?
24 A. To live what I'm living now.
25 Q. We can take a couple minutes if you would like.

**Page 11**

1  A. No, I just have a cough.
2  Q. Ms. Ravelo, I have put in front of you two
3  documents, Exhibits 2 and 3. I understand from your
4  earlier testimony you're not able to read those; is that
5  right?
6  A. No, I don't speak English.
7      (Defendant's Exhibit 2, Document, was marked
8   for identification.)
9      (Defendant's Exhibit 3, Document, was marked
10  for identification.)
11 BY MR. HENNING:
12 Q. In Exhibit No. 3, could you nevertheless turn to
13 page 17?
14 A. I don't know. This one?
15 Q. Yes. Do you see a reference there to Xiomara
16 Ravelo at number 194?
17 A. Excuse me? Where?
18     MR. HENNING: Bob, do you mind if I point to
19  things?
20     MR. GARY: No, go ahead.
21     THE WITNESS: Yes, that's my name.
22 BY MR. HENNING:
23 Q. Is that also your address next to the name?
24 A. Uh-huh.
25 Q. Do you know of a law firm called Morgan & Morgan?

**Page 12**

1  A. Yes.
2  Q. Are they helping you at all with your drywall?
3  A. No.
4  Q. Do they represent you?
5  A. No.
6  Q. Do you know -- can you name any of the lawyers
7  representing you in this case?
8  A. The one that I have present. I don't know of any
9  other one.
10 Q. Have you ever met before today with any lawyers
11 you understand to be representing you in this case?
12 A. No.
13 Q. Ms. Ravelo, who do you understand you have sued
14 in your lawsuit?
15 A. I don't understand.
16 Q. Have you ever heard the term "sue" before?
17 A. Well, yes.
18 Q. Have you sued anyone about your drywall?
19 A. What we're doing now is just a group of people.
20 Q. Do you understand what a lawsuit is?
21 A. I don't understand well.
22 Q. I'm sorry. What was the last word you said?
23 A. I don't understand well.
24 Q. Do you have any understanding of what it is?
25 A. It's what we're doing, no?

**Page 13**

1  Q. Ms. Ravelo, are you married?
2  A. Yes.
3  Q. What's your husband's name?
4  A. Felix Molina.
5  Q. When did you marry Mr. Molina?
6  A. August 6th of '83.
7  Q. Have you ever been married to anyone other than
8  Mr. Molina?
9  A. No.
10 Q. Do you have any children?
11 A. Yes.
12 Q. How many?
13 A. Two.
14 Q. What are their names?
15 A. Lisette Molina, and Felix Daniel Molina.
16 Q. Have either of them ever lived at 1010 Northeast
17 12th Terrace?
18 A. My son, Felix Daniel.
19 Q. Your daughter has never lived there?
20 A. No.
21 Q. Does your son still live there?
22 A. Yes.
23 Q. Has he lived there the entire time you've been in
24 the house?
25 A. Yes.

```
                                          14                                                  16
 1     Q.  Are you the sole owner -- back up.        1   you bought it?
 2        Ms. Ravelo, if I refer to the house today, can we   2      A.  I don't remember.
 3   agree that I'll be referring to 1010 Northeast 12th    3      Q.  Was it more than five?
 4   Terrace, Cape?                                  4      A.  No, I don't think so.
 5      A.  Correct.                                 5      Q.  Can you estimate whether it was more than three?
 6      Q.  Are you the sole owner of the house?     6      A.  Yes, possible.
 7      A.  Yes.                                     7      Q.  When you went into the house before you bought
 8      Q.  Your husband is not part owner of the house?  8   it, did you notice anything unusual?
 9      A.  No.                                      9      A.  No.
10      Q.  Why is that?                            10      Q.  When you went into the house before you bought
11      A.  Well, the house is in my name.          11   it, did you smell anything unusual?
12      Q.  Was it your decision to have the house only in  12      A.  No.
13   your name?                                     13      Q.  Everything seemed normal to you in the times you
14      A.  He's like married to me, but it's in my name.  I  14   went into the house before you bought it?
15   don't understand that.                         15      A.  Yes.
16      Q.  Did you consider having the house in both you and  16      Q.  Did you have the home inspected?
17   your husband's name?                           17      A.  Yes.
18      A.  It's like that.  I don't know.          18      Q.  What do you mean by inspected?
19      Q.  Where did you get married to your husband?  19      A.  Well, the inspection is to look at the entire
20      A.  In Cuba.                                20   house.
21      Q.  Did you buy your house?                 21      Q.  Who -- who did that inspection?
22      A.  Yes.                                    22      A.  It was a company.
23      Q.  Tell me how that happened.              23      Q.  Do you remember the company's name?
24      A.  How it happened?                        24      A.  No.
25      Q.  Tell me the circumstances of the purchase of your  25      Q.  Do you happen to remember any individual's name?

                                          15                                                  17
 1   house.                                          1      A.  No.
 2      A.  Nothing, normal process of buying a house.   2      Q.  Was there just one company who did an inspection?
 3      Q.  Who did you buy the house from?          3      A.  Well, they did many inspections of the house and
 4      A.  From the bank.                           4   of the septic.
 5      Q.  Were you -- was the house bought in a foreclosure  5      Q.  But it was just one company who did all that?
 6   sale?                                           6      A.  I think the inspector of the house was one, and I
 7      A.  Yes.                                     7   think the inspector for the septic was another.
 8      Q.  When did you buy the house?              8      Q.  Did both inspections of the home and the septic
 9      A.  In 2008.                                 9   tank occur before you bought the house?
10      Q.  Does October 2008 sound about right?    10      A.  Yes.
11      A.  November.                               11      Q.  Was it your decision to have those inspections
12      Q.  Did you see the house before you bought it?  12   done?
13      A.  Yes.                                    13      A.  Yes.
14      Q.  Did you go inside the house before you bought it?  14      Q.  Why did you decide to have the home inspected?
15      A.  Yes.                                    15      A.  Well, it's necessary and they asked for those
16      Q.  Did you have a realtor helping you?     16   inspections.
17      A.  Yes.                                    17      Q.  Who asked for those inspections?
18      Q.  Was there anyone else helping you?      18      A.  When you buy a house.
19      A.  No.                                     19      Q.  Was it the seller who asked for the inspections?
20      Q.  Who was the realtor?                    20      A.  I don't think so.  I don't know.
21      A.  Century 21.                             21      Q.  Why do you say it was necessary for the
22      Q.  Do you happen to remember the individual's name  22   inspections to happen?
23   who helped you?                                23      A.  I don't know.  It's just -- I just said that.
24      A.  Fernando Gaitan.                        24      Q.  Had you ever had a home inspection done before
25      Q.  How many times did you go inside the house before  25   this?
```

18

```
 1      A.  No, a house -- I don't understand.
 2      Q.  Did you ever own a house before the house we're
 3   here about today?
 4      A.  No.
 5      Q.  The house at 1010 Northeast 12th Terrace was the
 6   first house you've ever owned?
 7      A.  Yes, correct.
 8      Q.  Did you ever see a report from the home
 9   inspection?
10      A.  The report?
11      Q.  Did you ever see any document giving you the
12   results of the inspection?
13      A.  Yes.
14      Q.  Was it just one document?
15      A.  Imagine, I don't know that also.
16      Q.  However many documents it might have been, do you
17   still have them?
18      A.  I don't know.  I would have to look at my papers.
19   I don't know.
20      Q.  Do you remember whether they were written in
21   English, Spanish, or both?
22      A.  I think that everything here is written in
23   English.
24      Q.  Did someone ever translate the document for you?
25      A.  When I bought my house?
```

19

```
 1      Q.  At any time.
 2      A.  Whenever I go to somewhere, they translate it.
 3      Q.  So do you know the results of that home
 4   inspection?
 5      A.  Everything was fine.
 6      Q.  Was that true for both the house and the septic?
 7      A.  Excuse me?
 8      Q.  The home inspection came out fine; is that right?
 9      A.  Yes.
10      Q.  Did the septic inspection come out fine?
11      A.  Yes.
12      Q.  And those were the only two inspections done?
13      A.  That I know of, yes.
14      Q.  Were you at the house with the person doing the
15   home inspection?
16      A.  That day I was there.
17      Q.  Can you describe what that person did?
18      A.  No, but I wasn't present everything they did.
19      Q.  Can you tell me anything you saw that person do?
20      A.  I saw that he was checking the electrical
21   outlets.
22      Q.  Did you see him check anything else?
23      A.  No.
24      Q.  Do you remember turning the water on in the house
25   before you bought it?
```

20

```
 1      A.  I don't remember that.
 2      Q.  Do you know when the house was built?
 3      A.  In 2005.
 4      Q.  Did you know that at the time you bought the
 5   house?
 6      A.  Like what?
 7      Q.  When you bought the house, did you know it was
 8   built in 2005?
 9      A.  Yes.
10      Q.  Do you know who built the house?
11      A.  According it's Holiday Builder.
12      Q.  When did you learn that?
13      A.  Well, when I bought it because it was in all the
14   papers.
15      Q.  Are there Spanish versions of all the papers you
16   had with the purchase of your house?
17      A.  What?
18      Q.  Were all the -- were all the documents about the
19   purchase of your house in English?
20      A.  Of course.
21      Q.  Did someone read them to you in Spanish?
22      A.  Well, like I told you, they always translate for
23   me.  I don't speak English.
24      Q.  I understand.  Who translated those documents,
25   any documents about the purchase of your house?
```

21

```
 1         MR. GARY:  Objection.  I don't think that was her
 2   answer.  I think the question is, were the documents
 3   translated?
 4         MR. HENNING:  Fair enough.
 5   BY MR. HENNING:
 6      Q.  Were the documents translated?
 7      A.  Yes, they would read it to me, but imagine that.
 8      Q.  I'm not sure what you mean by "imagine that."
 9      A.  Oh, I'm sorry.  Well, it's like -- I don't know
10   how to explain it; that's what it is.
11      Q.  Did you somehow figure out what the documents
12   about the purchase of your house said?
13         MR. GARY:  Objection.
14         THE INTERPRETER:  Please repeat for the
15   interpreter.
16   BY MR. HENNING:
17      Q.  Sure.  Did you somehow figure out what the
18   documents about the purchase of your house said?
19      A.  What it said?
20      Q.  Did someone in your family translate the document
21   to you?
22      A.  Yes, at the moment of the closing.
23      Q.  How much did you pay for the house?
24      A.  How much I paid?
25      Q.  Yes.
```

Page 22

1  A. The loan was for 86,000, something like that.
2  Q. Did all the money for the purchase of the house
3  come from the loan?
4  A. It was the loan that the bank gave me.
5  Q. Did you contribute any of your own savings to the
6  purchase of the house?
7  A. Well, yes.
8  Q. How much?
9  A. I don't remember it well, the amount.
10  Q. Have you paid back part of the loan?
11  A. What?
12  Q. Have you been paying back the loan?
13  A. I pay every month my mortgage.
14  Q. Ms. Ravelo, have you ever heard of Federal
15  National Insurance Company?
16  A. That's the insurance on my house.
17  Q. Did you ever sue them?
18  A. Well, yes, I had a claim because I had problems
19  with the house.
20  Q. What problems?
21  A. The heater of the hot water.
22  Q. Any others?
23  A. No.
24  Q. What did you want Federal National Insurance
25  Company to do?

Page 23

1  A. To help me do the fixing.
2  Q. And did they pay you any money?
3  A. Yes.
4  Q. How much money did they pay you?
5  A. 11 -- I don't remember very well the amount.
6  Q. Did you have a lawyer for your disagreement with
7  Federal National Insurance Company?
8  A. Yes.
9  Q. Do you remember who that was?
10  A. I don't remember well the name because they're
11  American names.
12  Q. Do you have any documents about your dispute with
13  Federal National Insurance Company?
14  A. Yes.
15  Q. What was the problem with the hot water?
16  A. The heater, the temperature rose too high.
17  Q. Was there any damage to your house as a result?
18  A. Yes.
19  Q. What happened?
20  A. The plastic tubes, they exploded and they
21  perforated.
22  Q. Do you remember when that happened?
23  A. That's been some time. I don't remember the
24  date.
25  Q. Do you believe the problem with your hot water

Page 24

1  had anything to do with your drywall?
2     MR. GARY: Objection.
3     THE WITNESS: Perhaps.
4  BY MR. HENNING:
5  Q. Has anyone ever told you it did?
6  A. No, at that moment I didn't know anything.
7  Q. Have you ever heard the expression, you bought
8  the house as-is?
9  A. Could you repeat the question?
10  Q. Sure. I'll ask more generally. Have you ever
11  heard the expression buying a house as-is?
12  A. Uh-huh.
13  Q. What does that mean to you?
14  A. Well, buy it the way it is.
15  Q. And is that how you bought this house?
16  A. Like this how, like with the drywall?
17  Q. Whatever you understand as-is to mean, did you
18  buy this house as-is?
19     MR. GARY: Objection.
20     THE WITNESS: Uh-huh, like that.
21  BY MR. HENNING:
22  Q. Have you ever rented the house?
23  A. No.
24  Q. Do you use the house for anything other than to
25  live in?

Page 25

1  A. No.
2  Q. Have you ever gone by any other names?
3  A. Other names?
4  Q. Yes.
5  A. Like how?
6  Q. Any other than Xiomara Ravelo?
7  A. No, that's my name.
8  Q. Are you working right now?
9  A. Now, no.
10  Q. Have you ever worked?
11  A. Yes.
12  Q. When was the last time?
13  A. I don't remember well.
14  Q. Were you working when you bought the house?
15  A. Yes.
16  Q. Where were you working when you bought the house?
17  A. For a man -- the name of the guy was Rodriguez,
18  and I don't remember well the company, trucking or
19  something like that.
20  Q. The word before or something like that?
21  A. Trucking.
22  Q. What was your job?
23  A. I would help them in the buying and the things
24  that he had to do.
25  Q. Can you remember how much you got paid?

7 (Pages 22 to 25)

26

1  A. I don't remember well.
2  Q. Does your house have a well?
3  A. Yes.
4  Q. Does it have something called an aerator?
5  A. What?
6  Q. Have you ever heard the term "aerator"?
7  A. An aerator?
8  Q. Yeah, is that a term you've ever heard?
9  A. No, I don't know.
10 Q. How about a well pump, is that a term you've ever
11 heard?
12 A. That's what I have there. I have the water for
13 the system in the house.
14 Q. What's the system you mean?
15 A. The water.
16 Q. Is the system to do something to the water?
17 A. It brings the water into the house.
18 Q. Do you also have a system to try and clean the
19 water?
20 A. Yes, it's a treatment. Everything that you do to
21 the water.
22 Q. Okay if we call it the treatment system?
23 A. Uh-huh.
24 Q. Was the treatment system on the house when you
25 bought it?

27

1  A. Yes.
2  Q. Do you know why it's there?
3  A. Well, because it's necessary for the water.
4  Q. Why do you believe it's necessary for the water?
5     MR. GARY: Objection.
6     THE WITNESS: To do its treatment.
7  BY MR. HENNING:
8  Q. Ms. Ravelo, do you have any idea what the
9  treatment is?
10    MR. GARY: Objection.
11    THE WITNESS: It's put the salt and to clean it.
12 BY MR. HENNING:
13 Q. Is the water that comes into your house treated
14 by this system?
15 A. Yes.
16 Q. And has that been the case ever since you've been
17 in the house?
18 A. Yes, we always have done it.
19 Q. Have you ever had any problems with the treatment
20 system?
21    MR. GARY: Objection.
22    THE WITNESS: No.
23 BY MR. HENNING:
24 Q. At least not that you're aware of?
25 A. No.

28

1  Q. Did you ever smell anything unusual in your
2  house?
3     MR. GARY: Objection.
4     THE WITNESS: Yes.
5  BY MR. HENNING:
6  Q. What do you mean by that?
7  A. That there are very strong odors.
8  Q. Can you describe those odors?
9  A. Yes, it's a very strong odor, like something
10 strong, like egg. Even though I put aromas in the house,
11 everywhere in the house, when I go in, I still smell it.
12 Q. And you still smell it today?
13 A. Yes.
14 Q. Is it all the time you smell it?
15 A. Yes, and even more so when I go outside and I
16 come back in, that's when I feel it the most.
17 Q. When is the first time you smelled this odor?
18 A. At the beginning it didn't happen, but then it
19 would increase.
20 Q. How long after you moved into the house did you
21 first notice it?
22 A. Well, two years went by, a year something, two
23 years.
24 Q. Does that mean you first noticed it a year after
25 you moved in?

29

1  A. No, because I didn't know what it was because
2  then after I started, the appliances and equipment were
3  damaged.
4  Q. Let's stick to the odor for just a second.
5  A. Uh-huh.
6  Q. When did you first notice it?
7  A. More than a year.
8  Q. You mean more than a year after you moved in?
9  A. Yes, yes.
10 Q. Has it been constant ever since then?
11 A. Yes, and it has increased.
12    MR. HENNING: Why don't we take a break.
13    VIDEOGRAPHER: Going off the record. The time is
14 9:59 a.m.
15    (A break was taken.)
16    VIDEOGRAPHER: Back on the record. The time is
17 10:00 a.m.
18 BY MR. HENNING:
19 Q. Ms. Ravelo, what do you mean the odor increased?
20 A. It's even now, even stronger.
21 Q. Is it the same in all parts of the house?
22 A. Like I told you, I mostly notice it when I come
23 in.
24 Q. Do you notice it more in any particular part of
25 the house?

8 (Pages 26 to 29)

```
                                                     30
 1    A.  Imagine, I believe it's in everything because
 2  we're breathing it in the air.
 3    Q.  Have you ever smelled the same odor outside of
 4  your house?
 5    A.  No.
 6    Q.  Have you ever smelled it in any other building?
 7    A.  No.
 8    Q.  Is there anything else that you consider to be a
 9  problem that happened in your house after you moved in?
10    A.  Yes, I have many damages.
11    Q.  What are they?
12    A.  Two refrigerators have been damaged, two
13  televisions, one DVD, one computer, and then even a couple
14  days ago I put on a mixer and it didn't work.  And in this
15  moment I am without a refrigerator in the kitchen.
16    Q.  Were there any others that you're aware of?
17    A.  Yes, the refrigerator and then we had to change
18  the air conditioning in one occasion.  And then a few
19  months ago we had to fix the thermostat of the air.
20    Q.  Any others?
21    A.  And the refrigerator that I have out in the
22  garage is all rusted.
23    Q.  Any others?
24    A.  And the faucets of the bathrooms are all black.
25    Q.  Any others?
```

```
                                                     31
 1    A.  Everything that's metal, what's on top of the
 2  mirror in the bathroom.
 3    Q.  Any others?
 4    A.  And economical, monetary and spiritually and
 5  health, I am sick.
 6    Q.  Any others?
 7    A.  I've been ill.  My husband and my son had to go
 8  to the hospital.
 9    Q.  Any others?
10    A.  And myself.  And the cough doesn't go away, my
11  headache doesn't, either.
12    Q.  Any others?
13    A.  All the damages that I have is affecting me a
14  lot.
15    Q.  Are there any other particular kinds of damages
16  you can name?
17    A.  Yes, like the appliances and all of the outlets,
18  electrical outlets, they're with no electricity.
19    Q.  Are there any others?
20    A.  And the cables that go inside, they're getting
21  damaged.  Two microwaves have been damaged.
22    Q.  The cables you mentioned, are those wires?
23    A.  They're the ones that go down to the electrical
24  outlet.  They're all black.
25    Q.  Any others?
```

```
                                                     32
 1    A.  Like the faucet where I -- in the kitchen, that
 2  one I had to change it because it gets rusted in the sink.
 3  Everything that's metal, everything that's metal gets bad.
 4    Q.  What do you mean it gets bad?
 5    A.  It's damaged.  It changes colors.
 6    Q.  You testified earlier it's black.  Is that what
 7  you mean?
 8    A.  Yes, it changes to a dark color.
 9    Q.  Have you ever seen any metal outside of your
10  house change the same way?
11    A.  No.
12    Q.  No pipes along the outside of your house?
13    A.  Like pipes like how?
14    Q.  Do you have pipes outside of your house?
15    A.  Those are the tubes that are plastic.
16    Q.  Do you have any metal pipes outside your house?
17    A.  No, I did not notice it.
18    Q.  Ms. Ravelo, have you done anything to try to fix
19  any of these problems?
20    A.  Well, with the things that have damaged
21  themselves, excuse me, I had to replace them.
22    Q.  Did you spend any money to replace those?
23    A.  For sure.
24    Q.  Can you estimate how much?
25    A.  Like the television in the -- in the room, two of
```

```
                                                     33
 1  them have been damaged.
 2    Q.  Can you estimate how much money you've spent to
 3  replace whatever it is you replaced?
 4    A.  Exactly I don't have it.
 5    Q.  Can you give a rough estimate?
 6    A.  One of the televisions that I bought I bought at
 7  Sears, and it was 2,000 and something, but I don't
 8  remember exactly.
 9    Q.  Can you remember anything -- any more than that
10  that you've spent to replace these products?
11    A.  And the one that I just had to replace, that only
12  lasted me a year, and I just replaced it not long ago,
13  like 1,400.  I don't remember exactly the amount.
14    Q.  Is there anything else you can remember spending?
15    A.  Like the refrigerator of the kitchen has been
16  damaged, and I couldn't replace that.
17    Q.  For the stuff that you have replaced, can you
18  remember anything more that you spent?
19    A.  The microwaves are the other ones.
20    Q.  How much did you spend to replace them?
21    A.  I don't remember very well, but 200 and
22  something.
23    Q.  Anything else you can remember spending to
24  replace anything in your house?
25    A.  In the case of the visits to the hospital, my
```

**Page 34**

1  husband is paying medical bills.
2      Q.  Have you ever for yourself gone to the doctor for
3  I think you said -- for any sicknesses that you've had
4  since you moved in?
5      A.  I've gone in other occasions, but now I don't
6  have medical insurance to go.
7      Q.  Can you estimate how many times you've gone to
8  the doctor?
9      A.  And that -- since I've been in this with the
10  drywall, I haven't gone to the doctor.
11      Q.  Are your -- the physical problems you've had, do
12  you believe those are part of your lawsuit?
13          MR. GARY:  Objection.
14          THE WITNESS:  I think it's affecting me, and I'm
15      worried about all this.
16  BY MR. HENNING:
17      Q.  Do you believe that there's physical problems as
18  part of your lawsuit?
19          MR. GARY:  Objection.
20          THE WITNESS:  Yes.
21  BY MR. HENNING:
22      Q.  When did you first hear of National Gypsum
23  Company?
24      A.  When it was?  When it was?
25      Q.  When is the first time you've ever heard of

**Page 35**

1  National Gypsum Company?
2      A.  That's when I called Morgan & Morgan, and they
3  told me that they could not help me.
4      Q.  Okay.  Do you remember when you called Morgan &
5  Morgan?
6      A.  I don't remember if it was 2010, I don't remember
7  well.
8          MR. GARY:  Objection to questions that are going
9      to involve the attorney/client privilege.  Morgan &
10      Morgan was her attorney at the time she called.
11          MR. HENNING:  Well, I'm not going to ask the
12      content.
13          MR. GARY:  I'm just --
14          MR. HENNING:  I understand.
15  BY MR. HENNING:
16      Q.  What prompted you to call Morgan & Morgan?
17      A.  I wanted to seek the counsel, advice of an
18  attorney.
19      Q.  Was that about your drywall?
20      A.  Uh-huh.
21      Q.  Ms. Ravelo, in your own mind, when did you first
22  think you had a problem with your drywall?
23          MR. GARY:  Objection.
24          THE WITNESS:  When?  Like I -- like I told you,
25      when I started to be suspicious of the things that

**Page 36**

1      were happening to me.
2  BY MR. HENNING:
3      Q.  Mr. Gary's objection was a right one.  Do you
4  think you have a problem with your drywall?
5      A.  Uh-huh.
6      Q.  And when -- when did you first come to believe
7  that you had a problem with your drywall?
8          MR. GARY:  Objection.
9          THE WITNESS:  When it -- when it -- when it
10      happened.
11  BY MR. HENNING:
12      Q.  When what happened?
13      A.  Once I was there, a year after or two years.
14      Q.  Have you ever seen anything on the news about
15  problems with drywall?
16      A.  No.
17      Q.  Ms. Ravelo, have you concluded in your own mind
18  that the problems you've experienced are caused by the
19  drywall?
20          MR. GARY:  Objection.
21          THE WITNESS:  I believe.
22  BY MR. HENNING:
23      Q.  What makes you believe that?
24          MR. GARY:  Objection.
25          THE WITNESS:  What makes me believe that?

**Page 37**

1      Because I think if -- the appliance and all that, it
2      does that to them, imagine to me personally.
3  BY MR. HENNING:
4      Q.  Have you ever had your water tested?
5      A.  Yes, like I told you, I do the treatment and
6  everything.
7      Q.  Have you ever had someone come in and take a
8  sample of your water to test it?
9      A.  Well, like a sample.
10      Q.  Does your water smell at your house?
11      A.  I don't think so.  No.
12      Q.  Did you ever tell anyone you thought your water
13  was terrible?
14          MR. GARY:  Objection.
15          THE WITNESS:  I don't think so.  It's water from
16      the well, I don't drink it, but, yes, I do cook with
17      it.
18  BY MR. HENNING:
19      Q.  Why don't you drink it?
20      A.  Because I like filtered water.
21      Q.  And you think the water from the well is not
22  filtered water?
23      A.  I don't think so.
24      Q.  What do you mean by filtered water?
25      A.  Like this one that's here in this little bottle.

## Page 38

1  Q. Have you ever drank the water at your house from
2  the well?
3      A. It's a normal water.
4  Q. Does it taste any different than the water you're
5  drinking today?
6      A. Of course. Like this water, none other.
7  Q. Can you tell -- can you describe for me how it
8  tastes different?
9      MR. GARY: Objection.
10     THE WITNESS: Well, the water, it doesn't have
11     all the same flavor.
12 BY MR. HENNING:
13 Q. Does anyone in your house drink the water from
14 the well?
15     A. No.
16 Q. Ms. Ravelo, how did you become a plaintiff in the
17 lawsuit?
18     MR. GARY: Objection, if it involves
19     attorney/client communications.
20     THE WITNESS: I don't know that -- that word.
21 BY MR. HENNING:
22 Q. Do you mean "plaintiff"?
23     A. I don't know. I'm defending my problem. I don't
24 understand.
25 Q. Let me ask it differently. Do you consider

## Page 39

1  yourself part of a lawsuit?
2      A. Well, yes.
3  Q. How did you become part of that lawsuit?
4      MR. GARY: Same objection.
5      THE WITNESS: In this process that I'm in, I
6      don't know.
7  BY MR. HENNING:
8  Q. Do you know anything about how you became
9  involved in the lawsuit?
10     A. I believe it's because we're many people that --
11 we have the same problem.
12 Q. Yes, but do you know how you became involved?
13     A. I called Morgan & Morgan, and they referred me to
14 other people.
15 Q. Can you remember who they referred you to?
16     A. No, I seen their number on the television on
17 their advertisement.
18 Q. Their number, whose number?
19     A. Of Morgan & Morgan.
20 Q. And I understand you called them and they
21 referred you to some other folks; is that right?
22     A. Yes.
23 Q. Do you know the name of the person or law firm
24 they referred you to?
25     A. Who they referred me to?

## Page 40

1  Q. Yes.
2      A. I have the name of Leopoldo Cuban, I don't know.
3  Q. Could you say that again.
4      A. Leopoldo. That name is like that.
5  Q. Fair enough. And then after Morgan & Morgan
6  referred you to the Leopold folks, did you reach out to
7  them?
8      MR. GARY: Objection. Reach out, I think
9      that's --
10 BY MR. HENNING:
11 Q. Fair enough. Did you ever call the -- did you
12 reach -- did you contact the Leopold folks?
13     A. If I called them?
14 Q. Did you call them or did they call you?
15     MR. GARY: Objection.
16     THE WITNESS: I called them.
17 BY MR. HENNING:
18 Q. Do you remember when you did that?
19     A. It was approximately that time, around that time.
20 Q. What do you mean by that time?
21     A. When I -- when I suspected all this after being
22 there for two years in the house.
23 Q. And that's when you called Morgan & Morgan;
24 right?
25     A. Yeah, then I called them.

## Page 41

1  Q. That was about after two years you were in the
2  house?
3      A. Yes, after some time.
4  Q. Have you ever signed any document that you
5  understood was a contract with any lawyers?
6      A. No, I don't remember that.
7  Q. Ms. Ravelo, do you understand that you have filed
8  a lawsuit against National Gypsum?
9      A. Uh-huh.
10 Q. Could you just say yes or no out loud?
11     A. Well, yes, no.
12 Q. Sorry about that. That was my fault.
13     A. There's too many questions.
14 Q. I'm sorry. That was my fault. I was just asking
15 you to -- I think you said uh-huh. You don't need to
16 interpret that. Let me ask the question.
17     Ms. Ravelo, you understand you have filed a
18 lawsuit against National Gypsum?
19     A. Yes.
20 Q. Whose decision was it to file that lawsuit?
21     A. Well, of all those problems that we're having.
22 Q. I understand. But the act of filing the lawsuit,
23 whose decision was it to file the lawsuit?
24     MR. GARY: Objection.
25     THE WITNESS: Of the company.

11 (Pages 38 to 41)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

Page 42

1  BY MR. HENNING:
2      Q. Was it your decision to file a lawsuit?
3      A. My decision?
4      Q. Was it your decision?
5      A. Yes.
6      Q. Did you talk to anyone other than a lawyer about
7  your decision to file the lawsuit?
8      A. No.
9      Q. What do you want to get out of the lawsuit?
10     A. What I want to obtain is that my house gets fixed
11 and to remove all those problems.
12     Q. Do you want to get anything else out of the
13 lawsuit?
14     A. No, to fix my house.
15     Q. You still live in the house; right?
16     A. Yes, yes. I adore my house. I don't want to
17 lose it.
18     Q. Ms. Ravelo, before you bought your house, had you
19 ever heard of National Gypsum?
20     A. No.
21     Q. When is the first time you heard of National
22 Gypsum?
23     A. Didn't I tell you when I spoke with Morgan &
24 Morgan? They referred me.
25     Q. Had you heard of National Gypsum Company by the

Page 43

1  time you called Morgan & Morgan?
2      A. No.
3      Q. It was after you called them that you first heard
4  of National Gypsum?
5      A. They gave me the number of the person that would
6  attend to those cases.
7      Q. Ms. Ravelo, do you know if any of the drywall in
8  your house was made by someone other than National Gypsum?
9      A. I don't know. I don't know anything about that.
10     Q. Ms. Ravelo, before you bought your house, did you
11 ever see any written statement from National Gypsum
12 Company?
13     A. No.
14     Q. At any time have you seen any statement from --
15 have you seen any written statement from National Gypsum
16 Company?
17     A. No.
18     Q. Ms. Ravelo, have you ever contacted National
19 Gypsum?
20     A. If I have contacted them?
21     Q. Yes.
22     A. I don't know.
23     Q. Do you remember ever calling or writing to
24 National Gypsum?
25     A. I'm not sure.

Page 44

1      Q. Do you know whether anybody else for you
2  contacted National Gypsum?
3      A. I'm confused now.
4      Q. Let me ask it this way. Before this lawsuit was
5  filed, did you ever contact National Gypsum?
6      A. National is the company of the drywall; right?
7      Q. What do you understand National Gypsum Company to
8  be?
9      A. The one that did the drywall in my house or --
10     Q. That's what you understand it to be?
11     A. Is that the company that -- there's so many
12 questions. I'm confused.
13     Q. Okay. You mentioned a company that you called to
14 do everything. What do you mean by that?
15     A. My case. When I called -- like Leopoldo, and
16 they advised me of my case.
17     Q. Ms. Ravelo, do you know anything about how
18 drywall is made?
19     A. No.
20     Q. Have you ever asked for an estimate of how much
21 it would cost to fix your house?
22     A. No.
23     Q. Do you have any idea how much it would cost to
24 fix your house?
25     A. No.

Page 45

1      Q. Ms. Ravelo, have you ever heard of any
2  settlements about drywall litigation?
3      A. No.
4      Q. I used the word settlement, is that a term you've
5  heard before?
6      A. No.
7      Q. Do you have any understanding what it means?
8      A. Like making an arrangement with me? No.
9      Q. I'm just asking if you have any understanding of
10 what it means.
11     A. No, I don't have any, no.
12     Q. Have you done anything to try to get any money
13 from any drywall company other than filing this lawsuit?
14     A. No.
15     Q. Ms. Ravelo, you testified earlier about some
16 metal in your house turning a dark color. Do you remember
17 that?
18     A. Yes.
19     Q. Have you ever -- have you ever seen that same
20 thing happen to any metal outside of your house?
21        MR. GARY: Objection. Asked and answered.
22        THE WITNESS: No.
23 BY MR. HENNING:
24     Q. Mr. Gary's point is fair. I meant have you ever
25 seen it happen in another house or another place where you

12 (Pages 42 to 45)

**Page 46**

1  lived?
2     A. No.
3     Q. Have you ever contacted your insurance company
4  about your drywall?
5     A. No.
6     Q. Have you -- have you ever contacted any
7  government person about your drywall?
8     A. No.
9     Q. Have you ever heard of something called the
10 Consumer Product Safety Commission?
11    A. No.
12    Q. Ms. Ravelo, do you pay property taxes for your
13 house?
14    A. Like taxes for the house?
15    Q. Yes.
16    A. Yes.
17    Q. How much?
18    A. That's included in my mortgage.
19    Q. How much -- I assume monthly -- is your mortgage
20 payment?
21    A. Monthly?
22    Q. Yes.
23    A. 755, 755.
24    Q. Ms. Ravelo, have you ever talked to any newspaper
25 reporter about your drywall?

**Page 47**

1     A. No.
2     Q. Ms. Ravelo, do you know if anyone has tested your
3  drywall?
4     A. Yes, they did some tests.
5     Q. Have you ever seen the results of those tests?
6     A. The test, the results?
7     Q. Yeah. Has anyone ever told you -- let me take a
8  step back. Do you understand the word "results"?
9     A. Like you see a document or something.
10    Q. Yeah, have you seen any document saying, here's
11 what the test showed?
12    A. Well, yeah, they did an inspection where it came
13 out the sheetrock.
14    Q. What do you mean it came out the sheetrock?
15    A. We call it the drywall, the sheetrock Chinese.
16 I'm sorry.
17    Q. What do you mean the inspection came out the
18 sheetrock?
19    A. They -- they did inspections in the house, and
20 they took samples.
21    Q. And have you seen -- well, let me ask a different
22 question. Do you know what happened to the samples?
23    A. Well, they inspected it and they did everything.
24    Q. Have you considered leaving your house?
25    A. I've counted up to ten, but I don't have a place

**Page 48**

1  to go.
2     Q. Is there any other reason you haven't left your
3  house?
4     A. I don't have anywhere to go, and I don't want to
5  lose my house.
6     Q. Why don't we take five minutes.
7        VIDEOGRAPHER: Going off the record. The time is
8  10:44 a.m.
9        (A break was taken.)
10       VIDEOGRAPHER: Back on the record. The time is
11 10:59 a.m.
12 BY MR. HENNING:
13    Q. Ms. Ravelo, did you paint the drywall when you
14 moved into the house?
15    A. Yes.
16    Q. Did you do anything else to the drywall?
17    A. No, painted.
18    Q. Did you yourself paint it?
19    A. Yes.
20    Q. Do you remember where you got the paint?
21    A. In Lowe's.
22    Q. Do you remember what kind it was?
23    A. Normal paint.
24    Q. Do you still have any of the paint?
25    A. No.

**Page 49**

1     Q. Ms. Ravelo, do you use the Internet?
2     A. Yes.
3     Q. Have you ever put anything on the Internet about
4  your drywall?
5     A. No.
6     Q. Have you ever made a video of your house?
7     A. No.
8     Q. Do you know what Facebook is?
9     A. Excuse me? Really the Internet, my son uses it.
10 I don't know a lot about that.
11       (A discussion was held off the record.)
12 BY MR. HENNING:
13    Q. The house has a water heater?
14    A. Yes.
15    Q. Is the water heater that's in there now, is it
16 the same one when you bought the house?
17    A. No, we had to change it.
18    Q. You had to get a new one after the explosion we
19 talked about earlier today?
20    A. Yes.
21    Q. Do you know what kind you got?
22    A. It's one of those big ones.
23    Q. Where is it in the house?
24    A. In the garage.
25    Q. Do you park the cars in the garage?

13 (Pages 46 to 49)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

## Page 50

```
 1      A.  No.
 2      Q.  Is there any drywall in the garage?
 3      A.  Yes.
 4      Q.  Ms. Ravelo, have you ever heard the term class
 5   action?
 6      A.  Yes.
 7      Q.  What, if anything, does that mean to you?
 8      A.  Well, it's a group of people that were affected.
 9      Q.  For this case, what's the group of people?
10      A.  They're people that are in my same situation.
11      Q.  Have you ever heard the term class
12   representative?
13      A.  Group representative?
14      Q.  Class representative.  That's what I meant to
15   say.  That's what I said, class representative.
16      A.  Like my case?
17      Q.  Have you ever heard the term class
18   representative?
19      A.  I have my doubt.
20      Q.  I'm sorry.  Say that again.
21          THE INTERPRETER:  I have my doubt.
22   BY MR. HENNING:
23      Q.  Let me ask you this, what do you consider your
24   role to be in the lawsuit?
25      A.  My role?
```

## Page 51

```
 1      Q.  Yes.  Do you understand what your role is or
 2   what's your understanding of role?
 3      A.  To defend, defend my -- defend my case I'm
 4   affecting -- and if other people that are also in the same
 5   situation.
 6      Q.  Ms. Ravelo, do you know the size of the property
 7   where your house is located?
 8      A.  The size?  1,000 something.  Exactly, no.
 9      Q.  Ms. Ravelo, do you know anyone else who's had a
10   problem they think is with their drywall?
11      A.  No.
12      Q.  Have you ever heard of Chris Brucker?
13      A.  No.
14      Q.  Have you ever heard of Trever Nutting?
15      A.  No.
16      Q.  How about Wilfredo Retana?
17      A.  No.
18      Q.  How about Beatrix Retana?
19      A.  No.
20      Q.  How about George or Brenda Brincku?
21      A.  No.
22      Q.  Ms. Ravelo, do you know what an appraisal of your
23   home is?
24      A.  How much?
25      Q.  Do you have any sense of how much your home is
```

## Page 52

```
 1   worth now?
 2      A.  Now, no.
 3      Q.  How about when you bought it?
 4      A.  Like I don't understand.  What.
 5      Q.  I think you said you paid was it $86,000 for your
 6   house?
 7          MR. GARY:  That was the mortgage.
 8          THE WITNESS:  Uh-huh.
 9   BY MR. HENNING:
10      Q.  That was the amount of your mortgage?
11      A.  Yes.
12      Q.  When you bought the house, did you think it was
13   worth more or less or $86,000?
14      A.  No, I don't know.
15      Q.  Ms. Ravelo, have you ever been convicted of a
16   crime?
17      A.  No.
18      Q.  Have you ever been arrested?
19      A.  No.
20      Q.  Have you ever been fired from a job?
21      A.  No.
22      Q.  Ms. Ravelo, do you have any documents about your
23   drywall?
24          MR. GARY:  Objection.
25          THE WITNESS:  No.
```

## Page 53

```
 1   BY MR. HENNING:
 2      Q.  Do you have any documents about the purchase of
 3   your house?
 4      A.  Only the papers of the purchase.
 5      Q.  Whatever documents you have about either your
 6   drywall or your house, have you given those to any
 7   lawyers?
 8      A.  Myself of the walls, I don't have anything.
 9      Q.  And since the house was existing when you bought
10   it, I assume you have no idea who installed the drywall?
11      A.  No.
12      Q.  Have you made any complaints to anyone about your
13   drywall?
14      A.  No.
15      Q.  Let's do our best with a couple documents.  Ms.
16   Ravelo, do you have a document we marked as Exhibit 4 in
17   front of you?
18      A.  Uh-huh.
19          (Defendant's Exhibit 4, Verification, was
20   marked for identification.)
21   BY MR. HENNING:
22      Q.  Could you turn to the last page, please?  Even
23   one more.
24      A.  No.
25      Q.  If you turn that one over.  Is there nothing on
```

```
                                    54
 1   yours?  If you turn that page over?
 2       A.  Okay.  This one?
 3       Q.  Yes.  Is that your signature there?
 4       A.  Yes.
 5       Q.  Can you tell me what you understood you were
 6   signing here?
 7           MR. GARY:  Objection.
 8           THE WITNESS:  It's a verification; right?
 9   BY MR. HENNING:
10       Q.  Did you sign this?
11       A.  Yes.
12       Q.  And what did you understand a verification to be?
13           MR. GARY:  Objection to the extent it calls for a
14   communication between the attorney and the client.
15   BY MR. HENNING:
16       Q.  Yeah, I don't want to know anything you talked to
17   your lawyers about.
18           MR. GARY:  Other than what your lawyers explained
19   to you is the question.
20           THE WITNESS:  No.
21   BY MR. HENNING:
22       Q.  Ms. Ravelo, could you grab the document we just
23   marked as an Exhibit -- 5.  Any chance you recognize it?
24       A.  This is page five; right?
25       Q.  Let's start on the first page, do you see down at

                                    55
 1   the bottom middle there, are those your initials?
 2       A.  Yes.
 3           (Defendant's Exhibit 5, Document, was marked
 4       for identification.)
 5   BY MR. HENNING:
 6       Q.  And did you initial that page?  I'm sorry, Ms.
 7   Ravelo, I'm talking about --
 8       A.  They're my initials.
 9       Q.  Let's try it this way, maybe we can do it
10   quickly.  Throughout the document, each place where
11   there's an XR, are those your initials?
12       A.  Yes.
13       Q.  And were you the one who put those initials
14   there?
15       A.  Yes.
16       Q.  And if you could turn to a page marked with a
17   little number at the bottom right-hand corner,
18   Brucker-351.
19       A.  I can't see well.
20           MR. HENNING:  Do you mind if I just go?
21           MR. GARY:  No.
22           THE WITNESS:  Four, five.  Here's seven.
23   BY MR. HENNING:
24       Q.  Yes, page seven of the document.  Do you see --
25   I'm sorry.  Go ahead.

                                    56
 1       A.  Yes.
 2       Q.  Do you see your signature anywhere on that page?
 3       A.  Here (indicated).
 4       Q.  And did you sign that?
 5       A.  Yes.
 6       Q.  Ms. Ravelo, do you know what this document is?
 7       A.  Well, now I don't know because I can't read it.
 8       Q.  Would you have had someone interpret this for you
 9   before you signed it?
10           MR. GARY:  Objection.  "Would you have had."
11           MR. HENNING:  I understand.
12           THE WITNESS:  Oh, I don't know.  I'm not sure.
13   BY MR. HENNING:
14       Q.  Did you have someone interpret this document
15   before you signed it?
16           MR. GARY:  Objection.  Asked and answered.
17           THE WITNESS:  Perhaps.
18   BY MR. HENNING:
19       Q.  As a matter of your practice, would you sign
20   anything that is in English without having someone
21   translate it to you in Spanish?
22           MR. GARY:  Objection.  Asked and answered.
23           THE WITNESS:  I don't think so.
24   BY MR. HENNING:
25       Q.  Ms. Ravelo, have you ever seen anything that at

                                    57
 1   least you understood to be a complaint in your lawsuit?
 2       A.  No, I don't know.
 3       Q.  Have you ever seen anything you understood to be
 4   the third amended class action complaint in your lawsuit?
 5           MR. GARY:  Objection.
 6           THE INTERPRETER:  Please repeat for the
 7       interpreter.
 8           MR. HENNING:  Sure.
 9   BY MR. HENNING:
10       Q.  Have you ever seen anything you understood to be
11   the third amended class action complaint in your lawsuit?
12           MR. GARY:  Objection.  Let me state my objection
13   in English, which won't compromise the witness.  You
14   don't need to translate it.
15           My concern is that she doesn't understand the
16   term "complaint," and, therefore, the question is
17   confusing to her.
18           MR. HENNING:  Okay.
19           MR. GARY:  And certainly the third amended class
20   action complaint is more confusing, but you don't need
21   to translate that.  I don't want to --
22           MR. HENNING:  Why don't we do this, let's get an
23   answer to this question.
24           MR. GARY:  Sure.
25           MR. HENNING:  And then we'll try to clean it up.
```

## Page 58

1  BY MR. HENNING:
2     Q.  Have you ever seen anything that you understood
3  to be the third amended class action complaint in your
4  lawsuit?
5     A.  No.
6     Q.  Have you ever heard the term "complaint" before
7  as it relates to a lawsuit?
8     A.  No, I don't understand that.
9     Q.  Ms. Ravelo, could you grab the document we just
10 marked as Exhibit No. 7. Is that your signature at the
11 bottom there?
12    A.  Yes.
13        (Defendant's Exhibit 7, Document, was marked
14    for identification.)
15 BY MR. HENNING:
16    Q.  Did you sign that document?
17    A.  Yes.
18        MR. HENNING:  Bob, do you mind if we take five
19    minutes and I can go through my notes?
20        MR. GARY:  Sorry, you want to take five minutes?
21        MR. HENNING:  Yes.
22        MR. GARY:  Sure.
23        VIDEOGRAPHER:  Going off the record.  The time is
24    11:21 a.m.
25        (A break was taken.)

## Page 59

1         VIDEOGRAPHER:  Back on the record.  The time is
2     11:31 a.m.
3  BY MR. HENNING:
4     Q.  Ms. Ravelo, we spent a good bit of our early
5  morning discussion talking about Chinese drywall.  Do you
6  remember that?
7     A.  Yes.
8     Q.  And I want to make sure that I'm understanding
9  you correctly and what you mean by Chinese drywall.  So
10 I'll ask you, what do you mean by Chinese drywall?
11    A.  Okay.  Well, I asked to rectify, and when I refer
12 to drywall -- Chinese drywall in Spanish, but that drywall
13 I have in my house it wasn't in China, it was here made.
14    Q.  And so when you say Chinese drywall, you're not
15 necessarily talking about drywall that was made in China;
16 is that right?
17    A.  No, no, not at all.  That's how I say it because
18 that's the way I learned to say it.
19    Q.  Okay.  Do you know whether in your house there
20 was any drywall that was actually made in China?
21    A.  They told me yes, but mine is not from there.
22    Q.  Okay.  I don't have any more questions.
23        MR. GARY:  Okay.  We will not waive.
24        MR. HENNING:  One last thing for the record.
25    Mr. Gary and I have agreed that the written record for

## Page 60

1  today will be solely in English.  We have the
2  videotape, Beatrice has done a wonderful job.  If
3  after looking at the videotape you feel like there's
4  any follow-up necessary to clarify an interpretation
5  point, we'll do that, but we're not going to have
6  anything in the written record other than the English
7  version of the transcript.
8         MR. GARY:  Yes, that's agreed.
9         VIDEOGRAPHER:  This concludes the deposition.
10 The time is 11:34 a.m.
11
12      (Deposition concluded at 11:34 a.m.)

## Page 61

STATE OF _____ )
                        ) :ss
COUNTY OF _____ )


     I, XIOMARA RAVELO, the witness
herein, having read the foregoing
testimony of the pages of this deposition,
do hereby certify it to be a true and
correct transcript, subject to the
corrections, if any, shown on the attached
page.


                    _____
                        XIOMARA RAVELO


Sworn and subscribed to before
me, this        day of
         , 2012.

                    _____
                        Notary Public

## Page 62 — CERTIFICATE OF OATH

STATE OF FLORIDA)
COUNTY OF COLLIER)

I, the undersigned authority, certify that XIOMARA RAVELO personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 2nd day of February, 2012.

_____
Lori L. Bundy
Notary Public - State of Florida
My Commission No.: EE 132707
Expires: September 22, 2015

## Page 63 — REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA)
COUNTY OF COLLIER)

I, Lori L. Bundy, Certified Court Reporter and Notary Public in and for the State of Florida at Large, certify that I was authorized to and did stenographically report the deposition of XIOMARA RAVELO; that a review of the transcript was requested and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties; nor am I a relative or employee of any of the parties' attorney or counsel connected with the action; nor am I financially interested in the action.

DATED this 2nd day of February, 2012.

_____
Lori L. Bundy, FPR, RPR, CRR, CLR

## Page 64 — INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

## Page 65 — ERRATA

I wish to make the following changes, for the following reasons:

PAGE LINE
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____

_____     _____
WITNESS' SIGNATURE           DATE