1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA


------------------------------------------------
CHRIS BRUCKER, TREVER S. NUTTING,
XIOMARA RAVELO, WILFREDO E. RETANA
and BEATRIX CELSA RETANA, individually,
and on behalf of all others
similarly situated,


               Plaintiffs,

                                    CASE ACTION NO.
vs.                        2:10-cv-00405-FtM-29SPC

LOWES HOME CENTERS, INC., a North Carolina
Corporation, and NATIONAL GYPSUM COMANY,
a Delaware Corporation,


               Defendants.
------------------------------------------------
               2925 PGA Boulevard, Suite 200
               Palm Beach Gardens, Florida
               Friday, January 20, 2012
               9:08 a.m. - 1:44 p.m.

         VIDEOTAPED DEPOSITION OF BEATRIX RETANA

       Taken before Darline M. West,

Registered Professional Reporter, Notary Public

in and for the State of Florida At Large,

pursuant to Notice of Taking Deposition filed

by the Defendants in the above cause.


Job No. 23640-A

**2**

1  APPEARANCES:
2
3
4
5  On behalf of the Plaintiffs:
6    CUNEO GILBERT & LADUCA, LLP
7    507 C Street, NE
8    Washington, D.C. 20002
9    202.789.3960
10   By:  WILLIAM H. ANDERSON, ESQ.
11     wanderson@cuneolaw.com
12
13
14  On behalf of the Defendants:
15    MORGAN LEWIS & BOCKIUS
16    1701 Market Street
17    Philadelphia, Pennsylvania 19103-2921
18    215.963.5000
19    By:  THOMAS V. AYALA, ESQ.
20      tayala@morganlewis.com
21
22
23  ALSO PRESENT:
24    Wilfredo Retana, a Plaintiff
25    Paul Singletary, Video Technician

**3**

1          I N D E X
2  WITNESS:                    PAGE:
3  BEATRIX RETANA
4  DIRECT EXAMINATION                  6
   BY MR. AYALA:
5  CROSS-EXAMINATION                 127
   BY MR. ANDERSON:
6  REDIRECT EXAMINATION              130
   BY MR. AYALA:
7  CERTIFICATE OF OATH               132
   REPORTER'S CERTIFICATE            133
8
9
10          - - -
11
       E X H I B I T S
12
13       Description          Page
14 B. Retana Deposition   Proposed Second    11
   Exhibit 1       Amended Class Action
15               Complaint
   B. Retana Deposition   Third Amended Class   17
16 Exhibit 2       Action Complaint
   B. Retana Deposition   General Inspection   86
17 Exhibit 3       Protocol
   B. Retana Deposition   Plaintiff Wilfredo   87
18 Exhibit 4       Retana's Responses to
               Defendant's First Set
19               of Interrogatories
   B. Retana Deposition   Wilfredo Retana's    88
20 Exhibit 5       responses to the
               request for
21               documentation
   B. Retana Deposition   Interrogatories      89
22 Exhibit 6
   B. Retana Deposition   Request for Documents  93
23 Exhibit 7
   B. Retana Deposition   Income Tax Returns    93
24 Exhibit 8
25

**4**

1  B. Retana Deposition   South Florida        109
   Exhibit 9       Sun-Sentinel article,
2               "Proposed Chinese
3               Drywall Settlement to
               Help South
3               Floridians"
4  B. Retana Deposition   U.S. Consumer Product  124
   Exhibit 11       Safety Commission
5               Report
   B. Retana Deposition   Drywall Information   113
6  Exhibit 12       Center from the U.S.
               Consumer Product
7               Safety Commission
   B. Retana Deposition   Photographs          117
8  Exhibit 13
9  REPORTER'S NOTE:
10     (B. Retana Deposition Exhibit No. 10 was
   inadvertently skipped.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

1          P R O C E E D I N G S
2          - - -
3      VIDEO TECHNICIAN:  This is tape No. 1 in
4  the videotaped deposition of Beatrix Retana,
5  taken by the defendant in the matter of Chris
6  Brucker, Trever S. Nutting, Xiomara Ravelo,
7  Wilfred E. Retana, and Beatrix Celsa Retana
8  versus Lowe's Home Centers, Incorporated and
9  National Gypsum Company to be heard in the
10  United States District Court, Middle District of
11  Florida, Fort Myers Division, Civil Action No.
12  2:11-CV-00338-JES-DNF.
13      The deposition is being held at Leopold
14  Law, P.A., 2925 PGA Boulevard, Suite 200, Palm
15  Beach Gardens, Suite 200, Palm Beach, Florida,
16  on 20, January, 2012, at approximately 9:08 a.m.
17      My name is Paul is Singletary with David
18  Feldman Worldwide, and I am the legal video
19  specialist.  The court reporter is Darline West
20  in association with David Feldman Worldwide.
21      Counsel please introduce themselves, and
22  the court reporter please swear in the witness.
23      MR. AYALA:  Good morning, Tom Ayala on
24  behalf of New NGC, Inc. doing business as
25  National Gypsum Company.

2  (Pages 2 to 5)

6

```
 1            MR. ANDERSON:  William Anderson on
 2   behalf of the plaintiffs.
 3   THEREUPON,
 4            BEATRIX RETANA,
 5   called as a witness on behalf of the Defendants
 6   herein, having been first duly sworn, was examined
 7   and testified as follows:
 8            THE WITNESS:  Yes, I do.
 9            DIRECT EXAMINATION
10   BY MR. AYALA:
11       Q.  Good morning, Miss Retana.
12       A.  Yeah.  Good morning.
13       Q.  My name is Tom Ayala.  I'm going to be
14   asking you some questions today.
15            Have you ever given a deposition before?
16       A.  No.
17       Q.  Just a few ground rules and procedures, if
18   you will, that help the deposition go smoothly and
19   help the court reporter take down and transcribe
20   everything you and I are saying.  I'm going to be
21   asking you some questions.  If you would be kind
22   enough to wait until I finish my question before you
23   answer.
24            Will you agree to do that?
25       A.  Sure.
```

7

```
 1       Q.  And -- and I promise to do my best to wait
 2   until you finish your answer before I ask you a
 3   question, okay?
 4            If I ask you a question that you don't
 5   understand, will you please ask me to clarify it?
 6       A.  Sure.
 7       Q.  And if you answer the question, I'll just
 8   assume you understood it, okay?
 9            If you need a break, just let me know.  I
10   just ask if -- if there's a question pending, then
11   you can answer the question.  Then have a break
12   afterward.  Okay?
13       A.  Okay.
14       Q.  You understand you're under oath today?
15       A.  Yes.
16       Q.  And you've sworn to give the truth?
17       A.  Yes.
18       Q.  Is there any reason that you can think of
19   that you cannot give complete, accurate, and truthful
20   testimony today?
21       A.  No.
22       Q.  Have you taken any medications that might
23   impair your ability to give accurate testimony today?
24       A.  No.
25       Q.  Miss Retana, how is it that you became a
```

8

```
 1   plaintiff in this lawsuit?
 2       A.  I found a problem in my property, and that
 3   made me realize that I wasn't the only one with this
 4   problem.  And I needed to take some action to help
 5   myself and some others in the same position.
 6       Q.  Okay.  When -- when you talk about your
 7   "property," are you referring -- what property are
 8   you referring to?
 9       A.  The property I own at 11412, Mountain Bay
10   Drive in Riverview, Florida.
11       Q.  Throughout this deposition, if we refer to
12   the house or the property or your house, we an
13   agreement that that's the one we're talking about?
14       A.  Sure.
15       Q.  Okay.  How did you find your attorneys?
16       A.  He was referred to me by a website.
17       Q.  What was the website?
18       A.  American Watchdog.
19       Q.  Okay.  So you went on the Internet and
20   found the website, and I take it you submitted a
21   claim on the website; is that correct?
22       A.  I submitted information.  More information.
23       Q.  Okay.  And you typed -- typed that
24   information on the computer?
25       A.  Uh-huh.
```

9

```
 1       Q.  Okay.  And then -- and then what happened
 2   next?
 3            MR. ANDERSON:  Objection.  Form.
 4   BY MR. AYALA:
 5       Q.  You can answer.
 6       A.  I spoke to somebody there and explained my
 7   situation, and they gave me the phone number of
 8   Mr. Anderson's law office.  Then I got in touch with
 9   them.
10       Q.  Okay.  Without getting into any discussions
11   you had with your attorneys, which attorneys, other
12   than Mr. Anderson, have you had communications with?
13       A.  Just him.
14       Q.  "Just him."
15            Are -- are you aware of any other attorneys
16   besides Mr. Anderson representing you?
17       A.  Yes.
18       Q.  Okay.  Can you name any of them?
19       A.  No.
20       Q.  Before you contacted Mr. Anderson, did you
21   do any investigation of Mr. Anderson or his firm?
22       A.  No.
23       Q.  Okay.  Have you signed a retention
24   agreement with Mr. Anderson's law firm?
25       A.  Yes.
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

10

1    Q.  Who made the decision to -- to file the
2  lawsuit that we're here for today?
3       MR. ANDERSON:  Objection.  Form.
4       THE WITNESS:  It's complex.  I'll say
5    it was me who ultimately made the decision.
6  BY MR. AYALA:
7    Q.  With whom did you discuss the decision
8  before you authorized the lawsuit?
9    A.  I discussed it with my husband.
10   Q.  Anybody else?
11   A.  No.
12   Q.  When did you make the decision to sue?
13   A.  Beginning of 2010.
14   Q.  Is it possible it was the beginning of
15  2011?
16   A.  Oh, 2011, yeah.  Probably, yeah.
17   Q.  Who have you sued as a result of the
18  problem you described at the house?
19      MR. ANDERSON:  Objection.  Form.
20      THE WITNESS:  Can you rephrase the
21   question?
22  BY MR. AYALA:
23   Q.  Which companies or individuals have you
24  sued because of the problem that you described at the
25  house?

11

1    A.  Oh, nobody else, no.
2    Q.  Could you name for me the companies that
3  you sued?
4    A.  I haven't sued anybody.  I'm just working
5  on this case with -- against the National Gypsum.
6    Q.  Okay.
7    A.  Nobody else.
8    Q.  So you understand that you've sued National
9  Gypsum, correct?
10   A.  Yes.
11   Q.  Okay.  Aside from National Gypsum, who have
12  you sued?
13   A.  Nobody else.
14   Q.  I'm going to -- I'm going to show you a
15  document now.
16      Miss Retana, I'm showing you now what's
17  previously been marked as B. Retana Exhibit 1.  Do
18  you recognize this document?
19   A.  This is the same one, W. Retana, same one.
20      (B. Retana Deposition Exhibit 1, Proposed
21  Second Amended Class Action Complaint, was marked for
22  identification.)
23  BY MR. AYALA:
24   Q.  Could you identify this document for the
25  record, please?

12

1    A.  Yes.
2    Q.  Okay.  What is it?
3    A.  Well, the one in front of me is an
4  amendment.
5    Q.  Okay.
6    A.  Of the -- of the -- of the complaint.
7    Q.  Okay.  You see on the front page where it
8  says the word "Plaintiffs"?
9    A.  Yes.
10   Q.  And Wilfredo E. Retana and Beatrix Celsa
11  Retana, these individuals would be you and your
12  husband, correct?
13   A.  Correct.
14   Q.  You see on the front page of this document,
15  which, for the record, is identified as Proposed
16  Second Amended Class Action Complaint, and I'll
17  represent that this complaint was filed with leave of
18  court and was an operative complaint in this
19  litigation until the filing of the Third Amended
20  Complaint in October of 2011.
21      So back to the Second Amended Complaint
22  here.  Do you see on the first page where the word
23  "Defendants" appears?
24   A.  Yes.
25   Q.  Do you see here that Lowe's Home Centers,

13

1  Inc., is listed as one of the defendants in addition
2  to National Gypsum Company?
3    A.  Yes.
4    Q.  It appears you've sued Lowe's Home Centers
5  in addition to National Gypsum, correct?
6    A.  Correct.
7    Q.  Do you have any understanding of whether
8  the drywall that is in the Riverview house was sold
9  by Lowe's Home Centers, Inc.?
10      MR. ANDERSON:  Objection.  Form.
11      THE WITNESS:  I don't know.
12  BY MR. AYALA:
13   Q.  And -- just so we have a clear
14  understanding, Lowe's Home Center, Inc., you have an
15  understanding that Lowe's is the home improvement
16  store, a retail store that we see all over the state,
17  correct?
18   A.  Uh-huh.
19   Q.  So I understand, you don't have any
20  evidence or knowledge that Lowe's sold the drywall in
21  your Riverview house; is that correct?
22      MR. ANDERSON:  Objection.
23      THE WITNESS:  Personally, I don't know.
24  BY MR. AYALA:
25   Q.  Okay.  And sitting here today, you can't

4  (Pages 10 to 13)

14

1   refer me or the court or the jury to any document or
2   other information that would indicate that Lowe's
3   sold the drywall that was installed in the Riverview
4   house, correct?
5           MR. ANDERSON: Objection. Form.
6           THE WITNESS: Correct.
7   BY MR. AYALA:
8       Q.  Do you see at the top, Ms. Retana, of the
9   Second Amended Class Action Complaint, the complaint
10  indicates that it was filed on July 8th, 2011; do you
11  see that?
12      A.  Yeah.
13      Q.  Okay. Did you see this complaint before it
14  was filed?
15      A.  Yes.
16      Q.  And you reviewed this complaint before it
17  was filed?
18      A.  Yes.
19      Q.  And you authorized your attorneys to file
20  this complaint on your behalf?
21      A.  Yes.
22      Q.  Did you make any corrections or additions
23  to the complaint before it was filed?
24          MR. ANDERSON: Objection. Form.
25          THE WITNESS: No.

15

1   BY MR. AYALA:
2       Q.  Ms. Retana, if you would, I would like to
3   direct your attention to page 12 of the second
4   amended complaint.
5           Would you please read paragraph 64 of the
6   complaint for the record.
7       A.  "The Retana home is residential property
8   located at 11412 Mountain Bay Drive, Hillsboro
9   County, Riverview, Florida. The Retana home was
10  built in early 2006 and purchased in 2006 as an
11  investment rental property."
12      Q.  Are those accurate statements?
13      A.  Yes.
14      Q.  Just to short circuit this, I'm not going
15  to ask you to read this entire page because we'll
16  cover some of the facts and allegations in here in a
17  bit. But I'd like to direct your attention to
18  paragraph 68, please. Would you read that paragraph,
19  please.
20      A.  "A detailed inspection of the Retana
21  property indicated that all the drywall within the
22  home was made by National Gypsum Company."
23      Q.  Okay. What do you know about that detailed
24  inspection? Was there a report generated from that
25  inspection?

16

1           MR. ANDERSON: Objection. Form.
2           THE WITNESS: Yes.
3   BY MR. AYALA:
4       Q.  Okay. Do you have that report?
5       A.  I do, yes.
6       Q.  When did you first receive that report?
7       A.  I wouldn't be able to remember the exact
8   time.
9       Q.  When did the inspection occur?
10      A.  I don't remember. Last year some --
11  middle. I don't remember.
12      Q.  Did the inspection occur before July 8th,
13  2011?
14      A.  I can't say that.
15      Q.  If we assume that the detailed inspection
16  indicates that all the drywall within the home was
17  made by National Gypsum Company, and I haven't seen
18  the report, but if we assume that's what the report
19  says, would that be an accurate statement?
20          MR. ANDERSON: Objection. Form.
21          THE WITNESS: I -- I really didn't,
22  like, went into detail with the report.
23  Just what I know what was wrong with the
24  drywall. So I couldn't tell you exactly
25  what they found. I just know that it has

17

1   some problems.
2   BY MR. AYALA:
3       Q.  Will you agree to provide that report to
4   counsel so that he can provide it to me?
5       A.  Yes.
6           MR. ANDERSON: We're certainly happy to
7   take a look at what she's referring to, and
8   if appropriate, we'll produce it.
9   BY MR. AYALA:
10      Q.  Back to the first page of the complaint,
11  Ms. Retana, and maybe at this point, why don't we do
12  this: Let's go to the next complaint. If you could
13  please set that Second Class Action Complaint aside.
14  We'll take a look at the Third Class Action
15  Complaint. The Third Amended Class Action Complaint
16  is identified as B. Retana 2.
17          MR. ANDERSON: May I have a copy,
18  please?
19          (B. Retana Deposition Exhibit 2, Third
20  Amended Class Action Complaint, was marked for
21  identification.)
22  BY MR. AYALA:
23      Q.  Do you recognize this document,
24  Miss Retana?
25      A.  Yes, I do.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

18

1    Q.  Did you see the document before it was
2  filed?
3    A.  Yes.
4    Q.  Did you review this document before it was
5  filed?
6    A.  Yes.
7    Q.  Okay.  Did you make any changes to the text
8  of the Third Amended Complaint before it was filed?
9    A.  No.
10    Q.  Did you ask your counsel to make any
11  changes to it?
12    A.  No.
13    Q.  Okay.  What's your understanding of why the
14  Second Amended Class Action Complaint was amended to
15  the Third Class Action Complaint?
16    MR. ANDERSON:  Objection.  Form.
17    THE WITNESS:  No, no -- I don't know.
18  BY MR. AYALA:
19    Q.  Do you know what's different about the
20  Third Amended Class Action Complaint from the Second
21  Class Action Complaint?
22    A.  No.
23    Q.  Okay.  Ms. Retana, if we go to page 11 of
24  the Third Amended Class Action Complaint, does it
25  appear to you that the allegations listed under the

19

1  heading the "Retana Home" are identical to the
2  allegations -- comparable allegations in the Second
3  Amended Class Action Complaint?
4    MR. ANDERSON:  Objection.  Form.
5    THE WITNESS:  Yeah.
6  BY MR. AYALA:
7    Q.  Okay.  And in the Third Amended Class
8  Action Complaint, paragraph 68 again suggests that
9  all the drywall within the home was made by National
10  Gypsum Company, correct?
11    A.  Correct.
12    Q.  Ms. Retana, what steps -- what if any steps
13  did you take to make sure that the allegations in the
14  Third Amended Complaint regarding the Retana home
15  were accurate?
16    MR. ANDERSON:  Objection.  Form.
17    THE WITNESS:  Just provided access to
18    the property for the inspection to be done.
19  BY MR. AYALA:
20    Q.  Now, on the first page of the Third Amended
21  Class Action Complaint, Ms. Retana, just above the
22  word "Plaintiffs," it lists several individuals
23  including Wilfredo Retana, and Beatrix Retana, and
24  then it says, "Individually and on behalf of all
25  others similarly situated."

20

1    What's your understanding of the phrase "on
2  behalf of all others similarly situated"?
3    A.  We're acting on behalf of other people that
4  have -- that are in the same situation.
5    Q.  And how would you describe that situation?
6    MR. ANDERSON:  Objection.  Form.
7    THE WITNESS:  Some type of
8    contamination on the drywall material that
9    was made by National Gypsum.
10  BY MR. AYALA:
11    Q.  Anything else?
12    A.  I just know that it's -- it has awoken some
13  gases and deteriorate the -- the wiring on the house
14  and the appliances and AC units, and it makes it hard
15  to live in a property like that.  Plus a big odor in
16  the house, bad smell.
17    Q.  What do you understand to be your duties as
18  a proposed class representative?
19    MR. ANDERSON:  Objection.  Form.
20    THE WITNESS:  Doing what I'm doing
21    right now, providing my testimony on this
22    case.
23  BY MR. AYALA:
24    Q.  All right.  And other than appearing here
25  today for your deposition, what else have you done as

21

1  part of your duties as class representative --
2  proposed class representative?
3    MR. ANDERSON:  Objection.  Form.
4    THE WITNESS:  Providing all the
5    documents that I can, you know -- that can
6    help with the case.  I provide access to the
7    property and be available for -- for any
8    type of information they request from me.
9  BY MR. AYALA:
10    Q.  By the way, has there ever been a time that
11  your attorneys have asked you for access to the
12  property and you've denied it?
13    A.  Never.
14    Q.  Okay.  To your knowledge, how many times
15  has your property been inspected in the last two
16  years?
17    MR. ANDERSON:  Objection.  Form.
18    THE WITNESS:  I believe -- I think more
19    than once.
20  BY MR. AYALA:
21    Q.  To your knowledge, how many times have you
22  granted access to your attorneys to inspect the
23  property?
24    A.  Two.
25    Q.  Okay.

6  (Pages 18 to 21)

22

1    A.  Two times.
2    Q.  When did that happen?
3        MR. ANDERSON: Objection.  Form.
4        THE WITNESS:  Oh, it happens at the
5    beginning of the year, and then some other
6    times.  I don't recall the exact time.
7    But...
8    BY MR. AYALA:
9    Q.  When you say "the beginning of the year,"
10   you mean the beginning of 2011?
11   A.  Yes.
12   Q.  Without getting into any discussions with
13   your attorneys, how often do you speak with them
14   about the case?
15       MR. ANDERSON: Objection.
16       THE WITNESS:  Every -- I don't know,
17   once a month.
18   BY MR. AYALA:
19   Q.  Is it your understanding that by becoming a
20   class representative that you would receive a fee or
21   an award?
22       MR. ANDERSON: Objection.  Form.
23       THE WITNESS:  Yes.
24   BY MR. AYALA:
25   Q.  What's your understanding of what that fee

23

1    might be?
2        MR. ANDERSON: Objection.  Form.
3        THE WITNESS:  Enough money to fix the
4    property and to fix the properties of others
5    involved in the same situation.
6    BY MR. AYALA:
7    Q.  Okay.  And putting aside money with respect
8    to fixing any property, is it your understanding that
9    you would be entitled to a fee just for nothing other
10   than being a class representative in the case?
11       MR. ANDERSON: Objection.  Form.
12       THE WITNESS:  Say that again.
13       MR. AYALA: Could you read the question
14   back?
15       (A portion of the record was read by the
16   reporter)
17       THE WITNESS:  Oh, I wasn't aware of
18   that.
19   BY MR. AYALA:
20   Q.  Who do you believe has authority to settle
21   your lawsuit?
22       MR. ANDERSON: Objection.  Form.
23       THE WITNESS:  Probably the company that
24   built the -- made the drywall, with the
25   judge that will grant me that.

24

1    BY MR. AYALA:
2    Q.  Okay.  Putting aside any companies, who
3    among the plaintiffs in the lawsuit and the lawyers
4    in the lawsuit do you believe has authority to settle
5    the case?
6        MR. ANDERSON: Objection.  Form.
7        THE WITNESS:  I guess it's me and my
8    husband.  I could settle the case.
9    BY MR. AYALA:
10   Q.  Okay.  Ms. Retana, if you could please go
11   to page 12 of the Third Amended Complaint.
12   A.  Page 12?
13   Q.  Yes.  And if you could read paragraph 72 of
14   the complaint, please.
15   A.  "The class is defined as all owners of real
16   property within the State of Florida, having
17   structures built thereupon that contained National
18   Gypsum drywall and who have observable copper sulfide
19   corrosion within the same structure."
20   Q.  Thank you.
21       Ms. Retana, you're not seeking to
22   represent, are you, all homeowners in the State of
23   Florida who have National Gypsum drywall, are you?
24       MR. ANDERSON: Objection.  Form.
25       THE WITNESS:  Yes.  I'm representing

25

1    all those people that are in the same
2    situation.
3    BY MR. AYALA:
4    Q.  Okay.  If you look at paragraph 72 again --
5    A.  Uh-huh.
6    Q.  -- which is the document that you've
7    authorized to be filed in court as your operative
8    complaint, paragraph 72 doesn't say that you're
9    seeking to represent all homeowners who have National
10   Gypsum drywall, does it?
11       MR. ANDERSON: Objection.  Form.
12       THE WITNESS:  I really don't understand
13   what should I answer here.
14       MR. AYALA: Could you read the question
15   again, please?
16       THE COURT REPORTER:  Sure.
17       (A portion of the record was read by the
18   reporter)
19       MR. AYALA:  You know what, let me just
20   ask it a different way.
21   BY MR. AYALA:
22   Q.  If a Florida homeowner has corrosion in
23   their property but there's no evidence that that
24   corrosion was caused by National Gypsum drywall,
25   would you consider that homeowner to be part of your

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

26

1  proposed class?
2      MR. ANDERSON: Objection. Form.
3      THE WITNESS: No. It has to be in the
4  same case with me.
5  BY MR. AYALA:
6      Q. And when you say it has to be in the same
7  case as you --
8      A. Situation. It has to be similar to what is
9  happening to me. I cannot represent every type of
10  drywall, you know, deficiency out there.
11      Q. Now, do you understand that, at this point,
12  your case is not considered a class action unless and
13  until the court says it's a class action; do you
14  understand that?
15      A. Yes.
16      Q. You understand there's -- there's a process
17  that has to occur before your case could be
18  considered a class action, correct?
19      A. Yes.
20      Q. Okay. If the court were to refuse to
21  designate your case as a class action, would you
22  continue to try to recover for -- for alleged damage
23  to your property?
24      MR. ANDERSON: Objection. Form.
25      THE WITNESS: I haven't thought about

27

1  that.
2  BY MR. AYALA:
3      Q. Well, could you think about it now? The
4  question is -- the question is --
5      A. Definitely I want to recuperate what I
6  lost. I will seek more advice.
7      Q. And would it be fair to say that you
8  believe the damage to the property is significant?
9      A. Yes.
10      Q. It's costly?
11      A. Very much.
12      Q. It's cost you a lot of money?
13      A. Yeah.
14      MR. AYALA: Can we take a quick break?
15      MR. ANDERSON: Sure.
16      VIDEO TECHNICIAN: We're off the record
17  at 9:42.
18      (A recess was taken)
19      VIDEO TECHNICIAN: We're back on the
20  record at 9:50 a.m.
21  BY MR. AYALA:
22      Q. Okay. Miss Retano -- back on the record --
23  you're still under oath.
24      A. Yes.
25      Q. I would like to talk about the purchase of

28

1  the house. When did you purchase the Riverview
2  house?
3      A. 2006.
4      Q. How did you find the house?
5      MR. ANDERSON: Objection. Form.
6      THE WITNESS: A Realtor took me there.
7  BY MR. AYALA:
8      Q. Okay. And at the time you bought the
9  house, where were you living?
10      MR. ANDERSON: Objection. Form.
11      THE WITNESS: In Weston in -- where
12  I -- where I actually reside right now.
13  BY MR. AYALA:
14      Q. Okay. And Weston in Fort Lauderdale,
15  Florida?
16      A. Florida, yes.
17      Q. Approximately how far -- and you can
18  tell me by miles or how long of a drive it is -- how
19  far is it from Weston, Florida, to the property in
20  Riverview?
21      MR. ANDERSON: Objection. Form.
22      THE WITNESS: Three-and-a-half to four
23  hours.
24  BY MR. AYALA:
25      Q. Okay. Why are you looking at property

29

1  three-and-a-half to four hours away?
2      MR. ANDERSON: Objection to form.
3      THE WITNESS: Investment.
4  BY MR. AYALA:
5      Q. Okay. Did you consider the Riverview area
6  a beneficial or profitable investment area?
7      MR. ANDERSON: Objection. Form.
8      THE WITNESS: Yes.
9  BY MR. AYALA:
10      Q. Okay. And who sold you the house?
11      MR. ANDERSON: Objection. Form.
12      THE WITNESS: St. Joe's Company.
13  BY MR. AYALA:
14      Q. Was it your understanding that St. Joe's
15  Company was the builder of the house?
16      A. Yes.
17      Q. And that's your understanding today?
18      A. Yeah.
19      Q. Was -- was the house -- strike that.
20      Was construction on the house completed at
21  the time you purchased the house?
22      A. Yes.
23      Q. Okay. And so you didn't offer or even have
24  an opportunity to offer any input into what building
25  materials would go into the house, correct?

8 (Pages 26 to 29)

30

1    MR. ANDERSON: Objection. Form.
2    THE WITNESS: Yeah. Correct. I...
3    BY MR. AYALA:
4    Q.  What is the damage to the house for which
5    you're seeking to recover?
6    MR. ANDERSON: Objection. Form.
7    THE WITNESS: The damage of the house
8    is, you cannot use a lot of the switches in
9    the property because of corrosion. The AC
10   is broken. And the smell is so bad that it
11   smells like, you know, a dead animal is
12   inside. So it's not possible to live like
13   that.
14   BY MR. AYALA:
15   Q.  What is your understanding of what needs to
16   be done to the house in order to make it livable?
17   A.  Well, I'm not an expert on that, but my,
18   you know, knowledge is, like, the walls have to be
19   replaced, the wiring in the house, possible, needs to
20   be replaced, and all of the appliances.
21   Q.  Okay. And --
22   A.  And electric.
23   Q.  And you're relying on your experts in the
24   case who have issued reports in this case --
25   MR. ANDERSON: Objection.

31

1    BY MR. AYALA:
2    Q.  -- to make that determination, correct?
3    MR. ANDERSON: Form. Miss Retana, if
4    you can just pause for a moment and give me
5    an opportunity to object. Thank you.
6    THE WITNESS: Okay.
7    BY MR. AYALA:
8    Q.  Ms. Retana, just so I understand correctly,
9    have you and/or your husband ever lived in the
10   Riverview property?
11   A.  No.
12   MR. ANDERSON: Objection. Form.
13   BY MR. AYALA:
14   Q.  Okay. Have you any -- have you ever stored
15   any of your personal property in that -- in the
16   Riverview house?
17   A.  No.
18   Q.  Okay. Before you purchased the Riverview
19   property, did you have any conversations or
20   communications with anybody from National Gypsum
21   Company?
22   MR. ANDERSON: Objection. Form.
23   THE WITNESS: No.
24   BY MR. AYALA:
25   Q.  Okay. Before you purchased the house, did

32

1    you receive and review any written materials from
2    National Gypsum Company?
3    MR. ANDERSON: Objection. Form.
4    THE WITNESS: No. Not that I recall.
5    BY MR. AYALA:
6    Q.  What was the purchase price of the
7    Riverview house?
8    A.  Around 264.
9    Q.  Okay. Could you describe the house,
10   please?
11   A.  It is a two-story house with two -- with
12   four bedrooms, two-and-a-half bathroom, two-car
13   garage door, and nice size patio.
14   Q.  What about in terms of the utilities, could
15   you describe the utilities of the house?
16   MR. ANDERSON: Objection. Form.
17   THE WITNESS: What do you --
18   electricity service and --
19   BY MR. AYALA:
20   Q.  Water, sewer.
21   A.  Services from the city.
22   What do you want me to describe about the
23   utilities?
24   Q.  I would just like to know what they are,
25   who provides them.

33

1    A.  Oh. The city.
2    Q.  Okay. So the city provides the water?
3    A.  And -- yes.
4    Q.  And the city provides the sewer service?
5    A.  Yes.
6    Q.  Before you purchased the Riverview
7    property, who did you have discussions with about the
8    property?
9    MR. ANDERSON: Objection. Form.
10   THE WITNESS: Discussion about
11   purchasing the property.
12   BY MR. AYALA:
13   Q.  Uh-huh. Yes.
14   A.  My husband.
15   Q.  Anybody else?
16   A.  My Realtor.
17   Q.  Okay. Who was that? Who's your Realtor?
18   A.  Mare Paz Pereira.
19   Q.  Were there any other Realtors involved in
20   the purchase transaction for the property?
21   MR. ANDERSON: Objection. Form.
22   THE WITNESS: I guess the salesperson
23   in -- in the St. Joe's office.
24   BY MR. AYALA:
25   Q.  Okay. Have you ever heard the name

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

34

1    Ann Dougherty?
2        A.  Don Dougherty.
3        Q.  Don Dougherty.  Who is that?
4        A.  My actual Realtor right now.  When I
5    purchased the house, it was somebody else.
6        Q.  Before purchased the house, did you visit
7    the house?
8        A.  Before I purchased the house, I visit
9    the -- the area.  Because the house was -- wasn't
10   built.
11       Q.  At any time before you purchased the house,
12   did you physically visit the house, walk around, look
13   at it?
14       A.  Yes.
15       Q.  Okay.  Did you have the house inspected by
16   anyone other than you and your husband?
17       A.  No.
18       Q.  Okay.  When you visited the house, before
19   you bought the house and you inspected the house,
20   describe your observations about the house.
21           MR. ANDERSON: Objection.  Form.
22           THE WITNESS:  It looks like a typical
23   house, you know.  Everything new.  Nice and
24   clean.
25

35

1        BY MR. AYALA:
2        Q.  Did you notice a smell?
3        A.  No.
4        Q.  Did you look at the drywall?
5        A.  No.
6        Q.   You didn't look at the drywall in the house
7    before you bought it?
8        A.  No.
9        Q.  What is drywall?
10           MR. ANDERSON: Objection.  Form.
11           THE WITNESS:  It's a type of wall that
12   is made out of compound material put
13   between, like, sheets of paper, and then it
14   dries and it gets hard.
15       BY MR. AYALA:
16       Q.   And how would you describe the -- the
17   function or the purpose of drywall in the house?
18           MR. ANDERSON: Objection.  Form.
19           THE WITNESS:  Make a division through
20   the house.
21       BY MR. AYALA:
22       Q.   Have you ever lived in a house that did not
23   have drywall?
24           MR. ANDERSON: Objection.  Form.
25           THE WITNESS:  Yes.

36

1        BY MR. AYALA:
2        Q.  When was had that?
3        A.  I wasn't in this country, but I have, yeah.
4        Q.  Okay.  Where was it?
5        A.  In my -- the country that I'm from,
6    El Salvador.  We don't use drywall over there.
7        Q.  What's the substitute in El Salvador for
8    drywall?
9        A.  Concrete blocks.
10       Q.  Anything else?
11       A.  No.  Bricks, I believe.
12       Q.  Okay.  So you purchased the house in 2006.
13   Do you remember when in 2006 you bought the house?
14       A.  I believe it was in August.
15       Q.  In August, okay.
16           And I understand you purchased the house
17   with the intention of renting it out as an investment
18   property, correct?
19       A.  Yeah.
20       Q.  Okay.  When did you first rent the property
21   to a tenant?
22       A.  It was, like, two or three months after we
23   purchased the house.  So, I would say around October.
24       Q.  Who was the first tenant?
25       A.  I don't remember their names.  I never met

37

1    them.
2        Q.  Did you enter a lease agreement with them?
3        A.  Yes.
4        Q.  Do you still have that lease agreement?
5        A.  We'll have to look for it.
6           MR. AYALA: Okay.  I would make a
7    request for that, Counsel.
8           MR. ANDERSON:  Certainly be happy to
9    look.
10       BY MR. AYALA:
11       Q.  Do you remember if your first tenant was
12   one tenant or more than one tenant?
13       A.  I don't recall.
14       Q.  Okay.  Is -- is there anything you can
15   think of that would refresh your memory on who they
16   were and how many they were?
17       A.  I don't remember how many they were.  I
18   just remember that the first one was in the military
19   because he left because he has to be deployed.  So,
20   but...
21       Q.  How many tenants have you had at the
22   Riverview property?
23           MR. ANDERSON: Objection.  Form.
24           THE WITNESS:  I have three.
25

10  (Pages 34 to 37)

38

1    BY MR. AYALA:
2        Q.  So from 2006 to the present you've had
3    three total tenants; is that correct?
4        A.  Yes.
5            MR. ANDERSON: Objection.  Form.
6    BY MR. AYALA:
7        Q.  Could you please name for me, as best you
8    can, who the tenants are?
9        A.  I don't remember their names.  Except for
10   the last one.
11       Q.  Okay.  Who is the last one?
12       A.  Veronica Aponte.
13       Q.  Okay.  Could you tell me the time frames
14   that the three separate tenants or groups of tenants
15   lived in the property?
16           MR. ANDERSON: Objection.  Form.
17   BY MR. AYALA:
18       Q.  Let's start with tenant No. 1.
19       A.  Tenant No. 1, I believe, stayed there for a
20   year.
21       Q.  Okay.  So tenant No. 1 stayed in the
22   Riverview property from, roughly, October 2006 to,
23   roughly, October 2007; is that fair?
24       A.  Uh-huh.
25       Q.  How did you find tenant No. 1?

39

1            MR. ANDERSON: Objection.  Form.
2            THE WITNESS:  I had a management
3        company.
4    BY MR. AYALA:
5        Q.  What was the name of that company?
6        A.  Sunco Realty.
7        Q.  Sunco Realty?
8        A.  (Witness shakes head)
9        Q.  So Sunco Realty found tenant No. 1 for you?
10       A.  Yes.
11       Q.  Did you interview tenant No. 1?
12       A.  No.
13       Q.  Did you ever have any communications with
14   tenant No. 1?
15       A.  No.
16       Q.  Did you -- did you ever have any
17   communications with Sunco Realty about tenant No. 1?
18           MR. ANDERSON: Objection.  Form.
19           THE WITNESS:  Yes.  With Sunco, yeah.
20   BY MR. AYALA:
21       Q.  Okay.  Were those communications in
22   writing?
23       A.  Don't remember if I have it in writing.
24   But probably.
25       Q.  And you would have signed a lease agreement

40

1    with tenant No. 1, correct?
2        A.  Yes.
3        Q.  Okay.  Was that a one year lease?
4        A.  Yes.  A one year lease.
5        Q.  Did you ever receive any notification of --
6    did you ever receive any communications from tenant
7    No. 1 at all?
8        A.  Not at all.
9        Q.  Okay.  Did you ever receive any
10   communications from Sunco Realty regarding tenant
11   No. 1?
12           MR. ANDERSON: Objection.  Form.
13           THE WITNESS:  I don't think we had any
14       problem the first year or any complaint from
15       the tenant the first year.
16   BY MR. AYALA:
17       Q.  So no complaints from tenant No. 1 during
18   the first year?
19           MR. ANDERSON: Objection.  Form.
20   BY MR. AYALA:
21       Q.  Correct?
22       A.  That I can recall, yeah.
23       Q.  Let's talk about tenant No. 2.  Tenant
24   No. 2 took over the property in, roughly, October
25   of 2007; is that correct?

41

1        A.  You know, it took a couple of months after
2    the first one left to rent it again.  So I -- I'm not
3    sure if it was in the same year or following year
4    that we rented it.  And it was by the same management
5    company.  So they stayed about two years there.  The
6    second one stayed almost two years.
7        Q.  Okay.  So we can say that tenant No. 2
8    stayed from late 2007 until late 2009; is that
9    accurate?
10       A.  Uh-huh.  Yes.  Close.
11           MR. ANDERSON: Objection.  Form.
12   BY MR. AYALA:
13       Q.  Maybe we could even be more precise.  We
14   can say tenant No. 2 stayed from approximately
15   December of 2007 through December 2009; is that
16   correct?
17           MR. ANDERSON: Objection.
18       Mischaracterizes her testimony.  She said it
19       probably wasn't until the next year.
20           THE WITNESS: No.  I don't remember
21       exactly when we rented the second time.  It
22       wasn't right away.
23   BY MR. AYALA:
24       Q.  Okay.  Did you enter a lease agreement with
25   tenant No. 2?

11  (Pages 38 to 41)

42

1     A.  Yes.
2     Q.  Were you made aware of any complaints that
3  tenant No. 2 had about the house?
4        MR. ANDERSON:  Objection.  Form.
5        THE WITNESS:  I believe we have to fix
6     the AC.
7  BY MR. AYALA:
8     Q.  Okay.  When did you first receive a
9  complaint about the AC at the house?
10    A.  I wouldn't be able to tell you.  It's been
11  years.
12    Q.  When did you first learn that the air
13  conditioner at the house was not working properly?
14    A.  I'll be lying to you if I tell you a date.
15  I don't remember exactly.  I don't know how long --
16  how many months after they move in or anything.
17    Q.  Your complaint -- your Third Amended
18  Complaint, Miss Retana, if you would look at
19  paragraph 65.
20    A.  Page 12.
21    Q.  Would you please read the second sentence
22  of paragraph 65.
23    A.  Yes.  "From October 2006 through
24  October 2008 Retana home was occupied by
25  tenants."

43

1     Q.  Is that an accurate statement?
2     A.  Yes.
3     Q.  Except that they were separate -- they were
4  different tenants who occupied the home during the
5  2006 to 2008 period, correct?
6     A.  Yeah.
7     Q.  Would you please read the next sentence in
8  paragraph 65.
9     A.  Sixty-six?
10    Q.  Just the second sentence in paragraph 65.
11    A.  Oh, 65.  Okay.  "The Retanas first became
12  aware of the signs of corrosion when their tenants
13  informed them that the air conditioner failed as a
14  result of excessive corrosion on the coils."
15    Q.  I think you may have missed the first part.
16  It says, "In the late summer of 2008" -- correct me
17  if I'm wrong --
18    A.  Uh-huh.
19    Q.  -- "the Retanas first became aware of signs
20  of corrosion when their tenants informed them that
21  their air conditioner failed them as a result of
22  corrosion on the coils."
23        Did I read that correctly?
24    A.  Yes.
25    Q.  Did this document refresh your memory on

44

1  when you first learned of an issue with the air
2  conditioner at the Retana property?
3        MR. ANDERSON:  Objection.  Form.
4        THE WITNESS:  Yeah.  I guess.  Yeah.
5  BY MR. AYALA:
6     Q.  And so the statement in paragraph 65 is an
7  accurate statement; is that true?
8        VIDEO TECHNICIAN:  Five minutes.
9        MR. AYALA:  Okay.
10  BY MR. AYALA:
11    Q.  What did you do, if anything, in response
12  to the complaint about the air conditioner failing?
13        MR. ANDERSON:  Objection.  Form.
14        THE WITNESS:  Since I had a management
15     company, they took care of the problems.
16     Sent somebody to fix it and then charged me.
17  BY MR. AYALA:
18    Q.  And they charged you for fixing it?
19    A.  (Witness nods head)
20    Q.  Did you instruct the management company or
21  authorize the management company to fix the air
22  conditioning?
23    A.  Yes.
24    Q.  Okay.  Did you instruct the management
25  company to do anything other than fix the air

45

1  conditioner?
2     A.  Like?  Other like --
3     Q.  Anything.  Aside from --
4     A.  They were in charge of any problems with
5  the property.  They have to fix it.  So...  if the
6  tenant complained that -- that the toilet wasn't
7  working, they have to fix it.  Things like that.
8     Q.  Okay.  So other than authorizing the
9  management company to fix the -- the air conditioner,
10  what, if anything, else did you instruct the
11  management company to do?
12        MR. ANDERSON:  Objection.  Form.
13        THE WITNESS:  Nothing else.
14  BY MR. AYALA:
15    Q.  Okay.  Would it be fair to say that Sunco
16  Realty, the management company, fixed the air
17  conditioner in the summer of 2008?
18    A.  Yeah.
19    Q.  Okay.  So after the air conditioning was
20  fixed in the summer of 2008, did you have any other
21  complaints about anything in the property from
22  tenants?
23        MR. ANDERSON:  Objection.  Form.
24        THE WITNESS:  I wouldn't be aware
25     because I had a warranty service with the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

46

1      company where the tenant can call directly
2      to Service America, is the company. So I
3      wouldn't be aware exactly, you know, if they
4      have any problem, they fix it, they will
5      deal with them directly, not with me.
6      BY MR. AYALA:
7          Q.  What's the name of the warranty company?
8          A.  Service America.
9          Q.  Okay. So, Ms. Retana, did -- did you
10     and/or your husband instruct your complaints to
11     someone other than yourselves?
12         MR. ANDERSON: Objection. Form.
13         THE WITNESS: Yes.
14     BY MR. AYALA:
15         Q.  And you instructed your tenants to report
16     complaints about the house to the warranty company,
17     Service America; is that correct?
18         A.  That's correct.
19         Q.  Who other than Service America did you
20     instruct your tenants to report complaints about the
21     house to?
22         A.  The management company.
23         Q.  Sunco?
24         A.  Sunco.
25         Q.  Sorry. I didn't mean to interrupt.

47

1          So it's your understanding that -- well,
2      strike that.
3          So you instructed your tenants to report
4      complaints about the house to both Service America
5      and Sunco Realty; is that correct?
6          MR. ANDERSON: Objection. Form.
7          THE WITNESS: Yes.
8      BY MR. AYALA:
9          Q.  Now, Sunco Realty made you aware of the
10     October 2008 complaint about the air conditioner,
11     right?
12         A.  Right.
13         Q.  Did Sunco Realty or Service America or the
14     tenants make you aware of any other complaints that
15     the tenants had about the property?
16         MR. ANDERSON: Objection. Form.
17         THE WITNESS: Not that I recall.
18         VIDEO TECHNICIAN: Mr. Ayala?
19         MR. AYALA: We'll change the tape.
20         VIDEO TECHNICIAN: This is the end of
21     tape No. 1 of the deposition of
22     Beatrix Retana to be continued on tape
23     No. 2. We're off the record at 10:17 a.m.
24         (A recess was taken)
25         VIDEO TECHNICIAN: This is the

48

1      beginning of tape No. 2 in the deposition of
2      Beatrix Retana. We're back on the record at
3      10:19.
4      BY MR. AYALA:
5          Q.  Okay. Ms. Retana, have you ever received
6      any written communications from or authored by any of
7      the tenants in the property?
8          MR. ANDERSON: Objection. Form.
9          THE WITNESS: Yes.
10     BY MR. AYALA:
11         Q.  Okay. Do you still have copies of those
12     communications?
13         A.  I would like to -- I will have to review
14     my --
15         Q.  Okay. When you purchased the property, did
16     you -- did you have a file on the property?
17         MR. ANDERSON: Objection. Form.
18         THE WITNESS: Yes.
19     BY MR. AYALA:
20         Q.  That file contained documents related to
21     the purchase of the property?
22         A.  Correct.
23         Q.  Okay. Do you still have that file?
24         A.  I believe so. I have to look for it.
25         Q.  That file would have had, for example, the

49

1      mortgage documentation on the property?
2          A.  Yes.
3          Q.  Would have had the HUD form, the closing
4      documents on the property?
5          A.  Correct.
6          Q.  Any warranties from the builder of the
7      property?
8          MR. ANDERSON: Objection.
9          THE WITNESS: It should be there, yeah.
10     BY MR. AYALA:
11         Q.  Okay. Did you have an understanding that
12     there was a warranty from the builder on the
13     property?
14         A.  Yes.
15         Q.  And what's -- what's your understanding of
16     what that warranty was?
17         A.  It's supposed to cover some defects on the
18     property when it's new.
19         Q.  What's your understanding of how long of a
20     time period that warranty covers?
21         A.  I'm not really sure about it. I believe
22     it's ten years, but I don't know. I'm not really
23     sure about it.
24         Q.  Okay. Paragraph 66 of the complaint, I'll
25     read it, and you can correct me if I'm wrong. It

13  (Pages 46 to 49)

50

1    says, "On or about October of 2008, the first set of
2    tenants moved out of the property because of the
3    corrosion issues within the home."
4        Did I read that correctly?
5    A. You read that correctly, yeah.
6    Q. Okay. But is this an accurate statement,
7    because I thought the first set of tenants moved out
8    in October of 2007?
9        MR. ANDERSON: Objection. Form.
10   BY MR. AYALA:
11   Q. Is that -- so -- so which -- which is it?
12   A. I don't -- I don't remember exactly. But,
13   yeah. The time frame may be different.
14   Q. The time frame listed in this complaint may
15   be off?
16   A. Yeah, it might be off.
17   Q. Okay. So when did you learn -- when did
18   you learn that tenants moved out of the Retana
19   property in October of 2008 because of corrosion
20   issues within the home?
21       MR. ANDERSON: Objection. Form.
22       THE WITNESS: I wouldn't say I knew for
23   sure. They -- they didn't even move in
24   October. So...
25

51

1    BY MR. AYALA:
2    Q. So the tenants did not move out of the
3    house in October of 2008?
4    A. I don't remember. 2000 -- let me -- let me
5    just think for a minute.
6    Q. Sure. Sure. Take your time.
7    A. I believe they move in 2000 and -- we're in
8    2012. I will have to go back into my documents to --
9    to be more certain.
10   Q. Okay. Sitting here today, Ms. Retana, how
11   do you know that in 2008 tenants moved out of the
12   Riverview property because of the corrosion issue in
13   the home?
14       MR. ANDERSON: Objection. Form.
15       THE WITNESS: I just know they didn't
16   want to stay there anymore. Don't know for
17   sure.
18   BY MR. AYALA:
19   Q. Okay. So at time the tenants moved out of
20   the house in October 2008, you didn't know at that
21   time why they moved out of the house?
22       MR. ANDERSON: Objection. Form.
23       THE WITNESS: Yeah. I would say that.
24   BY MR. AYALA:
25   Q. Okay. But you knew they had complained

52

1    about the air conditioner failing, correct?
2    A. Yes, that's correct.
3    Q. And you knew that they had complained about
4    the air conditioner failing as a result of excessive
5    corrosion on the coils; is that correct?
6    A. No, no, no. Can you repeat?
7        MR. AYALA: Can you please read that
8    back?
9        THE COURT REPORTER: Yes.
10       (A portion of the record was read by the
11   reporter)
12       THE WITNESS: I'm not sure.
13   BY MR. AYALA:
14   Q. Okay.
15       THE WITNESS: I would like to take a
16   break.
17       MR. AYALA: Sure, sure.
18       VIDEO TECHNICIAN: We're off the record
19   at 10:26.
20       (A recess was taken)
21       VIDEO TECHNICIAN: We're back on the
22   record at 10:33.
23   BY MR. AYALA:
24   Q. Okay. Miss -- Ms. Retana, just so I
25   understand correctly, did you know or have any

53

1    relationship with the tenant -- either tenant No. 1
2    or tenant No. 2 before they rented the property?
3        MR. ANDERSON: Objection. Form.
4        THE WITNESS: Can you repeat the
5    question?
6    BY MR. AYALA:
7    Q. Did you know or have any relationship with
8    either tenant No. 1 or tenant No. 2 before they
9    rented the property?
10       MR. ANDERSON: Objection. Form.
11       THE WITNESS: No.
12   BY MR. AYALA:
13   Q. Okay. Did you have any direct
14   communications with tenant No. 1 or tenant No. 2
15   while they were renting the property?
16   A. No.
17   Q. So let's -- let's go in our minds to the
18   time period when tenant No. 2 moved out of the house,
19   okay? You're not exactly sure when that was, but it
20   was either 2008 or 2009; is that fair?
21       MR. ANDERSON: Objection. Form.
22       THE WITNESS: Sure.
23   BY MR. AYALA:
24   Q. Okay. Tenant No. 2 moved out of the house,
25   you've alleged in the complaint, that tenants in late

14  (Pages 50 to 53)

54

1    summer of 2008 -- strike that.
2        You've alleged in the complaint,
3    paragraph 65, that in late summer of 2008 the Retanas
4    first became aware of signs of corrosion when their
5    tenants informed them that the air conditioner failed
6    as a result of excessive corrosion on the coils.
7        Did I read that correctly?
8    A.  You read that correctly.
9    Q.  Okay.  And then on or about of October
10   2008, the first set of tenants moved out of the
11   property because of the corrosion issues within the
12   home.
13       Did I read that correctly?
14   A.  Yes.
15   Q.  Okay.  But as we -- as you testified
16   earlier, maybe it was the first set of tenants, maybe
17   it was the second set of tenants that moved out at
18   that time, correct?
19       MR. ANDERSON:  Objection. Form.
20       THE WITNESS:  Yeah. Correct.
21   BY MR. AYALA:
22   Q.  Okay.  When the tenants moved out of the
23   home in October of 2008, what was your understanding
24   of why they moved out of the home?
25       MR. ANDERSON:  Objection. Form.

55

1        THE WITNESS:  I don't -- I don't have a
2    reason for them moving out.
3    BY MR. AYALA:
4    Q.  Okay.  And so at the time they moved out,
5    so I understand correctly, you didn't -- you didn't
6    know why they moved out?
7    A.  Correct.
8    Q.  No one gave you a reason why they moved
9    out, correct?
10   A.  Uh-huh.
11   Q.  Okay.  The third tenant, the third and
12   final tenant, moved into the property after the
13   second set of tenants moved out, correct?  That third
14   tenant's name is Veronica Aponte; is that correct?
15   A.  Yes.
16   Q.  When did you first meet Ms. Aponte?
17   A.  I never met her.
18   Q.  Okay.  Have you had any communications with
19   Ms. Aponte?
20   A.  Yes.
21   Q.  Okay.  Did you have any communications with
22   Ms. Aponte before she rented the property?
23   A.  No.
24   Q.  How did you -- how -- how did you find
25   Ms. Aponte as a tenant?

56

1    A.  It was found through my Realtor,
2    Dawn Dougherty.
3    Q.  Okay.  Do you recall when Ms. Aponte moved
4    into the property?
5    A.  Yes.
6    Q.  When was that?
7    A.  December.
8    Q.  Of what year?
9    A.  Of 2010.
10   Q.  Am I correct that the Riverview property
11   was unoccupied by tenants for a period of
12   approximately a year?
13   A.  Uh-huh.
14   Q.  From, say, 2009 to December of 2010; is
15   that correct?
16   A.  I believe it was less than a year.  But...
17   Q.  Okay.  It -- the -- the Riverview property
18   was unoccupied for at least six months from 2009 to
19   2010; is that correct?
20   A.  Yeah.
21   Q.  Were you trying to rent the property during
22   the six-month period that it was unoccupied?
23   A.  Yes, I was.
24   Q.  And I take it the -- the realty company
25   just couldn't find a tenant for the property; is that

57

1    right?
2    A.  Correct.
3    Q.  Do you have an understanding of why they
4    couldn't find a tenant for the property?
5    A.  No.
6        MR. ANDERSON:  Objection. Form.
7    BY MR. AYALA:
8    Q.  Okay.  When did you first have
9    communications with Veronica Aponte?
10   A.  A couple of weeks after she moved.
11   Q.  Okay.  Do you recall the discussion?
12   A.  Yeah.
13   Q.  Could you tell me about it, please?
14   A.  She was complaining of a really bad smell
15   in the property and the AC not working properly.
16   Q.  How many times has your air conditioner
17   been replaced?
18       MR. ANDERSON:  Objection. Form.
19       THE WITNESS:  None.
20   BY MR. AYALA:
21   Q.  How many times have your air conditioner
22   coils been replaced?
23   A.  I'm not aware of what was replaced when it
24   got fixed.
25   Q.  Okay.  How many times has your air

15  (Pages 54 to 57)

58

1    conditioner been fixed, as you understand it?
2         MR. ANDERSON: Objection. Form.
3         THE WITNESS: I believe fixed was
4     twice, and the third time it wasn't fixed.
5    BY MR. AYALA:
6         Q.  Okay.  Am I correct it was -- the air
7    conditioner was fixed in the summer of 2008,
8    approximately?
9         A.  Uh-huh.
10        Q.  And then again in late 2009 or early 2010;
11   is that correct?
12        MR. ANDERSON: Objection. Form.
13        THE WITNESS: Something was fixed.  I
14    don't remember what it was.  But, you know.
15   BY MR. AYALA:
16        Q.  Okay.  Now, Ms. Aponte's complaint about
17   the air conditioner not working and the smell in the
18   house, did she describe the smell?
19        A.  Yeah.
20        Q.  How did she describe it?
21        A.  First she said it was like a dead animal
22   was falling through the AC.  And then like a rotten
23   egg.
24        Q.  Did -- what, if anything, did Ms. Aponte
25   tell you about the -- where in the house she was

59

1    smelling the odor?
2         A.  She said in the -- in the first floor.
3         Q.  Anywhere else?
4         A.  No.
5         Q.  And Ms. Aponte made her complaint about the
6    AC and the smell directly to you?
7         A.  Yes.
8         Q.  Okay.  Why did -- strike that.
9            Just having trouble understanding how it
10   came to be that she made the complaint to you when
11   you had instructed -- you testified earlier you had
12   instructed your tenants to make complaints to Sunco
13   Realty and Service America.
14           Could you just explain that to me?
15        MR. ANDERSON: Objection to form.
16        THE WITNESS: I wasn't working with
17    Sunco anymore.
18   BY MR. AYALA:
19        Q.  When did you stop working with Sunco?
20        A.  When the second tenant left.
21        Q.  Okay.  So were you working with -- when did
22   you stop working with Service America?
23        A.  No.  They were -- they were active until I
24    rented the third -- to Veronica.  So I would say to
25    last -- last year I was active with Service America.

60

1         Q.  Was Service America's warranty and repair
2    services available at the time Veronica Aponte took
3    over rental of the property?
4         A.  Yes.
5         Q.  It was still active, okay.
6            So why -- I still don't understand, why --
7    why wouldn't she complain to Service America?
8         A.  She did.
9         Q.  Okay.  Tell me about that.
10        A.  And when the technician went to the house,
11   he pointed out that the corrosion may be caused by
12   some contaminated drywall, and they could not re --
13   fix it anymore because of that condition.  So...
14        Q.  Okay.  Did you have discussions with a
15   technician from Service America?
16        A.  I did.
17        Q.  Okay.  When did that occur?
18        A.  Sometime in December, like I said.
19        Q.  December, 2010?
20        A.  2010.
21        Q.  Sorry.  Did the technician from Service
22   America generate a report as a result of his
23   inspection?
24        A.  He wouldn't -- I requested it multiple
25   times. He they just didn't do it.

61

1         Q.  Okay.  Didn't do it.
2            So as of December of 2010, you had received
3    a complaint from Veronica Aponte about the AC not
4    working and the smell, and you had communications
5    with Service America about their investigation of the
6    AC and the smell, correct?
7         MR. ANDERSON: Objection. Form.
8    BY MR. AYALA:
9         Q.  Okay.  How did you respond to the
10   information you received from Ms. Aponte and Service
11   America?
12        MR. ANDERSON: Objection. Form.
13        THE WITNESS: I got really worried
14    because I have heard about contaminated
15    drywall in other properties and started
16    investigating.
17   BY MR. AYALA:
18        Q.  When did you learn about contaminated
19   drywall in other properties?
20        A.  In the news.
21        Q.  And -- and approximately when did you start
22   hearing about reports of issues relating to drywall?
23        A.  Probably the same year.
24        Q.  Which was you what year?
25        A.  2010.

16  (Pages 58 to 61)

62

1      Q.   And so you said you started investigating
2   when you -- when you learned from Veronica and
3   Service America of issues at the property, correct?
4      A.   Correct.
5      Q.   What did do you to investigate?
6      A.   I went online to find what are the symptoms
7   when something is wrong with the drywall.
8      Q.   Okay.   What else?
9      A.   And everything that she was telling me was
10  the same thing that I can see in other situations
11  similar to -- to mine.
12     Q.   Okay.   Anything else?   What, if anything
13  else, did you do as part of your investigation?
14        MR. ANDERSON:   Objection.   Form.
15        THE WITNESS:   I tried to find help from
16     somebody that can prove that there was
17     something wrong.
18  BY MR. AYALA:
19     Q.   Okay.   When did you first form the belief
20  that the drywall in the house was the cause of the
21  smell and the problem with the air conditioner?
22        MR. ANDERSON:   Objection.   Form.
23        THE WITNESS:   I would say it was
24     December.
25

63

1   BY MR. AYALA:
2      Q.   December of --
3      A.   Of 2010.
4      Q.   Before you researched the Internet and saw
5   in the news the issue regarding drywall, had you ever
6   thought that drywall could cause air conditioners to
7   corrode and fail or cause odors in the house?
8         MR. ANDERSON:   Objection.   Form.
9         THE WITNESS:   I have no -- no clue
10     about it, no.
11  BY MR. AYALA:
12     Q.   Now, when you formed the belief that your
13  drywall was causing the issues in the Riverview
14  property, did you contact National Gypsum about it?
15     A.   No.
16     Q.   Did you contact Lowe's about it?
17     A.   No.
18     Q.   Did you contact National Gypsum or Lowe's
19  at any time before you authorized the filing of this
20  lawsuit?
21        MR. ANDERSON:   Objection.   Form.
22        THE WITNESS:   No.
23  BY MR. AYALA:
24     Q.   Did you -- in December of 2010, or really
25  at any time after that, did you make a -- a claim

64

1   with your warranty company, asking them to fix the
2   problem?
3         MR. ANDERSON:   Objection.   Form.
4         THE WITNESS:   Yes.
5   BY MR. AYALA:
6      Q.   Okay.   Did you make that claim in writing?
7      A.   I made a phone call.
8      Q.   Okay.   What did they say when you asked
9   them to fix the problem?
10     A.   They said that wasn't covered under the
11  warranty.
12     Q.   Okay.   Did you ask the builder of the
13  house, St. Joe's Company, to fix the problem?
14        MR. ANDERSON:   Objection.   Form.
15        THE WITNESS:   Yes.
16  BY MR. AYALA:
17     Q.   Did you ask them in writing?
18     A.   No.
19     Q.   And what did they say in response to your
20  request that they fix the problem?
21     A.   They just said that they were in litigation
22  in some cases about that, and they couldn't respond
23  to me.
24     Q.   What exactly did they say they were in
25  litigation about?

65

1      A.   I'm assuming about the same problem with
2   the drywall, you know.   That was our conversation.
3      Q.   Okay.   Aside from Service America,
4   St. Joe's -- and St. Joe's, did you ask anybody else
5   to fix the problem?
6         MR. ANDERSON:   Objection.   Form.
7         THE WITNESS:   The insurance company.
8   BY MR. AYALA:
9      Q.   When you said "The insurance company," you
10  referred to the insurance company that --
11     A.   The homeowner.
12     Q.   -- that covered homeowners?
13     A.   Uh-huh.
14     Q.   Just for the record, because I think we
15  talked over each other.
16        Which -- which insurance company was it?
17        MR. ANDERSON:   Objection.   Form.
18        THE WITNESS:   Homeowner insurance.
19  BY MR. AYALA:
20     Q.   What's the name of the company that
21  provided homeowner's insurance for the Riverview
22  property?
23     A.   Don't recall the name.
24     Q.   Did you submit a request to them in
25  writing?

17 (Pages 62 to 65)

66

1    MR. ANDERSON: Objection. Form.
2    THE WITNESS: I think you do it over
3    the phone, and they followed through.
4    BY MR. AYALA:
5    Q. Okay. And so am I correct that you have
6    had no written communications with the homeowner's
7    insurance company that covered the Riverview
8    property?
9    MR. ANDERSON: Objection. Form.
10   THE WITNESS: I might have something,
11   yeah.
12   BY MR. AYALA:
13   Q. What do you have?
14   A. They sent an adjuster to check the
15   property.
16   Q. Okay. Were you there for that?
17   A. No.
18   Q. What do you know about what the adjuster
19   did and what do you know about what the adjuster
20   concluded?
21   MR. ANDERSON: Objection. Form.
22   MR. AYALA: That's fair.
23   BY MR. AYALA:
24   Q. I'll ask it one at a time. What do you
25   know about what the adjuster did?

67

1    A. He went and looked at the property.
2    Q. What do you understand about what the
3    adjuster concluded about the property?
4    A. That it wasn't covered.
5    Q. Did you provide any information to the
6    insurance company about the property in writing?
7    MR. ANDERSON: Objection. Form.
8    THE WITNESS: Can you specify what
9    information?
10   BY MR. AYALA:
11   Q. I'm just trying to find out if -- if you
12   provided any information in writing about the
13   property to the insurance company.
14   MR. ANDERSON: Objection. Form.
15   THE WITNESS: I don't really -- I mean,
16   I can't -- like some type of information,
17   meaning --
18   BY MR. AYALA:
19   Q. For -- just for example, did they ask you
20   for any documentation about the house?
21   MR. ANDERSON: Objection. Form.
22   THE WITNESS: No.
23   BY MR. AYALA:
24   Q. Did you provide any documentation regarding
25   the house to the insurance company?

68

1    MR. ANDERSON: Objection. Form.
2    THE WITNESS: No.
3    BY MR. AYALA:
4    Q. You said the insurance company advised you
5    that the issues you've reported with the house were
6    not covered by the homeowner's insurance, correct?
7    A. Yes.
8    Q. Did they advise you in writing?
9    A. I believe so. I have a letter.
10   Q. Okay.
11   A. And just to correct, I believe the company
12   was Casualty Insurance, something like that. So, but
13   I --
14   Q. Casualty?
15   A. Casualty.
16   Q. Casualty Insurance, okay. Thank you.
17   Okay. How long did Ms. Aponte live at the
18   property?
19   A. She left in February. Two, three months.
20   Q. So she left in February of 2011?
21   A. Correct.
22   Q. Did you try to rent the property after
23   that?
24   A. No.
25   Q. Okay. Did you try to sell the property

69

1    after that?
2    A. Yes.
3    Q. Okay. When did you place the property up
4    for sale?
5    A. Probably August or September sometime in
6    2010.
7    Q. Okay. Why did you place the property up
8    for sale in August or September of 2010?
9    A. Because the rent -- it wasn't rented.
10   Q. By the way, did you ever refinance the
11   mortgage on the property?
12   A. No.
13   Q. Did you ever have the property appraised?
14   A. No.
15   Q. Okay. What was the sale price offered when
16   you placed the property up for sale in August or
17   September of 2010?
18   A. I can't remember the price right now.
19   Q. How much did you buy the house for?
20   A. 264.
21   Q. Do you recall whether the sale price that
22   you offered for the property in August or September
23   of 2010 -- do you recall whether that sale price was
24   higher or lower than $264,000?
25   A. It was lower.

18  (Pages 66 to 69)

70

1    Q.  Ball park, how much lower was it?
2    MR. ANDERSON:  Objection.  Form.
3    THE WITNESS:  Like, 230.
4    BY MR. AYALA:
5    Q.  Approximately how many potential buyers are
6    you aware of who came to visit the property?
7    A.  I'm not aware of any.
8    Q.  How long did you have the property listed
9    on the market for sale?
10   A.  Still listed.
11   Q.  Okay.  So the property has been listed for
12   sale continuously from August or September of 2010 to
13   today?
14   A.  Yes.
15   Q.  Okay.  Where is it listed for sale?
16   A.  Say that again.
17   Q.  I'm trying to find out where is it listed
18   for sale, in what media, in what databases?
19   A.  On the MLS website.
20   Q.  Are you working through a Realtor to sell
21   the property?
22   A.  Yes.
23   Q.  And that Realtor is John Dougherty [sic]?
24   A.  Don.  Yeah.
25   Q.  Have you completed a seller's disclosure

71

1    form for the property?
2    A.  Yes, I have.
3    Q.  Do you have a copy of that?
4    A.  Sure.
5    MR. AYALA:  I'd like -- I'd make a
6    request for the copy.
7    MR. ANDERSON:  Let me take a look.
8    BY MR. AYALA:
9    Q.  Ms. Retana, have you or your husband made
10   any improvements to the property since you purchased
11   it?
12   MR. ANDERSON:  Objection.  Form.
13   THE WITNESS:  No.
14   BY MR. AYALA:
15   Q.  Have you made any -- strike that.
16   Ms. Retana, have you or your husband sought
17   any tax relief from the IRS in connection with the
18   Riverview property?
19   MR. ANDERSON:  Objection.  Form.
20   THE WITNESS:  No.
21   BY MR. AYALA:
22   Q.  Have you sought any tax relief from the
23   State of Florida or anybody -- or any other
24   government entity with respect to the River --
25   Riverview property?

72

1    A.  No.
2    Q.  Are you still paying the mortgage on the
3    property?
4    A.  No.
5    Q.  Okay.  When did you stop paying the
6    mortgage on the property?
7    A.  Right after the second tenant left.
8    2009 -- 2010 -- or nine.  I'm so confused with the
9    dates.
10   Q.  Why did you stop paying the mortgage on the
11   property?
12   MR. ANDERSON:  Objection.  Form.
13   THE WITNESS:  I couldn't afford it.
14   BY MR. AYALA:
15   Q.  So I understand -- and I'm not trying to
16   have a memory test with the dates.  It's just helpful
17   to understand, as best we can, what happened when.
18   Would it be fair to say that the second
19   tenant moved out of the property at sometime in 2009?
20   A.  Yes.
21   Q.  Okay.  And so as we discussed before, there
22   was at least a six-month period where the property
23   went unrented, correct?
24   A.  Uh-huh.
25   Q.  Okay.  And you -- you and your husband

73

1    stopped paying the mortgage on the property when the
2    rent that normally would have covered the mortgage
3    stopped coming in, correct?
4    A.  Correct.
5    Q.  Have you or your husband requested a
6    forbearance from the mortgage company?
7    MR. ANDERSON:  Objection.  Form.
8    THE WITNESS:  I'm not really sure if
9    that's what it's called.  But we were trying
10   to work with the banks.
11   BY MR. AYALA:
12   Q.  Okay.  Have the banks threatened
13   foreclosure of the property?
14   A.  Yes.
15   Q.  Are you aware of whether the banks have
16   instituted legal proceedings to foreclose on the
17   property?
18   A.  Yes.  I -- they submitted papers to the
19   court.
20   Q.  What have you done, if anything, in
21   response to receiving the foreclosure papers from the
22   bank?
23   A.  I hired a lawyer that is sending the
24   information to them about my situation.
25   Q.  Okay.  Who is that lawyer?

19  (Pages 70 to 73)

74

1    A. Mark Hutner.
2    Q. Could you please spell his last name?
3    A. H-U-T-N-E-R.
4    Q. Ms. Retana, do you know what kind of --
5  what brand of drywall you have in your Riverview
6  property?
7        MR. ANDERSON: Objection. Form.
8        THE WITNESS: I know now.
9  BY MR. AYALA:
10    Q. Tell us what kind of drywall -- tell us
11  every kind of drywall that you're aware of that's in
12  your property?
13    A. Maybe I understood wrong. Not kind. What
14  brand of property I know that we have. The National
15  Gypsum --
16    Q. Okay.
17    A. -- drywall.
18    Q. Are you aware of any other brand of drywall
19  in your property -- installed in your property?
20    A. No.
21    Q. So as far as you're aware, Ms. Retana, all
22  of the drywall installed in your property was made by
23  National Gypsum; is that correct?
24    A. Not necessarily.
25    Q. But you're not aware of any drywall

75

1  installed in your property other than National Gypsum
2  drywall; is that correct?
3    A. Uh-huh. Yes.
4    Q. The understanding that you have, the
5  knowledge you have, about the brands of drywall in
6  your property, where does that understanding come
7  from?
8    A. From a report.
9    Q. What reports are you referring to?
10    A. Well, the adjuster told me about that --
11  that type of brand. He didn't mention anything else.
12    Q. Did the adjuster -- when you said the
13  adjuster, you're referring to the insurance adjuster
14  for the homeowner's insurance company?
15    A. Correct.
16    Q. Okay. Who is that adjuster; do you know?
17    A. The company sent him. So...
18    Q. Do you know his name?
19    A. I have to check my records to find his
20  name.
21    Q. Did he make any representations about the
22  brand of the drywall in the Riverview property? Did
23  he make any of those representations in writing?
24    A. No. I don't recall.
25    Q. Okay. Am I correct that your only basis

76

1  and understanding of what type of drywall is in your
2  house comes from what the insurance adjuster had told
3  you?
4        MR. ANDERSON: Objection. Form.
5        THE WITNESS: No.
6  BY MR. AYALA:
7    Q. Okay. How else do you have an
8  understanding of what kind of drywall you have in
9  your house?
10    A. By the report that was done by the experts
11  hired by my lawyer.
12    Q. Okay. Have you seen those reports?
13    A. I skimmed through it.
14    Q. Okay. Which -- which reports have you
15  seen?
16    A. Just one.
17    Q. You've seen one report.
18        Who authored that report? Tell me what you
19  know --
20    A. What?
21    Q. Tell me what you know about the report.
22  What does it say? Who authored the report?
23        MR. ANDERSON: Objection. Form. There
24  was a lot of questions.
25        MR. AYALA: That's fair. That's fair.

77

1  BY MR. AYALA:
2    Q. Let me start again.
3        What report have you seen?
4    A. I see one report with -- by a doctor, and I
5  just understood was that the drywalls are -- creates
6  some type of gas, that it creates odor -- odor and
7  corrosion to the -- to the property.
8    Q. Okay. What brand or brands of drywall does
9  the report you're referring to identify?
10        MR. ANDERSON: Objection. Form.
11        THE WITNESS: I don't recall. National
12  Gypsum. Might be some other, but I don't
13  recall.
14  BY MR. AYALA:
15    Q. Ms. Retana, have you ever heard of Chinese
16  drywall?
17    A. Yes, I have.
18    Q. What's your understanding of the term
19  "Chinese drywall"?
20    A. It was -- um, it was made in China.
21    Q. Okay.
22    A. And brought here to the U.S.
23    Q. What's your understanding of why drywall
24  was imported into Florida from China?
25        MR. ANDERSON: Objection. Form.

20  (Pages 74 to 77)

78

1      THE WITNESS: Because they couldn't
2  keep up with the growing developing, and
3  they needed more providers of the drywall.
4  BY MR. AYALA:
5      Q.  What's your understanding of the quality of
6  the Chinese drywall that was imported?
7      MR. ANDERSON: Objection. Form.
8      THE WITNESS: I have no clue.
9  BY MR. AYALA:
10      Q.  What have you -- have you read anything in
11  the news about Chinese drywall?
12      A.  Yes. That it's toxic.
13      Q.  Anything else anything about Chinese
14  drywall?
15      A.  Pretty much that it has the same effects
16  with the National Gypsum product.
17      Q.  Okay. What are the effects of Chinese
18  drywall that you know of?
19      MR. ANDERSON: Objection. Form.
20      THE WITNESS: Are the same -- what we
21  talk about, the same -- corrosion, and
22  malfunction of the appliances, and the
23  smell.
24  BY MR. AYALA:
25      Q.  Okay. Are you aware that agencies of the

79

1  United States Government and agencies of the State of
2  Florida have investigated Chinese drywall that's been
3  installed in homes in Florida and elsewhere around
4  the country?
5      A.  Yes.
6      Q.  Have you followed that investigation in the
7  news?
8      A.  No, not really.
9      Q.  Have you -- have you read any of the
10  reports or press releases of the government with
11  regard to that investigation?
12      A.  No.
13      Q.  Have you ever heard of the Consumer
14  Products Safety Commission?
15      A.  I have heard, yeah.
16      Q.  Are you aware that the Consumer Products
17  Safety Commission has led a multi-agency
18  investigation of Chinese drywall in the
19  United States?
20      A.  No.
21      Q.  Are you aware that the Florida Department
22  of Health, an agency of the State of Florida, has
23  participated in the government investigation of
24  Chinese drywall in the United States?
25      A.  I suppose, yeah.

80

1      Q.  Okay. What do you know about the
2  investigation of Chinese drywall in the
3  United States?
4      MR. ANDERSON: Objection. Form.
5  BY MR. AYALA:
6      Q.  What do you know about the government's
7  investigation of Chinese drywall in the
8  United States?
9      MR. ANDERSON: Objection. Form.
10      THE WITNESS: I don't know much. I
11  don't know much. Just that it's toxic.
12  BY MR. AYALA:
13      Q.  Did you ever consider the possibility that
14  you might have Chinese drywall in your Riverview
15  property?
16      A.  Yes.
17      Q.  Okay. Did you ever do anything to
18  investigate when you might have Chinese drywall in
19  your property?
20      A.  Yes.
21      Q.  Have you identified any Chinese drywall in
22  your property?
23      A.  Not me.
24      Q.  Okay. Are you aware of any Chinese drywall
25  on your property?

81

1      A.  I'm not sure.
2      Q.  Okay. Would you be pleased to learn, if it
3  were true, that there is Chinese drywall inside your
4  Riverview property?
5      MR. ANDERSON: Objection. Form.
6      THE WITNESS: No, I wouldn't be
7  pleased.
8  BY MR. AYALA:
9      Q.  The proposed class of Florida homeowners
10  who you seek to represent in the lawsuit that we're
11  here today to talk about, you're not seeking to
12  represent people who have Chinese drywall, are you?
13      A.  No.
14      Q.  Okay. What is your occupation, Ms. Retana?
15      A.  Realtor.
16      Q.  And as a Realtor, do you represent both
17  buyers and sellers in transactions for the sale of
18  property?
19      MR. ANDERSON: Objection. Form.
20      THE WITNESS: Just when there is
21  transaction to -- when it's allowed by both
22  parts.
23  BY MR. AYALA:
24      Q.  I -- I understand. You've represented
25  buyers in transactions for the sale of property,

21 (Pages 78 to 81)

```
                                                   82
1    correct?
2        A.  Yes.
3        Q.  And you've represented sellers on separate
4    occasions, correct?
5        A.  Yeah.
6        Q.  Um, and you live in Fort Lauderdale,
7    Florida, correct?
8        A.  Correct.
9        Q.  You must know people who have Chinese
10   drywall installed in their house, correct?
11       MR. ANDERSON:  Objection.  Form.
12       THE WITNESS:  Yeah.
13   BY MR. AYALA:
14       Q.  Chinese drywall is a major problem in
15   Florida, isn't it?
16       MR. ANDERSON:  Objection.  Form.
17       THE WITNESS:  I just know one person.
18   So...
19   BY MR. AYALA:
20       Q.  When you represent buyers, as their real
21   estate agent, in purchasing a piece of property, do
22   you advise them to have an inspection of the
23   property?
24       A.  Sure.  Yeah.
25       MR. ANDERSON:  Objection.  Form.
```

```
                                                   83
1    BY MR. AYALA:
2        Q.  Okay.  Do you advise them to have an
3    inspection of the property for Chinese drywall?
4        A.  Just if it depends on the year that was
5    built.
6        Q.  Okay.  If the -- if the house was built any
7    time from 2000 to the present, would you advise one
8    of your clients who's purchasing a property to have
9    it inspected for Chinese drywall?
10       A.  Yes.
11       VIDEO TECHNICIAN:  Four minutes.
12       MR. AYALA:  Okay.
13   BY MR. AYALA:
14       Q.  And why would you advise them that?
15       A.  I want them to be aware of the risks that
16   are --
17       THE COURT REPORTER:  I didn't hear you.
18       THE WITNESS:  I want them to be aware
19   of the risks that there are inside and with
20   the lead, too.
21   BY MR. AYALA:
22       Q.  Do you advise your clients to have their
23   properties inspected for the presence of National
24   Gypsum Company's drywall?
25       A.  No.
```

```
                                                   84
1        Q.  The report you mentioned you saw from --
2    from your experts, do you remember who wrote that
3    report?
4        A.  No.
5        Q.  Do you know who has inspected your
6    property?
7        A.  Who else was inspected --
8        Q.  Who all has inspected your property?
9        MR. ANDERSON:  Objection.  Form.
10   BY MR. AYALA:
11       Q.  Could you please tell us everyone you know
12   of who has inspected the Riverview property?
13       A.  The adjuster for the insurance, the
14   lawyers, and -- and the experts, the doctor.  So a
15   lot of representatives.  I don't really know exactly
16   who went.
17       Q.  Who was the doctor who inspected your
18   property?
19       A.  I don't know their names.
20       Q.  Okay.  How do you know he was a doctor?
21       A.  I don't know.  I'm just guessing that it's
22   related to science.  It should be a doctor.
23       Q.  When you say "doctor," are you referring to
24   a medical doctor?
25       A.  No, I don't think so.
```

```
                                                   85
1        Q.  Which lawyers of yours are you aware of who
2    have inspected your property?
3        A.  Say that again.
4        Q.  Which of your lawyers has inspected your
5    property?
6        A.  I believe Bill was there, and there was
7    another one with him.  I can't recall his name.
8        Q.  And just logistically, how do you give them
9    access to your property?
10       A.  I have a lock box there.
11       Q.  Okay.
12       VIDEO TECHNICIAN:  Mr. Ayala --
13       MR. AYALA:  Good time to take a break.
14       VIDEO TECHNICIAN:  This is the end of
15   tape No. 2 of Beatrix Retana to be continued
16   on tape No. 3.  We're off the record at
17   11:22 a.m.
18       (A recess was taken)
19       VIDEO TECHNICIAN:  This is the
20   beginning of tape No. 3 in the deposition of
21   Beatrix Retana.  We're back on the record at
22   11:34 a.m.
23   BY MR. AYALA:
24       Q.  We've looked at Exhibits 1 and 2, which are
25   the Second Amended Class Action Complaint and the
```

                                        22  (Pages 82 to 85)

86

1 Third Amended Class Action Complaint, correct?
2 A. Yes.
3 Q. Okay. Let me direct your attention to
4 Exhibit 3, please.
5 MR. ANDERSON: May I have a copy of
6 that, please?
7 MR. AYALA: Yes.
8 (B. Retana Deposition Exhibit 3, General
9 Inspection Protocol, was marked for identification.)
10 BY MR. AYALA:
11 Q. Ms. Retana, do you recognize this document?
12 A. I don't recall it, no.
13 Q. Okay. You don't recall ever seeing this
14 document before?
15 A. They all look the same to me.
16 Q. Okay. If you could turn to a couple of
17 pages in, the page that begins with Exhibit A,
18 General Inspection Protocol.
19 A. General Inspection Protocol, uh-huh.
20 Q. Have you ever seen this document before?
21 A. No.
22 Q. Are you aware that representatives and
23 experts on behalf of National Gypsum Company have
24 inspected your home?
25 A. Yes.

87

1 Q. Okay. When did that happen?
2 A. I remember I had to turn on the
3 electricity. I don't remember exact month.
4 Q. Okay. I take it you weren't there for that
5 inspection?
6 A. No.
7 Q. Okay. Do you know anything about the
8 results of that inspection?
9 A. No.
10 Q. Okay. Let's look at Exhibit 4, please.
11 MR. ANDERSON: May I have a copy of
12 that, please?
13 MR. AYALA: Yes.
14 (B. Retana Deposition Exhibit 4, Plaintiff
15 Wilfredo Retana's Responses to Defendant's First Set
16 of Interrogatories, was marked for identification.)
17 BY MR. AYALA:
18 Q. Do you recognize that document,
19 Miss Retana?
20 A. Yes.
21 Q. Okay. What is it?
22 A. This is a response to the Interrogatory.
23 It's a different one.
24 MR. ANDERSON: Wait. Excuse me. Just
25 to be clear. Is it your intention to ask

88

1 her questions about her husband's responses?
2 It's fine. It's obviously your prerogative.
3 But the -- the document that you gave me
4 is --
5 MR. AYALA: I appreciate it.
6 BY MR. AYALA:
7 Q. Okay. Exhibit No. 4 is Plaintiff Wilfredo
8 Retana's Responses to Defendant's First Set of
9 Interrogatories, correct?
10 A. Correct.
11 Q. Okay. Did -- did you review these
12 responses before -- well, did you review these
13 responses at all, at any time?
14 MR. ANDERSON: Objection. Form.
15 THE WITNESS: Yes.
16 BY MR. AYALA:
17 Q. When did you review them?
18 A. When -- a couple of weeks after -- after I
19 got the Interrogatories.
20 Q. Okay?
21 A. Before they were submitted.
22 Q. Okay. Let's look at Exhibit No. 5.
23 MR. ANDERSON: Thanks.
24 (B. Retana Deposition Exhibit 5, Wilfredo
25 Retana's responses to the request for documentation,

89

1 was marked for identification.)
2 BY MR. AYALA:
3 Q. Do you recognize this document?
4 A. Yes.
5 Q. What is it?
6 A. This is where you need to provide
7 documentation.
8 Q. Okay. And is this document your
9 understanding of Wilfredo Retana's responses to the
10 request for documentation that have been served on
11 plaintiffs in this litigation?
12 A. Yes.
13 Q. Okay. Did -- did you review this document
14 at any time?
15 A. Yes.
16 Q. When?
17 A. Last night, as a matter of fact.
18 Q. At any time before that, did you review it?
19 A. Before we send the -- yeah, before it was
20 submitted.
21 Q. Okay.
22 (B. Retana Deposition Exhibit 6,
23 Interrogatories, was marked for identification.)
24 BY MR. AYALA:
25 Q. Let's look at No. 6, Miss Retana, please.

23  (Pages 86 to 89)

90

1        Do you recognize that document, Ms. Retana?
2    A.  Yes.
3    Q.  What is that?
4    A.  It's the Interrogatories.
5    Q.  Have you reviewed those documents?
6    A.  Yes.
7    Q.  And -- did you review this document before
8    your attorneys served it on National Gypsum?
9    A.  Yes.
10   Q.  And if you turn to the last page of this
11   document, there's a verification.  Would you please
12   read that for the record.
13   A.  "I, Beatrix Retana, verify under penalty of
14   perjury that the foregoing response to the Defendant
15   New NGC, Inc. d/b/a National Gypsum Company's First
16   Set of Interrogatories to Plaintiff Beatrix Retana
17   are true and correct to the best of my knowledge,
18   information and belief."
19   Q.  And there's a signature at the bottom of
20   the page, correct?
21   A.  That's correct.
22   Q.  Whose signature is that?
23   A.  Mine.
24   BY MR. AYALA:
25   Q.  Let's go to No. 7, please.

91

1        THE WITNESS:  Bill, can you pass me
2    some more water, please?
3    BY MR. AYALA:
4    Q.  You know what, just one thing before we get
5    to No. 7.  Back to No. 6.  One question about No.
6    If you can go to page 13 of No. 6, please, Exhibit
7    No. 6.
8    A.  Okay.  Page 13.
9    Q.  Yes.  And Question No. 20 asks you to
10   identify each person who you allege is a member of
11   the putative class you seek to represent.
12       The question I have for you is, who, other
13   than -- than yourself and your husband, do you
14   believe is the -- is a member of the proposed class
15   that you seek to represent?
16       MR. ANDERSON:  Objection.  Form.
17       THE WITNESS:  The one listed in the
18   complaint.
19   BY MR. AYALA:
20   Q.  Okay.  The plaintiffs listed in the
21   complaint.
22       Anybody else?
23   A.  Not aware of who else, no, as a
24   representative.
25   Q.  Okay.  Who else is a member of the proposed

92

1    class that you seek to represent along with the other
2    named plaintiffs?
3        MR. ANDERSON:  Objection.  Form.
4        THE WITNESS:  All of the other members.
5    All the other people that has the same --
6    that are in the same situation.
7    BY MR. AYALA:
8    Q.  Okay.  Sitting here today, can you identify
9    any other individuals who fall within your proposed
10   class?
11       MR. ANDERSON:  Objection.  Form.
12       THE WITNESS:  No.
13   BY MR. AYALA:
14   Q.  Okay.  What's the basis for your belief
15   that there are individuals in addition to you and the
16   named plaintiffs on that complaint who have National
17   Gypsum drywall that allegedly has caused corrosion in
18   their property?
19       MR. ANDERSON:  Objection.  Form.
20       THE WITNESS:  It can be -- it just
21   can't be me.  The only person that has that.
22   If they sell it to me, they sell it to other
23   people.
24   BY MR. AYALA:
25   Q.  Okay.  Have you seen any testing of

93

1    anyone's drywall, other than your own, or testing of
2    anyone's home, other than your own, that leads you to
3    believe that somebody else, other than you, has
4    National Gypsum drywall that's caused corrosion in
5    their home?
6        MR. ANDERSON:  Objection.  Form.
7        THE WITNESS:  No.
8        (B. Retana Deposition Exhibit 7, Request
9    for Documents, was marked for identification.)
10   BY MR. AYALA:
11   Q.  Let's go to No. 7.  Do you recognize this
12   document, Ms. Retana?
13   A.  Yes, I do.
14   Q.  What is it?
15   A.  That's a request for documentation.
16   Q.  Okay.  Have you reviewed this document
17   before, Ms. Retana?
18   A.  Yes, I have.
19   Q.  Okay.  And when did you review it?
20   A.  Before it was submitted.
21   Q.  Okay.
22       (B. Retana Deposition Exhibit 8, Income Tax
23   Returns, was marked for identification.)
24   BY MR. AYALA:
25   Q.  Let's look at No. 8.  Ms. Retana.  Do you

24  (Pages 90 to 93)

94

1    recognize this set of documents, which I will
2    identify for the record as having Bates labeled
3    numbers Brucker 386 to Brucker 537.
4         Do you recognize these documents?
5    A.   Yes, I do.
6    Q.   Okay.  What are they?
7    A.   They're the filing of income taxes from --
8    from 2001 to 2010.
9    Q.   Okay.  Fair to say these are income tax
10   records of -- filed on behalf of yourself and your
11   husband?
12   A.   Yeah.
13   Q.   Okay.  I'm not going to ask you to pour
14   through all these.  I would like you to go to the
15   last page, if you will, which, for the record, is
16   Brucker 536.
17        MR. ANDERSON:  Just for clarification.
18   Brucker --
19        MR. AYALA:  536.
20        MR. ANDERSON:  I see a 537.
21        MR. AYALA:  I apologize.
22   BY MR. AYALA:
23   Q.   It's not the last page.  I stand corrected.
24        Would you please direct your attention to
25   Brucker 536.  What is this a page of?

95

1    A.   It's a net operating -- net operating loss.
2    Q.   For what year?
3    A.   For 2009.
4    Q.   Would you please read the description under
5    "Net Operating Loss Carried Forward" explanation.
6    A.   "These are the losses that were from cost
7    of operating a series of rental properties that were
8    caught up in the failing market place for real estate
9    value and cost of financing.  The losses as reported
10   on the 2009 return were $273,675.  I took $90,000 for
11   this year and left the rest for the next returns."
12   Q.   Okay.  As I understand, this report and the
13   tax records, your husband and yourself reported
14   losses from the cost of operating a series of rental
15   properties that were caught up in the failing
16   marketplace in Florida, correct?
17   A.   Correct.
18   Q.   How many rental properties have you owned,
19   you and your husband?
20        MR. ANDERSON:  Objection.  Form.
21        THE WITNESS:  Four.
22   BY MR. AYALA:
23   Q.   And let me ask it this way:  Can you tell
24   me the form of ownership?  Did you own it together
25   with your husband?

96

1        MR. ANDERSON:  Objection.  Form.
2        THE WITNESS:  Yeah.  Yeah, I believe
3    so.
4    BY MR. AYALA:
5    Q.   Okay.  So all four of the rental properties
6    that you've owned, you have owned those properties
7    together with your husband and not individually
8    separate from your husband, correct?
9    A.   Um, correct.
10   Q.   Okay.  Could you tell me the addresses of
11   those properties or the general location of those
12   properties?
13   A.   There is two properties in Tallahassee.
14   Q.   Okay.
15   A.   And there is one Sunrise.
16   Q.   Okay.  That's three.  And the fourth is
17   Riverview.  Okay.
18        Did you ever own a condo in Weston?
19   A.   No.
20   Q.   Do you know if your husband ever owned a
21   condo in Weston?
22   A.   No.
23   Q.   Just bear with me one minute.
24        Have you ever lived in a condo in Weston?
25   A.   No.

97

1    Q.   Maybe you could look briefly, please, at
2    page Brucker 429.
3        What is this document, Ms. Retana?
4    A.   A Supplement to Income and Loss.
5    Q.   And do you see Part 1, line 1, where it
6    says, "List the type and location of each rental real
7    estate property"?
8    A.   Yeah.  Condominium.  Small condominium.
9    Q.   Where does it say that the condo is
10   located?
11   A.   Weston, Florida.
12   Q.   Okay.  And this is tax documents that you
13   and your husband filed -- had filed with the IRS?
14   A.   Yes.
15   Q.   And you don't remember this condo?
16   A.   No.
17   Q.   Okay.  Can you -- can you tell me
18   approximately when you purchased each of the two
19   properties in Tallahassee?
20   A.   Maybe it was 2006, 2007.
21   Q.   Did you take out a mortgage on each of
22   those properties?
23   A.   Yes.
24   Q.   Maybe so we can identify them and
25   distinguish between those two properties, can you

25  (Pages 94 to 97)

98

1   give me the address or some other descriptive term to
2   describe them?
3       MR. ANDERSON: Objection. Form.
4       THE WITNESS: Yeah. One -- one is
5   1617, and the other one is 1621.
6   BY MR. AYALA:
7       Q. Are those two properties on the same
8   street?
9       A. Yeah.
10      Q. Okay. Would I be correct in saying that
11  you purchased 1617 in 2006 and you purchased 1621 in
12  2007?
13      A. No.
14      Q. The opposite is true?
15      A. No.
16      Q. When did you purchase 1617?
17      A. At the same time we purchased 1621.
18      Q. I see. Thank you.
19          Okay. Did you take out a mortgage on 1617
20      A. Yes.
21      Q. Did you put any money down of your own on
22  the 1617 property?
23      A. No.
24      Q. Did you put a down payment on the 1621
25  property?

99

1       A. Yes.
2       Q. Do you recall the amount of the down
3   payment?
4       A. I believe it was 10 percent.
5       Q. Okay. What was the purchase price of the
6   1621 property?
7       A. 169.
8       Q. What was the purchase price of the 1617
9   property?
10      A. 169.
11      Q. Okay. Did you make a down payment on the
12  Riverview property?
13      A. Yes.
14      Q. Okay. What was the amount of that down
15  payment?
16      A. Twenty-five -- 20 percent.
17      Q. And did you make a down payment on the
18  Sunrise property?
19      A. Yes.
20      Q. What was the amount of that down payment?
21      A. Twenty percent.
22      Q. When did you buy the Sunrise property?
23      A. 2005, I believe.
24      Q. What was the purchase price of the Sunrise
25  property?

100

1       A. 120?
2       Q. Okay. Each of the four properties, the two
3   in Tallahassee, the one in Sunrise, and the one in
4   Riverview, am I correct in saying that each of those
5   properties was an investment property for the purpose
6   of generating rental income?
7       A. Yeah.
8       Q. Okay. With respect to each of those four
9   properties, how would you describe the outcome of
10  that investment endeavor?
11      MR. ANDERSON: Objection. Form.
12      THE WITNESS: Bad investments.
13      MR. ANDERSON: Tom, I need to break
14  briefly. I have a call to make. I
15  apologize.
16      MR. AYALA: Okay.
17      VIDEO TECHNICIAN: We're off the record
18  at 11:57.
19      (A recess was taken)
20      VIDEO TECHNICIAN: We're back on the
21  record at 12:44.
22  BY MR. AYALA:
23      Q. Good afternoon, Ms. Retana.
24      A. Good afternoon.
25      Q. You're still under oath; do you understand?

101

1       A. Yes.
2       Q. When we were on the record before lunch,
3   you were giving testimony about the four investment
4   properties that you own, correct?
5       A. Yes.
6       Q. Okay. And you described those investment
7   properties as bad investment; do you remember that?
8       A. Yes.
9       Q. And we don't need to pour through the stack
10  of tax records that's sitting in front of you. Would
11  it be fair to say that for all or at least most of
12  the years that you've owned rental properties you and
13  your husband took a loss on those properties?
14      A. Yes.
15      Q. Are you continuing to pay the mortgage on
16  any of the four rental properties that you own?
17      A. I don't understand.
18      Q. I'm sorry?
19      A. No, not at this time.
20      Q. Are any of the four rental properties that
21  you own currently occupied by tenants?
22      A. Yes.
23      Q. Which ones?
24      A. The two in Tallahassee.
25      Q. And the two properties in Tallahassee that

26 (Pages 98 to 101)

102

1    are occupied by tenants, with respect to those, are
2    you receiving rental income on those properties?
3        A.  Yes.
4        Q.  Is the amount of rental income you're
5    receiving on those properties sufficient to cover the
6    cost of the mortgages on those two properties?
7        MR. ANDERSON:  Objection.  Form.
8        THE WITNESS:  No.
9    BY MR. AYALA:
10       Q.  Are you paying -- you and your husband
11   paying any part of the mortgages on any of the four
12   investment properties you own?
13       MR. ANDERSON:  Objection.  Form.
14       THE WITNESS:  No.
15   BY MR. AYALA:
16       Q.  Have foreclosure proceedings been
17   instituted on all four investment properties that you
18   own?
19       A.  No.
20       Q.  How many of the four investment properties
21   that you own have foreclosure proceedings been
22   instituted on?
23       A.  When -- when you say "instituted," I really
24   don't understand what that means.
25       Q.  Okay.  Thank you for clarifying.

103

1        Have you received legal papers filed by
2    lenders of your mortgages seeking to foreclose on the
3    four properties that you own?
4        A.  Yes.
5        Q.  And have you received those foreclosure
6    papers with respect to each of the four rental
7    properties that you own?
8        A.  No.
9        Q.  Okay.  How many of the four properties are
10   being currently foreclosed on?
11       A.  Three.
12       Q.  The attorney you mentioned before,
13   Mark Hutner, is Attorney Hutner representing you as
14   your attorney in connection with each of the three
15   foreclosure proceedings?
16       A.  Yes.
17       Q.  Ms. Retana, what is Beatrix Enterprises?
18       MR. ANDERSON:  Objection.  Form.
19       THE WITNESS:  It's just a company name.
20   BY MR. AYALA:
21       Q.  The name of what company?
22       A.  Of my company.
23       Q.  Okay.  What is the business of your
24   company?
25       A.  I do real estate.

104

1        Q.  Okay.  What kind of -- what kind of company
2    is it in terms of -- in terms of its legal form?  Is
3    it a partnership, is it an S corporation, is it a
4    corporation?
5        MR. ANDERSON:  Objection.  Form.
6        THE WITNESS:  It is a corporation.
7    BY MR. AYALA:
8        Q.  Okay.  Are you the sole shareholder of that
9    corporation?
10       A.  Yes.
11       Q.  Okay.  And you are the -- the owner of the
12   corporation Beatrix Enterprises, Correct?
13       A.  Well, it's actually not called Beatrix
14   Enterprises.
15       Q.  Oh, what is it called?
16       A.  Bret International Realty, but my
17   accountant just put --
18       Q.  I understand.  Okay.
19       Do you have an ownership interest in any
20   other business?
21       A.  No.
22       Q.  Was Bret International formerly known as
23   Beatrix Enterprises?
24       A.  Correct.
25       Q.  Does Bret International employ anyone?

105

1        A.  No.
2        Q.  Does Bret International have any business
3    function other than to serve as an agent for real
4    estate transactions?
5        MR. ANDERSON:  Objection.  Form.
6        THE WITNESS:  At this moment, yeah.
7    BY MR. AYALA:
8        Q.  What -- what are those business functions?
9        MR. ANDERSON:  Objection.  Form.
10       THE WITNESS:  Just, you know, to have
11   my -- my commissions come through my
12   business.
13   BY MR. AYALA:
14       Q.  Okay.  And so, for example, when a client
15   of Bret International purchases or sells a property,
16   Bret International receives a commission that is a
17   percentage of the value of that property, correct?
18       MR. ANDERSON:  Objection.  Form.
19       THE WITNESS:  Yes.
20   BY MR. AYALA:
21       Q.  And physically the check that the client
22   would write to cover the cost of the commission, who
23   would that go to?
24       A.  It will be to my broker's company, which is
25   Fortune International Realty.

27 (Pages 102 to 105)

```
                                                    106
1       Q.  So what is the relationship between Bret
2   International and Fortune International Realty?
3       A.  Okay.  I'm an independent -- I'm
4   self-employed.
5       Q.  Okay.
6       A.  Let me put it that way.  But I have to be
7   under the umbrella of a broker --
8       Q.  Okay.
9       A.  -- in order to -- to work in this business.
10  So I work for Fortune International.  I do my
11  business through them.  They get paid, and then they
12  pay me.
13      Q.  I understand.
14      A.  In this case, they pay -- they pay Bret
15  International.
16      Q.  In order to serve as a real estate agent in
17  the State of Florida, are there licensing
18  requirements?
19      A.  Yes.
20      Q.  Could you describe those briefly?
21      A.  The real estate licensing, you just have to
22  take a test, and you get your license renewed every
23  two years.
24      Q.  Are you a licensed real estate agent in
25  Florida?
```

```
                                                    107
1       A.  Yes.
2       Q.  Okay.  Um, would it be fair to say that
3   within the last five years the market conditions in
4   Florida have been failing?
5       MR. ANDERSON:  Objection.  Form.
6       THE WITNESS:  Yeah.
7   BY MR. AYALA:
8       Q.  And in fact, you and your husband reported
9   on your tax form in 2010 that the -- the market
10  conditions in real estate in Florida have been
11  failing, correct?
12      A.  Yes, that's correct.
13      Q.  Okay.  Would you agree with me that the
14  market conditions in Florida can vary by the region
15  in Florida?
16      MR. ANDERSON:  Objection.  Form.
17      THE WITNESS:  Uh-huh.  Yeah.
18  BY MR. AYALA:
19      Q.  And so, for example, as a real estate agent
20  in Florida, if you are representing a buyer in
21  connection with the purchase of a property, would you
22  look for comparable properties in order to estimate
23  the value of the property that is being purchased?
24      A.  Yes.
25      Q.  And where would you look for comparable
```

```
                                                    108
1   properties?
2       A.  Well, we have a system called the MLS where
3   you can look, and the tax records.
4       Q.  And in terms of the -- in terms of the
5   geography, in terms of the actual location of
6   potentially comparable properties, where would you
7   typically look in the course of your business as a
8   real estate agent?
9       A.  I would look no more than five miles away
10  from the subject property.
11      Q.  Would you agree that there are numerous
12  factors that are relevant to consider in the value of
13  a property?
14      A.  Yeah.
15      Q.  Could you give us a sense of what some of
16  those factors are?
17      A.  Upgrades on the property, pool.  I mean, it
18  can be a variation on the square footage.
19      Q.  Would location be one --
20      A.  Location.
21      Q.  Would the school system be one?
22      A.  Well, I mean, yeah.  If you're comparing on
23  the same side of the -- the same radial [sic], then,
24  yeah.
25      Q.  Any other factors that you can think of?
```

```
                                                    109
1       A.  How old the house is, you know, renovations
2   that have been done.
3       Q.  You testified earlier, Ms. Retana, that in
4   your current lawsuit you're not seeking to represent
5   homeowners who have Chinese drywall installed on
6   their properties, correct?
7       A.  Yes.
8       Q.  And that would be because -- correct me if
9   I'm wrong -- homeowners who have Chinese drywall
10  installed on their property have an interest in
11  seeking compensation from those responsible for
12  importing Chinese drywall; is that correct?
13      MR. ANDERSON:  Objection.  Form.
14      THE WITNESS:  Yes.
15      (B. Retana Deposition Exhibit 9,
16  South Florida Sun-Sentinel article, "Proposed Chinese
17  Drywall Settlement to Help South Floridians", was
18  marked for identification.)
19  BY MR. AYALA:
20      Q.  Let's look as Exhibit 9, please.  You have
21  it there?
22      A.  Uh-huh.
23      Q.  Could you please identify this document for
24  the record?
25      A.  South Florida Sun-Sentinel "Proposed
```

28  (Pages 106 to 109)

110

1    Chinese Drywall Settlement to Help South Floridians."
2    **Q.  What is the date of this document?**
3    A.  December 21st, 2011.
4    **Q.  What is the Sun-Sentinel?**
5    A.  It is a reputable newspaper.
6    **Q.  And what is the area of publication or the**
7    **area of dissemination of the newspaper?**
8    A.  South Florida.
9    **Q.  Okay.  And that -- the Sun-Sentinel covers**
10   **Weston, Florida, for example?**
11   A.  (Witness nods head)
12   **Q.  Can you please read -- let's see.  It's**
13   **about the middle of the -- the first page.  The**
14   **sentence beginning with "Thousands of homeowners."**
15   A.  "Thousands of homeowners have complained
16   that some drywall from China made their homes
17   unlivable, generating foul odors leading to corrosion
18   of pipes and wiring."
19   **Q.  Okay.  Next sentence?**
20   A.  "Banner Supply Co." --
21   **Q.  Oh --**
22   A.  Did I skip one?  "On Thursday, Knauf
23   Plasterboard Tianjin Co. became the first
24   manufacturer to settle thousands of claims, for up to
25   $1 billion."

111

1    **Q.  Let's stop there.  Were you aware of the**
2    **now plasterboard settlement for up to $1 billion**
3    **before today?**
4    A.  No.
5    **Q.  No one ever made you aware of that?**
6    A.  No.
7    **Q.  Could you read on, please?**
8    A.  "Here are answers to some questions about
9    the impact of this decision on homeowners with
10   defective drywall."  What can a homeowner with
11   defective Knauf drywall do now?"
12   **Q.  Did we skip --**
13   A.  Oh, the Banner Supply.  "Banner Supply, a
14   Miami-based firm that distributed Chinese drywall in
15   Florida, agreed in June to spend about $54 million to
16   compensate about 2,000 homeowners."
17   **Q.  Okay.  Miss Retana, before today, were you**
18   **ever made aware of the $54.5 million Banner Supply**
19   **settlement?**
20   A.  No.
21   **Q.  Miss Retana, in light of these settlements,**
22   **one for $1 billion and one for $55 million, if you**
23   **had Chinese drywall in your home, would that be**
24   **something you want to know?**
25   MR. ANDERSON:  Objection.  Form.

112

1    THE WITNESS:  If I have Chinese
2    drywall, yeah.
3    BY MR. AYALA:
4    **Q.  And why would you want to know that?**
5    MR. ANDERSON:  Objection.  Form.
6    THE WITNESS:  Because I want to get
7    compensation to fix my house, my property.
8    BY MR. AYALA:
9    **Q.  And if you had evidence that corrosive**
10   **Chinese drywall was installed in your house, would**
11   **you want to hold those responsible for importing**
12   **Chinese drywall into your house and into Florida?**
13   **Would you want to hold those responsible?**
14   MR. ANDERSON:  Objection.  Form.
15   THE WITNESS:  Yeah.
16   BY MR. AYALA:
17   **Q.  And you would want those responsible for**
18   **importing Chinese drywall to compensate you for the**
19   **damage to your property, correct?**
20   MR. ANDERSON:  Objection.  Asked and
21   answered.
22   THE WITNESS:  Yes.
23   BY MR. AYALA:
24   **Q.  Are you aware that National Gypsum has**
25   **never imported or sold any Chinese manufactured**

113

1    drywall?
2    A.  No, I wasn't aware.
3    **Q.  All right.  If I were to represent that to**
4    **you, would you have any basis to dispute it?**
5    MR. ANDERSON:  Objection.  Form.
6    THE WITNESS:  If you were to represent?
7    BY MR. AYALA:
8    **Q.  If I were to represent to you, as I'm**
9    **representing, sitting here right now, that National**
10   **Gypsum has never ever sold or imported any Chinese**
11   **manufactured drywall, would you have any evidence or**
12   **other basis to dispute that representation?**
13   A.  No.
14   MR. AYALA:  We'll go out of order a
15   little bit.  This is No. 12.  This is going
16   to be No. 12.
17   THE COURT REPORTER:  Hand it to the
18   witness?
19   MR. AYALA:  Please.
20   (B. Retana Deposition Exhibit 12, Drywall
21   Information Center from the U.S. Consumer Product
22   Safety Commission, was marked for identification.)
23   BY MR. AYALA:
24   **Q.  Ms. Retana, you've been handed what's been**
25   **marked as Exhibit 12.  Can you identify this document**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

114

1  for the record, please?
2      A.  Yes.  It's a Drywall Information Center
3  from the U.S. Consumer Product Safety Commission.
4      Q.  Okay.  Are you aware of what the drywall
5  information center is?
6      A.  No.
7      Q.  Okay.  In the course of your Internet
8  research, have you ever happened to come across the
9  drywall information center?
10     MR. ANDERSON:  Objection.  Asked and
11  answered.
12     THE WITNESS:  I don't remember.
13  BY MR. AYALA:
14     Q.  Okay.  Have you ever had any discussions
15  with anybody about the drywall information center?
16     A.  Not that I recall.
17     Q.  Okay.  Do you see the -- the picture on the
18  first page of Exhibit 12?
19     A.  Yeah.
20     Q.  And do you see the -- the blue rectangle at
21  top?
22     A.  Uh-huh.
23     Q.  Could you please read that?
24     A.  "Florida" --
25     Q.  I'm sorry.

115

1      A.  The title -- oh, the top.
2      Q.  Could you please read the text of the blue
3  rectangle?
4      A.  Okay.  Sorry.  "Where has problem drywall
5  been reported?"
6      Q.  And under that it says, "Answer."  Could
7  you please read the answer to that question?
8      A.  "To date, the CPSC has received about 3,905
9  reports from residents in 42 states, the District of
10  Columbia, American Samoa, and Puerto Rico who believe
11  their health symptoms or the corrosion of certain
12  metal components in their homes are related to the
13  presence of drywall produced in China.  State and
14  local authorities have also received similar
15  reports."
16     Q.  Okay.  And one more sentence, please.
17     A.  "We received our first incident report from
18  a consumer on December 22nd, 2008."
19     Q.  Okay.  And I was wrong.  I'm sorry.  And
20  just one more sentence, and you can -- you can end it
21  at the word "Florida."
22     A.  Okay.  "The majority of their reports of
23  the CPSC have come from consumers residing in the
24  State of Florida."
25     Q.  Okay.  Stop there.  And -- and the

116

1  illustration that you see on the first page of
2  Exhibit 12, what does that graphic illustrate to you
3  with respect to the number of Chinese drywall reports
4  in the State of Florida in comparison to other
5  states?
6      A.  It's the bigger sector.
7      Q.  Ms. Retana, have you ever seen any of the
8  defendants' expert reports that have been produced in
9  this litigation?
10     A.  Yes.
11     Q.  Okay.  Which ones have you seen?
12     A.  I don't --
13     Q.  How --
14     MR. ANDERSON:  Tom, just to be clear.
15  She has not signed the confidentiality
16  disclosure, and the reports that she's
17  thinking of are not reports, I guess, that
18  you're referring to.  I just don't want to
19  disclose something that you don't intend to.
20  BY MR. AYALA:
21     Q.  I'll ask -- I'll ask this:  How many expert
22  reports, in connection with this litigation, have you
23  seen?
24     A.  One.
25     Q.  Okay.  Is it your understanding that that

117

1  expert report was authored by an expert retained on
2  behalf of the plaintiff or was it authored by an
3  expert retained on behalf of the defendant?
4      A.  I'm not sure about that.
5      Q.  Okay, you're not sure.  All right.
6      MR. AYALA:  This is going to be 13.
7      (B. Retana Deposition Exhibit 13,
8  Photographs, was marked for identification.)
9      THE COURT REPORTER:  Here we go, ma'am.
10  BY MR. AYALA:
11     Q.  Ms. Retana, is that Exhibit 13 you're
12  looking at?
13     A.  Yes.
14     Q.  Okay.  Ms. Retana, would you please thumb
15  through Exhibit 13 and take a look at those
16  photographs.
17     Ms. Retana, do you recognize the house
18  that's being shown in these photographs?
19     A.  No.  Not really.
20     Q.  Let's look at the first one.  Mrs. Retana,
21  how many times have you been to your property at
22  Riverview?
23     A.  Twice.
24     Q.  Twice?  Twice in how many years?
25     A.  Just when I bought it.  That means 2006.

30  (Pages 114 to 117)

118

1       Q.  So you haven't been in the property since
2   2006?
3       A.  Uh-huh.  I haven't been there.
4       Q.  So the record is clear, you haven't been to
5   the property since 2006; is that correct?
6       A.  That's correct.
7       Q.  Ms. Retana, I'm going to represent to you
8   that these photos are photos of your property, your
9   investment property, located in Riverview, Florida,
10  okay?
11      A.  Okay.
12      Q.  And National Gypsum has had experts visit
13  the property in person and photograph the -- the
14  property, and those experts will testify that these
15  photographs are -- are, in fact, accurate photographs
16  of the Riverview property, when they inspected it on
17  September 7, 2011; do you understand that?
18          MR. ANDERSON:  Objection.  Form.
19          THE WITNESS:  Yes.
20  BY MR. AYALA:
21      Q.  Okay.  Now, these photographs aren't --
22  they don't have page numbers on them, but if you look
23  at the second page you can see the drywall that has
24  some writing on it.  Can you read that writing?
25      A.  "Venture Supply, Inc."  And I believe it

119

1   says MFG TA THE, China.
2       Q.  Ms. Retana, is today the first day you're
3   learning that your Riverview property contains
4   drywall that has a China label on it?
5           MR. ANDERSON:  Objection to form.
6           THE WITNESS:  No.
7   BY MR. AYALA:
8       Q.  When did you learn that the Riverview
9   property had drywall that contains a China label on
10  it?
11      A.  I don't recall when.  It's not that I --
12  with the label.  I just knew that there has some
13  Chinese drywall as well.
14      Q.  So, sitting here today, you're aware that
15  the Riverview property has Chinese drywall installed
16  in it?
17          MR. ANDERSON:  Objection.  Form.
18          THE WITNESS:  Yeah.
19  BY MR. AYALA:
20      Q.  Okay.  And -- and can you tell us how long
21  you've known that?
22      A.  Recently.
23      Q.  When you say "recently," can you give us a
24  general sense of when you first learned that the
25  property has Chinese drywall in it?

120

1       A.  This week or last week.
2       Q.  Okay.  How did you learn that?
3       A.  Through my lawyer.
4           VIDEO TECHNICIAN:  Five minutes.
5   BY MR. AYALA:
6       Q.  Were you surprised to learn that?
7       A.  Yeah.
8       Q.  What, if anything, do you know about the
9   propensity of the Chinese drywall in your property to
10  cause corrosion?
11          MR. ANDERSON:  Objection.  Form.
12          THE WITNESS:  Can you rephrase that?
13  BY MR. AYALA:
14      Q.  Sure.  I'll be happy to.
15          What, if anything, do you know about the
16  tendency or the likelihood that your Chinese drywall
17  in the property is corrosive?
18          MR. ANDERSON:  Objection.  Form.
19          THE WITNESS:  I have no clue.
20  BY MR. AYALA:
21      Q.  Okay.  What investigation are you aware of
22  that your experts have performed to exclude the
23  possibility that Chinese drywall at the property
24  caused corrosion at the property?
25          MR. ANDERSON:  Objection.  Form.

121

1           THE WITNESS:  I'm not aware of any.
2   BY MR. AYALA:
3       Q.  Okay.  And what investigation have you done
4   to exclude the possibility that Chinese drywall at
5   the property caused corrosion at the property?
6       A.  That was my lawyers and experts' job.  So I
7   leave it to them.
8       Q.  And to your knowledge -- well, strike that.
9           You're not aware of any information or
10  reports that exclude the Chinese drywall as the cause
11  of the corrosion; is that correct?
12          MR. ANDERSON:  Object to the form.
13          THE WITNESS:  Yes.
14  BY MR. AYALA:
15      Q.  Ms. Retana, there's another brand of
16  drywall in your property as well, manufactured by
17  American Gypsum; do you understand that?
18          MR. ANDERSON:  Objection.  Form.
19          THE WITNESS:  Yeah.  I see that now.
20  BY MR. AYALA:
21      Q.  And to your knowledge, the -- well, strike
22  that.
23          Now, as a property owner, when you look at
24  drywall, I'd like you to assume -- strike -- okay.
25  Strike all that.  I'm going to start over.

31 (Pages 118 to 121)

122

1          Are you aware, Ms. Retana, that the
2     government investigation of drywall, as reported on
3     the CPSC's Drywall Information Center, has identified
4     Elemental Sulfur as a unique marker for corrosive
5     drywall?
6          MR. ANDERSON: Objection to form.
7     BY MR. AYALA:
8       Q.  Are you aware of that?
9       A.  Some, yeah.
10      Q.  Are you aware that the governmental
11    investigators have identified an elevated Strontium
12    content as another unique marker as corrosive
13    drywall?
14         MR. ANDERSON: Objection. Form.
15         THE WITNESS:  Really, those terms,
16    they're not familiar to me.
17         VIDEO TECHNICIAN:  Mr. Ayala --
18         MR. AYALA:  The switch?
19         VIDEO TECHNICIAN:  Yeah.  This is the
20    end of tape No. 3 in the deposition of
21    Beatrix Retana to be continued on tape
22    No. 4.  We're off the record at 1:20 p.m.
23         (A recess was taken)
24         VIDEO TECHNICIAN:  This is the
25    beginning of tape No. 4 in the deposition of

123

1     Beatrix Retana.  We are back on the record
2     at 1:22 p.m.
3     BY MR. AYALA:
4       Q.  Ms. Retana -- Ms. Retana, you've alleged in
5     your lawsuit that drywall is corrosive not because of
6     Elemental Sulfur, not because of the Strontium, but
7     because of the microbiological cause; is that
8     correct?
9          MR. ANDERSON: Objection.  Form.
10         THE WITNESS:  I wouldn't know the
11    difference.  I mean, like, you put in word
12    that's I don't --
13    BY MR. AYALA:
14      Q.  Okay.
15      A.  -- feel comfortable agreeing or
16    disagreeing.
17      Q.  You allege in your complaint in this
18    litigation that drywall can be corrosive because it
19    contains "sulfur-reducing bacteria."  Do you recall
20    that?
21      A.  Yes.
22         MR. ANDERSON: Objection to form.
23    BY MR. AYALA:
24      Q.  And if I were to represent to you that an
25    allegation that sulfur-reducing bacteria are causing

124

1     drywall to be corrosive and I were to represent that
2     that was a microbiological alleged cause, would you
3     have any basis to dispute that?
4          MR. ANDERSON: Objection. Form.
5          THE WITNESS: No.
6     BY MR. AYALA:
7       Q.  Okay.  Ms. Retana, are you aware of anyone
8     other than your experts in this litigation who claim
9     that "sulfur-reducing bacteria" are causing drywall
10    to be corrosive?
11         MR. ANDERSON: Objection. Form.
12         THE WITNESS: No.
13    BY MR. AYALA:
14      Q.  Have you done any research to investigate
15    the backgrounds of your experts in this litigation?
16      A.  No.
17      Q.  Are you aware of whether the government,
18    including the CPSC, has considered the theory that
19    there's a microbiological cause of corrosive drywall
20    as opposed to Elemental Sulfur?
21         MR. ANDERSON: Objection. Form.
22         THE WITNESS: No.
23         (B. Retana Deposition Exhibit 11, U.S.
24    Consumer Product Safety Commission Report, was marked
25    for identification.)

125

1     BY MR. AYALA:
2       Q.  Let's look at -- let's look at No. 11,
3     Exhibit No. 11, please.
4          Ms. Retana, could you please identify this
5     document?
6       A.  U.S. Consumer Product Safety Commission
7     Report.
8       Q.  And the blue rectangle here, the tab says,
9     "Other Frequently Asked Questions," correct?
10      A.  Correct.
11      Q.  So this appears to be a frequently asked
12    question form published by the CPSC, correct?
13      A.  Correct.
14      Q.  Okay.  Could you go to the second page of
15    this form, Ms. Retana?  And do you see the first time
16    in bold where the word "Question" appears?  Could you
17    please read the question and answer for the record?
18      A.  "The CPSC testing show a microbiological
19    cause to the sulfur gas emission in problem drywall."
20      Q.  Okay.  And what's -- what's the CPSC's
21    answer to that?
22      A.  "No."
23      Q.  Read on, please.
24      A.  "Studies conducted by the U.S. Geological
25    Survey and by Environmental Health & Engineering

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

126

1  found no evidence of microbiological activity or a
2  microbiological source of sulfur-gas emission from
3  gypsum rock or problem drywall, including from
4  samples taken from affected homes."
5        Q.  Ms. Retana, now that you know that there's
6  Chinese drywall installed in the Riverview property
7  and now that you know of the settlement -- the
8  settlements that are in place, is it your intention
9  to seek to recover money from those settlements?
10       MR. ANDERSON:  Objection.  Form.
11       THE WITNESS:  I -- I don't know what
12  I'm going to do.
13  BY MR. AYALA:
14       Q.  Ms. Retana, have you ever had any
15  communications with any governmental official about
16  your Riverview property?
17       A.  No.
18       MR. AYALA:  Okay.  If we can just take
19  five minutes?
20       VIDEO TECHNICIAN:  We're off the record
21  at 1:28.
22       (A recess was taken)
23       VIDEO TECHNICIAN:  We're back on the
24  record a at 1:38 p.m.
25

127

1  BY MR. AYALA:
2        Q.  Ms. Retana, just a few things I don't think
3  I asked at the beginning.
4        Could you state your full name for the
5  record, please?
6        A.  Beatrix Retana.
7        Q.  Okay.  And could you just give me a general
8  sense of your employment history for the last ten
9  years?
10       MR. ANDERSON:  Objection.  Form.
11       THE WITNESS:  I work as a teacher
12  assistant in one of the schools, elementary
13  schools, near my house for two, three years.
14  BY MR. AYALA:
15       Q.  Okay.
16       A.  Then I took a break.  Went back to another
17  school in Pembroke Pines for two years, I believe.
18       Q.  Okay.
19       A.  And then I started working real estate.
20       MR. AYALA:  That's all I have.  I don't
21  have any other questions.  Thank you,
22  Ms. Retana.
23       THE WITNESS:  You're very welcome.
24           CROSS-EXAMINATION
25

128

1  BY MR. ANDERSON:
2        Q.  I just have a couple of questions.
3        How many investment properties did you say
4  you and your husband owned?
5        A.  Four.
6        Q.  Earlier in the deposition, Mr. Ayala, when
7  you all were discussing the Tallahassee properties,
8  one you called 1617; is that right?
9        A.  Yes.
10       Q.  And what was the number for the other one?
11       A.  1621 -- or 20 -- 21.  21.
12       Q.  Obviously we know about the one in
13  Riverview.  What was the other investment property?
14       A.  Sunrise.
15       Q.  Okay.  Do you still own the property in
16  Sunrise?
17       A.  No.
18       Q.  And why don't you own it anymore?
19       A.  I sold it for -- and settled with the bank.
20       Q.  Of the four investment properties that you
21  own -- I guess of the three investment properties
22  that you currently own, are there any of them where
23  you -- strike that.  Let me start over.
24       Do you owe more money on the two properties
25  in Tallahassee than you paid?

129

1        A.  Yes.
2        Q.  Did you owe more money on the Sunrise
3  property than you paid when it was sold?
4        A.  Yes.
5        Q.  Have you sued any of the drywall
6  manufacturers for -- strike that.
7        Have you filed any lawsuits in relation to
8  the Sunrise property?
9        A.  No.
10       Q.  Have you filed any lawsuits in relation to
11  the two properties in Tallahassee?
12       A.  No.
13       Q.  I want to direct your attention for a
14  second, if I could, to Exhibit 8.  And Mr. Ayala
15  asked you a question earlier about a statement
16  concerning a condominium, a small condominium in
17  Weston.
18       And in reviewing the records and trying to
19  figure out, after having testified that you don't own
20  a condominium in Weston and never did, what did you
21  conclude?
22       A.  That the CPA probably put the wrong city.
23  Probably he was referring to the one in Sunrise.
24       Q.  Okay.
25       MR. ANDERSON:  Nothing further.  That's

33 (Pages 126 to 129)

130

```
 1      it.
 2          REDIRECT EXAMINATION
 3   BY MR. AYALA:
 4      Q.  Miss Retana, when you were just asked
 5   whether you owed more money on the investment
 6   properties than you paid, what did you mean by that?
 7      A.  That the properties are not worth what I
 8   paid.
 9      Q.  What did you pay on each of the four
10   properties?
11      A.  169 on each of the properties in
12   Tallahassee.  Now they are worth, roughly, 60,000.
13      Q.  Okay.  Let's start there.  Now, the -- the
14   purchase price of the two properties in Tallahassee
15   was $169,000, correct?
16      A.  Yeah.
17      Q.  Okay.  But you didn't pay $169,000, right?
18      A.  I have a loan on those properties.
19      Q.  Okay.  And -- and so for one of the
20   properties, you -- you actually paid no money out of
21   pocket, correct?
22      A.  Yes.
23      Q.  Okay.  And for the other, one of the
24   properties, if I recall correctly, you paid
25   10 percent of the purchase price, correct?
```

131

```
 1      A.  Yes.
 2      Q.  And when I say you paid, I mean, that's a
 3   down payment money that came out of you and your
 4   husband's pocket, correct?
 5      A.  Yeah.
 6          MR. AYALA:  Okay.  No further
 7   questions.
 8          VIDEO TECHNICIAN:  This is the end of
 9   tape No. 4 and concludes the deposition of
10   Beatrix Retana, taken on 20, January, 2012.
11   We're off the record at 1:44 p.m.
12          (Whereupon, signature was not waived.  The
13   deposition concluded at 1:44 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

132

```
 1          C E R T I F I C A T E
 2
 3   STATE OF FLORIDA
     COUNTY OF PALM BEACH
 4
 5          I, BEATRIX RETANA, hereby certify that I
 6   have read the foregoing transcript of my deposition
 7   and that the statements contained therein, together
 8   with any additions or corrections made on the
 9   attached Errata Sheet, are true and correct.
10
11
12          Dated this _____ day of _____, 2012.
13
14
15
16          _____
             BEATRIX RETANA
17
18
19          The foregoing certificate was subscribed to
     before me this _____ day of _____, 2012,
20   by the witness who has produced a
     _____ as identification and who did
21   not take an additional oath.
22
23
24   _____
     Notary Public
25   my commission expires:
```

133

```
 1          CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA
 4   COUNTY OF PALM BEACH
 5
 6
 7          I, the undersigned authority, certify that
 8   BEATRIX RETANA personally appeared before me and was
 9   duly sworn January 20, 2012.
10
11          WITNESS my hand and official seal this 26th day
12   of January, 2012.
13
14
15          _____
16          DARLINE MARIE WEST
             Notary Public
17
18
19   My Commission Expires:
     October 26, 2013
20   #DD 933031
21
22
23
24
25
```

34  (Pages 130 to 133)

134

1          REPORTER'S CERTIFICATE
2
     STATE OF FLORIDA
3    COUNTY OF PALM BEACH
4
5       I, DARLINE MARIE WEST, RPR, certify that I was
6    authorized to and did stenographically report the
7    foregoing deposition; and that the transcript is a
8    true record thereof.
9
10      I further certify that I am not a relative,
11   employee, attorney, or counsel of any of the parties,
12   nor am I a relative or employee of any of the
13   parties' attorney or counsel connected with the
14   action, nor am I financially interested in the
15   action.
16
17      Dated this 26th day of January, 2012.
18
19
20
21   _____
22      DARLINE MARIE WEST, RPR
23
24
25

135

1          INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over carefully
4    and make any necessary corrections. You should state
5    the reason in the appropriate space on the errata
6    sheet for any corrections that are made.
7       After doing so, please sign the errata sheet
8    and date it.
9       You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12      It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

136

1          E R R A T A
2
3
4
5       I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___  ___  CHANGE:_____
10   REASON:_____
11   ___  ___  CHANGE:_____
12   REASON:_____
13   ___  ___  CHANGE:_____
14   REASON:_____
15   ___  ___  CHANGE:_____
16   REASON:_____
17   ___  ___  CHANGE:_____
18   REASON:_____
19   ___  ___  CHANGE:_____
20   REASON:_____
21
22   _____  _____
23   WITNESS' SIGNATURE      DATE
24
25

35  (Pages 134 to 136)