1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FT. MYERS DIVISION

---------------------------

GEORGE BRINCKU, BRENDA
BRINCKU,

   Plaintiffs,

                           CASE NO.
   vs.                       2:11-cv-00338-JES-DNF

NATIONAL GYPSUM COMPANY,
a Delaware Corporation,

   Defendant.
---------------------------


VIDEOTAPED DEPOSITION OF GEORGE BRINCKU

January 23, 2012

Henderson Franklin

1715 Monroe Street

Fort Myers, FL

9:01 a.m. to 12:16 p.m.


Reported By:
Lori L. Bundy, FPR, RPR, CRR, CLR
Job No: 23642

**2**

```
1    APPEARANCES:
2    For the Plaintiff:
3       Gary, Naegele & Theado
4       446 Broadway
5       Lorain, OH  44052-1797
6       (440) 244-3462
7    BY:  ROBERT D. GARY, ESQ.
8
9
10
11   For the Defendant:
12      Morgan, Lewis & Bockius, LLP
13      1701 Market Street
14      Philadelphia, PA  19103-2921
15      (215) 963-5668
16   BY:  JAMES D. PAGLIARO, ESQ.
17      jpagliaro@morganlewis.com
18
19
20   Also present:     BRENDA BRINCKU
21   Videographer:     KEVIN BUNDY, CLVS
22
23
24
25
```

**3**

```
1              I N D E X
2    WITNESS:                    PAGE:
3    GEORGE BRINCKU
     DIRECT EXAMINATION                5
4    BY MR. PAGLIARO:
5              - - -
6           E X H I B I T S
7              - - -
8         Description           Page
9    Defendant's    Notice of deposition    6
     Exhibit 1
10   Plaintiff's    Document from Banner Supply   48
     Exhibit 2
11   Plaintiff's    Document from RJL Drywall    48
     Exhibit 3
12   Plaintiff's    Lee County community    74
     Exhibit 4      development affidavit for
13                  wells
     Plaintiff's    Aerator/Degasifier    75
14   Exhibit 5
     Plaintiff's    Letter from Professor Eagar   101
15   Exhibit 6      and Dr. Larson
     Plaintiff's    Dr. Larson's return packet   101
16   Exhibit 7
     Plaintiff's    Letter from Thomas Eager at   101
17   Exhibit 8      MIT
     Plaintiff's    Letter dated November 2, 2009  102
18   Exhibit 9
19
20
21
22
23
24
25
```

**4**

```
1        VIDEOGRAPHER:  This is video number one of the
2    videotaped deposition of George Brincku taken by the
3    defendant in the matter of George Brincku and Brenda
4    Brincku versus National Gypsum Company, a Delaware
5    corporation in the United States District Court,
6    Middle District of Florida, Fort Myers division, civil
7    action number 2:11-CV-00338-JES-DNF.  This deposition
8    is being held at 1715 Monroe Street, Fort Myers,
9    Florida 33902 on January 23rd, 2012, at approximately
10   9:01 a.m.  My name is Kevin Bundy from the firm of
11   David Feldman Worldwide and I am a legal video
12   specialist.  The court reporter is Lori Bundy in
13   association with David Feldman Worldwide.  Will
14   counsel please introduce themselves.
15        MR. PAGLIARO:  Good morning.  For the record my
16   name is James Pagliaro, and I'm here to represent the
17   defendant, National Gypsum Company.
18        MR. GARY:  My name is Bob Gary, and I represent
19   George and Brenda Brincku.
20        VIDEOGRAPHER:  Will the court reporter please
21   swear in the witness.
22   THEREUPON,
23        GEORGE BRINCKU,
24   a witness, having been first duly sworn, upon his oath,
25   testified as follows:
```

**5**

```
1         DIRECT EXAMINATION
2    BY MR. PAGLIARO:
3    Q.  Good morning, Mr. Brincku.
4    A.  Good morning.
5    Q.  Mr. Brincku, I'm going to be taking your
6    deposition this morning.  You and I have met before;
7    correct?
8    A.  Yes.
9    Q.  And you know I represent the defendant in this
10   matter, National Gypsum Company?
11   A.  Yes.
12   Q.  Okay.  A couple ground rules, one, when you
13   answer the question, try to speak your answer, not just
14   nod your head.  Okay?
15   A.  Okay.
16   Q.  Secondly, if you don't understand a question,
17   feel free, I'll be happy to repeat myself and ask the
18   question again; is that okay?
19   A.  That's okay, yeah.
20   Q.  Okay.  And thirdly this is not a death march.  If
21   you want to take a break, if you need to go to the
22   restroom or anything, just let me know and we'll take a
23   break.  Fair enough?
24   A.  Yes, fair.
25   Q.  All right.  So, Mr. Brincku, the first thing I
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

6

1  want to do is Mark as George Brincku deposition Exhibit
2  No. 1 the deposition notice in this case.
3       (Defendant's Exhibit No. 1, Notice of deposition,
4       was marked for identification.)
5  BY MR. PAGLIARO:
6       Q.  Have you -- have you looked at this deposition
7  notice?
8       A.  This particular one?
9       Q.  Yes, sir.
10      A.  Oh, no.
11      Q.  But you understand you're having your deposition
12  taken in this case for use in the case that you brought
13  against my client, National Gypsum Company?
14      A.  Yeah, that's -- that's correct.
15      Q.  Mr. Brincku, let's start with this.  Have you
16  ever had your deposition taken before in any matter?
17      A.  No.
18      Q.  Have you ever been a plaintiff in a lawsuit
19  besides this lawsuit?
20      A.  No.
21      Q.  Have you ever been a defendant in a lawsuit?
22      A.  No.
23      Q.  Okay.  Have you ever been involved in any
24  activity where there's been alleged to be a crime, for
25  example?

7

1       A.  None whatsoever.
2       Q.  Okay.  So is this your first experience with
3  having your testimony taken under oath, sir?
4       A.  Yes, sir.
5       Q.  Okay.  Now, I know that your wife was involved in
6  giving testimony before various government bodies in the
7  context of this litigation, do you know that?
8       A.  Yes.
9       Q.  Okay.  Have you given testimony in front of the
10  State of Florida, the CPSC or any other sworn testimony?
11      MR. GARY:  Objection as to form as to the context
12  of the litigation.
13  BY MR. PAGLIARO:
14      Q.  Fair enough.  You can answer the question.  Have
15  you given testimony --
16      MR. GARY:  You can answer.
17  BY MR. PAGLIARO:
18      Q.  -- under oath in the -- let me backtrack.
19  Mr. Gary is right, maybe I'm being imprecise.  I'll
20  rephrase the question.
21      Have you provided any sworn testimony or sworn
22  statements on issues involved in this litigation?
23      A.  In Washington, DC?
24      Q.  Yes, sir.
25      A.  No.

8

1       Q.  Okay.  How about in Florida anywhere?
2       A.  No, nothing in sworn testimony.
3       Q.  Have you given statements, written statements, to
4  any government agency relating to the issues involved in
5  this case?  And when I say the issues in this case, I mean
6  the drywall situation in your -- in your home?
7       A.  Yes, there's -- I don't write anything to
8  anybody.  My wife does all that.  I just -- verbal.
9       Q.  Okay.  So you don't -- you can't think of any
10  written statements or testimony you've provided relating
11  to the issues that you've raised in this case?
12      A.  No, there's no written.  There's nothing I wrote
13  to anybody.
14      Q.  All right.  And no sworn statements?
15      A.  No, there was never any need to do a fair
16  statement.
17      Q.  Fair enough.  Can we agree that when we're
18  talking about the house involved in the case that you
19  brought against National Gypsum, the location of that
20  house is 18891 River Estate; is that correct?
21      A.  That's correct.
22      Q.  And what town is that in in Florida?
23      A.  That's in Alva, Florida.
24      Q.  It's in Alva.  Okay.  So when I talk about your
25  home or the house, what I'm referring to, we can agree on

9

1  this, unless I say otherwise, will be that particular
2  location, that real estate property; is that correct?
3       A.  Right.
4       Q.  Okay.  And I know you're probably living
5  somewhere else and you've lived other places, but when I
6  talk about the house involved in this litigation, we're
7  going to come -- we're going to be in agreement that
8  that's the house we're talking about?
9       A.  Yes.
10      Q.  Fair enough.  So I'm going to ask you a little
11  bit about your background, sir.
12      A.  Sure.
13      Q.  If I may.  How long have you been married to
14  Mrs. Brincku?
15      A.  Oh, wow.  Just wonderful, many, many years.  27.
16      Q.  27 years?
17      A.  Which is many.
18      Q.  Have you been married before, sir?
19      A.  No.
20      Q.  And how many children do you and Mrs. Brincku
21  have?
22      A.  We have three all together.
23      Q.  And just start with the oldest?
24      A.  Christine.
25      Q.  And how old is Christine?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

10

1    A.  She's 25.
2    Q.  Is she living with you now, sir?
3    A.  No.
4    Q.  And your second?
5    A.  Ashley.
6    Q.  Ashley's also a female?
7    A.  Yes.
8    Q.  How old is Ashley?
9    A.  She's 22.
10   Q.  And is she living with you now?
11   A.  No, she got married.
12   Q.  Oh, she's married.  Okay.  And you have a son;
13   correct?
14   A.  Yes.
15   Q.  What's your son's name?
16   A.  Harrison.
17   Q.  And how old is Harrison?
18   A.  11.
19   Q.  And I assume he's living with you now?
20   A.  Yeah, he's with us.
21   Q.  And where are you currently residing,
22   Mr. Brincku, you and your family?
23   A.  14901 Hawks Shadow Drive, Fort Myers, Florida
24   33905.
25   Q.  Hawks Shadow?

11

1    A.  Drive.
2    Q.  That's in Fort Myers?
3    A.  Yes, sir.
4    Q.  And how long have you been living there?
5    A.  Ever since we moved out of the house.
6    Q.  Okay.  I recall at some point hearing something
7    about the fact that you or Mrs. Brincku's mother was
8    involved, perhaps, with giving you space.  Are you living
9    with your mother, your mother-in-law, or is this your own
10   independent home?
11   A.  My mother-in-law provided the space we're living
12   in.  We're renting.
13   Q.  So we're renting from your mother-in-law?
14   A.  Yes.
15   Q.  Okay.  Is it a property I assume she owns; right?
16   A.  Yeah, she owns it.
17   Q.  Does she live with you?
18   A.  No.
19   Q.  She lives in the area?
20   A.  Yeah.
21   Q.  And you live there since you moved out of the
22   house that's involved in this litigation; correct?
23   A.  Yes.
24   Q.  And how many years has that been?
25   A.  Well, since -- well, February of -- March of '09.

12

1    Q.  So it's coming up on three years; correct?
2    A.  Yes, sir.
3    Q.  Let's get a little bit about your education.
4    Where did you go to high school, sir?
5    A.  I went to high school at Baron C. Collier.
6    Q.  And where is that located?
7    A.  Collier County, Naples.
8    Q.  Oh, okay.  And do you have -- did you graduate
9    from high school?
10   A.  Yes, sir.
11   Q.  That high school?
12   A.  Yes.
13   Q.  And do you have any posthigh school formal
14   education, Mr. Brincku?
15   A.  Yeah, I went to Vo-tech.
16   Q.  Okay.  And where was that located, sir?
17   A.  That was off of -- City of Naples, somewhere down
18   south of there.  I can't give you exact location.
19   Q.  All right.  Was that an education provided to you
20   by the City of Naples, by the county, Collier County?
21   A.  Yeah, it was basically a vocational school to
22   continue education.
23   Q.  Okay.
24   A.  They offered it to me, I took it.
25   Q.  What course of study did you have at the Vo-tech

13

1    school, sir?
2    A.  It was horticulture.
3    Q.  Okay.  And when did you graduate high school?
4    A.  2000.
5    Q.  And horticulture school was one year, two years?
6    A.  Horticultural school was a two-year program.  If
7    I can correct, it was 2001 I graduated.
8    Q.  From high school?
9    A.  Yeah.
10   Q.  You say you were married for 27 years, so what
11   year did you graduate from -- strike that.
12       What year were you married, 27 years from 2012,
13   my math says 1985 -- no.  '85?
14   A.  '85?
15   Q.  What year were you married, what year were you
16   married?
17   A.  Excuse me.  I'm sorry.
18   Q.  What year were you married?
19   A.  Well, let's see, 27 years ago; that's when I was
20   married.
21   Q.  So 1985?
22   A.  Uh-huh.
23   Q.  Okay.  So if you graduated high school in 2001,
24   did you go to high -- did you start high school before
25   that?  I mean, did you go back to school?

4  (Pages 10 to 13)

14

1    A.  It was just continuing education.
2    **Q.  Okay.**
3    A.  You know, from high school.  I graduated -- I
4  went to Naples High, and I also went to Baron Collier, so
5  four years there.
6    **Q.  Okay.  So I'm trying to get a sense of when you**
7  **started high school.**
8    A.  Started high school back in, you know -- oh,
9  gosh.  That's a long time ago.
10    **Q.  Yeah, I mean --**
11    A.  19 --
12    **Q.  I'm confused at little bit about your dates.**
13    A.  It's 1980, I'm sorry.
14    **Q.  You started high school in the 1980's.**
15    A.  I'm thinking of a graduation of my daughters.
16  It's in the '80s.
17    **Q.  When did you graduate, you, George Brincku,**
18  **graduate from high school, what year?**
19    A.  It was 19 -- yeah, class of 1980.
20    **Q.  1980.  Okay.  Now we're on the same page.**
21    A.  Yeah, sorry.
22    **Q.  And then you went to horticultural school**
23  **directly after that, or did you wait and go back?**
24    A.  Yeah, I just went right after, directly after
25  that.

15

1    **Q.  So by 1982 you had gotten out of horticultural**
2  **school?**
3    A.  Right.
4    **Q.  We have that right now?**
5    A.  Yes.
6    **Q.  So those dates you gave me before of 2000 and**
7  **2002, they're not correct?**
8    A.  You're absolutely right.  Things are a little
9  rusty way back 25, 30 years ago.
10    **Q.  Are those the dates your daughters graduated from**
11  **high school?**
12    A.  Yes.
13    **Q.  Cleared that up.  So aside from your Vo-tech**
14  **horticultural school and your high school, have you had**
15  **any other formal or any other formal training?**
16    A.  Yeah, I went to Edison Community College.
17    **Q.  Okay.  And when did you attend Edison?**
18    A.  Right after Vo-tech.
19    **Q.  Did you obtain a degree from Edison Community**
20  **College?**
21    A.  Just the two-year whatever they --
22    **Q.  They call it an associate's degree?**
23    A.  Yeah, it's just a two-year.
24    **Q.  And what course of study did you pursue at**
25  **Edison?**

16

1    A.  Business.
2    **Q.  And would it be fair to say you went there**
3  **directly after the Vo-tech school?**
4    A.  Yeah, it was right after.
5    **Q.  Okay.  So when you got married in 1985, you had**
6  **already completed your course of education; is that fair?**
7    A.  Yes.
8    **Q.  Okay.  Did you have any other formal education**
9  **after that point, sir?**
10    A.  No, it's just everything was business.
11    **Q.  Okay.  So when you say business, it was things**
12  **you learned while you were doing your business --**
13    A.  Right.
14    **Q.  -- is that correct?**
15    A.  Yes.
16    **Q.  And what course of business did you pursue right**
17  **about the time you left Edison and you got married?**
18    A.  Construction.
19    **Q.  Okay.  And when you say construction, did you**
20  **work on houses or commercial properties --**
21    A.  Yeah, I'm --
22    **Q.  Let me finish the question.**
23    A.  I'm sorry.
24    **Q.  Houses, commercial property, or some other form**
25  **of construction?**

17

1    A.  All entities.
2    **Q.  All entities.  Okay.  Did you work for a company,**
3  **sir?**
4    A.  Yes, sir.
5    **Q.  What was that?**
6    A.  Mike Bobiello (phonetic).
7    **Q.  Mike Bobiello?**
8    A.  Right, and Gundek Construction.
9    **Q.  Let's see if I can get that.  Gundek.  And where**
10  **is that located?**
11    A.  Collier County.
12    **Q.  Now, when you were working for Gundike**
13  **Construction, what type of work did you specifically do?**
14    A.  We built homes in Marco Island.
15    **Q.  Single-family homes?**
16    A.  Yes, sir.
17    **Q.  And what was your assigned responsibilities for**
18  **Gundek?**
19    A.  It was to build homes, to frame them, to look at
20  blueprints, to put the trusses together, to put the
21  plywood, everything from rock bottom all the way up.
22    **Q.  So you are actually constructing the homes**
23  **yourself?**
24    A.  No, I was with a team of people.  We were all
25  constructing it together.

5  (Pages 14 to 17)

18

1    Q.  Okay.
2    A.  We would have meetings in the morning, everybody
3  was given a specific task to do for the day.  They usually
4  had me walking tie beams doing this, that, and the other
5  thing.
6    Q.  But were you actually swinging a hammer and
7  framing up the houses and doing things like that as well?
8    A.  Yeah, using staple guns, framing, all that stuff.
9    Q.  Have you ever done drywalling?
10   A.  Yes.
11   Q.  Okay.  Did you do it when you were on
12  construction at Gundek?
13   A.  No, I did drywall in other places.
14   Q.  Okay.  And how long did you work at Gundek?
15   A.  I worked for him for about a year.
16   Q.  And what did you do after that?
17   A.  Well, then there was Mike Bobiello.
18   Q.  Oh, so Gundek and Bobiello are different?
19   A.  Right.
20   Q.  And how long did you work for Mr. Bobiello?
21   A.  Mr. Bobiello another year.  Nice guy.
22   Q.  And same sort of work, construction?
23   A.  Yeah.
24   Q.  Houses?
25   A.  Yeah, remodeling, tearing out old walls, drywall,

19

1  everything, putting it all back together.
2    Q.  And after Gundek and after Bobiello, where did
3  you go then for work?
4    A.  Well, I, you know, worked many years for Naples
5  Carpentry.
6    Q.  And, again, were you doing actual carpentry
7  construction work --
8    A.  Yes.
9    Q.  -- or were you on the business end?
10   A.  We built homes, we remodelled, we did everything
11  under the sun.
12   Q.  And how long were you with Naples Carpentry,
13  approximately?
14   A.  Oh, ever since I was a little boy.
15   Q.  How long did you work for that company, Naples
16  Carpentry?
17   A.  Well, it's my dad's business.
18   Q.  Oh, it's your dad's business.  I'm sorry.  I
19  didn't understand that.  So you went to work with your
20  dad's business?
21   A.  Oh, yeah, he -- I wasn't allowed to stay home
22  from Adam.  He said, son, you're coming with me, I said,
23  yes, sir.
24   Q.  Okay.  All right.  And so how long did you work
25  after leaving Bobiello going to Naples Carpentry, how long

20

1  did you work with your dad's business?
2    A.  Probably in the neighborhood of 20 years plus.
3    Q.  Okay.  So quite a long time.  Is your dad still
4  alive, Mr. Brincku?
5    A.  Yes, he is.
6    Q.  Does he still own his business?
7    A.  No, he's retired.
8    Q.  Okay.  At some point did you leave your father's
9  company?
10   A.  Yeah, I was to pursue other interests.
11  Horticulture was a fascination of mine, and my grandmother
12  always taught me to love plants.
13   Q.  And so did you leave to pursue a career in
14  horticulture?
15   A.  (Witness nodded head.)
16   Q.  You have to answer yes or no.
17   A.  Yes, I'm sorry.
18   Q.  Did you -- did you start your own business,
19  Mr. Brincku?
20   A.  Yes, I did.
21   Q.  And what was the name of that business, sir?
22   A.  George Brincku Home and Garden.
23   Q.  And where was that located?
24   A.  That was located in San Carlos Park.  Well, I'm
25  sorry, it was the starting of it there.  We moved out to

21

1  18891 River Estates Lane, that's where we started the
2  business.
3    Q.  All right.  So you started that business at the
4  same time you were building your house -- the house that's
5  involved in this litigation?
6    A.  Right.
7    Q.  Fair enough.  So prior to that time -- strike
8  that.
9       You began building that house, as I read the
10  records, in approximately 1984; is that correct?
11   A.  The San Carlos Park home?
12   Q.  No, I'm talking about your 1881 River Estates
13  home?
14   A.  In 1984?
15   Q.  No, I'm sorry, 2004, excuse me.
16   A.  Okay.
17   Q.  2004, I'm making the same mistake you did
18  backwards.  2004 you started building that home; is that
19  correct?
20   A.  Okay.
21   Q.  Do we have that right?
22   A.  Yeah, 2004.
23   Q.  All right.  Before you start building that
24  house, where were you living?
25   A.  I was living over in San Carlos Park.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

22

1    Q.   All right.  And where is that located, what town?
2    A.   That's in Estero.
3    Q.   And did you own that home?
4    A.   Yes.
5    Q.   Did you build that home?
6    A.   Yes.
7    Q.   You built that home as well?
8    A.   Uh-huh.
9    Q.   How long did you live at the San Carlos Park
10   property?
11   A.   15 years.
12   Q.   What type of drywall did you have in that
13   property, sir?
14   A.   National Gypsum.
15   Q.   Okay.  And did you experience any problem with
16   the drywall in your house in San Carlos Park?
17   A.   Nothing, no.
18   Q.   What kind of drywall do you have in the house
19   you're currently living, your mother-in-law's house, do
20   you know?
21   A.   Yes, I did -- I do know.
22   Q.   What is that?
23   A.   It's Lafarge.
24   Q.   Lafarge?
25        Now, let's go back to 2004, you're still living

23

1    in San Carlos Park, and at some point during that period
2    you decide you want to build another house; is that
3    correct?
4    A.   Yeah, but there was another house I built before
5    that house.
6    Q.   Okay.  Tell me about that, sir, please.
7    A.   That was across the street.
8    Q.   From?
9    A.   The house I was living in on Harrisburg Drive.
10   Q.   San Carlos Park?
11   A.   Right.
12   Q.   And did you move into that house?
13   A.   Yes.  That's where me and my wife got -- you
14   know, that was like in the '80s, '86, '87.
15   Q.   All right.  So you lived on two houses -- in two
16   houses in San Carlos Park?
17   A.   Yeah, on the same street.
18   Q.   Same street.  Okay.  Did you build both houses?
19   A.   Yeah, me and Naples Carpentry, my dad.
20   Q.   All right.  And you said you lived in one of the
21   houses 15 years.  What about the house across the street,
22   how long did you live there?
23   A.   That was quite -- that's, again, some distance.
24   That's like trying to remember, you know, when I
25   graduated.  That was like right after I graduated I moved

24

1    in there, and it was probably, I guess, five years.
2    Q.   Okay.  Was it a smaller home --
3    A.   Oh, yeah, smaller home.
4    Q.   -- than the house across the street?
5    A.   It was very small.  We had a baby, Christine, and
6    we outgrew it.
7    Q.   Okay.  And, again, that was the house that your
8    family business built?
9    A.   Yes, sir.
10   Q.   And what was the address at that first house, the
11   small house?
12   A.   It was, let's see, 8069 Harrisburg Drive.
13   Q.   All right.  And the house across the street you
14   built after, what was that address?
15   A.   That was -- boy, this memory stuff.  It was
16   Harrisburg Drive right across the street, it was 8069 and
17   80 -- I'm not -- I'm not sure.
18   Q.   All right.  Let's leave that blank, and maybe if
19   you recall during a break or you can tell Mr. Gary, I
20   would like to know.  I would like to get the actual street
21   address.
22   A.   I understand.
23   Q.   So you lived in that second larger house on
24   Harrisburg Drive for approximately 15 years?
25   A.   Yes, sir.

25

1    Q.   And did you have your other children while you
2    were in that house, Mr. Brincku?
3    A.   Yeah, we had two other kids.
4    Q.   How large a house was that, approximately?
5    A.   It was huge.  It was a two-story home.
6    Q.   And, again, that was a house that your family
7    business constructed, you participated in the
8    construction?
9    A.   Yes.
10   Q.   Okay.  And that is the house that you referred to
11   before that had National Gypsum wallboard in it?
12   A.   Yes, both homes did.
13   Q.   Okay.  All right.  Now, let's get to 2004.
14   You're in the house on Harrisburg Drive, the larger
15   house --
16   A.   Yes.
17   Q.   -- right?
18   A.   Yes.
19   Q.   And at some point in -- around that time period
20   you and your wife decided to build another home; is that
21   correct?
22   A.   Yes.
23   Q.   Okay.  So tell me what factors led you to decide
24   to build -- construct another home?
25   A.   Well, it was the rocketing of my business.  I

7 (Pages 22 to 25)

26

1  told my wife, we're going to need to stretch out our legs
2  here because we're too confined.  The business I wanted to
3  pursue was landscape design and consulting.
4      Q.  So it was a business impetus that -- that
5  suggested to you that you needed a larger premises?
6      A.  Yeah, it was a drive directive.  It was either do
7  it or die.
8      Q.  Okay.  And in order to build this other house,
9  did you need to borrow money?  Did you need to get a
10  mortgage?
11     A.  Yeah, we had -- we sold the other home, we had
12  money to get it going.  We bought the property.  Halfway
13  through it we had everything completed, and then we got a
14  mortgage after that.
15     Q.  Okay.  So let's go back to the beginning impetus
16  to build this home --
17     A.  Right.
18     Q.  -- the house that's involved in this litigation.
19  Did -- did you want to build this because you wanted space
20  in the home to conduct the landscaping business?
21     A.  Yeah, we would like to have an office, place
22  where we can store all our files.  The business was
23  growing, and we were growing with it.
24     Q.  Got ya.  Did you have equipment related to that
25  business --

27

1      A.  Yes.
2      Q.  -- the landscape equipment?
3      A.  We had hydraulic trailers, we had big huge
4  trailers, trucks.  We had -- from time to time we had
5  rental equipment constantly moving in, cranes, tractors.
6  And all that stuff needed to be housed and spaced.
7      Q.  Were you planning to house and space your
8  equipment for your business at the house that you were
9  building?
10     A.  No, that was just -- it was an area where I can
11  go to and I know I can conduct my business from there.
12     Q.  Okay.  Where were you storing your landscape
13  business equipment?
14     A.  Most -- most of my landscape business equipment
15  was at the house, a lot of it was rentals.
16     Q.  Okay.
17     A.  So there was time to time when I needed heavy
18  equipment, I would call up my rental company.
19     Q.  You don't necessarily purchase that equipment?
20     A.  No.
21     Q.  You rent it when you need it?
22     A.  Yeah, it was too expensive.  We're talking quite
23  a bit of money for equipment.
24     Q.  So you said your business was doing better, you
25  decided to build a larger premises for your family and for

28

1  your business.  What was driving your business to do
2  better, do you think?
3      A.  Well, it was great customer service.  We
4  constantly outline as customer service as our number one
5  objective.
6      Q.  And where was your business located?  Was it in
7  the Alva area, Fort Myers?
8      A.  No, it was in the Alva area.  We conducted just
9  everything in Fort Myers.
10     Q.  Okay.  How many people did you have working for
11  you, Mr. Brincku, at that time when you ran your
12  landscaping business?
13     A.  It was me, my wife, it was a family run business.
14     Q.  Okay.  What about the folks that actually cut the
15  lawns and did the -- trim the hedges?
16     A.  I was the worker bee.
17     Q.  Okay.
18     A.  I was a person who went out and just worked my
19  little heart out.
20     Q.  So you actually physically did the labor
21  involved in the landscaping?
22     A.  Everything, everything.
23     Q.  Did you from time to time use people to assist
24  you?
25     A.  Yeah, there was times I would use people, my

29

1  daughters.  They are great worker bees.
2      Q.  But you had no cadre of people that you would
3  turn to help you?
4      A.  As far as the cadre of people, from time to time,
5  yeah, there was people that, you know, just temps.
6      Q.  And where would you get these temporary
7  employees?
8      A.  Church.
9      Q.  Oh, okay.  The work that you did in your
10  landscaping business, was it residential, commercial, or
11  both?
12     A.  It was both.
13     Q.  Was it mostly one or the other?
14     A.  Mostly residential.
15     Q.  And what -- what menu of services did you offer
16  residential customers of your landscaping business?
17     A.  That was mostly just maintenance, cutting grass.
18     Q.  Did you do any what I'll call landscape design or
19  landscape architecture?
20     A.  Yeah, a lot of times they were relandscapes
21  within a landscape.  People would call for a revamping of
22  their existing landscape.
23     Q.  Did you do drawings for that?
24     A.  Yeah, I would do drawings and show them, and they
25  would like what I drew.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

30

1    Q.  And how long were you operating your landscape
2  business out of your home either in Harrisburg Drive or
3  River Estate Drive?
4    A.  How long?  Ever since I've been there.
5    Q.  Are you still operating a landscape business?
6    A.  No.
7    Q.  That's what I'm trying to get a sense of.  When
8  did it start, when did it end?
9    A.  It ended in February 2009 for me.  It was just
10  a -- it was a constant drain after that.  It was a
11  struggle just to keep things going because I had no place
12  to keep anything.
13    Q.  And how long were you conducting your landscape
14  business when you lived in Harrisburg Drive, before you
15  moved to the River Estates property?
16    A.  Rephrase the question.
17    Q.  Yeah, I'm just trying to get a sense, did you do
18  this for ten years, did you do this for five years, your
19  landscape business?
20    A.  Yeah.
21    Q.  So we know from '04 to '09 you already testified
22  that five years.  How long prior to that were you
23  operating your landscape business?
24    A.  I just dabbled in it.  There was times when
25  Phelps Construction, my sister's corporation, would need a

31

1  landscape and I would help her out.
2    Q.  And when did you stop officially working for the
3  Naples Carpentry entity?
4    A.  It was a lifelong commitment.  My dad needed me
5  tremendously.
6    Q.  So is it fair to say there was crossover
7  between --
8    A.  Yeah.
9    Q.  -- the time you were working for Naples Carpentry
10  and operating your own landscape business?
11    A.  Yeah, there was constant crossover.
12    Q.  Okay.
13    A.  I was a man with many hats.
14    Q.  All right.  Approximately what income or funds
15  were generated from your landscaping business when you
16  moved to River Estates -- the River Estates house?
17    A.  I'm the worker bee, my wife does all the
18  business.
19    Q.  Okay.
20    A.  So you'd have to ask her.
21    Q.  All right.  So you're testifying that you don't
22  recall or you don't know?
23    A.  Like I said, I work tremendous hours from
24  morning -- early morning to late at night.  I was taking
25  care of customers.  My main objective to the business was

32

1  to do customer service and to take care of customers at
2  all given times, no matter what hour of the day, no matter
3  what hour of the night.  If I was called in the middle of
4  the night, I would go and actually replace a sprinkler
5  that was broken in the middle of the night because
6  somebody had, you know -- I would take care of it.
7    Q.  I'm not getting that service.
8    A.  I know.
9    Q.  Where I'm at, I'll tell you that.
10    A.  That's -- that's the way I am.  I'm 100 percent
11  commitment to whatever I do.  And that was through my
12  customers.  I couldn't be involved in the paperwork.
13    Q.  So your testimony is you really were divorced
14  from the paperwork, the business end of the landscaping
15  business; is that correct?
16    A.  Right.  My wife took care of all the business
17  matters.
18    Q.  She did the billing, the cost --
19    A.  She did the billing, she did the -- the whole
20  nine yards.
21    Q.  What about the -- what about estimates?  Wouldn't
22  you be in the position to give the estimates, Mr. Brincku?
23    A.  Yeah, I guided her through those because I would
24  go out in the field and I would actually estimate how much
25  things would cost.  And what my bottom line is and what is

33

1  the least dollar I can do it for, without, you know -- but
2  she took care of it.
3    Q.  Where I live up north, landscaping business is
4  not a year-round business.  I assume that's different down
5  here, do I have that right?
6    A.  Yes, you are.  You're correct.
7    Q.  Okay.  I mean, people sometimes do snow removal
8  in the winter, but they are not planting bushes and
9  cutting grass.  Would it be fair to say it's a year-round
10  business here?
11    A.  Yeah, it is a year-round business; correct.
12    Q.  Now, you testified already that you stopped
13  pursuing your landscape business in February of '09; is
14  that correct?
15    A.  No, it went on about a couple years after that.
16    Q.  Okay.  Part time, less frequent?
17    A.  Well, there was just a lot of stuff that was just
18  dumped on top of me.
19    Q.  Okay.  Well, walk me through it.  Help me
20  understand what you're going through at the time.  You
21  were not able to do the business; is that what your
22  testimony is, or you had pressure on you that distracted
23  you from the business?  Explain -- walk me through it,
24  help me.
25    A.  There was just a lot of things going on.

9 (Pages 30 to 33)

34

1    Q.  All right.
2    A.  And if you want an explanation, just constant.
3  The first year was extreme -- I can't even explain it.
4    Q.  Did it not enable you to devote the time you
5  needed for your business; is that your testimony?
6    A.  Yeah, you're absolutely right.  Customer service
7  is my number one objective.  I -- I can't tell you --
8  customer service has been my lifelong commitment to my
9  customers.
10    Q.  Did you still continue to work with your dad's
11  company, the Naples Carpentry entity?
12    A.  My business was number one, and customer service
13  and just keeping on task, on focus, and if something drags
14  me away from that, I have to on task, on focus to other
15  things.  And it's just -- there was, you know, it hurt.
16    Q.  Well, tell the Court and the jury what it was
17  that took you away from your business.
18    A.  Well, all the drywall stuff took me away from my
19  business.
20    Q.  Okay.  So your testimony is the drywall issues in
21  your house at 11 -- 18891 River Estate in Alva, that was a
22  distraction for you that distracted you from pursuing your
23  business; is that correct?
24    A.  Yes, sir.
25    Q.  Okay.  And how long did that distraction last?

35

1    A.  It's still going on today.
2    Q.  Okay.  Are you working now outside the home?
3    A.  Yeah, I finally just had to accept where I'm at,
4  and I just said, well, I need to go to a place where
5  somebody can just pay me and I can survive.
6    Q.  Okay.  And where are you working now, sir?
7    A.  I work at Yoder Brothers.
8    Q.  And what is Yoder Brothers?
9    A.  It's a plant factory.
10    Q.  I'm sorry?
11    A.  A plant factory.
12    Q.  Oh, a plant factory.  Thank you.  For some reason
13  I thought at some point you were working at Lowe's.  Do I
14  have that wrong?
15    A.  You have that wrong.
16    Q.  Okay.
17    A.  I -- I worked as a kid, you know, for many years
18  I worked at Home Depot.
19    Q.  Oh, okay.  How long have you been working at
20  Yoder Brothers?
21    A.  One year.
22    Q.  If I were to ask you what your income level was
23  prior to working at Yoder Brothers when you were still
24  engaged at least at some part in the landscaping business,
25  do you know what that would be?

36

1    A.  Probably about half.
2    Q.  Half of?
3    A.  Half of what I, you know -- it's quite a
4  substantial pay cut.
5    Q.  Okay.  At Yoder Brothers?
6    A.  Yes.
7    Q.  Okay.  And approximately how much were you
8  earning in your landscaping business, approximately?
9    A.  That's something my wife has all the records on.
10  Again, she showed me from time to time what we were
11  making, and I was like, oh, wow, you know.  And then other
12  times, I'm just like, I wasn't paying attention.  I had
13  too much going on elsewhere.
14    Q.  Well, you are responsible for your own federal
15  income tax returns; right?
16    A.  Yes, we paid somebody to do our federal income
17  taxes.
18    Q.  Right.  But you signed returns, you reviewed the
19  returns?
20    A.  Yes.
21    Q.  All right.  So do you have any sense at all what
22  your income was during the period, say, 2008/2007?
23    A.  I would sign this and that's it.  I was in the
24  office in and out.  I looked at the documents, I said,
25  that looks great.

37

1    Q.  You have no recollection now?
2    A.  Not now, not right now, no.
3    Q.  Okay.  Is it that you don't recall or that you
4  don't know, they're two different things?
5    A.  It's just my wife took care of all the paperwork.
6  I -- I just didn't have -- you know, I did very little
7  with -- I trusted her to do the financing.
8    Q.  Okay.
9    A.  Me and my wife have a partnership.
10    Q.  At some point it appears on your federal income
11  tax forms.  And to be frank with you, I have your income
12  tax forms, they were produced to us in litigation, and I
13  didn't bring them because they are confidential, and I
14  didn't want to be dragging those around in fairness to you
15  and your wife.  But my recollection is at some point you
16  guys had cashed in some IRAs.  Does that sound right to
17  you?
18    A.  Yeah, that -- that's absolutely correct.  We used
19  that for the house.
20    Q.  Okay.  All right.  So when you were constructing
21  the house, you accessed money that you had in an IRA or a
22  retirement fund?
23    A.  In business, yeah.  It was business.
24    Q.  Okay.  And let's go back to your decision to
25  build this house, the house in our litigation.  How long

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

38

1  before you started construction did you decide to build
2  the house?  Was it a year, was it two years, had you been
3  talking about it for a while?
4      A.  Pretty quick.
5      Q.  Pretty quick.  Okay.  Did you draw up plans or
6  hire an architect, or did you draw up plans yourself?
7      A.  We hired an architect, an engineer.
8      Q.  Okay.  Could you tell me who that was, sir?
9      A.  He's got a strange name.
10     Q.  So do I.
11     A.  I'll have to let you know, if I can remember it.
12     Q.  We'll leave a blank there, and Mr. Gary will tell
13  us.
14     A.  Just leave a blank and I'll get it for you.
15     Q.  Was it someone you knew and worked with before,
16  Mr. Brincku?
17     A.  No, he's just a -- I think he's the -- Harry
18  Teeter was, yeah --
19     Q.  So you think the name was Harry Teeter?
20     A.  Yeah.
21     Q.  And how did you come to know Mr. Teeter?
22     A.  We called him up in the phone book.
23     Q.  But given the fact that your family had been in
24  construction, and built -- your own experience building
25  houses, wasn't there anybody that you had turned to that

39

1  you knew personally?
2      A.  My dad always had a set of plans, and he gave
3  them to me.  And he said, here, George, I need you to
4  frame out this, I need you to look at this, I need you to
5  put the trusses together for this project.  So the plans
6  were always furnished to us.  We never had to go and say,
7  here, we're going to furnish your plans; they were always
8  the customers' plans and the customer gave us the plans.
9      Q.  Okay.  What about things like permitting --
10     A.  Right.
11     Q.  -- for the house that you built on River Estate
12  in Alva.  Did you yourself pursue the permitting?
13     A.  No, my sister had a permit express corporation.
14     Q.  So, Mr. Brincku, what role did you play in the
15  design and construction of the house?
16     A.  Well, Harry Teeter did the whole engineering and
17  he did the specs, everything.  I mean, he just was to
18  the -- there was things that he said, you need to do this
19  this way, and we did it.
20     Q.  So what about the various systems on the house?
21  The septic system, the electrical system, Mr. Teeter
22  provide prints for all that, or is that something that you
23  subcontracted out?
24     A.  All subcontracted.
25     Q.  Did you work as the subcontractor, Mr. Brincku?

40

1      A.  Owner/builder.
2      Q.  Owner/builder.  I didn't ask you this before when
3  we talked about your formal education.  Are you certified
4  in any way as a contractor or anything related to the
5  construction -- do you hold any official certifications in
6  the arena of construction?
7      A.  No, because I was always umbrellaed underneath my
8  dad, Naples Carpentry.
9      Q.  And what about your dad, is your dad a carpenter?
10     A.  Yeah, and he was certified and everything.
11     Q.  So you considered yourself for purposes of the
12  18891 River Estate property as the owner/builder?
13     A.  Right.
14     Q.  Okay.  Did you consider yourself the general
15  contractor of the property?
16     A.  Just a man with many hats.  You know, my sister
17  offered a lot of people to help us out.  She said, hey, I
18  have a subcontractor for you.
19     Q.  Did your sister run a construction business as
20  well, Mr. Brincku?
21     A.  Uh-huh.
22     Q.  What's your sister's name?
23     A.  Linda Phelps.  Used to be Linda Brincku.
24     Q.  And is that the name of her business?
25     A.  Yeah, Phelps Construction, which she no longer

41

1  has.  She lives in Georgia.
2      Q.  And where was Phelps Construction?
3      A.  Fort Myers.  Yeah, our whole family has been in
4  construction.
5      Q.  So to the that extent you needed permitting or
6  licensing, did your sister's company take care of that, or
7  did you do any of that yourself?
8      A.  No, we -- we did a lot of that leg work.  I
9  didn't want to bother her too much, so there was many
10  times when I would do things, you know, to help her out.
11     Q.  Okay.  And who would have done the paperwork for
12  those transactions?
13     A.  Myself.
14     Q.  You did that yourself?
15     A.  Yeah.
16     Q.  Okay.  So that was not something you entrusted to
17  your wife?
18     A.  No, I actually went down to the -- down here to
19  the business part of it, took care of it.
20     Q.  And tell me what you can recall in terms of
21  licensing or permits that you were required to get to
22  construct your house on River Estates.
23     A.  It's just regular building, you know, you have to
24  build to code.
25     Q.  Was there anything specifically related to the

11  (Pages 38 to 41)

42

1   water that you remember in terms of permitting?

2      A.  Yeah, everything has to be permitted, even your

3   well.

4      Q.  The well.  Okay.  And who got the well permit?

5      A.  The well permit comes in a package.

6      Q.  And did you fill that package out?

7      A.  It comes in a package from Lee County, and

8   they -- they do the rest.  All their inspectors sign off

9   on the package.

10     Q.  Okay.  But in terms of actually applying for it,

11  did you make the application?

12     A.  No, it comes in a package.  It's a big packet

13  they give you, it's your well permit, it's your septic

14  permit, it's this permit, it's everything.

15     Q.  Okay.

16     A.  Your culvert.  It's everything that has to be

17  permitted.

18     Q.  I'm just trying to figure out how --

19     A.  There's a perk test.  Yeah, there's a perk test

20  on the property to see out how much water actually seeps

21  into the ground if it's okay to build on it.

22     Q.  And to the extent that you needed things signed

23  off on that process, who was doing the signing off,

24  your subcontractor?

25     A.  No, the licensed Lee County inspectors.

43

1      Q.  Okay.  So you don't recall signing anything in

2   the context of getting a water permit in the house?

3      A.  (Witness shook head.)

4      Q.  You have to say --

5      A.  You have to have it signed.

6      Q.  You have to say the word.

7      A.  No, you have -- you have to have it signed by the

8   inspection team, whoever Lee County provides, they come

9   out with their little yellow license plate.  And then they

10  go on your property, and they look at the stuff that has

11  been completed and they give you a signature.

12     Q.  So who did the actual work that they were

13  evaluating when they gave you the permit?

14     A.  Subcontractors.

15     Q.  Okay.  So when it comes to the water in that

16  house, who was doing the work?  What subcontractors?

17     A.  There was -- and I don't recall all the

18  subcontractors.  My wife has, again, a lot of that

19  information.  I was the worker bee, I was the guy behind

20  slinging, you know, all the framing and stuff like that.

21  That's about basically where I went with it.  Everything

22  else subcontracted.

23     Q.  So your wife would know who those subcontractors

24  are?

25     A.  Yes.  Yes, sir.

44

1      Q.  All right.  And do you know the name of the

2   subcontractor who, for example, dug your well?

3      A.  No, I don't recollect, you know, who done the

4   well, but I think it was Rivers, I'm not sure.

5      Q.  Rivers?

6      A.  (Witness nodded head.)

7      Q.  Is that correct?

8      A.  Maybe.  I don't know.  You're going to have to

9   ask my wife on that.

10     Q.  Okay.  And do you know was there any testing done

11  by the Lee County folks when they signed off on the

12  permits for the water?

13     A.  Yeah, they've done testing, but I don't know,

14  again, the environment, there was an environmental thing

15  out there for stuff.  I don't know what they were doing,

16  but everything was tested.

17     Q.  Okay.  Is there a swamp area behind that house,

18  sir?

19     A.  No, there is not.

20     Q.  Okay.  Is there water behind that house?

21     A.  No, there is not.  There's maybe way in the

22  distance there's a little tributary, but that is before

23  the locks.

24     Q.  Now, where are the locks located?

25     A.  We're above the locks.

45

1      Q.  Above the locks.  Okay.

2      A.  Yeah.

3      Q.  And why are the locks there, do you know?

4      A.  Yeah, the Caloosahatchee lock, whatever it is,

5   it's right over there in Alva.

6      Q.  What's that word you just used?

7      A.  What's that?

8      Q.  Caloosahatchee?

9      A.  Yeah, Caloosahatchee, it's an Indian name.

10     Q.  And is that the name of the body of the water or

11  the creek?

12     A.  Yeah, there's Telegraph Creek, which is probably

13  about, I would say a mile behind our house, which is west

14  of us.

15     Q.  Yeah.  How did you select the lot that you chose

16  to build the house on?

17     A.  Accessibility in and out, quiet.

18     Q.  How large was the lot that you purchased, sir?

19     A.  It was an acre.

20     Q.  One acre?

21     A.  And a quarter or an acre and an eighth, a little

22  over an acre.

23     Q.  Do you recall what you paid for the property, the

24  land, undeveloped land?

25     A.  35,000.

12  (Pages 42 to 45)

46

1      Q.   And I assume you owned that piece of property
2   before you decided to put the house on it, or did you do
3   it simultaneously?
4      A.   Yeah, yeah, it was purchase the property and then
5   started building the house.
6      Q.   Okay.  But you purchased the property to build
7   the house on it?
8      A.   Right.
9      Q.   Okay.  Who did you purchase it from?  Was it
10   farmland before?
11      A.   No, it was just purchased from a guy who had a
12   for sale sign on it.
13      Q.   Okay.  I actually drove around that area because
14   I visited your house one time.  It seemed to me there were
15   other houses being built contemporaneously to your house
16   being built --
17      A.   Exactly.
18      Q.   -- is that fair?
19      A.   Yes.
20      Q.   Okay.  Were the same builders or contractors
21   involved in constructing those homes as the home you built
22   on River Estates?
23      A.   No, everybody had different contractors.
24      Q.   And were you involved in building any of those
25   other houses?

47

1      A.   No, sir, I was not.
2      Q.   How about your sister's business or your father's
3   business?
4      A.   No, sir, they were not.
5      Q.   So this was an independent operation that you
6   initiated to build the house on this property; is that
7   correct?
8      A.   Yes, it's just there it is and that's where I'm
9   building it.
10      Q.   How -- how long was the period from between when
11   you broke ground and when the house was completed?
12      A.   It was about, let's see, broke ground it was
13   about seven months.  We started in January and moved in
14   October.
15      Q.   And that would have been '04?
16      A.   Yeah.
17      Q.   Now, I have receipts from the drywall
18   subcontractor.  If I show those to you, could you identify
19   them?
20      A.   Uh-huh.
21      Q.   Or would that be your wife?
22      A.   No, I could look at those and tell you where they
23   came from.
24      Q.   All right.  Just give me a minute here.
25      MR. PAGLIARO:  I have two documents here I would

48

1   like to have marked.  The first is a document from
2   Banner Supply Company that bears a date somewhere,
3   here it is, April 16th, '04.
4      (Plaintiff's Exhibit No. 2, Document from Banner
5   Supply, was marked for identification.)
6      MR. PAGLIARO:  And the second is a document which
7   will be three, George Brincku Exhibit 3, by RJL
8   Drywall, Inc., dated 4/27/04.
9      (Plaintiff's Exhibit No. 3, Document from RJL
10   Drywall, was marked for identification.)
11   BY MR. PAGLIARO:
12      Q.   So, Mr. Brincku, these, I will represent to
13   you -- and I don't think Mr. Gary will contradict me.
14   These were documents that were actually produced by your
15   family in this litigation.  They have a Bates stamp number
16   on them that says Brincku 320 --
17      A.   Uh-huh.
18      Q.   -- and Brincku 319, way at the bottom.
19      A.   That's correct.
20      Q.   Yeah.  So Brincku 320, which is George Brincku
21   Exhibit No. 2 is a Banner Supply Company receipt.  As I
22   said, the date is April 16th, 2004.  Do you see that?
23      A.   Yes, sir.
24      Q.   And have you seen that document before?
25      A.   I only saw this document after I called RJL up,

49

1   and I asked them, I need to have your supplier.
2      Q.   Okay.  And so you made that phone call to RJL?
3      A.   Yes, sir.
4      Q.   And did -- and what did you request specifically?
5      A.   I said, I need to have your supply company who
6   supplied you with the drywall.
7      Q.   Okay.  And when did you do that, do you recall?
8      A.   Yeah, that was in '09.
9      Q.   Okay.  I see on the top there's a -- I guess, a
10   transmission by fax.
11      A.   February 4th of '09.
12      Q.   Yeah, I see that.  So your recollection would be
13   it would be contemporaneous with this fax date up at the
14   top, 2/5/09?
15      A.   Yeah, that's correct.
16      Q.   And so you called the supplier and asked --
17      A.   (Witness shook head.)
18      Q.   -- them -- you called the contractor?
19      A.   I called RJL and I said I need to have who
20   brought you the drywall.
21      Q.   Okay.  And what does this document tell you about
22   the drywall at 18891 River Estate, this exhibit here?
23      MR. GARY:  Objection.
24      THE WITNESS:  Which I'm looking at.
25   BY MR. PAGLIARO:

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

50

1    Q.  The Banner Supply document, what information do
2  you -- let me rephrase the question, Mr. Gary objected and
3  it was a sloppy question.  Let me rephrase it.
4          What information do you see reflected here
5  relating to the drywall that would be important to you?
6    A.  Well, the -- drywall itself, what we got up
7  in our upstairs, according to our pictures.
8    Q.  Okay.  And what information do you gather from
9  this document, Exhibit 2, about that drywall?  I don't
10  want to put words in your mouth.  You tell me what you see
11  here.
12    A.  Well, I see drywall, half inch.
13    Q.  Okay.
14    A.  And then I also see drywall half inch on the next
15  page.
16    Q.  Okay.  And what about the first columns where it
17  says 1/20, for example, on page one of Exhibit 2?
18    A.  That's as many sheets as went upstairs.
19    Q.  Okay.  How do you know that?
20    A.  That's what RJL told me.
21    Q.  Okay.  So Mr. -- who did you speak to at RJL?
22    A.  Who did I speak to?
23    Q.  Yes.
24    A.  The owner.
25    Q.  The owner?

51

1    A.  Yeah.
2    Q.  So the owner of RJL told you that that 120 sheets
3  of regular drywall, half inch came -- was used in the
4  upstairs of your house?
5    A.  Yeah, the whole -- he just told me this is what
6  was used.
7    Q.  What about the -- I'm sorry.  Please finish.
8    A.  No, he said, yeah, that's what was used.
9    Q.  What about the next statement of five DensShield,
10  what does that mean?
11    A.  Well, that's -- that's shower material.
12    Q.  Is that drywall as well?
13    A.  Uh-huh.
14    Q.  And is it specially treated for use in damp
15  environments or something?
16    A.  Yeah, it's made out of concrete -- it's like
17  concrete board.
18    Q.  Okay.  And who is -- can you tell from this
19  document who the manufacturer of the drywall was from page
20  one?
21    A.  It was National Gypsum as well.
22    Q.  How do you know that from this document?
23    A.  That's what's printed on the back of the you,
24  know, the -- not from this document, no, I can't tell from
25  this document.

52

1    Q.  So it's fair to say that from this document,
2  because I looked at it several times --
3    A.  Right.
4    Q.  -- there's no indication that the drywall was
5  manufactured by National Gypsum company; correct?
6    A.  No, all I have is reassurance from RJL --
7    Q.  One step at a time.
8    A.  Okay.
9    Q.  The question I posed to you, listen to the
10  question.
11    A.  Yes, I'm sorry.
12    Q.  There's nothing in Exhibit 2, and if there is
13  tell me, I see nothing here, but you tell me if you see
14  something tell me that identifies the 120 sheets on page
15  one and the 117 sheets on page two as regular drywall, one
16  half inch that was manufactured by National Gypsum
17  drywall?
18        MR. GARY:  Look at the exhibit --
19        THE WITNESS:  Uh-huh.
20        MR. GARY:  -- before you answer the question.
21        THE WITNESS:  Right.  Yeah, I see something
22  there.
23  BY MR. PAGLIARO:
24    Q.  What is it?
25    A.  It says Gold Bond.

53

1    Q.  Now, where do you read Gold Bond?
2    A.  On the second page.
3    Q.  Right.  And where do you read Gold Bond?
4    A.  It's the compound.
5    Q.  It's a joint compound; is that correct?
6    A.  Right.  Same as our drywall, Gold Bond.
7    Q.  Right.  But I'm asking you a direct question.
8  Where on this document does it say that drywall was
9  manufactured by National Gypsum company?  It's not on here
10  is it, Mr. Brincku?
11    A.  No, it's not on there.
12    Q.  Okay.
13    A.  But it's safe to say that Gold Bond was what
14  everything was.
15    Q.  I move to strike the last part of the answer as
16  nonresponsive.
17        It's not on there, is it, sir?
18    A.  No, it's not.
19    Q.  Okay.  Work with me here.
20    A.  Okay.
21    Q.  Now we're on Exhibit 3.
22    A.  All right.
23    Q.  Okay.  And Exhibit 3 is a document dated 4/27/04.
24    A.  Uh-huh.
25    Q.  And that says, "Proposal submitted to George and

14  (Pages 50 to 53)

54

1    Brenda Brincku," do you see that, sir?
2    A.  Right, uh-huh.
3    Q.  And that's RJL Drywall?
4    A.  Right, uh-huh.
5    Q.  And that was the company, the subcontractor that
6    you had retained to do the drywall in the house that you
7    were constructing; is that correct?
8    A.  That's correct.
9    Q.  And how did you select this drywall
10   subcontractor?
11   A.  It was a contractor that my sister, Linda Phelps
12   used a lot.  It was also a contractor that my dad used a
13   lot, subcontractor.  We would, you know -- he would build
14   homes for himself, as well as homes for myself.
15   Q.  Okay.  And is this someone that you knew
16   personally, Mr. Brincku, the owner?
17   A.  It's just somebody that my sister -- you know, I
18   met him, I liked him.
19   Q.  Okay.
20   A.  Real nice guy.
21   Q.  Did you get other bids when you selected this
22   subcontractor, do you know?
23   A.  No, we just went with this one.
24   Q.  Okay.  And the bid he gave you was $7,700, do you
25   see that?

55

1    A.  Uh-huh.
2    Q.  And did that include all drywall for the walls;
3    am I reading that correctly?
4    A.  Yes, uh-huh.
5    Q.  So when you drywall a wall, you need to purchase
6    a number of things, you buy the actual boards; correct?
7    A.  Right.
8    Q.  And you also then buy joint compound --
9    A.  Right.
10   Q.  -- which goes between the boards; correct?
11   A.  That's right.
12   Q.  And then there's tape that goes over the joint
13   compounds; is that correct?
14   A.  That's right.
15   Q.  So it's like a system, isn't it?
16   A.  Uh-huh.
17   Q.  And there are a number of people that make
18   wallboard and make tape and make joint compounds; is that
19   correct, a number of manufacturers?
20   A.  Yeah, there's a lot of people that make it.
21   Q.  Right.  National Gypsum makes it; right?
22   A.  Right.
23   Q.  U.S. Gypsum makes it; correct?
24   A.  Yeah.
25   Q.  Lafarge makes it, you mentioned that already?

56

1    A.  Georgia Pacific.
2    Q.  Georgia Pacific is another manufacturer; is that
3    correct?
4    A.  Right.
5    Q.  Is there anything on this document that
6    identifies the drywall that Mr. -- that RJL -- I don't
7    know who Mr. RJL is -- who RJL was -- strike that.  Sloppy
8    question.
9        Is there anything on this document that
10   identifies all drywall to be put into the house by RJL,
11   the subcontractor, as being National Gypsum drywall?
12   A.  No, I don't see anything on there.
13   Q.  Okay.  When you were --
14   A.  Except the Gold Bond.
15   Q.  Well, the Gold Bond -- we'll go back over this
16   again.  The Gold Bond is a trade name for National Gypsum,
17   but it does modify the term "pail compound two-gallon
18   bucket," doesn't it -- five gallon bucket, excuse me?
19   A.  Uh-huh, I even have the original bucket.
20   Q.  All right.  But it doesn't modify the word
21   drywall?
22   A.  No.
23   Q.  Fair enough.  So we're going to get to how you
24   identify National Gypsum, I'm just trying to deal with the
25   documents that we have in front of us right now.

57

1    A.  Sure.
2    Q.  When you were contracting with the subcontractor
3    to build the house, did you tell him or did Mrs. Brincku
4    tell him, if you know, that you wanted National Gypsum
5    drywall in the house?
6    A.  I said I want 100 percent American made drywall.
7    Q.  Fair enough.  So that would have included not
8    only National but could have included U.S. Gypsum drywall?
9    A.  Yeah.
10   Q.  Or Lafarge drywall?
11   A.  No.
12   Q.  No?  Why is that?
13   A.  I said 100 percent -- I only trusted National
14   Gypsum as my drywall.
15   Q.  Okay.  But --
16   A.  I built my last two homes with it, and never any
17   issues.
18   Q.  But there are other American drywall
19   manufacturers?
20   A.  Yes, there's Georgia Pacific, there's USG,
21   there's, you know, Temple Inland.
22   Q.  At the time you were contracting to build this
23   house in 2004, had any of the news hit the media about the
24   Chinese drywall issues?
25   A.  No.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

58

1    Q.  Okay.  So -- and you were in the construction
2  business; correct?
3    A.  Right, yeah.
4    Q.  And you had heard nothing up to that point about
5  Chinese drywall that you can recall?
6    A.  There wasn't even a whisper of it.  Nothing was
7  happening in 2004 that I can recall.
8    Q.  And the same thing with domestic drywall.  Had
9  there been anything published about problems of the kind
10 you claim to experience in your house relating to
11 domestic, American drywall, prior to 2004?
12   A.  Prior to 2004?
13   Q.  Yes, sir.
14   A.  No, nothing prior to 2004 --
15   Q.  Okay.
16   A.  -- that I was aware of.
17   Q.  All right.  So the house is being constructed
18 during that period of seven months in 2004, and you
19 testified that the house was completed in October; is that
20 correct?
21   A.  Yes.
22   Q.  Okay.  When the house was completed, you were
23 still living on Harrisburg Drive; right?
24   A.  Right.
25   Q.  And you moved your family over to the new house?

59

1    A.  Right.  We lived there 15 years.
2    Q.  Okay.  And did you sell your other house that you
3  left?
4    A.  Uh-huh.
5    Q.  You told me in the beginning at some point
6  applied for a mortgage for the new house, the house on
7  River Estates?
8    A.  After the fact, yeah.
9    Q.  After?
10   A.  After we got into building it and found out that
11 we needed money.
12   Q.  So you applied for and got a mortgage; correct?
13   A.  Yeah.
14   Q.  And that would have been sometime before,
15 presumably before October 2004?
16   A.  During -- yeah, during that year.
17   Q.  And who did you go to to get a mortgage?
18   A.  My wife has all that information.
19   Q.  Do you recall how much you needed to borrow to
20 complete the construction?
21   A.  We just gave a rock estimate on it.
22   Q.  So was it 100,000, 200,000, 50,000?
23   A.  I don't know any of that information.  She has
24 all the documents, paperwork, you know, I just kind of
25 like, okay, let's do it, let's finish this --

60

1    Q.  Sorry.  Was the house appraised before they
2  allowed the mortgage?
3    A.  Yes, it was.
4    Q.  Do you recall who did the appraisal?
5    A.  Again, my wife has got that information.
6    Q.  Did there come a point in time, Mr. Brincku, when
7  you needed to get a second mortgage on the River Estates
8  house?
9    A.  Yes.
10   Q.  Okay.  When was that, do you recall?
11   A.  Probably after a couple years after we moved in.
12   Q.  And do you know what the entity was that lent you
13 the money on the second mortgage?
14   A.  My wife has got that.  I don't know.
15   Q.  Do you recall how much you needed to borrow in
16 that second mortgage?
17   A.  Not the exact figure, no.
18   Q.  Was it 100,000?
19   A.  About 50,000, somewhere in there.
20   Q.  And why did you have to pursue a second mortgage,
21 sir?
22   A.  Buying trucks, you know, expanding on the
23 business.  You have to invest a little money.
24   Q.  So this was a business-related issue?
25   A.  Yeah.

61

1    Q.  So at that time your landscape business was still
2  operating?
3    A.  Yeah, it started skyrocketing, and then I
4  figured, well, it's time to get employees and start really
5  doing this thing up.  So I wanted to do that.
6    Q.  Did you actually hire some folks to help you out?
7    A.  No, I -- we weren't ready to launch that -- that
8  launching pad.
9    Q.  So you move your family into the house in October
10 2004.  Were all three of your children still living with
11 your wife and yourself at that time?
12   A.  Christy went to college.
13   Q.  So you moved two children over, Ashley and --
14   A.  Ashley and Harrison, yeah.
15   Q.  They moved in with you to the new house?
16   A.  Yes.
17   Q.  So you experienced problems with that new house;
18 correct?
19   A.  Yeah, very first year.
20   Q.  Okay.  So give me some sense of when you first
21 started experiencing issues relating to the house and then
22 we'll talk about what they were.  But about what time?
23   A.  Well, after we first moved in in the very first
24 year I looked up and my attic fan quit working in my
25 attic.

16  (Pages 58 to 61)

62

1   Q.  Okay.
2   A.  And it just takes air from a certain part of the
3   house and exhausts it out.  It's above my daughter's
4   bedroom.  It was an octagon attic fan.
5   Q.  And it was above your daughter's?
6   A.  Bedroom.
7   Q.  Bedroom.  Okay.  And so what did you do?
8   A.  Well, I went to go see what the heck the problem
9   was, and it was shot, it was broken.
10   Q.  Okay.  What did you observe?
11   A.  Going up there?
12   Q.  Uh-huh.
13   A.  I observed corrosion of wires.
14   Q.  Was your daughter's bedroom on the first floor or
15   the second floor of the house?
16   A.  It was on the second floor.  I called it the
17   house of the rising -- the room of the rising sun.  It was
18   like the sun would hit it first.
19   Q.  Okay.
20   A.  The first thing that the sun would hit, Ashley's
21   bedroom.
22   Q.  Okay.  How many bedrooms did the house have?
23   Remind me.
24   A.  It was all together it was four bedrooms.
25   Q.  Weren't some of the bedrooms on the first floor?

63

1   A.  Yeah, there was three on the first floor and one
2   on the -- no, one on the first floor, three on the second
3   floor.
4   Q.  And the first floor bedroom, was that the bedroom
5   that you and your wife used?
6   A.  No, we used the upstairs bedroom.
7   Q.  Okay.  So was that a guest bedroom or your son's
8   bedroom?
9   A.  It was my daughter's bedroom for college.  She
10   would come and stay with us from time to time, and she
11   needed a place, too, to stay, so we had her, you know,
12   stay downstairs.
13   Q.  How many bathrooms did the house have?
14   A.  There were three bathrooms.
15   Q.  Okay.  And did that include a master bathroom
16   that went along with your master bedroom?
17   A.  Right.
18   Q.  Okay.  Where -- you also had an area that you set
19   aside as an office area; is that correct?
20   A.  Right.
21   Q.  Was that on the first floor as well?
22   A.  It was on the second floor.
23   Q.  Second floor.  Was there a garage in the house?
24   A.  Yes, it was above the garage area, the office.
25   Q.  Was there ever a shed in the -- affiliated with

64

1   the house, outside the house, a shed?
2   A.  Well, there was a pole barn, which was away from
3   the house.
4   Q.  A what?
5   A.  A pole barn.
6   Q.  I'm not familiar with that term.
7   A.  It's something that they use out in Alva to store
8   hay, you know, anything like that.
9   Q.  Oh.  So was it there before you built the house?
10   A.  No, we built it.
11   Q.  Okay.
12   A.  I had somebody build it for me.
13   Q.  And what did you build it for, your equipment?
14   A.  Yeah, to house the equipment.  There was, you
15   know, shovels, rakes, blowers, all sorts of stuff.
16   Q.  Now, was that pole barn, as you call it, was that
17   taken down at some point?
18   A.  No, that was there.
19   Q.  Is it still there now?
20   A.  Yeah, it's brand-new.
21   Q.  Okay.  What's the current status of the house?
22   Is anyone living in the house?
23   A.  (Witness shook head.)
24   Q.  You have to articulate.
25   A.  I'm sorry.  No.

65

1   Q.  And has it been vacant?
2   A.  Yes, it's been vacant.
3   Q.  How long has it been vacant?
4   A.  Ever since we moved out in February of -- March
5   of '09.
6   Q.  So it's been vacant almost three years; is that
7   correct?
8   A.  Yes, that's correct.
9   Q.  Okay.  Does anyone use the house for any purpose?
10   A.  The house is used from time to time, but we just
11   use the outside facilities, we don't use the indoor
12   facilities.
13   Q.  So explain to me what you mean by the outside
14   facilities.
15   A.  Well, my daughter expressed that she would like
16   to get married.
17   Q.  Oh, okay.
18   A.  And I said, where would you like to get married?
19   She said, dad, I would like to get married at the house.
20   Q.  Got ya.  So this is your second daughter, Ashley?
21   A.  No, it's my first daughter.
22   Q.  So has she been married?
23   A.  Yeah.
24   Q.  Okay.  And was she married at the house?
25   A.  Uh-huh.

17  (Pages 62 to 65)

66

1    Q.  Did you have a canopy or something set up
2  outside?
3    A.  Yeah, we had a tent.
4    Q.  Got ya.  They call them a marquee.  Was your
5  daughter actually married under the marquee, or did she
6  just have a reception there?
7    A.  She was married outside.
8    Q.  Okay.  And how long ago was that, Mr. Brincku?
9    A.  So like a year ago.
10   Q.  Okay.  And is that the only activity that's gone
11 on at the house in the last three years besides issues
12 relating to litigation?  I understand the litigation may
13 have generated some activities.
14   A.  Just, you know, I have my dog there.  I have no
15 place to put her.
16   Q.  Okay.  Have you tried to sell the home?
17   A.  No, I can't.  I would never be able to sell
18 something like that.
19   Q.  Okay.  What's the current status of the mortgages
20 that are on the home?  Are they in default?
21   A.  Well, now they are because the home from the tax
22 appraiser is worth zero.  There's no point in going on
23 with it.
24   Q.  So has anyone tried to repossess the home, any
25 entity try to repossess the home?

67

1    A.  Many times.
2    Q.  And so what's the status, then?
3    A.  The status is it's in forbearance.
4    Q.  Are you still the owner of the property?
5    A.  Yes.
6    Q.  Okay.  So let's go back to 2004 when you move in.
7  You talk about the fan above your daughter's bedroom.  Do
8  you recall that testimony?
9    A.  Yeah.
10   Q.  And recollecting that it needed to be replaced;
11 is that correct?
12   A.  (Witness nodded head.)
13   Q.  Did you do that work yourself, sir?
14   A.  No, I just -- I was so worn out after building
15 that house and, you know, just with everything that was
16 with it, it was like, okay, it's broken, I'll just have to
17 live with it.
18   Q.  Okay.  So you didn't actually just jump up and
19 replace it right away?
20   A.  (Witness shook head.)
21   Q.  You have to answer.
22   A.  No.  It's still there to this day.
23   Q.  Okay.  And your testimony was that that was within a
24 year of your moving into the house?
25   A.  Yes.

68

1    Q.  What was the next thing you observed in the house
2  that caused you to believe there was a problem?
3    A.  Well, just a lot of strange things going on,
4  light switches and GFIs, constant replacement.  My wife
5  would go, George, the GFI is broken.
6    Q.  What's a GFI, I'm sorry?
7    A.  It's just a -- -- they stick it in certain places
8  where if you have too much power it will just pop, you
9  know, kitchens.
10   Q.  So it's like a circuit breaker or a fuse or
11 something?
12   A.  Yeah, it's a protector -- it's a surge protector,
13 that's basically what it is.  That's what they call a GFI.
14   Q.  So what was your wife observing about the GFIs?
15   A.  Well, she would plug things in and they wouldn't
16 work, and I would hit the reset button and it wouldn't
17 work.
18   Q.  Okay.  Did you have an electrical contractor that
19 worked on the house?
20   A.  Yeah, we had an electrical contractor.
21   Q.  Do you know who that was?
22   A.  Somebody from Collier County.
23   Q.  Was it somebody that you knew before?
24   A.  Yeah.
25   Q.  You don't recall the name?

69

1    A.  No, he's just somebody I knew from my dad's
2  place.
3    Q.  I have some notes that were produced,
4  Mr. Brincku, which I'll show your wife tomorrow.  I think
5  these are in her handwriting, actually.
6    A.  He had a weird name, too.
7    Q.  A lot of that going around, huh?
8    A.  Jauwood (phonetic).
9    Q.  Jaw --
10   A.  Jauwood.  I think he's Indian or something.
11   Q.  But he's someone you were familiar with before --
12   A.  Oh, yeah.
13   Q.  -- he helped you with the house?
14   A.  Yeah, Jauwood.
15   Q.  So when you started having problems with the
16 electrical system in the house, did you call the
17 contractor that built the house?
18   A.  No.
19   Q.  I'm sorry, strike that.
20   A.  Okay.
21   Q.  Yeah.  When you started having problems with the
22 electrical systems in the house, did you call the
23 electrical subcontractor that helped you with those
24 systems when you built the house?
25   A.  No, it was just simple items that would go wrong.

18  (Pages 66 to 69)

70

1    Q.  Were you -- were you questioning whether or not
2  the electrical work had been done properly?
3    A.  No.  You know what, time to time you have a GFI
4  go out.  Time to time you have an electrical switch go
5  out.  I thought it was just bad stuff they made, you know,
6  I'm like, what the heck is wrong with everything nowadays.
7    Q.  Okay.  The material that was purchased for the
8  electrical system in the house, did you and your wife
9  purchase that separately, or was that purchased by the
10  sub, the same way the drywall was?
11    A.  We purchased everything separately, and then we
12  just gave it to the sub for that part of it.
13    Q.  Okay.  So the material in the electrical systems
14  was material --
15    A.  That came from Home Depot and Lowe's.
16    Q.  Because I see there's lots and lots of entries
17  here for Home Depot.
18    A.  Yeah, Home Depot.
19    Q.  Now, when you were building the house, were you,
20  George Brincku, actually going to Home Depot and buying
21  the stuff?
22    A.  Uh-huh.
23    Q.  You were?
24    A.  Yes.
25    Q.  So you were experienced enough from your prior

71

1  experience as a contractor and as an assistant with your
2  dad's business and in construction that you knew what to
3  buy and knew what systems needed to be -- need to be put
4  into the house; is that correct?
5    A.  Yeah, the contractor, subcontractor would give me
6  a laundry list and say, here, you go and purchase all
7  these items.
8    Q.  Okay.  I get it now.  So the electrical
9  subcontractor would give you a list of things that he or
10  she needed for that part of the work, and then you would
11  go out to Home Depot and buy that?
12    A.  Right, and that was to save him time because he
13  was coming from Collier County.  He didn't have time to go
14  and purchase the items.
15    Q.  Was that true of other systems besides the
16  electrical system?
17    A.  No, that was just that.
18    Q.  Okay.  I noticed that you had an aerator in the
19  house for your water.
20    A.  That's correct.
21    Q.  Can you tell me what you understand the purpose
22  of an aerator to be?
23    A.  Okay.  We had an aerator, but it was at the pole
24  barn, it wasn't at the house.  Okay.  The aerator operates
25  from the well.  The purpose of it is to take anything that

72

1  comes out of the ground and just blow it out of the
2  system, you know, anything that -- sulfur, you know like
3  that.
4    Q.  Okay.  And you said it was out at the pole barn?
5    A.  Yeah, it was behind the pole barn.
6    Q.  And the aerator that you had for the well was by
7  the pole barn, but the water went to the house; is that
8  correct?
9    A.  Yeah, the water was in a big tank that was pumped
10  from the pump in the tank.
11    Q.  Okay.
12    A.  That pumps the water through -- into a pressure
13  tank, which then goes into a water softener, which then
14  goes into the entire system of the house.
15    Q.  Okay.  And explain to me again what you
16  understand the purpose of an aerator to be, Mr. Brincku?
17    A.  It's to aerate the water to get, you know,
18  anything out of the ground, you know, just to aerate it
19  and get it back into the system.
20    Q.  Now, you mentioned sulfur.  Is there sulfur in
21  the water in that part of Florida?
22    A.  Yeah, there's slight sulfur.  We've had many
23  sulfur, you know, aerators on a lot of the houses that,
24  you know, we built.  But never -- nothing like what we
25  had.

73

1    Q.  Is it required to have an aerator to sell a
2  house?
3    A.  I don't know.
4    Q.  Is it standard practice to have an aerator in
5  that part of --
6    A.  All the neighbors have one.
7    Q.  Okay.  But is it standard practice when you're
8  constructing a house to construct it with an aerator in
9  that part of Florida?
10    A.  It's a good idea.  Why would you want raw water?
11  You never know, I mean, there could be something.  Who
12  knows.
13    Q.  Where does the water come from that's used in the
14  well?  Is there -- do you know the name of the water
15  table?
16    A.  No, I don't have any of that information.
17    Q.  Okay.  Who dug the well?
18    A.  That was done by our well company.  My wife has
19  got that information.
20    Q.  Okay.  Does the aerator have to be maintained?
21    A.  Yes, it does.
22    Q.  How do you maintain an aerator?
23    A.  Sometimes if things get out of hand you can put a
24  chlorine tablet in there, but other than that, there's
25  really no need for maintenance.

19  (Pages 70 to 73)

74

1    Q.  I'm going to show you something now we're going
2  to mark -- is it four?
3       COURT REPORTER:  Yes.
4       MR. PAGLIARO:  George Brincku Exhibit No. 4.
5       (Plaintiff's Exhibit No. 4, Lee County community
6  development affidavit for wells, was marked for
7  identification.)
8       VIDEOGRAPHER:  Going off the record.  The time
9  10:19 a.m.
10      (A break was taken.)
11      VIDEOGRAPHER:  Back on the record.  The time is
12  10:24 a.m.
13 BY MR. PAGLIARO:
14    Q.  So, Mr. Brincku, I think you were just handed
15 George Brincku Exhibit No. 4.
16    A.  Right.
17    Q.  And this is a Lee County community development
18 affidavit for wells.  Do you see that?
19    A.  Yeah, 10/1/2005.
20    Q.  Yeah.  Is this something that you ever saw
21 before?
22    A.  No.
23    Q.  Okay.  Do you recall there being a need for a
24 well affidavit when you were building your house?
25    A.  Not in 2004.

75

1    Q.  Okay.  So your testimony would be that
2  although -- that this says 2005, which I agree, but in
3  2004 you don't recall there being a requirement that there
4  be an affidavit?
5    A.  I -- I don't recall.  Again, I didn't do any of
6  the, you know, paperwork, as far as signing this.  I -- a
7  lot of times my wife, you'll see signatures of her
8  signature on things.
9    Q.  You'll agree with me there is a line here for the
10 signature of the owner/contractor --
11    A.  Right.
12    Q.  -- do you see that?  All right.  So you have
13 never seen this document before?
14    A.  Never seen it in my entire life.
15    Q.  Okay.  I'm going to show you another document
16 here.  It will be five.
17      (Plaintiff's Exhibit No. 5, Aerator/Degasifier,
18  was marked for identification.)
19 BY MR. PAGLIARO:
20    Q.  You have just been handed another exhibit, No. 5,
21 Mr. Brincku.
22    A.  Right.
23    Q.  It's an exhibit that shows an aerator/degasifier.
24 Do you recognize that particular degasifier?
25    A.  Yeah, it looks like the one I have at my house.

76

1    Q.  All right.  It's an Allied product.  And did you
2  have this product at your house as an aerator?
3    A.  Yes.
4    Q.  And, again, I'm trying to understand the
5  purchasing.  I get the electrical stuff that the
6  contractor basically gave you a list of things, you went
7  to Home Depot, bought what the contractor listed and then
8  gave it to the contractor; right --
9    A.  Right.
10   Q.  -- for electrical.  What about things like this
11 aerator, did you purchase this yourself, sir?
12   A.  Again, anything like this, the guy who is doing
13 the work, there was always a little laundry list, you
14 know, I need this, I need that on my job.  I'm like,
15 okay, if you think we need it, great, let's do it.
16   Q.  Okay.  So you think this is something you also
17 probably bought yourself at Home Depot or some other place
18 or ordered?
19   A.  Yeah, along with the water softener and
20 everything else, yeah.
21   Q.  Okay.  When you were acting as the owner/builder
22 for your house, approximately how much of your time per
23 day were you spending on these activities, you know,
24 related to the construction of the house?
25   A.  Well, it was from between my work schedule and

77

1  this, it was early morning to late at night.
2    Q.  Okay.  But were you spending two hours a day on
3  the house building or five hours a day?  I mean, do you
4  have any sense of how long?
5    A.  Oh, I was there well over eight, eight,
6  nine hours.  I would work until 12:00, midnight.
7    Q.  Right.  But during that period of time, you were
8  also doing things, I assume, related to your
9  income-producing business; right?
10   A.  Uh-huh, right.
11   Q.  So what I'm trying to get a sense of --
12   A.  16-hour days.
13   Q.  16-hour days.  Was it half the day spent on
14 building-related issues for your house, or was it a
15 quarter of a day?
16   A.  No, it was basically a whole day at the house, a
17 whole day at work.
18   Q.  Okay.
19   A.  I was an extreme driven person.
20   Q.  Okay.  So your testimony would be a full-time day
21 doing your landscaping business and a full-time day
22 doing --
23   A.  Right.
24   Q.  -- work --
25   A.  And the people that worked for me just had heart

20  (Pages 74 to 77)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

78

1    attacks because I told them what time they can be there
2    and what time they can't.
3        Q.  Okay.
4        A.  I had a lot of flexibility in the times that I
5    was able to do the things I needed to do, so if a
6    contractor showed up, I was there.
7        Q.  How far a distance was it, sir, from your house
8    on Harrisburg Drive to the house you were constructing?
9        A.  45 minutes, probably.  Well, maybe 30 minutes,
10   depending on traffic.
11       Q.  So it was like 20 miles, about 18 miles,
12   20 miles, something like that.
13       A.  Roughly, yeah.
14       Q.  So when you had to go purchase things at the Home
15   Depot, which Home Depot would you go to?
16       A.  The one on U.S. 41.
17       Q.  Okay.
18       A.  Which was in Fort Myers.
19       Q.  Okay.  So you would leave your house on
20   Harrisburg Drive --
21       A.  En route to Home Depot.
22       Q.  En route to Home Depot, and then drop the
23   material off at the house construction site?
24       A.  Right.
25       Q.  Let's go back to the process of uncovering the

79

1    issues with your house.  You testified about the air vent,
2    you testified about the electrical system having some
3    problems.  What was the next thing that happened that led
4    you to believe that you had a problem with the house?
5        A.  Well, after the switches and the GFIs and
6    different things like that going, motherboards started
7    going, DSLs.  We were constantly calling the phone company
8    to come and fix the DSL.
9        Q.  What's a DSL, I'm sorry?
10       A.  It was a -- line that came into the house and
11   provided you with a computer network.
12       Q.  Oh, okay.  I'm sorry.
13       A.  It's not like nowadays everything goes through
14   the air.  We're talking wire.
15       Q.  You were talking about the hard wiring --
16       A.  Yeah.
17       Q.  -- Internet access?
18       A.  Yeah, so we had constant issues with the DSL box,
19   which was located right in our office.  The guy kept
20   coming out and goes, I don't know why it's not working.
21       Q.  And how long were you living there when that
22   started to happen?
23       A.  That was after second, third year.
24       Q.  Okay.  So you had problems with the vent the
25   first year, problems with the electricity in the second

80

1    year, after the third year, this DSL issue?
2        A.  And AC coils.  19 months after we moved in, that
3    was like why in the world did all the tubing in my -- in
4    my coils start to pit and corrode and let Freon gas out
5    into my house.
6        Q.  Were those coils located on the condenser?
7        A.  No, it was -- it's two units, it's the heater --
8    it's a heater/AC unit.  It's inside the house.
9        Q.  So it's inside the house?
10       A.  Yeah, it's in the closet.
11       Q.  And was it on the first floor?
12       A.  Yeah, it was on -- no, the second floor.  Both
13   units were located on the second floor.
14       Q.  The house didn't have a basement; right?  That's
15   not typical here; right?  There's no basements?
16       A.  No, there's no basements.
17       Q.  So what does the house actually sit on?
18       A.  The house sits on a -- it's a big huge concrete
19   monolithic slab.
20       Q.  It's just a slab?
21       A.  Yeah.
22       Q.  So you dig --
23       A.  And also stem wall, and then it's filled up with
24   -- you know, because they built pillars into the ground.
25       Q.  Yes.

81

1        A.  To support the house because of the weight of the
2    home.  Like I said, it was engineered with Mr. Teeter, and
3    he just laid everything out, I need pillars, I need this,
4    I need that.  He told everybody what to do.
5        Q.  Is the ground pretty sandy there?
6        A.  No, it's pretty solid.
7        Q.  Is it?
8        A.  Yeah.
9        Q.  Okay.  But that's just a typical home
10   construction for that part of Florida, isn't it?
11       A.  Yeah, it's a two-story home, and just like any
12   other two-story structure in Florida.
13       Q.  So the construction is the slab with the pillars,
14   then the frame on top of it; right?
15       A.  Uh-huh.
16       Q.  And then it's clad; right?
17       A.  Yeah.
18       Q.  So back to the air conditioning unit in a closet
19   on the second floor of the new home; right?
20       A.  Right.
21       Q.  Okay.  What rooms are adjacent to that closet?
22       A.  Well, there's Ashley's bedroom, there's the
23   hallway going down to the downstairs.
24       Q.  Yes.
25       A.  That's the adjacent rooms to that.

21  (Pages 78 to 81)

82

1    Q.  Okay.  Does it adjoin a bathroom?
2    A.  From Ashley's, yeah, bedroom, then it goes in
3  towards the bathroom, then it goes into my son's bedroom,
4  then it goes into our bedroom.
5    Q.  And how did you notice the coil situation,
6  Mr. Brincku?  Were you in the closet, did someone point it
7  out to you, or did you find it yourself?
8    A.  Well, we called the AC people and they came out
9  and they told me I needed a new air conditioning coil.
10    Q.  Okay.  So the air conditioning was giving you
11  trouble?
12    A.  Yes.
13    Q.  Fair enough.  And, again, how long was that after
14  you moved in?
15    A.  That was 19 months.
16    Q.  Is it fair to say you run the air conditioning
17  pretty much almost all year down here?
18    A.  Various times.  It depends on how cold it gets.
19    Q.  Air conditioners get a lot of use down in this
20  part of Florida, right?
21    A.  Some do and some don't.  The ones at my house
22  really didn't get a good -- you know, they ran when they
23  needed to be run.
24    Q.  Okay.  Did the folks that came out to look at the
25  air conditioning unit when you had a problem, did they

83

1  show you the coils?
2    A.  Yes.
3    Q.  Okay.  Did you take photos of it?
4    A.  No, not at that time.
5    Q.  Okay.  And what did you do?
6    A.  I said, well, so we need to get it fixed.  I can't
7  live without AC.  So he fixed it.
8    Q.  All right.  And what happened after that?
9    A.  Then a couple months after that it started
10  happening all over again, but this time it happened with a
11  different unit.
12    Q.  Where was that unit located?
13    A.  It was the one for the downstairs, it sucked the
14  air from downstairs.
15    Q.  Same problem?
16    A.  Yeah, same -- same issue.  It was almost like a
17  mirror of the other one.
18    Q.  And what were you told?
19    A.  I was told, you're not going to believe this, but
20  this one's broken, too.
21    Q.  Okay.
22    A.  It can't be repaired.
23    Q.  Did you have any questions about that when you
24  talked to the air conditioning guy at the time?
25    A.  I was like, this is Trane air conditioning

84

1  systems, what seems to be the issue?  He just reassured me
2  that Trane is best in the business, don't worry, it's all
3  under control.  We'll -- you got good air conditioning
4  units.
5    Q.  Were -- were there any guarantees given the fact
6  you hadn't been in the house that long with the air
7  conditioning units, or warranties?
8    A.  Yeah, there was a warranty with it.
9    Q.  Okay.
10    A.  Yeah.
11    Q.  And so did you have to pay for the replacement,
12  or was it covered under the warranty?
13    A.  To a certain point, and then it was like, we
14  ain't paying for anything anymore.
15    Q.  Okay.
16    A.  They dropped us; just like that.
17    Q.  The company dropped you?
18    A.  No, the warranty people.
19    Q.  Oh, oh, oh.  What did you buy, one of those new
20  home warranties?
21    A.  No, it was the Trane warranty.
22    Q.  Okay.  Well, did it last for a certain period of
23  time, like so many years?
24    A.  Yeah, it was supposed to last for -- they gave a
25  warranty, I don't recall, but it was well over ten years.

85

1    Q.  And how did they drop you if you had a warranty
2  on it?
3    A.  Well, we had the guy from Texas who was the
4  president of Trane air conditioning fly in.  That's how
5  serious this was.  Because it was so serious that I told
6  him, if this isn't fixed I don't have time to keep coming
7  here and playing with the AC units.  It was quite comical
8  how many times we've had our air conditionings break down
9  in between of the coils.
10    Q.  And so they came out and inspected it for you at
11  a higher level?
12    A.  Oh, yeah, he came out, gave me his business card,
13  told me who he was.
14    Q.  And who did you understand him to be?
15    A.  The -- like the president of the company, you
16  know, corporation.
17    Q.  Okay.  And what -- what happened after that
18  meeting?
19    A.  He said he doesn't know why we have all this
20  black happening in our air condition coils.  He
21  couldn't -- he's never seen it before in all the years
22  that he's been doing it.
23    Q.  Did you get something official from the company
24  telling you you no longer had a warranty on the unit?
25    A.  Yeah, my wife has that information.

22  (Pages 82 to 85)

86

1    Q.  Okay.  So a problem with the electricity, and
2   then a problem with the air conditioning unit.  What was
3   the next thing you observed in the house?  Now we're out
4   almost two years, right, 19 months?
5    A.  Yeah, we're past two years, we're flying into
6   everything, appliances.  Really, really strange.  The
7   microwave just quit working.  Washing machines were just
8   like operating all different entities (sic).  I'm like
9   what in the world's going on here.  She would call me up
10  and say, George, this is not working.
11   Q.  Tell me --
12   A.  There was our refrigerator that gave us problems,
13  there was our oven, the element from our stove quit
14  working.  These are brand-new units.  It was a Polaris,
15  the best in the business, again.
16   Q.  Was it an electric oven or gas oven?
17   A.  It was an electric oven, it was a refrigerator,
18  you know, stove oven.  You can put your meals in cold and
19  they come back later and it's already cooked.
20   Q.  I need to get one of those.
21       So this is going into two years, you're
22  experiencing some of these problems with the appliances.
23  What -- what sorts of things did you then start
24  considering might be the cause?  Lead me through that
25  process, the things that you said.

87

1    A.  It's like you go through with this tunnel vision.
2   I don't know why things are happening, they're just
3   happening.
4    Q.  Okay.
5    A.  Again, strange things were happening.
6    Q.  When did you start making inquiries about what
7   might be the cause, is what I'm trying to get into?
8    A.  Well, my mother-in-law called us up, and that was
9   in December of '08.  And she said I think you guys -- I
10  know what your problem is over there, because you know, we
11  would talk to her about all the issues we were having
12  constantly.  And she couldn't believe it, either.  She's
13  like, this is a new home, why are you having those
14  problems?  So that was something that she alerted us to.
15   Q.  And what did your mother-in-law suggest might be
16  the cause?
17       MR. GARY:  Objection.
18       THE WITNESS:  She said it was -- oh, okay.
19  BY MR. PAGLIARO:
20   Q.  What -- I want to rephrase the question.  What
21  did your mother say to you about her belief about the
22  cause?
23   A.  She said something that she's read and we need to
24  look into it.
25   Q.  And what did she read?

88

1    A.  Just the newspaper article.
2    Q.  About what, though?
3    A.  About the drywall.
4    Q.  Okay.  And so did she send you the article that
5   she was referring to?
6    A.  No, she called Brenda.
7    Q.  Okay.  Had you yourself or Mrs. Brincku heard
8   anything in the media about drywall issues?
9    A.  (Witness shook head.)  Nothing, no, not prior to
10  that, no.
11   Q.  So it was your mother-in-law who first alerted
12  you guys to this issue in the media?
13   A.  Right.  I was totally taken off guard with it
14  because I looked at my wife, I said you're absolutely nuts
15  because we have 100 percent American-made products here,
16  American drywall.  What are you talking about?  And I got
17  mad at her.
18   Q.  Had you, Mr. Brincku, read at that time about
19  Chinese drywall issues?
20   A.  No, not at that particular time.  I was more
21  interested in trying to figure out what was wrong with my
22  house.
23   Q.  So what led you down the road to concluding that
24  it was the drywall, you, Mr. Brincku?
25   A.  Well, after looking at it for the next couple

89

1   weeks, going up in the attic, going through every stinking
2   piece of drywall that was up there, calling up my
3   subcontractor, asking him what -- what do we have, and he
4   reassured me that we have 100 percent American-made
5   products, I was like, well, I'm kind of confused.
6    Q.  By that time had you read about the Chinese
7   drywall issue?
8    A.  Early January, and then I saw some stuff online
9   that alerted me.
10   Q.  Early January what year, Mr. Brincku?  I'm sorry,
11  '09?
12   A.  '09, yes.
13   Q.  When you were going through the process of
14  investigating the drywall, you said you went up in the
15  attic?
16   A.  Uh-huh.
17   Q.  What did you observe up there, Mr. Brincku, at
18  that time?
19   A.  All the markings, American-made drywall.
20   Q.  Got ya.  Okay.  So you reassured yourself that
21  there was, in fact, American drywall in the house?
22   A.  Yeah.  And then I was also -- surprised by
23  something else in the attic.
24   Q.  What is that, sir?
25   A.  The backing of the insulation was melting all

23  (Pages 86 to 89)

**90**

1  over the wires.
2     **Q.  What was causing that?**
3     A.  I don't know.  At that particular time I was
4  really -- when I came down from the attic I was kind of
5  scratching my head.  I had never seen that before in all
6  the years of construction.  I never seen that, never,
7  period.  I just never seen that.
8     **Q.  Okay.  Now, when did you, George Brincku, become**
9  **convinced that it was, in fact, the drywall that was**
10 **causing the problems in your house?  What -- what -- what**
11 **is it that got you to that point, Mr. Brincku?**
12    A.  Actually taking a flashlight and looking at all
13 the ground wires inside the walls.
14    **Q.  And what did you observe?**
15    A.  There was in all parts of the house, whether it
16 was the bonus room or family room or living room, it was
17 just all black.  I couldn't understand it.  I'm like --
18 it's just incredible to actually see it.
19    **Q.  Mr. Brincku, do you know -- do you believe**
20 **there's a difference between what I'll call oxidation and**
21 **corrosion of metal?**
22    MR. GARY:  Objection.  What he believes about
23 oxidation and --
24 BY MR. PAGLIARO:
25    **Q.  Let me rephrase the question.**

**91**

1     **Do you recognize a distinction between what I'll**
2  **call oxidation, the normal process of metal darkening, and**
3  **corrosion?**
4     MR. GARY:  Objection.
5  BY MR. PAGLIARO:
6     **Q.  You can answer the question.  I'll stick with**
7  **that one.**
8     MR. GARY:  You can answer.
9     THE WITNESS:  Okay.  I seen enough of it that I
10 can distinguish between the two.
11 BY MR. PAGLIARO:
12    **Q.  Okay.  So you acknowledge that there is a**
13 **distinction?**
14    A.  Yeah.
15    **Q.  Okay.  And you know, for example, that copper,**
16 **under normal circumstances when it's exposed to air,**
17 **oxidizes?**
18    A.  Turns brown.
19    **Q.  Turns colors; right?**
20    A.  Right, turns brown, green, patina.
21    **Q.  Iron the same thing, it oxidizes; right?**
22    A.  Uh-huh.
23    **Q.  Metals do oxidize?**
24    A.  Yes.
25    **Q.  Silver tarnishes?**

**92**

1     A.  Yes.
2     **Q.  What is the difference in your mind, I'm not**
3  **asking for an expert opinion, I acknowledge you're not an**
4  **expert, what is the difference in your mind between that**
5  **process of oxidation and the atmosphere and what you're**
6  **calling corrosion?**
7     MR. GARY:  Objection.
8  BY MR. PAGLIARO:
9     **Q.  What's the difference in your mind?**
10    A.  There is a difference.  It was my nickels and
11 brass, the corrosion just in that.
12    **Q.  But what did you see?**
13    A.  Black.
14    **Q.  Okay.**
15    A.  Which was -- okay, copper, brass, nickel, silver,
16 it was like all different metals.
17    **Q.  Okay.**
18    A.  It wasn't just copper.
19    **Q.  So you're distinguishing between the fact that**
20 **not just the materials you were used to seeing oxidize,**
21 **like copper or silver, but some other materials; is that**
22 **correct?**
23    A.  Right, nickel, brass.
24    **Q.  What about in the actual condition of the**
25 **material, did you see any distinction between black and**

**93**

1  corrosion, do you make a distinction?
2     A.  Yeah.
3     MR. GARY:  Objection.
4  BY MR. PAGLIARO:  .
5     **Q.  You can answer.**
6     MR. GARY:  You can answer.
7     THE WITNESS:  Okay.  It all resembled the same
8  thing, same unique design and the same characteristics
9  as the other pieces of metal in the home.
10 BY MR. PAGLIARO:
11    **Q.  So what did you see on that metal that led you to**
12 **conclude this is corrosion versus oxidation?**
13    A.  Well, when -- when some of the switches would
14 malfunction and arc in the walls, I knew we had a huge
15 problem.
16    **Q.  You're not answering my question directly.**
17    A.  Well, I'm sorry.
18    **Q.  That's a result.**
19    A.  That's the result.
20    **Q.  Tell me what you saw with your eyes.**
21    A.  Okay.  What I saw with my eyes --
22    **Q.  That led you to conclude, this is corrosion.**
23    MR. GARY:  Objection.  You're asking what he saw
24 with his eyes?
25    MR. PAGLIARO:  Uh-huh.  He can tell me what he

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

94

1    observed on the metal that led him to conclude, this
2    is corrosion.
3    BY MR. PAGLIARO:
4        Q.  What did you see?  Was it blackening?
5        A.  I saw blackening, I saw blackening on this, that,
6    and the other thing.
7        Q.  All right.
8        A.  I mean, it was just --
9        Q.  That was the limit of it?
10       A.  Yeah, it was enough for me.  I mean, I --
11       Q.  I'm just asking you.
12       A.  Yeah, after the first year, I started -- we were
13   pulling things out of our closet, and I had a copper solar
14   powered radio when I was a kid, and I pulled it out of the
15   closet and I said, oh, look at this.  And I try, and it
16   wouldn't wind.  So I was intrigued by that.  I'm like, for
17   crying out loud, what a piece of junk, and then it
18   occurred to me, I'm like, let me take it apart and look at
19   it.  You know, and then the coils were all crusted black.
20       Q.  Go back to the drywall.  You examined the drywall
21   in the house to reassure yourself that it was domestic
22   American-made drywall; is that correct?
23       A.  Yes.
24       Q.  Okay.  And that process was about two years into
25   your being in the house; is that correct?

95

1        A.  That's correct, yeah.
2        Q.  Okay.  When did you, George Brincku, conclude
3    that it was the drywall that was causing a problem, versus
4    some other cause?
5        A.  It was pretty quick.
6        Q.  Did you examine any other possible cause besides
7    the drywall, in your own mind?
8        MR. GARY:  Objection to "in your own mind."
9    BY MR. PAGLIARO:
10       Q.  Let me rephrase the question.  Did you consider
11   any other possible cause before you concluded that it was
12   the drywall?
13       A.  I -- I had to ask for help.  Literally I asked
14   for help.
15       Q.  And who did you turn to to request help?
16       A.  MIT.
17       Q.  MIT.  Okay.  And by MIT you mean the
18   Massachusetts Institute of Technology?
19       A.  Uh-huh.
20       Q.  Okay.  And what led you to turn to MIT to request
21   assistance, Mr. Brincku?
22       A.  Search on the Internet.
23       Q.  And was there something on the Internet relating
24   to drywall?
25       A.  No, I was -- I was looking for an expert.

96

1        Q.  Okay.  And when you were looking for an expert,
2    you were looking for an expert in what area or field?
3        A.  Materials.
4        Q.  And so you stumbled on MIT from a search of the
5    Internet?
6        A.  Yes.
7        Q.  Did you learn the identity of a person that you
8    turned to, or it was just the institution?
9        A.  Just the institution.
10       Q.  Okay.  And how did you contact the institution?
11       A.  I called up the professor that made the video of
12   the thing, and he told me, I got somebody that I can refer
13   you to.
14       Q.  Was the video related to drywall that you saw?
15       A.  No, it was just chemistry.
16       Q.  I understand.
17       A.  And he was good.
18       Q.  You saw materials -- chemistry materials video on
19   the Internet that led you to say, hey, this lab looks like
20   they know what they're doing; is that fair?
21       A.  Yeah, he talked about chemicals and compounds.
22       Q.  Okay.  So you gave the lab a ring?
23       A.  Yeah, they have free classes online that you can
24   look at.
25       Q.  And what did they ask you to do in order to be

97

1    able to help you, Mr. Brincku?
2        A.  They didn't ask me to do anything.  I asked them.
3        Q.  Okay.  And what did you ask them?
4        A.  I gave them the number that I was referred to,
5    and I asked if you could do me a big favor and he said,
6    what is it?  And I said, well, I have a piece of drywall
7    here and I would like to send it to you.  Could you test
8    it?
9        Q.  And what did you ask him to test it for?
10       A.  I just said, could you just test it and tell me,
11   you know -- I didn't give him any information about what
12   the causes were, what was happening; I just said, I need
13   to be -- to have a real fair look at this.  I just need
14   you to look at it and from an objective -- you need to
15   just look at this --
16       Q.  Okay.
17       A.  -- and tell me what you think it is.
18       Q.  And you wanted him basically to analyze the
19   content of the drywall?
20       A.  He was basically going to look at it and let me
21   know if the drywall was any good or if it was bad.
22       Q.  Okay.  And how did he propose that they would
23   tell the difference?
24       A.  Well, he was going to look at it.  Again, nothing
25   mentioned about National Gypsum, nothing mentioned about

25  (Pages 94 to 97)

98

1  anybody.
2      Q.  Fair enough.
3      A.  That was private information for me and my wife I
4  didn't want to share.  I just asked him to do it for my
5  son, if he could do me a favor.
6      Q.  Okay.  And that was to look at the constituents,
7  the ingredients of the drywall?
8      A.  Yeah, because my immediate concern was for my
9  son's welfare.  He was a little boy, and, you know, it was
10  just his welfare and well-being.
11     Q.  Okay.  And you didn't -- when you spoke to the
12  person from MIT, did you explain to him what had gone on
13  in the house with the electrical system?
14     A.  Yeah, I did mention -- I said, I do have some
15  issues here.  I do have a problem with my AC units and I
16  do have a problem with my electrical systems and different
17  things, but I don't know, you know, you're just going to
18  have to look at it and tell me.
19     Q.  So what instructions did he give you, then, about
20  getting him the material?
21     A.  He said, I need you to take a piece, cut it, wrap
22  it in a plastic bag, date it, there was a form that you,
23  know, we signed and it was sent off.
24     Q.  Okay.  And how long did it take you to get a
25  response from MIT?

99

1      A.  It was a couple weeks after the process.
2      Q.  Did they call you first, Mr. Brincku?
3      A.  No, I -- I called them, and he told me they were
4  sending me information back.
5      Q.  Did you get it in writing?
6      A.  Yes, I did.
7      Q.  Okay.  And what did you understand that
8  information to tell you?
9      A.  It was all written out in a document, and then he
10  said you have defective drywall.
11     Q.  Okay.  So when you got the document, did you
12  recall the lab on the telephone?  Did you call them on the
13  phone?
14     A.  Yeah.  I said, you're kidding.  And he goes, no.
15  And then he said, well, what brand is this?  I said, well,
16  it's National Gypsum.
17     Q.  Okay.  And in what way did he say the drywall was
18  defective?
19         MR. GARY:  Objection.
20         MR. PAGLIARO:  You can answer.
21         MR. GARY:  In what way?
22  BY MR. PAGLIARO:
23     Q.  All right.  Explain to me what he told you that
24  led you to conclude that the drywall was defective.  What
25  did he tell you?

100

1      A.  Well, on top of all the -- all the x-rays and all
2  the microscopic images and all the other stuff, my second
3  encounter with him he said chlorides, said there was a
4  high amount of chlorides.
5      Q.  What did you understand chlorides to be?
6      A.  I thought it was Clorox.
7      Q.  Okay.
8      A.  Which it's not.
9      Q.  Do you recall the description in the
10  correspondence to you from MIT that talked about the
11  presence of cellulose in drywall?
12     A.  Yeah, there was another guy, Harold Larson.
13     Q.  And what did he tell you about cellulose?
14     A.  And professor --
15     Q.  Professor Early?
16     A.  Eagar.
17     Q.  Eagar?
18     A.  Yeah.  It's all written down on a document, and I
19  haven't had a chance to review it.  But what it said was
20  enough for me.
21     Q.  Okay.  What did you take out of the document that
22  you read?  What message did you get out of it as a
23  layperson?
24     A.  As a layperson I looked at it and I said, you
25  know what, this guy seems to be more intelligent -- it's

101

1  just -- I -- I just couldn't believe it, you know, it
2  was -- it was shocking.
3      Q.  But what did you get out of it that was shocking
4  you?
5      A.  It was just -- the drywall is defective.
6         MR. PAGLIARO:  Why don't we just take a break and
7  we can switch up.
8         VIDEOGRAPHER:  Going off the record.  The time is
9  10:56 a.m.
10        (A break was taken.)
11        VIDEOGRAPHER:  Back on the record.  The time is
12  11:13 a.m.
13  BY MR. PAGLIARO:
14     Q.  All right.  Mr. Brincku, I've just had the court
15  reporter hand you what we've marked together as George
16  Brincku Exhibit No. 6, 7, 8, and 9.  Let's go by them one
17  by one.  Do you have six in front of you?
18     A.  Let me see here, one, two, three, four.
19     Q.  You should have four in front of you?
20     A.  Yeah, I see them.
21        (Plaintiff's Exhibit No. 6, Letter from Professor
22  Eagar and Dr. Larson was marked for identification.)
23        (Plaintiff's Exhibit No. 7, Dr. Larson's return
24  packet, was marked for identification.)
25        (Plaintiff's Exhibit No. 8, Letter from Thomas

26  (Pages 98 to 101)

102

1    Eager at MIT, was marked for identification.)
2        (Plaintiff's Exhibit No. 9, Letter dated
3    November 2, 2009, was marked for identification.)
4    BY MR. PAGLIARO:
5        Q.  There should be a date order.  The first one I
6    have is a letter, what we marked as six is a letter dated
7    February the 12th, 2009, addressed to you, Mr. George
8    Brincku from --
9        A.  Right.
10       Q.  -- Professor Eagar and Dr. Larson.  Do you see
11   that?
12       A.  Yes.
13       Q.  And this is a letter that you received from MIT;
14   is that correct?
15       A.  Yes.
16       Q.  Okay.  And this was as a result of your inquiry
17   to them?
18       A.  Right.
19       Q.  And you're sending them the material from the
20   drywall in your house; correct?
21       A.  Right.
22       Q.  Okay.  And is this the first written
23   correspondence you got from them, Mr. Brincku?
24       A.  Yeah, this was my first written correspondence.
25       Q.  Okay.  Now, follow me, if you will, on page 2.

103

1    Doctor -- Professor Eagar and Dr. Larson --
2        A.  Right.
3        Q.  Say, quote, "It is my opinion that the mixture of
4    gypsum -- gypsum and cellulose from the drywall in your
5    home, combined with the normally humid atmosphere in
6    Florida, is releasing sulfur gases and causing corrosion
7    of copper and brass that was in your home."
8        Did I read that correctly?
9        A.  Yes.
10       Q.  Was that your understanding of what their
11   conclusion was at the time?
12       A.  It was his opinion.
13       Q.  What -- what did you conclude from reading this,
14   Mr. Brincku?
15       A.  I concluded that with his opinion it sort of all
16   made sense.
17       Q.  So you agree with it?
18       A.  To a certain point.
19       Q.  Were there any -- when you say to a certain
20   point, you believe there's some reservation.  Could you
21   identify any reservation that you had?
22       A.  No, I cannot.  It's just -- this was all new to
23   me.  This was probably new to him.  It was his ob --
24   opinion, and it was my observation.
25       Q.  Okay.  Had he done any physical inspection of

104

1    your house, or did he base his conclusions on what you
2    told him and the photographs that you sent?
3        A.  He got my packet in a box.
4        Q.  Okay.
5        A.  And I FedEx'd it to him.
6        Q.  What was in that packet is what I'm trying to get
7    at?
8        A.  It was the drywall.
9        Q.  Were there any photos of metal objects or
10   anything like that that you?
11       A.  (Witness shook head.)
12       Q.  No?
13       A.  There was -- at the second one there was copper,
14   and then there was some casing from the wires we sent him.
15       Q.  Okay.  So you did send him something besides the
16   sample of drywall?
17       A.  Right.
18       Q.  Yeah.  Tell me again what that was.
19       A.  There was a wire, a copper wire, there was some
20   casing from an electrical wire, and I -- I don't know if I
21   sent him this or not, but I think there was also
22   insulation involved.
23       Q.  Did he ask you for those specific things, or did
24   you on your own select it?
25       A.  No, this was something above and beyond after

105

1    this round of, you know, stuff and everything else kind of
2    went after that.
3        Q.  All right.  So after you received this letter of
4    February 12th, then you sent him a second packet; is that
5    correct?
6        A.  Yeah, there was another package involved.
7        Q.  Okay.  The next exhibit is Exhibit 7, George
8    Brincku Exhibit 7.  It's dated February 18th.
9        A.  Oh, okay.  Up here.  Yes.
10       Q.  Now, this is actually Dr. Larson returning things
11   to you; is that correct?
12       A.  Yes.
13       Q.  And it says, "At the request of Professor Eagar,
14   I'm returning the samples to you that you submitted for
15   our evaluation, and your sample bag number eight with the
16   penny, jewelry box corner, sample number five."  So these
17   were things you had sent to MIT?
18       A.  I sent to him, and then I requested it back.
19       Q.  So this is the correspondence that basically
20   accompanied the material coming back to you that you sent?
21       A.  Right.  These were -- and like I, you know,
22   explained, this was him returning my -- my stuff that I
23   gave him back.
24       Q.  But it's your testimony he didn't ask for this;
25   you on your own sent it; is that correct?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

106

1    A.  Yeah.  This stuff that I observed in the home,
2  and I said, could you test this as well.
3    Q.  Uh-huh.  Okay.  Did you send any photos with
4  that, Mr. Brincku?
5    A.  I don't recall about sending any photos.  I
6  really -- I can't remember.  All I know is we sent him
7  just the objects that were stated in here.  No, there was
8  no photos.
9    Q.  Okay.  The next George Brincku exhibit number is
10  eight, and it's a letter, again, to you from Thomas Eager
11  at MIT.  And this letter is dated June 5, 2009.  Do you
12  see that?  That would be --
13    A.  Yeah, this one over here.
14    Q.  -- eight; right?
15    A.  Yeah.
16    Q.  And this is a letter that you received from
17  Dr. Eagar; is that right?
18    A.  Yes, Dr. Eagar -- no, Professor Eagar.
19    Q.  Professor.
20    A.  Yeah, he's -- I don't know, he calls himself
21  professor here.
22    Q.  He's got an SCE, so he's probably a doctor?
23    A.  Right, he's probably a doctor, too.
24    Q.  What prompted this letter, if you know?
25    A.  Well, we had discussions, and I would talk to him

107

1  pretty lengthy.
2    Q.  So between February and June 5th you had other
3  conversations with Professor Eagar?
4    A.  Uh-huh.
5    Q.  And what were the topics of these conversations,
6  to the best of your recollection?
7    A.  Stuff that was -- things that were going on in
8  the home.  It was almost like a flood of memories came
9  back.
10    Q.  Okay.  And what was Professor Eagar telling you
11  that you were relying on, if anything?
12    A.  Well, it was just total confirmation of the
13  situation within my home, what I observed and what I had
14  felt -- not felt but what I had experienced.
15    Q.  At that time had there been more publicity about
16  the issues relating to what I'll call Chinese drywall?
17    A.  Yeah, it started coming out at around -- at that
18  time.  There were a lot of articles going on, and the
19  papers were starting to become flooded because it was just
20  like new information out there.
21    Q.  Would -- would you say that Professor Eagar was
22  aware of the Chinese drywall situation when you were
23  conversing with him?
24    MR. GARY:  Objection.
25  BY MR. PAGLIARO:

108

1    Q.  Did he say anything that led you to believe that
2  he was aware of the Chinese drywall situation?
3    A.  No, he did not.
4    Q.  Okay.
5    A.  He did not mention anything at that particular
6  time.  He only mentioned it in his letter that he sent to
7  me --
8    Q.  Okay.
9    A.  -- saying in comparison, and then that was,
10  again, I was like, all right, well, we're talking
11  American.  But whatever.
12    Q.  Was it your belief or did you have any
13  information that led you to conclude that Professor Eagar
14  had now begun to do a broader investigation of drywall
15  issues beyond the Brincku letter?
16    MR. GARY:  Objection.  It's two questions.
17    THE WITNESS:  He was only concerned with my
18  welfare because he said I'm doing this for you,
19  George, because of your son.
20  BY MR. PAGLIARO:
21    Q.  Were you paying him at all, Mr. Brincku?
22    A.  No, I didn't pay him one red dime.
23    Q.  You never gave him any money?
24    A.  (Witness shook head.)
25    Q.  All right.  Let me ask the question that Mr. Gary

109

1  objected to in a different way.  Were there any
2  conversations with Professor Eagar or Dr. Larson that led
3  you to believe that they were doing any testing of drywall
4  apart from the Brincku house?
5    A.  They were more intrigued about it than I was;
6  just a very interesting subject.
7    Q.  Okay.  But were they doing it in other houses?
8    A.  No, he never mentioned anything about any other
9  homes he was doing it in.
10    Q.  That's what I'm trying to get at.
11    A.  Yeah.
12    Q.  So you didn't come to the conclusion that he was
13  looking at your house in conjunction with looking at other
14  houses?
15    A.  No, that was only after the fact, later on after
16  about a year, then he started doing some more
17  investigation on his own.  I was not a part of any of
18  that.
19    Q.  Okay.  The next exhibit in this line is George
20  Brincku Exhibit No. 9, and this is actually later than the
21  last one.  This is dated November 2, 2009.
22    A.  Right.
23    Q.  And it's, again, from Professor Eagar to you.  Do
24  you see that?
25    A.  Exactly.

28  (Pages 106 to 109)

110

1    Q.  And you got this; right?
2    A.  Uh-huh.
3    Q.  And this actually includes some material, testing
4  material; is that right?
5    A.  Yes.
6    Q.  And this relates to the issue you mentioned
7  before about chlorides; is that correct?
8    A.  Right.
9    Q.  Okay.  Now, in this letter he refers to the fact
10  that his lab tested a sample of wallboard at the end of
11  the summer, I assume that's 2009, from a hardware home
12  center in Massachusetts.  Do you see that?
13   A.  Yeah.
14   Q.  Do you know who the manufacturer of that
15  wallboard was?
16   A.  No, he wouldn't tell me.
17   Q.  Okay.  Later on he says the nine samples included
18  wallboard -- he talked about -- excuse me, strike that.
19       He then goes on to say, "We tested another nine
20  samples" -- do you see that in the bottom paragraph --
21  "including wallboard from existing homes and wallboard
22  which had never been installed.  Some samples came from
23  Chinese wallboard manufacturers while some came with
24  labels from North American suppliers."
25   A.  Right.

111

1    Q.  Do you see that?
2    A.  Uh-huh.
3    Q.  Had you asked him to do that, Mr. Brincku?
4    A.  I did not ask him to do that.
5    Q.  Okay.  Do you know what prompted him to
6  independently purchase that wallboard?
7    A.  Yeah, it was a conversation we had about reclaim
8  water.
9    Q.  Was that before you received this letter in
10  November of 2009?
11   A.  No, that was my observation.  I was on the
12  Internet, and, again, I -- I saw there was a 2004 water
13  treatment plant.
14   Q.  Okay.  And when did you see that on the Internet?
15   A.  Well, "A Deal is a Deal."
16   Q.  I'm not sure I understand your answer.
17   A.  Well, that was the name of the article.
18   Q.  Oh, I'm sorry.  Okay.
19   A.  I'm sorry.
20   Q.  Okay.  All right.  I understand now.  And do you
21  know when you saw that?  I'm just trying to get a sense of
22  when that was in conjunction with these letters that --
23   A.  It explained everything in there to the point of
24  "A Deal is a Deal."
25   Q.  Okay.  And was that prior to your receiving this

112

1  letter in November 2nd, 2009?
2    A.  Uh-huh.
3    Q.  Exhibit 8 was?
4    A.  "A Deal is a Deal," yeah.
5    Q.  Okay.
6    A.  You can read it.  It's online.
7    Q.  And did you send that article to Professor Eagar
8  or Dr. Larson?
9    A.  I told him about it just like I'm telling you.
10   Q.  All right.  And what did you learn from that
11  article?
12   A.  I learned many things.
13   Q.  Okay.
14   A.  I learned how National Gypsum had to use
15  100 percent reclaimed water in order to make their
16  drywall.
17   Q.  All right.  Now, I do see attached to this
18  exhibit this watertechonline.com.  Do you see that plan to
19  use reclaimed water?
20   A.  Uh-huh -- wait, wait, I'm sorry.
21   Q.  It should be attached to that, Mr. Brincku?
22   A.  Okay.
23   Q.  Do you see that?
24   A.  The tables?
25   Q.  No, go further.

113

1    A.  Oh, go further.  Okay.  Water tech.
2    Q.  Do you see that?
3    A.  Yes, sir.
4    Q.  Is that one of the articles that you found?
5    A.  That may be one of the articles that I found.
6  I'm not, again, too familiar on this one, but I know the
7  article "A Deal is a Deal," and I do have that.
8    Q.  Why don't you -- I don't remember seeing
9  that in your material.  I'm not saying for sure I didn't
10  get it, but maybe if you had that, you could share with
11  Mr. Gary.
12       MR. GARY:  Apparently it's online if we don't
13  have it.
14       THE WITNESS:  Yeah.  You just go "A Deal is a
15  Deal," and it will come right up.
16  BY MR. PAGLIARO:
17   Q.  All right.  And your testimony would be that you
18  saw that article before this letter came to you --
19   A.  Oh, yes, yes, definitely.
20   Q.  And you discussed that with Professor Eagar?
21   A.  Yes.
22   Q.  Okay.
23   A.  It was even dated on the article that I have.  It
24  will probably show the date.
25   Q.  What did you conclude from that article?

29  (Pages 110 to 113)

114

1    A. Well, the conclusion was National Gypsum had to
2  use 100 percent reclaimed water.
3    Q. Okay. In which plant?
4    A. At the Palm Beach plant.
5    MR. GARY: Mr. Pagliaro we believe the article's
6  name is --
7    WOMAN: "A Bond is Broken."
8    THE WITNESS: "A Bond is Broken," right, and then
9  "A Deal is a Deal" is their subcaption.
10  BY MR. PAGLIARO:
11   Q. I'll find it. Was that something you found or
12  Ms. Brincku found?
13   A. Something that I found.
14   Q. So were you doing independent research on the
15  Internet during this time?
16   A. Yeah, and it was endless nights; just constant
17  searching.
18   Q. And what was driving you?
19   A. What was driving me was how can this happen? I
20  mean, this is not happening. I mean, this is just -- I
21  don't understand why something like this can happen.
22   Q. Did Professor Eagar or Dr. Larson indicate to you
23  in writing that they agreed somehow that the reclaimed
24  water issue was the cause of the problem with the drywall?
25  Did they say that?

115

1    A. Well, it was sort of after the fact, after we
2  came out with that. He kind of got, you know, one of
3  those bright moments and you, know, said, I think you're
4  on to something. We may look into the chlorides.
5    Q. And is that when you got this letter?
6    A. Yeah, he called me up one day kind of
7  flabbergasted and excited and just all sorts -- and I
8  said, Mr. -- Professor Eagar, please, slow down. Tell me
9  what you found out. He said, we did a chloride test. And
10  I said, really? I said, so what did you find out? He
11  said, well, you're not going to believe it. And I said,
12  no, what? And then that's when I got this form
13  (indicated).
14   Q. Okay. So did you believe that this substantiated
15  your theory that it was the chlorides that were the
16  problem with your wallboard?
17   MR. GARY: Objection.
18   THE WITNESS: I believe it was part of the
19  problem, yeah.
20  BY MR. PAGLIARO:
21   Q. Okay. When you say part of the problem, what
22  other -- what are the other parts of the problem?
23   A. I -- I don't have any more information on that.
24   Q. So did you ever receive anything else in writing
25  from Professor Eagar or Dr. Larson after this November

116

1  2009 George Brincku Exhibit No. 9?
2    A. Just phone calls. I would correspond with them.
3    Q. Okay. And what were the topics of the calls that
4  you had with them?
5    A. I will be there with you to support you.
6    Q. Is that what Professor Eagar said?
7    A. Yes.
8    Q. Did he follow up on that promise?
9    A. Yes.
10   Q. In what way?
11   A. In the fall.
12   Q. And what did he do to follow up on that?
13   A. Just said I will be there with you.
14   Q. But in what context? Was he physically with you?
15  Did he send something to support you?
16   A. He said if you need me there physically, I will
17  be there.
18   Q. And was he there for you?
19   A. Well, no, this is just in the event.
20   Q. Okay. All right. Now, when you came to the
21  decision, I assume about this time, that it was the
22  wallboard in your house that was causing the problems,
23  what did you decide to do as a result of that?
24   A. Well, it was to move out. I mean, it was just --
25  you know, how can I take all this -- well, part of this

117

1  information -- and continue to live here? After the fact
2  then there was more information, but how can I take my --
3  my first letter and say to myself, I'm going to still live
4  here? It just didn't seem like -- you know, not for my
5  son, I couldn't do it.
6    Q. Okay. So you made a decision to move out of the
7  house?
8    A. Yeah, the house didn't mean nothing to me after
9  that.
10   Q. And was that decision made after you got
11  Professor Early's (sic) letter?
12   A. Uh-huh. It was immediately. I mean, I just -- I
13  couldn't -- that house, I was like, it's not worth it.
14  The business, it's not worth it. Nothing is worth it.
15   Q. Did anyone, any scientist or medical person or
16  any person with an expert background, advise you that you
17  had to move out of the house?
18   A. No, it was all my self-inflictions that were
19  happening to me prior, that year. I couldn't breathe.
20   Q. Did your wife and you discuss it?
21   A. Yeah, I looked at her straight in the eye and I
22  said, Honey, we're on the trip of our lives. And she
23  said, what do you mean? I said we're moving out.
24   Q. So that was your decision?
25   A. Yeah, I made the ultimate decision, and she

30  (Pages 114 to 117)

118

1  looked at me and said, what? I said, Honey, I look at
2  this, and I'm a logical person, and all the stuff that's
3  happened to us and all the -- you know, in the years that
4  we've been there, this is not -- this is something that we
5  have to, you know, come together on, and she said, okay.
6      Q.  And so you moved out of the house?
7      A.  Yeah, we just dropped everything. It was almost
8  like evacuation for us.
9      Q.  So what -- that would have been about the winter
10 of 2009?
11     A.  Yeah, March.
12     Q.  March.  Okay.  And where did you move directly
13 after moving out of that house?
14     A.  My mother-in-law helped us out, she said, hey --
15 I said, no, I'm going to live in a tent, I'm going to live
16 in the back, and I was adamant about it. And she said
17 you're not living in a tent. I said, I'm going to live in
18 a tent. But she said, no, you're not going to live in a
19 tent. And she said, you're going to -- we'll set it up,
20 you can rent. I said, all right, fine, I'll rent.
21     Q.  And so you've been renting ever since?
22     A.  Yeah.
23     Q.  Aside from this correspondence with Professor
24 Eagar and Dr. Larson, did you receive anything else prior
25 to your instigating the lawsuit against National Gypsum

119

1  from another expert source?
2      A.  No, this was pretty much -- this was pretty much
3  the whole caboodle at that given time, then there were
4  other things that I proceeded as well. It was like --
5  okay, I got this and I got this packet, I got, you know,
6  all this stuff from him. But there were other things.
7      Q.  Well, tell me -- tell me what else that you got
8  in that time period, you know, the winter '09, spring '09,
9  that was driving your decision making?
10         MR. GARY:  Objection. Are you distinguishing
11 between what his lawyers received and what he
12 received?
13         MR. PAGLIARO:  No, I'm asking him what he
14 received.
15         MR. GARY:  All right.
16         THE WITNESS:  There was very little in between
17 that time between me hiring Bob Gary. You know, just
18 conversations that I've had with National Gypsum.
19 BY MR. PAGLIARO:
20     Q.  And when did you hire Mr. Gary?
21     A.  We hired him in -- around the same time. It was
22 a couple months, you know, after that.
23     Q.  Okay.  And in conjunction with the lawsuit, then,
24 you had other experts in the house, but that was all
25 related to the litigation; is that fair?

120

1      A.  Yes, sir.
2      Q.  And so when I -- I just want to make sure I'm
3  right about -- my conclusion is right that what I'm
4  hearing you say is prior to that instigation of the
5  lawsuit and prior to Mr. Gary sort of introducing the
6  litigation piece of it, the experts, the only expert
7  interaction you had was with Professor Early (sic) and
8  Dr. Larson; is that fair?
9      A.  That's a fair statement.  There may be some dates
10 or correspondence that may, you know, be in between.
11 There's a lot of stuff that happened that year, but that's
12 pretty much a fair, you know, statement.
13     Q.  So you didn't go out and hire other experts or
14 talk to other experts at the same time period prior to
15 Mr. Gary getting involved?
16     A.  No, it was just almost like after the Trane guy
17 came in and said he was going to, you know, that was the
18 end of that. It was almost like, you know, I felt like we
19 were being pushed off the cliff.
20     Q.  Did you consult with any government officials
21 prior to Mr. Gary coming on the scene during that period
22 of time between the Trane guy coming and between, you
23 know, the Early (sic) correspondence?
24     A.  Florida Department of Environmental Protection.
25     Q.  And what did you -- what did you ask them for?

121

1      A.  Would you live here?
2      Q.  And what was their response?
3      A.  Off the record?
4      Q.  You're on the record. I can't do that.
5      A.  Their response was, no, I would not live here.
6      Q.  Okay.  So who did you speak to at the Department
7  of Environmental Resources in Florida?
8      A.  Bob Colette.
9      Q.  Okay.
10     A.  Who's retired.
11     Q.  Did anyone from the department, state department
12 come out and look at your house?
13     A.  The what?
14     Q.  Did they come out and look at your house,
15 Mr. Colette or someone affiliated with him?
16     A.  Yeah, strangely enough the EPA came out.
17     Q.  Okay.  When did the EPA come out?
18     A.  Well, they just handed me a business card and
19 then walked in, looked at everything, walked right back
20 out. Which I thought was really peculiar.
21     Q.  And when was this, Mr. Brincku?
22     A.  You know, they came twice in between different
23 test -- and all of a sudden they would show up
24 miraculously, unannounced.
25     Q.  The U.S. EPA came to your house?

31  (Pages 118 to 121)

122

1    A.  Yeah.
2    Q.  Did you ever make a formal complaint to them?
3    A.  No, I just couldn't understand why they were at
4  my house.  It struck me so funny.
5    Q.  Was this before you hired Mr. Bob Gary?
6    A.  This is after we hired Bob Gary, this is when the
7  publicity started coming out and all of a sudden everybody
8  was, you know.  But I would have strange people walk
9  through my home and hand me business cards, and I would be
10 looking at them like who are you?  And they said, oh,
11 we're from the EPA, we're from them.  I'm like.
12   Q.  But the folks that represented they were from the
13 EPA, did they do any testing in your house?
14   A.  No, no, they just walked through and visually saw
15 things and then walked right back out.
16   Q.  Any conclusions from them?
17   A.  No, never heard a word from them.
18   Q.  What about from the Florida Department of
19 Environmental Health Or Environmental Services, did you
20 ever get any conclusions from them, Mr. Brincku, in
21 writing?
22   A.  There were some conclusions, but there was a lot
23 of conclusions that I don't even -- you know, we got
24 stackloads of papers and papers, and it's a lot of
25 information that I don't even, you know, know where to go,

123

1  unless you have something that you're going to provide, I
2  don't --
3    Q.  I'm just trying to figure out what you took from
4  that interaction in terms of --
5    A.  It was Bob Colette, he was such a gentlemen.
6  Walked in, bald head, went around, collected dust samples,
7  looked at them, looked at me, kind of sighed, went around,
8  collected some more dust samples, looked at the dust,
9  looked at me.  I said, what are you doing?  He said, well,
10 I'm just looking at all the dust.  I said, dust.  Yep,
11 dust.  And then he told me about the diaper factory.
12   Q.  Okay.  What about the diaper factory?
13   A.  Just the way things are -- how manufacturing
14 works.
15   Q.  And what does this have to do with wallboard?
16   A.  Well, he -- he understands about manufacturing
17 more than I do.
18   Q.  Well, you made a comment --
19   A.  I know, I know, I'm sorry.
20   Q.  I'm just trying to get a sense of what you found
21 amusing about the diaper factory?
22   A.  I thought it was amusing when he mentioned
23 diapers.  I was just like, where is this leading to?  But
24 okay.
25   Q.  When Mr. Colette, Colettee?

124

1    A.  Yeah.
2    Q.  When he came did to your house, had you
3  registered a formal complaint, like a signed complaint
4  with the Florida department?
5    A.  Yeah, it took them months to, you know, to
6  just -- not a formal complaint, but we just called them up
7  and said, hey, this is something you need to look at.
8    Q.  And what were their -- what was their formal
9  conclusion?
10   A.  That we had defective drywall.
11   Q.  Did they give that to you in writing,
12 Mr. Brincku?
13   A.  They gave it to us in pictures that were posted,
14 they gave it to us by conversations, and that was
15 basically it.  They just kind of -- you know, I'll never
16 forget it.  They were sitting there in the attic with
17 their flashlights, and they looked pale when they came
18 down.
19   Q.  So after this occurred and after you retained
20 Mr. Gary, then you were involved in a formal litigation
21 process; is that right?
22   A.  Yeah, because I -- I asked for the right thing to
23 be done so we could just move on from this and take care
24 of you, know, this -- what had happened.
25   Q.  Now, subsequent to this, Mr. Brincku, the

125

1  Consumer Product Safety Commission did an investigation of
2  wallboard in the U.S.; is that correct?
3    A.  Correct.
4    Q.  And how did you become aware of that?
5    A.  Well, we went to Washington.
6    Q.  And approximately when did you go to Washington?
7    A.  It was several years ago.  Me and my wife and
8  Harrison made a trip.
9    Q.  Was it after the lawsuit was filed?
10   A.  Yeah, it was after the lawsuit.
11   Q.  Did Mr. Gary go with you?
12   A.  No.
13   Q.  Okay.  What was the purpose of your trip?
14   A.  Just to go and find out what's being done, is
15 there any help.
16   Q.  Did you have any -- sorry.
17   A.  This is a disaster.
18   Q.  Did you have any meetings set up in Washington
19 that you were going to attend?
20   A.  Yeah, the Consumer Product Safety -- they were
21 so -- they were interested.  They actually were there with
22 us.
23   Q.  So you met with the -- we'll call it the CPSC --
24   A.  Yes.
25   Q.  -- folks.  Did you meet with anyone else when you

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

126

1   were in Washington, EPA or Congressmen?
2     A.  We met with senators.
3     Q.  U.S. senators?
4     A.  Uh-huh.
5     Q.  And how did you arrange for those meetings?
6     A.  You just go to the halls of Congress and you ask
7   for a request the day before and you go to their office
8   and you actually shake hands with the senator and you have
9   a conversation with them.
10    Q.  With the senator or with the staff or both?
11    A.  Sometimes with the senator, sometimes with the
12  staff.
13    Q.  How did you select the senators that you were
14  scheduled to meet?
15    A.  By appointment.
16    Q.  Okay.  Were they -- were they Florida senators,
17  were they your Florida senator?
18    A.  Yeah, they were all Florida constituent senators.
19    Q.  When you went to visit with the CPSC, what did
20  you understand the CPSC was doing about the drywall
21  issues?
22    A.  Well, they were spending millions of dollars in
23  order to do testing; that's what they told us.  And
24  they're running out of money.
25    Q.  Okay.  Did they question you about your home?

127

1     A.  Yes.
2     Q.  Was your home one of the houses they selected for
3   their investigation?
4     A.  No, it was -- it was almost like the first set
5   came out, and then as we persisted to needle them to, you
6   know, because we went up to Washington, they reluctantly
7   said, okay, we'll come out, you know, type thing.
8     Q.  And how many times did they visit your home?
9     A.  Once -- actually, twice.
10    Q.  Were you there when they were in your home,
11  Mr. Brincku?
12    A.  Yes.
13    Q.  And what did people from the CPSC do in your home
14  when you were there?
15    A.  One was an observer.
16    Q.  Okay.  Did they physically take samples?
17    A.  No, he just went to observe.
18    Q.  Okay.  At any time did the CPSC take samples from
19  your home?
20    A.  There was a second -- there was -- like test
21  coupons or something they put in there.
22    Q.  How about air sampling, was there air sampling
23  done by CPSC or --
24    A.  No, they just put little copper things and like
25  that.  And then they left and then came back and picked

128

1   them up.
2     Q.  There are reports in here or conclusions about
3   air sampling done in the houses.  Were you there when the
4   air sampling was done?
5     A.  Well, there was three people there, you know, me
6   and my wife, they were upstairs, you know, just all over
7   the place.
8     Q.  So you weren't necessarily watching them --
9     A.  No.
10    Q.  -- every minute they were there?
11    A.  No.
12    Q.  Fair enough.  And how long were they there that
13  second visit?
14    A.  Just a short time period.  They just walked in,
15  got their stuff, walked out.
16    Q.  Half a day, two hours?
17    A.  About 20, 30 minutes at most.  They just kind of
18  said, we're just wrapping up the equipment, we're going to
19  leave you alone.  I said, great, because I'm busy, and
20  that was the end of that.
21    Q.  At that time the house was empty; is that right?
22    A.  Yeah, the house was always empty, yeah.
23    Q.  When the CPSC took their samples, did you learn
24  later that they had reached some conclusions about your
25  house?

129

1     A.  They had a set of conclusions, we immediately
2   called up and said, did you do air chamber tests on our
3   home?  And they said, no, we did not.
4     Q.  And what did you understand their conclusions to
5   be at that time?
6         MR. GARY:  Objection.
7         THE WITNESS:  As far as the conclusions, I just
8   look at them with a grain of salt.
9   BY MR. PAGLIARO:
10    Q.  Okay.  But what were the conclusions from the
11  CPSC?
12        MR. GARY:  Objection.
13        THE WITNESS:  Well, the conclusions were that we
14  have a problem, they just don't have the money to
15  emulate -- to finish the project.
16  BY MR. PAGLIARO:
17    Q.  Was it your understanding that they
18  concluded that the wallboard in your house was the cause
19  of problems in your house?
20    A.  They did not mention that to us, no.
21    Q.  Okay.  Did they mention that in writing?
22    A.  No.
23    Q.  Do you disagree with the CPSC?
24    A.  No.  Whatever they did is fine with me, it's just
25  that's not -- you know, again, they didn't -- I asked for

33  (Pages 126 to 129)

130

1    an air chamber test.
2        Q.  Did you go and visit with them before their final
3    conclusions came out again?
4        A.  No, no.  We just -- they -- they had meetings all
5    over the state of Florida, I mean, they were just all over
6    the place.  And then we would run into the various
7    entities and, hey, I know you, I know you, you know, type
8    of thing.
9        Q.  Were you making rounds of various entities at the
10   same time?
11       A.  We were invited to different places.
12       Q.  Now, why were you invited, do you think, or do
13   you know?
14       A.  Just a huge interest in what was, you know,
15   because of the stuff online.
16       Q.  Had you identified yourselves as people who had
17   an issue with the American drywall?
18           MR. GARY:  Objection.  You?
19           MR. PAGLIARO:  The Brincku family.
20           THE WITNESS:  It happened to us, it's happened to
21   other people.  Not necessarily all National Gypsum,
22   but it's happened.
23   BY MR. PAGLIARO:
24       Q.  It is fair to say, though, that you and your wife
25   used social media to get your name out there and your

131

1    problem out there; is that fair?
2        A.  Yeah, I explained it like this.  It's like a
3    glass jar.  I'm inside the jar and you put the cap over
4    the jar, and I'm screaming at the top of my lungs but
5    nobody can hear me until you open up the lid and then I'm
6    able to get my message out.
7        Q.  Okay.  And what was the process of opening the
8    lid in your mind?
9        A.  Well, the process was, you know, I -- it just
10   needed to be heard.  I mean, this is a disaster.  We need
11   help.  I -- I've been evacuated out of my home, nobody has
12   even given me a bottle of water to relocate.  I had
13   expenses; just a huge amount of -- where am I going to put
14   my equipment, how am I going to run my business?  How am I
15   going to serve my customers?  And, again, you know, I'm
16   customer service every -- that was on my mind, my
17   customers, oh, my gosh, you know.
18       Q.  What prompted you and your family to institute a
19   Facebook page relating to American drywall?
20       A.  That was my wife's attention.  That was her
21   outlet.
22       Q.  Did you agree with that?
23       A.  I support my wife in everything she does.
24       Q.  You also posted material on YouTube; isn't that
25   correct?

132

1        A.  My wife -- I support her in everything she does.
2        Q.  I'm asking you --
3        A.  For me, no, I'm not one to do this.
4        Q.  Were you aware that there was a film --
5        A.  Yes, yes, those I'm aware of.  And those are --
6    those are me, yes.
7        Q.  And you appear in that film; right?
8        A.  Yeah, I was my own person on the film, yeah.
9        Q.  And your son appears in that film?
10       A.  Yeah, my son.
11       Q.  Okay.
12       A.  And I -- I was -- I had heels dug into the sand.
13   I didn't want -- at first didn't want to do it because I'm
14   like, why do I want myself exposed to this type of
15   publicity, I don't need it.  But at the same time I felt
16   like I'm doing this not just for me, but I'm doing it for
17   maybe others that may have the same problems.
18       Q.  So what was it that convinced you to do it if you
19   were digging in your heels?
20       A.  The overwhelming response from people around the
21   United States having the same issues.
22       Q.  So you were motivated by other people that
23   identify with your problem?
24       A.  Yeah.
25       Q.  Who did you expect should have done something for

133

1    you, Mr. Brincku?
2        A.  Insurance company.
3        Q.  Did you make an insurance claim?
4        A.  Yes.
5        Q.  You did, didn't you?
6        A.  Yes, I did.
7        Q.  Did your insurance company refuse to validate
8    your claim?
9        A.  At first, yeah.
10       Q.  And what happened -- you say at first.  What
11   happened afterwards?
12       A.  Well, they just totally denied like anything was
13   ever wrong.  Then I called them back up and I said, well,
14   you, me, and everybody has a huge problem.  And they said,
15   what's that?  And I said, well, Zurich, builder's
16   insurance, I said, are you going to take me seriously or
17   are you going to take me as like I'm a joke.  And they
18   said we're going to take you very seriously, and I said,
19   well, I'm glad to do that.  Then I need you to send
20   somebody out, I need you to look at my drywall.
21       Q.  Yeah, and did somebody come out and look,
22   Mr. Brincku?
23       A.  Yes, they did.
24       Q.  And what was the conclusion of Zurich and the
25   other insurance carriers?

34  (Pages 130 to 133)

134

1      A.  They told me I had carbon disulfide (phonetic)
2  coming out of my wallboard.
3      Q.  Did they refuse to pay any claim?
4      A.  They said that it was a pollution exclusion.
5      Q.  So they denied your claim?
6      A.  Yeah, reluctantly I was like, this is crazy.
7      Q.  Okay.  Did you take it any further after they
8  denied your claim?
9      A.  Yeah, I called up Allstate.  I was like, okay, my
10  builder's insurance, now you guys need to get involved.
11      Q.  And what did Allstate say?
12      A.  They came out and observed everything, they said,
13  don't turn the electric on.
14      Q.  And did they deny your claim?
15      A.  Yeah.
16      Q.  Okay.  Did you sue your insurance companies?
17      A.  That was up to my lawyers to take care of that.
18      Q.  Did you explore with your lawyers -- I'm not
19  asking what your lawyer told you, his advice, but did you
20  explore the issue of whether or not to sue your insurance
21  company?
22      MR. GARY:  Objection.  You can answer.
23      THE WITNESS:  Yeah, it was explored.  It could be
24  a possibility that we may have to go after the
25  insurance company.

135

1  BY MR. PAGLIARO:
2      Q.  Okay.  What do you believe the value of your
3  house should have been, Mr. Brincku?
4      A.  The value of the house?
5      Q.  Yeah?
6      MR. GARY:  Objection.  You mean after there had
7  not been --
8      THE WITNESS:  Drywall?
9  BY MR. PAGLIARO:
10      Q.  I would say had you not made this claim and
11  raised these issues, what do you assume the house would
12  have been valued?
13      MR. GARY:  Objection again.  Is the question
14  presuming the drywall -- or is the question presuming,
15  I mean, as you framed it, talking about raising the
16  issue.
17      MR. PAGLIARO:  All right.  Well, let me be as
18  precise as I can.
19  BY MR. PAGLIARO:
20      Q.  When you moved into the house --
21      A.  Right.
22      Q.  -- before any of the problems evolved; right?
23      A.  Yes.
24      Q.  What did you believe the value of the house to be
25  when you moved in?

136

1      A.  Well, in the area that it was in the homes were
2  well over half a million dollars just in the area that
3  they were in.  Some even in the million-dollar range.
4  We were lucky to find a piece of property that exhibited
5  the qualities that we were looking for for the price that
6  we bought it for.  It was prior to the housing boom.
7      Q.  So to answer my question, what did you believe
8  the value estimated the day you moved in in 2004?
9      A.  I believe the house was worth probably around,
10  you know, over 500,000 with the going market was.
11      Q.  Was there an appraisal of the house --
12      A.  Yes, there was.
13      Q.  -- that you were aware of?  And what was the
14  appraisal value?
15      A.  I don't remember.
16      Q.  When you got your mortgage on the house
17  initially, was it appraised?
18      A.  Yes.
19      Q.  Okay.  But you don't recall what that was?
20      A.  And I don't -- all that stuff was just paperwork,
21  and, again, my wife did the paperwork.
22      Q.  Pretty important paperwork when they're giving
23  you money for it, isn't it?
24      A.  It's crazy.  My wife, she's -- writes everything
25  down, she says you need to read this.

137

1      Q.  We'll have a chance to talk with her tomorrow
2  about that.
3      A.  Yeah.  Sorry, Brenda.
4      Q.  Is your testimony, Mr. Brincku, that you would
5  never live in that house?
6      A.  After all the things that I experienced, and
7  after all the hardships and the heartaches and the
8  emotional scars, yeah, there would be a -- a huge
9  consensus that I would just never go back.
10      Q.  You don't want to go back?
11      A.  No, it's just too much.
12      Q.  And by too much you mean the process you've gone
13  through that you believe has been emotionally damaging to
14  you?
15      A.  Nobody understands it.  They don't.
16      Q.  And what is it you believe people don't
17  understand, Mr. Brincku?
18      A.  They don't go understand what you go through.
19  They look the other way.  They don't even know when you
20  say National Gypsum, they think it's Chinese drywall.
21      Q.  When you went to visit with the people at the
22  State of Florida, how did you select which agency in the
23  state that you were going to focus on?
24      A.  It was just what things were available at the
25  time.

35 (Pages 134 to 137)

138

1    Q.  Did you also explore getting relief during the
2  foreclosure process from a state or government agency?
3    A.  Yeah, we turned to all the entities, there's
4  nothing, zero.  We exhausted every single thing.  Worked
5  with senators, congressmen, Dave Aronberg came to our
6  house, you name it, they were all there.  All made
7  speeches, all made promises, shook hands, took
8  photographs; nothing.
9    MR. PAGLIARO:  Bob, let's take a break for a
10  minute.
11    VIDEOGRAPHER:  Going off the record.  The time is
12  11:55 a.m.
13    (A break was taken.)
14    VIDEOGRAPHER:  Back on the record.  The time is
15  12:01 p.m.
16  BY MR. PAGLIARO:
17    Q.  So, Mr. Brincku, I just want to make sure I've
18  got all the bases covered here before we finish up.  We
19  talked about the process of identifying the manufacturer
20  of the drywall.  What did you do to identify the
21  manufacturer of the drywall in your house?
22    A.  Well, I told National Gypsum about it, they came
23  out for seven days, and they brought their engineers,
24  Packer Engineering, and they searched through every single
25  piece of drywall in that house.

139

1    Q.  Okay.
2    A.  They cut places where I wouldn't even think of
3  cutting, but they -- we're cutting here.  I'm like, okay,
4  great.
5    Q.  So did you do anything other than what was done
6  by the National Gypsum people, yourself, George Brincku,
7  to identify the manufacturer of the drywall?
8    A.  Yeah.  It was basically just different test
9  companies, you know, different test people, ones that come
10  in and look at for their own selves.
11    Q.  And not all the drywall in that house is National
12  Gypsum drywall, is it?
13    A.  No, there's -- all of it upstairs is National
14  Gypsum, a small part of it is USG, and that's downstairs.
15    Q.  And wasn't there some material that no one could
16  identify, some drywall?
17    A.  That -- that it is wrong, that is a board we
18  talked about that was on Banner Supplies.  That wasn't
19  drywall, that was DensShield.
20    Q.  So your testimony is that there was no drywall in
21  the house that couldn't be identified positively?
22    A.  No, everything was positively identified.  There
23  was a space in the closet that they said up in the corner
24  they couldn't identify it, but I actually went up there
25  and I ripped down the edge, and I saw that it was National

140

1  Gypsum.
2    Q.  Before you came to the definitive conclusion
3  yourself, George Brincku, that the drywall was what was
4  causing the problems in that house, what other things did
5  you consider in your own mind could have been the problem?
6    A.  I -- I stretched my mind to the ultimate
7  imagination possible.  I -- I looked at my flooring, I
8  looked at this, I looked at that, I looked at anything and
9  everything.  I looked at all the systems, nothing fit.
10    Q.  What did you eliminate as a possible cause that
11  you thought might have been?
12    MR. GARY:  Objection.  To the word eliminate.
13  You can answer.
14    THE WITNESS:  Well, I immediate -- the first
15  thing I did was the water.
16  BY MR. PAGLIARO:
17    Q.  And what did you do about the water?
18    A.  It doesn't corrode.
19    Q.  I'm sorry?
20    A.  It has no corrosion from the water.
21    Q.  Okay.  And how did you conclude that?
22    A.  Well, I concluded it through different test
23  entities coming in with their fancy equipment, checking
24  the water.  I also concluded it that the physical evidence
25  with my own eyes, the things I saw in the house, never

141

1  having to replace any strainer baskets in the house, never
2  having to, you know, replace anything that the water
3  touched.  Only where the water wasn't touching things were
4  turning.
5    Q.  I was in your house and would you agree with me
6  that the area around the tub faucet, for example, was
7  quite black?
8    A.  The tub faucet?
9    Q.  Yes.
10    A.  Yeah, that is quite black, yes.
11    Q.  Okay.  Did anyone complain of any odor coming
12  from the water in the house?
13    A.  No, there was never a complaint because we had an
14  active water softener.  Odors in the house only happen
15  when things are shut down and the place has been sitting
16  for -- I don't know, three years.  And then all of a
17  sudden everybody flips on all systems go, and I have stuff
18  in the hot water tank that's been there for three years
19  sitting.  You know, I'm no expert, but I could tell you
20  just by looking at it with a sound mind that this is not
21  right.
22    Q.  So, for example, when we visited the house and I
23  was in the house --
24    A.  Right.
25    Q.  -- in July of '09, I guess, wasn't it, Bob, July

36  (Pages 138 to 141)

142

1  of '09, the house had been shut up for a while, right, the
2  summer?
3      A.  Yeah, it was shut up.
4      Q.  When people come in and it's quite hot, do you
5  immediately turn the air conditioner on?
6      A.  The air conditioners are not -- they run like up
7  to a certain point and then they quit.  They start to
8  degress (sic).  They're not working.
9      Q.  I'm not sure you understand my question.
10     A.  Yeah, I know, I know what you're saying, but the
11  air conditioners right now do not operate full capacity.
12     Q.  Okay.  But when you know people are going to come
13  out and look at the house, CPSC, testing entities, the
14  State.  Do you physically go out ahead of time and turn
15  the systems on?
16     A.  I physically go out, turn all the systems on, but
17  as soon as they leave, I turn all the systems off.
18  They're usually out there for a day, some of them complain
19  like, oh, you know, this doesn't work.  I'm like, this is
20  what you got, guys, I don't know what to tell you.
21     Q.  So you don't run the air conditioning in the
22  summer if no one's in the house; right?
23     A.  Why should I pay -- if you could see my electric
24  bills, I have it listed, my electric bills, they're just
25  like $5, $6.  I even had them call me up and they said,

143

1  Mr. Brincku, is there a problem at your house?  I said,
2  what do you mean a problem?  And they're like, well,
3  according to your electric bill, what's going on with your
4  meter?
5      Q.  I can imagine them questioning that, actually.
6  But the point is you don't keep things running when you're
7  not in the house; right?
8      A.  No, and I have the receipts to prove it from the
9  electric company.
10     Q.  I have seen, produced to us from your lawyers,
11  material -- I mean, for example, there's a statement of
12  Brenda Brincku to the subcommittee of the Consumer Affairs
13  Insurance and Automotive Safety Science and Transportation
14  for the U.S. Senate?
15     A.  Right.
16     Q.  And did you make a statement or just
17  Mrs. Brincku?
18     A.  Mrs. Brincku.
19     Q.  Were you with Mrs. Brincku when she made that
20  statement?
21     A.  No, I was not.
22     Q.  Did you have any hand in preparing the statement
23  that Mrs. Brincku made?
24     A.  I gave that to her, she did that on her own, and
25  I'm extremely proud of her.

144

1      Q.  When you say you gave it to her, what did you
2  physically give to her?
3      A.  My blessing.
4      Q.  Okay.  Got it.  Same thing I see another piece of
5  correspondence that I have here, another document saying
6  the testimony of Brenda Brincku dated December 6th, 2011,
7  just this past December, to the subcommittee, United
8  States Senate Subcommittee on Commerce Science and
9  Transportation, and this actually is testimony that was
10  provided by Mrs. Brincku.  Were you physically with her
11  when she gave that testimony?
12     A.  I was online in that sense, not -- not I was
13  sitting there watching her live as it happened.
14     Q.  Okay.  Did Mrs. Brincku travel to Washington to
15  give this statement?
16     A.  She traveled by herself, and she was brave for
17  doing it.
18     Q.  Okay.  And, again, did you have any part in
19  preparing the written testimony or the oral testimony that
20  she gave?
21     A.  No, I did not.
22     Q.  Okay.  And you did not make any statement or give
23  any testimony to the senate committee?
24     A.  Just what I gave my wife.
25     Q.  Okay.  So just Mrs. Brincku speaking for herself?

145

1      A.  No, I told her to go.  I wish I could have been
2  there with her, but I had to work.
3      Q.  And you don't have any statements or testimony
4  that you provided to a government agency or the senate or
5  the State or the CPSC?
6      A.  Just Glenn.
7      Q.  Glenn?
8      A.  Just from the observer for Consumer Product
9  Safety Commission.  It was a big report.  He just -- he
10  went through the house, looked at everything, then asked
11  us questions.  It's just, you know --
12     Q.  You were answering questions by this CPSC
13  representative?
14     A.  Right.
15     Q.  You didn't give him a written statement signed by
16  George Brincku?
17     A.  (Witness shook head.)
18     Q.  Have you ever given an affidavit or a formal
19  written statement, Mr. Brincku, related to the issues in
20  this lawsuit?
21     A.  Just what I signed with my attorneys.
22     Q.  The legal papers?
23     A.  The legal papers.  I don't, you know, recollect
24  or member anything that I signed.
25     Q.  The Facebook site that we talked about earlier,

37  (Pages 142 to 145)

146

1  let me get the name of it so we're talking about the same
2  thing.
3      A.  Okay.
4      Q.  American and Chinese defective drywall.  Are you
5  familiar with that?
6      A.  Yeah, that was ProPublica.
7      Q.  No, this is actually a Facebook.com defective
8  drywall site.
9      A.  Okay.  That was Virginia?  I don't know.
10     Q.  Is this something that you or your wife started,
11 Mr. Brincku?
12     A.  No, I -- this is, again, she got my blessing and
13 my -- my heart on the issue.
14     Q.  But you don't physically set up this site or --
15     A.  No, I was the worker bee.  I got to go out and
16 make a living and work as hard --
17     Q.  Did you contribute any comments to the site or
18 comments to the Twitter site that were set up?
19     A.  Yeah, there was time and time when I made
20 comments, I told her you need to post this, you need to do
21 that.  I had my two cents in everything.
22     Q.  Okay.  You mentioned ProPublica.  What is
23 ProPublica?
24     A.  It's a news agency that's committed to telling
25 the truth.  They want to know, you know, it's a

147

1  publication.
2      Q.  How did you get involved with ProPublica?
3      A.  CBS.
4      Q.  The news station?
5      A.  Yes.
6      Q.  And there was a CBS report on your house?
7      A.  Yes.
8      Q.  How did that get instituted, do you know?
9      A.  That was instituted between litigation and
10 everything else.
11     Q.  So did you physically call CBS?
12     A.  No, we didn't physically call, they called us.
13     Q.  Who were you in regular contact with in the media
14 at ProPublica that sort of takes your point of view?
15         MR. GARY:  Objection to regular, takes your point
16     of view.
17         BY MR. PAGLIARO:
18     Q.  Who do you have contact with at ProPublica,
19 Mr. Brincku?  Is there a person you know there?
20     A.  Yeah, there's somebody that came out to the house
21 and took pictures of outlets.  And then there was also
22 Herald Tribune that took pictures of all the outlets.
23     Q.  Did you communicate with the folks at ProPublica,
24 the Herald Tribune, are there people you communicate with?
25         MR. GARY:  Objection.

148

1          THE WITNESS:  I mean, they made -- they made
2      their own observations from what they saw, and then
3      they -- they just made their own conclusions.  What I
4      said when I was there, I just showed them the facts.
5      I just pointed to things and said --
6          BY MR. PAGLIARO:
7      Q.  How did -- how did they know that Mr. Brincku had
8  an issue with his house?  How do they know that?
9      A.  By walking through my house --
10         MR. GARY:  Objection.
11         BY MR. PAGLIARO:
12     Q.  Well, they didn't just show up to your house like
13 the trick or treat kids?
14     A.  No.
15     Q.  How did they get there?
16     A.  They came -- they called me up and said, can we
17 come to your home?  And I said, sure.  And I said -- as
18 soon as they got there I went through the house, and like
19 I do with everybody, I said, look at this plug socket, and
20 they look at it and they go, oh, wow, and they take a
21 picture of it.  I say look at the air conditioning coils
22 here and they take a picture of it, and they look at this,
23 you know, light switch here and then they take a picture,
24 and then they look at this, you know, wall plug coming out
25 of the wall and they'd take a picture.  It was just -- it

149

1  was like, you know, everybody just would come in and just,
2  you know, they couldn't believe it.  I mean, it was not
3  just from them, but it was from multitudes of different
4  people.
5      Q.  I understand.  I'm trying to get at the
6  ProPublica piece, first of all.
7      A.  Right.
8      Q.  How did you come into contact with that
9  organization?
10     A.  Through CBS.
11     Q.  Through CBS.  Okay.  And what do you understand
12 their mission to be, ProPublica?
13         MR. GARY:  Objection.
14         THE WITNESS:  As far as their mission, I have no
15     idea.
16         BY MR. PAGLIARO:
17     Q.  Okay.  Well, what would be the purpose of talking
18 to them, then?
19         MR. GARY:  Objection.
20         BY MR. PAGLIARO:
21     Q.  What was your purpose in talking to them,
22 Mr. Brincku?
23     A.  Just, again, I'm in a jar.  Sometimes nobody
24 begins to understand but you.  When you're -- when the cap
25 begins to slowly close over that jar, your voice becomes

38  (Pages 146 to 149)

150

1  silenced.  And it's like in -- in times of, you know,
2  crisis, we all want to scream and just yell.
3      Q.  So you're just looking for somebody to talk to?
4      A.  I just need somebody to talk to.  Sometimes it's
5  just like -- you know.
6      Q.  What would make you select this particular
7  publication, ProPublica?
8      MR. GARY: ·Objection to the word "select."
9  BY MR. PAGLIARO:
10      Q.  Did you select them?
11      A.  I didn't select them, no.
12      Q.  What would make you speak to them, then?
13      A.  Well, Herald Tribune was associated, you know,
14  they were all, whatever, and they just --
15      Q.  And what kind of stories does ProPublica run?
16      MR. GARY:  Objection.
17  BY MR. PAGLIARO:
18      Q.  Relating to drywall?
19      MR. GARY:  What kind of stories?
20  BY MR. PAGLIARO:
21      Q.  Yeah, what was their point of view, as you
22  understand it?
23      MR. GARY:  Objection.  Assumes they have a point
24  of view.
25  BY MR. PAGLIARO:

151

1      Q.  They have a point of view.  What was their point
2  of view?
3      MR. GARY:  Objection.
4      THE WITNESS:  They're probably more into
5  environmental segments.
6  BY MR. PAGLIARO:
7      Q.  Okay.  So they're interested in the environment?
8      A.  Yeah.
9      Q.  And who at ProPublica have you had conversations
10  with, if anybody?  Is there a person that you turn to in
11  that organization?
12      MR. GARY:  Objection to turn to.  Is the question
13  who have you had conversations with?
14      MR. PAGLIARO:  Yeah, the question is who did he
15  have conversations with at ProPublica, besides the
16  person who showed up at your house.
17      THE WITNESS:  Just conversations that, you know,
18  we come in contact with the people.
19  BY MR. PAGLIARO:
20      Q.  I'm trying to figure out who the people are.
21  You're talking around me.  Just answer the question.
22      MR. GRAY:  He's looking for a name, George.  Do
23  you have a name?
24  BY MR. PAGLIARO:
25      Q.  Yeah, give me a name.

152

1      A.  Joe can -- I don't know, he's got a weird name,
2  too.  I can't remember.
3      Q.  How many times have you spoken to these people?
4      A.  I'm not trying to avoid the question.  I just
5  can't remember names that well.
6      Q.  All right.
7      A.  Especially if they have a really weird name like
8  Jauwood, Jocan (phonetic), Jacoolees (phonetic).
9      Q.  Are these people interested in your lawsuit, the
10  people from ProPublica?
11      MR. GARY:  Objection.
12      THE WITNESS:  No, they don't special interest in
13  any --
14  BY MR. PAGLIARO:
15      Q.  Have they asked about your lawsuit?
16      MR. GARY:  I didn't hear it.
17  BY MR. PAGLIARO:
18      Q.  Have they asked about your lawsuit?
19      A.  No, they haven't asked about my lawsuit.
20      Q.  Okay.
21      A.  Very -- you know, it's just -- it's like things
22  happen at certain times, and it's almost like, you know --
23  I explained it as like a breeze, all of a sudden a breeze
24  comes and you feel the breeze and it just moves on and it
25  flows in and out.

153

1      Q.  And the breeze for you is having the ability to
2  have some say, some --
3      A.  Yeah, it's just a voice.
4      Q.  -- pulpit?
5      A.  It's just a voice, and sometimes in a -- in a
6  place where you just don't feel like you're heard.
7      Q.  To deal with your frustrations?
8      MR. GARY:  Objection.
9      THE WITNESS:  No, no not to deal with my
10  frustrations; just to deal with just the whole thing
11  in general.
12  BY MR. PAGLIARO:
13      Q.  But are you frustrated, Mr. Brincku?  Have you
14  been frustrated?
15      A.  I can't say --
16      MR. GARY:  By what?
17      THE WITNESS:  Frustrated by the house or
18  frustrated by the lack of, you know, people wanting
19  to, you know, listen?  I mean, we've had friends for
20  20, 30 years, and they just -- I mean, some of them
21  just don't want to listen to us anymore.  I mean, who
22  do you turn to?
23  BY MR. PAGLIARO:
24      Q.  All I'm trying to get at is that -- what I'm
25  hearing when you say the words "who do you turn to" is

39 (Pages 150 to 153)

## 154

```
1    some level of frustration; is that fair?
2        A.  Well, anybody would be frustrated.
3        Q.  That's not the question I asked you.
4        A.  Okay.
5        Q.  I asked if you were frustrated.
6        A.  Oh, if I was frustrated.
7            MR. GARY:  Objection.
8    BY MR. PAGLIARO:
9        Q.  Yeah.
10       A.  You know, there would be times when I would be
11   frustrated, yes.
12           MR. PAGLIARO:  I have no further questions,
13   Mr. Gary.
14           MR. GARY:  All right.
15           MR. PAGLIARO:  Thank you, Mr. Brincku.
16           VIDEOGRAPHER:  This concludes the deposition.
17   The time is 12:16 p.m.
18           MR. GARY:  We won't waive.  He can look at it.
19
20       (Deposition concluded at 12:16 p.m.)
21
22
23
24
25
```

## 155

```
1
2    STATE OF _____ )
3                            ) :ss
4    COUNTY OF _____ )
5
6
7        I, GEORGE BRINCKU, the witness
8    herein, having read the foregoing
9    testimony of the pages of this deposition,
10   do hereby certify it to be a true and
11   correct transcript, subject to the
12   corrections, if any, shown on the attached
13   page.
14
15           _____
16           GEORGE BRINCKU
17
18
19
20   Sworn and subscribed to before
21   me, this        day of
22            , 2012.
23
24   _____
25       Notary Public
```

## 156

```
1            CERTIFICATE OF OATH
2
3    STATE OF FLORIDA
4    COUNTY OF COLLIER
5
6        I, the undersigned authority, certify that GEORGE
7    BRINCKU personally appeared before me and was duly sworn.
8
9        WITNESS my hand and official seal this 30th,
10   day of January, 2012.
11
12
13           _____
             Lori L. Bundy
14           Notary Public - State of Florida
             My Commission No.:  EE 132707
15   Expires:  September 22, 2015
16
17
18
19
20
21
22
23
24
25
```

## 157

```
1        REPORTER'S DEPOSITION CERTIFICATE
2
3    STATE OF FLORIDA
4    COUNTY OF COLLIER
5
6        I, Lori L. Bundy, Certified Court Reporter and Notary
7    Public in and for the State of Florida at Large, certify
8    that I was authorized to and did stenographically report
9    the deposition of GEORGE BRINCKU; that a review of the
10   transcript was requested and that the transcript is a true
11   and complete record of my stenographic notes.
12
13       I further certify that I am not a relative, employee,
14   attorney, or counsel of any of the parties; nor am I a
15   relative or employee of any of the parties' attorney or
16   counsel connected with the action; nor am I financially
17   interested in the action.
18
19       DATED this 30th day of January, 2012.
20
21
22           _____
             Lori L. Bundy, FPR, RPR, CRR, CLR
23
24
25
```

40 (Pages 154 to 157)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

158

```
1              INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over carefully
4   and make any necessary corrections. You should state
5   the reason in the appropriate space on the errata
6   sheet for any corrections that are made.
7       After doing so, please sign the errata sheet
8   and date it.
9       You are signing same subject to the changes
10  you have noted on the errata sheet, which will be
11  attached to your deposition.
12      It is imperative that you return the original
13  errata sheet to the deposing attorney within thirty
14  (30) days of receipt of the deposition transcript by
15  you. If you fail to do so, the deposition transcript
16  may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

159

```
1              E R R A T A
2
3
4
5       I wish to make the following changes,
6   for the following reasons:
7
8   PAGE LINE
9   ___ ___ CHANGE:_____
10  REASON:_____
11  ___ ___ CHANGE:_____
12  REASON:_____
13  ___ ___ CHANGE:_____
14  REASON:_____
15  ___ ___ CHANGE:_____
16  REASON:_____
17  ___ ___ CHANGE:_____
18  REASON:_____
19  ___ ___ CHANGE:_____
20  REASON:_____
21
22  _____   _____
23  WITNESS' SIGNATURE          DATE
24
25
```

41 (Pages 158 to 159)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585