UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FT. MYERS DIVISION

---------------------------

GEORGE BRINCKU, BRENDA BRINCKU,

Plaintiffs,

vs.

CASE NO. 2:11-cv-00338-JES-DNF

NATIONAL GYPSUM COMPANY, a Delaware Corporation,

Defendant.

---------------------------

VIDEOTAPED DEPOSITION OF BRENDA BRINCKU

January 24, 2012

Henderson Franklin

1715 Monroe Street

Fort Myers, FL

8:45 a.m. to 11:43 a.m.

Reported By:
Lori L. Bundy, FPR, RPR, CRR, CLR
Job No: 23644

APPEARANCES:

For the Plaintiff:
Gary, Naegele & Theado
446 Broadway
Lorain, OH 44052-1797
(440) 244-3462
BY: ROBERT D. GARY, ESQ.

For the Defendant:
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5668
BY: JAMES D. PAGLIARO, ESQ.
jpagliaro@morganlewis.com

Also present: GEORGE BRINCKU
Videographer: KEVIN BUNDY, CLVS

INDEX

| WITNESS: | PAGE: |
|---|---|
| BRENDA BRINCKU DIRECT EXAMINATION BY MR. PAGLIARO: | 5 |

- - -

EXHIBITS

- - -

| | Description | Page |
|---|---|---|
| Defendants' Exhibit 2 | Appraisal | 23 |
| Defendants' Exhibit 3 | Brincku notebook for house on 18891 River Estates Lane, Alva | 29 |
| Defendants' Exhibit 4 | Facebook page called American and Chinese defective drywall | 44 |
| Defendants' Exhibit 5 | Facebook page called Victims of Chinese Drywall | 48 |
| Defendants' Exhibit 6 | Twitter run | 59 |
| Defendants' Exhibit 7 | Zazzle.com Internet page | 63 |
| Defendants' Exhibit 8 | Testimony of Brenda Brincku | 74 |
| Defendants' Exhibit 9 | Statement of Brenda Brincku | 74 |
| Defendants' Exhibit 10 | ProPublica document | 84 |
| Defendants' Exhibit 11 | Document Bates stamped Brincku 428 though 622 | 93 |
| Defendants' Exhibit 12 | Report | 104 |
| Defendant's Exhibit 1 | Notice of deposition | 125 |

VIDEOGRAPHER: This is Video Number 1 of the videotaped deposition of Brenda Brincku taken by the defendant in the matter of George Brincku and Brenda Brincku versus National Gypsum Company, a Delaware corporation in the United States District Court, Middle District of Florida, Fort Myers Division, Civil Action Number 211 CV 00338 JES DNF.

This deposition is being held at 1715 Monroe Street, Fort Myers, Florida, 33902 on January 24th, 2012, at approximately 8:59 a.m.

My name is Kevin Bundy from the firm of David Feldman Worldwide, and I'm the legal video specialist. The court reporter is Lori Bundy, in association with David Feldman Worldwide.

Will counsel please introduce themselves.

MR. PAGLIARO: Good morning, I'm Jim Pagliaro, and I'm here on behalf of the defendant, National Gypsum Company.

MR. GARY: I am Bob Gary, and I represent the plaintiffs, George and Brenda Brincku.

VIDEOGRAPHER: Will the court reporter please swear in the witness.

THEREUPON,

BRENDA BRINCKU,

a witness, having been first duly sworn, upon her oath,

testified as follows:

DIRECT EXAMINATION

BY MR. PAGLIARO:

**Q. Good morning, Mrs. Brincku. Ms. Brincku, I know you were here yesterday for your husband's deposition, but the same ground rules apply. If you have a question about one of my questions, feel free to ask me to restate the question. If you need a break, let me know and we'll take it from there.**

**So will you please state your full name for the record, including your maiden name?**

A. Brenda Ann Peterson Brincku.

**Q. And Mrs. Brincku, you're married to George Brincku?**

A. Yes.

**Q. How long have you been married?**

A. 27 years.

**Q. And have you ever been married before?**

A. No.

**Q. Ms. Brincku, I'm going to do the same thing with your husband yesterday, and that's take you a little bit through your background just so we have a record of that.**

**Tell me where you went to high school.**

A. Fort Myers High.

**Q. And what year did you graduate?**

6

A. 1983.
**Q. And do you have any formal education after high school?**
A. Yes, I graduated -- I left high school in December, 1983, my senior year, and then the second half of my senior year, I went to Lee University and I went from there.
**Q. I want to pick up from a point where you said you went to Lee University.**
A. I went to Lee University from January to May of 1983, and then I graduated -- went back and graduated from high school.
**Q. Okay. And why did you attend Lee University during that period of time?**
A. I wanted to go to college, and I had already got all my credits from high school.
**Q. So you actually put a semester in from college before you graduated from high school?**
A. Right.
**Q. What did you study when you were in college for that period?**
A. Business.
**Q. And when you graduated from high school, did you have any focus during your high school years? Were you in the business preparation there, too?**

7

A. No.
**Q. Academic?**
A. No.
**Q. No? Just general academics?**
A. Yes.
**Q. After graduating from high school, did you attend any other formal schooling?**
A. Yes, I went to Edison Community College.
**Q. Okay. And where is that located?**
A. In Fort Myers.
**Q. And how long did you go there, ma'am?**
A. Like a semester, and also I went to -- the summer after I left Lee College, I went to a European seminary school for a month in Germany.
**Q. Do you know what the name of the school was?**
A. It was like -- Lee College is part of it. It was the European seminary college, something --
**Q. So it was a European study exercise in conjunction with Lee University?**
A. Yes, yes.
**Q. Okay. And where you study theology or some form of --**
A. I just went there for a semester. We traveled around Europe during that time, and my mom thought it would be a good opportunity for me to go abroad and study.

8

**Q. Okay. And you stayed for approximately half a year?**
A. No, just for a month.
**Q. A month?**
A. It was a summer program.
**Q. Okay. Have you received any degree after your high school --**
A. No.
**Q. -- graduation?**
A. No.
**Q. Okay.**
A. I got married.
**Q. When did you meet your husband, Mrs. Brincku?**
A. It was May of 1983.
**Q. And you were married '85?**
A. No. '84, actually.
**Q. Okay.**
A. We had my daughter in '85.
**Q. So your firstborn was born in '85?**
A. Correct.
**Q. When you were married, were you working outside the home?**
A. Yes.
**Q. Okay. And what were you doing?**
A. I was managing The Dancing Shoe.

9

**Q. And what is that, Mrs. Brincku?**
A. They sell ballet, aerobic equipment, and all that kind of thing.
**Q. Just what it sounds like?**
A. Yeah.
**Q. And how long did you have that position?**
A. I worked there for a couple years. I worked there through high school and then after -- when I was going to college at Edison.
**Q. Were you working at The Dancing Shoe when you were married to Mr. Brincku?**
A. Yes.
**Q. And when did you leave that job?**
A. After I had Ashley -- I mean, Christine, I'm sorry.
**Q. So that was 1985?**
A. Yes.
**Q. Okay.**
A. It was right around that time.
**Q. And did you have any other positions, occupational positions, outside the home after that?**
A. After that I worked -- I was basically a housewife, stay-at-home mom, and I did deliver newspapers in the morning so I could be home with her. And when I went to have Ashley I went and got a part-time job. They

paid benefits for 20 hours, and I worked at Maas Brothers.
**Q. And what is Maas Brothers?**
A. It's a clothing department store, similar to what Macy's is now.
**Q. And how long did you have that part-time job?**
A. I worked there from like '88 and '89.
**Q. Okay. Your husband testified yesterday that you were working along with him in his landscape business; is that correct?**
A. Yes, I did like the bookkeeping, and whenever he needed extra help, I would go and help him. You know, I didn't take a salary; I just went and helped with the business.
**Q. Okay. Before that when your husband was working for -- I believe he called it Naples Carpentry, his father's family business --**
A. Yeah.
**Q. -- were you assisting in any way with the business at that point, Mrs. Brincku?**
A. No. And basically, when he was working for his dad, it's kind of an agreement we had with his dad. We helped him build houses for him, and we helped -- he helped us build our house.
You know, when we built houses because we built three and then he built several houses, and, you know, he

would buy and then build and live in it for so long and then sell it and then build again another house. And it was kind of an agreement we did with him.
And like when his dad would go on vacation, he would just cover -- we wouldn't accept pay, and then the same thing, when George was self-employed like he had a lawn business, he would do the same thing for George.
And so that's kind of worked it out that -- it's a family thing, helping each other out.
**Q. Gotcha. So I understand it, what you're saying, I think, is that your father-in-law basically assisted with the construction of your first two houses on Harrisburg Drive; is that correct?**
A. Correct, uh-huh.
**Q. And did he provide -- basically build them for you?**
A. He helped with them, yeah.
**Q. Okay.**
A. When I was dating George when he built our first home.
**Q. Yes.**
A. And they were building that like in '83, and then he -- it was actually in his dad's name, and then when they got done, we had decided to get married and he gave us for the wedding present -- he turned over the house to

us and just switched over the names.
**Q. Understood. Now, can you remember the addresses of your houses?**
A. Yes.
**Q. On Harrisburg Drive. I had a suspicion you might?**
A. Our first house was 8069, our second house was 8096.
**Q. And as Mr. Brincku testified yesterday, they were literally across the street from each other?**
A. Yeah, they were diagonally across the street from each other. We liked looked the street so much we decided to build another house in the same area.
**Q. So now, when you built the second house, 8096, that was still when your husband was working for Naples Carpentry?**
A. Yeah, he did -- that was kind of on the side. He was also, during that time -- there was a few things he missed, but he worked at Publix when we were building the house. He would go in super early in the morning, and then he would build the house during -- you know, he would come home from work around 10:00 or 11:00 and work all day.
And then he also worked -- during that time, worked at We View at night as a camera man, as a floor

director.
**Q. And what's Publix, I'm sorry?**
A. Publix is a shopping -- grocery store. And so it enabled us to work and also build our home.
**Q. When you built the second home on Harrisburg Drive, did you make that home larger than the first home --**
A. Yes.
**Q. -- on Harrisburg Drive?**
**Explain to me what the difference was dimensionally.**
A. Okay. The first house was a two-bedroom, and it was a small starter home. And the second home was three bedroom and it had two and a half baths.
**Q. Were they basically the same construction in terms of what we were talking about yesterday, slab construction with --**
A. The first house was slab, wood frame. And the second house was a two-story. It had slab and it was wood frame.
**Q. Thank you. And I believe your husband said you lived in the second house for 15 years?**
A. Yes. Ashley was a baby -- in '89 we moved into it, August 1st of 1989, and then we moved out of it 15 years later.

14

**Q. So that would be 2004?**

A. Yeah, around -- yeah -- let's see, we moved -- yeah, 2004. It was about May we finally sold it because we wanted to -- we were building the third home, we wanted to live there and not have to pay rent as long as possible.

And then we stayed there as long as we could and then, you know, had our house up for sale until it sold. And it was about the summer of 2004.

**Q. Thank you. So we're going to shift gears now to the house you built on Estates Lane, and for purposes of this deposition, can we agree, when I talk about "the house," that's the house we're talking about now?**

A. Yes.

**Q. Is that fair?**

A. Yes, uh-huh.

**Q. So that house was at 18891 River Estates Lane in Alva; is that correct?**

A. Correct.

**Q. So what prompted you and your husband, as you recall, to build a new home when you were living on Harrisburg Drive?**

A. We had -- we decided -- we had a son at that time.

**Q. This is your son Harrison?**

15

A. Harrison, uh-huh. And we wanted him to be able to grow up in a safer neighborhood and to be able to run and play, and so we bought an acre and a quarter. And we had friends that lived out there, and we found the property and we were sold. We loved it out there.

**Q. Did you know that there was other construction going on around the property at that time?**

A. Yes.

**Q. When you say you loved the property, what is it that first attracted you to that area?**

A. I always wanted kind of a house in the country, and it was -- but then I didn't want to be isolated. It was a deed residential area, and it was higher upscale homes. And so the value was really going up at that time. We thought it was an excellent investment and so that's why we invested there.

And it was backed up behind the preserve, it was on a cul-de-sac, very quiet neighborhood. And every night -- I mean, every morning you could see the sun rise in the front yard and in the backyard you can watch the sunsets.

**Q. And do you agree with your husband's testimony that you paid $35,000 for that property?**

A. No. I'm the one that did the negotiation on the property.

16

**Q. Okay.**

A. He had asked 48,000, and I got him down to 45,000. I'm kind of the negotiator in everything. I wish it was 35,000, but --

**Q. So --**

A. But he gets a little confused with his numbers.

**Q. You purchased the property for $45,000?**

A. Yes.

**Q. And who did you buy from, do you remember?**

A. Yes. Ed. He lived two doors down the road, two doors down, and he -- three doors down. And he had bought it -- his intentions was to build the property where he was living, he was going to build that home and eventually sell that, and he had bought the other piece to build on that.

And he said, after he got done with the house, he's like, I'm done, I'm not building anymore, and he decided to sell the property.

**Q. Okay. Had you looked at other properties before you settled on that particular parcel of land?**

A. We kind of looked here and there. It was after a Labor Day party, we were out with our friends in Alva, and it was exactly what we had in mind. We saw that piece and we were sold.

**Q. So then you and your husband started the process**

17

**of being basically owner/builders; right?**

A. Correct.

**Q. Basically building this house?**

A. Yes.

**Q. Is this the first time you had undertaken this with your husband as a couple, to sort of build your own home?**

A. No. On 8096, I had helped him with that construction, and when I was dating, on 8069 on Harrisburg -- I was dating him, so they kind of initiated me into the family of building. And so then the -- so when we moved to 8096, I helped with the whole -- you know, helped with setting up things and stuff like that.

**Q. Describe for me the status of your husband's landscaping business as you saw it at that time in '04 when you were beginning to build your house.**

A. In '04, like I said, he -- let's see here. Let me go back here to 2004. Okay, when we actually -- he was working for Home Depot, and that was -- he forgot to mention that, but he was working for Home Depot for 15 years.

And he actually quit Home Depot, it was October -- let me think about this for a minute. I can tell you. It was right at the beginning, he quit Home Depot. And right before we moved into the home.

**Q. Into the --**
A. Yeah, right when we moved into the home.
**Q. The home?**
A. Yes, on River Estates Lane.
**Q. Okay.**
A. And then he went to work for Sunny Groves for three-month.
**Q. What's Sunny Groves?**
A. It's a landscape company.
**Q. Had he done any landscaping work before that, aside what he did around the house, I mean, for pay?**
A. Years ago, before that, he had owned a landscape -- I mean like a landscape/lawn business when we were first married. He had --
**Q. Did you assist him in the operation of his landscape business?**
A. Yeah. You know, whenever he needed help, I would go and help him.
**Q. What about the bookwork and the paperwork?**
A. Yeah, I did all that. I said sign this, and he just signed it. And he just trusts me enough to, you know, he knew I would look over everything. He just didn't have the time. He was just trying to keep up with everything.
**Q. So the deal was, as I understand it, he was out**

**doing the work, you were sort of the business manager; is that fair?**
A. Yeah. He's the busy bee and the worker bee, and I'm the -- keep care of all the paperwork. I do all that. He doesn't -- you know, I even basically run his own e-mail. He doesn't even do e-mail. I use his account.
**Q. Okay. So your husband quit Home Depot around about the time you moved into the house in Alva?**
A. Right.
**Q. And --**
A. October 2000.
**Q. You said for a short period of time he worked for Sunny Groves?**
A. Correct, for three months.
**Q. And then what happened?**
A. And then February 1st of 2005, we started the -- we decided -- he had been let go from Sunny Grove -- there was some things they were cut back and so forth. And we just -- we said we got to do something, and we had already been talking about -- he wasn't really happy with Sunny Grove and some things that were going on there, so we had already been talking about doing a business.
And it just -- we had to go in fast gear. And so February 1st, we said, okay, that's it, and we had a job the next day. And we went and got our license and

everything and we were off running. And his sister, who was a contractor, she was doing houses so she got us plugged in and got us some landscape jobs and we were off and running.
**Q. Did you register a business name, Mrs. Brincku?**
A. Yes, George Brincku Home & Garden, Incorporated.
**Q. And your testimony would be that was in 2005?**
A. Yes, February 2005. I think February 1st, around there.
**Q. Did you do any advertising of the business at that time?**
A. We started with different things. Later on, we had developed a website and we finally just did take that down. But over the time, we, you know, we started thinking of a business plan and things and we had gotten together some money and took some money invested into the business and bought a truck and trailers and things like that.
**Q. Is that the time that your husband was describing you took money out of retirement funds or pension funds that he had?**
A. Yes.
**Q. Okay. And that was invested in the business?**
A. Yes.
**Q. Okay. During this period, in the area in which**

**you were living in Florida, was this sort of still the boom construction period?**
A. Yes.
**Q. '05?**
A. Uh-huh.
**Q. So was there a big demand for landscaping work at that time?**
A. Yes. There's a lot of things going on and stuff.
**Q. How about your sister-in-law's business, was that doing well at the time?**
A. Yes.
**Q. When we hear a lot about the bubble, when did the bubble sort of break on the real estate market in the Alva area where you were living?**
A. For us, things were still selling and the Alva area was a little bit different than Fort Myers because it was a higher demand -- people wanted to be out there. It was kind of funny because old-time Florida residents were -- all my neighbors were people that graduated high schools from -- where I was.
**Q. So it wasn't transplants?**
A. No, it was all -- and so a lot of them were moving out there. And so the bubble didn't really -- 2009 for us. It was later than most of the people in Fort Myers.

22

**Q. Was your sister-in-law's business impacted by the bubble breaking?**
A. She ended up having to move because her husband got a job in Georgia and his parents had already moved to Georgia, and they decided he had gotten -- he's a golf pro, and so she decided to move with him, and so she closed the business down.
**Q. What was the impact of the real estate bubble bursting in the area of Florida where you lived when it did happen?**
MR. GARY: Objection.
BY MR. PAGLIARO:
**Q. As you observed it?**
MR. GARY: You can answer.
BY MR. PAGLIARO:
**Q. What did you observe?**
A. Well, what I observed, a lot of things changed.
**Q. A lot less building going on?**
A. Yeah, less building.
**Q. Was there less demand for landscape work?**
A. Yeah, it had gone down some.
**Q. We talked a little bit yesterday about appraisals of the house on River Estates with your husband, and you actually were able to find, I guess, last night, one of the appraisals; is that correct?**

23

A. Yes.
MR. PAGLIARO: I'm going to ask this to be marked, if I can, Bob.
MR. GARY: Sure.
THE WITNESS: That was when we had gone for a second mortgage.
BY MR. PAGLIARO:
**Q. We'll talk about that.**
A. Okay. Sorry.
(Defendants' Exhibit 2, Appraisal, was marked for identification.)
BY MR. PAGLIARO:
**Q. So let's start at the beginning, Mrs. Brincku.**
**When you first decided to build the house on River Estates, where was the funding for the building coming from?**
A. We had taken a loan on the property, and then we had used some -- it sounds crazy, but we had used some credit cards, put it on credit cards because we didn't know for sure -- prices were going up all the time and we didn't want to be locked into a mortgage and then have to go back and ask more.
So we had built, in the sale of our home, all those things, and we were able to -- and my mother and his mother had loaned us some money. So we were able to go

24

all the way up to the closing date in October 5th of 2004 -- or right around there, that area, we moved in 2004 -- I mean October 5th, but right when the closing date probably was, right around then. And we were able to then get a loan -- you know, had our loan closed and everything.
**Q. So if I understand correctly -- just correct me if I'm wrong -- what you did, basically, was cover as many of the building costs as you could from a variety of sources including credit cards, borrowing some loans from your family, to make it to the point where you could get to the closing and execute a mortgage; is that correct?**
A. Correct, uh-huh.
**Q. Okay. And so your first mortgage that you got when you closed on your house -- what was the first mortgage you had on the property, the property?**
A. I'm sorry. Repeat.
**Q. Yeah. So the mortgage you got when you closed on the house was the first mortgage that you held on the property on River Estates?**
A. Correct.
**Q. Fair enough. And how much was that mortgage for?**
A. Around 256,000. And at that time, we paid off all our loans and credit cards.
**Q. Did you pay your parents off, too?**

25

A. Yes, uh-huh. Oh, yeah. They got their money. They were first.
**Q. Fair enough. So you had a $256,000 on the house when you moved in. Tell me, was the house appraised for that mortgage?**
A. Yes.
**Q. And what was the appraisal, if you recall?**
A. At that time -- and that was 2004 -- that was kind of the beginning -- that was about 350,000, if I'm not mistaken.
**Q. And who held the mortgage -- the first mortgage on the house?**
A. American Brokers. I think that was the name of the company. And then Wells Fargo bought them out.
**Q. How long did you go with that first mortgage before you went to a second mortgage, refinanced?**
A. I think it was 2007, and it wasn't refinanced, it was a home, you know, equity loan.
**Q. So you didn't pay off the first mortgage; you still had that. You just took a line of credit --**
A. Right.
**Q. -- on the house; is that correct?**
A. Right.
**Q. And that exhibit that you have in front of you, Brenda Brincku 2?**

26

A. Yes.
**Q. Was that the appraisal for the house when you had that refinancing done?**
A. Correct.
**Q. Okay.**
A. It was -- market value was $893,367, and he was trying to get me to get a higher -- more than 60,000, and I said: No, we don't want it.
**Q. We remember those days. What's the date of that appraisal, Mrs. Brincku? It's up at the top, I think.**
A. It's 1/16/07.
**Q. So the house had gone up in value?**
A. A significant amount.
**Q. In the three years from the time you lived there; right?**
A. Correct.
**Q. Yeah. And how much did you borrow in this round?**
A. 60,000.
**Q. So this was truly like a home equity loan?**
A. Correct.
**Q. And why did you borrow that money, Mrs. Brincku?**
A. Well, we had my daughter going to school -- she was going to a private university up in Indiana and we used some of it for that, for some of the business. And also for the house. We were having a lot of problems with

27

repairs.
**Q. Did -- your husband had mentioned you had bought some equipment at that time.**
**Do you remember that?**
A. In 2007, yeah. I mean, we were always buying trailers and different things like that, you know.
**Q. The equipment that your husband needed to run his real estate business, which I assume was still going on in '07, right --**
A. The landscaping business?
**Q. -- the landscaping business, right. That was going on in 2007?**
A. Yes.
**Q. The equipment that he needed to run the landscaping business, was that maintained at the house on Estates Avenue?**
A. Yes.
**Q. Did you build a shed or something to keep that equipment?**
A. The pole barn.
**Q. That's right, the pole barn.**
A. I was in charge of getting all the materials together, and we had somebody come in and do that.
**Q. And your husband had mentioned the fact that a lot of material was rented or leased.**

28

**Is that your recollection as well?**
A. Yeah, the bigger equipment.
**Q. Were you responsible for those operations of the business? Doing the rentals and paying the bills and things like that?**
A. Yes, uh-huh.
**Q. And how many hours a day did it take you to sort of help run the business?**
A. I worked late at night, and we were also -- at the time, you know, we were getting ready to launch our website, and I would work with the web designer and different things like that. You know, I would go over preparations and --
**Q. The website for your husband's landscaping business?**
A. Yes, uh-huh. And going, you know, doing things and trying to -- building the business and stuff. And we were doing, you know, well at that time. We had gotten into a big development, and with a lot of high-end clients with million dollar homes and stuff.
So that is what kind of helped us through -- other people were struggling, but we had some really good high-end clients and some commercial accounts.
**Q. Did you ever have accounts where there were sort of gated communities where you got the whole account, or**

29

**was it sort of 1-to-1 selling of residences?**
A. That was the area that we were in. It was a high-end account, and it was in a development.
**Q. So you were basically just development landscaping?**
A. Yeah, it wasn't the whole development; there was other landscapers in there, but he had captured a good part of the market.
**Q. Yeah, you had a good part of the market. Mrs. Brincku, we were talking yesterday -- I would like to have these marked, if I could -- about the paperwork that you had maintained when you were constructing the house on River Estates.**
**So I'm going to have this marked and you can take a look at it.**
**(Defendants' Exhibit 3, Brincku notebook for house on 18891 River Estates Lane, Alva, was marked for identification.)**
BY MR. PAGLIARO:
**Q. Mrs. Brincku, this has been produced by your attorneys in this litigation. It's Bates stamped Brincku 322, and it says: Brincku notebook for house on 18891 River Estates Lane, Alva.**
A. Yes.
**Q. Do you recognize these notes?**

30

A. Yes, this is my handwriting.
**Q. This is all your handwriting?**
A. Yes.
**Q. And does this represent your sort of accounting entries for the payments to build the house?**
A. Yes. George kind of always teased me because I was always trying to figure out how much money I had saved and different things. I kept kind of meticulous records of stuff.
**Q. You appear to be pretty well organized.**
**Do you pride yourself on that?**
A. Huh?
**Q. Do you pride yourself on that?**
A. Yeah. It sometimes can be a downfall, being too meticulous on things.
**Q. On page 3 -- open the packet up, Mrs. Brincku.**
A. Yes.
**Q. And you'll see: Septic engineer, Harry Teeter. Do you see that? Right up at the top where it says permits. Literally when you open it. Just one page in.**
A. Okay. I'm sorry, because this said three over here. That's what was confusing me. Yes.
**Q. This is a section called Permits?**
A. Okay.
**Q. Is that fair?**

31

A. Correct.
**Q. And did you list here the permits that you had paid for?**
A. Yes.
**Q. Could you just run down those and tell me what you recall about them, if anything?**
A. Yeah. These were different things. We had to have, like, a high design thing that was for -- I think with the septic -- I'm not positive on that, but there was -- there's some things we had to hire.
**Q. And that was Apogee Design?**
A. Yes.
**Q. And I believe your husband mentioned Mr. Teeter yesterday, the surveyor?**
A. Yes, uh-huh. And he was our surveyor, and we had to pay him and the plan reviews.
**Q. What's the entry for environmental health, if you can recall?**
A. That's just something they made us pay. I'm not exactly for sure what exactly, if that had to do with -- I know they had to -- that's just probably one of their fees. I know we had to hire an environmentalist, and that could be it, to come out and inspect the land --
**Q. Inspect the property?**
A. Inspect the property and the soils and all that

32

stuff.
**Q. Was this all part --**
A. It's environmental things.
**Q. Sorry. This is listed as a permit.**
**Is this all part of what you understood to be the permitting process to build the house?**
A. Yes, uh-huh. We had to get these things done in order to build.
**Q. And I see you have a recording fee for the clerk?**
A. Yeah.
**Q. The plan -- go on.**
A. They were very strict out there because environmental things -- and that's how the preserve -- somebody owned that previously, and they found tortoise, you know, things and they had a flight pattern of birds and they took the property from the people.
**Q. So it was an animal wild life preservation thing?**
A. Yeah. I mean, they are very, very strict out there.
**Q. Mrs. Brincku, you have another entry for Harry Teeter, and it looks like engineer -- I assume that's what you have there?**
A. Yes.
**Q. And then it says: Soot 100 gift, 600. What does that mean?**

33

A. Oh, we gave -- I think we gave him a bonus because he did such a good job and kind of got some things done in time for -- because impact fees were going up.
**Q. Okay. So you gave him a little bonus?**
A. Yeah, a tip for being, you know, pushing it and getting it done faster for us.
**Q. Now, the big entry here, you'll agree with me, is the Lee County permits entry; is that correct?**
A. Correct.
**Q. And that's 7200-and-some-odd dollars; right?**
A. Correct.
**Q. And what did you understand those permits to be?**
A. That's all the permits that -- your roofing, your plumbing. You have to pay that all, you know, and impact fees ahead of time.
**Q. You heard yesterday we talked about the well permit. Was this included in this part of the permitting?**
A. The well permit was Paul Lawrence, and he got the permit for us.
**Q. Okay.**
A. And that was a $75 fee.
**Q. And who is Paul Lawrence, I'm sorry?**
A. He's a well guy out in Alva. He's been around forever doing wells. He was referred to us.
**Q. And so that was someone that someone else**

**referred you to?**

A. Correct.

**Q. And he took care of the well permitting?**

A. Correct.

**Q. So as the bookkeeper, paperwork person, you don't remember signing a well permit application?**

A. I don't recall that. I mean, there was a lot of paperwork I had to go through, but I don't recall. But I did look back on my records, and he charged us $75 for getting the permit and taking care of that.

**Q. And the electrical work in your house, that was done by a subcontractor; is that correct?**

A. Correct.

**Q. And who was that?**

A. Jauwood (phonetic).

**Q. Oh, your husband did mention that yesterday.**

A. Yes.

**Q. Is Jauwood on this list somewhere?**

**Oh, I see electric. Okay. Look at the bottom, the Bates stamp is 328.**

A. Mine is not stamped here.

**Q. The little tiny print, that's the official Bates stamp for the property?**

A. Oh, I see. 328.

**Q. That's the easiest way to find it?**

A. Yes.

**Q. There's a whole list of names here: Jeff Wood, Tony Perez, Sondo, England, Nate -- who are these folks?**

A. These are different people who did work, subcontractors.

**Q. Were they all people that did work under your heading of electric?**

A. Yes.

**Q. So tell me why so many people would be paid to do electrical work, I'm confused?**

A. No. Sometimes they had Jauwood -- he goes by Jay -- he would have different people or we had different people doing like a temp pole or different things come through and do different things.

So he came in later, and he did the thing and had helpers.

**Q. So these folks, to whom you paid some of them $2,000, $1,000, were they just doing spot assignments before Jauwood got involved on the electrical side?**

A. To be honest, I don't recall exactly. I just wrote the checks out and --

**Q. But it would be your testimony that -- as you're listed under this heading of electric?**

A. Yeah.

**Q. These would all be electric --**

A. Right, correct.

**Q. -- related?**

A. Right.

**Q. And on the other page, the facing page, you see that, it says electrical as well.**

A. Yes.

**Q. Now, this appears to be more what I'll call the equipment; is that correct?**

A. Correct.

**Q. And this equipment is equipment -- this electrical equipment is equipment your husband purchased at Lowe's or Home Depot, Sears, and then brought it to the house?**

A. Correct.

**Q. And the contractors would work with the equipment you purchased; correct?**

A. Right. We have kind of had the electricians on an hourly basis to do things.

**Q. Was your husband supervising the electrical work at that time?**

A. Yeah. He was, you know, making sure everything was done, checking over everything.

**Q. One other thing I wanted to ask you about, Mrs. Brincku. Just bear with me.**

A. Yeah. And also Jauwood did our electric in our

other home, too.

**Q. The home you did on Harrisburg Drive?**

A. Yeah, the 8096, and he was a friend of George's dad, so that's how we knew him.

**Q. I know what I wanted to ask you.**

**Look at Bates stamp 360 on the bottom.**

A. Okay.

**Q. That page has septic and sewer dated 4/1.**

**Do you see that?**

A. I'm sorry, Brincku 360?

**Q. 360 on the bottom, yeah.**

A. Okay, yes.

**Q. You see it says pole barn, and it has sun coast (phonetic) here, and it says septic here.**

A. Correct.

**Q. What are these three entries for, Joe 5200 plus 4150.**

A. Let me think here. This is -- I had kept track of every dime -- like one person wanted to charge us $5,200, and we paid 4,150. I always -- I'm sorry, I'm a little meticulous about -- I was trying to keep track of all the money I had saved in different areas.

**Q. So this basically is note by yourself?**

A. Yes. On money we saved.

**Q. Of money you saved because you went with one**

38

**contractor over another contractor?**
A. Correct.
**Q. Is that fair?**
A. Yes.
**Q. And you don't know what the "us" stands for?**
A. The Septic & Sewer, Incorporated is the company we hired to do septic.
**Q. And of course we talked about this yesterday on page 362 at the top: RJL Drywall?**
A. Correct.
**Q. Do you see that? And again, you have a note there 786 -- 7864, I guess, and then 7700, and then you subtracted and you have 940.**
**What is that entry, as you recall?**
A. Okay. This is Brincku 362?
**Q. 362, yes. The one with RJL Drywall at the top?**
A. I see RJL -- I'm just trying to see where you're talking about. Okay. The 940 added to 50 -- that was the savings that was continuing on. Let me see here because it's hard because we're skipping over.
**Q. The RJL Drywall bill?**
A. Okay, was 900 --
**Q. 7700. Do you remember that?**
A. Right, and it's -- oh, okay. Yeah, I had gotten an estimate -- this was -- yeah, this is part of my

39

savings thing.
I had called before -- George didn't know anything about this, but I was always calling people and stuff like that. That's where I took care of all that, and I had got an estimate before RJL, and they were more money.
And I went with RJL, they were closer, and George's sister-in-law and that's where -- because George had asked his sister-in-law, is there anybody that you would recommend.
**Q. So, again, this reflect --**
A. My savings.
**Q. Bids and then going with the lowest bidder; is that correct?**
A. Correct.
**Q. Okay.**
A. And somebody we preferred. Because at the time, I didn't really know. We were looking at a couple different things, and you know, she had recommended him to us. And he was close, so there was several reasons we picked him. And he had been around for 20 years.
**Q. And you signed a contract with RJL, which we saw yesterday?**
A. Correct.
**Q. And he did the work at the house --**

40

A. Yes.
**Q. -- on the drywall?**
A. Uh-huh.
**Q. Okay.**
A. And we had heard there was drywall shortages, and so that's why I got on top of that. We had already gone through the cement shortages in February, and had to pay more money. And I was like: I'm not going to get down to almost building a house and having to deal with shortages on drywall.
**Q. And this goes --**
A. That will hold us up.
**Q. Is this because of the building boom that was going on in the area?**
A. Yes.
**Q. So this Exhibit 3 represents all of your notes for the construction of the house?**
A. Correct.
**Q. And the amounts of money that you put out for that?**
A. Yes.
**Q. So when you're talking about how you basically floated the construction, these costs you were bearing yourself before you got the mortgage?**
A. Correct.

41

**Q. Okay.**
A. I was always trying to save money.
**Q. Approximately how much did you have in the house when you actually got the mortgage?**
A. I can't give you an exact figure off the top of my head. We had quite a bit of money in the house already.
**Q. It looks like about $50,000; is that wrong?**
A. Yeah. I mean, we had in the house, ourselves in the house?
**Q. That may be just the outside. I'm reading just the outside I see.**
A. What page are you on?
**Q. I see now what you did. You actually have subtotals, don't you? So start with 364.**
MR. GARY: Sorry. What page are you on?
MR. PAGLIARO: Brincku 364, Bob.
THE WITNESS: 364. Okay. Those are the storage -- Brincku 364?
BY MR. PAGLIARO:
**Q. Yeah.**
A. Those are things that -- extra costs, like we had to have storage -- and we had to have a recyclable bin. Are we on the same page? It says books and plans.
**Q. So to the page before, 362, the one we were on**

**before, RJL drywall?**

A. Yes, uh-huh.

**Q. At the bottom, you have: Labor savings for George, Brenda, Christine, and Ashley and you have a number, 107,475.**

A. All of us had worked and put sweat equity into the home.

**Q. You were trying to calculate what the value of that was?**

A. Uh-huh, yeah, because we had done a lot of work. My kids -- when my daughter came home from spring break, she was expected to work.

**Q. What kind of things did you guys do in the house when you were constructing it?**

A. We did anything George asked us to do, and I, you know, spent hours upon hours. I mean, it's not uncommon for us to go to bed at 1:00 in the morning. And Ashley worked. And whatever we could do to help.

**Q. Were you painting, were you --**

A. Oh, yeah. We paint, do anything, you know, we were capable of doing. We didn't do the hard labor, but anything -- cleaning up the property, doing whatever -- like I assisted in -- I got all the materials, put it all together, worked with some people that built our pole barn. My daughter Christine would help doing anything she

could do to help when she came home. And Ashley, too.

**Q. Was Christina at school at the time?**

A. Yes. On spring break and summer she would come home and work.

**Q. All right. Let's shift gears for a minute here.**

**Mrs. Brincku, I want to ask you some questions about what I call social networking.**

A. Okay.

**Q. Do you understand that term?**

A. Yes.

**Q. And so you mention, for example, that you helped a website designer design a website for your husband's landscape business; is that correct?**

A. Yes, uh-huh.

**Q. Okay. Now, in the events that occurred after your problems with your house -- the house?**

A. Uh-huh.

**Q. You became involved setting up computer-related social networking sites relating to drywall; is that correct?**

A. Correct.

**Q. Tell me what you did in that area?**

A. I set up an American and Chinese defective drywall page, and it was -- I could tell you the exact weekend. It was the weekend -- I was visiting my daughter

in Indiana. We had just watched a drywall hearing with Richard Kampf in 2009, May 2009, and we were talking about there's just so much news out there, they're starting to come out.

My daughter was the one that kind of actually convinced me to do it. She said wouldn't it be good to have a page that's kind of a support group and be able to put drywall news out.

**Q. And approximately when was that, Mrs. Brincku?**

A. May 2009.

**Q. Okay.**

A. If I'm not mistaken.

MR. PAGLIARO: Why don't we have this marked.

(Defendants' Exhibit 4, Facebook page called American and Chinese defective drywall, was marked for identification.)

BY MR. PAGLIARO:

**Q. Obviously we're dealing with electronic media.**

A. Yeah, my kids were like, Mom, we couldn't get you on Facebook. Now we can't get you off.

(A discussion was held off the record.)

BY MR. PAGLIARO:

**Q. So Mrs. Brincku, you've just been handed Brenda Brincku Exhibit 4 for this deposition, and it is a Facebook page called American and Chinese defective**

**drywall.**

**Do you see that?**

A. Correct.

**Q. Is this the site basically you set up?**

A. Yes. Well, my daughter set it up for me.

**Q. Would that be Christine or Ashley?**

A. Christine.

**Q. So Christine helped you set it --**

A. She's a graphic designer, yeah.

At the time she was going to school for graphic designs.

**Q. And you mention that she had suggested this --**

A. Yes.

**Q. -- Facebook page; is that correct?**

A. Correct. She was really involved on Facebook at the time, and she said, you know, it would be neat to start -- she was the one that kind of put the idea in my head, and she said it would be neat to start something like that so people can see drywall news and be able to network together and be like a support group.

**Q. And your testimony is this was started up in May?**

A. 2009.

**Q. 2009; right?**

A. Yeah. I was visiting her, and she helped -- she did the setup for me.

**Q. By that time, you were out of the house on River Estates; is that correct?**
A. Correct.
**Q. Okay. Did you have any other help besides your daughter in setting up this Facebook page?**
A. No.
**Q. And explain for us what you felt the purpose of this to be.**
A. Like a place for people to, you know, find drywall news, any drywall news, I would post it on there, and kind of a support, you know, support thing, get the word out, you know, if there's any drywall news that's going on.
**Q. Now, you mentioned that the site is called American and Chinese Defective Drywall.**
**Did you have Chinese drywall in your house?**
A. No.
**Q. What did you understand the Chinese drywall issues to be -- strike that.**
**Let me ask a better question.**
**What did you understand to be the issues related to defective Chinese drywall in people's homes?**
MR. GARY: Objection.
BY MR. PAGLIARO:
**Q. At the time?**

**You can answer.**
A. Okay. People that had coils, problems with their coils, blackening coils, problems with electrical wiring, that kind of thing.
**Q. Was it your belief that the problems that you experienced in your house were the same as the problems being described by people with Chinese drywall?**
MR. GARY: Objection. You can answer.
THE WITNESS: Correct.
BY MR. PAGLIARO:
**Q. Did you say correct?**
A. Yes.
**Q. Thank you.**
**Now, there's postings here relating to senate hearings; correct? Page 3.**
A. Page 3?
**Q. Yeah.**
A. Yes.
**Q. Did you keep track of what the government was doing with regard to any issues relating to drywall?**
A. Yes.
**Q. Okay. How did you do that?**
A. I have a friend in Virginia that she kind of keeps track of everything going on. She's very active. And so she started a page, and I sometimes would copy and

post things from her page to my page.
**Q. And what was your friend's page called?**
A. Victims of Chinese Drywall.
MR. PAGLIARO: I'm going to show you the next exhibit.
(Defendants' Exhibit 5, Facebook page called Victims of Chinese Drywall, was marked for identification.)
BY MR. PAGLIARO:
**Q. Now, you just mentioned your friend and a page called Victims of Chinese Drywall?**
A. Correct.
**Q. I just showed you Brenda Brincku Exhibit 5.**
A. Yeah.
**Q. And that has a page called Victims of Chinese Drywall?**
A. Correct.
**Q. Is that the site you were talking about?**
A. Yes.
**Q. And this site contained, among other things, obviously, a lot of other things, information relating to your family; is that correct?**
A. Correct.
**Q. Okay. And there's a photo on the front?**
A. Uh-huh.

**Q. Do you see that?**
A. Yes.
**Q. That's your family?**
A. Yes.
**Q. And Christine and Ashley, your son Harrison?**
A. Yes.
**Q. Is that photo from a wedding?**
A. Yes.
**Q. And whose wedding was that?**
A. My exchange student, in France.
**Q. And where did the wedding take place?**
A. In Paris. Right outside of Paris.
**Q. Nice trip, huh?**
A. Yeah. My kids paid for their trip to go, and what happened was my exchange student's father was very sick with cancer, and she had asked George if he would walk her down the isle if her father was unable to go.
And she's kind of our -- we've had 14 exchange students, and they're kind of like our daughters. And they always invite us to all their weddings. So they had asked us to be there. And she had asked especially for George to be there, that she was afraid that he was too ill that he wouldn't be able to walk her down.
**Q. This site, Victims of Chinese Drywall, you said was started by a friend.**

**Who is your friend?**

A. Colleen Stevens.

**Q. And you said she was in Virginia?**

A. Yes.

**Q. Does she maintain other sites relating to lobbying efforts, if you know?**

MR. GARY: I'm sorry. I didn't hear the question.

BY MR. PAGLIARO:

**Q. Did she maintain other sites relating to lobbying efforts in different areas?**

MR. GARY: Objection.

BY MR. PAGLIARO:

**Q. If you know.**

A. Yeah, I think this is the only one she does. I'm not positive.

**Q. Why was she involved or interested in, if you know, the drywall situation?**

A. Because she had Chinese drywall in her home.

**Q. Okay. Now, there's a film here, isn't there?**

A. Yes.

**Q. At least it's embedded in this website?**

A. Yes.

**Q. And is that your husband George, at least on the first frame of the film?**

A. Yes.

**Q. And what is depicted in this film?**

A. It's actually showing our house.

**Q. Is this a film that we talked about yesterday that your son Harrison is in as well?**

A. No.

**Q. No? It's another film?**

A. Yes.

**Q. Did you do the filming yourself, Mrs. Brincku?**

A. No.

**Q. Who did the filming for you?**

A. A friend.

**Q. What prompted you to have films done?**

A. Just to try to see if anybody else had the problem, and kind of for the victims.

**Q. How many films were done in your home?**

A. Two.

**Q. Were they both posted on YouTube?**

A. Yes.

**Q. And during what years? Was that 2009 or after?**

A. I'm not sure of the exact dates. One was posted first, and then like a year later, the other one was done.

**Q. Did anyone ask you to have these films done?**

A. No.

**Q. Who came up with the idea of doing the film?**

A. George.

**Q. And whose idea was it to use your son in the films -- one of the films?**

A. I was very involved and helping with victims, and things like that. And one thing I felt like that wasn't addressed and we had talked about -- and Harrison always kind of felt like he was kind of the kid that represented all the children. And so Harrison wanted his dogs in there representing the animals.

**Q. Mrs. Brincku, you mentioned you had become involved with what you call the victims. Were you paid for any of that activity?**

A. Oh, no. No.

**Q. This is something you did on your own?**

A. Yes.

**Q. And were you prompted to do this by the situation in your own house?**

A. Yes. I mean, I know what we had gone through, and I want to be able to share information with mortgages and different things that are gone through. And so that's why it's more of a support group, and just the different things that victims have gone through.

**Q. And you were trying to get a relief from a number of sources relating to -- strike that.**

**You were seeking relief from a number of sources**

**for the problems you were having with your drywall; is that correct?**

A. Yes.

**Q. So, for example, you looked to the government; is that right?**

A. Correct.

**Q. The state government?**

A. Correct.

**Q. The federal government?**

A. Correct.

**Q. You were also looking for help from Congress; isn't that correct?**

A. Correct.

**Q. You were looking for the senate to help you?**

A. Correct.

**Q. You went and met with senators; is that correct?**

A. Correct.

**Q. You were looking for the IRS to help you?**

A. Correct -- well, I didn't really -- the IRS, I never explored that.

**Q. Okay. Well, we'll talk about that a little later. How about the CPSC, you went to the CPSC?**

A. Yes.

**Q. Did I miss anything? You went to your insurance companies; isn't that correct?**

A. Correct, yes, for my builders and my homeowners.
**Q. All right. You went to the mortgage company?**
A. Correct.
**Q. And you went to the government about getting relief from your mortgage?**
A. Correct.
**Q. Okay. Did I miss anything?**
A. I think you covered it. I could be mistaken, but I think that was all.
**Q. Tell me what you know about an organization called ProPublica, Mrs. Brincku.**
A. They are a nonprofit. They investigated for the cover stories.
**Q. Is there a person there that you've had contact with, ProPublica?**
A. Yeah, Joaquin Sapien.
**Q. And what is Mr. Sapien -- is he a reporter?**
A. Yes.
**Q. Does he work for ProPublica?**
A. Correct.
**Q. And give me some sense of how many contacts you have with him over the course of the time when this started?**
A. I can't give you a number.
**Q. Is it somebody you talk to every week at the**

**height of the issues relating to this?**
A. When -- yeah, I mean, whenever he called me, you know, I just take his phone call.
**Q. Okay.**
A. You know, it's hard to say. Sometimes I wouldn't hear from him for long periods of time.
**Q. Did he describe to you his interest in your house?**
A. Yes, he contacted me.
**Q. And how did he describe it?**
A. He was interested in knowing -- you know, he had investigated Chinese drywall. He had done stories. He worked with the Herald Tribune, and he contacted us and heard about the American drywall and contacted us and asked us questions.
**Q. Did you feel he was cooperative with you in your search for help?**
MR. GARY: Objection.
THE WITNESS: He just was -- my biggest thing was it wasn't all about, quote, "our home." My biggest thing is what the victims are going through, and what can be done to help the victims. And so that's what we mainly talked about is what can be done, federal assistance programs and things like that.
BY MR. PAGLIARO:

**Q. So you were -- and I don't want to paraphrase it -- you just tell me if I'm wrong -- you were looking to him to help sort of piece through what might be done for people with the government and with institutions like mortgage agencies and other things; is that correct?**
MR. GARY: Objection.
THE WITNESS: Well, he would call and, you know, he had done a piece on our house, and then he would just ask me questions because he knew people were contacting me, they wouldn't talk to reporters or wouldn't talk to different things. But they would contact me and he would ask me: Okay. What's some of the things that the victims are going through.
BY MR. PAGLIARO:
**Q. All right. So it fair to say you were a sounding board for him for the victims?**
A. Yes.
**Q. Okay. I asked you about these two Facebook pages.**
A. Uh-huh.
**Q. Mrs. Brincku 4 and 5; right? Brenda Brincku 4 and 5?**
A. Correct.
**Q. The first one, which is the one that you initiated, the American and Chinese Defective Drywall.**

**Is that still up and going?**
A. Yes.
**Q. It is? And how many -- at this point, whenever this was photocopied, it said: 402 people liked this.**
**How large a following do you have now, do you know?**
A. Probably about the same.
**Q. And has anyone contacted you personally aside from this site, like an e-mail directly to you or a phone call?**
A. Yes, I've had e-mails.
**Q. 10, 20, 100?**
A. I've had a lot of e-mails of different people just saying, you know, tell me what signs I need to look for, and so I would tell them the signs, look for corrosion, copper wiring, and then hire a professional to have your house examined.
**Q. So --**
A. And then -- excuse me.
**Q. Sorry. I don't want to interrupt you.**
A. No, I'm fine.
**Q. This site, American and Chinese Drywall, Brenda Brincku 4, you said it was still in existence; correct?**
A. Correct.
**Q. On Facebook.**

58

**Has the traffic changed since you first put it up? Is there less traffic on it than there was?**

A. It just depends on what's going on in litigation with, like, Knauf, the big settlement, whenever there's somebody big that comes out, the traffic picks up. People have a lot of questions, and it's kind of a way, you know, to put it out there, and people can answer each other back and kind of the support group.

**Q. Do you still post on it regularly, Mrs. Brincku?**

A. Yes.

**Q. And, again, to the extent there is an announcement about a settlement, you actually post that on here?**

A. Yeah, like the Knauf settlement, anything that hits the news.

**Q. And you'll put a link on there?**

A. Yes.

**Q. How often do you check this Facebook site?**

A. Probably every day. If I get -- well, basically, if I get an e-mail of a story that came out about drywall, I post it on the page.

**Q. And do you get notices on your e-mails when someone posts on this page?**

A. Yes.

**Q. So it's a pretty active endeavor?**

59

A. Yeah.

**Q. What about the second one we talked about your friend set up?**

A. Uh-huh.

**Q. No. 5, the Victims of Chinese Drywall. I have to admit I know less about this one.**

**Is this still active?**

A. Yes.

**Q. Okay. And are people still posting on it?**

A. Yes.

**Q. Do you post on it?**

A. I'm not -- I'm on there occasionally.

**Q. I have one more question on this theme.**

A. Yeah. She set up that thing, and she put it together.

**Q. So the court reporter just handed you, Mrs. Brincku, what I marked as Brenda Brincku 6. And this is a Twitter run; is that right?**

A. Yes.

(Defendants' Exhibit 6, Twitter run, was marked for identification.)

BY MR. PAGLIARO:

**Q. And you are identified as the person who initiated BrendaBrincku@BBrinckuFlorida; right?**

A. Yes.

60

**Q. When did you set up this Twitter account?**

A. My daughter did. I never even done Twitter before then.

**Q. I know less about Twitter than Facebook, which isn't much.**

A. And she set it up to automatically anything that is posted on my American Drywall page automatically goes to Twitter. You know, I'm not a Twitter person. I don't really care for it that much.

**Q. So your daughter --**

A. In the beginning I was on it a little bit, and so then I could care less.

**Q. So let me see if I understand. Your daughter set this account up for you on Twitter?**

A. Correct.

**Q. And what did you want to accomplish by setting this up?**

A. She said it's the newest thing out; it's, you know, it will -- you know get the news out there about drywall, things like that, keep anything that comes out for the victims; they're on Twitter.

**Q. So the freshness of it is something she thought was relevant?**

A. Yes, uh-huh.

**Q. And did you actually tweet on this account?**

61

A. I had, uh-huh. I'm not on it lately, you know. I don't really pay attention, but it's, like what I said, from my American drywall page automatically goes on that.

**Q. It links to your American drywall page, so if you post something on that it automatically --**

A. Correct, so it automatically does that. I haven't been on there like six months of going and personally into it to tweet.

Before I was in the beginning, and I was telling my daughter this is crazy because she's like: You need to do Twitter and you need to do your Chinese drywall -- you know, the American and Chinese drywall page.

And I was like, I can't keep up with this, this is too -- and she said: Oh, I can just link it. Anything you post on one and then you don't have to post it twice. And so she did that.

**Q. I admit I don't know this technology very well, but basically --**

A. You're not missing out. I don't like Twitter really.

**Q. Do people tweet back on this account, or is it just you sort of putting out information?**

A. I just kind of put -- yeah. Once in a while they can send you a direct message, but I never go on there to check lately, you know, I just don't. I try to keep up

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

with that, and it was just too much, so when she -- you know, changed it, it's made it a lot easier, I don't have to deal with it.

And this -- I see this comment down here, you get people posting things advertising, I didn't make -- oh, I had to let people -- somebody hacked in my account and I had a problem with somebody hacking into my account and posting things. I had to change my password and stuff like that.

**Q. You posted several things on this account and on your Facebook account relating to the various settlements of drywall claims; is that correct?**

A. Yeah, with the Knauf drywall, everybody is really interested in what's going on with that.

**Q. And there's something about a Banner Supply; is that correct?**

A. Banner Supply, yes.

**Q. Did you take any position on your Facebook page about these settlements?**

A. Once in a while I would tell people they need to read what's going on so they're aware. A lot of people are working, husband and wife both working, don't have the time, and I try to make them aware, they need to know what's in the settlements before they make decisions.

**Q. Okay. So is it fair to say this Twitter site**

**isn't something you're regularly -- you yourself going on and posting to; is that correct?**

A. Yeah, ever since my daughter changed, I don't really need to mess with it.

MR. PAGLIARO: All right. One more here. This is 7.

(Defendants' Exhibit 7, Zazzle.com Internet page, was marked for identification.)

BY MR. PAGLIARO:

**Q. Mrs. Brincku, I just handed you -- again, it's something off the Internet. It's called zazzle.com, back slash, toxic drywall.**

**Do you see that?**

A. Yes.

**Q. What is zazzle?**

A. Zazzle is the place where you can create your own T-shirts and make designs and, you know, get them off the Internet.

**Q. When I open this, I see a lot of T-shirts, caps, mugs, carry bags, dog sweaters that have toxic drywall with a skull and cross bones in some instances lettered on them; is that correct?**

A. Uh-huh, correct.

**Q. What, if anything, did you have to do with these T-shirts, caps?**

A. It was my daughter's site. She did -- in December of 2009, we had a drywall rally for the victims, and it cost a lot of money to have it there and we didn't have the funds. And I did it with Richard Kampf, he was very involved. He was -- he's the one that testified in 2009.

And so in order to cover the costs, she had done this for them, and she had sponsored a booth with any money that she made went to sponsor a booth to help defray the costs of the drywall rally.

**Q. This is your daughter in the graphic design --**

A. Correct.

**Q. -- business; right? Did she actually design these insignia that were put on the T-shirts?**

A. Correct, yes.

**Q. And set up this, basically, mini business to sell this paraphernalia; is that correct?**

A. Yeah. I mean, she doesn't make any money. It was for the drywall rally. Anything she made, she put it towards that.

**Q. Did you take any money from this?**

A. No.

**Q. Okay. Tell me about the rally. Where was it held?**

A. It was held at the Shell Factory in Fort Myers.

**Q. The --**

A. The Shell Factory.

My uncle owns it, and he offered to have it there. He wanted to help out the victims.

**Q. December 2009?**

A. Yes.

**Q. Who organized the rally?**

A. Richard Kampf, and I helped him.

**Q. Is Richard Kampf a friend of yours?**

A. Through this whole drywall thing, yeah, he's the one that testified, and that's how I met him.

**Q. Does he have problem drywall in his house?**

A. Correct. Now he's had his house remediated. He put his own money out to have it remediated. He has Knauf drywall.

**Q. He had Knauf drywall?**

A. Yes.

**Q. That's Chinese drywall?**

A. Yeah, it's part of -- it's Knauf -- it's a German manufacturing, and it's -- they have a company in China.

**Q. So he had Chinese drywall in his house, Mr. Kampf?**

A. Correct.

**Q. And you said he had his house remediated?**

A. Yes, he did it -- he had a (inaudible) claim

66

remediate it for him.

**Q. And the remediation consisted of what? Do you know?**

A. Yeah. He had everything -- the wiring, everything gutted from his home, and AbsoClean (phonetic) Clean came and put like -- it's a nontoxic, safe enough to do your laundry. It's environmental friendly. He had it sprayed to take out any smells that were left in the house.

**Q. Did he have the drywall removed?**

A. Yes, everything.

**Q. And replaced?**

A. Tile, everything.

**Q. And replaced?**

A. Yes.

**Q. What was the it replaced with, do you know?**

A. I think he used USG.

**Q. But American drywall?**

A. Yes.

**Q. And you said there was a rally at the Shell Factory in Fort Myers, December 2009. Mr. Kampf organized it. You helped. Fair?**

A. Correct.

**Q. What role did you play in the rally?**

A. I just helped wherever I could, get fliers out,

67

stuff like that.

**Q. Did you put a posting on your website about it?**

A. Yes.

**Q. And how many people were drawn to the rally?**

A. Around 300.

**Q. Did any, I'll call them politicians show up, any government officials?**

A. Yes.

**Q. Who showed up from the government that you know?**

A. Kottkamp. He's -- I'm trying to think, the lieutenant governor.

**Q. The lieutenant governor of Florida showed up?**

A. Yes. He has the problem in his home.

**Q. Okay. Anyone else from the EPA, CPSC?**

A. CPSC showed up. We had booths set up so people could go and get information. It was kind of a way to -- for people that were finding out -- we were finding out a lot of people were just finding out about it. And it was a way for people to get information from the government agencies and, you know, when we invited them all -- you know, asked them if they would like to come and collect information, things, you know.

**Q. Did any lawyer show up representing people?**

A. We -- yeah. There were lawyers there to find out about it.

68

**Q. Did your lawyers come?**

A. Yes, Bob was there.

**Q. Mr. Gary?**

A. Yes.

**Q. Were there attempts made to get people to bring lawsuits?**

A. No. It was just mainly for the victims to get information about if they have this problem, kind of a way to be able to network, get us all together in one space.

**Q. Did you speak at the rally, Mrs. Brincku?**

A. Yes, I did.

**Q. Did your husband speak at the rally?**

A. Yes, he did.

**Q. Did Mr. Gary speak at the rally?**

A. No.

**Q. Did any lawyer speak at the rally?**

A. No, we did not allow lawyers to speak at the rally. This was not about the lawyers.

**Q. Did the lieutenant governor speak at the rally?**

A. Yes, he did.

**Q. Did any other government official speak at the rally?**

A. No. Mainly Richard Kampf.

**Q. What did the lieutenant governor say he was going to do about the problem, if anything?**

69

A. Basically, he was there for support, that he knows what the victims are going through and he understood and he was there to support them.

**Q. Were people asking for more than his, let's say, his sympathy support? Were they asking for financial support from the State of Florida?**

A. Yeah, at that time they were -- they were irate that there was no help, and so we were there to kind of calm them down and tell them what we were -- you know, Richard Kampf was -- he has a grass roots effort, and he's retired.

And he was the chief EPA in Philadelphia, so he had a lot of knowledge of things and so he was there to, you know -- and I was just kind of like, I call it the go-fer. Go for this, go for that, and help him out. And help the victims.

**Q. Mrs. Brincku, have you had any training or course work or technical background in conjunction with this drywall issue since '09?**

A. No.

**Q. Okay. So what you've learned about the issues you've learned through your own experience; is that fair?**

A. Correct.

**Q. And from what research you did on the Internet?**

A. Yes.

**Q. Okay. Is there anything else that you did to inform yourself about the scientific issues?**

A. As far as just on the Internet, just, you know, read things, articles.

**Q. Your husband testified yesterday about interactions you have with professors at MIT?**

A. Correct.

**Q. Did you have any similar interactions with people at universities, technical institutions?**

A. University of Florida came, but I wasn't there when he came. He just came to do his observation.

**Q. Did you call him?**

A. George would talk to him once in a while, you know, like to let him in the house and, you know, things like that. He would call, and he was doing an investigation for CBS news and he would call and say: Hey, I'm going to be here at this time, and let us in, and he would open up the door and, you know, be there when he was there.

**Q. Your house actually appeared one night on the CBS news; is that true?**

A. Yes.

**Q. On the national news?**

A. Yes.

**Q. How did that occur?**

A. CBS news called us and asked us if they could come out. They had heard about us.

**Q. Had they seen your Facebook page?**

A. No, I hadn't done a Facebook page then.

**Q. How did they hear about you? Did they say how they heard about you?**

A. At the time Gonzalez was our lawyer, and it was through his wife had told CBS news that they have an American --

**Q. So it was your then counsel --**

A. It was a group of lawyers.

**Q. -- it was your then-counsel Mr. Gonzalez, whose wife alerted CBS?**

A. Yes, she didn't alert. She just said, you know, they asked her if anything was going on with the drywall thing, and she said: Well, we have a client that has American drywall in their house.

**Q. Did they come out and interview you?**

A. Yes.

**Q. Okay. How long did they spend at your house?**

A. The day they came out, over an hour -- maybe a couple hours, looking at everything.

**Q. They took videos?**

A. Yes.

**Q. How big a crew?**

A. There was a cameraman, the person that did the interview, and I think another person. I think there was three of them.

**Q. Did anybody with an expert background or technical background come with them? Scientists or --**

A. That's -- they -- it was just came out to -- they ran two stories and they came out and she just did the story. And she was investigative reporter.

**Q. Okay. At that time had you been dealing with the folks at MIT?**

A. Yes. George had. I never had contact with -- I mean, maybe an e-mail and I would write back what George would tell me. But George was basically the one that dealt with him. I didn't really deal with him.

Now, I used George's e-mail account, and I would write to him whatever he told me to write to him. George hates e-mailing.

**Q. But just to put a point and time in it, it was after Mr. Brincku had had some correspondence with the folks at MIT --**

A. Correct.

**Q. -- that the CBS folks showed up?**

A. Yes.

**Q. Is that fair? How about in relationship to the rally? Do you remember?**

A. That's December 2009.

**Q. Was the CBS thing before?**

A. Yeah, there was two documentaries on CBS, and the first -- I mean, the two news clips, and that was, "Bad drywall rots new home," was the first one. And that was March, end of March 2009.

**Q. All right. Take a break.**

VIDEOGRAPHER: Going off the record. The time is 10:16 a.m.

(A break was taken.)

VIDEOGRAPHER: Back on the record. The time is 10:24 a.m.

BY MR. PAGLIARO:

**Q. Mrs. Brincku, we're back on the record. You had mentioned before that you received e-mails from other, you termed, victims.**

**Do you keep an e-mail account with those e-mails?**

A. Yes.

**Q. Are they in a folder in your e-mail account?**

A. Of the different victims?

**Q. Yeah.**

A. I just have them all over, I mean, on my account.

**Q. You seem pretty organized, though, don't you?**

A. Yeah, I have like for, you know, if MIT ever sent us something, I have the folders for them, but I get so

many e-mails that I can't do folders for everybody, you know, I just -- you know, sometimes people send and I answer them back and I delete them.

**Q. But you save some of them?**

A. Yeah.

MR. PAGLIARO: I'm going to have some things marked now, two things. One will be 8 and one will be 9.

(Defendants' Exhibit 8, Testimony of Brenda Brincku, was marked for identification.)

(Defendants' Exhibit 9, Statement of Brenda Brincku, was marked for identification.)

BY MR. PAGLIARO:

**Q. I didn't ask your husband yesterday, but I'm going to talk a little bit now about any prior testimony or statements that had been made. Let's start with the most general question.**

**Have you ever testified under oath, aside from things relating to this lawsuit and the issues in your home before this?**

A. No.

**Q. Okay. Never sued anybody?**

A. No.

**Q. Never a defendant in a lawsuit?**

A. No.

**Q. Car accident lawsuit?**

A. I had a car accident, but they settled and took care of my bill. They hit me from behind and destroyed my van, and so they took care of my van and took care of my medical bills, and that was it.

**Q. Is this --**

A. I sued them.

**Q. Is this the first time you've ever been deposed?**

A. You mean in a deposition?

**Q. Deposition.**

A. Yes.

**Q. And have you ever testified in a court?**

A. No.

**Q. Okay. Have you ever been convicted of a crime?**

A. No.

**Q. Okay. Let's talk about things related to the issues in your house -- the house.**

A. Okay.

**Q. You've given statements relating to the situation in your house; is that correct?**

A. Correct.

**Q. And you've testified related to the house; is that correct?**

A. Correct.

**Q. Okay. So I just had marked, and you can open it if you like, take a look at it, No. 8.**

**It says: Testimony of Brenda Brincku, Alva, Florida, before the United States senate committee on commerce, science, and transportation, subcommittee of product safety and insurance.**

**Do you see that?**

A. Right.

**Q. And the title says: Contaminated drywall examining the current health, housing, and product safety issues facing homeowners?**

A. Correct.

**Q. And this is dated December 6th, 2011.**

A. Yes.

**Q. So this is relatively recent; is that correct?**

A. Yes.

**Q. Okay. And what prompted this testimony? Did you get invited to testify?**

A. Yes, Senator Nelson's office asked me to testify.

**Q. Okay. And is this something that you wrote yourself or did you have help writing it?**

A. I had help.

**Q. Okay. Who helped you write this?**

A. Richard Kampf and Colleen Stevens.

**Q. And we talked about Mr. Kampf before?**

A. He was the EPA.

**Q. And who is Ms. Stevens?**

A. Colleen is the one that has the patient. She's in Virginia. They're both very active. And, like I said, I'm the little go-fer thing and help them.

**Q. And you gave this testimony this past December in the United States Senate?**

A. Correct.

**Q. Now, this document you talk about a lot of the federal agencies that are working on these problems and how -- and I'm quoting you -- they have failed us.**

**I'm looking at page 3.**

A. Correct.

**Q. You have it actually in bold, don't you?**

A. Yes.

**Q. When you gave the testimony, did you actually read this document?**

A. No, no.

**Q. You handed this in --**

A. Yes.

**Q. -- beforehand?**

A. Yes.

**Q. And then they asked you questions then?**

A. Yes.

**Q. Okay. And in your submitted testimony -- we'll call it submitted testimony in writing, you talk about the**

78

**agencies that, quote, failed us.**
A. Correct.
**Q. And that includes the Consumer Product Safety Commission failed us; correct?**
A. Yes.
**Q. And you say the U.S. Internal Revenue Service failed us; correct?**
A. Yes.
**Q. You say the Federal Emergency Management Commission failed us; correct?**
A. Correct.
**Q. That would be FEMA?**
A. Yes.
**Q. And you say the U.S. Department of Housing and Urban Development failed us; correct?**
A. Correct.
**Q. And the Center for Disease Control failed us; is that correct?**
A. Correct.
**Q. And the U.S. House of Representatives Drywall Caucus on Defective Drywall failed us; is that correct?**
A. Correct.
**Q. And you asked for the committee to consider some things, didn't you --**
A. Yes.

79

**Q. -- on the last two pages.**
**It says you asked the committee to require the Consumer Product Safety Commission to arrange for a peer review of its final remediation guidance, particularly because leaving electrical wiring in a contaminated home is clearly an unsafe condition.**
**Do you see that?**
A. Yes.
**Q. Do you know, has the committee required the Consumer Product Safety Commission to arrange for a peer review of its document?**
A. No, I don't know that.
**Q. Okay. You asked that they direct the CPSC to declare a product a hazard.**
**Have they done that?**
A. I'm sorry, which?
**Q. Second bullet.**
A. Okay. And what was the question? I'm sorry.
**Q. You asked the committee to consider directing the CPSC, the Consumer Product Safety Commission, to declare the product a hazard?**
A. Yes.
**Q. I assume by the product, you mean drywall?**
A. Yes.
**Q. Have they done that?**

80

A. No.
**Q. Okay. Are there any of the things on this list that you asked for that the committee has done?**
A. No. They are looking into the credit, Rubio's office, and Nelson's office.
**Q. Is Nelson your senator for Florida?**
A. Yes.
**Q. Is he the current senator?**
A. Yes.
**Q. The last thing you have, on the last page, it says: The committee shall consider the possibility of homeowners receiving federal grants under a declaration similar of that to a hurricane or flood administered by FEMA.**
**Do you see that?**
A. Yes.
**Q. What were you looking for in that respect?**
A. Richard Kampf helped me write some of this testimony because he's very knowledgeable on this area, and we were looking for -- and then later I had talked to Clint Odom from Nelson's office, and he had said there really isn't -- he explained to me about FEMA, and he said because that's only for natural disasters, acts of God. And that this is a man-made disaster and that FEMA cannot give funds for that to assist the homeowners.

81

**Q. Did the Brincku family make a claim to FEMA?**
A. No.
**Q. Okay. So you were looking for FEMA to sort of be expanded, if you will, to deal with this issue?**
A. Yes. And he explained to me why they couldn't do that.
**Q. Okay. Fair enough. Under this Exhibit 9 is a statement of Brenda Brincku, homeowner, submitted to the subcommittee on consumer affairs, insurance owners, science and transportation.**
**This is an earlier statement; is that correct?**
A. Correct.
**Q. When was this made, do you know?**
A. Christopher Day from Consumer Product Safety Commission asked me to submit my testimony for the hearing after Richard Kampf had testified in 2009.
**Q. Now, is this before --**
A. This is May 2009.
**Q. May 2009. Thank you.**
A. Yes.
**Q. This is after your rally?**
A. No.
**Q. No?**
A. Our rally was in December 2009.
**Q. Oh, I'm sorry. Well, then, look at -- let's look**

82

at the date again because in the second paragraph, it says: December 20, 2009, in an article in Fort Myers.
Do you see that?
A. Oh, it's supposed to be 2008. It's a typo.
Q. It's just a typo?
A. Yes.
Q. So I misunderstood.
A. Yeah, this might have been an old sheet because I think it was correct on the original. I'm not sure. But it was supposed to be 2008.
Q. Okay. That article appeared in 2009. This 2008 -- excuse me, December 2008, this testimony was submitted in May of --
A. 2009 was --
Q. -- 2009, and then the rally was in December 2009?
A. Correct.
Q. Do I have that right?
A. Yes.
Q. And this is something that you put together?
A. Yes. My friend helped me. This is when we are in Indiana, and she helped me put it together and -- because we were on vacation and we had found out Christopher Day from Consumer Product Safety Commission asked me to submit my testimony and we were on vacation, and so my friend -- I had to use her computer and her

83

printer and all that stuff.
Q. This isn't the same friend you have in Virginia?
A. No. This is just a friend. She has nothing to do with drywall. She was helping me to type it out and everything, helping me to type it out because I didn't have my computer with me.
Q. Did anyone else have any input in this document?
A. No. She didn't have any input in it. She just typed it.
Q. Okay. And did you appear, again, before this subcommittee -- the subcommittee in consumer affairs?
A. Yes.
Q. And submit this ahead of time, this statement?
A. No. On this one, no, I didn't appear -- I'm sorry. I mis --
Q. Let's go back.
A. Okay.
Q. Okay. So the fellow from CPSC asked you to prepare a statement; correct?
A. Correct. And that was after the hearing.
Q. And it was after the hearing?
A. And you had like two weeks to submit a hearing, and he asked -- Christopher Day asked me to submit my hearing.
Q. Okay?

84

A. -- or submit my testimony.
Q. Did you testify at the hearing?
A. No.
Q. Okay.
A. Just Richard Kampf.
Q. Gotcha.
A. And at the time, I hadn't met Richard yet.
Q. So the only time you actually physically testified, the time you testified in December of 2011?
A. Yes.
(Defendants' Exhibit 10, ProPublica document, was marked for identification.)
BY MR. PAGLIARO:
Q. I just had marked as Brenda Brincku Exhibit 10, Mrs. Brincku, a sheet from ProPublica relating to tainted drywall.
A. Yes.
Q. This is the organization we talked about before.
A. Correct.
Q. Is that your photo on the sheet?
A. Yes.
Q. And does that depict the time you testified before the senate/congress subcommittee?
A. Yes.
Q. And that was the testimony that has already been

85

identified and marked and that we talked about before as 8; is that correct? December 6th, 2011?
A. Yes, yes.
Q. Did you see this article by Joaquin Sapien before it was published?
A. No.
Q. So this basically is Mr. Sapien's report, as you understand it, on the hearing that took place the day before -- this is dated December 7th; is that correct?
A. Yes.
Q. Have you seen this document before?
A. Yes.
Q. When was the first time you saw this?
A. When it came out in the news.
Q. And you were quoted in here, is that correct, page 2?
It says: Brenda Brincku, a Florida homeowner who has sought relief for problems caused by drywall since 2004, said in written testimony that the federal agency -- quote, "The federal agencies working on this problem for over four years have failed us."
Is that correct?
A. Correct.
Q. Is that a correct reflection of what you said?
A. Yes.

86

**Q. We just read that in the statement, didn't we?**
A. Yes. He was there when I was testifying.
**Q. When you gave the statement before the hearing, you said then you showed up at the hearing and they asked you questions?**
A. Uh-huh.
**Q. Did they ask you questions from the statement?**
A. I'm sorry?
**Q. Did they use the statement to ask you -- did they say, Mrs. Brincku, you said in your statement X. What did you mean by that?**
A. He was just sitting in on the whole hearing.
**Q. I'm trying to get a sense of the process of this because I never seen one of these before. Probably should. You submit the statement beforehand, and then you sit there?**
A. Yes. My testimony is on file.
**Q. Right. And what happens then?**
A. I'm sorry. When where --
**Q. Do the senators ask you questions?**
A. Yeah. How it goes is the senators conduct, you know, the meeting, and then they ask each one of us to speak. And we have a limit of five minutes to speak.
And then afterwards, when, you know, all four of us had spoke, then the senators were allowed to ask --

87

they are allowed allotted time to ask the witnesses, which I was part of that, questions.
**Q. Okay. So the four people that spoke are the people arrayed here that are described -- you're one of them?**
A. Yes.
**Q. Now I understand. And you said they have some allotted time to ask questions. When you spoke, what did you say, if you can recall?**
A. I spoke for the victims and what they were going through and things that need to be changed.
**Q. Did you repeat what was in your statement or say something different?**
A. I repeated some of the things that were in my statement, and then some of the things that were new, you know, that we were trying to get out as much information in my testimony; and then, you know, and how the government failed us and then also about what the victims are going through and personal stories of what they had gone through.
**Q. And did they ask you any questions?**
A. Yes.
**Q. Do you remember any of the questions you were asked?**
A. Rubio talked about the credit, how the credit,

88

you know, repairing people's credit and how it's affected them. And, you know, that that's something he could possibly work on and help the victims with their credit, repairing their credit, because a lot of times, it had cause their -- it's kind of this downward thing, that they hit the credit agencies; and then after that, then it hits -- the insurance companies drop them; and then after that, it causes this downward spiral, and then they have a hard time getting insurance, and then it causes them to go into foreclosure and you are -- and then they worry about the banks going after them and then they go into bankruptcy.
**Q. And, in fact, you had problems with your mortgage company and your creditors with the house?**
A. Yes.
**Q. Are those resolved now, Mrs. Brincku?**
A. I just received a call yesterday from Wells Fargo and they're giving me an extension on my -- to May 1st.
**Q. Okay.**
A. They do it every three months.
**Q. We saw a statement -- we saw your testimony that you submitted in writing. I also read somewhere that you gave testimony to the EPA.**
**Do I have that right?**
A. To the EPA? I don't recall.

89

**Q. I don't remember the context of which I read it either, so I apologize to you.**
A. If it was a written statement, I'm sorry, I don't recall.
**Q. Do you recall any other statements that you gave to any -- you know, written statements you gave to any other federal agency or state agency?**
A. Consumer Product Safety Commission, they ask you to fill out a report when you're reporting it to the agency.
**Q. Yeah.**
A. And you know, Florida Department of Health, they came out.
**Q. I'm talking more about formal statements like this.**
A. Not like a written testimony like this.
**Q. All right.**
A. These were the only two.
**Q. So these are the only two that you recall?**
A. Yeah, that I recall.
**Q. Thank you. Now, you did make a claim or make a complaint to the CPSC, Consumer Product Safety Commission, didn't you?**
A. Correct.
**Q. And when was that, Mrs. Brincku?**

90

A. As soon as -- right after we had found -- right in December of 2008, and then we had written like a written report -- I think it was like May 2009, around there. I can't remember the exact date when, you know, I submitted it to the thing -- it might have been before then, that I had submitted problems and then I wrote another one like in May. There was like two of them, I think. I'm not sure.
**Q. Who directed you to the CPSC?**
A. It was in the News-Press.
**Q. Okay.**
A. And they said if you have the problems -- as soon as it came out in the News-Press, that's when my mom called and said: Brenda, this has got to be your problem. This is exactly what you're going through. I'm sorry. And you need to get on the phone with these people.
**Q. So this is the phone call that Mr. Brincku identified yesterday from his mother-in-law, your mom?**
A. Yes, that's my mom.
**Q. And do you agree with his testimony, that that's when a lightbulb sort of went off in your family that that drywall was a problem?**
A. Correct.
**Q. Okay. This is the call from your mom?**
A. Yes.

91

**Q. And what did she read, do you know? What had she read?**
A. In the News-Press on December 20th, 2008, it was on a Saturday because I remember I was in bed when I got the phone call and she had just gotten the paper. And she said: Brenda, oh, my gosh, this is what you have. This is what's wrong with your home. This describes your home to a T.
And I was like: What are you talking about?
And she's like: Go get the paper. And then they came out with another article on the next day on the Sunday. And then on Monday morning, I called Florida Department of Health, and Mr. Clark I spoke with.
And that was -- I remember that distinctly because my dad was going in for surgery right before Christmas for his heart.
**Q. And is that when you heard about the option of making a claim to the Consumer Product Safety Commission?**
A. Yeah. I mean, they gave me a list of things to do.
**Q. Okay. Fair enough. All right. And the CPSC actually came out and looked at your house?**
A. Yes, Clint on the left.
**Q. And you submitted some paperwork?**
A. Yes.

92

**Q. And they did testing?**
A. Not the first time, no. Glenn was just an observer. He comes out and does a full report on the home, and, you know, takes papers, photographs, all that stuff to turn in to them.
**Q. But he took photos?**
A. Yes.
**Q. Did he take any samples of the drywall?**
A. No, he's just an observer.
**Q. Observe, take photos, interview the people; correct?**
A. And the only other thing was the wiring.
We said we had a problem, and he said send -- he had already left and he said: You know what, go ahead and send three outlets. We have three outlets missing in our house that went to Consumer Product Safety Commission.
**Q. And that was after he visited the home?**
A. Yes.
**Q. When did they come back a second time and do testing?**
A. Let's see. It's been -- this is -- I can't remember, recall the exact date. I'm sorry.
**Q. All right. Let's see.**
A. It was in -- I think it was in like -- I don't want to say if I'm incorrect. It was last year sometime

93

that they came.
MR. PAGLIARO: Will you mark these, please. This will be Brenda Brincku No. 11.
(A discussion was held off the record.)
(Defendants' Exhibit 11, Document Bates stamped Brincku 428 though 622, was marked for identification.)
BY MR. PAGLIARO:
**Q. Mrs. Brincku, I just handed you what's been marked as Brenda Brincku Exhibit 11, and I will represent to you it's a packet we received from your lawyers in this litigation.**
**It's Bates stamped Brincku 428 on the bottom and goes on to Brincku 622, so it's a pretty thick packet here.**
A. Yes. This is an investigation that Glenn did.
**Q. Yeah. That's what I want to ask you about.**
**So this is something that came to you from the Consumer Product Safety Commission; is that correct?**
A. Correct.
**Q. Okay. And it's directed to Mr. and Mrs. Brincku; correct?**
A. Yes.
**Q. And it's dated November 18th, 2009?**
A. Yes.

94

**Q. Okay. And this was after Glenn Clark's investigation; correct?**
A. Glenn Dunlop.
**Q. I'm sorry, what's the last name?**
A. Glenn Dunlop, I believe.
**Q. I misunderstood. Anyway, it's after -- this is after the fact of the first person from the CPSC coming out --**
A. No, this is from the first person. This is dated 2009.
**Q. That's what I mean. But after he came to visit?**
A. Yeah. They came to visit and several months later, then they came out with the report. Because we had asked for the report originally, and they never sent it.
And we said, you know, Freedom of Information Act, we asked for the report and Todd had, you know, we had gotten it then.
**Q. So you actually made an FOI, Freedom of Information Act request, a formal request, to the CPSC?**
A. Yes.
**Q. And this is the packet that they sent you, what's been marked as 11?**
A. Yes.
**Q. And if you turn open the page, just on the first page, on the back, we have double-sided because it was so**

95

**thick.**
A. Yeah.
**Q. What is that paper, do you know, the epidemiologic investigator? This is something you filled out; correct?**
A. No, this is something they do.
**Q. But that's your handwriting, isn't it?**
A. Where? I'm sorry.
**Q. Is it on the top?**
A. Right here?
**Q. Yes, ma'am. Is that your handwriting?**
A. No.
**Q. It's not?**
A. No.
**Q. And this is -- what did you understand this document to be, Mrs. Brincku?**
MR. GARY: Objection.
THE WITNESS: It was just telling about our home.
BY MR. PAGLIARO:
**Q. Okay. But the words on this report were written by the CPSC; is that correct?**
A. Correct.
**Q. Did you review this when you received it, Mrs. Brincku?**
A. Yes, kind of.

96

**Q. I'm sorry?**
A. Went over it a little bit.
**Q. Were you satisfied with it, dissatisfied with it?**
A. It just basically told us, you know, said what it said and just what he observed.
**Q. There's a lot of information on the first page, for example, you know, the family members, the fact that your husband was the owner/builder, the dates that you moved, the construction, those kind of details.**
**I assume those details were provided to the CPSC by yourself, correct --**
A. Yes.
**Q. -- and your husband?**
A. Yes. The investigator sits down and asks you a whole huge series of questions.
**Q. When you looked at this, did you feel the investigator had gotten the information right?**
MR. GARY: Objection.
BY MR. PAGLIARO:
**Q. Let me rephrase the question. When you reviewed this, did you find anything in this report that you felt was incorrect factually?**
A. What I saw, basically -- was test results that I had sent in and I didn't see any corrections at the time what I saw. It's a huge report going through every single

97

little page, but a lot of it was just, you know, test results and things I sent. He had asked for those documents.
**Q. And you had submitted, for example, in this packet, and he sent back to you the drywall purchase paper that we saw yesterday from Banner?**
A. Yes.
**Q. And you had given that to him. There are also insurance policies here. Did you provide those insurance policies to the CPSC?**
A. Yes.
**Q. And were these the insurance policies for your home as you understood it?**
A. Yes. There was one for the builders and that was Zurich, and there was one for our homeowners, and that was State Farm. I think George said Allstate yesterday. It's State Farm. We've been with them forever.
**Q. Why did you submit those? Did the CPSC people ask for those?**
A. Yeah. I had told them that -- I had told them that he had come out, and they asked for the documentation.
**Q. These photos that are attached, and I apologize for the poor quality -- were these photos that the CPSC took?**

A. These are photos that they took.
**Q. These aren't your photos?**
A. No.
**Q. When you received this, did you contact the CPSC again?**
A. I had talked to them before about it, yes.
**Q. And what, if anything, did you tell them about the report?**
A. That I received it. You know, that kind of thing.
**Q. Okay. Did you have any complaint to them?**
A. Yeah. We want to get to the bottom of this.
**Q. So what --**
A. What's going on.
**Q. What did you ask them to do? I'm sorry.**
A. No, just asked them about -- we got a complaint. Is there anything going to be done?
**Q. And what response did you get, Mrs. Brincku?**
A. We'll see, we're working on it; that kind of thing.
**Q. Were you --**
A. Funding is always an issue with them.
**Q. Were you unhappy with that response?**
A. Yes.
**Q. Okay. Did tell them you were unhappy?**

A. Yes.
**Q. Okay. When was the next time you heard from the CPSC after November the 18th, 2009 -- officially. Not sometime -- not something that you reached out to them. When was the next time they contacted you after this period when you received this packet?**
A. When they came out last year --
**Q. Okay.**
A. -- to do testing.
**Q. Did you know ahead of time they were coming out?**
A. Yeah, they had to schedule it. We had to take time off work to be able for them to come out and do the testing.
**Q. What did they tell you?**
A. They just come in and inspect it. You don't really talk to them. As they're doing your work, they come out -- and they might ask you questions and you just answer it, but you let them do the inspection and things like that.
**Q. Did they phone you or contact you by mail to set the inspection up?**
A. You know, e-mails, and saying: Okay, we're going to come out. We're doing an investigation on American drywall and, you know, this is dates and times.
MR. GARY: Let me just show a continuing

objection to the line of questioning regarding the CPSC.
MR. PAGLIARO: Why is that? What's the basis?
MR. GARY: Well, the basis is if you intend to use their results at trial, I'm not sure that those results are admissible. So this may not be relevant. But that's for another moment.
I mean, you can certainly ask your questions. I'm just laying a little foundation here.
MR. PAGLIARO: I got it. I just want to understand. And, again, I'm just doing a discovery deposition here.
BY MR. PAGLIARO:
**Q. They contacted you by e-mail, they said they were coming out again; is that correct?**
A. Yes.
**Q. Okay. And they came out how long after they called you?**
A. I don't know. They were just setting it all up with all the defense people that were coming out to see. There was other American drywall victims.
**Q. You weren't living in the house at the time; correct?**
A. No.
**Q. And when did they physically come to the house**

**the second time?**
A. That's why I said I'm not exactly sure of the date. I can't remember off the top of my head.
**Q. You said you thought it was last year, though?**
A. Yes.
**Q. Spring, summer?**
A. Let's see. I'm trying to remember. It's like all these dates start, you know --
**Q. It would have to be fairly early in the year, wouldn't it?**
A. Yeah, yeah. And then it took them a while. It always takes them a long time to get reports back.
**Q. Were you physically at the house when they came out the second time?**
A. Yes.
**Q. Okay. And how long were they there?**
A. They were there for the day.
**Q. How many people were there?**
A. A lot. Several people were there. It just -- you know, they were all doing stuff. They were doing things.
**Q. Did they have questions for you while you were on the premises?**
A. They asked me a few questions.
**Q. Okay. And who identified themselves as sort of**

102

**the lead team member from the CPSC group?**
A. I can't remember his name off the top of my head.
**Q. And you said they were there a day?**
A. Yes.
**Q. Tell me what you observed them doing.**
**Did they take wall board samples?**
A. I think they took a couple, but they never did a chamber test on the wall board samples.
**Q. Your husband mentioned that yesterday. Did they do any air sampling that you saw?**
A. I can't remember them doing air samples. Like I said, we were kind of like, stay in a room and, you know, let us do our thing, so we tried to stay out of their way.
**Q. Did they take photos?**
A. Yeah.
**Q. Did they go behind the wall board to see the markings on the back of the wall board?**
A. Yes.
**Q. What else do you recall that they may have done?**
A. They put the copper strippings on the thing, and then we were having a problem. They asked us to turn on the air conditioning, and then I had called them back and said: Look, this air conditioning is not running properly and we're having some problems with the AC things and, you know, so that's -- I called them back for that to ask them

103

about that.
**Q. How many people were on the team for the CPSC, Mrs. Brincku?**
A. I can't remember exactly.
**Q. Five, seven?**
A. Yeah, it wasn't an enormous amount. I can't remember. I'm trying to -- let me think about it for a minute. There might have been like -- well, it wasn't -- three or four, and then we had Susan the investigator who sat with us in the kitchen, you know, during it.
**Q. Was it obvious to you that they had already had the benefit of this first interview that you did?**
A. They really didn't. They did their own investigation. You know, they did -- they looked at, I'm sure, looked ahead of time whose house they were coming to and reviewed things and stuff like that.
**Q. But they started from the beginning with you?**
A. Yeah. Most of all that information that I had filled out prior, they had that information already, and so we didn't have to go through all that line of questioning and all that stuff again.
They just went in and did their thing.
**Q. Did they talk about the fact that your home would not be identified by your name in the report?**
A. No. They didn't talk about it then. It's when

104

we received the full reports that they did the letter system.
**Q. And your house was letter H; is that correct?**
A. Correct.
**Q. And so you did get a copy of that final report?**
A. Yes.
**Q. Did you get it directly from the CPSC, or did you have to ask for it?**
A. They sent me directly.
**Q. Did you get the whole report or just the section dealing with your house?**
A. The whole first thing on the report.
**Q. I just marked as 12, Mrs. Brincku, a document that says: Evaluation of homes reported to be constructed with domestic wall board prepared for U.S. Consumer Products Safety Commission.**
**Is this the report that you received from the CPSC? And it's dated April 12, 2011.**
A. Yeah, because I remember getting the report last year.
(Defendants' Exhibit 12, Report, was marked for identification.)
BY MR. PAGLIARO:
**Q. And this is the report --**
A. And so they did --

105

**Q. I'm sorry.**
A. Go ahead.
**Q. No, go on and answer.**
A. No.
**Q. And this is the report in which your house appears as Home H; is that correct?**
A. Correct.
**Q. Okay. Why don't we take a break now so we can change the tape.**
VIDEOGRAPHER: Going off the record. The time is 10:59 a.m.
(A break was taken.)
VIDEOGRAPHER: Back on the record. The time is 11:03 a.m.
BY MR. PAGLIARO:
**Q. Mrs. Brincku, we're back on the record. That last exhibit I showed you, the report dated April 12th, 2011, Exhibit 12?**
A. Correct.
**Q. You said you received that directly from the CPSC?**
A. Yeah. I mean, we did ask them to send it to us because the test had been a while back, and they finally promised me they would send it, FedEx it, and I waited at the driveway for it. So I had asked for it.

106

**Q. And when you received it, did you review it with your husband?**
A. Yeah, I got it first and kind of glanced over it.
**Q. Okay. Before the report was issued, had you received any advance warning that was coming out?**
A. No. I had to keep asking for it.
**Q. Are you okay? Do you want some water?**
A. I drank some, but I'm okay.
**Q. Now, when your mom called a couple years earlier and indicated that she had seen this article about the drywall situation, do you remember that testimony?**
A. Yes.
**Q. Did you -- besides the people at MIT, did you contact any other person who was a scientist or an expert or anything like that?**
A. Florida Department of Health.
It happened on the 20th -- actually, they were the first people. The 20th came out in the papers -- 20th and 21st -- and then on Monday morning I called Florida Department of Health, and then a little bit later I had contacted Darren McMurray from Lanar Homes.
He had been on the news, and he knew all about the Chinese drywall and he had, you know, already taken care of a lot of Lanar Homes. And I asked him if he would come out.

107

His wife had been my babysitter, and so he took my call as I got him to take my call and she had baby sat for me, baby sat me when I was younger. And he came out and, you know, I was trying to figure out, hey, do we have the problem and stuff.
And he walked in, the first thing he did was put his hand underneath our sink and it came out black -- one of his helpers -- he brought two other guys with him, and then they started going around the house and he says: Oh, my God, you exhibit all the signs of Chinese drywall.
And he said: Would you mind if I started drilling holes in your house? And I was like, well -- and he had the little thing. I had said: Well, we got to know what's in -- we knew all upstairs was all National Gypsum because I had pictures -- well, I had -- at that point, I hadn't found the pictures yet, but we were pretty sure because we had seen the tags on the side because they had, you know, were in our house before they were put in. We weren't quite sure what was downstairs.
And so he started drilling holes and he looked and he said, well, I can't find -- all I see is National Gypsum in your house. Do you have any pictures? Can you think back and that's when we started looking for pictures, and we found the pictures of our drywall all upstairs with National Gypsum.

108

I had -- this is right before Hurricane Charley, and I had taken pictures of the whole house, and they had brought it in -- they had asked -- the drywall guys had asked if they could bring in the drywall while we had it open, and he said it will save you some money if you brought it in and we can put it in there so we don't have to drag it up the stairs.
And so we let him put it there. So it was sitting there for a little bit and I had taken pictures before Hurricane Charley came, showing -- in case something happened during the hurricane, showing exactly where we were in the stages of construction.
And so those pictures were on there with all the tags that said National Gypsum.
**Q. Okay. This gentlemen that came out, you said his name was Daryl?**
A. Darren McMurray.
**Q. McMurray?**
A. Yeah, he's like the vice president of this area.
**Q. For Lanar?**
A. Southwest Florida.
**Q. So he's a construction person?**
A. Yes. He's the one that's been handling all the stuff with the drywall, tearing out the homes. There's been almost a thousand homes that he's had to -- and he's

109

become kind of like the expert of it.
**Q. Does he do the remediation of the home?**
A. Yes. He's in charge of all that.
**Q. For that company?**
A. For Lanar Homes, yeah. Lanar Homes has been around for 50 years.
**Q. Yes, I heard of them. Did you and your husband explore having your home remediated?**
A. Yeah. Well, we got an estimate to see how much it would cost.
**Q. And what was the estimate?**
A. Around 250,000.
**Q. Okay. And you decided not to do that?**
A. No, we don't have that kind of funds.
**Q. Okay. Was it a funding issue?**
A. Yeah. We don't have $250,000 laying around. And we were still trying to figure out what is the proper remediation and what can do and make sure, you know, it never comes back again.
**Q. Did you get a formal bid proposal?**
A. Yes.
**Q. And who gave you that, Mrs. Brincku?**
A. I have submitted it to my lawyer, and I can't remember the name of the construction firm off the top of my head.

110

**Q. Was it before you instituted the lawsuit or after you instituted the lawsuit?**
A. After.
**Q. Okay.**
A. Yeah, this is way after.
**Q. Okay.**
A. A couple years afterwards.
**Q. Okay.**
A. It was probably around 2009.
**Q. So the bid you got to remediate the house was $250,000?**
A. Yeah.
**Q. Okay.**
A. And I think it was before you came out to the house just so you would have an estimate of what the damage was.
**Q. When you were still in the process of examining some of the problems you were having in the house, what other things did you consider might be the cause of the problems you were having in the house?**
A. I never -- I have been born and raised in Florida. I have never seen anything like this in my life -- never heard of anything like this. Fort Myers was a small town back then, and my mom had never heard any -- you know, I've been around -- you know, our family has

111

been around forever here. I mean, we're kind of like the pioneers here, and so we had never heard of anything.
And so automatically, when we had heard about the Chinese drywall -- drywall was drywall. Back then, you could write with it, like with a piece of chalk. I remember as a kid we would. And when we started opening up the walls and looking at the drywall, it was all gray, and there was no other doubt that there's a problem with the drywall. There was something going on.
**Q. So you decided it was the drywall.**
**Did you think of anything else that it might have been?**
A. No.
**Q. Okay. So is it fair to say you didn't go through a process of elimination? You just --**
A. I let the experts do that.
**Q. Okay. When you retained experts formally, was that in the context of litigation?**
A. MIT was the first one.
**Q. Right.**
A. And that was before we had done -- we hired that -- we had found out, and then my husband contacted MIT probably around January 5th, and we submitted samples around January 5th, 2009.
And we had gotten the test results, and MIT had

112

told us, you know: I'm sending the test results. And that's when we hired a lawyer.
**Q. Okay. And then it was in the context of the litigation with your lawyer that you retained other experts to do sampling and testing and other things; correct?**
A. Correct.
**Q. That's fair; right?**
A. Yes. And then we hired -- I mean, we didn't hire. Lanar Homes, that was back in January, we had Florida Department of Health that came out, and we had Lanar Homes, and to me that was confirmation.
You know, these were experts in the field and they were investigating and they were, you know, looking at -- my stepfather had told me when we met with Florida Department of Health he had asked them: If this was your home and this is your family, what would you do?
And he says: You need to hire an electrical engineer. And he says: I'm very concerned about fire.
And that was all my stepfather needed to know. And he said: That's it. You're out of here, Brenda. You guys -- I'm not making you guys guinea pigs. You are out of here.
**Q. Mrs. Brincku, who made the contact to National Gypsum Company? Was that you or your husband?**

113

A. My husband George.
**Q. Okay. And were you there when the people from National Gypsum Company came and looked at the house?**
A. Yes.
**Q. Okay. How many people came out from the company to look at the house?**
A. With the cleaning people and everybody, a total of 11.
**Q. Okay. And how long were they at the house?**
A. A week, from March 5th to March 11th.
**Q. And what year was that?**
A. 2009.
**Q. 2009. Okay. They took samples?**
A. Yes, and that -- going back to after we had contacted MIT, George had called National Gypsum, and that's the first contact we had with Jack Walker.
And George had said, you know, this is what's going on. We're almost positive all upstairs is National Gypsum. We need to come out, and they said: Well, we'll come out and look at it.
And then I told George, I said: I don't deal with lawyers or anything like that. But I said: We can't let a major corporation come in without representation. We don't know what we're doing, and we need a lawyer.
**Q. So that's --**

114

A. That's when we hired a lawyer.
**Q. That's when you decided to retain counsel?**
A. Correct.
**Q. Okay. In the context of doing research about the wall board, did you look at various things that may be the cause of the problems in the wall board in your view?**
A. I'm sorry?
**Q. Let me rephrase it. In examining the issue of what was in the wall board to try to identify what was causing the problems, did you do some research about that?**
A. Yes.
**Q. Okay. Tell me some of what you found.**
A. Well, just looking at different things -- my husband is the one that he likes to research and do a lot of that stuff, and so I look up things for him and articles for him about it.
**Q. Okay. And at one point, you had indicated something about flash. Do you recall that? Do you remember that?**
A. Yeah, there was talk about there could be flash, a lot of different things they were looking into that was in the news. You know, a lot of things, so George would just investigate. Whatever new came out, he would start looking into it.
**Q. Did you do the research for it, though, on the computer?**

115

A. He would tell me, okay -- and he did a lot of the research. That was one thing. He doesn't e-mail, but he knows how to use Google. He can Google and look on.
**Q. So you guys together sort of shared that task?**
A. Yeah, that was mainly his kind of thing. He enjoyed -- you know, not enjoyed it, but, you know, he did it and that was something he was better at it than I was.
**Q. When you would find things related to like the fly ash or the synthetic Gypsum issues, did you communicate those to the experts, or did you just talk among yourselves about it?**
A. Yeah. If we found something that we thought would be pertinent, we would send it to our lawyer --
**Q. Okay.**
A. -- for them to, you know, if this is something that the experts could look into.
**Q. Okay. And can you remember anything else that you looked into? I know you mentioned fly ash. We talked about synthetic Gypsum. Was there anything else?**
A. George looked into chlorides and different things.
**Q. The topic we talked about yesterday, the water?**
A. Huh?
**Q. The water issues?**

116

A. Right.
**Q. Anything else?**
A. Oh, there was other things. I mean, anything like I said, that came out, you know, he was always looking into it to see if he knew anything.
**Q. What other things do you recall?**
A. Sulfur, bacteria. I mean, you know, whatever they, you know, we looked into to see what could possibly be the cause of it in the drywall.
**Q. Okay. Did you read reports about what people felt was causing problems with the Chinese drywall?**
MR. GARY: Objection to "felt."
BY MR. PAGLIARO:
**Q. Okay. You're right. That's a bad question. Did you read reports that reflected investigator's determinations of what was causing the problems with Chinese drywall?**
A. I read a lot of, you know, whatever -- it was in the articles that I read.
**Q. And what did you see as being identified as the cause of the problems for Chinese drywall?**
A. They were looking at different things.
**Q. Do you remember any?**
A. There was different -- you know, all different things, and they were looking at if it was mine, if it was flow gas deceleration, if it was recycled.

117

They were just looking at a lot of different things.
**Q. You were keeping up with all this stuff; right?**
A. Yeah, because I post articles, you know, just putting them out there.
**Q. Did you reach any conclusion yourself about what was causing the problem with Chinese drywall from what you read?**
A. I mean, Consumer Product Safety Commission spent $5 million, and they're still not quite sure exactly what happened with the drywall.
**Q. Okay. Do you consider yourself, Mrs. Brincku, a community activist?**
MR. GARY: Objection.
BY MR. PAGLIARO:
**Q. Do you know what that term means?**
A. No. Explain.
**Q. Okay.**
A. What your term --
**Q. Someone who is active in the community in causes?**
A. This is really the first thing that -- I've been involved in helping like Habitat For Humanity, my husband and I helped build homes with our church, and you know, doing church activities, feeding the poor and things like

118

that.

**Q. But do you consider yourself an environmental activist?**

A. No.

**Q. Okay. When you got that CPSC report that we talked about, Exhibit 12, did you call the CPSC?**

A. On this?

**Q. Yes, ma'am.**

A. Yes.

**Q. Okay. And what did you tell them?**

A. I was just looking through it, and I asked them if they did a chamber test, and they said: No, we couldn't afford it.

**Q. Okay. And what else did you tell them, if anything?**

A. I asked the phone number to the chemists at Consumer Product Safety Commission.

**Q. Did they give you that?**

A. Yes.

**Q. Did you call the chemist yourself?**

A. Yes.

**Q. Who was that?**

A. Joel Reicht, R-E-I-C-H-T -- I'm not exactly sure. His name is Joel, I think.

**Q. What did you and Mr. Reicht discuss?**

119

A. I just asked him about the report. And he said: Well, we do have problems with -- there are some good American drywall and there's some bad American drywall. There's some good Chinese drywall and there's some bad Chinese drywall.

**Q. Did you express any concern or dispute about the findings of that report in 12?**

A. Yes. I was upset about the chamber test not being done.

**Q. Did you register any formal complaint?**

A. No.

**Q. Did you put anything in writing?**

A. No, that not that I can recall.

**Q. Did you actually go up and visit with the people at the Consumer Product Safety Commission? Did you go to Washington?**

A. Yes.

**Q. When did you do that?**

A. In December -- I mean November 2009.

**Q. And what was the context of that meeting? How did it come about?**

A. I went with Colleen Stevens, and it was basically for the victims. I met her up there. That's when Richard Kampf went with us. It was Richard Kampf, Colleen Stevens, Eric Bailey, George, and I.

120

**Q. Okay. When you were waiting for this final report, Exhibit 12, dated April 12th, 2011, you said it was quite a while until you got the report; right?**

A. Yeah.

**Q. You described that you were literally down at your driveway waiting for the delivery to come; correct?**

A. Yes.

**Q. Had you been calling them saying, like: Where is it?**

A. Yes.

**Q. And who would --**

A. And I had to wait at the driveway because they were delivering it to my old house.

**Q. No, I understand. I'm not being -- believe me I'm not being facetious.**

A. No, I'm just saying that's why it was there.

**Q. You had called about it because you were waiting for it; is that correct?**

A. Correct.

**Q. Okay. How long did you feel you had to wait until you got the final report? Was it months, was it weeks?**

A. It was months, I believe.

**Q. Okay. Did you talk to them -- anyone at the Consumer Product Safety Commission -- before you received the final report about what their findings were? Were they sharing any of that with you?**

A. The only thing that I had asked about, if they had found anything, and he said: Well, it's not the water.

**Q. Okay. And did anybody at the Consumer Products Safety Commission say anything about their conclusions relating to your house and the drywall?**

A. No.

**Q. So the first time you knew the final conclusions about your house was when you received Exhibit 12, the report of April 2011; is that correct?**

MR. GARY: Objection to the word "final."

THE WITNESS: When I called them, the reason I was calling them is to tell them we were having problems with the air conditioning.

BY MR. PAGLIARO:

**Q. Yes.**

A. And that's when he told me it's not the water.

**Q. Okay. All right.**

**Just give me a second.**

A. Okay.

**Q. When you were going through the process of building your house, do you remember whether you had to fill out for the county that you were building in, any**

122

**sort of disclosure statements about what you were doing with the house, how you were building the house, when you're the owner/builder? Do you recall that, a disclosure statement?**

A. I don't recall.

**Q. Okay. When you moved into the house, you heard your husband's testimony yesterday, you were sitting here through his deposition. And you talked at length about when he first started discovering problems in the house. Do you remember that testimony?**

A. I'm sorry. Repeat the question.

**Q. Yeah, that's okay. When your husband was testifying yesterday, I walked him through what he discovered in the house that led him to believe he had a problem.**

**Do you remember that testimony?**

A. Yes, uh-huh.

**Q. And he talked about the air conditioning coils and he talked --**

A. Correct.

**Q. -- about the various things that were going on.**

**Was there anything else besides what he said that you recall that led you to believe there were problems?**

A. Yes. The fire alarms going on.

**Q. Okay. Tell me about that.**

123

A. The fire alarms would go off in the middle of the night, and I would get up sometimes and investigate it and it just got to the point where I stopped -- like, you just sat in bed, thinking: Is this is real fire or is this not a real fire?

And one fire alarm -- the fire alarm outside had gone off, and the only way we could shut it off was turn it off with the box, at the box.

**Q. Was the fire alarm tied into the phone system?**

A. No, we have an alarm system for burglar.

**Q. So what you're talking about are the --**

A. Our electrical -- our alarms are run by battery and by electricity.

**Q. I understand.**

A. It's code.

**Q. I understand now. And did you investigate the cause of the fire alarms going off?**

A. Yeah. I couldn't understand why they were going off. They kept going off like every month and at different ones.

**Q. Okay. And what did you find to be the cause of that?**

A. We still don't know. I mean, you know, now I believe it to be corrosion.

**Q. Okay. Let's take five minutes.**

124

VIDEOGRAPHER: Going off the record. The time is 11:24 a.m.

(A break was taken.)

VIDEOGRAPHER: Back on the record. The time is 11:32 a.m.

BY MR. PAGLIARO:

**Q. Mrs. Brincku, we talked previously about the testimony that you gave, and you talked about some of the government agencies letting you down.**

**I'm going to reverse the question, and I'm going to ask you: Have there been any individuals or government agencies that have been supportive of what you -- what you're trying to do in the drywall situation?**

A. I think Senator Nelson's office has been, and Senator Rubio is getting on board. And there's been Senator Warner in Virginia and some of the other ones have tried to help the victims.

**Q. Have you gotten any relief from any of the financial institutions, like the mortgage companies, the insurance companies?**

A. The insurance company actually dropped us, and I made a call to our agent and I told them, you know, you can't do this. This is unfair to the victim because a lot of victims were going through that and it was causing a lot of havoc, and a week later they reinstated me.

125

**Q. So your house is insured?**

A. Yes.

MR. PAGLIARO: I have no further questions.

MR. GARY: Okay.

MR. PAGLIARO: Thank you very much, Mrs. Brincku.

THE WITNESS: Thank you.

MR. GARY: We won't waive. We'll review it. And it doesn't need to be expedited.

VIDEOGRAPHER: This concludes the deposition. The time is 11:33 a.m.

(Defendant's Exhibit 1, Notice of deposition, was marked for identification.)

(Deposition concluded at 11:33 a.m.)

STATE OF ______________ )
) :ss
COUNTY OF ______________)

I, BRENDA BRINCKU, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

______________________
BRENDA BRINCKU

Sworn and subscribed to before me, this day of , 2012.

______________________________
Notary Public



CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF COLLIER)

I, the undersigned authority, certify that BRENDA BRINCKU personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 31st day of January, 2012.

____________________
Lori L. Bundy
Notary Public - State of Florida
My Commission No.: EE 132707
Expires: September 22, 2015



REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA )
COUNTY OF COLLIER)

I, Lori L. Bundy, Certified Court Reporter and Notary Public in and for the State of Florida at Large, certify that I was authorized to and did stenographically report the deposition of BRENDA BRINCKU; that a review of the transcript was requested and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties; nor am I a relative or employee of any of the parties' attorney or counsel connected with the action; nor am I financially interested in the action.

DATED this 31st day of January, 2012.

__________________________
Lori L. Bundy, FPR, RPR, CRR, CLR



INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.